1  Daniel Feinberg – CA State Bar No. 135983
   Todd F. Jackson – CA State Bar No. 202598
2  Margaret E. Hasselman – CA State Bar No. 228529
   Nina R. Wasow – CA State Bar No. 242047
3  Kirsten Gibney Scott – CA State Bar No. 253464
   LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
4  1330 Broadway, Suite 1800
   Oakland, CA  94612
5  Telephone: (510) 839-6824
   Facsimile: (510) 839-7839
6  Email: dfeinberg@lewisfeinberg.com
   Email: tjackson@lewisfeinberg.com
7  Email: mhasselman@lewisfeinberg.com
   Email: nwasow@lewisfeinberg.com
8  Email: kscott@lewisfeinberg.com

9  *Attorneys for Plaintiffs and the Proposed Class*

10

11          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
12          SAN FRANCISCO AND OAKLAND DIVISION

13

14  THOMAS FERNANDEZ, LORA SMITH, and  )   Case No. C-06-07339 CW
    TOSHA THOMAS, individually and on behalf  )
15  of a class of all other persons similarly situated,  )
                                              )
16                   Plaintiffs,              )   **DECLARATION OF KIRSTEN G.**
                                              )   **SCOTT IN SUPPORT OF PLAINTIFFS'**
17           vs.                              )   **MOTION FOR CLASS**
                                              )   **CERTIFICATION**
18  K-M INDUSTRIES HOLDING CO., INC.;        )
    K-M INDUSTRIES HOLDING CO., INC.          )
19  ESOP PLAN COMMITTEE; WILLIAM E.          )
    AND DESIREE B. MOORE REVOCABLE           )
20  TRUST; TRUSTEES OF THE WILLIAM E.        )
    AND DESIREE B. MOORE REVOCABLE           )
21  TRUST; CIG ESOP PLAN COMMITTEE;          )
    NORTH STAR TRUST COMPANY;                )
22  DESIREE B. MOORE REVOCABLE TRUST;        )
    WILLIAM E. MOORE MARITAL TRUST;          )
23  WILLIAM E. MOORE GENERATION-             )
    SKIPPING TRUST; and DESIREE MOORE,        )
24  BOTH IN HER INDIVIDUAL CAPACITY          )
    AND AS TRUSTEE OF THE WILLIAM E.          )
25  AND DESIREE B. MOORE REVOCABLE           )
    TRUST'S SUCCESSOR TRUSTS NAMED           )
26  ABOVE,                                    )
                                              )
27                   Defendants.             )
    _____      )

28

I, Kirsten Scott, declare as follows:

1.     I am a member in good standing of the State Bar of California and an attorney with Lewis, Feinberg, Lee, Renaker & Jackson, P.C., which is counsel for Plaintiffs in this action. I have personal knowledge of the facts contained in this declaration and, if called to testify, will testify as set forth below.

2.     Attached hereto as Exhibit 1 is a true and correct copy of an excerpt of a Presentation by Stout Risius Ross to North Star Trust Company, dated September 26, 2005. The document was produced by the K-M Parties and is bates stamped KMH 5457-5458. The document was introduced as Deposition Exhibit 2.

3.     Attached hereto as Exhibit 2 is a true and correct copy of an ESOP Stock Purchase Agreement dated October 13, 1998. The document was produced by the Menke Group in response to Plaintiffs' subpoena and is bates stamped MK 1589-1598. The document was introduced as Deposition Exhibit 3.

4.     Attached hereto as Exhibit 3 is a true and correct copy of an excerpt from the deposition of Joseph Cristiano taken April 8, 2008.

5.     Attached hereto as Exhibit 4 is a true and correct copy of an excerpt from the deposition of John Menke taken March 21, 2008.

6.     Attached hereto as Exhibit 5 is a true and correct copy of Minutes of the Annual Combined Meeting of the Board of Directors and Shareholders of Kelly-Moore Paint Company, Inc., dated April 21, 1998. The document was produced by the K-M Parties and is bates stamped KMH 452-456. The document was introduced as Deposition Exhibit 62.

7.     Attached hereto as Exhibit 6 is a true and correct copy of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan. The document was produced by the K-M Parties and is bates stamped CIG 10954-11031. The document was introduced as Deposition Exhibit 66.

8.     Attached hereto as Exhibit 7 is a true and correct copy of a document entitled "K-M Industries Current Corporate Structure." The document was produced by the K-M Parties and is bates stamped CIG 4588.

9.    Attached hereto as Exhibit 8 is a true and correct copy of an excerpt from the deposition of Peter Cazzolla taken on March 19, 2008.

10.    Attached hereto as Exhibit 9 is a true and correct copy of an ESOP Stock Purchase Agreement dated October 18, 1999.  The document was produced by the K-M Parties and is bates stamped CIG 1870-1878.  The document was introduced as Deposition Exhibit 25.

11.    Attached hereto as Exhibit 10 is a true and correct copy of the K-M Defendants' Response to Plaintiffs' First Requests for Admission, dated May 11, 2007.

12.    Attached hereto as Exhibit 11 is a true and correct copy of the Moore Trust Defendants' Response to Plaintiffs' First Requests for Admission, dated May 11, 2007.

13.    Attached hereto as Exhibit 12 is a true and correct copy of a Trustee Engagement Agreement between North Star Trust and KMH, dated April 22, 2003.  The document was produced by the Moore Trust Parties and is bates stamped MT 543-551.  The document was introduced as Deposition Exhibit 255.

14.    Attached hereto as Exhibit 13 is a true and correct copy of a Resignation as Trustee by Herbert Giffins, dated April 22, 2003.  The document was produced by the K-M Parties and is bates stamped KMH 513.  The document was introduced as Deposition Exhibit 92.

15.    Attached hereto as Exhibit 14 is a true and correct copy of Kelly-Moore's Answers to Interrogatories in In re Complex Asbestos Litigation, dated June 8, 1990.  The document was produced by Stout Risius Ross in response to a subpoena by Plaintiffs and is bates stamped SRR 954-1008.

16.    Attached hereto as Exhibit 15 is a true and correct copy of an excerpt of a presentation by Kirkland & Ellis to KMH on February 2, 2002.  The document was produced by the K-M Parties and is bates stamped 10821-10832.  The document was introduced as Deposition Exhibit 259.

17.    Attached hereto as Exhibit 16 is a true and correct copy of the K-M Defendants' First Supplemental Response to Plaintiffs' First Set of Interrogatories, dated November 6, 2007.  The document was introduced as Deposition Exhibit 85.

18.    Attached hereto as Exhibit 17 is a true and correct copy of the K-M Industries

Holding Co. ESOP Form 5500 for 2005.  The document was downloaded from the freeERISA.com website on May 21, 2008.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 29, 2008 at Oakland, California.

_____/s/_____

Kirsten Scott

# EXHIBIT 1

## II.    OVERVIEW OF K-M INDUSTRIES

- K-M Industries is a holding company comprised entirely of two wholly-owned subsidiaries: (1) Kelly-Moore; and (2) CIG. K-M Industries owns 100 percent of the equity of Kelly-Moore and CIG, and Kelly-Moore and CIG represent K-M Industries' only two equity holdings.

- K-M Industries was formed on September 30, 1998, when the original Kelly-Moore Paint Company, Inc. changed its name to K-M Industries Holding Co., Inc. (which is referred to herein as "K-M Industries"). A new California company was incorporated and named Kelly-Moore Paint Company, Inc. (which is referred to herein as "Kelly-Moore"). All of the business assets and liabilities of K-M Industries (except for the shares representing the equity investment in CIG, which was acquired in 1985, and certain contractual legal rights between CIG and K-M Industries) were then transferred from K-M Industries to Kelly-Moore in exchange for 15,000 shares of Kelly-Moore common stock.

- The legal and ownership structure of K-M Industries and its two wholly-owned subsidiaries, Kelly-Moore and CIG, as of the Valuation Date is illustrated by the chart on the following page.

**SRR**

KMH 005457

## Legal and Ownership Structure of K-M Industries Holding Company, Inc.



- 6 -

EXHIBIT
2
Stritmatter   3-12-08

KMH 005458

# EXHIBIT 2

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this thirteenth day of October, 1998, by and among William E. Moore as trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and Kelly-Moore Paint Company, Inc., a California corporation (hereinafter referred to as the "Company"),

## W I T N E S S E T H:

WHEREAS, Trustee is the trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") established by the Company to be effective as of January 1, 1998, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding shares of K-M Industries Holding Co., Inc., a California corporation (the "Parent"); and

WHEREAS, Selling Shareholder desires to sell Thirty-three Million Seven Hundred Forty-five Four Hundred Fifty-five (33,745,455) shares of the Parent's Class P-B Stock (the "Shares") to the Trustee; and

1

EXHIBIT
3
Stritmatter  3-12-08

MK001589



2

CONFIDENTIAL

MK001590

fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee, then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee shares of the Parent's Class P-B Stock, or any combination thereof, equal in value to the difference between the Purchase Price and said fair market value for all such Shares. In the event that cash and/or shares of the Parent's Class P-B Stock are paid and/or transferred to the Trustee under this provision, such shares shall be valued at their fair market value as of the date hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid by Selling Shareholder on the amount of cash paid.

3.    <u>Representations and Warranties of Selling Shareholder</u>. The Selling Shareholder, to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties.

(a)    On the date hereof, the Shares being sold hereunder will be validly issued and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever upon or against such shares; and there will be in existence no limitations or restrictions of any kind (other than restrictions under a buy/sell agreement among Company shareholders) on the right of Selling Shareholder to sell such Shares in accordance with the terms hereof. No options, warrants, agreements, or similar rights created by the Company for the issue or sale of any stock or securities of any kind or for the purchase thereof by any person other than pursuant to or as disclosed by this Agreement will then be in existence.

(b)    Selling Shareholder is the owner, free and clear of any encumbrances, of the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

MK001591

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)    Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)    Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby.  Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year.  Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.    Representations and Warranties of Trustee.  Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

MK001592

(b)    Trustee has ful' power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)    Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.    <u>Representations and Warranties of Company</u>.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)    Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Parent.

(c)    None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

MK001593

outstanding "employer securities" of the Parent. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)     Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.     Obligations of Trustee. Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.     Indemnification. Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

MK001594

8.    <u>Survival of Representations, Warranties and Agreements</u>.  All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement.  All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    <u>Notices, etc</u>.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

> If to Selling Shareholder, at:
>
> > 303 Olive Hill Lane
> > Woodside, CA  94062
> > Attn:  William E. Moore
>
> If to Trustee, at:
>
> > Kelly-Moore Paint Company, Inc. Employee Stock Ownership
> > Plan and Trust
> > Attn.: Trustee
> > 987 Commercial Street
> > San Carlos, CA  94070
>
> If to the Company, at:
>
> > Kelly-Moore Paint Company, Inc.
> > Attn.: President
> > 987 Commercial Street
> > San Carlos, CA  94070

7

MK001595

10.    <u>Amendments and Entire Agreement</u>.  This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    <u>Parties in Interest</u>.  This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    <u>Law to Govern</u>.  This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    <u>Section and Other Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

MK001596

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WILLIAM E. AND DESIREE B. MOORE 1990
REVOCABLE TRUST, AS AMENDED:


_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee


TRUSTEE OF THE KELLY-MOORE PAINT
COMPANY, INC. EMPLOYEE STOCK
OWNERSHIP TRUST:


_____
William E. Moore, Trustee


KELLY-MOORE PAINT COMPANY, INC.


_____
Joseph P. Cristiano, President


_____
Stephen A. Ferrari, Secretary


9

MK001597

10/08/98   14:36 FAX 415 362 3268          Menke & Associates, Inc.                    ☒002/004

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WILLIAM E. AND DESIREE B. MOORE 1990 REVOCABLE TRUST, AS AMENDED:**

_____

William E. Moore, Trustee

_____

Desiree B. Moore, Trustee

**TRUSTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP TRUST:**

_____

William E. Moore, Trustee

**KELLY-MOORE PAINT COMPANY, INC.**

_____

Joseph P. Cristiano, President

_____

Stephen A. Ferrari, Secretary

9

MK001598

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

---

THOMAS FERNANDEZ, et al.,          )
                                   )
                Plaintiffs,        )
                                   ) Case No.
        vs.                        )
                                   ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                   )
                Defendants.        )
                                   )
                                   )
                                   )

---

VIDEOTAPED DEPOSITION OF JOSEPH CRISTIANO
April 8, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79129

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 78

1  did because he was very analytical.

2      Q    Did he say anything to you about the price

3  that Menke would charge as opposed to the price of

4  another installation firm?

5      A    No, I don't recall that at all.

6      Q    What was the purpose of the ESOP?

7      MS. SMITH:    Object to form.

8      A    The discussion that he had with me was

9  around diversification.  All of his estate was in

10 Kelly-Moore stock and the Paint Company.  And he

11 mentioned that he wanted to diversify that.  That was

12 part of it.  The other part, he after reading about the

13 ESOP, he said that that would be a good way to motivate

14 the people and also give them a piece of the action,

15 give them part ownership in the company.  And those are

16 the couple of the reasons that I recall him saying.

17 BY MS. HASSELMAN:

18     Q    Do you recall when he expressed those

19 reasons to you?

20     A    No, no, I don't.

21     Q    Was it in 1998, do you think?

22     A    Yes, yes.

23     Q    Do you recall having more than one

24 discussion with Mr. Moore regarding the purpose for

25 setting up the ESOP in 1998?

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 153

1              MR. SULLIVAN:   Object to the form.

2        A    Not that I am aware of.

3   BY MS. HASSELMAN:

4        Q    William Moore was the only member of the

5   ESOP committee and the trustee from implementation of

6   the ESOP until you left the company; is that correct?

7              MS. SMITH:   Object to form.

8        A    Yes.

9   BY MS. HASSELMAN:

10        Q    Did you have any concerns about Mr. Moore

11   serving as the only member of the ESOP committee?

12              MS. SMITH:   Object to form.

13        A    Yes.

14   BY MS. HASSELMAN:

15        Q    What concerns did you have?

16        A    I felt when it was originally formed that

17   we should have an outside administrator.

18        Q    Did you express that concern to Mr. Moore?

19        A    Yes, I did.

20        Q    When did you do that?

21        A    Some point in '98.

22        Q    Was it prior to the ESOP transaction?

23        A    Yes.

24        Q    Did you express that concern in a face to

25   face conversation?

Page 154

1          A      Yes.

2          Q      Did Mr. Moore respond?

3          A      Yes.

4          Q      What was his response?

5                 MS. SMITH:    Object to form.

6          A      No.    He was -- he was adamant that he was

7     going to be the administrator.

8     BY MS. HASSELMAN:

9          Q      Did he say why he was adamant that he was

10    going to be the administrator?

11         A      No.

12         Q      When you say you felt we should have had an

13    outside administrator, why did you feel that?

14         A      To protect --

15                MS. SMITH:    Object to form.

16         A      -- both the participants of the ESOP and

17    also to protect Mr. Moore, I felt that it should be an

18    independent outside administrator.

19    BY MS. HASSELMAN:

20         Q      Were you concerned that there was a

21    conflict of interest between Mr. Moore's role as ESOP

22    committee member and his role as the selling

23    shareholder?

24                MR. SULLIVAN:    Object to the form.

25         A      No, frankly that wasn't my area of concern.

1   It was more around it would be a lot safer if you had an

2   outside administrator, and the employees would probably

3   be more comfortable with an outside administrator.

4   BY MS. HASSELMAN:

5           Q    You said one of the reasons for

6   recommending an outside administrator was to protect the

7   participants.  Can you tell me how was it that having an

8   outside administrator would protect the participants?

9           MS. SMITH:   Object to form.

10          A    I just felt that an independent outside

11  administrator would probably have the interest of the

12  employees uppermost, No. 1.

13  BY MS. HASSELMAN:

14          Q    Were you concerned that Mr. Moore might

15  not?

16          MS. SMITH:   Object to form.

17          A    No, but I just felt more comfortable if it

18  was an outside administrator.

19  BY MS. HASSELMAN:

20          Q    When you say you think it would be safer to

21  have an outside administrator, can you tell me what you

22  mean?  Safer from what?

23          A    Problems.

24          MS. SMITH:   Object to form.

25  BY MS. HASSELMAN:

Page 156

1          Q      What kind of problems?

2          A      Well, I don't know.  I don't have

3     specific -- just it seemed a lot cleaner, a lot easier

4     to have an outside administrator.  And specific

5     problems, I really don't have any.

6          Q      Did he tell you why he was adamant that he

7     wanted to be the administrator?

8               MS. SMITH:   Object to form.

9          A      No, he just told me that he was going to be

10    the administrator.

11    BY MS. HASSELMAN:

12         Q      If he said so, that's how it was; right?

13         A      That was it.

14              MS. SMITH:   Object to form.

15    BY MS. HASSELMAN:

16         Q      To your knowledge did Mr. Moore ever

17    consider having an independent fiduciary represent the

18    ESOP for purposes of the transaction?

19              MS. SMITH:   Object to the form.

20              MR. SULLIVAN:   Object to the form.

21         A      Do you mean as the administrator of the

22    ESOP?  Is that --

23    BY MS. HASSELMAN:

24         Q      I mean, specifically to represent the ESOP

25    in the transaction in which the ESOP purchased stock

1

2

3

4

5

6

7

8                                          REDACTED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8                                    REDACTED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,        )
                                 )
            Plaintiffs,          )
                                 ) Case No.
       vs.                       )
                                 ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                 )
            Defendants.          )
                                 )
                                 )
                                 )

VIDEOTAPED DEPOSITION OF JOHN MENKE
March 21, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79125

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363   Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

REDACTED

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280  (800) 770-3363    Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

# EXHIBIT 5

CONFIDENTIAL



KMH 000452

CONFIDENTIAL

REDACTED

KMH 000453

CONFIDENTIAL

REDACTED

KMH 000454

CONFIDENTIAL

REDACTED

KMH 000455

CONFIDENTIAL

REDACTED

KMH 000456

# EXHIBIT 6

# K-M INDUSTRIES HOLDING CO., INC.

# EMPLOYEE STOCK OWNERSHIP PLAN

Prepared: June 30, 1999
©1999, Menke & Associates, Inc.
All rights reserved.



EXHIBIT
64
Ferrari 3-26-08

# CONTENTS

Section                                                                    Page

1.    NATURE OF PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

2.    DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

3.    ELIGIBILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

4.    PARTICIPATION IN ALLOCATION OF BENEFITS. . . . . . . . . . . . . . . . . . . .  19
      (a)    Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      (b)    Leave of Absence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      (c)    Suspended Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      (d)    Inactive Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      (e)    Uniformed Services Participants . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

5.    EMPLOYER CONTRIBUTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (a)    Amount of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (b)    Time for Making Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (c)    Form of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

6.    INVESTMENT OF TRUST ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (a)    Authorized Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (b)    Duties of Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (c)    Plan Loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (d)    Nonrecognition of Gain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

7.    ALLOCATIONS TO ACCOUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (a)    Individual Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (b)    Company Stock Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (c)    Other Investments Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

8.    EXPENSES OF THE PLAN AND TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . .  28

9.    VOTING COMPANY STOCK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

10.   DISCLOSURE TO PARTICIPANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (a)    Summary Plan Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (b)    Summary Annual Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (c)    Annual Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (d)    Notice of Rollover Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
      (e)    Additional Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

11.   ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES. . . . . . . . . . .  32
      (a)    Allocation of Employer Contributions and Forfeitures. . . . . . . . . . . . . . . . . .  32
      (b)    Allocation Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

i

12.   PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT. . . . . . . . . . . . . . . . . . 38
      (a)   Normal Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (b)   Disability Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (c)   Deferred Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

13.   OTHER TERMINATION OF SERVICE AND VESTING. . . . . . . . . . . . . . . . . . . . . 39
      (a)   Vesting Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      (b)   Vesting Upon Reemployment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      (c)   Forfeitures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      (d)   Cash-Out Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

14.   DISTRIBUTION OF PLAN BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (a)   Death, Disability or Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (b)   Other Termination of Participation. . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (c)   Death Prior to Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (d)   Valuation Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (e)   Consent and Notice Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (f)   Required Commencement of Benefit Distribution. . . . . . . . . . . . . . . 46
      (g)   Undistributed Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
      (h)   Optional Direct Transfer of Eligible Rollover Distributions. . . . . . . . 47
      (i)   Lien on Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15.   HOW PLAN BENEFIT WILL BE DISTRIBUTED. . . . . . . . . . . . . . . . . . . . . . . . . . 48
      (a)   Form of Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      (b)   Beneficiaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      (c)   Location of Participant or Beneficiary Unknown . . . . . . . . . . . . . . . 49

16.   RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK. . . . . . . 51
      (a)   "Put" Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
      (b)   Right of First Refusal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      (c)   Other Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

17.   SPECIAL PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
      (a)   Diversification of Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
      (b)   Cash Dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18.   ADMINISTRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (a)   Named Fiduciaries for Administration of Plan and for Investment and Control of
            Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (b)   Investment of Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      (c)   Funding Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      (d)   Claims Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (e)   Qualified Domestic Relations Orders. . . . . . . . . . . . . . . . . . . . . . . . . 60
      (f)   General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      (g)   Independent Fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

19.   AMENDMENT AND TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (a)   Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (b)   Changes in the Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (c)   Termination, Partial Termination or Complete Discontinuance of Contributions. . . . 64

ii

|  | (d) | Determination by Internal Revenue Service. | 65 |
|  | (e) | Return of Employer's Contribution. | 65 |
| 20. | | MISCELLANEOUS. | 67 |
|  | (a) | Participation by Affiliated Company. | 67 |
|  | (b) | Limitation of Rights; Employment Relationship. | 67 |
|  | (c) | Merger; Transfer of Assets. | 67 |
|  | (d) | Prohibition Against Assignment. | 67 |
|  | (e) | Applicable Law; Severability. | 68 |
| 21. | | TOP HEAVY PROVISIONS. | 69 |
|  | (a) | Definitions. | 69 |
|  | (b) | Vesting Requirements. | 71 |
|  | (c) | Minimum Benefits. | 72 |
|  | (d) | Limitation on Annual Additions. | 72 |
| 22. | | EXECUTION. | 74 |

iii

CIG 010957

# K-M INDUSTRIES HOLDING CO., INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

**Section 1.**    **NATURE OF PLAN**.

(a)    The purpose of this Plan is to enable participating Employees of the Company and of any participating affiliates to share in the growth and prosperity of the Company and to provide Participants with an opportunity to accumulate capital for their future economic security. A primary purpose of the Plan is to enable Participants to acquire a proprietary interest in the Company. Consequently, Employer Contributions made to the Trust will be primarily invested in Employer Securities.

(b)    This Plan, originally effective as of January 1, 1998, is amended and herein restated effective as of July 16, 1999 (except that provisions which are required to be effective before this date in accordance with the Uruguay Round Agreements Act (GATT), the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), the Small Business Job Protection Act of 1996 (SBJPA), and the Taxpayer Relief Act of 1997 (TRA'97) (collectively "GUST") are hereby generally applicable to the Plan Years beginning after December 31, 1996, unless an earlier or later effective date is required pursuant to a statute or Treasury Regulation or as stated in the Plan document). The Plan is intended to qualify as an Employee Stock Ownership Plan, as defined in Section 4975(e)(7) of the Internal Revenue Code (hereinafter referred to as the "Code"), and as a stock bonus plan under Section 401(a) of the Code. This Plan is adopted as an amendment and restatement of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan, originally effective as of January 1, 1998. On July 16, 1999, the California Capital Insurance Company Employee Stock Ownership Plan was merged with and into the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan. Effective as of July 16, 1999, K-M Industries Holding Co., Inc. became the sponsor of the Kelly-Moore Paint Company, Inc Employee Stock Ownership Plan; that plan is now amended and restated to be the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan.

All Trust assets acquired under this Plan as a result of Employer Contributions, income and other additions to the Trust will be administered, distributed, forfeited and otherwise

CIG 010958

governed by the provisions of this Plan which is administered by the Committee for the exclusive benefit of Participants in the Plan and their Beneficiaries. It is intended that all benefits, rights and features of this Plan be uniformly available to all Participants.

2

CIG 010959

## Section 2.   **DEFINITIONS**.

In this Plan, whenever the context so indicates, the singular or plural number shall each be deemed to include the other, and the capitalized words shall have the following meanings:

### ACCOUNT

One of several Accounts maintained to record the interest of a Participant in the Plan.

### AFFILIATED COMPANY

Any Company which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes the Employer, any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c) of the Code) with the Employer, any affiliated service group which includes the Employer (as defined in Section 414(m) of the Code), and any other entity required to be aggregated with the Employer under Section 414(o) of the Code. For purposes of Code Section 415 limits, the definition of Affiliated Company shall be expanded in accordance with Code Section 415(h).

### ALTERNATE PAYEE

A spouse, former spouse, child or other dependent of a Participant who is recognized by a Domestic Relations Order as having a right to receive all or a portion of the benefits otherwise payable to a Participant.

### ANNIVERSARY DATE

The 31st day of December of each year.

### ANNUAL ADDITIONS

The aggregate of amounts credited to a Participant's Accounts each year from Employer Contributions, Forfeitures, and a Participant's voluntary contributions (if any) under all defined contribution plans of an Employer or Affiliated Company; provided, however, that Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall be excluded if no more than one-third (⅓) of the Employer Contribution deductible under Section 404(a)(9) of the Code for that year is allocated to the Accounts of Highly Compensated Employees. Amounts allocated after March 31, 1984 to an individual medical account (as defined in Section 415(l)(2) of the Code) which is part of a pension or annuity plan maintained by the Company shall be treated as

3

CIG 010960

an Annual Addition. Any amounts attributable to postretirement medical benefits allocated to the separate account of a Key Employee (as defined in Section 419A(d)(3) of the Code) under any Welfare Benefit Plan (as defined in Section 419(e) of the Code) after December 31, 1985 shall be treated as an Annual Addition. A restored Forfeiture, a transfer from another qualified pension plan and a rollover contribution (if any) shall not be counted as an Annual Addition. For purposes of Code Section 415 limits, the definition of Annual Additions shall be expanded in accordance with Code Section 415(h).

## BENEFICIARY

The person or persons entitled to receive any benefits under the Plan in the event of a Participant's death.

## BOARD OF DIRECTORS

The board of directors of the Company.

## BREAK IN SERVICE

A Plan Year during which a Participant has not completed more than 500 Hours of Service.

## CODE

The Internal Revenue Code of 1986, as amended from time to time.

## COMMITTEE

The Committee appointed by the Board of Directors to administer the Plan and to give instructions to the Trustee.

## COMPANY

K-M Industries Holding Co., Inc., a California corporation.

## COMPANY STOCK

Shares of any class of stock, preferred or common, voting or nonvoting, which are issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, including Employer Securities and Qualified Employer Securities.

4

CIG 010961

**COMPANY STOCK ACCOUNT**

The Account of a Participant which is credited with the shares of Company Stock purchased and paid for by the Trust or contributed to the Trust.

**CONTRIBUTIONS**

Employer contributions which are deductible by an Employer under Section 404(a) of the Code.

**COVERED COMPENSATION**

The Total Compensation paid to a Participant by the Employer for each Plan Year, including any salary deferrals under Sections 401(k) and 125 of the Code, but excluding reimbursement or other expense allowances, fringe benefits (cash and noncash), moving expenses, welfare benefits, and deferred compensation except deferrals under Sections 401(k) and 125 of the Code. Notwithstanding the foregoing, Covered Compensation of any Participant taken into account in any Plan Year shall not exceed one hundred fifty thousand dollars ($150,000), as adjusted by the Commissioner for increases in cost of living in accordance with section 401(a)(17)(B) of the Code.

**DEFERRED RETIREMENT**

Termination of service subsequent to attainment of the Normal Retirement Date.

**DIRECT ROLLOVER**

A payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

**DISABILITY**

If a Participant terminated employment because of a total and permanent disability, the Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of the Participant's Accounts. "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

**DISQUALIFIED PERSON**

The term "Disqualified Person" shall mean a person who is a fiduciary with respect to the Plan; a person providing services to the Plan; an Employer any of whose employees are covered by the Plan; an employee organization any of

CIG 010962

whose members are covered by the Plan; an owner, directly or indirectly, of fifty percent (50%) or more of (i) the total combined voting power of all classes of voting stock or of the total value of all classes of the stock of a corporation, (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an Employer or an employee organization any of whose employees or members are covered by the Plan; a member of the family of any Disqualified Person; a corporation, partnership, trust or estate of which (or in which) fifty percent (50%) or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate is owned, directly or indirectly, or held by Disqualified Persons; an employee, officer, director (or any individual having powers, similar powers and responsibilities), a ten percent (10%) or more shareholder, or a highly compensated employee (earning ten percent (10%) or more of the yearly wages of an employer) of a Disqualified Person; or a ten percent (10%) or more (in capital or profits) partner or joint venturer of a Disqualified Person.

## DISTRIBUTEE

Any Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the Alternate Payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

## DOMESTIC RELATIONS ORDER

Any judgment, decree, or order (including approval of a property settlement agreement) which is made pursuant to a State domestic relations law and which relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a Participant.

## EFFECTIVE DATE

The Effective Date of this amended and restated Plan is July 16, 1999.

## ELIGIBILITY COMPUTATION PERIOD

To determine Years of Service and Breaks in Service for purposes of eligibility, the initial 12-month period shall commence on the date the Employee first performs an Hour of Service for the Company. The second 12-month period shall be the Plan Year which commences prior to the end of the initial 12-month period, regardless of whether the Employee is entitled to be credited with 1,000 Hours of Service during the initial eligibility computation period. An Employee who is

6

CIG 010963

credited with 1,000 Hours of Service in both the initial eligibility computation period and the first Plan Year which commences prior to the first anniversary of the Employee's initial eligibility computation period will be credited with two Years of Service for purposes of eligibility to participate. All subsequent computation periods will continue to be determined on the Plan Year.

## ELIGIBLE RETIREMENT PLAN

An individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the Distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

## ELIGIBLE ROLLOVER DISTRIBUTION

Any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer Securities).

## EMPLOYEE

A person, employed by an Employer, any portion of whose income is subject to withholding of income tax and/or for whom Social Security contributions are made by an Employer, as well as any other person qualifying as a common law employee of an Employer. Employee shall include Leased Employees unless: (i) such Employee is covered by a money purchase pension plan providing: (1) a nonintegrated Employer contribution rate of at least ten percent (10%) of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Section 125, Section 402(e)(3), Section 402(h) or Section 403(b) of the Code; (2) immediate participation; and (3) full and immediate vesting; and (ii) Leased Employees do not constitute more than twenty percent (20%) of the Company's nonhighly compensated work force.

CIG 010964

## EMPLOYER

K-M Industries Holding Co., Inc. and any other affiliate of the Company, as defined in Section 407(d) of the ERISA, or any predecessor or successor corporation, which has been designated by the Company as an Employer participating in the Plan, and which has accepted such designation and has agreed to be bound by the terms of the Plan and Trust Agreement.

## EMPLOYER SECURITIES

Common stock issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, having a combination of voting power and dividend rights equal to (i) that class of common stock of the Company having the greatest voting power and (ii) that class of common stock of the Company having the greatest dividend rights. Noncallable preferred stock shall be treated as Employer Securities if such stock is convertible at any time into common stock which meets the above requirements, and if (as of the date of acquisition by the Plan) the conversion price is reasonable.

## EMPLOYMENT COMMENCEMENT DATE

The date on which the Employee shall first perform an Hour of Service for the Employer.

## ENTRY DATE

The first day of January of each year.

## ERISA

The Employee Retirement Income Security Act of 1974, as amended from time to time.

## FISCAL YEAR

The annual accounting period adopted by the Company for federal income tax purposes.

## FORFEITURES

The portion of a Participant's Accounts which does not become part of the Participant's Plan Benefit. See Section 13 of the Plan.

8

## HIGHLY COMPENSATED EMPLOYEE

The term "Highly Compensated Employee" shall mean:  (a) a Highly Compensated Former Employee of the Company as well as (b) a Highly Compensated Current Employee.  The term "Highly Compensated Current Employee" shall mean any Employee who:

    (A)    was a five percent (5%) owner at any time during the year or the preceding year, or

    (B)    for the preceding year, had compensation from the Company and/or from an Affiliated Company in excess of eighty thousand dollars ($80,000) (indexed at such time and in such manner as the Secretary of the Treasury may provide), and was in the top-paid group of Employees (i.e., was among the top twenty percent (20%) of Employees in compensation) for such preceding year.

The term "compensation" shall mean, for purposes of this provision, as defined in IRC Section 415(c)(3) but without regard to Sections 125, 402(e)(3), 402(h)(1)(B) or 403(b) of the Code.

For purposes of determining whether an employee is a Highly Compensated Employee for the Plan Year beginning in 1997, these changes are to be treated as having been in effect for the Plan Year beginning in 1996.

The determination of who is a Highly Compensated Employee, including the determination of the number and identity of Employees in the top-paid group, will be made in accordance with the provisions of Section 414(q) of the Code and the regulations thereunder.

A former employee shall be treated as a "Highly Compensated Former Employee" if such employee was a Highly Compensated Employee when he separated from service or was a Highly Compensated Employee at any time after attaining age fifty-five (55).

## HOUR OF SERVICE

    (a)    Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer or any Affiliated Company during the applicable computation period.

    (b)    Each hour for which an Employee is paid, or entitled to payment, by the Employer or any Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability),

9

CIG 010966

layoff, jury duty, military duty or leave of absence. Notwithstanding the preceding sentence, (1) no more than 501 Hours of Service will be credited under this paragraph (b) to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (2) an hour for which an Employee is directly or indirectly paid, or entitled to payment, during a period in which no duties are performed, will not be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workmen's compensation, unemployment compensation or disability insurance laws; and (3) Hours of Service will not be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee. For purposes of this paragraph (b), a payment shall be deemed to be made by or due from an Employer or an Affiliated Company regardless of whether such payment is made by or due from the Employer or an Affiliated Company directly or indirectly through, among others, a trust fund, or insurer, to which the Employer or an Affiliated Company contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

(c)    Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Company.

(d)    The determination of Hours of Service for reasons other than the performance of duties, and the crediting of Hours of Service to computation periods, shall be in accordance with U.S. Department of Labor Regulations Section 2530.200b-2 (b) and (c). There shall be no duplication of Hours of Service under any of the foregoing provisions.

(e)    In the case of a salaried Employee who is not paid on an hourly basis, Hours of Service shall be based on any available records which accurately reflect the actual number of hours worked by such Employee. If such records do not exist, such Employee shall be credited with Hours of Service on the basis of 45 hours for each week for which the Employee would be credited with at least one Hour of Service.

(f)    For purposes of determining whether a Participant has incurred a one-year Break in Service, a Participant will be credited with Hours of Service for certain periods of absence from work by reason of the Participant's pregnancy, the birth of a Participant's child, the adoption of a Participant's child, or caring for a Participant's child during the period immediately following the birth or adoption of such child. If the Participant's normal work hours are known, such Participant will be credited with the number of hours that normally would have been credited for such absence. If the Participant's normal work hours are not known, such Participant will be credited with eight Hours of Service for each normal workday

10

CIG 010967

during such absence. Not more than 501 Hours of Service shall be credited for such purposes in the Plan Year in which such absence commences if the Participant would otherwise incur a Break in Service in such Plan Year; otherwise, such Hours of Service shall be credited in the following Plan Year if such absence continues in such Plan Year.

## INDEPENDENT APPRAISER

Any appraiser, appointed by the Trustee, who is independent of the Company and who meets requirements of the regulations prescribed under Section 170(a)(1) of the Code.

## INDEPENDENT FIDUCIARY

The term Independent Fiduciary shall refer to any entity or individual which is unrelated to any part of the Plan or Trust and which may be appointed from time to time by the Board of Directors, Trustee, or Committee to act on behalf of the Plan and/or Trust, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and/or Trust.

## LEASED EMPLOYEE

Any person (other than an Employee of the Company) who pursuant to an agreement between the Company and any other person ("leasing organization") has performed services for the Company (or for the Company and related persons determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis for a period of at least one (1) year, and such services are of a type historically performed by employees in the business field of the Company. Effective for all Plan Years beginning on or after January 1, 1997, the "historically performed" test is replaced with a new test under which an individual is not considered a leased employee unless the individual's services are performed under primary direction or control by the service recipient. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the Company shall be treated as provided by the Company.

## LIMITATION YEAR

For purposes of the limitations on Contributions and benefits imposed by Section 415 of the Code, the Limitation Year shall be the Plan Year.

11

CIG 010968

**NORMAL RETIREMENT**

Termination of service upon attainment of the Normal Retirement Date.

**NORMAL RETIREMENT DATE**

The date on which a Participant attains age sixty-five (65).

**OTHER INVESTMENTS ACCOUNT**

The Account of a Participant which is credited with a share of the net income (or loss) of the Trust and Employer Contributions and Forfeitures in other than Company Stock and which is debited with payments made to pay for Company Stock.

**PARTICIPANT**

Any Employee who is participating in this Plan as defined in Section 3 of the Plan or former Employee for whom an Account is maintained. A Participant ceases to be a Participant when such Participant's Account is closed after all amounts have been distributed or Forfeited.

**PLAN**

The K-M Industries Holding Co., Inc. Employee Stock Ownership Plan, which includes the Plan and Trust Agreement.

**PLAN BENEFIT**

The vested amount, as defined in Sections 12 and 13 of the Plan, of a Participant's Accounts.

**PLAN YEAR**

The twelve (12) month period ending on each Anniversary Date.

**QUALIFIED ELECTION PERIOD**

The six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

CIG 010969

## QUALIFIED EMPLOYER SECURITIES

Employer Securities which are issued by a domestic corporation that has no securities outstanding that are readily tradable on an established securities market, have been held for at least three (3) years by the seller and were not received by the seller in a distribution from a Plan qualified under Section 401(a) or in a transfer pursuant to an option or other right to acquire stock under Section 83, 422, 422A, 423 or 424 of the Code.

## QUALIFIED PARTICIPANT

Any Participant who has attained age fifty-five (55) and has completed ten (10) years of participation under the Plan.

## QUALIFIED REPLACEMENT PROPERTY

Any stock, bond, debenture, note, or other evidence of indebtedness issued by a domestic corporation (other than the Employer corporation or any corporation which is a member of a parent-subsidiary controlled group which includes the Employer corporation) which does not, for the taxable year preceding the taxable year in which such security is purchased, have passive investment income exceeding twenty-five percent (25%) of the gross receipts of such corporation for such year.

## RETIREMENT

Termination of service due to Normal Retirement, Deferred Retirement, or Disability.

## SECURITIES ACQUISITION LOAN

A loan which is used to purchase Employer Securities and which meets the requirements of paragraphs 1 and 2 of Section 6(c) of the Plan.

## SEGREGATED INVESTMENTS ACCOUNT

The Account of a Participant which is credited with amounts which may not be used to purchase shares of Company Stock pursuant to the provisions of Rev. Proc. 87-22.

## STOCK BONUS PLAN

The portion of the Plan which is designed to qualify as such and is subject to the rules pertaining to a stock bonus plan under Section 401(a) of the Code.

13

## SUSPENSE ACCOUNT

The Suspense Account maintained by the Committee to which shall be credited all shares of Employer Securities purchased with the proceeds of a Securities Acquisition Loan.

## TOTAL COMPENSATION

For purposes of Section 415 of the Code and the Top Heavy provisions in Section 21 of this Plan,

(a)    The term "Total Compensation" includes:

(1)    The Employee's wages, salaries, fees for professional services, and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includible in gross income (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan (as described in Section 1.62-2(c) of the regulations under Section 62 of the Code).

Total Compensation also includes elective deferrals to Section 401(k) plans and similar arrangements (for example, Employer contributions under a salary reduction arrangement to purchase a Code Section 403(b) annuity); elective contributions to Code Section 457 nonqualified deferred compensation plans; and salary reductions made to a cafeteria plan.

(2)    In the case of an Employee who is an employee within the meaning of Section 401(c)(1) of the Code and the regulations thereunder, the Employee's earned income (as described in Section 401(c)(2) of the Code and the regulations thereunder).

(3)    Amounts described in Sections 104(a)(3), 105(a) and 105(h) of the Code, but only to the extent that these amounts are includable in the gross income of the Employee.

(4)    Amounts paid or reimbursed by the Employer for moving expenses incurred by an Employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are not deductible by the Employee under Section 217 of the Code.

14

CIG 010971

(5)    The value of a nonqualified stock option granted to an Employee by the Employer, but only to the extent that the value of the option is includable in the gross income of the Employee for the taxable year in which granted.

(6)    The amount includable in the gross income of an Employee upon making the election described in Section 83(b) of the Code.

(7)    For purposes of subdivisions (1) and (2) of this subparagraph, foreign earned income (as defined in Section 911(b) of the Code), whether or not excludable from gross income under Section 911 of the Code.  Compensation described in subdivision (1) of this subparagraph is to be determined without regard to the exclusions from gross income in Sections 931 and 933 of the Code. Similar principles are to be applied with respect to income subject to Sections 931 and 933 of the Code in determining compensation described in subdivision (2) of this subparagraph.

(b)    The term "Total Compensation" does not include items such as:

(1)    Employer contributions made on behalf of an Employee to a simplified employee pension plan described in Code Section 408(k) are not considered as compensation for the taxable year in which contributed.  Additionally, any distributions from a plan of deferred compensation are not considered as compensation for Section 415 purposes, regardless of whether such amounts are includable in the gross income of the Employee when distributed.  However, any amounts received by an Employee pursuant to an unfunded nonqualified plan may be considered as compensation for Code Section 415 purposes in the year such amounts are includable in the gross income of the Employee.

(2)    Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture (under Section 83 of the Code).

(3)    Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option.

(4)    Other amounts which receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includable in the gross income of the Employee), or contributions made by an Employer (not under a salary deferral agreement) towards the purchase of an annuity contract described in Section 403(b) of the Code (only if the contributions are excludable from the gross income of the Employee).

15

CIG 010972

**TRUST**

The Trust created by the Trust Agreement entered into between the Company and the Trustee.

**TRUST AGREEMENT**

The Agreement between the Company and the Trustee or any successor Trustee establishing the Trust and specifying the duties of the Trustee.

**TRUSTEE**

The Trustee (or Trustees) designated by the Company's Board of Directors (and any successor Trustee). The Board of Directors may provide that any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan (including service as both Trustee and Committee member).

**VALUATION DATE**

The Anniversary Date coinciding with or immediately preceding the date of actual distribution of Plan Benefits. For purposes of the top heavy provisions of this Plan, the Valuation Date is the most recent Anniversary Date within a twelve (12)-month period ending on a Determination Date (as defined in Section 21).

**YEAR OF SERVICE**

For purposes of vesting under Section 13, all Plan Years beginning on or after the Effective Date during which an Employee has completed 1,000 or more Hours of Service, including any Plan Year during which such Participant has completed 1,000 or more Hours of Service but has not yet become eligible to participate in the Plan.

In addition, for purposes of vesting, Years of Service also include all years of employment with an Employer prior to the Effective Date of the Plan in which the Employee completed 1,000 or more Hours of Service within such Employer's fiscal year after December 31, 1995.

Years of Service also include, for purposes of vesting, all Years of Service prior to the Effective Date of this Plan recognized under the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and/or the California Capital Insurance Company Employee Stock Ownership Plan.

Notwithstanding the foregoing, effective as of December 12, 1994, service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.

16

CIG 010973

Section 3.    **ELIGIBILITY.**

Each Employee shall become eligible to participate in the Plan retroactively to the first day of the Plan Year in which the Employee first completes 1,000 Hours of Service, measured from the Employee's Employment Commencement Date.

All Employees who were eligible to participate in the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan or the California Capital Insurance Company Employee Stock Ownership Plan on the adoption date of this restated Plan are automatically eligible to participate in this Plan as of its Effective Date.

Upon the Employee so becoming eligible, participation shall be based on the total Covered Compensation paid to the Employee for the entire Plan Year during which the Employee becomes eligible to participate.  If an Employee who has met the eligibility requirements leaves the service of the Employer and returns to service without incurring a one-year Break in Service, the Employee shall commence participation immediately upon returning to Service.

An Employee whose terms of employment with the Employer are covered by a collective bargaining agreement shall not be eligible to participate in the Plan unless the terms of such collective bargaining agreement specifically provide for participation in this Plan.  Notwithstanding the foregoing, in the event any such Employees cease to be subject to the collective bargaining agreement, Years of Service for purposes of eligibility and vesting shall include years during which an Employee is covered by a collective bargaining agreement after the original Effective Date of the Plan.

An Employee who is a Leased Employee shall not be eligible to participate in this Plan. Notwithstanding the foregoing, in the event an Employee ceases to be a Leased Employee, Years of Service for purposes of eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

Nonresident aliens who do not receive any earned income (as defined in Code § 911(d)(2)) from the Employer which constitutes United States source income (as defined in Code § 861(a)(3)) are not eligible to participate in the Plan.  Notwithstanding the foregoing, in the event an Employee ceases to be a nonresident alien, Years of Service for purposes of

CIG 010974

eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

18

CIG 010975

Section 4.    **PARTICIPATION IN ALLOCATION OF BENEFITS.**

(a)    Participation.

A Participant will share in the allocation of Employer Contributions and Forfeitures only if the Participant has accumulated 1,000 or more Hours of Service during the Plan Year. A Participant who accumulates less than 1,000 Hours of Service during a Plan Year will not share in the allocation of Employer Contributions and Forfeitures under Section 11 for such Plan Year, and shall become an inactive Participant for that Plan Year.

A Participant reemployed following a Break in Service shall again resume participation in the Plan as of the date of reemployment for purposes of vesting under Section 13 and for purposes of participating in Employer Contributions and Forfeitures under Section 11 (subject to the requirements of this Section 4 and Section 13 of the Plan). However, if the Participant is reemployed after a Break in Service and has no vested rights under the Plan and the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the number of aggregate years of prebreak service, whichever is greater, the Participant shall be treated as a new Employee for purposes of participation.

(b)    Leave of Absence.

A Participant's employment is not considered terminated for purposes of the Plan if the Participant has been on leave of absence with the consent of the Company, provided that the Participant returns to the employ of the Company within thirty (30) days after the leave (or within such longer period as may be prescribed by law). Leave of absence shall mean a leave granted by the Company, in accordance with rules uniformly applied to all Participants, for reasons of health or public service or for reasons determined by the Company to be in its best interests. Solely for purposes of preventing a Break in Service, a Participant on such leave of absence shall be credited with eight (8) Hours of Service for each business day of the leave. A Participant who does not return to the employ of the Company within the prescribed time following the end of the leave of absence shall be deemed to have terminated employment as of the date when the leave began, unless such failure to return was the result of death, Disability or Retirement.

19

CIG 010976

(c)     Suspended Participation.

A Participant who ceases to be an eligible Employee by becoming subject to a collective bargaining agreement shall become a suspended Participant. During the period of suspension, no amounts shall be credited to the Participant's Accounts which are based on the Participant's Covered Compensation from and after the date of suspension. However, amounts previously credited to a Participant's Accounts shall continue to vest and the Participant shall be entitled to benefits in accordance with the provisions of Section 14(g) of this Plan throughout the period during which the Participant is on suspended status.

(d)     Inactive Participation.

A Participant who has more than 500 Hours of Service but less than 1,000 Hours of Service in any Plan Year shall be an inactive Participant for that Plan Year. No amounts shall be credited to such Participant's Accounts which are based on the Participant's Covered Compensation for that Plan Year.

(e)     Uniformed Services Participants.

Notwithstanding the foregoing, effective as of December 12, 1994, participation in the allocation of Employer Contributions and Forfeitures with respect to a Participant's qualified military service will be provided in accordance with Section 414(u) of the Code.

CIG 010977

**Section 5.**    **EMPLOYER CONTRIBUTIONS.**

    (a)    <u>Amount of Contribution.</u>

        Employer Contributions shall be made to the Trust in such amounts as may be determined by the Company's Board of Directors, provided that such Contributions shall not exceed the maximum amounts deductible under Sections 404(a)(3) and 404(a)(9) of the Code. To the extent the Trust has not received cash in an amount sufficient to meet the Trust's current obligations under a Securities Acquisition Loan, Employer Contributions shall be made in sufficient amounts to cover principal and interest on a Securities Acquisition Loan. Notwithstanding the foregoing, Employer Contributions may not be made in amounts which would permit the limitation described in Section 11(b) to be exceeded.

    (b)    <u>Time for Making Contribution.</u>

        Employer Contributions for each year must be established by resolution of the Company's Board of Directors and paid to the Trust not later than the due date for filing the Company's federal income tax return for that year, including extensions of such date.

    (c)    <u>Form of Contribution.</u>

        Employer Contributions may be paid in cash, shares of Company Stock or other property as the Company's Board of Directors may from time to time determine. Shares of Company Stock and other property will be valued at their then fair market value.

CIG 010978

**Section 6.**    **INVESTMENT OF TRUST ASSETS.**

(a)    Authorized Investments.

Employer Contributions in cash received by the Trust will be applied to pay any outstanding obligations of the Trust incurred for the purchase of Employer Securities, or may be applied to purchase additional shares of Company Stock from current shareholders, treasury shares, or newly issued shares from the Company. Pursuant to the terms of the Trust Agreement, the Committee may also direct the Trustee to invest funds under the Plan in savings accounts, certificates of deposit, securities, or other equity stocks or bonds or in any other kind of real or personal property, including interests in oil or other depletable natural resources, options, puts, calls, futures contracts and commodities; or such funds may be held in non-interest-bearing bank accounts as necessary on a temporary basis.

(b)    Duties of Committee.

Except as otherwise provided in Section 18(b), all investments will be made by the Trustee only upon the direction of the Committee. Except in the case of a purchase from a Disqualified Person (as defined in Section 16(b) of the Plan), all purchases of Company Stock shall be made at no more than fair market value, as determined by an Independent Appraiser as of the most recent Anniversary Date. In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of the Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

(c)    Plan Loans.

(1)    The Committee may direct the Trustee to incur Plan loans from time to time to carry out the purposes of the Trust, provided that if the loan is a Securities Acquisition Loan, the terms of the loan must comply with the following requirements: Any such loan shall be for a specified term, shall bear a reasonable rate of interest, and may only be secured by a collateral pledge of the Employer Securities so acquired. Any such loan shall be primarily for the benefit of Plan Participants and their Beneficiaries. No other Trust assets may be pledged as collateral by the Trustee, and no lender shall have recourse against Trust assets other than any shares of Employer Securities remaining subject to pledge. Any pledge of Employer Securities must provide for the release of shares so pledged pursuant to either the "General Rule" or the "Special Rule" set forth in Section 7. Shares of Employer Securities released from the Suspense

22

CIG 010979

Account shall be allocated to Participants' accounts in shares of stock or other nonmonetary units. Repayments of principal and interest on any Securities Acquisition Loan shall be made by the Trustee (as directed by the Committee) only from Employer Contributions in cash to the Trust, from any cash dividends received by the Trust on such Employer Securities or from any earnings attributable to the investment of Employer Contributions made to the Trust in cash to meet its obligations under the loan. Such Contributions, dividends and earnings shall be accounted for separately in the books of accounts of the Plan until the Securities Acquisition Loan is repaid. The proceeds of a Securities Acquisition Loan may be used only to acquire Employer Securities, to repay such loan or to repay a prior Securities Acquisition Loan. The Plan may not obligate itself to acquire securities from a particular security holder at an indefinite time determined upon the happening of an event such as the death of the holder. The protections and rights described in Section 16 are nonterminable. Should this Plan cease to be an Employee Stock Ownership Plan, or should the Securities Acquisition Loan be repaid, all Employer Securities will continue to be subject to the provisions of Section 16. If securities acquired with the proceeds of a Securities Acquisition Loan available for distribution consist of more than one class, a Distributee must receive substantially the same portion of each such class.

(2)    In the event of default upon a Securities Acquisition Loan, the value of Plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a Disqualified Person, a loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the loan. For purposes of this paragraph, the making of a guarantee does not make a person a lender.

(d)    <u>Nonrecognition of Gain</u>.

(1)    There shall be no recognition of gain upon a sale of Employer Securities to the Plan if (i) the seller has held such Securities for at least three (3) years, (ii) after the purchase the Plan owns at least thirty percent (30%) of each class of outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), or thirty percent (30%) of the total value of all outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), (iii) the seller purchases Qualified Replacement Property within three (3) months prior to the sale or within twelve (12) months after the sale, (iv) on or before the time (including extension) for filing an income tax return, the seller files with the IRS a written

23

CIG 010980

statement verified by the Company, regarding the terms of the sale, and (v) the Plan complies with the allocation requirements set forth in Section 11(b)(5).

(2)    If, during the three-year period after the Plan acquires Qualified Employer Securities in a transaction in which gain is not recognized, the Plan disposes of part or all of such Qualified Employer Securities, the Company shall be liable for a tax equal to ten percent (10%) of the amount realized upon the disposition, unless such disposition is necessary to meet the diversification requirements of Section 17(a) of the Plan, or unless such disposition is made to a Participant (or the Participant's Beneficiary) by reason of death, Disability, Retirement after age fifty-nine and one-half (59½), or a separation from service which results in a one-year Break in Service.

24

CIG 010981

**Section 7.**     **ALLOCATIONS TO ACCOUNTS.**

    (a)    Individual Accounts.

        The Committee shall establish and maintain individual Accounts for each Participant in the Plan. Individual Accounts shall also be maintained for all former Participants who still have an interest in the Plan. Except as provided in Section 17(a), such individual Accounts shall not require a segregation of the Trust assets and no Participant, former Participant or Beneficiary shall acquire any right to or interest in any specific asset of the Trust as a result of the allocation provided for in the Plan.

    (b)    Company Stock Account.

        (1)    The Company Stock Account of each Participant will be credited as of each Anniversary Date with the Participant's allocated share of Company Stock (including fractional shares) purchased and paid for by the Trust or contributed in kind by the Company, with Forfeitures of Company Stock and with stock dividends on Company Stock held in the Participant's Company Stock Account.

        Notwithstanding the provisions of this Subsection 7(b), the Plan is designed to allocate separate benefits, rights and features among the Plan's Participants, in accordance with IRS Regulation Section 1.401(a)(4)-4. The Participating Employers in this Plan are (1) Kelly-Moore Paint Company, Inc. (and its participating Affiliates) and California Capital Insurance Company (and its participating Affiliates). The Employer Securities acquired by this Plan shall consist of two classes of common stock of the Parent: Class P-B and Class I-B. Subject to receiving the IRS favorable determination regarding the allocation of separate benefits, the Company Stock Accounts of Participants employed by the Participating Employers Kelly-Moore Paint Company, Inc., K-M Universal Paint Company, Inc. and Preservative Paint Co. shall receive an allocation of <u>only</u> Class P-B common stock. The Company Stock Accounts of Participants employed by the Participating Employers California Capital Insurance Company, Monterey Insurance and Eagle West Insurance shall receive an allocation of <u>only</u> Class I-B common stock.

        Employer Securities acquired by the Trust with the proceeds of a Securities Acquisition Loan shall be credited to a Suspense Account. For each Plan Year during the duration of the loan, the number of shares of Employer Securities to be released from said

25

CIG 010982

Suspense Account and allocated to the Company Stock Accounts of Participants shall be determined pursuant to either the "General Rule" or the "Special Rule" described below as selected by the Committee for each Securities Acquisition Loan. Once the Committee has selected either the General Rule or the Special Rule, that Rule shall be used exclusively for the allocation of shares of Employer Securities purchased with the proceeds of a particular Securities Acquisition Loan.

(A)    General Rule: For each Plan Year during the duration of the loan, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(i)    The numerator of which is the amount of principal and interest paid for the Plan Year; and

(ii)    The denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years.

(B)    Special Rule:

(i)    For each Plan Year, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(aa)    The numerator of which is the amount of principal paid for the Plan Year; and

(bb)    The denominator of which is the sum of the numerator plus the principal to be paid for all future Plan Years.

(ii)    The Committee may select the Special Rule only if:

(aa)    The Securities Acquisition Loan provides for annual payments of principal and interest at a cumulative rate which is not less rapid at any time than level annual payments of such amounts for ten (10) years;

(bb)    The interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and

26

(cc)    By reason of a renewal, extension or refinancing, the sum of the expired duration of the original loan, any renewal period, any extension period and the duration of any new loan does not exceed 10 years.

(C)    In determining the number of shares to be released for any Plan Year under either the General Rule or the Special Rule:

(i)    The number of future years under the Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods;

(ii)    If the Loan provides for a variable interest rate, the interest to be paid for all future Plan Years must be computed by using the interest rate applicable as of the end of the Plan Year for which the determination is being made; and

(iii)    If the Employer Securities allocated to the Suspense Account includes more than one class of shares, the number of shares of each class to be withdrawn for a Plan Year from the Suspense Account must be determined by applying the applicable fraction provided for above to each such class.

(2)    Allocations of Company Stock shall be reflected separately for each class of such stock, and the Committee shall maintain adequate records of the aggregate cost basis of Company Stock allocated to each Participant's Company Stock Account.

(c)    Other Investments Account.

The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the net income (or loss) of the Trust, with cash dividends on Company Stock not distributed to Participants or used to pay a Securities Acquisition Loan and with Employer Contributions and Forfeitures in other than Company Stock. The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the unrealized appreciation (or deprecia-tion) in the value of Trust assets other than Company Stock. It will be debited for any payments for purchases of Company Stock or for repayment of debt (including principal and interest) incurred for the purchase of Employer Securities.

27

CIG 010984

**Section 8.    <u>EXPENSES OF THE PLAN AND TRUST.</u>**

Normal brokerage charges which are included in the cost of securities purchased (or charged to proceeds in the case of sales) shall be paid by the Trust.  The Company shall pay all expenses in connection with the design, establishment, or termination of the Plan.  The Trust shall pay all costs of administering the Plan and Trust, unless such expenses are paid by the Company.

28

CIG 010985

**Section 9.     VOTING COMPANY STOCK.**

All Company Stock held by the Trust shall be voted by the Trustee in accordance with instructions from the Committee. Notwithstanding the foregoing, Participants and/or Beneficiaries shall be entitled to direct the voting of any voting shares of Company Stock allocated to their Company Stock Accounts with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation. In accordance with instructions from the Committee, the Trustee shall vote any unallocated shares held by the Trust as well as any allocated shares for which a Participant has failed to give timely voting direction.

CIG 010986

**Section 10.    DISCLOSURE TO PARTICIPANTS.**

 (a) <u>Summary Plan Description.</u>

   Within one hundred twenty (120) days after the receipt of an initial favorable determination letter from the Internal Revenue Service relating to the qualification of the Plan, and thereafter within ninety (90) days after a Participant commences participation (or after a Beneficiary first receives benefits under the Plan), the Committee shall furnish such Participant (or Beneficiary) with the summary plan description required by Sections 102(a)(1) and 104(b)(1) of ERISA. Such summary plan description shall be updated from time to time as required under ERISA and the Department of Labor regulations thereunder.

 (b) <u>Summary Annual Report.</u>

   Within nine (9) months after each Anniversary Date, the Committee shall furnish each Participant (and each Beneficiary receiving benefits under the Plan) with the summary annual report of the Plan required by Section 104(b)(3) of ERISA, in the form required by regulations of the Department of Labor.

 (c) <u>Annual Statement.</u>

   As soon as possible after each Anniversary Date, Participants will receive a written statement of their Accounts showing as of that Anniversary Date:

   (1) The balance in each of their Accounts as of the preceding Anniversary Date.

   (2) The amount of Employer Contributions and Forfeitures allocated to their Accounts for the year.

   (3) The adjustments to their Accounts to reflect their share of dividends and the income and expenses of the Trust for the year.

   (4) The new balances in each of their Accounts, including the number of shares of Company Stock.

   (5) The vested percentage of their Plan Benefit.

   Upon the discovery of any error or miscalculation in an Account, the Committee shall correct the same insofar as, in the Committee's discretion, correction is feasible. Statements to Participants are for reporting purposes only, and no allocation, valuation or statement shall, by itself, vest any right or title in any part of the Trust fund.

CIG 010987

(d)  Notice of Rollover Treatment.

The Committee shall, when making any distribution which qualifies as a qualifying rollover distribution under Section 402(c) or Section 401(a)(31) of the Code, provide a written notice to the recipient which explains the provisions of Sections 402(c) and 401(a)(31) under which such distribution will not be subject to current tax if transferred to an Eligible Retirement Plan.  In the case of a distribution under Section 402(c), such notice shall be given not less than thirty (30) days nor more than ninety (90) days before the distribution date.  If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)11(c) of the Income Tax Regulations is given, provided that:

(1)  the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)  the Participant, after receiving the notice, affirmatively elects a distribution.

(e)  Additional Disclosure.

The Committee shall make available for examination by any Participant (or Beneficiary) copies of the summary plan description, the Plan, the Trust Agreement and the latest annual report of the Plan filed with the Department of Labor.  Upon written request of any Participant (or Beneficiary), the Committee shall furnish copies of such documents and may make a reasonable charge to cover the cost of furnishing such copies, as provided in regulations of the Department of Labor.

CIG 010988

**Section 11.    ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES.**

    (a)    Allocation of Employer Contributions and Forfeitures.

The allocation will be made as follows:

    (1)    Employer Contributions.

Employer Contributions will be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year. Shares of Employer Securities released from the Suspense Account (as provided in Section 7(b)) by reason of the payment of interest and principal on a Securities Acquisition Loan shall be allocated pursuant to Subsection 7(b) as of each Anniversary Date among the Accounts of Participants in the Plan who meet the require-ments of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensa-tion bears to the total Covered Compensation of all such Participants for that year.

    (2)    Forfeitures.

Forfeitures shall be allocated in the same manner as Employer Contributions are allocated.

    (3)    Net Income (or Loss) of the Trust.

The net income (or loss) of the Trust will be determined annually as of each Anniversary Date. Any stock dividends on shares of Company Stock held by the Trust shall be allocated to each Participant's Company Stock Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date. Trust income attributable to any cash dividends paid on shares of Company Stock (whether or not allocated) and not used to make payments on a Securities Acquisition Loan shall be allocated to each Participant's Other Investments Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date. Trust income attributable to any gain from the

32

CIG 010989

sale of unallocated shares of Employer Securities shall be allocated to each Participant's Other Investments Account in the proportion that each such Participant's Covered Compensation for the Plan Year bears to the total Covered Compensation of all such Participants for that Plan Year. All other net income (or loss) will be allocated to each Participant's Other Investments Account in the ratio in which the balance of the Participant's Other Investments Account on the preceding Anniversary Date bears to the sum of the balances of the Other Investments Accounts of all Participants on that date. For this purpose, Account balances shall be reduced by amounts distributed to Participants during the Plan Year.

The net income (or loss) includes the increases (or decreases) in the fair market value of assets of the Trust, interest, dividends, other income and expenses attributable to assets in the Other Investments Accounts since the preceding Anniversary Date. Net income (or loss) does not include the interest paid under any installment contract for the purchase of Company Stock by the Trust or on any loan obtained by the Trust to purchase Company Stock. Notwithstanding the foregoing, no income (or loss) shall be allocated to a terminated Participant's Account for the Plan Year in which the Participant receives final distribution of the Plan Benefit.

(b)    Allocation Limitations.

(1)    The total Annual Additions to a Participant's Accounts for any Limitation Year shall not exceed the lesser of (i) thirty thousand dollars ($30,000), or (ii) twenty-five percent (25%) of the Participant's Total Compensation for the Limitation Year.

The following is effective for plan years beginning after December 31, 1994 in order to bring the Plan's Code Section 415 provisions into compliance with the requirements of the General Agreement on Tariffs and Trade (GATT):

Effective for Plan Years beginning after December 31, 1994, notwithstanding any other provisions of the Plan, Contributions and other Annual Additions with respect to a Participant exceed the limitation of Code Section 415(c) if, when expressed as an Annual Addition (within the meaning of Code Section 415(c)(2)) to the Participant's Account, such Annual Addition is greater than the lesser of:

(A)    thirty thousand dollars ($30,000) or

33

CIG 010990

(B)    twenty-five percent of the Participant's compensation (as defined in Code Section 415(c)(3).

A Participant's allocable share of Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall not be included as an Annual Addition, provided that no more than one-third (⅓) of the Employer Contribution for that year is allocated to the Accounts of Highly Compensated Employees.

The Annual Additions under Section 11(b) with respect to Employer Securities released from the Suspense Account (by reason of Employer Contributions used for payments on a Securities Acquisition Loan) and allocated to Participants' Company Stock Accounts shall be based upon the lesser of (A) the amount of such Employer Contributions, or (B) the fair market value of such Employer Securities (determined by an Independent Appraiser) as of the Allocation Date. Annual Additions shall not include any allocation attributable to proceeds from the sale of Employer Securities by the Trust or to appreciation (realized or unrealized) in the fair market value of Company Stock.

(2)    If an Employer is contributing to another defined contribution plan, as defined in Section 414(i) of the Code, for Employees of the Company or any Affiliated Company, some or all of whom may be Participants in this Plan, then any such Participant's Annual Additions in such other plan shall be aggregated with the Participant's Annual Additions derived from this Plan for purposes of the limitation in Paragraph (1) of this Subsection.

(3)    If a Participant in this Plan is also a Participant in a defined benefit plan to which Contributions are made by an Employer or Affiliated Company, then in addition to the limitation contained in Paragraph (1) of this Subsection, such Participant's allocations shall be limited, such that the sum of the defined benefit plan fraction and the defined contribution plan fraction for any Limitation Year shall not exceed 1.0. For purposes of this Paragraph (3), the defined benefit plan fraction is a fraction, the numerator of which is the projected annual benefit of the Participant under all such defined Plans determined as of the close of the Limitation Year, and the denominator of which is the lesser of (i) the product of 1.25 multiplied by the dollar limitation in effect for such Plan Year, or (ii) the product of 1.4 multiplied by one hundred percent (100%) of the Participant's average Total Compensation for the Participant's highest

34

CIG 010991

three Limitation Years. For purposes of this Paragraph (3), the defined contribution plan fraction for any Limitation Year is a fraction, the numerator of which is the sum of the Annual Additions to the Participant's Accounts as of the close of the Limitation Year, and the denominator of which is the sum of the lesser of the following amounts determined for such year and for each prior Year of Service with the Employer: (i) the product of 1.25 multiplied by the dollar limitation in effect for such Limitation Year or (ii) the product of 1.4 multiplied by twenty-five percent (25%) of the Participant's Total Compensation.

Effective for all Limitation Years beginning after December 31, 1999, the combined plan limit is repealed, and therefore, this Subsection 11(b)(3) is deleted from the Plan.

(4)    If Company Stock is purchased from a shareholder of the Company and if such shareholder is also a Participant in this Plan, then notwithstanding anything to the contrary contained in this Plan, the total Account balances of such Participant's Accounts other than the Participant's Segregated Investments Account, combined with the total Account balances of the Accounts of such Participant's spouse, parents, grandparents, children, and grandchildren under the Plan, shall not exceed twenty percent (20%) of the total of all Account balances under the Plan. However, if the total Account balances of such Participant's Accounts exceed twenty percent (20%) of the total of all Account balances, then the amounts in excess of said twenty percent (20%) shall be credited to that Participant's Segregated Investments Account and invested in investments other than Company Stock.

(5)    In the case of a sale in which a seller elects nonrecognition of gain under Section 1042 of the Code, no portion of such Qualified Employer Securities may be allocated to the Account of (i) the seller (or the seller's family) during the nonallocation period or (ii) any other person who owns (after application of the family attribution rules) more than twenty-five percent (25%) of any class of outstanding Company Stock, or more than twenty-five percent (25%) of the total value of any class of outstanding Company Stock, at any time during the one-year period preceding the purchase of such Qualified Employer Securities by the Plan, or on any subsequent date when such Qualified Employer Securities are allocated to Participants in the Plan. For purposes of this Paragraph, the seller's family shall include the seller's spouse, ancestors, lineal descendants, and brothers and sisters. Notwithstanding the foregoing, lineal descendants of a seller shall be permitted to share in the allocation of Qualified Employer

35

CIG 010992

Securities, provided that the aggregate amount of such stock allocated for the benefit of all such lineal descendants does not exceed more than five percent (5%) of such stock purchased from the seller. For purposes of this Paragraph (5), a person shall be considered to be a more than twenty-five percent (25%) shareholder if the amount of Company Stock which such person owns (whether outright or as a Plan Participant), together with the amount of Company Stock owned by such person's spouse, children, grandchildren and parents (whether outright or as Plan Participants), exceeds twenty-five percent (25%) of any class of outstanding Company Stock or twenty-five percent (25%) of the total value of any class of outstanding Company Stock. For purposes of this Paragraph (5), the "nonallocation period" means the period beginning on the date of the sale and ending on the later of (i) the date which is ten (10) years after the date of sale, or (ii) the date of the Plan allocation attributable to the final payment of the Securities Acquisition Loan.

(6)    If, due to forfeitures, reasonable error in estimating compensation, or other limited facts and circumstances as determined by the Commissioner, the Account balances or the Annual Additions to a Participant's Accounts would exceed the limitation described in Paragraphs (1), (2) or (3) of this Subsection, the aggregate of the Annual Additions to this Plan and the Annual Additions to any other plan described in Paragraphs (2) or (3) shall be reduced until the applicable limitation is satisfied.

(7)    The reduction shall be treated the same as Forfeitures and shall be allocated in accordance with Section 11(a)(2) of the Plan to the Accounts of Participants who are not affected by this limitation.

(8)    If any amount cannot be reallocated under the foregoing provision, such amount shall be deposited in a suspense account and allocated to the maximum extent possible under Section 11(a)(2) of the Plan in succeeding years, provided that (i) no Employer Contributions are made until Section 415 of the Code will permit their allocation, (ii) no investment gains or losses are allocated to such suspense account, and (iii) the amounts in such suspense account are allocated at the earliest possible date.

(9)    Notwithstanding the preceding provisions of this Section 11, if the allocation provided above for a Plan Year would result in an allocation to Highly Compensated Employees of more than one-third of the Employer contributions which are deductible under

CIG 010993

Code Section 404(a)(9) for the Plan Year, the allocation of amounts to all Highly Compensated Employees shall be reduced in proportion to their respective Covered Compensation for the Plan Year, and the allocation to Participants other than Highly Compensated Employees shall be increased in proportion to their respective Covered Compensation for the Plan Year, by such amount that will result in the final allocation to the Highly Compensated Employees of Employer contributions which are deductible under Code Section 404(a)(9) being equal to one-third of the total allocation of such Employer contributions to all persons eligible to share in the allocations for said Plan Year.

37

CIG 010994

**Section 12.    PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT.**

Participation in the allocation of Employer Contributions and Forfeitures terminates as of the end of the Plan Year coinciding with or following a Participant's death, Disability or Retirement , provided the Participant completes 1,000 or more Hours of Service during such Plan Year. A Participant's Plan Benefit upon death, Disability or Retirement will be the total of the Participant's Account balances as of the coinciding or following Anniversary Date , provided the Participant completes 1,000 or more Hours of Service during such Plan Year.

A Participant who, while employed with the Company, dies or attains any of the following Retirement dates will be one hundred percent (100%) vested.

(a)    Normal Retirement.

A Participant's Normal Retirement Date is the date the Participant attains age sixty-five (65).

(b)    Disability Retirement.

If a Participant terminated employment because of a total and permanent disability, such Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of such Participant's Accounts. "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

(c)    Deferred Retirement.

If a Participant continues in the service of the Employer beyond the Normal Retirement Date, such Participant shall continue to participate in the Plan during any period of employment following the Normal Retirement Date.

Any amount credited to a Participant's Accounts with respect to the Employer's Contribution for the Plan Year in which such Participant dies, becomes Disabled or attains any of the above Retirement dates shall also be completely vested at the time of such contribution.

38

CIG 010995

**Section 13.**     **OTHER TERMINATION OF SERVICE AND VESTING.**

(a)     Vesting Schedule.

The vesting of a Participant's Plan Benefit will be based upon Years of Service, as defined in Section 2, in accordance with the following vesting schedule:

| Years of Service | Percentage of Accounts Vested |
|---|---|
| Less than Three Years | 0 |
| Three Years | 20 |
| Four Years | 40 |
| Five Years | 60 |
| Six Years | 80 |
| Seven or more Years | 100 |

The computation of a Participant's nonforfeitable percentage of the Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. For this purpose, the Plan shall be treated as having been amended if the Plan provides for an automatic change in vesting due to a change in top heavy status. In the event that the Plan is amended to change or modify any vesting schedule, a Participant with at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's non-forfeitable percentage computed under the Plan without regard to such amendment. If a Participant fails to make such election, then such Participant shall be subject to the new vesting sched-ule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

(1)     the adoption date of the amendment,

(2)     the effective date of the amendment, or

(3)     the date the Participant receives written notice of the amendment from the Employer or Committee.

(b)     Vesting Upon Reemployment.

If a Participant is reemployed by the Company following a Break in Service, such Participant's Accounts shall be vested as follows:

(1)     Vesting of Prior Account Balances.

If a Participant has had five consecutive one-year Breaks in Service, Years of Service after such five-year period will not be taken into account for purposes of determining a Participant's vested interest in the Participant's prebreak Account balances and new Accounts

39

CIG 010996

will be established to record the Participant's interest in the Plan for service after such five-year period.

    (2)   <u>Vesting of Subsequent Account Balances.</u>

    (A)   In the case of a Participant who, at the time of a Break in Service, does not have any vested right under Paragraph (a) above, Years of Service before such Break in Service shall not be taken into account unless such Participant returns to work for the Employer and completes one (1) Year of Service. Notwithstanding the foregoing, Years of Service before such Break in Service shall not be taken into account for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances if the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the aggregate number of years of prebreak service, whichever is greater.

    (B)   If a Participant had any degree of vested interest at the time of the Participant's Break in Service, such Participant shall participate retroactively to the Participant's reemployment date for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances. Upon resuming participation, such Participant's Years of Service shall include all Years of Service prior to the Break in Service.

    (c)   <u>Forfeitures.</u>

    Forfeitures shall be first charged against a Participant's Other Investments Account, with any balance charged next against the Participant's Company Stock Account. If a portion of a Participant's Account is to be forfeited and interests in more than one class of Employer Securities have been allocated to a Participant's Account, the Participant shall forfeit the same percentage of each such class. The disposition of such Forfeitures shall be as follows:

    (1)   If a Participant has incurred five consecutive one-year Breaks in Service and has not received a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as soon as possible after the close of the Plan Year in which the Participant incurs a five-year Break in Service.

    (2)   If a Participant who is not one hundred percent (100%) vested receives a distribution of a Plan Benefit, which is not a "cash-out distribution" (as defined below), prior to the occurrence of a five-year Break in Service, and such Participant returns to work for the Employer, the portion of the Participant's Accounts which was not vested shall be maintained

CIG 010997

separately (from any additional contributions to this Plan) until such Participant becomes one hundred percent (100%) vested. Such Participant's vested and nonforfeitable percentage in such separate Accounts upon any subsequent termination of Service shall be equal to:

$$\frac{X - Y}{100\% - Y}$$

For purposes of applying this formula, X is the vested percentage at the time of the subsequent termination, and Y is the vested percentage at the time of the prior termination. Separate Accounts shall share in the allocation of Trust income or loss on every Anniversary Date prior to Forfeiture, but such accounts shall not share in allocation of Trust income or loss on the Anniversary Date on which they are forfeited.

(3)     If a Participant receives a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as of the Anniversary Date coinciding with or following the date such Participant incurred a one-year Break in Service or received the cash-out distribution, whichever is later.

(d)     Cash-Out Distribution.

If a partially vested Participant receives a cash-out distribution, the cash-out distribution will result in a forfeiture of the nonvested portion of the Participant's Accounts. A "cash-out distribution" is a distribution of the entire vested portion of a Participant's Accounts that is made before the Participant incurs five (5) consecutive one-year Breaks in Service.

If any former Participant shall be reemployed by the Employer before five (5) consecutive one-year Breaks in Service, and such former Participant had received a cash-out distribution prior to reemployment, the forfeited portion of such Participant's Accounts shall be reinstated only if the Participant repays the full amount distributed to such Participant. Such repayment must be made by the former Participant before the Participant incurs five (5) consecutive one-year Breaks in Service following the date of distribution and before the five-year anniversary of his reemployment date. In the event the former Participant does repay the full amount distributed to such Participant, the undistributed portion of the Participant's Accounts must be restored in full, unadjusted by any gains or losses occurring subsequent to the Anniversary Date preceding the Participant's termination. Restoration of a Participant's

41

CIG 010998

Accounts shall include restoration of all Code Section 411(d)(6) protected benefits with respect to such restored amounts.

If the Participant repays the amount distributed to such Participant within the required time period, the Committee shall restore the forfeited portion of the Participant's Accounts as of the Anniversary Date coinciding with or following the repayment. Such amount shall be restored, to the extent necessary, in the following manner:

    (A)    first from current-year Forfeitures;

    (B)    second from current-year Trust earnings; and

    (C)    third from current-year Contributions.

To the extent the amounts described in clauses (A), (B) and (C) are insufficient to enable the Committee to make the required restoration, the Employer must contribute the additional amount necessary to enable the Committee to make the required restoration.

A terminated Participant who is zero percent (0%) vested shall be deemed to have received a cash-out distribution as of the day on which the Participant separates from service with the Employer. For purposes of applying the restoration provisions of this Paragraph, the Committee will treat a zero percent (0%) vested Participant as repaying the Participant's cash-out distribution on the first day of reemployment with the Employer.

CIG 010999

**Section 14.**   **DISTRIBUTION OF PLAN BENEFIT.**

(a)   Death, Disability or Retirement.

In the event of death, Disability or Retirement, subject to Subsection 14(e), distribution of a Participant's Plan Benefit shall commence during the following Plan Year and shall be distributed in a lump sum, beginning not later than one (1) year after the close of the Plan Year in which such event occurs.

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

(b)   Other Termination of Participation.

In the event a Participant terminates employment for reasons other than death, Disability or Retirement, subject to Subsection 14(e), the Participant's vested Plan Benefit will be distributed as follows:

(1)   Company Stock Account and Other Investments Account (Exceeding $3,500).

If a Participant is not reemployed before the end of the fifth (5th) Plan Year following the Plan Year in which the Participant terminates employment, distribution of the Participant's Company Stock Account and Other Investments Account will be made in a lump sum as soon as administratively feasible during the sixth (6th) Plan Year following the Plan Year in which the Participant terminates employment.

43

CIG 011000

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

Notwithstanding the foregoing provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities acquired with the proceeds of a Securities Acquisition Loan until the close of the Plan Year in which such Securities Acquisition Loan has been repaid in full.

Notwithstanding the other provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities to the extent that the Participants or Beneficiaries have elected to have their Company Stock Account diversified under the provisions of Section 17(a) hereof.

Notwithstanding anything in this Section 14 to the contrary, in the event a Participant's employment is terminated for reasons other than death, Disability or Retirement, subject to Section 14(e), distribution of the Participant's Plan Benefit shall commence no later than one (1) year after the close of the Plan Year in which the earliest of the following events occurs:

        (A)     the Participant's Normal Retirement Date; or

        (B)     the Participant's death; or

        (C)     the Participant's Disability.

44

CIG 011001

(2)    Company Stock Account and Other Investments Account ($3,500 or Less).

Notwithstanding the foregoing, if the total vested value of a Participant's Company Stock Account and Other Investments Account Accounts is three thousand five hundred dollars ($3,500) or less, distribution shall be made in a lump sum as soon as possible after the close of the Plan Year in which the Participant terminates employment.

(c)    Death Prior to Distribution.

If a Participant dies before distribution of the Participant's Plan Benefit has commenced, such Participant's entire Plan Benefit shall be distributed in accordance with Subsection 15(b) within five (5) years of the date of the Participant's death.

If a Participant dies after the distribution of the Plan Benefit has commenced, the remaining portion of the Plan Benefit shall be distributed (in accordance with Subsection 15(b)) at least as rapidly as under the method being used at the date of the Participant's death.

(d)    Valuation Date.

All Accounts shall be valued as of the appropriate Valuation Date. The Company or the Committee may require other valuations from time to time as necessary. Any valuation of Company Stock contributed to or purchased by the Plan shall be determined by an Independent Appraiser.

(e)    Consent and Notice Requirements.

If a present value of a Participant's Plan Benefit (determined in accordance with Section 411(a)(11)(B) of the Code) has ever exceeded three thousand five hundred dollars ($3,500) (or five thousand dollars ($5,000) for Plan Years beginning on or after August 5, 1997), any distribution prior to the later of age sixty-two (62) or the Participant's Normal Retirement Date may be made only with the written consent of the Participant. The Committee shall provide the Participant with a written notice which explains the provision of Section 411(a)(11), not less than thirty (30) days nor more than ninety (90) days before the distribution date. If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)-11(c) of the Income Tax Regulations is given, provided that:

45

CIG 011002

(1)     the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)     the Participant, after receiving the notice, affirmatively elects a distribution.

Failure of a Participant to consent to an immediate distribution within the applicable time limit may be treated by the Employer as an election by the Participant to defer distribution of the benefits to the later of age sixty-two (62) or the Normal Retirement Date of the Participant.

(f)     Required Commencement of Benefit Distribution.

(1)     Distribution of a Participant's Plan Benefit shall commence not later than sixty (60) days after the Anniversary Date coinciding with or next following the latest of (1) the Participant's Retirement, (2) the tenth (10th) anniversary of the date the Participant became a Participant, or (3) the Participant's separation from service. If the amount of a Participant's Plan Benefit cannot be determined (by the Committee) by the date on which a distribution is to commence, or the Participant cannot be located, distribution of the Participant's Plan Benefit shall commence within sixty (60) days after the date on which the Participant's Plan Benefit can be determined or after the date on which the Committee locates the Participant.

(2)     Pursuant to Section 401(a)(9) of the Code as amended by the Small Business Job Protection Act, distribution of a Participant's Plan Benefits is required to begin by April 1 of the Plan Year following the later of (1) the Plan Year in which the Participant attains age seventy and one-half (70½) or (2) the Plan Year in which the Participant separates from service with the Employer. However, in the case of a five-percent (5%) owner (as defined in Section 416(i)(1)(B)(i) of the Code), distributions are required to begin no later than April 1 of the next calendar year in which the Participant attains age seventy and one-half (70½).

All distributions made under this Subsection 14(f)(2) shall be determined and made in accordance with the Proposed Regulations under Section 401(a)(9), including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the Proposed Regulations.

46

CIG 011003

(g)    Undistributed Accounts.

Any part of a Participant's Company Stock Account and Other Investments Account which is retained in the Trust after the Anniversary Date coinciding with or immediately following the date on which the Participant terminates employment will continue to be treated as a Company Stock Account or as an Other Investments Account, as the case may be. Thus, the Other Investments Account of a terminated Participant will be debited (and the Participant's Company Stock Account will be credited) with such Participant's share of any repurchases of Company Stock from other terminated Participants. However, except in the case of reemployment (as provided for in Section 4), none of the Participant's Accounts will be credited with any further Employer Contributions or Forfeitures.

(h)    Optional Direct Transfer of Eligible Rollover Distributions.

Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, for all distributions made on or after January 1, 1993, a Distributee may elect, at the time and in the manner prescribed by the Plan Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

(i)    Lien on Distribution.

Notwithstanding anything to the contrary herein, if, at the time of distribution, a Participant is indebted to the Trust, or has retained in his or her possession money or property which properly belongs to the Trust, the Trust shall have a lien on such distribution pending the resolution of such ownership rights. The Trustee may exercise such lien either by directing the Company secretary to withhold any stock transfer of title, or by withholding distribution of any stock or the value of any stock or other assets, pending resolution of such ownership rights. Notwithstanding the foregoing, Plan Benefits under this Plan may not be assigned or alienated except to the extent allowable under Code Sections 401(a)(13) and 414(p).

47

CIG 011004

## Section 15.    HOW PLAN BENEFIT WILL BE DISTRIBUTED.

(a)    Form of Distribution.

Subject to a Participant's right to demand distribution of such Participant's Company Stock Account and Other Investments Account entirely in the form of Employer Securities, the Trustee may distribute such Participant's Plan Benefit entirely in cash or entirely in the form of Employer Securities. Distributions made in the form of Employer Securities shall be made in the form of whole shares of Employer Securities with the value of any fractional shares paid in cash.

However, if the Company's charter or bylaws restrict ownership of substantially all outstanding Employer Securities to Employees or to a trust under a qualified plan under Section 401(a) of the Code, or in the case of an Employer who elects to be treated as an S-corporation, as defined in Code Section 1361(a)(1), distribution of Plan Benefits may be made entirely in cash and Participants may not demand distribution of their Plan Benefit in the form of Employer Securities. Notwithstanding the foregoing, Employer Securities may be distributed by the Trustee subject to the requirement that such stock shall be immediately resold to the Employer (or the Trust).

Any shares purchased by the Employer (or the Trust) pursuant to this Subsection shall be purchased at their fair market value. For purposes of this Section, fair market value shall be based upon the appraised fair market value determined as of the Anniversary Date coinciding with or immediately preceding the date such shares are purchased. The appraised fair market value shall be determined by an Independent Appraiser and shall be based on all relevant factors for determining the fair market value of securities. In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction. Such shares shall be purchased by notifying the Participant (or Beneficiary) in writing.

The terms of payment for the purchase of such shares of stock shall be set forth in the written statement delivered to the Participant (or Beneficiary) and may be either in a single payment or in up to five (5) equal annual installments (with interest on the unpaid principal balance at a reasonable rate of interest), as determined by the Plan Committee. Payment for the

CIG 011005

purchase of such shares must commence within thirty (30) days after the Employer (or the Trust) notifies the Participant (or Beneficiary) of its intent to purchase the shares. If payment is made in installments, adequate security and a reasonable rate of interest must be provided.

The Trustee will make distributions from the Trust in accordance with instructions from the Committee.

    (b)    <u>Beneficiaries</u>.

        (1)    <u>Designation</u>.

Distribution will be made to the Participant if living, and if not, to the Participant's Beneficiary. A Participant may designate a Beneficiary upon becoming a Participant and may change such designation at any time by filing a written designation with the Committee. Notwithstanding anything in this Section 15 to the contrary, if a Participant is married, a Participant shall not designate anyone other than the Participant's spouse as primary Beneficiary of the Participant's Plan Benefit unless such spouse consents in writing to such designation, such spouse acknowledges the effect of such election, and such writing is witnessed by a Plan representative or notary public and filed with the Plan Committee.

        (2)    <u>Absence of Valid Designation</u>.

If, upon the death of a Participant, former Participant or Beneficiary, there is no valid designation of a Beneficiary on file with the Company or the benefit is not claimed by any Beneficiary within a reasonable period of time after the death of the Participant, the benefit shall be paid to the Participant's surviving spouse. If the Participant is not married or if the Participant's spouse does not survive the Participant, the benefit shall be paid to the Participant's estate.

    (c)    <u>Location of Participant or Beneficiary Unknown</u>.

If a Participant who is entitled to a distribution cannot be located and the Plan Committee has made reasonable efforts to locate the Participant, the Participant's interest shall be forfeited and treated as a Forfeiture in accordance with Section 13 at the time specified below. The Plan Committee will be deemed to have made reasonable efforts to locate the Participant if the Plan Committee is unable to locate the Participant (or, in the case of a deceased Participant, his or her Beneficiary) after having made two successive certified or similar mailings to the last address on file with the Plan Committee and after the Plan Committee has used the IRS Letter

49

Forwarding Program.  The Participant's Account(s) shall be forfeited as of the last day of the Plan Year in which occurs the close of the 12 calendar month period following the later of the two successive mailings.  If the Participant or Beneficiary makes a written claim for the Account(s) subsequent to the forfeiture, the Employer shall cause the Account(s) to be reinstated, first from current year Forfeitures, if any, and then from an additional Employer Contribution.

CIG 011007

**Section 16.**     <u>RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK</u>.

     (a)     <u>"Put" Option</u>.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, then the "Qualified Holder" (as defined below) of such stock shall be granted, at the time that such shares are distributed to the Qualified Holder, an option to "put" the shares to the Company; provided, however, that all such shares are so put; and provided, further, that the Trust shall have the option to assume the rights and obligations of the Company at the time the "put" option is exercised. The term "Qualified Holder" shall mean the Participant or Beneficiary receiving the distribution of such shares, any other party to whom the shares are transferred by gift or by reason of death, and also any trustee of an individual retirement account (as defined under Code Section 408) to which all or any portion of the distributed shares is transferred pursuant to a tax-free rollover transaction satisfying the requirements of Sections 402 and 408 of the Code. A "put" option shall provide that, for a period of sixty (60) days after such shares are distributed to a Qualified Holder (as defined above) (and, if the "put" is not exercised within such sixty (60) day period, for an additional period of sixty (60) days in the following Plan Year), the Qualified Holder would have the right to have the Company purchase such shares at their fair market value, as defined hereinabove in subsection (a). Such "put" option shall be exercised by notifying the Company in writing.

In the case of a lump sum distribution of Company Stock, the terms of payment for the purchase of such shares of stock shall be as set forth in the "put" and may be paid either in a single payment or in up to five (5) equal annual installments with interest on the unpaid principal balance at a reasonable rate of interest. Payment for the purchase of such shares must commence within thirty (30) days after the "put" is exercised. The period during which the put option is exercisable does not include any time during which the distributee is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable federal or state law. If payment is made in installments, adequate security and a reasonable rate of interest must be provided. In the case of an installment distribution, payment must be made within thirty (30) days after the put option is exercised with respect to any installment distribution of Company Stock.

CIG 011008

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

The requirements of this Subsection 16(a) shall not apply to the distribution of any portion of a Participant's Plan Benefit which has been diversified, distributed or transferred to another plan pursuant to the provisions of Subsection 17(a) hereof.

(b)     Right of First Refusal.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, such shares of Company Stock distributed by the Trustee may, as determined by the Company or the Committee, be subject to a "right of first refusal," until such time as such shares are publicly traded.  Such a "right" shall provide that prior to any subsequent transfer, the shares must first be offered by written offer, to the Trust, and then, if refused by the Trust, to the Company.  In the event that the proposed transfer constitutes a gift or other such transfer at less than fair market value, the price per share shall be determined by an Independent Appraiser (appointed by the Board of Directors) as of the Anniversary Date coinciding with or immediately preceding the date of exercise, except in the case of a transfer to a Disqualified Person.

In the event of a proposed purchase by a prospective bona fide purchaser, the offer to the Trust and the Company shall be at the greater of fair market value, as determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of exercise (except in the case of a purchase by a Disqualified Person), or at the price offered by the prospective bona fide purchaser.  In addition, such offer must equal or exceed the other terms of the offer made by the prospective bona fide purchaser.  In the case of a purchase by or transfer to a Disqualified Person, fair market value shall be determined as of the actual date of the transaction.  Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities.  The Trust may accept the offer at any time during a period not exceeding fourteen (14) days after receipt of such offer.  In the event the Trust does not accept such offer, the Company may accept such offer at any time during said fourteen (14) day period.

52

CIG 011009

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

(c)    Other Options.

Except as otherwise provided in this Section 16, no security acquired with the proceeds of a Securities Acquisition Loan may be subject to a put, call, buy-sell or similar arrangement while held by or when distributed from the Plan.

53

CIG 011010

**Section 17.**   **SPECIAL PROVISIONS.**

   (a)   <u>Diversification of Investments</u>.

   Within ninety (90) days after the close of each Plan Year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than twenty-five percent (25%) of the value of the Participant's Company Stock Account to the extent such value exceeds the amount to which a prior election, if any, applies. In the case of the sixth (6th) year of the Qualified Election Period, the preceding sentence shall be applied by substituting "fifty percent (50%)" for "twenty-five percent (25%)." The Participant's direction shall be completed no later than ninety (90) days after the close of the ninety (90) day election period.

   The Plan Committee shall offer at least three investment options (not inconsistent with regulations prescribed by the Internal Revenue Service) to each Participant who makes an election under this Subsection.

   In lieu of offering such investment options, the Plan Committee may direct that all amounts subject to Participant elections under this Subsection be distributed to Qualified Participants. All such distributions shall be distributed within ninety (90) days after the close of the ninety (90) day election period and shall be made in cash.

   In lieu of receiving a distribution under this Subsection, a Qualified Participant may direct the Plan to transfer the distribution to another qualified plan of the Company which accepts such transfers, provided that such plan permits employee-directed investments and does not invest in Employer Securities to a substantial degree. Such transfer shall be made within ninety (90) days after the close of the ninety (90) day election period.

   (b)   <u>Cash Dividends</u>.

   Cash dividends, if any, on shares of Company Stock allocated to Participants' Accounts may be accumulated in the Trust or may be paid to Participants currently as determined in the sole discretion of the Committee, exercised in a uniform and nondiscriminatory manner. Provided that the Plan is primarily invested in Employer Securities, it is intended that the Company shall be allowed a deduction with respect to any dividends paid on allocated shares of Company Stock of any class held by the Plan on the record date to the extent such dividends are paid in cash directly to the Participants, or their Beneficiaries, or are paid to the Plan and are

54

CIG 011011

distributed from the Plan to the Participants or their Beneficiaries not later than ninety (90) days after the close of the Plan Year in which paid; provided, however, that the Company shall not be required to pay or distribute any dividends with respect to the nonvested portion of the Company Stock Account of a Participant who has terminated employment prior to the date such dividends are paid directly to Participants, or are distributed from the Plan to the Participants.  Provided that the Plan is primarily invested in Employer Securities, it is also intended that the Company shall be allowed a deduction for any dividends used to make payments on a Securities Acquisition Loan the proceeds of which were used to acquire the Employer Securities (whether or not allocated) with respect to which the dividend is paid, provided that in the case of dividends paid on allocated shares, Employer Securities in an amount equal to such dividends are allocated to such Participants for the year in which such dividends would otherwise have been allocated to such Participants.  The Company shall be allowed a deduction for dividends paid only in the taxable year of the Company in which the dividend is either paid to a Participant or Beneficiary or held to make payments on a Securities Acquisition Loan.

Shares of Employer Securities released from the suspense account (as provided in Section 7(b) of the Plan) by reason of the payment of principal and interest on a Securities Acquisition Loan with cash dividends paid to the Trust, shall be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.

CIG 011012

**Section 18.**    <u>ADMINISTRATION.</u>

    (a)    <u>Named Fiduciaries for Administration of Plan and for Investment and Control of Plan Assets.</u>

        (1)    <u>Board of Directors.</u>

The Board of Directors shall have the following duties and responsibilities in connection with the administration of the Plan:

        (A)    Making decisions with respect to amending or terminating the Plan.

        (B)    Making decisions with respect to the selection, retention or removal of the Trustee.

        (C)    Making decisions with respect to the selection of the Plan Committee members.

        (D)    Periodically reviewing the performance of the Trustee, the members of the Committee, persons to whom duties have been allocated or delegated and any advisers appointed pursuant to paragraph (f)(1) below.

        (E)    Determining the form and amount of Employer Contributions.

The Board of Directors may by written resolution allocate its duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Board of Directors deems reasonable and prudent under the circumstances.

        (2)    <u>Plan Committee.</u>

        (A)    <u>General.</u>

The Company shall administer the Plan and is designated as the "Plan Administrator" within the meaning of Section 3(16) of ERISA and Section 414(g) of the Code. The Committee and the Company shall each be a "named fiduciary" within the meaning of Section 402 of ERISA, but each party's role as a named fiduciary shall be limited solely to the exercise of its own authority and discretion, as defined under this Plan, to control and manage the operation and administration of this Plan. A named fiduciary may designate other persons who are not named fiduciaries to carry out its fiduciary duties hereunder, and any such person shall become a fiduciary under the Plan with respect to such delegated responsibilities. The members

56

CIG 011013

of the Committee shall be appointed by the Board of Directors and shall serve, without compensation, until such time as they resign, die or become incapable of exercising their duties. All members of the Committee are designated as agents of the Plan for purposes of service of legal process. The Company shall certify to the Trustee the names and specimen signatures of the members of the Committee. Any member may resign at any time by submitting an appropriate written instrument to the Company, and while any vacancy exists, the remaining members of the Committee may perform any act which the Committee is authorized to perform. Any vacancy on the Committee shall be filled by appointment by the Board of Directors. All decisions required to be made by the Committee involving the interpretation, application and administration of the Plan shall be resolved by action of the Committee either at a meeting or in writing without a meeting.

(B)    Duties and Responsibilities.

The Committee shall have the following duties and responsibilities in connection with the administration of the Plan:

(i)    Establishing and implementing a funding policy as described in Paragraph (c) below.

(ii)    Determining the eligibility of Employees for participation in the Plan.

(iii)    Determining the eligibility of Employees for benefits provided by the Plan including such duties and responsibilities as are necessary and appropriate under the Plan's claims procedures.

(iv)    Making recommendations to the Board of Directors with respect to amendment or termination of the Plan, including recommendations with respect to contributions under the Plan.

(v)    Assuring that bonding requirements imposed by ERISA are satisfied.

(vi)    Authorizing, allocating and reviewing expenses incurred by the Plan.

(vii)    Communicating with Participants and other persons.

57

CIG 011014

(viii)    Reviewing periodically any allocation or delegation of duties and responsibilities and any appointment of advisers.

(ix)    Investing and controlling the Plan assets.

(x)    Directing the Trustee with respect to voting shares of Company Stock, in accordance with the provisions of Section 9.

(xi)    Interpreting and construing the terms of the Plan and Trust Agreement.

The Committee may establish rules and regulations and may take any other necessary or proper action to carry out its duties and responsibilities.  Notwithstanding the foregoing provisions, the Trustee shall have the primary responsibility for the withholding of income taxes from Plan distributions, for the payment of withheld income taxes on Plan distributions to the Internal Revenue Service, and for notification to Participants of their right to elect not to have income tax withheld from Plan distributions.  Compliance with record keeping and reporting requirements of ERISA shall be the primary responsibility of the Company.

The Plan Committee shall have full discretion to construe and interpret the terms and provisions of this Plan, which interpretation or construction shall be final and binding on all parties including, but limited to, the Company and any Participant or Beneficiary, except as otherwise provided by law.  The Plan Committee shall administer such terms and provisions in a uniform and nondiscriminatory manner and in full accordance with any and all laws applicable to the Plan.  When making a determination or calculation, the Plan Committee shall be entitled to rely upon information furnished by the Employer or anyone acting on behalf of the Employer.

(C)    <u>Allocation and Delegation of Responsibilities</u>.

The Committee may, by written resolution, allocate its administrative duties and responsibilities to one or more of its members or it may delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

CIG 011015

(b)    Investment of Plan Assets.

The Plan assets shall be invested and controlled by the Committee; provided, however, that the actual management of Trust investments, other than Company Stock, may be delegated to the Trustee or may be delegated to one or more investment managers appointed by the Committee. Any investment manager appointed hereunder shall have the power to manage, acquire or dispose of assets of the Plan and shall be either an investment adviser registered under the Investment Advisers Act of 1940, or a bank, as defined in that Act, or an insurance company qualified to perform such services under the laws of one or more states. If an investment manager has been appointed, the Trustee shall neither be liable for acts or omissions of such investment manager nor be under any obligation to invest or otherwise manage any asset of the Trust fund, nor shall the Committee be liable for any act or omission of the investment manager in carrying out such responsibility. The custody of Plan assets shall at all times be retained by the Trustee, unless they consist of insurance contracts or policies issued and held by an insurance company authorized to conduct an insurance business in a state. In addition to appointment of investment managers, the Committee shall have the following duties and responsibilities:

(1)    Periodically reviewing the investment of Plan assets and the performance of the Trustee and any investment managers. With respect to the Trustee, the Committee shall advise the Board of Directors of any matters which might be relevant to the decision as to whether the services of the Trustee should be retained. Based on its review, the Committee shall determine the desirability of appointing or retaining investment managers.

(2)    Determining an investment policy to be followed with respect to the Plan assets and communicating this policy to the person or persons responsible for investing the Plan assets.

The Committee may by written resolution, allocate its investment duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

59

CIG 011016

(c)   Funding Policy.

The funding policy of the Plan is to invest trust assets primarily in Company Stock over the life of the Plan. The Committee shall, from time to time, establish such investment methods as may be necessary to accomplish this funding policy.

(d)   Claims Procedures.

Any person whose claim for benefits under the Plan has been denied in whole or in part shall receive a written notice from the Committee setting forth the specific reasons for such denial, specific references to the Plan provisions on which the denial was based and an explanation of the procedure for review of the denial. Such person, or a duly authorized representative, may appeal to the Committee for a review of the denial by sending to the Committee a written request for review within sixty (60) days after receiving notice of the denial. The request for review shall set forth all grounds on which it is based, together with supporting facts and evidence which the claimant deems pertinent, and the Committee shall give the claimant the opportunity to review pertinent documents in preparing the request. The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. Within sixty (60) days after the receipt of the request for review, the Committee shall communicate to the claimant in writing its decision, and if the Committee confirms the denial, in whole or in part, the communication shall set forth the reasons for the decision and specific references to the Plan provisions on which the decision is based. Such decisions of the Committee shall be final and conclusive upon all parties.

(e)   Qualified Domestic Relations Orders.

(1)   In the case of any Domestic Relations Order received by the Plan, the Committee shall promptly notify the Participant and any other Alternate Payee of the receipt of such order and of the Plan's procedures for determining the qualified status of Domestic Relations Orders. Any Alternate Payee shall be permitted to designate a representative for receipt of copies of notices that are sent to the Alternate Payee with respect to such order. The amount that would be payable to the Alternate Payee shall be segregated in a segregated account as of the first day of the Plan Year during which the Domestic Relations Order is received by the Committee. Such segregated account shall continue to be treated in the same manner as the affected Accounts of the Participant, but will not be credited with any further contributions or

60

CIG 011017

forfeitures. Notwithstanding the foregoing, the Trustee may, in its sole discretion, exercised in a uniform and nondiscriminatory manner, choose to physically segregate the Account of the Alternate Payee and invest the assets of such Account, pursuant to Section 7 of the Plan, in assets other than Company Stock. If the order is determined to be a qualified order within the eighteen (18) month period described below, the segregated amount (including any interest or earnings thereon) shall continue to be treated as a segregated account in the name of the Alternate Payee. If the Committee determines that the order is not qualified, or if the Committee (or the appropriate court) is not able to resolve the issue within the eighteen (18) month period, the segregated amount (including any interest or earnings thereon) shall be restored to the Participant. For purposes of this Paragraph, the "eighteen (18) month period" shall mean the eighteen (18) month period beginning with the date on which the first payment would be required to be made under the Domestic Relations Order.

(2)    In determining whether a Domestic Relations Order is qualified, the Committee shall follow the procedures set forth in Section 18(d) with respect to claims for Plan Benefits.

(3)    A Domestic Relations Order will constitute a qualified Domestic Relations Order only if such order (i) does not require the Plan to provide any type or form of benefit (or any option) not otherwise provided under the Plan, (ii) does not require the Plan to provide increased benefits, and (iii) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another order previously determined to be a qualified order. In addition, a Domestic Relations Order will constitute a qualified order only if such order clearly specifies (i) the name and last known mailing address of the Participant and of each Alternate Payee covered by the order, (ii) the amount or the percentage of a Participant's Plan Benefit that is to be paid to each Alternate Payee, or the manner in which such amount or percentage is to be determined, (iii) the number of payments or the period to which such order applies, and (iv) each plan to which such order applies.

(4)    In the case of any payment to an Alternate Payee before a Participant has separated from service, the Plan shall not be required to make any payment to an Alternate Payee prior to the date the Participant attains (or would have attained) the Earliest Retirement Age. For purposes of this Paragraph, the term "Earliest Retirement Age" means the earliest of (i) the date

61

CIG 011018

on which the Participant is entitled to a distribution under the Plan, or (ii) the later of the date the Participant attains age fifty (50) or the earliest date on which the Participant could begin receiving benefit if the Participant separated from service.

    (f)    <u>General</u>.

    (1)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated, may employ other persons for advice in connection with their respective responsibilities, including actuaries, plan consultants, investment advisers, attorneys and accountants.

    (2)    Any person may serve in more than one capacity with respect to the Plan.

    (3)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated shall be indemnified and held harmless by the Company from any expense or liability hereunder unless due to or arising from fraud, dishonesty, gross negligence, or misconduct of the Board of Directors, the Committee, or such person, as the case may be.

    (4)    The Board of Directors, the Plan Administrator and the Committee shall have complete control with respect to the duties and responsibilities allocated to them under the terms of the Plan, with all power and discretion necessary to carry out any of their duties described herein.

The decisions of the Board of Directors, the Plan Administrator and the Committee in matters within their jurisdiction shall be final, binding and conclusive upon each Employer, each Employee, beneficiary and every other interested or concerned person or party.

    (g)    <u>Independent Fiduciary</u>.

An Independent Fiduciary may be appointed from time to time for such purposes as shall be determined by the Board of Directors, Trustee, or Committee. An Independent Fiduciary may be appointed to serve in such capacity as may be deemed appropriate to act on behalf of the Plan and Trust with respect to issues which involve a real or perceived conflict of interest among certain parties, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and Trust. The Independent Fiduciary shall be granted such power, authority and discretion as may be necessary and appro-

CIG 011019

priate for it to carry out its duties and responsibilities, including, but not limited to, any and all powers and discretion granted the Committee and the Trustee under the Plan and Trust.

CIG 011020

**Section 19.    AMENDMENT AND TERMINATION.**

(a)    Amendment.

To provide for contingencies which may require or make advisable the clarification, modification or amendment of this Agreement, the Company reserves the right to amend the Plan at any time and from time to time, in whole or in part, including without limitation, retroactive amendments necessary or advisable to qualify the Plan and Trust under the provisions of Sections 401(a) and 4975(e)(7) of the Code or any successor or similar statute hereafter enacted. Any such amendment to the Plan or Trust must be adopted by resolution of the Company's Board of Directors. However, no such amendment shall (1) cause any part of the assets of the Plan and Trust to revert to or be recoverable by the Company or be used for or diverted to purposes other than the exclusive benefit of Participants, former Participants and Beneficiaries, (2) deprive any Participant, former Participant or Beneficiary of any benefit already vested, except to the extent that such amendment may be necessary to permit the Plan or the Trust to qualify or continue to qualify as tax-exempt, (3) terminate the protections and rights described in Section 16, (4) alter, change or modify the duties, powers or liabilities of the Trustee hereunder without its written consent, or (5) with respect to any benefit previously accrued, eliminate or reduce any early retirement benefit or retirement type subsidy, or eliminate any optional form of benefit, except to the extent permitted by Section 411(d)(6) of the Code.

(b)    Changes in the Code.

Any other provision of this Plan to the contrary notwithstanding, if any amendment to the Code requires that a conforming plan amendment must be adopted effective as of a stated effective date in order for this Plan to continue to be a qualified plan, this Plan shall be operated in accordance with the requirement of such amendment to that law until the date when a conforming plan amendment is adopted, or the date when a clear and unambiguous nonconforming plan amendment is adopted, whichever occurs first.

(c)    Termination, Partial Termination or Complete Discontinuance of Contributions.

Although the Company has established the Plan with the bona fide intention and expectation that it will be able to make contributions indefinitely, nevertheless, the Company shall not be under any obligation or liability to continue its contributions or to maintain the Plan for any given length of time. The Company may in its sole discretion discontinue such contribu-

64

CIG 011021

tions or terminate the Plan in whole or in part in accordance with its provisions at any time without any liability for such discontinuance or termination. In the event of a termination or complete discontinuance of contribution, if the Plan is not replaced by a comparable plan qualified under Section 401(a) of the Code, then the Accounts of all Participants affected by the termination or discontinuance of contributions will become nonforfeitable. In the event of a partial termination, the Accounts of all Participants affected by the partial termination will become nonforfeitable. After termination of the Plan, the Committee and the Trust will continue until the Plan Benefit of each Participant has been distributed. After termination of the Plan, the Trust will be maintained until the Plan Benefits of all Participants have been distributed. Plan Benefits may be distributed following termination of the Plan or distributions may be deferred and distributed as provided in Section 14, as the Company shall determine. If Plan Benefits will be distributed after the Plan is terminated, the distribution may be delayed until IRS approval is received. In the event that Company Stock is sold in connection with the termination of the Plan or the amendment of the Plan to become a qualified employee plan that is not a stock bonus plan, all Plan Benefits will be distributed in cash.

    (d)    <u>Determination by Internal Revenue Service</u>.

    Notwithstanding any other provision of the Plan, if the Internal Revenue Service shall fail or refuse to issue a favorable written determination or ruling with respect to the initial qualification of the Plan and exemption of the Trust from tax under Section 501(a) of the Code, all Employer Contributions under Section 401(a), together with any income received or accrued thereon less any benefits or expenses paid shall, upon the written direction of the Company, be returned to the Company notwithstanding the provisions of the Trust, and the Trust shall then terminate. Any such Contribution returned to the Employer must be returned within one (1) year after the date the initial qualification is denied, but only if the application for the qualification is made by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted.

    (e)    <u>Return of Employer's Contribution</u>.

    Notwithstanding any other provision of the Plan, if a Contribution is conditioned on its deductibility and the deduction is disallowed or if a Contribution is made due to a mistake of fact, such Employer Contribution may be returned to the Employer if such Contribution is

CIG 011022

returned within one (1) year thereafter and if the amount returned does not exceed the excess of the actual Contribution over the amount which would have been contributed had there been no error in determining the deduction or mistake of fact. Earnings of the Plan attributable to the excess Contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

CIG 011023

**Section 20.** **MISCELLANEOUS.**

    (a)    <u>Participation by Affiliated Company.</u>

        (1)    Any Affiliated Company presently existing or hereafter acquired may, with the consent of the Company, adopt the Plan and Trust and thereby enable its employees to participate herein.

        (2)    In the event any Participant is transferred to an Affiliated Company which is a participating Employer, such Participant shall continue to participate hereunder in the allocation of Employer Contributions and the Participant's Accounts shall continue to vest in accordance with Section 13. Any Participant who is transferred to an Affiliated Company which is not a participating Employer shall be treated as a suspended Participant in accordance with Section 4(c).

    (b)    <u>Limitation of Rights: Employment Relationship.</u>

    All Plan Benefits will be paid only from the Trust assets and neither the Company nor any Employer nor the Committee nor the Trustee shall have any duty or liability to furnish the Trust with any funds, securities or other assets except as expressly provided in the Plan. Nothing herein shall be construed to obligate any Employer to continue to employ any Employee.

    (c)    <u>Merger: Transfer of Assets.</u>

    In no event shall this Plan be merged or consolidated with any other employee benefit plan, nor shall there be any transfer of assets or liabilities from this Plan to any other such plan, unless immediately after such merger, consolidation or transfer, each Participant's benefits, determined as if the plan had terminated, are at least equal to or greater than the benefits which the Participant would have been entitled to had this Plan been terminated immediately before such merger, consolidation or transfer.

    (d)    <u>Prohibition Against Assignment.</u>

    The benefits provided by this Plan may not be assigned or alienated; provided, however, that a qualified Domestic Relations Order shall not be construed as an assignment or alienation. Except for indebtedness to the Trust and orders to make payments or assign benefits to a spouse, former spouse, child or other dependent under a qualified Domestic Relations Order, neither the Company nor the Trustee shall recognize any transfer, mortgage, pledge,

67

hypothecation, order or assignment by any Participants or Beneficiaries of all or part of their interest hereunder, and such interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of creditors or other claimants from all orders, decrees, levies, garnishment and/or executions and other legal or equitable process or proceedings against such Participants or Beneficiaries to the fullest extent which may be permitted by law. Notwithstanding anything in Subsection 20(d) to the contrary, Plan Benefits may be reduced to satisfy a Participant's liability to the Plan due to: the Participant's conviction of a crime involving the Plan; a judgement, consent order, or decree in an action for violation of fiduciary standards; or a settlement involving the Department of Labor or the Pension Benefits Guarantee Corporation.

(e)    Applicable Law: Severability.

The Plan hereby created shall be construed, administered and governed in all respects in accordance with ERISA and to the extent not superseded by federal law, in accordance with the laws of the State of California; provided, however, that if any provision is susceptible of more than one interpretation, such interpretation shall be given thereto as is consistent with the Plan being a qualified Employee Stock Ownership Plan within the meaning of the Code. If any provision of this instrument shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective.

68

CIG 011025

**Section 21.**     **TOP HEAVY PROVISIONS**.

    (a)     Definitions.

        For purposes of this Section 21, the following capitalized words shall have the following meanings:

### AGGREGATION GROUP

    (1)     **Required Aggregation Group:** In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

    In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

    (2)     **Permissive Aggregation Group:** The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

    In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

    (3)     Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

    (4)     An Aggregation Group shall include any terminated plan of the Employer if it was maintained within the last five (5) years ending on the Determination Date.

### DETERMINATION DATE

    With respect to any Plan Year, the last day of the preceding Plan Year, or in the case of the first Plan Year of any Plan, the last day of such Plan Year.

69

CIG 011026

**KEY EMPLOYEE**

Any Employee, or former Employee, or Beneficiary of an Employee or former Employee, who at any time during the Plan Year containing the Determination Date or during any of the four (4) preceding Plan Years is (or was) (i) an officer (and employee) having an annual compensation greater than fifty percent (50%) of the amount in effect under Section 415(b)(1)(A) of the Code for any such Plan Year, (ii) a shareholder (and employee) who owns (excluding any stock held under the Plan) both more than one half percent (.5%) ownership interest in value and one of the ten (10) largest interests in the Company (whether directly or through constructive ownership rules) and having annual compensation of more than the limitation in effect under Section 415 (c)(1)(A) of the Code, (iii) a more than five percent (5%) shareholder, or (iv) a more than one percent (1%) shareholder if such shareholder receives more than one hundred fifty thousand dollars ($150,000) of compensation from the Company during the Plan Year. For purposes of (iii) and (iv) above, the terms "five percent (5%) shareholder" and "one percent (1%) shareholder" mean any employee who owns (excluding any stock held under the Plan) more than five percent (5%) (or more than one percent (1%) of the outstanding stock of the corporation, or who owns stock possessing more than five percent (5%) (or one percent (1%) of the total combined voting power of all stock of the corporation (determined without regard to the aggregation rules under Section 414 of the Code). For purposes of (ii) above, if two or more Employees have the same interest in the Company, the Employee having the greater annual compensation from the Company shall be treated as having the larger interest. For purposes of (i) above, the term "officers" means persons whose regular duties include executive administrative duties; however, no more than three (3) Employees or ten percent (10%) of all Employees (up to a maximum of fifty (50) Employees), whichever is greater, may be counted as officers. If the number of officers of the Company exceeds these limitations, those officers with the highest compensation in the Plan Year containing the Determination Date or any of the four preceding Plan Years shall be treated as Key Employees.

**NON-KEY EMPLOYEE**

Any Employee who is not a Key Employee.

**TOP HEAVY GROUP**

Any Aggregation Group, if as of the Determination Date, the sum of (1) the present value of the accrued benefits for Key Employees under all defined benefit plans included in such group and (2) the aggregate Account balances of Key Employees under all defined contribution plans included in such group, exceeds sixty percent (60%) of a similar sum determined for all Employees.

CIG 011027

**TOP HEAVY PLAN**

With respect to any Plan Year, of the Company or of any Affiliated Company, any plan or Aggregation Group of plans of the Company or of any Affiliated Company if, as of the Determination Date, the aggregate Account balances of Key Employees under the plan or plans exceeds sixty percent (60%) of the aggregate Account balances of all Employees under such plan or plans. For purposes of this definition, the term, "Account balances" shall include Account balances of Participants attributable to Employer Contributions, the Account balances attributable to Employees' Nondeductible Contributions, and the amount of the aggregate distributions, if any, made with respect to any Participant during the five-year period ending on the Determination Date, including any distributions under a terminated plan which would have been required to be included in an aggregation group had such plan not been terminated. The Account balances of an individual shall not be taken into account if such individual has not performed any services for the Company at any time during the five-year period ending on the Determination Date. The Account balances of a non-key employee with respect to any Plan Year shall not be taken into account if such individual was formerly a Key Employee for any prior Plan Year. Any rollover contributions or transfers that are unrelated (i.e., both initiated by the Employee and made from a plan maintained by one Employer to a plan maintained by another Employer) shall not be taken into account for purposes of determining whether a plan is a Top Heavy Plan or whether any Aggregation Group is a Top Heavy Group.

(b)    Vesting Requirements.

With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the vesting of Plan Benefits for such Plan Year with respect to any Participant who completes one or more Hours of Service after the Plan becomes a Top Heavy Plan or part of a Top Heavy Group will be based upon Years of Service, as defined in Section 2 in accordance with the following vesting schedule, until such time as the Plan is no longer deemed to be top heavy:

| Years of Service | Percentage of Accounts Vested |
|---|---|
| Two Years | 20 |
| Three Years | 40 |
| Four Years | 60 |
| Five Years | 80 |
| Six Years or More | 100 |

With respect to any Plan Year, if as of the relevant Determination Date, this Plan ceases to be a Top Heavy Plan or part of a Top Heavy Group, the vested percentage of a Participant's Account that was nonforfeitable before the Plan ceased to be top heavy will remain

71

CIG 011028

nonforfeitable, and any Employee who was a Participant during the Top Heavy Plan Year and who had three or more Years of Service (including any Years of Service not yet taken into account under the Plan) will automatically remain under the top heavy vesting schedule.

    (c)   <u>Minimum Benefits.</u>

       With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, Employer Contributions and Forfeitures for such Plan Year for each Participant who is not a Key Employee shall be not less than three percent (3%) of each Participant's Total Compensation until such time as this Plan is no longer deemed to be top heavy. Notwithstanding the foregoing, such percentage for any such Plan Year shall not exceed the highest percentage at which Contributions and Forfeitures are made for such Plan Year for any Key Employee, as determined by dividing the Contribution for such Key Employee by so much of such Key Employee's Total Compensation (including any salary deferrals) for the Plan Year as does not exceed two hundred thousand dollars ($200,000) (or one hundred fifty thousand dollars ($150,000) for Plan Years beginning on or after January 1, 1994). Elective contributions on behalf of Key Employees are taken into account in determining the minimum required contribution under Section 416(c)(2). However, elective contributions on behalf of Employees other than Key Employees may not be treated as Employer contributions for purposes of the minimum contribution or benefit requirement of Section 416 of the Code.

       Amounts paid by the Company under the Federal Insurance Contributions Act or under the Social Security Act may not be taken into account for purposes of providing the required minimum benefits to Participants who are not Key Employees.

       For purposes of this Subsection (c), the term "Participant" shall refer to any Employee who has not separated from service at the end of the Plan Year, including Employees who have failed to complete 1,000 Hours of Service, and any Employees who have been excluded because their compensation is less than a stated amount but who must nevertheless be considered Participants in order to satisfy the coverage requirements of Section 410(b) of the Code.

    (d)   <u>Limitation on Annual Additions.</u>

       With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the dollar limitation in the

CIG 011029

denominator of the defined contribution plan fraction and the defined benefit fraction shall be multiplied by 1.0 rather than by 1.25, for purposes of determining the aggregate limit on Contributions and Forfeitures for a Key Employee for such Plan Year, unless the sum of the Key Employees' benefits under all defined contribution plans does not exceed ninety percent (90%) of the total of all Participants' benefits for such Plan Year, and the Employer provides a minimum contribution of not less than four percent (4%) of each Participant's Total Compensation. The minimum benefit otherwise required under this paragraph shall be reduced to the extent a Participant who is not a Key Employee has received a benefit under any other plan maintained by the Employer and to the extent permitted by Section 416 of the Code and the regulations thereunder dealing with nonduplication of minimum benefits.

With respect to any Plan Year, if, as of the relevant Determination Date, any Employee is covered by both a top heavy defined contribution plan and a top heavy defined benefit plan, the minimum benefit provided for each such Participant who is not a Key Employee under the defined contribution plan shall be not less than five percent (5%) of the Participant's Total Compensation; provided, however, that if the Employer desires to use a factor of 1.25 in computing the denominators of the defined benefit fraction and in the denominator of defined contribution fraction, the defined contribution minimum benefit shall be seven and one half percent (7.5%) of compensation.

Solely for the purpose of determining if the Plan, or any other plan included in a required Aggregation Group of which this Plan is a part, is a Top Heavy Plan, the accrued benefit of an Employee (other than a Key Employee under a defined benefit plan or target benefit plan) shall be determined under (i) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Affiliated Employers, or (ii) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

73

CIG 011030

**Section 22.    EXECUTION.**

To record the adoption of this Plan, the Company has caused its appropriate officers to affix its corporate name and seal hereto this ___16___ day of ___July___, 1999.

K-M INDUSTRIES HOLDING CO., INC.

(SEAL)

By ~~William Moore~~
William E. Moore, President


By ~~Stephen Ferrari~~
Stephen A. Ferrari, Secretary

74

CIG 011031

# EXHIBIT 7

CONFIDENTIAL

REDACTED

CIG 004588

# EXHIBIT 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

---

THOMAS FERNANDEZ, et al.,                )
                                         )
                Plaintiffs,              )
                                         ) Case No.
        vs.                              )
                                         ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al., )
                                         )
                Defendants.              )
                                         )
                                         )
                                         )
                                         )

---

VIDEOTAPED DEPOSITION OF PETER CAZZOLLA
March 19, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79124

PETER CAZZOLLA

1          Q     Did you serve on an advisory committee?

2          A     I believe there was an -- there was an

3     advisory committee but it was not really formal.

4                MR. BORNSTEIN:    I object to form.  It's

5     ambiguous which ESOP we are talking about, which

6     advisory committee.

7                MR. FEINBERG:    There is only one ESOP.

8                MR. BORNSTEIN:    Well, there were two at

9     one time.

10    BY MR. FEINBERG:

11         Q     Let me explore that a little bit more.  Who

12    is currently the trustee of the ESOP?

13         A     That's North Star.

14         Q     And who is the trustee prior to North Star?

15         A     That was Bill Moore.

16         Q     Why did Mr. Moore step down as trustee?

17         A     That was a decision made at KMH and I was

18    not involved in that process.  He took ill and I know

19    that could have been a reason.  Other than that I can't

20    really answer specifically that question because I was

21    not part of that decision making process.

22         Q     So, well, let's clarify.  Mr. Moore stepped

23    down in 2003 as trustee?

24         A     You know, I don't know the exact date.

25    It's whenever North Star was appointed, so it was right

Esquire Deposition Services            505 Sansome Street, 5th Floor        San Francisco, California 9411
Phone (415) 288-4280                        (800) 770-3363                   Fax (415) 288-4286

a82d2e0c-e9a0-488c-a369-a2841daa5031

1    in that time frame.

2              MR. BORNSTEIN:    I would like to object to

3    this line of questioning to the extent that it's outside

4    the topics we volunteered him for.  So he can answer the

5    question, of course, but I object to any inference

6    speaking for the company about these matters.

7    BY MR. FEINBERG:

8         Q    No one has told you why Mr. Moore stepped

9    down as trustee?

10             MS. DILLER:    Calls for hearsay.

11        A    No one -- can you please repeat that

12   question?

13   BY MR. FEINBERG:

14        Q    Has anyone told you why Mr. Moore stepped

15   down as trustee?

16             MS. DILLER:    Same objection.

17        A    Well, I think in terms of his illness and

18   in terms of getting a more independent trustee involved

19   in the ESOP.

20   BY MR. FEINBERG:

21        Q    Why -- who wanted to have a more

22   independent trustee involved in the ESOP?

23        A    At that point I would assume it was the

24   board of directors of Kelly-Moore Paint.

25        Q    Do you have an --

Esquire Deposition Services          505 Sansome Street, 5th Floor          San Francisco, California 9411
Phone (415) 288-4280                   (800) 770-3363                  Fax (415) 288-4286

a82d2e0c-e9a0-488c-a369-a2841daa5031

```
 1        A     KMH.

 2        Q     Do you have an understanding as to why they

 3   wanted to have a more independent trustee involved with

 4   the ESOP?

 5             MS. DILLER:    Calls for speculation.

 6             MS. SMITH:    Join in the objection.

 7   BY MR. FEINBERG:

 8        Q     Do you have an understanding as to why the

 9   board of directors wanted to have a more independent

10   trustee involved?

11        A     Well, to insure there was a third party

12   objective opinion on the management of the ESOP.

13        Q     Was that a concern prior to the time that

14   Mr. Moore -- excuse me.  Was there a concern prior to

15   the time that North Star became trustee?

16             MS. SMITH:    Objection.  Calls for

17   speculation.

18        A     Was it a concern?

19   BY MR. FEINBERG:

20        Q     Yes?

21        A     Yes.

22        Q     Did you ever -- did you have that concern

23   yourself as president and CEO of CIG?

24        A     Yes.

25        Q     Did you ever express that concern to
```

a82d2e0c-e9a0-488c-a369-a2841daa5031

PETER CAZZOLLA

1     anyone?

2          A     Yes.

3          Q     Who did you express it to?

4          A     To Bill.

5          Q     When did you express that concern to Bill?

6          A     Well, I think in the early organization of

7     the ESOP.

8          Q     And we are talking now around 1998 or 1999?

9          A     Yes.

10         Q     Do you recall what you said to Mr. Moore

11    about your concern of having an independent third party

12    involved?

13         A     Just that it would be prudent to have a

14    third party because it's very difficult to be

15    independent and making decisions as an accumulative

16    owner.

17         Q     What did Mr. Moore say in response?

18         A     His response was, I really don't have an

19    issue with that.  He was comfortable with it.  And

20    basically that's what I can recollect.  I mean, I

21    don't -- I can't really recollect any specific wording

22    in terms of him addressing that with us other than

23    that's the way he functions and that's the way he ran

24    our companies.

25         Q     So he said that he was comfortable in

a82d2e0c-e9a0-488c-a369-a2841daa5031

PETER CAZZOLLA

1    serving both as -- he didn't see a conflict in himself

2    being the ESOP trustee?

3              MS. SMITH:   Objection.   Misstates

4    testimony.

5          A    I can't answer for him.   I mean, I guess

6    you would have to ask Bill and, unfortunately, we can't

7    so I can't really speculate.

8    BY MR. FEINBERG:

9          Q    Okay.   Was it your understanding that he

10   didn't view his role as ESOP trustee as presenting a

11   conflict of interest?

12         A    Yeah, I don't think he did.

13         Q    Now, do you recall that Mr. Giffins briefly

14   served as the trustee of the ESOP?

15         A    I do.

16         Q    And that was in between Mr. Moore and North

17   Star?

18         A    Yes, I believe that's right.

19         Q    Do you know why Mr. Giffins was serving

20   shall we say as an interim trustee?

21         A    Yes, again I believe it was because of

22   Bill's health.

23         Q    Did you play any role in selecting North

24   Star as the new trustee?

25         A    No.

Esquire Deposition Services          505 Sansome Street, 5th Floor          San Francisco, California 9411
Phone (415) 288-4280                    (800) 770-3363                         Fax (415) 288-4286

a82d2e0c-e9a0-488c-a369-a2841daa5031

PETER CAZZOLLA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED

a82d2e0c-e9a0-488c-a369-a2841daa5031

Page 44

1   delayed, was it not?

2          A     Yes, it was.

3          Q     Can you give us explanation about why the

4   launch of the CIG portion of the ESOP was delayed?

5          A     I believe it was a tax matter, trying to

6   get a private letter ruling from the IRS.  And initially

7   we wanted to form the ESOP as two separate ESOPs,

8   strictly California Capital and then the K-M Paint ESOP

9   and us being responsible for the CIG ESOP.

10         And what happened was that the IRS ruling

11  came back disallowing the reorganization structure in

12  terms of you cannot reorganize a company for the

13  purpose -- this is my general recollection -- you cannot

14  reform a company for the purpose of setting up an ESOP

15  and that if you set an ESOP up, there is like a three

16  year waiting period before you can separate them.  And

17  that's what I understood.

18         Q     So the end result was that you did not

19  separate CIG and Paint for the ESOP purposes?

20         A     Eventually we did not, and that's why KMH

21  basically was formed as part of that.

22         Q     And that's why it was -- is this why there

23  was a decision made to use tracking stock?

24         A     Yes.

25         Q     Can you give us a brief explanation of your

7c01d809-3125-4f3d-bf98-41d44ecc427c

# EXHIBIT 9

ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this _/8_ day of October, 1999, by and among William E. Moore as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust, formerly known as the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and K-M Industries Holding Co., Inc., a California corporation (hereinafter referred to as the "Company"),

W I T N E S S E T H:

WHEREAS, Trustee is the trustee of the amended and restated K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") originally effective as of January 1, 1998, and amended and restated effective as of July 16, 1999, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding Class I-B shares of the Company; and

1

EXHIBIT
25
Cazzolla   3-19-08

CIG 001870

REDACTED

2

CIG 001871

nation by the Internal Revenue Service, a court of competent jurisdiction or otherwise that the

fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee,

then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee

shares of the Company's Class P-B Stock, or any combination thereof, equal in value to the

difference between the Purchase Price and said fair market value for all such Shares.  In the event

that cash and/or shares of the Company's Class P-B Stock are paid and/or transferred to the

Trustee under this provision, such shares shall be valued at their fair market value as of the date

hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid

by Selling Shareholder on the amount of cash paid.

    3.    <u>Representations and Warranties of Selling Shareholder</u>.  The Selling Shareholder,

to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the

following representations and warranties.

    (a)    On the date hereof, the Shares being sold hereunder will be validly issued

and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever

upon or against such shares; and there will be in existence no limitations or restrictions of any

kind (other than restrictions under a buy/sell agreement among Company shareholders) on the

right of Selling Shareholder to sell such Shares in accordance with the terms hereof.  No options,

warrants, agreements, or similar rights created by the Company for the issue or sale of any stock

or securities of any kind or for the purchase thereof by any person other than pursuant to or as

disclosed by this Agreement will then be in existence.

    (b)    Selling Shareholder is the owner, free and clear of any encumbrances, of

the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

CIG 001872

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)     Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)     Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby. Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year. Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.     Representations and Warranties of Trustee.  Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)     Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

CIG 001873

(b)    Trustee has full power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)    Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.    Representations and Warranties of Company.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)    Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Company.

(c)    None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

CIG 001874

outstanding "employer securities" of the Company. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)     Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.     Obligations of Trustee.  Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.     Indemnification.  Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

CIG 001875

8.    <u>Survival of Representations. Warranties and Agreements</u>.  All statements
contained in any certificate, opinion or other instrument delivered by or on behalf of any party
pursuant hereto or in connection with the transactions and warranties by said party herein shall
survive the execution of this Agreement.  All representations and warranties shall survive the
execution of this Agreement and any investigation at any time made by or on behalf of any party
hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified
promptly in writing of any such claim.

9.    <u>Notices. etc</u>.  All notices, requests, demands and other communications hereunder
shall be in writing and shall be deemed to have been duly given if delivered or mailed by
registered or certified mail to the addresses herein designated or at such other address as may be
designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

303 Olive Hill Lane
Woodside, CA  94062
Attn:  William E. Moore

If to Trustee, at:

K-M Industries Holding Co., Inc. Employee Stock Ownership Plan
and Trust
Attn.: Trustee
987 Commercial Street
San Carlos, CA  94070

If to the Company, at:

K-M Industries Holding Co., Inc.
Attn.: President
987 Commercial Street
San Carlos, CA  94070

7

CIG 001876

10.    Amendments and Entire Agreement.  This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    Law to Govern.  This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    Section and Other Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

CIG 001877

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WILLIAM E. AND DESIREE B. MOORE 1990
REVOCABLE TRUST, AS AMENDED:


_William E Moore_
William E. Moore, Trustee


_Desiree B. Moore_
Desiree B. Moore, Trustee


TRUSTEE OF THE K-M INDUSTRIES
HOLDING CO., INC. EMPLOYEE STOCK
OWNERSHIP TRUST:


_William E Moore_
William E. Moore, Trustee


K-M INDUSTRIES HOLDING CO., INC.


_William E Moore_
William E. Moore, President


9

CIG 001878

# EXHIBIT 10

1  Ronald Lovitt, Bar No. 040921
   J. Thomas Hannan, Bar No. 039140
2  Henry I. Bornstein, Bar No. 75885
   LOVITT & HANNAN, INC.
3  900 Front Street, Suite 300
   San Francisco, California 94111
4  Telephone: (415) 362-8769
   Facsimile: (415) 362-7528
5  *rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com*

6
   Attorneys for Defendants K-M Industries
7  Holding Co. Inc.; K-M Industries Holding Co.
   Inc. ESOP Plan Committee; and CIG ESOP Plan Committee
8

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  THOMAS FERNANDEZ et al.,        )  Case No. C 06-07339 MJJ
                                    )
14            Plaintiffs,           )
                                    )  RESPONSE OF DEFENDANTS K-M
15       vs.                        )  INDUSTRIES HOLDING CO. INC., K-M
                                    )  INDUSTRIES HOLDING CO. INC. ESOP
16  K-M INDUSTRIES HOLDING CO., INC, et al. )  PLAN COMMITTEE, AND CIG ESOP PLAN
                                    )  COMMITTEE TO PLAINTIFFS' FIRST
17            Defendants.           )  REQUESTS FOR ADMISSIONS
                                    )
18                                  )
                                    )
19                                  )
                                    )
20                                  )

21

22  PROPOUNDING PARTY:    Plaintiffs Thomas Fernandez and Lora Smith

23  RESPONDING PARTY:     Defendants K-M Industries Holding Co. Inc.; K-M Industries Holding
                          Co. Inc. ESOP Plan Committee; and CIG ESOP Plan Committee

24  SET NUMBER:           One

25

26

27

28

CASE NO. C 06-07339 MJJ                    -1-              RESPONSE OF KMH DEFENDANTS
                                                     TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1

## PRELIMINARY STATEMENT

2      The Preliminary Statement and General Objections set forth herein apply to all requests for

3  admission to which defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc.

4  ESOP Plan Committee, and CIG ESOP Plan Committee respond herein.

5      The significant time that has passed since the events which form the basis of plaintiffs'

6  complaint has rendered the access of defendants K-M Industries Holding Co. Inc., K-M Industries

7  Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee to pertinent information

8  more difficult.  Given this fact and the fact that discovery is in its early stages, defendants K-M

9  Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

10  ESOP Plan Committee reserve the right to amend or supplement these objections and responses at

11  any time in light of future investigation or analysis, and reserve the right to rely on subsequently-

12  discovered information or information omitted from the objections and responses as a result of

13  mistake, error, or inadvertence.  These responses are not intended to admit or acquiesce in any

14  factual or legal contention, assertion, or characterization contained in the Plaintiffs' requests for

15  admissions.

16

## GENERAL OBJECTIONS

17      1.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

18  Plan Committee, and CIG ESOP Plan Committee object to the requests for admissions to the extent

19  that they are overbroad, unduly burdensome, oppressive, seek information irrelevant to the subject

20  matter of this litigation, and are not reasonably calculated to lead to the production of admissible

21  evidence.

22      2.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

23  Plan Committee, and CIG ESOP Plan Committee object to the requests for admissions to the extent

24  that the definitions and instructions set forth therein purport to impose obligations not required by

25  the Federal Rules of Civil Procedure.

26      3.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

27  Plan Committee, and CIG ESOP Plan Committee object to the definition of "RELEVANT TIME

28

CASE NO. C 06-07339 MJJ                    -2-                    RESPONSE OF KMH DEFENDANTS
                                                          TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1  PERIOD" on the ground that it is overbroad and unduly burdensome.

2      4.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

3  Plan Committee, and CIG ESOP Plan Committee object to every request for admission to the extent

4  it calls for information which comes within the attorney-client privilege, attorney work product

5  protection, or is protected from disclosure by any other recognized privilege or protection.

6  **RESPONSES TO REQUESTS FOR ADMISSIONS**

7  <u>**REQUEST FOR ADMISSION NO. 1:**</u>

8      Admit that the MOORE TRUST was a party in interest, within the meaning of ERISA §

9  3(14), 29 U.S.C. § 1102(14), with respect to the October 1998 transaction in which the MOORE

10  TRUST sold shares of KMH Series P Stock to the KMH PLAN.

11  <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**</u>

12      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

13  Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

14  subject to and without waiving the foregoing General Objections, the defendants K-M Industries

15  Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

16  Committee respond as follows:  Admitted.

17  <u>**REQUEST FOR ADMISSION NO. 2:**</u>

18      Admit that the MOORE TRUST was a party in interest, within the meaning of ERISA §

19  3(14), 29 U.S.C. § 1102(14), with respect to the October 1999 transaction in which the MOORE

20  TRUST sold shares of KMH Series I Stock to the KMH PLAN.

21  <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**</u>

22      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

23  Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

24  subject to and without waiving the foregoing General Objections, defendants K-M Industries

25  Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

26  Committee respond as follows:  Admitted.

27

28

1  **REQUEST FOR ADMISSION NO. 3:**

2    Admit that William E. Moore was a party in interest, within the meaning of ERISA § 3(14),

3  29 U.S.C. § 1102(14), with respect to both the October 1998 transaction in which the MOORE

4  TRUST sold shares of KMH Series P Stock to the KMH PLAN and the October 1999 transaction in

5  which the MOORE TRUST sold shares of KMH Series I Stock to the KMH PLAN.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

7    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

8  Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

9  subject to and without waiving the foregoing General Objections, defendants K-M Industries

10  Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

11  Committee respond as follows:  Admitted.

12  **REQUEST FOR ADMISSION NO. 4:**

13    Admit that William E. Moore was the sole representative acting on behalf of the PLANS in

14  the October 1998 transaction in which the MOORE TRUST sold shares of KMH Series P Stock to

15  the KMH PLAN.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

17    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

18  Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

19  further object on the ground that the phrase "sole representative acting on behalf of the PLANS" is

20  vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

21  objections, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

22  Plan Committee, and CIG ESOP Plan Committee respond as follows:  Defendants K-M Industries

23  Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

24  Committee admit that Mr. Moore, as Trustee of the Kelly Moore Paint Company Stock Ownership

25  Trust, was the only person who executed the documents on behalf of that Trust on the basis of which

26  the Trust purchased shares of Series P, Class B KMH stock from the Moore Trust in October 1998.

27

28

1    **REQUEST FOR ADMISSION NO. 5:**

2         Admit that William E. Moore was the sole representative acting on behalf of the PLANS in

3    the October 1999 transaction in which the MOORE TRUST sold shares of KMH Series I Stock to

4    the KMH PLAN.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

6         Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

7    Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

8    further object on the ground that the phrase "acting on behalf of the PLANS" is vague and

9    ambiguous as used in this context.  Subject to and without waiving the foregoing objections,

10   defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

11   Committee, and CIG ESOP Plan Committee respond as follows:  Defendants K-M Industries

12   Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

13   Committee admit that that Mr. Moore, as Trustee of the Kelly Moore Paint Company Stock

14   Ownership Trust, was the only person who executed the documents on behalf of that Trust on the

15   basis of which the Trust purchased shares of Series I, Class B KMH stock from the Moore Trust in

16   October 1999.

17   **REQUEST FOR ADMISSION NO. 6:**

18        Admit that owners of KMH Series P tracking stock hold equity in KMH, and not in Kelly-

19   Moore Paint.

20   **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

21        Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

22   Committee, and CIG ESOP Plan Committee incorporate the foregoing General objections and

23   further object on the ground that the term "KMH Series P tracking stock" is vague and ambiguous as

24   used in this context.  Subject to and without waiving the foregoing objections, defendants K-M

25   Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

26   ESOP Plan Committee admit that owners of KMB Series P stock hold equity in KMH, and not in

27   Kelly-Moore Paint.

28

1    **REQUEST FOR ADMISSION NO. 7:**

2        Admit that owners of KMH Series I tracking stock hold equity in KMH, and not in CIG.

3    **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

4        Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

5    Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

6    further object on the ground that the term "KMH Series I tracking stock" is vague and ambiguous as

7    used in this context.  Subject to and without waiving the foregoing objections, defendants K-M

8    Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

9    ESOP Plan Committee admit that owners of KMB Series I stock hold equity in KMH, and not in

10    CIG.

11    **REQUEST FOR ADMISSION NO. 8:**

12        Admit that the value of KMH Series P stock and Series I stock are both affected by the

13    performance and financial condition of KMH.

14    **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

15        Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

16    Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

17    further object on the ground that the term "affected by the performance and financial condition" is

18    vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

19    objections, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

20    Plan Committee, and CIG ESOP Plan Committee respond as follows:  Admitted.

21    **REQUEST FOR ADMISSION NO. 9:**

22        Admit that the value of KMH Series P stock and Series I stock are both affected by the

23    performance and financial condition of Kelly-Moore Paint.

24    **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

25        Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

26    Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

27    further objects on the ground that the term "affected by the performance and financial condition" is

28

1    vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

2    objections, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

3    Plan Committee, and CIG ESOP Plan Committee respond as follows: Denied.

4    **REQUEST FOR ADMISSION NO. 10:**

5        Admit that the value of KMH Series P stock and Series I stock are both affected by the

6    performance and financial condition of CIG.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

8        Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

9    Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

10   further object on the ground that the term "affected by the performance and financial condition" is

11   vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

12   objections, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

13   Plan Committee, and CIG ESOP Plan Committee respond as follows:  Denied.

14   **REQUEST FOR ADMISSION NO. 11:**

15       Admit that the KMH Plan holds its assets in a single trust and that the stock it holds is stock

16   of KMH.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

18       Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

19   Committee, and CIG ESOP Plan Committee incorporate herein by reference the foregoing General

20   Objections and further object on the ground that the term "stock of KMH" is vague and ambiguous

21   as used in this context.  Subject to and without waiving the foregoing objections, defendants K-M

22   Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

23   ESOP Plan Committee respond as follows:  Defendants K-M Industries Holding Co. Inc., K-M

24   Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee admit that the

25   KMH Plan holds its assets in a single trust account and further admit that the stock held by the KMH

26   Plan is Series P, Class B KMH stock and Series I, Class B KMH stock.

27

28

1  **REQUEST FOR ADMISSION NO. 12:**

2      Admit that throughout the RELEVANT TIME PERIOD, the KMH PLAN has had more than

3  40 PARTICIPANTS.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

5      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

6  Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections, and

7  subject to and without waiving the foregoing objections, defendants K-M Industries Holding Co.

8  Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee

9  respond as follows: Admitted.

10

11  DATED:  May 11,  2007                    LOVITT & HANNAN, INC.

12

13

14                                    By: _____
                                          Henry I. Bornstein
15                                    Attorneys for Defendants K-M Industries Holding
                                      Co. Inc.; K-M Industries Holding Co. Inc. ESOP
16                                    Plan Committee; and CIG ESOP Plan Committee

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, Laura J. Davies, the undersigned, hereby certify and declare:

1.    I am over the age of 18 years and am not a party to the within cause.

2.    I am employed in the office of a member of the bar of this Court, at whose direction this service was made.

3.    My business address is 900 Front Street, Suite 300, San Francisco, California 94111.

4.    On May 11, 2007, I served a true copy of the attached document(s) titled exactly:

RESPONSE OF DEFENDANTS K-M INDUSTRIES HOLDING CO. INC., K-M INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE, AND CIG ESOP PLAN COMMITTEE TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

on the interested parties in this action as follows:

__X__    **BY MAIL:**  I am readily familiar with my employer's mail collection and processing practices, know that said mail is collected and deposited with the United States Postal Service on the same day it is deposited in the interoffice mail, and know that postage thereon is fully prepaid.  Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope(s) at Lovitt & Hannan, Inc., , 900 Front Street, Suite 300, San Francisco, California 94111, addressed, sealed and charges prepaid as follows:

__X__    **BY FACSIMILE:**  On May 11, 2007 from my employer's facsimile machine telephone number (415) 362-7528, I transmitted a copy of said document(s) to the following addressee(s) at the following number(s), which is the number last given by that person on a document he or she has filed in this action and served on my employer.  The transmission was reported as complete and without error, and a transmission report properly issued by the transmitting machine.

Lisa S. Serebin
Nicole Diller
MORGAN, LEWIS & BOCKIUS LLP
One Market Street, Spear Street Tower
San Francisco, CA 94105
Phone: 415.442.1314
Fax: 415.442.1001

Todd Jackson
LEWIS FEINBERG LEE RENAKER & JACKSON
1330 Broadway, Suite 1800
Oakland, CA 94612
Phone: 510-839-6824
Fax: 510-839-7839

1

2  Robert L. Palmer                         Peter Rukin
   DoHoang T. Duong                         RUKIN HYLAND DORIA & TINDALL,
3  HENNIGAN, BENNETT & DORMAN LLP           LLP
   865 South Figueroa Street, Suite 2900    100 Pine Street, Suite 725
4  Los Angeles, California 90017            San Francisco, CA  94111
   Phone: (213) 694-1200                    Phone: 415-421-1800
5  Fax: (213) 694-1234                      Fax:  415-421-1700

6

7

8       6.     I declare under penalty of perjury that the foregoing is true and correct and that this

9  declaration was executed on May 11, 2007, at San Francisco, California.

10

11

12                              _____

13                                        Laura J. Davies

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 11

1   HENNIGAN, BENNETT & DORMAN LLP
    Robert L. Palmer (SBN 181462)
2   DoHoang T. Duong (SBN 219127)
    865 South Figueroa Street, Suite 2900
3   Los Angeles, California 90017
    Telephone: (213) 694-1200
4   Fax: (213) 694-1234
    Email:  palmer@hbdlawyers.com
5           duongd@hbdlawyers.com
6
    Attorneys for Defendants William E. and Desiree B.
7   Moore Revocable Trust and Trustees of William E.
    and Desiree B. Moore Revocable Trust
8

9

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO AND OAKLAND DIVISION

13

14   THOMAS FERNANDEZ and LORA SMITH,   )   Case No. C 06-07339 MJJ
     individually and on behalf of a class of all other )
15   persons similar situated,          )   RESPONSE OF DEFENDANTS WILLIAM E.
                                         )   AND DESIREE B. MOORE REVOCABLE
16              Plaintiffs,              )   TRUST AND TRUSTEES OF SAME TO
                                         )   PLAINTIFFS' FIRST REQUESTS FOR
17        vs.                            )   ADMISSIONS
                                         )
18   K-M INDUSTRIES HOLDING CO., INC.; K- )
19   M INDUSTRIES HOLDING CO., INC. ESOP )
     PLAN COMMITTEE; WILLIAM E. AND      )
20   DESIREE B. MOORE REVOCABLE TRUST;   )
     TRUSTEES OF THE WILLIAM E. AND      )
21   DESIREE B. MOORE REVOCABLE TRUST;   )
     ADMINISTRATOR OF THE ESTATE OF      )
22   WILLIAM E. MOORE, DECEASED; CIG     )
23   ESOP PLAN COMMITTEE; and NORTH      )
     STAR TRUST COMPANY,                 )
24                                       )
                Defendants.              )
25                                       )
                                         )
26                                       )
                                         )
27   _____)

28

C 06-07339 MJJ          RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST
603333\v1               AND TRUSTEES OF SAME TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1    PROPOUNDING PARTY:    Plaintiffs Thomas Fernandez and Lora Smith

2    RESPONDING PARTY:    Defendants William E. And Desiree B. Moore Revocable Trust,
3    presently known as the William E. Moore Marital Trust, and Desiree B. Moore, Trustee of said Trust

4    SET NUMBER:    One

5

6                    **PRELIMINARY STATEMENT**

7        The Preliminary Statement and General Objections set forth herein apply to all requests for

8 admission that Defendants William E. And Desiree B. Moore Revocable Trust, presently known as

9 the William E. Moore Marital Trust, and Desiree B. Moore, Trustee of said Trust (collectively,

10 "Moore Trust") respond to herein. The Moore Trust's response is made without waiving, or

11 intending to waive, but on the contrary expressly reserving: (1) the right to object, on the grounds of

12 competency, privilege, relevancy, materiality, or any other proper grounds, to the use of such

13 information for any purpose, in whole or in part, in any subsequent proceeding in this action or any

14 other action; (2) the right to object on any and all grounds, at any time, to other requests for

15 admission or other discovery procedures involving or relating to the subject matter of these requests

16 for admission; and (3) the right at any time to revise, correct, add to, or clarify any of the objections

17 or responses propounded herein.

18        The objections and responses herein reflect only the present state of the Moore Trust's

19 investigation regarding the information that Plaintiffs seek. Discovery and other investigation

20 concerning this litigation are continuing and are in their early stages. The Moore Trust therefore

21 reserves the right to amend or supplement these objections and responses at any time in light of

22 future investigation, research, or analysis, and also expressly reserves the right to rely on, at any

23 time, including trial, subsequently-discovered information or information omitted from the

24 objections and responses as a result of mistake, error, or inadvertence. The Moore Trust does not

25 hereby admit, adopt, or acquiesce in any factual or legal contention, assertion, or characterization

26 contained in the Plaintiffs' requests for admission.

27        These requests for admission ask the Moore Trust to admit or deny statements regarding

28 certain transactions alleged in the complaint. The complaint filed in this action asserts claims for

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

C 06-07339 MJJ     RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST
603333\v1       AND TRUSTEES OF SAME TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1   relief based on two transactions, which Plaintiffs alleged occurred in October 1998 and October

2   1999. Complaint ¶¶ 24, 31. The Moore Trust's responses to these requests for admission are based

3   on this understanding of the complaint.

4                                 **GENERAL OBJECTIONS**

5        1.     The Responses herein are true and correct to the best of the Moore Trust's knowledge

6   and information as of this date after diligent inquiry. These Responses are given without prejudice

7   to the Moore Trust's right to produce evidence of any subsequently discovered fact, writing, or

8   interpretation thereof, or to modify or amend the Responses. The Responses are made without

9   prejudice to the Moore Trust's right to introduce at trial evidence which is presently unknown and/or

10   is discovered subsequent to the date of these Responses.

11       2.     The Moore Trust objects to the Requests for Admissions to the extent that they are

12   overbroad, unduly burdensome, oppressive, seek information irrelevant to the subject matter of this

13   litigation, and are not reasonably calculated to lead to the production of admissible evidence.

14       3.     The Moore Trust objects to the Requests for Admissions to the extent that the

15   definitions and instructions set forth therein purport to impose obligations not required by the

16   Federal Rules of Civil Procedure. The Moore Trust's responses to the Requests for Admissions will

17   be completed solely in compliance with the requirements of Federal Rule of Civil Procedure 36.

18       4.     The Moore Trust objects to each and every Request for Admission contained in

19   Plaintiffs' Requests for Admission to the extent it calls for information which comes within the

20   attorney-client privilege, attorney work product protection, or is protected from disclosure by any

21   other recognized privilege or protection, and the Moore Trust and its counsel hereby assert such

22   privileges and immunities.

23       5.     The Moore Trust objects to each and every Request for Admission contained in

24   Plaintiffs' Requests for Admission to the extent that it calls for information or facts not presently

25   known to the Moore Trust.

26       6.     The Moore Trust objects to each and every Request for Admission contained in

27   Plaintiffs' Requests for Admission to the extent that it calls for information not within the Moore

28   Trust's possession, custody, or control.

1    7.    These General Objections are incorporated into each response in all sections set forth

2   below, which responses are made without waiver of any of the General Objections.

3                    **RESPONSES TO REQUESTS FOR ADMISSIONS**

4   <u>**REQUEST FOR ADMISSION NO. 1:**</u>

5    Admit that the MOORE TRUST was a party in interest, within the meaning of ERISA §

6   3(14), 29 U.S.C. § 1102(14), with respect to the October 1998 transaction in which the MOORE

7   TRUST sold shares of KMH Series P Stock to the KMH PLAN.

8   <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**</u>

9    The Moore Trust incorporates herein by reference the foregoing General Objections and

10   further objects on the ground that the request calls for a legal conclusion.  Subject to and without

11   waiving the foregoing objections, the Moore Trust responds as follows: Admitted.

12   <u>**REQUEST FOR ADMISSION NO. 2:**</u>

13    Admit that the MOORE TRUST was a party in interest, within the meaning of ERISA §

14   3(14), 29 U.S.C. § 1102(14), with respect to the October 1999 transaction in which the MOORE

15   TRUST sold shares of KMH Series I Stock to the KMH PLAN.

16   <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**</u>

17    The Moore Trust incorporates herein by reference the foregoing General Objections and

18   further objects on the ground that the request calls for a legal conclusion.  Subject to and without

19   waiving the foregoing objections, the Moore Trust responds as follows:  Admitted.

20   <u>**REQUEST FOR ADMISSION NO. 3:**</u>

21    Admit that William E. Moore was a party in interest, within the meaning of ERISA § 3(14),

22   29 U.S.C. § 1102(14), with respect to both the October 1998 transaction in which the MOORE

23   TRUST sold shares of KMH Series P Stock to the KMH PLAN and the October 1999 transaction in

24   which the MOORE TRUST sold shares of KMH Series I Stock to the KMH PLAN.

25   <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**</u>

26    The Moore Trust incorporates herein by reference the foregoing General Objections and

27   further objects on the ground that the request calls for a legal conclusion.  Subject to and without

28   waiving the foregoing objections, the Moore Trust responds as follows:  Admitted.

1  **REQUEST FOR ADMISSION NO. 4:**

2      Admit that William E. Moore was the sole representative acting on behalf of the PLANS in

3  the October 1998 transaction in which the MOORE TRUST sold shares of KMH Series P Stock to

4  the KMH PLAN.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

6      The Moore Trust incorporates herein by reference the foregoing General Objections and

7  further objects on the ground that the terms "sole representative" and "acting on behalf of the Plans"

8  are vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

9  objections, the Moore Trust responds further as follows:  only Mr. Moore, acting as the Trustee of

10  the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust, executed the documents on

11  behalf of that Trust on the basis of which it purchased shares of KMH Series P-B Stock from the

12  Moore Trust in October 1998.

13  **REQUEST FOR ADMISSION NO. 5:**

14      Admit that William E. Moore was the sole representative acting on behalf of the PLANS in

15  the October 1999 transaction in which the MOORE TRUST sold shares of KMH Series I Stock to

16  the KMH PLAN.

17  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

18      The Moore Trust incorporates herein by reference the foregoing General Objections and

19  further objects on the ground that the terms "sole representative" and "acting on behalf of the Plans"

20  are vague and ambiguous as used in this context.  Subject to and without waiving the foregoing

21  objections, the Moore Trust responds further as follows:  only Mr. Moore, acting as the Trustee of

22  the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust, executed the documents on

23  behalf of that Trust on the basis of which it purchased shares of KMH Series I-B Stock from the

24  Moore Trust in October 1999.

25  **REQUEST FOR ADMISSION NO. 6:**

26      Admit that owners of KMH Series P tracking stock hold equity in KMH, and not in Kelly-

27  Moore Paint.

28

C 06-07339 MJJ          RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST
603333\v1               AND TRUSTEES OF SAME TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

2      The Moore Trust incorporates herein by reference the foregoing General Objections and

3  further objects on the ground that the term "tracking stock" is vague and ambiguous as used in this

4  context. Subject to and without waiving the foregoing objections, the Moore Trust responds as

5  follows: owners of KMH Series P stock hold equity in KMH, and not in Kelly-Moore Paint..

6  **REQUEST FOR ADMISSION NO. 7:**

7      Admit that owners of KMH Series I tracking stock hold equity in KMH, and not in CIG.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

9      The Moore Trust incorporates herein by reference the foregoing General Objections and

10  further objects on the ground that the term "tracking stock" is vague and ambiguous as used in this

11  context. Subject to and without waiving the foregoing objections, the Moore Trust responds as

12  follows: owners of KMH Series I stock hold equity in KMH, and not in CIG.

13  **REQUEST FOR ADMISSION NO. 8:**

14      Admit that the value of KMH Series P stock and Series I stock are both affected by the

15  performance and financial condition of KMH.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

17      The Moore Trust incorporates herein by reference the foregoing General Objections and

18  further objects on the ground that the terms "affected" and "financial condition" is vague and

19  ambiguous as used in this context. Subject to and without waiving the foregoing objections, the

20  Moore Trust responds as follows: Admitted.

21  **REQUEST FOR ADMISSION NO. 9:**

22      Admit that the value of KMH Series P stock and Series I stock are both affected by the

23  performance and financial condition of Kelly-Moore Paint.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

25      The Moore Trust incorporates herein by reference the foregoing General Objections and

26  further objects on the ground that the terms "affected" and "financial condition" is vague and

27  ambiguous as used in this context. Subject to and without waiving the foregoing objections, the

28  Moore Trust responds as follows: Denied.

1  **REQUEST FOR ADMISSION NO. 10:**

2         Admit that the value of KMH Series P stock and Series I stock are both affected by the

3  performance and financial condition of CIG.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

5         The Moore Trust incorporates herein by reference the foregoing General Objections and

6  further objects on the ground that the terms "affected" and "financial condition" is vague and

7  ambiguous as used in this context.  Subject to and without waiving the foregoing objections, the

8  Moore Trust responds as follows:  Denied.

9  **REQUEST FOR ADMISSION NO. 11:**

10        Admit that the KMH Plan holds its assets in a single trust and that the stock it holds is stock

11  of KMH.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

13        The Moore Trust incorporates herein by reference the foregoing General Objections.  Subject

14  to and without waiving the foregoing objections, the Moore Trust responds as follows:  Admitted.

15  **REQUEST FOR ADMISSION NO. 12:**

16        Admit that throughout the RELEVANT TIME PERIOD, the KMH PLAN has had more than

17  40 PARTICIPANTS.

18  **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

19        The Moore Trust incorporates herein by reference the foregoing General Objections.  The

20  Moore Trust does not presently have facts sufficient to categorically confirm or deny this admission.

21  Subject to and without waiving the foregoing objections, the Moore Trust responds as follows: On

22  information and belief, admitted.

23

24

25

26

27

28

1    DATED: May 11, 2007                    HENNIGAN, BENNETT & DORMAN LLP

2

3                                           By: _____

4                                                DoHoang T. Duong
                                            Attorneys for Defendants William E. and Desiree B.
5                                           Moore Revocable Trust and Trustees of William E.
                                            and Desiree B. Moore Revocable Trust
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## PROOF OF SERVICE

I declare as follows:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017.

On **May 11, 2007**, I served the foregoing document described as **RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST AND TRUSTEES OF SAID TRUST TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS** on the interested parties in this action follows:

☐     by transmitting via facsimile the documents listed above to the fax number set forth below on this date. This transmission was reported as complete without error by a transmission report issued by the facsimile machine upon which the said transmission was made immediately following the transmission.

☐     by placing the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below

☐     by placing the document listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a FEDERAL EXPRESS agent for Delivery.

☐     by personally delivering the document listed above to the persons at the address set forth below.

## SEE ATTACHED SERVICE LIST

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **May 11, 2007**, at Los Angeles, California.



_____
Maria Luz Rangel

C 06-07339 MJJ
603333\v1

RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST AND TRUSTEES OF SAME TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

1

**SERVICE LIST**

2

**VIA FACSIMILE & FEDERAL EXPRESS**

Daniel Feinberg

3

Todd F. Jackson

Margaret E. Hasselman

4

Lewis, Feinberg, Renaker & Jackson, P.C.

1330 Broadway, Suite 1800

5

Oakland, California 94612

Telephone: (510) 839-6824

6

Facsimile: (510) 839-7839

7

**VIA FACSIMILE & FEDERAL EXPRESS**

Nicole A. Diller

8

Lisa S. Serebin

Andrew C. Sullivan

9

Morgan, Lewis & Bockius LLP

One Market Street

10

Spear Street Tower

San Francisco, CA 94105

11

Telephone: (415) 442-1000

Facsimile: (415) 442-1001

**VIA FACSIMILE & FEDERAL EXPRESS**

Peter Rukin

Rukin Hyland & Doria LLP

100 Pine Street, Suite 725

San Francisco, California

Telephone: (415) 421-1800

Facsimile: (415) 421-1700

**VIA FACSIMILE & FEDERAL EXPRESS**

Ronald Lovitt

Lovitt & Hannan, Inc.

900 Front Street, Suite 300

San Francisco, CA 94111

Telephone: (415) 362-8769

Facsimile: (415) 362-7528

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

C 06-07339 MJJ
603333\v1

RESPONSE OF DEFENDANTS WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST
AND TRUSTEES OF SAME TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

# EXHIBIT 12

REDACTED

-1-

MT 000543
Confidential

REDACTED

-2-

MT 000544
Confidential

REDACTED

-3-

MT 000545
Confidential

REDACTED

-4-

MT 000546
Confidential

REDACTED

-5-

MT 000547
Confidential

REDACTED

-6-

MT 000548
Confidential

REDACTED

-7-

MT 000549
Confidential

REDACTED

-8-

MT 000550
Confidential

REDACTED

-9-

MT 000551
Confidential

# EXHIBIT 13

## RESIGNATION AS TRUSTEE

By my signature below, I hereby confirm my resignation on April 22, 2003, as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (the "Plan") trust established pursuant to the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust Agreement dated July 1, 1999, effective April 22, 2003, and the assignment and transfer to North Star Trust Company, as successor trustee, of all money, securities and other property constituting the trust assets.

Date: 4/22/03

EXHIBIT
92
Giffins    3-28-08

KMH 006513

# EXHIBIT 14

PLAINTIFF'S
EXHIBIT
KM 41

BRAYTON & ASSOC

JUN 2 1 1990

RECEIVED

005537

1   HOWARD L. CHURCHILL, ESQ.
    KATHLEEN S. FARLEY, ESQ.
2   BURNHILL, MOREHOUSE, BURFORD,
    SCHOFIELD & SCHILLER, INC.
3   1220 Oakland Boulevard, Suite 200
    Post Office Box 5168
4   Walnut Creek, California 94596
    (415) 937-4950
5
    Attorneys for Defendant
6   KELLY-MOORE PAINT COMPANY, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF ALAMEDA

10

11  IN RE COMPLEX                    NO. 607734-9
    ASBESTOS LITIGATION
12  _____/

13  IN RE SHIPYARD AND APPLICATOR    NO. 537868-7
    ASBESTOS CASES (CONSOLIDATED
14  FOR DISCOVERY)                   DEFENDANT KELLY-MOORE'S
                                     ANSWERS TO PLAINTIFFS'
15                                   STANDARD SET OF
                                     INTERROGATORIES
16  _____/

17  PROPOUNDING PARTY:  Plaintiffs

18  RESPONDING PARTY:   Defendant KELLY-MOORE PAINT COMPANY, INC.

19  SET NO.:            ONE

20

21  TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

22       Defendant  KELLY-MOORE  PAINT  COMPANY,  INC. , responds  to

23  Plaintiffs' First Set of Interrogatories to Defendant as follows:

24  ///

25  ///

26  ///

27  ///

28  ///

BURNHILL, MOREHOUSE
BURFORD SCHOFIELD
& SCHILLER

                                    1

## DEFINITIONS

1
2  GEOGRAPHIC LIMITATION.  Unless otherwise specifically set
3  forth, the geographic scope of these interrogatories is NORTHERN
4  CALIFORNIA.

5  TIME LIMITATION.  Unless otherwise specifically set forth,
6  the time frame of these interrogatories is 1930 to the present.

7  "THIS DEFENDANT" (THIS DEFENDANT'S) shall mean the named
8  defendant herein, all of its predecessors in interest, and all of
9  its successors in interest.

10  "YOU" and "YOUR" refer to the defendant who is named above
11  as the responding party.

12  "ASBESTOS-CONTAINING PRODUCT(S)" shall mean any product(s)
13  of THIS DEFENDANT which THIS DEFENDANT knows or believes
14  contain(s) the mineral asbestos.

15  "RAW ASBESTOS FIBER" means asbestos fiber mined or milled,
16  either packaged or in bulk, not compounded with other substances
17  and essentially pure with the exception of naturally occurring
18  trace amounts of other substances.

19  "MARKET" (MARKETing, MARKETed) shall mean the mining,
20  supply, sale, labeling, distribution, importing, processing or
21  manufacture of raw asbestos fiber and/or asbestos-containing
22  products.

23  A request to describe the "NATURE" of ASBESTOS-CONTAINING
24  PRODUCT(S) shall mean to describe the: (a) color, (b) texture,
25  (c) form (i.e., powder, liquid, paste, solid, board, cloth,
26  blanket, wire insulation, etc.), and (d) physical dimensions
27  (length, width, height, volume and weight).

28  ///

BURNHILL MORHOUSE,
BURFORD, SCHOFIELD
& SCHILLER
...

2

KMDD003626

"DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code. A request to "IDENTIFY" a "DOCUMENT" or "WRITING" shall mean a request to state: (a) the author; (b) the addressee; (c) date of origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum, audio tape recording, photograph, etc.); and (e) its present location and name and present address of custodian thereof.

A request to state the "IDENTITY" of a person or individual means to state his or her name, the place of employment, job title, present business or present or last known home address, and present business telephone number.

"NORTHERN CALIFORNIA" shall encompass the following forty-six (46) counties: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo and Yuba.

A "CONTRACT UNIT(S)" shall mean a department, division, subdivision, branch, or group which has been or is now engaged in installation and/or removal of RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S).

"COMPANY" means any profit-making private enterprise, including corporations, partnerships, joint ventures, and sole proprietorships.

///

BURNHILL, MOREHOUSE,
BURFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P O BOX 5160

3

KMDD003627

## GENERAL OBJECTIONS

The following objections are raised as to each and every Interrogatory propounded in this set:

1. Defendant KELLY-MOORE objects on the grounds these Interrogatories are overly broad as to time and scope, are burdensome, and are not reasonably calculated to lead to discovery of admissible evidence.

2. Defendant KELLY-MOORE objects to the extent these Interrogatories may have been previously answered under oath and as such these Interrogatories are burdensome, oppressive, irrelevant and repetitious.

3. To the extent the Interrogatory is not full and complete in and of itself, contains subparts and/or compound, conjunctive, and disjunctive questions, Defendant KELLY-MOORE objects that these Interrogatories violate Code of Civil Procedure Section 2030.

4. Defendant KELLY-MOORE objects to the definitions and instructions on the basis the definitions are overly broad, vague and ambiguous, and burdensome. Furthermore, the definitions contain various matters that are not permissible under law, are unintelligible, and are overly broad, burdensome and oppressive, as well as vague and ambiguous.

5. Defendant KELLY-MOORE also objects to these Interrogatories to the extent they call for information protected by the attorney-client privilege, or the attorney work-product doctrine, or any other applicable privilege.

6. Furthermore, Defendant KELLY-MOORE does not waive any objections it has now or may have in the future concerning the

4

SSR 957

KMDD003628

1   Order of the Court allowing Plaintiffs to serve these

2   Interrogatories in Alameda County. By answering this set of

3   Interrogatories, Defendant KELLY-MOORE does not waive any of its

4   rights or remedies.

5

6                     **ANSWERS TO INTERROGATORIES**

7

8      Defendant KELLY-MOORE PAINT COMPANY, INC. responds to

9   Plaintiffs' Standard Set of Interrogatories as follows:

10

11   **INTERROGATORY NO. 1:**

12      With respect to the individual verifying these answers on

13   your behalf, state the following:

14      a. their name;

15      b. their present business address;

16      c. their present job title;

17      d. their date of first employment with you, and the dates

18   and titles of each job position they have held while they were

19   employed by you.

20     **ANSWER:**

21      Without waiving its general objections, Defendant KELLY-

22   MOORE responds as follows:

23      a. John Bacigalupo; Douglas Wayne Merrill.

24      b. John Bacigalupo: 987 Commercial Street, San Carlos, CA

25   94070; Douglas Merrill: 987 Commercial Street, San Carlos, CA

26   94070.

27      c. John Bacigalupo, Secretary-Treasurer; Douglas Merrill,

28   Vice President of Manufacturing.

BURNHILL MOREHOUSE
GUMORD SCHOFIELD
& SCHALER
A PROFESSIONAL CORPORATION
P C 891 1140

5

KMDD003629

1    d.  John  Bacigalupo: April  1969  to  January  1972  –

2  Accountant; January 1972 to January 1976 – Controller and

3  Assistant  General  Manager; January 1976 to April 1978 –

4  Accounting Manager for West Coast Rocky Mountain Division;  April

5  1978 to March 1980 – Vice President of Accounting; March 1980  to

6  Present – Vice President of Accounting and Secretary-Treasurer.

7    Douglas  Merrill:  July 1968 to October 1968 –  Quality

8  Control  Chemist;  October 1968 to December 1981 –  Research  and

9  Production Manager – Paco Division; December 1981 to March 1983 –

10  Assistant  to Vice President, Manufacturing; March 1983 to  April

11  1989  – Plant Manager; April 1989 to Present – Vice President  of

12  Manufacturing.

13

14  <u>INTERROGATORY NO. 2</u>:

15    State whether YOU are a corporation.  If so, state:

16    a.  YOUR full corporate name;

17    b.  the state of incorporation;

18    c.  the date of incorporation;

19    d.  the address of YOUR principal place of business;

20    e.  if YOU are wholly-owned or if more than five (5) percent

21  of the  ownership interest of YOUR COMPANY is owned  by  another

22  business entity, state that entity's name and principal place  of

23  business.

24    <u>ANSWER</u>:

25    Without  waiving  its general objections,  Defendant  KELLY-

26  MOORE responds as follows:

27    a.  Kelly-Moore Paint Company, Inc.

28    b.  California.

6

1        c.   December 4, 1952;

2        d.   987 Commercial Street, San Carlos, CA 94070.

3        e.   Not Applicable.

4

5    <u>INTERROGATORY NO. 3</u>:

6        Has THIS DEFENDANT ever been identified, known, or done

7    business under any other name? If so, please state such name or

8    names and the time period during which THIS DEFENDANT was so

9    known or identified.

10       <u>ANSWER</u>:

11       Without waiving its general objections, Defendant KELLY-

12   MOORE responds as follows:

13       NO.

14

15   <u>INTERROGATORY NO. 4</u>:

16       State whether YOU have ever been registered or qualified to

17   do business in the State of California. If so, state the date

18   YOU became qualified to conduct business in the State of

19   California.

20       <u>ANSWER</u>:

21       Without waiving its general objections, Defendant KELLY-

22   MOORE responds as follows:

23       Yes: December 4, 1952; however, Defendant KELLY-MOORE PAINT

24   COMPANY, INC. was a general partnership from April 1, 1946 until

25   the date of incorporation.

26

27   ///

28   ///

BURNHILL MORE-DUSE
BURFORD SCHOFIELD
& SCHULER

7

**INTERROGATORY NO. 5:**

Does THIS DEFENDANT currently have, or has THIS DEFENDANT had a department, division, subdivision, branch or group responsible for the design, development, manufacture, testing and use of ASBESTOS-CONTAINING PRODUCT(S). If so, state:

a.  the name of each present or former corporate department, division, subdivision, branch or group;

b.  the IDENTITY of the person most knowledgeable about such department, division, subdivision, branch or group.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a.  Paco Textures Division.

b.  Douglas Wayne Merrill.

**INTERROGATORY NO. 6:**

Has THIS DEFENDANT engaged in the MARKETing of ASBESTOS-CONTAINING PRODUCT(S) comprised in whole or in part of amosite asbestos fiber; if so, please state:

a.  the  trade, brand name and/or generic name of each  type of product;

b.  the  date(s) THIS DEFENDANT first MARKETed each type  of product;

c.  the date(s) THIS DEFENDANT ceased MARKETing each type of product;

d.  a  general  description of the chemical  composition  of each type of product, including:

///

8

BRAYTON, MORGAN
BURFORD, SCHOFIELD
& SCHULTZ
A PROFESSIONAL CORPORATION
P.O. BOX 6169

KMDD003632

1          (i)    the  type(s)  and/or grade(s)  of  RAW  ASBESTOS

2    FIBER contained in each type of product;

3          (ii)   the  quantitative percentage of the  type(s)  of

4    RAW ASBESTOS FIBER in each type of product;

5          (iii)  any change(s) in the quantitative percentages of

6    the type(s) of RAW ASBESTOS FIBER in each type of product;

7       e.  the NATURE of each type of product;

8       f.  a  description of any wording, markings and/or  logo  on

9    each type of product;

10      g.  the    recommended  use(s)  of  each  type of  product,

11   including temperature limits;

12      h.  the  name(s)  of  the manufacturer(s) of  each  type  of

13   product;

14      i.  the  name(s) and address(es) of the supplier(s)  of  the

15   amosite asbestos fiber used in each type of product;

16      j.  the   IDENTITY  of  the  person(s)  most   knowledgeable

17   concerning  the  purchase  of  amosite  asbestos  fiber  by  THIS

18   DEFENDANT.

19      **ANSWER:**

20      Without  waiving  its general objections, Defendant  KELLY-

21   MOORE responds as follows:

22      NO.

23

24   INTERROGATORY NO. 7:

25    Has  THIS  DEFENDANT  engaged in the  MARKETing  of  amosite

26   asbestos fiber; if so, please state:

27    a.  the  name and location of each  amosite  asbestos  mine

28   which  THIS  DEFENDANT  presently operates, has  operated,  ·or  in

BURNHILL MORLHOUSE
BURFORD SCHOFIELD
& SCHILLER

9

KMDD003633

1  which THIS DEFFENDANT has or had an ownership interest, including

2  the dates of such ownership, and the grade of amosite asbestos

3  fiber mined;

4      b.  the date(s)  THIS DEFENDANT first MARKETed  amosite

5  asbestos fiber;

6      c.  the date(s)  THIS DEFENDANT ceased MARKETing amosite

7  asbestos fiber;

8      d.  the grade(s) of such amosite asbestos fiber MARKETed  by

9  THIS DEFENDANT;

10      e.  the recommended use(s) of each grade of  such  amosite

11  asbestos fiber, including any temperature limits;

12      f.  the name(s)  and  address(es)  of  the  supplier(s)  of

13  amosite asbestos fiber to THIS DEFENDANT.

14      ANSWER:

15      Without  waiving  its  general objections,  Defendant KELLY-

16  MOORE responds as follows:

17      NO.

18

19  INTERROGATORY NO. 8:

20    Has  THIS  DEFENDANT engaged in the MARKETing  of  ASBESTOS-

21  CONTAINING  PRODUCTS comprised in whole or in part of  chrysotile

22  asbestos fiber; if so, please state:

23      a.  the  trade, brand name and/or generic name of each  type

24  of product;

25      b.  the  date(s) THIS DEFENDANT first MARKETed each type  of

26  product;

27      c.  the  date(s) THIS DEFENDANT ceased MARKETing each type of

28  product;

BURNHILL MOREHOUSE
BURFORD SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 1798
SANTA ROSA, CA 95406

10

KMDD003634

d.  a general description of the chemical composition of each type of product, including:

(i)  the type(s) and grade(s) of asbestos fiber contained in each type of product;

(ii)  the quantitative percentage of the types of asbestos fiber in each type of product;

(iii)  any change(s) in the quantitative percentages of the type(s) of asbestos fiber in each type of product;

e.  the NATURE of each type of product;

f.  a description of any wording, markings, and/or logo on each type of product;

g.  the recommended use(s) of each type of product, including temperature limits;

h.  the name of the manufacturer of each type of product;

i.  the name(s) and address(es) of the supplier(s) of the chrysotile asbestos fiber used in each type of product;

j.  the IDENTITY of the person(s) most knowledgeable concerning the purchase of chrysotile asbestos fiber by THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. - g.  Please see attached chart.

h.  Kelly-Moore Paint Company, Inc./Paco Textures Corp.

i.  Johns Manville, Carey Canada, and Union Carbide.

j.  Douglas Wayne Merrill, Plant Manager.

///

BURNHILL MORFHOUSE
BUMFORD SCHOFIELD
& MCKIERS

11

KMDD003635

KMDD003636

Interrogatory No. 8

| (a) Product | (b) On Market | (c) Withdrawn | Use of Asbestos Discontinued | (d i) (d ii) Description | Color | (e) Use | Weight |
|---|---|---|---|---|---|---|---|
| Bedding Cement | 12/60 | Not Withdrawn | 1970 | Dry Powder Chrysotile 6.0% | Grayish-white Powder | Embedding tape over interior gypsum board joints between 50°F and 100°F | 25-lb. bag |
| Taping Compound | 1970 | Not Withdrawn | 12/15/77 | Dry Powder Chrysotile 0-8.3% | Grayish-white Powder | Embedding tape over interior gypsum board joints. Between 50°F and 100°F | 25-lb. bag |
| Finishing Compound | 12/60 | 1982 | 12/20/77 | Dry Powder Chrysotile 0-7.5% | Yellow or Gray Powder | To conceal joints and nail holes with interior gypsum board. Between 50°F and 100°F | 25-lb. bag |
| Quik-Set Joint Compound | 1963 | Not Withdrawn | 1/8/78 | Dry Powder Chrysotile 0-6.0% | Off-white Powder | Fast Setting Joint Cement Between 45°F and 90°F | 25-lb. bag |
| All Purpose (Triple Duty) | 12/60 | 1982 | 1/10/78 | Dry Powder Chrysotile 0-8.3% | Grayish-white Powder | For taping, topping and texturing. Between 50°F and 100°F | 25-lb. bag |
| Ready Mix Taping | Unknown | 4/76 | Unknown | Pre-Mix Chrysotile 2.0 to 2.6% | Off-white Paste | Embedding tape over interior gypsum board joints. Between 50°F and 100°F | 50-lb. ctn |
| Ready Mix All Purpose | 12/60 | Not Withdrawn | 1/13/78 | Pre-Mix Chrysotile 0-2.6% | Off-white Paste | For taping, topping and texturing interior. Between 50°F and 100°F | 1 gal. pail 48-lb. ctn 50-lb. ctn 62-lb. pail |

SSR 965

KMDD003637

Interrogatory No. 8 (contd):

| (a) Product | (b) On Market | (c) Withdrawn | Use of Asbestos Discontinued | (d)1 (d)1 Description | Color | (g) Use | Weight |
|---|---|---|---|---|---|---|---|
| Ready Mix Topping | 1963 | Not Withdrawn | 1/14/78 | Pre-Mix Chrysotile 0-2.6% | Off-White or Yellow Paste | To conceal joints and nail holes for interior gypsum board. Between 50°F and 100°F | 50-lb. ctn 67-lb. pail |
| Wall Texture (Beztex A) | 12/60 | Not Withdrawn | 2/11/78 | Dry Powder Chrysotile 0-8.8% | Off-White Powder | Wall texture on interiors. Between 50°F and 100°F | 25-lb. bag 50-lb. bag |
| Texture Paint (not in California) | Unknown | Not Withdrawn | 2/11/78 | Dry Powder Chrysotile 0-6.7% | Off-White Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Splatter Texture (not in Calif.) | Unknown | 1980 | 1/12/78 | Dry Powder Chrysotile 0-6.0% | Off-White Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Sand Finish (not in Calif.) | Unknown | Not Withdrawn | 1/3/78 | Dry Powder Chrysotile 0-7.7% | Off-White Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Ceiling Texture (Beztex D) | 1964 | Not Withdrawn | 3/9/78 | Dry Powder Chrysotile 0-10.6% | Off-white or White powder | Texture for interior ceilings. Between 50°F and 100°F | 31-lb. bag 32-lb. bag 40-lb. bag |
| Product 225 | 1963 | Not Withdrawn | 1968 | Paint Chrysotile 0-4.1% | Paint | Surface Conditioner | 1-gal. pail 5-gal. pail |
| Product 235 | 1972 | Not Withdrawn | 1972 | Paint Chrysotile 0-7.5% | Paint | Tex-Bond | 1-gal. pail 5-gal. pail |
| Product 521 | 1974 | Not Withdrawn | 1978 | Paint Chrysotile 0-1.9% | Paint | Block Filler | 1-gal. pail 5-gal. pail |
| Radiant Heat Fill | 1974 | Unknown | Unknown, but did not contain asbestos by 1978 | Dry Powder Chrysotile | Powder | Radiant Heat Fill | Bag |

INTERROGATORY NO. 9:

Has THIS DEFENDANT engaged in the MARKETing of chrysotile asbestos fiber; if so, please state:

a. the name and location of each chrysotile asbestos mine which THIS DEFENDANT presently operates, has operated, or in which THIS DEFENDANT has or had an ownershp interest, including dates of such ownership, and the grade of chrysotile asbestos fiber mined;

b. the date(s) THIS DEFENDANT first MARKETed chrysotile asbestos fiber;

c. the date(s) THIS DEFENDANT ceased MARKETing chrysotile asbestos fiber;

d. the grade(s) of such chrysotile asbestos fiber MARKETed by THIS DEFENDANT;

e. the recommended use(s) of each grade of such chrysotile asbsetos fiber, including temperature limits;

f. the name(s) and address(es) of the supplier(s) of chrysotile asbestos fiber to THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 10:

Has THIS DEFENDANT engaged in the MARKETing of ASBESTOS-CONTAINING PRODUCTS comprised in whole or in part of crocidolite asbestos fiber; if so, please state:

///

BURNHILL HOMEHOUSE
BURFORD SCHOFIELD
& SCHILLER

12

KMDD003638

a. the trade, brand name and/or generic name of each type of product;

b. the date(s) THIS DEFENDANT first MARKETed each type of product;

c. the date(s) THIS DEFENDANT ceased MARKETing each type of product;

d. a general description of the chemical composition of each type of product, including:

(i) the type(s) and grade(s) of asbestos fiber contained in each type of product;

(ii) the quantitative percentage of the type(s) of fiber in each type of product;

(iii) any change(s) in the quantitative percentages of the type(s) of asbestos fiber in each type of product;

e. the NATURE of each type of product;

f. a description of any wording, markings and/or logo on each type of product;

g. the recommended use(s) of each type of product, including temperature limits;

h. the name of the manufacturer of each type of product;

i. the name(s) and address(es) of the supplier(s) of the crocidolite asbestos fiber used in each type of product;

j. the IDENTITY of the person(s) most knowledgeable concerning the purchase of crocidolite asbestos fiber by THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

13

1    NO.

2

3    <u>INTERROGATORY NO. 11:</u>

4        Has  THIS DEFENDANT engaged in the MARKETing of  crocidolite

5    asbestos fiber; if so, please state:

6        a.  the name and location of each crocidolite asbestos  mine

7    which  THIS DEFENDANT presently operates, has operated,  in  the,

8    and/or  in which THIS DEFENDANT has or had an ownershp  interest,

9    including  dates  of such ownership, and the  grade  of  asbestos

10   fiber mined;

11       b.  the date(s) THIS DEFENDANT first MARKETed  crocidolite

12   asbestos fiber;

13       c.  the date(s) THIS DEFENDANT ceased MARKETing  crocidolite

14   asbestos fiber;

15       d.  the grade(s) of such crocidolite asbestos fiber MARKETed

16   by THIS DEFENDANT;

17       e.  the recommended use(s) of each grade of such crocidolite

18   asbsetos asbestos fiber, including temperature limits;

19       f.  the name(s)  and  address(es) of  the  supplier(s)  of

20   crocidolite asbestos fiber to THIS DEFENDANT.

21       <u>ANSWER:</u>

22       Without  waiving  its general objections, Defendant KELLY-

23   MOORE responds as follows:

24       NO.

25

26   <u>INTERROGATORY NO. 12:</u>

27       Does  or  did THIS DEFENDANT have  a  controlling  ownership

28   interest  in  any COMPANY which MARKETed  ASBESTOS-CONTAINING

                              14

KMDD003640

PRODUCT(S); if so, please state:

    a.  the name of such COMPANY;

    b.  the date of incorporation of such COMPANY;

    c.  the state of incorporation of such COMPANY;

    d.  the date such interest was acquired;

    e.  the date such interest was changed or terminated, if applicable;

    f.  the name and location of each facility of such COMPANY;

    g.  the name of each type of ASBESTOS-CONTAINING PRODUCT(S) manufactured, processed, and/or assembled by such COMPANY.

    ANSWER:

    Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    NO.

INTERROGATORY NO. 13:

    Does or did THIS DEFENDANT have a controlling ownership interest in any COMPANY that MARKETed RAW ASBESTOS FIBER; if so, please state:

    a.  the name of such COMPANY;

    b.  the date of incorporation of such COMPANY;

    c.  the state or country of incorporation of such COMPANY;

    d.  the date such interest was acquired;

    e.  the dates such interest was changed or terminated, if applicable;

    f.  the name and location of each asbestos mine owned of such COMPANY;

///

15

KMDD003641

g. the grade and type of RAW ASBESTOS FIBER mined at each mine.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 14:

Has THIS DEFENDANT warehoused any RAW ASBESTOS FIBER or ASBESTOS-CONTAINING PRODUCT(S) in the State of California; if so, please state:

a. the address of each warehouse facility;

b. the year(s) THIS DEFENDANT utilized each facility;

c. the IDENTITY of the custodian of warehousing records.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

INTERROGATORY NO. 15:

Has THIS DEFENDANT owned or operated facilities anywhere in the United States in which ASBESTOS-CONTAINING PRODUCT(S) have been manufactured, processed and/or assembled; if so, state:

a. the address of each such facility, including city and state.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

16

1.  Kelly-Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

2.  Kelly-Moore Paint Company, Inc., 301 West Hurst Blvd., Hurst, Texas 75053.

3.  Kelly-Moore Paint Company, Inc., 3600 East 45th Avenue, Denver, Colorado 80216.

4.  Kelly-Moore Paint Company, Inc., 11200 Kirkland Way, Kirkland, Washington 98033.

5.  Kelly-Moore Paint Company, Inc., West Kenosha Street, Broken Arrow, Oklahoma 74012.

6.  Kelly-Moore Paint Company, Inc., The Alameda, Houston, Texas.

7.  Kelly-Moore Paint Company, Inc., 1400 Campus Drive, Ontario, California 91764.

INTERROGATORY NO. 16:

If THIS DEFENDANT owned or operated facilities in which ASBESTOS-CONTAINING PRODUCT(S) have been manufactured, processed and/or assembled, please state:

a.  the date said facilities began operation;

b.  the date said facilities ceased operation; and

c.  the name of each type of ASBESTOS-CONTAINING PRODUCT manufactured, processed or assembled at each such facility.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

1.  a.  December 1960.

    b.  March 1978.

17

KMDD003643

        c.  Please see attached chart.

    2.  a.  As far as Defendant is aware, 1970.

        b.  As far as Defendant is aware, 1977.

        c.  Unknown.

    3.  a.  As far as Defendant is aware, 1971.

        b.  As far as Defendant is aware, 1976.

        c.  Drywall products.

    4.  a.  As far as Defendant is aware, 1969.

        b.  As far as Defendant is aware, 1972.

        c.  Drywall products.

    5.  a.  As far as Defendant is aware, 1969.

        b.  As far as Defendant is aware, 1977.

        c.  Drywall products.

    6.  a.  As far as Defendant is aware, 1967.

        b.  As far as Defendant is aware, 1974.

        c.  Drywall products.

    7.  a.  As far as Defendant is aware, 1968.

        b.  Unknown; not operating at present...

        c.  Drywall products.


INTERROGATORY NO. 17:

    Has THIS DEFENDANT purchased or otherwise aquired any rights
to the manufacture of ASBESTOS-CONTAINING PRODUCT(S) from another
COMPANY? If so, state:

    a.  the date of purchase or acquisition of such rights;

    b.  the trade, brand, and/or generic name of such  ASBESTOS-
CONTAINING PRODUCT(S);

///

BURNHILL, MOREHOUSE
BURFORD, SCHOFIELD
& SCHILER
PROFESSIONAL CORPORATION
P.O. BOX 5485

18

c.  the  name  and location of any COMPANY from  which  such

rights were purchased or acquired;

d.  the  IDENTITY  of  the  custodian  of  records  of  such

purchase(s) or acquisition(s).

ANSWER:

Without  waiving  its  general  objections,  Defendant  KELLY-

MOORE responds as follows:

NO.

INTERROGATORY NO. 18:

Has THIS DEFENDANT applied for and/or received any patent(s)

for  any ASBESTOS-CONTAINING PRODUCT(S).  If so, state  for  each

such ASBESTOS-CONTAINING PRODUCT:

a.  the  product  for which each patent was  applied  and/or

issued;

b.  the date(s) of application;

c.  the date(s) of issuance of the patent(s), if granted;

d.  the date(s) of renewal, if any;

e.  the patent number(s);

f.  the  size and color, which appeared on the packaging or co

which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER.

ANSWER:

Without  waiving  its  general  objections,  Defendant  KELLY-

MOORE responds as follows:

Not Applicable.

///

///

BURNHILL MOREHOUSE
BURFORD SCHIRILLO
& SCHILLER

19

KMDD003645

**INTERROGATORY NO. 19:**

Has THIS DEFENDANT registered any trademark(s) for any ASBESTOS-CONTAINING PRODUCT(S); if so, state for each such ASBESTOS-CONTAINING PRODUCT:

a. the product for which each trademark was registered;

b. whether the registration was State or Federal;

   (i) if State, name the State;

c. the date(s) or registration;

d. the term(s) thereof;

e. the date(s) of renewal;

f. the name of the individual or COMPANY to whom each trademark was registered;

g. the IDENTITY of the custodian of such trademark records of THIS DEFENDANT.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. Trademark registered for Kelly-Moore's asbestos-containing products is under the name Paco. Each of the specific products are listed in Chart attached to Answer to Interrogatory No. 16.

b. Federal.

c. July 23, 1963.

d. Paco Textures Corporation owns U.S. Reg. No. 753,175 that was granted on July 23, 1963 for Paco. Paco Textures Corporation, assigns and transfer to Kelly-Moore Paint Company all rights, title and interest in Reg. No. 753,175.

///

20

SSR 975

KMDD003646

1      e.  Every 20 years the trademark is renewed;  last  renewal
2  was July 23, 1983.

3      f.  KELLY-MOORE PAINT COMPANY, INC.

4      g.  John Bacigalupo.

5

6  INTERROGATORY NO. 20:

7      Did  THIS  DEFENDANT  contract  with  the  General  Services
8  Administration  and/or  other  federal-government  agency  for  the
9  sale,  anywhere  in  the  United States,  or  RAW  ASBESTOS  FIBER
10  between 1930 and 1980; if so, state for each such sale:

11      a.  the grade(s) and type(s) of RAW ASBESTOS FIBER;

12      b.  the quantity;

13      c.  the date(s) of delivery;

14      d.  the location(s), including the address(es) of delivery;

15      e.  the  name(s)  of  the  agency  with  which  THIS  DEFENDANT
16  contracted;

17      f.  the date(s) of execution of such contract(s);

18      g.  the  IDENTITY  of  the  custodian  of  such  contract  records
19  of THIS DEFENDANT.

20      ANSWER:

21      Without  waiving  its  general  objections,  Defendant  KELLY-
22  MOORE responds as follows:

23      NO.

24

25  INTERROGATORY NO. 21:

26      Did  THIS  DEFENDANT  contract  with  the  General  Services
27  Administration  and/or  other  federal-government  agency  for  the
28  sale,  anywhere  in  the  United  States,  of  ASBESTOS-CONTAINING

BURNHILL, WOREHOUSE,
BURFORD SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P O BOX 1160
WALNUT CREEK CA 94596
415 933 4900

21

PRODUCT(S) between 1930 and 1980, please state for each such sale:

    a. the type of product;

    b. the quantity;

    c. the date(s) of delivery;

    d. the location(s), including the address(es) of delivery;

    e. the name(s) of the agency with which THIS DEFENDANT contracted;

    f. the date(s) of execution of such contract(s);

    g. the IDENTITY of the custodian of such contract records of THIS DEFENDANT.

    ANSWER:

    Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    NO.

INTERROGATORY NO. 22:

    Does THIS DEFENDANT have any records of the MARKETing, advertisement, or delivery of its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S) in or to NORTHERN CALIFORNIA? If so, state:

    a. the manner in which the records are kept, (e.g., in boxes, files, on microfilm, microfiche or computer tape or disk);

    b. the location(s) and address(es) where such records are maintained;

    c. the IDENTITY of the custodian of such records.

///

///

22

KMDD003648

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. In boxes and in files in storage room.

b. 987 Commercial Street, San Carlos, California.

c. Douglas Wayne Merrill.


**INTERROGATORY NO. 23:**

If THIS DEFENDANT has in its possession any records of the MARKETing, advertisement, or delivery of its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCTS (including microfilm, microfiche, computer tape or disk, or any other system in which data is taken from other records), state whether THIS DEFENDANT has retained the original DOCUMENTS from which the data entered into these modes of storage was obtained. If THIS DEFENDANT has not retained such original DOCUMENTS, state:

a. the date(s) when and location(s) where the original DOCUMENTS were disposed of;

b. the IDENTITY of the custodian of the original DOCUMENTS at the time of their disposal.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

///
///
///

BURNHAM, WOREHOUSI,
BURFORD SCHOFIELD
& SCHILER
- PROFESSIONAL CORPORATION
P O BOX 9130
WALNUT CREEK Ca 94596
415 937 6910

23

KMDD003649

**INTERROGATORY NO. 24:**

Does THIS DEFENDANT have in its possession any exemplar(s) of advertisements or brochures describing its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCTS; if so, please state:

    a.  the location of each exemplar;

    b.  the year(s) in which said exemplar(s) was utilized;

    c.  the IDENTITY of the custodian of such exemplars.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  1015 Commercial Street, San Carlos, California.

    b.  Unknown; sometime between 1961 and 1977.

    c.  Douglas Wayne Merrill.

**INTERROGATORY NO. 25:**

State the following:

    a.  the address(es) where the corporate records of THIS DEFENDANT (including minutes from the Board of Directors meetings and corporation annual reports), are currently located;

    b.  the IDENTITY of the custodian of such records.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  987 Commercial Street, San Carlos, California.

    b.  John Bacigalupo.

///
///

BURNHILL, MOREHOUSE
BURFORD SCHOFIELD
& SCHILLER
...

24

KMDD003650

INTERROGATORY NO. 26:

Describe the packaging or containers in which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER, including composition, dimension, shape and color.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

INTERROGATORY NO. 27:

Describe any logo, design, marking or printing, including size and color, which appeared on the packaging or containers in which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

INTERROGATORY NO. 28:

Describe the packaging or containers in which THIS DEFENDANT sold and/or distributed ASBESTOS-CONTAINING PRODUCT(S), including composition, dimension, shape and color.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Please see attached chart.

///

25

KMDD003651

1    INTERROGATORY NO. 29:

2        Describe any logo, design, marking or printing, including

3    size and color, which appeared on the packaging or containers  in

4    which THIS DEFENDANT sold and/or distributed  ASBESTOS-CONTAINING

5    PRODUCT(S).

6        ANSWER:

7        Without  waiving  its general objections,  Defendant  KELLY-

8    MOORE responds as follows:

9        A picture or sample of most asbestos-containing products has

10   been   retained at Kelly-Moore Paint Company,  Inc. at   987

11   Commercial  Street, San Carlos, California.  They  are  available

12   for review.  The markings differed for each product.

13

14   INTERROGATORY NO. 30:

15       Does  THIS  DEFENDANT have any exemplar(s) of  packaging  or

16   containers  in  which  its RAW ASBESTOS  FIBER  and/or  ASBESTOS-

17   CONTAINING PRODUCT(S) were sold and/or distributed; if so, state:

18       a.  the location of each exemplar;

19       b.  the year(s) in which said exemplar(s) was utilized;

20       c.  the IDENTITY of the custodian of such exemplars.

21       ANSWER:

22       Without  waiving  its general objections,  Defendant  KELLY-

23   MOORE responds as follows:

24       a.  987 Commercial Street, San Carlos, California.

25       b.  Unknown; sometime between 1961 and 1977;  differed  for

26   each product.

27       c.  Douglas Wayne Merrill.

28

26

SSR 981                                    KMDD003652

**INTERROGATORY NO. 31:**

Did THIS DEFENDANT put warnings of asbestos-related health hazards on bags of RAW ASBESTOS FIBER; if so, please state:

a. the wording of such warning(s), including size, location, and color;

b. whether the warning was put on a tag attached to the bags;

c. the date such warning(s) was first used;

d. whether any change was made in the wording of such warnings, the date(s) of such change, and the reasons for such change.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.


**INTERROGATORY NO. 32:**

Did THIS DEFENDANT put warnings of asbestos-related health hazards on the packaging or containers of ASBESTOS-CONTAINING PRODUCT(S)? If so, please state:

a. the working of such warnings, including size, location on the packaging or containers, and color;

b. the date such warning(s) was first used;

c. whether any change was made in the wording of such warning(s), the date(s) of such change, and the reason(s) for such change.

///

BURNHILL, MOREHOUSE,
BURFORD SCHOFIELD
& SCHILER
PROFESSIONAL CORPORATION
P O BOX 5166
WALNUT CREEK CA 94596
(510) 935-4951

27

KMDD003653

1    **ANSWER:**

2       Without waiving its general objections, Defendant KELLY-

3    MOORE responds as follows:

4       a.  Warnings were printed to read:

5                CAUTION - READ BEFORE USING

6                CONTAINS ASBESTOS FIBERS

              AVOID BREATHING DUST

7       BREATHING ASBESTOS DUST MAY CAUSE BODILY HARM

8       Warning size:  1-1/2" x 3-1/2" or larger.

9       b.  November 1972.

10

11   **INTERROGATORY NO. 33:**

12      Has THIS DEFENDANT distributed any brochures or pamphlets

13   that contain warnings of any asbestos-related health hazards; if

14   so, please state:

15      a.  the wording of such warning;

16      b.  the method used to distribute such brochures or

17   pamphlets;

18      c.  the date(s) such brochures or pamphlets were first

19   issued;

20      d.  whether THIS DEFENDANT has exemplar(s) of such brochures

21   or pamphlets;

22      e.  the IDENTITY of the custodian of such exemplar(s).

23   **ANSWER:**

24      Without waiving its general objections, Defendant KELLY-

25   MOORE responds as follows:

26      Please refer to Interrogatory No. 32.

27

28   ///

BURNHILL, MOREHOUSE,
BURFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P O BOX 9460
WALNUT CREEK CA 94596
(415) 937-4000

28

KMDD003654

<u>INTERROGATORY NO. 34</u>:

Did THIS DEFENDANT warn its employees and/or CONTRACT UNIT(S), anywhere in the United States, that exposure to asbestos could be hazardous to human health. If so, state:

a. whether copies of DOCUMENTS containing such warnings exist;

b. the IDENTITY of the custodian of such DOCUMENTS.

<u>ANSWER</u>:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. Yes.

b. Douglas Wayne Merrill, 1015 Commercial Street, San Carlos, California.


<u>INTERROGATORY NO. 35</u>:

State the IDENTITY of medical directors and/or industrial hygienists retained by THIS DEFENDANT in the United States.

<u>ANSWER</u>:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.


<u>INTERROGATORY NO. 36</u>:

Has any employee of THIS DEFENDANT testified by deposition on behalf of THIS DEFENDANT in a third-party case, brought in the United States, wherein the plaintiff has alleged an asbestos-related injury? If so, for each such third party case, please state:

BURNHILL MOREHOUSE
BURFORD SCHOFIELD
& SCHILER
A PROFESSIONAL CORPORATION
P O BOX 9166
WALNUT CREEK CA 94598
(415) 935-5400

29

KMDD003655

a.  the caption and case number;

b.  the court of filing including state and county;

c.  the date of the deposition;

d.  the name and address of plaintiff's counsel of record.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

1.  a.  Pete A. Fairl v. Western MacArthur Company, et al.,
        Action No. 296985.

    b.  State of California, County of Sacramento.

    c.  October 8, 1984.

    d.  George W. Kilbourne, Attorney at Law, 3755 Alhambra
        Avenue, Martinez, California 94553.

2.  a.  In Re: Clapper & Brayton Shipyard & Applicator
        Asbestos Cases Consolidated for Discovery, Action
        Nos. Misc. 959 (Sol) & 804416 (SF); James H.
        Williams v. Abex Corp., et al., Action No. 584329-1
        (Ala); Southwall Price v. Abex Corp., et al.,
        Action No. 584328-2 (Ala); Robert Dixon v. Abex
        Corp., et al., Action No. 584327-3 (Ala); Tommy
        Dixon v. Abex Corp., et al., Action No. 585105
        (Alameda); and Katherine & Joseph Maksim v. Johns-
        Manville, et al., Action No. 768674 (SF).

    b.  State of California, Counties of Solano, San
        Francisco and Alameda.

    c.  November 1, 1984.

    d.  Alan R. Brayton, 999 Grant Avenue, Novato, CA
        94948.

30

**INTERROGATORY NO. 37:**

Has THIS DEFENDANT been a member of the following:

a. Asbestos Textile Institute (ATI);

b. Industrial Hygiene Foundation and/or Industrial Health Foundation (IHF);

c. Mineral Wool Institute;

d. Industrial Mineral Insulation Manufacturers Institute;

e. Magnesia Silica Insulation Manufacturers Association;

f. National Insulation Manufacturers Association (NIMA);

g. Thermal Insulation Manufacturers Association (TIMA);

h. Asbestos Information Association (AIA);

i. Quebec Asbestos Mining Association (QAMA);

j. National Safety Council;

k. Asbestos Cement Producers Association;

l. Refractories Institute;

m. any other organizations or associations of manufacturers, miners, distributors, importers, labellers, suppliers and/or sellers of ASBESTOS-CONTAINING PRODUCTS;

(i) please state the name(s) of such organizations or associations.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. - m.  No.

(i)  Not Applicable.

///

31

**INTERROGATORY NO. 38:**

For each organization, association or other entity identified in your Response to Interrogatory No. 37, please state:

a. the dates during which THIS DEFENDANT was a member;

b. the name(s) of any publication(s) received by THIS DEFENDANT from such association or organization;

c. the name of such committee or subcommittee of which THIS DEFENDANT was a member, and the dates of such committee or subcommittee membership.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

**INTERROGATORY NO. 39:**

Has THIS DEFENDANT received any DOCUMENT(S) containing results or conclusions of any studies and/or tests conducted by the Saranac Laboratory at the Trudeau Foundation relating to the human health consequences of exposure to asbestos? If so, please:

a. IDENTIFY all such DOCUMENT(S);

b. state the date upon which THIS DEFENDANT first received such DOCUMENT(S);

c. the IDENTITY of the custodian of such DOCUMENT(S).

///
///
///

BURNHILL, MORR=OUSE
BUMFORD, SCHOFIELD
& SC-ILLER
a PROFESSIONAL CORPORATION
P C BOF 5166
WALNUT CREEK CA 94596
415 944 4433

32

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 40:**

State whether THIS DEFENDANT has ever maintained a library (or libraries) in the United States which contains books, articles, periodicals, journals and/or reference materials that relate to the subjects of asbestos, industrial hygiene, medicine, safety, occupational disease and/or engineering. If so, state:

a. the date each such library was established;

b. the location of each such library;

c. the IDENTITY of each librarian or other person in charge of such library.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 41:**

Has THIS DEFENDANT exchanged documents containing the results of or communicated with any individual or other COMPANY regarding tests and/or studies of the relationship between the inhalation of asbestos fibers and development of disease(s); if so, please state:

a. each individual or COMPANY with whom the information was exchanged or to whom it was communicated;

·33

b. the date(s) of any such exchanges or communications;

c. the IDENTITY of the custodian of such documents.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Unknown.

INTERROGATORY NO. 42:

Has any employee of THIS DEFENDANT testified before the Occupational Safety and Health Administration, the National Institute of Occupational Safety and Health, or any committee or subcommittee of the United States Congress on the inhalation of asbestos dust and the development of disease; if so, please state:

a. the entity before whom such testimony was given;

b. the date(s) and location(s) of such testimony;

c. the IDENTITY of the individual(s) who so testified;

d. whether any DOCUMENTS were presented to the entity before which testimony was given;

e. whether copies of DOCUMENTS presented were retained by THIS DEFENDANT;

(i) if so, state the IDENTITY of the custodian of the DOCUMENT(S).

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

34

SSR 989

KMDD003660

**INTERROGATORY NO. 43:**

At any of the physical facilities identified in the response to Interrogatory No. 15, has THIS DEFENDANT conducted, or caused to be conducted, tests and/or studies of ambient asbestos dust created during the manufacture, processing and/or assembling of ASBESTOS-CONTAINING PRODUCT(S); if so, please state:

a. each manufacturing facility, including location and address; at which any such test and/or study was conducted;

b. the date of each such test and/or study;

c. the individual(s) or entity conducting each such test and/or study;

d. whether THIS DEFENDANT has any documents containing the results and/or conclusions of each such study;

e. the IDENTITY of the custodian of the documents.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. 987 Commercial Street, San Carlos, California and possibly other locations that are unknown at this time.

b. Unknown.

c. Engineers.

d. The location of any documents, that may or may not be in existence, are unknown.

e. Douglas Wayne Merrill.

**INTERROGATORY NO. 44:**

Has THIS DEFENDANT conducted, or caused to be conducted, any tests and/or studies on ambient asbestos dust levels at any

35

KMDD003661

location or job site where its ASBESTOS-CONTAINING PRODUCTS were utilized in the United States; if so, please state:

    a.  the location, including name and address, at which each such test and/or study was conducted;

    b.  the individual(s) or entity conducting each such test and/or study;

    c.  the date of each such test and/or study;

    d.  whether THIS DEFENDANT has any DOCUMENTS containing the results and/or conclusions of each such test and/or study;

    a.  the IDENTITY of the custodian of these DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

No, other than answer listed above to Interrogatory No. 43.

INTERROGATORY NO. 45:

Did THIS DEFENDANT have any laboratory or other facility anywhere in the United States at which it conducted, or caused to be conducted, any tests and/or studies of its ASBESTOS-CONTAINING PRODUCTS to measure the amount of asbestos dust generated by any use for which such products were designed; if so, please state:

    a.  the location, including name and address, at which each such test and/or study was conducted;

    b.  the individual(s) or entity conducting each such test and/or study;

    c.  the date of each such test and/or study;

    d.  whether THIS DEFENDANT has any DOCUMENTS containing the results and/or conclusions of each such test and/or study;

BURNHAM WORKHOUSE
BURFORD, SCHOFIELD
& SCHULER

36

e.  the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 46:

Has THIS DEFENDANT made available to its employees engaged in the MARKETing of its RAW ASBESTOS FIBER and/or its ASBESTOS-CONTAINING PRODUCT(S), a medical examination program; if so, please state:

a.  whether chest x-rays or pulmonary function tests were part of such program(s);

b.  whether participation in any such program was a mandatory condition of employment or was voluntary;

(i)  if mandatory as a condition of employment, how frequently each employee was required to undergo such examination;

c.  whether THIS DEFENDANT has DOCUMENTS of such program;

d.  the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

a.  Yes.

b.  Mandatory from 1972-1978; voluntary from then on.

(i)  Unknown.

c.  Unknown.

d.  If such documents exist, Douglas Merrill.

///

37

1  <u>INTERROGATORY NO. 47</u>:

2      Has THIS DEFENDANT notified in writing any individuals or

3  COMPANIES to whom it MARKETed RAW ASBESTOS FIBER and/or ASBESTOS-

4  CONTAINING PRODUCT(S), anywhere in the United States, of the

5  potential relationship between exposure to asbestos and disease;

6  if so, please state:

7      a. the date(s) THIS DEFENDANT provided this information;

8      b. the means used for transmittal of such information;

9      c. whether THIS DEFENDANT has any copies of any DOCUMENTS

10  transmitting such information;

11      d. the IDENTITY of the custodian of such documents.

12      <u>ANSWER</u>:

13      Without waiving its general objections, Defendant KELLY-

14  MOORE responds as follows:

15      No, other than what is referred to in Answer to

16  Interrogatory No. 32.

17

18  <u>INTERROGATORY NO. 48</u>:

19      Has THIS DEFENDANT required any individual(s) who MARKETed

20  its ASBESTOS-CONTAINING PRODUCT(S) to wear respirators or face

21  masks; if so, please state:

22      a. the job title(s), if known, of individual(s) required to

23  wear respirators or face masks;

24      b. the date(s) on which THIS DEFENDANT first required the

25  wearing of respirators or face masks;

26      c. the means by which the requirement to wear respirators

27  or face masks was communicated;

28  ///

38

KMDD003664

1    d. whether THIS DEFENDANT has any copies of DOCUMENTS

2  communicating such requirements;

3    e. the IDENTITY of the custodian of such DOCUMENTS.

4    ANSWER:

5    Without waiving its general objections, Defendant KELLY-

6  MOORE responds as follows:

7    a. Plant workers.

8    b. Unknown.

9    c. Orally.

10    d. No.

11    e. Not Applicable.

12

13  INTERROGATORY NO. 49:

14    Does or did THIS DEFENDANT utilize or employ any CONTRACT

15  UNIT. If so, please state:

16    a. the inclusive periods of time the CONTRACT UNIT(S) was

17  utilized or employed;

18    b. the business address and name of the CONTRACT UNIT(S);

19    c. whether THIS DEFENDANT has any DOCUMENTS showing the

20  location(s) of the job site(s) where the CONTRACT UNIT(S) worked,

21  and if so, state the IDENTITY of the custodian of such DOCUMENTS.

22    ANSWER:

23    Without waiving its general objections, Defendant KELLY-

24  MOORE responds as follows:

25    NO.

26

27  ///

28  ///

BURNHILL MOREHOUSE
BURFORD, SCHOFIELD
& SCHILLER
...
...

39

SSR 994

KMDD003665

<u>INTERROGATORY NO. 50</u>:

Has THIS DEFENDANT received any written communication or other DOCUMENT, other than a claim for workers' compensation, that any person was claiming injury as a result of exposure to its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S); if so, please IDENTITY the first such written communication or DOCUMENT.

<u>ANSWER</u>:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Yes, first notice was received on or about July 30, 1977 when Kelly-Moore Paint Company, Inc. was served with its first lawsuit.

<u>INTERROGATORY NO. 51</u>:

Has any person filed a claim for asbestos-related injury regarding THIS DEFENDANT against any workers' compensation insurance carrier which provided coverage for THIS DEFENDANT; if so, please state:

    a.  the date of such claim;

    b.  the name of claimant;

    c.  the caption;

    d.  the case name;

    e.  the court in which the claim was filed;

    f.  the IDENTITY of the custodian of such documents.

///
///
///

BRAYTON, MOREHOUSE,
BURFORD SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P O BOX 1180
NOVATO CA 94948

40

KMDD003666

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not that KELLY-MOORE is aware of.

**INTERROGATORY NO. 52:**

Has any person filed a workers' compensation claim for asbestos-related injury against THIS DEFENDANT; if so, please state:

    a.  the date of such claim;

    b.  the name of claimant;

    c.  the caption;

    d.  the case number;

    e.  the court in which the claim was filed;

    f.  the IDENTITY of the custodian of such documents.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

At this point in time, Defendant KELLY-MOORE is aware of the following:

**WALTER R. LAWRENCE:**

    a.  March 31, 1983.

    b.  Walter R. Lawrence.

    c.  Walter R. Lawrence v. PACO, et al.

    d.  OAK 92646.

    e.  WCAB, Oakland.

    f.  Douglas Merrill.

///

BURNHILL, MOREHOUSE,
EUMFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 5148
WALNUT CREEK, CA 94596

41

KMDD003667

ISAAC BUSH:

a.  March 9, 1987.

b.  Isaac "Ike" Bush.

c.  Isaac Bush v. Lyles Diversified, Inc., et al.

d.  (WCAB) OAK 150427.

e.  WCAB, Oakland.

f.  Law Offices of Jack K. Clapper, 100 Shoreline Highway, Building B, Suite 300, Mill Valley, CA 94941.

Safire & Lewis, Esqs., 433 Turk Street, San Francisco, CA 94102.


INTERROGATORY NO. 53:

Does THIS DEFENDANT have insurance available to cover judgment(s) entered against it in asbestos-related personal injury lawsuits; if so, please state:

a.  the name and principal place of business of any insurance carrier who has issued such policy of insurance;

b.  the number and effective date of each policy;

c.  the amount(s) of coverage of each policy;

d.  the applicable dates of coverage;

e.  any reservation of rights contained in each such policy;

f.  the amount of coverage presently exhausted under each such policy;

g.  the amount of coverage presently available under each such policy;

h.  whether limits contained in each such policy include costs of defense.

///

42

                    KMDD003668

KMDD003669

BENJAMIN-MOORE PAINT COMPANY, INC.
Summary of Liability Policies
January 1, 1956 - October 1, 1986

| Insurer | Policy Number | Type of Liability Coverage | Amount of Coverage | Remarks |
|---|---|---|---|---|
| 1/1/56 - 1/1/57 Zurich Insurance Company* | 83-25-571 | Auto & Gen. Liability | Unverified | |
| 1/1/57 - 1/1/58 Zurich Insurance Company* | 84-52-064 | Auto & Gen. Liability | Unverified | |
| 1/1/58 - 1/1/59 Zurich Insurance Company* | 80-34-546 | Auto & Gen. Liability | Unverified | |
| 1/1/59 - 1/1/60 Zurich Insurance Company* | 80-39-250 | Auto & Gen. Liability | Unverified | |
| 1/1/60 - 1/1/61 Zurich Insurance Company* | 81-01-348 | Auto & Gen. Liability | Unverified | |
| 1/1/61 - 1/1/62 Zurich Insurance Company* | 83-55-390 | Auto & Gen. Liability | Unverified | |
| 1/1/62 - 1/1/63 Zurich Insurance Company* | 83-26-437 | Auto & Gen. Liability | Unverified | |
| 1/1/63 - 1/1/64 Zurich Insurance Company | 84-14-080 | Auto & Gen. Liability | B.I. 300,000/1,000,000 P.D. Auto 50,000 P.D. Other 50,000/100,000 | |
| 1/1/64 - 1/1/65 Zurich Insurance Company | 84-27-219 | Auto & Gen. Liability | B.I. 25,000/100,000** P.D. Auto 50,000 P.D. Other 50,000 | |

Page 1 of 5

*Policy unavailable at present time. A copy has been requested from the carrier. **We believe there is an umbrella policy for this year, but we have been unable to locate it at present.

SSR 998

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Please see attached list.

**INTERROGATORY NO. 54:**

Has THIS DEFENDANT owned or operated any petroleum refining facilities; if so, please state:

a.  whether any ASBESTOS-CONTAINING PRODUCT(S) WERE MARKETed on the premises of such refining facilities;

b.  the location, including the name and address of all such refining facilities;

c.  the dates of operation of such refining facilities;

d.  the types of ASBESTOS-CONTAINING PRODUCT(S) MARKETed on such premises;

e.  the names of the manufacturers of any ASBESTOS-CONTAINING PRODUCTS MARKETed on such premises;

f.  whether THIS DEFENDANT has documents identifying such MARKETing;

g.  the IDENTITY of the custodian of such documents.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 55:**

Has THIS DEFENDANT held a controlling ownership interest in any COMPANY which owned or operated petroleum refining

43

KMDD003670

1  facilities: if so, for the period(s) of time during which THIS
2  DEFENDANT held such interest, please state:

3      a. whether any ASBESTOS-CONTAINING PRODUCTS were MARKETed
4  on the premises of such refining facilities;

5      b. the location, including the name and address of all such
6  refining facilities;

7      c. the dates of operation of such refining facilities;

8      d. the types of ASBESTOS-CONTAINING PRODUCTS MARKETed on
9  such premises;

10     e. the names of the manufacturers of any ASBESTOS-
11 CONTAINING PRODUCTS MARKETed on such premises;

12     f. whether THIS DEFENDANT has DOCUMENTS identifying such
13 MARKETing;

14     g. the IDENTITY of the custodian of such DOCUMENTS.

15     ANSWER:

16     Without waiving its general objections, Defendant KELLY-
17 MOORE responds as follows:

18     NO.

19

20 INTERROGATORY NO. 57:

21     Has THIS DEFENDANT contracted with any COMPANY for the
22 MARKETing of ASBESTOS-CONTAINING PRODUCT(S) on any premises owned
23 or leased by THIS DEFENDANT; if so, please state:

24     a. the location, including name and address of such
25 premises;

26     b. the name and address of each such COMPANY;

27     c. the types of ASBESTOS-CONTAINING PRODUCTS;

28 ///

GRAHAME MOREHOUSE
BURFORD SCHOFIELD
& SCHILLER
ARCHITECTURAL COMMUNITY
P.O. BOX 9166
WALNUT CREEK CA 94596

44

KMDD003671

d.   the   name   of   the   manufacturers   of   such   ASBESTOS-CONTAINING PRODUCTS;

e.   whether THIS DEFENDANT has DOCUMENTS of such MARKETing;

f.   the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not that Defendant KELLY-MOORE is aware of.

DATED: June 8, 1990            BURNHILL, MOREHOUSE, BURFORD,
                               SCHOFIELD & SCHILLER, INC.


                               BY: Kathleen S. Farley
                               KATHLEEN S. FARLEY
                               Attorneys for Defendant
                               KELLY-MOORE PAINT COMPANY, INC.

45

KMDD003672

SSR 1001

**VERIFICATION**

I hereby declare under penalty of perjury that I am the Secretary-Treasurer of KELLY-MOORE PAINT COMPANY, INC., a corporation, a party in the In Re Complex Asbestos Litigation and the In Re Shipyard and Applicator Asbestos Cases (Consolidated for Discovery) cases, and am authorized to make this Verification for and on behalf of said corporation; that I have read Defendant Kelly-Moore's Answers to Plaintiffs' Standard Set of Interrogatories (Set No. One), and know the contents thereof, and the same is true of my own knowledge, except as to matters which are therein stated upon my information and belief, and as to those matters I believe them to be true.

Executed at San Carlos, California, this 7th day of June, 1990.

JOHN BACIGALUPO

KMDD003673

1

**VERIFICATION**

2

3      I hereby declare under penalty of perjury that I am the

4  Vice President -
   Manufacturing Operations   of KELLY-MOORE PAINT COMPANY, INC., a

5  corporation, a party in the In Re Complex Asbestos Litigation and

6  the In Re Shipyard and Applicator Asbestos Cases (Consolidated

7  for Discovery cases, and am authorized to make this Verification

8  for and on behalf of said corporation; that I have read Defendant

9  Kelly-Moore's Answers to Plaintiffs' Standard Set of

10 Interrogatories (Set No. One), and know the contents thereof, and

11 the same is true of my own knowledge, except as to matters which

12 are therein stated upon my information and belief, and as to

13 those matters I believe them to be true.

14     Executed at San Carlos, California, this  7th      day of

15 June                , 1990.

16

17                                         DOUGLAS MERRILL

18

19

20

21

22

23

24

25

26

27

28

SSR 1003

KMDD003674

PROOF OF SERVICE BY MAIL

I declare that:

I am employed in the County of Contra Costa, I am over the age of eighteen years and not a party to the within cause; my business address is 1220 Oakland Boulevard, Suite 200, Walnut Creek, California 94596. On June 20, 1990, I served the within

DEFENDANT KELLY-MOORE'S ANSWERS TO
PLAINTIFFS' STANDARD SET OF INTERROGATORIES

in said actions by placing a true copy of each enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Walnut Creek, California, addressed as follows:

See attached Plaintiff Counsel and Defense Counsel lists for

IN RE COMPLEX ASBESTOS LITIGATION,
Alameda County SC No. 607734-9

IN RE SHIPYARD AND APPLICATOR ASBESTOS CASES
(CONSOLIDATED FOR DISCOVERY),
Alameda County SC No. 537868-7

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 20, 1990, at Walnut Creek, CA 94596.

Irene Carpenter

KMDD003675

## IN RE COMPLEX ASBESTOS LITIGATION - ALAMEDA COUNTY

### PLAINTIFF COUNSEL PROOF OF SERVICE

BRUCE L. AHNFELDT, ESQ., 700 Franklin Street, Napa, CA 94559
LAW OFFICES OF ROGER BALT, P.O. Box 12095, 1407 Webster Street, Suite 208, Oakland, CA 94604
BRAYTON & ASSOCIATES, 999 Grant Avenue, P.O. Box 2109, Novato, CA 94948
BROWN & FINNEY, 2033 N. Main Street, Ste 430, Walnut Creek, CA 94596
CARLSON & HUSICK, 7080 Donlon Way, Suite 222, Dublin, CA 94568
CARTWRIGHT, SLOBODIN, et al., 101 California Street, Suite 2600, San Francisco, CA 94111
CASEY, GERRY, CASEY, et al., 110 Laurel Street, San Diego, CA 92101
CASEY, GERRY, CASEY, et al., 781 Tuolumne, Vallejo, CA 94590
LAW OFFICES OF JACK K. CLAPPER, 100 Shoreline Highway, Building B, Suite 300, Mill Valley, CA 94941
COREY & ORTON, 700 El Camino Real, Millbrae, CA 94030
DIGARDI & CAMPBELL, 436 - 14th Street, Suite 616, Oakland, CA 94612
DUDA, RAHIM & RATTO, 385 Grand Avenue, Suite 201, Oakland, CA 94610
GEORGE & BUCH, 930 S. La Brea Avenue, Los Angeles, CA 90036
CHRISTOPHER E. GRELL, ESQ., The Monadnock Building, 685 Market Street, Suite 340, San Francisco, CA 94105
JEFFREY B. HARRISON, ESQ., One Daniel Burnham Court, Suite 220C, San Francisco, CA 94109
HILDEBRAND, McLEOD, et al., 414 - 13th Street, 6th Floor, Oakland, CA 94612
HOBERG, FINGER, et al., 703 Market Street, 18th Floor, San Francisco, CA 94103
JARVIS, MILLER, et al., 221 Main Street, Suite 1001, San Francisco, CA 94105
KAZAN & McCLAIN, 171 Twelfth Street, Suite 300, Oakland, CA 94612
GEORGE W. KILBOURNE, ESQ., 3755 Alhambra Avenue, Suite 9, Martinez, CA 94553
LAW OFFICES OF KENNETH L. KNAPP, 1109 Quail Street, Newport Beach, CA 92660
MACK, HAZELWOOD, et al., 221 Pine Street, Suite 600, San Francisco, CA 94104
EDWIN C. MARTIN, JR., ESQ., 501 Shatto Place, Suite 100, Los Angeles, CA 90020
McCARTHY, JOHNSON & MILLER, 595 Market Street, Suite 2200, San Francisco, CA 94105
PELLETREAU, MOSES, et al., 2090 - 23rd Street, Box 35, San Pablo, CA 94806
JOHN C. ROBINSON, ESQ., 940 Adams Street, Suite B, Benicia, CA 94510
ROBERT C. SCHUBERT LAW OFFICES, One Embarcadero Center, Suite 370, San Francisco, CA 94111.mt3
SIMKE, CHODOS, et al., 6300 Wilshire Blvd., Suite 9000, Los Angeles, CA 90048
STEMPLE & BOYAJIAN, 1526 Tennessee Street, Vallejo, CA 94590
STERNS & WALKER, 280 Utah Street, San Francisco, CA 94103
ROBERT E. THOMAS, ESQ., 2502 Park Blvd., Suite 200, Palo Alto, CA 94306
GERALD J. TIERNAN, ESQ., 165 Fell Street, San Francisco, CA 94102
WILHELM, THOMPSON, et al., 600 Allerton Street, Redwood City, CA 94063

ALP(6/14/90)

IN RE COMPLEX ASBESTOS LITIGATION - ALAMEDA COUNTY

DEFENSE COUNSEL PROOF OF SERVICE

ADAMS, DUQUE & HAZELTINE, c/o Seyfarth, Shaw, et al., 101 California Street, Suite 2900, San Francisco, CA 94111

ANDERSON, GALLOWAY & LUCCHESE, 1676 N. California Blvd., Suite 500, Walnut Creek, CA 94596

ARCHER, McCOMAS & LAGESON, 2033 N. Main Street, Suite 800, P.O. Box 8035, Walnut Creek, CA 94596

ATCHISON, TOPEKA & SANTA FE RAILWAY CO., Legal Department, One Santa Fe Plaza, 5200 East Sheila Street, Los Angeles, CA 90040

BARFIELD, DRYDEN & RUANE, One California Street, Suite 3125, San Francisco, CA 94111

BENNETT, SAMUELSEN, et al., 1951 Webster Street, Suite 200, Oakland, CA 94612

BERRY & BERRY, 505 - 14th Street, 12th Floor, Oakland, CA 94612

BICKEL & DIAMOND, 4 Embarcadero Center, Suite 1650, San Francisco, CA 94111

BISHOP, BARRY, et al., 465 California Street, 11th Floor, San Francisco, CA 94104

BJORK, FLEER, et al., 483 - 9th Street, Oakland, CA 94607

BOGLE & GATES, 1400 KOIN Center, 222 S.W. Columbia, Portland, OR 97201

BRANSON, FITZGERALD & HOWARD, P.O. Box 2189, Redwood City, CA 94064

BROBECK, PHLEGER & HARRISON, One Market Plaza, San Francisco, CA 94105

BRONSON, BRONSON & McKINNON, 100 "B" Street, Suite 400, Santa Rosa, CA 95401

CARROLL, BURDICK & McDONOUGH, 44 Montgomery Street, Suite 400, San Francisco, CA 94104

CLAPP, MORONEY, et al., 4400 Bohannon Drive, Suite 100, Menlo Park, CA 94025

COOLEY, GODWARD, CASTRO, HUDDLESON & TATUM, One Maritime Plaza, 20th Floor, San Francisco, CA 94111

CRADDICK, CANDLAND & CONTI, 915 San Ramon Valley Blvd., P.O. Box 810, Danville, CA 94526

CROSBY, HEAFEY, ROACH & MAY, 1999 Harrison Street, Oakland, CA 94612

DERBY, COOK, QUINBY & TWEEDT, 333 Market Street, Suite 2800, San Francisco, CA 94105

DILLINGHAM & MURPHY, 605 Market Street, Penthouse, San Francisco, CA 94105

ERICKSEN, ARBUTHNOT, et al., 1304 Willow Street, Martinez, CA 94553

FINAN, WHITE & PAETZOLD, 150 Spear Street, Suite 1725, San Francisco, CA 94105

GILLES & NICORA, 1900 Embarcadero, Suite 201, Oakland, CA 94606

GLASPY & GLASPY, 201 N. Civic Drive, Suite 245, Walnut Creek, CA 94596

GORDON & REES, Embarcadero Center West, 275 Battery Street, 20th Floor, San Francisco, CA 94111

GRAHAM & JAMES, One Maritime Plaza, Suite 300, San Francisco, CA 94111

HARDIN, COOK, et al., 1999 Harrison Street, 18th Floor, Oakland, CA 94612-3508

HARRINGTON, FOXX, et al., 611 W. Sixth Street, 9th Floor, Los Angeles, CA 90017

ALAD(6/14/90) - 1

KMDD003677

HASSARD, BONNINGTON, etc., 5 Fremont Center, 50 Fremont Street, Suite 3400, San Francisco, CA 94105
BILL, GENSON, EVEN, CRANDALL & WADE, 505 Shatto Place, Los Angeles, CA 90020
HOWARD, RICE, NEMEROVISKI, CANNADY, ROBERTSON & FALK, 3 Embarcadero Center, Suite 700, San Francisco, CA 94111
NANCY E. HUDGINS, ESQ., 605 Market Street, San Francisco, CA 94105
HYDE & FORSBLAD, 1850 Mt. Diablo Blvd., Suite 310, Walnut Creek, CA 94596
IRSFELD, IRSPELD & YOUNGER, 100 W. Broadway, Suite 900, Glendale, CA 91210
JACKSON, WALLACE & HAYDEN, 33 New Montgomery Street, 18th Floor, San Francisco, CA 94105
JEDEIKIN, CONNOR & GREEN, 300 Montgomery Street, Suite 450, San Francisco, CA 94104
JEFFREY & HEINMANN, 685 Market Street, Suite 1000, San Francisco, CA 94105
KINCAID, GIANUNZIO, etc., P.O. Box 1828, Oakland, CA 94604
KINSELLA, BOESCH, et al., 1875 Century Park East, Suite 1600, Los Angeles, CA 90067
KNOX, RICKSEN & SNOOK, 1999 Harrison Street, Suite 1700, Oakland, CA 94612
LAW OFFICES OF JOHN LADD, 1683 Folsom Street, San Francisco, CA 94102
LANDELS, RIPLEY & DIAMOND, 450 Pacific Avenue, San Francisco, CA 94133
LATHAM & WATKINS, 633 West Fifth Street, Suite 4000, Los Angeles, CA 90071
LILLICK, McHOSE & CHARLES, Two Embarcadero Center, 26th Floor, San Francisco, CA 94111
LOW, BALL & LYNCH, 601 California Street, 21st Floor, San Francisco, CA 94108
MacKENROTH, SELEY & ANWYR, 1610 Arden Way, Suite 250, P.O. Box 255800, Sacramento, CA 95865
MARRON, REID & SHEEHY, 601 California Street, Suite 1200, San Francisco, CA 94108
RICHARD McCONNELL, ESQ., 114 Sansome Street, Suite 808, San Francisco, CA 94104
McCUTCHEON, DOYLE, et al., 3 Embarcadero Center, P.O. Box V, San Francisco, CA 94111
McDONALD, PERUSSINA & CULLOM, 635 Sacramento Street, Suite 720, San Francisco, CA 94111
McGLYNN, McLORG, et al., Bayside Plaza, 188 Embarcadero, Suite 200, San Francisco, CA 94105
McNAMARA, HOUSTON, et al., 1211 Newell Avenue, Suite 202, P.O. Box 5288, Walnut Creek, CA 94596
MENTZ, FINN, CLARK, et al., 333 Victory Avenue, South San Francisco, CA 94080
MORGENSTEIN & JUBELIRER, 101 Market Street, 6th Floor, San Francisco, CA 94105
O'BRIEN, HAMMOND & CONWAY, 220 Sansome Street, 7th Floor, San Francisco, CA 94104
PARICHAN, RENBERG, et al., 2350 West Shaw, Suite 130, Fresno, CA 93711
PARRISH & ASSOCIATES, 1255 Post Street, Suite 1100, San Francisco, CA 94109
PERKINS COLE, 10900 Wilshire Blvd., 11th Floor, Los Angeles, CA 90024
PETTIT & MARTIN, 101 California Street, San Francisco, CA 94111


ALAD(6/14/90) - 2

SSR 1007

KMDD003678

PILLSBURY, MADISON, et al., 225 Bush Street, P.O. Box 7880, San Francisco, CA 94120

POHLE, JOHNSON, et al., 501 "J" Street, Suite 610, Sacramento, CA 95814

POND, SHJEFLO & WOHL, 1730 S. El Camino Real, 6th Floor, San Mateo, CA 94402

POPELKA, ALLARD, et al., 160 West Santa Clara Street, Suite 1300, San Jose, CA 95113

ROGERS, JOSEPH, et al., Robert Dollar Building, 311 California Street, 10th Floor, San Francisco, CA 94104

ROPERS, MAJESKI, et al., 1001 Marshall Street, Redwood City, CA 94063

MARK H. ROSENTHAL, ESQ., 50 California Street, 30th Floor, San Francisco, CA 94111

SEDGWICK, DETERT, et al., One Embarcadero Center, 16th Floor, San Francisco, CA 94111

SHEPPHARD, MULLIN, et al., Four Embarcadero Center, 17th Floor, San Francisco, CA 94111

SHIELD & SMITH, 580 California Street, Suite 1400, San Francisco, CA 94104

STARK, WELLS, et al., Lake Merritt Plaza, 1999 Harrison Street, Suite 1300, Oakland, CA 94612

STATE COMPENSATION INSURANCE FUND, 1275 Market Street, 3rd Floor, San Francisco, CA 94103

ST. CLAIR, ZAPPETINI, McFETRIDGE & GRIFFIN, One Montgomery Street, Suite 1400, San Francisco, CA 94104

STEVENS & DRUMMOND, 1910 Olympic Blvd., Suite 250, Walnut Creek, CA 94596

STUMBOS & MASON, 800 - 9th Street, Suite 200, P.O. Box 868, Sacramento, CA 95804

SULLIVAN, ROCHE, et al., 333 Bush Street, 18th Floor, San Francisco, CA 94104

TARKINGTON, O'CONNOR, etc., One Market Plaza, Spear Street Tower, Suite 4100, San Francisco, CA 94105

THELEN, MARRIN, et al., One Kaiser Plaza, Suite 1950, Oakland, CA 94612

THOMPSON & HELLER, 3600 American River Drive, Suite 150, Sacramento, CA 95864

TOLPEGIN, IMAI, et al., One Post Street, Suite 2400, San Francisco, CA 94104

TOMLINSON, ZISKO, et al., 480 California Avenue, 2nd Floor, Palo Alto, CA 94306

WALSWORTH, FRANKLIN, etc., 111 Sutter Street, 19th Floor, San Francisco, CA 94104

WEINTRAUB, GENSHLEA, etc., 2535 Capitol Oaks Drive, Suite 400, Sacramento, CA 95833

WHITEHORN & RAVAZZINI, 2150 Franklin Street, Suite 571, Oakland, CA 94612

WISE, WIEZOREK, et al., 888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017

WRIGHT, ROBINSON, et al., 44 Montgomery Street, 18th Floor, San Francisco, CA 94104

ALAD(6/14/90) - 3

SSR 1008

# EXHIBIT 15

# Who is Liable?

*Plaintiff's Potential Targets for Fraudulent Transfer Liability*

- Paint Company ESOP

- California Insurance ESOP

- Broken O Ranch sale

Privileged & Confidential Attorney Work Product  Attorney-Client Communication

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010821

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception



Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010823
Confidential

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

# Who Is Liable?

## _Asbestos Liability as of the ESOP transaction:_
### _Potential Plaintiff Theory_

- Plaintiffs will extrapolate from asbestos history to argue the company was insolvent based on anticipated future claims

- Same extrapolation methods described before

Privileged & Confidential Attorney Work Product  Attorney-Client Communication

63



Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010826
Confidential

# Who Is Liable?

## *Asbestos Liability as of the ESOP transaction:*

### *Company Position*

- Future unasserted claims do not constitute legal liabilities for solvency analysis

- Only consider then-pending claims as of 1998

Privileged & Confidential Attorney Work Product  Attorney-Client Communication

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010827

# Spectrum of "Liabilities"



Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010828

# Who Is Liable?

## *Asbestos Liability as of the ESOP transaction:*

### *Company Alternative 1*

- Pending claims had no value:
  - No payments to 1998
  - Not identified on audited financials in accordance with GAAP; or

- Pending claims had some determinable value, far short of insolvency-creating

Privileged & Confidential Attorney Work Product Attorney-Client Communication

67

KMH 010829

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010830
Confidential

# Who Is Liable?

## _Asbestos Liability as of the ESOP transaction:_
### _Company Alternative 2_

- Future claims should not be counted, _but_

- Even if they do, the company was still solvent

69

Privileged & Confidential  Attorney Work Product  Attorney-Client Communication

KMH 010831

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

# EXHIBIT 16

1   Ronald Lovitt, Bar No. 040921
    J. Thomas Hannan, Bar No. 039140
2   Henry I. Bornstein, Bar No. 75885
    LOVITT & HANNAN, INC.
3   900 Front Street, Suite 300
    San Francisco, California 94111
4   Telephone: (415) 362-8769
5   Facsimile: (415) 362-7528
    *rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com*

6

7   Attorneys for Defendants K-M Industries Holding Co. Inc.;
    K-M Industries Holding Co. Inc. ESOP Plan Committee;
8   and CIG ESOP Plan Committee

9

RECEIVED

NOV 09 2007

LEWIS, FEINBERG, LEE,
RENAKER & JACKSON

UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12

13   THOMAS FERNANDEZ et al.,              )   Case No. C 06-07339 MJJ
                                           )
14                   Plaintiffs,           )   **FIRST SUPPLEMENTAL RESPONSE OF**
                                           )   **DEFENDANTS K-M INDUSTRIES**
15      vs.                                )   **HOLDING CO. INC., K-M INDUSTRIES**
                                           )   **HOLDING CO. INC. ESOP PLAN**
16   K-M INDUSTRIES HOLDING CO., INC, et al. )  **COMMITTEE, AND CIG ESOP PLAN**
                                           )   **COMMITTEE TO PLAINTIFFS' FIRST**
17                   Defendants.           )   **SET OF INTERROGATORIES**
                                           )   **[INTERROGATORY NO. 16]**
18                                         )
19                                         )
                                           )
20                                         )

21

22   PROPOUNDING PARTY:   Plaintiffs Thomas Fernandez and Lora Smith

23   RESPONDING PARTY:    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding
                          Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee

24   SET NUMBER:          One

25

26

27

28

**EXHIBIT**

85

Giffins   3-28-08

**PRELIMINARY STATEMENT**

1    The Preliminary Statement and General Objections set forth herein apply to all

2    interrogatories to which defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co.

3    Inc. ESOP Plan Committee, and CIG ESOP Plan Committee respond herein.

4    The significant time that has passed since the events which form the basis of plaintiffs'

5    complaint has rendered the access of defendants K-M Industries Holding Co. Inc., K-M Industries

6    Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee to pertinent information

7    more difficult. Given this fact and the fact that discovery is in its early stages, defendants K-M

8    Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

9    ESOP Plan Committee reserve the right to amend or supplement these objections and responses at

10   any time in light of future investigation or analysis, and reserve the right to rely on subsequently-

11   discovered information or information omitted from the objections and responses as a result of

12   mistake, error, or inadvertence. These responses are not intended to admit or acquiesce in any

13   factual or legal contention, assertion, or characterization contained in the Plaintiffs' interrogatories.

**GENERAL OBJECTIONS**

14   1.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

15   Plan Committee, and CIG ESOP Plan Committee object to the interrogatories to the extent that they

16   are overbroad, unduly burdensome, oppressive, seek information irrelevant to the subject matter of

17   this litigation, and are not reasonably calculated to lead to the production of admissible evidence.

18   2.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

19   Plan Committee, and CIG ESOP Plan Committee object to the interrogatories to the extent that the

20   definitions and instructions set forth therein purport to impose obligations not required by the

21   Federal Rules of Civil Procedure.

22   3.    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

23   Plan Committee, and CIG ESOP Plan Committee object to the definition of "DEFENDANTS,"

24   "YOU," and "YOUR" to the extent that it includes the attorneys of defendants K-M Industries

25   Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

1  Committee and thus purports to require the disclosure of information subject to the attorney-client

2  privilege and/or the attorney work product doctrine, and on the ground that they are overbroad and

3  exceed the requirements of Rule 33 to the extent they seek information not available to defendants

4  K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

5  ESOP Plan Committee.

6          4.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

7  Plan Committee, and CIG ESOP Plan Committee object to the definition of "RELATING TO" or

8  "RELATE TO" on the ground that it is overbroad and unduly burdensome, and that interrogatories

9  using this definition seek documents that are not relevant to the subject matter of this action and are

10 not calculated to lead to the discovery of admissible evidence.

11         5.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

12 Plan Committee, and CIG ESOP Plan Committee object to the definition of "RELEVANT TIME

13 PERIOD" on the ground that it is overbroad and unduly burdensome.

14         6.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

15 Plan Committee, and CIG ESOP Plan Committee object to the proposed definition of "IDENTIFY"

16 on the ground that it is overbroad and unduly burdensome and to the extent that it purports to

17 impose obligations beyond those required by the Federal Rules of Civil Procedure.

18         7.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

19 Plan Committee, and CIG ESOP Plan Committee object to every interrogatory to the extent it calls

20 for information which comes within the attorney-client privilege, attorney work product protection,

21 or is protected from disclosure by any other recognized privilege or protection.

22    **FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF**
      **INTERROGATORIES**
23

24 **INTERROGATORY NO. 16:**

25        List by name and date filed, all lawsuits or analogous proceedings initiated by or filed

26 against KMH, Kelly-Moore Paint, CIG, or any subsidiary of KMH, Kelly-Moore Paint, or CIG,

27 regarding asbestos, at any time.

28 CASE NO. C 06-07339 MJJ          -3-       FIRST SUPPLEMENTAL RESPONSE OF KMH
                                             DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                             INTERROGATORIES [INTERROGATORY NO. 16]

1   **RESPONSE TO INTERROGATORY NO. 16:**

2       Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

3   Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and

4   further object to this interrogatory on the ground that it is vague, ambiguous, overbroad and unduly

5   burdensome.  Specifically, the phrase "analogous proceedings" is vague and ambiguous as used in

6   this context.  Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

7   Plan Committee, and CIG ESOP Plan Committee also object to the interrogatory to the extent that it

8   is not limited to the period of time relevant to the claims and defenses raised in this lawsuit.

9   Furthermore, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

10   Plan Committee, and CIG ESOP Plan Committee object to this interrogatory on the ground that it is

11   not reasonably calculated to lead to the discovery of admissible evidence and is thus outside the

12   scope of permissible discovery.  Well over 60,000 lawsuits could be responsive to this interrogatory.

13   The burden of responding to this interrogatory far outweighs the likely benefit considering the

14   extremely limited relevance that the details of these lawsuits have to the claims being raised by the

15   plaintiffs in this lawsuit.

16       Subject to the foregoing general and specific objections, the defendants K-M Industries

17   Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

18   Committee respond as follows:

19       Pursuant to an agreement with Plaintiffs that providing a response listing the number of

20   separate plaintiffs' asbestos claims filed against the KM entities for each year from 1993 through

21   2006 shall be considered by Plaintiffs to be a complete and sufficient answer to this Interrogatory,

22   defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan

23   Committee, and CIG ESOP Plan Committee provide the following list of the number of separate

24   plaintiffs' asbestos "claims" filed during those years.  As the term "claim" is used in this

25   Interrogatory response, a single lawsuit making claims on behalf of five plaintiffs would constitute

26   five "claims."

27

28   CASE NO. C 06-07339 MJJ         -4-       FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                  DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                  INTERROGATORIES [INTERROGATORY NO. 16]

Due to the large time period covered by these statistics and the impossibility of ensuring that all of the claims have been accounted for, other claims may have been brought that are not included in these numbers. In supplying this information, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee have provided the most complete and accurate information available to them concerning the information listed below.

| Year | Number of Claims |
|------|------------------|
| 1993 | 38 |
| 1994 | 565 |
| 1995 | 2,757 |
| 1996 | 2,144 |
| 1997 | 4,364 |
| 1998 | 7,049 |
| 1999 | 9,707 |
| 2000 | 9,898 |
| 2001 | 13,736 |
| 2002 | 19,113 |
| 2003 | 22,829 |
| 2004 | 6,845 |
| 2005 | 4,977 |
| 2006 | 1,849 |

//
//
//
//
//

CASE NO. C 06-07339 MJJ                    -5-          FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                        DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                        INTERROGATORIES [INTERROGATORY NO. 16]

1    DATED: November 6, 2007                    LOVITT & HANNAN, INC.

2

3                                               By: _____
4                                                      Henry I. Bornstein
                                                Attorneys for Defendants K-M Industries Holding
5                                               Co. Inc.; K-M Industries Holding Co. Inc. ESOP
                                                Plan Committee; and CIG ESOP Plan Committee
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. C 06-07339 MJJ                    -6-        FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                     DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                     INTERROGATORIES [INTERROGATORY NO. 16]

**VERIFICATION**

I, Dan Stritmatter, declare:

I am the Chief Financial Officer of K-M Industries Holding Co., Inc.  I have read the foregoing First Supplemental Response of Defendants K-M Industries holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee and CIG ESOP Plan Committee to Plaintiffs' First Set of Interrogatories and know its contents. I am informed and believe that the matters therein are true and on that ground I allege that the matters therein are true.

Executed on November __7__, 2007 at San Carlos, California.

I declare under penalty of perjury that the foregoing is true and correct.


Dan Stritmatter

CASE NO. C 06-07339 MJJ                    -7-                    FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                                 DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                                 INTERROGATORIES [INTERROGATORY NO. 16]

1 | Lisa S. Serebin    *Attorneys for Defendant*
  | MORGAN, LEWIS & BOCKIUS LLP    *NORTH STAR TRUST COMPANY*
2 | One Market Street, Spear Street Tower
  | San Francisco, CA 94105
3

4 | Robert L. Palmer    *Attorneys for Defendant*
  | HENNIGAN, BENNETT & DORMAN LLP    *WILLIAM E. AND DESIREE B.*
5 | 865 South Figueroa Street, Suite 2900    *MOORE REVOCABLE TRUST;*
  | Los Angeles, California 90017    *DESIREE B. MOORE REVOCABLE*
6 |     *TRUST; WILLIAM E. MOORE*
  |     *MARITAL TRUST; WILLIAM E.*
7 |     *MOORE GENERATION-SKIPPING*
  |     *TRUST; and DESIREE B. MOORE*
8

9      6.    I declare under penalty of perjury that the foregoing is true and correct and that this

10   declaration was executed on November 8, 2007, at San Francisco, California.

11

12

13                                    Laura J. Davies

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   | CASE NO. C 06-07339 MJJ    -9-    FIRST SUPPLEMENTAL RESPONSE OF KMH
     |                                 DEFENDANTS TO PLAINTIFFS' FIRST SET OF
     |                                 INTERROGATORIES [INTERROGATORY NO. 16]

# EXHIBIT 17



**Quicklinks**

**Back to Company Detail page | New Search**
**Form 5500 | Schedule H | Schedule P | Schedule R | Other Documents | SHOW ALL**

| Form **5500**<br>Department of the Treasury<br>Internal Revenue Service | **Annual Return/Report of Employee Benefit Plan**<br>This form is required to be filed under sections 104 and 4065 of the Employee<br>Retirement Income Security Act of 1974 (ERISA) and sections 6039D, 6047(e),<br>6057(b), and 6058(a) of the Internal Revenue Code (the Code).<br>Complete all entries in accordance with<br>the instructions to the Form 5500. | Official Use Only<br>OMB Nos. 1210 - 0110<br>1210 - 0089 |
|---|---|---|
| Department of Labor<br>Pension and Welfare Benefits<br>Administration | | **2005**<br>This Form is Open to<br>Public Inspection |
| Pension Benefit Guaranty Corporation | | |

**Part I    Annual Report Identification Information**

For the calendar plan year 2005 or fiscal plan year beginning January 01, 2005, **and ending** December 31, 2005

**A** This return/report is for:
- (1) ☐ a multiemployer plan;
- (2) ☒ a single-employer plan (other than a multiple-employer plan);
- (3) ☐ a multiple-employer plan;
- (4) ☐ a DFE (specify)

**B** This return/report is:
- (1) ☐ the first return/report filed for the plan;
- (2) ☐ the amended return/report;
- (3) ☐ the final return/report filed for the plan;
- (4) ☐ a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here ☐

**D** If you filed for an extension of time to file, check the box and attach a copy of the extension application ☐

**Part II    Basic Plan Information** -- enter all requested information.

**1a** Name of plan

K-M INDUSTRIES HOLDING CO., INC. ESOP

**1b** Three-digit plan number (PN)    002

**1c** Effective date of plan (mo., day, yr.)
January 01, 1999

**2a** Plan sponsor's name and address (employer, if for a single-employer plan)
(Address should include room or suite no.)

K-M INDUSTRIES HOLDING CO., INC.
987 COMMERCIAL ST
SAN CARLOS, CA 94070-4018

**2b** Employer Identification Number (EIN)
94-1230192

**2c** Sponsor's telephone number
650-592-8337

**2d** Business code (see instructions)
551112

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, and to the best of my knowledge and belief, it is true, correct, and complete.

|  | 10/13/2006 | DAN STRITMATTER |
|---|---|---|
| Signature of plan administrator | Date | Typed or printed name of individual signing as plan administrator |

|  | 10/13/2006 | DAN STRITMATTER |
|---|---|---|
| Signature of employer/plan sponsor/DFE | Date | Typed or printed name of individual signing as employer, plan sponsor or DFE as applicable |

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.**    v2.3    Form **5500** (2005)

**3a** Plan administrator's name and address (if same as plan sponsor, enter "Same")

SAME

**3b** Administrator's EIN

**3c** Administrator's telephone number

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN and the plan number from the last return/report below:

**a** Sponsor's name

**b** EIN

**c** PN

**5** Preparer information (optional)    **a** Name (including firm name, if applicable) and address

**b** EIN

**c** Telephone no.

**6** Total number of participants at the beginning of the plan year    **6**    2,974

**7** Number of participants as of the end of the plan year (welfare plans complete only lines **7a, 7b, 7c,** and **7d**)

| | | | |
|---|---|---|---|
| **a** Active participants | | **a** | 1,829 |
| **b** Retired or separated participants receiving benefits | | **b** | |
| **c** Other retired or separated participants entitled to future benefits | | **c** | 819 |
| **d** Subtotal. Add lines **7a, 7b,** and **7c** | | **d** | 2,648 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits | | **e** | |
| **f** Total. Add lines **7d** and **7e** | | **f** | 2,648 |
| **g** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | | **g** | 2,642 |
| **h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | | **h** | 253 |
| **i** If any participant(s) separated from service with a deferred vested benefit, enter the number of separated participants required to be reported on a Schedule SSA (Form 5500) | | **i** | 641 |

**8** Benefits provided under the plan (complete 8a through 8c, as applicable)

**a** ☒ Pension benefits (check this box if the plan provides pension benefits and enter the applicable pension feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

2P    2I

**b** ☐ Welfare benefits (check this box if the plan provides welfare benefits and enter the applicable welfare feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

| **9a** Plan funding arrangement (check all that apply) | **9b** Plan benefit arrangement (check all that apply) |
|---|---|
| **(1)** ☐ Insurance | **(1)** ☐ Insurance |
| **(2)** ☐ Section 412(i) insurance contracts | **(2)** ☐ Section 412(i) insurance contracts |
| **(3)** ☒ Trust | **(3)** ☒ Trust |
| **(4)** ☐ General assets of the sponsor | **(4)** ☐ General assets of the sponsor |

**10** Schedules attached (Check all applicable boxes and, where indicated, enter the number attached. See instructions.)

| **a** Pension Benefit Schedules | **b** Financial Schedules |
|---|---|
| **(1)** ☒ **R** (Retirement Plan Information) | **(1)** ☒ **H** (Financial Information) |
| **(2)** ☐ **T** (Qualified Pension Plan Coverage Information) | **(2)** ☐ **I** (Financial Information – Small Plan) |
| If a Schedule T is not attached because the plan is relying on coverage testing information for a prior year, enter the year | **(3)** ☐ **A** (Insurance Information) |
| | **(4)** ☐ **C** (Service Provider Information) |
| **(3)** ☐ **B** (Actuarial Information) | **(5)** ☐ **D** (DFE/Participating Plan Information) |
| **(4)** ☒ **E** (ESOP Annual Information) | **(6)** ☐ **G** (Financial Transaction Schedules) |
| **(5)** ☒ **SSA** (Separated Vested participant Information) | **(7)** ☒ 1 **P** (Trust Fiduciary Information) |

**Back to Top**