Ronald Lovitt, Bar No. 040921
J. Thomas Hannan, Bar No. 039140
Henry I. Bornstein, Bar No. 75885
Terence F. Young, Bar No. 069943
LOVITT & HANNAN, INC.
900 Front Street, Suite 300
San Francisco, California 94111
Telephone: (415) 362-8769
Facsimile: (415) 362-7528
*rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com, tfylaw@earthlink.net*

Attorneys for Defendants K-M Industries
Holding Co. Inc.; K-M Industries Holding Co.
Inc. ESOP Plan Committee; and CIG ESOP Plan Committee

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| THOMAS FERNANDEZ et al., <br><br> Plaintiffs, <br><br> vs. <br><br> K-M INDUSTRIES HOLDING CO., INC, et al. <br><br> Defendants. | Case No. C 06-07339 CW <br><br> **DECLARATION OF TERENCE F. YOUNG IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** <br><br> Date: July 3, 2008 <br> Time: 2:00 p.m. <br> Courtroom: 2, 4th Floor <br> Judge: Hon. Claudia Wilken |

I, Terence F. Young, declare:

1.     I am an attorney licensed to practice in the State of California and before this Court. I am associated with Lovitt & Hannan, Inc., attorneys for Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee in this matter. I have custody of the relevant files of Lovitt & Hannan related to this action and am familiar with the contents thereof. I make this declaration in support of said defendants' opposition

to plaintiffs' motion for class certification.

2.    The facts stated herein are known to me personally and if called to testify thereto I could do so competently.

3.    Attached hereto as Exhibit A are true and correct copies of excerpts from the deposition of Thomas Fernandez taken in this matter on April 21, 2008.

4.    Attached hereto as Exhibit B are true and correct copies of excerpts from the deposition of Lora D. Smith taken in this matter on April 16, 2008.

5.    Attached hereto as Exhibit C are true and correct copies of excerpts from the deposition of Tosha Thomas taken in this matter on April 18, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 12, 2008 at San Francisco, California

_____
                /s/
            Terence F. Young

EXHIBIT A

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO AND OAKLAND DIVISION

4

CERTIFIED

5    _____    COPY

6    THOMAS FERNANDEZ, et al.,

7            Plaintiffs,                    )
                                            )
8            vs.                            ) Case No.
                                            )
9    K-M INDUSTRIES HOLDING CO., INC., et al., ) C-06-07339 CW
                                            )
10           Defendants.                    )
                                            )
11                                          )
                                            )
12                                          )

13    _____

14

15    VIDEOTAPED DEPOSITION OF THOMAS FERNANDEZ
                  April 21, 2008
16            San Francisco, California

17

18

19

20

21

22    Reported by:
      EMI ALBRIGHT
23    RPR, CSR No. 13042
      Job No. 79887
24

25

1  say until October of '96?

2          MR. LOVITT:   Yes.

3  BY MR. LOVITT:

4      Q    Did you have any employment between the

09:52  5  time that you left Capital Insurance Group and the time

6  that you joined Castle Inspection Service?

7      A    Well --

8          MS. HASSELMAN:   Hang on a second.  Ron, I

9  think there is just some confusion in the time frame.

09:52  10  If I can just make a suggestion, I think you might just

11  clarify the circumstances of the CIG employment and the

12  Castle Inspection Service.  I'm not sure they were

13  sequential.  So I think that might be the confusion in

14  the question.

09:53  15          THE WITNESS:   I can clarify the employment

16  with Castle and Capital.

17  BY MR. LOVITT:

18      Q    Why don't you do that for us.

19      A    For most of the time that I was working for

09:53  20  Capital Insurance Group, I was also a consultant for

21  Castle Inspection Service in addition to my employment

22  at Capital Insurance Group.

23      Q    I see.  So that was a part-time employment

24  for Castle?

09:53  25      A    That's correct.

1          Q     And you had full time employment with CIG?

2          A     That's correct.

3          Q     And was CIG aware that you were working

4     part time for Castle?

09:53   5          A     To the best of my knowledge at the time

6     they were not.

7          Q     Who was your boss at CIG?

8          A     During which time period?

9          Q     During the July of 19 -- July of 1997?

09:54  10     Excuse me. I am a little confused. I am looking at the

11     complaint, which is Exhibit 147. And I am not going to

12     get heavily involved in that right now. But I

13     understand that you worked for CIG from July of 1996

14     until October of 2005; is that correct?

09:54  15          A     I believe so.

16          Q     In 2005 who was your boss at CIG?

17          A     In 2005 my immediate supervisor at the time

18     was Steve Lehrke.

19          Q     And was Mr. Lehrke aware that you had

09:55  20     another employment with Castle?

21          A     No, I do not believe he was.

22          Q     Did you consider informing Mr. Lehrke that

23     you were also working for Castle?

24          A     No, I did not.

09:55  25          Q     Did you have any particular reason for not

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    wanting Mr. Lehrke to have that information?

2              MS. HASSELMAN:    Objection.  Assumes facts

3    not in evidence.

4         A    I did not see any reason why he should be

09:55    5    informed.

6    BY MR. LOVITT:

7         Q    Were you aware of a policy at CIG that full

8    time employees at CIG were to be working full time and

9    were not to engage in other employment?

09:56    10             MS. HASSELMAN:    Objection.  Assumes facts

11    not in evidence.

12        A    At the time that I was working for Castle

13    Inspection Group, I was not specifically aware of that

14    policy.

09:56    15    BY MR. LOVITT:

16        Q    Was it your understanding that if you had

17    revealed that you had other employment to Mr. Lehrke or

18    others at CIG that it might have some negative impact on

19    your employment at CIG?

09:56    20             MS. HASSELMAN:    Objection.  Assumes facts

21    not in evidence.

22        A    I had thought that it could have been a

23    possibility.

24    BY MR. LOVITT:

09:56    25        Q    So -- let's see.  So the dates on

16

1    obviously, I was not working for Castle.  There were

2    several lengthy time periods after the initial year that

3    I worked for CIG when I had not received any work from

4    Castle Inspection Service.

09:58  5         Q    Now, was it your understanding when you

6    were working for Castle Inspection Service that you were

7    working part time or full time?

8         A    Part time.

9         Q    So apart from the first -- roughly the

09:58  10   first year at CIG, during the rest of your term at CIG,

11   you were at the same time except for those periods when

12   you weren't getting any work, you were working for

13   Castle?

14        MS. HASSELMAN:    Objection.  Vague and

09:59  15   compound and ambiguous.

16        A    Rephrase the question.

17   BY MR. LOVITT:

18        Q    Yeah, you started at CIG in July of '96.

19   Apparently you started at Castle in July of '97;

09:59  20   correct?

21        A    Approximately the right day, yes.

22        Q    So the first year you worked at CIG, you

23   weren't affiliated with Castle; correct?

24        A    That is correct.

09:59  25        Q    After the first year that you worked for

1    CIG, for the remaining time that you worked for CIG, you

2    were also employed by Castle?

3              MS. HASSELMAN:    Objection.  Asked and

4    answered.

10:00    5         A    I believe I have gone over that already.

6    BY MR. LOVITT:

7         Q    What was your answer?

8              MS. HASSELMAN:    You can answer.

9         A    That's right.

10:00    10   BY MR. LOVITT:

11        Q    Now, what job did you have at CIG?

12        A    Loss control representative.

13        Q    What does a loss control representative do?

14        A    Loss control representative evaluates

10:00    15   various types of risks that will be under -- that will

16   be under various types of risks that the company is

17   going to be taking.  The loss control representative

18   evaluates the risk, possible areas of loss involved with

19   the particular risk subject to certain parameters, and

10:01    20   possibly makes some recommendations to possibly reduce

21   different types of risks inherent with certain types of

22   insurance and certain types of businesses and

23   properties, and also provides factual information to the

24   underwriters in regards to particular risks.

10:01    25        Q    And what does a high value specialist, the

1    work that you did at Castle Inspection Service, what

2    does that job entail?

3        A    Very similar except that's looking at high

4    value single family home real estate.  We are looking at

10:01  5    different types of construction, unique construction

6    features, and putting together not only underwriting

7    information for the underwriters but also detailed

8    construction and pricing information and hazard

9    information for the underwriters of these types of

10:01  10   risks.

11       Q    Did you have any kind of -- any type of

12   pension benefits at Castle?

13       A    At where?

14       Q    At Castle Inspection Service were there

10:02  15   any -- was there a pension plan that you were involved

16   with?

17       A    No.

18       Q    Was there an ESOP plan?

19       A    No.

10:02  20   Q    Was there any kind of retirement plan?

21       A    No.

22       Q    Were you -- were you an employee or an

23   independent contractor at Castle?

24       A    Independent contractor.

10:02  25   Q    How many hours a week did you devote to

1          MS. HASSELMAN:    Objection.  Vague and

2  ambiguous and compound.

3          A    I do not remember a response like that.

4  BY MR. LOVITT:

10:10   5          Q    Now, apart from these three people, since

6  you left CIG have you had communication with anyone

7  else?

8          A    Anyone else at CIG?

9          Q    At CIG, yeah?

10:11  10          A    Not that I can remember.

11          Q    Now, were you aware at the time that you

12  were at CIG that CIG was a subsidiary of a holding

13  company?

14          A    I was.

10:11  15          Q    And were you aware that the holding company

16  also had a subsidiary that was in the paint business?

17          A    I was.

18          Q    And that paint business was Kelly-Moore

19  Paint Company; is that correct?

10:11  20          A    That's correct.

21          Q    Now, do you have any professional or

22  friendly relationship with anyone working for the Paint

23  Company?

24          MS. HASSELMAN:    Objection.  Compound.

10:11  25  Vague.

1           A    No, I do not.

2      BY MR. LOVITT:

3           Q    Have you ever had such a relationship?

4                MS. HASSELMAN:   Objection.  Vague and

10:12  5      compound.

6           A    No, I have not.

7      BY MR. LOVITT:

8           Q    Do you know the name of any person past or

9      present who was an employee of the Paint Company?

10:12  10               MS. HASSELMAN:   Objection.  Vague and

11     ambiguous.

12          A    I'm sorry.  What was the question again?

13               MR. LOVITT:   Read it back, please, Emi.

14                    (Record read by the reporter.)

10:12  15

16               THE WITNESS:   I remember -- the answer

17     would be yes.

18     BY MR. LOVITT:

19          Q    And what is the name of that person?

10:12  20          A    I forgot the last name, but the first name

21     I believe was a Tosha.

22          Q    Is that person Tosha Thomas?

23          A    I think it is.

24          Q    How did you -- how did you make her

10:13  25     acquaintance?

28

1          A    I have never met her nor have I ever spoken

2    with her.   I was shown a copy of a legal form with her

3    name on it I believe last week in speaking with my

4    attorneys.

10:13    5          Q    Apart from Tosha Thomas, do you know the

6    name of any person who has ever worked for Kelly-Moore

7    Paint?

8               MS. HASSELMAN:   Objection.  Vague.

9          A    No.

10:13   10    BY MR. LOVITT:

11         Q    What is your understanding of your

12    responsibilities as a representative plaintiff in a

13    class action lawsuit?

14         A    My understanding is that I am not to

10:13   15    undertake any actions which would be detrimental to the

16    interest of any of the other class members.

17         Q    Who do you understand those class members

18    to be generically without referring to anybody's name?

19              MS. HASSELMAN:   Objection.  Vague and

10:14   20    ambiguous.  Calls for a legal conclusion.

21         A    All people who work for Kelly-Moore Paint

22    and all people who work for Capital Insurance Group.

23    BY MR. LOVITT:

24         Q    What do you understand your financial

10:14   25    responsibilities are with respect to this lawsuit?

29

1        Q      Please show the witness Exhibit 153.    153

2    purports to be a quarterly employee meeting dated

3    November 9, 1999.  And this is not the meeting.  This is

4    somehow a document in connection with the meeting.

11:04    5              Have you ever seen this one before?

6        A      I don't remember.

7        Q      The document has Bates No. CIG-ESI 00001542

8    through 1542.003.

9              Now, you mentioned that you had meetings at

11:04    10    your branch on a periodic basis; is that correct?

11        A      That's correct.

12        Q      Did you have quarterly employee meetings?

13        A      The best recollection I have that these

14    were minutes or selected parts of a meeting that took

11:04    15    place at the branch office in Monterey.  And these were

16    questions that came up and were answered at that time,

17    and then the answers were distributed in this form.

18        Q      Distributed to whom?

19        A      All employees of CIG.

11:05    20        Q      Now, I will ask you again is this the kind

21    of document you would normally put in your employee

22    folder?

23        A      This document, no.

24        Q      So how would you treat a document like this

11:05    25    after you received it?

1          MS. HASSELMAN:    Objection.  Calls for

2    speculation.  Assumes facts not in evidence.

3          A    I would normally discard such a document.

4    BY MR. LOVITT:

11:05   5          Q    On the first page of the document there's a

6    question that says, No. 1, what is the status of the

7    ESOP and what is the timeline for preparing statements

8    of employees' ESOP account status for all participants?

9    Please review how it works, explain the pretax savings

11:06  10    implications of participation on the 401(k) versus the

11    ESOP.

12          Do you recall -- do you recall that issue

13    being discussed at an employee meeting?

14          A    No.

11:06  15          Q    It says, response, as previously announced

16    the ESOP has been closed and 8,400,000 shares, paren,

17    42 percent of CIG, have been bought from K-M Industries

18    Holding Company Inc. for $55 million.  We expect to

19    provide each member of the ESOP with statements of

11:06  20    individual accounts within the first days -- first 60

21    days of each new calendar year beginning in the year

22    2000.

23          Were you made aware at some point that

24    42 percent of the stock in K-M Industries Holding

11:07  25    Company Inc. had been purchased by the ESOP for

64

1    $55 million?

2            A    Yes, I was.

3            Q    Did you ever do an arithmetic calculation

4    to see how much per share --

11:07   5            MS. HASSELMAN:    Objection.  Vague.

6    BY MR. LOVITT:

7            Q    -- that the ESOP had paid for the stock?

8            A    No, I did not.

9            Q    Were you interested in determining whether

11:07  10    or not the ESOP had paid fair value for the shares that

11    it had?

12            MS. HASSELMAN:    Objection.  Vague.  Calls

13    for a legal conclusion.

14            A    No, I was not.

11:07  15    BY MR. LOVITT:

16            Q    At some point you became interested in how

17    much the ESOP had paid for its shares?

18            MS. HASSELMAN:    Objection.  Vague and

19    misstates prior testimony.

11:08  20            A    At some point during which particular time

21    period?

22    BY MR. LOVITT:

23            Q    Either during your employment or after?

24            MS. HASSELMAN:    Same objections.

11:08  25            A    I'm sorry.  Would you repeat the question?

65

1    BY MR. LOVITT:

2         Q    Did you at some point during your

3    employment at CIG become interested in finding out how

4    much per share the ESOP had paid for its stock?

11:08  5         A    No.

6         Q    Did you become interested in that question

7    at some point after you terminated your employment?

8         A    No.

9         Q    Have you ever cared about the issue of how

11:09  10   much the ESOP paid for its shares?

11              MS. HASSELMAN:    Objection.  Vague.  Calls

12   for a legal conclusion.

13        A    No.

14   BY MR. LOVITT:

11:09  15        Q    156, please.  Please review Exhibit 156 and

16   I will have a couple of questions about it.  While you

17   are reviewing it, I will state for the record that

18   Exhibit 156 is a document on the California Insurance

19   Group letterhead addressed to CIG team members and

11:10  20   shareholders, re, the ESOP statement, plan year 2000,

21   signed by Peter M. Cazzolla, Bates No. P 054.

22              Have you ever seen this document before?

23        A    I'm not sure.

24        Q    Now, would this be one of the kinds of

11:10  25   documents that you would normally want to retain in the

66

1          A      Has something to do with the ESOP.

2          Q      In the middle of the report, just like one

3     that we saw earlier, it says, you have the right to

4     receive a copy of the full annual report or any part

12:33  5     thereof on request.  The items listed below are included

6     in that report.  One, an accountant's report, two,

7     financial information, and, three, assets held for

8     investments?

9              MS. HASSELMAN:    I am going to object that

12:33  10    that mischaracterizes a prior document and the documents

11    speak for themselves.

12              MR. LOVITT:    Okay.

13    BY MR. LOVITT:

14          Q      Then it goes on to say in the last

12:33  15    paragraph, you also have the legally protected right to

16    examine the annual report at the main office of the

17    plan, K-M Industries Holding Company Inc., 987

18    Commercial Street, San Carlos, California, 94070, and at

19    the U.S. Department of Labor in Washington, D.C.

12:34  20             Did you ever make an attempt prior to the

21    suit being filed to obtain additional information about

22    the ESOP?

23              MS. HASSELMAN:    Objection.  Vague and

24    ambiguous.

12:34  25          A      No, I did not.

111

1    anything that Mr. Moore did?

2              MS. HASSELMAN:    Objection.  Vague and

3    ambiguous.  Compound.  Calls for a legal conclusion.

4         A    No.

14:13  5    BY MR. LOVITT:

6         Q    Can you -- can you identify anything that

7    Mr. Moore did that you consider to be improper other

8    than in connection with selling his stock?

9              MS. HASSELMAN:    Objection.  Calls for a

14:13  10    legal conclusion.  Asked and answered.  Vague and

11    ambiguous.

12         A    No.

13    BY MR. LOVITT:

14         Q    Okay.  We are back to Exhibit 228.  If you

14:14  15    look on the second page, which is 00002713.002, and the

16    beginning of the first big paragraph on the page says,

17    as presented to you and discussed with team members

18    during previous team meetings, the worst case is if the

19    asbestos liability caused Kelly-Moore Paint to become

14:14  20    insolvent with the value of our ESOP shares -- no --

21    then the value of our ESOP shares could be zero up to

22    some positive dollar value depending on the ability of

23    Kelly-Moore Paint's assets and insurance to pay for the

24    asbestos liabilities.  Under this worst case scenario

14:15  25    CIG may be faced with a need to seek new investors.

135

1              Now, when -- I am assuming that you were

2    apprised of this information in August of '04 since this

3    document was distributed to all employees at CIG?  Is

4    that a correct assumption?

14:15    5         A    That's correct.

6         Q    Okay.  What was your reaction to this

7    information, this worst case scenario information?

8              MS. HASSELMAN:    Objection.  Vague and

9    ambiguous.  Vague as to time.

14:15   10         A    I was concerned.

11    BY MR. LOVITT:

12         Q    At this time did you consider seeking other

13    employment because of that concern?

14              MS. HASSELMAN:    Objection.  Vague and

14:16   15    ambiguous.

16         A    Yes.

17    BY MR. LOVITT:

18         Q    Well, if you lost the value of your ESOP

19    shares, you'd still be getting your salary; isn't that

14:16   20    right?

21              MS. HASSELMAN:    Objection.  Calls for

22    speculation.

23         A    That's correct.

24    BY MR. LOVITT:

14:16   25         Q    I mean, were you concerned that CIG would

136

1    just go out of business as a result of this ESOP -- this

2    asbestos litigation?

3            MS. HASSELMAN:    Objection.  Vague and

4    ambiguous and vague as to time.

14:17    5    BY MR. LOVITT:

6        Q    The time, just in case there is any doubt

7    about it, I am talking about August of '04.

8        A    No.

9        Q    So did you do anything about your concerns

14:17    10   in the August '04 time frame or shortly thereafter?

11           MS. HASSELMAN:    Objection.  Vague.

12       A    No.

13   BY MR. LOVITT:

14       Q    The middle paragraph says, please be

14:17    15   assured that all possible actions are being considered

16   to minimize the impact Kelly-Moore's asbestos

17   liabilities will have on the K-M Industries I stock we

18   own.  The stock valuation is still in progress and we

19   will be finalized once the appraisers are relatively

14:18    20   confident placing a value on Kelly-Moore Paint Company.

21           Did you think the company was being

22   forthright and correct in telling you and the others

23   employed by CIG that all possible actions were being

24   considered to minimize the impact of the Kelly-Moore

14:18    25   asbestos liabilities?

1    with what you responded to the first or second question,

2    those were the obligations -- maybe you could help me

3    understand.  I am having difficulty --

4          A    I think you basically asked why -- why were

15:58  5    you filing this lawsuit, what did you think was wrong.

6          Q    Uh-huh.

7          A    And I explained it, and that -- yeah.

8          Q    I guess what I am trying to understand is

9    why North Star Trust Company has been named as a

15:58  10    defendant and what facts you have to support the

11    allegations against North Star.  So maybe if we just

12    break that down into two questions, the first being do

13    you understand why you've sued North Star as a

14    defendant?

15:59  15          MS. HASSELMAN:    Same objections as before.

16    Calls for a legal conclusion.  And the same caution to

17    feel free to answer from your own knowledge but make

18    sure you don't reveal any communications with counsel.

19          A    My own knowledge is that they are somehow

15:59  20    involved with Kelly-Moore.

21    BY MR. SULLIVAN:

22          Q    And do you know how they are involved?

23          A    Administrator of some sort for the ESOP.

24          Q    And do you have any other facts specific to

15:59  25    the duties or responsibilities that North Star has?

174

1    MS. HASSELMAN:    Same objections.    Calls

2  for a legal conclusion.

3    A    Not that I can remember.

4  BY MR. SULLIVAN:

15:59  5    Q    And when you say not that you can remember,

6  does that mean that there are no facts or does that mean

7  that there were facts that you don't remember as we are

8  talking about it today?

9    MS. HASSELMAN:    Same objections.    Calls

16:00  10  for a legal conclusion.    Calls for speculation.

11    A    Probably not facts that I can remember

12  today.

13  BY MR. SULLIVAN:

14    Q    So you think there are facts that assert --

16:00  15  that support your claims against North Star?

16    A    I don't know.

17    Q    But it's fair to say that today you can't

18  recall any facts that support your claim against North

19  Star?

16:00  20    MS. HASSELMAN:    Objection.    Vague and

21  ambiguous.    Calls for a legal conclusion.

22    A    That's correct.

23  BY MR. SULLIVAN:

24    Q    And do you have any personal knowledge of

16:01  25  any facts to suggest that any of the ESOP valuations

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    were improper?

2              MS. HASSELMAN:    Objection.    Calls for a

3    legal conclusion.

4         A    No.

16:01    5              MS. HASSELMAN:    Calls for expert

6    testimony.    I'm sorry, I realize that was belated, but I

7    just want to get that in to the prior question as well.

8    BY MR. SULLIVAN:

9         Q    Do you have Exhibit 147 in front of you?

16:01   10    Have you seen this before?

11         A    Yes.

12         Q    Did you review this document before it was

13    filed on January 18, 2008?

14         A    No.

16:02   15         Q    Did you have an opportunity to review the

16    original complaint before it was filed?

17         A    No.

18         Q    Did you have any input into the contents of

19    the original complaint?

16:02   20              MS. HASSELMAN:    Objection.    Calls for

21    attorney client communications.

22    BY MR. SULLIVAN:

23         Q    I am just looking for a yes or no answer.

24              MS. HASSELMAN:    That calls for a legal

16:02   25    conclusion as well.

```
 1              A    Yes.

 2   BY MR. SULLIVAN:

 3              Q    And is there anything that you think should

 4   be in the complaint, the original complaint, that

16:02  5     wasn't?

 6                   MS. HASSELMAN:   Objection.  Calls for a

 7   legal conclusion.  You also have not shown him the

 8   original complaint and he hasn't had an opportunity to

 9   review that.

16:02 10     BY MR. SULLIVAN:

11              Q    Is there anything that you think should be

12   in the second amended complaint that is Exhibit 147 that

13   is not?

14                   MS. HASSELMAN:   Same objections.  It's a

16:03 15     long document.  If you want him to review it, he should

16   have time to review that.  Also calls for a legal

17   conclusion.

18              A    I would say I am not sure.

19   BY MR. SULLIVAN:

16:03 20             Q    What losses do you claim that you have

21   suffered as a result of the actions of the defendants

22   that have been named in the complaint?

23                   MS. HASSELMAN:   Objection.  Calls for a

24   legal conclusion.  Calls for expert testimony.

16:03 25             A    I'm not sure of the exact losses.
```

177

STATE OF CALIFORNIA )

: ss                      )

County of Alameda    )


        I, the undersigned, a Certified Shorthand Reporter

of the State of California, do hereby certify:  That the

foregoing proceedings were taken before me at the time and

place herein set forth; that any witnesses in the foregoing

proceedings, prior to testifying, were placed under oath;

that a verbatim record of the proceedings was made by me

using machine shorthand which was thereafter transcribed

under my direction; further, that the foregoing is an

accurate transcription thereof.

        I further certify that I am not a relative,

employee, attorney or counsel of any party to this action or

relative or employee of any such attorney or counsel and that

I am not financially interested in the said action or the

outcome thereof;

        IN WITNESS WHEREOF, I have this date subscribed my

name.

                    Dated:_____APR 2 9 2008_____


                    _Emi Albright_____

                    EMI ALBRIGHT, CSR No. 13042

**EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,

        Plaintiffs,

        vs.               No.  C 06-07339 CW

K-M INDUSTRIES HOLDING CO.,
INC., et al.,

        Defendants.

# CERTIFIED
# COPY

---

VIDEOTAPED DEPOSITION OF LORA D. SMITH

San Francisco, California

Wednesday, April 16, 2008

VOLUME 1

Reported by:
TRACY L. PERRY
CSR No. 9577
CHRIS TE SELLE
CSR No. 10836

JOB No. 84325

1    CIG and you were living in Waterford?

09:37:40  2        A    Correct.

09:37:46  3        Q    When you -- when you changed addresses did

4    you -- did you notify the post office or any -- that they

5    could forward your mail to your new address?

09:37:57  6        A    Yes.

09:37:59  7        Q    When you moved did you notify the people at CIG

8    that you had moved and give them your new address?

09:38:05  9        A    Yes.

09:38:08  10        Q    Who did you speak to at CIG to give them that

11    information, do you remember?

09:38:12  12        A    No, I don't remember.

09:38:18  13        Q    Have you been employed since you left CIG?

09:38:20  14        A    Yes.

09:38:23  15        Q    Where were you employed?

09:38:24  16        A    I helped a disabled man in Waterford, was a

17    caretaker.

09:38:31  18        Q    Mm-hmm.  Is that what you -- is that the reason

19    that you moved to Waterford, to take care of this

20    particular person?

09:38:36  21        A    No.

09:38:38  22        Q    And so how long did you work I guess as an aid

23    of some sort to a disabled person?  How long did you do

24    that -- were you doing that work?

09:38:56  25        A    Somewhere around a year.

16

09:38:57  1      Q    Okay.  Apart from that, have you had any other

        2   employment since you left CIG?

09:39:06  3      A    No.

09:39:16  4      Q    What was your job at CIG?

09:39:19  5      A    Assistant underwriter.

09:39:21  6      Q    In the Modesto office?

09:39:22  7      A    Yes.

09:39:24  8      Q    What does an assistant underwriter do?

09:39:26  9      A    Assists the main underwriter.

09:39:35  10     Q    Good.  And who was the main underwriter at the

        11  time?

09:39:38  12     A    Lynn Winters.

09:39:39  13     Q    Lynn?

09:39:39  14     A    Mm-hmm.

09:39:40  15     Q    And was he -- was he your boss?

09:39:42  16     A    She.

09:39:43  17     Q    Oh, Lynn was -- Lynn.  Okay.

09:39:46  18          Was she your boss?

09:39:47  19     A    No.

09:39:50  20     Q    Who -- who was actually your boss at CIG?

09:39:53  21     A    Jim Isham.  Jim Isham.

09:40:01  22     Q    And what was his position at the time?

09:40:03  23     A    Manager of the branch.

09:40:05  24     Q    Managed the whole --

09:40:05  25     A    Mm-hmm.

**LORA D. SMITH**

04/16/08

09:45:01  1          What month did you -- did you terminate your

2    employment at CIG in 2001?

09:45:14  3      A    October.

09:45:19  4      Q    Why did you -- why did you leave?

09:45:21  5      A    I had a baby and decided to stay home and raise

6    him myself.

09:45:26  7      Q    Were you happy with your employment there?  Were

8    you -- did you feel that you were appreciated and treated

9    well?

09:45:33 10          MS. HASSELMAN:  Objection; vague and compound.

09:45:35 11          THE WITNESS:  Yes, very much.

09:45:46 12  BY MR. LOVITT:

09:45:46 13      Q    What caused you to have the idea that you should

14    be a plaintiff in a lawsuit against the company --

09:45:54 15          MS. HASSELMAN:  I'll just --

09:45:54 16  BY MR. LOVITT:

09:45:54 17      Q    -- and others?

09:45:56 18          MS. HASSELMAN:  Just to clear up the parameters

19    around the question, answer -- if you can answer in your

20    own words without getting into any communications with

21    counsel, you can answer that, but just make sure that you

22    don't discuss any communications with your lawyers.

09:46:18 23          THE WITNESS:  Because I was told I would be paid for

24    my shares on a certain date and wasn't.

09:46:23 25  BY MR. LOVITT:

22

LORA D. SMITH

| 09:46:23 | 1 | Q | Who told you you'd be paid at a certain date? |
| 09:46:26 | 2 | A | Debbie in HR in the Monterey branch. |
| 09:46:34 | 3 | Q | And when did they tell you this? |
| 09:46:37 | 4 | A | In 2002 and 2003 and in 2004. |
| 09:46:46 | 5 | Q | After you left? |
| 09:46:46 | 6 | A | Yes. |
| 09:46:52 | 7 | Q | What did they tell you? |
| 09:46:55 | 8 | A | That I had to have five years of discontinued |
| | 9 | | service from the company. |
| 09:46:59 | 10 | Q | Mm-hmm. |
| 09:47:00 | 11 | A | After that time, the first calendar year, after |
| | 12 | | the five years of discontinued service, my shares would |
| | 13 | | be paid to me. |
| 09:47:10 | 14 | Q | And so they -- Debbie -- Debbie and who else |
| | 15 | | told you this? |
| 09:47:17 | 16 | | MS. HASSELMAN:  Objection; misstates testimony. |
| 09:47:21 | 17 | | BY MR. LOVITT: |
| 09:47:21 | 18 | Q | Debbie and who else? |
| 09:47:22 | 19 | | MS. HASSELMAN:  Same objection. |
| 09:47:24 | 20 | | BY MS. LOVITT: |
| 09:47:24 | 21 | Q | What's Debbie's last name? |
| 09:47:26 | 22 | A | I'm not sure. |
| 09:47:32 | 23 | Q | Did they tell you in writing or did they tell |
| | 24 | | you orally? |
| 09:47:35 | 25 | A | Over the phone. |

23

09:47:38 1        Q    And did you have any familiarity with -- with --

2    with something in writing that explained the plan to you?

09:47:49 3        MS. HASSELMAN:  Objection; vague.

09:47:51 4    BY MR. LOVITT:

09:47:51 5        Q    I mean had you ever seen -- had you ever seen a

6    written description of the ESOP plan that was in force at

7    the time that you were working there?

09:48:00 8        A    Yes.

09:48:02 9        Q    And had you ever read it?

09:48:07 10       A    Yes.

09:48:09 11       Q    But -- apparently you read it, but you still

12    wanted to talk to somebody about when you'd be entitled

13    to your distribution; is that right?

09:48:18 14       A    Yes.

09:48:18 15       MS. HASSELMAN:  Objection; argumentative.

09:48:23 16   BY MR. LOVITT:

09:48:23 17       Q    Now, you mentioned in the -- in the complaint

18    that's been filed, you said something to the effect that

19    you called the company in 2006 and asked them for a

20    distribution; is that correct?

09:48:37 21       MS. HASSELMAN:  Objection; the complaint speaks for

22    itself.

09:48:41 23   BY MR. LOVITT:

09:48:41 24       Q    Is that correct?

09:48:41 25       A    Yes.

10:11:32  1    BY MR. LOVITT:

10:11:32  2        Q    Okay.  No one other than a lawyer has ever told

          3    you that there is a problem regarding asbestos and the

          4    value of your ESOP shares, correct?

10:11:57  5        MS. HASSELMAN:  Object to the form.

10:11:59  6        THE WITNESS:  Yes.

10:12:03  7        MS. HASSELMAN:  And it's -- the question is

          8    ambiguous.  I'll add that objection to the question, as

          9    well.

10:12:23 10    BY MR. LOVITT:

10:12:23 11        Q    Now, you understand you're a plaintiff in a

         12    class action lawsuit; is that correct?

10:12:26 13        A    Yes.

10:12:27 14        Q    And what do you consider your responsibilities

         15    to be as a plaintiff in a class action?

10:12:41 16        A    To represent the employees.

10:12:44 17        Q    Which employees?

10:12:47 18        A    Employees that have -- that are participants in

         19    the ESOP program.

10:12:52 20        Q    Now, do you mean employees at CIG?

10:13:00 21        MS. HASSELMAN:  Objection; calls for a legal

         22    conclusion.

10:13:05 23        THE WITNESS:  Employees or past employees like me.

10:13:09 24    BY MR. LOVITT:

10:13:09 25        Q    Past employees of CIG.

                                                                      42

10:13:10  1          Do you -- do you represent employees of

2    Kelly-Moore Paint Company?

10:13:14  3      MS. HASSELMAN:  Objection; calls for a legal

4    conclusion and assumes facts not in evidence.

10:13:31  5      THE WITNESS:  Can you repeat the question?

10:13:32  6  BY MR. LOVITT:

10:13:32  7      Q   Do you consider it part of your responsibilities

8    as a plaintiff in a class action to represent the

9    interest of Kelly-Moore Paint Company employees?

10:13:43  10     MS. HASSELMAN:  Objection; same objections, calls

11   for a legal conclusion and assumes facts not in evidence.

10:13:49  12     THE WITNESS:  No.

10:13:52  13  BY MR. LOVITT:

10:13:52  14     Q   Have you ever been to the facilities at

15   Kelly-Moore Paint Company in California, any of their

16   offices or any of their stores?

10:14:04  17     A   Yes.

10:14:05  18     Q   Other than as a customer to buy paint, have you

19   ever been to one of those places?

10:14:09  20     A   No.

10:14:09  21     Q   Do you have any friends or acquaintances that

22   work for Kelly-Moore Paint Company?

10:14:16  23     A   No.

10:14:16  24     Q   Is it your understanding that Kelly-Moore Paint

25   Company has an ESOP?

43

|  |  |  |
|---|---|---|
| 10:16:04 | 1 | THE WITNESS: That's between my attorney and me. |
| 10:16:06 | 2 | BY MR. LOVITT: |
| 10:16:06 | 3 | Q  Are you paying the cost? |
| 10:16:13 | 4 | A  No. |
| 10:16:15 | 5 | Q  And do you -- who is paying the cost? |
| 10:16:20 | 6 | MS. HASSELMAN: I'll -- I'll caution the witness not |
|  | 7 | to reveal communications with counsel or the terms of |
|  | 8 | retainer agreements. |
| 10:16:26 | 9 | Ron, it's -- you're fine to ask if we're |
|  | 10 | advancing the cost or not, but I'm not going to let you |
|  | 11 | get into any details of the retainer -- |
| 10:16:34 | 12 | MR. LOVITT: I don't want to. |
| 10:16:34 | 13 | MS. HASSELMAN: -- or the terms of the retainer |
|  | 14 | agreement. |
| 10:16:36 | 15 | BY MR. LOVITT: |
| 10:16:36 | 16 | Q  Is it your understanding your attorney is |
|  | 17 | advancing the costs of the litigation? |
| 10:16:44 | 18 | A  Yes. |
| 10:16:49 | 19 | Q  Now, do you have any understanding as to what |
|  | 20 | the cost might be if you lose the lawsuit? |
| 10:16:58 | 21 | MS. HASSELMAN: I'll -- same objection; that this is |
|  | 22 | very close to attorney-client communication issues. So |
|  | 23 | if you have an understanding out of your own |
|  | 24 | understanding, then you can answer the question, but if |
|  | 25 | you have -- I would caution you not to get into any |

45

1    communications with counsel.

10:17:12  2         THE WITNESS:  I can't answer that.

10:17:25  3    BY MR. LOVITT:

10:17:25  4         Q    You understand that if the lawsuit is lost on

5    your side that the attorneys representing the defendants

6    would -- might claim an entitlement to a reimbursement of

7    their cost in defending the lawsuit.  Are you aware of

8    that?

10:17:43  9         MS. HASSELMAN:  Objection; calls for speculation and

10    calls for a legal conclusion.

10:17:49 11         THE WITNESS:  I don't know.

10:17:51 12    BY MR. LOVITT:

10:17:51 13         Q    You don't.  Can you tell me whether you have an

14    understanding as to -- whether you have an understanding

15    as to your -- your responsibility to pay the entire cost

16    of defending this lawsuit should you lose this lawsuit?

10:18:23 17         MS. HASSELMAN:  Same objections.  Calls for

18    speculation, calls for a legal conclusion, and it assumes

19    facts that aren't in evidence.

10:18:30 20    BY MR. LOVITT:

10:18:30 21         Q    Do you have an awareness of that?

10:18:32 22         MS. HASSELMAN:  Same objections.

10:18:40 23         THE WITNESS:  I don't know.

10:18:41 24    BY MR. LOVITT:

10:18:41 25         Q    Do you care?

46

10:18:41  1          MS. HASSELMAN:  Same objections and argumentative.

10:18:58  2          THE WITNESS:  Can you repeat the question?

10:19:00  3     BY MR. LOVITT:

10:19:00  4          Q    I withdraw the question.

10:19:12  5          Are you prepared to pay the cost of the lawsuit

          6     to the opposing parties if, in fact, you lose the

          7     lawsuit?

10:19:17  8          MS. HASSELMAN:  Same objections.  Calls for

          9     speculation, calls for a legal conclusion, and assumes

          10    facts that aren't in evidence.

10:19:28  11         THE WITNESS:  Can you repeat the question?

10:19:29  12         MR. LOVITT:  Tracy, read it back, please.

10:19:13  13              (□The record was read as follows:

10:19:13  14              "QUESTION:  Are you prepared to pay the cost

          15              of the lawsuit to the opposing parties if,

          16              in fact, you lose the lawsuit?")

10:19:38  17         MS. HASSELMAN:  Same objections.

10:19:45  18         THE WITNESS:  No.

10:19:59  19         MS. HASSELMAN:  Ron, do you think we could take a

          20    short restroom break before we get to that, please.

10:20:04  21         MR. LOVITT:  Sure.  Sure.

10:20:05  22         THE VIDEOGRAPHER:  The time is 10:20.  We are going

          23    off record.

10:20:09  24              (Recess taken:  10:20 until 10:42 a.m.)

10:20:13  25              (Deposition Exhibit 147 was marked.)

10:20:13  1          MR. LOVITT:  Yes.  Okay.

10:20:13  2       Q   Ms. Smith, I've handed you -- at least I think

       3   the reporter has handed you the -- the package of papers

       4   that's marked Exhibit Number 147.  Exhibit Number 147 is

       5   the second amended complaint, class action, corrected,

       6   and it's a 24-page document.

10:20:13  7          If you could just thumb through this, I have a

       8   couple of very general questions.  Well, let me just ask,

       9   have you ever seen this document before?

10:20:13 10       A   Yes.

10:20:13 11       Q   Did you see it before it was filed?

10:20:13 12       A   No.

10:20:13 13       Q   When did you -- when did you first see it?

10:20:13 14       A   April 15th of 2008.

10:20:13 15       Q   Oh, that means like yesterday?

10:20:13 16       A   Correct.

10:20:13 17       Q   Okay.  Do you know what this document is?

10:20:13 18       A   Yes.

10:20:13 19          MS. HASSELMAN:  Objection; vague.

10:20:13 20   BY MR. LOVITT:

10:20:13 21       Q   I'd like you to turn to page 3 of the document

      22   and look at paragraph number 6 and read it to yourself,

      23   and I have just a couple of questions about it.

10:20:13 24          Is that -- is paragraph 6 correct to the best of

      25   your knowledge?

                                                                    50

| | |
|---|---|
| 10:20:13 | 1 |

BY MR. LOVITT:

    Q    You ever heard of a company called North Star?

    A    Yes.

    Q    What -- what relationship does North Star have, to your knowledge, with -- with your ESOP shares?

    A    I don't know.

    Q    Do you know who the current trustee is of -- of your ESOP program?

    A    No.

    Q    Do you know the name of any person or entity that has ever served as a trustee for your ESOP plan?

    A    William Moore, I think.

    Q    I beg your pardon?

    A    William Moore, I think.

    Q    Now, when did Mr. Moore serve as a trustee?

    A    Well, at the very beginning.

    Q    Did he do anything wrong as a trustee?

    MS. HASSELMAN:  Objection; asked and answered, calls for a legal conclusion.  Ron, she's not -- she's not the source of this information.

    THE WITNESS:  I don't know.

BY MR. LOVITT:

    Q    Did it ever come to your attention that North Star, a company called North Star became a trustee of your ESOP?

62

LORA D. SMITH                                         04/16/08

10:20:13  1        A    Was I aware of that?

10:20:13  2        Q    Yeah.  Has it ever come to your attention that

3    North Star became or is a trustee of your ESOP?

10:20:13  4        MS. HASSELMAN:  Objection; compound and ambiguous.

10:20:13  5        THE WITNESS:  I wasn't aware they were the trustee.

6    I just had received a letter from them.

10:20:13  7    BY MR. LOVITT:

10:20:13  8        Q    Okay.  Now, North Star has been named as a

9    defendant in this lawsuit.  To your knowledge, did North

10   Star do anything wrong?

10:20:13 11        MS. HASSELMAN:  Same objections.  Calls for a legal

12   conclusion.  It's not her responsibility to know these

13   details, Ron.

10:20:13 14        MR. LOVITT:  Please, no speaking.

10:20:13 15            Tracy, read it back, please.

10:20:13 16                (The record was read as follows:

10:20:13 17                "QUESTION:  Okay.  Now, North Star has been

18                named as a defendant in this lawsuit.  To

19                your knowledge, did North Star do anything

20                wrong?")

10:20:13 21        MS. HASSELMAN:  Same objection.  Calls for a legal

22   conclusion.

10:20:13 23        THE WITNESS:  I don't know.

10:20:13 24    BY MR. LOVITT:

10:20:13 25        Q    Do -- are you comfortable suing North Star under

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**LORA D. SMITH**

04/16/08

| | | |
|---|---|---|
| 17:19:14 | 1 | Q. And could you state the date that you were |
| 17:19:16 | 2 | hired by CIG. |
| 17:19:19 | 3 | A. The first day I started? |
| 17:19:20 | 4 | Q. Sure. Yeah. |
| 17:19:21 | 5 | A. September 16, 1996. |
| 17:19:26 | 6 | Q. And how about the date that you were |
| 17:19:28 | 7 | terminated? |
| 17:19:29 | 8 | A. October 26, 2001. |
| 17:19:41 | 9 | Q. Can you tell me what you hope to |
| 17:19:43 | 10 | accomplish by filing this lawsuit. |
| 17:19:53 | 11 | A. No. |
| 17:20:10 | 12 | Q. Well, is there a reason that you filed the |
| 17:20:12 | 13 | lawsuit? |
| 17:20:15 | 14 | MS. HASSELMAN: Objection. Asked and answered. |
| 17:20:22 | 15 | BY MR. SULLIVAN: |
| 17:20:22 | 16 | Q. How did you retain your lawyers for this |
| 17:20:24 | 17 | case? |
| 17:20:25 | 18 | MS. HASSELMAN: Objection. You can answer to |
| 17:20:27 | 19 | the extent that you have information from your own |
| 17:20:30 | 20 | knowledge, but you shouldn't reveal any |
| 17:20:31 | 21 | communications, or, whether conversation or written, |
| 17:20:36 | 22 | with any of your attorneys. |
| 17:20:38 | 23 | THE WITNESS: I was referred. |
| 17:20:39 | 24 | BY MR. SULLIVAN: |
| 17:20:39 | 25 | Q. Who referred you to them? |

187

17:21:52  1      A.    I did contact a couple of attorneys in

17:21:54  2   Modesto, who wouldn't even touch it.

17:21:58  3      MS. HASSELMAN:  I'm just going to remind, even,

17:22:01  4   even if you didn't ultimately hire somebody as an

17:22:05  5   attorney, if you contacted them for purposes of

17:22:07  6   seeking legal advice, then your conversations with

17:22:09  7   them and your communications with them are

17:22:12  8   privileged.

17:22:12  9          So it's fine to answer the questions as

17:22:14  10  he's asked them, but just let's, both for the

17:22:20  11  questioner and for the witness, we shouldn't get

17:22:22  12  into any communications that you had with any

17:22:24  13  lawyers that you consulted.

17:22:26  14     THE WITNESS:  Okay.

17:22:27  15  BY MR. SULLIVAN:

17:22:27  16     Q.    And how many other attorneys did you

17:22:29  17  contact prior to the Lewis Feinberg firm?

17:22:38  18     A.    Two.

17:22:39  19     Q.    Why do you want to be a class

17:22:41  20  representative in this lawsuit?

17:22:51  21     A.    I really can't answer that.

17:22:56  22     Q.    When you say you can't answer, could you

17:22:59  23  explain what you mean by that.

17:23:02  24     MS. HASSELMAN:  I know my objection is late,

17:23:03  25  but I'm going to object to the question of why do

189

| | |
|---|---|
| 17:23:06 | 1 |
| 17:23:08 | 2 |
| 17:23:13 | 3 |
| 17:23:15 | 4 |
| 17:23:16 | 5 |
| 17:23:17 | 6 |
| 17:23:18 | 7 |
| 17:23:20 | 8 |
| 17:23:27 | 9 |
| 17:23:31 | 10 |
| 17:23:33 | 11 |
| 17:23:37 | 12 |
| 17:23:39 | 13 |
| 17:23:40 | 14 |
| 17:23:48 | 15 |
| 17:23:48 | 16 |
| 17:23:50 | 17 |
| 17:23:54 | 18 |
| 17:24:07 | 19 |
| 17:24:10 | 20 |
| 17:24:13 | 21 |
| 17:24:14 | 22 |
| 17:24:16 | 23 |
| 17:24:17 | 24 |
| 17:24:20 | 25 |

you want to be a class representative in this

lawsuit as vague.

         THE WITNESS:  I just don't have an answer for

you.

BY MR. SULLIVAN:

         Q.    Okay.

              Do you know what the responsibilities of

being a class representative are?

         A.    No.

         Q.    Do you believe that you are qualified to

be a class representative?

         MS. HASSELMAN:  Objection.  Calls for a legal

conclusion.

         THE WITNESS:  I don't know.

BY MR. SULLIVAN:

         Q.    Were you promised any compensation in

exchange for acting as a class representative.

         A.    No.

         Q.    What losses do you claim to have suffered

that you are seeking in the lawsuit?

         MS. HASSELMAN:  Objection.  Vague and

ambiguous.

BY MR. SULLIVAN:

         Q.    Are you seeking losses in this lawsuit?

         MS. HASSELMAN:  Same objection.

190

**LORA D. SMITH**

04/16/08

| | |
|---|---|
| 17:24:30 | 1 |
| 17:24:42 | 2 |
| 17:24:42 | 3 |
| 17:24:51 | 4 |
| 17:24:54 | 5 |
| 17:24:55 | 6 |
| 17:25:00 | 7 |
| 17:25:04 | 8 |
| 17:25:05 | 9 |
| 17:25:08 | 10 |
| 17:25:10 | 11 |
| 17:25:10 | 12 |
| 17:25:12 | 13 |
| 17:25:13 | 14 |
| 17:25:18 | 15 |
| 17:25:21 | 16 |
| 17:25:25 | 17 |
| 17:25:30 | 18 |
| 17:25:33 | 19 |
| 17:25:38 | 20 |
| 17:25:45 | 21 |
| 17:25:48 | 22 |
| 17:25:51 | 23 |
| 17:25:54 | 24 |
| 17:25:58 | 25 |

        THE WITNESS:  I don't know.

BY MR. SULLIVAN:

        Q.    What are you hoping for if you win?

        A.    To get the shares I was promised I would

get.

        Q.    And when you left in 2001, did you get

stock certificates, or anything of that nature?

        MS. HASSELMAN:  Objection, compound, and vague

and ambiguous.

        THE WITNESS:  Just my statements.

BY MR. SULLIVAN:

        Q.    Just your statements.

             Did you get anything other than the

statements and the various correspondence that we

have covered related to your shares?

        A.    No.

             Hold on.  Maybe I remember getting the,

when you get a, when you leave, when you leave, you

get a check of, I can't remember the name of it, but

I think I got one of those, like a, I can't think of

the word.

        Q.    Did it summarize how many shares you had?

        A.    No.  It had nothing to do with the shares,

and the company was just like, thank you for working

here, and, you know, you are leaving, and, so --

191

**LORA D. SMITH**

04/16/08

| 17:26:01 | 1 | I can't think of the word I'm looking for, |
| 17:26:04 | 2 | but it was something like that. |
| 17:26:05 | 3 | Q.   So is that first phone call to Debby, I |
| 17:26:09 | 4 | think you mentioned Debby in HR -- |
| 17:26:11 | 5 | A.   Uh-huh. |
| 17:26:11 | 6 | Q.   -- in Monterey, that's when you first |
| 17:26:14 | 7 | inquired about entitlement under the ESOP? |
| 17:26:17 | 8 | A.   Yes. |
| 17:26:20 | 9 | Q.   So, if you received your shares, would you |
| 17:26:23 | 10 | have any other losses? |
| 17:26:25 | 11 | MS. HASSELMAN:  Objection.  Calls for a legal |
| 17:26:27 | 12 | conclusion. |
| 17:26:31 | 13 | THE WITNESS:  No. |
| 17:26:37 | 14 | BY MR. SULLIVAN: |
| 17:26:37 | 15 | *DI  Q.   Earlier today, Mr. Lovitt introduced |
| 17:26:41 | 16 | Exhibit 147, which is the second amended class |
| 17:26:44 | 17 | action corrected complaint. |
| 17:26:49 | 18 | Did you have any input into the drafting |
| 17:26:51 | 19 | of that document? |
| 17:26:54 | 20 | MS. HASSELMAN:  Objection.  Calls for |
| 17:26:55 | 21 | attorney-client communications. |
| 17:26:59 | 22 | I'm not going to let her answer that. |
| 17:27:03 | 23 | BY MR. SULLIVAN: |
| 17:27:04 | 24 | Q.   Are you going to go ahead and follow the |
| 17:27:05 | 25 | instruction not to answer whether you had any input |

192

**LORA D. SMITH**

17:27:07  1    as to the complaint?

17:27:08  2        A.   Yes.

17:27:11  3        Q.   Did you review the complaint before it was

17:27:14  4    filed?

17:27:17  5        MS. HASSELMAN:   Objection.  Vague and

17:27:17  6    ambiguous.

17:27:20  7             Which complaint are you referring to?

17:27:22  8        MR. SULLIVAN:   Exhibit 147.

17:27:30  9        THE WITNESS:   No.

17:27:32  10   BY MR. SULLIVAN:

17:27:33  11       Q.   Were you aware that there were prior

17:27:35  12   versions of the complaint that were filed before the

17:27:37  13   January 18, 2008 date?

17:27:40  14       A.   Yes.

17:27:42  15       Q.   Had you reviewed any of the prior versions

17:27:45  16   of the complaint before they were filed?

17:27:48  17       A.   Yes.

17:27:52  18       Q.   Which version of the complaint did you

17:27:54  19   review?

17:27:57  20       A.   You mean did I review it before it was

17:27:59  21   actually filed?

17:28:00  22       Q.   Yes.

17:28:01  23       A.   No.  I'm sorry.  I take that back.  I

17:28:03  24   didn't read it before it was filed.  I saw the

17:28:05  25   complaint after it was filed.

17:29:40  1      go to page 13, it's paragraph 52.

17:29:55  2              Do you have any personal knowledge of

17:29:58  3      facts that support the statement that defendant

17:30:00  4      fiduciaries and KMH management intentionally

17:30:03  5      withheld information about the extent of KMH's

17:30:08  6      potential asbestos liability from participants who

17:30:10  7      were active employees, including plaintiffs

17:30:14  8      Fernandez and Thomas, that would have shown them and

17:30:16  9      other participants that the plan overpaid for KMH

17:30:22  10     stock?

17:30:22  11         MS. HASSELMAN:  Objection.  Calls for a legal

17:30:24  12     conclusion.

17:30:25  13         THE WITNESS:  No.

17:31:10  14     BY MR. SULLIVAN:

17:31:11  15         Q.   We talked earlier about the North Star

17:31:12  16     Trust Company, and it was a little unclear to me.

17:31:17  17              Do you know who North Star Trust Company

17:31:18  18     is?

17:31:19  19         MS. HASSELMAN:  Objection.  Asked and answered.

17:31:21  20         THE WITNESS:  No.

17:31:30  21     BY MR. SULLIVAN:

17:31:30  22         Q.   In terms of your complaint, is there

17:31:33  23     anything specific that you think that North Star

17:31:34  24     Trust Company did to not permit you to receive your

17:31:40  25     shares under the ESOP?

195

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____MAY  1 2008_____


TRACY L. PERRY
CSR No. 9577

1       I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3       That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11      Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15      I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18      IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____    MAY  1 2008

22

23                      _____

24                      CHRIS TE SELLE
                        CSR No. 10836

25

**EXHIBIT C**

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO AND OAKLAND DIVISION

4

5

6    THOMAS FERNANDEZ, et al.,              )
                                            )
7              Plaintiffs,                  )
                                            ) Case No.
8          vs.                             )
                                            ) C-06-07339 CW
9    K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                            )
10             Defendants.                  )
                                            )
11                                          )
                                            )
12

13

14

          VIDEOTAPED DEPOSITION OF TOSHA THOMAS
15                  April 18, 2008
              San Francisco, California
16

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 79885
24

25

1

1    said employee stock option plan.  I assume you mean

2    employee stock ownership plan.

3                    MR. HANNAN:  Sure.  I misspoke.

4                    MS. HASSELMAN:   I did not notice it until

09:44  5    the question was already out, but we might want to

6    re-ask it.

7    BY MR. HANNAN:

8         Q    Let me make it clear.  I misspoke and I

9    apologize, Ms. Thomas.  It's the employee stock

09:44  10   ownership plan.  Would your answer still be the same?

11        A    Yes.

12        Q    Now, did you become employed with

13   Kelly-Moore sometime in July of 2000?

14        A    Yes.

09:45  15        Q    And was that your next employment after the

16   Good Guys?

17        A    Yes.

18        Q    And how did you become -- happen to become

19   employed with Kelly-Moore?

09:45  20        A    Well, they had a job posting, so I applied

21   for a job at the time, which was an opening for the

22   mailroom.

23        Q    All right.  And you continued to be

24   employed with Kelly-Moore until July 2 of 2007?

09:45  25        A    Yes.

15

1  Q And as of July 2, 2007, you did not know

2 anything about the existence of a lawsuit pertaining to

3 the Kelly-Moore employee stock ownership plan; true?

4  A Yes.

09:46 5  Q Now, initially you were employed in the

6 mailroom at Kelly-Moore?

7  A Yes.

8  Q And how long were you employed in the

9 mailroom?

09:46 10  A For about from the day I started for about

11 a year, probably up until August of 2001.

12  Q And you, thereafter, became employed in

13 what?

14  A The human resources department.

09:46 15  Q All right.  And would you tell us what kind

16 of work the human resources department at Kelly-Moore

17 engaged in?

18    MS. HASSELMAN:  Objection.  Vague.

19 BY MR. HANNAN:

09:47 20  Q Do you understand the question?

21  A Can you repeat that, please?

22  Q Sure.  What did you understand to be the

23 purpose of the human resources department at

24 Kelly-Moore?

09:47 25    MS. HASSELMAN:  Objection.  Vague and

16

| | | |
|---|---|---|
| | 1 | is that? |
| | 2 | A    That was my relative of mine, that was her |
| | 3 | employer at the time. |
| | 4 | Q    I see.  And how did you come to prepare |
| 10:10 | 5 | these two pages of Exhibit 184? |
| | 6 | MS. HASSELMAN:   Objection.  Vague. |
| | 7 | A    Sorry.  Can you repeat it, please? |
| | 8 | BY MR. HANNAN: |
| | 9 | Q    How is it that you went through the process |
| 10:10 | 10 | of preparing these two pages, Exhibit 184? |
| | 11 | A    I just created the resume myself. |
| | 12 | Q    And had you seen some posting that |
| | 13 | indicated a position might be available with |
| | 14 | Kelly-Moore? |
| 10:11 | 15 | A    Yes, it was in a newspaper at the time. |
| | 16 | Q    Now, you were employed with Kelly-Moore |
| | 17 | until I believe July 2 of '07; is that correct? |
| | 18 | A    Yes. |
| | 19 | Q    And what happened that caused you to leave |
| 10:11 | 20 | Kelly-Moore? |
| | 21 | A    At the time when I left, I was -- I felt I |
| | 22 | was or I received discriminatory actions against myself |
| | 23 | and I worked in a hostile environment so I left the |
| | 24 | company. |
| 10:11 | 25 | Q    All right.  And what individual or |

30

```
 1   individuals engaged in discriminatory actions against

 2   you?

 3        A    At the time it was Debbie Culmer and

 4   Theresa Locascio.

 5        Q    I'm sorry.  I did not catch the second one.

 6   Theresa --

 7        A    Locascio.

 8        Q    Could you spell Locascio, for us?

 9        A    I believe it's L-o-c-a-s-c-i-o.

10        Q    And what is it that Ms. Culmer did that you

11   felt was discriminatory against you?

12        A    Raising her voice at me numerous times in

13   front of other employees, throwing paper towards me in

14   front of everyone, talking down to me just making me

15   feel bad in front of others as though she wasn't doing

16   to other employees in the department.

17             MS. HASSELMAN:   I am going to object to

18   this line of questions.  This is not relevant to the

19   case at all.  It's personal.  If there is a reason that

20   you can articulate to me that this is relevant to this

21   case.

22             MR. HANNAN:   Sure.  It's highly relevant.

23   It has to do with bias.

24   BY MR. HANNAN:

25        Q    All right.  And what is it that
```

10:12  5
10:12 10
10:12 15
10:13 20
10:13 25

31

1    Ms. Locascio did that caused you to conclude that she

2    was taking discriminatory action against you?

3        A    She, herself, I felt she also did a form of

4    harassment by following me throughout the building.  And

10:13  5    I did make a complaint regarding those actions.

6    Basically --

7        Q    And --

8        A    -- basically -- sorry to interrupt --

9    invading my space.

10:13  10       Q    Is there -- is there anything else that she

11   did apart from that that you felt constituted

12   harassment?

13       A    That was basically the gist of it, yeah.

14            MS. HASSELMAN:    I am objecting that this

10:13  15   whole line of questions is outside the scope of what

16   could possibly lead to the discovery of admissible

17   evidence in this case.  And I believe that there is not

18   a purpose to this line of questions other than to harass

19   the witness.  So I will leave a standing objection to

10:14  20   this line of questions.

21   BY MR. HANNAN:

22       Q    Returning to Ms. Culmer, have you told us

23   everything that Ms. Culmer did that you believe

24   constituted a discriminatory action against you?

10:14  25       A    Yes.

32

```
 1              Q      And have you told us everything that

 2       Ms. Locascio did that you believe constituted

 3       discriminatory action against you?

 4              A      Yes.

10:14  5              Q      All right.  Now, you say you reported the

 6       action by Ms. Locascio.  To whom did you report it?

 7              A      To Steve DeVoe.

 8              Q      And would you tell us who Mr. DeVoe was at

 9       the time?

10:14 10              A      Well, at the time he is the president of

11       Kelly-Moore Paint.

12              Q      And when did you report this to Mr. DeVoe?

13              A      I'm not -- I don't have exact dates but it

14       was before I left the company.

10:15 15              Q      Within a week?

16              A      I would say maybe couple months before.

17              Q      Couple of months before?

18              A      Yes.

19              Q      So it might have been in April or May?

10:15 20              A      Yes.

21                     MS. HASSELMAN:    Objection.  Calls for

22       speculation.  I realize it's a late objection, but it's

23       to the question, so it might have been in April or May.

24       And I am just going to renew my standing objection.  I

10:15 25       think you may need to wrap up this line of questions
```

33

```
 1   because it sounds like you are conducting discovery on

 2   an entirely different case and you are just harassing

 3   the witness.

 4   BY MR. HANNAN:

 5        Q     And tell us what you said to Mr. DeVoe and

 6   what he said to you with respect to that subject matter

 7   when you reported it to him.

 8        A     Well, I told him that I felt I was being

 9   mistreated, and I wanted to talk to him about the

10   situations that were going on or that I experienced at

11   the time.  And one of his suggestions were that we

12   should sit down -- me, myself, my manager and assistant

13   manager should talk about the situation or the matters.

14        Q     Anything else?

15        A     No.

16        Q     And what transpired after this conversation

17   with respect to that subject?

18        A     I'm sorry.  What transpired?  With myself

19   and my supervisor or --

20        Q     Yes, let's be precise.

21        A     Okay.

22        Q     A suggestion was made by Mr. DeVoe that

23   there be a meeting.  Did that take place?

24        A     Yes.

25        Q     And who was present?
```

Time stamps: 10:15 (line 5), 10:15 (line 10), 10:16 (line 15), 10:16 (line 20), 10:16 (line 25)

1        A    Debbie Culmer and Theresa Locascio.  Also

2    Lizzy Fernandez.

3        Q    Now, Ms. Culmer was your supervisor.  Who

4    was Ms. Fernandez?

10:16   5        A    She is a coworker that worked in human

6    resources department.

7        Q    And what was the reason for her being

8    present?

9        A    Because she was a witness to some of the

10:16   10   accusations -- or not accusations but some of the

11   complaints that I made pertaining to Debbie Culmer and

12   Theresa.

13       Q    And Theresa was present?

14       A    Yes.

10:17   15       Q    And what transpired in that meeting?

16       A    That basically for us to see if we can sit

17   down and talk about the situations as a group and maybe

18   it will resolve itself.

19            MR. HANNAN:  I'm sorry.  Could we have that

10:17   20   answer read back?

21                 (Record read by the reporter.)

22

23   BY MR. HANNAN:

24       Q    And did you then sit down and have that

10:17   25   discussion?

35

1         A    Yes.

2         Q    And what was the result of that discussion?

3         A    Well, I thought that things would get

4    better or change, and they did not.

10:18  5         Q    All right.  And did you suffer further

6    instances of what you believe to be harassment after

7    this meeting?

8         A    Yes.

9         Q    And did you make any complaint to anyone in

10:18 10    connection with these further incidents?

11         A    I did speak with Debbie Culmer, herself,

12    regarding some of the incidents, which basically led --

13    I mean, it did not resolve itself.  So I felt there was

14    no point to speak with her anymore about it.

10:18 15         Q    But you did speak to her at least once

16    after this group meeting?

17         A    Yes.

18         Q    And what did you say to her and she to you

19    on that occasion?

10:18 20         A    Well, I told her basically my feelings of

21    feeling that I was being mistreated.  Of course, she

22    disagreed.  And that was basically it.

23         MS. HASSELMAN:    I am going to renew my

24    objection here.  I think you are completely far off

10:19 25    field from what could possibly be relevant to this case.

36

1    You have not articulated how this could affect any way

2    that Ms. Thomas could -- anything about anything that is

3    relevant to this case.  I think you are conducting

4    discovery on another case.  I am going to give you three

10:19    5    more questions on this line and then we are going to

6    need to stop and you are going to either move on to

7    another line of questions or we are going to need to

8    leave.

9    BY MR. HANNAN:

10:19    10        Q    And did you make any effort to discuss this

11    matter with Mr. DeVoe after the meeting you just

12    described with Ms. Culmer?

13        A    Yes, after I left the company, I spoke with

14    him on the phone.

10:19    15        Q    And when did that occur?

16        A    Probably a week after my employment -- a

17    week after I left Kelly-Moore Paint.

18        Q    All right.  And what did you say to him and

19    he to you on that call?

10:20    20        MS. HASSELMAN:    Objection.  Compound.

21        A    Basically that the mistreatment that I

22    experienced from Debbie and that I can no longer work

23    with her under those conditions.  At the time I

24    mentioned that I would like to work with Kelly-Moore but

10:20    25    I can no longer work with her.  And at the time my

1    position was the only one that was open, so I decided

2    there wasn't an option for me.

3                    MS. HASSELMAN:    Let's take a break.  We

4    will go off the record.

10:20    5                    THE VIDEOGRAPHER:    We are off the record

6    at 10:20 a.m.

7                        (Recess 10:20 a.m.-10:41 a.m.)

8                    THE VIDEOGRAPHER:    We are back on the

9    record.  The time is 10:41.

10:42    10                    MS. HASSELMAN:    So as you know we've made

11    an objection that this line of questions regarding the

12    factual details surrounding Ms. Thomas' departure from

13    Kelly-Moore and her concerns regarding discrimination is

14    entirely irrelevant to this case and that the only

10:42    15    purpose for asking these questions is to harass and

16    upset the witness.

17                The way we think it makes the most sense to

18    proceed is if -- to allow you to continue the line of

19    questions for another few minutes.  But if you have more

10:42    20    than another ten minutes of questions on this line, we

21    are going to need to get a magistrate judge on the phone

22    in order to determine whether you are allowed to

23    continue to ask this line of questions.  And if the

24    judge says you are, then you are.  And that's how we

10:42    25    best think it is to proceed.

                                                                                    38

1          A     Anyone other?

2          Q     Anyone at all after the moment in time when

3     you hung up the telephone with Mr. DeVoe?

4          A     Well, the only other person that I

10:47  5     contacted was the unemployment office to basically

6     provide information as to why I left the company.

7          Q     And with whom did you speak at the

8     unemployment office?

9          A     I don't remember the name.  It was just an

10:48  10     unemployment claimant.

11          Q     Claimant?

12          A     A claims rep that takes, I guess, takes in

13     the information.

14          Q     All right.  Now, you have made reference --

10:48  15     let's go on beyond that.

16          A     Okay.

17          Q     After the discussion you had with the

18     claims representative, did you have any further

19     discussion at any time with anyone from Kelly-Moore

10:48  20     about the subject matter of harassment?

21          A     No.

22          Q     You mentioned that there were racial

23     comments made by upper management?

24          A     Yes.

10:48  25     Q     And those were directed at you?

43

1        A    I wouldn't necessarily say directed at me,

2   but I took offense to it as being an African-American

3   person.

4        Q    All right.  And when did you first take

10:49 5   offense at such comments?

6        A    I would say I heard it a few months or so

7   before I left the company.

8        Q    Would this be then April or May of '07?

9        A    Probably I would say April.

10:49 10       Q    And how many instances were there of these

11  comments?

12       A    To my knowledge it was just one particular

13  comment.

14       Q    All right.  And where did this comment

10:49 15  occur?

16       A    In the human resources department.

17       Q    And who was present?

18       A    It was Lizzy Fernandez, Theresa Locascio,

19  and Walter Leclerc.

10:49 20       Q    Walter Leclerc?

21       A    Leclerc.

22       Q    Would you spell Leclerc for us?

23       A    I believe it's L-e-c-l-e-r-c.

24       Q    All right.  And who was it that made the

10:50 25  first such comment?

44

1          A     Brought to my attention, it was Walter

2     Leclerc that made the comment.

3          Q     Was there more than one comment?

4          A     No.

10:50  5          Q     What is it that Mr. Leclerc said?

6          A     He made a comment of I hope it's not

7     another nigger.

8          Q     What was Mr. Leclerc's position at the time

9     he made that comment?

10:50  10          A     I believe he was director of risk

11     management.

12          Q     Is that an upper management position?

13          A     Yes.

14          Q     Now, had you in the past had some complaint

10:50  15     involving a woman named -- I may not pronounce it

16     correctly -- Voyce, V-o-y-c-e, or Voyce?

17          A     Yes.

18          Q     How is that pronounced?

19          A     Voyce, V-o-y-c-e.

10:51  20          Q     V-o-y-c-e?

21          A     Yes.

22          MR. HANNAN:  All right.  Mark as next in

23     order Exhibit 185 what appears to be a copy of a

24     Kelly-Moore memo dated January 12, 2004, revised January

10:51  25     20, 2004, subject, harassment is illegal.  And it has

45

```
 1          Q    Sure.  Were you aware that harassment was

 2     illegal at the time that you suffered the harassment

 3     you've described?

 4          A    Yes, I was aware it's illegal.

 5          Q    And was it partly as a result of having

 6     received this Exhibit 185?

 7          A    No.

 8               MR. HANNAN:   Mark as Exhibit 186 what

 9     appears to be a copy of a memorandum from Debbie Culmer

10     to Walter Leclerc.  The subject is personnel issue.  And

11     its production number is KMH 011098.

12                    (Exhibit No. 186 marked

13                     for identification.)

14

15     BY MR. HANNAN:

16          Q    Can you tell us what Exhibit 186 is,

17     Ms. Thomas?

18               MS. HASSELMAN:   Objection.  Vague.  Calls

19     for speculation.

20          A    It looks basically just an e-mail from

21     Debbie Culmer to Walter Leclerc.

22     BY MR. HANNAN:

23          Q    And have you seen this document before?

24          A    No.

25          Q    All right.  The document refers in the
```

10:53  5
10:53 10
10:54 20
10:54 25

47

1   first paragraph to a meeting with Tosha and Voyce.  Do

2   you recall that meeting?

3           A    Yes.

4           Q    All right.  And what occasioned that

10:54  5   meeting?

6           A    I'm sorry.  Can you repeat it, please?

7           Q    Why did that meeting occur?

8           A    Well, because Voyce was making

9   inappropriate comments to me.

10:55  10          Q    And what were these inappropriate comments?

11          A    Calling -- she called me Uncle Tom.  Said

12   that I was white in the face, basically that I was

13   trying to be white, basically.

14          Q    And there is an "N" with a blank here.  Did

10:55  15   she also call you some word beginning with "N"?

16          A    Nigger.

17          Q    And who was Voyce?

18          A    She was the receptionist at the time.

19          Q    All right.  And what race was Voyce?

10:55  20          A    African-American.

21          Q    And did you complain to anyone about

22   Voyce's conduct?

23          A    To Debbie Culmer.

24          Q    And what happened as a result of that

10:55  25   complaint?

1          A    When I brought it to Debbie's attention the

2    comments that Voyce made to me, that it bothered me, we

3    arranged, or Debbie arranged for the three of us to sit

4    down and have a discussion about it.

10:55    5          Q    And did that solve the problem?

6          A    I would -- totally, no, I mean, honestly,

7    no.

8          Q    Did it continue to be a problem thereafter?

9          A    She did not make those comments afterwards

10:56   10    but that does not erase the matter itself.

11          Q    All right.

12               MS. HASSELMAN:    Are you doing okay?

13               THE WITNESS:    Yeah.

14    BY MR. HANNAN:

10:56   15          Q    Now, did you take any action as a result of

16    your experiences that constituted harassment?

17               MS. HASSELMAN:    Objection.   Vague and

18    ambiguous.

19          A    You mean pertaining to this situation or --

20    BY MR. HANNAN:

21          Q    Well, let me -- that's not a good question.

22    Let me rephrase it.

23               You have indicated to us now that you

24    experienced several incidents of what you considered to

10:56   25    be harassment; true?

1          Q    You cannot tell me whether you ever spoke

2     with an attorney?  I am not asking what you said, but

3     did you ever speak with an attorney about the subject

4     matter of harassment?

10:57   5          A    Yes.

6               MS. HASSELMAN:    Objection.  You just asked

7     about the subject matter of the conversation with the

8     attorney.  You can ask whether she spoke with an

9     attorney and when but not anything about the subject

10:58  10     matter.

11     BY MR. HANNAN:

12          Q    I am not asking her what she said or what

13     the attorney said.  I am entitled to ask her whether

14     with respect to this subject as opposed to her estate

10:58  15     plan she spoke with an attorney.

16               And with what attorney or attorneys did you

17     speak with regard to the subject matter of harassment?

18          A    I contacted an attorney by the name of

19     Peter Rukin.

10:58  20          Q    Could you spell the last name for us?

21          A    R-u-k-i-n.

22          Q    All right.  And did you speak to any other

23     lawyer about this subject matter?

24          A    No.

10:58  25          Q    All right.  And did you engage Mr. Rukin's

51

1    services?

2         A    Did I engage his services?

3         Q    Yes, as a lawyer?

4         A    Yes.

10:58  5    Q    And did he agree to represent you?

6         MS. HASSELMAN:   Objection.  You are

7    getting into the content of the conversations at this

8    point.  I think you can ask it a different way that does

9    not look so much like it's looking for the subject

10:58 10    matter of the conversations.

11    BY MR. HANNAN:

12        Q    Did Mr. Rukin --

13        MS. HASSELMAN:   It's Rukin.

14    BY MR. HANNAN:

10:59 15    Q    I'm sorry.  Rukin.  Pardon me.  Strike

16    that.

17        Did Mr. Rukin undertake to represent you

18    with respect to the subject matter of harassment at

19    Kelly-Moore?

10:59 20    A    Well, we spoke about --

21        MS. HASSELMAN:   Objection.  This is the

22    type of question that is very difficult to answer

23    without getting into attorney client communications.

24    BY MR. HANNAN:

10:59 25    Q    How about yes or no?

52

| | | |
|---|---|---|
| | 1 | MS. HASSELMAN:   Yes or no would be an |
| | 2 | acceptable answer. |
| | 3 | BY MR. HANNAN: |
| | 4 | Q    Would you give us a yes or no?  Do you |
| 10:59 | 5 | recall the question? |
| | 6 | A    Can you repeat the question again, please? |
| | 7 | Q    Sure.  Did Mr. Rukin undertake to represent |
| | 8 | you with respect to the subject matter of harassment at |
| | 9 | Kelly-Moore?  Yes or no? |
| 10:59 | 10 | A    No, not at this time, no. |
| | 11 | Q    Did he at any time undertake to represent |
| | 12 | you with regard to that subject? |
| | 13 | A    No. |
| | 14 | Q    Have you taken any action, any legal action |
| 11:00 | 15 | of any sort with respect to that subject matter? |
| | 16 | A    Yes. |
| | 17 | Q    And what action have you taken? |
| | 18 | A    I contacted the EEOC. |
| | 19 | Q    And when did you do that? |
| 11:00 | 20 | A    I believe it was maybe September of '07. |
| | 21 | Q    All right.  And as a result of contacting |
| | 22 | them, did you take any further action? |
| | 23 | MS. HASSELMAN:   Objection.  Vague and |
| | 24 | ambiguous. |
| 11:00 | 25 | A    I'm sorry.  As of -- can you repeat it, |

53

1   please?

2   BY MR. HANNAN:

3         Q    Sure.  Did you do anything as a result of

4   having contacted the EEOC?

11:00  5              MS. HASSELMAN:    Same objection.

6         A    I provided whatever information, but --

7   BY MR. HANNAN:

8         Q    Did you file a complaint?

9         A    Yes.

11:00  10        Q    All right.  And when did you file the

11   complaint?

12        A    I don't have an exact date, but I would say

13   maybe September of '07.

14        Q    All right.  And what is the status of that

11:01  15   complaint?

16              MS. HASSELMAN:    Objection.  Vague.

17        A    Well, it's still in process.

18   BY MR. HANNAN:

19        Q    And have you had any discussion with anyone

11:01  20   about the subject matter of that complaint?

21        A    I'm sorry.  Discussion meaning?

22        Q    With anyone about the subject matter of

23   your EEOC complaint?

24        A    No, just the EEOC themselves.

11:01  25        Q    And with whom did you have that discussion

54

```
        1    at the EEOC?

        2         A     Scott -- I believe his name is Scott

        3    Doutie.

        4         Q     And when did you have that discussion?

11:01   5         A     It's been ongoing.  Probably about maybe

        6    four or five months ago.

        7         Q     Have you had several discussions?

        8         A     Yes.

        9         Q     And when was the most recent of those

11:01   10   discussions?

        11        A     I believe a couple weeks ago.

        12        Q     Now, you've testified that you first

        13   learned of the existence of this ESOP lawsuit after you

        14   left Kelly-Moore; true?

11:02   15        A     I'm sorry?  Repeat it, please.

        16        Q     If I understood your testimony, you

        17   testified that you first heard about the lawsuit you are

        18   here on today after you left Kelly-Moore; is that true?

        19        A     Yes.

11:02   20        Q     All right.  And when did you learn about

        21   this lawsuit?

        22              MS. HASSELMAN:   I am just going to caution

        23   the witness that the question of when you learned about

        24   the lawsuit is a proper question.  You can answer it

11:02   25   with a date.  But make sure that we don't get into any
```

                                                                    55

1          Q     And would you look, please, at

2     paragraph 27.  That paragraph states among other things

3     that the Kelly-Moore shares were valued at approximately

4     $6.88 per share.

11:12   5          MS. HASSELMAN:   Objection.  Misstates what

6     the document says and also vague as to time.

7     BY MR. HANNAN:

8          Q     How did you know that?

9          MS. HASSELMAN:   Objection.  Misstates

11:13  10     prior testimony.  Calls for a legal conclusion and

11     potentially calls for attorney client communications.

12     So if you can answer the question without getting into

13     any communications to or from counsel, you can answer.

14     And if not, you shouldn't.

11:13  15          A     Can't answer that question.

16     BY MR. HANNAN:

17          Q     Do you know whether it's true or not?

18          A     No, I don't know that it's true.

19          Q     Do you as you sit here today have any

11:13  20     problem with how the shares were valued?

21          MS. HASSELMAN:   Objection.  Calls for a

22     legal conclusion.  Vague and ambiguous.  Also vague as

23     to time.

24          A     Sorry.  Please repeat it, please.

11:14  25     BY MR. HANNAN:

64

```
 1          Q    Yes.  As you sit here right now, do you

 2     have any problem with the way the shares in Kelly-Moore

 3     were valued?

 4               MS. HASSELMAN:    Objection.    Same

11:14  5     objections.

 6          A    Yes.

 7     BY MR. HANNAN:

 8          Q    What is your problem?

 9               MS. HASSELMAN:    Objection.    Vague.

11:14  10        A    That there was too much paid into the plan.

11     BY MR. HANNAN:

12          Q    I see.  And what amount was paid that was

13     too much?

14               MS. HASSELMAN:    Objection.    Vague and

11:14  15    ambiguous and calls for a legal conclusion.

16          A    I don't know.

17     BY MR. HANNAN:

18          Q    Well, how much too much was it?

19               MS. HASSELMAN:    Objection.    Calls for a

11:14  20    legal conclusion.  You are asking her to testify about

21     damages.  It's an issue for experts.

22          A    I don't know.  Can't answer that question.

23     BY MR. HANNAN:

24          Q    Do you have any idea at all how much too

11:15  25    much you believe was paid?
```

1          MS. HASSELMAN:   Objection.  Asked and

2     answered.

3          A     No.

4     BY MR. HANNAN:

11:15     5          Q     Now, you also -- in this paragraph the

6     complaint also says that money was borrowed from

7     Kelly-Moore, 232 million.  Do you have some problem with

8     that?

9          MS. HASSELMAN:   Objection.  Misstates what

11:15    10     the document says.  Vague and ambiguous.  Argumentative.

11          A     You are asking me if I had any problem with

12     it?

13     BY MR. HANNAN:

14          Q     Yeah, is that a problem for you?

11:15    15          MS. HASSELMAN:   Same objections.

16          A     I don't know.

17     BY MR. HANNAN:

18          Q     And then it also says here that Kelly-Moore

19     in turn borrowed 136 million from CIG.  What is CIG?

11:16    20          A     California Insurance Group, I believe.

21          Q     All right.  And do you have a problem of

22     any sort with Kelly-Moore allegedly borrowing

23     136 million from CIG?

24          MS. HASSELMAN:   Same objections.  Vague

11:16    25     and ambiguous.  Calls for a legal conclusion.

66

```
 1   Argumentative.

 2        A    I don't know.

 3   BY MR. HANNAN:

 4        Q    All right.  Would you look at paragraph 28.

11:17  5  A    Okay.

 6        Q    And in part, paragraph 28 says that the

 7   defendant fiduciaries.  Who are they?

 8             MS. HASSELMAN:   Objection.  Calls for a

 9   legal conclusion.  Are you asking her or potentially ask

11:17 10  her to characterize a part of the document that you

11   haven't shown to her?

12   BY MR. HANNAN:

13        Q    Who did you think they were when you read

14   this in or about October of '07?

11:17 15            MS. HASSELMAN:   Objection.  Misstates

16   prior testimony.  Assumes facts not in evidence.

17        A    I don't know.  I have no idea.

18   BY MR. HANNAN:

19        Q    Then it says whoever these fiduciaries

11:17 20  were, that they failed to investigate adequately the

21   qualifications of any valuation expert.  Is that true?

22        A    Is this line -- paragraph 28?

23        Q    Yes, where it says -- the particular

24   portion that says that the fiduciaries failed to

11:18 25  investigate adequately the qualifications of any
```

```
 1   valuation expert retained to prepare the valuation of

 2   KMH in connection, so on and so forth?

 3            MS. HASSELMAN:   It's paragraph 29.

 4   BY MR. HANNAN:

 5        Q    I'm sorry.  I misspoke.  Let's go to

 6   paragraph 29, the paragraph.  What facts do you base

 7   your understanding upon, if any, that the fiduciaries

 8   failed to adequately investigate the qualifications of

 9   any valuation expert retained to prepare the valuation

10   of KMH?

11            MS. HASSELMAN:   Objection.  Calls for a

12   legal conclusion.  Assumes facts not in evidence.

13        A    I don't know.

14   BY MR. HANNAN:

15        Q    Going back to paragraph 28, is it true that

16   the defendant fiduciaries failed to insure that they

17   secured an independent expert assessment of the fair

18   market value of the KMH Series P stock purchased by the

19   plan on October 13, 1998?

20            MS. HASSELMAN:   Objection.  Calls for a

21   legal conclusion.  Vague and ambiguous.

22        A    I don't know.

23   BY MR. HANNAN:

24        Q    Would you turn to paragraph 32, please.

25   Among other things paragraph 32 says that Kelly-Moore
```

Timestamps in left margin: 11:18 (line 5), 11:18 (line 10), 11:19 (line 15), 11:19 (line 20), 11:20 (line 25)

68

```
 1    Paint Company -- strike that.
 2              Among other things, paragraph 32 says the
 3    valuation report of Kelly-Moore Paint Company prepared
 4    in connection with the October 13, '98 transaction
 5    failed to take into account KMH's potential liability in
 6    asbestos litigation.  Is that true?
 7              MS. HASSELMAN:   Objection.  The document
 8    speaks for itself.  Characterization is incomplete.
 9    Calls for a legal conclusion.  Calls for expert
10    testimony.
11         A    I don't know.
12    BY MR. HANNAN:
13         Q    Do you have any facts at all in your
14    possession that suggest to you that Kelly-Moore didn't
15    adequately consider asbestos exposure in October of
16    1998?
17              MS. HASSELMAN:   Objection.  Calls for a
18    legal conclusion.  Also you can answer to the extent
19    that you have facts in your personal knowledge that
20    don't -- that you can answer the question without
21    getting into any communications from counsel.  But if
22    you have to reveal communications from counsel to answer
23    the question, then you shouldn't.
24         A    Can't answer the question.
25    BY MR. HANNAN:
```

11:20  5
11:20  10
11:21  15
11:21  20
11:21  25

69

1        Q    That's because you don't know of any facts;

2   true?

3             MS. HASSELMAN:    Objection.  Argumentative.

4   Same objections as to the prior question.

11:21   5        A    You are saying because I don't know of any

6   facts?

7   BY MR. HANNAN:

8        Q    You don't know of any facts to support that

9   statement, do you?

11:21   10            MS. HASSELMAN:    Same objections.

11  Argumentative.

12       A    No.

13  BY MR. HANNAN:

14       Q    Now, it also says in paragraph 32 that this

11:21   15  significant asbestos liability was known to KMH

16  management.  Do you have any facts to support that

17  claim?

18            MS. HASSELMAN:    Same objections.  Calls

19  for a legal conclusion.  Argumentative.  Vague.

11:22   20       A    I'm sorry.  Paragraph 32?

21  BY MR. HANNAN:

22       Q    Yes, it's toward the end of paragraph 32.

23       A    No.

24       Q    Now, in paragraph 33 it makes reference to

11:22   25  something called tracking stock.  What is tracking

70

1    stock?

2               MS. HASSELMAN:    Objection.   Vague.   Calls

3    for expert testimony.   Calls for a legal conclusion.

4        A    I don't know.   I don't remember.

11:23  5           MS. HASSELMAN:    Are you doing okay?   Just

6    let us know if you want a break.

7            MR. HANNAN:    If you want to take a break,

8    just let us know.

9            THE WITNESS:    Yeah, I think so.

11:23  10         MR. HANNAN:    Mark as next in order, which

11   I believe is 187, what appears to be a Mind Our Own

12   Business of Kelly-Moore Paint Company letterhead with

13   the ESOP logo on the left side.   And it is dated October

14   2000.   The production numbers are KMH 000087 through 92.

15            (Exhibit No. 187 marked

16             for identification.)

17

18         MS. HASSELMAN:    I think the witness has

19   asked for a little break.

11:24  20         MR. HANNAN:    I'm sorry.   Do you want to

21   take a break?

22         THE WITNESS:    Yeah.

23         MR. HANNAN:    Absolutely.

24         MS. HASSELMAN:    We will deal with the

11:24  25  exhibit when we come back.

```
 1   BY MR. HANNAN:

 2        Q    And did you ever go to those files to look

 3   at any of these newsletters?

 4        A    Well, no, not if it's not necessarily

13:22  5  pertaining -- pertaining to me, no.

 6        Q    Well, as of '01 you were a participant,

 7   were you not, in the ESOP?

 8        A    Yes.

 9        Q    All right.  And did you as a participant in

13:22 10  the ESOP attempt to pay attention to what was going on

11   with the ESOP?

12             MS. HASSELMAN:   Objection.  Vague and

13   ambiguous.

14        A    In the beginning, no, not at the time.

13:23 15            MR. HANNAN:   Mark as next in order

16   Exhibit 192, a one page document.  Appears to be a Mind

17   Your -- excuse me -- Our Own Business newsletter,

18   production No. KMH 010690.

19                  (Exhibit No. 192 marked

20                   for identification.)

21

22   BY MR. HANNAN:

23        Q    Ms. Thomas, would you look at Exhibit 192

24   and tell us whether you can identify that for us.

13:23 25        A    This is a Mind Your Own Business document.
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | ESOP's purchase of Kelly-Moore stock may have been for       |
|       | 2  | more than fair market value due to the failure to            |
|       | 3  | discount the purchase price of the stock to account for      |
|       | 4  | the fact that the stock purchased by the plan was            |
| 14:41 | 5  | tracking stock?                                              |

                    MS. HASSELMAN:   Objection.  Compound.

Vague and ambiguous.  Calls for a legal conclusion.

        A     Yes.

BY MR. HANNAN:

        Q     Now, how was it that the pension plan

should have discounted the purchase price of the stock

to account for the fact that it was tracking stock?

                    MS. HASSELMAN:   Objection.  A couple

things.  You said pension plan.  But also calls for a

legal conclusion and calls for expert testimony.

                    MR. HANNAN:    I will withdraw the question

because of the pension plan.

BY MR. HANNAN:

        Q     How was it in your understanding,

Ms. Thomas, that the stock should have been discounted

for the fact that it was tracking stock?

                    MS. HASSELMAN:   Same objections.  Calls

for a legal conclusion.  Calls for expert testimony.

        A     I don't know.

BY MR. HANNAN:

152

1          Q     You read this complaint, did you not, and

2     you saw paragraph 53?

3                MS. HASSELMAN:   Objection.  Misstates

4     prior testimony.  Argumentative.  Asked and answered.

14:43   5          A     Yes.

6     BY MR. HANNAN:

7          Q     And it's being claimed on your behalf in

8     this complaint that one of the issues had to do with a

9     failure to discount the purchase price of the

14:43  10     Kelly-Moore stock paid by the ESOP; correct?

11          A     Yes.

12          Q     Well, what was the problem?

13                MS. HASSELMAN:    Objection.  Calls for a

14     legal conclusion.  Vague and ambiguous.  Calls for

14:43  15     expert testimony.

16          A     I don't know.

17     BY MR. HANNAN:

18          Q     What do you understand that to mean?

19                MS. HASSELMAN:    Same objections.

14:43  20     Argumentative.  Asked and answered.  Calls for a legal

21     conclusion.  Calls for expert testimony.  Vague and

22     ambiguous.

23          A     I don't know.

24     BY MR. HANNAN:

14:44  25          Q     What does it mean to you to discount the

1    purchase price?

2            MS. HASSELMAN:    Objection.    Vague and

3    ambiguous.

4        A    To discount the purchase price?

14:44  5    BY MR. HANNAN:

6        Q    Yeah.

7        A    To present something at a lower value than

8    what it really is.

9        Q    Okay.    And I believe we asked this earlier,

14:44  10   but do you know whether or not the stock was tracking

11   stock?

12       A    No, I do not know.

13       Q    And particularly the so-called P stock, do

14   you know the difference between P stock and I stock?

14:44  15       A    No.

16           MR. HANNAN:    All right.    Mark as next in

17   order Exhibit 199 what appears to be a memorandum from

18   Robert Stetson to a series of addressees including

19   Ms. Thomas.    And it is dated August 24, 2005, production

14:45  20   Nos. P 1230 and 31.

21           MS. HASSELMAN:    I will just object that

22   the document speaks for itself, and we don't have a

23   foundation at this time as to whether the Ms. Thomas

24   that Mr. Hannan has just represented appears on this

14:45  25   document is, in fact, the plaintiff.

154

1       Q    In connection with this lawsuit did you

2    consider whether this lawsuit, if successful, might lead

3    to the bankruptcy of Kelly-Moore?

4       A    Yes.

14:48   5       Q    And are you prepared to --

6       MS. HASSELMAN:  I'm sorry.  I need to

7    object to the prior question as vague and ambiguous as

8    to the term, this lawsuit.

9    BY MR. HANNAN:

14:48  10       Q    Are you prepared to accept the risk of

11    placing Kelly-Moore in bankruptcy if you are successful

12    in this lawsuit?

13       MS. HASSELMAN:  Objection.  Vague and

14    ambiguous.  Accept the risk?

14:48  15       A    Yes.

16    BY MR. HANNAN:

17       Q    So sometime before August 24 of '05, you

18    understood that the circumstances arising from the

19    asbestos litigation were so severe that Kelly-Moore

14:49  20    might end up in bankruptcy; correct?

21       A    Yes.

22       MR. HANNAN:  Mark as next in order a

23    milestone, Exhibit 200, what appears to be a company

24    newsletter, Mind Our Own Business, dated October 2005,

14:49  25    production Nos. P 1126 through 29.

157

1    BY MR. HANNAN:

2         Q    You had a right, did you not, that was

3    legally protected to examine the annual report at the

4    main office of the plan?

15:12   5              MS. HASSELMAN:    Objection.  Calls for a

6    legal conclusion.  Vague and ambiguous and vague as to

7    time.

8         A    I'm sorry.  Please repeat the question.

9    BY MR. HANNAN:

15:12   10         Q    You had a right, did you not, legally

11   protected right to examine the annual report at the main

12   offices of the plan?

13              MS. HASSELMAN:    Same objections.

14         A    Yes.

15:12   15   BY MR. HANNAN:

16         Q    And you didn't do so?

17         A    No, I did not.

18         Q    And you didn't do so before you proceeded

19   to become a plaintiff in this litigation; true?

15:12   20              MS. HASSELMAN:    Same objections.

21   Argumentative.  Calls for a legal conclusion.

22         A    No, I did not.

23   BY MR. HANNAN:

24         Q    Now, you also had a right to obtain at no

15:13   25   charge a statement of assets and liabilities of the plan

170

1    and accompanying notes.  You didn't do that?

2          A    No, I did not.

3                MS. HASSELMAN:    Same objections as to the

4    prior questions.

15:13  5    BY MR. HANNAN:

6          Q    Did it occur to you that the accompanying

7    notes might provide useful information in determining

8    whether or not the matters you were complaining about in

9    this lawsuit were accurate?

15:13  10                MS. HASSELMAN:    Objection.  Argumentative.

11    Calls for a legal conclusion.  Assumes facts not in

12    evidence.

13          A    Yes, it did.

14    BY MR. HANNAN:

15:13  15          Q    But you didn't do anything about that?

16          A    No, I did not.

17          Q    And you also had a right -- strike that.

18                You also had a right to receive from the

19    plan administrator a statement of income and expenses

15:13  20    together with accompanying notes; correct?

21                MS. HASSELMAN:    Objection.  Calls for a

22    legal conclusion.  Vague as to time.  Vague and

23    ambiguous.

24          A    Yes.

15:14  25    BY MR. HANNAN:

171

1          Q     And you could have reviewed these notes to

2     obtain information pertinent to this lawsuit before it

3     was filed; true?

4               MS. HASSELMAN:    Same objections.

15:14    5          A     Yes.

6     BY MR. HANNAN:

7          Q     But you didn't do so?

8          A     No, I did not.

9          Q     Now, although you don't recall receiving or

15:14   10     seeing the '04 or '03 statements that are set forth in

11     the second and third page of '04, do you have any reason

12     to believe that you didn't receive them?

13               MS. HASSELMAN:    Objection.    Calls for

14     speculation.

15:14   15          A     I don't recall receiving '04 and '03, no.

16     BY MR. HANNAN:

17          Q     But do you have any reason to think that

18     they weren't provided to you?

19               MS. HASSELMAN:    Objection.    Asked and

15:14   20     answered and calls for speculation.    Do you mean any

21     additional reason besides the fact that she doesn't

22     remember ever seeing them?

23          A     I just don't recall receiving them.

24               MR. HANNAN:    Mark as next in order

15:15   25     Exhibit 205, what appears to be a copy of a company Mind

172

            1          Q    But you believe you can represent the

            2    present employees?

            3                MS. HASSELMAN:   Objection.  Calls for a

            4    legal conclusion.

    15:56   5          A    Yes.

            6    BY MR. HANNAN:

            7          Q    What are your duties as a class

            8    representative?

            9          A    My duties?  I believe to basically maybe

    15:56   10   step in and do whatever I can to receive anything that

            11   was entitled to myself and others.

            12         Q    Yourself and others?

            13         A    Yes.

            14         Q    Anything you are entitled to?

    15:56   15         A    Yes.

            16         Q    All right.  What is a fiduciary duty?

            17               MS. HASSELMAN:   Objection.  Calls for a

            18   legal conclusion.  Vague and ambiguous.

            19         A    I don't know.

            20   BY MR. HANNAN:

            21         Q    Do you understand that you if appointed as

            22   a class representative would be undertaking a fiduciary

            23   duty?

            24         A    No, I don't know.

    15:56   25               MS. HASSELMAN:   Same objections to the

                                                                        191

1    second question as to the original question of what is a

2    fiduciary duty.

3    BY MR. HANNAN:

4         Q    Now, do you expect to receive anything for

15:57   5    your services as a class representative?

6              MS. HASSELMAN:    Objection.  Vague and

7    ambiguous.

8         A    I would say so, yes.

9    BY MR. HANNAN:

15:57   10        Q    What is it you expect to receive?

11        A    Whatever money that was paid into the plan,

12   I expect to receive that back.

13        Q    Anything else?

14        A    No.

15:57   15        Q    Now, do you understand that if your lawsuit

16   is unsuccessful that you may be required to pay the

17   costs -- the defense costs of the lawsuit?

18             MS. HASSELMAN:    Objection.  Calls for a

19   legal conclusion.

15:57   20        A    Yes.

21   BY MR. HANNAN:

22        Q    And are you prepared to do that?

23        A    No, not at this time, no.

24             MR. HANNAN:  Now, in the course of

15:58   25   questioning, on several occasions you have instructed

192

1          A      No, he did not.

2                 MS. HASSELMAN:    I have one other thing,

3     but I actually need to go off the record for just one

4     second and just fix something in one of the documents.

16:52  5                THE VIDEOGRAPHER:    Off the record at

6     4:52 p.m.

7                     (Recess 4:52 p.m.-4:53 p.m.)

8                 THE VIDEOGRAPHER:    We are back on the

9     record at 4:53 p.m.

10

11

12                EXAMINATION (Continuing)

13    BY MS. HASSELMAN:

14         Q      Ms. Thomas, I am going to ask you to take a

16:53 15    look back at the exhibit that were introduced earlier

16    that was 193.  It should be in the little pile just in

17    front of you.  Do you remember discussing this document

18    earlier today?

19         A      Yes.

16:54 20        Q      And do you recall that you said your best

21    estimate of when you first saw this document was in

22    approximately April of 2002?

23         A      Yes.

24         Q      And in April of 2002 when you believe you

16:54 25    first saw this document, do you recall whether you read

210

1    it thoroughly?

2         A    No, I did not.

3         Q    And could you look at the second page where

4    there's a heading marked, asbestos litigation, that was

16:55    5    also discussed earlier?

6         A    Yes.

7         Q    Do you recall whether you read that section

8    thoroughly in April of 2002?

9         A    No, I did not.

16:55    10         Q    Do you recall whether you understood all

11    the matters that are set forth in that paragraph headed,

12    asbestos litigation, in April of 2002?

13              MR. HANNAN:    Object as leading.

14         A    Not completely, no.

16:55    15              MS. HASSELMAN:    That's all we have.

16              THE VIDEOGRAPHER:    This concludes the

17    deposition of Tosha Thomas.    Total number of tapes are

18    three.    They will be retained at Esquire Deposition

19    Services in San Francisco.    We are going off the record.

16:55    20    The time is 4:55 p.m.

21              (Deposition concluded at 4:55 p.m.)

22

23

24

25

211

STATE OF CALIFORNIA )

: ss                 )

County of Alameda    )


I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:  That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____APR 2 8 2008_____

_Emi Albright_
_____

EMI ALBRIGHT, CSR No. 13042