Ronald Lovitt, Bar No. 040921
J. Thomas Hannan, Bar No. 039140
Henry I. Bornstein, Bar No. 75885
Terence F. Young, Bar No. 069943
LOVITT & HANNAN, INC.
900 Front Street, Suite 300
San Francisco, California 94111
Telephone: (415) 362-8769
Facsimile: (415) 362-7528
*rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com, tfylaw@earthlink.net*

Attorneys for Defendants K-M Industries
Holding Co. Inc.; K-M Industries Holding Co.
Inc. ESOP Plan Committee; and CIG ESOP
Plan Committee

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

THOMAS FERNANDEZ, LORA SMITH,
and TOSHA THOMAS, individually and on
behalf of a class of all others similarly
situated,

        Plaintiffs,

v.

K-M INDUSTRIES HOLDING CO., INC.,
*et al.,*

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C06-07339 CW

**DECLARATION OF DAN
STRITMATTER IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT BY DEFENDANTS
K-M INDUSTRIES HOLDING
CO., INC., K-M INDUSTRIES
HOLDING CO. INC. ESOP PLAN
COMMITTEE AND CIG ESOP
PLAN COMMITTEE [EXHIBITS
SUBMITTED UNDER SEAL]**

Hearing Date: July 31, 2008
Hearing Time: 2:00 p.m.
Courtroom:    2, 4th Floor
Judge:       Hon. Claudia Wilken

I, Dan Stritmatter, hereby declare:

    1.    I am Chief Financial Officer and Secretary of the Kelly-Moore Paint Company, Inc.,

and a member of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan Committee.

I have personal knowledge of the facts stated herein, and if called as a witness, I would and could

1    testify with respect thereto.

2        2.    I submit this Declaration in support of the concurrently-filed Motion for Summary

3    Judgment by defendants K-M Industries Holding Co., Inc., K-M Industries Holding Co., Inc. ESOP

4    Plan Committee and CIG ESOP Plan Committee.

5        3.    The Kelly-Moore Paint Company was founded in 1946 by William Moore and

6    William Kelly. It manufactured and sold paint, primarily to contractors and builders. The company

7    was incorporated in California in 1952, at which time Mr. Kelly retired and sold his interest in the

8    company to Mr. Moore.

9        4.    In 1998 and 1999, Kelly-Moore Paint Company ("Paint Company") owned a

10    subsidiary named California Capital Insurance Company ("CCIC"). CCIC wrote property and

11    casualty insurance policies in the states of California, Oregon and Nevada. The management of

12    CCIC was totally independent from the Paint Company.

13        5.    Attached hereto as Exhibit 1 is a true and correct copy of the Report of Investigation:

14    K-M Industries Holding Co. Inc ESOP, U.S. Department of Labor, Pension and Welfare Benefits

15    Administration, dated August 23, 2006.

16        6.    Attached hereto as Exhibit 2 is a true and correct copy of a letter dated August 25,

17    2006 from Francis C. Clisham, Regional Director of the Employee Benefits Security

18    Administration, U.S. Department of Labor, received by me in my capacity as member of the K-M

19    Industries Holding Co., Inc. Employee Stock Ownership Plan Committee.

20        7.    Attached hereto as Exhibit 3 is a true and correct copy of the Unanimous Written

21    Consent of the Board of Directors of Kelly-Moore Paint Company, Inc., effective September 30,

22    1998.

23        8.    During 1998, two ESOPs were established for the Paint Company and for CCIC. In

24    1999, the transaction was restructured and the two ESOPs were merged. As part of the restructuring

25

26

process, the Kelly-Moore Paint Company changed its name to K-M Industries Holding Co., Inc.

("KMH") and formed a new subsidiary named Kelly-Moore Paint Company, Inc. to which it

transferred all of its paint operations.  Attached hereto as Exhibit 4 is a true and correct copy of  K-

M Industries Holding Co., Inc. Employee Stock Ownership Plan document executed on July 16,

1999.

9.      Attached hereto as Exhibit 5 is a true and correct copy of the Minutes of a Joint

Special Meeting of the Boards of Directors of K-M Industries Holding Co., Inc. and Kelly Moore

Paint Company, Inc., dated February 28, 2003.

10.     Attached hereto as Exhibit 6 is a true and correct copy of a letter dated February 16,

1998 from Cheryl Mills, an attorney who was then representing the Kelly-Moore Paint Company, to

Ernst & Young, the company's auditors, a copy of which was received by the company and kept in

the company's files.

11.     Attached hereto as Exhibit 7 is a true and correct copy of a letter dated February 8,

1999 from Cheryl Mills, an attorney who was then representing the Kelly-Moore Paint Company, to

Ernst & Young, the company's auditors, a copy of which was received by the company and kept in

the company's files.

12.     Attached hereto as Exhibit 8 is a true and correct copy of the Consolidated Financial

Statements of the Kelly-Moore Paint Company, Inc., Years Ended December 31, 1998 and 1997,

with Report of Independent Auditors.

13.     Attached hereto as Exhibit 9 is a true and correct copy of the Consolidated Financial

Statements of the Kelly-Moore Paint Company, Inc., Years Ended December 31, 1999 and 1998,

with Report of Independent Auditors.

14.     Attached hereto as Exhibit 10 is a true and correct copy of the Final Judgment

entered in *Hernandez, et al. v. GAF Corp., et al.*, County Court, El Paso County, Texas, Case No.

2000-3559.

15.    Attached hereto as Exhibit 11 is a true and correct copy of the Compromise and Release entered in *Hernandez, et al. v. GAF Corp., et al.*, County Court, El Paso County, Texas, Case No. 2000-3559.

16.    Attached hereto as Exhibit 12 is a true and correct copy of the Consolidated Financial Statements, Kelly-Moore Paint Company, Inc. for the Years Ended December 31, 2001 and 2000, with Report of Independent Auditors.

17.    Attached hereto as Exhibit 13 is a true and correct copy of the Consolidated Financial Statements, Kelly-Moore Paint Company, Inc. for the Years Ended December 31, 2002 and 2001, with Report of Independent Auditors.

18.    During 2004 and 2005, preparation of the 2003 ESOP Annual Report was delayed because the uncertainties involving the outcome of the asbestos litigation on-going at that time caused North Star, the independent Trustee, to be unable to secure a reliable independent valuation of the shares owned by the ESOP.

19.    Attached hereto as Exhibit 14 is a true and correct copy of the Statement of Reasonable Cause submitted to the U.S. Department of Labor that explains the reasons for the delay in preparing the 2003 ESOP Annual Report.

20.    Attached hereto as Exhibit 15 is a true and correct copy of a letter dated March 25, 2005, sent by Mark S. Weisberg of Winston & Strawn LLP, attorneys for K-M Industries Holding Co., Inc., to the Department of Labor discussing the reasons for the delay in securing an independent valuation of the shares held by the ESOP.

21.    Attached hereto as Exhibit 16 is a true and correct copy of the "Mind Our Own Business" ESOP newsletter for Kelly-Moore Paint Company participants in the K-M Industries Holding Co., Inc. ESOP, dated October 2005, that I caused to be distributed to these participants on or about the date of the document.

I declare under penalty of perjury under the laws of the United States of America that the

1   foregoing is true and correct.   Executed at _San Carlos_, California this 23rd day of

2   June 2008.

3                                        _Dan Stritmatter_
                                          Dan Stritmatter

**EXHIBIT  1**

Report of Investigation

**U.S. Department of Labor**
Pension and Welfare Benefits Administration

This document is the property of the Pension and Welfare Benefits Administration. Its contents are not to be disclosed to unauthorized persons.

**File No. 70- 012587 (48)**

| | | | |
|---|---|---|---|
| Subject: | PLAN | Date: | 8/23/2006 |
| Case Name: | K-M Industries Holding Co. Inc. ESOP | Investigator: | Ex 7e |
| Address: | 987 Commercial St., San Carlos, CA 94070 | Approved By: | Ex 7c · 8/23/2006 |
| EIN/PN: | 94-1230192/002 | Status: Closed | 8/25/06 |

A Majette

## I.  Predication:

Ex 7e

## II.  Background:

Plan Sponsor: K-M Industries Holding Co. Inc.
Plan Type: Stock Bonus Plan & Leveraged ESOP
As of: 12/31/2004          Assets: $156,810,036.00          Participants: 2560
Period Covered by Investigation: 10/13/1998 to 12/31/2005
Other Plans Reviewed: None

## III.  Areas Examined:

- ☒ Bonding
- ☒ Reporting & Disclosure
- Contributions: ☐ EE ☒ ER
- ☐ Stocks & Bonds
- ☐ Real Estate
- ☐ Mortgages
- ☐ COBRA

- ☒ Other Loans
- ☒ ER Security/Real Property
- ☐ Partnerships/Jt Venture
- ☐ Other Investments
- ☐ Receivables/Payables
- ☐ Liabilities
- ☐ HIPAA

- ☐ Income/Earnings
- ☐ Expenses
- ☐ Valuations
- ☐ Cash
- ☐ Insurance
- ☒ Benefits

## IV.  Records Reviewed:

- ☒ Trustee/Corporate Minutes
- ☒ Correspondence Files
- ☒ Service Provider Contracts
- ☐ Insurance Contracts
- ☒ Plan/Trust Documents
- ☒ Bond

- ☒ Forms 5500
- ☒ Financial Statements
- ☐ Receipts/Disbursements
- ☐ Bank/Inv Statements
- ☒ Loan Records
- ☒ Liability Insurance

- ☐ Real Estate/Mortgage
- ☒ Appraisals/Valuations
- ☐ Partnerships/Jt Venture
- ☒ Stock Records
- ☒ Participant Records
- ☒ SPD/SAR

## V.  Interviews Conducted:

- ☒ Trustee(s)
- ☐ Corporate Personnel

- ☒ Plan Administrator
- ☐ Plan Attorney

- ☐ Plan Accountant

## VI.  Issues Identified and Resolution:

DOL 3561

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

I.    PREDICATION

      Ex 7e

II.   POTENTIAL JURISDICTIONAL PROBLEMS

      None.

III.  BACKGROUND

      A.    Type of Plan

            The plan is a stock bonus plan and leveraged ESOP. [1]

      B.    Number of Participants

            As of December 31, 2004, the plan has 2,560 participants. [2]

      C.    Plan Assets

            As of December 31, 2004, the plan had $177,307 in cash assets and 33,745,455
            shares of Class P-B common stock and 8.4 million shares of Class I-B common
            stock in the K-M Industries Holding Co., Inc. (K-M Industries), totalling in value
            in the amount of $156,810,036.  The stock was leveraged in the amount of
            $185,800,384.  The net assets were -$28,990,348. [3]

      D.    Date and Place Plan Established

            On September 30, 1998, the plan was established effective January 1, 1998, in the
            state of California, as the K-M Paint Co., Inc. ESOP (ESOP or Plan), by the
            sponsor of the plan, the K-M Paint Co, Inc., (Kelly-Moore), a subsidiary of the K-
            M Industries Holding Co., Inc. (K-M Industries).  The participating employers
            consisted of the Kelly-Moore and its affiliates, the K-M Universal Paint Co., Inc.,
            the Preservative Paint Co., Inc., and the K-M Paint Premier Drywall Tool Co.,
            Inc. [4]

            Effective July 16, 1999, the ESOP sponsored by California Capital Insurance
            Company (CCIC) was merged with and into the K-M Paint ESOP.  Following the
            merger, CCIC and its affiliates, Monterey Insurance and Eagle West Insurance,
            became participating employers in the K-M Paint ESOP. [5]

            Also effective July 16, 1999, the K-M Paint ESOP was amended and restated to
            change the sponsor of the ESOP from K-M Paint to the K-M Industries Holding

DOL 3562

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

Co. (K-M Industries) and to rename the plan and trust to the K-M Industries Holding Co., Inc. ESOP and Trust (K-M Industries ESOP or ESOP).[6]

The amended and restated plan also included provisions that permit the allocation of separate benefits among the participating employers. The Class P-B shares of the K-M Holding acquired by the ESOP will only be allocated to the participating employer Kelly Moore, and its participating affiliates, the K-M Universal Paint Co., Inc., Preservative Paint Co., and Premier Dry Wall Tool Co. The K-M Holding Class I-B shares acquired by the ESOP will only be allocated to the participating employer CCIC and its participating affiliates, Monterey Insurance and Eagle West Insurance.[7]

Also effective, July 16, 1999, the plan was restated to comply with GUST.[8]

The plan was approved by IRS in a letter dated June 26, 2000.[9]

E.    Type of Plan Administration

The plan is administered by the plan sponsor and a third party administrator.

F.    Plan Sponsor History

K-M Paint Co., Inc. (K-M Paint), the predecessor to Kelly-Moore, was founded as a partnership in 1946 by William Moore and William Kelly to manufacture paint to supply contractors and builders. K-M Paint was incorporated in the state of California in 1952 when Kelly retired and sold his interest in the partnership to Moore.[10]

In 1969, K-M Paint established Omega Realty Company as a wholly owned subsidiary and a captive provider of real estate services for K-M Paint.[11]

In 1986, K-M Paint purchased the Calmutual Insurance Company. Originally Ventura County Mutual Fire Insurance Company, which was incorporated in 1898, Calmutual acquired 100% ownership of American Eagle in 1981, and adopted the name California Insurance Group.[12]

In 1987, Calmutual was renamed California Capital Insurance Company (CCIC) and American Eagle was renamed Eagle West Insurance Company. In 1987, the Monterey Insurance Company was incorporated by K-M Paint and joined the California Insurance Group, the predecessor to the Capital Insurance Group (CIG).[13]

In 1988, K-M Paint acquired the Broken O Ranch, a cattle ranch in Augusta, Montana that maintained a herd of cattle and buffalo for sale and breeding. This property operated as a separate division of K-M Paint until 1998 when it was sold to the William E. and Desiree B Moore 1990 Revocable Trust[14]

August 25, 2006                    2

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

In 1988, K-M Paint established the K-M Insurance Company, Inc. (KMIC) as a wholly owned subsidiary and a captive insurance provider of automobile, general liability, and workers' compensation coverage for K-M Paint.[15]

In 1994, K-M Paint purchased Seattle-based Preservative Paint Co. As of 12/3103, Kelly-Moore still owned the assets acquired through this transaction, although some of the original Preservative Paint Co. stores have been closed.[16]

In 1995, K-M Paint acquired the assets of Universal Paint Corp. in Tempe, AZ. As of 12/31/03, Kelly-Moore still owned the assets acquired through this transaction.[17]

In 1996, K-M Paint purchased assets of Island Equipment Co., Inc. in Tamuning, Guam. Kelly-Moore operated the one paint store in Guam through January 2002, when it sold these assets.[18]

On September 30, 1998, K-M Paint changed its name to K-M Industries Holding Co., Inc (K-M Industries). Simultaneously, a new California company was incorporated and named Kelly-Moore Paint Company, Inc. (Kelly-Moore). K-M Universal Paint Co, K-M Paint Premier Drywall Tool, Inc., the Preservative Paint Co. (all of which are inactive entities as of 12/31/03), and KMIC and the Omega Realty Company became wholly owned subsidiaries of Kelly-Moore. Eagle West and Monterey Insurance became wholly owned subsidiaries of CCIC (hereafter CCIC or CIG). Kelly-Moore and CCIC became wholly owned subsidiaries of K-M Industries, which, along with Kelly-Moore, is headquartered in San Carlos, California.[19]

All of the business assets and liabilities of K-M Industries (except for shares representing the equity investment in CCIC and certain contractual legal rights between CCIC and K-M Industries were then transferred from K-M Industries to Kelly Moore in exchange for 15,000 shares of Kelly-Moore common stock.[20]

All of the business assets and liabilities of K-M Industries representing the equity investment in CCIC and certain contractual legal rights between CCIC and K-M Industries were then transferred from K-M Industries to CCIC in exchange for 190,000 shares of CCIC common stock.[21]

In 2001, the Nevada Capital Insurance Company was incorporated and became a wholly owned subsidiary of CCIC.[22]

In 2003, the California Insurance Group becomes the Capital Insurance Group. CIG consists of CCIC, Eagle West, Nevada Capital and Monterey Insurance.[23]

CCIC and its three wholly owned subsidiaries write property and casualty insurance policies in the states of California, Oregon and Nevada. The principal

August 25, 2006                    3

direct lines of business are commercial peril, private passenger automobile, homeowners and farm owners. CCIC is headquartered in Monterey, California.[24]

Kelly-Moore is primarily engaged in the design, manufacture, and retail sale of architectural paint and paint-related products and operates 158 stores in 10 states, and is the largest independently owned paint manufacturer in the U.S.[25]

### Recapitalization

On September 30, 1998, when K-M Paint became K-M Industries, the capital structure of K-M Industries was changed from one class of common shares with 7,648 shares outstanding to two classes of tracking shares of common stock (P and I), subdivided into two subclasses (A and B), with 100,000,000 shares outstanding. The P-shares (80,000,000) track the results of the Kelly-Moore operations and the I-shares (20,000,000) track the result of the CCIC.[26]

### Shareholders

<u>Prior to 9-30-98</u>

William E. and Desiree B Moore 1990 Revocable Trust owned:

100% of the 7,468 shares of issued and outstanding common stock[27]

<u>As of 9-30-98</u>

William E. and Desiree B Moore 1990 Revocable Trust owned:[28]

100% of the 46,254,545 shares of Class P-A
100% of the 33,745,455 shares of Class P-B
100% of the 12,000,000 shares of Class I-A
100% of the 8,000,000 shares of Class I-B

<u>10-13-98</u>[29]

William E. and Desiree B Moore 1990 Revocable Trust owned:

100% of the 46,254,545 shares of Class P-A
100% of the 12,000,000 shares of Class I-A
100% of the 8,000,000 shares of Class I-B

ESOP owned:

100% of the 33,745,455 shares of Class P-B

<u>10-14-99</u>

DOL 3565

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

William E. and Desiree B Moore 1990 Revocable Trust owned:[30]

100% of the 46,254,545 shares of Class P-A
100% of the 11,600,000 shares of Class I-A
100% of the 8,400,000 shares of Class I-B

ESOP owned:

100% of the 33,745,455 shares of Class P-B

10-18-99[31]

William E. and Desiree B Moore 1990 Revocable Trust owned:

100% of the 46,254,545 shares of Class P-A
100% of the 11,600,000 shares of Class I-A

ESOP owned:

100% of the 33,745,455 shares of Class P-B
100% of the 8,400,000 shares of Class I-B

| Shareholder | Series P | Series I | Total | Series P | Series I | Total |
|---|---|---|---|---|---|---|
| Moore Trust (Class A) | 46,254,545 | 11,600,000 | 57,854,545 | 57.82% | 58% | 57.85% |
| ESOP (Class B) | 33,745,455 | 8,400,000 | 42,145,455 | 42.18% | 42.0% | 42.15% |
| Total | 80,000,000 | 20,000,000 | 100,000,000 | 100.00% | 100.0% | 100.0% |

**BOD Members**[32]

K-M Industries

1998-2002

William Moore, COB[1]
Desiree Moore, Director
Stephen Ferrari, Secretary

January 2003

---

[1] William Moore died in December 2004

August 25, 2006                    5

William Moore, COB
Desiree Moore, Director
Herbert GIFFINS, Director

August 2003

William Moore, COB
Desiree Moore, Director
Herbert GIFFINS, Director
William Moore II, Director[2]
Christine McCall, Director[3]

2005

Desiree Moore, COB
Herbert GIFFINS, Director
William Moore II, Director
Christine McCall, Director

2006

Desiree Moore, COB
William Moore II, Director
Christine McCall, Director
Peter Cazzolla, President & CEO CCIC
Stephen Devoe, President & CEO Kelly-Moore

<u>Kelly-Moore</u>

1998-2002

William Moore COB
Joseph Cristiano, President & CEO
Stephen Ferrari, CFO

2002-2003

William Moore, COB
Herbert GIFFINS, President & CEO
Stephen Ferrari, CFO

2003-2005

---

[2] William Moore II is the son of William and Desiree Moore
[3] Christine McCall is the daughter of William and Desiree Moore

August 25, 2006                    6

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

William Moore, COB
Herbert GIFFINS, President & CEO
Dan Stritmatter, CFO

2005-2006

Desiree Moore, COB
Herbert GIFFINS, President & CEO
Dan Stritmatter, CFO

2006

Desiree Moore, COB
Stephen Devoe, President & CEO
Dan Stritmatter, CFO

<u>CCIC</u>

1998-2005

William Moore, COB
Peter Cazzolla, President & CEO

2005-Current

Desiree Moore, COB
Peter Cazzolla, President & CEO
Robert Erickson, CFO

G.    <u>Voting Company Stock</u>

Section 9 of the plan document indicates that company stock held by the trust shall be voted by the trustee in accordance with instructions from the committee except in the case of corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business or other similar transactions prescribed by regulation, in which case the participants would vote their shares. There is no evidence that any of the events requiring a pass through vote have occurred. The annual shareholder minutes reflect that the plan's trustee voted the shares of company stock owned by the plan.[33]

H.    <u>Type of Benefits</u>

Section 12 of the plan document indicates that benefits are payable in the event of death, disability and retirement. Section 13 of the plan indicates that participants vest at a rate of 20% each year beginning the third year and are fully vested in

August 25, 2006                    7

seven years. Section 3 of the plan document indicates that employees become eligible to participate in the plan retroactively to the first date of the plan year in which the employee first completes 1,000 hours of service, measured from the employees' employment commencement date. [34]

## IV.  BONDING; REPORTING AND DISCLOSURE; AND FIDUCIARY LIABILITY INSURANCE

### A.  Bonding

The plan is covered by a fidelity bond that is in accordance with ERISA, with an approved insurer, Chubb, for $1.5 million. [35]

### B.  Reporting and Disclosure

The plan's trustee completed a Statement of Reasonable Cause in accordance with ERISA Reg. 2560.502c-2(e) and IRC § 6652(c)(3) with the incomplete Form 5500 filed for the PYE 2003. The Statement indicated that the employer was working through matters necessary to complete Schedule H of the annual report that had resulted in 1) the trustee being unable to timely determine the fair market value of the QES held by the plan and 2) the employer was unable to timely obtain the required independent qualified public accountant's opinion on the plan. [36]

The reason for the delay given in the Statement indicated that Kelly-Moore had been named as defendants in numerous asbestos-related personal injury lawsuits. They have also been a party to litigation with Union-Carbide Corporation concerning the latter's supply of asbestos to the K-M Holdings. The extent of the K-M Holdings' potential future asbestos liabilities is at issue in the Union-Carbide litigation. The outcome of the Union-Carbide litigation could affect the K-M Holdings' ability to satisfy its long-term future asbestos liabilities as they accrue. Depending upon the outcome of the Union-Carbide litigation, the K-M Holdings expects that it might have to commission a qualified expert to perform a valuation of the Kelly-Moore's future asbestos liability. [37]

Valuations for the PYE 2003 and 2004 were completed on September 26, 2005. [38]

Forms 5500 and audits of the Plan for the PYE 2003 and 2004 were filed on March 30, 2006. [39]

Section 10 of the Plan document states that "within nine months after each anniversary date, the Committee shall furnish each participant and each beneficiary receiving benefits under the Plan with the summary annual report of the Plan required by § 104(b)(3) of ERISA, in the form required by the regulations of the Department of Labor". [40]

DOL 3569

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

SARs were prepared for the PYE 2003 and 2004.[41]

The plan's fiduciaries reported in its production of the plan documents for EBSA that SARs were distributed only upon request.[42] Herbert Giffins told the Department on July 19, 2006, that the Plan will begin mailing the SARs each year along with the participant statements. Dan Stritmatter, the in-house day to day administrator of the Plan was present during Giffins' interview.[43] In a letter to the Department dated August 17, 2006, Dan Stritmatter, on behalf of the Company, stated that "We have now implemented proper procedures to remedy this oversight, including better communication with the ESOP's third party administrator to ensure that all SARs will be included with participant statements every year, and we are confident that such an oversight will not happen again".[44]

Section 10 of the Plan document states that the "Committee shall furnish [participants and beneficiaries] with the summary plan description required by Sections 102(a)(1) and 104(b)(1) of ERISA" and that "[s]uch summary plan description shall be updated from time to time as required under ERISA".[45]

The SPD is dated 10-11-99, with two SMM issued on 1-1-98 and 1-1-02.[46] Herbert Giffins told the Department on July 19, 2006, that an updated SPD will be issued.[47] Dan Stritmatter told the Department on August 17, 2006, that a revised SPD has been drafted and will be finalized soon.[48]

Herbert Giffins answered the questions on the Reporting and Disclosure Checklist on July 19, 2006.[49]

As stated above, in a letter to the Department dated August 17, 2006, Dan Stritmatter, on behalf of the Company, stated that "We have now implemented proper procedures to remedy this oversight, including better communication with the ESOP's third party administrator to ensure that all SARs will be included with participant statements every year, and we are confident that such an oversight will not happen again".[50]

C.     Fiduciary Liability Insurance

The company maintains a private company management liability insurance policy with Arch Insurance Group for $5 million, which includes fiduciary liability insurance.[51]

V.     PLAN ADMINISTRATION AND FINANCIAL OPERATIONS

A.     Identities and Principal Duties of all Plan Official; Principal Employees; and Service Providers

**Plan Administrator**

August 25, 2006                              9

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

The SPD indicates that the company is the plan administrator and William Moore is the sole plan committee member.[52]  Herbert Giffins told the Department on July 19, 2006, that an updated SPD will be issued.[53]

Section 18 of the plan document indicates that the "company shall administer the plan and is designated as the plan administrator within the meaning of ERISA § 3(16) and IRC § 414(g).  The committee and the company shall each be a named fiduciary within the meaning of ERISA § 402.  In addition to being responsible for the general administration of the plan, the committee is responsible for establishing and implementing a funding policy, investing and controlling the plan assets, and directing the trustee with respect to voting shares of the company stock.  However, the actual management of trust investments, other than company stock, may be delegated to the trustee.  In addition, the committee is responsible for the periodic reviewing the investment of plan assets and the performance of the trustee; and determining an investment policy to be followed with respect to the plan assets.[54]

Amendment No. 4 of the Plan document effective April 22, 2003, amends the Plan to provide the Trustee with independent discretionary authority in connection with the investment, retention, custody and disposal of trust assets, including company stock, and to limit the discretionary authority of the Committee that administers the Plan to matters of Plan administration, and to remove any discretionary authority of the Committee with respect to the investment, retention, custody or disposal of Plan assets.[55]

Section 18 of the plan document indicates that the plan sponsor's BOD is responsible for the selection, retention, monitoring, and removal of the plan's trustee and plan committee members.[56]

**ESOP Committee Members**[57]

William Moore 1998-2002
Herbert GIFFINS 2002-2006
Peter Cazzolla 2005-Present
Dan Stritmatter 2004-Present
Stephen Devoe 2006-Present[58]
Bob Erickson 2005-Present[59]

**Trustee**

The SPD indicates that the company is the plan administrator and William Moore is the sole trustee.[60]  Herbert Giffins told the Department on July 19, 2006, that an updated SPD will be issued.[61]

The ESOP Trust Agreement between K-M Paint and William E. Moore, as Trustee, dated September 30, 1998, indicates that the Trustee shall have authority

August 25, 2006                          10

DOL 3571

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

and power only "as directed by the Committee". Among other duties, the Trustee was responsible for disposing of securities held in the trust, borrowing to acquire stock and voting the shares held by the trust. [62]

The ESOP Trust Agreement between K-M Holding and North Star Trust Company, as Trustee, dated April 22, 2003, (1) reflects the appointment of North Star as successor trustee for the Trust; (2) provides that the Trustee shall have independent discretionary authority in connection with the investment, retention, custody and disposal of trust assets, including company stock, and shall not be subject to the direction of the Company or the Committee appointed by the Company to administer the Plan, with respect to investment of trust assets; and (3) provides the Trustee with a qualified right to require the Company to repurchase shares of common stock from the trust when necessary to provide the trust with liquidity.[63]

Amendment No. 4 of the Plan document effective April 22, 2003, amends the Plan to provide the Trustee with independent discretionary authority in connection with the investment, retention, custody and disposal of trust assets, including company stock, and to limit the discretionary authority of the Committee that administers the Plan to matters of Plan administration, and to remove any discretionary authority of the Committee with respect to the investment, retention, custody or disposal of Plan assets.[64]

Section 18 of the plan document indicates that the plan sponsor's BOD is responsible for the selection, retention, monitoring, and removal of the plan's trustee and plan committee members.[65]

**Trustees**[66]

William Moore 1998-2002
Herbert GIFFINS 2002-2003
North Star Trust 2003-Present (Represented by Law Offices of Morgan & Lewis)

**Third Party Administrator**[67]

BSI/Menke Group 1998-Present

**Independent Appraiser**

Kelly-Moore[68]

ex7u

Sansome Street Appraisers
Ireland Associates 1998-2002

CCIC[69]

August 25, 2006                                    11

DOL 3572

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

*Ex 7c*

Duff & Phelps 1998-2002

<u>K-M Holding</u>[70]

*Ex 7c*

Stout/Resius/Ross (SRR) 2003-present

**Independent Auditor**[71]

Brach, Neal, Daney & Spence 1998-present
Burr Pilger & Mayer – 2003-Present (Kelly-Moore)[72]

**Plan Counsel**

Morgan Lewis (Erin Turley) represents the Plan's Trustee. [73]

B.  <u>Funding Method</u>

Section 5 of the Plan document indicates that the Plan is funded by employer contributions determined by the BOD and paid to the trust no later than the due date for filing the corporations Federal tax return, including extension.

Section 5 also indicates that "To the extent the Trust has not received cash in an amount sufficient to meet the Trust's current obligations under a Securities Acquisition Loan, Employer Contributions shall be made in sufficient amounts to cover principal and interest on a Securities Acquisition Loan", not to exceed annual allocations limits established by the IRC described in Section 11(b) of the Plan document.[74]

There is no other written funding policy.[75]

C.  <u>Allocation of Employer Contributions</u>

Section 11(a)(1) of the Plan document indicates that employer contributions will be allocated based on compensation.  In addition, shares released from the encumbrance due to an exempt loan will be released based on compensation.

Section 11(a)(3) of the Plan document indicates that "any stock dividends on shares of Company Stock held by the Trust shall be allocated to each Participant's Company Stock Account in the ratio in which the cumulative number shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date. Trust income attributable to any cash dividends paid on shares of Company Stock

DOL 3573

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

(whether or not allocated) and not used to make payments on Securities Acquisition Loan shall be allocated to each Participant's Other Investment Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the pre preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date."[76]

D. <u>Investment Policies and Practices</u>

Section 1 of the plan document indicates that employer contributions made to the trust will be primarily invested in employer securities. Section 6 of the Plan document indicates that employer contributions will be applied to any outstanding obligations incurred for the purchase of employer securities, or may be applied to purchase additional shares of employer securities. In addition, the employer contributions may be invested in savings accounts, CDs, securities or other equity stocks or bonds or in any other kind of real or personal property, including interests in oil or other depletable natural resources, options, puts, calls, futures contracts and commodities; or such funds may be held in non-interest bearing bank accounts as necessary on a temporary basis.[77]

E. <u>Benefit Payment Procedures</u>

Section 14 of the Plan document indicates that in the event of retirement, disability or death, distribution shall be made in a lump sum beginning no later than one year after the close of the Plan year in which the event occurred. If a participant, whose account balance exceeds $3,500, terminates for any other reason, distribution shall be made in a lump sum beginning as soon as administratively feasible during the sixth Plan year following the Plan year in which the participant terminates employment, although the Plan may not be required to distribute any employer securities acquired with the proceeds of a securities acquisition loan until the close of the Plan year in which the loan has been repaid in full. However, regardless of the reason for termination, distributions may be made in substantially equal annual installments over a period of five years. Nevertheless, if a participant, whose account balance is less than $3,500, terminates for any other reason, distribution shall be made in a lump sum as soon as possible after the close of the Plan year in which the participant terminates employment. Distributions may be delayed in the cases of termination for reasons other than death, disability and retirement until the close of the plan year in which a securities acquisition loan is repaid.[78]

The SPD effective July 16, 1999, mirrors the above.[79]

Because of the delay until September 26, 2005, in obtaining the annual appraisals for the Plan years ending 2003 and 2004, the Plan accounting for those years was not prepared until the fall of 2005. See Reporting and Disclosure section above.

August 25, 2006                    13

As a result, distributions were not been made in accordance with the Plan document, in particular, participants who terminated due to death, disability or retirement during the Plan year 2003 were not paid distributions by December 31, 2004.

Subsequent to obtaining the annual appraisals for the Plan years 2003 and 2004, the Plan accounting was completed. In December 2005, distributions totalling $814,082 were made to those participants who terminated due to death, disability or retirement during the Plan year 2003. In addition, distributions were timely made in December 2005 to those participants who terminated due to death, disability or retirement during the Plan year 2004. [80]

Also in December 2005, participants whose account balances had never exceeded $3,500 at the time they terminated employment with the Company in 2003 and 2004, for reasons other than death, disability or retirement, also received lump sum distributions of their account balances. Since the Plan document indicates that these participants will not receive distributions until "as soon as possible after the close of the Plan year in which they terminated", considering the extenuating circumstances, it could be argued that they received distributions as soon as possible, and, therefore, their distributions were timely made. [81]

On August 15 and 18, 2006, the Department spoke with all four complainants in this case. Sal DiMercurio and Robert Bergbower told the Department that their complaints were resolved with the Plan accounting brought up to date. Vincent Aguillar and Andy Fillis also advised that their complaints were resolved since they each received a distribution of their Plan assets in December 2005. [82]

F.    Put Option

Section 16 of the Plan document indicates that the Company shall provide a put option to any participant who receives a distribution of company stock in accordance with IRC § 409(h). The put option shall permit the participant to sell such Company stock to the Company (or the Plan) at any time during two option periods at the then fair market value. [83]

In response to the Department's document request letter dated June 23, 2005, Request Nos. 31-32, for all documents relating to the put option benefit, the Department received Sheets Annotated "Question 31- None" and "Question 32-None". [84]

Distribution forms provided to the Department did not indicate that participants could elect a distribution in shares and how those shares may be put back to the company. [85]

The Class P and I Series B shares are restricted. See below.

August 25, 2006                        14

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

G.    Right to Demand Securities

Section 15 of the Plan document indicates that subject to right to demand distributions in the form of employer securities, the trustee may make distributions in cash or in stock. However, if the Company's bylaws restrict ownership of substantially all outstanding employer securities to employees or to a trust under a qualified plan under IRC § 301(a), or in the case the employer elects to be treated as an S-corporation, distributions may be made entirely in cash. Notwithstanding the foregoing, employer securities may be distributed by the trustee subject to the requirement that such stock shall be immediately resold to the employer (or the trust).[86]

Section 9 (Article 8 –Sec.9.1) of the Amended and Restated Bylaws of K-M Holding adopted September 30, 1998, indicate that ownership of substantially all of the stock in the corporation (P and I Series "B" shares) shall be limited to individuals who are active employees of the corporation; stock bonus plans described in IRC § 401(a)(23); or ESOPs described in IRC § 4975(e)(7). For purposes of this provision, "substantially all" (as defined by IRC § 409(h)(2)) shall mean 80% or more of the outstanding voting shares in the corporation.[87]

Distribution forms provided to the Department did not indicate that participants could elect a distribution in shares and how those shares may be put back to the company.[88]

In a letter to the Department dated August 17, 2006, Dan Stritmatter advises that only the Class P and I Series "B" shares are restricted as allowed by IRS (Private Letter Ruling 9212013 (Dec. 19, 1991).[89]

H.    Diversification of Investments

Section 17 of the Plan document provides for diversification rights for Qualified Participants in accordance with IRC § 401(a) (28). Within 90 days after the close of each plan year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than 25% (or 50% in year 6 of the Qualified Election Period) of the value of the participant's Company Stock Account. "Qualified Participants" is defined in Section 2 of the Plan document as "Any Participant who has attained age 55 and has completed 10 years participation under the Plan". "Qualified Election Period" is defined as "The 6 Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant".[90]

Since the Plan has been in effect less than 10 years, there have been no "Qualified Participants".

I.    Valuations[91]

August 25, 2006                    15

DOL 3576

| Valuation as of: | Kelly-Moore (K-M Paint Common Shares) | CCIC (K-M Paint Common Shares) | K-M Industries Series-P Shares 80 MM | K-M Industries Series-I Shares 20 MM |
|---|---|---|---|---|
| 6-30-98 | | $150 MM* | | |
| 07-31-98 | $580 MM* | | | |
| 10-12-98 | $550 MM* | | $6.875 | |
| 12-31-98 | | | $4.50 | |
| 6-30-99 | | | | $6.55 |
| 12-31-99 | | | $4.69 | |
| 12-31-00 | | | $3.90 | $3.63 |
| 12-31-01 | | | $3.45 | $4.18 |
| 12-31-02 | | | $2.59 | $4.20 |
| 12-31-03 | | | $2.30 | $6.35 |
| 12-31-04 | | | $2.70 | $7.80 |
| 12-31-05 | | | $2.90 | $9.05 |

*This represents the total value of the subsidiary. The 7,468 shares of K-M Paint included the value of Kelly-Moore and CCIC.

J.      Stock Acquisition

Since the stock acquisitions that occurred in 1998 and 1999 are outside the statute of limitations, no investigation of the actual transactions occurred.

Dan Feinberg of the law firm Lewis, Feinberg, Renaker & Jackson told the Department on August 9, 2006, that he was going to file a complaint relating the 1998 and 1999 ESOP stock acquisitions, even though the transactions occurred outside the statute of limitations. He is going to use ERISA section 413 and attempt to overcome the statute of limitations problem by claiming there was a concealment of a fiduciary breach. He believes the 9th circuit Blue Cross case on concealment bolsters his position. Dan Feinberg believes the valuation reports valued "apples instead of the oranges" that were sold to the Plan. For one thing, he indicated that no discount was taken for the two tracking stocks. He said that investors are leery about two tracking stocks and this devalues the price of the stock.[92]

### October 13, 1998 Stock Acquisition

Based on the ESOP Stock Purchase Agreement dated October 13, 1998, entered into by the ESOP, the Moore Trust and Kelly-Moore, the Plan agreed to purchase 33,745,455 shares of P-B shares of K-M Industries stock from the Moore Trust at $6.875 per share, for a total purchase price $232 million.[93] With this acquisition, the ESOP acquired 42.18% ownership in the P-B shares.

August 25, 2006                    16

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

According to the Company's audited financial statements for the year ending 1998, the ESOP acquisition of shares was funded partially by the sale of investments and by borrowing $136 million from Prudential Insurance Company of America and the Pruco Life Insurance Company (Prudential).[94]

<u>IRC § 1042</u>

The sale of stock to the ESOP was pursuant to IRC § 1042.[95] Based on the Allocation Summary Report for the Plan for the PYE 12-31-02, the following individuals have received contributions of stock: James Moore, Gwendolyn Moore, Jimmie Moore, Micheal Moore, and Toby Moore.[96]

Herbert Giffins told the Department on July 19, 2006, that none of the Plans' participants named Moore are relatives to Mr. and Mrs. Moore.[97]

<u>Appraisal</u>

The purchase price was based on an updated opinion dated October 12, 1998, prepared by ᵔᵔᵔ Tc which indicated that the value of Kelly-Moore in total was $550 million. No appraisal report was prepared for this opinion. The appraiser updated his opinion as of July 31, 1998, which indicated that the value of Kelly-Moore in total was $580 million. An appraisal report was prepared for this opinion. The appraiser used the capitalization of earnings approach and made no adjustments for any minority interest and/or lack of marketability. The value was determined by multiplying projected earnings by the Price/Earnings multiple of 22x. The three most "nearly comparable" companies, analyzed by the appraiser, were selling on an average of 22x their earnings.[98] The value of the P-B shares acquired by the ESOP was $231,990,000 (42.18% of $550 million), which is $10,000 less than the acquisition price.

The Company's audited financial statements for the year ending 1998 indicate "Product liability lawsuits exist that, in the opinion of management and the Company's legal counsel, are adequately provided for within the limits of its insurance coverage".[99] The appraisal does not mention "product liability lawsuits".

<u>October 13, 1998 Prudential Loan to K-M Industries</u>

According to the Company's audited financial statements for the year ending 1998, the ESOP acquisition of shares was funded partially by the sale of investments and by borrowing $136 million. The Company issued two ten-year senior promissory notes with an aggregate principal amount of $136 million bearing interest at 6.86% per annum, which were payable in equal quarterly amounts, and are unsecured.[100]

August 25, 2006                    17

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

According to the Note Purchase, Private Shelf, and Revolving Credit Agreement dated October 13, 1998, signed by K-M Paint and the Prudential Insurance Company of America and the Pruco Life Insurance Company (Prudential), the notes would mature on October 13, 2008. There is no action, suit, investigation or proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries, or any properties or rights of the Company or any of its Subsidiaries, by or before any court, arbitrator or administrative or governmental body which could reasonably be expected to have a Material Adverse Effect. Material Adverse Effect is defined as a material adverse effect on (i) the business, operations, affairs, financial condition, assets or properties of the Company and its Subsidiaries taken as a whole or (ii) the ability of the Company to perform its obligations under this Agreement or any Note, or (iii) the validity or enforceability of this Agreement or any Note.[101]

According to the Kelly-Moore's audited financial statements for the year ending 2003, the two ten-year senior promissory notes were refinanced with an aggregate principal amount of $61,760,000 to the same lender. These notes bear interest at 7.66% per annum, are payable in quarterly amounts through 2007, and are secured with various Company-owned real estate parcels.[102]

According to the minutes of the BOD dated June 17, 2003, "Whereas, the Company has issued $136,000,000 aggregate principal amount of its Series A Notes due October 13, 2008, (the "Existing Notes") with an aggregate principal amount of $86,011,456 presently outstanding and the revolving credit facility contemplated by the Original Agreement having terminated pursuant to its terms".

### June 17, 2003 Amended & Restated Prudential Loan to K-M Industries

According to the Amendment and Restatement of Note Purchase, Private Shelf, and Revolving Credit Agreement dated June 17, 2003, signed by Kelly-Moore and the Prudential Insurance Company of America and the Pruco Life Insurance Company, in exchange for amending and restating the Original Agreement, the notes, with an aggregate principal of $86,011,456, would be secured by the certain mortgaged properties. The two notes, Series A-1 Notes and Series A-2 Notes had an aggregate principal amount of $73,511,456 and $12,500,000, respectively, each dated June 17, 2003, with the Series A-1 Notes maturing on October 13, 2008, and the Series A-2 Notes maturing April 13, 2007, each bearing interest on the unpaid balance at the rate of 7.66% per annum. In addition, immediately after the exchange of the Existing Notes, the Company had to make a prepayment of the Series A-1 Notes in the aggregate amount of $24,251,372.68. As of the date of the Note Purchase Agreement, the Company faces approximately 45,000 claims arising out of exposure to the Company's asbestos-containing products. These claimed injuries include asbestosis, lung cancer, other cancers and mesothelioma.[103]

August 25, 2006                                    18

DOL 3579

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

Based on a letter from Prudential to Dan Stritmatter, CFO, dated October 18, 2005, Prudential had no open receivables for the Kelly Moore Paint Company Senior Notes Nos. 48813#AA0 (maturity dated 10-13-08), 48813#AC6 (maturity date 10-13-08) and 48813#AD4 (maturity date 4-13-07). All payments made have been received timely.[104]

Herbert Griffin told the Department on July 19, 2006 that in 2003 Kelly-Moore failed a covenant of the loan agreement between it and Prudential Insurance, the money of which financed the 1998 ESOP loan. The covenant had to do with the profitability of Kelly-Moore. As a result, Prudential renegotiated the loan requiring more collateral. Prudential also required an additional $12 million repayment. Mr. and Mrs. Moore ended up loaning the Company the $12 million to pay Prudential.[105]

<u>2004 Moore Trust Loan to Kelly-Moore</u>

According to the Kelly-Moore's audited financial statements for the year ending 2004, Kelly-Moore issued four subordinated notes with an aggregate principal amount of $12 million to the majority shareholder of K-M Industries. The proceeds from the subordinated notes were used to pay down the notes payable to Prudential. These notes bear interest at 6% per annum, and are subordinated to the notes payable to Prudential. Two of the notes totalling $6 million are due at maturity in 2007, and two notes for $6 million are due at maturity in 2008.[106]

As stated above, Herbert Griffin told the Department on July 19, 2006 that in 2003 Kelly-Moore failed a covenant of the loan agreement between it and Prudential Insurance, the money of which financed the 1998 ESOP loan. The covenant had to do with the profitability of Kelly-Moore. As a result, Prudential renegotiated the loan requiring more collateral. Prudential also required an additional $12 million repayment. Mr. and Mrs. Moore ended up loaning the Company the $12 million to pay Prudential.[107]

<u>October 13, 1998 K-M Industries Loan to ESOP</u>

According to the ESOP Loan Agreement dated October 13, 1998, between the ESOP and the Company, the Company agreed to loan the ESOP <u>$232 million. According to the Loan Agreement, if any action or proceeding is commenced to enforce any of the provisions or rights under the Agreement, the prevailing party will be entitled to recover all of its costs, expenses and reasonable attorneys' fees, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.</u>[108]

According to the Promissory Note dated October 13, 1998, the ESOP agreed to pay the Company $232 million together with interest on the unpaid principal balance at rate equal to 6 ½ %. The loan was to be repaid in 57 quarterly

August 25, 2006                         19

DOL 3580

payments, which include principal and interest. The first payment, due on December 31, 1998, was to be paid in the amount of $23,236,648 and the remaining installments were to be paid in equal payments of principal and interest in the amount of $5,809,162, until the final payment due on December 31, 2012, when all remaining principal and interest is due. In the event of commencement of suit to enforce payment, the ESOP agreed to pay such attorney's fees and costs of collection as the court may adjudge reasonable. The Promissory Note was issued pursuant to the ESOP Loan Agreement. The Promissory Note was secured by a security interest in, and pledge of the shares pursuant to the Pledge Agreement.[109]

According to the Pledge Agreement dated October 13, 1998, between the ESOP and the Company indicates that:[110]

- The ESOP loan is secured by the shares acquired with the loan.

- If additional shares are issued by reason of stock dividends, stock splits, recapitalization, or reorganization, all of the additional shares issued to the ESOP then pledged, shall be held as collateral.

- If the ESOP defaults on the payment of the Note, the Company has the right to sell the collateral.

- If the Company applies the net proceeds of any such collection, realization, or sale, after deducting all costs and expenses of every kind incurred therein or incidental to the care, safe keeping, or otherwise of the collateral, or in any way relating to the rights of the Company, including reasonable counsel fees, to the payment in whole or in part of the Note, accounting for any surplus to ESOP.

- The Agreement shall be construed in accordance with the Laws of the State of California and the parties shall be entitled to such rights and duties as are imposed by the UCC of the State.

- Upon default by the ESOP as such that the Company shall have foreclosure rights against the shares, either arising under this Agreement, the Note, or applicable laws, such foreclosure rights shall be limited and restricted so that a transfer of shares from the ESOP to the Company shall occur only upon and to the extent of the failure by the ESOP to meet the payment schedule of the Note. The foreclosure rights shall be construed and interpreted so that this Agreement, and all rights and duties, thereunder, comply with IRC Reg. 54.4975-7(b)(6).[4]

---

[4] IRC Reg. 54.4975-7(b)(6) Default. In the event of default upon an exempt loan, the value of plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a disqualified person, a loan must provide for a transfer of plan assets upon default only upon and to the extent of the failure of the plan to meet the

DOL 3581

- Shares will be released in accordance with the principal and interest formula described in ERISA Reg. 2550.408b-3(h).

March 18, 2005, Amended and Restated K-M Industries Loan to ESOP

On March 18, 2005, the October 13, 1998, ESOP loan was amended and restated. The terms of the Amended Note indicate that the repayment of the balance of $153,493,087 on the original loan was to be extended until December 31, 2014. The interest on the unpaid balance is at a rate equal to 4.75% per annum, accruing from January 1, 2005. The balance is to be repaid in 9 annual installments of principal payments of $15,300,000 due on each December 31, beginning December 31, 2005, and a balloon payment of $15,349,309 plus all accrued and unpaid interest is due on December 31, 2014. All interest may accrue and shall not be due or payable until the foregoing balloon payment is due and payable on December 31, 2014. If the ESOP is unable to make either the principal payment due on December 31, 2005 or 2006, that will not cause the loan to go into default and the loan payments will be added to the balloon payment due on December 31, 2014.[111]

In the event of commencement of suit to enforce payment of this Note, the ESOP agrees to pay such attorney's fees and costs of collection as the court may adjudge reasonable.[112]

According to the Kelly-Moore's audited financial statements for the year ending 2004, the ESOP made only one note payment in March 2004, with agreement from the ESOP trustee.[113]

Based on loan payment records received on October 19, 2005, by the Department from Dan Stritmatter, CFO, the loan has been repaid each year in the amount of $23,236,648 in accordance with the terms of the promissory note until March 24, 2004, when K-M Industries ceased making contributions to the Plan to allow it to make further loan payments.[114] This is corroborated by the Plan Trust Reconciliation dated as of December 31, 2004.[115] The employer had an obligation to make sufficient contributions to the plan to allow it repay the loan in accordance with the terms of the loan.[116]

The Statement of Account for the period April 25, 2003 – May 15, 2006, shows that on December 21, 2005, the Plan received a principal payment in the amount of $22,590,922 and an interest payment in the amount of $7,290,922.[117]

John Hommel told the Department on July 19, 2006, that, when the Company wanted to renegotiate the ESOP loans with the Plan, North Star took on an

---

payment schedule of the loan. For purposes of this subparagraph (6), the making of a guarantee does not make a person a lender.

adversarial role to try to negotiate in the best interest of the participants and beneficiaries in accordance with the Department's FAB on ESOP Refinancing. The discussions went on for a month and a half and were quite contentious. Among other things, Hommel asked for an enforceable commitment by the Company to contribute to the Plan a sufficient amount to meet its loan liability. It also requested certain protections in case of sale of the Company. The Company would not agree to these stipulations. Although the Plan document indicates that the Company must contribute sufficient amounts to meet the Plan's loan liability, the Plan does not have a "contractual right" to this. In the end, the Company agreed to reduce the interest rate and reduce the number of years the loans would be extended for from four to two years. The Company was on the brink of bankruptcy. Under the circumstances, Hommel believed the final agreement was in the best interest of the participants and beneficiaries. [118] The negotiations were memorialized in a memo from Erin Turley to John Hommel dated March 21, 2005. [119]

On July 19, 2006, the Department received a revised Third Amended and Restated ESOP Promissory Note for $153,493,087.17 dated June 15, 2006. [120] On August 18, 2006, the Department received an Amendment to the Pledge Agreement and Amendment to ESOP Loan Agreement (for the original agreements dated October 13, 1998) that were dated August 17, 2006. [121] The language that violated ERISA was removed from the promissory note and amended agreements. The amount currently owed on the loan is $138,193,087.17 [122]

Release of Shares

Section 25 of the Plan document indicates that encumbered shares may be released by using either the principal and interest formula (General Rule) or the principal only formula (Special Rule). [123]

The Pledge Agreement dated October 13, 1998, indicates that the shares will be released based on the amount of principal and interest paid each year. [124]

Based on the Trust Reconciliation statements for the PYE 1999-2004 and what Perlita Biag at BSI told the Department April 7, 2004, encumbered shares are released based on the amount of principal and interest paid on the ESOP loan and are allocated based on compensation. Dividends earned on the shares both allocated and unallocated are released using the Fair Market Value Test and are allocated based on the stock account balances in the former case and compensation in the latter case. [125]

**October 18, 1999 Stock Acquisition**

Based on the ESOP Stock Purchase Agreement dated October 18, 1999, entered into by the ESOP, the Moore Trust and K-M Industries, the Plan agreed to

purchase 8.4 million shares of I-B shares of K-M Industries stock from the Moore Trust at $6.55 per share, for a purchase price $55 million.[126]  With this acquisition, the ESOP acquired ownership 42% in the I-B shares.

According to a letter dated October 6, 1999, from the Company to Bank of America, the acquisition would be funded by a Bank of America loan for $34,096,230 and a loan from the Company for $20 million.[127]

In addition, to the above loans, according to the undated K-M Industries Current Corporate Structure chart, the acquisition was funded by a Company contribution in the amount of $903,770.[128]  This is corroborated by the Trust Reconciliation statements for the PYE 1999-2004 and what Perlita Biag at BSI told the Department April 18, 2004.[129]

## IRC § 1042

The sale of stock to the ESOP was pursuant to IRC § 1042.[130]  Based on the Allocation Summary Report for the Plan for the PYE 12-31-02, the following individuals have received contributions of stock:

Ex 7c [131]

Herbert Giffins told the Department on July 19, 2006, that none of the Plans' participants named Moore are relatives to Mr. and Mrs. Moore.[132]

## Appraisal

The purchase price was based on an opinion as of June 30, 1999, prepared by Duff & Phelps, which indicated that 42% of the value of CCIC on a non-marketable, minority interest basis was $55 million.   An appraisal report was prepared for this opinion.   There was no update to the appraisal opinion as of the date of the transaction provided to the Department.   The Guideline Public Traded Company method was used with a 15% lack of marketability.[133]

## Loans to K-M Industries

### October 13, 1999 Bank of America Loan to K-M Industries

On October 13, 1999, K-M Industries borrowed $34,096,230 from Bank of America to lend to the ESOP to enable it to acquire 8.4 million shares of Class I-B Stock in K-M Industries.  According to the Promissory Note dated October 13, 1999, between K-M Industries and Bank of America, K-M Industries agreed to pay $34,096,230 pursuant to the Term Loan Agreement dated October 13, 1999.[134]

The Term Loan Agreement between the Bank of America and K-M Industries dated October 18, 1999, indicated that the bank would make a Tranche A bridge

DOL 3584

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

term loan for $6,096,230, maturing three months from the effective date in December 1999; and a Tranche B loan for $28 million maturing on March 18, 2004. The Tranche A loan was at an interest rate per annum equal to the Base Rate from time to time in effect minus .50%. The Tranche B loan was at an interest rate per annum equal to the Base Rate from time to time in effect minus .50% or at a rate per annum equal to the Offshore Rate applicable to each interest period for such Offshore Rate Advance plus 1.70% per annum from the effective date to and including March 18, 2001, and 1.65% thereafter. The loan was collateralized by 82% of the shares of CCIC owed by CCIC. The proceeds of the loan were to be used to finance the Plan's acquisition of employer securities.[135]

CCIC Stock Certificate No. 1 issued to K-M Industries for 155,800 was being held by the Bank of America.[136]

Based on Bank of America memoranda dated October 11-14, 2005, it appears that this loan was repaid in full on March 8, 2004.[137] According to the undated K-M Industries Current Corporate Structure chart, the Bank of America loan for $34,096,230 is paid off.[138]

October 18, 1999 CCIC Loan to K-M Industries

On October 18, 1999, K-M Industries borrowed $20 million from CCIC to lend to the ESOP to enable it to acquire 8.4 million shares of Class I-B Stock in K-M Industries. According to the Promissory Note dated October 18, 1999, between K-M Industries and CCIC, K-M Industries agreed to pay $20 million in 3 principal installments of $5.6 million on each March 18, beginning on March 18, 2005, and a balloon payment of $3.2 million on March 18, 2008. The interest rate on the loan was a rate equal to One-Month LIBOR plus 1.7% per annum through March 18, 2001, and One-Month LIBOR plus 1.65% per annum thereafter. Interest was to be paid monthly in arrears. The note was secured with a first priority interest in 18% of the shares of CCIC held by K-M Holding.[139]

CCIC Stock Certificate No. 2 issued to K-M Industries for 34,200 was being held by CCIC.[140]

March 18, 2005 Amended and Restated CCIC Loan to K-M Industries

On March 18, 2005, the October 18, 1999, CCIC loan was amended and restated. According to a Promissory Note dated March 18, 2005, between K-M Industries and CCIC, K-M Industries agreed to pay CCIC $20 million together with interest accruing from and after October 18, 1999, on the unpaid principal balance at a rate equal to 4.75% per annum. The note was secured with a first priority interest in 18% of the shares of CCIC held K-M Holding. The loan is to be paid in 9 annual principal payments of $2 million on each December 31, beginning on December 31, 2005, and a balloon payment of $2 million plus all accrued and unpaid interest on December 31, 2014. All interest may accrue and is not due or

payable until the balloon payment is due. If K-M Industries is unable to make either the principal payment due on December 31, 2005 or 2006, because the ESOP failed to make its payment on its Amended and Restated Promissory Note in the amount $32,049,478, that will not cause the loan to go into default and the loan payments will be added to the balloon payment due on December 31, 2014.[141]

### March 18, 2005 CCIC Loan to K-M Industries

According to a Promissory Note dated March 18, 2005, between K-M Industries and CCIC, K-M Industries agreed to pay CCIC $12,049,478 together with interest on the unpaid principal balance at a rate equal to 4.75% per annum, which interest shall accrue from and after January 1, 2005. The loan is to be paid in 9 annual principal payments of $1.2 million on each December 31, <u>beginning on December 31, 2005</u>, and a balloon payment of $1,249,478 plus all accrued and unpaid interest on December 31, 2014. All interest may accrue and is not due or payable until the balloon payment is due. If K-M Industries is unable to make either the principal payment due on December 31, 2005 or 2006, because the ESOP failed to make its payment on its Amended and Restated Promissory Note in the amount $32,049,478, that will not cause the loan to go into default and the loan payments will be added to the balloon payment due on December 31, 2014.[142]

Bob Erickson told the Department on August 1, 2006, that CCIC loaned K-M Industries the money to allow K-M Industries to pay the Bank of America loan off ahead of schedule.[143]

### October 18, 1999 K-M Industries Loan to ESOP

According to the ESOP Loan Agreement dated October 18, 1999, between the ESOP and the Company, the Company agreed to loan the ESOP <u>$54,096,230</u> to acquire 8,261,970 shares of the Company's Class I-B stock. <u>According to the Loan Agreement, if any action or proceeding is commenced to enforce any of the provisions or rights under the Agreement, the prevailing party will be entitled to recover all of its costs, expenses and reasonable attorneys' fees, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.</u>[144]

According to the Promissory Note dated October 18, 1999, between the ESOP and the Company, the ESOP agreed to pay the Company $54,096,230 together with interest on the unpaid principal balance at rate equal to 6 ½ %. The loan was to be repaid in 53 quarterly payments, which include principal and interest. The first payment, due on December 31, 1999, was to be paid in the amount of $5,907,382 and the remaining installments were to be paid in accordance with the amortization schedule continuing the final payment due on December 31, 2012, when all remaining principal and interest is due. <u>In the event of commencement of suit to enforce payment, the ESOP agreed to pay such attorney's fees and costs</u>

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

of collection as the court may adjudge reasonable. The Promissory Note was issued pursuant to the ESOP Loan Agreement. The Promissory Note was secured by a security interest in, and pledge of the shares pursuant to the Pledge Agreement.[145]

According to the Plan's audited financials for the PYE December 31, 2000, the promissory note was payable with an installment of $5,907,382 due on December 31, 1999, and a payment of $3,114,346 at the quarter end March 31, 2000, and quarterly payments of $1,314,346 to December 31, 2012, except for the quarter ending March 31, 2001 where the payment due is $2,825,871. The annual payments under the note should then be:

| | |
|---|---|
| 1999 | $5,907,382 |
| 2000 | $7,057,384 |
| 2001 | $6,768,909 |
| 2002-2012 | $5,257,384 |

However, it was management's intention to repay the note over 10 years with an installment of $6,194,566 being made on December 31, 1999, the first quarterly payment for each year to be approximating $3.6 million and three equal subsequent quarterly payments each year of approximately $1.3 million to December 31, 2008. The accelerated annual payments would be:

| | |
|---|---|
| 1999 | $6,194,566 |
| 2000-2008 | $7,500,000 [146] |

According to the Pledge Agreement dated October 18, 1999, between the ESOP and the Company indicates that:[147]

- In addition to pledging the 8,261,970 shares of the Company's Class I-B stock, if additional shares are issued by reason of stock dividends, stock splits, recapitalization, or reorganization, all of the additional shares issued to the ESOP then pledged, shall be held as collateral.

- If the ESOP defaults on the payment of the Note, the Company has the right to sell the collateral.

- If the Company applies the net proceeds of any such collection, realization, or sale, after deducting all costs and expenses of every kind incurred therein or incidental to the care, safe keeping, or otherwise of the collateral, or in any way relating to the rights of the Company, including reasonable counsel fees, to the payment in whole or in part of the Note, accounting for any surplus to ESOP.

August 25, 2006                                    26

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

- The Agreement shall be construed in accordance with the Laws of the State of California and the parties shall be entitled to such rights and duties as are imposed by the UCC of the State.

- Upon default by the ESOP as such that the Company shall have foreclosure rights against the shares, either arising under this Agreement, the Note, or applicable laws, such foreclosure rights shall be limited and restricted so that a transfer of shares from the ESOP to the Company shall occur only upon and to the extent of the failure by the ESOP to meet the payment schedule of the Note. The foreclosure rights shall be construed and interpreted so that this Agreement, and all rights and duties, thereunder, comply with IRC Reg. 54.4975-7(b)(6).[5]

- Shares will be released in accordance with the principal and interest formula described in ERISA Reg. 2550.408b-3(h).

<u>March 18, 2005 Amended and Restated Loan from K-M Industries to ESOP</u>

On March 18, 2005, the October 18, 1999, ESOP loan was amended and restated. The terms of the Amended Note indicate that the repayment of <u>the balance of $32,049,478 on the original loan was to be extended until December 31, 2014.</u> The interest on the unpaid balance is at a rate equal to 4.75% per annum, accruing from January 1, 2005. The balance is to be repaid in 9 annual installments of principal payments of $3.2 million due on each December 31, beginning December 31, 2005, and a balloon payment of $3,249,478 plus all accrued and unpaid interest is due on December 31, 2014. <u>All interest may accrue and shall not be due or payable until the foregoing balloon payment is due and payable on December 31, 2014. If the ESOP is unable to make either the principal payment due on December 31, 2005 or 2006, that will not cause the loan to go into default and the loan payments will be added to the balloon payment due on December 31, 2014.</u>[148]

<u>In the event of commencement of suit to enforce payment of this Note, the ESOP agrees to pay such attorney's fees and costs of collection as the court may adjudge reasonable.</u>[149]

Based on the trust reconciliation reports prepared by BSI for the PYE 1999-2004, the annual amount paid on the loan was:[150]

1999   $6,194,566

---

[5] IRC Reg. 54.4975-7(b)(6) Default. In the event of default upon an exempt loan, the value of plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a disqualified person, a loan must provide for a transfer of plan assets upon default only upon and to the extent of the failure of the plan to meet the payment schedule of the loan. For purposes of this subparagraph (6), the making of a guarantee does not make a person a lender.

August 25, 2006                    27

DOL 3588

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

<div style="margin-left:2em">

2000    $7,294,566
2001    $7,419,546
2002    $7,369,590
2003    $4,612,165
2004    $346,414
Total    $41,577,309

2005    $3,200,000
2006    $3,200,000
Total    $47,977,309

2007    $3,200,000
Total    $51,177,309

</div>

Had the loan been repaid in accordance with the original terms, the payments would have been as follows:

<div style="margin-left:2em">

1999    $5,907,382
2000    $7,057,384
2001    $6,768,909
2002    $5,257,384
2003    $5,257,384
2004    $5,257,384
Total    $35,505,827

2005    $5,257,384
2006    $5,257,384
Total    $46,020,595

2007    $5,257,384
Total    $51,277,979

</div>

If loan payments are made in accordance with the amended promissory note, the loan will be paid ahead of schedule until 2007, when it will become in arrears in accordance with the original terms of the loan. The employer had an obligation to make sufficient contributions to the plan to allow it to repay the loan in accordance with the terms of the loan.[151]

The Statement of Account for the period April 25, 2003 – May 15, 2006, shows that on December 15 and 21, 2005, the Plan received principal payments in the amount of $3,275,621 and $589,848, respectively; and on December 15, 2006, an interest payment in the amount of $1,534,597.[152]

John Hommel told the Department on July 19, 2006, that, when the Company wanted to renegotiate the ESOP loans with the Plan, North Star took on an adversarial role to try to negotiate in the best interest of the participants and

DOL 3589

beneficiaries in accordance with the Department's FAB on ESOP Refinancing. The discussions went on for a month and a half and were quite contentious. Among other things, Hommel asked for an enforceable commitment by the Company to contribute to the Plan a sufficient amount to meet its loan liability. It also requested certain protections in case of sale of the Company. The Company would not agree to these stipulations. Although the Plan document indicates that the Company must contribute sufficient amounts to meet the Plan's loan liability, the Plan does not have a "contractual right" to this. In the end, the Company agreed to reduce the interest rate and reduce the number of years the loans would be extended for from four to two years. The Company was on the brink of bankruptcy. Under the circumstances, Hommel believed the final agreement was in the best interest of the participants and beneficiaries. [153] The negotiations were memorialized in a memo from Erin Turley to John Hommel dated March 21, 2005. [154]

On July 19, 2006, the Department received a revised Second Amended and Restated ESOP Promissory Note for $32,307,297.00, dated March 18, 2005. [155] On August 18, 2006, the Department received an Amendment to the Pledge Agreement and an Amendment to ESOP Loan Agreement (for the original agreements dated October 18, 1999) that were dated August 17, 2006. [156] The language that violated ERISA was removed from the promissory note and amended agreements. The amount currently owed on this loan is $29,107,297. [157]

Release of Shares

Section 25 of the Plan document indicates that encumbered shares may be released by using either the principal and interest formula (General Rule) or the principal only formula (Special Rule). [158]

The Pledge Agreement dated October 18, 1999, indicates that the shares will be released based on the amount of principal and interest paid each year. [159]

Based on the Trust Reconciliation statements for the PYE 1999-2004 and what *Ex 7w* at BSI told the Department April 7, 2004, encumbered shares are released based on the amount of principal and interest paid on the ESOP loan and are allocated based on compensation. Dividends earned on the shares both allocated and unallocated are released using the Fair Market Value Test and are allocated based on the stock account balances in the former case and compensation in the latter case. [160]

---

[1] Plan document, p. 1, Case File Tab 21-2, and 6/30/03 Form 5500 Case File Tab 21-5
[2] 12-31-04 Form 5500 Case File Tab 29
[3] Ibid. and Stock Certificates P-B & I-B issued to ESOP on 10/18/99, 10/13/98 Tab 21-11
[4] KMPC Resolution dated 9/30/98 & KMHC BOD held 7/16/99 Case File Tab 21-2 & SRR 12/31/03 Appraisal Case File Tab 21-26
[5] KMHC BOD held 7/16/99 Case File Tab 21-2
[6] Ibid.

DOL 3590

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

---

[7] KMHC BOD held 7/16/99 & Plan document, p. 25 Case File Tab 21-2

[8] Plan document, p. 1 Case File Tab 21-2

[9] IRS Determination Letter dated June 26, 2000 Case File Tab 21-1

[10] SRR 12/31/2003 Appraisal p. 18 Cases File Tab 21-26

[11] Ibid., p.6

[12] Ibid., pp. 19, 69

[13] Ibid., p. 69

[14] Ibid., p. 19, & 9-1-98 & 10-15-98  K-M Paint BOD Minutes Case File Tab 21-22

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid., pp. 6,19

[20] Ibid. p.19

[21] CCIC Stock Certificate Nos. 1-2 Issued to K-M Industries 9-1-99 Case File Tab 21-11

[22] SRR 12/31/2003 Appraisal pp. 6, 69 Cases File Tab 21-26

[23] Ibid.

[24] Ibid. and Duff & Phelps 12/31/02 Appraisal p. 4 Case File Tab 21-24

[25] SRR 12/31/2003 Appraisal pp. 6, 20, 22 Case File Tab 21-26 & Duff & Phelps 12/31/02 Appraisal p. 4 Case File Tab 21-24

[26] Articles of Incorporation Filed 9-30-98 Case File Tab 21-13; SSR Appraisal 3/31/03 pp. 7-8 Case File Tab 21-26; Pitts Letter to IRS 3/5/99 p. 2 of Draft Case File Tab 21-8; Ernst & Young Audited Financials of Kelly-Moore dated 12-31-98, p. 7, Case File Tab 21-23; Brooks 7/31/98 Appraisal , p. 9, Case File Tab 21-25

[27] Ibid.

[28] Articles of Inc. Filed 9/30/98 Tab 21-13; SRR Appraisal 12/31/03 pp. 7-8 Tab 21-26; Stock Certificates P-A, P-B, I-A, I-B issued to Moores and ESOP on 10/18/99, 10/13/98, 9/30/98, 10/14/99 Tab 21-11

[29] Ibid.

[30] Articles of Inc. filed 10/14/99 Tab File 21-13

[31] Ibid.; SRR Appraisal 12/31/03 pp. 7-8 Tab 21-26;  Stock Certificates P-A, P-B, I-A, I-B issued to Moores and ESOP on 10/18/99, 10/13/98, 9/30/98, 10/14/99 Tab 21-11

[32] Certain Holding Company, Kelly-Moore and CCIC Shareholder and BOD Minutes Tab 21-18; RI Giffins Tab 42; RI Hommel Tab 43

[33] Annual shareholder meeting minutes 5/6/99-8/2/05 Case File Tab 21-22

[34] Plan document pp. 17, 38-39 Case File Tab 21-2

[35] Chubb Fidelity Bond Case File Tab 21-6

[36] Form 5500 filed for PYE 2003 Case File Tab 21-5

[37] Form 5500 filed for PYE 2003 Case File Tab 21-5

[38] SRR Appraisals for the PYE 2003 & 2004 Case File Tab 21-26

[39] Forms 5500 2003-2004 Case File Tab 29 Bulky File.

[40] Plan document dated 6-30-99 p. 30 Case File Tab 21-2

[41] Ibid.

[42] Sheet annotated Question 6 Case File Tab 21-27

[43] Herbert Giffins RI Case File Tab 42

[44] Dan Stritmatter Letter to Department dated 8-17-06 Case File Tab 56

[45] Plan document dated 6-30-99 p. 30 Case File Tab 21-2

[46] SPD dated 10-11-99 and SMM Effective 1-1-98 and 1-1-02 Case File Tab 21-3

[47] Herbert Giffins RI Case File Tab 42

[48] Note on T/C w/Dan Stritmatter Case File Tab 50

[49] Ibid.

[50] Stritmatter Letter to the Department dated 8-17-06 Case File Tab 56

[51] Management Liability Policies from 9/25/01 to 9/25/02 & 9/25/03 to 9/25/05 Case File Tab 21-6

[52] SPD dated 10-11-99 p. 3 Case File Tab 21-3

[53] Herbert Giffins RI Case File Tab 42

[54] Ibid., pp 56-59

August 25, 2006                    30

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

[55] Plan Amendment No. 4 effective 4-22-03 and K-M Holding BOD Minutes Consenting to Amendment No. 4 Case File Tab 21-2

[56] Plan Document p. 56 Case File Tab 11-2

[57] List of ESOP Committee Members/Trustees/Plan Administrators Tab 21-9

[58] Herbert Giffins RI Case File Tab 42

[59] Herbert Giffins RI Case File Tab 42

[60] SPD dated 10-11-99 p. 4 Case File Tab 21-3

[61] Herbert Giffins RI Case File Tab 42

[62] ESOP Trust Agreement dated 9-30-98 Case File Tab 21-11

[63] ESOP Trust Agreement dated 4-22-03 and K-M Holding BOD Minutes Consenting to Agreement Case File Tab 21-4

[64] Plan Amendment No. 4 effective 4-22-03 and K-M Holding BOD Minutes Consenting to Amendment No. 4 Case File Tab 21-2

[65] Plan Document p. 56 Case File Tab 11-2

[66] Ibid., Note on T/C w/Mark Weisberg dated 1-28-05 Case File Tab 6

[67] Ibid.

[68] Kelly-Moore Appraisals 1998-2002 Case File Tab 21-25; List of Service Providers Case File Tab 21-10

[69] CCIC Appraisals 1999-2002 Case File Tab 21-24; List of Service Providers Case File Tab 21-10

[70] SRR Appraisals 2003-2005 Case File Tab 21-26 and Tab 42 Bulky File; List of Service Providers Case File Tab 21-10

[71] List of Service Providers Case File Tab 21-10

[72] Audits of Forms 5500 PYE 2003-2004 Case File Tab 29 Bulky File

[73] John Hommel RI Case File Tab 43

[74] Plan document effective 7-16-99, pp. 21, 33-37, Case File Tab 21-2

[75] Sheet Annotated Question 14 None Case File Tab 21-27

[76] Plan document effect 7-6-99, p. 32, Case File Tab 21-2

[77] Plan document effective 7-16-99, pp. 1, 22, Case File Tab 21-2

[78] Plan document effective 7-16-99, pp. 43-45, Case File Tab 21-2

[79] SPD effective 7-16-99, pp. 14-15, Case File Tab 21-3

[80] Lists of Participants Eligible for Distributions and Distributions Made for the PYE 2003-2004 for Kelly-Moore Case File Tab 42; Plan CIG Series P Statement of Account (4-25-03 thru 5-15-06) Plan Paint Co. Series P Statement of Account (4-25-03 thru 5-15-06) Case File Tab 36 (Bulky File); Bob Erickson E-Mail 8-17-06 Distribution Instructions for PYE 2003-2004 for CCIC Case File Tab 51

[81] Lists of Participants Eligible for Distributions and Distributions Made for the PYE 2003-2004 Case File Tab 42

[82] Notes on T/Cs w/ ℇχℸℂ and ℇχ℔ on 8-15-06 and ℇχℸℂ on 8-18-06 Case File Tabs 47-49, 52

[83] Plan document effective 7-16-99, p. 51-52 Case File Tab 21-2

[84] Sheet Annotated Question 31-32 Case File Tab 21-27

[85] Distribution Election Forms Case File Tab 21-21

[86] Plan document effective 7-16-99, p. 48 Case File Tab 21-2

[87] Amended & Restated Bylaws adopted 9-30-98 Tab 21-13

[88] Distribution Election Forms Case File Tab 21-21

[89] Stritmatter Letter to the Department dated 8-17-06 Case File Tab 56

[90] Plan document effective 7-16-99, pp. 12-13, 54 Case File Tab 21-2

[91] Appraisals 1998-2005 Case File Tabs 21-24 to 21-26, 36 (Bulky File)

[92] Note on T/C w/Dan Feinberg Case File Tab 46

[93] Stock Purchase Agreement dated 10-13-98 Case File Tab 21-16

[94] K-M Paint Audited Financials for 1998, pp. 8, 15 Case File Tab 21-23

[95] Ibid.

[96] Allocation Summary Reports dated 12-31-02 Case File Tab 21-12

[97] Herbert Giffins RI Case File Tab 42

[98] ℇχℸℂ opinion letters dated 8-5-98 and 10-12-98 Case File Tab 21-25

[99] K-M Paint Audited Financials for 1998, p. 17 Case File Tab 21-23

[100] K-M Paint Audited Financials for 1998, pp. 8, 15 Case File Tab 21-23

[101] Note Purchase, Private Shelf, and Revolving Credit Agreement dated October 13, 1998, p. 1, 31 Case 21-20

August 25, 2006                               31

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

---

[102] Kelly-Moore 2003 Audited Financials, p. 16 Case File Tab 21-23

[103] Amendment & Restatement Note Purchase, Private Shelf, and Revolving Credit Agreement dated June 18, 2003, pp. 1, 2, 4, Schedule 8C, Case File Tab 21-20

[104] Prudential letter to Dan Stritmatter dated 10-18-05 Case File Tab 23

[105] Herbert Giffins RI Item 31 Case File Tab 42

[106] Kelly-Moore 2004 Audited Financials, p. 14 Tab 21-23

[107] Herbert Giffins RI Item 31 Case File Tab 42

[108] ESOP Loan Agreement dated 10-13-98 Case File Tab 21-16

[109] ESOP Promissory Note dated 10-13-98 Case File Tab 21-16

[110] ESOP Pledge Agreement dated 10-13-98 Case File Tab 21-16

[111] Amended & Restated ESOP Promissory Note dated 3-18-05 Case File Tab 21-16

[112] Ibid.

[113] Kelly-Moore 2004 Audited Financials, p. 11 Tab 21-23.

[114] Dan Stritmatter letter to Bank of the West dated 3-24-04 Case File Tab 23

[115] Trust Reconciliation Case File Tab 31

[116] Plan document effective 7-16-99, pp. 21, 33-37, Case File Tab 21-2

[117] Statement of Account for the period April 25, 2003 – May 15, 2006 Tab 36 Bulky File

[118] John Hommel RI Case File Tab 43

[119] Turley Memo to Hommel dated 3-21-05 Case File Tab 54

[120] Third Amended and Restated ESOP PN for $153,493,087.17 dated 6-15-06 Case File Tab 43

[121] Amendments to the Pledge Agreement ESOP and Loan Agreement to the Original Agreements dated 10-13-98 dated 8-17-06 Case File Tab 53 and

[122] ESOP Amortization Schedule for $153,493,087 Loan Case File Tab 57

[123] Plan Document dated 7/16/99 p. 25 Case File Tab 21-2

[124] Pledge Agreement dated 10/13/98 Case File Tab 21-16

[125] Note on T/C w/ ExC Case File Tab 27 Trust Reconciliation statements for the PYE 1999-2004 Case File Tab 31

[126] Stock Purchase Agreement dated 10-18-99 Case File Tab 21-17

[127] Letter dated October 6, 1999, from the Company to Bank of America Case File Tab 21-17

[128] K-M Industries Current Corporate Structure chart Case File Tab 21-17

[129] Note on T/C w/ ExTc Case File Tab 32 Trust Reconciliation statements for the PYE 1999-2004 Case File Tab 31

[130] Stock Purchase Agreement dated 10-18-99 Case File Tab 21-17

[131] Allocation Summary Reports dated 12-31-02 Case File Tab 21-12

[132] Herbert Giffins RI Case File Tab 42

[133] Duff & Phelps Valuation as of 6-30-99 Case File Tab 21-24

[134] Promissory Note dated October 13, 1999, for $34,096,230 between K-M Industries and Bank of America Case File 21-17

[135] Bank of America Term Loan Agreement dated 10-18-99, pp. 6, 9, 11-13, 31, 37 Case File Tab 23

[136] CCIC Stock Certificate No. 1 issued to K-M Industries for 155,800 Case File 21-11

[137] Bank of America Memos dated 10-11&14-05 Case File Tab 23

[138] K-M Industries Current Corporate Structure chart Case File Tab 21-17

[139] Promissory Note for $20 million dated October 18, 1999 between K-M Industries & CCIC Case File 21-17

[140] CCIC Stock Certificate No. 2 issued to K-M Industries for 34,200 Case File 21-11

[141] Promissory Note dated March 18, 2005, for $20 million between K-M Industries and CCIC Case File 21-17

[142] Promissory Note dated March 18, 2005, for $12,049,478 between K-M Industries and CCIC Case File 21-17

[143] Note on T/C w/Bob Erickson on 8-1-06 Case File Tab 49

[144] ESOP Loan Agreement dated 10-18-99 Case File Tab 21-17

[145] ESOP Promissory Note dated 10-18-99 Case File Tab 21-17

[146] ESOP audited financials for PYE 2000 pp. 10-11 Case File Tab 21-23

[147] ESOP Pledge Agreement dated 10-18-99 Case File Tab 21-17

[148] Amended & Restated ESOP Promissory Note for $32,049,478 dated 3-18-05 between Co. & ESOP Case File Tab 21-17

[149] Ibid.

August 25, 2006                    32

K-M INDUSTRIES HOLDING CO. INC. ESOP
70-012587

---

[150] BSI Trust Reconciliation Reports for the PYE 1999-2004 Case File Tab 21-31
[151] Plan document effective 7-16-99, pp. 21, 33-37, Case File Tab 21-2
[152] Statement of Account for the period April 25, 2003 – May 15, 2006 Tab 36 Bulky File
[153] John Hommel RI Case File Tab 43
[154] Turley Memo to Hommel dated 3-21-05 Case File Tab 54
[155] Second Amended and Restated ESOP PN for $32,307,297 dated 3-18-05 Case File Tab 43
[156] Amendments to the Pledge Agreement and Loan Agreement to the Original Agreements dated 10-18-99 dated 8-17-06 Case File Tab 53
[157] ESOP Amortization Schedule for $32,049,478 Loan Case File Tab 57
[158] Plan Document dated 7/16/99 p. 25 Case File Tab 21-2
[159] Pledge Agreement dated 10/18/99 Case File Tab 21-16
[160] Note on T/C w/. Ex7c Case File Tab 27 Trust Reconciliation statements for the PYE 1999-2004 Case File Tab 31

August 25, 2006                                    33

DOL 3594

**EXHIBIT 2**

71 Stevenson Street, Suite 915
San Francisco, CA 94105

**RECEIVED**

**AUG 3 0 2006**

**CIG**

AUG 2 5 2008

Reply to the Attention of: 70-012587
Holly A. Holman, Senior Investigator
(415) 975-4590 x150

Desiree Moore, COB
K-M Industries Holding Co. Inc.,
Administrator
K-M Industries Holding Co. Inc. ESOP
987 Commercial St.
San Carlos, CA 94070

John Hommel, President
North Star, Trustee
K-M Industries Holding Co. Inc. ESOP
500 West Madison St. Ste. 3150
Chicago, ILL 60661

Dan Stritmatter, ESOP Committee Member
K-M Industries Holding Co. Inc. ESOP
Kelly-Moore Paints
987 Commercial St.
San Carlos, CA 94070

Bob Erickson, ESOP Committee Member
K-M Industries Holding Co. Inc. ESOP
Capital Insurance Group
2300 Garden Road
Monterey, CA 93940

Subject:    K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
            EIN/PN: 94-1230192/002

Dear Fiduciaries:

The Department of Labor has responsibility for administration and enforcement of Title I of the
Employee Retirement Income Security Act of 1974 (ERISA).  Title I establishes standards
governing the operation of employee benefit plans such as the K-M Industries Holding Co. Inc.
Employee Stock Ownership Plan (Plan).

This office has concluded its investigation of the Plan and the activities of the Plan's fiduciaries.
Based on the facts gathered in this investigation, and subject to the possibility that additional
information may lead us to revise our views, it appears that you and the K-M Industries Holding

CIG 010317

Co. Inc., as the Plan's fiduciaries, may have violated several provisions of ERISA[1]. The purpose of this letter is to advise you of our findings.

As we understand the facts, many of which were provided by you to this office during the course of our investigation, the Plan, effective January 1, 1998, is sponsored by the K-M Industries Holding Co. Inc. (Company). Section 1 of the Plan document indicates that the Plan is intended to qualify as an employee stock ownership plan and stock bonus plan, and to be primarily invested in employer securities. Section 18 of the Plan document indicates that the Company shall administer the Plan and is designated as the Plan Administrator; and that the Plan Committee and the Company shall each be a named fiduciary.

The ESOP Trust Agreement between the Company and North Star Trust Company, as Trustee, dated April 22, 2003, reflects the appointment of North Star as trustee for the Trust; and provides that the Trustee shall have independent discretionary authority in connection with the investment, retention, custody and disposal of trust assets, including company stock, and shall not be subject to the direction of the Company or the Committee appointed by the Company to administer the Plan, with respect to investment of trust assets.

Section 18 of the Plan document indicates that the Company's Board of Directors is responsible for the selection, retention, monitoring, and removal of the Plan's Trustee and Plan Committee members. Accordingly, the Company and you are fiduciaries to the Plan within the meaning of ERISA § 3(21).

Prohibited Loans

Our investigation disclosed that, as the Plan's fiduciaries, you caused the Plan to engage in prohibited loans between the Plan and the Company, a party-in-interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C).

Specifically, on October 13, 1998, the Plan borrowed $232 million from the Company to enable it to purchase 33,745,455 shares of Company class P-B common stock from the Moore Trust. Accordingly, on October 13, 1998, the Plan entered into a loan agreement with the Company and, pursuant to that loan agreement, issued a promissory note in favor of the Company. The promissory note was secured by a security interest in, and pledge of the shares pursuant to a pledge agreement, also dated October 13, 1998.

The loan agreement provided that, "if any action or proceeding is commenced to enforce any of the provisions or rights under the agreement, the prevailing party will be entitled to recover all of its costs, expenses and reasonable attorneys' fees, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be

---

[1] The text of ERISA sections cited in this letter is enclosed as Attachment A.

CIG 010318

included as part of such judgment". In addition, the promissory note provided that, in the event of commencement of suit to enforce payment, the Plan agreed to pay "such attorney's fees and costs of collection as the court may adjudge reasonable". Furthermore, the pledge agreement provided that, if the Plan defaults on the payment of the note, the Company "shall apply the net proceeds of any such collection, realization, or sale, after deducting all costs and expenses of every kind incurred therein or incidental to the care, safe keeping, or otherwise of the collateral, or in any way relating to the rights of the Company, including reasonable counsel fees, to the payment in whole or in part of the note, accounting for any surplus to the Plan".

On March 18, 2005, the loan was amended and restated. The terms of the amended promissory note, provided that "in the event of commencement of suit to enforce payment of this note, the Plan agrees to pay such attorney's fees and costs of collection as the court may adjudge reasonable".

On October 18, 1999, the Plan borrowed $54,096,230 from the Company to enable it to purchase 8,261,970 shares of Company class I-B common stock from the Moore Trust. Accordingly, on October 18, 1999, the Plan entered into a loan agreement with the Company and, pursuant to that loan agreement, issued a promissory note in favor of the Company. The promissory note was secured by a security interest in, and pledge of the shares pursuant to a pledge agreement, also dated October 18, 1999.

The loan agreement provided that, "if any action or proceeding is commenced to enforce any of the provisions or rights under the agreement, the prevailing party will be entitled to recover all of its costs, expenses and reasonable attorneys' fees, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment". In addition, the promissory note again provided that, in the event of commencement of suit to enforce payment, the Plan agreed to pay "such attorney's fees and costs of collection as the court may adjudge reasonable". Furthermore, the pledge agreement again provided that, if the Plan defaults on the payment of the note, the Company "shall apply the net proceeds of any such collection, realization, or sale, after deducting all costs and expenses of every kind incurred therein or incidental to the care, safe keeping, or otherwise of the collateral, or in any way relating to the rights of the Company, including reasonable counsel fees, to the payment in whole or in part of the note, accounting for any surplus to the Plan".

On March 18, 2005, the loan was amended and restated. The terms of the amended promissory note, again provided that "in the event of commencement of suit to enforce payment of this note, the Plan agrees to pay such attorney's fees and costs of collection as the court may adjudge reasonable".

ERISA § 406(a)(1)(B) generally prohibits the lending of money or other extension of credit between a plan and party-in-interest. However, ERISA § 408(b)(3) and the Department's regulation, 29 CFR § 2550.408b-3, exempts a loan from the restrictions imposed by §

3

CIG 010319

406(a)(1)(B), if that loan meets certain criteria. In particular, 29 CFR § 2550.408b-3(f) provides that, in the event of default upon an exempt loan, the value of plan assets transferred must not exceed the amount of default. If the lender is a party-in-interest, a loan must provide for a transfer of plan assets upon default only upon and to the extent of the failure to meet the payment schedule of the loan. An ESOP loan fails to conform to this requirement if the loan or plan document requires the plan to pay an amount that constitutes more than the scheduled loan payment in default.

In our view, the loans referenced above did not meet the exemptive relief provided by ERISA § 408(b)(3) in that, under the terms of default, the Plan must pay attorneys' fees and costs of collection if so adjudged by a court in connection with the lender's efforts to collect the indebtedness. Therefore, in our view, the Plan's fiduciaries were in violation of ERISA § 404(a)(1)(A) and (B) and §§ 406(a)(1)(B) and (D).

Subsequent to the Department's investigation, on July 19, 2006, the Department received a revised Third Amended and Restated ESOP Promissory Note for $153,493,087.17 dated June 15, 2006 and a Second Amended and Restated ESOP Promissory Note for $32,307,297.00, dated March 18, 2005. On August 18, 2006, the Department received Amendments to the Pledge Agreements and the ESOP Loan Agreements (for the original loans dated October 13, 1998, and October 18, 1999) that were dated August 17, 2006. The language that violated ERISA was removed from the promissory notes and amended agreements. The amount currently owed on these loans is $167,300,384.

<u>Failure to Distribute Plan Assets</u>

Our investigation also revealed that the Plan's fiduciaries failed to distribute benefits in accordance with the Plan documents. Specifically, you failed to distribute benefits due participants who terminated their employment with the Company due to death, disability and retirement during the Plan year ending 2003 "beginning no later than one year after the close of the Plan year in which the event occurred" in accordance with Section 14 of the Plan document. The failure to make timely distributions was a violation of ERISA §§ 404(a)(1)(A), (B) and (D).

Subsequent to the Department's investigation, in December 2005, distributions totaling $814,082 were made to those participants who terminated due to death, disability or retirement during the Plan year 2003. In addition, also in December 2005, distributions were timely made to those participants who terminated due to death, disability or retirement during the Plan year 2004.

CIG 010320

Failure to Disclose to Participants

Summary Annual Report

Our investigation also revealed that the Plan's fiduciaries failed to provide summary annual reports to the Plan's participants and beneficiaries in accordance with Section 10 of the Plan document, which states that "within nine months after each anniversary date, the Committee shall furnish each participant and each beneficiary receiving benefits under the Plan with the summary annual report of the Plan required by § 104(b)(3) of ERISA, in the form required by the regulations of the Department of Labor". The failure to provide the summary annual reports was a violation of ERISA §§ 104(b)(3) and 404(a)(1)(B) and (D).

In a letter to the Department dated August 17, 2006, Dan Stritmatter, on behalf of the Company, stated that "We have now implemented proper procedures to remedy this oversight, including better communication with the ESOP's third party administrator to ensure that all SARs will be included with participant statements every year, and we are confident that such an oversight will not happen again".

Summary Plan Description

Our investigation also revealed that the Plan's fiduciaries failed to provide a summary plan description to the Plan's participants and beneficiaries in accordance with Section 10 of the Plan document, which states that the "Committee shall furnish [participants and beneficiaries] with the summary plan description required by Sections 102(a)(1) and 104(b)(1) of ERISA" and that "[s]uch summary plan description shall be updated from time to time as required under ERISA".

ERISA § 104(b)(1) states that the "administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, every fifth year...an updated summary plan description described in § 102 which integrates all plan amendments made within such five-year period". In our opinion, your failure to provide an updated summary plan description to the Plan's participants and beneficiaries is a violation of ERISA § 102(a)(1), 104(b)(1) and 404(a)(B) and (D).

It is our understanding from Dan Stritmatter that an updated summary plan description has been drafted and will be finalized soon.

Conclusion

We have concluded that no further action by the Department is warranted at this time since you have taken the above noted corrective actions, with the exception that we await receipt of the revised summary plan description to determine whether it is in conformance with ERISA.

CIG 010321

The Department's decision not to take further action is binding on the Department only and only concerns the matters discussed above. Any other individual or governmental agency remains free to take whatever action it may deem appropriate.

As you may be aware, Congress, in enacting ERISA, added § 4975 to the Internal Revenue Code of 1954, which imposes an excise tax on disqualified persons (generally, the same as parties in interest under Title I of ERISA) who engage in prohibited transactions with employee retirement benefit plans. In general, this excise tax, which is administered and enforced by the Internal Revenue Service, is applicable in two steps - a first level tax equal to fifteen percent of the amount involved in the transaction for each taxable year during which the transaction is outstanding and a second level tax equal to 100 percent of the amount involved if the transaction is not corrected. The excise tax is paid concurrently with the filing of a Form 5330 (Form and Instructions enclosed).

Pursuant to § 3003(c) of ERISA, 29 U.S.C. § 1203(c), the Secretary of Labor is required to transmit to the Secretary of Treasury information indicating that a prohibited transaction has occurred. Accordingly, this matter will be referred to the Internal Revenue Service.

We hope this letter will be helpful to you in the future execution of your fiduciary duties.

Sincerely,

Francis C. Clisham
Regional Director

Enclosures

6

CIG 010322

ERISA

Sec. 3(14) The term "party in interest" means, as to an employee benefit plan -

    (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
        (B) a person providing services to such plan;

    (C) an employer any of whose employees are covered by such plan;

Sec. 3(21)(A) ... a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. ...

Sec. 101(a) The administrator of each employee benefit plan shall cause to be furnished in accordance with section 104(b) to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan --

    (1) a summary plan description described in section 102(a)(1); and

    (2) the information described in sections 104(b)(3) and 105(a) and (c).

Sec. 102(a)(1) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 104(b). The summary plan description shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 104(b)(1)....

Sec. 102(b) The ... summary plan description shall contain the following information: The name and type of administration of the plan; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); a description of the relevant provisions of any applicable collective bargaining agreement; the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 503 of this Act).

CIG 010323

Sec. 104(b)  Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:  (1)  The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 102(a)(1) --

(A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or

(B) if later, within 120 days after the plan becomes subject to this part.
The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, every fifth year after the plan becomes subject to this part an updated summary plan description described in section 102 which integrates all plan amendments made within such five-year period, except that in a case where no amendments have been made to a plan during such five-year period this sentence shall not apply.  Notwithstanding the foregoing, the administrator shall furnish to each participant, and to each beneficiary receiving benefits under the plan, the summary plan description described in section 102 every tenth year after the plan becomes subject to this part.  If there is a modification or change described in section 102(a)(1), a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

Sec. 104(b)(3)  Within 210 days after the close of the fiscal year of the plan, the administrator shall furnish to each participant, and to each beneficiary receiving benefits under the plan, a copy of the statements and schedules, for such fiscal year, described in subparagraphs (A) and (B) of section 103(b)(3) and such other material (including the percentage determined under section 103(d)(11)) as is necessary to fairly summarize the latest annual report.

Sec. 404(a)(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --

(A)  for the exclusive purpose of: (i) providing benefits to participants and their Beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

(B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(D)  in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or Title IV.

Sec. 406(a)(1)  A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect...

(B)  lending of money or other extension of credit between the plan and a party in interest;...

(D)  transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; ...

Sec 408(b)  Enumeration of transactions exempted from 29 USC §1106 prohibitions.  The prohibitions provided in section 406 [29 USC §1106] shall not apply to any of the following transactions:

2

CIG 010324

(3)  A loan to an employee stock ownership plan (as defined in section  407(d)(6) [29 USC §1107(d)(6)]), if –

(A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and

(B) such loan is at an interest rate which is not in excess of a reasonable rate.

If the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying employer securities (as defined in section 407(d)(5) [29 USC §1107(d)(5)]).

**ERISA Reg 29 CFR §2550.408b-3 Loans to Employee Stock Ownership Plans.**

(a) Definitions.  When used in this section, the terms listed below have the following meanings:

(1) ESOP.  The term "ESOP" refers to an employee stock ownership plan that meets the requirements of section 407(d)(6) of the Employee Retirement Income Security Act of 1974 (the Act) and 29 CFR 2550.407d-6 . It is not synonymous with "stock bonus plan." A stock bonus plan must, however, be an ESOP to engage in an exempt loan. The qualification of an ESOP under section 401 (a) of the Internal Revenue Code (the Code) and 26 CFR 54.4975-11 will not be adversely affected merely because it engages in a non-exempt loan.

(2)  Loan.  The term "loan" refers to a loan made to an ESOP by a party in interest or a loan to an ESOP which is guaranteed by a party in interest. It includes a direct loan of cash, a purchase-money transaction, and an assumption of the obligation of an ESOP. "Guarantee" includes an unsecured guarantee and the use of assets of a party in interest as collateral for a loan, even though the use of assets may not be a guarantee under applicable state law. An amendment of a loan in order to qualify as an exempt loan is not a refinancing of the loan or the making of another loan.

(3)  Exempt loan.  The term "exempt loan" refers to a loan that satisfies the provisions of this section. A "non-exempt loan" is one that fails to satisfy such provisions.

(4) Publicly traded.  The term "publicly traded" refers to a security that is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 (15 USC 78f) or that is quoted on a system sponsored by a national securities association registered under section 15A(b) of the Securities Exchange Act (15 USC 78o).

(5) Qualifying employer security.  The term "qualifying employer security" refers to a security described in 29 CFR 2550.407d-5 .

(b) Statutory exemption

(1)  Scope.  Section 408(b)(3) of the Act provides an exemption from the prohibited transaction provisions of sections 406(a) and 406(b)(1) of the Act (relating to fiduciaries dealing with the assets of plans in their own interest or for their own account) and 406(b)(2) of the Act (relating to fiduciaries in their individual or in any other capacity acting in any transaction involving the plan on behalf of a party (or representing a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries). Section 408(b)(3) does not provide an exemption from the prohibitions of section 406(b)(3) of the Act (relating to fiduciaries receiving consideration for their own personal account

3

CIG 010325

from any party dealing with a plan in connection with a transaction involving the income or assets of the plan).

(2)  Special scrutiny of transaction.  The exemption under section 408(b)(3) includes within its scope certain transaction in which the potential for self-dealing by fiduciaries exists and in which the interests of fiduciaries may conflict with the interests of participants. To guard against these potential abuses, the Department of Labor will subject these transactions to special scrutiny to ensure that they are primarily for the benefit of participants and their beneficiaries. Although the transactions need not be arranged and approved by an independent fiduciary, fiduciaries are cautioned to scrupulously exercise their discretion in approving them. For example, fiduciaries should be prepared to demonstrate compliance with the net effect test and the arm's-length standard under paragraphs (c) (2) and (3) of this section. Also, fiduciaries should determine that the transaction is truly arranged primarily in the interest of participants and their beneficiaries rather than, for example, in the interest of certain selling shareholders.

(c)  Primary benefit requirements

(1)  In general.  An exempt loan must be primarily for the benefit of the ESOP participants and their beneficiaries. All the surrounding facts and circumstances, including those described in paragraphs (c) (2) and (3) of this section, will be considered in determining whether such loan satisfies this requirement. However, no loan will satisfy such requirement unless it satisfies the requirements of paragraphs (d), (e) and (f) of this section.

(2)  Net effect on plan assets.  At the time that a loan is made, the interest rate for the loan and the price of securities to be acquired with the loan proceeds should not be such that plan assets might be drained off.

(3)  Arm's-length standard.  The terms of a loan, whether or not between independent parties, must, at the time the loan is made, be at least as favorable to the ESOP as the terms of a comparable loan resulting from arm's-length negotiations between independent parties.

(d)  Use of loan proceeds.  The proceeds of an exempt loan must be used, within a reasonable time after their receipt, by the borrowing ESOP only for any or all of the following purposes:

(1)  To acquire qualifying employer securities.

(2)  To repay such loan.

(3)  To repay a prior exempt loan.  A new loan, the proceeds of which are so used, must satisfy the provisions of this section.

Except as provided in paragraphs (i) and (j) of this section or as otherwise required by applicable law, no security acquired with the proceeds of an exempt loan may be subject to a put, call, or other option, or buy-sell or similar arrangement while held by and when distributed from a plan, whether or not the plan is then ESOP.

(e)  Liability and collateral of ESOP for loan.  An exempt loan must be without recourse against the ESOP. Furthermore, the only assets of the ESOP that may be given as collateral on an exempt loan are qualifying employer securities of two classes: Those acquired with the proceeds of the exempt loan and those that were used as collateral on a prior exempt loan repaid with the proceeds of the current exempt

4

CIG 010326

loan. No person entitled to payment under the exempt loan shall have any right to assets of the ESOP other than:

(1) Collateral given for the loan,

(2) Contributions (other than contributions of employer securities) that are made under an ESOP to meet its obligations under the loan, and

(3) Earnings attributable to such collateral and the investment of such contributions. The payments made with respect to an exempt loan by the ESOP during a plan year must not     exceed an amount equal to the sum of such contributions and earnings received during or prior to the year less such payments in prior years. Such contributions and earnings must be accounted
for separately in the books of account of the ESOP until the loan is repaid.

(f) Default. In the event of default upon an exempt loan, the value of plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a party in interest, a loan must provide for a transfer of plan assets upon default only upon and to the extent of the failure of the plan to meet the payment schedule of the loan. For purposes of this paragraph, the making of a guarantee does not make a person a lender.

5

CIG 010327

**EXHIBIT 3**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 3

## ENTIRE DOCUMENT
## SUBMITTED UNDER SEAL

## CIVIL L.R. 79-5(b)

**(BATES #KMH 007909 - KMH 007950)**

**EXHIBIT 4**

K-M INDUSTRIES HOLDING CO., INC.

EMPLOYEE STOCK OWNERSHIP PLAN

Prepared:  June 30, 1999
©1999, Menke & Associates, Inc.
All rights reserved.



EXHIBIT
64
Ferrari  3-26-08

# CONTENTS

| Section | | Page |
|---|---|---|
| 1. | NATURE OF PLAN. | 1 |
| 2. | DEFINITIONS. | 3 |
| 3. | ELIGIBILITY. | 17 |
| 4. | PARTICIPATION IN ALLOCATION OF BENEFITS. | 19 |
| | (a) Participation. | 19 |
| | (b) Leave of Absence. | 19 |
| | (c) Suspended Participation. | 20 |
| | (d) Inactive Participation. | 20 |
| | (e) Uniformed Services Participants | 20 |
| 5. | EMPLOYER CONTRIBUTIONS. | 21 |
| | (a) Amount of Contribution. | 21 |
| | (b) Time for Making Contribution. | 21 |
| | (c) Form of Contribution. | 21 |
| 6. | INVESTMENT OF TRUST ASSETS. | 22 |
| | (a) Authorized Investments. | 22 |
| | (b) Duties of Committee. | 22 |
| | (c) Plan Loans. | 22 |
| | (d) Nonrecognition of Gain. | 23 |
| 7. | ALLOCATIONS TO ACCOUNTS. | 25 |
| | (a) Individual Accounts. | 25 |
| | (b) Company Stock Account. | 25 |
| | (c) Other Investments Account. | 27 |
| 8. | EXPENSES OF THE PLAN AND TRUST. | 28 |
| 9. | VOTING COMPANY STOCK. | 29 |
| 10. | DISCLOSURE TO PARTICIPANTS. | 30 |
| | (a) Summary Plan Description. | 30 |
| | (b) Summary Annual Report. | 30 |
| | (c) Annual Statement. | 30 |
| | (d) Notice of Rollover Treatment. | 31 |
| | (e) Additional Disclosure. | 31 |
| 11. | ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES. | 32 |
| | (a) Allocation of Employer Contributions and Forfeitures. | 32 |
| | (b) Allocation Limitations. | 33 |

i

CIG 010955

12.   PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT. . . . . . . . . . . . . . . . . . . . 38
      (a)    Normal Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (b)    Disability Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (c)    Deferred Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

13.   OTHER TERMINATION OF SERVICE AND VESTING. . . . . . . . . . . . . . . . . . . . . . 39
      (a)    Vesting Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      (b)    Vesting Upon Reemployment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      (c)    Forfeitures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      (d)    Cash-Out Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

14.   DISTRIBUTION OF PLAN BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (a)    Death, Disability or Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (b)    Other Termination of Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (c)    Death Prior to Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (d)    Valuation Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (e)    Consent and Notice Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (f)    Required Commencement of Benefit Distribution. . . . . . . . . . . . . . . . . 46
      (g)    Undistributed Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
      (h)    Optional Direct Transfer of Eligible Rollover Distributions. . . . . . . . . 47
      (i)    Lien on Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15.   HOW PLAN BENEFIT WILL BE DISTRIBUTED. . . . . . . . . . . . . . . . . . . . . . . . . 48
      (a)    Form of Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      (b)    Beneficiaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      (c)    Location of Participant or Beneficiary Unknown . . . . . . . . . . . . . . . . . 49

16.   RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK. . . . . . . . 51
      (a)    "Put" Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
      (b)    Right of First Refusal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      (c)    Other Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

17.   SPECIAL PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
      (a)    Diversification of Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
      (b)    Cash Dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18.   ADMINISTRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (a)    Named Fiduciaries for Administration of Plan and for Investment and Control of
             Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (b)    Investment of Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      (c)    Funding Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      (d)    Claims Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (e)    Qualified Domestic Relations Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (f)    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      (g)    Independent Fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

19.   AMENDMENT AND TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (a)    Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (b)    Changes in the Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (c)    Termination, Partial Termination or Complete Discontinuance of Contributions. . . . 64

ii

CIG 010956

(d)    Determination by Internal Revenue Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65
(e)    Return of Employer's Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

20.    MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67
(a)    Participation by Affiliated Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67
(b)    Limitation of Rights; Employment Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . .  67
(c)    Merger; Transfer of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67
(d)    Prohibition Against Assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67
(e)    Applicable Law; Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

21.    TOP HEAVY PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
(a)    Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
(b)    Vesting Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71
(c)    Minimum Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72
(d)    Limitation on Annual Additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72

22.    EXECUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

iii

CIG 010957

# K-M INDUSTRIES HOLDING CO., INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

**Section 1.**     **NATURE OF PLAN.**

(a)     The purpose of this Plan is to enable participating Employees of the Company and of any participating affiliates to share in the growth and prosperity of the Company and to provide Participants with an opportunity to accumulate capital for their future economic security. A primary purpose of the Plan is to enable Participants to acquire a proprietary interest in the Company. Consequently, Employer Contributions made to the Trust will be primarily invested in Employer Securities.

(b)     This Plan, originally effective as of January 1, 1998, is amended and herein restated effective as of July 16, 1999 (except that provisions which are required to be effective before this date in accordance with the Uruguay Round Agreements Act (GATT), the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), the Small Business Job Protection Act of 1996 (SBJPA), and the Taxpayer Relief Act of 1997 (TRA'97) (collective-ly "GUST") are hereby generally applicable to the Plan Years beginning after December 31, 1996, unless an earlier or later effective date is required pursuant to a statute or Treasury Regulation or as stated in the Plan document). The Plan is intended to qualify as an Employee Stock Ownership Plan, as defined in Section 4975(e)(7) of the Internal Revenue Code (herein-after referred to as the "Code"), and as a stock bonus plan under Section 401(a) of the Code. This Plan is adopted as an amendment and restatement of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan, originally effective as of January 1, 1998. On July 16, 1999, the California Capital Insurance Company Employee Stock Ownership Plan was merged with and into the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan. Effective as of July 16, 1999, K-M Industries Holding Co., Inc. became the sponsor of the Kelly-Moore Paint Company, Inc Employee Stock Ownership Plan; that plan is now amended and restated to be the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan.

All Trust assets acquired under this Plan as a result of Employer Contributions, income and other additions to the Trust will be administered, distributed, forfeited and otherwise

1

CIG 010958

governed by the provisions of this Plan which is administered by the Committee for the exclusive benefit of Participants in the Plan and their Beneficiaries.  It is intended that all benefits, rights and features of this Plan be uniformly available to all Participants.

2

CIG 010959

## Section 2.    DEFINITIONS.

In this Plan, whenever the context so indicates, the singular or plural number shall each be deemed to include the other, and the capitalized words shall have the following meanings:

### ACCOUNT

One of several Accounts maintained to record the interest of a Participant in the Plan.

### AFFILIATED COMPANY

Any Company which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes the Employer, any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c) of the Code) with the Employer, any affiliated service group which includes the Employer (as defined in Section 414(m) of the Code), and any other entity required to be aggregated with the Employer under Section 414(o) of the Code. For purposes of Code Section 415 limits, the definition of Affiliated Company shall be expanded in accordance with Code Section 415(h).

### ALTERNATE PAYEE

A spouse, former spouse, child or other dependent of a Participant who is recognized by a Domestic Relations Order as having a right to receive all or a portion of the benefits otherwise payable to a Participant.

### ANNIVERSARY DATE

The 31st day of December of each year.

### ANNUAL ADDITIONS

The aggregate of amounts credited to a Participant's Accounts each year from Employer Contributions, Forfeitures, and a Participant's voluntary contributions (if any) under all defined contribution plans of an Employer or Affiliated Company; provided, however, that Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall be excluded if no more than one-third (⅓) of the Employer Contribution deductible under Section 404(a)(9) of the Code for that year is allocated to the Accounts of Highly Compensated Employees. Amounts allocated after March 31, 1984 to an individual medical account (as defined in Section 415(l)(2) of the Code) which is part of a pension or annuity plan maintained by the Company shall be treated as

3

CIG 010960

an Annual Addition. Any amounts attributable to postretirement medical benefits allocated to the separate account of a Key Employee (as defined in Section 419A(d)(3) of the Code) under any Welfare Benefit Plan (as defined in Section 419(e) of the Code) after December 31, 1985 shall be treated as an Annual Addition. A restored Forfeiture, a transfer from another qualified pension plan and a rollover contribution (if any) shall not be counted as an Annual Addition. For purposes of Code Section 415 limits, the definition of Annual Additions shall be expanded in accordance with Code Section 415(h).

## BENEFICIARY

The person or persons entitled to receive any benefits under the Plan in the event of a Participant's death.

## BOARD OF DIRECTORS

The board of directors of the Company.

## BREAK IN SERVICE

A Plan Year during which a Participant has not completed more than 500 Hours of Service.

## CODE

The Internal Revenue Code of 1986, as amended from time to time.

## COMMITTEE

The Committee appointed by the Board of Directors to administer the Plan and to give instructions to the Trustee.

## COMPANY

K-M Industries Holding Co., Inc., a California corporation.

## COMPANY STOCK

Shares of any class of stock, preferred or common, voting or nonvoting, which are issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, including Employer Securities and Qualified Employer Securities.

4

CIG 010961

## COMPANY STOCK ACCOUNT

The Account of a Participant which is credited with the shares of Company Stock purchased and paid for by the Trust or contributed to the Trust.

## CONTRIBUTIONS

Employer contributions which are deductible by an Employer under Section 404(a) of the Code.

## COVERED COMPENSATION

The Total Compensation paid to a Participant by the Employer for each Plan Year, including any salary deferrals under Sections 401(k) and 125 of the Code, but excluding reimbursement or other expense allowances, fringe benefits (cash and noncash), moving expenses, welfare benefits, and deferred compensation except deferrals under Sections 401(k) and 125 of the Code. Notwithstanding the foregoing, Covered Compensation of any Participant taken into account in any Plan Year shall not exceed one hundred fifty thousand dollars ($150,000), as adjusted by the Commissioner for increases in cost of living in accordance with section 401(a)(17)(B) of the Code.

## DEFERRED RETIREMENT

Termination of service subsequent to attainment of the Normal Retirement Date.

## DIRECT ROLLOVER

A payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

## DISABILITY

If a Participant terminated employment because of a total and permanent disability, the Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of the Participant's Accounts. "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

## DISQUALIFIED PERSON

The term "Disqualified Person" shall mean a person who is a fiduciary with respect to the Plan; a person providing services to the Plan; an Employer any of whose employees are covered by the Plan; an employee organization any of

5

CIG 010962

whose members are covered by the Plan; an owner, directly or indirectly, of fifty percent (50%) or more of (i) the total combined voting power of all classes of voting stock or of the total value of all classes of the stock of a corporation, (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an Employer or an employee organization any of whose employees or members are covered by the Plan; a member of the family of any Disqualified Person; a corporation, partnership, trust or estate of which (or in which) fifty percent (50%) or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate is owned, directly or indirectly, or held by Disqualified Persons; an employee, officer, director (or any individual having powers, similar powers and responsibilities), a ten percent (10%) or more shareholder, or a highly compensated employee (earning ten percent (10%) or more of the yearly wages of an employer) of a Disqualified Person; or a ten percent (10%) or more (in capital or profits) partner or joint venturer of a Disqualified Person.

### DISTRIBUTEE

Any Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the Alternate Payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

### DOMESTIC RELATIONS ORDER

Any judgment, decree, or order (including approval of a property settlement agreement) which is made pursuant to a State domestic relations law and which relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a Participant.

### EFFECTIVE DATE

The Effective Date of this amended and restated Plan is July 16, 1999.

### ELIGIBILITY COMPUTATION PERIOD

To determine Years of Service and Breaks in Service for purposes of eligibility, the initial 12-month period shall commence on the date the Employee first performs an Hour of Service for the Company. The second 12-month period shall be the Plan Year which commences prior to the end of the initial 12-month period, regardless of whether the Employee is entitled to be credited with 1,000 Hours of Service during the initial eligibility computation period. An Employee who is

6

CIG 010963

credited with 1,000 Hours of Service in both the initial eligibility computation period and the first Plan Year which commences prior to the first anniversary of the Employee's initial eligibility computation period will be credited with two Years of Service for purposes of eligibility to participate. All subsequent computation periods will continue to be determined on the Plan Year.

## ELIGIBLE RETIREMENT PLAN

An individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the Distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

## ELIGIBLE ROLLOVER DISTRIBUTION

Any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer Securities).

## EMPLOYEE

A person, employed by an Employer, any portion of whose income is subject to withholding of income tax and/or for whom Social Security contributions are made by an Employer, as well as any other person qualifying as a common law employee of an Employer. Employee shall include Leased Employees unless: (i) such Employee is covered by a money purchase pension plan providing: (1) a nonintegrated Employer contribution rate of at least ten percent (10%) of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Section 125, Section 402(e)(3), Section 402(h) or Section 403(b) of the Code; (2) immediate participation; and (3) full and immediate vesting; and (ii) Leased Employees do not constitute more than twenty percent (20%) of the Company's nonhighly compensated work force.

7

CIG 010964

**EMPLOYER**

K-M Industries Holding Co., Inc. and any other affiliate of the Company, as defined in Section 407(d) of the ERISA, or any predecessor or successor corporation, which has been designated by the Company as an Employer participating in the Plan, and which has accepted such designation and has agreed to be bound by the terms of the Plan and Trust Agreement.

**EMPLOYER SECURITIES**

Common stock issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, having a combination of voting power and dividend rights equal to (i) that class of common stock of the Company having the greatest voting power and (ii) that class of common stock of the Company having the greatest dividend rights. Noncallable preferred stock shall be treated as Employer Securities if such stock is convertible at any time into common stock which meets the above requirements, and if (as of the date of acquisition by the Plan) the conversion price is reasonable.

**EMPLOYMENT COMMENCEMENT DATE**

The date on which the Employee shall first perform an Hour of Service for the Employer.

**ENTRY DATE**

The first day of January of each year.

**ERISA**

The Employee Retirement Income Security Act of 1974, as amended from time to time.

**FISCAL YEAR**

The annual accounting period adopted by the Company for federal income tax purposes.

**FORFEITURES**

The portion of a Participant's Accounts which does not become part of the Participant's Plan Benefit. See Section 13 of the Plan.

8

CIG 010965

## HIGHLY COMPENSATED EMPLOYEE

The term "Highly Compensated Employee" shall mean:  (a) a Highly Compensated Former Employee of the Company as well as (b) a Highly Compensated Current Employee.  The term "Highly Compensated Current Employee" shall mean any Employee who:

(A)     was a five percent (5%) owner at any time during the year or the preceding year, or

(B)     for the preceding year, had compensation from the Company and/or from an Affiliated Company in excess of eighty thousand dollars ($80,000) (indexed at such time and in such manner as the Secretary of the Treasury may provide), and was in the top-paid group of Employees (i.e., was among the top twenty percent (20%) of Employees in compensation) for such preceding year.

The term "compensation" shall mean, for purposes of this provision, as defined in IRC Section 415(c)(3) but without regard to Sections 125, 402(e)(3), 402(h)(1)(B) or 403(b) of the Code.

For purposes of determining whether an employee is a Highly Compensated Employee for the Plan Year beginning in 1997, these changes are to be treated as having been in effect for the Plan Year beginning in 1996.

The determination of who is a Highly Compensated Employee, including the determination of the number and identity of Employees in the top-paid group, will be made in accordance with the provisions of Section 414(q) of the Code and the regulations thereunder.

A former employee shall be treated as a "Highly Compensated Former Employee" if such employee was a Highly Compensated Employee when he separated from service or was a Highly Compensated Employee at any time after attaining age fifty-five (55).

## HOUR OF SERVICE

(a)     Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer or any Affiliated Company during the applicable computation period.

(b)     Each hour for which an Employee is paid, or entitled to payment, by the Employer or any Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability),

9

CIG 010966

layoff, jury duty, military duty or leave of absence. Notwithstanding the preceding sentence, (1) no more than 501 Hours of Service will be credited under this paragraph (b) to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (2) an hour for which an Employee is directly or indirectly paid, or entitled to payment, during a period in which no duties are performed, will not be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workmen's compensation, unemployment compensation or disability insurance laws; and (3) Hours of Service will not be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee. For purposes of this paragraph (b), a payment shall be deemed to be made by or due from an Employer or an Affiliated Company regardless of whether such payment is made by or due from the Employer or an Affiliated Company directly or indirectly through, among others, a trust fund, or insurer, to which the Employer or an Affiliated Company contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

(c)     Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Company.

(d)     The determination of Hours of Service for reasons other than the performance of duties, and the crediting of Hours of Service to computation periods, shall be in accordance with U.S. Department of Labor Regulations Section 2530.200b-2 (b) and (c). There shall be no duplication of Hours of Service under any of the foregoing provisions.

(e)     In the case of a salaried Employee who is not paid on an hourly basis, Hours of Service shall be based on any available records which accurately reflect the actual number of hours worked by such Employee. If such records do not exist, such Employee shall be credited with Hours of Service on the basis of 45 hours for each week for which the Employee would be credited with at least one Hour of Service.

(f)     For purposes of determining whether a Participant has incurred a one-year Break in Service, a Participant will be credited with Hours of Service for certain periods of absence from work by reason of the Participant's pregnancy, the birth of a Participant's child, the adoption of a Participant's child, or caring for a Participant's child during the period immediately following the birth or adoption of such child. If the Participant's normal work hours are known, such Participant will be credited with the number of hours that normally would have been credited for such absence. If the Participant's normal work hours are not known, such Participant will be credited with eight Hours of Service for each normal workday

10

CIG 010967

during such absence. Not more than 501 Hours of Service shall be credited for such purposes in the Plan Year in which such absence commences if the Participant would otherwise incur a Break in Service in such Plan Year; otherwise, such Hours of Service shall be credited in the following Plan Year if such absence continues in such Plan Year.

## INDEPENDENT APPRAISER

Any appraiser, appointed by the Trustee, who is independent of the Company and who meets requirements of the regulations prescribed under Section 170(a)(1) of the Code.

## INDEPENDENT FIDUCIARY

The term Independent Fiduciary shall refer to any entity or individual which is unrelated to any part of the Plan or Trust and which may be appointed from time to time by the Board of Directors, Trustee, or Committee to act on behalf of the Plan and/or Trust, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and/or Trust.

## LEASED EMPLOYEE

Any person (other than an Employee of the Company) who pursuant to an agreement between the Company and any other person ("leasing organization") has performed services for the Company (or for the Company and related persons determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis for a period of at least one (1) year, and such services are of a type historically performed by employees in the business field of the Company. Effective for all Plan Years beginning on or after January 1, 1997, the "historically performed" test is replaced with a new test under which an individual is not considered a leased employee unless the individual's services are performed under primary direction or control by the service recipient. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the Company shall be treated as provided by the Company.

## LIMITATION YEAR

For purposes of the limitations on Contributions and benefits imposed by Section 415 of the Code, the Limitation Year shall be the Plan Year.

11

CIG 010968

## NORMAL RETIREMENT

Termination of service upon attainment of the Normal Retirement Date.

## NORMAL RETIREMENT DATE

The date on which a Participant attains age sixty-five (65).

## OTHER INVESTMENTS ACCOUNT

The Account of a Participant which is credited with a share of the net income (or loss) of the Trust and Employer Contributions and Forfeitures in other than Company Stock and which is debited with payments made to pay for Company Stock.

## PARTICIPANT

Any Employee who is participating in this Plan as defined in Section 3 of the Plan or former Employee for whom an Account is maintained. A Participant ceases to be a Participant when such Participant's Account is closed after all amounts have been distributed or Forfeited.

## PLAN

The K-M Industries Holding Co., Inc. Employee Stock Ownership Plan, which includes the Plan and Trust Agreement.

## PLAN BENEFIT

The vested amount, as defined in Sections 12 and 13 of the Plan, of a Participant's Accounts.

## PLAN YEAR

The twelve (12) month period ending on each Anniversary Date.

## QUALIFIED ELECTION PERIOD

The six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

CIG 010969

## QUALIFIED EMPLOYER SECURITIES

Employer Securities which are issued by a domestic corporation that has no securities outstanding that are readily tradable on an established securities market, have been held for at least three (3) years by the seller and were not received by the seller in a distribution from a Plan qualified under Section 401(a) or in a transfer pursuant to an option or other right to acquire stock under Section 83, 422, 422A, 423 or 424 of the Code.

## QUALIFIED PARTICIPANT

Any Participant who has attained age fifty-five (55) and has completed ten (10) years of participation under the Plan.

## QUALIFIED REPLACEMENT PROPERTY

Any stock, bond, debenture, note, or other evidence of indebtedness issued by a domestic corporation (other than the Employer corporation or any corporation which is a member of a parent-subsidiary controlled group which includes the Employer corporation) which does not, for the taxable year preceding the taxable year in which such security is purchased, have passive investment income exceeding twenty-five percent (25%) of the gross receipts of such corporation for such year.

## RETIREMENT

Termination of service due to Normal Retirement, Deferred Retirement, or Disability.

## SECURITIES ACQUISITION LOAN

A loan which is used to purchase Employer Securities and which meets the requirements of paragraphs 1 and 2 of Section 6(c) of the Plan.

## SEGREGATED INVESTMENTS ACCOUNT

The Account of a Participant which is credited with amounts which may not be used to purchase shares of Company Stock pursuant to the provisions of Rev. Proc. 87-22.

## STOCK BONUS PLAN

The portion of the Plan which is designed to qualify as such and is subject to the rules pertaining to a stock bonus plan under Section 401(a) of the Code.

13

CIG 010970

## SUSPENSE ACCOUNT

The Suspense Account maintained by the Committee to which shall be credited all shares of Employer Securities purchased with the proceeds of a Securities Acquisition Loan.

## TOTAL COMPENSATION

For purposes of Section 415 of the Code and the Top Heavy provisions in Section 21 of this Plan,

(a)    The term "Total Compensation" includes:

(1)    The Employee's wages, salaries, fees for professional services, and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includible in gross income (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan (as described in Section 1.62-2(c) of the regulations under Section 62 of the Code).

Total Compensation also includes elective deferrals to Section 401(k) plans and similar arrangements (for example, Employer contributions under a salary reduction arrangement to purchase a Code Section 403(b) annuity); elective contributions to Code Section 457 nonqualified deferred compensation plans; and salary reductions made to a cafeteria plan.

(2)    In the case of an Employee who is an employee within the meaning of Section 401(c)(1) of the Code and the regulations thereunder, the Employee's earned income (as described in Section 401(c)(2) of the Code and the regulations thereunder).

(3)    Amounts described in Sections 104(a)(3), 105(a) and 105(h) of the Code, but only to the extent that these amounts are includable in the gross income of the Employee.

(4)    Amounts paid or reimbursed by the Employer for moving expenses incurred by an Employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are not deductible by the Employee under Section 217 of the Code.

14

CIG 010971

(5)    The value of a nonqualified stock option granted to an Employee by the Employer, but only to the extent that the value of the option is includable in the gross income of the Employee for the taxable year in which granted.

(6)    The amount includable in the gross income of an Employee upon making the election described in Section 83(b) of the Code.

(7)    For purposes of subdivisions (1) and (2) of this subparagraph, foreign earned income (as defined in Section 911(b) of the Code), whether or not excludable from gross income under Section 911 of the Code. Compensation described in subdivision (1) of this subparagraph is to be determined without regard to the exclusions from gross income in Sections 931 and 933 of the Code. Similar principles are to be applied with respect to income subject to Sections 931 and 933 of the Code in determining compensation described in subdivision (2) of this subparagraph.

(b)    The term "Total Compensation" does not include items such as:

(1)    Employer contributions made on behalf of an Employee to a simplified employee pension plan described in Code Section 408(k) are not considered as compensation for the taxable year in which contributed. Additionally, any distributions from a plan of deferred compensation are not considered as compensation for Section 415 purposes, regardless of whether such amounts are includable in the gross income of the Employee when distributed. However, any amounts received by an Employee pursuant to an unfunded nonqualified plan may be considered as compensation for Code Section 415 purposes in the year such amounts are includable in the gross income of the Employee.

(2)    Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture (under Section 83 of the Code).

(3)    Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option.

(4)    Other amounts which receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includable in the gross income of the Employee), or contributions made by an Employer (not under a salary deferral agreement) towards the purchase of an annuity contract described in Section 403(b) of the Code (only if the contributions are excludable from the gross income of the Employee).

15

CIG 010972

**TRUST**

> The Trust created by the Trust Agreement entered into between the Company and the Trustee.

**TRUST AGREEMENT**

> The Agreement between the Company and the Trustee or any successor Trustee establishing the Trust and specifying the duties of the Trustee.

**TRUSTEE**

> The Trustee (or Trustees) designated by the Company's Board of Directors (and any successor Trustee). The Board of Directors may provide that any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan (including service as both Trustee and Committee member).

**VALUATION DATE**

> The Anniversary Date coinciding with or immediately preceding the date of actual distribution of Plan Benefits. For purposes of the top heavy provisions of this Plan, the Valuation Date is the most recent Anniversary Date within a twelve (12)-month period ending on a Determination Date (as defined in Section 21).

**YEAR OF SERVICE**

> For purposes of vesting under Section 13, all Plan Years beginning on or after the Effective Date during which an Employee has completed 1,000 or more Hours of Service, including any Plan Year during which such Participant has completed 1,000 or more Hours of Service but has not yet become eligible to participate in the Plan.

> In addition, for purposes of vesting, Years of Service also include all years of employment with an Employer prior to the Effective Date of the Plan in which the Employee completed 1,000 or more Hours of Service within such Employer's fiscal year after December 31, 1995.

> Years of Service also include, for purposes of vesting, all Years of Service prior to the Effective Date of this Plan recognized under the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and/or the California Capital Insurance Company Employee Stock Ownership Plan.

> Notwithstanding the foregoing, effective as of December 12, 1994, service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.

16

CIG 010973

Section 3.    **ELIGIBILITY.**

Each Employee shall become eligible to participate in the Plan retroactively to the first day of the Plan Year in which the Employee first completes 1,000 Hours of Service, measured from the Employee's Employment Commencement Date.

All Employees who were eligible to participate in the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan or the California Capital Insurance Company Employee Stock Ownership Plan on the adoption date of this restated Plan are automatically eligible to participate in this Plan as of its Effective Date.

Upon the Employee so becoming eligible, participation shall be based on the total Covered Compensation paid to the Employee for the entire Plan Year during which the Employee becomes eligible to participate. If an Employee who has met the eligibility requirements leaves the service of the Employer and returns to service without incurring a one-year Break in Service, the Employee shall commence participation immediately upon returning to Service.

An Employee whose terms of employment with the Employer are covered by a collective bargaining agreement shall not be eligible to participate in the Plan unless the terms of such collective bargaining agreement specifically provide for participation in this Plan. Notwithstanding the foregoing, in the event any such Employees cease to be subject to the collective bargaining agreement, Years of Service for purposes of eligibility and vesting shall include years during which an Employee is covered by a collective bargaining agreement after the original Effective Date of the Plan.

An Employee who is a Leased Employee shall not be eligible to participate in this Plan. Notwithstanding the foregoing, in the event an Employee ceases to be a Leased Employee, Years of Service for purposes of eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

Nonresident aliens who do not receive any earned income (as defined in Code § 911(d)(2)) from the Employer which constitutes United States source income (as defined in Code § 861(a)(3)) are not eligible to participate in the Plan. Notwithstanding the foregoing, in the event an Employee ceases to be a nonresident alien, Years of Service for purposes of

17

CIG 010974

eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

18

CIG 010975

**Section 4.** <u>**PARTICIPATION IN ALLOCATION OF BENEFITS.**</u>

    (a)   <u>Participation.</u>

        A Participant will share in the allocation of Employer Contributions and Forfeitures only if the Participant has accumulated 1,000 or more Hours of Service during the Plan Year. A Participant who accumulates less than 1,000 Hours of Service during a Plan Year will not share in the allocation of Employer Contributions and Forfeitures under Section 11 for such Plan Year, and shall become an inactive Participant for that Plan Year.

        A Participant reemployed following a Break in Service shall again resume participation in the Plan as of the date of reemployment for purposes of vesting under Section 13 and for purposes of participating in Employer Contributions and Forfeitures under Section 11 (subject to the requirements of this Section 4 and Section 13 of the Plan). However, if the Participant is reemployed after a Break in Service and has no vested rights under the Plan and the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the number of aggregate years of prebreak service, whichever is greater, the Participant shall be treated as a new Employee for purposes of participation.

    (b)   <u>Leave of Absence.</u>

        A Participant's employment is not considered terminated for purposes of the Plan if the Participant has been on leave of absence with the consent of the Company, provided that the Participant returns to the employ of the Company within thirty (30) days after the leave (or within such longer period as may be prescribed by law). Leave of absence shall mean a leave granted by the Company, in accordance with rules uniformly applied to all Participants, for reasons of health or public service or for reasons determined by the Company to be in its best interests. Solely for purposes of preventing a Break in Service, a Participant on such leave of absence shall be credited with eight (8) Hours of Service for each business day of the leave. A Participant who does not return to the employ of the Company within the prescribed time following the end of the leave of absence shall be deemed to have terminated employment as of the date when the leave began, unless such failure to return was the result of death, Disability or Retirement.

19

CIG 010976

(c)    Suspended Participation.

A Participant who ceases to be an eligible Employee by becoming subject to a collective bargaining agreement shall become a suspended Participant. During the period of suspension, no amounts shall be credited to the Participant's Accounts which are based on the Participant's Covered Compensation from and after the date of suspension. However, amounts previously credited to a Participant's Accounts shall continue to vest and the Participant shall be entitled to benefits in accordance with the provisions of Section 14(g) of this Plan throughout the period during which the Participant is on suspended status.

(d)    Inactive Participation.

A Participant who has more than 500 Hours of Service but less than 1,000 Hours of Service in any Plan Year shall be an inactive Participant for that Plan Year. No amounts shall be credited to such Participant's Accounts which are based on the Participant's Covered Compensation for that Plan Year.

(e)    Uniformed Services Participants.

Notwithstanding the foregoing, effective as of December 12, 1994, participation in the allocation of Employer Contributions and Forfeitures with respect to a Participant's qualified military service will be provided in accordance with Section 414(u) of the Code.

20

CIG 010977

**Section 5.**    <u>**EMPLOYER CONTRIBUTIONS**</u>.

    (a)    <u>Amount of Contribution</u>.

        Employer Contributions shall be made to the Trust in such amounts as may be determined by the Company's Board of Directors, provided that such Contributions shall not exceed the maximum amounts deductible under Sections 404(a)(3) and 404(a)(9) of the Code. To the extent the Trust has not received cash in an amount sufficient to meet the Trust's current obligations under a Securities Acquisition Loan, Employer Contributions shall be made in sufficient amounts to cover principal and interest on a Securities Acquisition Loan. Notwithstanding the foregoing, Employer Contributions may not be made in amounts which would permit the limitation described in Section 11(b) to be exceeded.

    (b)    <u>Time for Making Contribution</u>.

        Employer Contributions for each year must be established by resolution of the Company's Board of Directors and paid to the Trust not later than the due date for filing the Company's federal income tax return for that year, including extensions of such date.

    (c)    <u>Form of Contribution</u>.

        Employer Contributions may be paid in cash, shares of Company Stock or other property as the Company's Board of Directors may from time to time determine. Shares of Company Stock and other property will be valued at their then fair market value.

CIG 010978

**Section 6.**    <u>INVESTMENT OF TRUST ASSETS.</u>

    (a)    <u>Authorized Investments.</u>

        Employer Contributions in cash received by the Trust will be applied to pay any outstanding obligations of the Trust incurred for the purchase of Employer Securities, or may be applied to purchase additional shares of Company Stock from current shareholders, treasury shares, or newly issued shares from the Company. Pursuant to the terms of the Trust Agreement, the Committee may also direct the Trustee to invest funds under the Plan in savings accounts, certificates of deposit, securities, or other equity stocks or bonds or in any other kind of real or personal property, including interests in oil or other depletable natural resources, options, puts, calls, futures contracts and commodities; or such funds may be held in non-interest-bearing bank accounts as necessary on a temporary basis.

    (b)    <u>Duties of Committee.</u>

        Except as otherwise provided in Section 18(b), all investments will be made by the Trustee only upon the direction of the Committee. Except in the case of a purchase from a Disqualified Person (as defined in Section 16(b) of the Plan), all purchases of Company Stock shall be made at no more than fair market value, as determined by an Independent Appraiser as of the most recent Anniversary Date. In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of the Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

    (c)    <u>Plan Loans.</u>

        (1)    The Committee may direct the Trustee to incur Plan loans from time to time to carry out the purposes of the Trust, provided that if the loan is a Securities Acquisition Loan, the terms of the loan must comply with the following requirements: Any such loan shall be for a specified term, shall bear a reasonable rate of interest, and may only be secured by a collateral pledge of the Employer Securities so acquired. Any such loan shall be primarily for the benefit of Plan Participants and their Beneficiaries. No other Trust assets may be pledged as collateral by the Trustee, and no lender shall have recourse against Trust assets other than any shares of Employer Securities remaining subject to pledge. Any pledge of Employer Securities must provide for the release of shares so pledged pursuant to either the "General Rule" or the "Special Rule" set forth in Section 7. Shares of Employer Securities released from the Suspense

CIG 010979

Account shall be allocated to Participants' accounts in shares of stock or other nonmonetary units. Repayments of principal and interest on any Securities Acquisition Loan shall be made by the Trustee (as directed by the Committee) only from Employer Contributions in cash to the Trust, from any cash dividends received by the Trust on such Employer Securities or from any earnings attributable to the investment of Employer Contributions made to the Trust in cash to meet its obligations under the loan. Such Contributions, dividends and earnings shall be accounted for separately in the books of accounts of the Plan until the Securities Acquisition Loan is repaid. The proceeds of a Securities Acquisition Loan may be used only to acquire Employer Securities, to repay such loan or to repay a prior Securities Acquisition Loan. The Plan may not obligate itself to acquire securities from a particular security holder at an indefinite time determined upon the happening of an event such as the death of the holder. The protections and rights described in Section 16 are nonterminable. Should this Plan cease to be an Employee Stock Ownership Plan, or should the Securities Acquisition Loan be repaid, all Employer Securities will continue to be subject to the provisions of Section 16. If securities acquired with the proceeds of a Securities Acquisition Loan available for distribution consist of more than one class, a Distributee must receive substantially the same portion of each such class.

(2)    In the event of default upon a Securities Acquisition Loan, the value of Plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a Disqualified Person, a loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the loan. For purposes of this paragraph, the making of a guarantee does not make a person a lender.

(d)    Nonrecognition of Gain.

(1)    There shall be no recognition of gain upon a sale of Employer Securities to the Plan if (i) the seller has held such Securities for at least three (3) years, (ii) after the purchase the Plan owns at least thirty percent (30%) of each class of outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), or thirty percent (30%) of the total value of all outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), (iii) the seller purchases Qualified Replacement Property within three (3) months prior to the sale or within twelve (12) months after the sale, (iv) on or before the time (including extension) for filing an income tax return, the seller files with the IRS a written

23

CIG 010980

statement verified by the Company, regarding the terms of the sale, and (v) the Plan complies with the allocation requirements set forth in Section 11(b)(5).

(2)     If, during the three-year period after the Plan acquires Qualified Employer Securities in a transaction in which gain is not recognized, the Plan disposes of part or all of such Qualified Employer Securities, the Company shall be liable for a tax equal to ten percent (10%) of the amount realized upon the disposition, unless such disposition is necessary to meet the diversification requirements of Section 17(a) of the Plan, or unless such disposition is made to a Participant (or the Participant's Beneficiary) by reason of death, Disability, Retirement after age fifty-nine and one-half (59½), or a separation from service which results in a one-year Break in Service.

24

CIG 010981

**Section 7.    ALLOCATIONS TO ACCOUNTS.**

    (a)    Individual Accounts.

        The Committee shall establish and maintain individual Accounts for each Participant in the Plan. Individual Accounts shall also be maintained for all former Participants who still have an interest in the Plan. Except as provided in Section 17(a), such individual Accounts shall not require a segregation of the Trust assets and no Participant, former Participant or Beneficiary shall acquire any right to or interest in any specific asset of the Trust as a result of the allocation provided for in the Plan.

    (b)    Company Stock Account.

        (1)    The Company Stock Account of each Participant will be credited as of each Anniversary Date with the Participant's allocated share of Company Stock (including fractional shares) purchased and paid for by the Trust or contributed in kind by the Company, with Forfeitures of Company Stock and with stock dividends on Company Stock held in the Participant's Company Stock Account.

        Notwithstanding the provisions of this Subsection 7(b), the Plan is designed to allocate separate benefits, rights and features among the Plan's Participants, in accordance with IRS Regulation Section 1.401(a)(4)-4. The Participating Employers in this Plan are (1) Kelly-Moore Paint Company, Inc. (and its participating Affiliates) and California Capital Insurance Company (and its participating Affiliates). The Employer Securities acquired by this Plan shall consist of two classes of common stock of the Parent: Class P-B and Class I-B. Subject to receiving the IRS favorable determination regarding the allocation of separate benefits, the Company Stock Accounts of Participants employed by the Participating Employers Kelly-Moore Paint Company, Inc., K-M Universal Paint Company, Inc. and Preservative Paint Co. shall receive an allocation of only Class P-B common stock. The Company Stock Accounts of Participants employed by the Participating Employers California Capital Insurance Company, Monterey Insurance and Eagle West Insurance shall receive an allocation of only Class I-B common stock.

        Employer Securities acquired by the Trust with the proceeds of a Securities Acquisition Loan shall be credited to a Suspense Account. For each Plan Year during the duration of the loan, the number of shares of Employer Securities to be released from said

25

CIG 010982

Suspense Account and allocated to the Company Stock Accounts of Participants shall be determined pursuant to either the "General Rule" or the "Special Rule" described below as selected by the Committee for each Securities Acquisition Loan. Once the Committee has selected either the General Rule or the Special Rule, that Rule shall be used exclusively for the allocation of shares of Employer Securities purchased with the proceeds of a particular Securities Acquisition Loan.

(A)    General Rule: For each Plan Year during the duration of the loan, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(i)    The numerator of which is the amount of principal and interest paid for the Plan Year; and

(ii)    The denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years.

(B)    Special Rule:

(i)    For each Plan Year, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(aa)    The numerator of which is the amount of principal paid for the Plan Year; and

(bb)    The denominator of which is the sum of the numerator plus the principal to be paid for all future Plan Years.

(ii)    The Committee may select the Special Rule only if:

(aa)    The Securities Acquisition Loan provides for annual payments of principal and interest at a cumulative rate which is not less rapid at any time than level annual payments of such amounts for ten (10) years;

(bb)    The interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and

26

CIG 010983

(cc)    By reason of a renewal, extension or refinancing, the sum of the expired duration of the original loan, any renewal period, any extension period and the duration of any new loan does not exceed 10 years.

(C)    In determining the number of shares to be released for any Plan Year under either the General Rule or the Special Rule:

(i)    The number of future years under the Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods;

(ii)    If the Loan provides for a variable interest rate, the interest to be paid for all future Plan Years must be computed by using the interest rate applicable as of the end of the Plan Year for which the determination is being made; and

(iii)    If the Employer Securities allocated to the Suspense Account includes more than one class of shares, the number of shares of each class to be withdrawn for a Plan Year from the Suspense Account must be determined by applying the applicable fraction provided for above to each such class.

(2)    Allocations of Company Stock shall be reflected separately for each class of such stock, and the Committee shall maintain adequate records of the aggregate cost basis of Company Stock allocated to each Participant's Company Stock Account.

(c)    Other Investments Account.

The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the net income (or loss) of the Trust, with cash dividends on Company Stock not distributed to Participants or used to pay a Securities Acquisition Loan and with Employer Contributions and Forfeitures in other than Company Stock. The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the unrealized appreciation (or deprecia-tion) in the value of Trust assets other than Company Stock. It will be debited for any payments for purchases of Company Stock or for repayment of debt (including principal and interest) incurred for the purchase of Employer Securities.

27

CIG 010984

Section 8.    <u>EXPENSES OF THE PLAN AND TRUST</u>.

Normal brokerage charges which are included in the cost of securities purchased (or charged to proceeds in the case of sales) shall be paid by the Trust. The Company shall pay all expenses in connection with the design, establishment, or termination of the Plan. The Trust shall pay all costs of administering the Plan and Trust, unless such expenses are paid by the Company.

28

CIG 010985

**Section 9.    <u>VOTING COMPANY STOCK</u>.**

All Company Stock held by the Trust shall be voted by the Trustee in accordance with instructions from the Committee. Notwithstanding the foregoing, Participants and/or Beneficiaries shall be entitled to direct the voting of any voting shares of Company Stock allocated to their Company Stock Accounts with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation. In accordance with instructions from the Committee, the Trustee shall vote any unallocated shares held by the Trust as well as any allocated shares for which a Participant has failed to give timely voting direction.

CIG 010986

**Section 10.**     **DISCLOSURE TO PARTICIPANTS.**

    (a)    Summary Plan Description.

        Within one hundred twenty (120) days after the receipt of an initial favorable determination letter from the Internal Revenue Service relating to the qualification of the Plan, and thereafter within ninety (90) days after a Participant commences participation (or after a Beneficiary first receives benefits under the Plan), the Committee shall furnish such Participant (or Beneficiary) with the summary plan description required by Sections 102(a)(1) and 104(b)(1) of ERISA. Such summary plan description shall be updated from time to time as required under ERISA and the Department of Labor regulations thereunder.

    (b)    Summary Annual Report.

        Within nine (9) months after each Anniversary Date, the Committee shall furnish each Participant (and each Beneficiary receiving benefits under the Plan) with the summary annual report of the Plan required by Section 104(b)(3) of ERISA, in the form required by regulations of the Department of Labor.

    (c)    Annual Statement.

        As soon as possible after each Anniversary Date, Participants will receive a written statement of their Accounts showing as of that Anniversary Date:

        (1)    The balance in each of their Accounts as of the preceding Anniversary Date.

        (2)    The amount of Employer Contributions and Forfeitures allocated to their Accounts for the year.

        (3)    The adjustments to their Accounts to reflect their share of dividends and the income and expenses of the Trust for the year.

        (4)    The new balances in each of their Accounts, including the number of shares of Company Stock.

        (5)    The vested percentage of their Plan Benefit.

        Upon the discovery of any error or miscalculation in an Account, the Committee shall correct the same insofar as, in the Committee's discretion, correction is feasible. Statements to Participants are for reporting purposes only, and no allocation, valuation or statement shall, by itself, vest any right or title in any part of the Trust fund.

30

CIG 010987

(d)    Notice of Rollover Treatment.

The Committee shall, when making any distribution which qualifies as a qualifying rollover distribution under Section 402(c) or Section 401(a)(31) of the Code, provide a written notice to the recipient which explains the provisions of Sections 402(c) and 401(a)(31) under which such distribution will not be subject to current tax if transferred to an Eligible Retirement Plan.  In the case of a distribution under Section 402(c), such notice shall be given not less than thirty (30) days nor more than ninety (90) days before the distribution date.  If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)11(c) of the Income Tax Regulations is given, provided that:

(1)    the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)    the Participant, after receiving the notice, affirmatively elects a distribution.

(e)    Additional Disclosure.

The Committee shall make available for examination by any Participant (or Beneficiary) copies of the summary plan description, the Plan, the Trust Agreement and the latest annual report of the Plan filed with the Department of Labor.  Upon written request of any Participant (or Beneficiary), the Committee shall furnish copies of such documents and may make a reasonable charge to cover the cost of furnishing such copies, as provided in regulations of the Department of Labor.

31

CIG 010988

Section 11.   **ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES.**

    (a)    <u>Allocation of Employer Contributions and Forfeitures</u>.

        The allocation will be made as follows:

        (1)    <u>Employer Contributions</u>.

            Employer Contributions will be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.  Shares of Employer Securities released from the Suspense Account (as provided in Section 7(b)) by reason of the payment of interest and principal on a Securities Acquisition Loan shall be allocated pursuant to Subsection 7(b) as of each Anniversary Date among the Accounts of Participants in the Plan who meet the require-ments of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensa-tion bears to the total Covered Compensation of all such Participants for that year.

        (2)    <u>Forfeitures</u>.

            Forfeitures shall be allocated in the same manner as Employer Contributions are allocated.

        (3)    <u>Net Income (or Loss) of the Trust</u>.

            The net income (or loss) of the Trust will be determined annually as of each Anniversary Date.  Any stock dividends on shares of Company Stock held by the Trust shall be allocated to each Participant's Company Stock Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date.  Trust income attributable to any cash dividends paid on shares of Company Stock (whether or not allocated) and not used to make payments on a Securities Acquisition Loan shall be allocated to each Participant's Other Investments Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date.  Trust income attributable to any gain from the

32

CIG 010989

sale of unallocated shares of Employer Securities shall be allocated to each Participant's Other Investments Account in the proportion that each such Participant's Covered Compensation for the Plan Year bears to the total Covered Compensation of all such Participants for that Plan Year. All other net income (or loss) will be allocated to each Participant's Other Investments Account in the ratio in which the balance of the Participant's Other Investments Account on the preceding Anniversary Date bears to the sum of the balances of the Other Investments Accounts of all Participants on that date. For this purpose, Account balances shall be reduced by amounts distributed to Participants during the Plan Year.

The net income (or loss) includes the increases (or decreases) in the fair market value of assets of the Trust, interest, dividends, other income and expenses attributable to assets in the Other Investments Accounts since the preceding Anniversary Date. Net income (or loss) does not include the interest paid under any installment contract for the purchase of Company Stock by the Trust or on any loan obtained by the Trust to purchase Company Stock. Notwithstanding the foregoing, no income (or loss) shall be allocated to a terminated Participant's Account for the Plan Year in which the Participant receives final distribution of the Plan Benefit.

(b)     Allocation Limitations.

(1)     The total Annual Additions to a Participant's Accounts for any Limitation Year shall not exceed the lesser of (i) thirty thousand dollars ($30,000), or (ii) twenty-five percent (25%) of the Participant's Total Compensation for the Limitation Year.

The following is effective for plan years beginning after December 31, 1994 in order to bring the Plan's Code Section 415 provisions into compliance with the requirements of the General Agreement on Tariffs and Trade (GATT):

Effective for Plan Years beginning after December 31, 1994, notwithstanding any other provisions of the Plan, Contributions and other Annual Additions with respect to a Participant exceed the limitation of Code Section 415(c) if, when expressed as an Annual Addition (within the meaning of Code Section 415(c)(2)) to the Participant's Account, such Annual Addition is greater than the lesser of:

(A)     thirty thousand dollars ($30,000) or

33

CIG 010990

(B)    twenty-five percent of the Participant's compensation (as defined in Code Section 415(c)(3).

A Participant's allocable share of Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall not be included as an Annual Addition, provided that no more than one-third (⅓) of the Employer Contribution for that year is allocated to the Accounts of Highly Compensated Employees.

The Annual Additions under Section 11(b) with respect to Employer Securities released from the Suspense Account (by reason of Employer Contributions used for payments on a Securities Acquisition Loan) and allocated to Participants' Company Stock Accounts shall be based upon the lesser of (A) the amount of such Employer Contributions, or (B) the fair market value of such Employer Securities (determined by an Independent Appraiser) as of the Allocation Date. Annual Additions shall not include any allocation attributable to proceeds from the sale of Employer Securities by the Trust or to appreciation (realized or unrealized) in the fair market value of Company Stock.

(2)    If an Employer is contributing to another defined contribution plan, as defined in Section 414(i) of the Code, for Employees of the Company or any Affiliated Company, some or all of whom may be Participants in this Plan, then any such Participant's Annual Additions in such other plan shall be aggregated with the Participant's Annual Additions derived from this Plan for purposes of the limitation in Paragraph (1) of this Subsection.

(3)    If a Participant in this Plan is also a Participant in a defined benefit plan to which Contributions are made by an Employer or Affiliated Company, then in addition to the limitation contained in Paragraph (1) of this Subsection, such Participant's allocations shall be limited, such that the sum of the defined benefit plan fraction and the defined contribution plan fraction for any Limitation Year shall not exceed 1.0. For purposes of this Paragraph (3), the defined benefit plan fraction is a fraction, the numerator of which is the projected annual benefit of the Participant under all such defined Plans determined as of the close of the Limitation Year, and the denominator of which is the lesser of (i) the product of 1.25 multiplied by the dollar limitation in effect for such Plan Year, or (ii) the product of 1.4 multiplied by one hundred percent (100%) of the Participant's average Total Compensation for the Participant's highest

34

CIG 010991

three Limitation Years.  For purposes of this Paragraph (3), the defined contribution plan fraction for any Limitation Year is a fraction, the numerator of which is the sum of the Annual Additions to the Participant's Accounts as of the close of the Limitation Year, and the denominator of which is the sum of the lesser of the following amounts determined for such year and for each prior Year of Service with the Employer: (i) the product of 1.25 multiplied by the dollar limitation in effect for such Limitation Year or (ii) the product of 1.4 multiplied by twenty-five percent (25%) of the Participant's Total Compensation.

Effective for all Limitation Years beginning after December 31, 1999, the combined plan limit is repealed, and therefore, this Subsection 11(b)(3) is deleted from the Plan.

(4)     If Company Stock is purchased from a shareholder of the Company and if such shareholder is also a Participant in this Plan, then notwithstanding anything to the contrary contained in this Plan, the total Account balances of such Participant's Accounts other than the Participant's Segregated Investments Account, combined with the total Account balances of the Accounts of such Participant's spouse, parents, grandparents, children, and grandchildren under the Plan, shall not exceed twenty percent (20%) of the total of all Account balances under the Plan.  However, if the total Account balances of such Participant's Accounts exceed twenty percent (20%) of the total of all Account balances, then the amounts in excess of said twenty percent (20%) shall be credited to that Participant's Segregated Investments Account and invested in investments other than Company Stock.

(5)     In the case of a sale in which a seller elects nonrecognition of gain under Section 1042 of the Code, no portion of such Qualified Employer Securities may be allocated to the Account of (i) the seller (or the seller's family) during the nonallocation period or (ii) any other person who owns (after application of the family attribution rules) more than twenty-five percent (25%) of any class of outstanding Company Stock, or more than twenty-five percent (25%) of the total value of any class of outstanding Company Stock, at any time during the one-year period preceding the purchase of such Qualified Employer Securities by the Plan, or on any subsequent date when such Qualified Employer Securities are allocated to Participants in the Plan.  For purposes of this Paragraph, the seller's family shall include the seller's spouse, ancestors, lineal descendants, and brothers and sisters.  Notwithstanding the foregoing, lineal descendants of a seller shall be permitted to share in the allocation of Qualified Employer

35

CIG 010992

Securities, provided that the aggregate amount of such stock allocated for the benefit of all such lineal descendants does not exceed more than five percent (5%) of such stock purchased from the seller. For purposes of this Paragraph (5), a person shall be considered to be a more than twenty-five percent (25%) shareholder if the amount of Company Stock which such person owns (whether outright or as a Plan Participant), together with the amount of Company Stock owned by such person's spouse, children, grandchildren and parents (whether outright or as a Plan Participants), exceeds twenty-five percent (25%) of any class of outstanding Company Stock or twenty-five percent (25%) of the total value of any class of outstanding Company Stock. For purposes of this Paragraph (5), the "nonallocation period" means the period beginning on the date of the sale and ending on the later of (i) the date which is ten (10) years after the date of sale, or (ii) the date of the Plan allocation attributable to the final payment of the Securities Acquisition Loan.

(6)     If, due to forfeitures, reasonable error in estimating compensation, or other limited facts and circumstances as determined by the Commissioner, the Account balances or the Annual Additions to a Participant's Accounts would exceed the limitation described in Paragraphs (1), (2) or (3) of this Subsection, the aggregate of the Annual Additions to this Plan and the Annual Additions to any other plan described in Paragraphs (2) or (3) shall be reduced until the applicable limitation is satisfied.

(7)     The reduction shall be treated the same as Forfeitures and shall be allocated in accordance with Section 11(a)(2) of the Plan to the Accounts of Participants who are not affected by this limitation.

(8)     If any amount cannot be reallocated under the foregoing provision, such amount shall be deposited in a suspense account and allocated to the maximum extent possible under Section 11(a)(2) of the Plan in succeeding years, provided that (i) no Employer Contributions are made until Section 415 of the Code will permit their allocation, (ii) no investment gains or losses are allocated to such suspense account, and (iii) the amounts in such suspense account are allocated at the earliest possible date.

(9)     Notwithstanding the preceding provisions of this Section 11, if the allocation provided above for a Plan Year would result in an allocation to Highly Compensated Employees of more than one-third of the Employer contributions which are deductible under

36

CIG 010993

Code Section 404(a)(9) for the Plan Year, the allocation of amounts to all Highly Compensated Employees shall be reduced in proportion to their respective Covered Compensation for the Plan Year, and the allocation to Participants other than Highly Compensated Employees shall be increased in proportion to their respective Covered Compensation for the Plan Year, by such amount that will result in the final allocation to the Highly Compensated Employees of Employer contributions which are deductible under Code Section 404(a)(9) being equal to one-third of the total allocation of such Employer contributions to all persons eligible to share in the allocations for said Plan Year.

CIG 010994

**Section 12.     PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT.**

Participation in the allocation of Employer Contributions and Forfeitures terminates as of the end of the Plan Year coinciding with or following a Participant's death, Disability or Retirement, provided the Participant completes 1,000 or more Hours of Service during such Plan Year. A Participant's Plan Benefit upon death, Disability or Retirement will be the total of the Participant's Account balances as of the coinciding or following Anniversary Date, provided the Participant completes 1,000 or more Hours of Service during such Plan Year.

A Participant who, while employed with the Company, dies or attains any of the following Retirement dates will be one hundred percent (100%) vested.

(a)     Normal Retirement.

A Participant's Normal Retirement Date is the date the Participant attains age sixty-five (65).

(b)     Disability Retirement.

If a Participant terminated employment because of a total and permanent disability, such Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of such Participant's Accounts. "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

(c)     Deferred Retirement.

If a Participant continues in the service of the Employer beyond the Normal Retirement Date, such Participant shall continue to participate in the Plan during any period of employment following the Normal Retirement Date.

Any amount credited to a Participant's Accounts with respect to the Employer's Contribution for the Plan Year in which such Participant dies, becomes Disabled or attains any of the above Retirement dates shall also be completely vested at the time of such contribution.

CIG 010995

**Section 13.    OTHER TERMINATION OF SERVICE AND VESTING.**

    (a)    Vesting Schedule.

        The vesting of a Participant's Plan Benefit will be based upon Years of Service, as defined in Section 2, in accordance with the following vesting schedule:

| Years of Service | Percentage of Accounts Vested |
|---|---|
| Less than Three Years | 0 |
| Three Years | 20 |
| Four Years | 40 |
| Five Years | 60 |
| Six Years | 80 |
| Seven or more Years | 100 |

        The computation of a Participant's nonforfeitable percentage of the Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. For this purpose, the Plan shall be treated as having been amended if the Plan provides for an automatic change in vesting due to a change in top heavy status. In the event that the Plan is amended to change or modify any vesting schedule, a Participant with at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's non-forfeitable percentage computed under the Plan without regard to such amendment. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

        (1)    the adoption date of the amendment,

        (2)    the effective date of the amendment, or

        (3)    the date the Participant receives written notice of the amendment from the Employer or Committee.

    (b)    Vesting Upon Reemployment.

        If a Participant is reemployed by the Company following a Break in Service, such Participant's Accounts shall be vested as follows:

        (1)    Vesting of Prior Account Balances.

        If a Participant has had five consecutive one-year Breaks in Service, Years of Service after such five-year period will not be taken into account for purposes of determining a Participant's vested interest in the Participant's prebreak Account balances and new Accounts

39

CIG 010996

will be established to record the Participant's interest in the Plan for service after such five-year period.

    (2)   Vesting of Subsequent Account Balances.

      (A)    In the case of a Participant who, at the time of a Break in Service, does not have any vested right under Paragraph (a) above, Years of Service before such Break in Service shall not be taken into account unless such Participant returns to work for the Employer and completes one (1) Year of Service. Notwithstanding the foregoing, Years of Service before such Break in Service shall not be taken into account for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances if the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the aggregate number of years of prebreak service, whichever is greater.

      (B)    If a Participant had any degree of vested interest at the time of the Participant's Break in Service, such Participant shall participate retroactively to the Participant's reemployment date for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances. Upon resuming participation, such Participant's Years of Service shall include all Years of Service prior to the Break in Service.

    (c)   Forfeitures.

      Forfeitures shall be first charged against a Participant's Other Investments Account, with any balance charged next against the Participant's Company Stock Account. If a portion of a Participant's Account is to be forfeited and interests in more than one class of Employer Securities have been allocated to a Participant's Account, the Participant shall forfeit the same percentage of each such class. The disposition of such Forfeitures shall be as follows:

      (1)    If a Participant has incurred five consecutive one-year Breaks in Service and has not received a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as soon as possible after the close of the Plan Year in which the Participant incurs a five-year Break in Service.

      (2)    If a Participant who is not one hundred percent (100%) vested receives a distribution of a Plan Benefit, which is not a "cash-out distribution" (as defined below), prior to the occurrence of a five-year Break in Service, and such Participant returns to work for the Employer, the portion of the Participant's Accounts which was not vested shall be maintained

40

CIG 010997

separately (from any additional contributions to this Plan) until such Participant becomes one hundred percent (100%) vested. Such Participant's vested and nonforfeitable percentage in such separate Accounts upon any subsequent termination of Service shall be equal to:

$$\frac{X - Y}{100\% - Y}$$

For purposes of applying this formula, X is the vested percentage at the time of the subsequent termination, and Y is the vested percentage at the time of the prior termination. Separate Accounts shall share in the allocation of Trust income or loss on every Anniversary Date prior to Forfeiture, but such accounts shall not share in allocation of Trust income or loss on the Anniversary Date on which they are forfeited.

(3)    If a Participant receives a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as of the Anniversary Date coinciding with or following the date such Participant incurred a one-year Break in Service or received the cash-out distribution, whichever is later.

(d)    Cash-Out Distribution.

If a partially vested Participant receives a cash-out distribution, the cash-out distribution will result in a forfeiture of the nonvested portion of the Participant's Accounts. A "cash-out distribution" is a distribution of the entire vested portion of a Participant's Accounts that is made before the Participant incurs five (5) consecutive one-year Breaks in Service.

If any former Participant shall be reemployed by the Employer before five (5) consecutive one-year Breaks in Service, and such former Participant had received a cash-out distribution prior to reemployment, the forfeited portion of such Participant's Accounts shall be reinstated only if the Participant repays the full amount distributed to such Participant. Such repayment must be made by the former Participant before the Participant incurs five (5) consecutive one-year Breaks in Service following the date of distribution and before the five-year anniversary of his reemployment date. In the event the former Participant does repay the full amount distributed to such Participant, the undistributed portion of the Participant's Accounts must be restored in full, unadjusted by any gains or losses occurring subsequent to the Anniversary Date preceding the Participant's termination. Restoration of a Participant's

41

CIG 010998

Accounts shall include restoration of all Code Section 411(d)(6) protected benefits with respect to such restored amounts.

If the Participant repays the amount distributed to such Participant within the required time period, the Committee shall restore the forfeited portion of the Participant's Accounts as of the Anniversary Date coinciding with or following the repayment. Such amount shall be restored, to the extent necessary, in the following manner:

(A)    first from current-year Forfeitures;

(B)    second from current-year Trust earnings; and

(C)    third from current-year Contributions.

To the extent the amounts described in clauses (A), (B) and (C) are insufficient to enable the Committee to make the required restoration, the Employer must contribute the additional amount necessary to enable the Committee to make the required restoration.

A terminated Participant who is zero percent (0%) vested shall be deemed to have received a cash-out distribution as of the day on which the Participant separates from service with the Employer. For purposes of applying the restoration provisions of this Paragraph, the Committee will treat a zero percent (0%) vested Participant as repaying the Participant's cash-out distribution on the first day of reemployment with the Employer.

42

CIG 010999

**Section 14.    DISTRIBUTION OF PLAN BENEFIT.**

(a)    Death, Disability or Retirement.

In the event of death, Disability or Retirement, subject to Subsection 14(e), distribution of a Participant's Plan Benefit shall commence during the following Plan Year and shall be distributed in a lump sum, beginning not later than one (1) year after the close of the Plan Year in which such event occurs.

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

(b)    Other Termination of Participation.

In the event a Participant terminates employment for reasons other than death, Disability or Retirement, subject to Subsection 14(e), the Participant's vested Plan Benefit will be distributed as follows:

(1)    Company Stock Account and Other Investments Account (Exceeding $3,500).

If a Participant is not reemployed before the end of the fifth (5th) Plan Year following the Plan Year in which the Participant terminates employment, distribution of the Participant's Company Stock Account and Other Investments Account will be made in a lump sum as soon as administratively feasible during the sixth (6th) Plan Year following the Plan Year in which the Participant terminates employment.

43

CIG 011000

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

Notwithstanding the foregoing provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities acquired with the proceeds of a Securities Acquisition Loan until the close of the Plan Year in which such Securities Acquisition Loan has been repaid in full.

Notwithstanding the other provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities to the extent that the Participants or Beneficiaries have elected to have their Company Stock Account diversified under the provisions of Section 17(a) hereof.

Notwithstanding anything in this Section 14 to the contrary, in the event a Participant's employment is terminated for reasons other than death, Disability or Retirement, subject to Section 14(e), distribution of the Participant's Plan Benefit shall commence no later than one (1) year after the close of the Plan Year in which the earliest of the following events occurs:

(A)    the Participant's Normal Retirement Date; or

(B)    the Participant's death; or

(C)    the Participant's Disability.

44

CIG 011001

(2)    Company Stock Account and Other Investments Account ($3,500 or Less).

Notwithstanding the foregoing, if the total vested value of a Participant's Company Stock Account and Other Investments Account Accounts is three thousand five hundred dollars ($3,500) or less, distribution shall be made in a lump sum as soon as possible after the close of the Plan Year in which the Participant terminates employment.

(c)    Death Prior to Distribution.

If a Participant dies before distribution of the Participant's Plan Benefit has commenced, such Participant's entire Plan Benefit shall be distributed in accordance with Subsection 15(b) within five (5) years of the date of the Participant's death.

If a Participant dies after the distribution of the Plan Benefit has commenced, the remaining portion of the Plan Benefit shall be distributed (in accordance with Subsection 15(b)) at least as rapidly as under the method being used at the date of the Participant's death.

(d)    Valuation Date.

All Accounts shall be valued as of the appropriate Valuation Date. The Company or the Committee may require other valuations from time to time as necessary. Any valuation of Company Stock contributed to or purchased by the Plan shall be determined by an Independent Appraiser.

(e)    Consent and Notice Requirements.

If a present value of a Participant's Plan Benefit (determined in accordance with Section 411(a)(11)(B) of the Code) has ever exceeded three thousand five hundred dollars ($3,500) (or five thousand dollars ($5,000) for Plan Years beginning on or after August 5, 1997), any distribution prior to the later of age sixty-two (62) or the Participant's Normal Retirement Date may be made only with the written consent of the Participant. The Committee shall provide the Participant with a written notice which explains the provision of Section 411(a)(11), not less than thirty (30) days nor more than ninety (90) days before the distribution date. If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)-11(c) of the Income Tax Regulations is given, provided that:

45

CIG 011002

(1)    the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)    the Participant, after receiving the notice, affirmatively elects a distribution.

Failure of a Participant to consent to an immediate distribution within the applicable time limit may be treated by the Employer as an election by the Participant to defer distribution of the benefits to the later of age sixty-two (62) or the Normal Retirement Date of the Participant.

(f)    Required Commencement of Benefit Distribution.

(1)    Distribution of a Participant's Plan Benefit shall commence not later than sixty (60) days after the Anniversary Date coinciding with or next following the latest of (1) the Participant's Retirement, (2) the tenth (10th) anniversary of the date the Participant became a Participant, or (3) the Participant's separation from service. If the amount of a Participant's Plan Benefit cannot be determined (by the Committee) by the date on which a distribution is to commence, or the Participant cannot be located, distribution of the Participant's Plan Benefit shall commence within sixty (60) days after the date on which the Participant's Plan Benefit can be determined or after the date on which the Committee locates the Participant.

(2)    Pursuant to Section 401(a)(9) of the Code as amended by the Small Business Job Protection Act, distribution of a Participant's Plan Benefits is required to begin by April 1 of the Plan Year following the later of (1) the Plan Year in which the Participant attains age seventy and one-half (70½) or (2) the Plan Year in which the Participant separates from service with the Employer. However, in the case of a five-percent (5%) owner (as defined in Section 416(i)(1)(B)(i) of the Code), distributions are required to begin no later than April 1 of the next calendar year in which the Participant attains age seventy and one-half (70½).

All distributions made under this Subsection 14(f)(2) shall be determined and made in accordance with the Proposed Regulations under Section 401(a)(9), including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the Proposed Regulations.

46

CIG 011003

(g)    Undistributed Accounts.

Any part of a Participant's Company Stock Account and Other Investments Account which is retained in the Trust after the Anniversary Date coinciding with or immediately following the date on which the Participant terminates employment will continue to be treated as a Company Stock Account or as an Other Investments Account, as the case may be. Thus, the Other Investments Account of a terminated Participant will be debited (and the Participant's Company Stock Account will be credited) with such Participant's share of any repurchases of Company Stock from other terminated Participants. However, except in the case of reemployment (as provided for in Section 4), none of the Participant's Accounts will be credited with any further Employer Contributions or Forfeitures.

(h)    Optional Direct Transfer of Eligible Rollover Distributions.

Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, for all distributions made on or after January 1, 1993, a Distributee may elect, at the time and in the manner prescribed by the Plan Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

(i)    Lien on Distribution.

Notwithstanding anything to the contrary herein, if, at the time of distribution, a Participant is indebted to the Trust, or has retained in his or her possession money or property which properly belongs to the Trust, the Trust shall have a lien on such distribution pending the resolution of such ownership rights. The Trustee may exercise such lien either by directing the Company secretary to withhold any stock transfer of title, or by withholding distribution of any stock or the value of any stock or other assets, pending resolution of such ownership rights. Notwithstanding the foregoing, Plan Benefits under this Plan may not be assigned or alienated except to the extent allowable under Code Sections 401(a)(13) and 414(p).

47

CIG 011004

Section 15.    HOW PLAN BENEFIT WILL BE DISTRIBUTED.

    (a)    Form of Distribution.

        Subject to a Participant's right to demand distribution of such Participant's Company Stock Account and Other Investments Account entirely in the form of Employer Securities, the Trustee may distribute such Participant's Plan Benefit entirely in cash or entirely in the form of Employer Securities. Distributions made in the form of Employer Securities shall be made in the form of whole shares of Employer Securities with the value of any fractional shares paid in cash.

        However, if the Company's charter or bylaws restrict ownership of substantially all outstanding Employer Securities to Employees or to a trust under a qualified plan under Section 401(a) of the Code, or in the case of an Employer who elects to be treated as an S-corporation, as defined in Code Section 1361(a)(1), distribution of Plan Benefits may be made entirely in cash and Participants may not demand distribution of their Plan Benefit in the form of Employer Securities. Notwithstanding the foregoing, Employer Securities may be distributed by the Trustee subject to the requirement that such stock shall be immediately resold to the Employer (or the Trust).

        Any shares purchased by the Employer (or the Trust) pursuant to this Subsection shall be purchased at their fair market value. For purposes of this Section, fair market value shall be based upon the appraised fair market value determined as of the Anniversary Date coinciding with or immediately preceding the date such shares are purchased. The appraised fair market value shall be determined by an Independent Appraiser and shall be based on all relevant factors for determining the fair market value of securities. In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction. Such shares shall be purchased by notifying the Participant (or Beneficiary) in writing.

        The terms of payment for the purchase of such shares of stock shall be set forth in the written statement delivered to the Participant (or Beneficiary) and may be either in a single payment or in up to five (5) equal annual installments (with interest on the unpaid principal balance at a reasonable rate of interest), as determined by the Plan Committee. Payment for the

CIG 011005

purchase of such shares must commence within thirty (30) days after the Employer (or the Trust) notifies the Participant (or Beneficiary) of its intent to purchase the shares. If payment is made in installments, adequate security and a reasonable rate of interest must be provided.

The Trustee will make distributions from the Trust in accordance with instructions from the Committee.

(b)    Beneficiaries.

(1)    Designation.

Distribution will be made to the Participant if living, and if not, to the Participant's Beneficiary. A Participant may designate a Beneficiary upon becoming a Participant and may change such designation at any time by filing a written designation with the Committee. Notwithstanding anything in this Section 15 to the contrary, if a Participant is married, a Participant shall not designate anyone other than the Participant's spouse as primary Beneficiary of the Participant's Plan Benefit unless such spouse consents in writing to such designation, such spouse acknowledges the effect of such election, and such writing is witnessed by a Plan representative or notary public and filed with the Plan Committee.

(2)    Absence of Valid Designation.

If, upon the death of a Participant, former Participant or Beneficiary, there is no valid designation of a Beneficiary on file with the Company or the benefit is not claimed by any Beneficiary within a reasonable period of time after the death of the Participant, the benefit shall be paid to the Participant's surviving spouse. If the Participant is not married or if the Participant's spouse does not survive the Participant, the benefit shall be paid to the Participant's estate.

(c)    Location of Participant or Beneficiary Unknown.

If a Participant who is entitled to a distribution cannot be located and the Plan Committee has made reasonable efforts to locate the Participant, the Participant's interest shall be forfeited and treated as a Forfeiture in accordance with Section 13 at the time specified below. The Plan Committee will be deemed to have made reasonable efforts to locate the Participant if the Plan Committee is unable to locate the Participant (or, in the case of a deceased Participant, his or her Beneficiary) after having made two successive certified or similar mailings to the last address on file with the Plan Committee and after the Plan Committee has used the IRS Letter

49

CIG 011006

Forwarding Program. The Participant's Account(s) shall be forfeited as of the last day of the Plan Year in which occurs the close of the 12 calendar month period following the later of the two successive mailings. If the Participant or Beneficiary makes a written claim for the Account(s) subsequent to the forfeiture, the Employer shall cause the Account(s) to be reinstated, first from current year Forfeitures, if any, and then from an additional Employer Contribution.

50

CIG 01100

**Section 16.**    <u>RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK.</u>

    (a)    <u>"Put" Option.</u>

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, then the "Qualified Holder" (as defined below) of such stock shall be granted, at the time that such shares are distributed to the Qualified Holder, an option to "put" the shares to the Company; provided, however, that all such shares are so put; and provided, further, that the Trust shall have the option to assume the rights and obligations of the Company at the time the "put" option is exercised. The term "Qualified Holder" shall mean the Participant or Beneficiary receiving the distribution of such shares, any other party to whom the shares are transferred by gift or by reason of death, and also any trustee of an individual retirement account (as defined under Code Section 408) to which all or any portion of the distributed shares is transferred pursuant to a tax-free rollover transaction satisfying the requirements of Sections 402 and 408 of the Code. A "put" option shall provide that, for a period of sixty (60) days after such shares are distributed to a Qualified Holder (as defined above) (and, if the "put" is not exercised within such sixty (60) day period, for an additional period of sixty (60) days in the following Plan Year), the Qualified Holder would have the right to have the Company purchase such shares at their fair market value, as defined hereinabove in subsection (a). Such "put" option shall be exercised by notifying the Company in writing.

In the case of a lump sum distribution of Company Stock, the terms of payment for the purchase of such shares of stock shall be as set forth in the "put" and may be paid either in a single payment or in up to five (5) equal annual installments with interest on the unpaid principal balance at a reasonable rate of interest. Payment for the purchase of such shares must commence within thirty (30) days after the "put" is exercised. The period during which the put option is exercisable does not include any time during which the distributee is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable federal or state law. If payment is made in installments, adequate security and a reasonable rate of interest must be provided. In the case of an installment distribution, payment must be made within thirty (30) days after the put option is exercised with respect to any installment distribution of Company Stock.

51

CIG 01100

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

The requirements of this Subsection 16(a) shall not apply to the distribution of any portion of a Participant's Plan Benefit which has been diversified, distributed or transferred to another plan pursuant to the provisions of Subsection 17(a) hereof.

(b)    <u>Right of First Refusal</u>.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, such shares of Company Stock distributed by the Trustee may, as determined by the Company or the Committee, be subject to a "right of first refusal," until such time as such shares are publicly traded. Such a "right" shall provide that prior to any subsequent transfer, the shares must first be offered by written offer, to the Trust, and then, if refused by the Trust, to the Company. In the event that the proposed transfer constitutes a gift or other such transfer at less than fair market value, the price per share shall be determined by an Independent Appraiser (appointed by the Board of Directors) as of the Anniversary Date coinciding with or immediately preceding the date of exercise, except in the case of a transfer to a Disqualified Person.

In the event of a proposed purchase by a prospective bona fide purchaser, the offer to the Trust and the Company shall be at the greater of fair market value, as determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of exercise (except in the case of a purchase by a Disqualified Person), or at the price offered by the prospective bona fide purchaser. In addition, such offer must equal or exceed the other terms of the offer made by the prospective bona fide purchaser. In the case of a purchase by or transfer to a Disqualified Person, fair market value shall be determined as of the actual date of the transaction. Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. The Trust may accept the offer at any time during a period not exceeding fourteen (14) days after receipt of such offer. In the event the Trust does not accept such offer, the Company may accept such offer at any time during said fourteen (14) day period.

52

CIG 011009

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

    (c)    <u>Other Options</u>.

Except as otherwise provided in this Section 16, no security acquired with the proceeds of a Securities Acquisition Loan may be subject to a put, call, buy-sell or similar arrangement while held by or when distributed from the Plan.

53

CIG 011010

### Section 17.    SPECIAL PROVISIONS.

(a)    Diversification of Investments.

Within ninety (90) days after the close of each Plan Year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than twenty-five percent (25%) of the value of the Participant's Company Stock Account to the extent such value exceeds the amount to which a prior election, if any, applies. In the case of the sixth (6th) year of the Qualified Election Period, the preceding sentence shall be applied by substituting "fifty percent (50%)" for "twenty-five percent (25%)." The Participant's direction shall be completed no later than ninety (90) days after the close of the ninety (90) day election period.

The Plan Committee shall offer at least three investment options (not inconsistent with regulations prescribed by the Internal Revenue Service) to each Participant who makes an election under this Subsection.

In lieu of offering such investment options, the Plan Committee may direct that all amounts subject to Participant elections under this Subsection be distributed to Qualified Participants. All such distributions shall be distributed within ninety (90) days after the close of the ninety (90) day election period and shall be made in cash.

In lieu of receiving a distribution under this Subsection, a Qualified Participant may direct the Plan to transfer the distribution to another qualified plan of the Company which accepts such transfers, provided that such plan permits employee-directed investments and does not invest in Employer Securities to a substantial degree. Such transfer shall be made within ninety (90) days after the close of the ninety (90) day election period.

(b)    Cash Dividends.

Cash dividends, if any, on shares of Company Stock allocated to Participants' Accounts may be accumulated in the Trust or may be paid to Participants currently as determined in the sole discretion of the Committee, exercised in a uniform and nondiscriminatory manner. Provided that the Plan is primarily invested in Employer Securities, it is intended that the Company shall be allowed a deduction with respect to any dividends paid on allocated shares of Company Stock of any class held by the Plan on the record date to the extent such dividends are paid in cash directly to the Participants, or their Beneficiaries, or are paid to the Plan and are

CIG 011011

distributed from the Plan to the Participants or their Beneficiaries not later than ninety (90) days after the close of the Plan Year in which paid; provided, however, that the Company shall not be required to pay or distribute any dividends with respect to the nonvested portion of the Company Stock Account of a Participant who has terminated employment prior to the date such dividends are paid directly to Participants, or are distributed from the Plan to the Participants. Provided that the Plan is primarily invested in Employer Securities, it is also intended that the Company shall be allowed a deduction for any dividends used to make payments on a Securities Acquisition Loan the proceeds of which were used to acquire the Employer Securities (whether or not allocated) with respect to which the dividend is paid, provided that in the case of dividends paid on allocated shares, Employer Securities in an amount equal to such dividends are allocated to such Participants for the year in which such dividends would otherwise have been allocated to such Participants. The Company shall be allowed a deduction for dividends paid only in the taxable year of the Company in which the dividend is either paid to a Participant or Beneficiary or held to make payments on a Securities Acquisition Loan.

Shares of Employer Securities released from the suspense account (as provided in Section 7(b) of the Plan) by reason of the payment of principal and interest on a Securities Acquisition Loan with cash dividends paid to the Trust, shall be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.

CIG 011012

**Section 18.    ADMINISTRATION.**

    (a)    <u>Named Fiduciaries for Administration of Plan and for Investment and Control of Plan Assets</u>.

        (1)    <u>Board of Directors</u>.

            The Board of Directors shall have the following duties and responsibilities in connection with the administration of the Plan:

            (A)    Making decisions with respect to amending or terminating the Plan.

            (B)    Making decisions with respect to the selection, retention or removal of the Trustee.

            (C)    Making decisions with respect to the selection of the Plan Committee members.

            (D)    Periodically reviewing the performance of the Trustee, the members of the Committee, persons to whom duties have been allocated or delegated and any advisers appointed pursuant to paragraph (f)(1) below.

            (E)    Determining the form and amount of Employer Contributions.

            The Board of Directors may by written resolution allocate its duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Board of Directors deems reasonable and prudent under the circumstances.

        (2)    <u>Plan Committee</u>.

            (A)    <u>General</u>.

            The Company shall administer the Plan and is designated as the "Plan Administrator" within the meaning of Section 3(16) of ERISA and Section 414(g) of the Code. The Committee and the Company shall each be a "named fiduciary" within the meaning of Section 402 of ERISA, but each party's role as a named fiduciary shall be limited solely to the exercise of its own authority and discretion, as defined under this Plan, to control and manage the operation and administration of this Plan. A named fiduciary may designate other persons who are not named fiduciaries to carry out its fiduciary duties hereunder, and any such person shall become a fiduciary under the Plan with respect to such delegated responsibilities.    The members

CIG 011013

of the Committee shall be appointed by the Board of Directors and shall serve, without compensation, until such time as they resign, die or become incapable of exercising their duties. All members of the Committee are designated as agents of the Plan for purposes of service of legal process. The Company shall certify to the Trustee the names and specimen signatures of the members of the Committee. Any member may resign at any time by submitting an appropriate written instrument to the Company, and while any vacancy exists, the remaining members of the Committee may perform any act which the Committee is authorized to perform. Any vacancy on the Committee shall be filled by appointment by the Board of Directors. All decisions required to be made by the Committee involving the interpretation, application and administration of the Plan shall be resolved by action of the Committee either at a meeting or in writing without a meeting.

(B)    Duties and Responsibilities.

The Committee shall have the following duties and responsibilities in connection with the administration of the Plan:

(i)    Establishing and implementing a funding policy as described in Paragraph (c) below.

(ii)    Determining the eligibility of Employees for participation in the Plan.

(iii)    Determining the eligibility of Employees for benefits provided by the Plan including such duties and responsibilities as are necessary and appropriate under the Plan's claims procedures.

(iv)    Making recommendations to the Board of Directors with respect to amendment or termination of the Plan, including recommendations with respect to contributions under the Plan.

(v)    Assuring that bonding requirements imposed by ERISA are satisfied.

(vi)    Authorizing, allocating and reviewing expenses incurred by the Plan.

(vii)    Communicating with Participants and other persons.

57

CIG 011014

(viii)    Reviewing periodically any allocation or delegation of duties and responsibilities and any appointment of advisers.

(ix)    Investing and controlling the Plan assets.

(x)    Directing the Trustee with respect to voting shares of Company Stock, in accordance with the provisions of Section 9.

(xi)    Interpreting and construing the terms of the Plan and Trust Agreement.

The Committee may establish rules and regulations and may take any other necessary or proper action to carry out its duties and responsibilities. Notwithstanding the foregoing provisions, the Trustee shall have the primary responsibility for the withholding of income taxes from Plan distributions, for the payment of withheld income taxes on Plan distributions to the Internal Revenue Service, and for notification to Participants of their right to elect not to have income tax withheld from Plan distributions. Compliance with record keeping and reporting requirements of ERISA shall be the primary responsibility of the Company.

The Plan Committee shall have full discretion to construe and interpret the terms and provisions of this Plan, which interpretation or construction shall be final and binding on all parties including, but limited to, the Company and any Participant or Beneficiary, except as otherwise provided by law. The Plan Committee shall administer such terms and provisions in a uniform and nondiscriminatory manner and in full accordance with any and all laws applicable to the Plan. When making a determination or calculation, the Plan Committee shall be entitled to rely upon information furnished by the Employer or anyone acting on behalf of the Employer.

(C)    Allocation and Delegation of Responsibilities.

The Committee may, by written resolution, allocate its administrative duties and responsibilities to one or more of its members or it may delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

58

CIG 011015

(b)    Investment of Plan Assets.

The Plan assets shall be invested and controlled by the Committee; provided, however, that the actual management of Trust investments, other than Company Stock, may be delegated to the Trustee or may be delegated to one or more investment managers appointed by the Committee. Any investment manager appointed hereunder shall have the power to manage, acquire or dispose of assets of the Plan and shall be either an investment adviser registered under the Investment Advisers Act of 1940, or a bank, as defined in that Act, or an insurance company qualified to perform such services under the laws of one or more states. If an investment manager has been appointed, the Trustee shall neither be liable for acts or omissions of such investment manager nor be under any obligation to invest or otherwise manage any asset of the Trust fund, nor shall the Committee be liable for any act or omission of the investment manager in carrying out such responsibility. The custody of Plan assets shall at all times be retained by the Trustee, unless they consist of insurance contracts or policies issued and held by an insurance company authorized to conduct an insurance business in a state. In addition to appointment of investment managers, the Committee shall have the following duties and responsibilities:

(1)    Periodically reviewing the investment of Plan assets and the performance of the Trustee and any investment managers. With respect to the Trustee, the Committee shall advise the Board of Directors of any matters which might be relevant to the decision as to whether the services of the Trustee should be retained. Based on its review, the Committee shall determine the desirability of appointing or retaining investment managers.

(2)    Determining an investment policy to be followed with respect to the Plan assets and communicating this policy to the person or persons responsible for investing the Plan assets.

The Committee may by written resolution, allocate its investment duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

CIG 011016

(c)    Funding Policy.

The funding policy of the Plan is to invest trust assets primarily in Company Stock over the life of the Plan. The Committee shall, from time to time, establish such investment methods as may be necessary to accomplish this funding policy.

(d)    Claims Procedures.

Any person whose claim for benefits under the Plan has been denied in whole or in part shall receive a written notice from the Committee setting forth the specific reasons for such denial, specific references to the Plan provisions on which the denial was based and an explanation of the procedure for review of the denial. Such person, or a duly authorized representative, may appeal to the Committee for a review of the denial by sending to the Committee a written request for review within sixty (60) days after receiving notice of the denial. The request for review shall set forth all grounds on which it is based, together with supporting facts and evidence which the claimant deems pertinent, and the Committee shall give the claimant the opportunity to review pertinent documents in preparing the request. The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. Within sixty (60) days after the receipt of the request for review, the Committee shall communicate to the claimant in writing its decision, and if the Committee confirms the denial, in whole or in part, the communication shall set forth the reasons for the decision and specific references to the Plan provisions on which the decision is based. Such decisions of the Committee shall be final and conclusive upon all parties.

(e)    Qualified Domestic Relations Orders.

(1)    In the case of any Domestic Relations Order received by the Plan, the Committee shall promptly notify the Participant and any other Alternate Payee of the receipt of such order and of the Plan's procedures for determining the qualified status of Domestic Relations Orders. Any Alternate Payee shall be permitted to designate a representative for receipt of copies of notices that are sent to the Alternate Payee with respect to such order. The amount that would be payable to the Alternate Payee shall be segregated in a segregated account as of the first day of the Plan Year during which the Domestic Relations Order is received by the Committee. Such segregated account shall continue to be treated in the same manner as the affected Accounts of the Participant, but will not be credited with any further contributions or

60

CIG 011017

forfeitures. Notwithstanding the foregoing, the Trustee may, in its sole discretion, exercised in a uniform and nondiscriminatory manner, choose to physically segregate the Account of the Alternate Payee and invest the assets of such Account, pursuant to Section 7 of the Plan, in assets other than Company Stock. If the order is determined to be a qualified order within the eighteen (18) month period described below, the segregated amount (including any interest or earnings thereon) shall continue to be treated as a segregated account in the name of the Alternate Payee. If the Committee determines that the order is not qualified, or if the Committee (or the appropriate court) is not able to resolve the issue within the eighteen (18) month period, the segregated amount (including any interest or earnings thereon) shall be restored to the Participant. For purposes of this Paragraph, the "eighteen (18) month period" shall mean the eighteen (18) month period beginning with the date on which the first payment would be required to be made under the Domestic Relations Order.

(2)    In determining whether a Domestic Relations Order is qualified, the Committee shall follow the procedures set forth in Section 18(d) with respect to claims for Plan Benefits.

(3)    A Domestic Relations Order will constitute a qualified Domestic Relations Order only if such order (i) does not require the Plan to provide any type or form of benefit (or any option) not otherwise provided under the Plan, (ii) does not require the Plan to provide increased benefits, and (iii) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another order previously determined to be a qualified order. In addition, a Domestic Relations Order will constitute a qualified order only if such order clearly specifies (i) the name and last known mailing address of the Participant and of each Alternate Payee covered by the order, (ii) the amount or the percentage of a Participant's Plan Benefit that is to be paid to each Alternate Payee, or the manner in which such amount or percentage is to be determined, (iii) the number of payments or the period to which such order applies, and (iv) each plan to which such order applies.

(4)    In the case of any payment to an Alternate Payee before a Participant has separated from service, the Plan shall not be required to make any payment to an Alternate Payee prior to the date the Participant attains (or would have attained) the Earliest Retirement Age. For purposes of this Paragraph, the term "Earliest Retirement Age" means the earliest of (i) the date

61

CIG 011018

on which the Participant is entitled to a distribution under the Plan, or (ii) the later of the date the Participant attains age fifty (50) or the earliest date on which the Participant could begin receiving benefit if the Participant separated from service.

(f)    General.

(1)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated, may employ other persons for advice in connection with their respective responsibilities, including actuaries, plan consultants, investment advisers, attorneys and accountants.

(2)    Any person may serve in more than one capacity with respect to the Plan.

(3)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated shall be indemnified and held harmless by the Company from any expense or liability hereunder unless due to or arising from fraud, dishonesty, gross negligence, or misconduct of the Board of Directors, the Committee, or such person, as the case may be.

(4)    The Board of Directors, the Plan Administrator and the Committee shall have complete control with respect to the duties and responsibilities allocated to them under the terms of the Plan, with all power and discretion necessary to carry out any of their duties described herein.

The decisions of the Board of Directors, the Plan Administrator and the Committee in matters within their jurisdiction shall be final, binding and conclusive upon each Employer, each Employee, beneficiary and every other interested or concerned person or party.

(g)    Independent Fiduciary.

An Independent Fiduciary may be appointed from time to time for such purposes as shall be determined by the Board of Directors, Trustee, or Committee. An Independent Fiduciary may be appointed to serve in such capacity as may be deemed appropriate to act on behalf of the Plan and Trust with respect to issues which involve a real or perceived conflict of interest among certain parties, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and Trust. The Independent Fiduciary shall be granted such power, authority and discretion as may be necessary and appro-

62

CIG 011019

priate for it to carry out its duties and responsibilities, including, but not limited to, any and all powers and discretion granted the Committee and the Trustee under the Plan and Trust.

CIG 01102

### Section 19.    <u>AMENDMENT AND TERMINATION</u>.

(a)    <u>Amendment</u>.

To provide for contingencies which may require or make advisable the clarification, modification or amendment of this Agreement, the Company reserves the right to amend the Plan at any time and from time to time, in whole or in part, including without limitation, retroactive amendments necessary or advisable to qualify the Plan and Trust under the provisions of Sections 401(a) and 4975(e)(7) of the Code or any successor or similar statute hereafter enacted.  Any such amendment to the Plan or Trust must be adopted by resolution of the Company's Board of Directors.  However, no such amendment shall (1) cause any part of the assets of the Plan and Trust to revert to or be recoverable by the Company or be used for or diverted to purposes other than the exclusive benefit of Participants, former Participants and Beneficiaries, (2) deprive any Participant, former Participant or Beneficiary of any benefit already vested, except to the extent that such amendment may be necessary to permit the Plan or the Trust to qualify or continue to qualify as tax-exempt, (3) terminate the protections and rights described in Section 16, (4) alter, change or modify the duties, powers or liabilities of the Trustee hereunder without its written consent, or (5) with respect to any benefit previously accrued, eliminate or reduce any early retirement benefit or retirement type subsidy, or eliminate any optional form of benefit, except to the extent permitted by Section 411(d)(6) of the Code.

(b)    <u>Changes in the Code</u>.

Any other provision of this Plan to the contrary notwithstanding, if any amendment to the Code requires that a conforming plan amendment must be adopted effective as of a stated effective date in order for this Plan to continue to be a qualified plan, this Plan shall be operated in accordance with the requirement of such amendment to that law until the date when a conforming plan amendment is adopted, or the date when a clear and unambiguous nonconforming plan amendment is adopted, whichever occurs first.

(c)    <u>Termination, Partial Termination or Complete Discontinuance of Contributions</u>.

Although the Company has established the Plan with the bona fide intention and expectation that it will be able to make contributions indefinitely, nevertheless, the Company shall not be under any obligation or liability to continue its contributions or to maintain the Plan for any given length of time.  The Company may in its sole discretion discontinue such contribu-

64

CIG 011021

tions or terminate the Plan in whole or in part in accordance with its provisions at any time without any liability for such discontinuance or termination. In the event of a termination or complete discontinuance of contribution, if the Plan is not replaced by a comparable plan qualified under Section 401(a) of the Code, then the Accounts of all Participants affected by the termination or discontinuance of contributions will become nonforfeitable. In the event of a partial termination, the Accounts of all Participants affected by the partial termination will become nonforfeitable. After termination of the Plan, the Committee and the Trust will continue until the Plan Benefit of each Participant has been distributed. After termination of the Plan, the Trust will be maintained until the Plan Benefits of all Participants have been distributed. Plan Benefits may be distributed following termination of the Plan or distributions may be deferred and distributed as provided in Section 14, as the Company shall determine. If Plan Benefits will be distributed after the Plan is terminated, the distribution may be delayed until IRS approval is received. In the event that Company Stock is sold in connection with the termination of the Plan or the amendment of the Plan to become a qualified employee plan that is not a stock bonus plan, all Plan Benefits will be distributed in cash.

(d)    <u>Determination by Internal Revenue Service.</u>

Notwithstanding any other provision of the Plan, if the Internal Revenue Service shall fail or refuse to issue a favorable written determination or ruling with respect to the initial qualification of the Plan and exemption of the Trust from tax under Section 501(a) of the Code, all Employer Contributions under Section 401(a), together with any income received or accrued thereon less any benefits or expenses paid shall, upon the written direction of the Company, be returned to the Company notwithstanding the provisions of the Trust, and the Trust shall then terminate. Any such Contribution returned to the Employer must be returned within one (1) year after the date the initial qualification is denied, but only if the application for the qualification is made by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted.

(e)    <u>Return of Employer's Contribution.</u>

Notwithstanding any other provision of the Plan, if a Contribution is conditioned on its deductibility and the deduction is disallowed or if a Contribution is made due to a mistake of fact, such Employer Contribution may be returned to the Employer if such Contribution is

65

CIG 011022

returned within one (1) year thereafter and if the amount returned does not exceed the excess of the actual Contribution over the amount which would have been contributed had there been no error in determining the deduction or mistake of fact. Earnings of the Plan attributable to the excess Contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

66

CIG 01102

**Section 20.    MISCELLANEOUS.**

(a)    Participation by Affiliated Company.

(1)    Any Affiliated Company presently existing or hereafter acquired may, with the consent of the Company, adopt the Plan and Trust and thereby enable its employees to participate herein.

(2)    In the event any Participant is transferred to an Affiliated Company which is a participating Employer, such Participant shall continue to participate hereunder in the allocation of Employer Contributions and the Participant's Accounts shall continue to vest in accordance with Section 13. Any Participant who is transferred to an Affiliated Company which is not a participating Employer shall be treated as a suspended Participant in accordance with Section 4(c).

(b)    Limitation of Rights; Employment Relationship.

All Plan Benefits will be paid only from the Trust assets and neither the Company nor any Employer nor the Committee nor the Trustee shall have any duty or liability to furnish the Trust with any funds, securities or other assets except as expressly provided in the Plan. Nothing herein shall be construed to obligate any Employer to continue to employ any Employee.

(c)    Merger; Transfer of Assets.

In no event shall this Plan be merged or consolidated with any other employee benefit plan, nor shall there be any transfer of assets or liabilities from this Plan to any other such plan, unless immediately after such merger, consolidation or transfer, each Participant's benefits, determined as if the plan had terminated, are at least equal to or greater than the benefits which the Participant would have been entitled to had this Plan been terminated immediately before such merger, consolidation or transfer.

(d)    Prohibition Against Assignment.

The benefits provided by this Plan may not be assigned or alienated; provided, however, that a qualified Domestic Relations Order shall not be construed as an assignment or alienation. Except for indebtedness to the Trust and orders to make payments or assign benefits to a spouse, former spouse, child or other dependent under a qualified Domestic Relations Order, neither the Company nor the Trustee shall recognize any transfer, mortgage, pledge,

67

CIG 011024

hypothecation, order or assignment by any Participants or Beneficiaries of all or part of their interest hereunder, and such interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of creditors or other claimants from all orders, decrees, levies, garnishment and/or executions and other legal or equitable process or proceedings against such Participants or Beneficiaries to the fullest extent which may be permitted by law.  Notwithstanding anything in Subsection 20(d) to the contrary, Plan Benefits may be reduced to satisfy a Participant's liability to the Plan due to:  the Participant's conviction of a crime involving the Plan; a judgement, consent order, or decree in an action for violation of fiduciary standards; or a settlement involving the Department of Labor or the Pension Benefits Guarantee Corporation.

(e)     Applicable Law: Severability.

The Plan hereby created shall be construed, administered and governed in all respects in accordance with ERISA and to the extent not superseded by federal law, in accordance with the laws of the State of California; provided, however, that if any provision is susceptible of more than one interpretation, such interpretation shall be given thereto as is consistent with the Plan being a qualified Employee Stock Ownership Plan within the meaning of the Code.  If any provision of this instrument shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective.

68

CIG 011025

**Section 21.    TOP HEAVY PROVISIONS.**

(a)    Definitions.

For purposes of this Section 21, the following capitalized words shall have the following meanings:

## AGGREGATION GROUP

(1)    **Required Aggregation Group**: In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

(2)    **Permissive Aggregation Group**: The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

(3)    Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

(4)    An Aggregation Group shall include any terminated plan of the Employer if it was maintained within the last five (5) years ending on the Determination Date.

## DETERMINATION DATE

With respect to any Plan Year, the last day of the preceding Plan Year, or in the case of the first Plan Year of any Plan, the last day of such Plan Year.

69

CIG 01102

## KEY EMPLOYEE

Any Employee, or former Employee, or Beneficiary of an Employee or former Employee, who at any time during the Plan Year containing the Determination Date or during any of the four (4) preceding Plan Years is (or was) (i) an officer (and employee) having an annual compensation greater than fifty percent (50%) of the amount in effect under Section 415(b)(1)(A) of the Code for any such Plan Year, (ii) a shareholder (and employee) who owns (excluding any stock held under the Plan) both more than one half percent (.5%) ownership interest in value and one of the ten (10) largest interests in the Company (whether directly or through constructive ownership rules) and having annual compensation of more than the limitation in effect under Section 415 (c)(1)(A) of the Code, (iii) a more than five percent (5%) shareholder, or (iv) a more than one percent (1%) shareholder if such shareholder receives more than one hundred fifty thousand dollars ($150,000) of compensation from the Company during the Plan Year. For purposes of (iii) and (iv) above, the terms "five percent (5%) shareholder" and "one percent (1%) shareholder" mean any employee who owns (excluding any stock held under the Plan) more than five percent (5%) (or more than one percent (1%) of the outstanding stock of the corporation, or who owns stock possessing more than five percent (5%) (or one percent (1%) of the total combined voting power of all stock of the corporation (determined without regard to the aggregation rules under Section 414 of the Code). For purposes of (ii) above, if two or more Employees have the same interest in the Company, the Employee having the greater annual compensation from the Company shall be treated as having the larger interest. For purposes of (i) above, the term "officers" means persons whose regular duties include executive administrative duties; however, no more than three (3) Employees or ten percent (10%) of all Employees (up to a maximum of fifty (50) Employees), whichever is greater, may be counted as officers. If the number of officers of the Company exceeds these limitations, those officers with the highest compensation in the Plan Year containing the Determination Date or any of the four preceding Plan Years shall be treated as Key Employees.

## NON-KEY EMPLOYEE

Any Employee who is not a Key Employee.

## TOP HEAVY GROUP

Any Aggregation Group, if as of the Determination Date, the sum of (1) the present value of the accrued benefits for Key Employees under all defined benefit plans included in such group and (2) the aggregate Account balances of Key Employees under all defined contribution plans included in such group, exceeds sixty percent (60%) of a similar sum determined for all Employees.

70

CIG 011027

**TOP HEAVY PLAN**

With respect to any Plan Year, of the Company or of any Affiliated Company, any plan or Aggregation Group of plans of the Company or of any Affiliated Company if, as of the Determination Date, the aggregate Account balances of Key Employees under the plan or plans exceeds sixty percent (60%) of the aggregate Account balances of all Employees under such plan or plans. For purposes of this definition, the term, "Account balances" shall include Account balances of Participants attributable to Employer Contributions, the Account balances attributable to Employees' Nondeductible Contributions, and the amount of the aggregate distributions, if any, made with respect to any Participant during the five-year period ending on the Determination Date, including any distributions under a terminated plan which would have been required to be included in an aggregation group had such plan not been terminated. The Account balances of an individual shall not be taken into account if such individual has not performed any services for the Company at any time during the five-year period ending on the Determination Date. The Account balances of a non-key employee with respect to any Plan Year shall not be taken into account if such individual was formerly a Key Employee for any prior Plan Year. Any rollover contributions or transfers that are unrelated (i.e., both initiated by the Employee and made from a plan maintained by one Employer to a plan maintained by another Employer) shall not be taken into account for purposes of determining whether a plan is a Top Heavy Plan or whether any Aggregation Group is a Top Heavy Group.

(b)    <u>Vesting Requirements</u>.

With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the vesting of Plan Benefits for such Plan Year with respect to any Participant who completes one or more Hours of Service after the Plan becomes a Top Heavy Plan or part of a Top Heavy Group will be based upon Years of Service, as defined in Section 2 in accordance with the following vesting schedule, until such time as the Plan is no longer deemed to be top heavy:

| <u>Years of Service</u> | <u>Percentage of Accounts Vested</u> |
|---|---|
| Two Years | 20 |
| Three Years | 40 |
| Four Years | 60 |
| Five Years | 80 |
| Six Years or More | 100 |

With respect to any Plan Year, if as of the relevant Determination Date, this Plan ceases to be a Top Heavy Plan or part of a Top Heavy Group, the vested percentage of a Participant's Account that was nonforfeitable before the Plan ceased to be top heavy will remain

71

CIG 011028

nonforfeitable, and any Employee who was a Participant during the Top Heavy Plan Year and who had three or more Years of Service (including any Years of Service not yet taken into account under the Plan) will automatically remain under the top heavy vesting schedule.

    (c)    <u>Minimum Benefits</u>.

        With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, Employer Contributions and Forfeitures for such Plan Year for each Participant who is not a Key Employee shall be not less than three percent (3%) of each Participant's Total Compensation until such time as this Plan is no longer deemed to be top heavy. Notwithstanding the foregoing, such percentage for any such Plan Year shall not exceed the highest percentage at which Contributions and Forfeitures are made for such Plan Year for any Key Employee, as determined by dividing the Contribution for such Key Employee by so much of such Key Employee's Total Compensation (including any salary deferrals) for the Plan Year as does not exceed two hundred thousand dollars ($200,000) (or one hundred fifty thousand dollars ($150,000) for Plan Years beginning on or after January 1, 1994). Elective contributions on behalf of Key Employees are taken into account in determining the minimum required contribution under Section 416(c)(2). However, elective contributions on behalf of Employees other than Key Employees may not be treated as Employer contributions for purposes of the minimum contribution or benefit requirement of Section 416 of the Code.

        Amounts paid by the Company under the Federal Insurance Contributions Act or under the Social Security Act may not be taken into account for purposes of providing the required minimum benefits to Participants who are not Key Employees.

        For purposes of this Subsection (c), the term "Participant" shall refer to any Employee who has not separated from service at the end of the Plan Year, including Employees who have failed to complete 1,000 Hours of Service, and any Employees who have been excluded because their compensation is less than a stated amount but who must nevertheless be considered Participants in order to satisfy the coverage requirements of Section 410(b) of the Code.

    (d)    <u>Limitation on Annual Additions</u>.

        With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the dollar limitation in the

<div align="center">72</div>

CIG 011029

denominator of the defined contribution plan fraction and the defined benefit fraction shall be multiplied by 1.0 rather than by 1.25, for purposes of determining the aggregate limit on Contributions and Forfeitures for a Key Employee for such Plan Year, unless the sum of the Key Employees' benefits under all defined contribution plans does not exceed ninety percent (90%) of the total of all Participants' benefits for such Plan Year, and the Employer provides a minimum contribution of not less than four percent (4%) of each Participant's Total Compensation. The minimum benefit otherwise required under this paragraph shall be reduced to the extent a Participant who is not a Key Employee has received a benefit under any other plan maintained by the Employer and to the extent permitted by Section 416 of the Code and the regulations thereunder dealing with nonduplication of minimum benefits.

With respect to any Plan Year, if, as of the relevant Determination Date, any Employee is covered by both a top heavy defined contribution plan and a top heavy defined benefit plan, the minimum benefit provided for each such Participant who is not a Key Employee under the defined contribution plan shall be not less than five percent (5%) of the Participant's Total Compensation; provided, however, that if the Employer desires to use a factor of 1.25 in computing the denominators of the defined benefit fraction and in the denominator of defined contribution fraction, the defined contribution minimum benefit shall be seven and one half percent (7.5%) of compensation.

Solely for the purpose of determining if the Plan, or any other plan included in a required Aggregation Group of which this Plan is a part, is a Top Heavy Plan, the accrued benefit of an Employee (other than a Key Employee under a defined benefit plan or target benefit plan) shall be determined under (i) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Affiliated Employers, or (ii) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

CIG 011030

**Section 22.    EXECUTION.**

To record the adoption of this Plan, the Company has caused its appropriate officers to affix its corporate name and seal hereto this ___*16*___ day of ___*July*___, 1999.

K-M INDUSTRIES HOLDING CO., INC.

(SEAL)

By ___*William E. Moore*___
    William E. Moore, President


By ___*Stephen Ferrari*___
    Stephen A. Ferrari, Secretary

74

CIG 011031

EXHIBIT 5

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 5

# ENTIRE DOCUMENT
# SUBMITTED UNDER SEAL

# CIVIL L.R. 79-5(b)

# (BATES #KMH 007372 - KMH 007378)

**EXHIBIT 6**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 6

## ENTIRE DOCUMENT
## SUBMITTED UNDER SEAL

## CIVIL L.R. 79-5(b)

## (BATES #KMH 007204 - KMH 007205)

BLUEBIRD OFFICE SUPPLIES (888) 477-070 www.bluebonline.co

**EXHIBIT  7**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 7

# ENTIRE DOCUMENT
# SUBMITTED UNDER SEAL

# CIVIL L.R. 79-5(b)

# (BATES #KMH 007206)

**EXHIBIT 8**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 8

# ENTIRE DOCUMENT
# SUBMITTED UNDER SEAL

# CIVIL L.R. 79-5(b)

# (BATES #NS00001232 - NS00001254)

**EXHIBIT 9**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 9

# ENTIRE DOCUMENT
# SUBMITTED UNDER SEAL

# CIVIL L.R. 79-5(b)

# (BATES #NS00001211 - NS00001231)

**EXHIBIT 10**

NO. 2000-3559

| | |
|---|---|
| ALFREDO HERNANDEZ, SR. and ELIZABETH HERNANDEZ, Individually and as Next Friends of JAIME E. HERNANDEZ, a Minor and AMY HERNANDEZ, a Minor; ALFREDO HERNANDEZ, JR; and ISELA PEREZ;<br><br>        Plaintiffs,<br><br>VS.<br><br>GAF CORPORATION (f/k/a NEWCO HOLDINGS, INC.), individually and as successor to GAF CORPORATION (f/k/a GENERAL ANILINE & FILM COMPANY), and THE RUBEROD COMPANY; GAF BUILDING MATERIALS CORPORATION (f/k/a Edgecliff, Inc.), individually and as successor to GAF BUILDING AND MATERIALS CORPORATION, GAF CORPORATION (f/k/a GENERAL ANILINE & FILM COMPANY), and THE RUBEROD COMPANY; G-I HOLDINGS, INC., individually and as successor to GAF BUILDING AND MATERIALS CORPORATION, GAF CORPORATION (f/k/a GENERAL ANILINE & FILM COMPANY), and THE RUBEROD COMPANY; BUILDING MATERIALS CORPORATION OF AMERICA, individually and as successor to GAF BUILDING AND MATERIALS CORPORATION, GAF CORPORATION (f/k/a GENERAL ANILINE & FILM COMPANY), and THE RUBEROD COMPANY; U.S. GYPSUM COMPANY; CROWN CORK AND SEAL COMPANY, INC. (successor to MUNDET CORK COMPANY); A. P. GREEN INDUSTRIES, INC. (f/k/a A. P. GREEN REFRACTORIES COMPANY, a subsidiary of U. S. GYPSUM COMPANY); ARMSTRONG WORLD INDUSTRIES, INC. (successor to ARMSTRONG CORK COMPANY); METROPOLITAN LIFE INSURANCE COMPANY; FOSTER WHEELER ENERGY CORPORATION; QUIGLEY COMPANY, INC.; | IN THE COUNTY COURT<br><br><br>AT LAW NO. THREE<br><br><br>Filed With The Court<br>Date: Sept. 21, 2001<br>Time: 8:40<br><br>_James Alvas_<br>      JUDGE |

JUDGMENT
O:\YLOPEZ\DOCS\HERNANDEZ.A\DOCS\FINAL JUDGMENT.1.WPD



Page 1 of 13

GASKET HOLDING, INC. (successor to
FLEXITALLIC GASKET COMPANY); NORTH
AMERICAN REFRACTORIES COMPANY;
PROKO INDUSTRIES, INC.; SYNKOLOID, A
DIVISION OF MURALO CO., INC.; GEORGIA-
PACIFIC CORPORATION (individually and as
successor to BESTWALL GYPSUM COMPANY);
MINNESOTA MINING AND
MANUFACTURING COMPANY (a/k/a "3M");
U.S. MINERAL PRODUCTS COMPANY; THE
FLINTKOTE COMPANY; HARBISON-
WALKER REFRACTORIES COMPANY
(formerly a division of INDRESCO INC.);
UNIROYAL HOLDING, INC. (successor to U. S.
RUBBER COMPANY); KELLY-MOORE PAINT
COMPANY, INC.; AQUA-CHEM, INC. (d/b/a
CLEAVER-BROOKS DIVISION);
RAPID-AMERICAN CORPORATION (as
successor-by-merger to GLEN ALDEN
CORPORATION, BRIGGS MANUFACTURING
CO., PHILIP CAREY CORPORATION AND
PHILIP CAREY MANUFACTURING
COMPANY); INDRESCO INC. (successor to
HARBISON-WALKER REFRACTORIES, a
division of INDRESCO, INC.); GENERAL
REFRACTORIES COMPANY; T&N plc (f/k/a
TURNER & NEWALL PLC, individually and as
successor and alter ego of KEASBEY AND
MATTISON COMPANY); ASTEN, INC. d/b/a/
ASTEN GROUP, INC.; ACandS, INC.; FEDERAL
MOGUL GLOBAL GROWTH, LTD. (individually
and/or as successor-in-interest to T&N plc, T&N
Ltd., and/or T&N, Inc.); FEDERAL MOGUL
CORPORATION (individually and/or as successor-
in-interest to T&N plc, T&N Ltd., and/or T&N, Inc.,
and as successor-interest to COOPER
AUTOMOTIVE DIVISION of COOPER
INDUSTRIES, INC., WAGNER ELECTRIC
CORPORATION and ABEX CORPORATION
f/k/a AMERICAN BRAKE SHOE COMPANY and
AMERICAN BRAKE SHOE and FOUNDRY
COMPANY (successor-by-merger to THE
AMERICAN BRAKE SHOE and FOUNDRY
COMPANY and THE AMERICAN BRAKEBLOK
CORPORATION, f/k/a THE AMERICAN BRAKE

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

JUDGMENT
O:\YLOPEZ\DOCS\HERNANDEZ.A\DOCS\FINAL JUDGMENT.1.WPD

KMH_ESI00000318.002

MATERIAL CORPORATION); FEDERAL §
MOGUL PRODUCTS, INC., f/k/a MOOG §
AUTOMOTIVE INC. (successor-in-interest to §
WAGNER ELECTRIC CORPORATION and as §
subsidiary of FEDERAL MOGUL §
CORPORATION, f/k/a MOOG AUTOMOTIVE §
DIVISION OF COOPER INDUSTRIES, INC. §
and/or COOPER AUTOMOTIVE DIVISION of §
COOPER INDUSTRIES, INC.); PNEUMO ABEX §
CORPORATION, successor-in-interest to ABEX §
CORPORATION (f/k/a AMERICAN BRAKE §
SHOE COMPANY, f/k/a AMERICAN BRAKE §
SHOE AND FOUNDRY COMPANY including §
THE AMERICAN BRAKEBLOK DIVISION, §
successor-by-merger to THE AMERICAN BRAKE §
SHOE and FOUNDRY COMPANY and THE §
AMERICAN BRAKEBLOK CORPORATION, §
f/k/a THE AMERICAN BRAKE MATERIALS §
CORPORATION); T&N plc (successor in interest §
to KEASBEY & MATTISON); TURNER AND §
NEWALL INDUSTRIES, INC. d/b/a/ UNITED §
GASKET CORP.; TURNER AND NEWALL, §
LTD. d/b/a/ UNITED FABRICATED; T&N, LTD. §
(f/k/a T&N, PLC, TURNER & NEWALL, LTD., §
TURNER & NEWALL, PLC AND TAF §
INTERNATIONAL, LTD., f/k/a TURNER §
ASBESTOS FIBRES, LTD., f/k/a RAW §
ASBESTOS DISTRIBUTORS); W. R. GRACE & §
CO.-CONN. (successor to W. R. GRACE & §
COMPANY); CERTAINTEED CORPORATION; §
KELLOG, BROWN & ROOT, INC., successor-by- §
merger to BROWN & ROOT, INC. (successor-in- §
interest to BROWN & ROOT I, INC., BROWN & §
ROOT, INC. [a Texas corporation] and BROWN & §
ROOT USA, INC.); DRESSER INDUSTRIES, §
INC., successor-by-merger to BROWN & ROOT §
HOLDINGS, INC. (f/k/a/ BROWN & ROOT, INC. §
[a Delaware corporation], successor-in-interest to §
BROWN & ROOT I, INC., BROWN & ROOT, §
INC. [a Texas Corporation] and BROWN & ROOT §
USA, INC.); J.T. THORPE COMPANY §
(individually and as successor-in-interest to THORPE §
INSULATION COMPANY); OWENS-ILLINOIS, §
INC. (successor to OWENS-ILLINOIS GLASS §
COMPANY); ZURN INDUSTRIES, INC. (a/k/a §

KMH_ESI00000318.003

|  |  |
|---|---|
| and successor-by-merger to ERIE CITY IRON WORKS); COMBUSTION ENGINEERING, INC. (individually and as successor-in-interest to M. H. DETRICK COMPANY, WALSH REFRACTORY CORPORATION and REFRACTORY AND INSULATION CORPORATION); D.B. RILEY, INC. (f/k/a RILEY STOKER CORPORATION); JOHN CRANE, INC.; DANA CORPORATION; and A.P. GREEN SERVICES, INC., | § § § § § § § § § § § |
| Defendants. | §  EL PASO COUNTY, TEXAS |

# FINAL JUDGMENT

CAME ON FOR TRIAL BY JURY the claims of Plaintiffs ALFREDO HERNANDEZ, SR.

and ELIZABETH HERNANDEZ, Individually and as Next Friends of JAIME HERNANDEZ

and AMY HERNANDEZ, Minors; ALFREDO HERNANDEZ, JR., and ISELA PEREZ, against

Defendant KELLY-MOORE PAINT COMPANY, INC. All claims of these Plaintiffs against all other

Defendants have been settled and dismissed. After due deliberation, the jury returned a compensatory

verdict of $40,515,000 and a punitive verdict of $15,000,000 on or about August 28, 2001 as follows:

1.    Do you find that Plaintiff ALFREDO HERNANDEZ, SR. sustained an asbestos-related injury or disease?

Answer "YES" or "NO".                    YES

If you have answered Question No. 1 "YES," answer Question No. 2; otherwise, do not answer Question No. 2.

2.    Did the negligence, if any, of those listed below proximately cause the injury or disease to Alfredo Hernandez, Sr.?

Answer "YES" or "NO".

|  |  | Yes | No |
|---|---|---|---|
| KELLY-MOORE PAINT COMPANY, INC. | ANSWER: | X |  |
| GEORGIA PACIFIC | ANSWER: |  | X |
| SYNKOLOID | ANSWER: |  | X |

If you have answered Question No. 1 "YES," answer Question No. 3; otherwise, do not answer Question No. 3.

KMH_ESI00000318.004



3.    Was there a defect in the marketing of the asbestos-containing products at the time they left the possession of those listed below that was a producing cause of the injury to ALFREDO HERNANDEZ, SR.?

A "marketing defect" with respect to the product means the failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

"Adequate" warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonable prudent person.

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

Answer "YES" or "NO".

|  | YES | NO |
|---|---|---|
| KELLY-MOORE PAINT COMPANY, INC. | X | —— |
| GEORGIA-PACIFIC | —— | X |
| SYNKOLOID | —— | X |

If you have answered Questions No. 2 or 3 "YES," with respect to one or more of the Defendant(s), then answer Question No. 3a; otherwise, do not answer Question No. 3a.

3a.    For each of those listed below found by you to have caused the injury or disease to Alfredo Hernandez, Sr. that resulted in his injury or disease, find the percentage of responsibility. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of causation, if any, attributable to those named below is not necessarily measured by the number of acts, omissions, or product defects found.

Assign a percentage only to those Defendant(s) you have answered "Yes" to in Questions No. 2 or 3:

| | | |
|---|---|---|
| a. | KELLY-MOORE PAINT COMPANY, INC. | 100% |
| b. | SYNKOLOID | 0% |
| c. | GEORGIA-PACIFIC CORPORATION | 0% |

TOTAL:    100%

JUDGMENT
O:\YLOPEZ\DOCS\HERNANDEZ.A\DOCS\FINAL JUDGMENT.1.WPD    Page 5 of 13

KMH_ESI00000318.005

OCT. 4. 2001   9:17AM    #5 BARON & BUDD 214 520 1181                NO. 1136   P. 12/19

4.    What sum of money, if paid now in cash, would fairly and reasonably compensate ALFREDO HERNANDEZ, SR., for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

    a.    Physical pain and mental anguish sustained in the past.

Answer: $___4,000,000___

    b.    Physical pain and mental anguish that, in reasonable probability, ALFREDO HERNANDEZ, SR., will sustain in the future.

Answer: $___3,000,000___

    c.    Disfigurement sustained in the past.

Answer: $___3,000,000___

    d.    Disfigurement that, in reasonable probability, ALFREDO HERNANDEZ, SR., will sustain in the future.

Answer: $___3,000,000___

    e.    Physical impairment sustained in the past.

Answer: $___3,500,000___

    f.    Physical impairment that, in reasonable probability, ALFREDO HERNANDEZ, SR., will sustain in the future.

Answer: $___3,500,000___

    g.    Medical care that, in reasonable probability, ALFREDO HERNANDEZ, SR., will sustain in the future.

Answer: $___1,000,000___

If you have answered Questions No. 2 or 3 "YES," answer Question No. 5; otherwise, do not answer Question No. 5.

JUDGMENT
O:\YLOPEZ\DOCS\HERNANDEZ.A\DOCS\FINAL JUDGMENT.1.WPD

Page 6 of 13

KMH_ESI00000318.006

5.    What sum of money, if paid now in cash, would fairly and reasonably compensate ELIZABETH HERNANDEZ, for injuries, if any, to her husband that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Answer separately, in dollar and cents, for damages, if any.

    a.    Loss of household services sustained in the past.

      "Household services" means the performance of household and domestic duties by a spouse to the marriage.

Answer: $   15,000

    b.    Loss of household services that, in reasonable probability, ELIZABETH HERNANDEZ will sustain in the future.

Answer: $   500,000

    c.    Loss of consortium sustained in the past.

      "Consortium" means the mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love and felicity necessary to a successful marriage.

Answer: $   1,000,000

    d.    Loss of consortium that, in reasonable probability, ELIZABETH HERNANDEZ will sustain in the future.

Answer: $   4,000,000

If you have answered Questions No. 2 or 3 "YES," answer Question No. 6; otherwise, do not answer Question No. 6.

6.    What sum of money, if paid now in cash, would fairly and reasonably compensate the children for this loss, if any, of parental consortium that resulted from the physical injury to their father, ALFREDO HERNANDEZ, SR.?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

KMH_ESI00000318.007

"Parental consortium" means the positive benefits flowing from the parent's love, affection, protection, emotional support, services, companionship, care, and society.

In considering your answer to this question, you may consider only the following factors: The severity of the injury to the parent and its actual affect on the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium-giving relationships are available to the child.

Answer separately for each, in dollars and cents, for damages, if any:

For JAIME HERNANDEZ —

    That were sustained in the past:

        Amount    $ __1,000,000__

    and, that in reasonable probability will be sustained in the future:

        Amount    $ __2,500,000__

For AMY HERNANDEZ —

    That were sustained in the past:

        Amount    $ __1,000,000__

    and, that in reasonable probability will be sustained in the future: .

        Amount    $ __2,500,000__

For ISELA PEREZ —

    That were sustained in the past:

        Amount    $ __1,000,000__

    and, that in reasonable probability will be sustained in the future:

        Amount    $ __2,500,000__

For ALFREDO HERNANDEZ, JR. —

    That were sustained in the past:

        Amount    $ __1,000,000__

    and, that in reasonable probability will be sustained in the future:

        Amount    $ __2,500,000__

KMH_ESI00000318.008

If you have answered Questions No. 2 or 3 "YES," answer Question No.7; otherwise, do not answer Question No. 7.

7.    Do you find by clear and convincing evidence that the injury to **ALFREDO HERNANDEZ, SR.** resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means:

(a)    a specific intent by the Defendant to cause substantial injury to the Plaintiff; or

(b)    an act or omission by the Defendant,

(i)    which, when viewed objectively from the standpoint of the Defendant at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii)    of which the Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

Answer "YES" or "NO".

KELLY-MOORE PAINT COMPANY, INC. ANSWER:    YES

If you have answered Question No. 7 "YES", answer Question No. 8; otherwise, do not answer Question No. 8.

8.    What sum of money, if any, should be assessed against **KELLY-MOORE PAINT COMPANY, INC.** and awarded to **ALFREDO HERNANDEZ, SR.** as exemplary damages for its malicious conduct?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment. Exemplary damages include punitive damages. Factors to consider in awarding exemplary damages, if any, are:

a.    The nature of the wrong.

b.    The character of the conduct involved.

c.    The degree of culpability of the wrongdoer.

d.    The situation and sensibilities of the parties concerned.

e.    The extent to which such conduct offends a public sense of justice and propriety.

KMH_ESI00000318.009

Answer in dollars and cents, if any.     Answer: $ 15,000,000

Based on the verdict of the jury, the Court's rulings during trial, the applicable law, and taking into account the prior settlements received by Plaintiffs it is

**ORDERED, ADJUDGED and DECREED:**

**WITH REGARD TO COMPENSATORY DAMAGES:**

1.     That Plaintiff **ALFREDO HERNANDEZ, SR.** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset for settlements of $1,535,243.50) compensatory damages in the amount of $ 19,464,756.50.

2.     That Plaintiff **ELIZABETH HERNANDEZ** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset for settlements of $403,764.50) compensatory damages in the amount of $ 5,111,235.50.

3.     That Plaintiff **ALFREDO HERNANDEZ, JR.** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset of $255,248.00) compensatory damages in the amount of $ 3,244,752.00 .

4.     That Plaintiff **ISELA PEREZ** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset of $255,248.00) compensatory damages in the amount of $3,244,752.00.

5.     That Plaintiff **JAIME HERNANDEZ** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset of $255,248.00) compensatory damages in the amount of $3,244,752.00.

6.     That Plaintiff **AMY HERNANDEZ** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** (after an offset of $255,248.00) compensatory damages in the amount of $3,244,752.00.

KMH_ESI00000318.010

OCT. 4. 2001   9:18AM   #5 BARON & BUDD 214 520 1181                        NO. 1136   P. 17/19

**WITH REGARD TO PUNITIVE DAMAGES:**

7.    That Plaintiff **ALFREDO HERNANDEZ, SR.** shall have and recover from Defendant **KELLY-MOORE PAINT COMPANY, INC.** punitive damages in the amount of $2,750,000.00 (representing two times the economic damages awarded by the jury plus $750,000.00 in non-economic damages).

**WITH REGARD TO PREJUDGMENT INTEREST:**



8.    That Plaintiff **ALFREDO HERNANDEZ, SR.** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *1,759,827.30* .

9.    That Plaintiff **ELIZABETH HERNANDEZ** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *462,111.70* .

10.    That Plaintiff **ALFREDO HERNANDEZ, JR.** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *293,361.14* .

11.    That Plaintiff **ISELA PEREZ** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *293,361.14* .

12.    That Plaintiff **JAIME HERNANDEZ** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *293,361.14* .

13.    That Plaintiff **AMY HERNANDEZ** shall recover prejudgment interest on his award pursuant to TEX. FIN. CODE ANN. § 304.102 *et seq.* at the rate of TEN PERCENT (10%) per annum, simple, from October 26, 2000, the day this lawsuit was filed, until the day before this Judgment was signed, in the amount of $ *293,361.14* .

**AND IT IS FURTHER ORDERED:**

KMH_ESI00000318.011

14.    That post-judgment interest on the amounts owed by Defendant to Plaintiffs shall accrue at the rate of TEN PERCENT (10%) per annum, compounded annually, from the day this Judgment is signed until satisfaction of Judgment, pursuant to TEX. FIN. CODE ANN. §304.001, *et seq.*

15.    That all claims of Plaintiffs against all other Defendants have been settled and are dismissed.

6.    That costs of suit shall be taxed against Defendant **KELLY-MOORE PAINT COMPANY, INC.**

7.    That all other relief not expressly granted herein is hereby denied.

LET EXECUTION LIE IF NOT TIMELY PAID

SIGNED this 21 day of Sept 2001.

THE HONORABLE JUDGE JAVIER ALVEREZ, PRESIDING

APPROVED AS TO FORM (only)
DEFENDANT:

KELLY-MOORE PAINT COMPANY, INC.

BY: _____
Todd N. Wade
Brown McCarroll L.L.P.
111 Congress Avenue
Austin, TX 78701
Telephone:   512.472.5456
Fax:      512.479.1155

KMH_ESI00000318.012

APPROVED AS TO SUBSTANCE AND FORM:
PLAINTIFFS:

BY: _____

Brent M. Rosenthal
Richard I. Nemeroff
Lisa R. Kivett
BARON & BUDD, P.C.
3102 Oak Lawn, Suite 1100
Dallas, TX 75219-4281
(214) 521-3605
(214) 520-1181 (Fax)

JUDGMENT
O:\YLOPEZ\DOCS\HERNANDEZ.A\DOCS\FINAL JUDGMENT.1.WPD

Page 13 of 13

KMH_ESI00000318.013

**EXHIBIT 11**

NO. 2000-3559

| | | |
|---|---|---|
| ALFREDO HERNANDEZ, SR. and | § | IN THE COUNTY COURT |
| ELIZABETH HERNANDEZ, | § | |
| Individually and as Next Friends of | § | |
| JAIME E. HERNANDEZ, a Minor and | § | |
| AMY HERNANDEZ, a Minor; | § | |
| ALFREDO HERNANDEZ, JR.; and | § | |
| ISELA PEREZ, | § | |
| | § | |
| Plaintiffs, | § | AT LAW NO. 3 |
| | § | |
| vs. | § | |
| | § | |
| GAF CORPORATION, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | EL PASO COUNTY, TEXAS |
| | § | |

## COMPROMISE AND RELEASE

THIS COMPROMISE AND RELEASE is made and entered into between ALFREDO

HERNANDEZ, SR. and Kelly-Moore Paint Company, Inc. ("Kelly-Moore").

## DEFINITION OF PLAINTIFFS

"Plaintiffs" means ALFREDO HERNANDEZ, SR., and ELIZABETH HERNANDEZ,

Individually and as Next Friends of JAIME E. HERNANDEZ, a Minor and AMY

HERNANDEZ, a Minor, along with their heirs, executors, administrators, successors and

assigns; and JUAN CARLOS GARAY, Guardian Ad Litem on Behalf of the Minor Children,

JAIME E. HERNANDEZ and AMY HERNANDEZ; ALFREDO HERNANDEZ, JR.; and

ISELA PEREZ.

COMPROMISE AND RELEASE - Page 1
KM.Hernandez.rls.final.wpd (wpc)(JEA)

### STATEMENT OF FACTS

Plaintiffs brought suit against several companies, as defendants, in the lawsuit styled "HERNANDEZ, et al., vs. GAF CORPORATION, et al.", No. 2000-3559 (the "Litigation"). Said lawsuit, filed October 26, 2000, was tried before a jury in COUNTY COURT AT LAW NO. 3 of EL PASO COUNTY, TEXAS. The jury rendered a verdict on August 28, 2001, and a Final Judgment was entered in the Litigation on September 21, 2001. Plaintiff brought suit seeking to recover damages from the defendants because of ALFREDO HERNANDEZ, SR.'s alleged exposure to products containing asbestos. ALFREDO HERNANDEZ, SR. allegedly came into contact with these products during the course of his/her employment. Plaintiffs sued Kelly-Moore because they believed that Kelly-Moore manufactured one of the asbestos-containing products.

### SCOPE OF SETTLEMENT

Bona fide disputes and controversies exist between the parties to this Compromise and Release, both as to fact and to law, and by reason of such disputes and controversies, the parties desire to compromise and settle all asbestos-related claims and causes of action of any kind of Plaintiffs against Kelly-Moore and its parent corporation, subsidiaries, affiliates, predecessors-in-interest, and successors-in-interest and their distributors relating to ALFREDO HERNANDEZ, SR.'s exposure to any asbestos-containing products manufactured by Kelly-Moore.

### SETTLEMENT TERMS

For and in consideration of the mutual promises and covenants herein contained, and intending to be legally bound hereby, the parties to this Compromise and Release do hereby agree as follows:

**COMPROMISE AND RELEASE**- Page 2
KM.Hernandez.rls.final.wpd (wpc)(JEA)

KMH_ESI00000317.002

## A. SETTLEMENT PAYMENT

Kelly-Moore shall pay the present value sum of FIFTEEN MILLION DOLLARS AND 00/100 DOLLARS ($15,000,000.00) in the manner and according to the terms and provisions set forth herein and in Exhibit A attached hereto and made a part hereof for all purposes. That sum may be paid by check payable to the following payees:

$12,119,530.00 to Alfredo Hernandez, Sr. and his attorneys of record in the Litigation, Baron & Budd, P.C., jointly;

$ 2,880,470.00 to Aegon Assignment Corporation to fund the periodic payments obligation as set forth in Exhibit A, attached hereto.

All sums set forth herein constitute damages on account of personal injuries or sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended, and no portion of such amounts constitute additional, exemplary or punitive damages, or damages other than actual damages on account of personal injuries or sickness.

## B. RELEASES

Release by Plaintiffs. Plaintiffs hereby knowingly and voluntarily release, acquit and forever discharge Kelly-Moore Paint Company, Inc. and its parent corporations, subsidiaries, predecessors-in-interest, successors-in-interest, employees, representatives, insurers (to the extent they are insurers for Kelly-Moore Paint Company for asbestos-related claims), and assigns of and from any and all asbestos-related causes of action, suits, promises, damages, judgements, executions, claims and demands of whatever kind or nature, in law or in equity, which Plaintiffs now have, or have ever had, or may have in the future, against Kelly-Moore Paint Company, Inc. and its parent corporations, subsidiaries, affiliates, predecessors-in-interest, successors-in interest, employees, representatives, insurers (to the extent as defined above) and

KMH_ESI00000317.003

assigns (hereinafter referred to as the "Kelly-Moore Entities") for, upon or by reason or any of the facts alleged by Plaintiffs in the Litigation, whether in contract or in tort, for any other damages whatsoever, which have accrued or may ever accrue to Plaintiffs or his/her/their heirs, executors, legal representatives, administrators, successors, or assigns regarding ALFREDO HERNANDEZ, SR.'s exposure to any asbestos-containing products manufactured by Kelly-Moore and his/her injuries resulting therefrom. Notwithstanding any language to the contrary, it is specifically agreed that the spouse and children of ALFREDO HERNANDEZ, SR. are not releasing and do not release any claim(s) they may have for injury to their bodies allegedly caused by asbestos.

Scope of Release. Except as noted above in Paragraph B of this Release as it relates to the Kelly-Moore Entities and notwithstanding any of the foregoing or following language, it is specifically not the intention of the parties to this Compromise and Release to release any other party or person, firm or corporation that might be responsible to Plaintiffs for the condition alleged who received, acquired, purchased, distributed or to whom was furnished by any entity, any asbestos fiber, asbestos-containing insulation material, asbestos-containing material or asbestos dust-producing material allegedly manufactured, produced and/or sold, distributed or otherwise placed in the stream of commerce by any other party, person, firm or corporation.

## C.  REPRESENTATION AND WARRANTIES

Plaintiffs represent and warrant that they are legally competent to execute the Release, that they are over the age of eighteen (18) years, that no promise or agreement which is not expressed herein has been made to either of them to execute the Release, and that they are not relying upon any statement or representation of any agent of the companies or individuals being released hereby.  Plaintiffs are relying upon their own judgment and have been represented by

COMPROMISE AND RELEASE- Page 4
KM.Hernandez.rls.final.wpd (wpc)(JEA)

KMH_ESI00000317.004

legal counsel in this matter. Plaintiffs understand that the Release herein shall operate as a full, complete and final release and settlement of any and all claims referred to herein.

Plaintiffs further represent and warrant by their signatures below that their execution of this Compromise and Release is done of their own free will and accord with advice of counsel without reliance on any representation of any kind or character not expressly set forth herein.

Plaintiffs hereby declare and represent that the injuries sustained are or may be permanent and/or as yet unknown and unmanifested and that recovery therefore is uncertain and indefinite. Plaintiffs also declare that in executing this Release they are releasing the Kelly-Moore Entities from all claims relating to ALFREDO HERNANDEZ, SR.'s alleged asbestos-related disease, including but not limited to, claims for ALFREDO HERNANDEZ, SR.'s pleural disease, asbestosis, any type of asbestos-related cancer and/or mesothelioma.

Plaintiffs have not assigned any part of the litigation to any other party.

## D. INDEMNITY AND CONTRIBUTION

**Plaintiffs agree to and do hereby indemnify and hold harmless each and all of the Kelly-Moore Entities and individuals released herein from any and all asbestos-related claims, demands (excluding costs of court and attorneys fees), actions and causes of actions which may be hereafter asserted by any person, firm or corporation claiming by, through or under Plaintiffs in connection with the asbestos exposure of ALFREDO HERNANDEZ, SR. and his/her resulting injuries therefrom.**

## E. RELEASE OF JUDGMENT

Plaintiffs agree to and shall cause a Release of Judgment to be executed in the Litigation as to Defendant Kelly-Moore.

**COMPROMISE AND RELEASE**- Page 5
KM.Hernandez.rls.final.wpd (wpc)(JEA)

## F. THIRD-PARTY LIENS

Plaintiffs represent and warrant that they are not aware of any liens that exist (as of the date of signing this document) against the Judgment under the Texas Hospital Liens law or under Medicaid. Further, Plaintiffs agree to be responsible for resolving any workers' compensation and health care provider liens out of the proceeds of the settlement, as may be required by law, or any other liens allowed by state or federal law.

## GENERAL PROVISIONS

This Agreement, including Exhibit A attached hereto, sets forth the entire understanding and agreement between the parties with reference to the subject matter hereof and shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. There are no representations, promises, warranties, covenants, agreements or undertakings between the parties to this Compromise and Release with reference to the subject matter hereof other than those expressly set forth and provided herein. In fact, any liability by the companies and individuals released herein is expressly denied.

The terms of this Compromise and Release are contractual and are not merely recitals. The agreements and covenants contained herein are to compromise doubtful and disputed claims, and avoid further litigation. No agreements, releases or any other consideration given herein shall be construed as an admission of liability by any company or individual released herein.

The terms of this agreement are to be kept confidential by the Plaintiffs.

This agreement shall be construed and enforced in accordance with the laws of the State of Texas.

KMH_ESI00000317.006

If any action at law or equity, including any action for declaratory relief, is brought to enforce or interpret the provisions of this Compromise and Release, the prevailing parties shall be entitled to recover reasonable attorneys' fees from the adverse parties. Such fees may be set by the Court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fee shall be in addition to any other relief which may be rewarded.

Each of the parties hereto shall be responsible for its own attorneys' fees and costs of court in connection with the Litigation and this Compromise and Release.

The Compromise and Release reached herein has been negotiated in good faith by the parties hereto. All parties agree to participate in the preparation of, and execute any documents necessary to establish the good faith nature of this settlement, if it should be necessary.

The Guardian Ad Litem appointed by the Court in this case on behalf of the minor children has considered the above-referenced settlement with defendant Kelly-Moore, and has concluded in his capacity as Guardian Ad Litem that the settlement is in the best interests of the minor children.

KMH_ESI00000317.007

IN WITNESS WHEREOF, the undersigned have executed this agreement on this 26th day of November _____, 2001 .

_____
ALFREDO HERNANDEZ, SR., Individually and
as Next Friends of JAIME E. HERNANDEZ, a
Minor and AMY HERNANDEZ, a Minor


_____
ELIZABETH HERNANDEZ, Individually and as
Next Friends of JAIME E. HERNANDEZ, a Minor
and AMY HERNANDEZ, a Minor


_____
JUAN CARLOS GARAY, Guardian-Ad-Litem on
Behalf of the Minor Children, JAIME E.
HERNANDEZ and AMY HERNANDEZ


_____
ALFREDO HERNANDEZ, JR.


_____
ISELA PEREZ

KMH_ESI00000317.008

IN WITNESS WHEREOF, the undersigned have executed this agreement on this

___23rd___ day of ___November___, 20__01__.


_____
ALFREDO HERNANDEZ, SR., Individually and
as Next Friends of JAIME E. HERNANDEZ, a
Minor and AMY HERNANDEZ, a Minor


_____
ELIZABETH HERNANDEZ, Individually and as
Next Friends of JAIME E. HERNANDEZ, a Minor
and AMY HERNANDEZ, a Minor


_____
JUAN CARLOS GARAY, Guardian Ad Litem on
Behalf of the Minor Children, JAIME E.
HERNANDEZ and AMY HERNANDEZ


_____
ALFREDO HERNANDEZ, JR.


_____
ISELA PEREZ


**COMPROMISE AND RELEASE**- Page 8
KM.Hernandez.rls.final.wpd (wpc)(JEA)

THE STATE OF _TEXAS_                     §
                                        §
COUNTY OF _El PaSO_                      §

BEFORE ME, the undersigned authority, on this day personally appeared ALFREDO

HERNANDEZ, SR., known to me to be the person whose name is subscribed to the above and

foregoing instrument, and acknowledged to me that he/she executed said instrument for the

purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _26th_ day of

_November_ , 20_01_ .



NOTARY PUBLIC, IN AND FOR THE
STATE OF _____

My Commission Expires:              Printed Name of Notary Public

_____             _____

```
          ★  OLGA JACQUEZ
             MY COMMISSION EXPIRES
             December 16, 2004
```

KMH_ESI00000317.010

THE STATE OF TEXAS                    §
                                      §
COUNTY OF El Paso                     §

BEFORE ME, the undersigned authority, on this day personally appeared ELIZABETH

HERNANDEZ, known to me to be the person whose name is subscribed to the above and

foregoing instrument, and acknowledged to me that he/she executed said instrument for the

purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 26th day of

November, 2001.



OLGA JACQUEZ
MY COMMISSION EXPIRES
December 16, 2004

NOTARY PUBLIC IN AND FOR THE
STATE OF _____

My Commission Expires:

Printed Name of Notary Public

_____

**COMPROMISE AND RELEASE**- Page 10
KM.Hernandez_rls.final.wpd (wpc)(JEA)

KMH_ESI00000317.011

THE STATE OF Texas    §

COUNTY OF El Paso    §

BEFORE ME, the undersigned authority, on this day personally appeared JUAN CARLOS GARAY, Guardian Ad Litem on Behalf of the Minor Children, JAIME E. HERNANDEZ and AMY HERNANDEZ, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he/she executed said instrument for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 26th day of November, 2001.



OLGA JACQUEZ
MY COMMISSION EXPIRES
December 16, 2004

NOTARY PUBLIC IN AND FOR THE STATE OF

My Commission Expires:                Printed Name of Notary Public

_____              _____

**COMPROMISE AND RELEASE**- Page 11
KM.Hernandez.rls.final.wpd (wpc)(JEA)

KMH_ESI00000317.012

THE STATE OF TEXAS §
§
COUNTY OF El Paso §

BEFORE ME, the undersigned authority, on this day personally appeared ALFREDO HERNANDEZ, JR., known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he/she executed said instrument for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 26th day of November, 2001.



OLGA JACQUEZ
MY COMMISSION EXPIRES
December 18, 2004

My Commission Expires:

NOTARY PUBLIC IN AND FOR THE STATE OF _____

Printed Name of Notary Public

_____    _____

**COMPROMISE AND RELEASE**- Page 12
KM.Hernandez.rls.final.wpd (wpc)(JEA)

KMH_ESI00000317.013

THE STATE OF _____ §
                                                                §
COUNTY OF _____ §

BEFORE ME, the undersigned authority, on this day personally appeared ISELA PEREZ, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he/she executed said instrument for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23rd day of November, 2001.

*Nicole Heatwole*
NOTARY PUBLIC, IN AND FOR THE
STATE OF Oklahoma

My Commission Expires:
5-7-2005

Printed Name of Notary Public

*Nicole Heatwole*

NICOLE HEATWOLE
NOTARY
PUBLIC
IN AND FOR
STATE OF
OKLAHOMA
OKLAHOMA COUNTY

# EXHIBIT A
### (Page 1 of 5)

## SCHEDULE OF PERIODIC PAYMENTS

MEASURING LIFE:    ELIZABETH HERNANDEZ (DOB: 12/1/1966) (SS#: 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)

PAYEE:    ELIZABETH HERNANDEZ

PAYMENTS:    $2,729.27 PER MONTH FOR LIFE, 30 YEARS CERTAIN, BEGINNING 1/1/2002. THE FINAL CERTAIN PAYMENT WILL BE 12/1/2031.

BENEFICIARY:    THE ESTATE OF ELIZABETH HERNANDEZ

MAIL PAYMENTS TO:    14798 Chazy Court

El Paso, TX 79927

**\* \* \* \* \* \* \* \* \* \* \* \* \* \***

MEASURING LIFE::    ISELA PEREZ (DOB: 11/14/1975) (SS#: 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)

PAYEE:    ISELA PEREZ

PAYMENTS:    $1,336.69 PER MONTH FOR LIFE, 30 YEARS CERTAIN, BEGINNING 1/1/2002. THE FINAL CERTAIN PAYMENT WILL BE 12/1/2031.

BENEFICIARY:    THE ESTATE OF ISELA PEREZ

MAIL PAYMENTS TO:    3113 Neighbors Lane

Del City, OK 73115

**\* \* \* \* \* \* \* \* \* \* \* \* \* \***

MEASURING LIFE:    ALFREDO HERNANDEZ, JR. (DOB: 7/23/1980) (SS#:  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)

PAYEE:    ALFREDO HERNANDEZ, JR.

PAYMENTS:    $1,605.31 PER MONTH FOR LIFE, 30 YEARS CERTAIN, BEGINNING 1/1/2002. THE FINAL CERTAIN PAYMENT WILL BE 12/1/2031.

BENEFICIARY:    THE ESTATE OF ALFREDO HERNANDEZ, JR.

MAIL PAYMENTS TO:    635 Anahi

El Paso, TX 79927

**\* \* \* \* \* \* \* \* \* \* \* \* \* \***

# EXHIBIT A
### (Page 2 of 5)

### SCHEDULE OF PERIODIC PAYMENTS (Cont'd)

MEASURING LIFE:    AMY HERNANDEZ  (DOB: 7/14/1987) (SS#: 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)

PAYEE:    AMY HERNANDEZ

PAYMENTS:    $20,000.00 PAID EVERY AUGUST 1 AND JANUARY 1 FOR 5 YEARS CERTAIN ( 10 PAYMENTS), BEGINNING 8/1/2005.  LAST PAYMENT ON 1/1/2010.

$1,000.00 PER MONTH FOR 5 YEARS CERTAIN (60 PAYMENTS), BEGINNING 8/1/2005.  LAST PAYMENT ON 7/1/2010.

$3,274.00 PAID MONTHLY, INCREASING AT 3% COMPOUNDED ANNUALLY, FOR LIFE, 30 YEARS CERTAIN, BEGINNING 8/1/2010. LAST CERTAIN PAYMENT ON 7/1/2040.

$25,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2005.
$50,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2012.
$75,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2017.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2022.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2027.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2032.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2037.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2042.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2047.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2052.

BENEFICIARY:    THE ESTATE OF AMY HERNANDEZ

MAIL PAYMENTS TO:    635 Anahi

El Paso, TX 79927

* * * * * * * * * * * * * * *

## EXHIBIT A
### (Page 3 of 5)

### SCHEDULE OF PERIODIC PAYMENTS (Cont'd)

MEASURING LIFE:    JAIME EDUARDO HERNANDEZ  (DOB: 7/14/1992) (SS#: 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)

PAYEE:    JAIME EDUARDO HERNANDEZ

PAYMENTS:    $25,000.00 PAID EVERY AUGUST 1 AND JANUARY 1 FOR 5 YEARS CERTAIN ( 10 PAYMENTS), BEGINNING 8/1/2010. LAST PAYMENT ON 1/1/2015.

$1,200.00 PER MONTH FOR 5 YEARS CERTAIN (60 PAYMENTS), BEGINNING 8/1/2010. LAST PAYMENT ON 7/1/2015.

$5,335.90 PAID MONTHLY, INCREASING AT 3% COMPOUNDED ANNUALLY, FOR LIFE, 30 YEARS CERTAIN, BEGINNING 8/1/2015. LAST CERTAIN PAYMENT ON 7/1/2045.

$25,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2010.
$50,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2017.
$75,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2022.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2027.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2032.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2037.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2042.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2047.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2052.
$100,000.00 GUARANTEED LUMP SUM PAYMENT ON 7/14/2057.

BENEFICIARY:    THE ESTATE OF JAIME EDUARDO HERNANDEZ

MAIL PAYMENTS TO:    14798 Chazy Court

El Paso, TX 79927

### * * * * * * * * * * * * * * *

### TERMS AND PROVISIONS OF THE PERIODIC PAYMENTS

(1)  All sums set forth herein constitute damages on account of personal injuries or sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended, and no portion of such amounts constitute additional, exemplary or punitive damages, or damages other than actual damages on account of personal injuries or sickness.

KMH_ESI00000317.017

# EXHIBIT A

### (Page 4 of 5)

**(2) Payee's Rights to Payments**

Plaintiffs acknowledge that the Periodic Payments cannot be accelerated, deferred, increased or decreased by the Plaintiffs or any Payee; nor shall the Plaintiffs or any Payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.

**(3) Payee's Beneficiary**

Any payments to be made after the death of any Payee pursuant to the terms of this Settlement shall be made to the person designated herein in the SCHEDULE OF PERIODIC PAYMENTS, or as shall later be designated in writing by any Payee of the age of majority. If no person or entity is so designated, or if the person designated is not living at the time of the Payee's death, such payments shall be made to the estate of the Payee. Any Payee of the age of majority may request a change of beneficiary. No such designation, nor any revocation thereof, shall be effective unless it is in writing and delivered to the Defendants' Assignee. The designation must be in a form acceptable to the Defendants' Assignee before such payments are made.

**(4) Consent to Qualified Assignment**

Plaintiffs acknowledge and agree that Defendant(s) and/or their Insurer ("Assignor") will make a "qualified assignment," within the meaning of Section 130(c) of the Internal Revenue Code of 1986, as amended, of the Defendants' liability to make the Periodic Payments set forth set forth herein to **Aegon Assignment Corporation** ("Assignee"). The Assignees' obligation for payment of the Periodic Payments shall be no greater than that of

KMH_ESI00000317.018

# EXHIBIT A

### (Page 5 of 5)

Defendants (whether by judgment or agreement) immediately preceding the assignment of the Periodic Payments obligation. Such assignment, when executed, shall be accepted by the Plaintiffs without right of rejection and shall completely release and discharge the Defendants from the Periodic Payments obligation assigned to the Assignee. The Plaintiffs recognize that, in the event of such an assignment, the Assignee shall be the sole obligor with respect to the Periodic Payments obligation, and that all other releases with respect to the Periodic Payments obligation that pertain to the liability of the Defendants shall thereupon become final, irrevocable and absolute.

### (5) Right to Purchase an Annuity

The Defendants, themselves or through the Assignee, reserve the right to fund the liability to make the Periodic Payments set forth herein through the purchase of annuity policies from **Transamerica Life Insurance and Annuity Company ("Annuity Issuer")**. The Assignee shall be sole owner of the annuity policy issued and shall have all rights of ownership. The Assignee may have the annuity payments mailed directly to the Payee(s). Payees shall be responsible for maintaining a current mailing address for Payee(s) with the Assignee.

### (6) Discharge of Obligation

Upon making a Qualified Assignment, the obligation of the Assignee to make each Periodic Payment shall be discharged upon the mailing of a valid check in the amount of each such payment to the designated address of the Payee. Upon written request and in accordance with their standard procedures, Assignee and Annuity Issuer will reissue any payment check that has not been executed.

KMH_ESI00000317.019

*[handwritten: Jeff Hernandez + copy to Suzanne]*

## BARON & BUDD

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS
SUITE 1100
3102 OAK LAWN AVENUE
DALLAS, TEXAS  75219-4281
(214) 521-3605
TELECOPIER (214) 520-1181

FREDERICK M. BARON
RUSSELL W. BUDD
BRENT M. ROSENTHAL
LISA A. BLUE, Ph.D.
MARY E. SKELNIK
STEVEN D. WOLENS
MELISSA K. HUTTS
ROBERTA E. ASHKIN*
STEVE BAUGHMAN JENSEN
ALLEN N. STEWART
RICHARD I. NEMEROFF
LISA R. KIVETT
LEANNE JACKSON
LAURA BAUGHMAN
ELIZABETH R. SCHECK

LAURIE J. MEGGESIN
SCOTT MORRISON
WESLEY K. YOUNG
STEPHEN C. JOHNSTON
MISTY A. FARRIS
WILLIAM R. TAPSCOTT, JR.
ASHLEY HIGGINS JETER
BEN K. DUBOSE
AMY J. SHAHAN
TAER IM OH
SUSAN L. BOZORTH*
LADD R. GIBKE
ANN TUTORY HARPER
ALAN B. RICH
JESSICA T. HUDGINS
CAREN LOCK HANSON
KIM LEVINGSTON
LAWRENCE N. GETTYS*
KEVIN D. McHARGUE
ALICIA D. BUTLER
JORDAN C. FOX*

SPECIAL COUNSEL:
ELLEN A. PRESBY

DIANE M. ANDREW*
SAM T. RICHARD
CHRISTINA E. MANCUSO

ALEX BARLOW
KAMELA A. WILKINSON
*PATRICK O'NEAL
JOHN E. ANSBACH
ANDREA S. BOURNE
JENNIFER BARBER GRAY
VIRGINIA L. ADAMS
*JOSEPH W. BELLUCK
JOYCELL M. HOLLINS
WENDY C. TRIPOOI
MARSY A. MORRIS
LAURA S. MONDELLO
IGNACIO BARBERO
TAD GROUND
STEPHANIE A. FINCH
J. CATHERINE GILES
JAMES D. PIEL
SCOTT R. FRIELING
THOMAS M. SIMS
JOHN J. SPILLANE
DANA H. GRAY

NATALIE F. DUNCAN
MONTY WADE SULLIVAN
ALLEN R. VAUGHT
JENNIFER K. BRITTON
*DANIEL C. BURKE
AMY M. CARTER
ANN J. R. COLE
FRANK C. GOODRICH
CARLA M. BURKE
SCOTT L. FROST
TIFFANY NEWUN
CATHERINE G. ZILAHY
CRAIG H. SCHUMACHER
JACQUELINE MONTEJANO
S. ANN SAUCER
JULIANNE J. HAERSCHEL
BRIAN P. MIN
REY FERNANDEZ
EDMOND L. MARTIN
DONNA J. BLEVINS
STEPHANIE N. BROOKS
DAVID T. RITTER

*LICENSED IN STATES OTHER THAN TEXAS

November ~~28~~ 27, 2001

*[handwritten: payment has been made !]*

VIA ~~FEDERAL EXPRESS~~ HAND DELIVERY

Kay Andrews
Brown McCarroll
111 Congress Avenue
Austin, TX 78701

Re:  *Alfredo Hernandez, Sr., et al. v GAF Corporation, et al.;* Cause No. 2000-3559
     In the County Court at Law #3, El Paso County, Texas

Dear Kay:

Pursuant to our discussions of earlier today and in regard to the above-referenced matter, please find enclosed the original Compromise and Release reflecting the settlement between your client Kelly-Moore Paint Company and the Hernandez family.  The Compromise and Release has been signed by all parties and notarized where indicated.

As we discussed today, immediate payment by your client is critical.  The structured settlement amounts and pay plans reflected in Exhibit A to the Compromise and Release are only accurate and available if funded by the end of this week, November 30, 2001.  Please forward the required checks as indicated in the Compromise and Release to Baron and Budd, P.C. no later than this Friday, November 30, 2001. We will promptly forward the annuity check to the annuity company that same day for funding as agreed and pursuant to the Qualified Assignment.

Please call me immediately if you anticipate any problems with payment as outlined above.

With regards,

Very truly yours,

John E. Ansbach

Enclosure

KMH_ESI00000317.020

**EXHIBIT 12**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 12

## ENTIRE DOCUMENT
## SUBMITTED UNDER SEAL

## CIVIL L.R. 79-5(b)

## (BATES #MK 005368 - MK 005391)

**EXHIBIT 13**

# DECLARATION OF DAN STRITMATTER

IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC. ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE

# Exhibit 13

## ENTIRE DOCUMENT
## SUBMITTED UNDER SEAL

## CIVIL L.R. 79-5(b)

## (BATES #NS00001507 - NS00001532)

BLUEBIRD
OFFICE SUPPLIES
(888) 477-0700
www.bluebirdonline.com

**EXHIBIT 14**

## STATEMENT OF REASONABLE CAUSE

In accordance with ERISA Reg. 2560.502c-2(e) and Code Section 6652(c)(3), K-M Industries Holding Co., Inc. (the "Employer") hereby submits the Statement of Reasonable Cause in order to set forth the facts explaining the Employer's inability to file a complete annual report for the plan year ending December 31, 2003 (the " '03 Annual Report"). The Employer is working through matters necessary to complete the Schedule H of the Employer's '03 Annual Report for its Employee Stock Ownership Plan (the "Plan") that have resulted in the following: (1) the trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan ("Plan") inability to timely determine the fair market value of the Employer Securities held by the Plan; and (2) the Employer's inability to timely obtain the required independent qualified public accountant's opinion on the Plan.

The reasons for the Employer's inability to timely file a completed Form 5500 is based on the following:

The Employer and its wholly-owned subsidiary, Kelly-Moore Paint Company, Inc., have been named as defendants in numerous asbestos-related personal injury lawsuits. They have also been a party to litigation with Union-Carbide Corporation concerning the latter's supply of asbestos to the Employer. The extent of the Employer's potential future asbestos liabilities is at issue in the Union-Carbide litigation. The outcome of the Union-Carbide litigation could affect the Employer's ability to satisfy its long-term future asbestos liabilities as they accrue. Depending on the outcome of the Union-Carbide litigation, the Employer expects that it might have to commission a qualified expert to perform a valuation of the Employer's (and Kelly-Moore Paint Company, Inc.'s) future asbestos liabilities. If a qualified expert determines that the Employer's probable and estimatable liability to future asbestos claimants exceeds insurance and other assets available to satisfy those claims, that will be material to a valuation of the Employer's Securities.

1

DOL 2528

Due to the uncertainly involving the outcome of the litigation and its possible impact on the financial aspects of the Employer and the valuation of the Employer Securities held by the Plan, the valuation of the Employer Securities held by the Plan will not begin until the outcome of the litigation is known. The decision to take this prudent course of action has directly resulted in the delay to timely file a complete Form 5500 for the 2003 Plan year end.

Finally, the Employer, in an effort to substantially comply with the Plan's annual return reporting requirements, has completed the Schedule H for the '03 Annual Report by basing the value of the Employer Securities held by the Plan on such shares "book value". The inclusion of this information by the Employer represents a good faith effort by the Employer to provide a reasonably completed Form 5500 using a reasonable approach to prepare such form.

DOL 2529

EXHIBIT  15

MAR 2 9 2005

V.P. / SEC'Y

# WINSTON & STRAWN LLP

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

CITY POINT
1 ROPEMAKER STREET
LONDON, EC2Y 9HT

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

(312) 558-5600

FACSIMILE (312) 558-5700

www.winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

1400 L STREET, N.W.
WASHINGTON, D.C. 20005-3502

MARK S. WEISBERG
(312) 558-8070
mweisberg@winston.com

March 25, 2005

Ms. Mary E. Bryant
Chief, Returns Processing
Department of Labor-EBSA
P.O. Box 7045
Lawrence, KS  66044-7045

Re:    3104491-K-M Industries Holding Co., Inc. ESOP (the "Plan")

Dear Ms. Bryant:

The purpose of this letter is to respond, on behalf of our client, K-M Industries Holding Co., Inc. (the "Company") to your most recent letter of February 25 (a copy of which is included herewith) requesting an accountant's opinion and other information related to the Plan in connection with the Plan's Form 5500 for 2003.

As the Company indicated in its previous letter of January 26, 2005 and its statement of reasonable cause included with the 2003 filing, there are significant corporate issues the Company is working with counsel and others to resolve in order to allow the Trustee to be able to determine the fair market value of the employer securities and to obtain an accountant's opinion with respect to the Plan. In particular, the Company and its wholly-owned subsidiary, Kelly-Moore Paint Company, Inc., are defendants in a number of asbestos-related personal injury lawsuits. Depending on the outcome of the litigation, the employer expects that it might have to commission a qualified expert to perform an evaluation of the employer's (and its subsidiary, Kelly-Moore Paint Company, Inc.'s) future asbestos liabilities. If a qualified expert determines that the employer's probable and estimatable liability to future asbestos claimants exceeds insurance and other assets available to satisfy these claims, that information will be material to a valuation of the employer's securities and may lead to the Company seeking judicial relief and/or a global settlement with asbestos claimants.

Due to the uncertainty of the various asbestos cases, the changing law in some of the 19 states in which cases are pending, and the possible impact on the financial aspects of the Company and the value of the Company's securities held by the Plan, the valuation of the Company securities held by the Plan is not scheduled to begin until some of such uncertainty is

WINSTON & STRAWN LLP

Ms. Mary E. Bryant
March 25, 2005
Page 2

removed.  The ESOP Trustee is currently in the process of preparing its engagement letter for the firm of Stout Risius Ross to conduct the required valuation.  All of these issues combined have resulted in the delay to timely file the complete Form 5500 for the 2003 year.

The parties are working diligently towards resolution of these issues.  However, prior to being in a position of more certainty, the Trustee has not been and continues not to be able to conduct a proper and meaningful valuation.  Additionally, hastily making a valuation with the unknown variables so pervasive may result in unintended consequences in other corporate areas.

If you have any questions about these matter, please do not hesitate to give me a call.

Very truly yours,

Mark S. Weisberg

MSW:kaj

cc:    K-M Industries Holding Co., Inc.
       North Star
       Erin Turley
       Holly Holman (DOL)

CHI:1508645.1



OMB Clearance No: 1210-0110
In Reply refer to: 3139513
Friday Feb 25, 2005 Letter No: 3002
CAF: N
Telephone Number: 1-866-463-3278

**RECEIVED**

MAR – 1 2005
**RECEIVED** V.P. / SEC'Y

FEB 28 2005

CORP. PERSONNEL

K-M INDUSTRIES HOLDING CO., INC.
987 COMMERCIAL ST
SAN CARLOS, CA 94070-4018

| | |
|---|---|
| Employer Identification Number: | 94-1230192 |
| Plan Number: | 002 |
| Plan Name: | K-M INDUSTRIES HOLDING CO., INC. ESOP |
| Plan Year Beginning: | 2003-01-01 |
| Plan Year Ending: | 2003-12-31 |
| DLN: | 84037-338-11106-4 |

Dear Filer:

We recently sent you a letter asking for clarification of information provided on the Form 5500, Annual Return/Report of Employee Benefit Plan you filed. The information from your response was entered into the processing system, however, further clarification is needed. In order for us to continue to process your filing, please check your records and furnish us with the information described below:

Our records indicate that you have not attached an Accountant's Opinion. Your plan/DFE appears to contain assets, liabilities and/or income. Please provide us with the Accountant's Opinion, related financial statements and notes, or else change the reporting of your financial information. In addition, if you did not answer the information on Schedule H, Line 3(a), 3(b), and/or 3(c) or need to correct the information you previously reported, please attach a corrected Schedule H ensuring that the appropriate items of Line 3 on Schedule H are completed. (204)

Please send us the information within 30 days from the date of this letter so we can continue to process your form. If you change any other line item(s) not specifically requested in this letter, please circle or highlight these changes. Be sure to review the instructions for all items, because the data you change may require you to change other entries or add or subtract new ones.

If you have questions about this letter, please write to us at the address shown below. If you prefer, you may call 1-866-463-3278. If you get our answering machine, please leave the name of the person you want us to ask for as part of the message. Whenever you write, please include your name, telephone, the hours you can be reached, and a copy of this letter. Keep a copy for your records.

Name to call _____ Telephone number ( ) - _____ Hours _____

C3139513SM



If you don't send us the requested information, you could be subject to IRS and DOL penalties as explained in the instructions to the form.

Thank you for your cooperation.

Sincerely yours,

Mary E. Bryant
Chief, Returns Processing
Department of Labor
Employee Benefits Security Administration

Mail reply to:
Department of Labor-EBSA
P.O. Box 7045
Lawrence, KS 66044-7045

C3139513SM

KMH 002808

**EXHIBIT 16**



**KELLY-MOORE PAINTS** ™

EMPLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

October, 2005

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2003 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1000 hours for Kelly-Moore in 2003 received a contribution for 2003. **A value has also been determined for 2004 and statements for 2004 will be distributed in the next couple of months.**

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of **$23,803,431.23** has been put into our ESOP for 2003. This includes a contribution out of Kelly-Moore profits of $23,236,648.44 and a contribution of $566,782.79 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. A full $23,236,648.44 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. Remember that this was the loan that was used to buy the original stock. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $23,236,648.44 divided by the total of principal and interest of all the loan payments (which go on from 1998 to 2012 or 15 years) of $347,460,310.84. Note: This loan was restated in 2005 to extend the term to 2014 due to asbestos issues in 2004. This result is then multiplied by the 33,745,455 shares in the ESOP. This allows for a release of approximately **2,256,750.63** shares to employee shareholder accounts for 2003.

## SHARE VALUE

At December 31, 2003, the independent appraiser found the per share valuation decreased from $2.5875 in 2002 to **$2.30**. This is the value that is used to value both old and new shares on the 2003 statements. Remember the stock price may go up or down based on many factors. Among other things, the independent appraiser looks at current profits, potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset levels, debt levels, market valuations of other paint companies and other items.



EXHIBIT
200
Thomas    4-18-08

P1126

## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year is on a multi-step process based on your 2003 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-03  The main reason why final balances may be less than prior years is that while the contribution may have brought account values up, the decline in stock value brought them down.

## FORFEITURES

Again this year, you may see activity on the forfeiture line.  Forfeitures arise from participants who terminate before they are fully vested.  If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested.  Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate.  These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares.  There continues to be risk in the ultimate value of the Kelly-Moore shares due to substantial ongoing asbestos litigation.   Depending on the results of this litigation, there could be further severe effect to the value of the shares.  Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk.  This can be done by participating in other retirement vehicles such as 401K plans (which now has a Company match), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through September of 2005 are virtually the same as through September 2004. This sales figure is good for the company, considering fifteen stores were sold in the Houston, San Antonio and Arizona markets in September 2004.  Margins continue to increase for the company and operating expenses are down for 2005.  Profits for the company have increased in 2005 over 2004.

P1127

**TRUSTEE**

An independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required independent of Kelly-Moore and the appraiser.

**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. **SHARES** – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by the Moore trusts. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. The Series P-B shares have additional dividend rights, making it easier to make ESOP contributions.

2. **VALUE OF SHARES** – The fair market value of the shares at the statement date.

3. **CONTRIBUTIONS/INVESTMENTS** – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. **FORFEITURES** – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. **DISTRIBUTIONS** - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. **VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. **VESTED INTEREST VALUE** – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. **PER SHARE VALUE AS OF 12/31/03** – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. **PARTICIPANT STATUS** – NP is a new participant.
    B1, B2, DD, TA, TE, TI are participants who have terminated.
    CP and PA are continuing participants.
    PD is a participant paid in full due to being fully vested at retirement.
    PX is a participant who has forfeited balances due to lack of vesting.
    RH is a participant who has both quit and then rehired since the start of the plan.
    RN is a participant who has retired after 65 years of age.

10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998, 1999, 2000 or 2001, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00, 12/31/01 or 12/31/02. Finally, if the first year that you worked 1000 hours was 2003, the plan vesting date will show 12/31/03.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/03 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.