

Ronald Lovitt, Bar No. 040921
J. Thomas Hannan, Bar No. 039140
Henry I. Bornstein, Bar No. 75885
Terence F. Young, Bar No. 069943
LOVITT & HANNAN, INC.
900 Front Street, Suite 300
San Francisco, California 94111
Telephone: (415) 362-8769
Facsimile: (415) 362-7528
*rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com, tfylaw@earthlink.net*

Attorneys for Defendants K-M Industries
Holding Co. Inc.; K-M Industries Holding Co.
Inc. ESOP Plan Committee; and CIG ESOP
Plan Committee

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

THOMAS FERNANDEZ, LORA SMITH
and TOSHA THOMAS, individually and on
behalf of a class of all others similarly
situated,

        Plaintiffs,

v.

K-M INDUSTRIES HOLDING CO., INC.,
*et al.,*

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C06-07339 CW

**[REDACTED] DECLARATION
OF PETER M. CAZZOLLA IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT BY
DEFENDANTS K-M INDUSTRIES
HOLDING CO., INC., K-M
INDUSTRIES HOLDING CO. INC.
ESOP PLAN COMMITTEE AND
CIG ESOP PLAN COMMITTEE**

Hearing Date: July 31, 2008
Hearing Time: 2:00 p.m.
Courtroom:   2, 4th Floor
Judge:       Hon. Claudia Wilken

I, Peter M. Cazzolla, hereby declare:

1.    I am President and Chief Executive Officer ("CEO") of Capital Insurance Group

("CIG"), member of the Boards of Directors of CIG, K-M Industries Holding Co., Inc., and Kelly-

Moore Paint Company, Inc. and member of the K-M Industries Holding Co., Inc. Employee Stock

1  Ownership Plan Committee. CIG was formerly known as California Insurance Group and, before

2  that, as California Capital Insurance Company ("CCIC"). I have been President and CEO of CIG

3  since March 1993. I have personal knowledge of the facts stated herein, and if called as a witness, I

4  would and could testify competently thereto.

5      2.    I submit this Declaration in support of the concurrently-filed Motion for Summary

6  Judgment by defendants K-M Industries Holding Co., Inc., K-M Industries Holding Co., Inc. ESOP

7  Plan Committee and CIG ESOP Plan Committee.

8      3.    CIG was a subsidiary of Kelly-Moore Paint Company until 1999.  In 1999, Kelly-

9  Moore Paint Company changed its name to K-M Industries Holding Co., Inc. ("KMH") and formed

10 a new subsidiary named Kelly-Moore Paint Company, Inc. ("K-M Paint") to which it transferred all

11 of its paint operations. CIG then became a subsidiary of KMH.

12     4.    From the time I joined CIG through the present, CIG has been in the business of

13 writing property and casualty insurance policies in the states of California, Arizona, Oregon,

14 Washington and Nevada.  The management and operations of CIG, and CCIC before it, were totally

15 independent from K-M Paint.

16     5.    During 1998, two Employee Stock Ownership Plans ("ESOPs") were formed for the

17 benefit of the employees of CIG and the original Kelly-Moore Paint Company.  At the same time,

18 two Committees were established to administer the ESOPs.  William Moore was named as each

19 Committee's sole fiduciary member. Attached hereto as Exhibit 1 is a true and correct copy of the

20 California Capital Insurance Company Resolutions Authorizing Execution and Implementation of

21 Employee Stock Ownership Plan.

22     6.    In or about 2002, I became aware that litigation and liability exposure related to

23 asbestos litigation against K-M Paint had caused KMH to consider the possibility of bankruptcy.  I

24 had previously believed that K-M Paint's asbestos issues would not have any effect on CIG's

25 financial condition since they were separate companies and since, as a subsidiary, CIG would not be

26

1  responsible for KMH's liabilities.  When I heard in 2002 that the asbestos situation was worsening

2  ███████████████████████████████████ I concluded for the first time that

3  ███████████████████ could have an effect on the value of CIG and hence on the "I" tracking

4  shares held by the CIG employees participating in the CIG ESOP.

5       7.    Accordingly, in May 2002, I sent a memorandum to the CIG ESOP participants

6  concerning the Kelly-Moore asbestos litigation and the possible effect it could have on their ESOP

7  shares. Attached hereto as Exhibit 2 is a true and correct copy of my May 2002 memorandum to the

8  CIG ESOP participants.

9       8.    The memorandum explained that the significant asbestos claims filed against Kelly-

10  Moore had led the management of Kelly-Moore to conclude that the litigation was "likely to depress

11  [K-M Paint's] stock value," and that "as a result of our joint ownership by K-M Industries Holding

12  Co., Inc., the asbestos litigation may depress the value of our CIG stock, which would affect the

13  value of your ESOP account."

14       9.    ██████████████████████████ in January 2003, I followed up on my

15  May 2002 memorandum with a second memorandum dated January 21, 2003, to the CIG ESOP

16  participants concerning the Kelly-Moore asbestos litigation and the possible effect it could have on

17  their ESOP shares. In the memorandum to "All CIG Team Members" I informed them that Duff &

18  Phelps again had been retained as an independent appraiser of the value of the CIG "tracking" stock.

19  I also reminded the CIG ESOP participants of the continuing asbestos litigation against K-M Paint

20  and stated, "Although the pending claims have been asserted against Kelly-Moore rather than CIG,

21  which are both owned by K-M Holdings, you should be aware that there are some circumstances

22  under which the asbestos litigation might adversely affect the value of the shares held by your

23  ESOP." I concluded, "Therefore, to the extent that any claim – even one arising out of Kelly-

24  Moore's operations – is ultimately satisfied by K-M Holdings rather than one of its subsidiaries, the

25  value of the shares held by your ESOP may be affected adversely." Attached hereto as Exhibit 3 is a

1  true and correct copy of my January 21, 2003, memorandum to the CIG ESOP participants.

2      10.    My January 21, 2003, memorandum provided information on the asbestos claims

3  being asserted against Kelly-Moore and explained again that because of KMH's ownership of CIG,

4  under some circumstances, the value of the CIG participants' ESOP shares could be adversely

5  affected by the asbestos litigation.

6      11.    Soon after the ESOP was formed, I sent a memo informing all employees of its

7  formation.  In the memop I explained that the new ESOP had purchased the Class I-B common share

8  of KMH for $55,000,000 and that those shares represented a 42% ownership interest of CIG.

9  Attached hereto as Exhibit 4 is a true and correct copy of my memorandum announcing the

10 formation of the CIG ESOP.

11     12.  On November 9, 1999, as part of a Quarterly Employee Meeting, I caused a

12 memorandum to be sent to all employees comprising questions that had been submitted by

13 employees and answers prepared by me and others.  In that memorandum I again explained the

14 formation of the ESOP and told the employees that the ESOP had purchased 8,400,000 shares of

15 CIG for $55,000,000. Attached hereto as Exhibit 5 is a true and correct copy of the Quarterly

16 Employee Meeting Questions and Answers memo dated November 9, 1999.

17     13.    On November 14, 2005, I sent a letter on CIG letterhead to all "CIG Team

18 Member[s] and Employee/Owner[s]" to which was attached each CIG ESOP participant's ESOP

19 Statement for 2003.  In the letter I explain the delay in issuing the Statements by stating, "As we

20 have communicated to you over the last several years, the reason we have experienced a delay in

21 completing our stock valuation was the asbestos-liability exposure incurred by our sister company,

22 Kelly-Moore Paint Company."  I went on to caution, "Progress is being made in the management

23 and control of Kelly Moore Paint's asbestos liability; however, its future development could have an

24 impact on CIG's future stock value." Attached hereto as Exhibit 6 is a true and correct copy of my

25 letter dated November 14, 2005.

26

14.    On December 1, 2005, I sent a letter on CIG letterhead to all "CIG Team Member[s] and Employee/Owner[s]" to which was attached each CIG ESOP participant's ESOP Statement for 2004. In that letter I again explain that the Kelly Moore asbestos liability claims "could have an impact on CIG's future stock value." Attached hereto as Exhibit 7 is a true and correct copy of my letter dated December 1, 2005.

15.    On March 2, 2004, as part of a Quarterly Employee Meeting, I caused a memorandum to be sent to all employees comprising questions that had been submitted by employees and answers prepared by me and others. In that memorandum I explained the circumstances surrounding the original issuance of the CIG ESOP shares and stated, "Also, the outcome of Kelly-Moore Paint Company's asbestos liabilities will affect the value of K-M Industries Class "I" stock, which we hold." Attached hereto as Exhibit 8 is a true and correct copy of the Quarterly Employee Meeting Questions and Answers memo dated March 2, 2004.

16.    On August 16, 2004, as part of a Quarterly Employee Meeting, I caused a memorandum to be sent to all employees comprising questions that had been submitted by employees and answers prepared by me and others. In that memorandum I explained the delay in issuing ESOP Participant Statements for 2003, stating in part, "The primary obstacle [to obtaining maximum benefit possible from our ESOP] continues to be the extent of the liabilities created by asbestos claims and the estimated future value of these claims and their subsequent impact on the equity value of Kelly Moore." I go on to warn that "[T]he worst case is if the asbestos liabilities cause Kelly Moore Paint to become insolvent, then the value of our ESOP shares could be zero up to some positive dollar value, depending on the ability of Kelly Moore paint's assets and insurance to pay for the asbestos liabilities." Attached hereto as Exhibit 9 is a true and correct copy of the Quarterly Employee Meeting Questions and Answers memo dated August 16, 2004.

17.    On October 11, 2004, I sent an Inter-Office Memorandum to all CIG Employees on the subject of Year 2003 ESOP Allocations. I explain in the memorandum that the issuance of

2003 allocations has been delayed because the fair market value of the shares of Series "I" tracking stock has not yet been determined.  I also provide information about the number of suits pending against K-M Paint and the status of the Union Carbide litigation. Attached hereto as Exhibit 10 is a true and correct copy of my October 11, 2004 memorandum.

18.    On October 22, 2004, I sent an Inter-Office Memorandum to all CIG Employees to inform them that K-M Paint had lost the trial against Union Carbide. Attached hereto as Exhibit 11 is a true and correct copy of my October 22, 2004 memorandum.

19.    On November 2, 2004, as part of a Quarterly Employee Meeting, I caused a memorandum to be sent to all employees comprising questions that had been submitted by employees and answers prepared by me and others.  In that memorandum I explain the expected effect of the loss of the Union Carbide suit by K-M Paint and again explain what actions would be taken if the "worst case scenario" occurs and the value of the CIG ESOP shares goes to "zero or some positive dollar value." Attached hereto as Exhibit 12 is a true and correct copy of my November 2, 2004 memorandum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed at _San Diego_, California this 21st day of June 2008.

_Peter M. Cazzolla_
Peter M. Cazzolla

**EXHIBIT 1**

CALIFORNIA CAPITAL INSURANCE COMPANY

RESOLUTIONS AUTHORIZING EXECUTION

AND IMPLEMENTATION OF

EMPLOYEE STOCK OWNERSHIP PLAN

---

The Chairman reported that an Employee Stock Ownership Plan had been developed to qualify as an Employee Stock Ownership Plan under Section 401(a) as defined by Section 4975(e)(7) of the Internal Revenue Code. The Chairman distributed to each member of the Board copies of the Plan and Trust Agreement and recommended that they be adopted by the Company, effective as of January 1, 1998. After discussion and upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Employee Stock Ownership Plan and the Trust Agreement, in substantially the forms submitted to this meeting, be, and they hereby are, adopted effective as of January 1, 1998; and it was further

RESOLVED, that the appropriate officers of the Company be, and they hereby are, authorized and directed to submit to the Internal Revenue Service the Employee Stock Ownership Plan, Trust Agreement and other documents relating to the adoption of the Plan with their request that the Internal Revenue Service issue a Determination Letter that the said Plan is a qualified plan under Section 401(a) of the Internal Revenue Code; and it was further

RESOLVED, that the following be, and he hereby is, designated as Trustee of the Employee Stock Ownership Plan:

William E. Moore

and it was further

RESOLVED, that the President or a Vice President and the Secretary or an Assistant Secretary of the Company be, and they hereby are, authorized and directed to execute the Employee Stock Ownership Plan and the Trust Agreement on behalf of the Company and to obtain an execution of the Trust Agreement by the Trustee; and it was further

1

**EXHIBIT**

_101_

Mines   4-02-08

CIG 008057

RESOLVED, that the following is hereby designated as a member of the Committee to administer the Employee Stock Ownership Plan:

William E. Moore

and it was further

RESOLVED, that the following individuals will serve as a nonvoting nonfiduciary members of the Employee Stock Ownership Plan Advisory Committee:

Peter M. Cazzolla
Edward T. Mines

and it was further

RESOLVED, that a copy of the Employee Stock Ownership Plan and the Trust Agreement be attached to and made a part of the Minutes of this meeting; and it was further

RESOLVED, that the appropriate officers of the Company be, and they hereby are, authorized and directed to do any and all things necessary to implement the establishment of the Plan and to carry out the intent of the foregoing resolutions.

CIG 008058

# CERTIFICATE

I, Edward T. Mines, hereby certify that I am the duly appointed and acting Secretary of California Capital Insurance Company and that the above resolutions are a true and correct copy of resolutions duly adopted at a meeting of the Board of Directors held on the _4th_ day of _DECEMBER_, 1998, at which meeting a quorum was at all times present and acting, and that said resolutions are still in full force and effect.

Date ___12-8-98___

By _Edward T. Mines_
Edward T. Mines, Secretary
California Capital Insurance Company

**EXHIBIT 2**



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company



PETER M. CAZZOLLA
President-C.E.O.

May 31, 2002

Dear CIG Owner and Team Member:

We have completed the fourth year of our Employee Stock Ownership Program, and I am pleased to announce that the value of our company and personal ownership continues to grow. Upon completion of their annual appraisal of CIG, Duff and Phelps has set the value of our company at $4.18 a share. This current fair market value is 15% higher than last year's value of $3.63. Additionally, as each year passes, the vested portion of our stock balance increases as long as we continue to be active and qualified members of the CIG team.

I again want to remind you that there are many factors that can positively or negatively affect the value of our CIG stock. Several of the key factors include company growth and profit performance, the stock performance of publicly traded insurance companies similar to CIG, and the reduction of our ESOP loan principal. One other factor has been brought to our attention that may have an effect on the future value of our CIG stock. K-M Industries Holding Co., Inc., our holding company, also owns Kelly-Moore Paint Company. Significant asbestos claims have been filed against Kelly-Moore. To date, the costs of these claims have been covered by insurance policies. Kelly-Moore is vigorously proceeding against its various insurance carriers to assure coverage for these asbestos-related claims. As the asbestos litigation continues against Kelly-Moore, Kelly-Moore's current belief is that the litigation is likely to depress its stock value. As a result of our joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation may depress the value of our CIG stock, which would affect the value of your ESOP account.

As we have communicated to you at our Quarterly Owner/Employee Meetings, we have many challenges facing us, and we are meeting these challenges with timely and decisive actions that will keep our company on a course of long-term profit and growth. I assure you that, to the best of our ability, your management team is highly focused and dedicated to do all we can to ensure that the operating and financial position of CIG will not be compromised over the long term by market conditions or emerging liabilities.

Sincerely,

Peter M. Cazzolla
President and Chief Executive Officer

pmc/lld

**EXHIBIT**
Lora Smith 162
CT 4/16/08

**EXHIBIT 3**

## CALIFORNIA INSURANCE GROUP
### Inter-Office Memorandum

Date:     January 21, 2003

To:       All CIG Team Members

From:     Peter Cazzolla

Subject:  Kelly-Moore Asbestos Litigation

---

As we have done in the past four years of our ESOP, we will again contract with Duff & Phelps to appraise the value of our CIG "tracking" stock to determine the value of our ESOP accounts.

When we distributed your ESOP statement to you in June 2002, included with your statement was a note from me summarizing the company's stock-appraisal results and a statement advising you about Kelly-Moore's asbestos litigation. As a follow-up to this advisement, our sister company, Kelly-Moore, continues to be a defendant in asbestos litigation. Currently there are over 30,000 claims pending against Kelly-Moore. These claims arise from a product manufactured decades ago by a prior subsidiary called Paco Textures Corporation. The manufactured product was a joint compound that contained asbestos.

Although the pending claims have been asserted against Kelly-Moore rather than CIG, which are both owned by K-M Holdings, you should be aware that there are some circumstances under which the asbestos litigation might adversely affect the value of the shares held by your ESOP. These shares—like those held by the Kelly-Moore ESOP—are actually "tracking" shares issued by K-M Holdings, itself. The shares held by your ESOP will track the performance of CIG and the shares held by the Kelly-Moore ESOP will track the performance of Kelly-Moore. Both sets of tracking shares, however, are subject to whatever debts K-M Holdings, itself, might have to third parties. Therefore, to the extent that any claim—even one arising out of Kelly-Moore's operations—is ultimately satisfied by K-M Holdings rather than one of its subsidiaries, the value of the shares held by your ESOP may be affected adversely.

pmc/lld



EXHIBIT

Lora Smith 16 5
CT 4/16/08

**EXHIBIT 4**



CALIFORNIA
INSURANCE GROUP
Since 1898 ®

California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

Dear CIG Business Partner:

With the close of our first 100 years of successful performance, we must now face the challenges and opportunities of the new Millennium with renewed vigor and a strong desire to succeed. To motivate us in meeting these challenges, we now have an incentive that should encourage us individually and collectively to perform at our highest level: company ownership!

Congratulations on becoming an owner and business partner of the California Insurance Group. Through the implementation of our Employee Stock Ownership Plan (ESOP), we now have a significant financial interest, by means of stock ownership, in our company. The ESOP has purchased the Class I-B Common Shares of our Parent Company, K-M Industries Holding Co., Inc. (Sponsor Company) for $55,000,000.00. These Common Shares represent 42% ownership of the California Insurance Group. Mr. William E. Moore sold the shares to us to create a market for the stock he owns without a sale to outside interests and to recognize the loyalty, dedication, and hard work of CIG team members. The release of this stock for allocation to employee shareholder accounts is expected to be completed over the next nine years. Each year, stock will be distributed to eligible employees based on the financial performance of the company.

Now that we have an ownership interest in our company, we will share in its long-term value and growth. To realize this reward, we all must take absolute accountability for the way we individually perform and to involve ourselves, through active participation, in identifying and implementing the best business practices in running our company.

I am sure you are as proud as I to be a part of such an outstanding company and are grateful for this wonderful opportunity. I look forward to working with you in making CIG the best we can be, which will result in our mutual growth and prosperity.

Sincerely,

Peter M. Cazzolla

PMC/lld



EXHIBIT 5



| QUARTERLY EMPLOYEE MEETING |
| --- |
| November 9, 1999 |

**QUESTIONS AND ANSWERS**

1.  **What is the status of the ESOP and what is the timeline for preparing statements of employee "ESOP account status" for all participants. Please review how it works...explain the "pre-tax" savings implications of participation on the 401(k) versus the ESOP. (Carolyn Schwarz, Home Office, Project Leader—ITS)**

    *Response:*

    *As previously announced, the ESOP has been closed and 8,400,000 shares (42%) of CIG have been bought from K-M Industries Holding Co., Inc. for $55,000,000. We expect to provide each member of the ESOP with statements of individual accounts within the first 60 days of each new calendar year, beginning in the year 2000.*

    *Our 401(k) rules do not allow employees to contribute after-tax dollars to their account. Therefore, if employees elect to contribute to the 401(k) Plan, they will deposit before-tax dollars to their account. The ERISA limits the amount of before-tax dollars that can be deposited in a qualified retirement plan(s), which in our case includes the 401(k) and the ESOP. If employees choose to contribute to the 401(k), then the amount they deposit in the 401(k) will be deducted from their maximum permissible 25% payroll limitation on contributions to qualified tax deferral plans to comply with the ERISA limitations on before-tax deposits in qualified retirement plans.*

2.  **Why doesn't our company allow business casual dress? I work underneath computers, underneath desks, I carry computers...I don't like to have to wear a tie and wear nice shoes. Nice shoes are expensive and easily damaged. Business casual does not mean that people dress like slobs or wear ugly clothing. Thanks. (Stephen O'Neill-Yoder, Home Office, Technical Support Assistant—ITS)**

    *Response:*

    *When team members are performing tasks that do not require dressier clothing, it is acceptable to wear appropriate casual clothing that suits the task, e.g., jobs requiring moving, cleaning, or storing.*

EXHIBIT

Lora Smith 153
CT 4/16/08

Questions and Answers
November 9, 1999
Page 2

_____

3. Now that I am a stockholder and partial owner of this company, I would like to ask you to reconsider the dress code here at CIG. I would like to see it relaxed to business casual dress everyday. I believe the gentlemen in this company would be happier if they didn't have to wear neckties and dress shoes everyday. I also believe the women would be happier if they didn't have to wear dress shoes and hose. Our dress code is not dictated for reasons of safety and most of us have direct contact with the public only over the phone. I think allowing people to dress more comfortably would allow people to focus more on delivering better customer service, rather than on worrying about what someone else is wearing. Will you please reconsider your previous decision on the dress code? (Beverly Smith, Home Office, Project Leader—ITS)

*Response:*

*We have made several adjustments over the years to provide more opportunity for casual clothing to be worn during business hours. Our dress policy is one that sets a professional standard for our company four days out of each workweek. We feel that this is a fair compromise at this time, and we will continue to be receptive to a dress code modification that does not detract from the professional image of our company.*

4. I also think that you could expand your core business hours from 8-5 to 8-6 easily by allowing some flextime. If you have half of your staff work from 8-5 and the other half work from 9-6, your business still appears to be open from 8-6 without increasing the number of hours worked by employees. You would also gain phone coverage in more departments by having the 8-5 group keep the 12-1 lunch period while the 9-6 group can take the 1-2 lunch slot. Your computer operations currently cover these extended hours already, so your systems are already available to you. I'm probably over simplifying this issue, but I thought I'd mention it anyway. (Beverly Smith, Home Office, Project Leader—ITS)

*Response:*

*We have been evaluating flexible business hours and have not found one that can be applied equitably throughout the company for all employees, and one that will not cause deterioration in our customer service. We also will be faced with a new Wages and Hours law that creates additional complications to the implementation of flexible hours, which needs to be considered as part of any plan we adopt. Your suggestion will be considered as we evaluate the flextime concept.*

CIG_ESI00001542.002

Questions and Answers
November 9, 1999
Page 3

---

5. I am <u>thankful</u> to work for a company that keeps pace with other companies
   in compensating employees (salaries, medical, dental, and vision plans,
   ESOP, sick leave, paid vacation days). Now that CIG is more removed
   from the Kelly-Moore Paint Company, is there a possibility that the
   vacation schedule could be reevaluated? I am asking because by the time I
   have earned more than 10 days of vacation, my younger children will be
   past the stage of childhood diseases, field trips, awards ceremonies, and
   other special things that take place in their young lives. Is it possible to
   take time off without pay in certain circumstances, say if a child is sick?
   Any other times that it would be okay to do so? Thank you for your
   response. (Anonymous)

   *Response:*

   *We continue to review our benefit program every year with a goal of providing the
   best possible benefits our company can afford, from both a cost and productivity
   standpoint. We are in the process of conducting this review for the year 2000 and
   will include your concerns in our review process.*

CIG_ESI00001542.003

**EXHIBIT 6**





California Capital Insurance Company
Nevada Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

November 14, 2005

Dear CIG Team Member and Employee/Owner:

We are pleased to provide you with your ESOP Statement for 2003. As we have communicated to you over the last several years, the reason we have experienced a delay in completing our stock valuation was the asbestos-liability exposure incurred by our sister company, Kelly Moore Paint Company. Even though this asbestos liability remains with Kelly Moore Paint, our independent stock appraiser feels that the liability has been fairly stated and that the Paint Company has relative value on a going-concern basis. Progress is being made in the management and control of Kelly Moore Paint's asbestos liability; however, its future development could have an impact on CIG's future stock value.

You will be encouraged to see that the per-share price of CIG's stock for 2003 was $6.35, an increase of 51% over 2002's price of $4.20. Our increase in value is attributed to the continued hard work and commitment to a high level of performance by all CIG team members. I encourage you to thank all team members and business partners for their contribution to the increase in the value of our company.

As we go forward, it is our goal to complete timely ESOP stock valuations and to deliver them to all ESOP participants by June of each year. Along these lines, we have completed the stock valuation for 2004, and you can expect to receive your ESOP Statement with 2004 account values before the end of 2005. I am pleased to announce that our CIG stock value for 2004 is $7.80, a 22% increase over our prior valuation and 19% higher than our initial contribution price of $6.55.

I am proud of being a CIG team member and greatly appreciate our team's high performance level and pride as well. It is an exceptional opportunity for us, as owners, to share in the financial success of our efforts.

Best personal regards,

Peter M. Cazzolla

2004 — $37,000
$15,000

pmc/lld

EXHIBIT  7



**CIG** SINCE 1698

*California Capital Insurance Company*
*Nevada Capital Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

PETER M. CAZZOLLA
*President-C.E.O.*

December 1, 2005

Dear CIG Team Member and Employee/Owner:

Enclosed you will find your ESOP Statement for 2004. As I communicated to you in my cover letter included with your 2003 ESOP Statement, even though Kelly-Moore Paint Company continues with a liability exposure to asbestos, our independent stock appraiser asserts, as of the 2004 valuation, that their liability has been fairly stated and that the Paint Company has relative value on a going-concern basis. Significant resources continue to be applied to managing and controlling Kelly-Moore Paint's asbestos liability; however, the future development of these claims could have an impact on CIG's future stock value.

Our price per share for 2004 is $7.80, a 22% increase over our 2003 per-share price of $6.35. You should also note that our 2004 per-share value exceeds the ESOP per-share cost price of $6.55 by 19%. This is the first time our price per share has exceeded cost.

You will also notice that your 2004 ESOP Statement includes a small amount in the Investment line that represents stock allocation for our ESOP loan interest expense only. We did not allocate stock in 2004 due to the uncertainty of Kelly-Moore Paint's asbestos liability and subsequent delay in valuations. To fairly deal with the ESOP uncertainty in 2004, CIG's Board of Directors established our 401(k) Profit Sharing Plan and contributed approximately 25% of each team member's annual salary into his or her personal 401(k) account. Future remaining ESOP participant investments, the shares we receive each year, will be extended over an additional five years with the final share allocations to be made in 2014. This extension of our ESOP provides added incentive for team members to stay with CIG, helps us attract new employees, and enhances our annual financial performance by reducing the expenditures related to our ESOP.

We are pleased that we are back on track to complete our ESOP valuations in a timely way, and our goal continues to be to deliver statements to all participants by June of each year. Thank you again for your part in making CIG a company of choice by our customers, which leads to the enhanced financial value of our company for all CIG employees and shareholders.

Best personal regards,

Peter M. Cazzolla

pmc/lld
Enclosure

EXHIBIT
Lora Smith   JS
CT 4/16/08

P044

**EXHIBIT 8**

 **?**

QUARTERLY EMPLOYEE MEETING
March 2, 2004

*QUESTIONS AND ANSWERS*

1. **Could you give a brief description of how the company stock is evaluated with respect to the ESOP?  When the stock was first issued, what was the value, and what is the current value?  What can we as employees do to increase its value?  (Gus Barkley, Junior Accountant — Home Office)**

   *Response:*

   *The ESOP Stock is the Class "I" stock of our parent company, K-M Industries Holding Co, Inc., purchased in October 1999 at a price of $6.55 per share.  Among others, there are two major factors used to appraise the value of the shares.*

   *(1) Comparable Public Company Analysis — Various aspects of similar companies are compared.*

   *(2) Tracking Stock Issues and Overall Performance of CIG.*

   *Once the fair market value is determined, Duff & Phelps deducts the remaining debt.  Finally, this value is discounted for "lack of marketability" (generally about 15%).*

   *Also, the outcome of Kelly-Moore Paint Company's asbestos liabilities will affect the value of K-M Industries Class "I" stock, which we hold.*

   *Value at December 31, 2002 was $4.20 per share.*

   *AS EMPLOYEES, WE CAN INCREASE OUR ESOP VALUE BY PERFORMIMG OUR JOB RESPONSIBILITIES THE BEST WE CAN EACH AND EVERY DAY. THE GREATER THE NUMBER OF HIGH-PERFORMING TEAM MEMBERS, THE BETTER OUR COLLECTIVE COMPANY PERFORMANCE AND RESULTS WILL BE.*

EXHIBIT
223
Fernandez 4-21-08

CIG_ESI00001791
Confidential

**EXHIBIT  9**

 **QUARTERLY EMPLOYEE MEETING**
**August 16, 2004**

*QUESTIONS AND ANSWERS*

1. **My questions pertain to ESOP as our Participant Statement for 2003 has not yet been received. (Anonymous)**

   - **If my employment ends today, what happens to my vested benefits? Will the vested amount/value I have in my account today be put aside so as not to gain or lose value until the time it is distributed to me?**

   *Response:*

   *You have a vested percentage at the end of each plan year, i.e., from 20% to 100%. When you terminate employment with CIG, that percentage remains the same from the last year you qualified to participate in the ESOP (worked 1,000 hours).*

   *No, your account will not be put aside to not change value until distributed to you.*

   *There may be small numbers of shares added to your account in following years from forfeitures and dividends, but the primary reason for increases/decreases in the value of your vested benefit will be from the change in share value. (Example — If the share value doubles, so will your account balance.)*

   - **Is there anything the Plan Administrator/Committee can do or have done to protect the benefits of the Plan participants in light of the asbestos/Mesothelioma lawsuits, which will be ongoing for many years to come?**

   *Response:*

   *The K-M Industries plan administrators and the plan trustee, North Star ESOP and Fiduciary Services, have been and are continuing to evaluate options to obtain the maximum benefit possible from our ESOP. The primary obstacle continues to be the extent of the liabilities created by asbestos claims and the estimated future value of these claims and their subsequent impact on the equity value of Kelly Moore. At this point, Kelly Moore Paint Company continues to take legal action to settle individual claims, with reasonable success, and to quickly move to trial their lawsuit against Union Carbide. Several trial dates were set this year with subsequent postponements. The trial date for August has been moved to September regarding this case, subject to further postponement due to challenges by Union Carbide. It is difficult to predict the outcome of a jury trial, so we will have to*

EXHIBIT

*228*

*Fernandez  4-21-08*

CIG_ESI00002713
Confidential

Questions and Answers
August 16, 2004
Page 2

---

*wait for the jury's verdict.   A verdict in favor of Kelly Moore should affect our ESOP value positively, but this cannot be guaranteed.*

*As presented to you and discussed with team members during previous Team Meetings, the worst case is if the asbestos liabilities cause Kelly Moore Paint to become insolvent, then the value of our ESOP shares could be zero up to some positive dollar value, depending on the ability of Kelly Moore Paint's assets and insurance to pay for the asbestos liabilities.  Under this worst-case scenario, CIG may be faced with a need to seek new investors.  Due to the excellent performance of CIG team members and our resultant strong financial performance, we should be in a position to put an equity structure in place that will allow the continuance of our company strategies.*

*Please be assured that all possible actions are being considered to minimize the impact Kelly Moore's asbestos liabilities will have on the K-M Industries "I" stock we own.   The stock valuation is still in progress and will be finalized once the appraisers are relatively confident placing a value on Kelly Moore Paint Company.*

2.  With regards to the Personal Lines auto insurance policies, do you see us in a hard or a soft market?   What is the difference between the two?   In what timeframes do the two above occur: one to two years, two to three years?   What type of business strategy will CIG use in the different markets?   My questions come about because of all the TV ads that I have seen about discount auto insurance.   One such ad shows CDI statistics with different company names and the rates that they charge.   The companies sponsoring the ads that I've seen are Century 21, Progressive, and Mercury, along with Geico.   (Gus Barkley, Junior Accountant—Home Office)

*Response:*

*A hard market is one where prices remain at a relatively higher level and underwriting terms and coverage are more restrictive.  A soft market is one where prices are lower and underwriting terms and coverage more broad.  The timing of these market conditions is driven by company loss experience and their strategies regarding growth and profit. Additionally, higher investment returns tend to encourage companies to lower rates to gain more premium dollars for investment returns that more than offset underwriting losses.*

*CIG will continue to market our personal lines products through independent agents.  Other distribution models utilizing independent agents are being employed to better compete at point of sale with direct writers.  Advertising may also be part of this strategy, however, not to the extent of the larger National Insurers.  One-hundred-percent electronic interface with our agents and policyholders for new*

Questions and Answers
August 16, 2004
Page 3

---

*and renewal transactions, with Internet access, will give CIG a strong position in the markets we serve. This capability will improve our retention of existing clients and, through increased efficiency, allow our products to remain competitive. We have also embarked on a project to strengthen customer partnership and loyalty with CIG. The name of the project is CIGville, and you will be hearing more about our new program in the coming months. During our upcoming planning cycle, we will be developing strategies and actions to achieve our revised company five-year strategic goals, which are:*

- *Attain a before-tax average rate of return on surplus of 15% and revenue-growth rate of 10%.*

- *Develop strong agency relationships to achieve an average direct written premium of $1 million per agency.*

- *Provide superior customer service every transaction, every time, resulting in an average policyholder-retention ratio of 88% for all lines.*

- *Ensure team members, organization, and operating systems produce the flexibility needed to attain open communication, efficient operations, and proper controls, meeting or exceeding a total expense ratio, excluding commissions, of 15.5%.*

CIG_ESI00002713.003
Confidential

EXHIBIT 10

# CIG
## Inter-Office Memorandum

**DATE:**      October 11, 2004

**TO:**        All CIG Employees

**FROM:**      Peter Cazzolla

**SUBJECT:**   Year 2003 ESOP Allocations

---

Since our August Quarterly Employee Meeting and communications, we have had a number of inquiries regarding 2003 ESOP allocations. From the inception of the ESOP, the ESOP Statements have usually been distributed in mid-June; however, this year's have been delayed because the fair market value of our parent company's Series "I" Stock on a non-marketable minority interest basis is yet to be determined. The number of shares earned by each employee for the Plan Year 2003 cannot be calculated in the absence of the share value. Neither is there a basis for estimating the approximate value of the ESOP shares.

At this time, we do not have any more information than what is available publicly and on the Internet. The number of asbestos suits filed against our sister company, Kelly-Moore Paint Company, has increased to approximately 48,000. Most recently, on September 13, the trial commenced with Kelly-Moore Paint suing Union Carbide for liability of all pending suits. That trial is expected to last from four to six weeks. In view of the uncertainty of this case, and possibly other unknown factors, the Trustee does not feel a "fair market value" can be determined at this time.

We expect the statements will be provided to participants before December 31, 2004. Regretfully, this is the best information we have, but rest assured that you will be informed of any significant developments as soon as we are aware of them.

Any specific questions you have can be directed to Ed Mines or me.

pmc/lld



EXHIBIT
229
Fernandez 4-21-08

**EXHIBIT 11**

# CIG
## Inter-Office Memorandum

DATE:       October 22, 2004

TO:         All CIG Employees

FROM:       Peter Cazzolla

SUBJECT:    Kelly-Moore Paint Company Lawsuit

---

We learned today that Kelly-Moore Paint Company lost the trial and received a defense verdict in favor of Union Carbide. The Paint Company is now considering other options, and as we become aware of them, we will be sure to share them with you.

I know this is disappointing for everyone, but we will do all we can to protect our ESOP interests.


pmc/lld

EXHIBIT

230

Fernandez 4-21-08

**EXHIBIT 12**

**?**     QUARTERLY EMPLOYEE MEETING
November 2, 2004

*QUESTIONS AND ANSWERS*

1. Can you send us the winners list for the monthly Gold Card drawing like you do the TEAM-O-GRAMS and the quarterly meeting information? Since we never get to see the winners list, we have no way of knowing that the program actually exists. It would also be nice if you could put the information about why they received the Gold Card so we know what a good job people in the company are doing. (Anonymous)

*Response:*

*Information on the Gold Card Drawing winners is sent to the Branches when they are selected. We will follow up to ensure that the winners list is published in the Branches.*

*We would like to furnish details on every award that is given. However, we receive a large number of awards for a variety of different Customer Service activities. That makes it extremely difficult to publish each award winner's accomplishment in sufficient detail.*

2. Since the valuation of the ESOP is now in question, has there been any consideration given to alternative financial incentives should the fund zero out? (Anonymous)

*Response:*

*Yes, we are evaluating various benefit options, and we will advise all employees of any revisions to our benefit program.*

3. Should Kelly-Moore lose its suit against Union Carbide and file for bankruptcy, what happens to CIG and our ESOP? Thank you. (Kirsten Hadley, Associate Publication Specialist II — Home Office)

*Response:*

*Kelly-Moore's loss of the lawsuit against Union Carbide is not expected to have any effect on CIG. As communicated to you in our Quarterly Meeting on August 16, 2004, the K-M Industries plan administrators and the plan trustee, North Star ESOP and Fiduciary Services, have been and are continuing to evaluate options to obtain the maximum benefit possible from our ESOP. The primary obstacle*

CIG_ESI00002715
Confidential

Questions and Answers
November 2, 2004
Page 2

---

*continues to be the extent of the liabilities created by asbestos claims and the estimated future value of these claims and their subsequent impact on the equity value of Kelly-Moore. At this point, Kelly-Moore Paint Company continues to take legal action to settle individual claims, with reasonable success.*

*Also presented and discussed with team members during previous Team Meetings, the worst case is if the asbestos liabilities cause Kelly-Moore Paint to become insolvent, then the value of our ESOP shares could be zero up to some positive dollar value, depending on the ability of Kelly-Moore Paint's assets and insurance to pay for the asbestos liabilities. Under this worst-case scenario, CIG may be faced with a need to seek new investors. Due to the excellent performance of CIG team members and our resultant strong financial performance, we should be in a position to put an equity structure in place that will allow the continuance of our company strategies.*

*Again, please be assured that all possible actions are being considered to minimize the impact Kelly-Moore's asbestos liabilities will have on the K-M Industries "I" stock we own. The stock valuation is still in progress and will be finalized once the appraisers are relatively confident placing a value on Kelly-Moore Paint Company. All employees will be made aware of new developments regarding our ESOP as they occur. Thank you for your understanding, patience, and continued dedicated performance.*

4. **Is the standard three percent increase at yearly review going to be reevaluated? (Anonymous)**

*Response:*

*The annual merit increase is evaluated each year, with this year being no different. We are in the process of reviewing our compensation program and salary ranges to determine our competitive-salary position. In addition, we are reviewing the budget process to evaluate our salary-administration expenses. When these activities are complete, we will communicate our compensation guidelines as appropriate.*

CIG_ESI00002715.002
Confidential

Questions and Answers
November 2, 2004
Page 3

---

5. Establishing a longevity recognition program which utilizes financial reward incentives may help with retaining good employees. Is CIG concerned about the number of employees that come and go, the costs involved, and what are they considering to improve the situation? (Anonymous)

*Response:*

*We at CIG are concerned about employee retention, and we feel our benefit package is competitive. Our entire benefit program—including group health benefits, vacations, holidays, education assistance, salary structure, performance incentives, retirement plans, flexible spending accounts, and individual career planning—is reviewed annually for competitiveness and its relation to affordability. A number of enhancements have been made to our benefit program in terms of all these benefit areas.*

6. Do we get a copy of the meetings, and is it ever possible to have a conference call on these Quarterly Meetings? (Rose Peters, Commercial Lines Underwriting Clerk, Anaheim Branch)

*Response:*

*Copies of the Quarterly Employee Meetings are sent electronically to all Branch Managers to be used at Branch Team Meetings and then posted on local bulletin boards for further reference. In view of the large number of CIG Branch offices, conference calls for the QEMs are not practical.*

CIG_ESI00002715.003
Confidential