Daniel Feinberg – CA State Bar No. 135983
Todd F. Jackson – CA State Bar No. 202598
Margaret E. Hasselman – CA State Bar No. 228529
Nina R. Wasow – CA State Bar No. 242047
Kirsten G. Scott – CA State Bar No. 253464
LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, CA  94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
Email: dfeinberg@lewisfeinberg.com
Email: tjackson@lewisfeinberg.com
Email: mhasselman@lewisfeinberg.com
Email: nwasow@lewisfeinberg.com
Email: kscott@lewisfeinberg.com

*Attorneys for Plaintiffs and the Class*
(Additional counsel listed within)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO AND OAKLAND DIVISION

| | |
|---|---|
| THOMAS FERNANDEZ, LORA SMITH, and TOSHA THOMAS, individually and on behalf of a class of all other persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> K-M INDUSTRIES HOLDING CO., INC.; K-M INDUSTRIES HOLDING CO., INC. ESOP PLAN COMMITTEE; WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; TRUSTEES OF THE WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; CIG ESOP PLAN COMMITTEE; NORTH STAR TRUST COMPANY; DESIREE B. MOORE REVOCABLE TRUST; WILLIAM E. MOORE MARITAL TRUST; WILLIAM E. MOORE GENERATION-SKIPPING TRUST; and DESIREE MOORE, BOTH IN HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST'S SUCCESSOR TRUSTS NAMED ABOVE, <br><br> Defendants. | Case No. C-06-07339 CW <br><br> **REDACTED** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Date:       July 31, 2008 <br> Time:       2:30 p.m. <br> Courtroom:  2, 4th Floor <br> Judge:      Hon. Claudia Wilken |

## TABLE OF CONTENTS

Page No.

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Moore Family Owned and Controlled Kelly Moore Paint and CIG. . . . . . . 2

    B.    Asbestos Litigation Against Kelly-Moore Paint Began Long Before the 1998 ESOP Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Insurance Coverage for Kelly-Moore's Asbestos Liability Was Uncertain in 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    Mr. Moore Decided to Form an ESOP In Order to Plan for His Estate While Maintaining Control of The Company. . . . . . . . . . . . . . . . . . . . . . . . 6

    E.    K-M Concealed Material Information Regarding Asbestos Liability From the Valuator for the 1998 Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . 7

    F.    Kelly-Moore Hired Attorney Cheryl Mills To Coordinate Asbestos Litigation in 1997, Prior to the ESOP Transactions, But Did Not Provide Her Findings to Valuators, Auditors or ESOP Participants. . . . . . . . . . . . . . . . . . . . . . 9

    G.    In the 1998 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M and Moore Trust Defendants Withheld Asbestos Information From Auditors, Valuators, and Participants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The K-M and Moore Trust Defendants Withheld a December 1998 Letter From Cheryl Mills From Valuators and Participants. . . . . . . . . . . . . 12

        2.    The K-M Defendants Concealed Information About Kelly-Moore's Asbestos Liability From Auditors. . . . . . . . . . . . . . . . . . . . . . . . 13

    H.    In the 1999 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M and Moore Trust Defendants Withheld Vital Information From Auditors, Valuators, and Participants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.    The K-M and Moore Trust Defendants Hid Information About Asbestos Liabilities After the ESOP Transactions That Concealed their Fiduciary Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    J.    Kelly-Moore and CIG's Communications With Participants Concealed That the 1998 and 1999 Transactions Were For More Than Fair Market Value. . . . . . . 19

    K.    North Star, the Successor Trustee, Failed to Investigate the 1998 and 1999 Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A.    ERISA's Statute of Limitations for Fiduciary Violations. . . . . . . . . . . . . . 26

B.  Plaintiffs' Claims Against The K-M Defendants and the Moore Trust Defendants Are Timely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    1.  The K-M and Moore Trust Defendants' Violations of ERISA First Occurred in 1998 and 1999 When the ESOP Purchased Stock from the Moore Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    2.  Because the K-M and Moore Trust Defendants Withheld Vital Information From the Participants, Valuators, and Auditors, Plaintiffs' Claims Against Them are Timely Under the Fraud or Concealment Exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        i.  The K-M Defendants Engaged in Acts of Fraud or Concealment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            a.  Concealment of Asbestos Litigation Against Kelly-Moore From Participants. . . . . . . . . . . . . . . . . . . . . . . . . 30

            b.  Concealment of the Asbestos Litigation Against Kelly-Moore From Valuators. . . . . . . . . . . . . . . . . . . . . . 33

            c.  Concealment of Asbestos Litigation Against Kelly-Moore From Auditors. . . . . . . . . . . . . . . . . . . . . . . . . . 35

            d.  Concealment of the Columbia Financial Advisors, Inc. Report from Participants and Valuators. . . . . . . . . . . . . 37

            e.  The K-M Defendants Concealed Asbestos Information After The ESOP Transactions. . . . . . . . . . . . . . . . . . . . 37

        ii.  Acts of Concealment by the Moore Trust Defendants. . . . . . . . 38

    4.  The Court Should Not Countenance the K-M and Moore Trust Defendants' Arguments Based on Rule 9(b). . . . . . . . . . . . . . . . . . . 41

    5.  If the Fraud or Concealment Exception Applies, Plaintiffs Filed Suit Within the Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

C.  Plaintiffs Filed Suit Against North Star Within the Applicable Statute of Limitations Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    1.  Plaintiffs Allege That North Star Breached Its Fiduciary Duty By Failing to Take Proper Steps to Remedy the Fiduciary Violations Committed By Mr. Moore and His Co-Fiduciaries in the 1998 and 1999 Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    2.  North Star Could Have Pursued Claims for Fiduciary Violations Against the Prior Trustee and Co-Fiduciaries After North Star Became Successor Trustee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    3.  Plaintiffs Filed Their Breach of Fiduciary Duty Claim Against North Star Within the Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

Page No.

**FEDERAL CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Barker v. Am. Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . 28

Bolt v. Merrimack Pharmaceuticals, Inc., 503 F.3d 913 (9th Cir. 2007) . . . . . . . . . . . . . 36

Canale v. Yegen, 782 F. Supp. 963 (D.N.J. 1992) and 789 F. Supp. 147 (D.N.J. 1992) . . . . . 40

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Community Bancshares, Inc. v. Patterson, 547 F. Supp. 2d 1230 (N.D. Ala. 2008) . . . . . . . . 40

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992) . . . . . . . . . . . . 26

Evanson v. Price, 2006 WL 2829789 (E.D. Cal. Sept. 29, 2006) . . . . . . . . . . . . . . . . . . 31, 37

Fink v. Nat'l Sav. and Trust Co., 772 F.2d 951, 957 (D.C. Cir. 1985) . . . . . . . . . . . . . . . 49

Foman v. Davis, 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Han v. Mobil Oil Corp., 73 F.3d 872 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Harris v. Itzhaki, 183 F.3d 1043 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Heim v. Weeres Industries, Inc., 1990 WL 25102 (Minn. App. 1990) . . . . . . . . . . . . . . . . . 6

Hemphill v. Pers. Representative of the Estate of James J. Ryskamp, Jr., 2006 WL 1837917 (E.D. Cal. July 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Horn v. McQueen, 215 F. Supp. 2d 867 (W.D. Ky. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 27

In re AST Research Securities Litig., 887 F. Supp. 231 (C.D. Cal. 1995) . . . . . . . . . . . . . . 42

In re Crown Vantage, Inc., 2004 WL 1635543 (N.D. Cal. July 12, 2004) . . . . . . . . . . . . . . 29

In re Enron Securities, Derivative & ERISA Litigation, 284 F.Supp.2d 511 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

J. Geils Band Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245 (1st Cir. 1996) . . . . . 45

Landwehr v. DuPree, 72 F.3d 726 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Lundy v. Union Carbide Corp., 695 F.2d 394 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . 26

Martin v. Consultants & Adm'rs, 966 F.2d 1078 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . 45

Meagher v. International Association of Machinists and Aerospace Workers Pension Plan, 856 F.2d 1418 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 45

Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999) . . . . . . . . . . . 26

Peralta v. Hispanic Business, Inc., 419 F.3d 1064 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 32

Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380 (1993) . . . . 36

Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1220 (7th Cir. 1990) . . . . . . . 28

S.E.C. v. Sands, 902 F. Supp. 1149 (C.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Shaver v. Operating Engineers Local 428 Pension Trust Fund, 332 F.3d 1198 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 46, 47

Snow v. Harnischfeger Corp., 12 F. 3d 1154 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Stanford University Hosp. v. Federal Ins. Co., 174 F.3d 1077 (9th Cir. 1999) . . . . . . . . . . . . . 29

Tatum v. R.J. Reynolds Tobacco Co., 2007 WL 1612580 (M.D.N.C. May 31, 2007) . . . . . . . . 29

Volk v. D.A. Davidson & Co., 816 F.2d 1406 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . passim

W.R. Grace & Co. v. Western U.S. Industries, 608 F.2d 1214 (9th Cir. 1979) . . . . . . . . . . . . 29

Waller v. Blue Cross of Cal., 32 F.3d 1337 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**STATE CASES**

In re Rehabilitation of Centaur Ins. Co., 158 Ill.2d 166 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Middlesex Ins. Co. v. Mann, 177 Cal. Rptr. 495 (Cal. Ct. App. 1981) . . . . . . . . . . . . . . . . . . . 40

Paramount Communications, Inc. v. Gibraltar Cas. Co., 90 N.Y.2d 507 (1997) . . . . . . . . . . . . 6

Pillsbury v. Karmgard, 22 Cal. App. 4th 743  (Cal. Ct. App. 1994) . . . . . . . . . . . . . . . . . . . . . 38

Quackenbush v. Mission Ins. Co., 46 Cal. App.4th 458  (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 6

**FEDERAL STATUTES**

29 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1102(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 U.S.C. § 1104(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

29 U.S.C. § 1105(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

29 U.S.C. § 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 U.S.C. § 1108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 U.S.C. § 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I.    INTRODUCTION.

In moving for summary judgment on all of Plaintiffs' claims based on ERISA's[1] statute of limitations, Defendants omit or gloss over the key facts. In 1998 and 1999, William Moore acted as both buyer and seller of company stock when he sold his family trust's shares to the ESOP while serving as the sole ESOP trustee. In connection with these transactions, the K-M and Moore Trust Defendants[2] withheld crucial information about Kelly-Moore Paint Company's asbestos liabilities from ESOP participants, the valuators who appraised Kelly-Moore Paint and Capital Insurance Group ("CIG") for the transactions, and the Company's auditors. If a prudent, independent fiduciary had been informed of these asbestos liabilities, the fiduciary would have either demanded a substantially lower price for the stock or walked away from the deal altogether. By hiding Kelly-Moore's asbestos liabilities both before and after the ESOP stock transactions, the K-M and Moore Trust Defendants concealed their ERISA violations from participants. The K-M and Moore Trust Defendants' actions of withholding information bring this case within the "fraud or concealment" provision of ERISA's statute of limitations, rendering Plaintiffs' claims timely.

North Star's summary judgment motion sets up a claim that Plaintiffs have not asserted against North Star and ignores the gravamen of Plaintiffs' actual claim against North Star. Plaintiffs have not asserted that North Star's breaches took place in 1998 and 1999. Instead, Plaintiffs allege that North Star breached its fiduciary duties after it was appointed as successor trustee in 2003. Plaintiffs allege that beginning in 2003, North Star failed to take appropriate

---

[1] The Employee Retirement and Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq.

[2] The "K-M Defendants" include K-M Industries Holding Co., Inc. ("KMH"), the KMH ESOP Plan Committee, and the CIG ESOP Plan Committee. The "Moore Trust Defendants" consists of the Moore Trust and Trustees of the Moore Trust; successor trusts which include the Desiree B. Moore Revocable Trust, the William E. Moore Marital Trust, and the William E. Moore Generation-Skipping Trust; and Desiree Moore, both in her individual capacity and as trustee of the Moore Trust's successor trusts. "North Star" is Defendant North Star Trust Company.

steps to investigate and remedy breaches of duty by Mr. Moore and his co-fiduciaries. That alleged breach of North Star's duties as a successor trustee falls within the ERISA statute of limitations, because it occurred less than six years before Plaintiffs filed suit and Plaintiffs did not have actual knowledge of the breach until after 2005.

## II.    FACTS.

### A.    The Moore Family Owned and Controlled Kelly Moore Paint and CIG.

William E. Moore founded Kelly-Moore Paint in 1946 and served a leading role in the company until his death in 2004. Declaration of Dan Stritmatter in Support of K-M Defendants' Motion for Summary Judgment ("Stritmatter Dec.") at ¶ 3. He was the President of the Company until 1984, when Joseph Cristiano was hired as President and CEO. Declaration of Nina Wasow in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("Wasow Dec."), Exh. 1 (Cristiano Dep. 23:1-23:11).[3] However, Mr. Moore continued in his role as Chairman of the Board of Directors until his death on November 21, 2004, and "was very active in running the company," including coming in to the office every day, until approximately 2002. Exh. 2; Exh. 1 (Cristiano Dep. at 23:13-24:7). *See also* Exh. 3 (Stritmatter Dep. 86:8-87:13) (noting that Mr. Moore took a "hands on" approach); Exh. 4 (Cazzolla Dep. 125:4-22) (explaining that Mr. Moore "was a person that ran [the company] on his own. He wanted to be in charge and in control of the operation"). Mr. Moore's wife, Defendant Desiree Moore, also served (and continues to serve) on the Kelly-Moore Paint Board of Directors. *See, e.g.*, Exhs. 5, 6; Wasow Dec. ¶ 8. Until the 1998 ESOP transaction, the Moores's family trust, the William E. and Desiree B. Moore Revocable Trust ("Moore Trust"), was the sole owner of Kelly-Moore Paint. Exh. 9. Mr. and Mrs. Moore served as trustees of the Moore Trust until Mr. Moore's death, at which point Mrs. Moore became the sole trustee of the successor trusts. Exh. 9; Exh. 10 at MT 2134-36.

---

[3] Unless otherwise noted, all Exhibits cited herein are attached to the Wasow Declaration, and will be cited by Exhibit number only. Cites to deposition transcripts will be cited by Exhibit number and "[Deponent's surname] Dep."

In 1985, Kelly-Moore Paint acquired California Capital Insurance Company, which later changed its name to CIG. Exh. 11 at CIG 1317; Declaration of Peter Cazzolla in Support of K-M Defendants' Motion for Summary Judgment ("Cazzolla Dec.") at ¶¶ 1, 3. Mr. Moore was on the Board of Directors of CIG until his death, and Mrs. Moore also served and continues to serve on the CIG Board of Directors. *See* Exhs. 12, 13. CIG was wholly owned by the Moore Trust until the ESOP purchased 42% of Mr. Moore's shares in 1999. Exh. 14.

**B.    Asbestos Litigation Against Kelly-Moore Paint Began Long Before the 1998 ESOP Transaction.**

Kelly-Moore Paint Company has a long history of asbestos litigation liability, of which Mr. Moore and other company officers were well aware. A former subsidiary of Kelly-Moore Paint, Paco Textures Corporation,[4] sold asbestos-containing products, including patching compounds and seam sealers for drywall, from 1968 until approximately 1981. Exh. 16 (Giffins Dep. 47:13-48:13). In 1971, William Moore, apparently anticipating litigation, established an "asbestos repository" at Kelly-Moore's headquarters in San Carlos, where company documents relating to asbestos were collected. *Id.* (Giffins Dep. 43:22-44:24).[5]


REDACTED


William Moore was copied on the memo. *Id.* Kelly-Moore Paint was first sued for asbestos-related bodily injuries in 1977. Exh. 19 at p. 40.


REDACTED


---

[4] Kelly-Moore purchased Paco in the 1960s, and held it as a wholly-owned subsidiary until its dissolution in 1982. Exh. 15 at KMH 5463.

[5] Mr. Cristiano testified that he learned about the asbestos repository a couple of years after he came to work for Kelly-Moore (in 1984), "when asbestos became an issue." Exh. 1 (Cristiano Dep. 108:11-16).

1

2

3                                    **REDACTED**

4

5

6

7

8         The next decade saw the bankruptcies of the major suppliers of the asbestos fibers used in

9    Kelly-Moore's products.

10                                    **REDACTED**

11                                          Johns-Manville went bankrupt due

12   to asbestos liability in 1982.  The actuarial consultant retained by Reed International in 1981 to

13   analyze Kelly-Moore's asbestos liabilities sent the Company a series of newspaper articles about

14   the then-pending Johns-Manville bankruptcy, which also discussed the rising tide of asbestos

15   cases and ongoing coverage disputes with insurance companies.  Exh. 25.[6]  Carey Canadian went

16   bankrupt in 1990.  Exh 26 at NS 823.

17         Kelly-Moore's asbestos problems escalated in the wake of these bankruptcies.

18

19

20                                    **REDACTED**

21

22

23         Also in 1997, the settlement of *Patricio Sanchez*, an asbestos bodily injury

24   case in El Paso, Texas, exhausted the first of Kelly-Moore's primary insurance policies covering

25   asbestos bodily injury cases.  Exh. 27.  After the *Sanchez* case, asbestos was "on the radar" at

26   Kelly-Moore, according to Cheryl Mills, an attorney whom the company hired in 1997 to oversee

27   _____

28   [6] These articles were retained in Kelly-Moore's asbestos repository, as shown by the KMH-AR
     prefix.

1   the asbestos litigation and report to the company and its auditors about asbestos litigation and

2   insurance coverage. Exh. 28 (Mills Dep. 53:1-53:14, 63:21-63:22). In fact, in 1997, there were

3   4,364 new asbestos bodily injury claims filed against Kelly Moore (compared to 2,144 new

4   claims filed in 1996). Exh. 29 at p. 5.              **REDACTED**

5

6   The situation worsened in 1998 and 1999. In 1998, 7,049 new asbestos claims were filed

7   against Kelly-Moore, bringing the total number of claims filed since 1993 to 16,917. Exh. 29 at

8   p. 5. 9,707 new claims were filed in 1999, bringing the total number of claims filed since 1993

9   to 26,624. *Id.*

10

11                              **REDACTED**

12

13                              Kelly-Moore's top management was aware of this wave

14  of asbestos claims, but, as discussed below, they concealed asbestos litigation from ESOP

15  participants, auditors, and valuators, and the liability was not accounted for in the valuations for

16  the ESOP transactions.

17  **C.    Insurance Coverage for Kelly-Moore's Asbestos Liability Was Uncertain in 1998.**

18  Kelly-Moore was advised to put all of its insurers on notice of asbestos claims in 1981.

19  Exh. 32.

20

21

22

23

24                              **REDACTED**

25

26

27

28

REDACTED                    In addition, several of Kelly-Moore's

reinsurers were insolvent by 1998.[7]  Thus, by 1998, the extent of available insurance coverage

was already in doubt.  *See also id.* (noting that "Kelly-Moore faced significant numbers of

asbestos suits long before 2000").[8]

**D.    Mr. Moore Decided to Form an ESOP In Order to Plan for His Estate While Maintaining Control of The Company.**

In the Spring of 1998, Mr. Moore began seriously considering implementation of an

ESOP.  *See* Exh. 38 (Ferrari Dep. 67:5-67:25).

REDACTED

. In other words, one of his reasons for establishing

the ESOP was to extract some capital from the company and reduce his tax liability.  Exh. 40

(Menke Dep. 104:21-104:25).  Mr. Moore also wanted to diversify his personal assets.  Exh. 1

(Cristiano Dep. 78:6-78:11).  However, he also "wanted to absolutely maintain control" of the

company.  Exh. 40 (Menke Dep. 112:25-113:12, 114:15-18).  *See also* Exh. 4 (Cazzolla Dep.

125:4-22) ("He wanted to be in charge and in control of the operation").

To achieve his goals, Mr. Moore began discussions with Menke & Associates, which is a

one-stop shop for ESOP services.  Exh. 40 (Menke Dep. 44:20-50:11).  Shortly after the first

meeting with Mr. Moore, Menke & Associates sent him a letter explaining some of the

advantages of an ESOP, including that the selling shareholder (Mr. Moore) would be able to

realize some or all of his investment in the company tax-free, while maintaining control: "[y]ou

---

[7] *See* Exh. 36 (chart of Kelly-Moore's insurers); *Quackenbush v. Mission Ins. Co.*, 46 Cal. App. 4th 458, 464 (Cal. Ct. App. 1996) (Mission Insurance Company placed in liquidation in 1987); *Heim v. Weeres Industries, Inc.*, 1990 WL 25102, *1 (Minn. Ct. App. 1990) (Pine Top Insurance Company placed in liquidation in 1987); *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E. 2d 1015, 1016 (Ill. 1994) (Centaur Insurance Company placed in rehabilitation in 1987); *Paramount Communications, Inc. v. Gibraltar Cas. Co.*, 90 N.Y.2d 507, 511 (N.Y. 1997) (Integrity Insurance Company declared insolvent in 1987).

[8] By 2001, the dispute over the excess insurers' duty to defend or indemnify escalated to litigation, with Kelly-Moore filing a lawsuit in San Francisco Superior Court against multiple insurers for breach of contract and bad faith.  Exh. 37.

may elect yourself to be a one-person ESOP Committee, thereby voting all the stock in the ESOP for as long as you wish." Exh. 41 at MT 108. *See also* Exh. 40 (Menke Dep. at 114:25-115:14) (explaining that Mr. Moore could keep absolute control by acting as the sole member of the ESOP Committee and the Trustee). Menke & Associates also advised that Mr. Moore could provide very limited information to participants: under the heading "Confidentiality Preserved Each Year," the letter states that "the employees simply receive their individual account values. The employees do not have to see the balance sheet or profit/loss statements or even the appraisal." (emphasis in original). Exh. 41 at MT 108.

Mr. Moore engaged Menke & Associates on May 11, 1998. Exh. 42. Menke & Associates provided plan design and installation services to Kelly-Moore and CIG; it did not provide services to the ESOP. Exh. 40 (Menke Dep. at 129:23-130:24).

As discussed below, in October 1998, Mr. Moore sold 42% of the Moore Trust's interest in Kelly-Moore Paint to the ESOP for $232 million, and also served as the sole trustee for the ESOP. He sold 42% of the Moore Trust's interest in CIG to the ESOP in October 1999 for $55 million. As the trustee of the ESOP, Mr. Moore conducted no negotiations for the ESOP, hired no independent advisors for the ESOP, retained absolute voting control of the ESOP shares, and chose to keep the participants in the dark.

**E.    K-M Concealed Material Information Regarding Asbestos Liability From the Valuator for the 1998 Transaction.**

To assist in setting a price for the ESOP shares, Mr. Moore (as both buyer and seller of the shares) hired a valuator who worked for a subsidiary of the Menke Group, the same company that helped install the ESOP. Mr. Moore, as the fiduciary of the to-be-formed Kelly-Moore Paint ESOP, entered into an agreement with Sansome Street Appraisers on May 26, 1998, for valuation services; B.J. Brooks was given the assignment.[9] Exh. 43; Exh. 44; Exh. 40 (Menke Dep. 67:3-68:4). Mr. Brooks, who worked for a company which had a financial stake in the establishment

---

[9] Sansome Street Appraisers, Inc. is a wholly-owned subsidiary of the Menke Group, and John Menke is its president. Exh. 40 (Menke Dep. 66:3-67:2). Clients pay Sansome Street Appraisers (or Menke directly) for valuation services, and the appraiser is paid a percentage of that fee (50% for initial valuations and 60% for annual updates). Exh. 47 (Ireland Dep. 23:5-23:20, 24:11-24:19).

and administration of the ESOP, was not a fully independent valuator.

Mr. Brooks performed a valuation of Kelly-Moore Paint as of July 31, 1998, which concluded that the Company was worth $580 million. Exh. 45 at KMH 1440. He provided an updated valuation as of the transaction date, October 13, 1998, concluding that the Company was worth $550 million. Exh. 46.

Although Mr. Brooks reviewed the Company and its assets and liabilities, nothing in his valuation report suggests that he was provided with any information about asbestos litigation against the Company. Mr. Brooks died shortly after the October 1998 transaction. Exh. 47 (Ireland Dep. 29:3-12). Mr. Ferrari claims that he discussed asbestos litigation against Kelly-Moore with Mr. Brooks, but his statement is unsupported by any documents or corroborating evidence. Exh. 38 (Ferrari Dep. 216:16-19). *See also* Declaration of Stephen Ferrari in Support of K-M Defendants' Motion for Summary Judgment ("Ferrari Dec.") ¶ 10. Mr. Ferrari could not recall the specifics of the alleged communications, including whether he told Mr. Brooks the number of claims pending, or whether he gave Mr. Brooks any documents about asbestos litigation. Exh. 38 (Ferrari Dep. at 245:10-246:11).


REDACTED


Exh. 40 (Menke Dep. 230:17-232:2). Finally, Mr. Brooks' valuation report dated August 5, 1998 does not mention asbestos, nor does his updated valuation letter as of October 12, 1998. Exhs. 45, 46.

Moreover, John Menke, who was intimately involved in setting up the ESOP, and who owned Sansome Street Appraisers, testified that no one from Kelly-Moore alerted him to any asbestos litigation against the Company until 2001 or 2002. *See* Exh. 40 (Menke Dep. 66:3-66:5, 190:11-192:25). Indeed, Mr. Menke noted that had anyone mentioned asbestos liability to him at the time of the transactions, he likely would have included that information in letters he sent to

banks in an attempt to secure financing for the ESOP transaction. Exh. 40 (Menke Dep. 194:25-196:16).

Robert Ireland, the valuator who took over after Mr. Brooks passed away, testified that he could not recall receiving any information about Kelly-Moore's involvement in asbestos litigation until sometime after 2000. Exh. 47 (Ireland Dep. 75:16-76:19, 77:11-78:12).[10] The first valuation report to mention asbestos litigation was Mr. Ireland's report as of year-end 2000, which was completed in March 2001. Exh. 53, Exh. 47 (Ireland Dep. 132:21-24). Thus, nothing in the record supports Mr. Ferrari's self-serving testimony that he provided information about asbestos liability to the now-deceased Mr. Brooks, and it should therefore be disregarded.

**F.      Kelly-Moore Hired Attorney Cheryl Mills To Coordinate Asbestos Litigation in 1997, Prior to the ESOP Transactions, But Did Not Provide Her Findings to Valuators, Auditors or ESOP Participants.**

As noted above, attorney Cheryl Mills was retained in 1997 to coordinate the Company's response to asbestos litigation, including tracking the number of lawsuits filed and the remaining insurance coverage. Exh. 1 (Cristiano Dep. 26:21-27:2, 29:1-15)[11]; Exh. 28 (Mills Dep. 53:1-19).

Mr. Ferrari testified that just prior to the first ESOP transaction, on October 1, 1998, Mssrs. Ferrari and Cristiano had a telephone conversation with Ms. Mills

REDACTED

---

[10] Mr. Ferrari contradicts this testimony, stating that he discussed Kelly-Moore's asbestos litigation and insurance coverage with Mr. Ireland in early 1999. Ferrari Dec. ¶ 12.

[11]

REDACTED

In his deposition, Mr. Ferrari asserted that Mr. Cristiano was the main person dealing with Ms. Mills. Exh. 38 (Ferrari Dep. 170:8-9). Mr. Cristiano, however, testified that Mr. Ferrari was her primary point of contact. Exh. 1 (Cristiano Dep. 45:13-24).

1    The latter statement refers to the fact that one of Ms. Mills' responsibilities was reporting

2    on asbestos litigation to Ernst & Young, the auditor for Kelly-Moore Paint. Exh. 28 (Mills Dep.

3    65:6-17). In February 1998, Ms. Mills' letter to Ernst & Young about pending litigation against

4    Kelly-Moore failed to mention any asbestos cases. Exh. 55. Instead, the letter affirmatively

5    stated that no matters other than those listed (an EPA superfund site and a personal injury matter)

6    would affect the company's consolidated financial statement by more than $200,000 in the

7    aggregate. *Id.* In order for that statement to be true, each of the over 10,000 asbestos claims

8    pending against KM at year-end 1997 would have to be worth $20 or less.

9        Mr. Ferrari testified that the conversation with Ms. Mills memorialized in the note to file

10    was part of the company's "due diligence" process in setting up the ESOP, but he does not recall

11    any details of the conversation. Exh. 38 (Ferrari Dep. 175:2-14). However, Ms. Mills testified in

12    a deposition in 2003 that she was not involved in setting up the ESOP, and that she did not

13    provide any information to people involved in setting up the ESOP. Exh. 28 (Mills Dep. 62:20-

14    63:14). Ms. Mills did not analyze information such as the size of the population that might have

15    been exposed to asbestos sold by Kelly-Moore, the period of exposure, or the age of those

16    exposed in order to assess the present value of future asbestos claims when the ESOP was set up.

17    *Id.* at 64:17-66:21, 68:23-69:16.

18        Mr. Ferrari never shared Ms. Mills' statements with the ESOP participants. Exh. 38

19    (Ferrari Dep. 175:18-22). Neither did Mr. Cristiano nor anyone else at Kelly-Moore (including

20    Mr. Moore). Exh. 1 (Cristiano Dep. 56:21-57:3). Finally, as discussed below, Ms. Mills'

21    opinion was not provided to the valuator by the Company or by Mr. Moore.

22    **G.    In the 1998 Transaction, Mr. Moore Was the Buyer and the Seller, and the
         K-M and Moore Trust Defendants Withheld Asbestos Information From
23         Auditors, Valuators, and Participants.**

24        The first ESOP transaction closed on October 13, 1998. Exh. 9 at MK001589. The

25    Moore Trust sold 33,745,455 shares of stock[12] to the ESOP for $6.875 per share, or

26    _____

27    [12] As part of the 1998 transaction, the company was re-structured. Declaration of Caroline
     Walters in Support of Motion for Summary Judgment by the Moore Trust Parties ("Walters
28    Dec."), Exh. A (KMH 3119-3120). A holding company, K-M Industries Holding Co., Inc.
     ("KMH"), was formed, which held Kelly-Moore Paint Co. and CIG as wholly-owned

$232,000,000 total. *Id.*

Mr. Moore as the trustee of the ESOP was the buyer, and as trustee of the Moore Trust (which held the Moore family's shares in the company) was also the seller. *Id.* at MK 1597. At least two company executives expressed reservations to Mr. Moore about his decision to serve as the sole trustee of the ESOP – Mr. Cristiano testified that he felt that "an independent outside administrator would probably have the interest of the employees uppermost, No. 1," Exh. 1 (Cristiano Dep. 155:10-12) – but Mr. Moore was "adamant" that he would be the sole trustee. *Id.* at 153:4-154:7. Mr. Cazzolla testified that he told Mr. Moore that "it would be prudent to have a third party because it's very difficult to be independent and making decisions as an accumulative owner," but Mr. Moore was unconcerned because "that's the way he functions and that's the way he ran our companies." Exh. 4 (Cazzolla Dep. 21:25-22:24).[13] This was consistent with Mr. Moore's overall approach: he was "very hands on" and "made all the decisions for the company," Exh. 3 (Stritmatter Dep. 86:8-87:13), and once he made a decision, "that was it." Exh. 1 (Cristiano Dep. 156:6-13). *See also id.* at 157:8-14 (stating that he "only recommended things to [Mr. Moore] once").

The ESOP participants were not independently represented in the transaction. Exh. 40 (Menke Dep. 130:3-6). As trustee of the ESOP and seller of the stock, Mr. Moore was the ultimate decision-maker as to the price paid in the 1998 transaction. Exh. 1 (Cristiano Dep. 186:5-9); Exh. 38 (Ferrari Dep. 267:25-268:4). There were no negotiations over the price. *See* Exh. 38 (Ferrari Dep. 269:21-271:14).

---

subsidiaries. *Id.*

**REDACTED**

The shares of KMH were organized into two groups of "tracking stock," each intended to track the performance of their underlying subsidiary. The "Series P" stock tracks Kelly-Moore Paint, and the "Series I" stock tracks CIG. Stritmatter Decl. Exh. 3.

[13] *See also id.* at 125:4-22 (explaining that Mr. Moore "was a person that ran [the company] on his own. He wanted to be in charge and in control of the operation. And he felt confident and we did too, quite honestly, even though we told him there could be a technical conflict, that he was confident that that would not be an issue for him.").

1.    **The K-M and Moore Trust Defendants Withheld a December 1998 Letter From Cheryl Mills From Valuators and Participants.**

REDACTED

1

2.     **The K-M Defendants Concealed Information About Kelly-Moore's
Asbestos Liability From Auditors.**

2

3

4

5

6

7

8

9

10

11

12

13

REDACTED

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED

However, Mr. Ferrari received copies of Ms. Mills' letters to auditors wherein information about asbestos liability was withheld.  *See* Exh. 61; Exh. 38 (Ferrari Dep. 202:24-203:6).

REDACTED                                           Mr.

Cristiano again testified that Ms. Mills was reporting to the auditor about asbestos litigation and that they had sufficient insurance, Exh. 1 (Cristiano Dep. 233:5-24), but this was not true as described above.

The Company's withholding of information about asbestos litigation from Ernst & Young (through its executives and its attorney) is significant because, among other reasons, the valuator for Kelly-Moore Paint relied on the audited financials and notes thereto for information about the company's liabilities.  *See* Exh. 47 (Ireland Dep. 136:13-137:2).  *See also* Exh. 59 (Bodenstein Dep. 57:8-12, 58:14-59:5) (the valuator for CIG also relied on Kelly-Moore's audited financials for information about asbestos litigation).  Thus, hiding crucial information from Ernst & Young amounted to concealment from the valuators as well.[14]

**H.    In the 1999 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M and Moore Trust Defendants Withheld Vital Information From Auditors, Valuators, and Participants.**

Mr. Moore, both as Trustee of the ESOP and Chairman of the Board of CIG, engaged

REDACTED

1    Duff & Phelps to provide a valuation of the Series I stock as of June 30, 1999.[15]

2                                    REDACTED

3            However, Mr. Moore was unhappy with Duff & Phelps' valuation, believing

4    their value conclusion to be too low. Exh. 4 (Cazzolla Dep. 114:6-115:7); Exh. 70 (Mines Dep.

5    155:6-156:16). He had a telephone conversation with Kenneth Bodenstein of Duff & Phelps,

6    who was primarily responsible for their valuation report, in which he asked why the valuation

7    conclusion was not higher. Exh. 59 (Bodenstein Dep. 124:9-125:19); Exh. 4 (Cazzolla Dep.

8    115:8-22). Mr. Bodenstein explained Duff & Phelps' analysis to Mr. Moore, and declined to

9    increase the price per share. Exh. 59 (Bodenstein Dep. 128:11-23); Exh. 4 (Cazzolla Dep.

10    115:16-22).

11            Accordingly, Mr. Moore decided to cancel the Duff & Phelps report, and engaged

12    Columbia Financial Advisors, Inc., to perform another valuation of CIG. Exh. 70 (Mines Dep.

13    156:17-157:4); Exh. 71; Exh. 72. Kathryn Daly, the valuator at Columbia Financial in charge of

14    the CIG assignment, was not told that there had already been two valuations performed by Duff

15    & Phelps. Exh. 73 (Daly Dep. 35:15-36:11). She was not given Duff & Phelps' June 1999

16    valuation, even though she requested copies of all valuations of CIG performed in the prior five

17    years. *Id.* (Daly Dep. 35:21-37:14); Exh. 74 at CIG 008177.

18                            REDACTED            Ed Mines, the CFO of CIG, and

19    Peter Cazzolla, the CEO of CIG, also received copies of Columbia Financial's draft valuation.

20    Exh. 70 (Mines Dep. 187:20-189:17); Exh. 4 (Cazzolla Dep. 141:15-17).

21                            REDACTED                    Mr. Moore was

22    dissatisfied with Ms. Daly's valuation, because the estimated range of value was not higher than

23    Duff & Phelps' value conclusion. Exh. 73 (Daly Dep. 96:2-10) (statement by Ms. Daly that she

24    ────────────────────────

25    [15] CIG first engaged Duff & Phelps to provide a valuation report in June 1998. At that time,

26    KMH contemplated that there would be separate ESOPs for Kelly-Moore Paint and CIG, and that
     both transactions would happen in 1998. Exh. 4 (Cazzolla Dep. 43:25-44:17). However, the IRS

27    would not approve that arrangement, and the two ESOPs were merged in July 1999. *Id.*; Exh. 67
     at CIG 004588. Accordingly, the ESOP's purchase of Series I tracking stock, which was

28    intended to track the performance of CIG, was delayed until October 1999. Exh. 4 (Cazzolla
     Dep. 43:25-44:17).

vaguely recalls that Mr. Moore thought her valuation was too low). Ms. Daly vaguely recalled a conversation with Mr. Moore in which he questioned why her draft report had a range of values, and she explained that "for purposes of a transaction, the trustee would negotiate a point along the range." *Id.* at 56:17-22. It was a "curious conversation," according to Ms. Daly, because Mr. Moore as trustee would have had to negotiate with himself. *Id.* at 57:2-11. Mr. Moore asked Ms. Daly whether he could use the high end of her range of value, and requested that Ms. Daly prepare a fairness opinion letter for a price of $55 million. *Id.* at 70:14-72:22; Exh. 76 at CIG 008154. Ms. Daly prepared a draft fairness opinion, but never finalized it because she was fired soon after. Exh. 73 (Daly Dep. 32:18-33:24).[16]

Duff & Phelps' original value conclusion of $55 million was ultimately used in the transaction, and they provided an updated valuation letter as of the date of the transaction. Exh. 77. However, Duff & Phelps was never told that there had been a valuation of CIG by another appraiser which had concluded a range of fair market value starting at $48.5 million. Exh. 59 (Bodenstein Dep. 130:8-24). Although Mr. Mines admitted that a purchase price of $48.5 million would have been better for the ESOP participants, Exh. 70 (Mines Dep. 198:15-199:1), the participants also were never told that there was another valuation of CIG which concluded that the ESOP could negotiate a lower fair market value than the price actually paid.

Neither Duff & Phelps nor Columbia Financial were informed that Kelly-Moore Paint had thousands of asbestos lawsuits pending against it in 1999. Exh. 59 (Bodenstein Dep. 53:5-54:1); Exh. 73 (Daly Dep. 52:1-10). Duff & Phelps was first told by Mssrs. Mines and Cazzolla in 2002 that there was asbestos litigation against the Paint company. Exh. 59 (Bodenstein Dep. 53:24-54:1); *see also* Exh. 78 (notes of conversation between Mr. Bodenstein and Mr. Mines dated April 30, 2002, in which Mr. Mines notified Mr. Bodenstein of asbestos litigation against

---

[16] Ms. Daly sent Mr. Moore some information (pursuant to his request) about how he could invest his personal ESOP proceeds, after which Mr. Moore called her, infuriated, and stated that she "had no business disrupting his team by sending that information" and called her a "god damn bitch." Exh. 73 (Daly Dep. 38:9-39:21). She was informed soon thereafter by Victor Alam, an attorney for Menke & Associates, that CIG would be using Duff & Phelps going forward. *Id.* at 40:23-41:3.

Kelly-Moore).

The second ESOP transaction closed on October 18, 1999.  Exh. 14.

REDACTED

Again, Mr. Moore acted as both the buyer and the seller in the transaction, and there was no negotiation over the price paid by the ESOP or independent representation of the ESOP participants.  Exh. 14; Exh. 4 (Cazzolla Dep. 154:25-155:24); Exh. 70 (Mines Dep. 217:17-218:3).

**I.     The K-M and Moore Trust Defendants Hid Information About Asbestos Liabilities After the ESOP Transactions That Concealed their Fiduciary Violations.**

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDACTED

**J.    Kelly-Moore and CIG's Communications With Participants Concealed That the 1998 and 1999 Transactions Were For More Than Fair Market Value.**

Kelly-Moore Paint and CIG officers, as well as Mr. Moore, provided minimal information to participants in the ESOP from its inception. On May 1, 1998, Mr. Cristiano sent an announcement of the ESOP to employees of Kelly-Moore Paint. Exh. 85. The letter did not say that Mr. Moore was both the buyer and the seller of the shares, nor did it mention asbestos litigation against the company, nor did it state how the company would be valued or who would value it. *Id.* Menke & Associates also conducted briefings for Kelly-Moore employees at various sites around the inception of the ESOP. Exh. 86. These briefings likewise did not mention asbestos litigation or valuation of the company. *See* Exh. 87 (DVD of "Employee Stock Ownership Plan/401k Plan Update").

CIG announced the ESOP to employees through a memo from its CEO, Peter Cazzolla. Exh. 88. The memo informed employees that the ESOP had purchased 42% of the Series I stock of K-M Industries Holding Co., Inc. for $55 million, and that "Mr. William E. Moore sold the shares to us to create a market for the stock he owns without a sale to outside interests." *Id.* The memo did not inform participants about the valuation by Columbia Financial, which had found that $48.5 million would be a fair price for the Series I stock, nor did it inform participants about the existence of thousands of asbestos bodily injury cases pending against Kelly-Moore Paint nor that Mr. Moore acted as both buyer and seller in the transaction. *Id.* Mr. Mines also solicited questions about the ESOP from CIG employees around the 1999 transaction. Exh. 70 (Mines Dep. 212:16-22). One participant, Ken Myatt, emailed Ed Mines a series of questions including: "how was the company stock valued?" and "since CIG stock is not traded on an open market, what assurance is there that the purchase price of employee stock was set fairly?" Exh. 89. However, these difficult questions were not addressed in the "ESOP Questions and Answers" document that was used in Mr. Mines' presentation to managers. Exh. 90; Exh. 70 (Mines Dep. 212:5-213:8). *See also* Declaration of Peter Cazzolla in Support of K-M Defendants' Motion for Summary Judgment ("Cazzolla Dec."), Exh. 5 (memorandum dated November 9, 1999,

1  answering questions about the ESOP).[18]

2      In October 1999, Steve Ferrari sent a memo to employees of Kelly-Moore's Hurst factory

3  to "clarify" "certain misleading statements . . . regarding our ESOP." Exh. 92. In it, he stated

4  that the ESOP's decline in value of over $66 million in 1998 was due to the fact that the ESOP

5  took on a loan to purchase stock. *Id.* He made no mention of the thousands of asbestos cases

6  pending against Kelly-Moore at that time. *Id.*

7      After the ESOP was implemented, Kelly-Moore Paint communicated with employees

8  about the ESOP through cover letters for annual plan statements, *see, e.g.*, Exh. 93, and through a

9  quarterly newsletter called "Mind Our Own Business." *See, e.g.*, Exh. 94. The earliest

10  communication from Kelly-Moore Paint to participants making any mention of asbestos is an

11  issue of Mind Our Own Business from May 2001. Exh. 95. The newsletter states, "Remember

12  that profits are one of the key items that affect your share price. Other items that may also affect

13  your share price include valuations of other paint companies, our asset and debt levels and

14  product liability issues such as asbestos litigation." *Id.* It contains no information about the

15  number of asbestos cases then pending against Kelly-Moore or the amount of insurance available

16  to cover such cases. More importantly, it does not mention that there were over 15,000 claims

17  pending against Kelly-Moore at the time of the 1998 and 1999 stock purchases, or the fact that

18  asbestos liability was not taken into account in determining the price paid in those transactions.

19  *Id.*

20      The next mention of asbestos litigation came in another issue of Mind Our Own Business,

21  dated October 2001, in which the company announced a large asbestos judgment against it

22  (presumably the *Hernandez* verdict). Exh. 96. The newsletter went on to say that "[t]he

23  Company works very hard to defend itself against asbestos litigation, but such litigation

24  continues to be a concern to the financial health and the stock price of the Company." *Id.* Again,

25  the October 2001 Mind Our Own Business withheld the fact that massive asbestos litigation was

26  already pending against the company in 1998 and 1999, and that such litigation was not taken

27  _____

28  [18] CIG also sent cover letters along with annual plan statements, *see, e.g.*, Exh. 91, but they
likewise contained no information about Kelly-Moore's asbestos liabilities.

into consideration in setting the stock price. *Id.*

The first mention of asbestos litigation to CIG employees (Mind Our Own Business was not sent to them) came in May 2002, in a memo from Peter Cazzolla to CIG team members.[19] Exh. 98.[20] Mr. Cazzolla sent another memo to CIG employees in January 2003, further discussing the asbestos litigation. Exh. 99.[21] These memos explain the nature of the relationship between Kelly-Moore and CIG – namely, that one holding company owned Kelly-Moore and CIG, and that as a result the asbestos litigation could harm the value of both types of tracking stock held by the ESOP. Exhs. 98, 99. They are striking in that they are very explicit about the scope and possible effect of the asbestos litigation in the future, but make absolutely no mention of the asbestos liability that existed at the time of the 1998 and 1999 transactions.

### K.     North Star, the Successor Trustee, Failed to Investigate the 1998 and 1999 Transactions.

By Spring 2003, Mr. Moore's health had deteriorated to the point where the KMH Board

---

[19] This memo, and other memos labeled as interoffice memoranda, do not appear to have been sent to former employees of CIG. Exh. 4 (Cazzolla Dep. 175:21-176:4). *See also* Exh. 97 (Smith Dep. 125:19-25) (testifying that she did not receive Mr. Cazzolla's May 2002 memo).

[20] **REDACTED**

**REDACTED**

[21] The memo states: "Currently there are over 30,000 claims pending against Kelly-Moore. . . . Although the pending claims have been asserted against Kelly-Moore rather than CIG, which are both owned by K-M Holdings, you should be aware that there are some circumstances under which the asbestos litigation might adversely affect the value of the shares held by your ESOP. These shares – like those held by the Kelly-Moore ESOP – are actually "tracking" shares issued by K-M Holdings, itself. . . . Both sets of tracking shares, however, are subject to whatever debts K-M Holdings, itself, might have to third parties. Therefore, to the extent that any claim – even one arising out of Kelly-Moore's operations – is ultimately satisfied by K-M Holdings rather than one of its subsidiaries, the value of the shares held by your ESOP may be affected adversely."

of Directors decided that he should resign as trustee of the ESOP. Exh. 16 (Giffins Dep. 106:24-108:2). North Star was appointed as the successor trustee of the ESOP on April 22, 2003. Exh. 100 at MT000543. North Star and Kelly Moore's representatives discussed Kelly Moore's asbestos litigation at their first meeting in March 2003. Exhs. 101, 102; Exh. 103 (Hommel Dep. 129:19-131:4, 135:10-136:18). According to North Star's designated 30(b)(6) witness, John Hommel, North Star immediately "attempted to familiarize itself with Kelly Moore's asbestos liability." Exh. 103 (Hommel Dep. 160:13-161:7, 162:4-16, 151:14-152:13). North Star also evaluated Kelly Moore's insurance coverage for asbestos litigation as soon as it became successor trustee. Exh. 103 (Hommel Dep. 162:17-24).

North Star devoted substantial time and resources to evaluating Kelly Moore's "forward looking projections" of asbestos litigation liability. Exh. 103 (Hommel Dep. 169:14-170:13).

REDACTED

In contrast, North Star did not investigate whether (1) Kelly Moore's asbestos litigation liability was accounted for in the 1998 and 1999 transactions between the ESOP and the Moore Trust; and (2) the ESOP paid more than fair market value for the stock purchased from the Moore Trust. As discussed below, North Star gave these issues scant consideration, even though substantial concerns were brought to North Star's attention.

North Star's notes from meetings with Kelly-Moore and CIG representatives show that North Star had warning signs about the initial ESOP transactions. North Star's notes from the May 14, 2003 "Kelly Moore Due Diligence Meeting" attended by John Hommel, a senior vice president at North Star (and an attorney), and Mr. Ferrari, Kelly Moore's CFO, state "Initial ESOP Purchase – we need to figure out how far along the asbestos litigation was when the initial purchase took place – was it factored into the valuation? Did Tee [Trustee] look at; take into consideration?" Exh. 108 at NS00020233.

REDACTED

1

2                                           REDACTED

3

4

5        North Star eventually hired SRR as the ESOP's new valuation advisor effective

6   April 25, 2005.  Exh. 109

                                            REDACTED

7

8   NS00031513.

9

10

11

12

13

14

15

16        In addition, North Star knew that Mr. Moore had a glaring conflict of interest because he

17   was both the buyer and the seller in the 1998 and 1999 ESOP transactions, and no independent

18   fiduciary or advisor represented the interests of the ESOP participants.  North Star's marketing

19   materials stress the importance of having an independent fiduciary represent the interests of the

20   ESOP participants – "In its capacity as trustee or independent fiduciary, North Star retains the

21   requisite impartiality to avoid potential conflicts of interest."  Exh. 110, Exh. 103 (Hommel Dep.

22   109:10-23).  Likewise, despite the fact that Mr. Hommel has emphasized the importance of

23   "hir[ing] an independent trustee whose actions are supported by the work of an independent

24   _____

25   22                              REDACTED

26

27   23 Mr. Hommel's notes from this meeting are captioned "Thursday Dec. 30."  Exh. 107 at
     NS00031513.  December 30 fell on a Thursday in 2004.  *See*
28   http://www.timeanddate.com/calendar/index.html?year=2004&country=1.

PLAINTIFFS' OPP. TO DEFS' MOTIONS FOR SUM. JUDG. [CASE NO. C-06-07339 CW]    Page 23

financial advisor and legal counsel" in an ESOP conference presentation, North Star did not investigate whether the lack of an independent fiduciary infected the original transactions. Exh. 111 at p. 4.

Despite the red flags discussed above, North Star did not take steps to investigate or remedy the fiduciary violations committed by the prior ESOP fiduciaries.

REDACTED

Nor did North Star investigate the valuations used for the 1998 and 1999 transactions. Robert Ireland, who prepared the valuations for Paint tracking stock from December 1998 until December 2002, testified that North Star did not ask him any questions about his December 1998 valuation when North Star became successor trustee. Exh. 47 (Ireland Dep. 202:10-13). Nor did North Star ask Mr. Ireland any questions about the valuation for the October 1998 transaction prepared by the late B. J. Brooks. *Id.* at 202:14-17. In fact, Mr. Ireland doesn't recall North Star asking him any questions about when he first learned of Kelly Moore's asbestos litigation liability. *Id.* at 202:18-23.[25] North Star never contacted Kathryn Daly, who performed the second valuation of CIG. Exh. 73 (Daly Dep. 99:1-3). Mr. Cazzolla, the 30(b)(6) witness for

---

[24] Mr. Hommel also admitted that North Star strives to document in writing substantive communications and communications with counsel in its role as independent trustee. Exh. 103 (Hommel Dep. 45:20-48:6).

[25] Mr. Hommel claimed that North Star did, in fact, ask Mr. Ireland about the 1998 transaction, Exh. 103 (Hommel Dep. 274:10-275:3).

1    CIG, could not recall whether North Star ever investigated the potential liability of prior

2    fiduciaries of the ESOP, nor could he recall any conversations with anyone from North Star

3    about the terms of the 1998 and 1999 transactions. Exh. 4 (Cazzolla Dep. 184:18-185:25).

4        North Star did not obtain any actuarial studies of asbestos litigation liability from Kelly-

5    Moore. Exh. 103 (Hommel Dep. 165:9-12). North Star did not get any documents from Kelly

6    Moore relating to asbestos liability as of the time of the initial ESOP transactions. *Id.* (Hommel

7    Dep. 167:11-14).

8

9                                  REDACTED

10

11       In short, the evidence shows that starting in 2003 North Star either had or should have

12   had concerns about the fairness of the 1998 and 1999 transactions, but failed to take adequate

13   steps to remedy the fiduciary violations by Mr. Moore and his co-fiduciaries. North Star

14   thoroughly investigated the impact of Kelly Moore's asbestos litigation liability on the proper

15   valuation of the ESOP's tracking stock as of 2003 and in subsequent years, but did not

16   investigate the original transaction. North Star also obtained advice from attorneys, valuation

17   experts, and other professional advisors as part of its review of the impact of Kelly Moore's

18   asbestos litigation liability on the then-current and future valuations. North Star, however, failed

19   to take similar steps to investigate whether Mr. Moore and his co-fiduciaries violated their

20   fiduciary obligations in the 1998 and 1999 transactions.

21   **III.    LEGAL STANDARD.**

22       Summary judgment is proper only if there are no genuine issues as to any material fact

23   and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*

24   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment always

25   bears the initial responsibility of identifying the evidence which it believes demonstrates the

26   absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. "[A]t the summary

27   judgment stage the judge's function is not himself to weigh the evidence and determine the truth

28   of the matter . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, "[t]he

     evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor. *Id.* at 255. *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Issues of credibility and intent should not be resolved on summary judgment. *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

Whether a statute of limitations bars an action is typically viewed as a mixed question of law and fact: "whether the statute of limitations (rule of law) bars the action may depend on certain historical facts" such as whether Defendants took affirmative steps to conceal their fiduciary violations. Schwarzer, Tashima & Wallace, FEDERAL CIVIL PROCEDURE BEFORE TRIAL (2008), § 14:220. Summary judgment is not proper where there are factual disputes as to when a plaintiff was on notice of his claim. *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 397 (9th Cir. 1982). *See also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (holding that "the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the [fact-finder]").

## IV.    ARGUMENT.

The K-M and Moore Trust Defendants engaged in fraud or concealment of facts that prevented participants from discovering those Defendants' violations of ERISA. Defendants spend most of their briefs on arguments related to whether six years have elapsed since the alleged violations of ERISA. This is beside the point for the K-M and Moore Trust Defendants, because those Defendants' actions in concealing the fact and scope of Kelly-Moore's asbestos liability from participants, valuators, and auditors, both at the time of the two ESOP transactions and after, prevented Plaintiffs from discovering that the Plan paid too much for its stock until many years later. Accordingly, the "fraud or concealment" exception to the ERISA statute of limitations applies to the K-M and Moore Trust Defendants.

As discussed in Section C below, Plaintiffs' claim against Defendant North Star falls within the statute of limitations because North Star's failure to take appropriate steps to investigate and remedy the prior fiduciaries' violations occurred after North Star became successor trustee in 2003, and Plaintiffs filed suit in 2006.

### A.    ERISA's Statute of Limitations for Fiduciary Violations.

All of Plaintiffs' claims are governed by the ERISA statute of limitations for fiduciary violations, which provides that no breach of fiduciary duty action may be commenced after the

earlier of:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
> *except that in the case of fraud or concealment*, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (emphasis added).[26]

### B. Plaintiffs' Claims Against The K-M Defendants and the Moore Trust Defendants Are Timely.

#### 1. The K-M and Moore Trust Defendants' Violations of ERISA First Occurred in 1998 and 1999 When the ESOP Purchased Stock from the Moore Trust.

The starting point for the Court's statute of limitations analysis is identifying Defendants' alleged fiduciary violations. *Meagher v. Int'l Assn. of Machinists and Aerospace Workers Pension Plan*, 856 F.2d 1418, 1422 (9th Cir. 1988) ("To apply the limitations period, we must first isolate and define the underlying violation upon which [plaintiff's] claim is founded.").

Plaintiffs make two claims against the K-M and Moore Trust Defendants. First, Plaintiffs allege that the ESOP's purchases of stock for more than fair market value violated the prohibited transactions rules codified at ERISA § 406, 29 U.S.C. § 1106. Second Amended Complaint ("SAC") ¶¶ 74, 75. All sales of stock between an ESOP and a party in interest such as Mr. Moore are per se violations of the prohibited transaction rules under ERISA § 406, regardless of good intention or procedural prudence, unless the K-M and Moore Trust Defendants meet their burden of proving that the ESOP paid fair market value for the company shares it purchased. *Horn v. McQueen*, 215 F. Supp. 2d 867, 876 (W.D. Ky. 2002); ERISA §§ 406, 408, 29 U.S.C. §§ 1106, 1108. Thus, the prohibited transaction claims accrued on October 13, 1998 and October

---

[26] The K-M and Moore Trust Defendants' argument that the ERISA statute of limitations is a "*statute of repose,*" *see* Memorandum of Points and Authorities in Support of K-M Defendants' Motion for Summary Judgment ("K-M Brief") at 6-7; Memorandum of Points and Authorities in Support of Moore Trust Defendants' Motion for Summary Judgment ("Moore Trust Brief") at 6-7, is misplaced and irrelevant. The statute contains an express provision for extending the limitations period in the case of fraud or concealment, and thus Defendants' repose can be disturbed.

18, 1999, respectively.

Second, Plaintiffs allege that the K-M Defendants and Defendant Desiree Moore breached their fiduciary duties under ERISA §§ 404(a)(1) and 409, 29 U.S.C. §§ 1104(a)(1) and 1109, by causing the ESOP to pay more than fair market value for KMH stock in 1998 and 1999. SAC ¶¶ 67, 16. In addition to the overpayments, Plaintiffs further allege that the K-M Defendants and Desiree Moore breached their fiduciary duties to the ESOP by failing to hire an independent valuator or provide full information to the valuator, and by failing to sufficiently review the valuation and ask questions before relying upon it. SAC ¶ 67. These breaches each took place prior to or on the October 13, 1998 and October 18, 1999 transaction dates.

### 2. Because the K-M and Moore Trust Defendants Withheld Vital Information From the Participants, Valuators, and Auditors, Plaintiffs' Claims Against Them are Timely Under the Fraud or Concealment Exception.

The fraud or concealment exception applies here due to the information withheld by the K-M and Moore Trust Defendants. As a result, the statute of limitations runs six years from the Plaintiffs' discovery of Defendants' fiduciary violations. 29 U.S.C. § 1113. Thus, Defendants' arguments about the applicability of the "continuing violation" theory and the characterization of the breaches as omissions rather than acts are irrelevant. *See* K-M Brief at 9-12; Moore Trust Brief at 9-13.

The fraud or concealment exception applies when "an ERISA fiduciary either 'misrepresent[s] the significance of facts the beneficiary is aware of (fraud) or . . . hid[es] facts so that the beneficiary never becomes aware of them (concealment).'" *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1401 (9th Cir. 1995) (quoting *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990)). Defendants must have hidden or misrepresented facts which had the effect of concealing any of their fiduciary violations. *See, e.g., Hemphill v. Pers. Representative of the Estate of James J. Ryskamp, Jr.*, 2006 WL 1837917, at *17 (E.D. Cal. July 5, 2006) (holding that the defendant's withholding of information from the plaintiff rendered it impossible for her to discover all breaches of fiduciary duty, and thus tolling was appropriate). Thus, if Plaintiffs can show facts upon which a reasonable fact-finder could determine that the K-M and Moore Trust Defendants engaged in acts constituting fraud or concealment, then the

1    statute of limitations for *all* of Plaintiffs' claims against them is extended to six years after

2    Plaintiffs' discovery of the fiduciary violations.

3                    **i.    The K-M Defendants Engaged in Acts of Fraud or Concealment.**

4         The K-M Defendants concealed and misrepresented facts about asbestos litigation against

5    Kelly-Moore from participants. In addition, they concealed and misrepresented facts about

6    asbestos litigation from valuators and auditors, which also had the effect of preventing

7    participants from discovering the K-M Defendants' breaches of fiduciary duty.

8         As an initial matter, acts by Kelly-Moore or CIG senior management, or by William

9    Moore as chairman of the board, are imputed to KMH. *See Stanford Univ. Hosp. v. Fed. Ins.*

10   *Co.*, 174 F.3d 1077, 1086 (9th Cir. 1999). Their knowledge is also imputed to the corporation.

11   *See W.R. Grace & Co. v. Western U.S. Industries, Inc.*, 608 F.2d 1214, 1219 (9th Cir. 1979) ("It

12   is a well settled principle that knowledge of officers and key employees of a corporation,

13   obtained while acting in the course of their employment and within the scope of their authority, is

14   imputed to the corporation itself.") (citations omitted). *See also In re Crown Vantage, Inc.*, 2004

15   WL 1635543, at *5 (N.D. Cal. July 12, 2004) (holding that knowledge of a corporation's sole

16   shareholder is legally imputed to the corporation). By the same token, any acts by William

17   Moore were acts of the ESOP Plan Committees, because he was the sole member from the

18   inception of the ESOP until 2003.[27] *See* Exh. 115 at NS00001648; Exh. 3 (Stritmatter Dep.

19   ───────────────

20   [27] Contrary to the K-M Defendants' argument, *see* K-M Brief at 4 n.4, the KMH ESOP Plan
     Committee and the CIG ESOP Plan Committee are proper defendants. Pursuant to ERISA §

21   402(a)(1), each plan must provide for "one or more named fiduciaries who jointly or severally
     shall have authority to control and manage the operation and administration of the plan." ERISA

22   § 402(a)(1), 29 U.S.C. § 1102(a)(1). The KMH Plan in effect at the time of the 1999 transaction
     listed its "Plan Committee" as a named fiduciary. Exh. 112 (KMH Plan 6/30/99 at 56, CIG

23   011013). The CCIC Employee Stock Ownership Plan in effect as of June 22, 1998 listed its
     "Plan Committee" as a named fiduciary. Exh. 113 (CCIC Plan 6/22/98 at 52, CIG 008479). And

24   the "Plan Committee" was also a named fiduciary of the Kelly-Moore Paint Company, Inc.
     Employee Stock Ownership Plan effective January 1, 1998. Exh. 114 (Paint Plan 6/11/98 at 51,

25   MK001541). Thus, each Plan Committee was a fiduciary with authority to administer the plan.

26   The unpublished case relied on by Defendants, *Tatum v. R.J. Reynolds Tobacco Co.*, 2007
     WL 1612580 (M.D.N.C. May 31, 2007), confuses the *plan itself*, which cannot be sued for

27   breach of fiduciary duty, and the Plan Committee, which is responsible for administering the plan

28   in accordance with its fiduciary duties. *See Tatum*, 2007 WL 1612580 at *8 (citing cases holding

73:14-74:4).

Bearing this in mind, there were multiple affirmative acts by representatives of Kelly-Moore Paint, CIG, and KMH that had the effect of concealing the breaches from participants.

### a.    Concealment of Asbestos Litigation Against Kelly-Moore From Participants.

The K-M Defendants hid the fact that Kelly-Moore had significant asbestos liabilities from participants at the time of the transactions in 1998 and 1999. Mr. Cristiano's announcement of the ESOP said nothing about asbestos litigation, Exh. 85, nor did briefings by the Menke organization (done at the behest of and on behalf of the Company). Likewise, Mr. Cazzolla said nothing about asbestos litigation against Kelly-Moore in his announcement of the ESOP to CIG employees. Exh. 88. It is undisputed that the company said nothing to ESOP participants about Kelly-Moore's asbestos litigation until 2001, and statements in 2001 and after addressed pending and future, not past, asbestos litigation. Until discovery in this lawsuit, the K-M Defendants have *never* given participants information about the number, value, or type of asbestos claims pending against the company in 1998 and 1999. Ferrari Dec. ¶¶ 15-24. *See supra* Section II.J.

REDACTED

---

that the *plan* is not a proper defendant). Courts that have correctly differentiated between the plan itself and its fiduciaries in analyzing whether a Plan Committee may be sued have determined that it may. *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 616-17 (S.D. Tex. 2003) (calling Committee defendants' challenge "frivolous" and noting that "ERISA, which provides the substantive law here, expressly contemplates when an administrative committee acts in the denial of plan benefits or as a fiduciary in breach of its fiduciary duties, it may be sued.").

1  would be unaware of the existence of over 15,000 thousand asbestos claims asserted by 1998.

2          The K-M Defendants make a halfhearted attempt to assert that they did not conceal the

3  existence and magnitude of asbestos litigation against Kelly-Moore in 1998 and 1999 via

4  unsupported, incredible statements by Mr. Ferrari that this was "common knowledge" among

5  Kelly-Moore employees. Ferrari Dec. ¶ 15; Exh. 38 (Ferrari Dep. 291:12-15). The only basis for

6  Mr. Ferrari's statement was his belief that some employees worked for Kelly-Moore back when

7  asbestos-containing products were being manufactured (i.e. in the 1970s); he could not recall

8  ever directly discussing asbestos litigation with employees. Exh. 38 (Ferrari Dep. 292:3-293:4).

9  There is no other evidence that asbestos litigation against Kelly-Moore was common knowledge

10  among employees. In fact, Plaintiff Tosha Thomas (a former Kelly-Moore employee) testified

11  that she became aware of asbestos litigation against the company in 2002. Exh. 116 (Thomas

12  Dep. 110:16-111:2). The K-M Defendants have not proffered testimony from any employees

13  (other than top executives) that they knew about asbestos litigation in 1998 and 1999, or that

14  asbestos litigation was common knowledge. Furthermore, even assuming that some employees

15  knew there was some asbestos litigation, the evidence shows that the KM and Trust Defendants

16  still concealed information regarding the scope and severity of that litigation that would have led

17  a prudent fiduciary to demand more information and negotiate a better deal for the participants.

18  At most, Mr. Ferrari's statement only serves to create a genuine issue of material fact as to the

19  participants' knowledge about asbestos litigation in 1998 and 1999, which should preclude

20  summary judgment.

21          The K-M Defendants' actions constitute concealment within the meaning of the statute of

22  limitations: Mssrs. Ferrari, Cristiano, and Moore had knowledge that the company faced

23  thousands of asbestos lawsuits at the time of the ESOP transactions and decided not to reveal that

24  knowledge to the participants. In *Evanson v. Price*, 2006 WL 2829789, at *2, 5 (E.D. Cal. Sept.

25  29, 2006), the court found concealment because defendants placed certain letters in a file that

26  was inaccessible to others and kept secret the contents of those letters. This case is similar to

27  *Evanson* because Mr. Moore certainly had knowledge about the extent and severity of the

28  asbestos litigation: he received an actuarial analysis of Kelly-Moore's likely future asbestos

1   liabilities in 1981. Exhs. 20, 21, 22, 23. He presided over the Board of Directors meeting

2                               REDACTED                                    and he

3   communicated directly and indirectly with Cheryl Mills. Exh. 1 (Cristiano Dep. 38:19-39:16).

4   He also kept copies of newspaper articles about other companies forced into bankruptcy by

5   asbestos litigation. Exh. 25. Mssrs. Ferrari and Cristiano had, *inter alia*, (1) communications

6   with Cheryl Mills about the scope of asbestos litigation, Exh. 54, Section II.F at p. 9-10, and (2)

7   their own knowledge as Kelly-Moore executives that the company was a defendant in a large

8   number of asbestos lawsuits. *See* Ferrari Dec. ¶ 5, Cristiano Dec. ¶¶ 3-4. Further, the Company

9   received letters from insurers declaring exhaustion of policies due to asbestos litigation. *See,*

10  *e.g.*, Exh. 34. All of this information was, literally and figuratively, placed in files to which

11  participants, valuators, and auditors did not have access and kept secret. These actions are not

12  "mere silence," *see* K-M Brief at 14, they are concealment.

13          Further, the K-M Defendants' argument that they believed disclosure to participants of

14  the existence of asbestos litigation was unnecessary because such litigation was purportedly

15  covered by insurance, *see* K-M Brief at 16-17 n.6, is simply an argument that there was no

16  fiduciary violation.[28] It amounts to an argument that they concealed information about asbestos,

17  but such concealment caused no harm. That argument actually supports Plaintiffs' position in the

18  current motion: the fact that Defendants chose to conceal information about asbestos litigation is

19  sufficient under the fraud or concealment exception. Concealing that there were thousands of

20  asbestos cases in 1998 and 1999 had the effect of preventing participants from questioning the

21  purchase price – in other words, it had the effect of concealing the alleged violations of ERISA.

22  *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (noting that the statute of

_____

24  [28] Defendants contend, in essence, that information about Kelly-Moore's asbestos liabilities to

25  participants was immaterial. Although the Court should not reach this issue because it goes to
    the merits of Plaintiffs' claims, it is worth noting that the Ninth Circuit has held that, consistent

26  with ERISA's purpose to safeguard the well-being of employees, plan fiduciaries have a duty to
    disclose information (beyond the express disclosure obligations in the statute) that will allow

27  plan participants to "know where they stand with respect to the plan," make informed decisions
    about whether to seek alternative employment, or "bargain further." *Peralta v. Hispanic*

28  *Business, Inc.*, 419 F.3d 1064, 1072-73 (9th Cir. 2005).

1  limitations should be tolled if the plaintiff "establishes affirmative conduct on the part of the

2  defendant which would, under the circumstances of the case, lead a reasonable person to believe

3  that he did not have a claim for relief") (internal citation omitted).

4      Further, in asserting that asbestos litigation did not have to be disclosed because it was

5  supposedly covered by insurance, Defendants misrepresent the record. Cheryl Mills, the attorney

6  to whom Mssrs. Cristiano and Ferrari delegated responsibility to keep track of asbestos litigation,

7  told them in writing in December 1998 that "a few large hits" could throw projections about

8

9                                      REDACTED                            Thus,

10  coverage for asbestos cases was in doubt even in 1998, and Kelly-Moore executives knew it. *See*

11  *supra* Section II.C. In addition, there are credibility issues as to whether Kelly-Moore executives

12  actually believed that asbestos litigation did not need to be disclosed because it was covered by

13  insurance: Mr. Ferrari states (incredibly, as discussed below) that he informed the valuator for

14  the Paint company in 1998 about the litigation and insurance coverage therefor. Ferrari Dec. ¶

15  10. If the valuator had to be informed of the litigation – presumably so that he could make a

16  judgment as to whether it affected the company's value – then the participants had to be informed

17  for the same reason.

18      Construing the facts in the light most favorable to Plaintiffs, the K-M Defendants

19  concealed their knowledge of asbestos litigation from participants. At a minimum, there are

20  disputed issues of fact which preclude summary judgment.

21          **b.    Concealment of the Asbestos Litigation Against Kelly-Moore
                    From Valuators.**

22      In addition to concealing facts about asbestos litigation (and insurance coverage) from

23  participants, the K-M Defendants concealed such facts from the persons hired to appraise Kelly-

24  Moore Paint in 1998 and CIG in 1999, which likewise had the effect of preventing participants

25  from discovering the breach.

26      The K-M Defendants concealed the existence and magnitude of Kelly-Moore's asbestos

27  litigation from the valuator for the 1998 transaction, B.J. Brooks. *See supra* Section II.I. Mr.

28  Ferrari stated, in his deposition and his declaration, that he told Mr. Brooks about the existence

of asbestos litigation against Kelly-Moore, including the "large number of asbestos claims and the insurance coverage for those claims." Ferrari Dec. ¶ 10. Substantial evidence casts doubt upon Mr. Ferrari's assertions: first, Mr. Brooks' notes from conversations with Mr. Ferrari do not mention asbestos. Second, letters and faxes from Mr. Ferrari to Mr. Brooks enclosing information pertinent to the valuation do not identify any asbestos-related documents. Third, Mr. Brooks' valuation report dated August 5, 1998, and his update letter dated October 12, 1998, make no mention of any asbestos claims against the company. Fourth, the valuator who took over the Kelly-Moore assignment from Mr. Brooks, Robert Ireland, testified that he did not receive any information about asbestos litigation from Mr. Ferrari until sometime after 2000. Exh. 47 (Ireland Dep. 75:16-76:19, 77:11-78:12). Fifth, Mr. Menke, who was involved in multiple aspects of the ESOP, was not told about asbestos litigation by Mr. Cristiano, Mr. Moore, or anyone else, until 2001 or 2002. *See* Exh. 40 (Menke Dep. 66:3-5, 190:11-192:25). Viewing the facts in the light most favorable to Plaintiffs, Mr. Ferrari did not inform Mr. Brooks about any asbestos litigation against Kelly-Moore. Mr. Cristiano testified that he was not aware of whether any information about asbestos litigation was provided to Mr. Brooks. Exh. 1 (Cristiano Dep. 183:16-184:1, 184:24-185:3). The only reasonable inference from these facts is that the K-M Defendants and Mr. Moore concealed the existence and magnitude of asbestos litigation from Mr. Brooks.

Further, the K-M Defendants and Mr. Moore concealed the existence and scope of asbestos litigation against Kelly-Moore from Duff & Phelps, the principal valuator for CIG, as well as from Columbia Financial Advisors, Inc., the second-opinion valuator that Mr. Moore hired in an attempt to obtain a higher price for the Series I stock. Exh. 59 (Bodenstein Dep. 53:5-54:1); Exh. 73 (Daly Dep. 52:1-10).

Concealment of asbestos litigation from the valuators by Mssrs. Ferrari, Cristiano and Mines constitutes concealment within the meaning of the fraud or concealment exception to the statute of limitations. The valuators could not take asbestos litigation liabilities into account in their appraisals without information on its scope. This also had the effect of concealing the fiduciary violations from Plaintiffs because they could not learn of the proper fair market values

for the 1998 and 1999 valuations from their account statements or annual updates from the plan fiduciaries.[29] The K-M Defendants' fraud or concealment prevented Plaintiffs from learning that the ESOP paid far too much for the stock Mr. Moore purchased from the Moore Trust on their behalf in 1998 and 1999.

          **c.**    **Concealment of Asbestos Litigation Against Kelly-Moore From Auditors.**

Annual letters to Ernst & Young from Mssrs. Cristiano and Ferrari in 1998, 1999, and 2000 contained affirmative misrepresentations about the nature of asbestos litigation against



REDACTED

---

[29] By way of contrast, when Paint stock's value fell in 1999, Mr. Ferrari was quick to explain the purported cause to ESOP participants, stating that the share price fell due to the new ESOP debt. Exh. 92.

1    that Kelly-Moore had any asbestos liability. Exhs. 55, 61, 60. She acted as an agent of the

2    Company in reporting to the auditor, *see Pioneer Inv. Services Co. v. Brunswick Associates Ltd.*

3    *Partnership,* 507 U.S. 380, 396 (1993) ("clients must be held accountable for the acts and

4    omissions of their attorneys"). Thus, her letters also constitute acts of concealment by Kelly-

5    Moore which had the effect of concealing the fiduciary violations.

6        Defendants may assert that Kelly Moore did not have to disclose its asbestos litigation to

7    auditors, valuators, or ESOP participants in 1998 and 1999, because Kelly Moore believed that

8    its liabilities would be covered by insurance. Aside from misrepresenting the facts, this

9    argument has no merit. Basic principles of business and accounting require separate disclosure

10   of liabilities (such as asbestos litigation) and assets (such as expected insurance recoveries).

11   Both third parties that considered buying Kelly Moore Paint – Reed International and Benjamin

12   Moore – insisted upon a careful analysis of Kelly Moore's asbestos liabilities as part of their due

13   diligence. *See supra* Sections II.B, II.I. In addition, the Financial Accounting Standards Board

14   (FASB) holds that "[i]t is a general principle of accounting that the offsetting of assets and

15   liabilities in the balance sheet is improper except where a right of setoff exists." FASB

16   Accounting Principles Board (APB) No. 10. Exh. 117 at paragraph 7.[30] Similarly, American

17   Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 96-1,

18   *Environmental Remediation Liabilities,* Paragraph 140, states that "The amount of an

19   environmental remediation liability should be determined independently from any potential claim

20   for recovery, and an asset relating to the recovery should be recognized only when realization of

21   the claim for recovery is deemed probable."[31] Exh. 118.

22        Concealment of Kelly-Moore's asbestos liabilities from Ernst & Young also had the

---

[30] *See also* FASB Interpretation (FIN) No. 39, *Offsetting of Amounts Related to Certain Contracts.* Exh. 119 at p. 2.

[31] Although SOP 96-1 focuses on environmental remediation, the SOP provides guidance on a broad spectrum of environmental liabilities except as specifically excluded in Paragraphs 100-01. The Ninth Circuit has recognized that FIN and APB opinions are among "the highest level" of "[o]fficially established accounting principles" in the Generally Accepted Accounting Principles (GAAP) hierarchy. *Bolt v. Merrimack Pharmaceuticals, Inc.,* 503 F.3d 913, 918 n. 6 (9th Cir. 2007). SOP opinions are in the next highest level of accounting authority. *Id.*

1    effect of preventing Plaintiffs from discovering the K-M and Moore Trust Defendants' fiduciary

2    violations. *See Volk*, 816 F.2d at 1415. The valuators relied on audited financials for

3    information about Kelly-Moore's asbestos liabilities, *see supra* Section II..G, and thus

4    concealment from auditors prevented participants from discovering the proper fair market value

5    for the KMH shares purchased by the ESOP in 1998 and 1999.

###    d.    Concealment of the Columbia Financial Advisors, Inc. Report from Participants and Valuators.

6
7
     The K-M Defendants prevented ESOP participants from discovering that they could have

8    paid a lower price for the Series I stock purchased in 1999, by concealing the fact that there was

9    another valuation performed which concluded that the fair market value of 42% of Series I stock

10   could be $48.5 million, or $6.5 million less than they actually paid.

11   Messrs. Moore, Mines, and Cazzolla all received copies of ___ .      **REDACTED**

12        Exh. 75; Exh. 70 (Mines Dep. 187:20-189:17); Exh. 4 (Cazzolla Dep. 141:15-17).

13   However, participants in the ESOP were never informed of its existence or range of values.

14   Further, Duff & Phelps, the valuator whose price was ultimately used in the transaction, was

15   never told that there was a second valuation of CIG. Exh. 59 (Bodenstein Dep. 130:8-24).

16   Again, similar to the letters in *Evanson v. Price*, Ms. Daly's valuation was put away and

17   kept secret. 2006 WL 2829789 at *4-5. Had participants known that there was a valuation

18   opining that the fair market value of 42% of the Series I stock was less than the price paid by the

19   ESOP, they would have been put on notice that the price actually paid for the stock was too high;

20   instead, they were prevented from discovering the breach by Defendants' concealment.

21   Accordingly, the Court should find that the K-M Defendants engaged in fraud or concealment

22   sufficient to toll the statute of limitations.

###    e.    The K-M Defendants Concealed Asbestos Information After The ESOP Transactions.

23
24
25   As discussed in the fact section, the K-M Defendants continued to conceal important

26   information regarding asbestos liability from the participants, valuators, and auditors after the

27   1998 and 1999 transactions, thereby preventing discovery of their ERISA violations

28                                **REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

REDACTED

14

15

16

17

18

19

20

21

22

23

24        ii.     **Acts of Concealment by the Moore Trust Defendants**.

25        William Moore and Desiree Moore were the trustees of the Moore Trust at the time of the

26   transactions. *See* Exhs. 9, 14.  A trust must, of course, act through its trustee(s).  *See*

27   RESTATEMENT (2ND) OF TRUSTS § 169 ("Upon acceptance of the trust by the trustee, he is under

28   a duty to the beneficiary to administer the trust.").  *See also Pillsbury v. Karmgard*, 22 Cal. App.

4th 743, 753 (Cal. Ct. App. 1994) (holding that a trust "is not an entity separate from its trustees" and thus the trustee is the real party in interest in litigation involving trust property).

REDACTED

Thus, Mr. Moore's concealment of the existence and magnitude of asbestos liability against Kelly-Moore Paint is attributable to the Moore Trust.[32]

William Moore, as discussed above, ran KMH and its subsidiaries, and he had direct knowledge about the asbestos litigation facing Kelly-Moore.

REDACTED

Mr. Moore was "very much involved in the . . . asbestos issue," Exh. 1 (Cristiano Dep. 38:19-39:16), just as he was actively involved in all other aspects of Kelly-Moore and CIG. However, he concealed the information he had about asbestos litigation from employees, valuators, and auditors.

Mr. Moore also concealed Kathryn Daly's report, and the fact that the fair market value of CIG could have been more than $6 million less than the price paid by the ESOP, from participants. Mr. Moore certainly received a copy of her report, as discussed above, and was personally responsible for firing her. *See supra* Section II.H. Disclosure of her report would have caused participants to question the fairness of the price paid for the Series I tracking stock in 1999, but Mr. Moore kept it secret.

---

[32] The Moore Trust's argument that Plaintiffs cannot make out the elements for co-fiduciary liability against Desiree Moore are misplaced in this motion for summary judgment on the statue of limitations. Moore Trust Brief p. 15-16. Whether Mrs. Moore is liable for breach of fiduciary duty will be addressed in a subsequent motion for summary judgment on the merits, or at trial.

1    The fact that Mr. Moore wore many hats – trustee of the ESOP, sole member of the ESOP

2    committee, majority owner of KMH and its subsidiaries, and Chairman of their Boards of

3    Directors – does not excuse his concealment of Kelly-Moore's asbestos liability.  Courts have

4    held that knowledge gained by an ERISA fiduciary while acting in a corporate capacity does not

5    disappear when he acts as in his fiduciary capacity:  "[e]ven if [defendant] was wearing a

6    different corporate hat at the time he committed the fraud, when he donned the Plan

7    Administrator hat in 1998 and made decisions about the ESOP, he did so with full knowledge of

8    his own fraudulent misconduct that would negatively affect the Plan.  He may have figuratively

9    'taken off' the other hat, but . . . that knowledge remained in his head even if he kept it 'under his

10   hat,' his new one, that is."  *Community Bancshares, Inc. v. Patterson*, 547 F. Supp. 2d 1230,

11   1245 (N.D. Ala. 2008) (citing *Canale v. Yegen*, 782 F. Supp. 963 (D.N.J. 1992) and 789 F. Supp.

12   147 (D.N.J. 1992)).

13   Desiree Moore, as co-trustee of the Moore Trust, is legally chargeable with Mr. Moore's

14   acts of concealment, because she did nothing to stop them.  *See Middlesex Ins. Co. v. Mann*, 177

15   Cal. Rptr. 495, 504 (Cal. Ct. App. 1981) (holding that a trustee is responsible for the wrongful

16   acts of a co-trustee "which, by his negligence, he enabled the co-trustee to commit").

17

18                                      **REDACTED**

19   She has been a member of the Board of Directors of Kelly-Moore Paint

20   and KMH at all times since 1997, and has been the Chairperson of the Board since Mr. Moore's

21   death.  Thus, she also had direct knowledge about Kelly-Moore's asbestos liability which she

22   concealed from participants.

23   Because the trustees of the Moore Trust concealed information about asbestos litigation

24   and Kathryn Daly's valuation report, the statute of limitations for Plaintiffs' claims against the

25   Moore Trust Defendants can not run until six years after Plaintiffs' discovery of their fiduciary

26   violations.

27

28

### 4.  The Court Should Not Countenance the K-M and Moore Trust Defendants' Arguments Based on Rule 9(b).

The K-M Defendants (and, to some extent, the Moore Trust Defendants) assert that Plaintiffs fall short of the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). K-M Brief at 12-13, Moore Trust Brief at 15. As the Court well knows, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, the Court should, at this stage in the case, consider all of the evidence proffered by Plaintiffs and Defendants in determining whether the fraud or concealment exception applies, and should not limit its review to the allegations in the pleadings. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56, Notes to 1963 Amendment. *See also Snow v. Harnischfeger Corp.*, 12 F. 3d 1154, 1157 (1st Cir. 1993) (same).

Defendants could have – but did not – move to dismiss based on their statute of limitations defense. Such a motion would have been the proper time to attack Plaintiffs' pleadings. *See S.E.C. v. Sands*, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995) (on motions and cross-motions for summary judgment, holding that "the assertion that the complaint fails to plead scienter and fraud with particularity is an attack on the pleading. It normally provides the grounds for a motion to dismiss. The allegation that the complaint does not state fraud with particularity is not an affirmative defense on which the Defendants will produce evidence at trial"). The Court should not countenance Defendants' gamesmanship in waiting until completion of over a year of discovery to raise this issue.

Further, Defendants have been on notice that Plaintiffs intended to invoke the fraud or concealment exception since the inception of the case,[33] and all of the discovery sought by

---

[33] The parties' Joint Case Management Statement identifies as one of the key issues in the case "[w]hether the defendants intentionally concealed facts relevant to plaintiffs' claims from the plaintiffs." Docket No. 26 at 4-5. *See also, e.g.*, SAC ¶¶ 43, 51, 52 (alleging that KMH management and other fiduciaries intentionally withheld information about Kelly-Moore's

1    Plaintiffs made clear that Plaintiffs would attempt to show that their claims were timely due to

2    Defendants' concealment of asbestos litigation liabilities.  Plaintiffs' responses to Defendants'

3    contention interrogatories served as additional notice that Plaintiffs intended to show at summary

4    judgment that Defendants engaged in concealment.  Walter Decl. Exhs. J, K.  Thus, Defendants

5    cannot show prejudice from any deficiency in Plaintiffs' pleadings on the fraud or concealment

6    issue.  *See Han v. Mobil Oil Corp.*, 73 F.3d 872, 877-78 (9th Cir. 1995) (holding that an

7    affirmative defense based on lapse of a limitations period may be raised for the first time on a

8    motion for summary judgment where no prejudice is caused to the non-moving party).

9         However, if the Court is concerned about ensuring that the Complaint complies with Rule

10   9(b), it should allow amendment to conform with proof.  *See* Fed. R. Civ. P. 15(b)(2) ("A party

11   may move – at any time, even after judgment – to amend the pleadings to conform them to the

12   evidence and to raise an unpleaded issue.").  "The Federal Rules reject the approach that pleading

13   is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the

14   principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v.*

15   *Gibson*, 355 U.S. 41, 48 (1957).  Rule 15(a) provides that leave to amend shall be freely given

16   when justice so requires; "this mandate is to be heeded.  If the underlying facts or circumstances

17   relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity

18   to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Defendants would

19   not be prejudiced by amendment, for the reasons noted above.  Thus, amendment to conform

20   with evidence should be allowed.  *See In re AST Research Securities Litig.*, 887 F. Supp. 231,

21   236 (C.D. Cal. 1995) (permitting amendment to conform to proof because the alleged

22   impropriety added to the complaint "has been a recurring issue in this action" and the amended

23   complaint "merely places the proverbial 'meat on the bone'").

         ### 5.    If the Fraud or Concealment Exception Applies, Plaintiffs Filed Suit
             Within the Statute of Limitations.

25        If the Court finds that the fraud or concealment exception applies, the next question is

26   whether Plaintiffs brought this action within six years of their discovery of the fiduciary

28   asbestos liabilities from valuators and participants).

1   violations. ERISA § 413, 29 U.S.C. § 1113 ("except that in the case of fraud or concealment,

2   such action may be commenced not later than six years after the date discovery of such breach or

3   violation.") Plaintiffs filed suit on November 29, 2006. Thus, Plaintiffs must have discovered

4   the breaches sometime after November 29, 2000. As discussed below, the evidence shows that

5   Plaintiffs had no actual or constructive notice of the fiduciary violations arising from the initial

6   ESOP transactions until well after that date.[34]

7        There is no evidence that the Company ever told ESOP participants about the massive

8   asbestos liability facing Kelly Moore Paint at the time of the 1998 and 1999 ESOP transactions.

9   *See supra* Section II.J. Plaintiffs did not learn of the asbestos liability facing the Company in

10  1998 and 1999 until very recently. *See* Declaration of Tosha Thomas in Support of Plaintiffs'

11  Opposition to Defendants' Motions for Summary Judgment ("Thomas Dec.") ¶ 2; Declaration of

12  Thomas Fernandez in Support of Plaintiffs' Opposition to Defendants' Motions for Summary

13  Judgment ("Fernandez Dec.") ¶ 2. Further, there were no communications at all about asbestos

14  liabilities with ESOP participants until 2001, and those communications only addressed the

15  impact of asbestos claims in 2001 and in the future. *See supra* Section II.J.

                                    REDACTED

18                                      These communications withheld vital

19  information, e.g., that asbestos litigation against Kelly-Moore had been ongoing since before

20  1998, information about the thousands of asbestos cases pending against Kelly-Moore in 1998

21  were withheld from auditors and valuators, asbestos liabilities were not considered in the 1998

22  and 1999 transactions, and a second-opinion valuator reported a fair market value range

23  supporting a lower price for the 1999 transaction. Thus, the Company did not inform ESOP

24  participants of the key facts relating to the breaches alleged by Plaintiffs.

---

26  [34] ERISA § 413 provides for a six-year statute from the date of plaintiff's discovery of the breach
27  where there is fraud or concealment, which is more generous than the three-year statute from the
    date of plaintiff's actual knowledge of the breach where there is no fraud or concealment. This
28  longer statute apparently reflects a policy decision intended to deter acts of fraud or concealment
    by fiduciaries since such actions are clearly inconsistent with ERISA's fiduciary duties.

1     Given that the K-M and Moore Trust Defendants concealed so much information from

2     participants, none of the Plaintiffs was aware that there was significant asbestos litigation against

3     Kelly-Moore in 1998 and 1999 until shortly before the commencement of this litigation.  Neither

4     Lora Smith nor Thomas Fernandez (who worked for CIG) was informed at any time by CIG (or

5     KMH) that there had been a large number of asbestos cases against Kelly-Moore Paint in 1998

6     and 1999.  *See* Fernandez Dec. ¶ 2.  Likewise, Tosha Thomas was not informed at any time by

7     Kelly-Moore (or KMH) that there had been a large number of asbestos cases against the

8     Company in 1998 and 1999.  Thomas Dec. ¶ 2.  Mr. Fernandez testified that he could not recall

9     when he first became aware that there was asbestos litigation against Kelly-Moore, but that he

10    remembered being told in 2004 that asbestos liability could affect the value of his ESOP shares

11    in the future.  Exh. 121 (Fernandez Dep. 32:16-33:12; 119:3-8).  Tosha Thomas testified that she

12    first became aware of asbestos litigation against Kelly-Moore in 2002 or 2003.  Exh. 116

13    (Thomas Dep. 110:16-111:2, 199:23-200:9).  Lora Smith (who worked for CIG) testified that she

14    first became aware of asbestos litigation in 2007 through communications with counsel.  Exh. 97

15    (Smith Dep. 36:5-37:4).[35]

16        Further, none of the Plaintiffs discovered that the Plan may have overpaid for the stock

17    purchased in 1998 and 1999 until long after November 2000.  Mr. Fernandez testified that he

18    first questioned whether the Plan may have overpaid, and thus sought legal counsel, when he

19    received notification from the company that the value of the ESOP could fall to zero due to

20    asbestos litigation, which occurred in 2004.  Exh. 122; Exh.121 (Fernandez Dep. 183:15-184:1).

21    Both Ms. Thomas and Ms. Smith testified that they first came to believe that the ESOP overpaid

22    for shares 1998 when they met with counsel for Plaintiffs in this matter in 2007.  Exh. 116

23    (Thomas Dep. 149:22-150:19); Exh. 97 (Smith Dep. 57:4-22).  Accordingly, none of the

24

25    [35] North Star's discussion of when Plaintiffs learned of asbestos litigation against Kelly-Moore is
26    misleading and, at times, inaccurate.  *See* North Star Brief at 10-12.  For example, North Star
      asserts that Lora Smith admitted contemporaneously receiving Mr. Cazzolla's May 2002 memo
27    about asbestos litigation against Kelly-Moore.  The deposition testimony that North Star cites is
      actually about Ms. Smith's receipt of a cover letter for her 1999 Plan statement, which doesn't
28    mention asbestos.  Exh. 97 (Smith Dep. 81:13-82:14).

1  Plaintiffs even arguably discovered K-M and Moore Trust Defendants' fiduciary violations until

2  years after November 2000, rendering this case timely under the applicable statute of limitations.

3        Defendants may argue that actual discovery is not required under the fraud or

4  concealment exception, and Plaintiffs must sue when they have "constructive" discovery of the

5  breach.  The Ninth Circuit has not addressed whether constructive discovery is sufficient to start

6  the running of the statute of limitations for the fraud or concealment exception to ERISA.  The

7  First and Seventh Circuits have held that under the fraud or concealment exception, both actual

8  and constructive discovery of the breach will trigger the running of the statute of limitations.  *See*

9  *J. Geils Band Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1254-55 (1st Cir.

10  1996); *Martin v. Consultants & Adm'rs*, 966 F.2d 1078, 1096 (7th Cir. 1992).  The First Circuit

11  stated that plaintiffs have "constructive" discovery if they receive documents with "sufficient

12  storm warnings" to alert them to the possibility of fraud had they acted with reasonable diligence.

13  *J. Geils Band*, 76 F.3d at 1252.

14        Even, assuming arguendo, that the 2001 communications to participants about Kelly-

15  Moore's asbestos problems were "sufficient storm warnings" to start the 6-year statute under the

16  fraud or concealment exception, Plaintiffs' lawsuit filed in 2006 is timely.  Therefore, the Court

17  should deny the K-M and Moore Trust Defendants' motions for summary judgment, because

18  Plaintiffs have shown that there is a genuine issue as to whether (1) these Defendants hid or

19  misrepresented facts which had the effect of concealing their fiduciary violations, and (2)

20  Plaintiffs filed suit within six years of their discovery of Defendants' fiduciary violations.

21      **C.**    **Plaintiffs Filed Suit Against North Star Within the Applicable Statute of Limitations Period.**

22

23          **1.**    **Plaintiffs Allege That North Star Breached Its Fiduciary Duty By Failing to Take Proper Steps to Remedy the Fiduciary Violations Committed By Mr. Moore and His Co-Fiduciaries in the 1998 and 1999 Transactions.**

24

25        As stated above, "to apply the limitations period, [the Court] must first isolate and define

26  the underlying violation upon which . . . plaintiff's claim is founded." *Meagher*, 856 F.2d at

27  1422.  North Star's motion for summary judgment misstates the underlying violation for

28

1    Plaintiffs' claim against North Star.[36]

2        Plaintiffs do not allege that North Star played any role in the 1998 and 1999 ESOP

3    transactions. Rather, after North Star became the successor trustee of the ESOP in 2003, North

4    Star learned that the original trustee and sole member of the Plan Committee, Mr. Moore, and his

5    co-fiduciaries had breached their fiduciary duties in the 1998 and 1999 ESOP transactions, but

6    failed to take proper steps to remedy these fiduciary violations.

7        Plaintiffs allege that North Star violated ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3),

8    which states that a fiduciary "shall be liable for a breach of fiduciary responsibility by such other

9    fiduciary . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable

10   efforts under the circumstances to remedy the breach." SAC ¶ 68. In *Silverman v. Mutual Ben.*

11   *Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998), the Second Circuit held that "[t]his principle is

12   consistent with the common law of trusts, which imposes a duty on a successor trustee to remedy

13   the breach of a prior trustee, and imposes liability for breach of this duty 'to the extent to which a

14   loss results from [the successor trustee's] failure to take such [remedial] steps.' *See*

15   RESTATEMENT (SECOND) OF TRUSTS § 223(2) and cmts. c. and d. (1959)." Comment c states that

16   "[s]ince a trustee is under a duty to the beneficiary to take reasonable steps to realize on claims

17   which are part of the trust property, a successor trustee is liable for breach of trust if he neglects

18   to take proper steps to compel his predecessor to redress a breach of trust committed by the

19   predecessor." RESTATEMENT (SECOND) OF TRUSTS § 223(2) cmt.d.[37]

20       In *Silverman*, the prior trustees had embezzled funds from the pension plan. 138 F.3d at

21

---

22   [36] North Star's incorrect statement of Plaintiffs' claim is puzzling because Plaintiffs answered
     North Star's contention interrogatories and Plaintiffs' counsel had a detailed telephone
23   discussion of Plaintiffs' theory of liability and position with regard to the applicable statute of
     limitations with North Star's counsel. Declaration of Daniel Feinberg in Support of Plaintiffs'
24   Opposition to Defendants' Motions for Summary Judgment ¶ 2 and Exh. 1.

25   [37] The courts frequently turn to the Restatement of Trusts in limning ERISA's fiduciary duties
26   because ERISA draws much of its content from the common law of trusts, the law that governed
     most benefit plans before ERISA's enactment. *See Central States, Southeast & Southwest Areas*
27   *Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985) ("[R]ather than explicitly
     enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the
28   common law of trusts to define the general scope of their authority and responsibility).

1    101. The Second Circuit found that the plaintiff adduced sufficient evidence that the successor

2    trustee had knowledge of the prior trustees' fiduciary breach and failed to take sufficient steps to

3    recover the missing funds. *Id.* at 104-05. The Court nonetheless affirmed summary judgment in

4    favor of the successor trustee because the prior trustees were insolvent and therefore the plaintiff

5    failed to show that the plan suffered any loss from the successor trustee's inaction. *Id.* at 105.

6
                                    REDACTED
7

8        As shown *supra* in Section II.K, North Star's primary focus upon becoming successor

9    trustee in April 2003 was to understand the scope of Kelly-Moore's future asbestos liability and

10   its impact on the then-current value of the ESOP's tracking stocks.

11

12
                                    REDACTED
13

14

15

16       As successor trustee, North Star had to exercise its independent judgment to decide

17   whether Kelly-Moore faced significant asbestos liability at the time of the 1998 and 1999

18   transactions. As shown *supra* in Section II.B, Kelly-Moore's asbestos litigation liability was not

19   a problem that suddenly burst forth in 2001. Rather, the Company had known about the

20   predicament for years, and the rising tide of asbestos claims made it clear by 1998 that Kelly-

21   Moore faced serious consequences from selling products containing over 50 tons of asbestos over

22   the course of 15 years. Exh. 124. Faced with Kelly-Moore's dire situation in 2003, North Star

23   should have investigated whether (1) asbestos litigation liability should have been taken into

24   account in the 1998 and 1999 transactions in which Mr. Moore, acting on behalf of the ESOP,

25   purchased stock from Mr. Moore, acting on behalf of the Moore Trust; and (2) whether the ESOP

26   paid more than fair market value. The evidence shows that North Star either did not investigate

27   these issues or gave them only passing consideration.

28       North Star may argue that it investigated the 1998 and 1999 ESOP transactions, but

1  decided that there was no basis for pursuing claims against Mr. Moore or his co-fiduciaries. That

2  argument is irrelevant to the statute of limitations. Further, there is no record of this purported

3  investigation or North Star's decision-making process.[38]

4          **2.    North Star Could Have Pursued Claims for Fiduciary Violations
           Against the Prior Trustee and Co-Fiduciaries After North Star**

5          **Became Successor Trustee.**

6          North Star cannot argue that the statute of limitations for North Star's potential ERISA

7  fiduciary violation claims against Mr. Moore had already expired when it became successor

8  trustee in 2003. In *Landwehr v. DuPree*, 72 F.3d 726, 732 (9th Cir. 1995), the Ninth Circuit held

9  "that the limitations period in an ERISA action begins to run on the date that the person bringing

10 suit learns of the breach or violation." The plaintiff in an action under ERISA for fiduciary

11 violations is the "fiduciary, beneficiary, or participant bringing suit." *Id*. That other fiduciaries

12 knew of the violations does not set the limitations period running. North Star's actual knowledge

13 initiated the limitations period "regardless of whether any Plan fiduciary or service provider

14 knew of the violation before that date." *Id*.

15         Thus, under the "actual knowledge" prong of ERISA § 413, North Star had until at least

16 April 2006 to file suit against Mr. Moore or his family trusts. Likewise, under the "last action"

17 prong of ERISA § 413, North Star had until at least six years after the 1998 and 1999 ESOP

18 transactions, i.e., until at least October 2004 and October 2005, respectively, to file suit against

19 Mr. Moore or his Estate. If North Star believed that it needed more time to investigate Mr.

20 Moore's potential fiduciary violations, then North Star could have demanded a tolling agreement

21

22 ———————————————

23 [38] Both ERISA and the common law of trusts impose on trustees a fiduciary duty to keep
   adequate records of their actions. *Shaver v. Operating Engineers Local 428 Pension Trust Fund*,

24 332 F.3d 1198, 1202 (9th Cir. 2003). *See also* Gertner, M., *Employee Benefits Journal*, p. 5
   (December 1988) ("Upon receiving the advice and opinion of the expert, the trustees must

25 carefully review and consider it and challenge it, not blindly accept and rubber-stamp it. Next,
   the trustees must add to the expert's advice and opinion their own input based on their

26 knowledge and experience. *Finally, the trustees must document this prudent methodological
   procedure they have employed.*") (Emphasis added.). Similarly, Mr. Hommel testified that a

27 trustee should document the steps taken in exercising fiduciary duties as "a practice that I would
   say is advisable towards [establishing] the good, strong paper trail and process that supports your

28 conclusion as to whether or not your decision is prudent." Exh. 103 (Hommel Dep. 63:13-17).

1    – a step that North Star never considered.  Wasow Dec. ¶ 130.[39]

2           **3.    Plaintiffs Filed Their Breach of Fiduciary Duty Claim Against North
                    Star Within the Statute of Limitations.**

3           Likewise, Plaintiffs filed their claim against North Star within the statute of limitations

4    period under ERISA § 413.  The applicable statute of limitations period is six years from the date

5    of North Star's breach or omission.  Since, as discussed above, the statute of limitations for

6    North Star's claim against Mr. Moore or his Estate expired at the earliest in October 2004,

7    Plaintiffs had until at least October 2010 to file suit against North Star.

8           Nor can North Star invoke the "actual knowledge" prong of ERISA § 413.  Prior to filing

9    this action, the Plaintiffs did not know what steps defendant North Star had (or had not) taken to

10   remedy Mr. Moore's fiduciary violations.  Thomas Dec. ¶ 3; Fernandez Dec. ¶ 3.  Moreover, the

11   documents produced in discovery by Defendants indicate that North Star's first communication

12   with ESOP participants was in 2005, *see* Exh. 125 (July 5, 2005 letter), so Plaintiffs had no way

13   to know that North Star was the ESOP's new trustee prior to that date.  Even if the ESOP had

14   informed Plaintiffs in 2003 that North Star had been named the successor trustee, this would not

15   have been  enough to start running the statute of limitations.  Unless a transaction is "inherently a

16   statutory breach of fiduciary duty," disclosure of that transaction alone, "cannot communicate the

17   existence of an underlying breach."  *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1341 (9th Cir.

18   1994) (citing *Fink v. Nat'l Sav. and Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985)).  Defendant

19   North Star has not submitted any evidence that Plaintiffs had actual knowledge of the underlying

20   facts of its failure to remedy Mr. Moore's fiduciary violations.

21          In sum, since the statute of limitations for Plaintiffs' claim against Defendant North Star

22   will not run until October 2010, at the earliest, and Plaintiffs filed suit in 2006, the Court should

23   deny North Star's motion for summary judgment.

24   **III.    CONCLUSION.**

25          For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

---

[39] Plaintiffs believe that ERISA § 413's "fraud or concealment" provision may have extended the statute of limitations for North Star's potential fiduciary claims against Mr. Moore, but the Court need not decide this issue for purposes of the present motion.

1    Motions for Summary Judgment.

2

3    Dated:  July 10, 2008                          Respectfully submitted,

4                                                   LEWIS, FEINBERG, LEE,
                                                    RENAKER & JACKSON, P.C.

5                                         By:       ___/s/_____

6                                                   Todd Jackson
                                                    LEWIS, FEINBERG, LEE,
7                                                   RENAKER & JACKSON, P.C.
                                                    1330 Broadway, Suite 1800
8                                                   Oakland, CA  94612
                                                    Telephone: (510) 839-6824
9                                                   Facsimile: (510) 839-7839

10                                                  Peter Rukin – CA State Bar No. 178336
                                                    RUKIN HYLAND DORIA
11                                                  & TINDALL LLP
                                                    100 Pine Street, Suite 725
12                                                  San Francisco, CA
                                                    Telephone: (415) 421-1800
13                                                  Facsimile: (415) 421-1700
                                                    Email: peterrukin@rhddlaw.com
14
                                                    *Attorneys for Plaintiffs*
15                                                  *and the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28