# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,           )
                                    )
            Plaintiffs,             )
                                    ) Case No.
      vs.                           )
                                    ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,   )
                                    )
            Defendants.             )
                                    )
                                    )
                                    )

VIDEOTAPED DEPOSITION OF JOSEPH CRISTIANO
April 8, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79129

5010d824-80af-4d0f-b31f-0419e7c733e3

1      Q    Was William E. Moore the president and CEO
2  of Kelly-Moore Paint until you took over?
3      A    He definitely was president.  I'm not sure
4  of the CEO title.
5      Q    Was anyone president between Mr. Moore and
6  you?
7      A    No.
8      Q    Do you know why he stepped down in 1984?
9           MS. SMITH:   Object to form.
10     A    He told me that he wanted to retire.  And
11 that's why he hired me.
12 BY MS. HASSELMAN:
13     Q    Did he play an active role in running the
14 company after 1984 when you took over as president?
15          MR. LOVITT:   Object to the form.
16     A    Yes.
17 BY MS. HASSELMAN:
18     Q    What role did he play at that time?
19          MS. SMITH:   Object to form.
20     A    He was chairman and was very active in
21 running the company.
22 BY MS. HASSELMAN:
23     Q    Did he come into the office regularly?
24     A    Yes.
25     Q    Did he come in every day?

5010d824-80af-4d0f-b31f-0419e7c733e3

1          A    Yes.

2          Q    Did you work closely with him during that

3    time?

4          A    Yes.

5          Q    How long did Mr. Moore continue to play an

6    active role in running Kelly-Moore Paint?

7          A    I would say up until the 2002 period.

8          Q    That's approximately when you left

9    Kelly-Moore; is that correct?

10         A    Yes.

11         Q    Did he stop playing an active role in

12   running the company while you were still president?

13              MS. SMITH:    Object to form.

14         A    Say that again.  State that again, please.

15   BY MS. HASSELMAN:

16         Q    Did he stop playing an active role in

17   running the company during the time that you were

18   president?

19         A    No, he didn't stop playing an active role.

20         Q    Do you have any knowledge as to whether he

21   continued to play an active role in running the company

22   after you left?

23         A    I don't.

24         Q    I am going to ask you to look at a short

25   document.  This will be the next exhibit.  This will be

5010d824-80af-4d0f-b31f-0419e7c733e3

1           MS. SMITH:    Object to form.

2       A    That's what it was intended to be.

3   BY MS. HASSELMAN:

4       Q    And did that, in fact, happen?

5       A    No.

6       Q    Did someone else take over coordinating the

7   asbestos litigation?

8           MS. SMITH:    Object to form.

9       A    Yes.

10  BY MS. HASSELMAN:

11      Q    Who took that role over?

12      A    Herb Giffins.

13      Q    Up until the date of this document was it

14  your responsibility to coordinate the asbestos

15  litigation?

16          MS. SMITH:    Object to form.

17      A    No.

18  BY MS. HASSELMAN:

19      Q    Was that among your responsibilities?

20      A    Yes.

21      Q    Did anyone else have a responsibility for

22  coordinating the asbestos litigation?

23          MS. SMITH:    Object to form.

24      A    Yes.

25  BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 27

1      Q    Who else had that responsibility?

2      A    Our attorney, Cheryl Mills, and Herb

3   Giffins was taking more and more responsibility for the

4   asbestos.

5      Q    What was your role with respect to the

6   asbestos litigation at Kelly-Moore?

7      A    It varied during the years.

8      Q    When did you first get involved with the

9   asbestos litigation at Kelly-Moore?

10         MS. SMITH:   Object to form.

11     A    Probably late '90s.

12   BY MS. HASSELMAN:

13     Q    Do you recall specifically which year?

14     A    Not good on years so you may have to help

15   me on some of these.  '97, '98, I'd guess.

16     Q    It was before the ESOP got put into place;

17   is that correct?

18         MS. SMITH:   Object to form.

19     A    Yes, I believe so.

20   BY MS. HASSELMAN:

21     Q    When you first became involved with

22   asbestos litigation at Kelly-Moore, what was your role?

23         MS. SMITH:   Object to form.

24     A    I believe it was funneling the information

25   that the insurance companies were sending in to

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 29

1    your responsibilities to track the number of lawsuits

2    filed against Kelly-Moore with respect to asbestos?

3         A    No.

4         Q    Did someone at Kelly-Moore have that

5    responsibility?

6              MS. SMITH:    Object to form.

7         A    Not that I am aware of.

8    BY MS. HASSELMAN:

9         Q    Did Cheryl Mills have that responsibility?

10             MS. SMITH:    Object to form.

11        A    Yes.

12   BY MS. HASSELMAN:

13        Q    Did she report that information to you?

14             MS. SMITH:    Object to form.

15        A    Yes.

16   BY MS. HASSELMAN:

17        Q    How often did Ms. Mills report information

18   to you regarding the number of lawsuits filed against

19   Kelly-Moore relating to asbestos?

20             MS. SMITH:    Object to form.

21        A    I can't recall.

22   BY MS. HASSELMAN:

23        Q    Do you recall when Cheryl Mills became

24   involved?

25             MS. SMITH:    Object to form.

5010d824-80af-4d0f-b31f-0419e7c733e3

1        A     Not that I remember, no.

2        Q     Other than the issue with information flow

3    that we have been talking about, do you recall

4    discussing any other aspect of the asbestos litigation

5    with Mr. Moore during the 1980s?

6        A     Not really because it wasn't a problem

7    then.  It was, you know, it was nuisance value.  That's

8    the way it was always referred to in the company.  It

9    was, you know, there was no grave concern about it.  It

10   was just product liability issues that we faced every

11   day, so it was not a big issue then.

12       Q     Earlier we were discussing what your role

13   was with respect to the asbestos litigation when you

14   first became involved in approximately 1997.  And you

15   said that at first your role was to funnel information

16   from the insurance companies to Mr. Moore and

17   Mr. Ferrari; is that correct?

18       A     Yes.

19       Q     And at some point did your role with

20   respect to the asbestos litigation change?

21            MS. SMITH:    Objection.  Form.

22       A     Yes, as the number of lawsuits cranked up,

23   it was my role to get someone -- in this case it was

24   Cheryl Mills -- to coordinate that because Mr. Moore was

25   very adamant that I was hired to run the Paint Company.

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 39

1    And he wanted me focusing on the Paint Company, and the

2    only way I could do that was to get some outside

3    resource to focus on the asbestos problem.

4    BY MS. HASSELMAN:

5         Q    So then was it one of your responsibilities

6    to oversee Ms. Mills' work?

7         A    Yes.

8         Q    And what was involved in that?

9         A    She became the one that was totally

10   responsible for dealing with the insurance companies,

11   with anything to do with asbestos.  And, frankly, the

12   way that it worked was that Cheryl reported to me but I

13   passed the information on to Steve Ferrari and

14   Mr. Moore, who was still very much involved in the

15   asbestos litigation -- not the litigation but the

16   asbestos issue.

17        Q    What were they involved in relating to

18   asbestos issues that was not the litigation?

19        A    Just overseeing what was going on in any of

20   the asbestos issues that were raised.  I'm trying to

21   think of a specific and I can't come up with one right

22   now.  But they were -- Steve Ferrari, for example, would

23   be responsible for paying Cheryl and monitoring her

24   bills and that type of thing.

25        Q    Other than passing along information to

5010d824-80af-4d0f-b31f-0419e7c733e3

1       Q    Did they handle commercial litigation?

2            MR. LOVITT:    Object to the form.

3       A    Can you -- what do you mean by commercial?

4    BY MS. HASSELMAN:

5       Q    Let me ask it a different way.  Did

6    Kelly-Moore have other law firms that it used to handle

7    other kind of litigation besides the asbestos and the

8    environmental litigation?

9       A    Yes.

10      Q    And when did Pillsbury Levinson first begin

11   doing work for Kelly-Moore?

12      A    I would say early '90s.

13      Q    Do you know whether Ms. Mills had direct

14   contact with Mr. Ferrari with respect to asbestos

15   litigation?

16      A    Yes.

17      Q    Do you know whether she had direct contact

18   with Mr. Moore with respect to asbestos litigation?

19      A    Yes.

20      Q    And what type of contact did Ms. Mills have

21   with Mr. Ferrari?

22           MS. SMITH:    Object to form.

23      A    She probably talked with Steve Ferrari more

24   than she talked with me.

25   BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 46

1    Q    And can you tell me how it is that you know

2  that?

3    A    Just comments from Steve, that he had

4  talked to Cheryl.  And it was more frequently than I had

5  talked to her.

6    Q    Do you know what Ms. Mills and Mr. Ferrari

7  discussed in those conversations?

8    MS. SMITH:    Object to form.

9    A    No, I'm not sure.

10  BY MS. HASSELMAN:

11    Q    And you said she had direct contact with

12  Mr. Moore as well?

13    A    Yes.

14    Q    And what is your basis for knowing that?

15    A    Either Cheryl would mention to me that she

16  had talked to Mr. Moore or Mr. Moore would mention to me

17  that he had talked to Cheryl.

18    Q    Do you recall Mr. Moore ever telling you

19  what he had spoken with Ms. Mills about?

20    MS. SMITH:    Objection.

21    A    Mostly around asbestos litigation but I

22  don't recall anything specific.

23  BY MS. HASSELMAN:

24    Q    Do you recall -- did Mr. Moore ever tell

25  you that he had spoken with Ms. Mills regarding the

5010d824-80af-4d0f-b31f-0419e7c733e3

1    Q    Did you talk about this conversation with

2  Mr. Moore?

3    A    I don't recall whether we did or not.

4    Q    Did you discuss insurance coverage for

5  asbestos litigation with Mr. Moore at any time before

6  the ESOP transaction in October of 1998?

7              MS. SMITH:   Object to form.

8    A    Not that I can recall.

9  BY MS. HASSELMAN:

10   Q    Just to clarify is that you believe you

11  didn't have any such conversation or you simply can't

12  remember whether you had one or not?

13             MS. SMITH:   Objection.  Asked and

14  answered.

15   A    I may have had a conversation but it was

16  ten years ago and I just don't recall it.

17  BY MS. HASSELMAN:

18   Q    Is it your recollection that you did have

19  such a conversation with Mr. Moore then?

20   A    I don't recall it.

21   Q    Did you tell employees about this

22  conversation with Cheryl Mills?

23             MS. SMITH:  Object to form.

24   A    I didn't, no.

25  BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 57

1        Q     Do you know whether anyone else did?

2              MS. SMITH:     Object to form.

3        A     Not that I am aware of.

4    BY MS. HASSELMAN:

5        Q     Do you recall how long this telephone

6    conversation with Ms. Mills was?

7        A     No, I'm sorry, I don't.

8        Q     Do you have an estimate of how long it was?

9        A     I'm sorry, I don't.  That was a long time

10   ago.

11       Q     Did you receive any written reports from

12   Ms. Mills prior to this phone call on October 1st?

13             MS. SMITH:     Object to form.  Asked and

14   answered.

15       A     Prior to the -- well, I think earlier in

16   that year she sent us the memo that I was referring to

17   that the accountants had to have, EY had to have for

18   their March '98 -- '97 -- of the year '97.  In March

19   of '98 they would have had to put a report together.

20   And I am fairly certain that Cheryl must have given us

21   something like a report, something in writing prior to

22   this date, which would have been included in the

23   March '98 EY report -- financial report.

24   BY MS. HASSELMAN:

25       Q     So that report you would have received in

Page 72

1       A    I don't know.

2       Q    Do you know whether anyone gave the

3   information in this letter to Ernst & Young?

4       A    I don't know.

5       Q    Do you know whether the letter was given to

6   Duff & Phelps?

7            MS. SMITH:   Object to form.

8       A    I don't know.

9   BY MS. HASSELMAN:

10      Q    Do you know whether the information in the

11  letter was given to Duff & Phelps?

12      A    I don't know.

13      Q    Was the information in this letter

14  communicated to the employees of Kelly-Moore Paint

15  besides you and Mr. Ferrari and Mr. McDonald?

16           MS. SMITH:   Object to form.

17      A    Not that I'm aware of.

18  BY MS. HASSELMAN:

19      Q    Do you know whether Mr. Moore received this

20  letter?

21      A    He didn't receive it from me, but he could

22  have received it from someone else.  I'm not sure.  I

23  don't know.

24      Q    Did you ever talk about this letter with

25  him?

1    did because he was very analytical.

2         Q    Did he say anything to you about the price

3    that Menke would charge as opposed to the price of

4    another installation firm?

5         A    No, I don't recall that at all.

6         Q    What was the purpose of the ESOP?

7              MS. SMITH:    Object to form.

8         A    The discussion that he had with me was

9    around diversification.  All of his estate was in

10   Kelly-Moore stock and the Paint Company.  And he

11   mentioned that he wanted to diversify that.  That was

12   part of it.  The other part, he after reading about the

13   ESOP, he said that that would be a good way to motivate

14   the people and also give them a piece of the action,

15   give them part ownership in the company.  And those are

16   the couple of the reasons that I recall him saying.

17   BY MS. HASSELMAN:

18        Q    Do you recall when he expressed those

19   reasons to you?

20        A    No, no, I don't.

21        Q    Was it in 1998, do you think?

22        A    Yes, yes.

23        Q    Do you recall having more than one

24   discussion with Mr. Moore regarding the purpose for

25   setting up the ESOP in 1998?

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 108

1    BY MS. HASSELMAN:

2         Q    Have you ever reviewed any documents in the

3    asbestos repository?

4         A    No.

5         Q    What's the source of your understanding of

6    what is contained in the repository?

7              MS. SMITH:    Object to form.

8         A    Any document related to asbestos would go

9    into those file cabinets.

10   BY MS. HASSELMAN:

11        Q    And where did you learn what is kept in the

12   asbestos repository?

13             MS. SMITH:    Object to form.

14        A    From Mr. Moore when I originally came to

15   work, a couple years later when I -- when asbestos

16   became an issue.

17   BY MS. HASSELMAN:

18        Q    Is it your understanding that the asbestos

19   repository includes information regarding the number of

20   claims filed against Kelly-Moore with respect to

21   asbestos?

22             MS. SMITH:    Object to form.

23        A    I'm not sure what was in there.    There were

24   file cabinet after file cabinet of folders.    I'm not

25   sure what was in there.

5010d824-80af-4d0f-b31f-0419e7c733e3

1   at the last full paragraph on the page?  Well, let me

2   ask you this.  When you received this letter in 2000,

3   did you read it?

4        A    Yes, I did.

5        Q    Did you pass it along to anyone?

6        A    Yes.

7        Q    Who did you pass it to?

8        A    Mr. Moore.

9        Q    Did you discuss this letter with Mr. Moore?

10       A    I don't recall.

11       Q    Did Mr. Moore say anything to you about

12  this letter in 2000?

13            MS. SMITH:    Object to form.

14       A    Not that I recall, no.

15  BY MS. HASSELMAN:

16       Q    Do you know whether Mr. Ferrari received

17  this letter?

18       A    No, I don't know.

19       Q    Did you give him the letter?  Did you give

20  Mr. Ferrari this letter?

21       A    Not that I can recall, no.

22       Q    Do you see the sentence in the last

23  paragraph, the last full paragraph on the second page

24  that says, it is unknown how many claims will ultimately

25  be made against Kelly-Moore; therefore, it is impossible

1          MS. SMITH:    Object to form.

2      A    Yes.

3  BY MS. HASSELMAN:

4      Q    Do you know whether this letter was ever

5  given to Mr. Ireland?

6      A    I don't know.

7      Q    And when I say Mr. Ireland -- I can't

8  remember if we established this or not -- I am referring

9  to Robert Ireland who performed valuations for the -- of

10  the KMH Paint tracking stock for the ESOP.  Is that your

11  understanding of who Mr. Ireland is as well?

12      A    Yes.

13      Q    And do you know whether this letter was

14  given to him?

15      A    No, I don't know.

16      Q    Do you know whether this letter was given

17  to Ernst & Young?

18          MS. SMITH:    Object to form.

19      A    I don't know that either.

20  BY MS. HASSELMAN:

21      Q    Do you know whether the information in the

22  letter was given to Ernst & Young?

23          MS. SMITH:    Object to form.

24      A    I don't know.

25  BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

1      Q    And do you know whether the information in

2   the letter was given to Mr. Ireland?

3      A    I don't know.

4      Q    Do you know whether the letter was given to

5   Duff & Phelps?

6      A    I don't know.

7      Q    Or the information in it, do you know if

8   that was given to Duff & Phelps?

9      A    I don't know.

10     Q    Do you know if the information was

11  communicated to Kelly-Moore employees?

12          MS. SMITH:   Object to form.

13     A    Not that I am aware of.

14  BY MS. HASSELMAN:

15     Q    Was Ms. Mills an expert on valuing asbestos

16  contingent liabilities?

17          MS. SMITH:   Object to form.

18     A    I don't know.

19  BY MS. HASSELMAN:

20     Q    Do you know whether she ever asked an

21  outside entity that specialized in valuing asbestos

22  claims to do a projection of Kelly-Moore's potential

23  claims or payments?

24     A    Not to my knowledge.

25          MS. SMITH:   Object to form.

5010d824-80af-4d0f-b31f-0419e7c733e3

1          A     No.

2     BY MS. HASSELMAN:

3          Q     Are you aware that a company called Reed

4     Decorative Products looked into purchasing Kelly-Moore

5     in 1981?

6          A     Yes.

7          Q     When did you learn that?

8          A     1984.

9          Q     How did you learn that?

10         A     Mr. Moore.

11         Q     Was that in a conversation?

12         A     Yes.

13         Q     Was that a face to face conversation or a

14    phone call?

15         A     Face to face.

16         Q     Was that at Kelly-Moore offices?

17         A     Boy, trying to remember.  No, I think it

18    was at a restaurant.

19         Q     So this wasn't a formal meeting?

20         A     No.

21         Q     Do you recall the context in how the

22    information came up?

23         A     Yes.

24         Q     What was that context?

25         A     Mr. Moore was -- I was division president

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 139

1  of Sherwin Williams.  Mr. Moore was recruiting me from

2  Sherwin Williams.  And during the discussion of coming

3  to work for Kelly-Moore, he said that a few years before

4  he had had negotiations with Reed International to sell

5  the company and that the communications had fallen

6  through over the British pound sterling re-evaluation or

7  something along those lines and that he had decided not

8  to sell the company to them and instead go out and hire

9  the first president other than him of the company.  And

10 he was recruiting me for that job.

11      Q    Did Mr. Moore tell you that Reed as part of

12 its due diligence in considering purchasing Kelly-Moore

13 had an actuarial study done of Kelly-Moore's potential

14 asbestos litigation liabilities?

15      A    No.  He told me that it was all over the

16 British pound sterling.

17      Q    I am going to mark the next exhibit.  We

18 are up to 114, aren't we?  Let's mark 115 as well.

19                (Exhibit No. 114 and 115 marked

20                 for identification.)

21

22      Q    For the record Exhibit 114 is Bate stamped

23 NS 00016905.  And Exhibit 115 is Bate stamped NS

24 00016908 through 910.  I am sorry.  Exhibit 114 is 905

25 through 907.

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 152

1    sure that the situation had not changed from what she

2    said had been going on before that.  So that would be

3    the only instance that I can think of that might respond

4    to that question.

5    BY MS. HASSELMAN:

6         Q    Did you provide the letters that Ms. Mills

7    wrote to you to valuators performing valuations of KMH

8    tracking stock for purposes of the ESOP transactions?

9         A    No.

10             MS. SMITH:   Objection to form.  Vague.

11   BY MS. HASSELMAN:

12        Q    Do you know whether anyone else did?

13             MS. SMITH:   Objection to form.

14        A    Not the best of my knowledge.

15   BY MS. HASSELMAN:

16        Q    Were you aware that in the late 1990s

17   Ms. Mills looked into obtaining additional insurance

18   coverage for past asbestos exposure?

19             MS. SMITH:   Object to form.

20        A    No.

21   BY MS. HASSELMAN:

22        Q    Did you ask her to do that?

23        A    Not that I can recall, no.

24        Q    Do you know whether someone else at

25   Kelly-Moore asked her to do that?

5010d824-80af-4d0f-b31f-0419e7c733e3

1      A     Yes.

2      Q     Did Mr. Moore respond?

3      A     Yes.

4      Q     What was his response?

5            MS. SMITH:    Object to form.

6      A     No.    He was -- he was adamant that he was

7   going to be the administrator.

8   BY MS. HASSELMAN:

9      Q     Did he say why he was adamant that he was

10  going to be the administrator?

11     A     No.

12     Q     When you say you felt we should have had an

13  outside administrator, why did you feel that?

14     A     To protect --

15           MS. SMITH:    Object to form.

16     A     -- both the participants of the ESOP and

17  also to protect Mr. Moore, I felt that it should be an

18  independent outside administrator.

19  BY MS. HASSELMAN:

20     Q     Were you concerned that there was a

21  conflict of interest between Mr. Moore's role as ESOP

22  committee member and his role as the selling

23  shareholder?

24           MR. SULLIVAN:    Object to the form.

25     A     No, frankly that wasn't my area of concern.

5010d824-80af-4d0f-b31f-0419e7c733e3

1   It was more around it would be a lot safer if you had an

2   outside administrator, and the employees would probably

3   be more comfortable with an outside administrator.

4   BY MS. HASSELMAN:

5          Q    You said one of the reasons for

6   recommending an outside administrator was to protect the

7   participants.  Can you tell me how was it that having an

8   outside administrator would protect the participants?

9               MS. SMITH:   Object to form.

10         A    I just felt that an independent outside

11  administrator would probably have the interest of the

12  employees uppermost, No. 1.

13  BY MS. HASSELMAN:

14         Q    Were you concerned that Mr. Moore might

15  not?

16              MS. SMITH:   Object to form.

17         A    No, but I just felt more comfortable if it

18  was an outside administrator.

19  BY MS. HASSELMAN:

20         Q    When you say you think it would be safer to

21  have an outside administrator, can you tell me what you

22  mean?  Safer from what?

23         A    Problems.

24              MS. SMITH:   Object to form.

25  BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 156

1       Q   What kind of problems?

2       A   Well, I don't know.  I don't have

3 specific -- just it seemed a lot cleaner, a lot easier

4 to have an outside administrator.  And specific

5 problems, I really don't have any.

6       Q   Did he tell you why he was adamant that he

7 wanted to be the administrator?

8       MS. SMITH:  Object to form.

9       A   No, he just told me that he was going to be

10 the administrator.

11 BY MS. HASSELMAN:

12       Q   If he said so, that's how it was; right?

13       A   That was it.

14       MS. SMITH:  Object to form.

15 BY MS. HASSELMAN:

16       Q   To your knowledge did Mr. Moore ever

17 consider having an independent fiduciary represent the

18 ESOP for purposes of the transaction?

19       MS. SMITH:  Object to the form.

20       MR. SULLIVAN:  Object to the form.

21       A   Do you mean as the administrator of the

22 ESOP?  Is that --

23 BY MS. HASSELMAN:

24       Q   I mean, specifically to represent the ESOP

25 in the transaction in which the ESOP purchased stock

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 157

1  from the Moore Trust.

2          A     He never talked to me about that.

3          Q     Did you ever --

4          A     Sorry, I don't know.

5          Q     Excuse me.  I didn't mean to speak over

6  you.

7          A     I just said that so I don't know.

8          Q     Did you ever recommend that he considered

9  having an independent fiduciary represent the ESOP in

10  the transaction?

11               MR. SULLIVAN:  Object to the form.

12         A     I only recommended things to him once.  And

13  so the answer would be no.  I did not recommend it after

14  that time, that one discussion.

15  BY MS. HASSELMAN:

16         Q     There was no separate legal counsel for the

17  trustee and the ESOP; is that correct --

18               MS. SMITH:  Object to the form.

19               MR. SULLIVAN:  Object to the form.

20  BY MS. HASSELMAN:

21         Q     -- at the time of the 1998 transaction?

22               MS. SMITH:  Object to form.

23         A     I really don't know actually.

24  BY MS. HASSELMAN:

25         Q     Do you know whether you knew in 1998

5010d824-80af-4d0f-b31f-0419e7c733e3

1    looked at yesterday.

2         Q    Other than the documents that you think you

3    saw yesterday, do you have any other basis for recalling

4    that Mr. Brooks spoke with Mr. Ferrari during his

5    process of creating his valuation reports in 1998?

6         A    No, I don't.

7         Q    Would you turn to Exhibit 53.  Could you

8    look through this briefly and tell me if you recognize

9    it?

10        A    I saw it yesterday.  Other than that I

11   don't recognize it.

12        Q    Did you ever receive a request from

13   Mr. Brooks for information in connection with his

14   preparation of valuation reports in 1998?

15        A    No.

16        Q    Did you have any involvement with providing

17   information or documents to Mr. Brooks in connection

18   with his 1998 valuations?

19             MS. SMITH:    Objection to form.

20        A    No.

21   BY MS. HASSELMAN:

22        Q    Do you have any knowledge of what

23   information or documents were provided to Mr. Brooks for

24   purposes of his 1998 valuations?

25             MS. SMITH:    Object to form.

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 184

1           A     No.

2      BY MS. HASSELMAN:

3           Q     Do you know whether Mr. Brooks received

4      financial projections in connection with his valuations

5      in 1998?

6                 MR. LOVITT:    Excuse me, please.  Please

7      repeat the question.

8                 MS. HASSELMAN:    Could you read it back?

9                 (Record read by the reporter.)

10

11          A     Again yesterday I believe I saw some data

12     like that in the information that I went over at the

13     attorney's office.

14     BY MS. HASSELMAN:

15          Q     But other than seeing some documents

16     yesterday, you are not aware of any -- well, let me say

17     that a different way.

18                Other than seeing some documents yesterday,

19     do you have any basis for any knowledge of whether

20     Mr. Brooks received financial projections in 1998?

21                MS. SMITH:    Object to form.

22          A     No.

23     BY MS. HASSELMAN:

24          Q     Do you have any knowledge on regarding

25     whether Mr. Brooks received any information on

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 185

1    Kelly-Moore's asbestos litigation liabilities?

2             MS. SMITH:   Object to form.

3         A    No, I don't have any information.

4    BY MS. HASSELMAN:

5         Q    Did you have any conversations with

6    Mr. Moore regarding Exhibit 9, which is the August 1998

7    report from Mr. Brooks?

8         A    No, not that I can recall.

9         Q    Did Mr. Moore say anything to you about

10   Mr. Brooks' valuation that came out in August of 1998?

11            MS. SMITH:   Object to form.

12        A    No.

13   BY MS. HASSELMAN:

14        Q    Did you have any conversations with

15   Mr. Ferrari about the August 1998 report?

16        A    Not that I can recall.

17        Q    Did you have any conversations with

18   Mr. Moore regarding the October 12, 1998, letter to the

19   board that's marked as Exhibit 55?

20        A    No.

21        Q    And did Mr. Moore say anything to you about

22   the report that is reflected in Exhibit 55?

23        A    Not that I can recall, no.

24            MS. SMITH:   Object to form.

25   BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 186

1      Q    Did you have any conversations with

2  Mr. Moore regarding the valuation conclusion that

3  Mr. Brooks had reached for the Paint Company stock?

4      A    No.

5      Q    Did Mr. Moore make the final decision about

6  what the transaction price would be between the ESOP and

7  the Moore Trust?

8           MS. SMITH:    Object to form.

9      A    Yes, I believe so, yeah.

10  BY MS. HASSELMAN:

11      Q    Are you aware of whether there is any

12  negotiation about the transaction price?

13           MS. SMITH:    Object to form.

14      A    I'm not aware of whether he did or didn't,

15  no, I don't know.

16  BY MS. HASSELMAN:

17      Q    And both of those questions I am referring

18  to the 1998 transaction.  Is that how you understood my

19  question?

20      A    Yes.

21      Q    Did you have any input on the transaction

22  price?

23      A    No.

24           MS. SMITH:    Object to form.

25  BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 221

1   Q  Do you know why that was added?

2   A  I think that was about the time that Cheryl

3 was now writing direct to EY, and we didn't feel a need

4 that we had to continue putting anything in from ours

5 because it was going directly from Cheryl to EY.  She

6 was sending documents then to them.  And the little bit

7 I can remember about it, I think we were a little bit

8 sensitive about saying something in here that wasn't

9 exactly what Cheryl said.  So I think she was -- she

10 was -- if I got the dates right, I think she was the one

11 feeding the information to EY after this point rather

12 than Steve and I trying to feed the information to

13 her -- to EY.

14   Q  Could you look at Exhibit 76?  Have you

15 seen this document before?

16   A  I believe I saw this yesterday in the

17 attorney's office.

18   Q  Do you know whether you saw it prior to

19 yesterday?

20   A  I don't believe I saw it.

21   Q  A moment ago you said that by the time of

22 Exhibit 125 that Ms. Mills was writing directly to EY.

23 Is this the letter that you are referring to when you

24 say she was writing directly to EY?

25     MS. SMITH:  Object to form.

5010d824-80af-4d0f-b31f-0419e7c733e3

BY MS. HASSELMAN:

    Q   Okay.  Let's look at Exhibit 75 briefly to clear up this dispute.  Do you have Exhibit 75?

    MR. LOVITT:    Yeah.

BY MS. HASSELMAN:

    Q   Exhibit 75 is dated December 11th 1998; is that right?

    MR. LOVITT:    That's right.

BY MS. HASSELMAN:

    Q   And that is before February 12th 1999; is that right?  Let's just let the witness answer.

    MR. LOVITT:    That is not the pertinent exhibit that talks about -- okay.  I am wrong.  Sorry.

    MS. HASSELMAN:  Okay.

    MR. LOVITT:    Disregard everything I said about that.

BY MS. HASSELMAN:

    Q   You could turn back to Exhibit 127, Mr. Cristiano.  And back on page KMH 11026 and the legal matters section, the last sentence says that the company confirms that the potential claim by the Ngs relating to their occupancy of the company's San Francisco shopping mall is not expected to result in a material loss to the company.  Is that right?

    A   Yes.

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 228

1    Q    Do you recall what that is referring to?

2    A    A tenant problem with the Ngs, I believe in

3  South San Francisco shopping center owned by Kelly-Moore

4  Paint.

5    Q    And there was a -- was that a landlord

6  tenant dispute?

7    A    Yes.

8    Q    And were the Ngs tenants of Kelly-Moore?

9    A    Yes.

10   Q    Were they tenants of the entire shopping

11  mall or just one store or what was the scope of their

12  tenancy?

13   A    One store but the shopping mall was owned

14  by Kelly-Moore.

15   Q    So a landlord tenant dispute for a single

16  store in a shopping mall was worth mentioning to Ernst &

17  Young but the thousands of asbestos claims that had been

18  filed against Kelly-Moore --

19        MR. LOVITT:   Objection.  Argumentative.

20        MS. SMITH:   Objection.

21        MS. HASSELMAN:   Emi, did you get the end

22  of my question?  Before the objections came in, I had

23  said, but the thousands of asbestos claims that have

24  been filed against Kelly-Moore.  And then I said, were

25  not mentioned, were not worth mentioning.  But the

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 229

1    objections drowned that out.

2              MS. SMITH:   Object to form.

3              MR. SULLIVAN:   Object as to form.   That

4    misstates the prior testimony.

5    BY MS. HASSELMAN:

6         Q    Do you have an answer to the question,

7    Mr. Cristiano?

8         A    No, I just think you are trying to make me

9    feel bad and you didn't.  So that's all I have to say.

10        Q    Looking at page 11025 in the contingent

11   liability section -- this is in Exhibit 127 -- you still

12   believed at this time that nothing with the asbestos

13   litigation was serious enough to merit reporting to

14   Ernst & Young?

15             MS. SMITH:   Object to form.

16             MR. SULLIVAN:   Object to form.  Misstates

17   prior testimony.

18        A    Reports were being done by our attorney,

19   Cheryl Mills, to Ernst & Young.

20   BY MS. HASSELMAN:

21        Q    I will go to the next exhibit, 128.

22                  (Exhibit No. 128 marked

23                   for identification.)

24

25        Q    Exhibit 128 is Bate stamped KMH 007206.

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 232

1    BY MS. HASSELMAN:

2        Q    The next exhibit, this is Exhibit 129 is

3    Bate stamped EY 70 through 77.

4                    (Exhibit No. 129 marked

5                     for identification.)

6

7        Q    Mr. Cristiano, have you seen this document

8    before?

9        A    Yes, in 2000.

10       Q    On the second to last page is that your

11   signature?

12       A    Yes.

13       Q    And did Mr. Ferrari draft this document?

14       A    Yes.

15       Q    Did you review it for accuracy before

16   signing it?

17       A    Yes.

18       Q    Could you look at the very last page Bate

19   stamped EY 77?  What is this page?

20           MS. SMITH:   Object to form.

21       A    It appears to be an adjustment of the audit

22   numbers where they recorded $724,000 incorrectly, and

23   the 724,000 is corrected here.

24   BY MS. HASSELMAN:

25       Q    And is it your understanding that this

5010d824-80af-4d0f-b31f-0419e7c733e3

Page 233

1    letter is referring to matters for the fiscal year 1999?

2              MS. SMITH:    Object to form.

3         A    Yes.

4    BY MS. HASSELMAN:

5         Q    If you could turn to the page stamped

6    EY 73, under contingent liabilities, you see the

7    language that there are no unasserted claims or

8    assessments including those our lawyers have advised us

9    of that are probable of assertion and must be disclosed?

10        A    Yes.

11        Q    It continues from there.  I don't mean to

12   characterize it, that that is the end of the document.

13             At the time of this letter in February of

14   2000, did you still believe that nothing serious enough

15   was happening with asbestos litigation to warrant

16   disclosure to the auditors?

17             MR. SULLIVAN:    Object as to form.

18        A    Our attorney was continuing to advise us

19   that we had adequate insurance.

20   BY MS. HASSELMAN:

21        Q    Is it your understanding that Ms. Mills was

22   reporting asbestos litigation matters to Ernst & Young?

23             MS. SMITH:    Object to form.

24        A    Yes.

25   BY MS. HASSELMAN:

5010d824-80af-4d0f-b31f-0419e7c733e3

REDACTED

5010d824-80af-4d0f-b31f-0419e7c733e3

REDACTED

5010d824-80af-4d0f-b31f-0419e7c733e3

REDACTED

# EXHIBIT 2

CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN MATEO
### HEALTH DEPARTMENT
SAN MATEO, CALIFORNIA

REDACTED

# CONFIDENTIAL

KMH 001797

# EXHIBIT 3

Dan Stritmatter                    CONFIDENTIAL                    March 12, 2008

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO AND OAKLAND DIVISION

4

5    ─────────────────────────────────────────────

6    THOMAS FERNANDEZ, et al.,              )
                                            )
7                  Plaintiffs,              )
                                            ) Case No.
8            vs.                            )
                                            ) C-06-07339 CW
9    K-M INDUSTRIES HOLDING CO., INC., et al., )
                                            )
10                 Defendants.              )
                                            )
11                                          )
                                            )
12
     ─────────────────────────────────────────────
13

14

            VIDEOTAPED DEPOSITION OF DAN STRITMATTER
15                   March 12, 2008
                   Oakland, California
16

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 79122
24

25

Page 73

1    the law through Congress that sort of thing.  We have

2    been made aware of those, those changes made it

3    necessary amendments to the plan, voted on those

4    amendments, and then presented those to the board.

5         Q    Any other times?

6              MS. DILLER:    Same objections.

7              MR. PALMER:    Same objection.  Calls for a

8    legal conclusion.

9         A    Those are the two that stick out in my

10   mind.  You know, without looking through the board

11   minutes or reviewing documents and everything, that's

12   all I can really recall at this time.

13   BY MR. JACKSON:

14        Q    And you referred to the ESOP committee.

15   How long has there been an ESOP committee?

16        A    I believe there have been ESOP committee

17   since 1998.

18        Q    Is it your understanding that the only

19   member of the ESOP committee -- strike.

20             Who is on the ESOP committee from 1998

21   until 2003, if you know?

22        A    I believe that Mr. Moore was on the ESOP

23   committee -- William Moore.  And then in 2002 or 2003,

24   somewhere in that time frame Mr. Herb Giffins was on the

25   committee, sole committee member.

Dan Stritmatter                CONFIDENTIAL                March 12, 2008

Page 74

1    Q    Prior to 2002 or 2003 when Mr. Giffins came

2    on as the sole committee member, was Mr. Moore the sole

3    committee member?

4    A    As far as I'm aware, yes.

5    Q    When did Mr. Giffins stop being the sole

6    committee member?

7    A    In the year 2004.

8    Q    Did he remain on the committee starting in

9    2004?

10    A    Yes.

11    Q    Who joined him?

12    A    Mr. Cazzolla.

13    Q    Anyone else?

14    A    And myself.

15    Q    Who is currently on the committee?

16    A    Mr. DeVoe, Mr. Cazzolla, Mr. Bob Erickson,

17    and myself.

18    Q    From 2004 until now have there been any

19    other members of the committee and who were they?

20    A    No, those are all the members listed.

21    Q    When did Mr. Giffins drop off?

22    A    When he retired.

23    Q    And who replaced him?

24    A    Mr. DeVoe.

25    Q    When did Mr. Erickson join?

Dan Stritmatter                    CONFIDENTIAL                    March 12, 2008

Page 86

```
 1    have it up through his retirement?

 2         A    He had it up through his retirement.

 3         Q    For who was the Paint president?  Is it

 4    Mr. Moore was the Paint president and CEO until 1984; is

 5    that correct?

 6         A    I'm not sure the title of Mr. Moore during

 7    that time period.

 8         Q    Do you know what Mr. Moore's duties were

 9    during that time period?

10         A    Well, I assume he was the president of the

11    company.  I don't know whether he held the CEO title.

12    But he was also the owner of the company and I'm sure

13    made all the decisions for the company during that time.

14         Q    What about from 1984 until 2000, what were

15    his duties during that period?

16              MR. PALMER:   Object to form.

17         A    Without seeing the minutes and everything,

18    I'm not aware.  I assume that he was chairman of the

19    board during that time.  But after his retirement and

20    the new president, Joseph Cristiano, not quite sure what

21    his duties were at that point.

22    BY MR. JACKSON:

23         Q    Was he still very active in the company?

24              MR. PALMER:   Object to form.

25         A    I believe that he was, yes.
```

505 Sansome Street Ste. 502            Esquire Deposition Services            San Francisco, C.A. 94111
Phone (415) 399-4280                      1-800-770-3363                      Fax (415) 288-4286

Dan Stritmatter                              CONFIDENTIAL                                    March 12, 2008

Page 87

1    BY MR. JACKSON:

2          Q     And why do you believe that he was?

3          A     He was hands on with the way he ran the

4    company as president and such and believe that he

5    probably continued to be so after his retirement.

6          Q     When you say after his retirement, you mean

7    after he stepped down as president in 1984?

8          A     Correct.

9          Q     When you say you assume he continued to be

10   hands on, what do you mean by hands on?

11         A     Well, be involved in the company.  I mean,

12   he was the owner of the company so, obviously, had a

13   vested interest in the success of the company.

14               MR. BORNSTEIN:  Excuse me.  I just want to

15   have another objection.  I don't believe this topic is

16   on the list, so I don't think this is going to bind the

17   company in the structure of the duties of Mr. Moore

18   after he retired.

19               MR. JACKSON:  I believe it falls within

20   organization, but I hear your objection.

21               MR. LOVITT:  Well, the witness has no

22   actual knowledge of this.  That's why it would be

23   inappropriate for him to speak for the company.

24   BY MR. JACKSON:

25         Q     When did you start with the company?