# EXHIBIT 4

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO AND OAKLAND DIVISION

4

5   _____

6   THOMAS FERNANDEZ, et al.,                )
                                             )
7                  Plaintiffs,               )
                                             ) Case No.
8           vs.                              )
                                             ) C-06-07339 CW
9   K-M INDUSTRIES HOLDING CO., INC., et al.,)
                                             )
10                 Defendants.               )
                                             )
11                                           )
                                             )
12

13  _____

14

          VIDEOTAPED DEPOSITION OF PETER CAZZOLLA
15                   March 19, 2008
                  Oakland, California
16

17

18

19

20

21

22  Reported by:
    EMI ALBRIGHT
23  RPR, CSR No. 13042
    Job No. 79124
24

25

1          A    KMH.

2          Q    Do you have an understanding as to why they

3    wanted to have a more independent trustee involved with

4    the ESOP?

5               MS. DILLER:   Calls for speculation.

6               MS. SMITH:   Join in the objection.

7    BY MR. FEINBERG:

8          Q    Do you have an understanding as to why the

9    board of directors wanted to have a more independent

10   trustee involved?

11         A    Well, to insure there was a third party

12   objective opinion on the management of the ESOP.

13         Q    Was that a concern prior to the time that

14   Mr. Moore -- excuse me.  Was there a concern prior to

15   the time that North Star became trustee?

16              MS. SMITH:   Objection.  Calls for

17   speculation.

18         A    Was it a concern?

19   BY MR. FEINBERG:

20         Q    Yes?

21         A    Yes.

22         Q    Did you ever -- did you have that concern

23   yourself as president and CEO of CIG?

24         A    Yes.

25         Q    Did you ever express that concern to

1    anyone?

2          A    Yes.

3          Q    Who did you express it to?

4          A    To Bill.

5          Q    When did you express that concern to Bill?

6          A    Well, I think in the early organization of

7    the ESOP.

8          Q    And we are talking now around 1998 or 1999?

9          A    Yes.

10         Q    Do you recall what you said to Mr. Moore

11    about your concern of having an independent third party

12    involved?

13         A    Just that it would be prudent to have a

14    third party because it's very difficult to be

15    independent and making decisions as an accumulative

16    owner.

17         Q    What did Mr. Moore say in response?

18         A    His response was, I really don't have an

19    issue with that.  He was comfortable with it.  And

20    basically that's what I can recollect.  I mean, I

21    don't -- I can't really recollect any specific wording

22    in terms of him addressing that with us other than

23    that's the way he functions and that's the way he ran

24    our companies.

25         Q    So he said that he was comfortable in

Page 32

1        Q    2005?

2        A    Uh-huh.

3        Q    Who in particular played this monitoring

4   role?

5        A    That would be Tom -- Tom Scherff, vice

6   president of claims.

7        Q    When did you personally first become aware

8   that Paint was facing asbestos claims?

9        A    I want to say --

10        MS. SMITH:    Objection to form.

11        A    -- in my earlier years I want to say

12   somewhere around -- I really cannot give a specific

13   date, but it was rather early, and Bill came into a

14   board meeting or we had manager meetings and just

15   mentioned it to us and said we are facing some asbestos

16   litigation.  And his comment was kind of just a

17   commentary really.  And he said we have a good person

18   helping us out there and we have plenty of insurance so

19   we should be in good shape.

20   BY MR. FEINBERG:

21        Q    And this was a manager meeting at CIG?

22        A    Yes.

23        Q    When you say early on, I believe you've

24   testified that you have been there for 15 years?

25        A    Right.

1      Q      So my math skills are limited, but I am

2  guessing that puts us back to about 1993?

3      A      No, I would say more like '97, '98, right

4  in that area.

5      Q      Do you know what prompted Mr. Moore to

6  raise this issue?

7      A      I think it was a matter of information for

8  us.

9      Q      So was there any particular event --

10     A      Because we are an insurance business, and I

11  think it was an insurance matter, and that was basically

12  it.

13     Q      Did anyone ask -- did anyone -- well, who

14  was at this manager meeting besides you and Mr. Moore?

15     A      My senior executives.

16     Q      That would be Mr. Mines?

17     A      Yes.

18     Q      And who else?

19     A      Tom Scherff and Bob Winn.

20     Q      And you had -- how often did these manager

21  meetings take place?

22     A      They were monthly for a number of years.  I

23  can't tell you exactly when we went to quarterly.

24     Q      Do you recall anything else Mr. Moore said

25  at this manager meeting?

Page 43

1  the 1999 ESOP transaction?

2        A    Yes.

3        Q    Was this -- who did he meet with at CIG?

4        A    He met with the team, myself, Bob Winn, Ed

5  Mines, and Tom Scherff.

6        Q    This would be the management team?

7        A    Yes.

8        Q    And do you recall what he said about the

9  upcoming ESOP?

10        A    Well, it was --

11             MS. SMITH:    Objection.   Vague as to which

12  ESOP.

13        A    -- pretty general in terms of how it works,

14  how it's a win win.   That's basically it.   It wasn't --

15  it wasn't a very detailed meeting.

16             MR. HANNAN:   Mr. Cazzolla, excuse me.   I

17  didn't mean to interrupt the answer.   There is some

18  objections being made.   It may be hard for you to hear

19  them.   Would you take time before you answer so if

20  there's an objection, the record will be clear as to

21  what the objection is and then answer the question.

22  Thank you.

23             MS. DILLER:    Thank you.

24  BY MR. FEINBERG:

25        Q    Now, the CIG portion of the ESOP was

1    delayed, was it not?

2         A    Yes, it was.

3         Q    Can you give us explanation about why the

4    launch of the CIG portion of the ESOP was delayed?

5         A    I believe it was a tax matter, trying to

6    get a private letter ruling from the IRS.  And initially

7    we wanted to form the ESOP as two separate ESOPs,

8    strictly California Capital and then the K-M Paint ESOP

9    and us being responsible for the CIG ESOP.

10             And what happened was that the IRS ruling

11   came back disallowing the reorganization structure in

12   terms of you cannot reorganize a company for the

13   purpose -- this is my general recollection -- you cannot

14   reform a company for the purpose of setting up an ESOP

15   and that if you set an ESOP up, there is like a three

16   year waiting period before you can separate them.  And

17   that's what I understood.

18        Q    So the end result was that you did not

19   separate CIG and Paint for the ESOP purposes?

20        A    Eventually we did not, and that's why KMH

21   basically was formed as part of that.

22        Q    And that's why it was -- is this why there

23   was a decision made to use tracking stock?

24        A    Yes.

25        Q    Can you give us a brief explanation of your

1   and a higher performing company would be above the

2   middle of the range.

3          Q     So it was because CIG was a higher

4   performing company?

5          A     We are a higher performing company.

6          Q     Do you recall discussing this June 1999

7   valuation with Mr. Moore?

8          A     Discussing it -- no, I am trying to

9   remember now.  Submitted it to him -- when we send them

10  the copy, and then once he received it, he called Ed --

11  Ed Mines -- and expressed that he thought the valuation

12  was low and wanted to challenge A.M. Best at least in

13  terms of what that value would be and discuss more about

14  it.

15         Q     Sorry to interrupt, but you said challenge

16  A.M. Best.  I think you meant to say --

17         A     Oh, Duff & Phelps.  Yeah, Duff & Phelps.

18         Q     And just to clarify, the 1999 valuation is

19  lower than the 1998 valuation that we looked at this

20  morning?  The overall value it ascribes to the

21  enterprise, it's a lower value than 1998?  Or is that

22  not your recollection?

23         A     Well, I would have to look at the report

24  again and compare them.

25         Q     So let's go back.  Mr. Moore said that

1    he -- I interrupted you to make it clear that it was

2    Duff & Phelps rather than A.M. Best.  But why don't you

3    finish your answer.  What was Mr. Moore's reaction?

4         A    So he felt the value was not in keeping

5    with what he thinks the value of the company should be

6    and wanted to further discuss the valuation with Duff &

7    Phelps.

8         Q    Do you know if he further discussed the

9    valuation with Duff & Phelps?

10        A    He did.

11        Q    So how do you know that he did?

12        A    Well, because he communicated that to Ed

13   Mines.  And then in terms of the response from Ken

14   Bodenstein he told us about that as well, Ed and I, Ken

15   did.  And that's how we knew.

16        Q    What did Mr. Bodenstein tell you about his

17   discussion with Mr. Moore?

18        A    He wasn't too elaborate.  He just said

19   that, you know, Bill asked him whether the valuation was

20   a reasonable and fair valuation of the company, why

21   wasn't it higher, basically.  And they said it does

22   represent a fair value of the company.

23        Q    Did Mr. Moore ask you to advocate for a

24   higher valuation with Duff & Phelps?

25        A    No.

Page 125

1          MS. SMITH:  Objection to the form.

2          MS. DILLER:  Objection.

3    BY MR. FEINBERG:

4          Q    Did the two of you agree on that point that

5    one shouldn't be both the owner of the shares and also

6    the trustee?

7          A    We did.

8          Q    Did the two of you convey your opinion to

9    Mr. Moore?

10         A    We did.

11         Q    And what did Mr. Moore say?

12         A    He was confident.  That knowing his

13   character -- and you'd have to know his character -- he

14   was a very outstanding person, even before the ESOP the

15   way he dealt with us and how he ran the company.  He was

16   a person that ran it on his own.  He wanted to be in

17   charge and in control of the operation.  And he felt

18   confident and we did too, quite honestly, even though we

19   told him there could be a technical conflict, that he

20   was confident that that would not be an issue with him.

21   And we accepted the fact knowing his character, his

22   credibility.

23         Q    The next note on this page says, meet

24   independent portfolio manager to run ESOP in Bill

25   Moore's best interest.

Page 141

1  received in shuffled condition and we did our best to

2  put it in the correct order.   So it begins with CIG

3  8220, then goes 230, 223, 224, 225, 221, 217, 216, 219,

4  218.   231 is a fax cover page.   Probably doesn't matter

5  whether you put it at the front or the back in this

6  case.   But if anybody, counsel, if any counsel thinks we

7  have it in the wrong order, you can let me know.   But in

8  the meantime why don't you take a look at it and see if

9  it's a document you read before.

10          Is this a document you have seen before,

11  Mr. Cazzolla?

12      A    By virtue of the process and seeing Bill's

13  cover note here to Ed, I would have seen this because Ed

14  would have reviewed it with me.

15      Q    So is your understanding that you would

16  have seen it around September 8th 1999?

17      A    I would say yes.

18      Q    Do you know if Columbia Financial sent a

19  draft of this valuation letter to Mr. Moore?

20      A    No, I wouldn't.   I don't recall.

21      Q    I take it, would you have recollection as

22  to whether or not you received a draft of this valuation

23  letter that's dated September 7th?

24      A    Since I didn't respond initially to this

25  until I saw it as forwarded to me by Ed, as part of that

1   Phelps valuation and the verifying valuation conducted

2   by Kathy Daly.

3   BY MR. FEINBERG:

4        Q    How was Kathy Daly's valuation a confirming

5   valuation?

6        A    Because of her process and analysis and her

7   expertise.

8        Q    What was her conclusion as to the price?

9   Isn't it a range from 48 to 55 million?

10       A    It was a range.

11       Q    So did she provide -- to your knowledge did

12  she provide somebody with an opinion that the proper

13  value is $55 million or did she just provide an opinion

14  that there was a range of value between 48 and 55

15  million?

16            MS. SMITH:   Objection to the form.

17       A    I can't -- I can't verify that whether she

18  did or she didn't.  Goes back to the value again, even

19  though there's a range, just like Duff & Phelps

20  initially had a range based on the performance of the

21  company.  The higher end of the range, assuming with all

22  the proper methodologies by the experts, pegged that

23  value at 55 million.

24  BY MR. FEINBERG:

25       Q    Do you know if there were any -- well, do

Page 155

1    you know who decided that the price was going to be

2    $55 million?  Who made the ultimate decision that the

3    transaction price was going to be 55 million?

4           MS. SMITH:    Objection.  Object to the

5    form.

6       A    Bill Moore.

7    BY MR. FEINBERG:

8       Q    Do you know whether there were any

9    negotiations as to the transaction price between the

10   Moore Trust and the ESOP?

11          MS. SMITH:    Objection to the form.

12      A    I don't.

13   BY MR. FEINBERG:

14      Q    Who would know if there were any

15   negotiations as to the price?

16      A    I just don't like the word, negotiations,

17   because I don't think there were any negotiations

18   regarding that, but I --

19      Q    So if there were no negotiations, that's a

20   fair answer.

21      A    Yeah.

22      Q    So it's your knowledge there were no

23   negotiations about the price?

24      A    Right.  Right.

25      Q    And Mr. Moore made the ultimate decision

Page 175

1    mark as Exhibit 28 a document that's Bate stamped CIG

2    2447.

3                        (Exhibit No. 28 marked

4                        for identification.)

5

6    BY MR. FEINBERG:

7         Q    Have you seen this one before,

8    Mr. Cazzolla?

9         A    Yes, again I am the author.

10        Q    And this is also to CIG team members but

11   this one is called interoffice memorandum.  Once again

12   is it fair to assume that this was delivered to current

13   CIG employees at their work site?

14        A    Yes.

15        Q    Is it also fair to assume that it was not

16   sent to former CIG employees who are no longer working

17   for the company but were ESOP participants?

18        A    I can't unequivocally say it wasn't sent to

19   them, but being interoffice it's a likelihood, but I

20   would have to verify that.

21        Q    So you think it's likely that it was not

22   sent to former employees?

23        A    Yes.

24        Q    And would that be -- would it be your

25   assumption that documents, CIG documents labeled

Page 176

1    interoffice memorandum were not sent to former employees

2    who were participants in the ESOP?

3              MS. SMITH:   Objection to form.

4         A    That would be a fair statement.

5              MR. FEINBERG:   If it's okay with you folks

6    to take a ten minute break?

7              MR. HANNAN:   Provided that we are making

8    sufficient progress as we are running toward the end of

9    our time.

10             MR. FEINBERG:   Well, we have plenty of

11   time left, but you will get out at a reasonable hour,

12   you have my assurance, yes.

13             THE VIDEOGRAPHER:   The time is 3:31 p.m.

14   We are going off the record.

15             (Recess 3:31 p.m.-3:45 p.m.)

16             THE VIDEOGRAPHER:   The time is 3:45 p.m.

17   We are going back on the record.

18

19             EXAMINATION (Continuing)

20   BY MR. FEINBERG:

21        Q    Mr. Cazzolla, has CIG ever considered

22   filing for bankruptcy in recent years?

23        A    No.

24             MS. SMITH:   Objection to form.

25        (The following page 177 is marked confidential.)

7c01d809-3125-4f3d-bf98-41d44ecc427c

Page 184

1    much for the stock purchase from the Moore Trust in 1998

2    or 1999?

3                    MS. SMITH:    Objection.  Form.

4                    MR. HANNAN:    I further caution and I don't

5    know that it applies and it's a little tricky, but if

6    you received any communication from a lawyer who was

7    representing CIG or the trust, you should not divulge

8    that.  And, if necessary, if that comes up, we should

9    take a break and discuss it before you answer.

10                   MR. BORNSTEIN:    And I would like also to

11   object.  I think this is beyond the scope of what we

12   volunteered him for, so I don't think it's going to bind

13   the company -- should put on the record.

14   BY MR. FEINBERG:

15       Q    That said, can you answer the question or

16   would you like me to repeat?

17       A    Would you repeat it, please.

18       Q    Is CIG aware of North Star ever

19   investigating or considering whether the ESOP paid too

20   much for the stock purchased from the Moore Trust in

21   1998 or 1999?

22                   MS. DILLER:    Calls for speculation.  Lacks

23   foundation.

24       A    I don't recall that.

25   BY MR. FEINBERG:

```
1        Q    Is CIG aware of North Star ever
2   investigating the potential liability of prior ESOP
3   fiduciaries?
4             MS. DILLER:   Same objections.
5             MS. SMITH:   Objection.  Form.
6        A    I would imagine as part of their
7   responsibility as trustee in the valuations, as they
8   became aware -- they were aware of the asbestos
9   liabilities at that point.  I cannot, though, state
10  whether, what processes they actually went through at
11  that point.
12  BY MR. FEINBERG:
13       Q    Who have you communicated with at North
14  Star regarding ESOP matters?
15       A    Well, there's John Hommel, John Kober, Erin
16  Turley.
17       Q    Do you recall any discussions with those
18  three individuals about -- do you recall any discussion
19  with those three individuals about the terms of the 1998
20  and 1999 ESOP transactions?
21       A    I don't.
22       Q    Do you recall any conversations with those
23  three individuals about potential liability of the prior
24  fiduciaries of the ESOP?
25       A    I don't.
```

# EXHIBIT 5

# MINUTES OF ANNUAL COMBINED MEETING OF THE
# BOARD OF DIRECTORS AND SHAREHOLDERS
# OF
# KELLY-MOORE PAINT COMPANY, INC.

## MARCH 26, 1997



KMH 011004
Confidential

REDACTED

KMH 011005
Confidential

REDACTED

KMH 011006
Confidential

REDACTED

KMH 011007
Confidential

REDACTED

KMH 011008
Confidential

# EXHIBIT 6

# CONFIDENTIAL

MINUTES OF A JOINT SPECIAL MEETING
OF THE BOARDS OF DIRECTORS OF
K-M INDUSTRIES HOLDING CO., INC. ("HOLDINGS")
AND
KELLY MOORE PAINT COMPANY, INC. (THE "COMPANY")



KMH 000555

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

# CONFIDENTIAL



KMH 000556

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

CONFIDENTIAL



KMH 000557

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

# EXHIBIT 7

UNANIMOUS WRITTEN CONSENT IN LIEU OF
A MEETING OF THE BOARD OF DIRECTORS
OF
KELLY-MOORE PAINT COMPANY, INC.

CONFIDENTIAL

REDACTED

KMH 006546

RESOLVED, that this Corporation extend the $150,000, 5% bridge loan to Herbert R. Giffins. The loan will be due upon sale of Herbert Giffins' current house in Colleyville, Texas, not to exceed 365 days from the original note date of October 16, 2002.

IN WITNESS WHEREOF, the undersigned being all of the directors of the corporation, do hereby execute this instrument as of the 14th day of March 2003.

_____
Director

_____
Director

_____
Director

_____
Director

_____
Director

KMH 006547

# EXHIBIT 8

CONFIDENTIAL

MINUTES OF A JOINT SPECIAL MEETING
OF THE BOARDS OF DIRECTORS OF
K-M INDUSTRIES HOLDING CO., INC. ("HOLDINGS")
AND
KELLY MOORE PAINT COMPANY, INC. (THE "COMPANY")



REDACTED

CONFIDENTIAL



CONFIDENTIAL



KMH 000507

CONFIDENTIAL



KMH 000508

# EXHIBIT 9

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this thirteenth day of October, 1998, by and among William E. Moore as trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and Kelly-Moore Paint Company, Inc., a California corporation (hereinafter referred to as the "Company"),

## W I T N E S S E T H:

WHEREAS, Trustee is the trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") established by the Company to be effective as of January 1, 1998, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding shares of K-M Industries Holding Co., Inc., a California corporation (the "Parent"); and

WHEREAS, Selling Shareholder desires to sell Thirty-three Million Seven Hundred Forty-five Four Hundred Fifty-five (33,745,455) shares of the Parent's Class P-B Stock (the "Shares") to the Trustee; and

1

EXHIBIT

3

Stritmatter  3-12-08

MK001589

REDACTED

CONFIDENTIAL

MK001590

fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee,

then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee

shares of the Parent's Class P-B Stock, or any combination thereof, equal in value to the

difference between the Purchase Price and said fair market value for all such Shares. In the event

that cash and/or shares of the Parent's Class P-B Stock are paid and/or transferred to the Trustee

under this provision, such shares shall be valued at their fair market value as of the date hereof

and interest at a reasonable rate from the date hereof to the date of payment shall be paid by

Selling Shareholder on the amount of cash paid.

    3.    <u>Representations and Warranties of Selling Shareholder</u>. The Selling Shareholder,

to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the

following representations and warranties.

    (a)    On the date hereof, the Shares being sold hereunder will be validly issued

and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever

upon or against such shares; and there will be in existence no limitations or restrictions of any

kind (other than restrictions under a buy/sell agreement among Company shareholders) on the

right of Selling Shareholder to sell such Shares in accordance with the terms hereof. No options,

warrants, agreements, or similar rights created by the Company for the issue or sale of any stock

or securities of any kind or for the purchase thereof by any person other than pursuant to or as

disclosed by this Agreement will then be in existence.

    (b)    Selling Shareholder is the owner, free and clear of any encumbrances, of

the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

MK001591

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)     Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)     Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby.  Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year.  Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.     <u>Representations and Warranties of Trustee</u>.  Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)     Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

MK001592

(b)     Trustee has ful' power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)     Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.     <u>Representations and Warranties of Company</u>.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)     The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)     Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Parent.

(c)     None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

MK001593

outstanding "employer securities" of the Parent. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)    Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.    Obligations of Trustee. Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.    Indemnification. Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

MK001594

8.    Survival of Representations, Warranties and Agreements.  All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement.  All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    Notices, etc.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

303 Olive Hill Lane
Woodside, CA  94062
Attn:  William E. Moore

If to Trustee, at:

Kelly-Moore Paint Company, Inc. Employee Stock Ownership
Plan and Trust
Attn.: Trustee
987 Commercial Street
San Carlos, CA  94070

If to the Company, at:

Kelly-Moore Paint Company, Inc.
Attn.: President
987 Commercial Street
San Carlos, CA  94070

7

MK001595

10.    <u>Amendments and Entire Agreement</u>. This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    <u>Parties in Interest</u>. This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    <u>Law to Govern</u>. This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    <u>Section and Other Headings</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

MK001596

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WILLIAM E. AND DESIREE B. MOORE 1990 REVOCABLE TRUST, AS AMENDED:**


_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee


**TRUSTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP TRUST:**


_____
William E. Moore, Trustee


**KELLY-MOORE PAINT COMPANY, INC.**


_____
Joseph P. Cristiano, President


_____
Stephen A. Ferrari, Secretary


9

MK001597

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WILLIAM E. AND DESIREE B. MOORE 1990 REVOCABLE TRUST, AS AMENDED:**

_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee


**TRUSTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP TRUST:**

_____
William E. Moore, Trustee


**KELLY-MOORE PAINT COMPANY, INC.**

_____
Joseph P. Cristiano, President


_____
Stephen A. Ferrari, Secretary


9

MK001598

# EXHIBIT 10

<u>Declaration of Division of Trusts</u>

Whereas, on January 20, 2004 the William E. and Desiree B. Moore 1990 Revocable Trust Agreement ("Trust") was restated in its entirety, and

Whereas, William E. Moore died on November 21, 2004; and

Whereas, in Article VI. B. 1. a Survivor's Trust is to be set up consisting of the Surviving Trustor's one-half interest in the community property, and

Whereas, in Article VI C. the Surviving Trustor has the power to make the division so that it will it will be equal in value as between the Surviving Trustor and the other Trusts, and

Whereas, Desiree B. Moore as the Surviving Trustor and the Surviving Spouse and wishes to make such split so as to ease in the administration of the Trust, and

Whereas, such split was agreed to on December 10, 2004 in a meeting with Ronald J. Linder, and

Desiree B. Moore declares the following to be the split to carry out the terms of the Trust.

I.      <u>Creation and Name of the Survivor's Trust, etc.</u>

     A.      The Trustee declares that she will hold the assets allocated to the Survivor's Trust upon the terms in Article VII. The Trust shall be known as the Desiree B. Moore Revocable Trust u/a dtd January 20, 2004. Since, pursuant to Article VII. C. she has the power in her individual capacity to revoke or amend the Survivor's Trust in its entirety, she intends to change the registered ownership using her social security number which is 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. While it will take some time to effectuate transferring legal title to the correct name, it is intended that the change in title is to take effect immediately.

     B.      The William E. and Desiree B. Moore 1990 Revocable Trust Agreement in part became irrevocable on the Death of William E. Moore. All assets in the name of that trust not

Q:\CT\m\Moore\William & Desiree\Admin Bill\split agreement revised.wpd

MT 002134

allocated to the Desiree B. Moore Revocable Trust shall continue to be held in Trust and may be referred to as the William E. Moore Administrative Trust with an EIN number of 20-6362647. Note that this is a continuation of the original trust and is not a new trust.

II.    **Divisions of Assets**

      A.    The assets shall be divided as outlined on the Schedule A attached.

          1.    The existing Revocable Trust shall change its name to the William E. Moore Administrative Trust ("Administrative Trust") and obtain a new Identification Number for filing income tax returns and giving holders of assets a correct number. As noted above the assets allocated to the Survivor's Trust shall be distributed to a new account as noted above.

          2.    There are three large assets that will be difficult to value so the split is equal for each of them: Broken O Ranch (items 2 and 16), Kelly-Moore stock (items 3 and 4), and rental real estate (items 9 through 14). It is contemplated that the split of the Ranch may be effectuated by the formation of a Montana LLC with each Trust owning a 50% interest; a California LLC may be used for the rental real estate and the stock shall divided as to shares.

          3.    The Smith Barney investment account numbered 34608 shall be used to equalize the split of assets between the Survivor's Trust and the Administrative Trust. It is contemplated that these numbers may change for information received prior to the split. In early November 2005 the split will be reviewed and an adjustment shall be made to reflect any information that is not known at the original date of the split of that account.

          4.    All other assets shall be put in the name of either the Survivor's Trust or the Administrative Trust as indicated on Schedule B.

          5.    Debts as of the date of death are to be paid ½ by each trust and the Administrative Trust is to bear all of the administrative costs except that if a probate is opened in which the Survivor has an interest the Survivor's Trust shall bear its share of such probate costs.

      B.    By November 21, 2005, the Administrative Trust shall be divided between the Marital Trust and the Residuary Trust pursuant to the terms of the Trust agreement. The split provided for in this document is to spin off the Survivor's Trust.

      C.    To accomplish the split I authorize Delagnes, Linder & Duey, LLP to take the steps necessary to accomplish the split.

Q:\Clien\Moore\William & Desiree\Admin Bill\split agreement revised.wpd

MT 002135

III.    Accounting matters

    A.    The following matters are general instructions and may be modified to carry out the purpose of this agreement:

        1.    The Bank of the West checking account, allocated to the Administrative Trust has received the rental income. Until such time as an LLC is formed, one-half of the monthly rentals shall be transferred to the Wells Fargo account after all rents are received.

        2.    All expenses of maintaining the house, other than debts on November 21, 2004, shall be paid by the Survivor's Trust using the Wells Fargo Account or an account that replaces it.

        3.    The SmithBarney Citigroup account 34608 shall be the investment account for the Administrative Trust and the part allocated to the Survivor's Trust shall be put in account 06397 with Desiree's social security number on the account. As either of the checking accounts becomes too large, funds will be transferred to the SmithBarney account for that Trust.

        4.    The amount due as a pension (item 6) and the amount due as a bonus (item 27) shall be deposited in the Survivor's Trust and if it is inadvertently put in the wrong account will be changed to the correct account when convenient.

        5.    All debts as of November 21 and any gift tax due for 2004 shall be paid equally by the two trusts. If income taxes are due or there is a refund due for 2004, Delagnes, Mitchell & Linder, LLP shall compute the proper allocation between the two trusts.


_Desiree B. Moore_
Desiree E. Moore, Trustee

Q:\CT\n\Moore\William & Desiree\Admin Bill\split agreement revised.wpd

MT 002136