# EXHIBIT 14

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this ___/8___ day of October, 1999, by and among William E. Moore as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust, formerly known as the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and K-M Industries Holding Co., Inc., a California corporation (hereinafter referred to as the "Company"),

## W I T N E S S E T H:

WHEREAS, Trustee is the trustee of the amended and restated K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") originally effective as of January 1, 1998, and amended and restated effective as of July 16, 1999, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding Class I-B shares of the Company; and

1

**EXHIBIT**

25

Cazzolla   3-19-08

CIG 001870

CONFIDENTIAL

REDACTED

CIG 001871

nation by the Internal Revenue Service, a court of competent jurisdiction or otherwise that the fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee, then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee shares of the Company's Class P-B Stock, or any combination thereof, equal in value to the difference between the Purchase Price and said fair market value for all such Shares.  In the event that cash and/or shares of the Company's Class P-B Stock are paid and/or transferred to the Trustee under this provision, such shares shall be valued at their fair market value as of the date hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid by Selling Shareholder on the amount of cash paid.

3.    Representations and Warranties of Selling Shareholder.  The Selling Shareholder, to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties.

(a)    On the date hereof, the Shares being sold hereunder will be validly issued and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever upon or against such shares; and there will be in existence no limitations or restrictions of any kind (other than restrictions under a buy/sell agreement among Company shareholders) on the right of Selling Shareholder to sell such Shares in accordance with the terms hereof.  No options, warrants, agreements, or similar rights created by the Company for the issue or sale of any stock or securities of any kind or for the purchase thereof by any person other than pursuant to or as disclosed by this Agreement will then be in existence.

(b)    Selling Shareholder is the owner, free and clear of any encumbrances, of the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

CIG 001872

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c) Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d) Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby. Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year. Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4. Representations and Warranties of Trustee. Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a) Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

CIG 001873

(b)    Trustee has full power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)    Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.    Representations and Warranties of Company.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)    Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Company.

(c)    None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

CIG 001874

outstanding "employer securities" of the Company. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)    Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6. ·    <u>Obligations of Trustee</u>. Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.    <u>Indemnification</u>. Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

CIG 001875

8.    <u>Survival of Representations. Warranties and Agreements</u>.  All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement.  All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    <u>Notices. etc</u>.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

303 Olive Hill Lane
Woodside, CA  94062
Attn:  William E. Moore

If to Trustee, at:

K-M Industries Holding Co., Inc. Employee Stock Ownership Plan
and Trust
Attn.: Trustee
987 Commercial Street
San Carlos, CA  94070

If to the Company, at:

K-M Industries Holding Co., Inc.
Attn.: President
987 Commercial Street
San Carlos, CA  94070

7

CIG 001876

10.    <u>Amendments and Entire Agreement</u>.  This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    <u>Parties in Interest</u>.  This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    <u>Law to Govern</u>.  This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    <u>Section and Other Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

CIG 001877

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WILLIAM E. AND DESIREE B. MOORE 1990
REVOCABLE TRUST, AS AMENDED:


_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee


TRUSTEE OF THE K-M INDUSTRIES
HOLDING CO., INC. EMPLOYEE STOCK
OWNERSHIP TRUST:


_____
William E. Moore, Trustee


K-M INDUSTRIES HOLDING CO., INC.


_____
William E. Moore, President


9

CIG 001878

# EXHIBIT 15

Presentation to North Star Trust Company
As Trustee of the
K-M Industries Holding Company, Inc.
Employee Stock Ownership Plan
As of December 31, 2003

Report Date:
September 26, 2005



SRR

STOUT | RISIUS | ROSS

KMH 005447

CONF CONFIDENTIAL

REDACTED

KMH 005463

CONFIDENTIAL

REDACTED

KMH 005464

CONFIDENTIAL

REDACTED

KMH 005465

# EXHIBIT 16

HERBERT R.  GIFFINS                                    March 28, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

---

| | |
|---|---|
| THOMAS FERNANDEZ, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. |
| vs. | ) |
| | ) C-06-07339 CW |
| K-M INDUSTRIES HOLDING CO., INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

---

VIDEOTAPED DEPOSITION OF HERBERT R. GIFFINS
March 28, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79127

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280   (800)  770-3363    Fax  (415)  288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R.  GIFFINS                              March 28, 2008

Page 43

1              MS. SMITH:   Objection to form.

2         A    There was a period when asbestos things

3    started to become an issue from what I understand.  I am

4    a third party in this, so I am saying how I understand

09:59   5    happened.  And Mr. Moore called and had everybody send

6    in to San Carlos any records that they had relevant to

7    sales, letters relevant to purchasing and that type of

8    thing.  And all that was collected at San Carlos.

9    BY MS. SCOTT:

09:59   10        Q    If you know when was that call made out to

11   collect the documents in one location?

12        A    I think it was in --

13             MS. SMITH:   Objection to form.

14        A    I'm sorry.

09:59   15             MR. HANNAN:   Go ahead.

16   BY MS. SCOTT:

17        Q    That's great.  If you could just pause and

18   wait so that objections -- but then go ahead and answer

19   the question.

09:59   20        A    I realize that.  I didn't expect the

21   objection.

22             It was around '71.

23        Q    Did you ever ask anyone why documents were

24   collected in '71?

09:59   25             MS. SMITH:   Objection to form.

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363   Fax (415) 288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R.  GIFFINS                                March 28, 2008

Page 44

1           A     In '71 did I ever ask why documents were

2      collected?

3      BY MS. SCOTT:

4           Q     That was unclear.  Let me clarify.  Do you

10:00   5      know why the documents were collected around 1971?

6                 MS. SMITH:   Objection to form.

7           A     As I said, I think the asbestos issue was

8      becoming an issue, and Mr. Moore wanted to have all

9      records in one central location for safekeeping.  And

10:00   10     that's why they were all brought to San Carlos and a

11     repository was established.

12     BY MS. SCOTT:

13          Q     When you say that the asbestos issue was

14     becoming an issue, could you explain what you mean by

10:00   15     that?

16                MS. SMITH:   Objection to form.

17          A     In 1971 OSHA, OSHA publication was put out

18     where it talked about the possible dangers of asbestos

19     and the ill effects of asbestos and so forth, and it was

10:01   20     quite a lengthy verbatim type thing.  And when the

21     company got a copy of that, then there was sort of I

22     guess you say a red flag that maybe there was an issue

23     with asbestos.  And that's why it's my understanding

24     that's why the records were collected.

10:01   25     BY MS. SCOTT:

Esquire Deposition Services     505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363     Fax  (415)  288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R.  GIFFINS                                    March 28, 2008

Page 47

1          A     It was very obvious that going through the

2     documents that soon -- as soon as there was a concern or

3     appeared to be a concern about asbestos in the OSHA

4     publication, that the company and Mr. Moore took a very

10:05  5     positive step to do something to assure that the

6     employees, the people working in the factory as well as

7     the customers, that everything was done to protect their

8     health and wellbeing and to follow up with what OSHA

9     required to be followed up with immediately.  And that's

10:05  10     to me was the key point of the documents I'm talking

11     about.

12     BY MS. SCOTT:

13          Q     Do you know when -- now, let me clarify.

14     Let me make sure I understand.  Who was PACO?  What was

10:05  15     the PACO company?

16          MS. SMITH:    Object to form.

17          A     Okay.  1968 Mr. Moore purchased the company

18     that was in Richmond, California, by the name of PACO.

19     And they manufactured drywall type materials like seam

10:06  20     fillers and that type of thing.  And Mr. Moore bought

21     the company in '68 and continued to run -- the company

22     was run as a subsidiary of the company, as a separate

23     division, and continued to manufacture drywall type

24     products, which seam sealers, patching compounds, that

10:06  25     type of thing.

HERBERT R.   GIFFINS                          March 28, 2008

Page 48

1    BY MS. SCOTT:

2        Q    And these are -- some of these materials --

3    some of the products that were produced by PACO

4    contained asbestos; is that right?

10:06    5        MR. SULLIVAN:    Object to form.

6        A    At the time all the products contained

7    asbestos.

8    BY MS. SCOTT:

9        Q    Do you know when -- do you know when PACO

10:07    10    stopped producing materials that had asbestos in it?

11        MS. SMITH:    Object to the form.

12        A    '74 -- wait a minute.  Hold on one second.

13    About '81, I think.

14    BY MS. SCOTT:

10:07    15        Q    And how do you know this?  What is your

16    basis for knowledge about this?

17        A    Again going through the documents.  And I

18    have not looked at them for a while so again I am a

19    little fuzzy.  When you retire and you worry about

10:07    20    grandchild's baseball games, you also forget some of

21    this stuff.

22        Q    Did you ever communicate with any attorneys

23    who wanted documents from the asbestos repository?

24        MS. SMITH:    Object to form.

10:07    25        MR. BORNSTEIN:    Object to form.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R.  GIFFINS                          March 28, 2008

Page 106

1    would like you to turn back to that.  Do you have that

2    one in front of you?

3             A    Okay.

4             Q    If you go to page -- well, it's the fourth

13:04    5    page in the document.  Do you see the page that the

6    title is acceptance of appointment as trustee?

7             A    Correct.

8             Q    Does that document refresh your

9    recollection as to --

13:04    10             A    As to the date, yes, as I indicated I was

11    trustee.  But the date helps me out.

12             Q    So you became trustee in it looks like

13    February 28th of 2003; is that right?

14             A    That's what it says, yes.

13:05    15             Q    Who was the trustee right before you, the

16    trustee of the ESOP?

17             A    William E. Moore.

18             Q    So as seems to be indicated on the

19    following two pages later --

13:05    20             A    Later or --

21             Q    -- two pages later is titled, resignation

22    as trustee?

23             A    Okay.

24             Q    So this seems to suggest that William Moore

13:05    25    resigned as trustee on February 28th 2003.  Is that your

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R.  GIFFINS                                March 28, 2008

Page 107

1    understanding?

2         A    Yes.

3         Q    In February of 2003 was Mr. Moore

4    participating in board meetings?

13:06    5         A    He was attending only, yes.

6         Q    If you know, what was Mr. Moore's health

7    like in about that time, February 2003?

8         A    Questionable.  You know, his health was

9    obviously starting to deteriorate.

13:06    10        Q    Was he still actively involved at all in

11    the day to day runnings of Kelly-Moore Paint?

12        A    No.

13        Q    When did that stop, if you know?

14        A    I don't know when he stopped coming into

13:07    15    the office on a regular basis.  It was before I even got

16    there.  So he still was involved in some issues but he

17    just didn't come in the office on a regular basis.  That

18    was the routine when I got there, so I don't know when

19    that all started.

13:07    20        Q    When you talk about when you got there, do

21    you mean as president and CEO --

22        A    Yes, ma'am, I'm sorry.

23        Q    Did Mr. Moore ever tell you why he was

24    stepping down as trustee?

13:07    25        A    He did not tell me personally.  It was

HERBERT R.  GIFFINS                          March 28, 2008

Page 108

1    decided at the board meeting that it was appropriate for

2    him to step down at the time because of health issues.

3           Q     When did you start going to the board

4    meetings?

13:08    5           A     I think it was I'm not sure when Joe

6    resigned off from the board, but it wasn't long after I

7    took and assumed the position of president and CEO,

8    because I filled his position when he retired.

9           Q     And did Mr. Moore attend the board meetings

13:08   10    from when you started on the board at least until

11    February 2003?

12           A     Yes.

13           Q     And you said earlier I believe that he

14    attended but -- well, what was his level of

13:09   15    participation in those board meetings?

16           A     He was chairman of the board.

17           Q     And did he take an active role in those

18    board meetings?

19                 MR. BORNSTEIN:    Object to form.

13:09   20           A     I'm not sure I understand your active, your

21    reference to active.  But he attended the board meetings

22    and there were comments made back and forth.  So I don't

23    know what you mean by active.

24    BY MS. SCOTT:

13:10   25           Q     Was anyone at Kelly-Moore ever concerned

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

# EXHIBIT 17



KELLY-MOORE PAINT COMPANY
ORGANIZATIONAL CHART

KMH 009088

# EXHIBIT 18

PACO TEXTURES MEMO



KMH-AR0005173

Confidential