# EXHIBIT 19



PLAINTIFF'S
EXHIBIT
KM 41

BRAYTON & ASSOC

JUN 2 1 1990
RECEIVED

005537

1  HOWARD L. CHURCHILL, ESQ.
   KATHLEEN S. PARLEY, ESQ.
2  BURNHILL, MOREHOUSE, BURFORD,
   SCHOFIELD & SCHILLER, INC.
3  1220 Oakland Boulevard, Suite 200
   Post Office Box 5168
4  Walnut Creek, California 94596
   (415) 937-4950
5
   Attorneys for Defendant
6  KELLY-MOORE PAINT COMPANY, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF ALAMEDA

10

11 IN RE COMPLEX                        NO. 607734-9
   ASBESTOS LITIGATION
12  _____/

13 IN RE SHIPYARD AND APPLICATOR         NO. 537868-7
   ASBESTOS CASES (CONSOLIDATED
14 FOR DISCOVERY)                        DEFENDANT KELLY-MOORE'S
                                         ANSWERS TO PLAINTIFFS'
15                                       STANDARD SET OF
                                         INTERROGATORIES
16  _____/

17 PROPOUNDING PARTY:  Plaintiffs

18 RESPONDING PARTY:  Defendant KELLY-MOORE PAINT COMPANY, INC.

19 SET NO.:           ONE

20

21 TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

22     Defendant  KELLY-MOORE  PAINT  COMPANY,  INC. , responds  to

23 Plaintiffs' First Set of Interrogatories to Defendant as follows:

24 ///

25 ///

26 ///

27 ///

28 ///

BURNHILL, MOREHOUSE
BURFORD SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 5168

                                    1

## DEFINITIONS

GEOGRAPHIC LIMITATION.    Unless otherwise specifically set forth, the geographic scope of these interrogatories is NORTHERN CALIFORNIA.

TIME LIMITATION.    Unless otherwise specifically set forth, the time frame of these interrogatories is 1930 to the present.

"THIS DEFENDANT" (THIS DEFENDANT'S) shall mean the named defendant herein, all of its predecessors in interest, and all of its successors in interest.

"YOU" and "YOUR" refer to the defendant who is named above as the responding party.

"ASBESTOS-CONTAINING PRODUCT(S)" shall mean any product(s) of THIS DEFENDANT which THIS DEFENDANT knows or believes contain(s) the mineral asbestos.

"RAW ASBESTOS FIBER" means asbestos fiber mined or milled, either packaged or in bulk, not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

"MARKET" (MARKETing, MARKETed) shall mean the mining, supply, sale, labeling, distribution, importing, processing or manufacture of raw asbestos fiber and/or asbestos-containing products.

A request to describe the "NATURE" of ASBESTOS-CONTAINING PRODUCT(S) shall mean to describe the: (a) color, (b) texture, (c) form (i.e., powder, liquid, paste, solid, board, cloth, blanket, wire insulation, etc.), and (d) physical dimensions (length, width, height, volume and weight).

///

BURNHILL WORKHOUSE.
BURFORD, SCHOFIELD
& SCHILLER

2

KMDD003626

"DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code. A request to "IDENTIFY" a "DOCUMENT" or "WRITING" shall mean a request to state: (a) the author; (b) the addressee; (c) date of origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum, audio tape recording, photograph, etc.); and (e) its present location and name and present address of custodian thereof.

A request to state the "IDENTITY" of a person or individual means to state his or her name, the place of employment, job title, present business or present or last known home address, and present business telephone number.

"NORTHERN CALIFORNIA" shall encompass the following forty-six (46) counties: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo and Yuba.

A "CONTRACT UNIT(S)" shall mean a department, division, subdivision, branch, or group which has been or is now engaged in installation and/or removal of RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S).

"COMPANY" means any profit-making private enterprise, including corporations, partnerships, joint ventures, and sole proprietorships.

///

BURNHILL, MOREHOUSE,
BURFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 1240

3

## GENERAL OBJECTIONS

The following objections are raised as to each and every Interrogatory propounded in this set:

1. Defendant KELLY-MOORE objects on the grounds these Interrogatories are overly broad as to time and scope, are burdensome, and are not reasonably calculated to lead to discovery of admissible evidence.

2. Defendant KELLY-MOORE objects to the extent these Interrogatories may have been previously answered under oath and as such these Interrogatories are burdensome, oppressive, irrelevant and repetitious.

3. To the extent the Interrogatory is not full and complete in and of itself, contains subparts and/or compound, conjunctive, and disjunctive questions, Defendant KELLY-MOORE objects that these Interrogatories violate Code of Civil Procedure Section 2030.

4. Defendant KELLY-MOORE objects to the definitions and instructions on the basis the definitions are overly broad, vague and ambiguous, and burdensome. Furthermore, the definitions contain various matters that are not permissible under law, are unintelligible, and are overly broad, burdensome and oppressive, as well as vague and ambiguous.

5. Defendant KELLY-MOORE also objects to these Interrogatories to the extent they call for information protected by the attorney-client privilege, or the attorney work-product doctrine, or any other applicable privilege.

6. Furthermore, Defendant KELLY-MOORE does not waive any objections it has now or may have in the future concerning the

4

1    Order of the Court allowing Plaintiffs to serve these

2    Interrogatories in Alameda County. By answering this set of

3    Interrogatories, Defendant KELLY-MOORE does not waive any of its

4    rights or remedies.

5

6                 **ANSWERS TO INTERROGATORIES**

7

8      Defendant KELLY-MOORE PAINT COMPANY, INC. responds to

9    Plaintiffs' Standard Set of Interrogatories as follows:

10

11    <u>INTERROGATORY NO. 1:</u>

12      With respect to the individual verifying these answers on

13    your behalf, state the following:

14      a. their name;

15      b. their present business address;

16      c. their present job title;

17      d. their date of first employment with you, and the dates

18    and titles of each job position they have held while they were

19    employed by you.

20     <u>ANSWER:</u>

21    Without waiving its general objections, Defendant KELLY-

22    MOORE responds as follows:

23      a. John Bacigalupo; Douglas Wayne Merrill.

24      b. John Bacigalupo: 987 Commercial Street, San Carlos, CA

25    94070; Douglas Merrill: 987 Commercial Street, San Carlos, CA

26    94070.

27      c. John Bacigalupo, Secretary-Treasurer; Douglas Merrill,

28    Vice President of Manufacturing.

SRR 958      KMDD003629

d.  John  Bacigalupo:  April  1969  to  January  1972  -
Accountant;  January  1972  to  January  1976  -  Controller  and
Assistant  General  Manager;  January  1976  to  April  1978  -
Accounting Manager for West Coast Rocky Mountain Division;  April
1978 to March 1980 - Vice President of Accounting; March 1980  to
Present - Vice President of Accounting and Secretary-Treasurer.

Douglas  Merrill:  July 1968 to October 1968 -  Quality
Control  Chemist;  October 1968 to December 1981 -  Research  and
Production Manager - Paco Division; December 1981 to March 1983 -
Assistant  to Vice President, Manufacturing; March 1983 to  April
1989  - Plant Manager; April 1989 to Present - Vice President  of
Manufacturing.

INTERROGATORY NO. 2:

State whether YOU are a corporation.  If so, state:

a.  YOUR full corporate name;

b.  the state of incorporation;

c.  the date of incorporation;

d.  the address of YOUR principal place of business;

e.  if YOU are wholly-owned or if more than five (5) percent
of  the  ownership interest of YOUR COMPANY is owned  by  another
business entity, state that entity's name and principal place  of
business.

ANSWER:

Without  waiving  its general objections,  Defendant  KELLY-
MOORE responds as follows:

a.  Kelly-Moore Paint Company, Inc.

b.  California.

6

KMDD003630

c. December 4, 1952;

d. 987 Commercial Street, San Carlos, CA 94070.

e. Not Applicable.

INTERROGATORY NO. 3:

Has THIS DEFENDANT ever been identified, known, or done business under any other name? If so, please state such name or names and the time period during which THIS DEFENDANT was so known or identified.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 4:

State whether YOU have ever been registered or qualified to do business in the State of California. If so, state the date YOU became qualified to conduct business in the State of California.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Yes; December 4, 1952; however, Defendant KELLY-MOORE PAINT COMPANY, INC. was a general partnership from April 1, 1946 until the date of incorporation.

///

///

7

KMDD003631

**INTERROGATORY NO. 5:**

Does THIS DEFENDANT currently have, or has THIS DEFENDANT had a department, division, subdivision, branch or group responsible for the design, development, manufacture, testing and use of ASBESTOS-CONTAINING PRODUCT(S). If so, state:

a. the name of each present or former corporate department, division, subdivision, branch or group;

b. the IDENTITY of the person most knowledgeable about such department, division, subdivision, branch or group.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. Paco Textures Division.

b. Douglas Wayne Merrill.


**INTERROGATORY NO. 6:**

Has THIS DEFENDANT engaged in the MARKETing of ASBESTOS-CONTAINING PRODUCT(S) comprised in whole or in part of amosite asbestos fiber; if so, please state:

a. the trade, brand name and/or generic name of each type of product;

b. the date(s) THIS DEFENDANT first MARKETed each type of product;

c. the date(s) THIS DEFENDANT ceased MARKETing each type of product;

d. a general description of the chemical composition of each type of product, including:

///

BURNHILL, MOREHOUSE
BURFORD, SCHOFIELD
& SCHALER
...

8

KMDD003632

(i)    the  type(s)  and/or grade(s)  of  RAW  ASBESTOS FIBER contained in each type of product;

(ii)    the  quantitative percentage of the  type(s)  of RAW ASBESTOS FIBER in each type of product;

(iii)   any change(s) in the quantitative percentages of the type(s) of RAW ASBESTOS FIBER in each type of product;

e.   the NATURE of each type of product;

f.   a  description of any wording, markings and/or  logo  on each type of product;

g.   the   recommended  use(s)  of  each  type  of  product, including temperature limits;

h.   the  name(s)  of  the manufacturer(s) of each  type  of product;

i.   the  name(s) and address(es) of the supplier(s) of  the amosite asbestos fiber used in each type of product;

j.   the    IDENTITY  of  the  person(s)  most    knowledgeable concerning  the  purchase  of  amosite  asbestos  fiber  by  THIS DEFENDANT.

**ANSWER:**

Without  waiving  its  general  objections,  Defendant  KELLY-MOORE responds as follows:

NO.


**INTERROGATORY NO. 7:**

Has  THIS  DEFENDANT  engaged  in  the  MARKETing  of  amosite asbestos fiber; if so, please state:

a.   the   name  and location of each  amosite  asbestos  mine which  THIS  DEFENDANT  presently  operates,  has  operated,  or  in

9

which THIS DEFFENDANT has or had an ownership interest, including the dates of such ownership, and the grade of amosite asbestos fiber mined;

b. the date(s) THIS DEFENDANT first MARKETed amosite asbestos fiber;

c. the date(s) THIS DEFENDANT ceased MARKETing amosite asbestos fiber;

d. the grade(s) of such amosite asbestos fiber MARKETed by THIS DEFENDANT;

e. the recommended use(s) of each grade of such amosite asbestos fiber, including any temperature limits;

f. the name(s) and address(es) of the supplier(s) of amosite asbestos fiber to THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 8:

Has THIS DEFENDANT engaged in the MARKETing of ASBESTOS-CONTAINING PRODUCTS comprised in whole or in part of chrysotile asbestos fiber; if so, please state:

a. the trade, brand name and/or generic name of each type of product;

b. the date(s) THIS DEFENDANT first MARKETed each type of product;

c. the date(s) THIS DEFENDANT ceased MARKETing each type of product;

10

SRR 963          KMDD003634

1  d.  a  general  description of the chemical composition  of

2  each type of product, including:

3      (i)    the  type(s)  and  grade(s)  of  asbestos  fiber

4  contained in each type of product;

5      (ii)    the  quantitative  percentage of  the  types  of

6  asbestos fiber in each type of product;

7      (iii)  any change(s) in the quantitative percentages of

8  the type(s) of asbestos fiber in each type of product;

9  e.  the NATURE of each type of product;

10  f.  a  description of any wording, markings, and/or logo  on

11  each type of product;

12  g.  the    recommended  use(s)  of  each  type  of  product,

13  including temperature limits;

14  h.  the name of the manufacturer of each type of product;

15  i.  the  name(s) and address(es) of the supplier(s)  of  the

16  chrysotile asbestos fiber used in each type of product;

17  j.  the    IDENTITY  of  the  person(s)  most  knowledgeable

18  concerning  the  purchase of chrysotile asbestos  fiber by  THIS

19  DEFENDANT.

20  ANSWER:

21  Without  waiving  its general objections,  Defendant  KELLY-

22  MOORE responds as follows:

23  a. - g.  Please see attached chart.

24  h.  Kelly-Moore Paint Company, Inc./Paco Textures Corp.

25  i.  Johns Manville, Carey Canada, and Union Carbide.

26  j.  Douglas Wayne Merrill, Plant Manager.

27

28  ///

BURNHILL MORE-O-SH
BURFORD SCHOME.O
& SCHOMLEO
...
...

11

KMDD003635

KMDD003636

Interrogatory No. 8

| (a) Product | (b) On Market | (c) Withdrawn | Use of Asbestos Discontinued | (d)1 (d)11 Description | Color | (g) Use | Weight |
|---|---|---|---|---|---|---|---|
| Bedding Cement | 12/60 | Not Withdrawn | 1970 | Dry Powder Chrysotile 6.0% | Grayish-white Powder | Embedding tape over interior gypsum board joints between 50°F and 100°F | 25-lb. bag |
| Taping Compound | 1970 | Not Withdrawn | 12/15/77 | Dry Powder Chrysotile 0-8.3% | Grayish-white Powder | Embedding tape over interior gypsum board joints. Between 50°F and 100°F | 25-lb. bag |
| Finishing Compound | 12/60 | 1982 | 12/20/77 | Dry Powder Chrysotile 0-7.5% | Yellow or Gray Powder | To conceal joints and nail holes with interior gypsum board. Between 50°F and 100°F | 25-lb. bag |
| Quik-Set Joint Compound | 1963 | Not Withdrawn | 1/8/78 | Dry Powder Chrysotile 0-6.0% | Off-white Powder | Fast Setting Joint Cement Between 45°F and 80°F | 25-lb. bag |
| All Purpose (Triple Duty) | 12/60 | 1982 | 1/10/78 | Dry Powder Chrysotile 0-8.3% | Grayish-white Powder | For taping, topping and texturing. Between 50°F and 100°F | 25-lb. bag |
| Ready Mix Taping | Unknown | 4/76 | Unknown | Pre-Mix Chrysotile 2.0 to 2.6% | Off-white Paste | Embedding tape over interior gypsum board joints. Between 50°F and 100°F | 50-lb. ctn |
| Ready Mix All Purpose | 12/60 | Not Withdrawn | 1/13/78 | Pre-Mix Chrysotile 0-2.6% | Off-white Paste | For taping, topping and texturing interiors. Between 50°F and 100°F | 1 gal. pail 40-lb. ctn 50-lb. ctn 62-lb. pail |

KMDD003637

Interrogatory No. 8 (contd)

| (a) Product | (b) On Market | (c) Withdrawn | Use of Asbestos Discontinued | (d) (d1) Description | Color | (g) Use | Weight |
|---|---|---|---|---|---|---|---|
| Ready Mix Topping | 1963 | Not Withdrawn | 1/14/78 | Pre-Mix Chrysotile 0-2.5% | Off-white or Yellow Paste | To conceal joints and nail holes for interior gypsum board. Between 50°F and 100°F | 50-lb. ctn 62-lb. pail |
| Wall Texture (Bestex A) | 12/60 | Not Withdrawn | 2/11/78 | Dry Powder Chrysotile 0-8.0% | Off-white Powder | Wall texture on interiors. Between 50°F and 100°F | 25-lb. bag 50-lb. bag |
| Texture Paint (not in California) | Unknown | Not Withdrawn | 2/11/78 | Dry Powder Chrysotile 0-6.7% | Off-white Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Splatter Texture (not in Calif.) | Unknown | 1980 | 1/12/78 | Dry Powder Chrysotile 0-6.0% | Off-white Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Sand Finish (not in Calif.) | Unknown | Not Withdrawn | 1/3/78 | Dry Powder Chrysotile 0-7.7% | Off-white Powder | Texture Between 50°F and 100°F | 25-lb. bag |
| Ceiling Texture (Bestex D) | 1964 | Not Withdrawn | 2/9/78 | Dry Powder Chrysotile 0-10.0% | Off-white or White Powder | Texture for interior ceilings. Between 50°F and 100°F | 11-lb. bag 33-lb. bag 40-lb. bag |
| Product 225 | 1963 | Not Withdrawn | 1966 | Paint Chrysotile 0-6.1% | Paint | Surface Conditioner | 1-gal. pail 5-gal. pail |
| Product 235 | 1972 | Not Withdrawn | 1978 | Paint Chrysotile 0-7.5% | Paint | Tex-Bond | 1-gal. pail 5-gal. pail |
| Product 521 | 1974 | Not Withdrawn | 1978 | Paint Chrysotile 0-1.9% | Paint | Block Filler | 1-gal. pail 5-gal. pail |
| Radiant Heat Fill | 1974 | Unknown | Unknown, but did not contain asbestos by 1978 | Dry Powder Chrysotile | Powder | Radiant Heat Fill | Bag |

INTERROGATORY NO. 9:

Has THIS DEFENDANT engaged in the MARKETing of chrysotile asbestos fiber; if so, please state:

a. the name and location of each chrysotile asbestos mine which THIS DEFENDANT presently operates, has operated, or in which THIS DEFENDANT has or had an ownershp interest, including dates of such ownership, and the grade of chrysotile asbestos fiber mined;

b. the date(s) THIS DEFENDANT first MARKETed chrysotile asbestos fiber;

c. the date(s) THIS DEFENDANT ceased MARKETing chrysotile asbestos fiber;

d. the grade(s) of such chrysotile asbestos fiber MARKETed by THIS DEFENDANT;

e. the recommended use(s) of each grade of such chrysotile asbsetos fiber, including temperature limits;

f. the name(s) and address(es) of the supplier(s) of chrysotile asbestos fiber to THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.


INTERROGATORY NO. 10:

Has THIS DEFENDANT engaged in the MARKETing of ASBESTOS-CONTAINING PRODUCTS comprised in whole or in part of crocidolite asbestos fiber; if so, please state:

///

12

1    a.  the  trade, brand name and/or generic name of each  type

2  of product;

3    b.  the  date(s) THIS DEFENDANT first MARKETed each type  of

4  product;

5    c.  the date(s) THIS DEFENDANT ceased MARKETing each type of

6  product;

7    d.  a  general  description of the chemical  composition  of

8  each type of product, including:

9    (i)   the  type(s)  and  grade(s)  of  asbestos  fiber

10  contained in each type of product;

11    (ii)  the  quantitative percentage of the  type(s)  of

12  fiber in each type of product;

13    (iii) any change(s) in the quantitative percentages of

14  the type(s) of asbestos fiber in each type of product;

15    e.  the NATURE of each type of product;

16    f.  a  description of any wording, markings and/or  logo  on

17  each type of product;

18    g.  the  recommended  use(s)  of  each  type  of  product,

19  including temperature limits;

20    h.  the name of the manufacturer of each type of product;

21    i.  the  name(s) and address(es) of the supplier(s)  of  the

22  crocidolite asbestos fiber used in each type of product;

23    j.  the  IDENTITY  of  the  person(s)  most  knowledgeable

24  concerning  the  purchase of crocidolite asbestos fiber  by  THIS

25  DEFENDANT.

26    ANSWER:

27    Without  waiving  its general objections,  Defendant  KELLY-

28  MOORE responds as follows:

BURNHILL MOREHOUSE
BURFORD, SCHOFIELD
& SCHILLER
...

13

NO.

**INTERROGATORY NO. 11:**

Has THIS DEFENDANT engaged in the MARKETing of crocidolite asbestos fiber; if so, please state:

a. the name and location of each crocidolite asbestos mine which THIS DEFENDANT presently operates, has operated, in the, and/or in which THIS DEFENDANT has or had an ownershp interest, including dates of such ownership, and the grade of asbestos fiber mined;

b. the date(s) THIS DEFENDANT first MARKETed crocidolite asbestos fiber;

c. the date(s) THIS DEFENDANT ceased MARKETing crocidolite asbestos fiber;

d. the grade(s) of such crocidolite asbestos fiber MARKETed by THIS DEFENDANT;

e. the recommended use(s) of each grade of such crocidolite asbsetos fiber, including temperature limits;

f. the name(s) and address(es) of the supplier(s) of crocidolite asbestos fiber to THIS DEFENDANT.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 12:**

Does or did THIS DEFENDANT have a controlling ownership interest in any COMPANY which MARKETed ASBESTOS-CONTAINING

14

KMDD003640

PRODUCT(S); if so, please state:

    a. the name of such COMPANY;

    b. the date of incorporation of such COMPANY;

    c. the state of incorporation of such COMPANY;

    d. the date such interest was acquired;

    e. the date such interest was changed or terminated, if applicable;

    f. the name and location of each facility of such COMPANY;

    g. the name of each type of ASBESTOS-CONTAINING PRODUCT(S) manufactured, processed, and/or assembled by such COMPANY.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 13:

Does or did THIS DEFENDANT have a controlling ownership interest in any COMPANY that MARKETed RAW ASBESTOS FIBER; if so, please state:

    a. the name of such COMPANY;

    b. the date of incorporation of such COMPANY;

    c. the state or country of incorporation of such COMPANY;

    d. the date such interest was acquired;

    e. the dates such interest was changed or terminated, if applicable;

    f. the name and location of each asbestos mine owned of such COMPANY;

///

15

KMDD003641

g. the grade and type of RAW ASBESTOS FIBER mined at each mine.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 14:

Has THIS DEFENDANT warehoused any RAW ASBESTOS FIBER or ASBESTOS-CONTAINING PRODUCT(S) in the State of California; if so, please state:

a. the address of each warehouse facility;

b. the year(s) THIS DEFENDANT utilized each facility;

c. the IDENTITY of the custodian of warehousing records.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

INTERROGATORY NO. 15:

Has THIS DEFENDANT owned or operated facilities anywhere in the United States in which ASBESTOS-CONTAINING PRODUCT(S) have been manufactured, processed and/or assembled; if so, state:

a. the address of each such facility, including city and state.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

16

KMDD003642

1. Kelly-Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

2. Kelly-Moore Paint Company, Inc., 301 West Hurst Blvd., Hurst, Texas 75053.

3. Kelly-Moore Paint Company, Inc., 3600 East 45th Avenue, Denver, Colorado 80216.

4. Kelly-Moore Paint Company, Inc., 11200 Kirkland Way, Kirkland, Washington 98033.

5. Kelly-Moore Paint Company, Inc., West Kenosha Street, Broken Arrow, Oklahoma 74012.

6. Kelly-Moore Paint Company, Inc., The Alameda, Houston, Texas.

7. Kelly-Moore Paint Company, Inc., 1400 Campus Drive, Ontario, California 91764.

INTERROGATORY NO. 16:

If THIS DEFENDANT owned or operated facilities in which ASBESTOS-CONTAINING PRODUCT(S) have been manufactured, processed and/or assembled, please state:

a. the date said facilities began operation;

b. the date said facilities ceased operation; and

c. the name of each type of ASBESTOS-CONTAINING PRODUCT manufactured, processed or assembled at each such facility.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

1. a. December 1960.

b. March 1978.

17

SRR 972    KMDD003643

c.  Please see attached chart.

2.  a.  As far as Defendant is aware, 1970.

b.  As far as Defendant is aware, 1977.

c.  Unknown.

3.  a.  As far as Defendant is aware, 1971.

b.  As far as Defendant is aware, 1976.

c.  Drywall products.

4.  a.  As far as Defendant is aware, 1969.

b.  As far as Defendant is aware, 1972.

c.  Drywall products.

5.  a.  As far as Defendant is aware, 1969.

b.  As far as Defendant is aware, 1977.

c.  Drywall products.

6.  a.  As far as Defendant is aware, 1967.

b.  As far as Defendant is aware, 1974.

c.  Drywall products.

7.  a.  As far as Defendant is aware, 1968.

b.  Unknown; not operating at present.

c.  Drywall products.

INTERROGATORY NO. 17:

Has THIS DEFENDANT purchased or otherwise aquired any rights
to the manufacture of ASBESTOS-CONTAINING PRODUCT(S) from another
COMPANY?  If so, state:

a.  the date of purchase or acquisition of such rights;

b.  the trade, brand, and/or generic name of such  ASBESTOS-
CONTAINING PRODUCT(S);

///

18

SRR 973          KMDD003644

c. the name and location of any COMPANY from which such rights were purchased or acquired;

d. the IDENTITY of the custodian of records of such purchase(s) or acquisition(s).

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 18:

Has THIS DEFENDANT applied for and/or received any patent(s) for any ASBESTOS-CONTAINING PRODUCT(S). If so, state for each such ASBESTOS-CONTAINING PRODUCT:

a. the product for which each patent was applied and/or issued;

b. the date(s) of application;

c. the date(s) of issuance of the patent(s), if granted;

d. the date(s) of renewal, if any;

e. the patent number(s);

f. the size and color, which appeared on the packaging or co which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

///

///

19

**INTERROGATORY NO. 19:**

Has THIS DEFENDANT registered any trademark(s) for any ASBESTOS-CONTAINING PRODUCT(S); if so, state for each such ASBESTOS-CONTAINING PRODUCT:

    a.  the product for which each trademark was registered;

    b.  whether the registration was State or Federal;

       (i)  if State, name the State;

    c.  the date(s) or registration;

    d.  the term(s) thereof;

    e.  the date(s) of renewal;

    f.  the name of the individual or COMPANY to whom each trademark was registered;

    g.  the IDENTITY of the custodian of such trademark records of THIS DEFENDANT.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  Trademark registered for Kelly-Moore's asbestos-containing products is under the name Paco. Each of the specific products are listed in Chart attached to Answer to Interrogatory No. 16.

    b.  Federal.

    c.  July 23, 1963.

    d.  Paco Textures Corporation owns U.S. Reg. No. 753,175 that was granted on July 23, 1963 for Paco. Paco Textures Corporation, assigns and transfer to Kelly-Moore Paint Company all rights, title and interest in Reg. No. 753,175.

///

20

KMDD003646

e.  Every 20 years the trademark is renewed; last renewal was July 23, 1983.

f.  KELLY-MOORE PAINT COMPANY, INC.

g.  John Bacigalupo.

INTERROGATORY NO. 20:

Did THIS DEFENDANT contract with the General Services Administration and/or other federal-government agency for the sale, anywhere in the United States, or RAW ASBESTOS FIBER between 1930 and 1980; if so, state for each such sale:

a.  the grade(s) and type(s) of RAW ASBESTOS FIBER;

b.  the quantity;

c.  the date(s) of delivery;

d.  the location(s), including the address(es) of delivery;

e.  the name(s) of the agency with which THIS DEFENDANT contracted;

f.  the date(s) of execution of such contract(s);

g.  the IDENTITY of the custodian of such contract records of THIS DEFENDANT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 21:

Did THIS DEFENDANT contract with the General Services Administration and/or other federal-government agency for the sale, anywhere in the United States, of ASBESTOS-CONTAINING

21

PRODUCT(S) between 1930 and 1980, please state for each such sale:

    a. the type of product;

    b. the quantity;

    c. the date(s) of delivery;

    d. the location(s), including the address(es) of delivery;

    e. the name(s) of the agency with which THIS DEFENDANT contracted;

    f. the date(s) of execution of such contract(s);

    g. the IDENTITY of the custodian of such contract records of THIS DEFENDANT.

    ANSWER:

    Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    NO.


INTERROGATORY NO. 22:

    Does THIS DEFENDANT have any records of the MARKETing, advertisement, or delivery of its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S) in or to NORTHERN CALIFORNIA? If so, state:

    a. the manner in which the records are kept, (e.g., in boxes, files, on microfilm, microfiche or computer tape or disk);

    b. the location(s) and address(es) where such records are maintained;

    c. the IDENTITY of the custodian of such records.

///

///

SRR 977          KMDD003648

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  In boxes and in files in storage room.

    b.  987 Commercial Street, San Carlos, California.

    c.  Douglas Wayne Merrill.


**INTERROGATORY NO. 23:**

If THIS DEFENDANT has in its possession any records of the MARKETing, advertisement, or delivery of its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCTS (including microfilm, microfiche, computer tape or disk, or any other system in which data is taken from other records), state whether THIS DEFENDANT has retained the original DOCUMENTS from which the data entered into these modes of storage was obtained. If THIS DEFENDANT has not retained such original DOCUMENTS, state:

    a.  the date(s) when and location(s) where the original DOCUMENTS were disposed of;

    b.  the IDENTITY of the custodian of the original DOCUMENTS at the time of their disposal.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

///
///
///

23

KMDD003649

**INTERROGATORY NO. 24:**

Does THIS DEFENDANT have in its possession any exemplar(s) of advertisements or brochures describing its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCTS; if so, please state:

    a.  the location of each exemplar;

    b.  the year(s) in which said exemplar(s) was utilized;

    c.  the IDENTITY of the custodian of such exemplars.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  1015 Commercial Street, San Carlos, California.

    b.  Unknown; sometime between 1961 and 1977.

    c.  Douglas Wayne Merrill.

**INTERROGATORY NO. 25:**

State the following:

    a.  the address(es) where the corporate records of THIS DEFENDANT (including minutes from the Board of Directors meetings and corporation annual reports), are currently located;

    b.  the IDENTITY of the custodian of such records.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  987 Commercial Street, San Carlos, California.

    b.  John Bacigalupo.

///

///

BURNHILL, WOREHOUSE
BUFORD SCHOFIELD
& SCHILLER

24

KMDD003650

**INTERROGATORY NO. 26:**

Describe the packaging or containers in which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER, including composition, dimension, shape and color.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

**INTERROGATORY NO. 27:**

Describe any logo, design, marking or printing, including size and color, which appeared on the packaging or containers in which THIS DEFENDANT sold and/or distributed RAW ASBESTOS FIBER.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

**INTERROGATORY NO. 28:**

Describe the packaging or containers in which THIS DEFENDANT sold and/or distributed ASBESTOS-CONTAINING PRODUCT(S), including composition, dimension, shape and color.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Please see attached chart.

///

25

KMDD003651

**INTERROGATORY NO. 29:**

Describe any logo, design, marking or printing, including size and color, which appeared on the packaging or containers in which THIS DEFENDANT sold and/or distributed ASBESTOS-CONTAINING PRODUCT(S).

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

A picture or sample of most asbestos-containing products has been retained at Kelly-Moore Paint Company, Inc. at 987 Commercial Street, San Carlos, California. They are available for review. The markings differed for each product.

**INTERROGATORY NO. 30:**

Does THIS DEFENDANT have any exemplar(s) of packaging or containers in which its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S) were sold and/or distributed; if so, state:

a. the location of each exemplar;

b. the year(s) in which said exemplar(s) was utilized;

c. the IDENTITY of the custodian of such exemplars.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. 987 Commercial Street, San Carlos, California.

b. Unknown; sometime between 1961 and 1977; differed for each product.

c. Douglas Wayne Merrill.

26

**INTERROGATORY NO. 31:**

Did THIS DEFENDANT put warnings of asbestos-related health hazards on bags of RAW ASBESTOS FIBER; if so, please state:

a. the wording of such warning(s), including size, location, and color;

b. whether the warning was put on a tag attached to the bags;

c. the date such warning(s) was first used;

d. whether any change was made in the wording of such warnings, the date(s) of such change, and the reasons for such change.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

**INTERROGATORY NO. 32:**

Did THIS DEFENDANT put warnings of asbestos-related health hazards on the packaging or containers of ASBESTOS-CONTAINING PRODUCT(S)? If so, please state:

a. the working of such warnings, including size, location on the packaging or containers, and color;

b. the date such warning(s) was first used;

c. whether any change was made in the wording of such warning(s), the date(s) of such change, and the reason(s) for such change.

///

27

1    **ANSWER:**

2    Without waiving its general objections, Defendant KELLY-

3    MOORE responds as follows:

4    a.  Warnings were printed to read:

5                    CAUTION - READ BEFORE USING
                    CONTAINS ASBESTOS FIBERS
6                    AVOID BREATHING DUST
            BREATHING ASBESTOS DUST MAY CAUSE BODILY HARM
7
8    Warning size:  1-1/2" x 3-1/2" or larger.

9    b.  November 1972.

10

11   **INTERROGATORY NO. 33:**

12   Has THIS DEFENDANT distributed any brochures or pamphlets

13   that contain warnings of any asbestos-related health hazards; if

14   so, please state:

15   a.  the wording of such warning;

16   b.  the method used to distribute such brochures or

17   pamphlets;

18   c.  the date(s) such brochures or pamphlets were first

19   issued;

20   d.  whether THIS DEFENDANT has exemplar(s) of such brochures

21   or pamphlets;

22   e.  the IDENTITY of the custodian of such exemplar(s).

23   **ANSWER:**

24   Without waiving its general objections, Defendant KELLY-

25   MOORE responds as follows:

26   Please refer to Interrogatory No. 32.

27

28   ///

BURNHILL, MOREHOUSE,
BUMFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 5185
WALNUT CREEK CA 94596
(925) 937-4500

28

KMDD003654

INTERROGATORY NO. 34:

Did THIS DEFENDANT warn its employees and/or CONTRACT UNIT(S), anywhere in the United States, that exposure to asbestos could be hazardous to human health. If so, state:

a. whether copies of DOCUMENTS containing such warnings exist;

b. the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. Yes.

b. Douglas Wayne Merrill, 1015 Commercial Street, San Carlos, California.


INTERROGATORY NO. 35:

State the IDENTITY of medical directors and/or industrial hygienists retained by THIS DEFENDANT in the United States.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.


INTERROGATORY NO. 36:

Has any employee of THIS DEFENDANT testified by deposition on behalf of THIS DEFENDANT in a third-party case, brought in the United States, wherein the plaintiff has alleged an asbestos-related injury? If so, for each such third party case, please state:

29

a.  the caption and case number;

b.  the court of filing including state and county;

c.  the date of the deposition;

d.  the name and address of plaintiff's counsel of record.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

1.  a.  Pete A. Fairl v. Western MacArthur Company, et al., Action No. 296985.

    b.  State of California, County of Sacramento.

    c.  October 8, 1984.

    d.  George W. Kilbourne, Attorney at Law, 3755 Alhambra Avenue, Martinez, California 94553.

2.  a.  In Re: Clapper & Brayton Shipyard & Applicator Asbestos Cases Consolidated for Discovery, Action Nos. Misc. 959 (Sol) & 804416 (SF); James H. Williams v. Abex Corp., et al., Action No. 584329-1 (Ala); Southwall Price v. Abex Corp., et al., Action No. 584328-2 (Ala); Robert Dixon v. Abex Corp., et al., Action No. 584327-3 (Ala); Tommy Dixon v. Abex Corp., et al., Action No. 585105 (Alameda); and Katherine & Joseph Maksim v. Johns-Manville, et al., Action No. 768674 (SF).

    b.  State of California, Counties of Solano, San Francisco and Alameda.

    c.  November 1, 1984.

    d.  Alan R. Brayton, 999 Grant Avenue, Novato, CA 94948.

30

KMDD003656

INTERROGATORY NO. 37:

    Has THIS DEFENDANT been a member of the following:

a. Asbestos Textile Institute (ATI);

b. Industrial Hygiene Foundation and/or Industrial Health Foundation (IHF);

c. Mineral Wool Institute;

d. Industrial Mineral Insulation Manufacturers Institute;

e. Magnesia Silica Insulation Manufacturers Association;

f. National Insulation Manufacturers Association (NIMA);

g. Thermal Insulation Manufacturers Association (TIMA);

h. Asbestos Information Association (AIA);

i. Quebec Asbestos Mining Association (QAMA);

j. National Safety Council;

k. Asbestos Cement Producers Association;

l. Refractories Institute;

m. any other organizations or associations of manufacturers, miners, distributors, importers, labellers, suppliers and/or sellers of ASBESTOS-CONTAINING PRODUCTS;

    (i) please state the name(s) of such organizations or associations.

ANSWER:

    Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. - m. No.

    (i) Not Applicable.

///

31

SRR 986                    KMDD003657

**INTERROGATORY NO. 38:**

For each organization, association or other entity identified in your Response to Interrogatory No. 37, please state:

a. the dates during which THIS DEFENDANT was a member;

b. the name(s) of any publication(s) received by THIS DEFENDANT from such association or organization;

c. the name of such committee or subcommittee of which THIS DEFENDANT was a member, and the dates of such committee or subcommittee membership.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not Applicable.

**INTERROGATORY NO. 39:**

Has THIS DEFENDANT received any DOCUMENT(S) containing results or conclusions of any studies and/or tests conducted by the Saranac Laboratory at the Trudeau Foundation relating to the human health consequences of exposure to asbestos? If so, please:

a. IDENTIFY all such DOCUMENT(S);

b. state the date upon which THIS DEFENDANT first received such DOCUMENT(S);

c. the IDENTITY of the custodian of such DOCUMENT(S).

///

///

///

BURNHILL, MOREHOUSE
BUMFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.C. BOX 9146

32

KMDD003658

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 40:**

State whether THIS DEFENDANT has ever maintained a library (or libraries) in the United States which contains books, articles, periodicals, journals and/or reference materials that relate to the subjects of asbestos, industrial hygiene, medicine, safety, occupational disease and/or engineering. If so, state:

a. the date each such library was established;

b. the location of each such library;

c. the IDENTITY of each librarian or other person in charge of such library.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

**INTERROGATORY NO. 41:**

Has THIS DEFENDANT exchanged documents containing the results of or communicated with any individual or other COMPANY regarding tests and/or studies of the relationship between the inhalation of asbestos fibers and development of disease(s); if so, please state:

a. each individual or COMPANY with whom the information was exchanged or to whom it was communicated;

-33-

KMDD003659

b. the date(s) of any such exchanges or communications;

c. the IDENTITY of the custodian of such documents.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Unknown.


INTERROGATORY NO. 42:

Has any employee of THIS DEFENDANT testified before the Occupational Safety and Health Administration, the National Institute of Occupational Safety and Health, or any committee or subcommittee of the United States Congress on the inhalation of asbestos dust and the development of disease; if so, please state:

a. the entity before whom such testimony was given;

b. the date(s) and location(s) of such testimony;

c. the IDENTITY of the individual(s) who so testified;

d. whether any DOCUMENTS were presented to the entity before which testimony was given;

e. whether copies of DOCUMENTS presented were retained by THIS DEFENDANT;

(i) if so, state the IDENTITY of the custodian of the DOCUMENT(S).

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

34

**INTERROGATORY NO. 43:**

At any of the physical facilities identified in the response to Interrogatory No. 15, has THIS DEFENDANT conducted, or caused to be conducted, tests and/or studies of ambient asbestos dust created during the manufacture, processing and/or assembling of ASBESTOS-CONTAINING PRODUCT(S); if so, please state:

a. each manufacturing facility, including location and address; at which any such test and/or study was conducted;

b. the date of each such test and/or study;

c. the individual(s) or entity conducting each such test and/or study;

d. whether THIS DEFENDANT has any documents containing the results and/or conclusions of each such study;

e. the IDENTITY of the custodian of the documents.

**ANSWER:**

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

a. 987 Commercial Street, San Carlos, California and possibly other locations that are unknown at this time.

b. Unknown.

c. Engineers.

d. The location of any documents, that may or may not be in existence, are unknown.

e. Douglas Wayne Merrill.

**INTERROGATORY NO. 44:**

Has THIS DEFENDANT conducted, or caused to be conducted, any tests and/or studies on ambient asbestos dust levels at any

35

KMDD003661

location or job site where its ASBESTOS-CONTAINING PRODUCTS were utilized in the United States; if so, please state:

a. the location, including name and address, at which each such test and/or study was conducted;

b. the individual(s) or entity conducting each such test and/or study;

c. the date of each such test and/or study;

d. whether THIS DEFENDANT has any DOCUMENTS containing the results and/or conclusions of each such test and/or study;

e. the IDENTITY of the custodian of these DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

No, other than answer listed above to Interrogatory No. 43.

INTERROGATORY NO. 45:

Did THIS DEFENDANT have any laboratory or other facility anywhere in the United States at which it conducted, or caused to be conducted, any tests and/or studies of its ASBESTOS-CONTAINING PRODUCTS to measure the amount of asbestos dust generated by any use for which such products were designed; if so, please state:

a. the location, including name and address, at which each such test and/or study was conducted;

b. the individual(s) or entity conducting each such test and/or study;

c. the date of each such test and/or study;

d. whether THIS DEFENDANT has any DOCUMENTS containing the results and/or conclusions of each such test and/or study;

36

KMDD003662

e. the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 46:

Has THIS DEFENDANT made available to its employees engaged in the MARKETing of its RAW ASBESTOS FIBER and/or its ASBESTOS-CONTAINING PRODUCT(S), a medical examination program; if so, please state:

a. whether chest x-rays or pulmonary function tests were part of such program(s);

b. whether participation in any such program was a mandatory condition of employment or was voluntary;

(i) if mandatory as a condition of employment, how frequently each employee was required to undergo such examination;

c. whether THIS DEFENDANT has DOCUMENTS of such program;

d. the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

a. Yes.

b. Mandatory from 1972-1978; voluntary from then on.

(i) Unknown.

c. Unknown.

d. If such documents exist, Douglas Merrill.

///

37

KMDD003663

INTERROGATORY NO. 47:

Has THIS DEFENDANT notified in writing any individuals or COMPANIES to whom it MARKETed RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S), anywhere in the United States, of the potential relationship between exposure to asbestos and disease; if so, please state:

a. the date(s) THIS DEFENDANT provided this information;

b. the means used for transmittal of such information;

c. whether THIS DEFENDANT has any copies of any DOCUMENTS transmitting such information;

d. the IDENTITY of the custodian of such documents.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

No, other than what is referred to in Answer to Interrogatory No. 32.

INTERROGATORY NO. 48:

Has THIS DEFENDANT required any individual(s) who MARKETed its ASBESTOS-CONTAINING PRODUCT(S) to wear respirators or face masks; if so, please state:

a. the job title(s), if known, of individual(s) required to wear respirators or face masks;

b. the date(s) on which THIS DEFENDANT first required the wearing of respirators or face masks;

c. the means by which the requirement to wear respirators or face masks was communicated;

///

38

KMDD003664

    d.  whether THIS DEFENDANT has any copies of DOCUMENTS communicating such requirements;

    e.  the IDENTITY of the custodian of such DOCUMENTS.

<u>ANSWER</u>:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

    a.  Plant workers.

    b.  Unknown.

    c.  Orally.

    d.  No.

    e.  Not Applicable.

<u>INTERROGATORY NO. 49</u>:

Does or did THIS DEFENDANT utilize or employ any CONTRACT UNIT. If so, please state:

    a.  the inclusive periods of time the CONTRACT UNIT(S) was utilized or employed;

    b.  the business address and name of the CONTRACT UNIT(S);

    c.  whether THIS DEFENDANT has any DOCUMENTS showing the location(s) of the job site(s) where the CONTRACT UNIT(S) worked, and if so, state the IDENTITY of the custodian of such DOCUMENTS.

<u>ANSWER</u>:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

/// 
///

BURNHILL MOREHOUSE
BURFORD, SCHOFIELD
& SCHILLER

39

SRR 994

KMDD003665

INTERROGATORY NO. 50:

Has THIS DEFENDANT received any written communication or other DOCUMENT, other than a claim for workers' compensation, that any person was claiming injury as a result of exposure to its RAW ASBESTOS FIBER and/or ASBESTOS-CONTAINING PRODUCT(S); if so, please IDENTITY the first such written communication or DOCUMENT.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Yes, first notice was received on or about July 30, 1977 when Kelly-Moore Paint Company, Inc. was served with its first lawsuit.

INTERROGATORY NO. 51:

Has any person filed a claim for asbestos-related injury regarding THIS DEFENDANT against any workers' compensation insurance carrier which provided coverage for THIS DEFENDANT; if so, please state:

    a. the date of such claim;

    b. the name of claimant;

    c. the caption;

    d. the case name;

    e. the court in which the claim was filed;

    f. the IDENTITY of the custodian of such documents.

///
///
///

BURNHILL, MOREHOUSE,
BURFORD SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 1180
OAKLAND, CA 94604

40

KMDD003666

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not that KELLY-MOORE is aware of.

INTERROGATORY NO. 52:

Has any person filed a workers' compensation claim for asbestos-related injury against THIS DEFENDANT; if so, please state:

a.   the date of such claim;

b.   the name of claimant;

c.   the caption;

d.   the case number;

e.   the court in which the claim was filed;

f.   the IDENTITY of the custodian of such documents.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

At this point in time, Defendant KELLY-MOORE is aware of the following:

WALTER R. LAWRENCE:

a.   March 31, 1983.

b.   Walter R. Lawrence.

c.   Walter R. Lawrence v. PACO, et al.

d.   OAK 92646.

e.   WCAB, Oakland.

f.   Douglas Merrill.

///

BURNHILL, MOREHOUSE,
BURFORD, SCHOFIELD
& SCHILLER
A PROFESSIONAL CORPORATION
P.O. BOX 3144
WALNUT CREEK, CA 94596

41

**ISAAC BUSH:**

a.  March 9, 1987.

b.  Isaac "Ike" Bush.

c.  Isaac Bush v. Lyles Diversified, Inc., et al.

d.  (WCAB) OAK 150427.

e.  WCAB, Oakland.

f.  Law Offices of Jack K. Clapper, 100 Shoreline Highway, Building B, Suite 300, Mill Valley, CA 94941.

    Safire & Lewis, Esqs., 433 Turk Street, San Francisco, CA 94102.


**INTERROGATORY NO. 53:**

    Does THIS DEFENDANT have insurance available to cover judgment(s) entered against it in asbestos-related personal injury lawsuits; if so, please state:

    a.  the name and principal place of business of any insurance carrier who has issued such policy of insurance;

    b.  the number and effective date of each policy;

    c.  the amount(s) of coverage of each policy;

    d.  the applicable dates of coverage;

    e.  any reservation of rights contained in each such policy;

    f.  the amount of coverage presently exhausted under each such policy;

    g.  the amount of coverage presently available under each such policy;

    h.  whether limits contained in each such policy include costs of defense.

///

42

KMDD003668

KMDD003669

KELLY-MOORE PAINT COMPANY, INC.
Summary of Liability Policies
January 1, 1956 - October 1, 1986

| Insurer | Policy Number | Type of Liability Coverage | Amount of Coverage | Remarks |
|---|---|---|---|---|
| 1/1/56 - 1/1/57 Zurich Insurance Company* | 83-23-271 | Auto & Gen. Liability | Unverified | |
| 1/1/57 - 1/1/58 Zurich Insurance Company* | 84-32-044 | Auto & Gen. Liability | Unverified | |
| 1/1/58 - 1/1/59 Zurich Insurance Company* | 84-34-34h | Auto & Gen. Liability | Unverified | |
| 1/1/59 - 1/1/60 Zurich Insurance Company* | 80-59-350 | Auto & Gen. Liability | Unverified | |
| 1/1/60 - 1/1/61 Zurich Insurance Company* | 81-01-348 | Auto & Gen. Liability | Unverified | |
| 1/1/61 - 1/1/62 Zurich Insurance Company* | 81-55-990 | Auto & Gen. Liability | Unverified | |
| 1/1/62 - 1/1/63 Zurich Insurance Company* | 83-2h-617 | Auto & Gen. Liability | Unverified | |
| 1/1/63 - 1/1/64 Zurich Insurance Company | 84-44-050 | Auto & Gen. Liability | B.I. 500,000/1,000,000, P.D. Auto 50,000 P.D. Other 50,000/100,000 | |
| 1/1/64 - 1/1/65 Zurich Insurance Company | 84-27-219 | Auto & Gen. Liability | B.I. 25,000/100,000bbb, P.D. Auto 50,000 P.D. Other 50,000 | |

Page 1 of 9

*Policy unavailable at present time. A copy has been requested from the carrier.
**We believe there is an umbrella policy for this year, but we have been unable to locate it at present.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Please see attached list.

INTERROGATORY NO. 54:

Has THIS DEFENDANT owned or operated any petroleum refining facilities; if so, please state:

a. whether any ASBESTOS-CONTAINING PRODUCT(S) WERE MARKETed on the premises of such refining facilities;

b. the location, including the name and address of all such refining facilities;

c. the dates of operation of such refining facilities;

d. the types of ASBESTOS-CONTAINING PRODUCT(S) MARKETed on such premises;

e. the names of the manufacturers of any ASBESTOS-CONTAINING PRODUCTS MARKETed on such premises;

f. whether THIS DEFENDANT has documents identifying such MARKETing;

g. the IDENTITY of the custodian of such documents.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

NO.

INTERROGATORY NO. 55:

Has THIS DEFENDANT held a controlling ownership interest in any COMPANY which owned or operated petroleum refining

43

facilities:  if so, for the period(s) of time during  which  THIS
DEFENDANT held such interest, please state:

a.  whether any ASBESTOS-CONTAINING PRODUCTS were  MARKETed
on the premises of such refining facilities;

b.  the location, including the name and address of all such
refining facilities;

c.  the dates of operation of such refining facilities;

d.  the  types of ASBESTOS-CONTAINING PRODUCTS  MARKETed  on
such premises;

e.  the   names  of  the  manufacturers  of  any   ASBESTOS-
CONTAINING PRODUCTS MARKETed on such premises;

f.  whether  THIS DEFENDANT has DOCUMENTS  identifying  such
MARKETing;

g.  the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without  waiving  its general objections,  Defendant  KELLY-
MOORE responds as follows:

NO.


INTERROGATORY NO. 57:

Has  THIS  DEFENDANT  contracted with any  COMPANY  for  the
MARKETing of ASBESTOS-CONTAINING PRODUCT(S) on any premises owned
or leased by THIS DEFENDANT; if so, please state:

a.  the  location,  including  name  and  address  of  such
premises;

b.  the name and address of each such COMPANY;

c.  the types of ASBESTOS-CONTAINING PRODUCTS;

///

44

d. the name of the manufacturers of such ASBESTOS-CONTAINING PRODUCTS;

e. whether THIS DEFENDANT has DOCUMENTS of such MARKETing;

f. the IDENTITY of the custodian of such DOCUMENTS.

ANSWER:

Without waiving its general objections, Defendant KELLY-MOORE responds as follows:

Not that Defendant KELLY-MOORE is aware of.

DATED: June 8, 1990                BURNHILL, MOREHOUSE, BURFORD,
                                   SCHOFIELD & SCHILLER, INC.


                                   BY: _Kathleen S. Farley_
                                   KATHLEEN S. FARLEY
                                   Attorneys for Defendant
                                   KELLY-MOORE PAINT COMPANY, INC.

45

SRR 1001          KMDD003672

<u>**VERIFICATION**</u>

I hereby declare under penalty of perjury that I am the <u>Secretary-Treasurer</u> of KELLY-MOORE PAINT COMPANY, INC., a corporation, a party in the <u>In Re Complex Asbestos Litigation</u> and the <u>In Re Shipyard and Applicator Asbestos Cases (Consolidated for Discovery</u> cases, and am authorized to make this Verification for and on behalf of said corporation; that I have read Defendant <u>Kelly-Moore's Answers to Plaintiffs' Standard Set of Interrogatories (Set No. One)</u>, and know the contents thereof, and the same is true of my own knowledge, except as to matters which are therein stated upon my information and belief, and as to those matters I believe them to be true.

Executed at San Carlos, California, this <u>7th</u> day of <u>June</u>, 1990.

<u>John Bacigalupo</u>
JOHN BACIGALUPO

JOHNSON, MOREHOUSE
RUMFORD, SCHOFIELD
& SCHILLER
PROFESSIONAL CORPORATION
P O BOX 5468
WALNUT CREEK CA 94596
(415) 937-8000

SRR 1002

KMDD003673

## VERIFICATION

I hereby declare under penalty of perjury that I am the Vice President - Manufacturing Operations of KELLY-MOORE PAINT COMPANY, INC., a corporation, a party in the In Re Complex Asbestos Litigation and the In Re Shipyard and Applicator Asbestos Cases (Consolidated for Discovery cases, and am authorized to make this Verification for and on behalf of said corporation; that I have read Defendant Kelly-Moore's Answers to Plaintiffs' Standard Set of Interrogatories (Set No. One), and know the contents thereof, and the same is true of my own knowledge, except as to matters which are therein stated upon my information and belief, and as to those matters I believe them to be true.

Executed at San Carlos, California, this ___7th___ day of June _____, 1990.

_____
DOUGLAS MERRILL

SRR 1003        KMDD003674

PROOF OF SERVICE BY MAIL

I declare that:

I am employed in the County of Contra Costa, I am over the age of eighteen years and not a party to the within cause; my business address is 1220 Oakland Boulevard, Suite 200, Walnut Creek, California 94596. On June 20, 1990, I served the within

DEFENDANT KELLY-MOORE'S ANSWERS TO
PLAINTIFFS' STANDARD SET OF INTERROGATORIES

in said actions by placing a true copy of each enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Walnut Creek, California, addressed as follows:

See attached Plaintiff Counsel and Defense Counsel lists for

IN RE COMPLEX ASBESTOS LITIGATION,
Alameda County SC No. 607734-9

IN RE SHIPYARD AND APPLICATOR ASBESTOS CASES
(CONSOLIDATED FOR DISCOVERY),
Alameda County SC No. 537868-7

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 20, 1990, at Walnut Creek, CA 94596.

Irene Carpenter

IN RE COMPLEX ASBESTOS LITIGATION — ALAMEDA COUNTY

PLAINTIFF COUNSEL PROOF OF SERVICE

BRUCE L. AHNFELDT, ESQ., 700 Franklin Street, Napa, CA 94559
LAW OFFICES OF ROGER BALT, P.O. Box 12095, 1407 Webster Street, Suite 208, Oakland, CA 94604
BRAYTON & ASSOCIATES, 999 Grant Avenue, P.O. Box 2109, Novato, CA 94948
BROWN & FINNEY, 2033 N. Main Street, Ste 430, Walnut Creek, CA 94596
CARLSON & HUSICK, 7080 Donlon Way, Suite 222, Dublin, CA 94568
CARTWRIGHT, SLOBODIN, et al., 101 California Street, Suite 2600, San Francisco, CA 94111
CASEY, GERRY, CASEY, et al., 110 Laurel Street, San Diego, CA 92101
CASEY, GERRY, CASEY, et al., 781 Tuolumne, Vallejo, CA 94590
LAW OFFICES OF JACK K. CLAPPER, 100 Shoreline Highway, Building B, Suite 300, Mill Valley, CA 94941
COREY & ORTON, 700 El Camino Real, Millbrae, CA 94030
DIGARDI & CAMPBELL, 436 - 14th Street, Suite 616, Oakland, CA 94612
DUDA, RAHIM & RATTO, 385 Grand Avenue, Suite 201, Oakland, CA 94610
GEORGE & BUCH, 930 S. La Brea Avenue, Los Angeles, CA 90036
CHRISTOPHER E. GRELL, ESQ., The Monadnock Building, 685 Market Street, Suite 340, San Francisco, CA 94105
JEFFREY B. HARRISON, ESQ., One Daniel Burnham Court, Suite 220C, San Francisco, CA 94109
HILDEBRAND, McLEOD, et al., 414 - 13th Street, 6th Floor, Oakland, CA 94612
HOBERG, FINGER, et al., 703 Market Street, 18th Floor, San Francisco, CA 94103
JARVIS, MILLER, et al., 221 Main Street, Suite 1001, San Francisco, CA 94105
KAZAN & McCLAIN, 171 Twelfth Street, Suite 300, Oakland, CA 94612
GEORGE W. KILBOURNE, ESQ., 3755 Alhambra Avenue, Suite 9, Martinez, CA 94553
LAW OFFICES OF KENNETH L. KNAPP, 1109 Quail Street, Newport Beach, CA 92660
MACK, HAZELWOOD, et al., 221 Pine Street, Suite 600, San Francisco, CA 94104
EDWIN C. MARTIN, JR., ESQ., 501 Shatto Place, Suite 100, Los Angeles, CA 90020
McCARTHY, JOHNSON & MILLER, 595 Market Street, Suite 2200, San Francisco, CA 94105
PELLETREAU, MOSES, et al., 2090 - 23rd Street, Box 35, San Pablo, CA 94806
JOHN C. ROBINSON, ESQ., 940 Adams Street, Suite B, Benicia, CA 94510
ROBERT C. SCHUBERT LAW OFFICES, One Embarcadero Center, Suite 370, San Francisco, CA 94111.mt3
SINKE, CHODOS, et al., 6300 Wilshire Blvd., Suite 9000, Los Angeles, CA 90048
STEMPLE & BOYAGIAN, 1526 Tennessee Street, Vallejo, CA 94590
STERNS & WALKER, 280 Utah Street, San Francisco, CA 94103
ROBERT E. THOMAS, ESQ., 2502 Park Blvd., Suite 200, Palo Alto, CA 94306
GERALD J. TIERNAN, ESQ., 165 Fell Street, San Francisco, CA 94102
WILHELM, THOMPSON, et al., 600 Allerton Street, Redwood City, CA 94063

ALP(6/14/90)

IN RE COMPLEX ASBESTOS LITIGATION - ALAMEDA COUNTY

DEFENSE COUNSEL PROOF OF SERVICE

ADAMS, DUQUE & HAZELTINE, c/o Seyfarth, Shaw, et al., 101 California Street, Suite 2900, San Francisco, CA 94111
ANDERSON, GALLOWAY & LUCCHESE, 1676 N. California Blvd., Suite 500, Walnut Creek, CA 94596
ARCHER, McCOMAS & LAGESON, 2033 N. Main Street, Suite 800, P.O. Box 8035, Walnut Creek, CA 94596
ATCHISON, TOPEKA & SANTA FE RAILWAY CO., Legal Department, One Santa Fe Plaza, 5200 East Sheila Street, Los Angeles, CA 90040
BARFIELD, DRYDEN & RUANE, One California Street, Suite 3125, San Francisco, CA 94111
BENNETT, SAMUELSEN, et al., 1951 Webster Street, Suite 200, Oakland, CA 94612
BERRY & BERRY, 505 - 14th Street, 12th Floor, Oakland, CA 94612
BICKEL & DIAMOND, 4 Embarcadero Center, Suite 1650, San Francisco, CA 94111
BISHOP, BARRY, et al., 465 California Street, 11th Floor, San Francisco, CA 94104
BJORK, FLEER, et al., 483 - 9th Street, Oakland, CA 94607
BOGLE & GATES, 1400 KOIN Center, 222 S.W. Columbia, Portland, OR 97201
BRANSON, FITZGERALD & HOWARD, P.O. Box 2189, Redwood City, CA 94064
BROBECK, PHLEGER & HARRISON, One Market Plaza, San Francisco, CA 94105
BRONSON, BRONSON & McKINNON, 100 "B" Street, Suite 400, Santa Rosa, CA 95401
CARROLL, BURDICK & McDONOUGH, 44 Montgomery Street, Suite 400, San Francisco, CA 94104
CLAPP, MORONEY, et al., 4400 Bohannon Drive, Suite 100, Menlo Park, CA 94025
COOLEY, GODWARD, CASTRO, HUDDLESON & TATUM, One Maritime Plaza, 20th Floor, San Francisco, CA 94111
CRADDICK, CANDLAND & CONTI, 915 San Ramon Valley Blvd., P.O. Box 810, Danville, CA 94526
CROSBY, HEAFEY, ROACH & MAY, 1999 Harrison Street, Oakland, CA 94612
DERBY, COOK, QUINBY & TWEEDT, 333 Market Street, Suite 2800, San Francisco, CA 94105
DILLINGHAM & MURPHY, 605 Market Street, Penthouse, San Francisco, CA 94105
ERICKSEN, ARBUTHNOT, et al., 1304 Willow Street, Martinez, CA 94553
FINAN, WHITE & PAETZOLD, 150 Spear Street, Suite 1725, San Francisco, CA 94105
GILLES & NICORA, 1900 Embarcadero, Suite 201, Oakland, CA 94606
GLASPY & GLASPY, 201 N. Civic Drive, Suite 245, Walnut Creek, CA 94596
GORDON & REES, Embarcadero Center West, 275 Battery Street, 20th Floor, San Francisco, CA 94111
GRAHAM & JAMES, One Maritime Plaza, Suite 300, San Francisco, CA 94111
HARDIN, COOK, et al., 1999 Harrison Street, 18th Floor, Oakland, CA 94612-3508
HARRINGTON, FOXX, et al., 611 W. Sixth Street, 9th Floor, Los Angeles, CA 90017

ALAD(6/14/90) - 1

HASSARD, BONNINGTON, etc., 5 Fremont Center, 50 Fremont Street, Suite 3400, San Francisco, CA 94105

HILL, GENSON, EVEN, CRANDALL & WADE, 505 Shatto Place, Los Angeles, CA 90020

HOWARD, RICE, NEMEROVISKI, CANNADY, ROBERTSON & FALK, 3 Embarcadero Center, Suite 700, San Francisco, CA 94111

NANCY E. HUDGINS, ESQ., 605 Market Street, San Francisco, CA 94105

HYDE & FORSBLAD, 1850 Mt. Diablo Blvd., Suite 310, Walnut Creek, CA 94596

IRSFELD, IRSFELD & YOUNGER, 100 W. Broadway, Suite 900, Glendale, CA 91210

JACKSON, WALLACE & HAYDEN, 33 New Montgomery Street, 18th Floor, San Francisco, CA 94105

JEDEIKIN, CONNOR & GREEN, 300 Montgomery Street, Suite 450, San Francisco, CA 94104

JEFFREY & HEINMANN, 685 Market Street, Suite 1000, San Francisco, CA 94105

KINCAID, GIANUNZIO, etc., P.O. Box 1828, Oakland, CA 94604

KINSELLA, BOESCH, et al., 1875 Century Park East, Suite 1600, Los Angeles, CA 90067

KNOX, RICKSEN & SNOOK, 1999 Harrison Street, Suite 1700, Oakland, CA 94612

LAW OFFICES OF JOHN LADD, 1683 Folsom Street, San Francisco, CA 94102

LANDELS, RIPLEY & DIAMOND, 450 Pacific Avenue, San Francisco, CA 94133

LATHAM & WATKINS, 633 West Fifth Street, Suite 4000, Los Angeles, CA 90071

LILLICK, McHOSE & CHARLES, Two Embarcadero Center, 26th Floor, San Francisco, CA 94111

LOW, BALL & LYNCH, 601 California Street, 21st Floor, San Francisco, CA 94108

MacKENROTH, SELEY & ANWYE, 1610 Arden Way, Suite 250, P.O. Box 255800, Sacramento, CA 95865

MARRON, REID & SHEEHY, 601 California Street, Suite 1200, San Francisco, CA 94108

RICHARD McCONNELL, ESQ., 114 Sansome Street, Suite 808, San Francisco, CA 94104

McCUTCHEON, DOYLE, et al., 3 Embarcadero Center, P.O. Box V, San Francisco, CA 94111

McDONALD, PERUSSINA & CULLOM, 635 Sacramento Street, Suite 720, San Francisco, CA 94111

McGLYNN, McLORG, et al., Bayside Plaza, 188 Embarcadero, Suite 200, San Francisco, CA 94105

McNAMARA, HOUSTON, et al., 1211 Newell Avenue, Suite 202, P.O. Box 5288, Walnut Creek, CA 94596

MENTZ, FINN, CLARK, et al., 333 Victory Avenue, South San Francisco, CA 94080

MORGENSTEIN & JUBELIRER, 101 Market Street, 6th Floor, San Francisco, CA 94105

O'BRIEN, HAMMOND & CONWAY, 220 Sansome Street, 7th Floor, San Francisco, CA 94104

PARICHAN, RENBERG, et al., 2350 West Shaw, Suite 130, Fresno, CA 93711

PARRIEE & ASSOCIATES, 1255 Post Street, Suite 1100, San Francisco, CA 94109

PERKINS COLE, 10900 Wilshire Blvd., 11th Floor, Los Angeles, CA 90024

PETTIT & MARTIN, 101 California Street, San Francisco, CA 94111

ALAD(6/14/90) - 2

PILLSBURY, MADISON, et al., 225 Bush Street, P.O. Box 7880, San Francisco, CA 94120

POBLE, JOHNSON, et al., 501 "J" Street, Suite 610, Sacramento, CA 95814

POND, SHJEFLO & WOHL, 1730 S. El Camino Real, 6th Floor, San Mateo, CA 94402

POPELKA, ALLARD, et al., 160 West Santa Clara Street, Suite 1300, San Jose, CA 95113

ROGERS, JOSEPH, et al., Robert Dollar Building, 311 California Street, 10th Floor, San Francisco, CA 94104

ROPERS, MAJESKI, et al., 1001 Marshall Street, Redwood City, CA 94063

MARK H. ROSENTHAL, ESQ., 50 California Street, 30th Floor, San Francisco, CA 94111

SEDGWICK, DETERT, et al., One Embarcadero Center, 16th Floor, San Francisco, CA 94111

SHEPPHARD, MULLIN, et al., Four Embarcadero Center, 17th Floor, San Francisco, CA 94111

SHIELD & SMITH, 580 California Street, Suite 1400, San Francisco, CA 94104

STARK, WELLS, et al., Lake Merritt Plaza, 1999 Harrison Street, Suite 1300, Oakland, CA 94612

STATE COMPENSATION INSURANCE FUND, 1275 Market Street, 3rd Floor, San Francisco, CA 94103

ST. CLAIR, ZAPPETINI, McFETRIDGE & GRIFFIN, One Montgomery Street, Suite 1400, San Francisco, CA 94104

STEVENS & DRUMMOND, 1910 Olympic Blvd., Suite 250, Walnut Creek, CA 94596

STUMBOS & MASON, 800 - 9th Street, Suite 200, P.O. Box 868, Sacramento, CA 95804

SULLIVAN, ROCHE, et al., 333 Bush Street, 18th Floor, San Francisco, CA 94104

TARKINGTON, O'CONNOR, etc., One Market Plaza, Spear Street Tower, Suite 4100, San Francisco, CA 94105

THELEN, MARRIN, et al., One Kaiser Plaza, Suite 1950, Oakland, CA 94612

THOMPSON & HELLER, 3600 American River Drive, Suite 150, Sacramento, CA 95864

TOLPEGIN, IMAI, et al., One Post Street, Suite 2400, San Francisco, CA 94104

TOMLINSON, ZISKO, et al., 480 California Avenue, 2nd Floor, Palo Alto, CA 94306

WALSWORTH, FRANKLIN, etc., 111 Sutter Street, 19th Floor, San Francisco, CA 94104

WEINTRAUB, GENSHLEA, etc., 2535 Capitol Oaks Drive, Suite 400, Sacramento, CA 95833

WHITEHORN & RAVAZZINI, 2150 Franklin Street, Suite 571, Oakland, CA 94612

WISE, WIEZOREK, et al., 888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017

WRIGHT, ROBINSON, et al., 44 Montgomery Street, 18th Floor, San Francisco, CA 94104

ALAD(6/14/90) - 3

SRR 1008

KMDD003679

# EXHIBIT 20

# COUDERT BROTHERS

ATTORNEYS AND COUNSELLORS AT LAW

200 PARK AVENUE

NEW YORK, N.Y. 10166



NOV 2 8 1981

TELEPHONE
(212) 880-4400

TELEX
INTL: RCA 234373
ITT 424736
WUI 666764
DOMESTIC: 148439

TELECOPIER
DEX 4100
(212) 972-1786
(212) 661-4345

RAPICOM 1500
(212) 490-3751

MAGNETIC COMMUNICATOR
IBM
(212) 867-6970

XEROX 600
(212) 662-2094

CABLE
"TREDUOC" NEW YORK

WASHINGTON, D.C. 20006
   One Farragut Square South
SAN FRANCISCO, CA. 94111
   Suite 3550, Four Embarcadero Center
PARIS, 75008 FRANCE
   52 Avenue des Champs-Elysees
LONDON, EC4N 9DL ENGLAND
   49-51 Bow Lane
BRUSSELS, B-1050 BELGIUM
   149 Avenue Louise, Box 8
HONG KONG
   Alexandra House, 20 Chater Road
SINGAPORE, 0106
   5 Shenton Way
RIYADH, SAUDI ARABIA
   Suite 515, Saudi Real Estate Building
   Sitteen Street, P.O. Box 2700
BAHRAIN
   Hewel Building, Diplomatic Area
   P.O. Box 5366, Manama
TOKYO, MINATO-KU, 107 JAPAN
   Tanaka & Takahashi
   New Aoyama Building W-1352
   1-1, Minami Aoyama 1-chome
RIO DE JANEIRO, 20,000 BRAZIL
   Ulhoa Canto, Rezende, Neviani e Guerra
   Avenida Almirante Barroso 81

November 25, 1981

REDACTED



EXHIBIT
88
Giffins 3-28-08

KMX 02103

KMWK 004059

KMH-AR0001941

Confidential

REDACTED

KMH-AR0001942

Confidential

REDACTED

Confidential

# EXHIBIT 21

SECTION II
EXHIBIT IV
SHEET 8

REED DECORATIVE PRODUCTS

ASBESTOS LITIGATION MODEL

DISPLAY OF EXPECTED MORTALITY
BY CALENDAR YEAR

ALL AGE GROUPS



KMH-AR0001925

Confidential

# EXHIBIT 22

EXHIBIT A

REED DECORATIVE PRODUCTS

ASBESTOS LITIGATION MODEL
DISPLAY OF EXPECTED LOSS COSTS BY CALENDAR YEAR OF MANIFESTATION
ALL AGE GROUPS



KMH-AR0001933

onfidential

# EXHIBIT 23

# KELLY-MOORE MEMO

TO _____ WILLIAM E. MOORE _____    FROM _____ DOUG MERRILL _____    DATE 10/17/82

SUBJECT _____ REVIEW OF "ANALYSIS OF ASBESTOS-RELATED CLAIM
OF KELLY-MOORE PAINT COMPANY, INC." _____



Confidential

# EXHIBIT 24

BRIEF HISTORY OF KELLY-MOORE'S PACO DRY WALL DIVISION'S
PRODUCTION AND SALES



Confidential



KMH-AR0002034

Confidential

REDACTED

KMH-AR0002035

Confidential

# EXHIBIT 25

*The Wall Street Journal, Aug. 31, 1982*

# Travelers Says It Proposed Plan to Help Manville a Day Prior to Chapter 11 Filing

*A WALL STREET JOURNAL News Roundup*

Travelers Insurance Cos. said it filed a plan to help Manville Corp. cover costs of asbestos-related, personal-injury claims a day before Manville's filing for protection under Chapter 11 of the federal Bankruptcy Code.

Travelers Insurance, a unit of Hartford, Conn.-based Travelers Corp., said it filed the plan with Superior Court of California at San Francisco Aug. 25, the day before Manville also filed court papers seeking $5 billion punitive damages from its insurance carriers. Manville alleges that the insurers refused to honor their obligations under various liability policies covering asbestos disease and property damage claims.

Travelers said its plan calls for a pooled fund, to which involved insurers would contribute until the court resolves the complicated coverage issues. Travelers didn't specify the amount of the fund.

While Travelers said it was willing to participate in the pool, the company also said that it has fulfilled product-liability obligations of its contracts with Manville. A Travelers Insurance official said: "We've paid the full amount" of the total aggregate product-liability limits of the policies. "Yet," he added, "we are willing, on an interim basis, to pay into a pool that will pay (Manville's) settlement and defense costs."

As reported, Manville has sought protection under Chapter 11 of the Bankruptcy Code to fend off thousands of lawsuits from plaintiffs who claim they have been injured by asbestos, a product that causes various lung ailments, including cancer.

Under Chapter 11, a company can continue to operate free from creditors' suits. The Manville filing is unusual because the company is financially strong. In bankruptcy cases, usually the party seeking protection is in dire financial straits. Manville has argued that if it didn't seek protection now it soon would have been overwhelmed by the suits, which, according to the company, could number as many as 52,000. Some lawyers representing plaintiffs have called Manville's use of Chapter 11 "fraudulent."

Travelers said it had paid defense and other expenses for Manville as they were incurred "until the limits were exhausted." Travelers provided general liability insurance policies to Manville Corp., previously Johns-Manville Corp., from 1947 through 1976.

One major dispute among insurers and their clients is the "exposure" and the "manifestation" theories of asbestos-related diseases, including lung cancer. Some argue that the insurer that held the policy when the illness manifested itself should pay the damages. Others say the exposure theory should prevail, because it can take 20 to 40 years after exposure to the product for ill effects to be manifested. Thus the formula to make all insurers pay to a general fund, re-gardless of when their policies were in force, has gained ground.

In an unrelated action, Manville won a victory in federal bankruptcy court in New York. In the first challenge to its Chapter 11 filing, Judge Burton R. Lifland upheld the company. Lawyers for plaintiffs in asbestos-damage cases had requested that the bankruptcy judge lift the Chapter 11 barrier to pending suits filed against Manville to allow them to take a deposition from an ailing 83-year-old witness against Manville.

Manville's lawyers argued that if an exception was made in this case, soon there would be a flood of similar filings. Judge Lifland refused the request and set Sept. 29 to hear further argument.

Meanwhile, no date has been set for preliminary meeting to form a creditors' committee to look into the Manville filing.

KMX 02129

KMWK 003880

Tillinghast, Nelson & Warren

KMH-AR0002003

THE WALL STREET JOURNAL,
Tuesday, August 31, 1982

# Manville's Chapter 11 Filing Spotlights Tiny Firm That Probes Health Hazards

### By Neil Maxwell
*Staff Reporter of The Wall Street Journal*

DENVER—A tiny consulting firm in suburban Boston is at the center of one of history's biggest and most controversial bankruptcy cases.

Epidemiology Resources Inc., a two-year-old company with a full-time staff of five, conducted research for Manville Corp. on asbestos-related disease. The study led to the company's decision to seek protection of federal bankruptcy laws.

Citing results of the study, Manville said it is being overwhelmed by the cost of litigation. And even though the company acknowledges that it is financially healthy, it filed for reorganization under Chapter 11, halting all claims and litigation against it.

The filing angered attorneys for thousands of plaintiffs who claim to suffer from lung diseases caused by exposure to asbestos made by Manville. And it practically assures a court challenge of the research by Epidemiology Resources of Brookline, Mass.

### 'How Much Disease'

Manville said it asked Epidemiology Resources to project "how much asbestos-related disease there would be in the future." Manville took the answer and figured there would be 32,000 new plaintiffs along with the 20,000 who have filed suit. Manville has said it could cost more than $2 billion to resolve that many claims.

"We want to know exactly where those figures came from," said one lawyer, who believes Manville is using the consulting firm's study to exaggerate the seriousness of its financial position.

Manville defended the study as conservative and said Epidemiology Resources was chosen because it was "the best qualified" of several concerns, most connected with universities, that study health hazards.

Manville won't comment on the study's methodology and Nancy Dreyer, 32-year-old chairman and president of Epidemiology Resources, said that "any comment should come from [Manville]."

While Epidemiology Resources is young and small, Miss Dreyer said, it is well qualified to do such studies, and some past customers agree. General Motors Corp. for example, has used the firm to check studies it had done elsewhere. A GM spokesman said the company was satisfied with results.

### Checking Others

Some of Epidemiology Resources' projects apparently involved checking others' work and putting it in presentable form. Texaco Inc., for example, hired the consulting firm "to interpret medical data for the media and to add credibility to our own studies," a Texaco spokesman said. The oil company work has involved such things as occupation-related mortality studies of diseases like leukemia, a spokesman said.

Miss Dreyer lists her husband, Kenneth J. Rothman, an associate professor of epidemiology at Harvard University, as a member of the firm's senior advisory board. The other two members, she said, are Philip Cole, chairman of the epidemiology department at the University of Alabama Medical School in Birmingham, and Henry Kohn, retired professor of radiation biology at Harvard. (Prof. Kohn said that he didn't know he was on the board, but that he hadn't seen a corporate letterhead lately and that being considered a senior adviser was fine with him.)

Miss Dreyer declined to disclose owners or other officers in the company, which is closely held. She said that for the year ended June 30 "we did show a small profit," but that as far as current operations go, "I don't know. There are substantial variations from month to month." In addition to staff members the firm said it has a network of consultants it hires to help on specific projects.

### Name Problem

But the firm is so obscure that even Manville executives have a tough time with it. At a news conference in Denver the day after its filing for Chapter 11 status, Manville's chairman, John A. McKinney, said he couldn't remember the consulting firm's name. Later, a Manville spokesman said it was Epidemiological Research Inc., San Francisco. Hours later he amended that to the proper name.

Before starting the company, Miss Dreyer worked for Equitac Inc., helping develop a division to perform epidemiological work, but the unit was sold, she said.

Miss Dreyer wouldn't disclose how much the firm was paid for the Manville study or whether it has done work previously for the construction and forest-products company. "I'm not at liberty to talk about that," Miss Dreyer said.

A study by doctors at Mount Sinai Hospital in New York has indicated that nearly 235,000 deaths will result between 1967 and 2027 from asbestos exposure. A smaller number of injuries possibly resulting in lawsuits would also emerge, according to William J. Nicholson, associate professor at Mount Sinai School of Medicine, who helped conduct the hospital's study.

KMWK 003881

KMX 02130

Tillinghast, Nelson & Warren

KMH-AR0002004

# Manville Filing Expected to Have A Wide Effect

## Creditors Are Seen Sharing Estimated $2 Billion Cost To Settle Health Claims

*By Dean Rotbart*
*Staff Reporter of The Wall Street Journal*

DENVER—Although Manville Corp.'s unusual bankruptcy filing last week was intended chiefly to shield the company from thousands of current and future asbestos-related claims, estimated to total $2 billion, the actual impact will extend far beyond asbestos victims and their families.

Despite the relative strength of Manville's balance sheet and cash flow, dozens, if not hundreds, of the company's creditors and suppliers stand to lose millions of dollars because of Manville's decision to seek protection under Chapter 11 of the federal Bankruptcy Code. "The (reorganization) plan won't be a 100 cents-on-the-dollar plan, or we wouldn't be" in bankruptcy, a company official said.

Many investors, of course, already have suffered huge paper losses on their holdings of the construction and forest-products company's preferred and common stocks. And at the very least, it appears that hundreds of millions of dollars of accounts and notes payable by Manville and other accrued liabilities will remain frozen, barring special court intervention, until all the legal issues of reorganization are resolved. The company concedes that isn't likely to be soon.

The practical effect is that the company's creditors and suppliers "are going to have to share the burden" of paying off individuals who claim health damage from exposure to asbestos made by Manville, from Wald, a company attorney, said. Claiming it is "completely overwhelmed" by the cost of asbestos-related litigation, Manville filed for bankruptcy Thursday morning, halting all claims and litigation against the company. (See related story on page 15.)

### Seeks Government Aid

Along with other asbestos makers, Manville believes the federal government should pass legislation to help pay asbestos claims, because the product was used during World War II in U.S. shipbuilding efforts. Some critics believe Manville's bankruptcy filing is intended to force the government to provide aid to the industry, and at least one critic labeled the company's action "a fraud on the bankruptcy laws." Many asbestos plaintiffs and their attorneys also blasted Manville's action last week, calling it a dodge.

Manville creditors and suppliers of such goods as pipe resin, utilities, roofing materials and services, reacted with chagrin and anger. "It isn't fair," complained one Colorado small business man, who is awaiting $50,000 in payments from Manville. "This asbestos business goes back 30 to 40 years and I had nothing to do with it, so why should I pay for it?" he asked. Added an official of a major Eastern supplier that doesn't expect to recover much of its money from Manville: "Once these things get into the courts, you're dead."

In other related developments:
—Some of the company's largest unsecured creditors said they expect to meet with Manville management in Denver today or tomorrow to hear the company's explanation for the filing, its proposed course of action and its pleas for support. "My guess is that they will have (some outline of) their reorganization plan there" for creditors to comment on, said Charles Hazelrigg, an executive at United Bank of Denver, which holds $6 million of Manville debt.

—Representatives of the Asbestos Litigation Group, consisting of 150 lawyers who are suing Manville and others over health damage claims, planned to meet today in New York to hire a bankruptcy lawyer to lead their attack against Manville's filing and to discuss filing a motion later this week asking that the stay of lawsuits against Manville be lifted. If the judge accepts that motion, he would set a preliminary hearing within 30 days, "and then Manville would have to show its cards," said Fred. M. Baron, a Dallas lawyer who is a trustee of the group.

—The company's Johns-Manville unit, which makes asbestos, filed papers in San Francisco Superior Court seeking $5 billion in punitive damages from its insurance carriers. The unit alleges that the insurers refused to honor their obligations under various liability policies covering asbestos disease and property damage claims. As a result, the company said it had to spend tens of millions of dollars, which "so strained its financial resources that reorganization proceedings had to be commenced." The filings seek to amend an earlier complaint against two dozen insurers, in which Johns-Manville asked for declaratory judgments, damages and other relief. The company currently faces 16,500 asbestos-related claims.

### $2 Billion Estimate 'Conservative'

(The filing disclosed that the company has spent more on lawyers than on health injury claims so far. It listed legal fees of $24.5 million, $24 million for injuries and $7.5 million for property damage.)

—John H. McKinney, Manville's chairman and president, told a news conference Friday that a company-sponsored study that estimated a total of 52,000 asbestos-related suits eventually might be filed against Manville is "conservative" in its conclusions, including the estimated $2 billion cost of the suits. The study was done by a two-year-old Boston consulting concern, Epidemiology Resources Inc., whose president, Nancy Dreyer, said it has had varied experience in conducting environmental and occupational health surveys. Clients include major industrial concerns, she said, and a recent task was to determine if it is safe for natives to return to Bikini island in the South Pacific, 35 years after an atomic bomb was set off there. (It isn't, she said.) She also said that only the epidemiology part of the survey leading to the prediction of 52,000 lawsuits was done by her concern, not the arithmetic leading to the $2 billion damages estimated by Manville. She wouldn't discuss details of the survey.

The study intentionally assessed the company's legal problems on the low side, "so if anyone could attack them (the findings), they'd attack them for being low," Mr. McKinney said. Manville used the study's findings as evidence of its need to seek court protection.

—Mr. McKinney also defended the Chapter 11 filing as Manville's "best chance of coming up whole (rather than facing) eventual liquidation and cannibalization of the company's assets." He contended that if Manville hadn't sought court protection now, in a position of relative financial strength, the alternative would have been to seek it in a few years after some assets had been depleted by further asbestos claims. Mr. McKinney said the prospect of having to liquidate some assets to help pay legal costs motivated him to drop his personal objections to a Chapter 11 filing.

In Hartford, officials of Travelers Indemnity Co., a unit of Travelers Corp., declined immediate comment, saying they hadn't yet seen a copy of the amended complaint filed in San Francisco by Manville.

Also in Hartford, John Shea, vice president and claims counsel for Aetna Life & Casualty Co., said the insurer hasn't had any direct financial dealings with Manville in settling asbestos claims.

"We really haven't been involved (in the dispute) because our layer of insurance coverage hasn't been reached," Mr. Shea said, adding that Aetna isn't the primary insurer and wouldn't cover claims until several of the other carriers had exhausted their coverage.

Officials of Home Life Insurance Co. of New York were unavailable for comment.

Until Friday's news conference, some Manville suppliers and investors thought they might be spared the pains of the company's bankruptcy. "We were hopeful that they'd at least pay (preferred) dividends and interest on their debt," said Craig Hobbs, an official of Seattle-based Unigard Insurance Group, which holds 16,000 Manville preferred shares.

But Mr. McKinney told reporters that all creditors, whether asbestos-related or not, would be treated the same and face the same potential losses. "Yes, the shareholders and creditors are in a difficult position," he said. Nevertheless, he explained, "when you go into one of these proceedings, you're restructuring everything."

Manville declined to identify its unsecured creditors, ranging from Prudential Corp., with about $68 million of debt, to small suppliers with only a few dollars in debt. As of June 30, according to the company's Chapter 11 filing, Manville had $190.3 million in accounts and notes payable, and $148.6 million in other accrued liabilities. The company's long-term debt at the time was $498.1 million. In composite trading Friday on the New York Stock Exchange, the company's common stock closed at $5.125, off $2.75. The preferred closed at $18.375, off $13.625.

### 'Tremendous' Cash Flow

Because the filing lets it suspend payments on existing obligations, such as debt, dividends and legal claims, Mr. McKinney said Manville should "generate a tremendous amount of cash for running our businesses." As such, he said it won't make any "significant borrowings" in the next year, adding that it is "perfectly possible" that the company will begin paying cash for its materials.

Manville isn't likely to have a choice in the matter, as many suppliers said they will begin shipping products only on a cash-on-delivery basis. Some said they've already halted all shipments on Manville orders, awaiting cash payments. United Bank of Denver froze Manville's payroll account last Thursday and returned all company-issued checks. However, last Friday, Manville opened new accounts in cash with the bank, which then let Friday's payroll checks clear.

Because Manville's decision to file bankruptcy was based principally on legal and political considerations and not on a cash crunch, most investors, creditors and suppliers were caught off guard, and many were overexposed in their financial dealings with Manville.

"When we are worried about the health of companies such as Chrysler or International Harvester, we cover ourselves and require payments every two weeks," said one Manville supplier who could take a loss of as much as $1 million. "But this bankruptcy came as a complete surprise." Several financial advisers said they had recently been recommending Manville stock as a "bargain."

As recently as two weeks ago, about 75 Manville suppliers turned out at a golf outing in Colorado sponsored by a chemical company. "There wasn't even a peep of a suggestion" about Manville's impending bankruptcy, said one supplier who attended the event. Even now, some creditors say they will need weeks to assess the extent of their possible losses.

The town of Winder, Ga., for example, said it could lose a loss of as much as $400,000 in revenue from utility services it provided Manville's nearby fiberglass insulation plant this month. Ernest Grahm, clerk and treasurer of the town, said he doesn't know how much of the town's money will be frozen by Manville's action because the town won't even bill Manville until early next month.

For Winder, which has a population of about 9,000, the loss of $400,000, even temporarily, would mean forgoing about 6% of its annual revenue. "It would be hard for us to handle," said a somber Mr. Grahm. "The first thing we'd have to do is cut back on some of our capital expenditures, and then hope we wouldn't get into any kind of actual service reductions."

KMWK 003882

Tillinghast, Nelson & Warren

KMX 02131

KMH-AR0002005

THE WALL STREET JOURNAL, ...

# Problems Have Long Plagued Asbestos Firms

### By Raymond A. Joseph
*Staff Reporter of The Wall Street Journal*

NEW YORK—The bankruptcy petition filed Thursday by Manville Corp. was just the latest shock for the battered asbestos industry.

As thousands of cases of asbestos-related diseases among asbestos workers and users have come to light, U.S. asbestos consumption has fallen by about half since 1973. For the past several years asbestos makers have either gotten out of the business entirely, or have tried hard to dissociate themselves from their product.

Some companies have changed their names. The century-old Johns-Manville Corp. became Manville Corp.; Raybestos-Manhattan Inc. became Raymark Corp.; Keene Corp. became Bairnco Corp.; Southern Asbestos Co. became Southern Textiles Corp., a unit of H.K. Porter Co.; Union Asbestos & Rubber Co. became Unarco Industries Inc., and then UNR Industries Inc. UNR filed for bankruptcy protection in July.

## U.S. Asbestos Consumption



(Thousands of metric tons)

659   610   619   561       359   350

'76   '77   '78   '79   '80   '81

*Source: Interior Department*

The change of names was mainly cosmetic, and in some cases reflected corporate diversification. But the structural changes that accompanied some were more significant. A newly organized holding company would assign a percentage of assets to the various units, including one saddled with asbestos products. The idea was that asbestos-related claims could be paid only from that unit's assets, not the parent's.

### 'A Tangled Web'

Manville, for example, had assigned 26% of its more than $2 billion in assets to the asbestos subsidiary. The company hasn't explained how it arrived at that figure. Chicago-based UNR had assigned only pre-1970 assets to Unarco. Its asbestos unit, "even though UNR hadn't made any asbestos products since 1962. UNR, which has diversified since then, has assets of more than $200 million now, up from $24 million in 1969.

But the bankruptcy filings of both Manville and UNR throw those attempts to assign assets into question. Both filings affect the parent companies and most of their subsidiaries, not just the units that make or made asbestos. Malcolm Gaynor, UNR's bankruptcy lawyer, explains: "It was such a tangled web that we decided to file for Chapter 11 protection for all those units whose assets might have been liable" to claims.

Companies have been moving away from asbestos. Raymark, for example, has been replacing asbestos with other fibers, including metal and glass, to make such things as shoe brakes for cars. Southern Textiles, which changed to that name in 1979, says that its use of asbestos has come down steadily. Currently, says a spokesman, the company's products, some of which are used in construction, are about 40% made with asbestos, down from 90% five years ago.

### Dangerous Effects

The use of asbestos has been decreasing in this country as the dangerous effects of the product have become known. According to the U.S. Bureau of Mines, U.S. consumption of asbestos fell to about 350,000 metric tons last year from a high of 795,000 metric tons in 1973.

Asbestos, has been used in various applications including shipbuilding and for underground water pipes. Dr. Irving Selikoff, an expert in asbestos-related diseases at New York's Mount Sinai Hospital, says a 700-page report produced for the Department of Labor, states that between 1940 and 1979 more than 27 million Americans were exposed to asbestos in one form or another. Approximately 20 million of those people are still alive. Some will suffer the ill effects of asbestos, he says. He estimates that the industry should anticipate up to 10,000 cancer deaths a year related to asbestos to the end of the century. Asbestos-related diseases include mesothelioma, a cancer of the lining of the lungs, and asbestosis, a lung disease similar to emphysema.

Asbestos products still are being made and used, although under strict safety regulations laid down by the Occupational Safety and Health Administration. Places where asbestos is handled now have signs warning of its health hazards and workers use special masks.

Plaintiffs who suffered from asbestos exposure are fighting across a broad front. Some are challenging the asbestos companies' restructuring, especially that of Manville. In a suit in federal district court in Boston, Manville argues that the suit shouldn't be amended to include parent Manville Corp. as a defendant, because the suit was filed several years ago against Johns-Manville Corp. and Manville Corp. didn't exist until last year.

Judge Robert DeGiacomo last month said he recognized the "concern" of the plaintiff that the changes at Manville might have been intended to shield a good portion of the company's assets.

Ironically, some plaintiffs see Manville's bankruptcy petition as potential good news. "With Chapter 11, it's another ballgame," says Ronald Motley, a Barnwell, S.C., lawyer who represents some asbestos victims. "We will get to see the evidence on which they claim protection," he says.

The Manville filing sent lawyers at other asbestos makers scurrying. After a day of huddling among lawyers and executives at Bairnco, the company decided to *increase* its quarterly dividend to 12 cents a share from 10 cents. Bairnco, which makes construction materials, had made asbestos for only four years, ending in 1972. It recently won a court decision requiring its insurers to cover any costs from asbestos claims, and it no longer has to set aside an annual reserve against earnings. "We feel we'll continue to do all right," says a spokesman.

Approximately 300 companies at one time used asbestos in their products. One major user was Eagle-Picher Industries Inc., Cincinnati. The company, a maker of machinery, automotive and industrial goods, has been out of the asbestos business for years. Yet asbestos-related suits have been siphoning off between 10% and 15% of the company's cash flow. But Eagle-Picher says it has no intention of cutting its dividend or of filing for protection under Chapter 11.

Attorneys representing plaintiffs still worry about the possibility that another asbestos concern will follow the industry leader. "Who would have thought that Manville would have made such a desperate move?" asks Thomas Henderson, a Pittsburgh lawyer.

KMX 02132

KMWK 003883

KMH-AR0002006

12

# REVIEW & OUTLOOK

## The Price of 'Toxic Torts'

Product liability lawyers have a name for the kind of case that forced Manville Corp. to seek refuge in bankruptcy court last week. It's called a "toxic tort," or a damage claim resulting from exposure to some toxic substance. It's a burgeoning category in a burgeoning field of law. But there must be a better way for victims to be compensated for their losses and manufacturers held accountable for the safety of their products and workplaces.

The Manville case may well prove to be the dramatic event needed to call attention to the waste and injustice that have resulted from the failure of the legal system to deal with product liability in an orderly manner. A very large and financially strong company chose Chapter 11 bankruptcy because it was facing over 52,000 lawsuits and potential damage awards of $2 billion arising from health injuries associated with years of making asbestos products.

This is a case of a company attempting to use law in an innovative way to counter the innovative ways law has been used against it. In the hands of modern lawyers, judges and juries, the old English Common Law concept of torts, wrongful acts that entitle the victim to damages, has been stood on its head. In some judicially liberal states like California, a "wrongful act" may consist of nothing more than having fulfilled a government contract years ago to protect seamen from shipboard fires, using a material that was later found to pose health risks to the people who installed it.

Some of the Manville cases are of that type, dating back to worker exposures in World War II shipyards, when asbestos seemed a minor hazard compared to those that would be risked by sailors on fighting ships. That is not to say that corporations have always been as careful as they should be about work hazards. Damage suits, along with union pressures, safety legislation, workmen's compensation claims and increased medical understanding of occupational hazards all have combined to raise the corporate consciousness. We certainly are not inclined to argue for the abolition of tort law.

On the other hand, the Manville case illuminates serious problems. Lawyers have made product liability a happy hunting ground for fees and, as Manville argued in full-page newspaper ads last week, the lawyers in these cases often fare far better financially than the victims they represent. Fee limitation might reduce the number of speculative filings.

Findings and awards vary widely from case to case and state to state. The Nebraska Supreme Court last year upheld a state workmen's compensation board award to the widow of a man who had installed asbestos insulation for some 40 firms over 35 years. Lacking a more equitable formula, the board had simply assessed the last company the man had worked for. Statutes of limitations also vary widely from state to state, making it possible for Californians to collect large damages, for example, on claims that could not even be filed in New York. A uniform code may be the answer.

In cases where a widespread hazard has been belatedly discovered, separate court suits are highly inefficient in economic terms. Aside from plaintiff lawyer fees and court costs, product liability cases have piled large new legal costs on business corporations. Newsweek not long ago came up with the estimate that the Fortune 500 spend some $2.5 billion a year on lawyers. Consumers pay for corporate law just as they pay for the steel, machinery or engineering talent corporations use. Some chemical companies, wary of product liability suits, even have set up "product stewardship" departments, at some cost, to monitor the safety of products their customers make with their chemicals.

In the asbestos field, Congress has been groping for a more efficient way to deal with claims, mainly through an industry-financed fund. This effort, however, also has become, adversarial, pitting Democrat George Miller of California against Manville et al. Congressman Miller wants to exclude existing suits. Manville wants them covered and also wants the government to pay part of the cost. Clearly, such funds can become political footballs, as black lung compensation for coal miners has demonstrated. But it should not be beyond the wit of Congress and industry to come up with an efficient way of compensating asbestos victims fairly.

Finally, a word about asbestos itself. It has about 3,000 commercial and industrial uses, some of them vital to human safety. We can't see why the producer of such a valuable product should be forced into bankruptcy for self-protection. Tort law has become a vast tangle, and whatever else Manville has achieved, it has called attention to the need for untangling it.

KMX 02133

KMWK 003884

*THE WALL STREET JOURNAL, AUG. 30, 1982*

## Dole Says Manville Filing to Affect Review Of U.S. Bankruptcy Code by Senate Panel

By a WALL STREET JOURNAL Staff Reporter

WASHINGTON — Manville Corp.'s unusual bankruptcy law filing last week is intensifying a partial review of federal bankruptcy law already under way in Congress.

Manville's decision to seek protection under Chapter 11 of the Bankruptcy Code because of a barrage of lawsuits charging health damages from asbestos it produced was criticized as "dubious and unusual at best," by Sen. Robert Dole (R., Kan.). Sen. Dole heads a judiciary subcommittee that is studying a part of the Bankruptcy Code that apparently is related to Manville's move. Sen. Dole indicated the panel should consider changing the law to ensure that other companies don't file for Chapter 11 protection when faced with product-liability lawsuits.

Manville took the highly unusual action even though its construction and forest-products businesses are, according to the company, "in good shape." But the company said it is "completely overwhelmed by the cost of asbestos health lawsuits filed against us." The claims against the company will be frozen as a result of the filing.

Also, as a result of filing under Chapter 11, the bankruptcy court, rather than federal and state courts, will decide the outcome of the suits. The company will gain a delay in legal action while its reorganization proceeds, and it won't have to fight thousands of different cases across the country, according to one bankruptcy expert.

According to some legal experts, Manville's situation might have become more complicated if it had delayed its filing. A recent Supreme Court decision called into question a company's use of the bankruptcy code as a means of defense against such issues as product-liability lawsuits. The court ruled that bankruptcy judges should be restricted to ruling on issues directly related to bankruptcy proceedings and shouldn't be permitted to review other issues "arising in or related to" bankruptcy cases, such as product-liability cases.

One of the majority opinions cited the fact that the 1978 law lets bankruptcy judges decide legal issues previously reserved for federal district courts but doesn't give the judges the life tenure or salary protection that other federal judges are provided under the Constitution.

The court's ruling takes effect Oct. 4, unless Congress amends the law to grant federal bankruptcy judges such job protection. Currently, bankruptcy judges are appointed for 14-year terms and their pay can be reduced by Congress.

The House Judiciary Committee earlier this month approved a measure that would give the bankruptcy jurists lifetime tenure and salary protection. Sen. Dole's subcommittee recently held hearings and will begin drafting legislation when Congress returns from its recess Sept. 8.

Sen. Dole said the Manville filing might force the Senate to consider a broader amendment, but he left unclear what it might contain. "America's bankruptcy system can ill afford the additional strains placed upon it by those who would use its protection for shelter against personal or corporate attacks where other remedies . . . would seem more appropriate," the senator said in a statement.

## Eagle-Picher to Retain Level of Its Dividend, Despite Asbestos Suits

By a WALL STREET JOURNAL Staff Reporter

CINCINNATI—Asbestos-related lawsuits are gobbling between 10% and 15% of Eagle-Picher Industries Inc.'s cash flow, but the company doesn't intend to cut its current 24-cent quarterly dividend and "in no way" is contemplating filing a Chapter 11 petition, company officials said.

Thomas E. Petry, president and chief executive officer, said the 10% to 15% outflow "has an impact but it doesn't hurt our ability to finance moving into new product lines or major capital expenditures because that's the ultimate way to overcome the asbestos problem—to outgrow it."

Manville Corp. filed for protection under Chapter 11 of the federal Bankruptcy Code last week because of asbestos lawsuits. The filing freezes pending litigation and provides court protection from creditors.

Mr. Petry, however, exhibited confidence in Eagle-Picher's ability to handle the asbestos problem, at least for a lengthy period. "Our cash requirements for asbestos, while having grown to the present $7 million-plus a year, aren't going to mushroom soon, he said. "We know the pace of actual cash outflows. We can't determine the insurance coverage, but obviously we have some idea of that," he added in an interview.

Eagle-Picher, a maker of machinery, automotive and industrial goods, he said, is prepared to operate on the assumption that the litigation will continue to siphon the 10% to 15% of cash flow "indefinitely" or until a broader resolution of the problem is reached. The company's cash flow has been between $40 million and $55 million the past three years.

Eagle-Picher is one of a number of defendant corporations against which individual claims have been filed for alleged damage to health because of exposure to asbestos. Eagle-Picher made asbestos-content insulation under government contract in the 1940s and 1960s. It discontinued using asbestos in 1972.

So far, through 1981, Eagle-Picher settled 1,400 suits of 11,700 filed at an average $7,000 each, including legal costs.

KMX 02134

KMWK 003885

Tillinghast, Nelson & Warren

KMH-AR0002008

KMX 02135

THE WALL STREET JOURNAL, FRIDAY, AUGUST 27, 1982

# Despite Strong Business, Litigation Forces Manville to File for Reorganization

## Attention: Manville Corporation Shareholders, Employees, Customers, Suppliers and Creditors

On Thursday, August 26, Manville Corporation and its principal American and Canadian affiliates filed voluntarily for reorganization under Chapter 11 in New York.

In the following interview, John A. McKinney, Manville's Chief Executive, answers questions about the background of this startling development:

**Q.** Mr. McKinney, this announcement was a surprise. What's wrong with Manville's operations?

**A.** Nothing is wrong with our businesses. Filing Chapter 11 does not mean that the Company is going out of business or that its assets will be liquidated. Thousands of asbestos-health lawsuits are the problem! We're the American and world leader in a number of markets, mostly related to construction. During the current recession our sales have held up well and we've operated at better than break even (if you include litigation expenses). We've slimmed down too, having eliminated more than 1500 salaried jobs in the last six months. We'll continue to generate substantial cash flow. Our Chapter 11 lawyers tell me Manville has stronger business and cash flow than any other big company that's ever filed.

**Q.** Your business are in good shape, but you filed under Chapter 11? Why?

**A.** We're overwhelmed by 16,500 lawsuits related to the health effects of asbestos, with many more projected. The federal government has refused to allow us responsibility to its shipyard workers. Congress has failed to act to provide compensation for claimants. Chapter 11 is the only orderly way for the Company to handle the litigation and treat everybody fairly. You may have read recently that another publicly held asbestos manufacturer has taken the same step.

**Q.** Could you have avoided Chapter 11?

**A.** No. To avoid Chapter 11, we would have had to strangle the Company slowly, by deferring maintenance and postponing capital expenditures. We would also have had to cannibalize our good businesses just to keep going. If current trends had continued we would have had to mortgage our plants and properties and new debt would be most difficult and expensive to obtain. This is no way to go forward. Chapter 11 avoids these problems and preserves our operations.

**Q.** Will Manville go out of business?

**A.** No. Our businesses will keep operating, very smoothly, we believe.

**Q.** Will any of your 25,000 employees lose their jobs?

**A.** I don't think Chapter 11 will cause a single employee to lose a job, pay or benefits. In fact, we believe Chapter 11 is the best way to permit the Company to operate normally, providing jobs and useful products, despite all the litigation. Most important, I want to keep our employees' morale up. They've done a bang-up job to keep Manville lean and competitive.

**Q.** Can you pay your suppliers?

**A.** We don't expect any significant problem in making full, timely payment for new shipments after our filing.

**Q.** What effect will Chapter 11 have on your customers?

**A.** None. We will continue to manufacture and ship high-quality products and provide the same services, as always.

**Q.** What will happen to the lawsuits?

**A.** The Chapter 11 filing automatically stays all lawsuits pending against us. New lawsuits are also automatically stopped. We hope to establish an effective system to handle these claims in Chapter 11.

**Q.** What are all these lawsuits really about?

**A.** It's a long story. Here's the bottom line: Not until 1964 was it known that excessive exposure to asbestos fiber released from asbestos-containing insulation products can sometimes cause certain lung diseases. Since the mid-70s, lawsuits have been brought against Johns-Manville, our subsidiary, on behalf of nearly 20,000 people alleging injury from excessive asbestos exposure. We have disposed of about 3,500 of these cases by settlement or trial. In a significant number of cases tried, juries have found that we were not at fault and acted responsibly in light of then-existing medical knowledge. Nevertheless, new lawsuits have been coming in at a rate of 500 a month—every month! In the absence of Congressional action, the board of directors concluded there is no conceivable resolution to this burden, other than Chapter 11. Just to put it in perspective, Manville has stated that asbestos-health litigation surpasses in size all the automobile accident suits pending across the nation before no-fault insurance laws were adopted.

**Q.** 20,000 plaintiffs? 6,000 new ones a year? Where are these suits coming from?

**A.** Well, many of them come from workers in shipyards and industries which used our asbestos fiber and products. Decades can pass between excessive exposure to asbestos and onset of the disease. For instance, there was excessive insulation on the steam pipes and boilers on most ships built or refitted during World War II. The largest group suing us now consists of shipyard workers claiming recently manifested injury from asbestos exposure during wartime service, 40 years ago.

**Q.** What about your insurance? Shouldn't the insurance companies take care of the problem?

**A.** Over the years, Johns-Manville Corporation's former insurance broker bought insurance coverage for it totaling hundreds of millions of dollars. Right now, however, only one company is paying, and it pays only a small part of each claim.

**Q.** Why is that?

**A.** The whole subject disgusts me. Now, when we need the coverage, with one exception, the insurance companies are reneging. We sued them all in California in early 1980 to force payment. Yet, won't believe it, but even now, 30 months later, we still aren't sure which judge will preside over the case. As a result the case has gone nowhere. As much as anything else, the sad turn of insurance companies has made it necessary for us to take this action. I have instructed that our damage claims in the California case be increased by five billion dollars to penalize companies' creditors and shareholders for their losses.

**Q.** How much do the asbestos lawsuits cost you?

**A.** Including our outside legal fees, the cost is currently over $40,000 per case. This is a sharply higher than our average in prior years. Internal legal staff costs are also substantial.

**Q.** If all 16,500 currently now pending cost $40,000 to settle, that would total over $660 million. Without payment from your insurance companies, your problem is obvious.

**A.** Right! And that doesn't take into account the cases yet to be filed. Talking about legal costs,

one of the truly outrageous aspects of this situation is the amount of money being poured down the drain in litigation expenses and contingent fees paid to plaintiffs' lawyers. Our best guess is that the injured worker receives less than a third of the total cost of these suits. The court system, with separate individual trials, is too inefficient and haphazard for a massive problem like this. We need an effective, practical national system which delivers maximum payments to injured workers, minimizes the costs of delivering those payments and withholds payment to those with no disability.

**Q.** What do you mean by haphazard?

**A.** There is no better word to describe our experience to date in the litigation. We had one suit from a plaintiff with doubtful asbestosis who had retired on a full disability pension with a broken ankle. He received an additional award for asbestos disease of one and a quarter million dollars. We have seen others totally disabled or in fact dead who received no award from the jury. In one recent trial in Texas, five separate juries hearing five different cases were empaneled and heard the same evidence before the same judge in the same courtroom at the same time. Their findings ranged from no liability to punitive awards. Maybe haphazard is too weak a description. This type of toxic tort litigation is an intolerable gambling exercise for both plaintiff and defendant.

**Q.** Why did you file now?

**A.** We're a public company. We are required to comply with certain accounting requirements. Under these rules, we're supposed to estimate the costs of current and probable litigation whenever possible and create a reserve for the liability in an amount equal to the estimate. When the asbestos cases began to proliferate, we couldn't estimate that probable number of cost, and our auditors qualified their opinion about our financial statements. When we found that the number of new cases was not declining and our "data base" of pending cases was large enough to assist in making projections, we hired epidemiologists and other professionals to develop an estimate of probable future disease cases. Early this month, they finished their work. On the basis of their work so far, we forecast that we could get at least 32,000 more lawsuits on top of the 20,000 already asserted. Some people outside Manville have assumed many more claims than that.

**Q.** A total of 52,000 lawsuits at a cost of $40,000 apiece could mean a total cost of two billion dollars and that doesn't include an inflation factor. Could Manville afford it?

**A.** Not on our own. Our businesses are strong and viable, but they might not be able to pay a bill that big. Even if we could pay, without the protection of Chapter 11, it would cripple us. The cost of handling paperwork for this number of cases is staggering. We have to incur that cost in all events and sometimes we are pressured by the courts to pay settlements without court determination that disability exists. We also might have to sell good businesses to raise cash. In Chapter 11, we can keep these businesses going and use their earnings to pay our liabilities. And timing is of course a problem. We have limited control over the timing of lawsuits and the ability to match timing of litigation payments against available cash. Disregarding the litigation, we are a low-debt company with a book net worth of $1.1 billion. When a reserve is booked, net worth must also be reduced. The booking of a large reserve now for current and future asbestos health liabilities would wipe out most of our net worth. Without showing a good-sized net-worth on our balance sheet, affordable credit would have dried up, and we simply could not have operated. So, when our board of directors learned this month of the probable need for a large reserve, it considered the options and concluded we had to file for relief under Chapter 11.

**Q.** How do you feel about this?

**A.** Awful. I've never had to do anything I hated more. Our loyal suppliers, lenders and shareholders all may suffer losses for their credit and investment exposures before our Chapter 11 filing. Losses could be very, very large for our present shareholders. Then, too, the many people who do have disabling injuries from excessive exposure will be hurt. Their claims will be delayed and reduced. Still, it seems to us that the only orderly way to treat everyone fairly is through a court-supervised Chapter 11 proceeding.

**Q.** Most people think disabled workers are fully protected by workers' compensation. How is it they can sue you?

**A.** You're partly right. Workers' compensation covers an employer's liability to its employees for injury in the workplace. The law has been interpreted to make "employer" and "employee" very restrictive terms. This means that a 1940's employee of a shipyard can get workers' compensation from the shipyard, but he can't also sue us for having supplied the allegedly defective product. I don't agree with that, but the fact is we are being sued in virtually every state because of it.

**Q.** Isn't there some other national program for people injured while on the job?

**A.** There are programs in other industries, but not for asbestos workers. There should be a statutory compensation program for asbestos injuries. We've tried to get a program passed, but Congress has been preoccupied. This is another reason we've been forced into Chapter 11. No other country uses the court litigation system to provide compensation for occupational disease.

**Q.** How long will you be in Chapter 11?

**A.** That depends. I've ordered our lawyers to go full blast. One of the biggest problems will be court approval of the estimated amount that is the base for producing liability claimants. Once we get that approved, I think that getting out of Chapter 11 ought to be just a matter of finishing up the legal proceedings. In the meantime, I understand that a company in Chapter 11 is allowed to conduct as a plant in the ordinary course of business without court approval.

One other thing needs attention. Our lawyers tell me that Congress needs to act by October 6 to straighten out an important technical point of bankruptcy court jurisdiction. Important aspects of our Chapter 11 case could be stalled until we get new legislation. I hope Congress will resolve this important technical problem quickly and move forward a resolution of occupational disease litigation so that the thousands of claimants and voters caught up in this problem will be spared the extensive, inefficient and haphazard litigation system we have been saddled with. I also hope the government will see fit to its responsibilities for having placed a heavy burden on causing the disease problem.

**Q.** Is there anything else we missed?

**A.** Yes. You should know that I and the people who work for the Company have toiled every stone at least once serving an onerous solution to this problem. Chapter 11 hurts, yes. However, our board believes Chapter 11 is the best way to protect our businesses. We expect to emerge from Chapter 11 stronger than ever. We are determined to make the best of this for everyone involved.

August 27, 1982

KMH-AR0002009

August 11, 1982

## Radical Tactic

### Manville's Big Concern As It Files in Chapter 11 Is Litigation, Not Debt

#### Bankruptcy Petition Freezes Asbestos Suits, May Prod Government to Help Out

#### 'They Want a Bail-Out Bill'

DENVER—Manville Corp. has filed a bankruptcy petition although it is far from broke.

In a highly unusual—and unexpected—development, the financially strong construction and forest-products giant sought protection yesterday under Chapter 11 of the federal Bankruptcy Code for political and legal reasons.

"Our businesses are in good shape despite this recession," John H. McKinney,

*This article was prepared by Wall Street Journal staff reporters Neil Maxwell, G. Christian Hill and Raymond A. Joseph.*

Manville's chairman and president, said. But he added: "We are completely overwhelmed by the cost of the asbestos health lawsuits filed against us." The company has 16,500 claims pending against it now, with 500 new ones being filed each month. The lawsuits, which essentially charge health damage from exposure to asbestos produced by Manville, will be frozen as a result of the Chapter 11 filing.

Manville apparently decided to file for Chapter 11 protection after a recent outside study brought its legal problems into sharp focus. The study concluded that 52,000 such suits might eventually be filed, and they might cost $2 billion. "I think that's what did it," says R. Jerry Falkner, an analyst with Underwood Neuhaus & Co. in Houston. "Under accounting rules, once you have an estimate of a liability, you have to set up a reserve, so their net worth of $1.1 billion would have been wiped out."

##### Role of Government Cited

The bankruptcy filing also appears to be an attempt to influence the federal government, which Manville and others in the asbestos business contend should share the burden of liability for asbestos health damage because the product was used in U.S. shipbuilding efforts during World War II. Mr. McKinney said that Manville's Chapter 11 action "might not have been necessary if the government had accepted financial responsibility for its role in causing much of the disease."

Fred M. Baron, a Dallas attorney who represents clients suing Manville and others for asbestos damages, says, "They are trying to force the government's hand. They want a bail-out bill. That's 100% behind their filing."

Manville Corp., formerly Johns-Manville Corp., is the Western world's leading producer of asbestos, and company officials have conceded that this has helped to make Manville one of the most sued companies in the world. In recent years, asbestos has become known as the cause of deadly lung diseases that often don't show up until 20 or 40 years after exposure.

The Manville Chapter 11 filing is the most dramatic in a series of maneuvers within the beleaguered industry to minimize the impact of accumulating asbestos litigation. All told, some 30,000 claims have been filed against some 260 asbestos concerns to date.

##### UNR's Chapter 11 Filing

A similar Chapter 11 filing was made July 29 by Chicago-based UNR Industries Inc., a steel fabricator that is swamped by damage suits although it hasn't made an asbestos product since 1962. UNR weighed various options—including liquidation—before deciding on Chapter 11 as "the most prudent course," says Malcolm Gaynor, a lawyer who is handling UNR's reorganization.

After UNR filed for bankruptcy, Manville began making the rounds of federal and state courts in which suits had been filed naming UNR and Manville as co-defendants. Manville argued that since it was a co-defendant, legal action should be stayed against it as well as UNR because of the Chapter 11 filing.

Plaintiffs' attorneys in the asbestos litigation are highly cynical about the Chapter 11 action, viewing it as ploy to head off the relentless stream of litigation. "It's a fraud on the bankruptcy laws," declares Ronald L. Motley, a Barnwell, S.C., attorney who represents some 3,000 asbestos plaintiffs.

Alluding to a series of bleak announcements in recent weeks by companies facing asbestos claims, Mr. Motley says: "The script now isn't hard to follow: First you cut the dividend, then you eliminate it, and finally you file for Chapter 11." Manville followed this sequence. Raymark Corp., formerly Raybestos-Manhattan Inc., omitted its dividend earlier this week after reducing it last year. But the company says it has "no intention" of filing for Chapter 11.

##### Other Filings Predicted

William F. Bailey, senior vice president of Boston-based Commercial Union Insurance Cos., predicts that other asbestos companies "may follow Manville and UNR" into Chapter 11.

The Manville and UNR filings may benefit insurers who are battling one another and their asbestos-company clients over the payment of asbestos damage claims. "As we read it now," Mr. Bailey says, "any suit that Manville may have had going against an insurer will also be stayed."

Manville, on the other hand, cites insurers' role in its Chapter 11 filing. Mr. McKinney, in an advertisement placed in newspapers today, says that Manville's insurers haven't been paying the company's claims, and so "as much as anything else, the bad faith of insurance companies has made it necessary for us to take this action."

One large insurance corporation, ironi-

*Please Turn to Page 8, Column 1*

KMX 02136

KMWK 003887

Tillinghast, Nelson & Warren

KMH-AR0002010

8          THE WALL STREET JOURNAL, Friday, August 27, 1982

# Radical Tactic: Filing Chapter 11 Bankruptcy Plea, Manville Corp. Takes Aim at Costly Asbestos Suits

*Continued From First Page*

cally, is listed among Manville's largest unsecured creditors — Prudential Insurance Co., holding $68 million of debt. Other large creditors: Morgan Guaranty Trust Co., $36 million; Bank of America, Chemical Bank, and Citibank, each for $20 million; Republic National Bank of Dallas, $12 million; and Continental Illinois National Bank and Wells Fargo Bank for $10 million each.

The asbestos battle, meanwhile, has also been heating up in Washington. Congress has three bills pending that would partly bail out asbestos manufacturers, but all have stalled because either industry or labor has strong objections to certain provisions.

Manville has fought for a bill that would require the federal government to pay for almost all of the cost of compensating asbestos victims, but it hasn't gotten as far to first base. One bill calls for 50% of the cost to be picked up by the government, but observers say that, too, has little chance.

The most talked-about bill is one introduced by Democratic Congressman George Miller of California, chairman of the House Labor Standards subcommittee. It would set up an industry-financed fund to provide pensions for injured workers. It would allow suits already filed to proceed but would prohibit future suits. All industries that used asbestos products would contribute to some degree. But Manville and other manufacturers vigorously contest the bill because of its cost and its failure to deal with present suits.

John Lawrence, staff director of the Labor Standards subcommittee, says Congress is apt to view Manville's bankruptcy filing with deep suspicion. "We are going to make sure this isn't a little corporate shuck and jive" to escape liability, he says.

Congressman Miller suggests that Manville may have escaped the reach of his bill by filing under Chapter 11. "We have to see whether this cuts off our ability to include Manville," he says. "What if Manville won't be there as a contributor to the fund? Will other manufacturers show a greater interest in the bill, or run to bankruptcy court themselves?"

From the standpoint of its balance sheet, Manville Corp. is considered the healthiest giant corporation ever to file for Chapter 11. Its June 30 financial statement boasts a net worth of $1.1 billion, with short-term debt of

## Dow Jones May Change Industrial Average List

*By a WALL STREET JOURNAL Staff Reporter*

NEW YORK—Dow Jones & Co. said it is considering possible changes in the list of stocks included in the Dow Jones Industrial Average.

The move was prompted by the bankruptcy petition of Manville Corp., one of the 30 stocks in the average, and the New York Stock Exchange's plan to suspend trading in the stock Sept. 10.

Johns-Manville Corp., which changed its name last year, became a component of the average Jan. 29, 1930, replacing North American Aviation. It is believed to be the first component of the average to file for bankruptcy protection since the 30-component average began Oct. 1, 1928.

If and when a substitution is made for a component of the index, it wouldn't have any immediate effect on the average, because the divisor used to calculate the average is changed when a substitution is made. The change assures that the "new" average is the same as the previous one.

Current calculations of the average include Manville at 7¾, the price of its last trade on Wednesday.

$102 million and long-term debt totaling $498.7 million. This is considerably better than the one-to-one debt-to-equity ratio considered satisfactory for large manufacturers. The company earned $60.3 million in 1981 but had a loss of $25.1 million for the first half of 1982, because of a recession-related decline in demand for its products.

The financial statement didn't contain an estimate of the liability from the asbestos suits. The company did, however, make detailed estimates of potential liability in yesterday's bankruptcy petition. It stated that through the first half of this year it had settled about 3,500 asbestos-related claims, for an average of $16,600 per claim. It said the current cost of settling claims was running about $40,000 per claim. In addition, Manville said, in five cases decided during the first half of this year, it was held liable for punitive damages averaging $616,000 per case.

The company said that its board and a special committee formed to review the situation concluded that the potential costs of asbestos cases "could and probably will exceed Manville's ability to pay and finance the continuing operation of Manville's businesses." It added that the total "financial burden" could range from 12 billion "to many times that amount over the next 20 years."

So-called punitive damages have become a major worry for asbestos concerns. Two years ago, the California Supreme Court ruled that plaintiffs were entitled to punitive or other damages because Manville had fraudulently concealed its knowledge of asbestos hazards from workers. Previously, recovery of damages by Manville employees

had been limited to workers' compensation awards specified by state laws; for plaintiffs not employed by Manville, only compensatory damages had been awarded.

"I think what set them on this course was punitive damages," says Michael P. Mealey, managing editor of the Asbestos Litigation Reporter, a publication devoted to covering the asbestos legal battle. "Those damages aren't covered by insurance—they come right out of the company's pocket."

Filing Chapter 11 halts all legal action against Manville. The bankruptcy judge, rather than federal and state courts, now decides the outcome of cases, according to bankruptcy expert Vern Countryman, a professor at Harvard University. The company will benefit not only from a delay in legal action while its reorganization proceeds, he says, but also from not having to fight thousands of different cases across the country.

Mr. Countryman sees a good chance that Manville will emerge from Chapter 11 proceedings as a sound operation. If the net worth figure of $1.1 billion "is anywhere in the ballpark," he says, "they should emerge from a reorganization with something left for shareholders."

In a sense, Manville's decision pitted the interests of its shareholders against the growing burden of its legal liability, and the shareholders lost, at least for the time being. Common stock worth about $609 million in 1981 is now worth little or nothing because it is so illiquid and the ultimate value is so speculative. Preferred shares worth $112.6 million Wednesday are also now of questionable value.

The market obviously sensed Manville's growing difficulties. The common stock declined from a high of $26.50 in 1981 to a recent low of $6.875. It closed at $7.875 Wednesday on the Big Board. The market value of the common stock at that price is $186 million. The stocks didn't trade yesterday, and the New York Stock Exchange said it will suspend trading in the shares Sept. 10.

Asbestos has been linked to the development of lung cancer; to mesothelioma, a cancer of the lining of the lungs; and asbestosis, a lung disease similar to emphysema. Asbestos miners, former employees of companies that manufactured asbestos products—and their survivors—now are among those suing for compensation for illness and death allegedly caused by the mineral.

To one victim of asbestosis, Manville's bankruptcy filing is but one more attempt to escape a court award and other litigation that has been pending for five years. Jim Vermeulen, a 55-year-old former worker at Manville's Stockton, Calif., asbestos concrete pipe plant, has a personal injury and fraud suit against Manville, and two years ago the California Supreme Court ordered Manville to pay him $28,000 in rehabilitation benefits.

Manville is still contesting the $28,000 award in a lower court. He says, of the bankruptcy filing, he says "It is as plain as the nose on my face that Manville will do anything it can to evade responsibility."

KMWK 003888          KMX 02137

Tillinghast, Nelson & Warren

KMH-AR0002011

THE WALL STREET JOURNAL, Thursday, August 5, 1982

# Corporate Dividend News

## Manville Corp. Skips Payout, Fears Harm From Asbestos Suits

*Staff Reporter of* THE WALL STREET JOURNAL

DENVER—Manville Corp., the big asbestos producer, omitted its quarterly dividend and conceded for the first time that the impact of rapidly growing asbestos-related health-damage claims could greatly hurt its financial health.

The company had cut its quarterly paid last May to 20 cents a share from 48 cents, the first reduction since 1940.

The company, the largest producer of asbestos in the non-Communist world and a substantial manufacturer of construction products, said it took the action after receiving an outside consultant's report on the possible impact of asbestos litigation. The company quoted the report as saying that "commencement of new asbestos health litigation against members of the Manville corporate

group may well continue unabated for a number of years.

"The board appointed a committee to review the study "and to appraise the potential future impact on the company of pending and anticipated asbestos health cases, the possible need for creation of substantial reserves and the strategic and financial options available."

In the annual report, Manville had maintained there wasn't any reason to set up reserves, as the outcome of the asbestos-suit torrent "cannot be reasonably determined." But the company's auditors have qualified for two years their opinion of the annual report, because of possible liability.

More than 16,000 plaintiffs, mostly former asbestos workers either for Manville customers or for the U.S. government in World War II shipyards (or their survivors) have filed at least 11,000 lawsuits, claiming health damage or death resulted from exposure to company products.

Manville's deepening fiscal troubles have been apparent for some time. In the first quarter the company had its first quarterly loss in 50 years. Then it nearly quadrupled that loss in the second quarter.

Some analysts thought the dividend was

in jeopardy but the omission came as a jolt to others.

"I'm frankly surprised," said Barbara Alexander of Smith Barney, Harris Upham & Co. "Management had led everybody to believe they would retain the dividend as long as possible."

As recently as June, John A. McKinney, chairman, said he didn't expect further cuts in the dividend. The Smith Barney analyst said outside directors may have forced the move. "It would appear that the outside directors, who control the board, must believe that they need the cash, or that things are worse than company pronouncements have led people to believe," she said.

Yesterday, Manville said "the burden of the existing case-load, combined with the continued incidence of new asbestos health litigation at current levels, could have a material adverse effect on Manville's consolidated financial position and earnings."

Suits against the company claiming health damage or death from exposure to asbestos has been multiplying for more than 9%, recently its liability has increased, with the allowance, in some cases of punitive damages. Such damages aren't covered by insurance, as actual damages

are. Manville asserts that it has insurance to pay for $600 million of insured claims.

The company has begun listing "asbestos health costs" as a line item in earnings statements, and it is a growing item. The second-quarter figure rose to $5 million before taxes from $2.7 million a year earlier. For the half, it rose to $8.6 million before taxes from $5.2 million.

The forest-products and construction company has also been having other problems, including slumping sales of construction products. The second-quarter loss was $19.9 million, compared with profit of $11.4 million, or 22 cents a share, a year earlier.

KMX 02138

KMWK 003889

Tillinghast, Nelson & Warren