# EXHIBIT 26



*Public Policy Monograph*
*December 2001*

# Overview of Asbestos Issues and Trends

AMERICAN ACADEMY OF ACTUARIES

NS00000802

# AMERICAN ACADEMY *of* ACTUARIES

The American Academy of Actuaries is the public policy organization for actuaries practicing in all specialties within the United States. A major purpose of the Academy is to act as the public information organization for the actuarial profession. The Academy is non-partisan and assists the public policy process through the presentation of clear and objective actuarial analysis. The Academy regularly prepares testimony for Congress, provides information to federal elected officials, comments on proposed federal regulations, and works closely with state officials on issues related to insurance. The Academy also develops and upholds actuarial standards of conduct, qualification and practice and the Code of Professional Conduct for all actuaries practicing in the United States.

Prepared by the American Academy of Actuaries Mass Tort Work Group

Jennifer L. Biggs, FCAS, MAAA - *Chairperson*
Raja R. Bhagavatula, FCAS, MAAA
Ralph S. Blanchard, III, FCAS, MAAA
Bryan C. Gillespie, FCAS, MAAA
Lee R. Steeneck, FCAS, MAAA
Kimberley A. Ward, FCAS, MAAA



## December 2001

Richard C. Lawson, Executive Director
Noel Card, Director of Communications
M. Todd Tuten, Director of Public Policy
Greg Vass, Casualty Policy Analyst

American Academy of Actuaries
1100 Seventeenth Street NW
Seventh Floor
Washington, DC 20036
Tel (202) 223-8196
Fax (202) 872-1948
www.actuary.org

© *2001 by the American Academy of Actuaries. All Rights Reserved.*

NS00000803

# Overview of Asbestos Issues and Trends

## Table of Contents

Introduction ................................................................................................1

History of Asbestos Usage ..........................................................................1

Health Risks Associated with Asbestos Exposure ......................................2

Current Personal Injury Claim Situation ..................................................3

Concerns of Major Parties Involved in Asbestos
    (Personal Injury) Litigation ................................................................5

Prior Efforts to Solve the Asbestos Problem ............................................8

Summary and Conclusions ........................................................................8

Exhibits and Reference Lists ....................................................................10

### Executive Summary

The asbestos problem, initially recognized decades ago, is not going away. Recently, asbestos litigation has been described by the U.S. Supreme Court as an "elephantine mass[1]" and by A.M. Best as a "tidal surge.[2]" Litigation that most thought would decline by the end of the 20th century is accelerating. The number of annual claim filings is increasing. The size of awards made to settle claims is also increasing. Two recent estimates from actuarial consulting firms long-involved in such work indicate that the ultimate costs arising from U.S. exposure to asbestos could range from $200 to $275 billion. Approximately 2,000 people per year are dying from mesothelioma, a signature disease of asbestos. However, many defendants assert that the majority of claimants filing claims and receiving awards are not impaired. The mass and cost of the litigation are forcing otherwise healthy companies to file for bankruptcy.[3] As the initial targets in the litigation have become unable to pay their share of damages, plaintiffs attorneys have named additional peripheral defendants (who did not manufacture asbestos and thus contend that they were generally less likely to have known of its dangers to human health) in the lawsuits. Many defendant companies believe they are not getting a fair legal evaluation of their cases in court, and the Supreme Court has twice overturned efforts to resolve the litigation through class action settlements. While Congress has been called upon to act, no major legislative action has yet occurred.

NS00000804

NS00000805



American Academy of Actuaries
1100 Seventeenth Street NW
7th Floor
Washington, DC 20036
Tel (202) 223-8196
Fax (202) 872-1948
www.actuary.org

NS00000806

AMERICAN ACADEMY *of* ACTUARIES

## Introduction

This monograph has been written by the American Academy of Actuaries — Mass Torts Work Group. Its purpose is to provide a brief history of personal injury claims arising out of asbestos exposure to aid in understanding current issues arising out of these claims. The intended audience includes those who may become involved with proposed public policy responses to these issues.

This paper is organized into the following sections:
- History of Asbestos Usage
- Health Risks Associated with Asbestos Exposure
- Current Personal Injury Claim Situation
- Concerns of Major Parties Involved in Asbestos (Personal Injury) Litigation
- Prior Efforts to Solve the Asbestos Problem
- Summary and Conclusions

## History of Asbestos Usage

Asbestos was once considered a "miracle mineral[4]." This naturally occurring silicate has six varieties[5] and many favorable characteristics, including resistance to fire, heat, and corrosion. It is strong, durable, and flexible - its fibers can be woven into cloth. Asbestos is inexpensive because it is available in abundant quantities. Its versatility has led to its use as a component of numerous products in numerous industries (e.g., building materials such as insulation, roofing, and flooring, brake and boiler linings, wire insulation, gaskets, and ship building - especially during World War II). In fact, asbestos was classified as a strategic material during World War II.[6]

It has been estimated that more than 100 million[7] people in the United States were occupationally exposed to asbestos during the 20th century. This is significantly higher than the 27.5 million Americans previously estimated to be exposed to asbestos between 1940 and 1980 in a 1982 Mt. Sinai School of Medicine study conducted by Dr. William Nicholson, Dr. Irving Selikoff, and George Perkel.[8]

Asbestos use in the United States has been curtailed significantly since its peak of nearly 1 million tons in 1973.[9] After Congress passed the Occupational Safety and Health Act (OSHA) in 1970, increasingly strict standards were imposed to enforce safety precautions in the workplace. However, these workplace safety standards do not protect end-users of asbestos-containing products.

There were approximately 3,500 products in U.S. commerce that contained asbestos when the U.S. Environmental Protection Agency (EPA) attempted to place a complete ban on asbestos in 1989. The EPA's ban was successfully challenged before the 5th U.S. Circuit Court of Appeals in 1991. The case was remanded to the trial court, which left very few portions of the ban intact.[10] Thus, asbestos-containing products are still legal in the United States today. Approximately 600,000 to 700,000 tons of asbestos were imported into the United States during the past ten years and used in various industries; however, the end uses are not tracked effectively, and warning label requirements are vague. Therefore, there remains ongoing exposure to asbestos in the United States today.

Asbestos use continues at significantly higher levels abroad, especially in developing nations. Due to the immediate benefits of some asbestos products (e.g., inexpensive cement pipes to transport clean drinking water or to dispose of sewage), its use is widespread. Unfortunately, in many nations, few safety precautions are being taken, and there is a large number of individuals who may potentially contract future asbestos-related diseases.

1

NS00000807



OVERVIEW OF ASBESTOS ISSUES AND TRENDS

Even if asbestos usage in products ceased immediately throughout the world, potential individual exposure to asbestos fibers would continue, perhaps indefinitely. This residual exposure would be caused by:

- Previously manufactured products containing asbestos that have not been replaced or discarded;
- Dust or other waste remaining in the environment from previous use or incomplete disposal of those products;
- Erosion of naturally occurring deposits in asbestos-bearing rocks.[11, 12]

## Health Risks Associated With Asbestos Exposure

Several diseases have been linked to asbestos exposure, including mesothelioma, lung cancer, other cancers, asbestosis, and pleural injuries. A long latency period from initial exposure to disease manifestation resulted in delayed recognition of its health hazards. This contributed to the unrestricted (or minimally restricted) use of asbestos until OSHA standards were implemented in the 1970s.

| Asbestos Diseases | | |
|---|---|---|
| **Disease** | **Injury[13]** | **Average[14] Latency** |
| Mesothelioma[15] | ■ A malignant tumor arising in the pleura[16] membranes (of the lungs or diaphragm) and pericardial membrane of the heart.<br>■ Symptoms may be vague, including chest pain, shortness of breath, weakness, and weight loss. Diagnosis may be suspected by chest X-ray, but a full pathologist's microscopic exam is needed.<br>■ Fatal within 1 - 2 years. | 30-40 years |
| Lung Cancer | ■ A malignant tumor of the bronchi[17] covering that grows to surrounding tissue.<br>■ Symptoms include chest pains, cough, weakness, and shortness of breath. Chest X-rays may detect the cancer, but a pathologist's microscopic exam is needed.<br>■ Often fatal. | 20-30 years |
| Possibly Other Cancers[18] | ■ Tumors of the throat, larynx, esophagus, stomach, colon, lymphoid.<br>■ X-rays may detect the cancer, but a pathologist's microscopic exam is needed.<br>■ Often fatal. | 20-30 years |
| Asbestosis | ■ A pulmonary insufficiency caused by scarring near alveoli. (As the body tries to dissolve asbestos fibers trapped in lung tissue, it produces an acid that does little damage to the fibers, but may cause severe scarring in the surrounding tissue.[19])<br>■ Diagnosis through physical signs, history of exposure, pulmonary functioning test, CT scan/radiological findings. Some appreciable level of exposure over 10 years is likely required before a detectable significant amount of functioning is lost.<br>■ Slowly progressive, potentially fatal. | 10-20 years[20] |
| Pleural Injuries | ■ Generally nonimpairing fibrosis or scarring of pleura tissue over the chest wall or diaphragm.<br>■ Evidenced by effusion, thickening, plaque, or calcification.<br>■ Do not appear to be pre-cancerous, but may increase risk of developing lung cancer in the future. | 20-30 years |

NS00000808



AMERICAN ACADEMY *of* ACTUARIES

## Current Personal Injury Claim Situation

There have been many epidemiological studies regarding the population exposed to asbestos in various industries, the latency and incidence of disease, and the resulting projections of individuals expected to file asbestos-related claims (see Reference List 1). These projections have varied widely. However, by June 2001, Johns-Manville, the most prominent early defendant in asbestos litigation, had already received more than 500,000 personal injury claims. The Manville Trust (finally approved in 1988 after Johns-Manville declared bankruptcy in 1982) now expects that it will eventually receive about 2 million total claims.[21]

It is estimated that there are currently at least 200,000[22] asbestos bodily injury (BI) cases pending in state and federal courts. About 60,000 new claimants filed lawsuits during 2000[23]. This figure is significantly higher than the average of approximately 20,000 per year experienced by several major defendants in the early 1990s. The increase was not expected based on the epidemiological studies performed in the 1980s and 1990s, partly because these studies underestimated the exposed population. Other reasons for the increased filing rate include:

- The greater propensity of claimants to sue in response to the aggressiveness of some plaintiffs attorneys;[24]
- A "catch-up" of filings after an attempted class action settlement[25] was overturned;
- The need to file claims by a certain date in order to get on the creditor list in a bankruptcy, coupled with the recent bankruptcies of several companies that produced asbestos products;
- Expedited action on the part of the claimants anticipating possible legal reform efforts.

A disproportionate percentage of the claims are filed in state courts in perceived pro-plaintiff jurisdictions, clear evidence some say, of "forum shopping" on the part of plaintiffs attorneys. For example, while Mississippi[26] has only 1 percent of the U.S. population, approximately 20 percent of the pending cases were filed in this state. Similar disproportionately large percentages of cases were filed in Texas, with the number decreasing somewhat after the state enacted tort reform in 1997.

There are currently about 2,000 new mesothelioma cases filed each year.[27] There are another 2,000 to 3,000 cancer cases that are likely attributable (at least in part) to asbestos. There are a smaller number of serious asbestosis cases. The remaining cases are either pleural injuries or claimants who do not currently exhibit signs of injury.[28] It is estimated that more than 90 percent (or more than 54,000 claims filed during 2000) are for claimants alleging nonmalignant injuries. There is significant concern that the awards paid for nonmalignant claims will exhaust funds that would otherwise be available to compensate individuals who will suffer from the more serious asbestos-related diseases.

Many workers with asbestos-related injuries were employed in union trades (such as installers and electricians) and worked at a large number of sites with asbestos-containing products over their careers. Some of these job sites had numerous asbestos-containing products. As a result, many of these workers name a large number of defendants in their lawsuits.

Plaintiffs attorneys typically join several plaintiffs in a group to file claims against multiple defendants. The plaintiffs' injuries are often quite dissimilar, ranging from those who are not currently impaired or who have nonmalignant injuries to those suffering from cancer and mesothelioma. This grouping of claims, defendant companies assert, has forced them to make payments on claims of perceived questionable merit in order to avoid facing the mesothelioma cases in court in front of a sympathetic jury with the potential for substantial punitive damages.

The involvement of multiple plaintiffs and multiple defendants results in a more complicated and expensive process for resolving asbestos claims than for typical tort claims (see Exhibit 1).

3

NS00000809

## OVERVIEW OF ASBESTOS ISSUES AND TRENDS

As a result of asbestos litigation, many companies, including nearly all of the major asbestos manufacturers, have declared bankruptcy (see Reference List 2). As the financial stability of these major players has become impaired and they have been unable to pay their share of damages, the share of awards that must be satisfied by the remaining major defendants has increased, and plaintiffs have named additional peripheral defendants in the lawsuits. While approximately 300 companies were targeted by plaintiffs in the 1980s, more than 2,000 companies have been named as defendants in asbestos litigation today.[29]

The activities that have resulted in asbestos lawsuits include those of the major defendants, such as producers of raw asbestos, installers, and insulators, as well as the activities of the peripheral defendants, who manufactured products where asbestos was encapsulated, were distributors of products containing asbestos, or were owners of premises that contained asbestos. The connection of older peripheral defendants to asbestos is clear (e.g., use of asbestos as an insulating material by boiler manufacturers). However, the connection of some of the newer peripheral defendants to asbestos is not obvious (e.g., Campbell's Soup, Gerber (baby food), and Sears Roebuck.)[30]

The potential culpability of many peripheral defendants is clearly different from that of the major manufacturers (e.g., Johns-Manville), and thus many believe that expecting these peripheral defendants to warn of the dangers of asbestos is unreasonable. Nonetheless, in the current legal system (where the plaintiff's burden of proof as to their injury and its connection to a peripheral defendant's product has sometimes been relaxed for the sake of administrative efficiency), these peripheral defendants are often held jointly and severally liable[31] with the major producers[32]. They are now bearing a substantial portion of the costs of awards relating to decades of asbestos use.

Workers suffering from asbestos-related injuries were originally compensated through the workers' compensation system, subject to statutory benefit limits then in effect. However, in 1973, the plaintiffs in the landmark case of *Borel v. Fibreboard* were successful in holding asbestos manufacturers strictly liable for the failure to warn of an unreasonably dangerous product. Tort theory involved in asbestos litigation has continued to evolve over the years. The sheer number of asbestos claims has severely challenged the court system. Some feel that, in attempting to mitigate this problem, courts often choose not to apply typical negligence-based theories regarding product liability in asbestos cases. Awards for mesothelioma cases typically exceed $1 million, with compensation for cancer and nonmalignant claims being lower. However, a significant portion of the dollars paid by defendants have not reached those who were injured, due to high transaction costs.[33] As the perception of asbestos litigation as a highly lucrative practice area has increased, so has the number of law firms specializing in this work.[34]

Estimates of ultimate personal injury - related costs from exposure of the U.S. population to asbestos range from $200 to $275 billion.[35] Much uncertainty surrounds these estimates due to possible variations in disease emergence and incidence rates and legal costs. There is additional uncertainty as to who will ultimately pay these costs (e.g., whether it is the remaining viable defendants, their insurers, or some other source). Currently it is estimated that $60 to $70 billion of the costs will be borne by the U.S. property/casualty insurance market.[36] As of year-end 2000, U.S. insurers and reinsurers[37] had paid approximately $22 billion and held approximately $10 billion in reserves to pay future claims, as disclosed in their Annual Statements filed with state insurance departments.[38]

4

AMERICAN ACADEMY *of* ACTUARIES

| Evolving Legal Theory | | |
|---|---|---|
| **Date** | **Case** | **Significance** |
| 1973 | Borel v. Fibreboard<br>■ Fifth Circuit U.S. Court<br>of Appeals | ■ Shifted asbestos awards from the workers' compensation system to the court system.<br>■ Six manufacturers held jointly & severally liable using theory of strict liability for failure to warn.<br>  • Joint & Several Liability — adopted by several states. Premise: insulation workers were exposed to products of many manufacturers. Not possible to determine source of asbestos fibers causing injury, and typically, none of the manufacturers provided warnings regarding the dangers of asbestos.<br>  • Strict Liability — Restatement of Torts, Section 402A — adopted by the American Law Institute in 1965. States: "One who sells any product in a defective condition unreasonably dangerous to the consumer ... is subject to liability for physical harm thereby caused to the ultimate user or consumer."<br>■ Court said danger of asbestos was recognized in the 1920s, 1930s. |
| 1982 | Beshada v. Johns-Manville<br>■ N.J. Supreme Court<br>90 N.J. 191, 447 A.2d 539 (1982) | Superstrict Liability — holds asbestos defendents liable due to failure to warn even if the defendant did not know/would not have known of asbestos risk. |
| 1986 | Halphen v. Johns-Manville<br>■ L.A. Supreme Court<br>484 So. 2d 110 (L.A. 1986)<br>p. 4022 3/28/1986 | |
| 1993 | Daubert v. Merrell Dow<br>■ No. 92-102,<br>U.S. Supreme Court | U.S. Supreme Court directed lower federal courts to act as "gatekeepers" to ensure that "new" scientific evidence is relevant and reliable. |
| 1997 | Metro North v. Buckley<br>■ No. 96-320,<br>U.S. Supreme Court | U.S. Supreme Court decided it was inappropriate to render awards for emotional harm and medical monitoring. One of the reasons for the decision was that payments to people who are not ill would facilitate bankruptcy among defendants and would be at the expense of those who have been harmed. |

## Concerns of Major Parties Involved in Asbestos (Personal Injury) Litigation

There are many groups involved in asbestos litigation. Some of the concerns of these groups are outlined below.

<u>Seriously Injured Claimants</u> This group contains those whose injuries are detectable and indisputable (e.g., mesothelioma, some cancers, serious asbestosis). There is generally agreement that these individuals deserve to be compensated in some form for the injuries they have suffered.

■ Due to the short life expectancy of the claimants, this group places high importance on resolving their claims quickly, which often does not take place in the current legal environment.

NS00000811



OVERVIEW OF ASBESTOS ISSUES AND TRENDS

- Compensation systems with high transaction costs diminish funds available to meet this group's greater needs.
- Those who will develop serious illnesses in future years face another risk - that the companies that made the products that led to their injuries may become bankrupt and therefore will be unable to compensate them.

**Nonseriously Injured and Unimpaired Claimants** The majority of the claimants in this group are presently unimpaired, although they may have an x-ray that shows some type of thickening or scarring of the lungs.

- One concern of those with a pleural condition is that if they do not proceed with a lawsuit today, a statute of limitations issue may prevent them from being eligible to recover damages for more serious conditions they may develop in the future. This concern has been addressed in some states (e.g., Massachusetts) through an inactive docket/pleural registry.[38]
- Another concern of this group is that if they do not proceed with a lawsuit now, money may not be available if they develop a serious injury later. For example, awards of punitive damages to today's seriously injured claimants may reduce funds available to pay for the same type of injuries that plaintiffs who currently have less serious injuries may develop in the future.
- Additionally, this group faces future health uncertainty, including the need for ongoing medical monitoring.

**Plaintiffs Attorneys** The issues for the plaintiffs attorneys generally match those of their clients as described above, and also encompass the desire for compensation and reward for the cost of acquiring and developing these cases.

**Judges** Two main concerns of this group are trial docket pressures and fairness of results. These concerns have been voiced as far back as the 1980s and relate to the volume of asbestos lawsuits. It is felt by some that trial docket pressures force actions which speed up the trial process and produce potentially less equitable results, such as where the claims of those with significantly different injuries are consolidated and the periods of time in which to conduct discovery are shortened.

**Major Asbestos Defendants** These are the companies that made asbestos-containing products and have been involved in asbestos litigation since the 1980s. Many of them have filed for Chapter 11 protection.

- For the most part, these defendants have stated that they cannot get a fair trial in state court. This is illustrated in the Babcock & Wilcox and W.R. Grace bankruptcy filings, where the companies are attempting to have their liability determined under federal bankruptcy rules, which require objective medical criteria.
- Another related concern is that the grouping of seriously injured and nonseriously injured claimants may, as a consequence of the "piggyback effect" of juror sympathy, result in awards that are too high for the nonseriously injured.
- This group is concerned that it is paying awards that should be funded (at least in part) by other parties.[40] For several asbestos diseases, there is a material synergistic effect between exposure to asbestos and smoking. To date, however, asbestos company suits against the tobacco industry have been unsuccessful.[41]
- This group is concerned that uninjured plaintiffs are being compensated.

NS00000812



AMERICAN ACADEMY *of* ACTUARIES

- This group is concerned that the current system for compensating asbestos-related injury victims is expensive.
- This group wants to achieve finality - by being able to put the consequences of past business judgments behind them.

<u>Peripheral Defendants</u> An increasing number of these companies (that had asbestos encapsulated in their products or had asbestos on their premises) have been sued in asbestos litigation. There has been an increase in the profile of these defendants largely due to the bankruptcy of the initial asbestos product manufacturers.

- Some members of this group believe that they should not be held liable for asbestos-related injuries, because asbestos in their product was encapsulated and should not have contributed to the injury.
- This group is concerned that it will take on a share of liability that was previously borne by the bankrupt asbestos manufacturers.
- The peripheral defendants say it is unfair to hold them accountable for the same knowledge of health risks as the major defendants in the same lawsuit. This group is also concerned that the vast majority of cases are being brought to trial in venues they perceive to be favorable to plaintiffs. For example, only 2 percent of the original plaintiffs in the Cosey litigation in Mississippi were from the county in which the lawsuit was filed.[42]
- This group also contends that courts too often fail to require the use of objective evidence to evaluate whether claimants are injured. This issue was raised as far back as 1991 when plaintiffs attorney Ron Motley commented "[t]here are gross abuses in our system. We have lawyers who have absolutely no ethical concerns for their own clients that they represent, we have untrammeled screenings of marginally exposed people and the dumping of tens of thousands of cases in our court system, which is wrong [and] should be stopped."[43]
- Another concern of these defendants is that they are held responsible for the liability that should be borne by non-U.S. companies. It can be difficult for plaintiffs attorneys to bring suits against non-U.S. companies, and such suits could ultimately be resolved in federal court. Due to the potential difficulty in bringing suits and since plaintiffs attorneys typically prefer to try cases in state rather than federal court, some U.S. defendants contend that the effort to pursue foreign defendants will rarely be made.
- Defense expenses relative to plaintiffs' awards are considerably higher for peripheral defendants. This is due in part to the fact that a peripheral defendant may be easily named in a suit. However, because discovery often takes place very close to trial, the peripheral defendant may find it nearly impossible to obtain dismissal from the case before incurring significant costs. Peripheral defendants often pay to settle lawsuits even when they do not believe they have liability, because the risk of trying a suit when nearly everyone else has settled is extremely high due to the setoff rules that apply in many states.
- Similar to the major defendants, this group wants to achieve finality and be able to put the consequences of past business judgments behind them.

<u>Insurers and Reinsurers</u> The concerns of this group are generally the same as for their policyholders, the major and peripheral defendants, plus:

- This group is concerned with the interpretation of contracts and the possible liabilities that may be imputed to them, which they never intended to insure.

7

NS00000813



OVERVIEW OF ASBESTOS ISSUES AND TRENDS

- There is increased concern among this group regarding settlements with claimants who currently have no clearly-identifiable injury, and with policyholders making (small) payments to claimants who may not be able to establish product identification. This concern has been publicly voiced by Equitas, the UK insurer, which on June 1, 2001, began to require more disclosure of this type of information before settling claims.
- This group wants predictability of financial results and finality with respect to quantifying their ultimate liabilities.

## Prior Efforts to Solve the Asbestos Problem

Asbestos defendants and their insurers/reinsurers have attempted to create various solutions to the asbestos problem over the years (see Exhibit 2). These efforts include the Wellington Agreement between asbestos producers and their insurers in 1985, the formation of the Center for Claims Resolution (CCR) in 1988, the CCR Futures Deal in 1993 (i.e., the Georgine Settlement), the Fibreboard Settlement in 1993, and the Owens Corning Fiberglas National Settlement Program in 1998. There have been repeated cries for legislative reform, especially after unsuccessful attempts to settle claims on a class action basis (i.e., Georgine and Fibreboard) (see Exhibit 3).

Congress has also been involved in the search for solutions. A federally administered central fund was proposed as early as 1977. However, none of the bills proposed gained adequate support.

More recently, the Fairness in Compensation Act of 1999 (H.R. 1283) was proposed to establish the Asbestos Resolution Corporation. This bill would have used an alternative dispute resolution (ADR) process to reduce lawsuits in the court system. Claimants would have been required to prove medical eligibility for compensation. Awards for pain and suffering, emotional distress, and loss of consortium would have been allowed, but punitive damage awards would have been barred. The bill would have created a pleural registry (inactive docket) for unimpaired claimants. Costs would have been funded by the defendant companies, rather than through tax revenue.

Currently, retroactive tax relief for asbestos manufacturers is being considered (H.R. 1412). This legislation would allow a company to carry back asbestos losses to the taxable years in which the taxpayer was first involved in the production or distribution of asbestos products to reduce income tax payments made in these prior years.

## Summary and Conclusions

Exposure to disease-causing asbestos fibers in the United States and the world has been widespread. Though on the decline, such exposure has not ended and may never totally cease. In the United States, this has resulted in a significant number of personal injury claims against defendants over the past 20 years.

Rather than gradually decreasing over time, the pace of these claim filings has been increasing, for multiple reasons. Several attempts have been made to comprehensively address this situation, but all have failed to date. It has been argued that some attempts to address parts of the problem may have even exacerbated it, by expanding the number of involved parties to include claimants with questionable injuries and minimally or nonliable peripheral defendants.

The size and growth of the problem has led to numerous bankruptcies and calls for a comprehensive legislative response, as many believe that the current legal system is ill-suited to handle asbestos personal injury claims. While several legislative proposals have been discussed over the years, enactment of such solutions does not appear imminent.

8

NS00000814





AMERICAN ACADEMY *of* ACTUARIES

| Historical Legislative Involvement | | | |
|---|---|---|---|
| **Date** | **Effort** | **Details** | **Status** |
| 1977 | Bill sponsored by Rep. M. Fenwick (R-N.J.) — district included location of Johns-Manville. | The bill would compensate asbestos victims through a federally administered central fund. | Reintroduced in 1981; did not pass. |
| 1980 | Asbestos Health Hazards Compensation Act" introduced by Senator Gary Hart (D-Co.). | The bill: ■ Barred the victims of asbestos disease from filing suits under the tort system; ■ Left the administration of asbestos-compensation claims with the states; ■ Called for the establishment of federal minimum standards for compensating asbestos workers. | Reintroduced in 1981; did not pass. |
| 1994 | Bankruptcy Reform Bill of 1994 | ■ Sec. 524g enables debtor in Chapter 11 reorganization to establish a "trust toward which the debtor may channel future asbestos related liability ... to provide explicit legislative guidance to ensure the equitable treatment of mass future asbestos claimants." ■ Creditors obtain at least 50 percent of the value of the company if it emerges from bankruptcy. ■ Bankruptcy allows: • a stay on claims; • requirement of medical criteria; • appointment of a representative for future claimants; • estimations/provisions for the liquidation of claims. | Enacted January 25, 1994. The Babcock & Wilcox Chapter 11 Informational Brief stated that "Congress has provided a mechanism for resolution of asbestos mass-tort claims within the bankruptcy system." |
| 1999-2000 | H.R. 1283 - Fairness in Compensation Act of 1999 | The bill would : ■ establish Asbestos Resolution Corporation; ■ Set up Office of Asbestos Compensation; ■ Create ADR process; ■ Require proof of medical eligibility; ■ Not impose a statute of limitations; ■ Permit full compensatory awards (including pain & suffering, emotional distress, loss of consortium); ■ Bar punitive damages; ■ Receive funding from defendant companies, not through tax revenue. | Passed out of the Judiciary Committee, but never considered by the full House of Representatives; not reintroduced in 107th Congress. |
| 2001 | H.R. 1412 - Retroactive Tax Relief | ■ Amends Internal Revenue Code 468B(b) to provide that no tax be imposed on any settlement fund to resolve present and future asbestos claims. ■ Amends Section 172(f) to provide that the portion of any specified loss attributable to asbestos may be carried back to the taxable years in which the taxpayer was first involved in the production/distribution of asbestos products to reduce income tax payments in prior years. | Introduced and referred to the Ways and Means Committee; has not moved. Proponents: Say the bill would ensure that victims get just compensation and help prevent further bankruptcies. Opponents: Describe the bill as an "industry bailout" and an asbestos "feeding frenzy" for the bar because attorneys will get most of the $300-$500 million that it will cost taxpayers over the next 10 years. |

9

NS00000815

OVERVIEW OF ASBESTOS ISSUES AND TRENDS

Exhibits
    1. The Asbestos Tort Claim Process...............................................................11
    2. Prior Efforts to Solve the Asbestos Problem ....................................12
    3. Calls for Legislative Action.....................................................................14

Reference Lists
    1. Various Epidemiological Studies ...........................................................15
    2. Asbestos Defendants Declaring Bankruptcy ..................................17

Endnotes.....................................................................................................................18

NS00000816



AMERICAN ACADEMY *of* ACTUARIES

| The Asbestos Tort Claim Process | | Exhibit 1 |
|---|---|---|
| | **Typical Tort Claim** | **Asbestos Tort Claim** |
| Plaintiff | One injured party | Blocks of claims:<br>■ filed by same attorney on same date<br>■ have common connection (e.g., same labor union, location, or one-time place of employment)<br>■ involved dissimilar degree of injury/disease suffered |
| Defendant | One clearly identified party | Multiple defendants and complications including:<br>■ long latency<br>■ pervasiveness of use throughout various industries<br>■ many different asbestos products present at some work sites<br>■ efficiencies of plaintiffs' bar |
| Event | Single event causing injury with definable time, location | Multiple years (e.g., each exposure to asbestos fiber is an event, plus fibers are in the lungs causing damage)<br>Multiple locations (e.g., every location over multiple years where asbestos was present) |
| Claim Filing | Short lag between event and filing (a few months to a few years) | Lag up to 40-50 years |
| Forum | Clear, undisputed location where event occurred | Broad discretion for plaintiff to file claim in forum of choice |
| Discovery | Focused | Complicated/expensive<br>■ multiple parties claiming injuries<br>■ dissimilar injuries<br>■ multiple exposures — name and organizational changes<br>■ long time lag — lost records |
| Claim Resolution | Relatively timely (several months to a few years) | Long process due to:<br>■ multiple plaintiffs with varying levels of exposure and medical conditions<br>■ multiple defendants with varying levels of exposure and legal strategies<br>■ "events" over many years at many locations |
| Who Pays? | The defendant or a single insurance policy | The defendants and multiple insurers/reinsurers on multiple policies due to:<br>■ multiple contract wordings<br>■ multiple jurisdictions<br>■ large limits of coverage<br>■ multiple reinsurers<br>■ insolvencies |

11



EXHIBITS AND REFERENCE LISTS



## Prior Efforts to Solve the Asbestos Problem

| Effort | Stakeholders | Purpose |
|---|---|---|
| Wellington Agreement signed June 19, 1985 | ■ 34 asbestos producers<br>■ 16 insurers | ■ Create the Asbestos Claims Facility (ACF)<br>■ Provide claimants with an efficient and more equitable alternative to the tort system<br>■ Reduce legal costs for plaintiffs and defendants<br>■ End disputes over insurance coverage |
| Center for Claims Resolution (CCR) - Formed October 12, 1988 | ■ Originally 21 asbestos producers | ■ Successor organization to the ACF<br>■ Resolve claims for a fair value |
| CCR Futures Deal - 1993 | ■ 20 asbestos producers | ■ CCR's proposed settlement to the Georgine class action[10] |
| Fibreboard[12]<br>(1993 class action settlement) | ■ A single asbestos defendant | ■ Global settlement of 186,000 pending plus future personal injury claims |
| Owens Corning Fiberglas (OCF) National Settlement Program (NSP) - December 1998 | ■ Initially one asbestos defendant, OCF<br>■ Later applied to Fibreboard after it was acquired by OCF | ■ To resolve OCF (and later Fibreboard) claims |

NS00000818

AMERICAN ACADEMY of ACTUARIES

|  | Exhibit 2 |
|---|---|
| **Features/Operation** | **Outcome** |
| ■ Costs shared among the members using a formula based on each producer's previous litigation experience.<br>■ Each member paid percent share, regardless of whether:<br>  ● The producer was named in the suit;<br>  ● The claimant could prove that the injury was caused by that producer's product.[45]<br>■ Claimants required to show an asbestos-related impairment.<br>■ Claims evaluated based on employment, medical and compensation history.<br>■ Claimant could receive a noncash "settlement" if there were no disease (tolled the statute of limitations).<br>■ Claimant could return to the tort system if not satisfied with the ACF's settlement offer.<br>■ The ACF did not pay punitive damages. | ■ The ACF was dissolved October 3, 1998, after withdrawal of the seven largest producer members.<br>■ Resulted largely from disputes among producers over their allocated shares of costs.<br>■ Insurance coverage agreements resolved by the Wellington Agreement remained in place when the ACF was dissolved. |
| ■ CCR was more aggressive than the ACF in settling claims.[46] | ■ After the CCR Futures Deal was overturned, the CCR continued to negotiate and settle claims on behalf of its members. It settled 350,000 claims and paid over $5 billion from 1988 to 2000.<br>■ On February 1, 2001, the CCR announced it was "changing its method of operation to allow members more flexibility and customized representation in handling their individual asbestos liability."[47]<br>■ As of August 1, 2001 CCR will stop settling new asbestos claims on behalf of its remaining 14 members.[48]<br>■ Currently involved in litigation among its remaining members and their insurers relating to settlements agreed to during 2000.[49] |
| ■ Claimant had to provide sworn proof of exposure to an asbestos-containing product of at least one CCR member.<br>■ Claimant had to satisfy certain medical, exposure, and latency criteria.<br>■ Case flow caps (maximum annual claim filings) were specified for the next 10 years.<br>■ Ranges of settlements by disease category were set for the next 10 years, and the increase in average claim amounts for the second 10-year period was limited to 20 percent above the initial levels. | ■ Class decertified[51] because the disparity among the claimants' illnesses was found to be greater than their commonality.<br>■ The Supreme Court observed that "the argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution."<br>■ The reversal resulted in a flood of new claims against CCR member companies. |
| ■ Class did not allow opt-outs due to its limited fund rationale.<br>■ There was also a "Trilateral Agreement" back-up plan for $2 billion funded by two of Fibreboard's insurers — Continental Casualty and Pacific Indemnity — in case the global settlement was not approved. | ■ Settlement rejected by the U.S. Supreme Court in 1999 because:<br>  ● It excluded some potential plaintiffs;<br>  ● There were questions about the fairness of the distribution[53];<br>  ● There were conflicting interests within the class;<br>  ● The Supreme Court held that more consideration should have been given to Fibreboard's financial condition.[54] |
| ■ Initially resolved 90 percent of OCF's pending claims.<br>■ Established fixed payments for future claims without litigation.<br>■ Private agreement between OCF and plaintiff's counsel did not require court approval. | ■ Originally the NSP was well accepted.<br>■ OCF underestimated the size of its liability[55] and the NSP accelerated the timing of payments.<br>■ OCF filed for bankruptcy protection on October 5, 2000. |

13

NS00000819



EXHIBITS AND REFERENCE LISTS

| Calls for Legislative Action | | Exhibit 3 |
|---|---|---|
| **Date** | **Source** | **Comment** |
| 1990 | U.S. Supreme Court Panel (led by Chief Justice Rehnquist) | 1991 report said "situation has reached critical dimensions and is getting worse," and the courts were "ill-equipped to address the mass of claims in an effective manner."[56] |
| 1996 | State v. MacQueen 479 S.E. 2d, 300, 304 (W. Va. 1996) | "Congress, by not creating any legislative solution to these problems, has effectively forced the courts to adopt diverse, innovative, and often nontraditional judicial management techniques to reduce the burden of asbestos litigation that seems to be paralyzing the active dockets."[57] |
| 1997 | Amchem v. Windsor U.S. Supreme Court No. 96-270, June 25, 1997 | The Court observed that "the argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution."[58] |
| 1999 | Ortiz v. Fibreboard U.S. Supreme Court No. 97-1704, June 23, 1999 | Supreme Court again calls on Congress, says existing asbestos litigation is an "elephantine mass ... that calls for national legislation." |
| 1999 | The Fairness in Compensation Act of 1999: Legislative Hearing on H.R. 1283 | "The victims of [the asbestos litigation] crisis are most injured plaintiffs, especially future plaintiffs, who don't get as much as they should; defendants who are bankrupted way out of proportion to harm they caused; jurors and judges whose judgment is skewed by natural human reactions to the cases before them; and society itself, which is paying grotesque sums of money to lawyers and uninjured persons, when that money should be going to the most-injured and to medical research."[59] |

14

NS00000820





| **Various Epidemiological Studies** | | **Reference List 1** |
|---|---|---|
| **Year** | **Source** | **Study** |
| 1980 | Higginson | Proportion of Cancers Due to Occupation, Preventive Medicine |
| 1980 | Hogan & Hoel | Estimating Cancer Risk Associated with Occupational Asbestos Exposure Risk Analysis |
| 1981 | Enterline | Proportion of Cancer Due to Exposure to Asbestos, Banbury Report 9: Quantification of Occupational Cancer |
| 1981 | McDonald | Mesothelioma as an Index of Asbestos Impact, Banbury Report 9: Quantification of Occupational Cancer |
| 1981 | Peto, Henderson, Pike | Trends in Mesothelioma Incidence in the U.S. and the Forensic Epidemic Due to Asbestos Exposure During World War II, Banbury Report 9: Quantification of Occupational Cancer |
| 1982 | Irving Selikoff (Mt. Sinai School of Medicine) | Disability Compensation for Asbestos-Associated Disease in the United States. |
| 1982 | William Nicholson, George Perkel, Irving Selikoff | Occupational Exposure to Asbestos: Population at Risk and Projected Mortality — 1980-2030 |
| January 1982 | Paul MacAvoy (Yale) | The Economic Consequences of Asbestos-Related Disease |
| August 2, 1982 | Alexander Walker (Statistics and Epidemiology Research Corporation) | Projections of Asbestos-Related Disease 1980-2009 |
| September 1982 | Conning & Company | The Potential Impact of Asbestos on the Insurance Industry |
| July 1983 | Kakalik, Ebener, Felstiner, Shanley (RAND — The Institute for Civil Justice) | Costs of Asbestos Litigation |
| September 15, 1983 | Kenneth Manton (Congressional Research Service The Library of Congress) | An Evaluation of Strategies for Forecasting the Implications of Occupational Exposure to Asbestos |
| June 1986 | William Nicholson | Airborne Asbestos Health Assessment Update |
| 1988 | British Journal of Industrial Medicine | Projection of Asbestos Related Diseases in the United States, 1985-2009 |
| January 20, 1992 | Shearson Lehman Brothers | Charting the Asbestos Minefield: An Investor's Guide |

15

NS00000821

EXHIBITS AND REFERENCE LISTS

| Various Epidemiological Studies | | Reference List 1 (cont.) |
|---|---|---|
| **Year** | **Source** | **Study** |
| July 1992 | Federick Dunbar, National Economic Research Associates, Inc. (NERA) | Forecast of Asbestos-Related Personal Injury Claims Against National Gypsum Company: Final Report |
| July 15, 1992 | Mark Peterson (Legal Analysis Systems, Inc.) | Findings Re: Liability of National Gypsum for Pending and Future Asbestos Personal Injury Claims |
| June 1993 | Dunbar & Martin (nee Neuman) (NERA) | Estimating Future Asbestos Claims: Lessons from the National Gypsum Litigation |
| August 13, 1993 DRAFT | Stallard & Manton (Duke University) | Estimates and Projections of Asbestos Related Diseases and Exposures Among Manville Personal Injury Settlement Trust Claimants, 1990-2049 |
| September 23, 1993 | Dan Rourke, The Resource Planning Corporation (RPC) | The Manville Personal Injury Settlement Trust Claims Forecast Model |
| After 1994 | William Blot (International Epidemiology Institute, Ltd.) | Trends in Asbestos-Related Diseases |
| March 8, 1994 DRAFT | Stallard & Manton (Duke University) | Projections of Asbestos Related Personal Injury Claims Against the Manville Personal Injury Settlement Trust 1990-2049, by Occupation, Date of First Exposure, and Type of Claim |
| March 4, 1995 | The Lancet, Vol. 345, No. 8949 | Continuing increase in mesothelioma mortality in Britain |
| 1996 | The Cologne Re | Asbestos-Related Claims in the USA and Impact on the Reinsurance Industry |
| 1997 | Bertram Price | Analysis of Current Trends in United States Mesothelioma Incidents |
| 2001 | Mealey's Asbestos Bankruptcy Conference 2001/David T. Austern | The Manville Trust Experience |
| August 2001 | RAND Documented Briefing (DB-362.0-ICJ) | Asbestos Litigation in the U.S.: A New Look at an Old Issue |

NS00000822

AMERICAN ACADEMY *of* ACTUARIES

| Asbestos Defendants Declaring Bankruptcy[1] | | Reference List 2 | |
|---|---|---|---|
| **Company** | **Year of Bankruptcy** | **Company** | **Year of Bankruptcy** |
| 1. Amatex Corporation | 1982 | 27. Lykes Brothers Steamship | 1995 |
| 2. American Shipbuilding | 1993 | 28. M.H. Detrick | 1998 |
| 3. Armstrong World Industries [2] | 2000 | 29. National Gypsum | 1990 |
| 4. Atlas Corporation | 1998 | 30. Nicolet | 1987 |
| 5. Babcock & Wilcox | 2000 | 31. North American Asbestos Corporation | 1976 |
| 6. Baldwin Ehret Hill | 1993 | 32. Owens Corning Fiberglas | 2000 |
| 7. Brunswick Fabrications | 1998 | 33. Pacor | 1986 |
| 8. Burns & Roe Enterprises | 2000 | 34. Pittsburgh Corning | 2000 |
| 9. Cassiar Mines | 1992 | 35. Powhatan Mining Company | |
| 10. Celotex [3] | 1990 | 36. Prudential Lines | 1986 |
| 11. Continental Producers Corporation | | 37. Raytech Corporation [6] | 1989 |
| 12. Delaware Insulations | 1989 | 38. Rock Wool Manufacturing | 1996 |
| 13. E.J. Bartells | 2000 | 39. Rutland Fire & Clay | 1999 |
| 14. Eagle Picher Industries | 1991 | 40. SGL Carbon | 1998 |
| 15. Eastco Industrial Safety Corporation | 2001 | 41. Skinner Engine Company | 2001 |
| 16. Federal Mogul | 2001 | 42. Standard Asbestos Manuf. & Insulation | 1990 |
| 17. Forty-Eight Insulations | 1985 | 43. Standard Insulations Inc. | 1986 |
| 18. Fuller-Austin Insulation | 1998 | 44. Todd Shipyards | 1987 |
| 19. G-I Holdings | 2001 | 45. United States Lines [7] | 1986 |
| 20. Gatke Corp. | 1987 | 46. UNR Industries [8] | 1982 |
| 21. Hillsborough Holdings | 1989 | 47. U.S. Gypsum | 2001 |
| 22. H.K. Porter Co. [4] | 1991 | 48. U.S. Mineral | 2001 |
| 23. Johns-Manville | 1982 | 49. Wallace & Gale | 1984 |
| 24. Joy Technologies [5] | 1999 | 50. Washington Group International | 2001 |
| 25. Keene Corp. | 1993 | 51. Waterman Steamship Corp. | 1983 |
| 26. Kentile Floors | 1992 | 52. W.R. Grace | 2001 |

[1] Most (but potentially not all) of these asbestos defendants filed bankruptcy as a result of asbestos. We have attempted to include each corporation once (rather than counting multiple subsidiaries).
[2] Including subsidiaries Desseaux Corporation and Nitram Liquidators, Inc.
[3] Including Carey Canada, Panacon, Philip Carey Company, and Smith & Kanzler.
[4] Including Southern Asbestos Company and Southern Textile.
[5] Including Harnischfeger and Ecolaire.
[6] Including Raymark Industries and Raymark Corp.
[7] Including McLean Industries and First Colony Farms.
[8] Including Union Asbestos & Rubber (Unarco).

NS00000823

OVERVIEW OF ASBESTOS ISSUES AND TRENDS

## Endnotes

[1] The U.S. Supreme Court referred to asbestos litigation as an "elephantine mass" in *Ortiz v. Fibreboard*, 97 U.S. 1704 (1999).

[2] The insurance rating agency A.M. Best referred to asbestos claims as a "tidal surge" in *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers*. Special Report (7 May 2001), 3.

[3] Fourteen companies filed bankruptcy during 2000 – 2001 as a result of asbestos litigation, including Armstrong World Industries, Babcock & Wilcox, Burns & Roe Enterprises, E.J. Bartells, Eastco Industrial Safety Corp., Federal Mogul, G-I Holdings (GAF), Owens Corning Fiberglas, Pittsburgh Corning, Skinner Engine Co., U.S. Gypsum, U.S. Mineral, Washington Group International, and W.R. Grace.

[4] "Asbestos: A Tiny But Lethal Fiber," at http://www.pilotonline.com/special/asbestos/primer.html (6 May 2001). Also referred to as the "magic mineral" in the *British Journal of Industrial Medicine* 47 (1990), 361.

[5] The six varieties are actinolite, amosite, anthophyllite, crocidolite, tremolite, and chrysotile. According to the July 1977 *Scientific American*, chrysotile once accounted for more than 95 percent of asbestos use worldwide. It has a serpentine structure and is noticeably softer and more flexible than the other types.

[6] "Eliminating Asbestos From Fireproofing Materials," *Chemical Innovation* 30, no. 6 (June 2000), 21-29.

[7] Austern, David, "The Manville Trust Experience," in *Mealey's Asbestos Bankruptcy Conference 2001*, (2001), 118.

[8] Shearson Lehman Brothers, Inc. *Industry Report* ( 20 January 1992), 6.

[9] Alleman, James E. and Brooke T. Mossman, "Asbestos Revisited," *Scientific American* (July 1997), 74.

[10] Only new product uses, commercial paper, corrugated paper, specialty paper, rollboard, and flooring felt containing asbestos remained banned after the 1991 remand.

[11] "Asbestos," at http://www.epa.gov/ttn/uatw/hlthef/asbestos.html (24 July 2001).

[12] California ambient asbestos white paper at http://www.arb.ca.gov/toxics/asbestos.htm.

[13] Description of the pulmonary function and exposure to asbestos that gives rise to disease: Inhaled air progresses from nose, sinus, pharynx, trachea to the bronchi of air passages within the lungs. Lungs are covered with a thin membrane called pleura. The upper diaphragm (muscle which causes air to be inhaled/exhaled) also has a pleura. Lungs are composed of 200-300 million air sacs, called alveoli, at the ends of bronchi. The gas exchange of oxygen for carbon dioxide happens here. Generally, the body's natural barriers naturally expel most dusts, including asbestos, for years before they become overwhelmed and a clinical problem develops.

[14] Actual latency periods for individuals may be shorter or longer.

[15] Signature disease of asbestos exposure.

[16] The pleural space is the space between the inner and outer lining of the lung. It is normally very thin and lined only with a very small amount of fluid.

[17] Bronchi are one of two primary divisions of the trachea that lead into the right or left lung.

[18] "It is now universally agreed that exposure to asbestos fibers can, in certain circumstances, lead to three diseases: asbestosis, lung cancer and mesothelioma of the lining of the lung (pleura) or stomach (peritoneum). It can also cause a group of benign conditions of the pleura. Controversy remains over whether it may cause a group of other cancers, including cancers of the larynx, gastrointestinal tract and kidney," write Frederick C. Dunbar, Denise Neumann Martin, and Phoebus J. Dhrymes in *Estimating Future Claims, Case Studies from Mass Tort and Product Liability*. (Andrews Professional Books, 1996).

[19] "FAQs, Asbestos Divison," at http://www.okdol.state.ok.us/asbestos/asbestos%20FAQ.htm.

[20] *Ibid*.

[21] Austern, David, "The Manville Trust Experience," in *Mealey's Asbestos Bankruptcy Conference 2001*, (2001), 114.

18

NS00000824

AMERICAN ACADEMY *of* ACTUARIES

[22] Babcock & Wilcox Co, *Informational Brief* (2000). See also Christopher Edley Jr., "Statement Concerning H.R. 1283, The Fairness in Asbestos Compensation Act," prepared for the House Committee on the Judiciary, 106th Cong., 2d sess., 1999, 15.

[23] "Asbestos Companies Report Annual Numbers of Pending Claims, New Filings in 2000," *Mealey's Litigation Report: Asbestos* (18 May 2000), 19-24.

[24] Plaintiff attorney activities include the creation of asbestos litigation specialty firms, union hall x-ray screenings, and Sunday sports page and Internet advertisements. See Richard B. Schmitt, "How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial," *Wall Street Journal* (5 March 2001).

[25] For more information regarding the proposed settlement to the Georgine class action (i.e., the Center for Claims Resolution (CCR) Futures Deal), see Exhibit 2.

[26] "Recently for example, asbestos cases reportedly have "migrat[ed] en masse" to certain counties in Mississippi because of favorable long-arm jurisdictional rules and because '[j]uries in those counties rarely, if ever, rule against plaintiffs in product liability cases, and defendants do not have the right to perform medical exams on any claims.'" Stephen Labaton, "Top Asbestos Makers Agree to Settle 2 Large Lawsuits," *New York Times* (23 January 2000).

[27] Estimate of 2,000 meso cases per year: *Mealey's Asbestos Conference* (1999), Manville table on claims received by year, 47. Bertram Price, "Analysis of Current Trends in United States Mesothelioma Incidence," *American Journal of Epidemiology* 19, no. 3 (1997), 216 (figure 4). Mesothelioma Applied Research Foundation, Legacy http://www.marf.org.

[28] The American Thoracic Society has set a minimum x-ray reading for classifying an individual as "impaired." See Victor E. Schwartz and Leah Lorber, "A Letter to the National's Trial Judges: How the Focus on Efficiency is Hurting You and Innocent Victims in Asbestos Liability Cases," *American Journal of Trial Advocacy* 24, no. 2 (2001), 27. However, there is no broad medical agreement on the definition of pleural plaques.

[29] "Asbestos Continues to Bite Industry," *Business Insurance* (8 January 2001); "Finance and Economics: A Trail of Toxic Torts," *Economist* (27 January 2001). However, a variety of other estimates indicate the number could be much higher than 2,000, perhaps as high as 5,000.

[30] "Still Killing," *Economist* (19 August 2000); *Wall Street Journal* (5 March 2001).

[31] Joint liability imposed on joint tortfeasors that allows enforcement of the entire judgment against any one of the tortfeasors. In some jurisdictions, joint and several liability remains despite adoption of comparative fault, and in others it has been eliminated by comparative fault.

[32] "Companies want to pay what they paid 15 or 20 years ago, and don't want to take into consideration that there might be fewer companies to pay, which means higher shares of liability." Fred Baron, of the Dallas law firm Baron & Budd, as quoted in "Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps," *Wall Street Journal* (12 April 2001).

[33] "[O]f every dollar paid by defendants, over sixty cents goes to the lawyers. Adding the overhead costs of both the judicial and the insurance systems, asbestos litigation consumes two dollars of society's resources in order to deliver a single dollar to people who were exposed." Christopher Edley Jr., "Statement Concerning H.R. 1283, The Fairness in Asbestos Compensation Act," prepared for the House Committee on the Judiciary, 106th Cong., 2d sess., 1999, 5.

[34] Richard B. Schmitt, "How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial," *Wall Street Journal* (5 March 2001).

[35] Estimates of total ultimate cost from Tillinghast–Towers Perrin and Milliman USA studies.

[36] Estimates of net amount insured by U.S. property/casualty insurers and reinsurers from Tillinghast–Towers Perrin and Milliman USA studies.

[37] A reinsurer provides insurance to direct insurance companies by contracting to accept the transfer, in

NS00000825

OVERVIEW OF ASBESTOS ISSUES AND TRENDS

whole or in part, of a risk or contingent liability covered under an existing insurance contract.

[38] *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers*, A.M. Best Special Report (7 May 2001), 1.

[39] "Some courts have adopted mechanisms for separating out claims by individuals who are not sick. For example, in Massachusetts, the judges have an inactive docket which provides a way for plaintiffs with asbestos-related pleural diseases to toll the statute of limitations until such time that they develop asbestosis or some type of malignancy. Cases on the inactive docket are exempt from discovery and can only be removed to the active docket by the filing of a subsequent complaint. A similar inactive docket approach is used by some courts in Maryland." Victor E. Schwartz and Leah Lorber, "A Letter to the National's Trial Judges: How the Focus on Efficiency is Hurting You and Innocent Victims in Asbestos Liability Cases," *American Journal of Trial Advocacy* 24, no. 2 (2001). See also Mark A. Behrens and Monica G. Parham, "Stewardship for the Sick: Preserving Assets for Asbestos Victims through Inactive Docket Programs," *American Journal of Trial Advocacy* 24, no. 2 (2001), 17.

[40] E.g., the tobacco industry and makers of polio vaccines. SV40 (Simian Virus 40) has been found in the cells of certain rare cancers, including mesothelioma. It has been alleged that contamination of early batches of the Salk vaccine and test batches of the Saben vaccine (polio vaccines) cause mesothelioma. However, these findings have not met the Daubert standard for admissibility in court.

[41] The Manville Trust sued the tobacco industry in *Falise*, which ended in a mistrial in January 2001. The suit was later dropped. Additionally, 22 asbestos injury plaintiffs and Owens Corning filed suit against several tobacco companies in 1998, alleging a conspiracy to hide the health risks associated with cigarette smoking and asbestos exposure. The Jefferson County Circuit Court dismissed the suit in May 2001, ruling that Mississippi's law prohibits recovery for an indirect injury. "Updates," *Business Insurance* (28 May 2001).

[42] Henry J. Hyde, "Statement of House Judiciary Committee Chairman Henry J. Hyde, Committee on the Judiciary, Hearing on H.R. 1283, Fairness in Asbestos Compensation Act of 1999," prepared for the House Committee on the Judiciary, 106th Cong., 2d sess., 1999; at http://www.productslaw.com/hr1283.html.

[43] Ronald L. Motley and Susan Nial, " Critical Analysis of the Brickman Administrative Proposal: Who Declared War on Asbestos Victims' Rights?"in *Proceedings of the Administrative Conference of the United States, October 31, 1991 Colloquy: An Administrative Alternative to Tort Litigation to Resolve Asbestos Claims.*

[44] Paul Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* (Pantheon, 1985), 195.

[45] "Thus the traditional requirement of product identification and proximate cause was eliminated for the desired common good of reducing litigation expenses, which threatened to exceed the total indemnity paid." *Best's Review* (12 May1993).

[46] As of October 1992 (after four years of operation), the CCR had resolved 115,000 claims and had 55,000 claims pending.

[47] "Today the one-time emissary has been knocked down to clerical assistant, existing, for the most part, to process claims." *Wall Street Journal* (7 February 1992.)

[48] "Updates," *Business Insurance* (25 June 2001).

[49] A Washington state court judge ordered the CCR to pay the full amount of damages agreed to by 17 members during nine different settlement agreements finalized in 2000 prior to the withdrawal of National Gypsum and the bankruptcy of Armstrong World Industries. Remaining CCR members have sued their insurers for failing to pay toward the liabilities of former CCR members, which have subsequently been allocated and billed to the remaining members and then allocated to each insurer.

[50] Also known as *Amchem v. Windsor*, conditional class certification was granted by U.S. District Judge Weiner on February 15, 1993.

[51] The 3rd Circuit U.S. Court of Appeals decertified the class on May 10, 1996, and on June 27, 1996, the

NS00000826



AMERICAN ACADEMY *of* ACTUARIES

manufacturers' petition for a rehearing was denied. The Supreme Court upheld the lower court's decision (6-2) on June 27, 1997, with Justice Ginsburg stating that the "sprawling class" did not meet the requirements of Rule 23. *Amchem Products, Inc. et al. v. Windsor et al.*, 96 Sup. Ct. 270 (1997).

[52] *Ortiz v. Fibreboard*, also known as Ahearn.

[53] Forty-five thousand pending claims represented by the counsel achieving the class action settlement were settled in a separate agreement for a higher average amount.

[54] Fibreboard was allowed to keep virtually all of its net worth, paying only $500,000, and potential insurance funds were greater than $2 billion.

[55] OCF underestimated the frequency and severity of claims in the National Settlement Program (NSP) as well as the number of opt-outs. "Credit Suisse First Boston," Quarterly Report 28 November 2000, 10.

[56] The six member Rehnquist committee issued its 43-page report, *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation 2*, at the annual meeting of the Judicial Conference of the United States on March 12, 1991. See *The National Law Journal*. Also see the District of Delaware U.S. Bankruptcy Court. *W.R. Grace Informational Brief* (2001), 15 (footnote 27).

[57] 479 S.E. 2d 300, 304 (W.Va. 1996).

[58] *Amchem Products, Inc. et al. v. Windsor et al.*, 96 Sup. Ct. 270 (1997).

[59] Statement by William N. Eskridge, Jr., as quoted in Babcock & Wilcox Company, *Informational Brief*, (22 February 2000), 37.

NS00000827

# EXHIBIT 27

RECEIVED

NOV -7 1997

Krista L. Glenn
Long Term Exposure Claims Management
Major Claims Department
Direct Line 215.761.3216
Fax Number 215.761.5541



CIGNA Property
& Casualty
Pre-ordered facilities

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**

November 3, 1997

Pat McDonald
Kelly-Moore Paint Co., Inc.
P.O. Box 3016
987 Commercial Lane
San Carlos, CA 94070

1601 CHESTNUT STREET
P.O. BOX 7716
TL-56
PHILADELPHIA, PA 19192-2

PL 010444
Confidential

REDACTED

PL 010445
Confidential

# EXHIBIT 28

CHERYL MILLS

Page 1

NO. 19785-BH02

| | | |
|---|---|---|
| KELLY-MOORE PAINT COMPANY, INC. | ) ) ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) ) | |
| vs | ) ) | BRAZORIA COUNTY, TEXAS |
| DOW CHEMICAL COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | 23RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

CHERYL MILLS

DECEMBER 17, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of CHERYL MILLS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 17th of December, 2003, from 9:13 to 12:37, before Tracy Fanselau, CSR #9440, in and for the State of Texas, reported by Stenograph and video, at the offices of Pillsbury and Levinson, One Embarcadero Center, Thirty-Eighth Floor, San Francisco, California 94111, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

KMH_DOW_ESI 0000344                                    b979d155-422e-4494-b22d-d31861808553

CHERYL MILLS

Page 53

1    Sanchez case was in March of 1997 and I got that call from

2    Kelly-Moore very -- wanting to know what's been happening with

3    their asbestos litigation, what have the carriers been doing,

4    what have the attorneys been doing.

5        And I know that after we dealt with the actual Sanchez

6    case, which was over in a few days by the time I was called,

7    maybe a day or two, one of their questions to me to look at

8    was, what do we have?  What's our insurance coverage?  Is

9    asbestos covered?  Is it excluded?  Because the Sanchez case

10   suddenly out of nowhere took Kelly-Moore out of that realm

11   where apparently the carriers were getting a lot of dismissals,

12   settling cases for a hundred dollars, 2,000 dollars, things

13   were in that range.  And so it was never on the radar.

14   Suddenly asbestos was on the radar.  Yeah.

15       So I imagine -- no.  I shouldn't imagine.  It may have

16   been a board meeting that they confirmed, but they did ask me

17   in that time period.  That was my very first task to do along

18   with figuring out what was going on down in Texas was to figure

19   out, did we have insurance coverage for this?

20       Q    Okay.  In the course of your evaluating the asbestos

21   litigation, did you ever ask any outside group or party who

22   specializes in valuing asbestos claims to do a projection off

23   into the future as to what Kelly-Moore could expect in, say,

24   the next 15, 20 years?

25       A    Did I?  No.

 1   took over as the CEO end of 2002, so I don't know if he went

 2   through my things or not.

 3       Q    Okay.

 4       A    Mr. Cristiano retired.

 5       Q    For this 12 month period from July '98 to June '99,

 6   did you, for example, calculate the average amount per claim,

 7   the average amount for disease and so forth?

 8       A    I would have been doing that based upon statistics

 9   from our counsel.

10       Q    Okay.  You did that every year?

11       A    Well, it wasn't an annual thing.  It was an ongoing

12   -- I would ask for numbers -- at some point in time toward the

13   end of when I represented Kelly-Moore, but I couldn't tell you

14   exactly when, I asked for, from Texas and California, I

15   believe, monthly as to what did you settle, what are you -- so

16   I could watch and see if there were any trends as to what was

17   happening with the litigation.

18       Q    Do you remember when the ESOP, employees stock option

19   program, was set up in 1998?

20       A    I wasn't a part of the setting up of the ESOP, but I

21   did become aware at some point in time that the ESOP had been

22   set up.

23       Q    Did you participate in any way in setting up the

24   ESOP?

25       A    Oh, no, that's outside my area.  No.

CHERYL MILLS

1        Q      Okay.

2        A      They had -- Kelly-Moore used specialized counsel that

3     focuses on that area of law.

4        Q      Okay.   Did you provide any information to people who

5     were involved with setting up the ESOP to assist them with it?

6        A      No.

7        Q      Do you know who Mr. B.J. Brooks is?

8        A      No.

9        Q      And I take it, that you didn't give any opinions to

10    the people setting up the ESOP as to the value of future

11    asbestos claims?

12       A      I didn't talk with anybody setting up the ESOP.   I

13    don't know if information I was providing to the company would

14    have been transmitted.

15       Does that answer your question?

16       Q      Yes.   What I'm wondering is did you ever sit down in

17    1998 and do a comprehensive valuation of all current and future

18    asbestos claims, taking into account the trends in asbestos

19    litigation, the diseases you were seeing and so forth and try

20    to put any kind of dollar figure on that?

21       A      I would have in those early years with my

22    involvement -- I got involved in 1997.   I don't know exactly

23    when my first report would have been saying, here's how many

24    claims we had.   We only had 5,000, I think, for the whole

25    country.   But it was up from the ten years before or so when we

KMH_DOW_ESI 0000344.63

CHERYL MILLS

Page 64

1    only had 400.

2                    MR. PILLSBURY:  Would you like any water?

3                    THE WITNESS:  Yeah, I do.  Can I just take a

4    break?

5                    MR. LASSETTER:  Sure.

6                    THE WITNESS:  I'm drying out here.  I took an

7    antihistamine.

8                    (Recess taken from 11:02 to 11:06)

9                    THE WITNESS:  Okay.  We had left off, you were

10   asking me --

11        Q    No.

12        A    I'm sorry.

13        Q    Sorry.

14        A    It's your deposition.

15        Q    It's okay.  It's hard to be the witness.

16        A    Right.

17        Q    I'm wondering if when the ESOP was set up, if you

18   actually sat down and did an analysis of the present value of

19   all future asbestos claims, taking into account the types of

20   claims, the values per claim, the growth rates of those types

21   of claims, all those things that someone would do if they were

22   doing a formal asbestos evaluation?

23        A    Oh boy, your question is a lot of things.  First of

24   all, I don't know what a formal asbestos evaluation would be,

25   but -- and I don't know -- you told me when the ESOP was set

KMH_DOW_ESI 0000344.64

CHERYL MILLS

1    up, but I wasn't part of that process when it was being set up.

2        I can tell you, though, that I would at various times do

3    -- I can't remember all the tasks you had in there, but I would

4    do the best I could to determine where's our insurance, where

5    we're at, not only for the company to keep track of what's

6    going on in the litigation, but I was the attorney that was

7    responsible for reporting to Ernst & Young each year on behalf

8    of the company for the audit to let them know any claim that

9    was over -- it changed during the years, whether it's five,

10    10,000, I can't remember exactly.

11        The figures changed each year according to general

12    accounting principles as to what gets reported.  It was a

13    pretty low threshold.  So anything I had that could possibly

14    have the potential, I would report to Ernst & Young so that the

15    auditors would know this is, you know, how much insurance we've

16    got -- we've got lots of insurance coverage, these are the

17    claims.

18        And when did you tell me the ESOP went in?

19    Q    1998?

20    A    1998.  Yeah.  The asbestos litigation didn't look

21    like a very big issue.  We didn't have that many claims.

22        MR. LASSETTER:  Okay.  Object to the responsiveness.

23    Q    (By Mr. Lassetter)  In 1998, did you sit down and try

24    to do a formal analysis of what the future looked like for

25    Kelly-Moore and its asbestos claims, taking into account things

CHERYL MILLS

1    like an estimation of the size of the population that might

2    have been exposed, the number of claims per disease, the

3    average payment of claims per disease, dates of exposure, the

4    age of the people exposed, those kinds of things?

5        A    Okay.  I would have looked at not the age.  I would

6    have not looked at the period of exposure because all the

7    complaints that came into us would give the entire period of

8    time that pay co was in existence so without doing some huge

9    analysis and deposing every single person that made a claim so

10   I know I wouldn't have looked at that.  As for the growth, the

11   way you phrased it, I wouldn't have done that.  I would have

12   looked, though, at the friends as to how many claims are being

13   brought against Kelly-Moore.  Are they increasing?  What kind

14   of diseases are we seeing?  So I would have tracked all of

15   that.  And I would have done a report on that, those issues.

16       Q    Did you provide to the people setting up the ESOP,

17   your estimate of what the future claims were worth in terms of

18   a present value?

19       A    You've asked me a lot of questions about the ESOP.  I

20   wasn't -- I didn't -- I didn't participate at all in the ESOP,

21   and I didn't meet anybody setting up the ESOP.

22       Q    Okay.

23       A    But I did provide information to Kelly-Moore about

24   all those issues that you're talking about.

25       Q    Okay.  And you don't know whether those -- that data

KMH_DOW_ESI 0000344.66

CHERYL MILLS

1    guess would be number 8 --

2        A    Right.

3        Q    -- is a restatement of the consolidated financial

4    statements for the years ending 2001 and 2002, December 31

5    2002.

6        A    If you're going to ask me, had I seen it, if it ends

7    2002, I wouldn't have.  I would have been on the bench by the

8    time it came out.

9        Q    Okay.  Were you involved in preparing any formal

10   valuations to be given to Ernst & Young which looked at

11   Kelly-Moore's asbestos liabilities including things like an

12   estimation of the population exposed, the average age of those

13   exposed, the duration of exposure, dates of exposure and those

14   kinds of things?

15       A    When you use all those, we've already gone through

16   all those items and I tried to delineate for you which sort of

17   tasks I would have done.  So I'm not sure what you're asking

18   me.  Did you want me to go ahead and clarify which things I did

19   do?

20       Q    Let me ask you a different way because that's a fair

21   point.

22       A    Okay.

23       Q    Are you aware that there are people, economists who

24   actually specialize in taking companies, looking at their

25   asbestos liabilities future asbestos liabilities and projecting

CHERYL MILLS

Page 69

1    them out into the future?

2         A    I've heard of that, yes.

3         Q    While you were working on behalf of Kelly-Moore --

4         A    Uh-huh.

5         Q    -- YOU never had anybody do that kind of in depth

6    analysis?

7         A    No.

8         Q    And you never did it yourself?

9         A    I don't know.  I'm not sure what they do.  So I've

10   told you what I've done.  You're going to have to ask them if

11   that's what they do.  I don't know.

12        Q    If it involves things like estimating the size of the

13   population, the age of those exposed, duration of exposure, you

14   would not have done that because you didn't have access to that

15   type of information?

16        A    Correct.

17        Q    Okay.  Anyone we're done with that thought.

18        How much do you know about the substantive facts of the

19   defenses presented by Kelly-Moore in the litigation?

20        A    I think that question doesn't make a whole lot of

21   sense to me.  I'm sorry.

22        Q    You're right.  It doesn't make any sense.  It's too

23   broad.

24        Would you, for example, from time to time review discovery

25   responses before they were filed?

KMH_DOW_ESI 0000344.69

# EXHIBIT 29

1   Ronald Lovitt, Bar No. 040921
    J. Thomas Hannan, Bar No. 039140
2   Henry I. Bornstein, Bar No. 75885
    LOVITT & HANNAN, INC.
3   900 Front Street, Suite 300
    San Francisco, California 94111
4   Telephone: (415) 362-8769
    Facsimile: (415) 362-7528
5   rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com
6
    Attorneys for Defendants K-M Industries Holding Co. Inc.;
7   K-M Industries Holding Co. Inc. ESOP Plan Committee;
    and CIG ESOP Plan Committee
8

RECEIVED

NOV 09 2007

LEWIS, FEINBERG, LEE,
RENAKER & JACKSON

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13   THOMAS FERNANDEZ et al.,            )  Case No. C 06-07339 MJJ
                                         )
14              Plaintiffs,              )  **FIRST SUPPLEMENTAL RESPONSE OF**
                                         )  **DEFENDANTS K-M INDUSTRIES**
15        vs.                            )  **HOLDING CO. INC., K-M INDUSTRIES**
                                         )  **HOLDING CO. INC. ESOP PLAN**
16   K-M INDUSTRIES HOLDING CO., INC, et al. ) **COMMITTEE, AND CIG ESOP PLAN**
                                         )  **COMMITTEE TO PLAINTIFFS' FIRST**
17              Defendants.              )  **SET OF INTERROGATORIES**
                                         )  **[INTERROGATORY NO. 16]**
18                                       )
                                         )
19                                       )
                                         )
20                                       )

21

22   PROPOUNDING PARTY:   Plaintiffs Thomas Fernandez and Lora Smith

23   RESPONDING PARTY:    Defendants K-M Industries Holding Co. Inc., K-M Industries Holding
                          Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee
24
     SET NUMBER:          One
25

26

27

**EXHIBIT**

*85*

Giffins   3-28-08

28   CASE NO. C 06-07339 MJJ          -1-         FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                  DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                  INTERROGATORIES [INTERROGATORY NO. 16]

## PRELIMINARY STATEMENT

The Preliminary Statement and General Objections set forth herein apply to all interrogatories to which defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee respond herein.

The significant time that has passed since the events which form the basis of plaintiffs' complaint has rendered the access of defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee to pertinent information more difficult. Given this fact and the fact that discovery is in its early stages, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee reserve the right to amend or supplement these objections and responses at any time in light of future investigation or analysis, and reserve the right to rely on subsequently-discovered information or information omitted from the objections and responses as a result of mistake, error, or inadvertence. These responses are not intended to admit or acquiesce in any factual or legal contention, assertion, or characterization contained in the Plaintiffs' interrogatories.

## GENERAL OBJECTIONS

1.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee object to the interrogatories to the extent that they are overbroad, unduly burdensome, oppressive, seek information irrelevant to the subject matter of this litigation, and are not reasonably calculated to lead to the production of admissible evidence.

2.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee object to the interrogatories to the extent that the definitions and instructions set forth therein purport to impose obligations not required by the Federal Rules of Civil Procedure.

3.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee object to the definition of "DEFENDANTS," "YOU," and "YOUR" to the extent that it includes the attorneys of defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan

1   Committee and thus purports to require the disclosure of information subject to the attorney-client

2   privilege and/or the attorney work product doctrine, and on the ground that they are overbroad and

3   exceed the requirements of Rule 33 to the extent they seek information not available to defendants

4   K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG

5   ESOP Plan Committee.

6       4.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

7   Plan Committee, and CIG ESOP Plan Committee object to the definition of "RELATING TO" or

8   "RELATE TO" on the ground that it is overbroad and unduly burdensome, and that interrogatories

9   using this definition seek documents that are not relevant to the subject matter of this action and are

10  not calculated to lead to the discovery of admissible evidence.

11      5.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

12  Plan Committee, and CIG ESOP Plan Committee object to the definition of "RELEVANT TIME

13  PERIOD" on the ground that it is overbroad and unduly burdensome.

14      6.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

15  Plan Committee, and CIG ESOP Plan Committee object to the proposed definition of "IDENTIFY"

16  on the ground that it is overbroad and unduly burdensome and to the extent that it purports to

17  impose obligations beyond those required by the Federal Rules of Civil Procedure.

18      7.      Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP

19  Plan Committee, and CIG ESOP Plan Committee object to every interrogatory to the extent it calls

20  for information which comes within the attorney-client privilege, attorney work product protection,

21  or is protected from disclosure by any other recognized privilege or protection.

22  **FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES**

23

24  **INTERROGATORY NO. 16:**

25      List by name and date filed, all lawsuits or analogous proceedings initiated by or filed

26  against KMH, Kelly-Moore Paint, CIG, or any subsidiary of KMH, Kelly-Moore Paint, or CIG,

27  regarding asbestos, at any time.

28

**RESPONSE TO INTERROGATORY NO. 16:**

Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee incorporate the foregoing General Objections and further object to this interrogatory on the ground that it is vague, ambiguous, overbroad and unduly burdensome. Specifically, the phrase "analogous proceedings" is vague and ambiguous as used in this context. Defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee also object to the interrogatory to the extent that it is not limited to the period of time relevant to the claims and defenses raised in this lawsuit. Furthermore, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee object to this interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence and is thus outside the scope of permissible discovery. Well over 60,000 lawsuits could be responsive to this interrogatory. The burden of responding to this interrogatory far outweighs the likely benefit considering the extremely limited relevance that the details of these lawsuits have to the claims being raised by the plaintiffs in this lawsuit.

Subject to the foregoing general and specific objections, the defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee respond as follows:

Pursuant to an agreement with Plaintiffs that providing a response listing the number of separate plaintiffs' asbestos claims filed against the KM entities for each year from 1993 through 2006 shall be considered by Plaintiffs to be a complete and sufficient answer to this Interrogatory, defendants K-M Industries Holding Co. Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee provide the following list of the number of separate plaintiffs' asbestos "claims" filed during those years. As the term "claim" is used in this Interrogatory response, a single lawsuit making claims on behalf of five plaintiffs would constitute five "claims."

1    Due to the large time period covered by these statistics and the impossibility of ensuring that

2    all of the claims have been accounted for, other claims may have been brought that are not included

3    in these numbers. In supplying this information, defendants K-M Industries Holding Co. Inc., K-M

4    Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee have provided

5    the most complete and accurate information available to them concerning the information listed

6    below.

| Year | Number of Claims |
|------|------------------|
| 1993 | 38 |
| 1994 | 565 |
| 1995 | 2,757 |
| 1996 | 2,144 |
| 1997 | 4,364 |
| 1998 | 7,049 |
| 1999 | 9,707 |
| 2000 | 9,898 |
| 2001 | 13,736 |
| 2002 | 19,113 |
| 2003 | 22,829 |
| 2004 | 6,845 |
| 2005 | 4,977 |
| 2006 | 1,849 |

//
//
//
//
//

1    DATED: November 6, 2007                LOVITT & HANNAN, INC.

2

3                                           By: _____

4                                                    Henry I. Bornstein
                                            Attorneys for Defendants K-M Industries Holding
5                                           Co. Inc.; K-M Industries Holding Co. Inc. ESOP
                                            Plan Committee; and CIG ESOP Plan Committee
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   CASE NO. C 06-07339 MJJ                -6-        FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                      DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                      INTERROGATORIES [INTERROGATORY NO. 16]

1    **VERIFICATION**

2        I, Dan Stritmatter, declare:

3        I am the Chief Financial Officer of K-M Industries Holding Co., Inc.  I have read the

4 foregoing First Supplemental Response of Defendants K-M Industries holding Co, Inc., K-M

5 Industries Holding Co. Inc. ESOP Plan Committee and CIG ESOP Plan Committee to Plaintiffs'

6 First Set of Interrogatories and know its contents. I am informed and believe that the matters therein

7 are true and on that ground I allege that the matters therein are true.

8        Executed on November __7__, 2007 at San Carlos, California.

9        I declare under penalty of perjury that the foregoing is true and correct.

10

11

12                       _____

13                       Dan Stritmatter

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   CASE NO. C 06-07339 MJJ            -7-          FIRST SUPPLEMENTAL RESPONSE OF KMH
DEFENDANTS TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES [INTERROGATORY NO. 16]

1  Lisa S. Serebin                          *Attorneys for Defendant*
   MORGAN, LEWIS & BOCKIUS LLP              *NORTH STAR TRUST COMPANY*
2  One Market Street, Spear Street Tower
   San Francisco, CA  94105
3

4  Robert L. Palmer                         *Attorneys for Defendant*
   HENNIGAN, BENNETT & DORMAN LLP           *WILLIAM E. AND DESIREE B.*
5  865 South Figueroa Street, Suite 2900    *MOORE REVOCABLE TRUST;*
   Los Angeles, California 90017            *DESIREE B. MOORE REVOCABLE*
6                                           *TRUST; WILLIAM E. MOORE*
                                            *MARITAL TRUST; WILLIAM E.*
7                                           *MOORE GENERATION-SKIPPING*
                                            *TRUST; and DESIREE B. MOORE*
8

9       6.    I declare under penalty of perjury that the foregoing is true and correct and that this

10  declaration was executed on November 8, 2007, at San Francisco, California.

11

12

13                                  Laura J. Davies

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  CASE NO. C 06-07339 MJJ              -9-         FIRST SUPPLEMENTAL RESPONSE OF KMH
                                                    DEFENDANTS TO PLAINTIFFS' FIRST SET OF
                                                    INTERROGATORIES [INTERROGATORY NO. 16]

# EXHIBIT 30

REDACTED

7/9/2008 at 6:02 PM

CIG_ESI 593_CONF ("Pending at Yearend" tab)

Brown McCarroll, L.L.P.
AUS:2187316

# EXHIBIT 31

REDACTED

EXHIBIT

_259_

Hommel 3-08-08

KMH 010821

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010822
Confidential

REDACTED

Attorney-Client Privileged – Produced Pursuant to Fiduciary Exception

KMH 010823
Confidential

REDACTED

KMH 010824
Confidential

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010827

REDACTED

REDACTED

Attorney-Client Privileged – Produced Pursuant to Fiduciary Exception

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010830
Confidential

REDACTED

Attorney-Client Privileged – Produced Pursuant to Fiduciary Exception

KMH 010831

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 010832
Confidential

# EXHIBIT 32

LAW OFFICES

# TRUCE, VEAL, JACKSON & TAYLOR

WALTER TRUCE
HARLAN VEAL
TRAVIS M. JACKSON
GEORGE R. TAYLOR
ROGER D. BOLGARD

1710 INDUSTRIAL ROAD
POST OFFICE 190A
SAN CARLOS, CALIFORNIA 94070
TELEPHONE (415) 595-0444

October 8, 1981

**RECEIVED**

OCT 13 1981

INS./ADMIN.

Kelly-Moore Paint Company, Inc.
987 Commercial Street
San Carlos, CA  94070

Attention:  Mr. Douglas W. Merrill

Re:  <u>Insurance Coverage, Asbestosis Cases</u>

**EXHIBIT**
**90**
Giffins 3-28-08

Dear Doug:

Per our conversation of a few days ago, I am enclosing a chart which I have prepared illustrating insurance coverage for Kelly-Moore Paint Company, Inc. from January 1, 1967 to May 1, 1982.  In reviewing this matter, I have determined that <u>all</u> of the carriers have not been put on notice of each asbestosis case.

At the present time, the 5th and 6th Circuits of the U. S. Court of Appeals have affirmed the "exposure theory" regarding insurance coverage by carriers.  Aetna Casualty & Surety is to petition the U. S. Supreme Court to review the matter.  If this theory prevails over the "manifestation theory" in said appeal, then, several old carriers of Kelly-Moore's insurance must also defend the corporation.

As a result thereof, it is appropriate to serve notice on <u>each</u> carrier of record, including excess carriers.  As you can see, our chart only goes back to 1967.  Every effort should be made to determine at least carrier and policy numbers as far back as possible.  By copy of this letter, I am requesting Durward Berry to do so.

In addition to the foregoing, Mr. Berry is to supply us with a photocopy of the following policies:  INA from 1967 64-70 to 1970; The Hartford 1970-71; INA Excess 1969-71; USF I.I. also 71-72 GA620187 from January 15, 1972 to January 15, 1973; Liberty Mutual LGI-161-015355-054 from January 1, 1974 to January 1, 1975; and the latest excess coverage for 1981-82.

Thank you for your immediate attention to these matters.

Very truly yours,

TRUCE, VEAL, JACKSON, TAYLOR & BOLGARD

By                Roger D. Bolgard

Roger D. Bolgard

K-MO38791

RDB/jlp
Enclosure
cc:  Mr. William E. Moore
     Mr. John Bacigalupo
     Mr. Svend Stubb ✓
     Mr. Durward Berry ✓



Plaintiff/Defendant
Deposition Exhibit
1/3
Case #: 3-25-14-5
Date: 10-1-02

KMHC0372 1902

PL 003042

| | | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 |
|---|---|---|---|---|---|---|---|---|
| | LINE NO. | | | (1) | (2) | (3) | (4) | (5) |
| 1 | Co. | INA | INA | | Hartford | USF-II | USF-II | Lib Mos |
| 2 | Policy # | GAL 31356 | GAL 45571 | | SCC 309925 | GA 213099 | GA 620127 | LA1-161-915353-04 |
| 3 | Date | 1/1/67-1/1/68 | 1/1/68-1/1/70 | | 1/1/70-1/1/71 | 1/1/71-1/1/72 | 1/1/72-1/1/73 | 1/1/73-1/1/74 |
| 4 | | | | | | | | |
| 5 | BI CN | | | | | * | * | * |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | Co. | | | INA | | Amer. Home | North River | |
| 12 | Policy # | | | X86 22366 | | 267-4274 | DCL 917542 | |
| 13 | Date | | | 1/1/69-1/1/71 | | 1/1/70-1/1/74 | 12/17/71-1/1/74 | |
| 14 | Cov. | | | | | canc. 1/1/72 | | |
| 15 | | | | | | | | |
| 16 | Co. | | | | | | | |
| 17 | Policy # | | | | | | | |
| 18 | Date | | | | | | | |
| 19 | | | | | | | | |
| 20 | CN | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |

K-MO38792

KMHC0372 1903

PL 003043

Kelly Moore Paint Company, Inc: Insur. re Coverage

| 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|------|------|------|------|------|------|------|------|
| Lib Mut LE1-111-015355-044 1/1/74-1/1/75 | Lib Mut 355-095 5/1/75-5/1/76 | Lib Mut 355-096 | Lib Mut 355-097 | Truck Insurance Exchange 5120019 | | | |
| LG1-161-015355-094 5/1/74-5/1/75 | 500,000 | 5/1/76-5/1/77 | 5/1/77-5/1/78 | $1,000,000 (KT 216) 5/1/78-5/1/82 | | | |
| * | * | * | | ALL 51160046 A350 Only | | | |
| Lib Mut LE1-111-015355-054 1/1/73-1/1/74 | Lib Mut 355-105 5/1/75-5/1/76 | Lib Mut 355-106 5/1/76-5/1/77 | Lib Mut 355-107 5/1/77-5/1/78 | Lib Mut 355-108 5/1/78-5/1/79 (smaller) | Interstate M84-90-16 5/1/79-5/1/80 | Cont. Ins SRU 2155623 5/1/80-5/1/81 | |
| ALE3 LE1-121-015355-104 5/1/74-5/1/75 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 20,000,000 | 20,000,000 | |
| | | | | * * First Top UF 50-10-29 6/23/78-5/1/79 10,000,000 | | 2D Layer Cont. Equal 178-76-9 5/1/80-5/1/81 | |
| | | | | 2nd layer | | | |
| | | | | Interstate 3-55-U-027791 6/1/78-6/1/79 10,000,000 | | 40,000,000 | |
| | | | | First State 926755 6/1/78-5/1/79 10,000,000 | | 3rd layer Amer. Excess BLLL-7073250 5/1/80-5/1/81 | |
| | | | | Excess II 522000169 5/1/78-5/22/81 | | 40,000,000 | |
| | | | | canc. 5,000,000 | | | |
| | | | | Fed. Ins 79-22.7926 5/1/77-5/22/77 | | | |
| | | | | canc. 5,000,000 | | | |

K-MO38793

KMHC0372 1904

PL 003044

EXHIBIT 33

# MILLS & LARSON

### ATTORNEYS AT LAW

CHERYL RAE MILLS

December 10, 1999

**CONFIDENTIAL**



Mr. James Ferraro
December 10, 1999
Page 2

Please contact me if you need any additional information.

Sincerely,

Cheryl Rae Mills

CRM/co
Enclosures

MILLS & LARSON
ATTORNEYS AT LAW

PL 000010

# EXHIBIT 34



ENVIRONMENTAL CLAIMS OFFICE    **ZURICH-AMERICAN**
**INSURANCE GROUP**

**RECEIVED**

JUL 1 0 1998

PILLSBURY, LEVINSON
& MILLS, LLP

July 7, 1998

Mr. Joseph P. Cristiano
President
Kelly-Moore Paint Company, Inc.
P.O. Box 3016
San Carlos, CA 94070

RE:    OUR INSURED: KELLY-MOORE PAINT COMPANY, INC.
      OUR CLAIM NO.:   912-50076 (MASTER FILE)
      CLAIMANTS:   VARIOUS ASBESTOS BODILY INJURY CLAIMS



PL 010454
Confidential

REDACTED

PL 010455
Confidential

REDACTED

PL 010456
Confidential

# EXHIBIT 35

**<u>Clarification of Facts Concerning Coverage and Coverage Disputes</u>**



Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH_ESI00006484
Confidential

REDACTED

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

REDACTED

KMH_ESI00006484.003
Confidential

# EXHIBIT 36

KMH_ESI 6493 CONF

REDACTED

**KELLY-MOORE PAINT COMPANY, INC.**
**COVERAGE CHART**