# EXHIBIT 37

COPY

1   Philip L. Pillsbury, Jr. (SBN 72261)
    Jonathan D. Pendleton (SBN 160264)
2   PILLSBURY & LEVINSON, LLP
    One Embarcadero Center, 38th Floor
3   San Francisco, California 94111
    Telephone: (415) 433-8000
4   Facsimile: (415) 433-4816

5   Charles N. Freiberg (SBN 70890)
    David B. Goodwin (SBN 104469)
6   Michael S. Greenberg (SBN 99727)
    HELLER EHRMAN WHITE & McAULIFFE, LLP
7   333 Bush Street
    San Francisco, California 94104-2878
8   Telephone:  (415) 772-6000
    Facsimile:  (415) 772-6268
9
10  Attorneys for Plaintiff,
    KELLY-MOORE PAINT COMPANY, INC.

11

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA

13          IN AND FOR THE COUNTY OF SAN FRANCISCO

14

15  KELLY-MOORE PAINT COMPANY, INC.,   )   Case No. _____
                                       )
16          Plaintiff,                 )
                                       )
17      v.                             )   COMPLAINT FOR BREACH OF
                                       )   CONTRACT, BREACH OF THE
18  LIBERTY MUTUAL INSURANCE CO.;      )   IMPLIED COVENANT OF GOOD
    CONTINENTAL INSURANCE CO.; THE     )   FAITH AND FAIR DEALING, AND
19  NORTH RIVER INSURANCE CO.;         )   DECLARATORY RELIEF; DEMAND
    INSURANCE COMPANY OF NORTH         )   FOR JURY TRIAL
20  AMERICA; AMERICAN HOME             )
    ASSURANCE CO.; CONTINENTAL         )
21  CASUALTY CO.; MISSION INSURANCE    )
    CO.; FEDERAL INSURANCE CO.; FIRST  )
22  STATE INSURANCE CO.; U.S. FIRE     )
    INSURANCE CO.; AMERICAN EXCESS     )
23  INSURANCE CO.; INTERSTATE FIRE &   )
    CASUALTY CO.; TRANSPORT            )
24  INDEMNITY CO.; INTEGRITY           )
    INSURANCE CO.; and DOES 1-50,      )
25  inclusive,                         )
                                       )
26          Defendants.                )
                                       )
27  _____)

28  _____

ENDORSED
F I L E D
San Francisco County Superior Court

OCT 0 4 2001

GORDON PARK-LI, Clerk
BY: _____ MIKE MORRIS
                    Deputy Clerk

PLAN 1    MAR 0 8 2002

32   147

PL 001695

Plaintiff KELLY-MOORE PAINT COMPANY, INC., alleges as follows:

**GENERAL ALLEGATIONS**

1.      At all materials times herein, plaintiff KELLY-MOORE PAINT COMPANY, INC. ("KELLY-MOORE") was and is a corporation incorporated in the State of California, operating a paint and building materials manufacturing business, with its principal place of business in San Carlos, Califonia.

2.      Plaintiff is informed and believes that at all material times herein, defendant LIBERTY MUTUAL INSURANCE COMPANY ("LIBERTY MUTUAL") was and is a corporation or other business entity authorized to transact, and transacting, insurance business in the State of California.  LIBERTY MUTUAL is a Massachusetts mutual insurance company with its principal place of business in Boston, Massachusetts.

3.      Plaintiff is informed and believes that at all material times herein, defendant THE NORTH RIVER INSURANCE COMPANY ("NORTH RIVER") was and is a corporation or other business entity authorized to transact, and transacting, insurance business in the State of California.  NORTH RIVER is a New Jersey corporation with its principal place of business in Morristown, New Jersey.

4.      Plaintiff is informed and believes that at all material times herein, defendant CONTINENTAL INSURANCE COMPANY ("CONTINENTAL") was and is a corporation or other business entity authorized to transact, and transacting, insurance business in the State of California.  CONTINENTAL is a New Hampshire corporation with its principal place of business in Chicago, Illinois.

5.      Plaintiff is informed and believes that at all material times herein, defendant INSURANCE COMPANY OF NORTH AMERICA ("INA") was and is a corporation or other business entity authorized to transact, and transacting,

---

1

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

PL 001696

1   insurance business in the State of California.  INA is a Pennsylvania corporation with

2   its principal place of business in Philadelphia, Pennsylvania.

3        6.    Plaintiff is informed and believes that at all material times herein,

4   defendant AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME")

5   was and is a corporation or other business entity authorized to transact, and

6   transacting, insurance business in the State of California.  AMERICAN HOME  is a

7   New York corporation with its principal place of business in New York, New York.

8        7.    Plaintiff is informed and believes that at all material times herein,

9   defendant CONTINENTAL CASUALTY COMPANY ("CONTINENTAL

10   CASUALTY") was and is a corporation or other business entity authorized to

11   transact, and transacting, insurance business in the State of California.

12   CONTINENTAL CASUALTY  is an Illinois corporation with its principal place of

13   business in Chicago, Illinois.

14        8.    Plaintiff is informed and believes that at all material times herein,

15   defendant MISSION INSURANCE COMPANY ("MISSION") was and is a

16   corporation or other business entity authorized to transact, and transacting,

17   insurance business in the State of California. MISSION  is a California corporation

18   with its principal place of business in Long Beach, California, and is currently in

19   liquidation.

20        9.    Plaintiff is informed and believes that at all material times herein,

21   defendant FEDERAL INSURANCE COMPANY ("FEDERAL") was and is a

22   corporation or other business entity authorized to transact, and transacting,

23   insurance business in the State of California. FEDERAL is a New Jersey corporation

24   with its principal place of business in Warren, New Jersey.

25        10.    Plaintiff is informed and believes that at all material times herein,

26   defendant FIRST STATE INSURANCE COMPANY ("FIRST STATE") was and is a

27

2

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

28

Case No. C-01-0700 CRB ARB

PL 001697

1     corporation or other business entity authorized to transact, and transacting,

2     insurance business in the State of California. FIRST STATE is a Delaware corporation

3     with its principal place of business in Boston, Massachusetts.

4           11.     Plaintiff is informed and believes that at all material times herein,

5     defendant U.S. FIRE INSURANCE COMPANY ("U.S. FIRE") was and is a

6     corporation or other business entity authorized to transact, and transacting,

7     insurance business in the State of California. U.S. FIRE is a New York corporation

8     with its principal place of business in Morristown, New Jersey.

9           12.     Plaintiff is informed and believes that at all material times herein,

10     defendant AMERICAN EXCESS INSURANCE COMPANY ("AMERICAN EXCESS")

11     was and is a corporation or other business entity authorized to transact, and

12     transacting, insurance business in the State of California. AMERICAN EXCESS  is a

13     Delaware corporation with its principal place of business in New York, New York.

14           13.     Plaintiff is informed and believes that at all material times herein,

15     defendant INTERSTATE FIRE & CASUALTY COMPANY ("INTERSTATE") was and

16     is a corporation or other business entity authorized to transact, and transacting,

17     insurance business in the State of California.  INTERSTATE is an ILLINOIS

18     corporation with its principal place of business in Chicago, Illinois.

19           14.     Plaintiff is informed and believes that at all material times herein,

20     Defendant TRANSPORT INDEMNITY COMPANY ("TRANSPORT") was and is a

21     corporation or other business entity authorized to transact, and transacting,

22     insurance business in the State of California.  TRANSPORT is a California

23     corporation with its principal place of business in Los Angeles, California.

24           15.     Plaintiff is informed and believes that at all material times herein,

25     Defendant INTEGRITY INSURANCE COMPANY ("INTEGRITY") was and is a

26     corporation or other business entity authorized to transact, and transacting,

27

28

**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF**

Case No. C-01-0700 CRB ARB

PL 001698

1    insurance business in the State of California. INTEGRITY is a New Jersey

2    corporation with its principal place of business in Paramus, New Jersey, and is

3    currently in liquidation.

4        16.    Plaintiff is ignorant of the true names and capacities of defendants sued

5    herein as DOES 1-50, inclusive, and therefore sues these defendants by said fictitious

6    names. Plaintiff is informed and believes, and thereon alleges, that said fictitiously

7    named defendants are responsible in some manner for the events and happenings

8    herein referred to, and negligently or otherwise caused injuries and damages

9    proximately thereby to plaintiff as herein alleged.

10       17.    At all material times herein, each of the named and fictitiously named

11   defendants was acting individually or as agent, servant and employee of each of his,

12   her, or its co-defendants, and at all of said times each of said named or fictitiously

13   named defendants was acting within the scope of said agency, service and

14   employment. At all relevant times, each of the acts of each of the said defendants

15   was ratified by each of the other said defendants.

16                          <u>THE "ASBESTOS LITIGATION"</u>

17       18.    KELLY-MOORE, through its subsidiary PACO Textures Corporation

18   ("PACO"), manufactured asbestos-containing building materials from

19   approximately 1960 to 1978.

20       19.    Tens of thousands of claimants in a number of jurisdictions have

21   brought bodily injury actions against KELLY-MOORE relating to alleged exposure

22   to PACO asbestos-containing products (the "Asbestos Litigation"). The Asbestos

23   Litigation claimants either do not specify the dates of their exposure to PACO

24   asbestos-containing products or allege that exposure occurred prior to October 1,

25   1984.

26

27

28

PL 001699

## INSURANCE POLICIES

20.    LIBERTY MUTUAL, INA, U.S. FIRE, and several other insurance carriers issued certain primary liability insurance policies to KELLY-MOORE with effective dates from approximately January 1, 1956 to October 1, 1984. Each of these primary liability policies provided defense and indemnity coverage to KELLY-MOORE for bodily injury claims, including the asbestos-related personal injury claims that comprise the Asbestos Litigation.

21.    KELLY-MOORE is informed and believes, and thereon alleges, that the bodily injury products liability aggregate limits of each of the primary liability insurance policies are exhausted.

22.    LIBERTY MUTUAL, CONTINENTAL, NORTH RIVER, INA, AMERICAN HOME, and MISSION issued first-layer excess liability insurance policies to KELLY-MOORE with effective dates from approximately January 1, 1966 to October 1, 1984. Attached hereto as Exhibit "A" and incorporated herein by reference is a schedule which lists each first-layer excess policy that KELLY-MOORE is informed and believes LIBERTY MUTUAL, CONTINENTAL, NORTH RIVER, INA, AMERICAN HOME, and MISSION issued to KELLY-MOORE. Each of these first-layer excess liability policies provided defense and indemnity coverage to KELLY-MOORE for bodily injury claims, including the asbestos-related personal injury claims that comprise the Asbestos Litigation, for sums in excess of the policy limits of the underlying primary liability policies.

23.    KELLY-MOORE is informed and believes, and thereon alleges, that based upon preliminary projections of its asbestos-related liabilities arising out of the Asbestos Litigation, the bodily injury products liability aggregate limits of each of the first-layer excess liability insurance policies listed in Exhibit A will be exhausted presently.

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

PL 001700

24.    CONTINENTAL CASUALTY, FEDERAL, FIRST STATE, U.S. FIRE, AMERICAN EXCESS, INTERSTATE, TRANSPORT, and INTEGRITY issued second-layer and third-layer excess liability insurance policies to KELLY-MOORE with effective dates from approximately June 24, 1977 to October 1, 1984.  Attached hereto as Exhibit "B" and incorporated herein by reference is a schedule which lists each second-layer and third-layer excess policy that KELLY-MOORE is informed and believes CONTINENTAL CASUALTY, FEDERAL, FIRST STATE, U.S. FIRE, AMERICAN EXCESS, INTERSTATE, TRANSPORT, and INTEGRITY issued to KELLY-MOORE.  Each of these second-layer and third-layer excess liability policies provided defense and indemnity coverage to KELLY-MOORE for bodily injury claims, including the asbestos-related personal injury claims that comprise the Asbestos Litigation, for sums in excess of the policy limits of the underlying excess liability policies.

25.    KELLY-MOORE is informed and believes, and theron alleges, that based upon preliminary projections of its asbestos-related liabilities arising out of the Asbestos Litigation, the bodily injury products liability aggregate limits of each of the second-layer and third-layer excess liability insurance polices listed in Exhibit B will be impacted in the near future.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Liberty Mutual and Continental)

26.    Plaintiff incorporates by reference paragraphs 1 through 25 and realleges said allegations as though here fully set forth.

27.    From approximately January 1, 1974 to May 22, 1978, LIBERTY MUTUAL insured KELLY-MOORE under certain umbrella excess liability policies, including, without limitation, the following:  (a) Policy No. LE1-161-015355-054, with a policy period from January 1, 1974 to January 1, 1975, with per occurrence and

6

PL 001701

1    aggregate policy limits of $10 million; (b) Policy No. LE1-161-015355-104 (designated

2    as a "rewrite" of Policy No. LE1-161-015355-054), with a policy period from May 1,

3    1974 to January 1, 1975, with per occurrence and aggregate policy limits of $10

4    million; (c) Policy No. LE1-161-015355-105, with a policy period from May 1, 1975 to

5    May 1, 1976, with per occurrence and aggregate policy limits of $10 million; (d)

6    Policy No. LE1-161-015355-106, with a policy period from May 1, 1976 to May 1,

7    1977, with per occurrence and aggregate policy limits of $10 million; (e) Policy No.

8    LE1-161-015355-107, with a policy period from May 1, 1977 to May 1, 1978, with per

9    occurrence and aggregate policy limits of $10 million; and (f) Policy No. LE1-161-

10   015355-108, with a policy period from May 1, 1978 to May 22, 1978, with per

11   occurrence and aggregate policy limits of $10 million (collectively referred to as the

12   "LIBERTY MUTUAL Policies").

13       28.    LIBERTY MUTUAL, at all relevant times until approximately February

14   2001, acted as the "lead carrier" in defending and indemnifying KELLY-MOORE in

15   the Asbestos Litigation.

16       29.    LIBERTY MUTUAL, through its agents, represented to KELLY-

17   MOORE that all of the LIBERTY MUTUAL Policies provide insurance coverage to

18   KELLY-MOORE for the Asbestos Litigation, and would provide a total of at least $50

19   million in insurance coverage to KELLY-MOORE for indemnification of the Asbestos

20   Litigation claims. These representations were made by agents of LIBERTY

21   MUTUAL with actual or ostensible authority to make such representations, and

22   were binding upon LIBERTY MUTUAL. Officers, directors and/or managing agents

23   of LIBERTY MUTUAL made, authorized or ratified all statements and positions

24   taken by LIBERTY MUTUAL relating to the existence of at least $50 million in

25   insurance coverage available to KELLY-MOORE for the Asbestos Litigation.

26

27

28

30.    In reliance upon these representations of substantial insurance coverage, KELLY-MOORE allowed LIBERTY MUTUAL to settle numerous cases without any communication with or involvement by KELLY-MOORE or its defense counsel.

31.    After KELLY-MOORE had relied upon LIBERTY MUTUAL's representations of $50 million in available coverage, LIBERTY MUTUAL changed its position and asserted that only $10 million in coverage was available.

32.    While controlling these settlement negotiations, LIBERTY MUTUAL overpaid settlements in many of the claims against KELLY-MOORE, thereby prematurely exhausting its claimed $10 million policy limits.  Upon exhausting the claimed $10 million policy limits, LIBERTY MUTUAL has sought to withdraw from any further participation in KELLY-MOORE's defense in the Asbestos Litigation.

33.    KELLY-MOORE is informed and believes and theron alleges that LIBERTY MUTUAL exhausted its claimed $10 million policy limits prematurely in order to avoid its obligation under the Policies to continue paying defense costs in the Asbestos Litigation.

34.    KELLY-MOORE is informed and believes and thereon alleges that LIBERTY MUTUAL, acting as lead carrier, has unreasonably withheld policy benefits and wrongfully handled claims by, *inter alia*, the following:  failing to pay reasonable defense fees and costs in a timely manner; failing to pay expert witnesses in a timely manner; failing to pay settlement funds to claimants in a timely manner, thereby forcing claimants to file motions to compel payment of settlement funds; failing to keep KELLY-MOORE informed of settlement negotiations, despite knowing that there existed a risk of excess liability to KELLY-MOORE; failing to keep defense counsel for KELLY-MOORE informed of settlement negotiations; failing to communicate with defense counsel about the Asbestos Litigation generally; failing

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

PL 001703

1    to seek competent legal advice on matters of settlement; disregarding competent

2    legal advice on matters of settlement; failing to evaluate claims against KELLY-

3    MOORE; failing to properly investigate claims against KELLY-MOORE; overpaying

4    settlements, thereby causing KELLY-MOORE's limits of liability to exhaust

5    prematurely, and thereby improperly raising the average value of future asbestos-

6    related personal injury settlements; and failing to give its insured's interests equal

7    consideration with its own by firing Texas defense counsel, who were highly

8    experienced in representing KELLY-MOORE in the Asbestos Litigation, over

9    KELLY-MOORE's express objections, in an effort to save defense costs, and

10    otherwise to advance LIBERTY MUTUAL's interests over those of KELLY-MOORE.

11        35.    From approximately May 1, 1980 to October 1, 1983, CONTINENTAL

12    insured KELLY-MOORE under certain umbrella liability policies, including, without

13    limitation, the following:  (a) Umbrella Liability Policy No. SRU 2 15 56 23, with a

14    policy period from May 1, 1980 to May 1, 1981, with per occurrence and aggregate

15    policy limits of $20,000,000; (b) Umbrella Liability Policy No. SRU 2 15 56 65, with a

16    policy period from May 1, 1981 to May 1, 1982, with per occurrence and aggregate

17    policy limits of $20,000,000; and (c) Umbrella Liability Policy No. SRU 2 15 57 50, with

18    a policy period from May 1, 1982 to October 1, 1983, with per occurrence and

19    aggregate policy limits of $20,000,000 (collectively referred to herein as the

20    "CONTINENTAL Policies").  The CONTINENTAL Policies are excess to the

21    underlying primary liability policies issued by Truck Insurance Exchange for the

22    May 1, 1980 to October 1, 1983 time period.

23        36.    The CONTINENTAL Policies provide both defense and indemnity

24    coverage to KELLY-MOORE for the asbestos-related personal injury claims that

25    comprise the Asbestos Litigation, in excess of the policy limits of the underlying

26    primary liability policies issued by Truck Insurance Exchange.

27

28

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

PL 001704

1    37.    KELLY-MOORE has been informed by its insures that the aggregate

2    limits of each of the primary liability policies have exhausted, including those

3    primary policies underlying the CONTINENTAL Policies, issued by Truck Insurance

4    Exchange.

5    38.    KELLY-MOORE is informed and believes and thereon alleges that,

6    upon exhaustion of the primary policies, CONTINENTAL reached an agreement

7    with two of KELLY-MOORE's other excess liability insurers, LIBERTY MUTUAL and

8    NORTH RIVER, to share, on a percentage basis, payment of judgments and

9    settlements of the Asbestos Litigation claims against KELLY-MOORE.

10    39.    CONTINENTAL has refused to pay KELLY-MOORE's defense costs in

11    the Asbestos Litigation.

12    40.    KELLY-MOORE has duly complied with all the material terms and

13    conditions of the LIBERTY MUTUAL Policies and CONTINENTAL Policies.

14    41.    KELLY-MOORE has been and is exposed to liability to pay substantial

15    sums because of alleged bodily injury in connection with the claims asserted against

16    KELLY-MOORE in the Asbestos Litigation.

17    42.    KELLY-MOORE timely notified CONTINENTAL of the claims asserted

18    against KELLY-MOORE in the Asbestos Litigation, and requested that

19    CONTINENTAL investigate these claims, provide KELLY-MOORE with a defense to

20    these claims, and pay on KELLY-MOORE's behalf any sum that KELLY-MOORE

21    may be liable to pay because of alleged bodily injury relating to the Asbestos

22    Litigation.

23    43.    CONTINENTAL has refused to honor its obligation to investigate and

24    to defend against the claims asserted against KELLY-MOORE in the Asbestos

25    Litigation.

26

27

28

10

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

44.    CONTINENTAL has wrongfully refused to defend KELLY-MOORE in the Asbestos Litigation, and has breached its contractual duties to investigate and defend against claims made against KELLY-MOORE in the Asbestos Litigation, as described above.

45.    LIBERTY MUTUAL has breached its contractual duties by unreasonably withholding policy benefits, failing to investigate claims, and wrongfully handling claims against KELLY-MOORE in the Asbestos Litigation, as described above.

46.    By reason of LIBERTY MUTUAL's and CONTINENTAL's wrongful conduct, KELLY-MOORE has been caused to suffer and will continue to suffer substantial prejudice and damages.

47.    By reason of LIBERTY MUTUAL's and CONTINENTAL's breach of contract, KELLY-MOORE has been caused to suffer and continues to suffer ongoing loss of the benefits it is due, together with interest thereon at the legal rate from the date the payment should have been made under the terms of the respective LIBERTY MUTUAL and CONTINENTAL Policies until it is paid.

WHEREFORE, plaintiff prays judgment against defendants LIBERTY MUTUAL and CONTINENTAL, as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against Liberty Mutual and Continental)

48.    Plaintiff incorporates by reference paragraphs 1 through 47 and realleges said allegations as though here fully set forth.

49.    Implied in each insurance policy is a covenant by the insurer that it will act in good faith and fair dealing with its insured; that it will do nothing to interfere with the right of its insured to receive the benefits of the policy; that it will give at

11

1    least as much consideration to the interests of its insured as it gives to its own

2    interests; that it will investigate all possible bases for coverage; and that it will deny

3    no claim without thoroughly investigating the foundation for the denial and at all

4    times deal in good faith with its insured (hereinafter referred to as "the implied

5    covenant of good faith and fair dealing").

6        50.    At all material times herein, LIBERTY MUTUAL has violated its

7    covenant of good faith and fair dealing by, *inter alia*, the following:

8            (a)    Consciously and unreasonably failing to properly investigate

9            the claims against KELLY-MOORE fairly and in good faith, and

10           refusing to give the insured's interests equal consideration with its

11           own;

12           (b)    Consciously and unreasonably failing to pay reasonable defense

13           fees and costs in a timely manner;

14           (c)    Consciously and unreasonably failing to pay expert witnesses in

15           a timely manner;

16           (d)    Consciously and unreasonably failing to pay settlement funds

17           to claimants in a timely manner, thereby forcing claimants to file

18           motions to compel payment of settlement funds;

19           (e)    Consciously and unreasonably failing to keep KELLY-MOORE

20           informed of settlement negotiations, despite knowing that there

21           existed a risk of excess liability to KELLY-MOORE;

22           (f)    Consciously and unreasonably failing to keep defense counsel

23           for KELLY-MOORE informed of settlement negotiations;

24           (g)    Consciously and unreasonably failing to communicate with

25           defense counsel about the Asbestos Litigation generally;

26

27                                                        12

28

PL 001707

(h)     Consciously and unreasonably failing to seek competent legal advice on matters of settlement, and disregarding competent legal advice on matters of settlement;

(i)     Consciously and unreasonably failing to properly evaluate claims against KELLY-MOORE;

(j)     Consciously and unreasonably failing to give its insured's interests equal consideration with its own by overpaying settlements, thereby causing KELLY-MOORE's insurance coverage to exhaust prematurely, and thereby improperly raising the average value of future asbestos-related personal injury settlements;

(k)     Consciously and unreasonably failing to give its insured's interests equal consideration with its own by firing Texas defense counsel, who were highly experienced in representing KELLY-MOORE in the Asbestos Litigation, over KELLY-MOORE's express objections, in an effort to save defense costs, and otherwise to advance LIBERTY MUTUAL's interests over those of KELLY-MOORE; and

(l)     Consciously and unreasonably embarking on an interpretation of the facts and policy provisions calculated to deprive KELLY-MOORE of coverage when LIBERTY MUTUAL knew that KELLY-MOORE was and is entitled to full coverage under each of the LIBERTY MUTUAL policies.

51.     At all material times herein, CONTINENTAL has violated its covenant of good faith and fair dealing by, *inter alia*, the following:

(a)     Consciously and unreasonably refusing to pay KELLY-MOORE benefits to which it is entitled pursuant to the CONTINENTAL Policies, and depriving KELLY-MOORE of its rightful benefits with the

13

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, AND DECLARATORY RELIEF

PL 001708

1    knowledge that said denials were and are wrongful and contrary to

2    CONTINENTAL's obligations under the CONTINENTAL Policies and

3    the law;

4    (b)    Consciously and unreasonably failing to properly investigate

5    KELLY-MOORE's claim fairly and in good faith and refusing to give

6    KELLY-MOORE's interests at least as much consideration as

7    CONTINENTAL gave its own;

8    (c)    Consciously and unreasonably refusing to make payment to

9    KELLY-MOORE, with the intent of saving itself money at KELLY-

10    MOORE's expense;

11    (d)    Consciously and unreasonably denying coverage without

12    thoroughly investigating the foundation for its denial; and

13    (e)    Consciously and unreasonably embarking on an interpretation

14    of the facts and policy provisions calculated to deprive KELLY-MOORE

15    of coverage when CONTINENTAL knew that KELLY-MOORE was

16    and is entitled to coverage.

17    52.    KELLY-MOORE is informed and believes and thereon alleges that the

18    aforementioned conduct is a common pattern and practice on the part of LIBERTY

19    MUTUAL and on the part of CONTINENTAL with regard to the manner in which

20    they treat their insureds.

21    53.    KELLY-MOORE is informed and believes and theron alleges that in

22    taking such actions, LIBERTY MUTUAL and CONTINENTAL each acted with malice,

23    fraud and/or oppression, as defined as California Civil Code §3294.

24    54.    As a proximate result of LIBERTY MUTUAL's and CONTINENTAL's

25    actions, KELLY-MOORE has been caused to suffer and will continue to suffer

26    substantial prejudice and damages.

27
28

PL 001709

1      55.     As a further proximate result of LIBERTY MUTUAL's and

2  CONTINENTAL's actions, KELLY-MOORE has incurred, and will continue to incur,

3  attorneys' fees and related costs in order to obtain the policy benefits LIBERTY

4  MUTUAL and CONTINENTAL have withheld.

5      56.     As a result of LIBERTY MUTUAL's and CONTINENTAL's conduct, as

6  alleged herein, KELLY-MOORE is entitled to recover its damages, including

7  attorneys' fees and expenses, and to claim and recover punitive damages from

8  LIBERTY MUTUAL and CONTINENTAL, in amounts to sufficient to punish and

9  make an example of LIBERTY MUTUAL and CONTINENTAL in order to deter such

10  conduct in the future.

11      WHEREFORE, plaintiff prays judgment against defendants LIBERTY

12  MUTUAL and CONTINENTAL, as hereinafter set forth.

13                        **THIRD CAUSE OF ACTION**

14                  **(Declaratory Relief Against All Defendants)**

15      57.     Plaintiff incorporates by reference paragraphs 1 through 56 and

16  realleges said allegations as though here fully set forth.

17      58.     Each of the excess liability policies listed in Exhibits A and B provided

18  defense and indemnity coverage to KELLY-MOORE for bodily injury claims,

19  including asbestos-related personal injury claims that comprise the Asbestos

20  Litigation.

21      59.     Claimants in the Asbestos Litigation allege bodily injury that occurred

22  during the time period that each of defendants' excess liability policies was in effect.

23      60.     KELLY-MOORE is informed and believes, and theron alleges, that

24  based upon preliminary projections of its asbestos-related liabilities arising out of

25  the Asbestos Litigation, the bodily injury products aggregate limits of each of the

26  defendants' excess liability policies will be exhausted or impacted in the near future.

27                                   15
   COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
28              AND FAIR DEALING, AND DECLARATORY RELIEF

                                   Case No. C-01-0700 CRB ARB

PL 001710

61.    An actual controversy of a justiciable nature exists between KELLY-MOORE and defendants over defendants' rights, duties and obligations arising out of the terms, conditions, exclusions and limitations of defendants' respective liability insurance policies regarding the Asbestos Litigation.

62.    KELLY-MOORE desires and is entitled to a judicial declaration of the rights, duties and obligations of defendants setting forth the extent of the duty to defend and/or indemnify that defendants owe to KELLY-MOORE under defendants' respective liability insurance policies in the Asbestos Litigation.

WHEREFORE, plaintiff prays for judgment against defendants as follows:

1.    For special damages against LIBERTY MUTUAL and CONTINENTAL according to proof;

2.    For exemplary damages against LIBERTY MUTUAL and CONTINENTAL according to proof;

3.    For declaratory relief against all defendants that each defendant owes a duty to defend and indemnify plaintiff under their respective polices of excess liability insurance relating to the Asbestos Litigation;

4.    For attorneys' fees incurred in obtaining policy benefits;

5.    For costs of suit incurred herein;

6.    For prejudgment interest; and

7.    For such other and further relief that the court may deem just and proper.

//

//

//

//

//

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF

Case No. C-01-0700 CRB ARB

PL 001711

1

## JURY DEMAND

2      Plaintiff KELLY-MOORE PAINT COMPANY, INC. demands trial by jury.

3

4      Dated:  October _4_, 2001                    PILLSBURY & LEVINSON, LLP

5

6                                                   By_____

7                                                      Philip L. Pillsbury, Jr.

8                                                   Attorneys for Plaintiff
                                                    KELLY-MOORE PAINT COMPANY, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                  17

28      COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING, AND DECLARATORY RELIEF

                                                    Case No. C-01-0700 CRB ARB

PL 001712

**EXHIBIT A**

PL 001713

*Kelly-Moore Paint Company, Inc. v.*
*Liberty Mutual Insurance Company, et al.*

### EXHIBIT A (First Excess Layer) TO:

**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

| INSURANCE CARRIER | POLICY NUMBER | POLICY TERM |
|---|---|---|
| Continental Casualty Company | RDX9686114 | 1/1/64-1/1/65 |
| Insurance Company of North America, Inc. | XBC5650 | 1/1/65-1/1/69 (4 annual periods) |
| Insurance Company of North America, Inc. | XBC22366 | 1/1/69-1/1/72 (3 annual periods) |
| American Home Assurance Company | BE2674274 | 12/1/70-1/1/74 (4 annual periods |
| North River Insurance Company | DCL917362 | 10/26/71-12/17/71 |
| North River Insurance Company | DCL917542 | 12/17/71-1/1/75 (4 annual periods) |
| Liberty Mutual Insurance Company | LG1-161015355-054 | 1/1/74-5/1/74 |
| Liberty Mutual Insurance Company | LG1-161015355-104 | 5/1/74-5/1/75 |
| Liberty Mutual Insurance Company | LG1-161015355-105 | 5/1/75-5/1/76 |
| Liberty Mutual Insurance Company | LG1-161015355-106 | 5/1/76-5/1/77 |
| Liberty Mutual Insurance Company | LG1-161015355-107 | 5/1/77-5/1/78 |
| Liberty Mutual Insurance Company | LG1-161015355-108 | 5/1/78-5/22/78 |
| Mission Insurance Company | M849015 | 5/1/79-5/1/80 |
| Continental Insurance Company | SRU2155623 | 5/1/80-5/1/81 |
| Continental Insurance Company | SRU2155665 | 5/1/81-5/1/82 |
| Continental Insurance Company | SRU2155750 | 5/1/82-10/1/83 (2 annual periods) |

PL 001715

*Kelly-Moore Paint Company, Inc. v.*
*Liberty Mutual Insurance Company, et al.*

**EXHIBIT B (Second & Third Excess Layers) TO:**

**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF
GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF; DEMAND
FOR JURY TRIAL**

| INSURANCE CARRIER | POLICY NUMBER | POLICY TERM |
|---|---|---|
| Federal Insurance Company | 7920443 | 6/24/77-5/1/78 |
| United States Fire Insurance Company | 522-0001692 | 5/1/78-5/23/78 |
| First State Insurance Company | 926755 | 6/5/78-5/1/79 |
| Interstate Fire & Casualty Company | 155-U027331 | 6/5/78-5-1-79 |
| Continental Casualty Company | RDX1787608 | 5/1/80-5/1/81 |
| Continental Casualty Company | RDX1776773 | 5/1/81-5/1/82 |
| Continental Casualty Company | RDX1776851 | 5/1/82-10/1/83 (2 annual periods) |
| Continental Casualty Company | RDX62135809 | 10/1/83-2/14/84 |
| Integrity Insurance Company | XL208293 | 2/14/84-10/1/84 |
| Insurance Company of North America | XPC156102 | 2/14/84-10/1/84 |
| Transport Indemnity Company | TEL00810C | 2/14/84-10/1/84 |
| First State Insurance Company | 925027 | 6/24/77-5/1/78 |
| Federal Insurance Company | 79227956 | 5/1/78-523/ |
| American Excess Insurance Company | EUL5073250 | 5/1/80-5/1/81 |

EXHIBIT 38

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

_____

THOMAS FERNANDEZ, et al.,                )
                                         )
              Plaintiffs,                )
                                         ) Case No.
       vs.                               )
                                         ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al., )
                                         )
              Defendants.                )
                                         )
                                         )
                                         )
_____

VIDEOTAPED DEPOSITION OF STEPHEN FERRARI
March 26, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79126

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN  FERRARI                                        March 26, 2008

Page 67

1    BY MR. JACKSON:

2        Q    We have taken a short break.  Are you ready

3    to continue, Mr. Ferrari?

4        A    Yes.

10:37   5        Q    Thank you.  How did the idea of setting up

6    the ESOP come about?

7        A    I recall Bill Moore became aware of the

8    ESOP and decided to investigate, investigate an ESOP a

9    little bit further.

10:38  10        Q    I see.  And when you say Bill Moore became

11   aware of the ESOP -- and by Bill Moore you also referred

12   to him as Mr. Moore quite often?

13        A    Bill Moore and Mr. Moore.

14        Q    So Bill Moore became aware of an ESOP.

10:38  15   What do you mean by that?

16        A    Well, he became aware that ESOPs existed.

17   And he I believe got the understanding that with an ESOP

18   one could get some -- an owner of a company could get

19   some liquidity of a company.  He also could provide an

10:38  20   retirement plan for individuals, provide them with an

21   ownership interest in a company.  And the ESOP also

22   would provide for certain tax deductions.  And when he

23   became aware of all these benefits of an ESOP, he

24   decided that it would be appropriate to look into the

10:39  25   possibility of an ESOP further.

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN  FERRARI                                    March 26, 2008

Page 170

1      Q    Other than relying on Cheryl Mills, what

2  other steps, if any, did the company take to address its

3  concerns about asbestos related lawsuits?

4           MR. PALMER:    Object to the form.

13:56   5      A    I don't recall right now.  In 1998 we did

6  rely on our counsel and I believe Cheryl Mills did

7  extensive analyses of the coverage.  And again it was my

8  understanding that's who the company relied upon.  Joe

9  Cristiano was the main person who dealt with her.

13:57  10  BY MR. JACKSON:

11      Q    When you said it's your understanding that

12  she did extensive analysis, did you talk to her about

13  the analysis she did?

14      A    I believe Joe Cristiano was the main person

13:57  15  that talked with her.  I believe I may have had

16  conversations with her on occasion, though.  I don't

17  recall the detail of those conversations at the moment.

18      Q    Do you recall what she told you she was

19  doing as her analysis?

13:57  20      A    I don't recall the details of that right

21  now.

22      Q    Do you recall if she hired an actuary to

23  take a look at the number of asbestos lawsuits that

24  could be filed?

13:57  25      A    I don't recall.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN   FERRARI                                    March 26, 2008

Page 175

1    officially whether Cheryl Mills still felt that way.

2              I believe this was near the time of the

3    transaction -- the ESOP transaction.  So we, Joe

4    Cristiano and I, called her up and asked her is that

14:13    5    still the case that the insurance still will cover any

6    and all asbestos claims.  And she basically said that

7    was the case.  And we wrote that down.  And I put that

8    in the file, I believe.

9              I believe after that Cheryl Mills continued

14:14   10    to represent in 1998, that that was the case.  And

11    simply as part of our due diligence to do what's right

12    in the interest of the participants and in the interest

13    of setting up the ESOP, I wanted to know or we wanted to

14    know.  And that's why we had that conversation.

14:14   15         Q    Did you tell Mr. Moore about your

16    conversation with Cheryl Mills?

17         A    I don't recall.

18         Q    Did you tell the ESOP participants about

19    your conversation with Cheryl Mills?

14:15   20         A    I don't believe there was any specific

21    conversation with the ESOP participants because there

22    was not a concern.  Basically we got the representation

23    that the asbestos claims were covered by insurance.  I

24    know where that especially changed was after the

14:15   25    Hernandez lawsuit.  At that time I recall specifically

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN  FERRARI                                    March 26, 2008

Page 202

1    Q    Other than letters to auditors, were there

2    any other letters from Cheryl Mills that you are aware

3    of addressing insurance coverage in the asbestos

4    litigation prior to December 11th 1998?

15:17    5              MR. PALMER:   Object to the form.

6    A    There may have been.  I don't recall right

7    now.

8    BY MR. JACKSON:

9    Q    So you don't know if there were or not?

15:17    10    A    I don't recall.

11    Q    If I represent to you -- well, where would

12    such documents be stored?

13    A    Normally they were kept in the files behind

14    Arleen Lombardi's desk at Kelly-Moore Paint Company.

15:17    15    Q    I am going to ask you to take a look at a

16    document which we will mark as 76.

17              (Exhibit No. 76 marked

18               for identification.)

19

15:18    20    Q    It's KMH 7204 and 05.

21              MR. LOVITT:   Is there an extra copy over

22    there?  Okay.

23    BY MR. JACKSON:

24    Q    Is this the letter you were referring to a

15:18    25    moment ago when you said that there were documents sent

STEPHEN  FERRARI                                    March 26, 2008

Page 203

1    by Cheryl Mills to the auditor?

2         A    I believe this was the letter.  I don't see

3    any carbon copy from Kelly-Moore, but I believe

4    Kelly-Moore did get a copy of this letter.  Typically

15:19   5    the letters that went to auditors normally were copied

6    Kelly-Moore.

7         Q    So this is the earlier letter you were

8    referring to?

9         A    I believe this was the letter.

15:19  10         Q    Other than Exhibit 76 and the letter in

11   Exhibit 75, prior to December 11th of 1998, do you

12   recall if there were any other letters regarding

13   insurance coverage in the asbestos litigation from

14   Cheryl Mills?

15:19  15         A    There may have been other letters in 1998.

16   I don't recall.  There may have been other letters in

17   conjunction with prior audits that were similar to this.

18   I don't recall the details right now.

19         Q    Other than letters to auditors, do you

15:20  20   recall prior to December 12th 1990 -- I'm sorry --

21   December 11th 1998, there being any letter from Cheryl

22   Mills to anyone at the company that you saw that laid

23   out insurance coverage for asbestos litigation?

24         A    There may have been but I just don't recall

15:20  25   right now.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363      Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN    FERRARI                                    March 26, 2008

Page 213

1    any discussions with anyone at the company about this

2    December 11th 1998, letter from Cheryl Mills?

3            A    I don't know.  I don't recall right now.

4            Q    Do you recall disclosing it to Mr. Moore?

15:32   5        A    I don't recall.

6            Q    Do you recall disclosing it to the ESOP

7    participants?

8            A    I don't recall disclosing it to the ESOP

9    participants because it says there was adequate

15:32  10    insurance to -- adequate insurance to cover asbestos

11    litigation and future asbestos litigation.  It wasn't

12    until after the Hernandez case I believe that there was

13    more concerns about what was happening with the asbestos

14    litigation.  And since we wanted to do what was right

15:32  15    for the participants, we disclosed information when the

16    company had concerns.  As we got information that there

17    was concerns based upon the discussions with our

18    attorneys, we disclosed information to the ESOP

19    participants.

15:33  20        Q    Let's go back to that letter for a second

21    then on Exhibit 75.  On the first page of it, so

22    Exhibit 75, what is the second page and the first page

23    of the letter; do you see that page?

24            A    Yes.

15:34  25        Q    The sentence beginning, as we both know; do

STEPHEN  FERRARI                                           March 26, 2008

                                                              Page 216

            1           Q     Tell me when you've had a chance to look at

            2     that.

            3           A     I see this letter.

            4           Q     I am going to ask you to go back to 75 for

  15:37     5     a moment.  Do you have Exhibit 75 in front of you?

            6           A     I do have Exhibit 75.

            7           Q     Did you give Exhibit 75 to B.J. Brooks?

            8           A     I don't recall.

            9           Q     Do you know if Mr. Cristiano did?

  15:38    10           A     I don't recall.

           11           Q     Do you know if anybody at Paint did?

           12           A     I don't recall.

           13           Q     Did you give it to Mr. Ireland?

           14           A     I don't recall.

  15:38    15           Q     Do you --

           16           A     I recall that we discussed asbestos

           17     litigation and insurance coverage with Mr. Brooks and

           18     Mr. Ireland, but I don't recall specifically what

           19     documents we gave to them.

  15:38    20           Q     Did you give them this letter; do you know?

           21           A     I don't know.

           22           Q     This letter wasn't received until after the

           23     initial Paint transaction; correct?

           24           A     I believe the ESOP transaction for

  15:39    25     Kelly-Moore Paint was 1998.  And this letter appears to

STEPHEN  FERRARI                                    March 26, 2008

Page 245

1             MR. PALMER:    Object to the form.

2             MS. DILLER:    Argumentative.

3        A    I gave him whatever information that he

4    requested.  I also told him about any -- told him about

16:31   5    asbestos litigation and insurance coverage.  If he would

6    have asked me for any information, I would have given it

7    to him.  I am not sure what he asked for and what I gave

8    him.

9    BY MR. JACKSON:

16:31  10        Q    What exactly did you tell him about

11    asbestos litigation?

12        A    I don't recall the detail of that

13    conversation right now.  I know that based upon the

14    information we had gotten from Cheryl Mills is that we

16:32  15    had a large number of asbestos claims and that I also

16    told him that based upon the information that we got

17    from her, she said that we had plenty of insurance right

18    now.

19        Q    Anything else you told him?

16:32  20        A    I don't recall right now.

21        Q    Do you know why he didn't mention any of

22    that information in his reports?

23             MR. PALMER:    Object to the form.  Calls

24    for speculation.

16:32  25    BY MR. JACKSON:

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN   FERRARI                                    March 26, 2008

Page 246

1        Q    Asking if you know?

2        A    I don't know.

3        Q    Did you tell him that there were over

4   10,000 claims at the time that the valuation was done?

16:32   5        A    I don't recall if I told him an exact

6   number.  But I do recall that I told him that there was

7   many claims so that he knew that there was a large

8   magnitude of asbestos litigation.

9        Q    Did you give him any document which laid

16:33   10  out the magnitude of the asbestos litigation?

11       A    I don't recall.

12       Q    Do you know if he took notes when you told

13  him this?

14       A    I don't specifically recall.

16:33   15       Q    Do you generally recall whether or not he

16  was taking notes when you met with him about the

17  company?

18       A    I don't recall.

19       Q    I am going to ask you to take a look at

16:33   20  what has been previously marked as Exhibit 52.

21  Actually, let's start with Exhibit 53.  You already have

22  53?

23       A    I have 53 here.

24       Q    I will ask you to look at the second page

16:34   25  there.  Do you have that document in front of you?

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN   FERRARI                                    March 26, 2008

Page 267

1    update letter.

2         A     There is 55 and here is Exhibit 9.

3         Q     Looking first at Exhibit 9, did you review

4    a draft of this document before you reviewed the final

17:06   5    document?

6         A     I don't recall if I reviewed a draft before

7    the final document, if there was one.  I don't recall.

8         Q     Do you recall receiving what you understood

9    to be a draft and writing anything on a draft?

17:07   10         A     I don't recall.

11         Q     What about Exhibit 55?  Do you recall if

12    you ever saw a draft of 55 before it became final?

13         A     I don't recall.

14         Q     All right.  I am going to ask you to

17:07   15    look -- oh, William Moore made the final decision about

16    what the transaction price for the October 1998 Paint

17    ESOP would be; correct?

18         A     We received -- we received a valuation from

19    Mr. Brooks, and that provided -- it was an independent

17:07   20    appraisal from Mr. Brooks.  And that provided the basis

21    for the ESOP transaction in October of 1998.

22         Q     When you said we received, what do you mean

23    by we?

24         A     Well, it came to the company.

17:08   25         Q     Were you a part of the decision to accept

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN  FERRARI                                    March 26, 2008

Page 268

1    that as a reasonable value and use it as the transaction

2    price for the 1998 ESOP?

3         A    I recall that William E. Moore made the

4    final decision as to accepting the valuation.  I recall

17:08  5    it was discussed with Joe Cristiano and myself.  I don't

6    recall the details of that discussion right now, but I

7    seem to recall that.

8         Q    When did that discussion happen?

9         A    I don't recall.

17:08  10        Q    Did it happen before the transaction?

11        A    I just don't recall the date of the

12   transaction -- I mean, the date of that discussion.

13        Q    And do you recall anything that Mr. Moore

14   said about why he was accepting the Brooks report?

17:08  15        A    I don't recall the details of that

16   discussion.  We went to Mr. Brooks to give us an

17   independent valuation.  I gave him all the information

18   he needed and he provided that information.  We looked

19   at it to see if we saw anything that was unreasonable

17:09  20   and then simply went with the valuation, I believe.

21        Q    And my question is do you recall anything

22   Mr. Moore said about why he was accepting the Brooks

23   report?

24        A    I don't recall any of those details right

17:09  25   now.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN    FERRARI                                    March 26, 2008

Page 269

1      Q    Did you have a meeting -- you said there

2    was a meeting with him and Mr. Cristiano; is that right?

3      A    I don't recall if I said there was a

4    meeting.  I believe I said that there was a discussion

17:09    5    with Mr. Moore and Mr. Cristiano regarding the

6    valuation.

7      Q    Was that a face to face meeting or

8    discussion?

9      A    I just don't recall right now.

17:09   10      Q    Was that discussion at Mr. Moore's house;

11    do you recall?

12      A    I don't recall.

13      Q    And do you recall what Mr. Moore said, if

14    anything, about the valuation and why he was going to

17:10   15    use it to set the price for the ESOP?

16      A    I don't recall --

17           MS. DILLER:   Mischaracterizes testimony.

18    Object to the form.

19      A    I don't recall the details right now.

17:10   20    BY MR. JACKSON:

21      Q    Do you recall if there were any

22    negotiations about the transaction price for the ESOP?

23           MR. PALMER:   Object to the form.

24      A    Mr. Brooks was -- was -- was engaged to

17:10   25    provide a valuation.  I don't recall negotiations with a

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

Page 270

1    valuation.  That wouldn't seem appropriate.

2    BY MR. JACKSON:

3         Q    Do you recall any negotiations between the

4    buyer and -- the seller of the shares, the Moore Trust

17:10   5    and the buyer of the shares, the ESOP, regarding the

6    price that the transaction would be done at?

7              MR. PALMER:   Object to the form.

8         A    I don't recall any such details.

9    BY MR. JACKSON:

17:11   10        Q    Do you recall if there were any

11   negotiations?

12        A    I don't recall.

13        Q    Were you a party to any such negotiations?

14        A    I don't recall.

17:11   15        Q    Well, would you recall if there were

16   actually negotiations where you said, I think the price

17   should be higher or lower for the ESOP deal?

18        A    I don't recall.

19        Q    Would you recall if there were any

17:11   20   discussions that you were involved in where the amount

21   of the ESOP deal was discussed?

22        A    I recall there was discussions that I had

23   with Joe Cristiano and William Moore regarding the

24   valuation that Mr. Brooks provided.  I don't recall

17:11   25   further detail of discussions at the present time.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN  FERRARI                                    March 26, 2008

Page 271

1      Q    And do you recall if there was any point at

2    which there was a negotiation about what the price

3    should be?

4            MR. PALMER:   Object to the form.  You

17:12  5    asked him that.  He's answered it several times.

6      A    I don't recall any such negotiations with

7    Mr. Brooks.  I don't believe anything like that

8    occurred.  I don't recall a further details of

9    discussions.

17:12  10  BY MR. JACKSON:

11     Q    Do you recall any negotiations between

12   Mr. Moore and anybody else regarding what the price for

13   the ESOP should be?

14     A    I don't recall.

17:12  15     Q    Do you recall any conversations or

16   negotiations between Mr. Cristiano and anyone else

17   regarding what the price for the ESOP's sales should be?

18     A    I don't recall.

19     Q    Were you a party to any conversations where

17:12  20  you negotiated with anyone regarding what the price of

21   the ESOP shares should be?

22     A    I don't recall.

23           MR. LOVITT:   What is the time check,

24   please, Mr. Video Man?

17:13  25           MR. JACKSON:   We can go off the record to

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN   FERRARI                                    March 26, 2008

Page 291

1          Q     To your knowledge is this the first time

2     that the company informed employees regarding the

3     asbestos litigation liabilities for Kelly-Moore Paint?

4                MS. DILLER:    Object to the form.

17:47  5                MR. PALMER:    Object to the form.

6          A     I don't recall if this was the first time

7     that employees were aware of asbestos litigation.

8     BY MR. JACKSON:

9          Q     I didn't ask whether they were aware.    I

17:47  10    said that the company informed them.

11               MS. DILLER:    Object to the form.

12         A     I don't recall if this is the first time

13    that the employees were informed of asbestos litigation.

14    I believe it was common knowledge that there was some

17:48  15    asbestos litigation there.    I don't recall which Mind

16    Your -- Our Own Business was the first time that it was

17    mentioned right now.    I know in various Mind Our Own

18    Businesses asbestos litigation was mentioned.    This was

19    first time that the Hernandez -- this was the Hernandez

17:48  20    case.    And I believe that was the first time it was

21    mentioned.

22    BY MR. JACKSON:

23         Q     My question is do you think that you told

24    the employees in a Mind Our Own Business prior to

17:48  25    October of 2001 that there was asbestos liability at the

STEPHEN   FERRARI                                    March 26, 2008

Page 292

1    company?

2          A    I don't recall.

3          Q    And you said that you thought it was common

4    knowledge.  What is your basis for that?

17:49    5          A    Some of the employees who worked at

6    Kelly-Moore had been there since there was asbestos

7    relating -- there was products that contained asbestos.

8    I believe they had worked there a long time and were

9    aware that the asbestos was in products made by PACO

17:49    10   Textures Corporation, which I believe were made -- some

11   may have been made on premises of Kelly-Moore Paint

12   Company.  And since those employees had worked there a

13   long time, I believe they were aware of some of the

14   lawsuits.

17:49    15              MR. PALMER:   Do you have a time check?

16   BY MR. JACKSON:

17         Q    Other than those --

18              THE VIDEOGRAPHER:   One minute and ten

19   seconds.

17:49    20   BY MR. JACKSON:

21         Q    Other than those employees, any other basis

22   you have for saying that there was knowledge about the

23   asbestos liability?

24         A    I don't recall details on that right now.

17:50    25         Q    Did you have any direct discussions with

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN   FERRARI                                March 26, 2008

Page 293

1    employees about asbestos liability?

2                MR. PALMER:   Object to the form.

3                MS. DILLER:   Object to the form.

4          A    I don't recall.

17:50    5    BY MR. JACKSON:

6          Q    And going back to Mr. Ireland's valuations,

7    for the valuations after 1998, do you recall any

8    questions that anyone at Kelly-Moore had about any of

9    those valuations?

17:50   10                MR. PALMER:   Object to the form.

11                MS. DILLER:   Can you repeat the question?

12                MR. LOVITT:   Would you please reread the

13   question back.

14   BY MR. JACKSON:

17:50   15          Q    For valuations, Mr. Ireland's valuations

16   after the valuation for the year ending 1998, do you

17   recall any questions that anyone at Kelly-Moore had

18   about any of those valuations?

19                MR. PALMER:   Object to the form.

17:50   20          A    I don't recall.

21   BY MR. JACKSON:

22          Q    So you don't recall any questions?

23                MR. PALMER:   Object to the form.

24                MS. DILLER:   Object to the form.

17:50   25   Mischaracterizes testimony.

# EXHIBIT 39

# CONFIDENTIAL

---

**MINUTES OF ANNUAL COMBINED MEETING OF THE**

**BOARD OF DIRECTORS AND SHAREHOLDERS**

**OF**

**KELLY-MOORE PAINT COMPANY, INC.**

**APRIL 21, 1998**

---



KMH 000452

**CONFIDENTIAL**



KMH 000453

# CONFIDENTIAL



KMH 000454

**CONFIDENTIAL**



KMH 000455

CONFIDENTIAL



KMH 000456

EXHIBIT 40

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,            )
                                     )
            Plaintiffs,              )
                                     ) Case No.
      vs.                            )
                                     ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                     )
            Defendants.              )
                                     )
                                     )
                                     )

VIDEOTAPED DEPOSITION OF JOHN MENKE
March 21, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79125

John Menke                    Confidential                    March 21, 2008

Page 44

1      called Menke & Associates, comma, Inc., dash, Georgia.

2              Q      And that is still in existence?

3              A      Yes.

4              Q      Does it have any employees?

5              A      No.

6              Q      And no asset?

7              A      No.  And then we have another one that is

8      Menke & Associates, comma, Inc., dash, Illinois.

9              Q      Any others?

10             A      No.

11             Q      Did Menke & Associates, Inc. Georgia or

12     Menke & Associates, Inc. Illinois, did either of them

13     have anything to do with the Kelly-Moore ESOP or play

14     any role in the Kelly-Moore ESOP?

15             A      No.

16             Q      All right.  Starting with Menke &

17     Associates, is Menke & Associates, Inc. a wholly owned

18     subsidiary of the Menke Group?

19             A      Yes.

20             Q      What services does Menke & Associates

21     provide?

22             A      Menke & Associates provides plan

23     installation services, provides employee communication

24     services, and provides annual administration, slash,

25     recordkeeping services, and provides legal services.

John Menke                     Confidential                March 21, 2008

1          Q    When you say that it provides these

2     services, these are all in the context of ESOPs;

3     correct?

4          A    Correct.

5          Q    Is there does Menke & Associates provide

6     non-ESOP related plan installation, employee

7     communications, plan administration, or legal services?

8          A    We provide some non-ESOP services, limited

9     services for clients who also have a 401(k) or a profit

10    sharing plan or a money purchase plan.  And we also

11    provide, back in your prior question, in addition to

12    services, there is some limited investment banking

13    services.

14         Q    What investment banking services does Menke

15    & Associates provide?

16         A    Feasibility studies and assisting in

17    raising financing for ESOP transactions.

18         Q    When you say feasibility studies, what do

19    you mean?

20         A    These are Excel feasibility studies as to

21    whether a particular transaction involving an ESOP might

22    or might not be feasible.

23         Q    And when you say Excel, do you mean that

24    they are Excel spreadsheets involved?

25         A    Excel spreadsheets, yes.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280   (800)  770-3363    Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                Confidential               March 21, 2008

1      Q      And typically what information is included

2  in a feasibility study as to whether or not an ESOP will

3  make sense?

4      A      Well, one item would be whether the

5  transaction will be financeable, whether it will meet

6  the cash flow test, cash flow requirements and meet --

7  have enough coverage ratio, for example, so that it

8  would be appealing or attractive to a lender.  And then

9  the other issue is typically whether the company's

10 eligible payroll is large enough to accomplish the

11 transaction within contribution limits and allocation

12 limits.

13     Q      And when you say the eligible payroll is

14 large enough to meet allocation and contribution limits,

15 you mean in order to get the plan tax qualified; is that

16 correct?

17     A      In order for the transaction to fit.

18     Q      To fit what?

19     A      To fit within those limitations.

20     Q      If you can explain to me your understanding

21 of contribution limits?

22     A      Well, in an ESOP the basic limit is that

23 contributions in the case of a regular "C" corporation

24 are limited to 25 percent of payroll plus interest.  If

25 the one third rule is passed, you can contribute -- the

John Menke                Confidential                March 21, 2008

Page 47

1    company sponsor can contribute in addition to that

2    25 percent interest on the ESOP loan and in addition to

3    that under 404 can contribute deductible dividends, if

4    the dividends are used to pay down the ESOP loan.

5         Q    When you say refer to 404, what are you

6    referring to?

7         A    Of the Internal Revenue Code.

8         Q    So Section 404; is that correct?

9         A    Section 404.

10        Q    And when you say allocation limits, what

11   are you referring to?

12        A    I am referring to Section 415 of the Code.

13        Q    And particularly what about 415?

14        A    Well, 415 currently limits allocations to

15   any one individual to the lesser of 45,000 or

16   100 percent of compensation.

17        Q    You said the other investment advice that

18   Menke & Associates may provide is financing.  What do

19   you mean by that?

20        A    Well, assisting the company in raising the

21   financing for an ESOP transaction.

22        Q    And what sort of financing assistance does

23   Menke & Associates provide to clients when they ask for

24   it?

25        A    That would typically involve preparation of

John Menke                    Confidential                    March 21, 2008

Page 48

1    a deal book, which explains the company, the

2    transaction, and has the financial models.  So we would

3    assist them in preparing a deal book or what you might

4    call an offering memorandum.  And then assist them with

5    soliciting indications of interest from banks or other

6    lenders and then assisting in negotiating the terms of

7    the loan.

8         Q    How is Menke typically -- how is Menke &

9    Associates typically compensated for providing this

10   financing?

11             MR. PALMER:   Object to form.

12             THE WITNESS:   Sorry?

13             MR. PALMER:   I object to the form of the

14   question.

15             THE WITNESS:   Okay.  Well, I think that's

16   fairly clear that we would typically charge a fee for

17   the preparation of the deal book and then a fee for -- a

18   success fee for raising the financing, contingent upon

19   the success of the transaction.

20   BY MR. JACKSON:

21        Q    Is that success fee sometimes tied to

22   whether or not you save the client money regarding the

23   interest rate of a loan, for instance?

24        A    Yes.

25        Q    And is that success fee sometimes tied to

John Menke                    Confidential                    March 21, 2008

1    you get a percentage of the amount that you are deemed

2    to have saved the client?

3          A     Correct.

4          Q     You mentioned plan installation -- bless

5    you -- as one of the services that Menke & Associates

6    provides.  What are the constituent elements of plan

7    installation services that Menke & Associates provides?

8          A     Yes, those are spelled out in our proposal

9    for plan installation, consist of financial consulting

10   about the feasibility of the transaction.  It includes

11   drafting the plan trust and related documents.  Includes

12   procuring the IRS determination letter.  It includes

13   giving the initial employee meeting or meetings

14   explaining the plan.  And it includes providing them

15   with administrative forms to administer and operate the

16   plan.

17         Q     And the legal services, it sounds like

18   you've just covered the employee communication,

19   administration, and plan installation functions.  What

20   about the legal services function?  What --

21         A     The legal services are optional services.

22         Q     And typically what would those optional

23   services that Menke & Associates offers be?

24         A     Those would be --

25         MR. PALMER:     Object to the form.

John Menke                      Confidential                 March 21, 2008

Page 50

1          A     Those would be spelled out in our optional

2     services agreement.  It's attached to our installation

3     proposal.  And it would include drafting the ESOP

4     transaction documents, which would include the stock

5     purchase agreement, the ESOP loan agreement, the ESOP

6     promissory note, the ESOP pledge agreement.  And then in

7     addition we also provide drafts or documents, legal

8     documents for various employee incentive plans such as

9     management stock bonus plans or a stock option plan or a

10    SERP, Supplemental Executive Retirement Plan, or phantom

11    stock plan.

12    BY MR. JACKSON:

13         Q     Does Menke & Associates also provide

14    selling shareholders advice as to investment vehicles

15    for the proceeds of a sale to an ESOP?

16         A     I'm sorry.  Repeat that.

17         Q     Does Menke & Associates also provide

18    selling shareholders advice as to the investment

19    vehicles they can use for the proceeds of a sale to an

20    ESOP, a sale of company stock to an ESOP?

21         A     No.

22         Q     That service has been provided to some

23    Menke Group clients in the past; is that correct?

24         MR. OTIS:   Excuse me.  Could you read the

25    question back, please?  The question before that?

John Menke                    Confidential                    March 21, 2008

1    Mark Bowers.  And then everybody else is involved in

2    recordkeeping and administration.

3            Q    Sansome Street Appraisers is a wholly owned

4    subsidiary of Menke Group?

5            A    Right.

6            Q    What services does Sansome Street

7    Appraisers provide its clients?

8            A    Appraisals and fairness opinions.

9            Q    All in the ESOP context?

10           A    Yes.

11           Q    Does Sansome Street Appraisers provide

12   appraisals and fairness opinions for ESOPs that are not

13   being installed by Menke & Associates?

14               MR. PALMER:   Object to the form.

15           A    Does it provide appraisal services and

16   fairness opinions that are not installed by -- basically

17   not.  Now, there is some plans that we don't install but

18   later we come to administer.  And then they would be a

19   Menke client, and they might be a case or two where then

20   Sansome Street does services for a plan that we didn't

21   install.

22   BY MR. JACKSON:

23           Q    Who heads Sansome Street Appraisers?

24           A    I do.

25           Q    Are you a CEO or do you have another title,

John Menke                 Confidential                March 21, 2008

1    if you know?

2         A    Just I use president.

3         Q    And does Sansome Street Appraisers have

4    employees?

5         A    No.

6         Q    Does it have independent contractors that

7    it uses to do appraisals?

8         A    Yes.

9         Q    And how many?

10             MR. PALMER:    Object to the form.

11        A    We have 10 to 15.

12   BY MR. JACKSON:

13        Q    Okay.  Do those appraisers work only for

14   Sansome Street Appraisers or do they work for other

15   clients as well?

16        A    They work for other clients as well.

17        Q    Are there any subdivisions or subsidiaries

18   of Sansome Street Appraisers?

19        A    No.

20        Q    Can you tell me from 1998 to present if any

21   Sansome Street Appraisers were involved in the

22   Kelly-Moore Holding ESOP?

23        A    Yes.

24        Q    And who were those appraisers?

25        A    Jack Brooks and Bob Ireland.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                    Confidential                  March 21, 2008

1          Q     And does Jack Brooks also go by B.J.

2    Brooks?

3          A     B.J. Brooks, yes.  And Bob Ireland is

4    Robert M. Ireland.  Robert M -- is that right?  Okay.

5          Q     And were there any other Sansome Street

6    Appraisers who provided any appraisal services to

7    Kelly-Moore with regard to its ESOP?

8                MS. DILLER:   Object to the form.

9    BY MR. JACKSON:

10         Q     Fair enough.  Kelly-Moore Holding with

11   regard to its ESOPs?

12         A     Not that I know of.

13         Q     Did Global Telecommunications Investment

14   Group, LLC have anything to do with the Kelly-Moore

15   Holding ESOP?

16         A     No, no.

17         Q     For the legal department at Menke &

18   Associates, does the legal department ever contract with

19   outside counsel to provide particular legal services?

20               MR. PALMER:   Object to the form.

21         A     Yeah, I'm not sure what you mean by does it

22   ever contract.  I mean, the legal --

23   BY MR. JACKSON:

24         Q     Let me put it in simpler terms.  Does Menke

25   & Associates -- does the Menke & Associates legal

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                    Confidential                    March 21, 2008

Page 104

1          Q     Do you remember what was talked about at

2     that meeting?

3          A     I don't remember very much of what was

4     talked about.  I think Mr. Moore had a number of

5     questions of which leads me to believe that he had not

6     yet made a final decision.

7               The one thing I remember about the meeting

8     was that we -- I mentioned how growing up as a kid in

9     Amarillo, I had even seen Kelly-Moore stores.  And then

10    he mentioned how that was one of his favorite stores was

11    the one in Amarillo because he bought that store, bought

12    that property years ago, and it was on the old Route 66

13    which used to be the old Chisholm Trail.  And he sort of

14    went off, you know, in fond memories of the good old

15    days.

16         Q     Other than telling you about the Amarillo

17    store, did he tell you why he was considering creating

18    an ESOP?

19         A     I don't -- I don't remember that

20    discussion, no.

21         Q     At some point you came to understand that

22    he was considering establishing an ESOP among other

23    reasons to cash out some of his value in the company on

24    a tax advantage basis; right?

25         A     Right.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415) 288-4280  (800) 770-3363    Fax  (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

Page 112

1    been in the file.  But I don't recall seeing this cover

2    letter.

3        Q     When you say the proposal, what are you

4    referring to?

5        A     The installation proposal.

6        Q     Okay.  Looking at the second page of that

7    document, under confidentiality preserved each year,

8    salaries, bonuses, ownership perks are not disclosed,

9    under that heading?

10       A     Correct.

11       Q     Was it typical for the marketer to tell

12   clients that the employees don't have to see balance

13   sheets or profit loss statements or even the appraisal?

14       A     I don't know whether it's typical for all

15   of them or not.  This was Kyle's sort of standard

16   letter.

17       Q     And do you recall talking to Mr. Moore

18   about the fact that the employees don't have to see

19   balance sheets or profit and loss statement or even

20   appraisals if you set up an ESOP?

21       A     I don't recall.

22       Q     Do you recall Mr. Coltman telling you that

23   he talked to Bill Moore about that?

24       A     No.

25       Q     Do you recall if at any point in your

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280  (800) 770-3363    Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                 Confidential              March 21, 2008

1    discussions with Bill Moore he said it was important to

2    him that he be able to keep certain information

3    confidential?

4         A    I don't remember a specific conversation

5    about that.

6         Q    Do you remember a general statement by him

7    about that or --

8         A    I can just vaguely remember, you know, a

9    general conversation or, you know, concern about keeping

10   control.  And almost every owner has a question, you

11   know, or two about that, am I really going to be able to

12   keep control.

13        Q    And by keep control, what do you mean?

14        A    Keeping the voting control.

15        Q    Okay.  And are there any other aspects to

16   keeping control other than just having voting control?

17             MR. PALMER:   Object to the form.

18             MR. OTIS:    Would you read that question

19   back, please?

20   BY MR. JACKSON:

21        Q    I can read it.  Are there any other aspects

22   to keeping control other than having voting control?

23             MR. PALMER:   Object to the form.

24             MS. DILLER:   Calls for expert testimony.

25   BY MR. JACKSON:

John Menke                  Confidential                March 21, 2008

Page 114

1          Q     In your knowledge?

2          A     I'm sorry.   What?

3          Q     In your knowledge?

4                MR. OTIS:   Do you understand the question?

5          A     Are there any aspects to control that --

6    what?

7    BY MR. JACKSON:

8          Q     Actually let me break it out.   You said

9    keeping voting control.   Let's start with that.   What

10   was Mr. Moore's concern about keeping voting control?

11               MS. DILLER:   Mischaracterizes testimony.

12   Assumes facts not in evidence.

13         A     Yeah, that --

14   BY MR. JACKSON:

15         Q     What did Mr. Moore tell you about his

16   desire to keep voting control?

17         A     Well, mainly he wanted to absolutely

18   maintain control.

19         Q     And absolutely maintain voting control?

20         A     Voting control.

21         Q     Was there any other type of control that

22   you discussed with Mr. Moore?

23         A     And I don't -- that I don't specifically

24   recall.

25         Q     And did you explain to him how he could

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363     Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                Confidential                March 21, 2008

1   keep absolute control of voting?

2        A    Yeah, simply by being the committee and the

3   trustee.

4        Q    I see.  And as the trustee he would vote

5   the ESOP shares; correct?

6        A    Correct.

7        Q    And, in fact, under the control heading

8   here, Mr. Coltman's letter says, you may elect yourself

9   to be a one person ESOP committee, thereby voting all

10  the stock in the ESOP for as long as you wish; correct?

11       A    Uh-huh.

12       Q    And, in fact, Mr. Moore did decide to elect

13  himself as a one person ESOP committee, didn't he?

14       A    I believe so.

15       Q    You said prior to the meeting you would

16  have taken a look at the file; is that correct?

17       A    Well, whatever I had.  I mean, if -- so at

18  that point I don't know if he had signed the proposal or

19  just had a proposal.  But I think I would have at least

20  had a copy of the proposal, whether it was signed or

21  not.

22       Q    At the bottom of the April 17th letter from

23  Mr. Coltman it says, enclosures.  Was one of the

24  enclosures typically a proposal for design and

25  installation?

John Menke                Confidential              March 21, 2008

Page 129

1        A    No.

2        Q    Do you remember discussing the $50,000

3    payment at that first meeting?

4        A    No.

5        Q    Moving back a few pages in the document to

6    the section called drafting of plan documents, the last

7    line there, Menke & Associates will work with you and

8    your counsel to prepare the necessary corporate minutes,

9    committee minutes and stock purchase agreement.  Do you

10   recall if Menke & Associates did, in fact, serve those

11   functions for the Paint ESOP?

12       A    Yes.

13       Q    And for the KMH ESOP when CIG was brought

14   in as well?

15       A    Yes.

16       Q    And for the CIG portion of that as well?

17       A    Yes.

18       Q    And that was an additional cost; correct?

19       A    Correct.

20       Q    Do you remember what the additional charge

21   to the company was for those -- for those services?

22       A    No, no, I do not.

23       Q    And Menke & Associates was retained by the

24   company; correct?

25       A    Correct.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                    Confidential            March 21, 2008

Page 130

1          Q    And not by the ESOP; correct?

2          A    Correct.

3          Q    Was anyone representing the ESOP

4    independently in this transaction, if you know?

5               MR. PALMER:    Object to the form.

6          A    Not that I know of.

7    BY MR. JACKSON:

8          Q    At any point was Menke & Associates

9    providing services for the ESOP?

10         A    I guess that gets into opinions or --

11         Q    Let me restate it.

12         A    We provided administration as a contract

13   administrator but that's to the company.  We were

14   engaged by the company to administer the recordkeeping

15   for the ESOP.

16         Q    Other than that did -- other than

17   administration for the ESOP that the company hired Menke

18   & Associates to do, was there any other services that

19   Menke & Associates provided directly to the ESOP?

20              MS. DILLER:    Object to the form.

21         A    Yeah, first we didn't say that we provided

22   those services to the ESOP.  And I don't think of any

23   other services.  I can't think of any other -- of any

24   services that we provided to the ESOP.

25   BY MR. JACKSON:

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                    Confidential                    March 21, 2008

Page 190

1    BY MR. JACKSON:

2         Q    Looking at No. 3 on that document, which is

3    on page 3, item No. 3, the first line of that is there

4    is no pending or to the best of our knowledge threatened

5    action, suit, or proceeding or any other order, writ,

6    judgment, award, injunction, or decree against or

7    affecting the ESOP before any court, governmental agency

8    or arbitrator.

9              Do you see that?

10   A    Yes.

11        Q    Did you understand that Kelly-Moore had a

12   number of asbestos lawsuits pending against it as of

13   October 13th 1998?

14             MS. DILLER:    Assumes facts not in

15   evidence.

16   BY MR. JACKSON:

17        Q    I am asking if you know.

18   A    I did not know.

19        Q    You didn't know that?

20   A    I did not.

21        Q    Did Mr. Moore tell you that?

22   A    No.

23        Q    Did anybody tell you that there had been

24   thousands of claims made against Kelly-Moore at that

25   point?

John Menke                  Confidential                March 21, 2008

1              MS. DILLER:    Assumes facts not in

2     evidence.    Argumentative.

3     BY MR. JACKSON:

4         Q    I am asking.

5         A    No one told me.

6         Q    Do you know if anybody told Mr. Coltman?

7         A    I wouldn't know.

8         Q    Why wouldn't you know?

9         A    How would I know if they told Mr. Coltman?

10        Q    Did you ask Mr. Coltman to review this

11    letter before you sent it?

12        A    No, Mr. Coltman's not a lawyer.

13        Q    In order to make the representations in

14    this letter, who did you talk to?

15        A    First of all, relied on the company's

16    financial statements and, secondly, representations from

17    Mr. Ferrari.

18        Q    Anyone else?

19        A    Not that I recall.

20        Q    Did Mr. Ferrari tell you that the company

21    had asbestos lawsuits pending against them?

22        A    No.

23        Q    Did Mr. Moore tell you that at any point?

24        A    No.

25        Q    When did you first find out that

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                     Confidential                March 21, 2008

Page 192

1    Kelly-Moore had problems with asbestos litigation?

2         A    Several years later.

3         Q    When you say several years, later than

4    2000?

5         A    I don't know when I first heard about it,

6    but it was this was '98, '99, 2000 -- probably 2001 or

7    2002.

8         Q    So nobody told you before the 1998

9    transaction?

10        A    No.

11            MS. DILLER:    Mischaracterizes testimony.

12   BY MR. JACKSON:

13        Q    Nobody told you before the 1999 CIG

14   transaction either?

15            MS. DILLER:    Mischaracterizes testimony.

16        A    I will repeat again, I did not know of any

17   asbestos litigation until 2001 or 2002.

18   BY MR. JACKSON:

19        Q    Who told you in 2001 or 2002 that there

20   were problems with asbestos litigation at Kelly-Moore

21   Paint?

22            MR. PALMER:    Object to the form.

23        A    I don't recall who I first heard it from.

24   All I recall, it was indirectly.  I didn't hear it from

25   the company.

Page 194

1    them what was going on?

2         A    No.

3         Q    Why not?

4         A    I wasn't the contact person.  Victor Alam

5    would be the one who would -- was the lawyer on the

6    case.

7         Q    Did you talk to Victor Alam about

8    Kelly-Moore's asbestos liability when you found out

9    about it in 2001 or 2002?

10        A    Well, I put it the other way around.  I

11   think he brought it to my attention.

12        Q    I see.

13        A    But whether he was the first to bring it to

14   my attention or not, I don't know.

15        Q    Do you know how he found out?

16        A    I don't.

17        Q    Did you talk about it with Kyle Coltman?

18        A    Not that I recall.

19        Q    Do you remember what you and Mr. Alam

20   talked about with regard to Kelly-Moore's asbestos

21   liability in 2001 or 2002?

22             MR. PALMER:   Object to the form.

23        A    I don't.

24   BY MR. JACKSON:

25        Q    Would you have changed your representation

John Menke                    Confidential                    March 21, 2008

Page 195

1    in No. 3 if you knew about asbestos lawsuits that had

2    been filed against Kelly-Moore Paint?

3                    MR. PALMER:    Object to the form.

4                    MS. DILLER:    Calls for speculation.

5                    MR. LOVITT:    Object to form.

6                    MS. DILLER:    Rank speculation.

7            A    Yeah, I really can't say what I would have

8    done.  It's speculative.  I, you know -- might have

9    depended on how much insurance coverage they had, the

10   level of claims, whole series of issues.  I don't know

11   what I -- you know, can't say what I would have done or

12   said.  I mean, clearly if they had claims that were not

13   being covered by insurance, that would have been in the

14   financial statements, and then clearly I could not have

15   or would not have given the opinion then.

16   BY MR. JACKSON:

17           Q    So you think it should have been covered by

18   the financial statements?

19                   MR. PALMER:    Object to the form.

20                   MR. LOVITT:    Form of the question.

21                   MS. DILLER:    Mischaracterizes testimony.

22           A    Yeah, I am just saying if it had been

23   stated differently in the financial statements, that

24   would have affected my opinion.

25   BY MR. JACKSON:

John Menke                  Confidential              March 21, 2008

Page 196

1          Q    And what would have needed to be in the

2     financial statements for your opinion to be effective?

3               MR. LOVITT:    Object to the form of the

4     question.

5          A    As an example, if the financial statements

6     had a paragraph that I have seen in a few other cases

7     that said the company has claims that are of the sort

8     that we cannot estimate and may have damages that are,

9     you know, subject the company to uncertain financial

10    statements or financial history, then obviously I would

11    not have been able to give an opinion.

12              MR. LOVITT:    Move to strike.  Sorry.

13    BY MR. JACKSON:

14         Q    Would you have done your --

15              MR. LOVITT:    Move to strike.

16              MR. JACKSON:    I heard the move to strike.

17              MR. LOVITT:    You did but the important

18    lady didn't.

19    BY MR. JACKSON:

20         Q    Would you have done your own due diligence

21    on the level of asbestos liability before writing

22    paragraph 3 if you had known that it was material?

23              MR. PALMER:    Object to the form of the

24    question.

25              MR. LOVITT:    Object to the form.  Calls

John Menke                    Confidential              March 21, 2008

Page 230

1    was done with no letter update?

2         A    Probably would be.

3         Q    And why?

4         A    Well, because the regulation requires that

5    there be a letter as of the date of the transaction,

6    actually.

7         Q    Is there any other reason that you would be

8    concerned?

9         A    Well --

10             MS. DILLER:   Vague and ambiguous.

11        A    -- I mean, the purpose of the regulation is

12   to make sure that the transaction is still fair.  So the

13   concern is that the valuation could have changed in the

14   interim between the date of the last appraisal and the

15   transaction date.

16   BY MR. JACKSON:

17        Q    I am going to ask you now to take a look at

18   a document which we will mark 52, which is MK 3534

19   through 3549.

20             (Exhibit No. 52 marked

21              for identification.)

22

23        Q    This may be a fairly short set of

24   questions.  Do you recognize the handwriting on the

25   first page of that document?

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

John Menke                    Confidential                    March 21, 2008

1          A    Yes.

2          Q    Whose is it?

3          A    It's Jack Brooks.

4          MS. DILLER:    I'm sorry.    What was the

5    answer to the question?

6          THE WITNESS:    Jack Brooks.

7    BY MR. JACKSON:

8          Q    By Jack Brooks you mean B.J. Brooks?

9          A    B.J. Brooks.

10         Q    Same person?

11         A    Right.

12         Q    Have you seen Mr. Brooks' working notes on

13   valuations before?

14         A    Yes.

15         Q    Have you seen this document before?

16         A    You mean this particular document?

17         Q    Yes, sir.

18         A    Yeah, it was in the documents in your

19   subpoena.

20         Q    I see.    What do you understand this

21   document to be?

22         A    These are his notes from talking with

23   somebody at the company, presumably Steve Ferrari, but I

24   have no idea how many people were involved.    But these

25   are his notes from either a meeting or a telephone

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

23769c21-4489-4d16-8bde-00ca310129e5

Page 232

1  conference where he's gone through with his sort of

2  checklist of due diligence.

3        Q    Did you discuss these notes with him?

4        A    No.

5        Q    I am going to now ask you to take a look at

6  a document MK 1141 through 1143 which we will mark as

7  53.

8                    (Exhibit No. 53 marked

9                     for identification.)

10

11       A    Yes.

12       Q    Have you seen that document before?

13       A    Yes.

14       Q    When did you see it?

15       A    Well, this particular document again was in

16  the documents in your subpoena.

17       Q    Prior to producing it to us, have you seen

18  it -- prior to producing it to plaintiffs, have you seen

19  it?

20       A    I'm sure I have somewhere.  Can't say when.

21       Q    Do you know if did Mr. Brooks run this by

22  you before he sent it to Kelly-Moore?

23       A    Well, the document was prepared by Kyle

24  Coltman.

25       Q    I see.  Did Mr. Coltman run it by you

# EXHIBIT 41

*Menke & Associates, Inc.*
*Corporate Financial Consultants*

*Mendham, New Jersey*

*144 Sansome, Suite 1000*
*San Francisco, California 94104-3821*
*(415) 362-5200*
*Fax (415) 362-3268*

**RECEIVED**

APR 2 0 1998

April 17, 1998

PERSONAL AND CONFIDENTIAL

Mr. Bill Moore, Chairman
Kelly-Moore Paint Co.
987 Commercial Street
San Carlos, CA  94070

Dear Bill:

I enjoyed meeting you and Joe on Wednesday and I look forward to possibly designing and implementing the ESOP for Kelly-Moore Paint Co. I think an ESOP would be very valuable for you and your employees and thus have prepared the enclosed materials as our proposal for the design and installation of an ESOP for Kelly-Moore Paint Co. (the "Company").

As we discussed, an ESOP provides a natural and economical way for you to cash in your investment in the Company on a tax-advantaged basis, ultimately pass control to the next generation of management, and simultaneously tie each employee's long-term compensation to the success of the Company.  Properly designed, an ESOP is advantageous to you, to successor managers, to the Company, and to the employees.

**Benefit to Selling Shareholder**

As the seller, you would realize some—or eventually all—of your investment in the Company tax free, provided that you observe the requirements for tax-free rollover: A seller is permitted to elect tax-free treatment for the transaction that puts the ESOP trust over the 30% ownership hurdle and for all subsequent transactions of whatever size.  If you eventually sell your entire 100% interest worth an estimated $600 million, the resulting diversified investment portfolio would be more than $150 million larger than with a taxable sale.  The proceeds of the sale must be reinvested in stocks or bonds of American operating companies, either public or private.

I have assumed that the ESOP would initially borrow $180 million and purchase 30% of the outstanding stock.  After several years, it is probable that the initial borrowing could be sufficiently paid down to permit the ESOP to finance a second transaction, which would enable you to sell some more of your interest tax free.

> **EXHIBIT**
> _33_
> _Menke    3-21-08_

MT 000107

*Menke & Associates, Inc.*

Mr. Bill Moore
April 17, 1998
Page 2

**Benefit to the Company**

From the Company's perspective, an ESOP sale draws upon pretax profits rather than after-tax dollars. Thus, an ESOP is inherently 34% (+ state tax) easier on the Company's cash flow than other ways of cashing out an owner, virtually all of which draw upon after-tax cash.

For each $1 million of stock purchased, therefore, the Company must earn only $1 million pretax, whereas a nondeductible redemption or key employee bonus buyout would require about $1.6 million of pretax earnings.

**Confidentiality Preserved Each Year. Salaries, bonuses, ownership perks are not disclosed.**

I should also point out that no disclosure of confidential information is required; the employees simply receive their individual account values. The employees do not have to see the balance sheet or profit/loss statements or even the appraisal.

**Control**

From your perspective, control does not change. You may elect yourself to be a one-person ESOP Committee, thereby voting all the stock in the ESOP for as long as you wish. An ESOP permits voting control to remain in the hands of the current controlling individuals for the indefinite future. Initially, the shares in the ESOP will be voted by a plan committee appointed by the current Board of Directors. When you choose to appoint a successor manager or management team to the Plan Committee, control over the ESOP shares passes to the next generation.

**Benefit to Successor Managers: Ownership**

Menke & Associates, Inc. recommends that successor managers own enough stock in the Company to guarantee their commitment to the Company. If projections indicate that currently owned shares and their ESOP accounts would be insufficient, we may recommend creating a supplementary management stock bonus plan.

MT 000108

*Menke & Associates, Inc.*

Mr. Bill Moore
April 17, 1998
Page 3


**Benefit to Employees**

Menke's experience with over 1,500 ESOP companies and published studies clearly
show the benefits of ESOPs for employees as well. By financing the transition of
ownership in the most economical way, employee-owned companies retain more
capital for long-term growth. A cogent employee communications program, one that
helps the employees to understand how they can make the Company more profitable,
can have dramatic effect on productivity, profitability, and stock price. And both of
these effects now benefit not only the founding shareholder, but the new employee
shareholders as well. If the Company's payments to buy you out average 15% of
payroll annually, a long-term employee will earn ownership equivalent to 150% of
annual compensation, plus growth, over a ten-year period.

In summary, it appears that the ESOP could be structured to accomplish your various
objectives. You will have established a true employee incentive plan, inasmuch as the
value of the Company's shares is tied to the efforts of the participants of the ESOP.
The ESOP also enables you to sell your shares to the ESOP tax-free, and all voting
control would still continue under existing arrangements. Furthermore, the cash flow of
the Company could also be enhanced.

**The Next Step**

If the enclosed proposal is of interest to you, we should arrange another meeting or
have another phone conversation together. In the meantime, if you have any
questions, please feel free to call me at (800) 347-8357 or (415) 362-5200.

Sincerely,

MENKE & ASSOCIATES, INC.

Kyle Coltman
Chief Executive Officer

KC:js

Enclosures

MT 000109