# EXHIBIT 42



*Menke & Associates, In*

Kelly-Moore Paint Co.

PROPOSAL FOR THE

DESIGN AND INSTALLATION OF AN

EMPLOYEE STOCK OWNERSHIP PLAN

EXHIBIT

34

Menke    3-21-08

MK001745

*Menke & Associates, Inc.*

*Corporate Financial Consultants*

*Mendham, New Jersey*

*114 Sansome, Suite 1000*
*San Francisco, California 94104-3821*
*(415) 362-5200*
*Fax (415) 362-3268*

April 17, 1998

PERSONAL AND CONFIDENTIAL

Mr. Bill Moore, Chairman
Kelly-Moore Paint Co.
987 Commercial Street
San Carlos, CA   94070

Dear Bill:

The purpose of this letter is to set forth our recommendations and the terms of our proposal for the design and qualification of an Employee Stock Ownership Plan ("ESOP") for Kelly-Moore Paint Co. (the "Company").

The main objectives of the use of an Employee Stock Ownership Plan for Kelly-Moore Paint Co., as we understand them, are as follows:

1.    To provide a tax-deductible and flexible, in-house market for the acquisition of your shares.

2.    To provide you the opportunity to sell some or eventually all of your shares tax-free, subject to the rollover provisions of the Code, based upon your timetable.

3.    To enable the Company to borrow money for the stock purchase and to repay the entire loan with before-tax dollars.

4.    To provide you with a valuable diversification vehicle in order to avoid having your major personal asset be stock in a privately-held company.

5.    To provide a means for your employees to earn a benefit that is tied to the long-term success of the business.

6.    To attract, retain, motivate and reward productive employees.

7.    To provide the Company with a shareholder "liquidity and diversification" technique that may be preferable to the alternatives of stock redemption, which requires after-tax dollars, or liquidation of the corporation or sale of the corporation to an outside party.

The background facts, as we understand them, are as follows:

MK001746



Mr. Bill Moore
April 17, 1998
Page 2

1.    The Company manufactures and distributes paint and paint supplies.

2.    The Company is owned solely by you.

3.    Kelly-Moore Paint Co.'s annual sales for the fiscal year ended 12/31/97 were
      $275 million.  Its aftertax earnings for the same period were $21 million.  For the
      year ending 12/31/98, the Company projects sales of $295 million and aftertax
      profits of about $22.5 million.

4.    The Company's annual payroll is about $55 million.  Its 2,300 employees are
      both union and nonunion, although union employees will not be included in the
      ESOP.

5.    The Company has an existing matching 401(k) plan.

6.    For preliminary illustration purposes, we assume that the Company value is
      about $600 million.

Based on the above information we discussed, we believe that an Employee Stock
Ownership Plan can be structured as a tax-qualified employee benefit plan somewhat
along these lines:

1.    The Company would adopt an ESOP covering all nonunion employees, with
      provisions for allocating Company contributions to employees of the Company in
      proportion to their relative compensation.  The ESOP would be designed to
      qualify under Section 401(a) of the Internal Revenue Code as a tax-deductible,
      deferred compensation plan.  The ESOP would be designed to be primarily
      invested in shares of common stock of the Company.

2.    As we discussed, you would probably discontinue any Company "matching"
      contributions to the 401(k) Plan.  The Company will likely maintain the existing
      401(k) Plan as an ongoing plan and will introduce the ESOP as a second,
      separate plan.

3.    The Company could make annual contributions to the ESOP in cash or in newly
      issued stock or treasury stock.  Pursuant to the Internal Revenue Code, these
      contributions would be tax-deductible for state and federal income tax purposes
      to the extent that they do not exceed 15% of covered compensation paid to all
      covered employees during the year.  Assuming a covered payroll of $55 million,
      the Company could make annual tax-deductible contributions of up to
      $8.25 million per year.

MK001747



Mr. Bill Moore
April 17, 1998
Page 3

If you would like to "set the stage" for an eventual stock purchase by the ESOP, the Company can make deductible cash contributions to the ESOP and accumulate this cash for several years in order to purchase stock at a future date. We call this ESOP a "prefunded" ESOP since it does not own any employer stock right away.

The amount of contribution each year would be at the discretion of the Board of Directors and could be varied each year from 0% to 15% of covered compensation. The initial contribution to the Plan need not be made until the last day for filing the corporate tax return including extensions. If a contribution of 15% of covered compensation will not accomplish your objectives you might leverage the ESOP.

4.   Assuming the ESOP were to be leveraged, it would borrow sufficient funds from any lender (i.e., Kelly-Moore Paint Co. itself and/or your insurance company) to enable it to purchase at least 30% of your Company stock. As we discussed, this would allow you to avoid paying a capital gains tax on your sales gain. Assuming that the Company is valued at $600 million, and that the ESOP acquires 30% of the outstanding stock, the Plan would borrow $180 million.

5.   The terms of the loans would provide for repayment over, say, a 10-year period. The amortization period typically is between five and 10 years. Accordingly, the Plan would be obligated to make annual principal payments of $18 million. Assuming that the loan carries interest at 8% per annum, the Plan would be obligated to pay interest in the amount of $14.4 million the first year. Thereafter, the interest would decline as the principal is paid. Thus, the ESOP's total liability for the payment of principal and interest at the end of the first year would be $32.4 million (or $26.8 million if amortized evenly during the 10 years).

6.   The Company would make annual contributions to the ESOP in cash in an amount necessary to pay the interest and principal payments on the loan. Pursuant to the Internal Revenue Code, these contributions are tax-deductible for federal income tax purposes in any amount up to 25% of covered compensation to the extent necessary to pay the principal on the loan. Over and above the 25% limitation, the Company may contribute dividends (to the ESOP only) which are also tax-deductible if such dividends are used to repay debt and are paid during the fiscal year. In addition, the Company may contribute and deduct however much is necessary to pay the interest on the loan even if this

MK001748



Mr. Bill Moore
April 17, 1998
Page 4

    amount exceeds 25% of payroll.  Contributions to pay interest are counted in the 25% limit if more than one-third of the contributions are allocated to highly compensated employees.

7.    The cash contributions received by the ESOP would then be used to repay the lenders (i.e., Kelly-Moore Paint Co. and your insurance company).

8.    Finally, the sale price for the common stock would be at fair market value as required by the Internal Revenue Code and related regulations.

Bill, I have only outlined the general structure of our proposal.  A great many variations are possible, depending on policy decisions and individual circumstances.  Some of the advantages we feel you should consider under an ESOP are these:

1.    An in-house market for your the shareholders is created by the ESOP.

2.    The ESOP enables the repurchase of outstanding shares tax-free, subject to the rollover provisions.  You must buy stocks and bonds of American corporations to qualify for tax-free rollover.

3.    The ESOP enables the repurchase of outstanding shares with tax-deductible dollars to the Company, as contrasted to after tax funds used in a stock redemption.

4.    The ESOP permits borrowing wherein not only the interest but also the <u>principal</u> payments are tax deductible.

5.    The Company acquires a strong employee motivational tool and employees acquire a beneficial interest in the Company for which they work.  The employee/owners have a unique opportunity to build wealth through stock appreciation without personal liability.

6.    ESOPs provide continuity of ownership and control.  The ESOP committee is appointed by the Board of Directors.  Thus, voting control continues as under existing arrangements or can be arranged in the manner you specify.

7.    The ESOP could be prefunded with cash for several years in order to purchase your stock at a future time.

8.    The ESOP enables the Company to decrease its income tax liability.

MK001749



Mr. Bill Moore
April 17, 1998
Page 5

Should you desire to go forward with an Employee Stock Ownership Plan for the Company, the services of Menke & Associates in connection with the design and qualification of the Plan are as follows:

FINANCIAL CONSULTING

Menke & Associates, in conjunction with corporate management, will design a plan for the acquisition of stock by the ESOP. Such plan shall include advice and assistance in structuring the transaction so as to comply with all applicable IRS contribution and allocation limitations. Menke & Associates will also be available to assist in the explanation of any aspects of the ESOP or the transactions thereunder to others who may be involved, such as the shareholders, Directors, Company counsel, Company auditors and Company lenders.

DRAFTING OF PLAN DOCUMENTS

Menke & Associates attorneys will work with you and, at your election, your counsel to design an Employee Stock Ownership Plan and the related Employee Stock Ownership Trust Agreement. When these documents and all policy and procedural questions are resolved, the final documents will be submitted for adoption and signature. The form and content of The Plan and Trust shall be designed by Menke & Associates to reflect and facilitate the Company's desires and preferences with respect to the various items covered therein. In addition, Menke & Associates will work with you and your counsel to prepare the necessary corporate minutes, committee minutes and stock purchase agreement.

OBTAIN INTERNAL REVENUE SERVICE APPROVAL

When the ESOP and the related documents are in a form satisfactory to you, Menke & Associates will prepare the application to the Employee Plans/Exempt Organizations (EP/EO) Division of the Internal Revenue Service for a Determination Letter. Menke & Associates will submit the application (Forms 5300, 5309 and 2848), together with the Plan and Trust Agreement, to the Internal Revenue Service and will explain and work with the EP/EO representatives of the Internal Revenue Service in connection with obtaining IRS approval. The Revenue Act of 1987 requires a determination application letter fee that ranges from $700 to $1,250 per plan. This fee is payable directly to the Internal Revenue Service upon submission of the Plan documents.

MK001750



Mr. Bill Moore
April 17, 1998
Page 6

## ASSISTANCE IN CLOSING OF TRANSACTION

Menke & Associates, Inc. will assist the Company and its counsel in closing the transaction, including the following services:

- Review and/or revision of loan documents to assure compliance with IRS regulations.
- Draft and/or review Stock Purchase Agreement.
- Draft and/or review ESOP Loan Agreement, ESOP Promissory Note and ESOP Pledge Agreement to "mirror" the loan from the lender to the Company.
- Draft and/or review corporate minutes to authorize the transactions.
- Draft and/or review Committee minutes to authorize the transactions.

## EMPLOYEE COMMUNICATIONS

Menke & Associates shall prepare a general explanation booklet, which explains the background and philosophy of the ESOP, and a Summary Plan Description booklet, which explains the technical aspects of the Plan. In addition, Menke & Associates shall design a color slide presentation about the Plan and shall have Sherman Coultas or John Givens, my partners in charge of employee communications, speak to the covered employees at meetings held during the course of ten days for the purpose of communicating the Plan in greater detail and answering questions. To minimize travel costs, we strive to limit employee briefings to the first week of each calendar month. By following this schedule we are able to prorate travel costs among several clients within certain geographic regions. Briefings which require extra day(s) consistent with client needs will be subject to an incremental fee of $1,000 per day.

## ADMINISTRATIVE FORMS

Menke & Associates shall design and prepare various administrative forms that are necessary in operating the Plan and in periodically advising the Plan participants of their accumulated Plan benefits and of their options and alternatives under the Plan, with respect to the distribution of Plan benefits. The foregoing services do not include Annual Administration Services. See subsequent paragraph entitled "Annual Administration Services."

MK001751



Mr. Bill Moore
April 17, 1998
Page 7

PAYMENT SCHEDULE

Payment of **$50,000** for the aforementioned services shall be made in accordance with the following schedule.

1.    35% upon delivery of this proposal to Menke & Associates, Inc. as a retainer.

2.    40% upon delivery to the Company of the Plan and Trust Agreement.

3.    15% upon submission of the Plan and Trust Agreement to the Internal Revenue Service, together with other required documents.

4.    10% upon delivery of the Summary Plan Description (SPD) and the Administrative System.

Menke & Associates will absorb all out-of-pocket expenses, with the exception of expenses incurred in connection with travel on behalf of the Company and the fee charged by the IRS for plan submissions.

Menke & Associates guarantees the Plan will receive a favorable Determination Letter from the Internal Revenue Service. Otherwise, all fees paid, less out-of-pocket costs, will be refunded. The services and associated fees, as stated in this proposal, will be honored by Menke & Associates, Inc. for a period of one year from the date of this proposal.

ANNUAL ADMINISTRATION SERVICES

Menke & Associates shall provide the annual administration services necessary to administer and operate the Plan. The administration services include the following: (a) allocation of contributions, forfeitures and investment gains and losses as of each anniversary date; (b) preparation of individual statements of accounts for distribution to employees; (c) preparation and filing of Internal Revenue Service annual tax returns.

The fee for the Annual Administration Services is based upon the number of participants, as set forth in the attached Schedule.

MK001752



*Menke & Associates, Inc.*

Mr. Bill Moore
April 17, 1998
Page 8

SUPPLEMENTARY DOCUMENTS

If requested by the Company, Menke & Associates, Inc. shall draft other documents incidental to the installation of an ESOP including the following: (a) supplementary executive retirement plans (SERP); (b) management stock bonus plans; (c) revised buy/sell agreements; (d) loan agreements; (e) pledge agreements; (f) opinion letters.

The fees for drafting the above documents are set forth in the attached schedule.

We hope the foregoing fully describes our program, and the services and fee arrangements. At your convenience, I would like to schedule a meeting to answer any questions and/or to discuss in detail all pertinent plan provisions you will require should you decide to proceed with the acceptance of this proposal.

Sincerely,

MENKE & ASSOCIATES, INC.

Kyle Coltman
Chief Executive Officer

KC/js

Enclosures


ACKNOWLEDGMENT: The foregoing proposal is hereby accepted on behalf of Kelly-Moore Paint Co.



Date: _May 11, 1998_         By: _William E. moore - Chairman_
                                     Authorized Officer


MK001753



*Menke & Associates, Inc.*

# OVERVIEW OF LEVERAGED ESOP



MK001754



*Menke & Associates, Inc.*
*Corporate Financial Consultants*                    *Mendham, New Jersey*

*114 Sansome, Suite 1000*
*San Francisco, California 94104-3821*
*(415) 362-5200*
*Fax (415) 362-3268*

## ESOP ANNUAL ADMINISTRATION FEE SCHEDULE

I.    **Participant Record Services** (as of each Anniversary Date)

    1.    Prepare individual statements of account for each participant.
    2.    Prepare summary allocation.
    3.    Prepare termination report.
    4.    Update employee census information.
    5.    Prepare summary annual report of the trust.

**PARTICIPANT RECORD FEE:**

    $25/Participant - first 100 $20/Participant - next 200 $15/Participant - thereafter $30/Termination Document and Letter of Transfer $10/Form 1099 - (maximum)

II.    **Annual Report and Continuing Consulting**

    1.    Reconcile trustee report.
    2.    Prepare Form 5500 - annual return to IRS.
    3.    Prepare Form 5500-C - annual return to IRS.
    4.    Prepare Schedule A (insurance information), if required.
    5.    Prepare Schedule SSA (identification of separated participants with deferred vested benefits), if required.
    6.    Notify committee of any changes in the laws or regulations.
    7.    Consult with committee on any changes or update of plan.
    8.    Consult with committee on recommended improvements in the operation of the plan.
    9.    Consult with committee regarding plan transactions.

**ANNUAL REPORT AND CONTINUING CONSULTING FEE:  $2,250.00**

III.    **Additional Plans**

Separate accounts attributable to a replaced or amended prior plan will be billed at 50% of the above schedule.

IV.    **Special Services**

Fees quoted separately.

OVER 1,000 ESOPs DESIGNED SINCE 1974          **MK001755**

# EXHIBIT 43

05/26/98  08:19 FAX 415 362 3268     Menke & Associates, Inc.     ☑003/005

*Sansome Street Appraisers, Inc.*

*Mendham, New Jersey*

*114 Sansome Street, Suite 808*
*San Francisco, California 94104-3818*
*(415) 362-9900*
*Fax (415) 362-6492*

May 26, 1998

PERSONAL AND CONFIDENTIAL

Mr. Steve Ferrari
Vice President-Finance
Kelly-Moore Paint Co.
987 Commercial Street
San Carlos, CA  94070

Dear Steve:

This letter will serve as our proposal for the completion of a professional appraisal of Kelly-Moore Paint Co. (the "Company").

The determination of fair market value for ESOP, recapitalization or other purposes, is based upon the guidelines established by IRS Ruling 59-60, as well as other generally accepted criteria.  The valuation considers such aspects as the nature, history and prospects of the Company and the industry in which it operates, the stated book value, the pro forma financial statements, and other factors relating to the general financial condition of the Company, the earnings history and prospects, dividend paying capacity, any unique characteristics of the block of stock being valued, a consideration and analysis of available information concerning comparable publicly traded companies, recent arm's-length sales of stock (if any), bona fide offers to acquire (if any) and other factors.  The consideration of the various factors and the significance of each, obviously, is subject to the judgment of the valuer and not merely a mathematical process.

The comprehensive written valuation report discusses the various factors analyzed and considered, and discusses the reasoning leading to the determination of a fair market value.

The appraisers of Sansome Street Appraisers, Inc. have performed over 5,000 valuations, most of them for ESOP purposes.  None of these valuations has been successfully challenged by the IRS.

The fee for the completion of the formal appraisal of the fair market value of the capital stock of the Company will be **$15,000**.  Such fee shall be payable at the time this proposal is accepted in the following manner:

1.     50% upon execution of this Agreement.
2.     50% upon delivery of the completed valuation to the Company.

EXHIBIT

*53*

Menke   3-21-08

MK001141

*Sansome Street Appraisers, Inc.*

Mr. Steve Ferrari
May 26, 1998
Page 2

Sansome Street Appraisers, Inc., and its agents, operate as contract consultants to the trust, and are not parties to the transaction. Accordingly, the Company agrees to indemnify Sansome Street Appraisers, Inc. and its agents and hold harmless from any claims or expenses, including attorneys' fees, that may be asserted against Sansome Street Appraisers, Inc. or its agents with respect to appraisal reports prepared by them, unless claims or expenses are due to the negligence or willful misconduct of Sansome Street Appraisers, Inc. or its agents.

Sansome Street Appraisers, Inc. will absorb all out-of-pocket expenses, except those incurred for travel on behalf of the Company.

The fee for annual stock reappraisals shall be **$7,000,** subject to change in the future.

The following information will be needed to complete the valuation:

1.   Complete financial information for the past five years.

2.   Interim financial statements for the current year, if any.

3.   Any descriptive materials available about the Company, the market served, and the competition.

4.   Previous valuations of Company stock, if any.

5.   Any operating plans or projections, as appropriate, involving future financial, marketing and expansion plans.

6.   Any offers to purchase the Company or its stock.

This proposal is for a standard ESOP valuation and includes appropriate consultation with principals and your accountant. If the valuation assignment is expanded to include such additional tasks as extensive consulting with attorneys and other company advisors, determining a valuation conclusion for a different application, reaffirming the ESOP valuation conclusion at a subsequent transaction date, or valuing multiple classes of stock, or if your company's organizational structure requires extraordinary financial and accounting documentation and analysis, then a supplemental proposal covering the additional service with a fee schedule will be prepared.

MK001142

05/28/98  08:20 FAX 415 362 3268        Menke & Associates, Inc.                    ☒005/005

*Sansome Street Appraisers, Inc.*

Mr. Steve Ferrari
May 26, 1998
Page 3

The valuation must be determined as of a date (the "Valuation Date"[1]) which is not earlier than 90 days prior to the Closing Date of the transaction. If there is a delay of more than 90 days between the Valuation Date and the Closing Date, it will be necessary to obtain an opinion letter which confirms the valuation opinion as of the Closing Date. The fee for the preparation of a Closing Date opinion letter shall be up to **$500**. If there is a significant change in the financial results of the Company or in the financial prospects of the Company between the Valuation Date and the Closing Date, it will be necessary to obtain a stock reappraisal as of the Closing Date. The fee for the preparation of a stock reappraisal shall be up to the same as the fee set forth above for an "annual stock reappraisal."

The acting fiduciary and any successor fiduciary shall have the right to terminate this agreement at any time.

We hope the foregoing fully describes the valuation and the services and fee arrangements. Please indicate your acceptance by acknowledging and returning a copy of this letter with the retainer and the required information.

Very truly yours,

SANSOME STREET APPRAISERS, INC.

Kyle Coltman
Senior Vice President

KC:js

ACKNOWLEDGMENT: The foregoing proposal is hereby accepted on behalf of the Kelly-Moore Paint Co. ESOP.

Date: MAY 28, 1998          By: William E Moore
                                        Acting Fiduciary

MK001143

---

[1]Please note that the Valuation Date is the date as of which the Company is appraised. It is not the date the valuation report is transmitted to the acting fiduciary.

# EXHIBIT 44



# SANSOME STREET APPRAISERS, INC.



Business Valuation
Appraisals

114 Sansome Street, Suite 808
San Francisco, California 94104-3818
(415) 362-9900
FAX (415) 362-6492

5 Cold Hill Road South, Suite 23
P.O. Box 352
Mendham, New Jersey 07945-0352
(201) 543-5850
FAX (201) 543-5756

Called Jack
5-22-98
C-off msg. We will
like to proceed

**EXHIBIT**

30

Menke    3-21-08

KMH 001312



**B. J. Brooks, ASA**

Bryant J. Brooks has an extensive background in corporate finance, venture capital, investment banking and mergers and acquisitions. Mr. Brooks was President of Bay Equities, a venture capital firm, from 1972 to 1974. From 1966 to 1972, Mr. Brooks was President of Boothe Computer Investment Corporation, also a venture capital firm. Prior to that, Mr. Brooks was Vice President and Treasurer of Continental Capital Corporation, a publicly-held Small Business Investment Company. Mr. Brooks is a senior member of the American Society of Appraisers.

Mr. Brooks was graduated Phi Beta Kappa from Yale University in 1950, receiving a B.S. degree in Economics. He received an M.B.A., with Distinction, from Harvard University in 1955.

**J. R. Leyon Associates, Inc.**

Prior to becoming a valuation analyst, John R. Leyon was manager of financial planning and analysis for AT&T Communications.

Mr. Leyon received a B.S. in Industrial Engineering from Lehigh University and his M.B.A from the Harvard Graduate School of Business Administration. Mr. Leyon has also been a guest lecturer at the Boston College Graduate School of Business.



## Services Provided by Sansome Street Appraisers, Inc.

Sansome Street Appraisers, Inc. is an appraisal register which contracts with independent appraisal firms to provide business valuation appraisals of private companies.

Most of the firms employed by Sansome Street Appraisers, Inc. have provided business valuation appraisal services since 1974. Collectively, the firms engaged by Sansome Street Appraisers, Inc. provide business valuation appraisals for over 600 companies per year.

Business valuation appraisals are primarily prepared for purposes of establishing the value of stock to be acquired by Employee Stock Ownership Plans. However, the firms engaged by Sansome Street Appraisers, Inc. also appraise the value of private companies for purposes of sale or merger, for estate and gift tax purposes, for purposes of divorce, and for purposes of valuing stock options and other employee stock purchase plans.

The names and backgrounds of the independent appraisal firms which are engaged by Sansome Street Appraisers, Inc. to provide business valuation appraisals are as follows:

KMH 001313

**Everett A. Mathews, Inc.**

Everett A. Mathews graduated from the University of California, Berkeley, with a B.S. degree in Finance. Prior to 1971 he was employed as a commercial loan officer by Security Pacific National Bank in their San Francisco Main Office with responsibility for lending to businesses. Since 1971 he has specialized in financial analysis and the valuation of closely-held businesses.

**Enterprise Services, Inc.**

Scott D. Miller has an extensive background in financial management and analysis that includes his experience with Arthur Andersen & Company, and as a principal and officer in several closely held companies. As the Vice President of Finance in a large, closely held ESOP company he gained in-depth knowledge on all aspects of ESOPs. He founded the Wisconsin Chapter of the ESOP Association. Mr. Miller has completed valuation studies for a broad range of assignments including mergers and acquisitions, gift taxes, estate taxes, and ESOPs.

Mr. Miller received his M.B.A. degree in Finance from Cornell University, his B.A. degree from Kenyon College, and he is a Certified Public Accountant (CPA) in Wisconsin. His professional affiliations include membership in the American Institute of Certified Accountants (AICPA), the Wisconsin Institute of Certified Public Accountants (WICPA) and the National Association of Certified Valuation Analysts (NACVA).





**Ireland Associates**

Robert M. Ireland was previously a Vice President and General Partner of Kelso & Company, Inc.

Prior to his association with Kelso & Company, Mr. Ireland was a consultant to Transamerica Corporation and Memorex Corporation. From 1970 to 1974, Mr. Ireland was a Security Analyst at BA Investment Management Corporation, a subsidiary of Bank of America NT&SA.

Mr. Ireland graduated from Stanford University with an A.B. in Economics in 1965. He received his M.B.A. in Finance from the University of California at Los Angeles in 1967.

Mr. Ireland is a senior member of the American Society of Appraisers.

**Pilot Financial Services, Inc.**

Donald J. Tubb has varied and extensive experience in general and financial management as well as in corporate finance and business valuation. Mr. Tubb is a retired Air Force officer with 22 years service as a pilot and operations/logistics manager. He was a Vice President in the Wells Fargo Bank Corporate Finance Department from 1977 through 1981 where he performed stock valuations and assisted in corporate planning, mergers/acquisitions and private placements for bank customers. He has also served as CFO of a manufacturing company. Mr. Tubb is a senior member of the American Society of Appraisers.

Mr. Tubb received an M.B.A degree in Finance in 1973 from the University of California at Berkeley and a B.A. in 1955 from Oklahoma State University.

KMH 001314

## Services Provided by Sansome Street Appraisers, Inc.

Sansome Street Appraisers, Inc. is an appraisal register which contracts with independent appraisal firms to provide business valuation appraisals of private companies.

Most of the firms employed by Sansome Street Appraisers, Inc. have provided business valuation appraisal services since 1974. Collectively, the firms engaged by Sansome Street Appraisers, Inc. provide business valuation appraisals for over 600 companies per year.

Business valuation appraisals are primarily prepared for purposes of establishing the value of stock to be acquired by Employee Stock Ownership Plans. However, the firms engaged by Sansome Street Appraisers, Inc. also appraise the value of private companies for purposes of sale or merger, for estate and gift tax purposes, for purposes of divorce, and for purposes of valuing stock options and other employee stock purchase plans.

The names and backgrounds of the independent appraisal firms which are engaged by Sansome Street Appraisers, Inc. to provide business valuation appraisals are as follows:



**B. J. Brooks, ASA**

Bryant J. Brooks has an extensive background in corporate finance, venture capital, investment banking and mergers and acquisitions. Mr. Brooks was President of Bay Equities, a venture capital firm, from 1972 to 1974. From 1968 to 1972, Mr. Brooks was President of Boothe Computer Investment Corporation, also a venture capital firm. Prior to that, Mr. Brooks was Vice President and Treasurer of Continental Capital Corporation, a publicly-held Small Business Investment Company.

Mr. Brooks is a senior member of the American Society of Appraisers.

Mr. Brooks was graduated Phi Beta Kappa from Yale University in 1961 receiving a B.S. degree in Economics. He received an M.B.A., with Distinction, from Harvard University in 1955.

**J. R. Leyon Associates, Inc.**

Prior to becoming a valuation analyst, John R. Leyon was manager of financial planning and analysis for AT&T Communications.

Mr. Leyon received a B.S. in Industrial Engineering from Lehigh University and his M.B.A. from the Harvard Graduate School of Business Administration. Mr. Leyon has also been a guest lecturer at the Boston College Graduate School of Business.

KMH 001315

# EXHIBIT 45

B.J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

Evaluation
of the
Common Stock
of

KELLY-MOORE PAINT COMPANY, INC.

as of
July 31, 1998

Prepared by:
B. J. BROOKS, ASA
August 1998

EXHIBIT

9

Stritmatter    3-12-08

Corporate Valuations

Financial Consulting

KMH 001439

B.J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

**CONFIDENTIAL**

**REDACTED**

KMH 001440

B.J. BROOKS

**CONFIDENTIAL**

Kelly-Moore Paint Company, Inc.
August 5, 1998
Page two

REDACTED

KMH 001441

B.J. Brooks

**CONFIDENTIAL**

**REDACTED**

KMH 001442

B.J. BROOKS

**CONFIDENTIAL**

**REDACTED**

KMH 001443

B.J. BROOKS

CONFIDENTIAL

REDACTED

KMH 001444

B.J. BROOKS

## DESCRIPTION AND HISTORY OF THE COMPANY

### Summary

Kelly-Moore Paint Company, Inc., of San Carlos, California, designs and manufactures a complete line of architectural paints. The paints and purchased paint-related products are marketed through Company stores, primarily to professional painting contractors. The Company also currently owns two insurance companies: California Insurance Group (CIG) and K-M Insurance Company; and also owns Montana Operations, a cattle ranch in Montana. The proposed recapitalization anticipates that CIG and the Montana operations will be spun out of the Company. Consequently, the following paragraphs concern only the paint operations, referred to as Kelly-Moore Paints (KMP), and K-M Insurance Company (KMI), a captive insurer providing automobile, general liability and workers' compensation coverage for KMP.

The Company was founded as a partnership in 1946 by Mr. William Moore and Mr. William Kelly and incorporated in 1952. The Company has grown and prospered over the years. At the present time, the Company owns and operates four manufacturing plants and markets through approximately 145 company stores (some owned, some leased) throughout the Southwest and West Coast states. Total revenues during 1997 were almost $270 million. KMP is the largest privately held paint company in the United States.

The Company has operated profitably and has financed its growth with retained earnings. The Company has no funded debt. KMP is privately held by one shareholder.

### Products and Services

KMP manufactures and markets water-based and oil based exterior and interior paints; available in gloss, semi-gloss and flat finishes. The Company also manufactures and markets a limited range of stain and varnish products. The Company purchases and markets a wide variety of paint related products, such as Rustoleum, solvents, varnishes, spray equipment, masking tape, ladders, brushes, rollers, buckets, gloves, drop cloths, wallpaper and others. An estimated 80% of the total sales volume derives from paint products manufactured in-house.

The Company considers its products to be of the highest quality, and is continually alert to the need to maintain and improve quality and service. An important competitive advantage is the ability and willingness to match colors provided by customers — and the ability to guarantee that any batch of a given color will match previous batches. The corporate ability to manufacture and deliver specified colors rapidly is an important service provided to customers.

The Company does not manufacture private label products for mass marketers or others. All paint products are sold under the Company names.

-4-

KMH 001445

B.J. BROOKS

# CONFIDENTIAL

REDACTED

KMH 001446

B.J. BROOKS

### Operations

The Company operates from four plants, as shown below:

| Location | Size | Comment |
|---|---|---|
| San Carlos, CA | 350M sq.ft. | Full line |
| Hurst, TX | 340M sq.ft. | Full line |
| Tempe, AZ | 44M sq.ft. | Full line |
| Seattle, WA | 47M sq.ft. | Limited line |

San Carlos was the original location of the Company. The Company began manufacturing paint in Texas in 1962, and the present Texas plant was finished in 1971. Hurst is between Dallas and Fort Worth and the plant serves the Southwest and Colorado. The Preservative Paint Co. in Seattle was purchased in 1994 and the Universal Paint Corporation in Tempe, Arizona was purchased in 1995. Both acquisitions were acquired as a way to acquire market presence in these two markets.

The Company has the ability to increase production, as may be required. Consequently, production capacity is not considered to be a constraint on the Company's growth.

Operations consist of standard paint-making processes: receiving and storing raw materials, mixing the raw materials into a wide variety of colors and types of paint, using additives when appropriate, testing for trueness and consistency of color and other variables, packaging, labeling, warehousing and shipping. The principal raw material is titanium dioxide, available from a number of suppliers. Other raw materials include a wide variety of extenders, pigments and other items. The Company has no "single vendor" problems due to the wide availability of standard raw materials.

The Company's stores typically vary in size from 5,000 to 8,000 square feet, and are generally larger than those of competitors. The extra space allows the stores to carry more inventory and is considered to provide a definite competitive advantage. Annual sales value per store varies from approximately $1 million to $3 million. $1 million is considered the threshold sales volume for profitable ongoing operations.

### Other

The Company's corporate headquarters are in San Carlos, California, approximately 25 miles south of San Francisco.

The Company considers itself to be people-oriented and is continually conscious of the contribution of its employees to its continued success and prosperity. The individual store managers, for instance, are given considerable authority, and responsibility, for the operation of each location. There are approximately 2,200 employees, including 300 who are union members.

KMP has kept its manufacturing facilities up-to-date, and believes it is not unduly exposed to any EPA or similar contingencies.

KMH 001447

B.J. BROOKS

**CONFIDENTIAL**

**REDACTED**

KMH 001448

B.J. BROOKS

**CONFIDENTIAL**

REDACTED

KMH 001449

B.J. BROOKS

**CONFIDENTIAL**

REDACTED

KMH 001450

B.J. BROOKS

**CONFIDENTIAL**

REDACTED

KMH 001451

B.J. BROOKS

**CONFIDENTIAL**

**REDACTED**

KMH 001452

B.J. BROOKS

**CONFIDENTIAL**

REDACTED

KMH 001453

B.J. BROOKS

**CONFIDENTIAL**

REDACTED

KMH 001454

B.J. BROOKS    **CONFIDENTIAL**

REDACTED

KMH 001455

B.J. BROOKS

CONFIDENTIAL

REDACTED

-15-

KMH 001456

B.J. BROOKS

**CONFIDENTIAL**

**REDACTED**

KMH 001457

B.J. Brooks

**CONFIDENTIAL**

**REDACTED**

KMH 001458

B.J. BROOKS

CONFIDENTIAL

REDACTED

KMH 001459

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit A-1

Balance Sheets
Paint Operations

REDACTED

KMH 001460

CONFIDENTIAL

KELLY-MOORE PAINT COMPANY, INC.

Exhibit A-2

Balance Sheets
K-M Insurance Company, Inc.

REDACTED

KMH 001461

KELLY-MOORE PAINT COMPANY, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
CALIFORNIA INSURANCE GROUP (2)
JUNE 30,1998 AND 1997
(UNAUDITED)

Exhibit A-3

# CONFIDENTIAL

REDACTED

KMH 001462

CONFIDENTIAL

KELLY-MOORE PAINT COMPANY, INC.

Exhibit 8-1

Source and Application of Funds
1997

REDACTED

KMH 001463

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit B-2

Source and Application of Funds
5 Years to December 31, 1997

REDACTED

KMH 001464

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit C-1

Income Statements

**REDACTED**

KMH 001465

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit C-2

Income Statements
Common Size

**REDACTED**

KMH 001466

CONFIDENTIAL

KELLY-MOORE PAINT COMPANY, INC.

Exhibit C-3

Income Statements
K-M Insurance Company, Inc.

REDACTED

KMH 001467

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit C-4

Income Statements
(Common Size)
K-M Insurance Company, Inc.

REDACTED

KMH 001468

CONFIDENTIAL

KELLY-MOORE PAINT COMPANY, INC.

Exhibit C-5

Selected Income Statement Data

REDACTED

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit D-1

Pro Forma Earnings

**REDACTED**

KMH 001470

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit D-2

Pro Forma Earnings

REDACTED

KMH 001471

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit D-3

Selected Financial Ratios

REDACTED

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit F-1

Selected Data
Guideline Companies

REDACTED

KMH 001473

**CONFIDENTIAL**

KELLY-MOORE PAINT COMPANY, INC.

Exhibit F-2

Selected Data
Guideline Companies

REDACTED

KMH 001474

B.J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

EXPERIENCE

| | |
|---|---|
| 1975 to Present | Independent Financial Consultant - San Francisco |

Primary emphasis of consulting practice has been on the evaluation of the common stock and other securities of private companies for Employee Stock Ownership Trusts and Stock Bonus Plans, gift taxes, death taxes, mergers and acquisitions, issuance of stock options and restricted stock, litigation, marriage dissolution, partnership dissolution and other purposes. More than 900 written reports have been prepared for more than 250 individual clients.

Assignments have involved expert witness testimony at depositions and trial, as well as representation of clients before taxing authorities.

| | |
|---|---|
| 1972 to 1974 | BAY EQUITIES, INC. - San Francisco<br>President |

Managed Bay Equities, Inc., a private venture capital corporation owned by 16 pension fund clients of the Trust Department of the First National Bank of Chicago. BEI was founded to purchase BCIC's assets. At the end of 1974, BEI's $4 million portfolio consisted of investments in 12 technology-oriented companies.

Investigated, negotiated and completed new investments. Monitored and counseled individual investees, with particular emphasis on financial problems. Director of six investee companies.

| | |
|---|---|
| 1968 to 1972 | BOOTHE COMPUTER INVESTMENT CORPORATION - San Francisco<br>President |

Established and managed BCIC, a wholly-owned venture capital subsidiary of Boothe Computer Corp. Established policies and operating procedures; identified and analyzed appropriate investment opportunities; presented detailed recommendations; negotiated and completed investment transactions; monitored investee operations; terminated investment participations and administered all aspects of BCIC's operations. BCIC invested over $4-1/2 million in 14 companies during four years. Identified, evaluated and negotiated with prospective purchasers of BCIC resulting in the sale of BCIC's total portfolio to Bay Equities in 1972.

| | |
|---|---|
| 1961 to 1968 | CONTINENTAL CAPITAL CORPORATION - San Francisco<br>Vice President, Treasurer, Secretary |

Participated in all aspects of the management of Continental, a publicly-held Small Business Investment Company, as Continental's portfolio grew from less than $1 million to more than $10 million.

Corporate Valuations                                                    Financial Consulting

KMH 001475

B.J. BROOKS

Resume - pg. 2

| 1957 to 1961 | FIBREBOARD CORPORATION - San Francisco |
|---|---|
| | Manager, Market Planning |

Coordinated information, ideas and interests of the various operating departments - marketing research, sales, production and finance - to develop significant and practical long-range facilities plans.

| 1955 to 1957 | UNION CHEMICAL & MATERIAL CORPORATION - Chicago |
|---|---|
| | Financial Analyst |

Analyzed merger possibilities and performed other staff financial work.

| 1950 to 1953 | UNION CARBIDE CORPORATION - New York |
|---|---|
| | Copywriter |

Wrote advertising copy for the Linde Air Products Division of Union Carbide.

## EDUCATION

| 1953 to 1955 | Harvard University - M.B.A. in Business Administration, Degree with Distinction |
|---|---|
| 1946 to 1950 | Yale University - B.S. in Economics, Phi Beta Kappa |

## DIRECTORSHIPS AND PROFESSIONAL ACTIVITIES

| Present | Senior Member: | American Society of Appraisers |
|---|---|---|
| | Director: | McGrath RentCorp |
| | | Fair, Isaac and Company, Incorporated |
| | | Lifetouch Inc. |
| Past | Trustee: | Continental Capital Liquidation Trust |
| | Instructor: | Golden Gate University |
| | | - Graduate level finance course |
| | Director: | California Tennis Club |
| | | ICOT Corporation |
| | | Information Magnetics Corporation |
| | | Metric Resources Corporation |
| | | Vector General, Inc. and other small companies |
| | President: | Western Association of SBICs (1964-65) |

## MILITARY EXPERIENCE

| 1945 to 1946 | U.S. Navy |
|---|---|

KMH 001476

# EXHIBIT 46

B.J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

**CONFIDENTIAL**

RECEIVED
OCT 1 9 1998
V.P./SEC'Y

October 12, 1998

Board of Directors
K-M Industries Holding Co., Inc.
987 Commercial Street
P.O. Box 3016
San Carlos, California 94070



B.J. BROOKS

CONFIDENTIAL



KMH 001368

B.J. BROOKS

CONFIDENTIAL



KMH 001369

K-M INDUSTRIES HOLDING CO., INC.

Exhibit A

Selected Data
Guideline Companies

| | | SW | ICI | VC | PPG | LI | RPM |
|---|---|---|---|---|---|---|---|
| Stock Price: | 12/31/96 | $20 | $52 | $26-5/16 | $56-1/8 | $18-1/4 | $ 8-1/2 |
| | 12/31/97 | 24-3/4 | 64-15/16 | 31-7/8 | 57-1/8 | 20-5/8 | 15-1/4 |
| | 6/30/98 | 33-1/8 | 64-1/2 | 39-3/4 | 69-9/16 | 21-5/8 | 17 |
| | 9/30/98 | 21-3/4 | 31-3/4 | 29-15/16 | 54-9/16 | 17-5/8 | 14-7/16 |
| | 10/12/98 | 23-9/16 | 38-3/16 | 27-7/8 | 55-5/16 | 14-5/8 | 15 |
| Price/Earnings Multiple: | 12/31/97 | 18.8X | 22.8X | 21.4X | 14.6X | 17.5X | 17.9X |
| | 6/30/98 | 21.9 | 22.6 | 25.2 | 16.9 | 17.0 | 21.3 |
| | 9/30/98 | 14.1 | 12.9 | 18.6 | 13.6 | 13.5 | 17.2 |
| | 10/12/98 | 15 | 12 | 17 | 14 | 12 | 18 |

NOTES:    -- Price/Earnings multiples are based upon figures for latest twelve months (LTM), not
         necessarily latest fiscal year.
      -- SW  = The Sherwin Williams Company
         ICI = Imperial Chemical Industries PLC
         VC  = Valspar Corporation
         PPG = PPG Industries, Inc.
         LI  = Lilly Industries, Inc.
         RPM = RPM, Inc.

SOURCE:   -- Public information, primarily Media General IndustriScope and The Wall Street Journal.

KMH 001370

# EXHIBIT 47

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

---

THOMAS FERNANDEZ, et al.,          )
                                   )
            Plaintiffs,            )
                                   ) Case No.
        vs.                        )
                                   ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                   )
            Defendants.            )
                                   )
                                   )
                                   )

---

VIDEOTAPED DEPOSITION OF ROBERT M. IRELAND
April 23, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79905

84600c7c-3adf-4a54-939f-a112e4212ad1

Page 23

1       Q     When Sansome Street Appraisers was formed,

2   did your relationship with Menke change at all?

3       A     Not really.

4       Q     Okay.

5       A     Been pretty much the same as -- we'd be

6   offered the opportunity to do a valuation for an ESOP

7   client, and we could accept it or reject it.  And once

8   we accepted it, we would do the work and basically

9   independent of Menke.  And they would essentially market

10  our valuation services.  And they would charge a fee and

11  we would get a percentage of that fee.

12      Q     I see.  So Menke charged a fee of the

13  client for procuring valuation services, and you got a

14  percentage of that fee; is that correct?

15      A     Well --

16            MS. DILLER:   Mischaracterizes testimony.

17      A     Menke or Sansome Street Appraisers,

18  whatever that was.  But they would charge a fee for the

19  valuation.  And I would get a percentage of the fee

20  charged.

21  BY MS. WASOW:

22      Q     I see.  So you --

23      A     They were really the marketing arm for

24  called a Registry of Independent Appraisers.

25      Q     So were you paid directly by the companies

84600c7c-3adf-4a54-939f-a112e4212ad1

Page 24

1    for your appraisals services or were you paid by the

2    Menke Group?

3            A     More --

4            MR. PALMER:    Object to form.

5            A     Mostly I was paid by Menke or Sansome

6    Street Appraisers, Sansome Street Appraisers when that

7    organization came in to be.   Occasionally a client would

8    pay me, and then I would remit the proper percentage to

9    Menke or Sansome Street.

10   BY MS. WASOW:

11           Q     And what percentage was that?

12           A     It varied from about for original

13   appraisals, I think it was around 50 percent, and for

14   annual updates 60 percent.

15           Q     So you were paid 60 percent of the total

16   fee -- is that correct --

17           A     Yes.

18           Q     -- for annual updates?

19           A     Yes.

20           Q     All right.  And going back for a second,

21   you said that you were offered a valuation and you could

22   accept or reject it; is that right?

23           A     Yes.

24           Q     And did you ever reject an offer of

25   valuation from Mr. Menke?

84600c7c-3adf-4a54-939f-a112e4212ad1

1    Q    Do you know what -- sorry.

2    A    -- because of Jack Brooks' death.

3    Q    When did Mr. Brooks die?

4    A    I don't recall, but had to be sometime in

5    that time frame between the time the Kelly-Moore --

6    initial Kelly-Moore transaction took place and me being

7    asked to perform the year end update --

8    Q    And do you recall --

9    A    -- in 1998.

10    Q    -- when you were asked to perform that year

11    end update?

12    A    It was probably in early 1999.

13    Q    And Mr. Coltman approached you to perform

14    that valuation?

15    A    I think so but I don't recall specifically.

16    Q    Do you recall why you were selected to

17    perform that valuation?

18    A    Probably because I had many years of

19    experience in business valuation.  Perhaps it was

20    because I was a -- had the ASA designation in business

21    valuation.  It may have been because I had done a paint

22    company before, experience in the industry.

23    Q    What paint company had you performed a

24    valuation of before?

25    A    It was a company called Tnemec.  I better

84600c7c-3adf-4a54-939f-a112e4212ad1

Page 75

1          A    I relied upon the opinions that were set

2     forth in the audit report.  Whether I discussed them in

3     significant detail with Mr. Ferrari, now I don't recall.

4     I know at some point in time we did, but I don't exactly

5     know when.

6     BY MS. WASOW:

7          Q    With regard to the paragraph that I just

8     read on KMH 912, did Mr. Ferrari ask you any questions

9     about that paragraph?

10         A    Not that I recall.

11         Q    Did Mr. Moore ask you any questions about

12    that paragraph?

13         A    Never spoke with Mr. Moore.

14         Q    You never spoke with Mr. Moore at all?

15         A    Never spoke with Mr. Moore at all.

16         Q    Did Mr. Ferrari tell you that Kelly-Moore

17    Paint was a defendant in some asbestos bodily injury

18    suits in 1998?

19         A    I don't have any recollection of that.  He

20    did tell me at some point in time, but I don't recall

21    when.

22         Q    When he told you that, do you remember

23    whether he told you how many cases were pending against

24    Kelly-Moore Paint?

25         A    At some point in time he did quantify the

84600c7c-3adf-4a54-939f-a112e4212ad1

1    number of cases.

2         Q    Was that after your initial conversation

3    about Kelly-Moore's asbestos litigation?

4         A    I can't be sure when he quantified the

5    number of cases or the magnitude of the cases, if it was

6    at the same time or not.  As time progressed, more and

7    more information about the asbestos litigation was

8    provided to me.  And I asked for some of that

9    information.

10        Q    Do you recall whether your first

11   conversation with Mr. Ferrari was after 2000?

12        A    Could have been.

13        Q    But you are not sure?

14        A    You are saying concerning asbestos

15   litigation?

16        Q    That's correct.

17        A    It could have been.

18        Q    But you are not sure if it was?

19        A    I'm not sure.  Most likely that it was.

20   But I think if you review the audited financial

21   statements and the comments made by the company's

22   auditors, their statements relative to litigation

23   matters and environmental matters gradually changed over

24   time and became more specific and more descriptive.

25        Q    And is it fair to say that as those reports

84600c7c-3adf-4a54-939f-a112e4212ad1

1  became more descriptive and specific, you started to

2  receive more specific and descriptive information from

3  the company about asbestos litigation?

4          MR. PALMER:   Object to the form.  Object

5  to the form.

6      A    Again I don't specifically remember when I

7  got the specific information.  But I know when I saw the

8  information in the audit reports, I made reference to

9  those matters in my own report.

10 BY MS. WASOW:

11     Q    Do you recall being provided with any

12 documents about Kelly-Moore's asbestos litigation in

13 1998 -- I'm sorry -- for your report as of year end

14 1998?

15     A    I don't recall any documents.

16     Q    Were you provided with any information

17 about the different type of claims -- asbestos related

18 claims pending against Kelly-Moore as of year end 1998?

19     A    Not that I recall.

20     Q    And were you provided with any information

21 about the geographic location of asbestos claims pending

22 against Kelly-Moore Paint as of year end 1998?

23     A    Again for 1998 I don't recall any specific

24 geographic reference or any reference to specifically to

25 asbestos litigation.

1          Q     So you don't recall being provided with any

2    information about settlement amounts in asbestos claims

3    pending as of year end 1998?

4          A     That's correct.

5          Q     Were you provided any information about the

6    amount of insurance coverage that Kelly-Moore had as of

7    year end 1998 for asbestos bodily injury claims?

8                MR. PALMER:    Object to the form.

9          A     Since I don't recall any reference to

10   asbestos litigation for year end 1998, I don't think --

11   I think that begs the question.  If I had, then -- I

12   don't.

13   BY MS. WASOW:

14         Q     All right.  So just to be clear you don't

15   recall being told that there was sufficient insurance

16   coverage for pending claims as of year end 1998?

17               MS. DILLER:    Object to the form.

18         A     I don't specifically recall any reference

19   or discussion about insurance coverage as of year end

20   1998.  I mean to be clear it's possible Steve Ferrari

21   may have mentioned something that maybe discussing the

22   product liability claims or something like that, that

23   the company had sufficient -- I believe had sufficient

24   insurance coverage to cover any such claims.  And that

25   was the opinions that they received from their legal

84600c7c-3adf-4a54-939f-a112e4212ad1

Page 122

1    financial statements.

2          Q    So other than that information in the

3    audited financial statements, did you receive any

4    specific information about asbestos litigation against

5    Kelly-Moore before preparing your report as of year end

6    1999?

7               MR. PALMER:   Object to form.

8          A    Not that -- not that I recall.

9    BY MS. WASOW:

10         Q    Were you aware of an attorney called Cheryl

11   Mills?

12         A    Pardon?

13         Q    Do you know of an attorney called Cheryl

14   Mills?

15         A    I don't know of an attorney named Cheryl

16   Mills.

17         Q    Do you recall ever seeing any letters from

18   Kelly-Moore's attorneys to Kelly-Moore about asbestos

19   litigation?

20         A    My recollection is when we started

21   discussing asbestos litigation in greater detail,

22   Mr. Ferrari indicated to me that legal counsel had

23   provided opinions, I think, to the auditors and to

24   Kelly-Moore, maybe to the board of directors; I don't

25   know.  But he did not provide me any of that

84600c7c-3adf-4a54-939f-a112e4212ad1

1    documentation.  I think it was under the guise of

2    attorney client privilege and all that.

3        Q    Did Mr. Ferrari say that he couldn't give

4    you any documents from Kelly-Moore's attorneys because

5    of attorney client privilege?

6        A    I know he told me there were some documents

7    he could not give to me.  Exactly when he said that, I

8    don't recall.  But there were -- there was some type of

9    reports they had or, you know, opinions that he said he

10   was unable to provide to me based on -- and I am making

11   the assumption that advised not to by their corporate

12   counsel or something like that.

13       Q    So did Mr. Ferrari tell you that he

14   couldn't provide them because of attorney client

15   privilege?

16       A    That's my recollection, but I don't have a

17   specific remembrance of the wording that he used.

18       Q    And this conversation with Mr. Ferrari

19   about the company's legal advice, did that take place

20   after you prepared your valuation as of year end 1999?

21       A    That's my -- that's my recollection.

22       Q    Did Mr. Ferrari describe the contents of

23   those documents to you?

24       A    What time frame are we talking about?

25       Q    Well, I believe you've said you can't

84600c7c-3adf-4a54-939f-a112e4212ad1

1        A    Okay.  Okay.

2        Q    See the No. 1 near the top of the page?

3        A    Yes.

4        Q    Says that you last visited the company on

5   March 23rd 1999?

6        A    Okay.

7        Q    Why didn't you visit closer to the date of

8   this valuation?

9        A    For the most part the only purpose of the

10  visit is to see the facilities, and for the most part

11  they hadn't changed much.  And I was always able to

12  handle the questioning over the phone.

13       Q    So you didn't have a general practice of

14  visiting every year that you did a follow up valuation?

15       A    No, I did not.  My general practice is

16  every three to five years.  But it really depends on the

17  company.  Some companies, you know, want me to come.

18  Some companies don't want to pay for it.  So it's

19  sometimes it's economic issues with the company;

20  sometimes it's not.  And --

21       Q    This was the first valuation of Kelly-Moore

22  Paint that you performed that specifically mention

23  asbestos lawsuits against the company; is that correct?

24       A    That's correct.

25       Q    So let's turn to page 1070.

84600c7c-3adf-4a54-939f-a112e4212ad1

1    A    That's correct.

2    Q    Okay.

3    A    Yeah, I believe at that time they were

4    still not too concerned that about the exposure they

5    had.  Their concern was growing, but they also felt that

6    they had sufficient insurance coverage.

7    Q    So besides your conversation with

8    Mr. Ferrari, did you take any other steps to get

9    information about Kelly-Moore's asbestos litigation at

10    that time?

11    A    I don't -- I don't recall any additional

12    steps at that time.

13    Q    Did you ever talk about Kelly-Moore's

14    asbestos litigation with Ernst & Young?

15    A    No.

16    Q    Is it fair to say that you relied on Steve

17    Ferrari's statement that the company had adequate

18    insurance coverage as of year end 2000 to cover asbestos

19    litigation?

20         MR. PALMER:    Object to form.

21         MS. DILLER:    Object to form.

22    A    I think I relied upon the statement in the

23    audit report that they had adequate insurance coverage.

24    What the company said to the auditors, I don't know, but

25    usually they are quite thorough in investigating

84600c7c-3adf-4a54-939f-a112e4212ad1

1  situations like that to the extent that they are able to

2  do so.

3  BY MS. WASOW:

4      Q    Did you ever ask what the company told the

5  auditors?

6          MR. PALMER:   Object to form.

7      A    Don't recall.  All I recall is there were

8  legal opinions provided to the auditors, but those were

9  not provided to me.

10  BY MS. WASOW:

11      Q    How did you know that there were legal

12  opinions provided to the auditors?

13      A    One, just from experience of being a

14  business valuator, when I see statements in audit

15  reports like the ones we are referring to here that

16  talks about lawsuits are adequately provided for within

17  the limits of insurance coverage, auditors won't write

18  statements like that unless they have some comfort

19  letter from the company's law firm.

20      Q    Any other reasons?

21      A    Not that I can think of.

22      Q    I think you said that when you saw that

23  note in the financial -- in the audited financials, you

24  asked Mr. Ferrari about it; is that right?

25      A    I believe so.

84600c7c-3adf-4a54-939f-a112e4212ad1

1  BY MS. WASOW:

2       Q    I am asking do you think that that is Dan

3  Stritmatter's handwriting on the first page?

4       A    I don't know.

5       Q    Okay.  Between the time that you prepared

6  this draft valuation and the time that you were asked

7  not to continue working, did you -- were you asked to

8  make any changes to the draft?

9       A    Not that I know of.

10      Q    When North Star came on as trustee of the

11  Kelly-Moore ESOP, did they ask you any questions about

12  your 1998 valuation report of Kelly-Moore Paint?

13      A    No.

14      Q    And when North Star came on as trustee, did

15  they ask you any questions about the Brooks valuation

16  report?

17      A    No.

18      Q    Did North Star -- when North Star came on

19  as trustee, did they ever ask you when you first learned

20  about Kelly-Moore's asbestos litigation?

21      A    Did they ask me -- North Star?  I don't

22  recall them asking.  But by that time they knew about

23  it, so --

24      Q    Did North Star ask you about what

25  disclosures Kelly-Moore had made to you about asbestos

84600c7c-3adf-4a54-939f-a112e4212ad1