# EXHIBIT 67

CONFIDENTIAL

## K-M INDUSTRIES CURRENT CORPORATE STRUCTURE
### (Post-1998 ESOP Transaction)

REDACTED

CIG 004588

# EXHIBIT 68

• 2029 CENTURY PARK EAST, SUITE 820 • LOS ANGELES, CA 90067 • 310-264-8006 • FAX 310-284-8130

JUN 23 1999

## DUFF&PHELPS, LLC

June 22, 1999


Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
2300 Garden Road
Monterey, CA 93940


Dear Mr. Moore:

We are pleased to submit this proposal as the basis of an agreement (the "Agreement") among yourself, the trustee (the "Trustee") of the K-M Industries Holding Co. Inc. Employee Stock Ownership Plan (the "ESOP"), K-M Industries Holding Co. Inc. ("K-M Industries"), California Capital Insurance Company ("California Capital" or the "Company") and Duff & Phelps, LLC ("Duff & Phelps"), whereby Duff & Phelps would serve as independent financial advisor to the Trustee, to provide an opinion as to the fair market value of a 42% interest in the Series "I" Tracking Stock of K-M Industries Holding Co., It is our understanding that this valuation will be used by the Trustee in connection with potential ESOP transactions. Duff & Phelps has previously provided financial advisory services to the Company.

### Nature and Scope of Engagement

As background for our analysis, we will meet with key members of Company management to discuss in detail the history, current operations, and future outlook of California Capital and K-M Industries. Our financial analysis will be based on available historical financial statements and operating data provided by management. We will also review industry and comparable public company financial data obtained from published or other available sources. The Company warrants and represents that all information provided or otherwise made available to Duff & Phelps by or on behalf of the Company will be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they are made. The Company further warrants and represents that any projections provided by them to Duff & Phelps will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable. The Company acknowledges and agrees that in rendering its services hereunder Duff & Phelps will be using and relying on the information provided by and on behalf of the Company without independent verification thereof by Duff & Phelps. Duff

*Corporate Advisors Since 1932*

EXHIBIT

16

Cazzolla  3-19-08

CIG 008250

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 2

& Phelps assumes no responsibility for the accuracy or completeness of any information provided by or on behalf of the Company or any other information regarding the Company provided or otherwise made available to Duff & Phelps.

We will use generally accepted valuation and analytical techniques as the basis for our Opinion. Duff & Phelps agrees to maintain the confidentiality of all information provided to it by the Company. The Company agrees that it will not permit any summary of or excerpt from the Opinion or any written materials prepared by Duff & Phelps and provided to the Company in support of the Opinion to be given to anyone who is not a party to this Agreement. Such Opinion and written materials shall be used only for the purposes described in the Agreement. No public reference to the Opinion or this Agreement may be made, without the express written consent of Duff & Phelps, which shall not be unreasonably withheld.

## Work Product

At the conclusion of our engagement (the "Engagement"), we will provide you with a written report which will set forth the scope of our assignment, the principal materials reviewed, the assumptions and qualifications upon which we have relied and our final Opinion as of the valuation date.

## Fees

Our fees for this Engagement, as outlined above, will be $40,000. Duff & Phelps requests a $20,000 retainer to be paid upon execution of this Agreement, to be credited against the fees described above. The remainder of the fees will be due upon completion of the Engagement, where completion is defined as delivery of the final Opinion unless this Engagement is terminated by you prior to such delivery. Any party hereto may terminate this Agreement at any time upon written notice, without liability or continuing obligation, except as set forth in the remainder of this paragraph. Neither the termination nor completion of this Engagement shall effect: (i) any compensation earned by Duff & Phelps up to the date of termination or completion; (ii) the reimbursement of expenses incurred by Duff & Phelps up to the date of termination or completion; (iii) the indemnification provisions; and (iv) the provisions relating to successors and assigns in the following paragraph. If this Engagement is terminated prior to completion, Duff & Phelps would bill you for its professional time spent to date on the Engagement plus out-of-pocket expenses, less the retainer.

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 3

In addition to the fees described above, the Company agrees to promptly reimburse Duff & Phelps, from time to time upon request, for its reasonable out-of-pocket and incidental expenses, as documented, for travel, meals, lodging, telephone, document reproduction, telecopying, and computer charges and database access fees, and for reasonable fees and expenses of counsel, consultants and advisors retained by Duff & Phelps, incurred during the term, and in furtherance, of its Engagement hereunder.    Fees for legal counsel, consultant and advisors will not be paid by the company without prior written approval for such services.  No portion of these fees is contingent upon the consummation of a transaction or the conclusion reached in the Opinion.  In the event that the terms of the Engagement as outlined herein are modified after substantial completion of the analysis by Duff & Phelps in preparation of its Opinion and such modifications require substantial additional analysis or other services by Duff & Phelps, the Company agrees to negotiate in good faith the terms of additional compensation to Duff & Phelps.

## Indemnification

To the fullest extent lawful, the Company will promptly, upon demand, indemnify and hold harmless Duff & Phelps, LLC and its affiliates (collectively, "D&P"), and each director, officer, employee, agent, member and controlling person of D&P (any or all of the foregoing hereinafter referred to as an "Indemnified Person"), from and against all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel and accountants), costs and liabilities (joint or several), (collectively, "Losses"), resulting directly or indirectly from any threatened or pending investigation, action, claim, proceeding or dispute, including securityholder actions (collectively, a "Claim"), which are related to or arise out of D&P's Engagement, role, activities or the performance or non-performance of professional services on the Company's behalf.  The Company will not be responsible, however, for any Losses which are judicially determined to have resulted primarily and directly from the willful misconduct or gross negligence of the party seeking indemnification hereunder; but pending any such judicial determination, the indemnification and reimbursement obligations of the Company hereunder shall continue to apply.  The Company also agrees that neither D&P nor any Indemnified Person shall have any liability to the Company, its owners, parents, creditors or securityholders for or in connection with its Engagement, except for Losses incurred by the Company which are judicially determined to have resulted primarily and directly from D&P's willful misconduct or gross negligence.  For purposes of the foregoing, "judicially determined" shall mean determined by a court of competent jurisdiction in a final non-appealable judgment on the merits.

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 4

The Company will not, without the prior written consent of D&P, settle or compromise or consent to the entry of any judgment in any pending or threatened Claim or Proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise or consent includes provisions holding harmless and unconditionally releasing D&P and each other Indemnified Person hereunder from all liability related to or arising out of such Claim or Proceeding, including claims for contribution. The Company shall not be liable for any settlement of any Claim effected by D&P without its written consent (which consent shall not be unreasonably withheld). The Company's indemnity, reimbursement and contribution obligations provided for herein shall: (1) be in addition to any liability that the Company otherwise may have to D&P and any rights that D&P or any Indemnified Person may have at common law or otherwise; (2) survive the completion or termination of professional services rendered by D&P under the Agreement; (3) apply to any activities prior to this date and any amendment, modifications or future addition to D&P's Engagement; and (4) inure to the benefit of the heirs, personal representatives, successors, and assigns of D&P and each other Indemnified Person. The Company hereby consents to personal jurisdiction and service and venue in any court in which any Claim or Proceeding which is subject to the terms provided for herein is brought against D&P or any other Indemnified Person. The parties waive any right to trial by jury with respect to any claim or proceeding related to or arising out of D&P's Engagement, any transaction or conduct in connection therewith or this Agreement.

The Agreement shall inure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto. Each such counterpart shall be, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same Agreement. This Agreement may not be modified or amended except in writing signed by the parties hereto.

Corporate Obligation

The obligations of D&P are solely corporate obligations. No director, officer, employee, agent, shareholder or controlling person of D&P shall be subjected to any liability to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement.

CIG 008253

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 5


In conclusion, we look forward to working with you on this Engagement.  If the
foregoing terms are acceptable to you, we request that you arrange to have the Agreement
fully executed and returned to us, along with the retainer fee in the amount of $20,000.

Sincerely,

**DUFF & PHELPS, LLC**

By: _____
           Kenneth Bodenstein
           Managing Director


AGREED TO AND ACCEPTED BY:

**K-M INDUSTRIES HOLDING CO. INC. EMPLOYEE STOCK OWNERSHIP PLAN**

By: _William E. Moore_____

Title: _____Trustee_____    Date: _JUNE 25, 1999_____


**K-M INDUSTRIES HOLDING CO. INC.**

By: _William E. Moore_____

Title: _____Chairman_____    Date: _JUNE 25, 1999_____


**CALIFORNIA CAPITAL INSURANCE COMPANY**

By: _William E. Moore_____

Title: _____Chairman_____    Date: _JUNE 25, 1999_____

# EXHIBIT 69

# DUFF&PHELPS, LLC

2029 CENTURY PARK EAST, SUITE 820 • LOS ANGELES, CA 90067

310/284-8008 • FAX 310/284-8130

## K-M INDUSTRIES HOLDING CO., INC.
## CLASS I STOCK

### VALUATION AS OF

### JUNE 30, 1999

*The information contained herein is of a confidential nature and is intended for the*
*exclusive use of the persons or firm to whom it is furnished by us. Reproduction,*
*publication, or dissemination of portions hereof may not be made without*
*prior approval of Duff & Phelps, LLC.*



EXHIBIT
18
Cazzolla    3-19-08

KMH 005817

# K-M Industries Holding Co., Inc.
## Table of Contents

I.      Engagement Overview

II.     Business Overview and Risk Analysis

III.    Economic Overview

IV.     Financial Overview

V.      CCIC Valuation
        Comparable Company Analysis

VI.     KMI's Classes P and I Tracking Stock

VII.    Discount for Lack of Marketability

VIII.   Overview on Tracking Stock

IX.     Value Conclusion

KMH 005818

K-M INDUSTRIES HOLDING CO., INC.
ENGAGEMENT OVERVIEW

CONFIDENTIAL

REDACTED

KMH 005819

K-M INDUSTRIES HOLDING CO., INC.
BUSINESS OVERVIEW & RISK ANALYSIS

CONFIDENTIAL

REDACTED

KMH 005820

K-M INDUSTRIES HOLDING CO., INC. CONFIDENTIAL
BUSINESS OVERVIEW & RISK ANALYSIS

REDACTED

KMH 005821

## K-M INDUSTRIES HOLDING CO., INC.
### BUSINESS OVERVIEW & RISK ANALYSIS

**Employees**

The Company has approximately 274 employees. Approximately 170 of these employees are located at the Company's headquarters in Monterey.

**Claims**

Whenever possible, the Company utilizes internal staff in claims operations. Each branch is staffed with a claims manager and at least one adjuster. To meet unusual demand requirements, however, independent adjusters are often utilized. The Company has also outsourced all legal counsel since in-house counsel was eliminated in July 1997.

**Management**

The Company and its subsidiaries are all under the same general management. There have been no recent changes in the Company's directors or senior management. Key managers and directors are listed below.

| Manager | Title |
|---|---|
| William E. Moore | Chairman of the Board |
| Peter M. Cazzolla | President and CEO |
| Thomas H. Scherff | VP, Claims |
| Robert D. Winn | VP, Underwriting/Field Operations |
| Edward T. Mines | VP, Chief Financial Officer |

Directors

William E. Moore
Peter M. Cazzolla
Desiree B. Moore

**Property**

As of the valuation date, the Company owned no real estate. CCIC's headquarter facility, located in Monterey California, is leased from the Kelly-Moore Paint Company.

- 4 -

DUFF & PHELPS, LLC

KMH 005822

K-M INDUSTRIES HOLDING CO., INC.
BUSINESS OVERVIEW & RISK ANALYSIS

**CONFIDENTIAL**

REDACTED

K-M INDUSTRIES HOLDING CO., INC.
BUSINESS OVERVIEW & RISK ANALYSIS

CONFIDENTIAL

REDACTED

KMH 005824

K-M INDUSTRIES HOLDING CO., INC.
BUSINESS OVERVIEW & RISK ANALYSIS

*Industry consolidation*
The insurance industry is undergoing a period of rapid consolidation.  Competitors are attempting to maintain or grow market share, and as a consequence, price competition has been particularly severe.

DUFF & PHELPS, LLC

KMH 005825

## K-M INDUSTRIES HOLDING CO., INC.
### ECONOMIC OVERVIEW

*The purpose of this economic overview is to provide a review of the current condition of the national economy and the outlook for the year to come. The overview reflects the consensus forecast of the Blue Chip Economic Indicators panel (the "Consensus") and our examination of other pertinent economic analyses. As these sources are generally published midmonth, this overview reflects the economic outlook as of that time.*

### Overall Economic Growth

Numbers for the first quarter of 1999 surpassed analysts' expectations. Inflation-adjusted (real) GDP rose at an annual rate of 4.5%, more than a percentage point faster than Consensus forecasts. Surging domestic demand offset the drag from trade, wherein a sharp widening of the net export deficit subtracted 2.5 percentage points from overall growth. Personal consumption expenditures (PCE) expanded at a 6.7% real annual rate, faster than any quarter in 1998. While durable goods continued to do well, it was primarily home furniture, appliances and household equipment that provided the boost. As a percentage of total GDP, household expenditures rose to a near-record level of 73.2% in the first quarter of 1999. Retail sales grew at an impressive annual rate of nearly 15%.

Additionally, home buying produced a 15.6% annualized increase in residential investment, spending on information technology rose at a 21% annual rate, residential construction did well, rising at a 16% annual rate, and total gross private domestic investment rose at a 10% rate, its best quarterly gain since the first quarter of last year.

The Consensus forecast of 1999 real GDP growth rose 0.3 of a percentage point from last month to 3.8%, while that of nominal GDP growth rose an identical 0.3 of a point to 5.1%, which would exceed 1998's growth rate of 4.9%. Real GDP is now expected to grow at an annual rate of 3.0% in the second quarter of 1999, 2.8% in the third quarter and 3.0% in the fourth, all higher than last month's estimates. This would produce a fourth-quarter-over-fourth-quarter gain in real GDP of 3.3% in 1999 compared with 4.3% in 1998.

Consensus forecasts of economic activity in 2000 also registered increases this month. Analysts now estimate real GDP will grow 2.5% next year and nominal GDP will rise by 4.2%, increases of 0.2 of a percentage point and 0.1 of a point, respectively. The GDP price index is expected to increase 1.7% next year, 0.1 of a point less than a month ago.

The Consensus forecast of the real next export deficit rose sharply to $312.2 billion; it is expected to reach $-323.5 billion in 2000. As Asia and Latin America rebound, U.S. exports will grow and the trade gap will shrink.

DUFF & PHELPS, LLC

KMH 005826

## K-M INDUSTRIES HOLDING CO., INC.
### ECONOMIC OVERVIEW

*Consumption and Investment*

In addition to May's upward revisions in Consensus estimates of 1999 GDP growth, forecasts of growth this year also rose in real disposable personal income (from 3.3% to 3.6%), PCE (from 3.9% to 4.4%) and corporate profits (from 1.8% to 3.1%). The estimate of 1999 growth in nonresidential investment remained at 7.6%. The Consensus now puts total 1999 housing starts at 1.65 million, compared to 1.62 million last month. PCE and disposable personal income (DPI) are expected to grow 2.8% and 2.7%, respectively; both estimates are up 0.2 of a point from last month. The 1999 forecast of the Consumer Price Index (CPI) remained at 1.9%, but sharply rising gasoline prices threaten an upward revision of that estimate next month.

The Consensus currently believes tight labor markets, solid wage and salary growth, high levels of confidence and the wealth effects of the sharp rebound in stock prices since last fall likely preclude a sharp, sustained cutback in spending. The CPI estimate for 2000 remained at 2.3% for a fourth consecutive month.

*Inflation and Unemployment*

The unemployment rate is expected to average 4.3% in 1999, unchanged from last month's estimate, and 4.5% in 2000.

*Interest Rates*

The Fed made no change in interest rates or monetary policy at the May 18 meeting, after which the Fed funds rate was 4.75%, T-bills were trading at 4.50%, 10-year T-notes at 5.60%, and 30-year Treasury bonds at 5.85%. Analysts expect rates to remain close to current levels going forward, with the long bond in a range of 5.40% to 6.00%, the 10-year between 5.00% and 5.80%, and Fed funds at 4.75%. In the foreign exchange markets, the euro has slightly recovered from the weakness seen at the start of NATO's Yugoslavian campaign. A rate of $1.05 to $1.08 against the euro is expected through the end of the summer. The Japanese yen, recently near 120, could weaken to about 125 by late summer.

---

Sources:   *Blue Chip Economic Indicators*, April 10, 1999
           *Standard & Poor's Trends & Projections*, April 15, 1999

DUFF & PHELPS, LLC

KMH 005827

## K-M INDUSTRIES HOLDING CO., INC.
### FINANCIAL OVERVIEW



REDACTED

KMH 005828

K-M INDUSTRIES HOLDING CO., INC.
FINANCIAL OVERVIEW    **CONFIDENTIAL**

REDACTED

KMH 005829

K-M INDUSTRIES HOLDING CO., INC.
FINANCIAL OVERVIEW

CONFIDENTIAL

REDACTED

KMH 005830

CALIFORNIA CAPITAL INSURANCE COMPANY
Consolidated Income Statement
GAAP Based
Five Months Ended May 31, 1998 - 1999 and
Latest Twelve Months Ended May 31, 1999

**CONFIDENTIAL**

REDACTED

KMH 00!

CALIFORNIA CAPITAL INSURANCE COMPANY
Consolidated Income Statement
GAAP Based
For Years Ended December 31, 1993 to 1998

CONFIDENTIAL

REDACTED

KMH 005832

CALIFORNIA CAPITAL INSURANCE COMPANY
Margin Analysis
GAAP Based
For Years Ended December 31, 1993 to 1998

CONFIDENTIAL

REDACTED

KMH 005833

CALIFORNIA CAPITAL INSURANCE COMPANY
Consolidated Balance Sheet
GAAP Based
December 31, 1993 to 1998 and
May 31, 1999

**CONFIDENTIAL**

REDACTED

KMH 005834

## K-M INDUSTRIES HOLDING CO., INC.
### KMI'S CLASSES P AND I STOCK

The Articles of Incorporation of the Kelly-Moore Paint Company, Inc., a California Corporation, were amended and restated in September of 1998 to cause the following changes to the Articles of Incorporation:

- The Kelly-Moore Paint Company, Inc. was renamed K-M Industries Holding Co., Inc. ("KMI"). The paint operations of the Kelly-Moore Paint Company and CCIC became wholly-owned subsidiaries of KMI.

- The Company is authorized to issue 100 million shares of common stock, 80 million to be designated as "Class P Stock" and 20 million to be designated as "Class I Stock".

- Both Class P Stock and Class I Stock will be treated as Tracking Stock, where each class is intended to reflect operations of different subsidiaries of the parent company. The Class P Stock will track the performance of KMI's paint subsidiary (the Kelly-Moore Paint Company) and the Class I Stock will track the performance of KMI's insurance subsidiary (CCIC).

- Each class of stock is entitled to one vote per share in all matters to be voted upon by shareholders of KMI. Class I Stock and Class P Stock will vote together as one class in such matters.

- Restrictions on the sale or other transfer of 10% or greater of either company's stock require a 70% passing vote of Class P shareholders if the transfer or sale relates to the Paint subsidiary and a 70% passing vote by the Class I shareholders if such transfer or sale relates to KMI's insurance subsidiary.

- Each class of stock is to be further divided into two series of stock: a Series A stock and a Series B stock. Both series shall vote together as one class and are entitled to receive dividends as a whole.

- Dividends to shareholders of Class P Stock will be limited to the sum of: (1) all dividends received by KMI from KMI's paint subsidiary; (2) the proceeds received by KMI from the sale of any capital of the paint subsidiary; and (3) a pro rata amount (taking into account all classes of common stock in KMI and Class P Stock as a portion of that amount) x KMI's retained earnings and surplus available for distribution from sources other than (1) or (2).

- Dividends to shareholders of Class I Stock will be limited to the sum of (1) all dividends received by KMI from KMI's insurance subsidiary; (2) the proceeds received by KMI from the sale of any capital of the insurance subsidiary; and (3) a pro rata amount (taking into account all classes of common stock in KMI and Class I

DUFF & PHELPS, LLC

KMH 005835

K-M INDUSTRIES HOLDING CO., INC.
KMI'S CLASSES P AND I STOCK

Stock as a portion of that amount) x KMI's retained earnings and surplus available for distribution from sources other than (1) or (2).

- Shareholders of Class P-A Stock or Class I-A Stock have the option to convert, at any time, each share of Class P-A Stock or Class I-A Stock into one share of Class P-B Stock or Class I-B Stock, respectively. Each share of Class P-B Stock and Class I-B Stock will be automatically converted into one fully paid and nonassessable share of Class P-A Stock and Class I-A Stock, respectively, upon the effectiveness of a registration statement covering the first underwritten offer and sale of KMI's Common Stock.

- In the event of a liquidation, dissolution or winding up of KMI, whether involuntary or voluntary, Class P shareholders are entitled to the common stock of the paint subsidiary and Class I shareholders are entitled to the common stock of the insurance subsidiary. Each class of stock is also entitled to cash or other property equal to the amount of any accrued dividends, provided there is sufficient cash or other property to also repay all Class P Stock and Class I Stock accrued dividends.

  In the case where there are insufficient assets to repay all Class P Stock and Class I Stock accrued dividends, each class shall receive in lieu thereof the pro rata portion (based on the proportion which each class' accrued dividends bears to the total accrued dividends of both classes) of KMI's net assets.

  In the case where there are remaining net assets of KMI after payment of all accrued dividends, the remaining assets shall be distributed ratably to the holders of Class P Stock and Class I Stock on a share-for-share basis without distinction as to class shares.

In summary, KMI's Class P Stock and Class I Stock were developed to "track" solely the operations of KMI's paint subsidiary and KMI's insurance subsidiary, respectively. This capital structure is intended to provide holders with securities that would represent the value of either KMI's paint subsidiary or its insurance subsidiary, independent of one another.

DUFF & PHELPS, LLC

KMH 005836

# K-M INDUSTRIES HOLDING CO., INC.
## COMPARABLE PUBLIC COMPANY ANALYSIS

### Overview of Methodology

**Determine representative levels of revenue, earnings, etc.**

- Representative of company's revenues or earnings generating capability going forward.

- Adjusted for unusual and nonrecurring items, if necessary.

- Completed on a minority interest basis.

**Select market multiples to apply to representative levels**

- Comparable public companies were used as a guide.

- Investment attributes of subject company were contrasted to the comparable companies.

**Multiples of:**

- Total revenue

- Net premiums earned

- Pretax income

- Earnings or net income

- Book value

- 19 -

DUFF & PHELPS, LLC

KMH 005837

K-M INDUSTRIES HOLDING CO., INC.
COMPARABLE PUBLIC COMPANY ANALYSIS

CONFIDENTIAL

REDACTED

K-M INDUSTRIES HOLDING CO., INC.
COMPARABLE PUBLIC COMPANY ANALYSIS

Comparative Analysis

**Size**

With premiums earned of $121 million for the twelve months ended May 31, 1999 and total assets of $254 million at May 31, 1999, CCIC is smaller than most of the comparable companies (when taken as a single group) but is similar to the Tier 1 subset of companies. The Tier 1 companies have annual premiums earned ranging from $88 to $189 million and total assets ranging from $222 to $409 million.

**Growth**

Since 1998, CCIC has exhibited negative growth rates (in terms of premiums earned). Additionally, CCIC has lower growth rates than those exhibited by the comparable companies. While many of the comparable companies have grown through acquisitions, CCIC's growth has been entirely internally driven.

**Profitability**

CCIC's profitability has declined since 1997, due primarily to a highly competitive pricing environment. In comparison to the comparable companies, CCIC has recently been at the middle to higher end in terms of profitability margins exhibited.

**Returns**

CCIC's return on average assets has been at the higher end of the range of comparable companies. CCIC's return on invested capital, however, has been near the middle and lower end of the range of comparable companies.

**Leverage**

The Company exhibits generally similar levels of financial leverage relative to the comparable companies. With regards to operating leverage (in terms of net premiums earned to equity) the Company is at the lower end of the range.

**Risk**

CCIC is relatively small when compared to the comparable companies. Because of this, the Company is relatively more vulnerable to certain risks including: (i) the loss of a key manager, (ii) adverse regional political or economic developments, (iii) adverse regional weather events, and (iv) downward pricing pressure from larger competitors. While these risks are present at many companies, any one of the listed events has the potential to cause CCIC significant hardship. It is our opinion that the added risk

- 21 -

DUFF & PHELPS, LLC

KMH 005839

## K-M INDUSTRIES HOLDING CO., INC.
### COMPARABLE PUBLIC COMPANY ANALYSIS

involved with an investment in CCIC would warrant lower capitalization multiples for the Company.

**Future Growth**

Net premiums earned can be expected to grow at low single digit rates in the future. Profitability, however, is not expected to grow at the same pace as increasing pricing pressure from stiff competition in California can be expected to keep CCIC's margins relatively narrow. Although none are currently planned, an acquisition made by CCIC could result in more rapid growth in premiums and potentially improved profitability (through cost savings from the elimination of duplicative overhead) over what may be generated internally.

**Conclusion**

Based on the Company's historical growth and profitability, in light of its current risk profile and prospects for future growth, we believe that an investment in the Company offers slightly lower growth prospects and slightly higher risk than the comparable public companies.

DUFF & PHELPS, LLC

KMH 005840

KMI INDUSTRIES HOLDING CO., INC.
COMPARABLE COMPANY ANALYSIS

CONFIDENTIAL

REDACTED

DUFF & PHELPS, LLC

KMH 005841

KMI INDUSTRIES HOLDING CO., INC.
COMPARABLE COMPANY ANALYSIS

CONFIDENTIAL

REDACTED

]

KMH 005842

## CALIFORNIA CAPITAL INSURANCE COMPANY
## ANALYSIS OF PUBLICLY TRADED COMPARABLE COMPANIES
## VALUATION MULTIPLES
### June 30, 1999

| | Price as a Multiple of Earnings Per Share(1) | | | LTM Relative to S&P 500 (%) | Capitalized Value as a Multiple of Pretax Income(1) | | LTM Premium Earned | LTM Total Revenue | Price as a Multiple of Book Value |
|---|---|---|---|---|---|---|---|---|---|
| | LTM | Projected Fiscal Year | 3-Year Average | | LTM | 3-Year Average | | | |
| **Tier 1** | | | | | | | | | |
| Donegal Group | 12.0x | 9.5x | 9.6x | 33.8 | 11.1x | 8.8x | 0.87x | 0.78x | 0.9x |
| Farm Family Holdings | 11.6 | 10.7 | 12.2 | 32.8 | 8.2 | 8.9 | 0.96 | 0.86 | 1.2 |
| Gainsco | DEF | 12.8 | 22.1 | NM | DEF | 25.5 | 1.54 | 1.34 | 1.2 |
| Merchants Group | 10.4 | 10.9 | 21.7 | 29.3 | 6.2 | 15.2 | 0.58 | 0.50 | 0.7 |
| Meridian Insurance Group | 11.7 | 16.8 | 14.9 | 33.0 | 9.1 | 13.2 | 0.70 | 0.61 | 0.9 |
| Penn-America Group | 11.8 | 12.4 | 10.0 | 33.3 | 7.8 | 8.4 | 1.05 | 0.94 | 1.0 |
| | | | | | | | | | |
| Range - High | 12.0 | 16.8 | 22.1 | 33.8 | 11.1 | 25.5 | 1.54 | 1.34 | 1.2 |
| Low | 10.4 | 9.5 | 9.6 | 29.3 | 6.2 | 8.4 | 0.58 | 0.50 | 0.7 |
| | | | | | | | | | |
| Mean | 11.5 | 12.2 | 15.1 | 32.4 | 8.5 | 13.3 | 0.95 | 0.84 | 1.0 |
| Median | 11.7 | 11.6 | 13.5 | 33.0 | 8.2 | 11.0 | 0.91 | 0.82 | 0.9 |
| | | | | | | | | | |
| **Tier 2** | | | | | | | | | |
| Commerce Group | 10.2x | 11.9x | 9.9x | 28.8 | 7.8x | 7.4x | 1.12x | 0.9x | 1.3x |
| Harleysville Group | 9.1 | 10.5 | 12.1 | 25.8 | 8.6 | 11.5 | 1.04 | 0.88 | 1.1 |
| Mercury General Corp. | 11.4 | 11.1 | 12.9 | 32.2 | 9.0 | 10.0 | 1.70 | 1.57 | 2.0 |
| Ohio Casualty Corp. | 20.3 | 22.2 | 12.2 | 57.3 | 20.3 | 10.8 | 1.02 | 0.90 | 0.9 |
| Progressive Corp. | 24.7 | 23.6 | 27.9 | 69.7 | 18.3 | 20.7 | 2.27 | 2.14 | 3.9 |
| State Auto Financial Corp. | 15.7 | 12.6 | 16.8 | 44.4 | 11.2 | 13.4 | 1.55 | 1.37 | 1.6 |
| 20th Century Industries | 14.7 | 13.4 | 15.6 | 41.6 | 10.5 | 11.8 | 2.23 | 1.97 | 2.1 |
| | | | | | | | | | |
| Range - High | 24.7 | 23.6 | 27.9 | 69.7 | 20.3 | 20.7 | 2.27 | 2.14 | 3.9 |
| Low | 9.1 | 10.5 | 9.9 | 25.8 | 7.8 | 7.4 | 1.02 | 0.88 | 0.9 |
| | | | | | | | | | |
| Mean | 15.2 | 15.0 | 15.3 | 42.8 | 12.2 | 12.2 | 1.56 | 1.40 | 1.8 |
| Median | 14.7 | 12.6 | 12.9 | 41.6 | 10.5 | 11.5 | 1.55 | 1.37 | 1.6 |

S & P 500     35.4
Dow Jones Industrial Avg     26.7

(1) Special items have been excluded from all calculations.

Sources: Standard & Poor's Compustat Services, Inc., Bloomberg Financial and First Call Corporation.

- 25 -

DUFF & PHELPS, LLC

KMH 005843

## CALIFORNIA CAPITAL INSURANCE COMPANY
## ANALYSIS OF PUBLICLY TRADED COMPARABLE COMPANIES
## MARKET DATA
($ in Millions except Per Share)
June 30, 1999

| | Common Stock Data | | | | Dividend Data | | | Capital Structure Data | | | |
| | Common Stock Price | 52 - Week Range High | 52 - Week Range Low | Primary Market | Indicated Dividend | Current Yield | Shares Outstanding | Equity Value | Total Debt | Capitalized Value* | % Debt to Capitalized Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Tier 1** | | | | | | | | | | | |
| Donegal Group | 11.375 | 19.875 | 10.063 | NSDQ | $0.36 | 3.2% | 8,249 | $94 | $15 | $109 | 13.8% |
| Farm Family Holdings | 34.188 | 40.563 | 28.000 | NYSE | 0.00 | 0.0 | 5,254 | 180 | 0 | 180 | 0.0 |
| Gainsco | 5.875 | 7.938 | 3.938 | NYSE | 0.07 | 1.2 | 20,897 | 123 | 18 | 141 | 12.8 |
| Merchants Group | 22.375 | 24.375 | 18.500 | ASE | 0.40 | 1.8 | 2,410 | 54 | 0 | 54 | 0.0 |
| Meridian Insurance Group | 16.750 | 20.250 | 14.547 | NSDQ | 0.32 | 1.9 | 7,260 | 122 | 10 | 131 | 7.4 |
| Penn-America Group | 10.375 | 13.250 | 8.250 | NYSE | 0.21 | 2.0 | 8,736 | 91 | 2 | 93 | 2.1 |
| **Tier 2** | | | | | | | | | | | |
| Commerce Group | 24.375 | 38.750 | 21.875 | NYSE | $1.12 | 4.6% | 34,857 | $850 | $0 | $853 | 0.0% |
| Harleysville Group | 20.500 | 27.063 | 17.625 | NSDQ | 0.50 | 2.4 | 29,271 | 600 | 97 | 697 | 13.9 |
| Mercury General Corp. | 34.000 | 69.438 | 31.938 | NYSE | 0.84 | 2.5 | 54,686 | 1,859 | 78 | 1,937 | 4.0 |
| Ohio Casualty Corp. | 36.125 | 47.875 | 34.125 | NSDQ | 1.84 | 5.1 | 30,761 | 1,111 | 255 | 1,366 | 18.7 |
| Progressive Corp. | 145.000 | 170.750 | 95.938 | NYSE | 0.26 | 0.2 | 72,800 | 10,556 | 1,071 | 11,627 | 9.2 |
| State Auto Financial Corp. | 13.500 | 16.500 | 9.375 | NSDQ | 0.10 | 0.7 | 42,058 | 568 | 0 | 568 | 0.0 |
| 20th Century Industries | 18.500 | 29.125 | 16.000 | NYSE | 0.64 | 3.5 | 87,635 | 1,621 | 101 | 1,723 | 0.1 |

S & P 500          1,372.710
Dow Jones Industrial Avg   10,970.800

* Equity value plus debt, preferred stock, and minority interest.

Sources: Standard & Poor's Compustat Services, Inc., Bloomberg Financial and First Call Corporation.

- 26 -

DUFF & PHELPS, LLC

KMH 005844

## CALIFORNIA CAPITAL INSURANCE COMPANY
## ANALYSIS OF PUBLICLY TRADED COMPARABLE COMPANIES
## OPERATING PERFORMANCE
($ In Millions except Per Share)
June 30, 1999

| | Earnings Per Share(1) | | | Pretax Income(1) | | Book Value Per Share | LTM Premium Earned | LTM Total Revenue | LTM Ended | Projected EPS for Year Ending |
|---|---|---|---|---|---|---|---|---|---|---|
| | LTM | Projected Fiscal Year | 3-Year Average | LTM | 3-Year Average | | | | | |
| **Tier 1** | | | | | | | | | | |
| Donegal Group | $0.95 | $1.20 | $1.18 | $9.8 | $12.4 | $12.44 | $125 | $140 | Mar99 | Dec99 |
| Farm Family Holdings | 2.94 | 3.19 | 2.81 | 21.8 | 20.2 | 27.59 | 187 | 208 | Mar99 | Dec99 |
| Gainsco | (0.01) | 0.46 | 0.27 | (1.2) | 5.5 | 5.10 | 91 | 105 | Mar99 | Dec99 |
| Merchants Group | 2.16 | 2.05 | 1.03 | 8.7 | 3.5 | 29.97 | 94 | 107 | Mar99 | Dec99 |
| Meridian Insurance Group | 1.44 | 1.00 | 1.12 | 14.5 | 10.0 | 19.27 | 189 | 214 | Mar99 | Dec99 |
| Penn-America Group | 0.88 | 0.84 | 1.04 | 11.9 | 11.0 | 10.74 | 88 | 99 | Mar99 | Dec99 |
| **Tier 2** | | | | | | | | | | |
| Commerce Group | $2.39 | $2.05 | $2.46 | $109.1 | $114.7 | $18.90 | $762 | $865 | Mar99 | Dec99 |
| Harleysville Group | 2.24 | 1.95 | 1.70 | 81.4 | 60.7 | 18.45 | 672 | 788 | Mar99 | Dec99 |
| Mercury General Corp. | 2.98 | 3.05 | 2.64 | 215.1 | 193.0 | 17.13 | 1,138 | 1,234 | Mar99 | Dec99 |
| Ohio Casualty Corp. | 1.78 | 1.63 | 2.96 | 67.2 | 126.5 | 41.29 | 1,344 | 1,521 | Mar99 | Dec99 |
| Progressive Corp. | 5.88 | 6.15 | 5.20 | 635.7 | 560.4 | 36.89 | 5,124 | 5,441 | Mar99 | Dec99 |
| State Auto Financial Corp. | 0.86 | 1.07 | 0.80 | 50.8 | 42.3 | 8.30 | 367 | 414 | Mar99 | Dec99 |
| 20th Century Industries | 1.26 | 1.38 | 1.19 | 163.4 | 146.5 | 8.90 | 774 | 875 | Mar99 | Dec99 |

S & P 500    38.79
Dow Jones Industrial Avg    410.88

(1) Special items have been excluded from all calculations.

Sources: Standard & Poor's Compustat Services, Inc., Bloomberg Financial and First Call Corporation.

- 27 -

DUFF & PHELPS, LLC

KMH 005845



CALIFORNIA INSURANCE GROUP
Comparable Public Companies – Tier 1
5-Year Stock Price Performance

- 28 -

DUFF & PHELPS, LLC

KMH 005846



CALIFORNIA INSURANCE GROUP
Comparable Public Companies – Tier 2
5-year Stock Price Performance

June 1994 = 100

| Commerce Group | Mercury General | Ohio Casualty |
| Harleysville Group | 20th Century | |
| Progressive Corp. | State Auto Financial | |

DUFF & PHELPS, LLC

KMH 005847



CALIFORNIA INSURANCE GROUP
Comparable Public Companies vs. S&P 500
5-Year Stock Price Performance

- 30 -

KMH 005848

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE RANKING

CONFIDENTIAL

**REDACTED**

KMH 005849

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL PERFORMANCE
FINANCIAL PROFILE
1993 - 1998

REDACTED

CONFIDENTIAL

KMH 005850

CONFIDENTIAL

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL PERFORMANCE
GROWTH
1993 - 1998

REDACTED

KMH 005851

CONFIDENTIAL

Tte Tte

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL PERFORMANCE
PROFITABILITY RATIOS
1993 - 1994

**REDACTED**

KMH 005852

CONFIDENTIAL

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL / PERFORMANCE
RETURNS
1993 - 1998

REDACTED

KMH 005853

CONFIDENTIAL

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL PERFORMANCE
LATEST BALANCE SHEET DATA
1998

REDACTED

KMH 005854

CONFIDENTIAL

CALIFORNIA CAPITAL INSURANCE COMPANY
COMPARATIVE FINANCIAL PERFORMANCE
1993 - 1998

REDACTED

KMH 005855

CALIFORNIA CAPITAL INSURANCE COMPANY

Analysis of Comparable Companies

## TIER 1 Group of Comparable Companies

| | Donegal Group | Farm Family Holdings | Gainsco Inc. | Meridian Insurance Group Inc. | Merchants Group Inc. | Penn-America Group |
|---|---|---|---|---|---|---|
| Ticker | DGIC | FFH | GNA | MIGI | MGP | PNG |
| LTM Net Premiums Earned ($MM) | $125.0 | $187.0 | $91.0 | $180.0 | $91.0 | $99.0 |
| LTM Pre-Tax Income ($MM) | $9.8 | $21.8 | ($1.2) | $14.3 | $8.7 | $11.9 |
| 6/09 Equity Mkt Cap ($MM) | $94.0 | $180.0 | $123.0 | $122.0 | $58.0 | $91.0 |
| Capitalized Value ($MM) | $109.0 | $180.0 | $141.0 | $131.0 | $54.0 | $93.0 |
| Type of Company | Property & casualty insurance provider | Parent company of two subsidiaries providing casualty and life insurance. | Vertically integrated property and casualty insurance holding company specializing in underwriting excess and surplus lines. | Underwriter of property and casualty insurance. | Insurance holding company offering property and casualty insurance through its wholly owned subsidiary, Merchants Insurance Co. of New Hampshire, Inc. | Underwriter of commercial property, general liability and nonstandard personal automobile insurance. |
| Services and Products | The company provides automobile, homeowners, commercial multi-peril, workers' compensation and other lines of insurance. | The company sells principally individual whole life, term and universal life products, as well as single and flexible premium deferred annuities and disability income insurance products. | Through its subsidiaries, the company provides property and casualty insurance, and also focuses on certain specialty and nonstandard markets within the commercial auto, auto garage, general liability, property and personal non-standard insurance lines. | The company underwrites property and casualty insurance, including personal and commercial automobile, homeowners, farmowners, commercial multi-peril and workers' compensation. | The company offers personal automobile and homeowners' insurance, as well as commercial business insurance. Its commercial business is primarily retail and mercantile in nature, small to medium-sized businesses, low insured commercial risks. | The company underwrites commercial property, general liability and nonstandard personal automobile insurance, on an excess and surplus lines or nonstandard basis. |
| Target Market | The Company provides insurance primarily in the following states: PA, MD, DE, VA and OH. | Subsidiaries include specialized, property and casualty insurers of farms, agricultural related businesses and residents and businesses of rural and suburban communities in the U.S. Northeast. | The company is approved to write insurance in 48 states and the District of Columbia. | The company offers its products to 13 midwestern states. | The company offers its products to preferred risk individuals and small to medium size businesses in thirteen states, primarily in the Northeast, but also in the Mid-Atlantic and Midwest. Businesses targeted include primarily retail and service operations, artisan contractors, and light manufacturing establishments. | |
| **Capitalized Value as a multiple of:** | | | | | | |
| Net Premiums Earned | 0.9x | 1.0x | 1.5x | 0.7x | 0.6x | 1.1x |
| Total Revenue | 0.8x | 0.9x | 1.3x | 0.6x | 0.5x | 0.9x |
| Pre-Tax Income | 11.1x | 8.2x | def | 9.1x | 6.2x | 7.8x |
| **Price as a multiple of:** | | | | | | |
| Earnings | 12.0x | 11.6x | def | 11.7x | 10.0x | 11.8x |
| Projected Earnings | 9.5x | 10.7x | 12.8x | 16.8x | 10.5x | 12.4x |
| Book Value | 0.9x | 1.2x | 1.2x | 0.9x | 0.7x | 1.0x |

*Capitalized Value - Equity value plus debt, preferred stock, and minority interest, less cash and equivalents.*

- 38 -

DUFF & PHELPS, LLC

KMH 005856

# CALIFORNIA CAPITAL INSURANCE COMPANY

## Analysis of Comparable Companies

### TIER 2 Group of Comparable Companies

| | The Commerce Group, Inc. | Harleysville Group, Inc. | Mercury General Corporation | Ohio Casualty Corporation |
|---|---|---|---|---|
| Ticker | CGI | HGIC | MCY | OCAS |
| LTM Net Premiums Earned ($MM) | $762.0 | $672.0 | $1,138.0 | $1,344.0 |
| LTM Pre-Tax Income ($MM) | $109.1 | $61.4 | $215.1 | $67.2 |
| 6/99 Equity Mkt Cap ($MM) | $850.0 | $600.0 | $1,859.0 | $1,111.0 |
| Capitalized Value ($MM) | $853.0 | $697.0 | $1,937.0 | $1,066.0 |
| Type of Company | Parent of two property and casualty insurance subsidiaries. | Regional holding company for property and casualty insurance companies. | Insurance holding company whose subsidiaries operate primarily in California. | Property and casualty insurer; underwrites personal and commercial insurance and engaged in insurance premium financing. |
| Services and Products | The company writes property and casualty insurance including commercial automobile, homeowners, inland marine, fire, general liability and commercial multi-peril insurance. | Personal auto insurance is the company's single biggest segment although total commercial business dominates personal lines. The company's commercial lines include auto, workers' compensation and multi peril. Personal lines include primarily auto and homeowners insurance. | The company's subsidiaries write a full line of automobile coverage for all classifications of risk. The company also writes a small amount of homeowners insurance, commercial and dwelling fire insurance and commercial property insurance. Non-automobile lines of insurance accounted for 5.22% of premiums written in 1997. | The company underwrites most forms of property-casualty insurance including auto insurance (personal and commercial), homeowners, commercial multi-peril, workers' compensation, general liability, fidelity and surety insurance. |
| Target Market | The company is the leading provider of personal automobile insurance in Massachusetts. The company also writes personal automobile insurance in California and originates residential and commercial mortgages on a limited basis within Massachusetts and Connecticut. Through a new subsidiary the company also writes automobile and homeowners insurance in 28 states through 34 AAA automobile club offices. | The company's subsidiaries' marketing territories are in the eastern and midwestern U.S. The company's products are marketed primarily in 21 states in the eastern and midwestern U.S. through about 3,000 independent insurance agencies. The company has regional offices in the states of GA, IL, IN, MD, MA, MI, MN, NJ, NY, NC, OH, PA, TN and VA. | The company's subsidiaries operate primarily in California, with a smaller amount of auto insurance written in the states of GA, IL, TX, OK, KS and FL. The company sells its policies through more than 1,000 independent agents, with about 800 in California and 650 in Oklahoma, Kansas and Texas. | The company is represented by more than 4,600 independent agents in 39 states. In 1997 the company's five largest markets were New Jersey, Ohio, Kentucky and Pennsylvania. |
| Capitalized Value as a multiple of: | | | | |
| Net Premiums Earned | 1.1x | 1.0x | 1.7x | 1.0x |
| Total Revenue | 1.0x | 0.9x | 1.6x | 0.9x |
| Pre-Tax Income | 7.8x | 8.6x | 9.0x | 20.3x |
| Price as a multiple of: | | | | |
| Earnings | 10.2x | 9.1x | 11.4x | 20.1x |
| Projected Earnings | 11.9x | 10.5x | 11.1x | 22.2x |
| Book Value | 1.3x | 1.1x | 2.0x | 0.9x |

*Capitalized Value = Equity value plus debt, preferred stock, and minority interest, less cash and equivalents.*

- 39 -

DUFF & PHELPS, LLC

KMH 005857

CALIFORNIA CAPITAL INSURANCE COMPANY
Analysis of Comparable Companies

## TIER 2 Group of Comparable Companies, Continued

| | The Progressive Corporation | State Auto Financial | 20th Century Industries |
|---|---|---|---|
| Ticker | PGR | STFC | TW |
| LTM Net Premiums Earned ($MM) | $5,124.0 | $967.0 | $774.0 |
| LTM Pre-Tax Income ($MM) | $615.7 | $50.8 | $163.4 |
| 6/99 Equity Mkt Cap ($MM) | $10,356.0 | $568.0 | $1,621.0 |
| Capitalized Value ($MM) | $11,627.0 | $568.0 | $1,721.0 |
| Type of Company | Leading underwriter of nonstandard auto and other specialty personal lines coverages. | Writer of property and casualty insurance in 26 states. | Insurance holding company with subsidiaries that market auto insurance. |
| Services and Products | The company's core business consists of underwriting private passenger auto, recreational vehicle and small commercial vehicle insurance - primarily nonstandard insurance policies. The company also provides motorcycle and boat insurance as well as credit-related insurance to lending institutions. | The company offers personal and commercial automobile, homeowners, commercial multi-peril, workers' compensation and fire insurance. | The company's subsidiary markets full-coverage private passenger auto insurance directly to consumers. Subsidiary also markets and writes personal excess liability insurance. |
| Target Market | The company operates in 43 states, with Florida, Texas, New York and Ohio accounting for over 41% of the company's written premiums. | The company targets 26 states, primarily in the central and eastern U.S., excluding New York, New Jersey and the New England states. | The company mainly targets the California market but has expanded into Nevada, Oregon, Washington and Arizona in the past two years. |
| Capitalized Value as a multiple of: | | | |
| Net Premiums Earned | 2.3x | 1.6x | 2.2x |
| Total Revenue | 2.1x | 1.4x | 2.0x |
| Pre-Tax Income | 18.3x | 11.2x | 10.5x |
| Price as a multiple of: | | | |
| Earnings | 24.7x | 15.7x | 14.7x |
| Projected Earnings | 13.6x | 12.6x | 13.6x |
| Book Value | 3.9x | 1.6x | 2.1x |

*Capitalized Value = equity value plus debt, preferred stock, and minority interest, less cash and equivalents.*

- 40 -

DUFF & PHELPS, LLC

KMH 005858

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

The methods we have used to value the Company's common stock results in values representative of the price at which the stock would trade if there were an active, seasoned public market for the stock (the marketable minority interest value). The comparative company method is based on the prices at which minority interest blocks of common stocks trade in the public equity markets. The stocks we examined in applying this method have had public markets for considerable periods, are traded daily in significant volumes, and are seasoned by past trading and the fact that the operations, finances and conditions surrounding the companies which issued the stocks are regularly followed by a community of securities analysts and investors.

The Company's common stock has never traded in any public market nor is there any reasonable prospect of the stock being registered in the foreseeable future for trading in a public market. Absent a price set in a public market; extensive, widely circulated information about a company; a following of security analysts and investors; or the prospect of a sale of a company or an initial public offering of its stock in the near term, it is difficult to find parties interested and willing to buy a minority holding of stock in a closely-held company. It would be extremely difficult under these circumstances to find a buyer willing to pay a price based on what the stock's value would be if it had an active, seasoned public market. In recognition of the difficulties of selling a minority holding of stock in a closely-held company where all these circumstances prevail, a discount for lack of marketability is often applied in valuing such a stock interest.

There is no definitive body of generally available information on the prices at which trades of minority holdings of stocks in closely-held companies have occurred. Even if such information were available, it would not provide a basis for calculating discounts for lack of marketability since there would be no public market prices to refer to on the closely-held stocks. In the absence of actual data on discounts for lack of marketability for closely-held stock, valuation analysts have devised several models for estimating appropriate levels of such discounts. These models fall into two general categories: (1) stock sales prior to an initial public offering ("IPO"); and (2) the restricted stock model. These models are presented in further detail on the following pages.

DUFF & PHELPS, LLC

KMH 005859

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

---

### Stock Sales Prior to an IPO

Analyzing stock sales prior to an IPO is method to estimate discounts for lack of marketability. This is done by examining the relationship between prices paid in private transactions for stocks in companies prior to initial public offerings with the prices at which the stocks were offered to the public. The following table summarizes the results of two of these studies.

| Study | Years Covered | Marketability Discounts | | |
|---|---|---|---|---|
| | | Range | Mean | Median |
| Emory (Baird Company) | 1980 - 1995 | (6%) to 94% | 44% | 43% |
| Willamette Mgmt. Assoc. | 1975 - 1993 | NA | 41% | 52% |

### Emory Studies

John Emory of Robert W. Baird & Company has conducted a series of pre-IPO studies covering 206 IPOs from 1985 to 1995. The mean and median discounts for all transactions were 44% and 43%, respectively. The mean and median discounts were also fairly consistent across all periods studied.

Source:    Emory, John D., "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock." *Business Valuation News*, September 1985, pp. 21-4; Business Valuation Review, December 1992, Pp. 208-212; March 1994, pp. 3-7; and December 1995, pp. 155-60.

### Willamette Study

Willamette Management Associates, Inc. has performed a series of pre-IPO studies covering 827 transactions, involving 432 companies, occurring between 1975 and 1993. The mean and median discounts found in this study were 41% and 52%, respectively.

Source:    Willamette Management Associates, Pre-IPO Studies, in Christopher Z. Mercer, *Quantifying Marketability Discounts*. Memphis, TN: Peabody Publishing, LP, 1997. PP 82-85.

DUFF & PHELPS, LLC

KMH 005860

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

### Restricted Stock Model

The restricted stock model is based on the differences observed between the prices paid for restricted stock in private placements and the prices at which the unrestricted stock of the same companies were trading in public markets. The restricted stock involved in the private placements generally were unregistered "letter" stock which were not marketable except as provided under the Securities and Exchange Commission's Rule 144. Under this rule, the stocks were restricted from transfer to other owners (except in a subsequent private placement) for a period of at least two years. The restricted stock were identical in every way except marketability, to common stock traded on recognized public exchanges or in the over-the-counter market.

The differences in prices on the same dates observed between restricted and unrestricted common stock of the same companies can be attributed to the restricted stock's lack of immediate marketability, analogous in certain respects to the lack of marketability of stock of closely-held companies. The discounts observed in the prices of restricted stock reflect the fact that a holder of such securities may sustain losses or forgo profits because of the inability to sell them at a time of his own choosing. He is forced to hold the stock while the prices of the unrestricted stock fluctuate as a result of changes in the issuing companies' businesses or operations, in their financial conditions as the use of debt financing goes up or down, in the demand for the individual companies' stock or in general stock market conditions.

Numerous studies of the discounts attached to restricted stocks have been published and we have periodically conducted our own studies of such discounts. It should be noted that in most of the transactions analyzed in these studies, the buyer generally expected to be able to resell the stock in the public market in the foreseeable future. The following table summarizes the results of some of these studies.

| Study | Years Covered | Marketability Discounts | | |
|---|---|---|---|---|
| | | Range | Mean | Median |
| SEC Institutional Investor | 1966 - 1969 | (15%) to 80% | 26% | 24% |
| Gelman | 1968 - 1970 | <15% to >40% | 33% | 33% |
| Moroney | 1968 - 1972 | (30%) to 90% | 36% | 33% |
| Maher | 1969 - 1973 | 3% to 76% | 35% | 33% |
| Trout | 1968 - 1972 | NA | 34% | NA |
| Standard Research Consultants | 1978 - 1982 | 7% to 91% | NA | 45% |
| Willamette Mgmt. Assoc. | 1981 - 1984 | NA | NA | 31% |
| Silber | 1981 - 1988 | (13%) to 84% | 34% | 35% |
| Management Planning | 1980 - 1995 | 0% to 58% | 28% | 29% |
| Duff & Phelps | 1992 - 1997 | (13%) to 90% | 24% | 18% |

- 43 -

KMH 005861

**K-M INDUSTRIES HOLDING CO., INC.**
DISCOUNT FOR LACK OF MARKETABILITY

---

### Securities and Exchange Commission Study

In 1971, the Securities and Exchange Commission published the Institutional Investor Study Report ("SEC Study") to serve as a basis for the Internal Revenue Service Revenue Ruling 77-287. Revenue Ruling 77-287 sets forth valuation guidelines to determine discounts for lack of marketability for securities restricted under Rule 144. The SEC Study empirically examined discounts in transactions involving securities that are restricted under Rule 144. Based on more than 300 transactions, the SEC Study found the following relationships:

| By Sales (in millions): | Average Discount Range |
|---|---|
| $ 100 + | 10.1 - 20% |
| $ 20 - 100 | 10.1 - 20% |
| $ 5 - 20 | 30.1 - 40% |
| $ 1 - 5 | 30.1 - 40% |
| $ 0 - 1 | 40.1 - 50% |

| By Earnings (in millions): | |
|---|---|
| $ 10 + | 10.1 - 20% |
| $ 1 - 10 | 10.1 - 20% |
| $ 0 - 1 | 20.1 - 30% |

| By Exchange: | |
|---|---|
| NYSE | 10.1 - 20% |
| ASE | 20.1 - 30% |
| OTC Reporting | 20.1 - 30% |
| OTC Non reporting | 30.1 - 40% |

Source:   "Discounts Involved in Purchases of Common Stock," in *Institutional Investor Study Report of the Securities and Exchange Commission*. Washington, D.C.: U.S. Government Printing Office, March 10, 1971. Vol. 5:2444-2456, Document No. 92-64, Part 5.

- 44 -

DUFF & PHELPS, LLC

KMH 005862

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

---

### Management Planning Study

Management Planning, Inc. ("Management Planning") has conducted an ongoing restricted stock study over a period of years that updates the SEC study. Management Planning analyzed all private placements which were reported from 1980 through 1995 which met the following criteria:

- The company selling stock in a private placement must have common stock, which is equal in all other respects except marketability to the registered stock that is publicly held and actively traded.

- Sufficient data on the private transaction must be readily available to enable analysis.

- Sufficient data on the private transaction must be readily available.

- The publicly-traded common stock counterpart must be selling at a price of at least $2.00 per share.

- The company must be a domestic corporation.

- The company must not have been characterized in public disclosure documents as being in a "developmental" stage.

Based on this criteria, 200 private transactions were identified and analyzed. Subsequent elimination of start-up companies with revenues less than $3 million, companies which had suffered a deficit in the fiscal year preceding the transaction and transactions that were known to have registration rights resulted in 49 transactions meeting the final criteria.

The average and median discounts for the group of issues analyzed were 28% and 29%, respectively, with a range of 0% to 58%.

Source:    Management Planning, Inc., "The Management Planning Study, " in Christopher Z. Mercer, *Quantifying Marketability Discounts*. Memphis, TN: Peabody Publishing, LP, 1997. PP 345-70.

DUFF & PHELPS, LLC

KMH 005863

# K-M Industries Holding Co., Inc.
## Discount for Lack of Marketability

### Duff & Phelps Study

On June 30, 1997, Duff & Phelps completed a study involving private placements of Rule 144 stock by public companies which had essentially the same common stock publicly trading on an exchange or over the counter. The purpose of the study was to examine discounts associated with Rule 144 stock relative to the price of freely traded equivalent common stock.

Safe harbor provisions under Rule 144 allow for the resale of restricted securities and control securities without registration, subject to certain resale limitations. Restricted securities are securities acquired from the issuer or an affiliate of the issuer (controlling shareholders, certain directors, and officers) in a private transaction. Control securities are securities owned by affiliates of the issuer, whether acquired in the open market or in private transactions.

For affiliates of the issuer, the safe harbor provisions of Rule 144 restrict the sale of unregistered stock after a one year holding period as follows. The amount of stock sold in any three month period, together with any stock sold by such person within the preceding three months, cannot exceed the greater of: 1) one percent of the outstanding shares of the issuer; or 2) the average weekly trading volume for the four week period immediately preceding the proposed sale. The sale must be conducted in a brokerage transaction or through a market maker, and a notice on Form 144 must be filed with the SEC concurrently with the sale.

For non-affiliates of the issuer, the safe harbor provisions of Rule 144(k) allow the sale of unregistered stock after a two-year holding period without being subject to any of the other Rule 144 requirements.

Duff & Phelps used the Securities Data Corporation database to identify private placement issues of Rule 144 stock by public companies which have identical freely traded securities. The study analyzed 62 private placements between January 1992 to June 1997.

The average and median discounts for the group of issues analyzed were 24% and 18%, respectively, with a range of -13% (a premium) to 90%.

- 46 -

KMH 005864

K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

---

### Other Studies

#### Gelman Study

Gelman analyzed the prices paid for restricted securities by four closed-end investment companies founded in 1968 and specializing in restricted securities. In total, Gelman used public disclosure documents of the issuing companies to analyze 89 transactions which occurred between 1968 and 1970. Gelman found that the average discount was 33% and that nearly 60% of the transactions reflected discounts of 30% or more.

Source:    Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company." *Journal of Taxation*, June 1972, pp. 353-4.

#### Moroney Study

Moroney analyzed 146 purchases of restricted equity securities (common stocks, convertible preferred stocks, convertible debt securities, warrants) by ten registered investment companies. Moroney found mean and median discounts of 36% and 33%, respectively. Additionally, in 55% of the transactions, the discounts were 30% or greater.

In comparing these discounts to those of a minority interest in a closely held corporation, Moroney offers the following reasons for even higher discounts in the later:

"...in the late 1960 and early 1970s, many buyers of restricted securities felt confident they would be able to market them to the public in two or three years either by registration and public sale as a block, or by feeding them slowly into the market without registration. By contrast, most hypothetical buyers of most minority interests in closely held companies involved in tax cases haven't the foggiest idea as to when or how they will be able to sell... Literally, in many instances the buyer must prepare himself to hold the stock for an indeterminable period of time, maybe for as long as a generation."

"Before a registered investment company buys restricted securities, the investment company's staff and investment committee have rated the investment a good risk and promising... On the other hand, a considerable number of companies whose stocks must be valued for tax purposes are palpably without promise."

Source:    Moroney, Robert E., "Most Courts Overvalue Closely Held Stocks." *Taxes*, March 1973, pp. 144-55.

DUFF & PHELPS, LLC

KMH 005865

K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

---

**Maher Study**

Maher analyzed 34 purchases of restricted common stock by four mutual funds between 1969 and 1973. Maher found that the mean discount for lack of marketability was 35%. After eliminating the top 10% and bottom 10% of purchases in an effort to remove especially high and low risk situations, the mean discount was unchanged at 35%. Maher further noted that the discount for lack of marketability even exceeded the cost of making the stock marketable via a public offering. This was potentially due to several factors: "...by committing funds to restricted common stock, the willing buyer (a) would be denied the opportunity to take advantage of other investments, and (b) would continue to have his investment at the risk of the business until the shares could be offered to the public or another buyer is found."

Source:    Maher, J. Michael, "Discounts for Lack of Marketability for Closely-Held Business Interests." *Taxes*, September 1976, pp. 562-71.

**Trout Study**

Trout analyzed the prices paid for restricted securities by six investment companies between 1968 and 1972. Utilizing data from 60 transactions with an average discount of 33%, Trout constructed economic models to estimate the discount that should be accorded a transfer of restricted securities. The variables and assumptions included in the models are described below.

- Exchange listing* - major exchange listing was associated with lower discounts
- Number of shares outstanding - a large number of shares outstanding was associated with lower discounts
- Shares purchased as % of share outstanding - control effects were associated with lower discounts while blockage effects were associated with higher discounts
- Purchases of less than 1%* - small purchases were associated with lower discounts
- Value of purchase - larger purchases were associated with higher discounts

  * Indicator variable

While the models accounted for approximately 24% of the variation in discounts observed in the subject transactions, much of the variation remained unexplained due to the nature of the purchase agreements, differences in relative bargaining power and the lack of an auction market for restricted securities. Thus, other relevant information, if any, should be used to adjust the results derived from applying these models.

Source:    Trout, Robert R., "Estimation of the Discount Associated with the Transfer of Restricted Securities." *Taxes*, June 1977, pp. 381-5.

DUFF & PHELPS, LLC

KMH 005866

K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

**Standard Research Consultants Study**

In an update to the SEC Study, Standard Research Consultants analyzed 28 private placements of restricted common stock from October 1978 through June 1982. The discounts ranged from 7% to 91% with median discount of 45%. This study found support for higher discounts for smaller companies as well as for inconsistently profitable companies.

Source:     Pittock, William F. and Stryker, Charles H., "Revenue Ruling 77-287 Revisited." *SRC Quarterly Reports*, Spring 1983, pp. 1-3.

**Willamette Study**

Willamette Management Associates, Inc. performed an analysis of 33 restricted stock transactions occurring between January 1981 and May 1984. The median discount found in this study was 31%.

Source:     Willamette Management Associates, Private Placements of Restricted Stocks, January 1981 through May 1984, in Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Third Edition. Chicago, IL: Irwin Professional Publishing, 1996.

**Silber Study**

Silber reviewed 310 private placements of common stock of publicly traded companies between 1981 and 1988. After eliminating issues that had warrants or other special provisions, 69 private placements were analyzed. The average discount for the 69 transactions was 33.75% and the range was a premium of 12.7% to a discount of 84%. Dividing the sample at the median discount of 35%, Silber found that firms with lower revenues, earnings and market capitalizations were associated with higher discounts. The results of the study are presented below:

| Discount | > 35% | < 35% | All |
|---|---|---|---|
| Number of companies | 34 | 35 | 69 |
| Percentage discount | 53.9% | 14.1% | 33.75% |
| Revenues | $13.9 | $65.4 | $40.0 |
| Earnings | ($1.4) | $3.2 | $0.9 |
| Market Capitalization | $33.8 | $74.6 | $54.0 |
| Dollar size of issue | $2.7 | $5.8 | $4.3 |
| Restricted share / total shares | 16.3% | 10.9% | 13.6% |

Source:     Silber, William L. "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices." *Financial Analysts Journal*, July-August 1991, pp. 60-4.

DUFF & PHELPS, LLC

KMH 005867

### K-M INDUSTRIES HOLDING CO., INC.
#### DISCOUNT FOR LACK OF MARKETABILITY

**Summary of Factors Affecting the Discount for Lack of Marketability**

| Factor | Effect on Discount for Lack of Marketability | |
| --- | --- | --- |
| | Higher | Lower |
| Public markets | No foreseeable public offering | Imminent public offering |
| Other markets | No other markets | Limited market (e.g. ESOP) |
| Sale of the company | No foreseeable sale of company | Imminent sale of company |
| Dividend Policy | No foreseeable dividends | Imminent large dividends |
| Transfer restrictions | Significant transfer restrictions | No transfer restrictions |
| Pricing information | No trading activity | Recent trading activity |
| Options | Not applicable | Put option |
| Financial status | Small, weak and volatile | Large, strong and stable |
| Industry status | Unattractive for investment purposes | Attractive for investment purposes |
| Management | Weak management | Strong management |
| Other | Size of block (depends on size and circumstances) Buy-sell agreement (depends on provisions) | |

- 50 -

KMH 005868

K-M INDUSTRIES HOLDING CO., INC.
OVERVIEW ON TRACKING STOCK

Tracking stocks are being developed with greater frequency as companies seek a method of allowing investors to focus on the performance of a subsidiary or division that operates in a specific industry. Typically, a company will issue a tracking stock out of concern that the investment markets will undervalue an entire company because the markets do not understand how to allocate value to one or more of a company's major businesses.

Many believe that tracking stocks "unlock the value" of a company's divisions without the need for a spin-off or Initial Public Offering ("IPO") of that division. There are, however, several factors which must be considered in the valuation of tracking stock. These include, but are not limited to, the following:

1) The ownership interest represented by the tracking stock issue, relative to the Company's non-tracking common stock;

2) Who the shareholders of the tracking stock will be, and their relative interest in the class of tracking stock;

3) The industry in which the company being "tracked" by the stock operates in;

4) The relative voting rights of the classes of tracking stock; and

5) Tracking stocks are more likely to trade at a discount to their comparable, peer, non-tracking stock issues due to:

   - Lack of specific voting rights related to the targeted group or operation
   - Difficulty in achieving acquisition premiums in valuation
   - Potential double taxation on the sale of a targeted group
   - Ability of parent to unwind the tracking stock at predetermined formula which may not fully reflect current value
   - Market focus on product instead of underlying investment themes
   - Notwithstanding the allocation of assets and liabilities and shareholders' equity among targeted groups, holders of one group's tracking stock will be subject to all of the risks associated with the others
   - Potential divergence of interests between targeted groups and the issues that could arise in resolving such conflicts

DUFF & PHELPS, LLC

KMH 005869

K-M INDUSTRIES HOLDING CO., INC.
VALUE CONCLUSION

CONFIDENTIAL

REDACTED

KMH 005870

# EXHIBIT 70

Edward Mines                                    April 2, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,                )
                                         )
            Plaintiffs,                  )
                                         ) Case No.
        vs.                              )
                                         ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al., )
                                         )
            Defendants.                  )
                                         )
                                         )
                                         )

VIDEOTAPED DEPOSITION OF EDWARD MINES
April 2, 2008
Monterey, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79128

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363   Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                    April 2, 2008

Page 117

1          A      Not that I recall.

2                 MR. PALMER:    Object to form.

3     BY MS. HASSELMAN:

4          Q      If you look at page 1, which is stamped CIG

5     1316, do you see at the under the heading marked

6     conclusion that Duff & Phelps has concluded that a

7     30 percent interest in the common stock of the company

8     is worth $45 million; do you see that?

9          A      Yes.

10         Q      Did you discuss that valuation conclusion

11    with Duff & Phelps?

12         A      Yes.

13         Q      And what was the nature of that discussion?

14         A      Just discussed how the appraisal was

15    conducted and how they arrived at that price.

16         Q      Did you discuss whether the value should be

17    higher or lower?

18         A      I'm sure we did.

19         Q      Do you recall those conversations?

20         A      No.

21         Q      Did you --

22         A      If we had questioned on that valuation

23    being proper, we would have discussed it with them.

24         Q      If you had questions.  But sitting here

25    today do you recall whether you questioned whether that

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363   Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                    April 2, 2008

                                                    Page 118

1    was a correct valuation conclusion?

2         A    No, I don't recall.

3         Q    Did you discuss the valuation conclusion

4    with Mr. Moore?

5         A    Yes.

6         Q    And was he satisfied with the Duff & Phelps

7    valuation as of June 30th '98?

8              MS. DILLER:   Object to the form.

9         A    No.

10   BY MS. HASSELMAN:

11        Q    How was he dissatisfied with it?

12        A    He didn't feel that it was a fair value.

13        Q    Did he think the company was worth more?

14        A    Yes, he did.

15        Q    Did he express that to Duff & Phelps?

16        A    Not directly, not to my knowledge.

17        Q    When you say not directly, did he express

18   it indirectly?

19        A    He expressed it to the officers of this

20   company, namely Peter Cazzolla, Tom Scherff, Bob Winn,

21   and myself.

22        Q    And did you then convey that to Duff &

23   Phelps?

24        A    Yes, I did.

25        Q    And what was Duff & Phelps' response to

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363   Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                   April 2, 2008

Page 155

1    transaction?

2           A    Yes.

3           Q    With whom were the conversations that you

4    are making notes of on this document?

5           A    I can't say for certain.

6           Q    In the third section, if you will, of the

7    first page, based on the dividing lines, you see the

8    phrase, book value too low per Bill?  It's in the middle

9    of that third section.

10          A    Yes.

11          Q    Is Bill in that phrase Bill Moore?

12          A    Yes, and that particular marked off section

13   would have been a phone call with Steve Ferrari.  That's

14   why I had it written over in the left column.

15          Q    Okay.  Thank you.  Did Mr. Moore tell you

16   that the book value for CIG was too low in the Duff &

17   Phelps report?

18          A    Bill Moore did not tell me that.  This was

19   taken from the discussion with Steve Ferrari.

20          Q    Was it your understanding from Mr. Ferrari

21   that Mr. Moore had told Mr. Ferrari that the book value

22   was too low in the Duff & Phelps report?

23          A    Yes.

24          MR. PALMER:   Object to form.

25   BY MS. HASSELMAN:

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363   Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                    April 2, 2008

Page 156

1      Q    Do you know whether he meant that the

2   overall value of the company was too low in the Duff &

3   Phelps report?

4           MS. DILLER:    Object to the form.

5      A    I do know that that is what his contention

6   was.

7   BY MS. HASSELMAN:

8      Q    That the valuation conclusion was too low?

9      A    He did not feel that was an adequate

10  appraisal.

11     Q    Let's be careful not to talk over each

12  other.  We are starting to do that again.

13          When you say he felt it wasn't an adequate

14  appraisal, do you mean he felt that the company was

15  worth more money than Duff & Phelps had said?

16     A    Yes.

17     Q    Up at the top of the page it says, cancel D

18  and P, no final report.  Do you see that?

19     A    Yes.

20     Q    What does that mean?

21     A    Means that Bill Moore did not find the

22  appraisal acceptable by Duff & Phelps, so he did not

23  want a final report issued for acceptance.

24     Q    And in the second marked off section marked

25  8/09/99 where it says, have an Oregon company preparing

Edward Mines                                    April 2, 2008

Page 157

1    a report on a preliminary basis, if Bill likes it, we

2    can have it finalized, what does that mean?

3         A    Bill wanted Columbia to appraise the value

4    of the company.

5         Q    And does, if Bill likes it, we can have it

6    finalized, mean that if the valuation conclusion that

7    Columbia reached in its valuation it was going to

8    perform was enough money, that Mr. Moore would have the

9    report finalized for the transaction?

10                MR. LOVITT:    Object to the form.

11                MS. DILLER:    Object to the form.

12        A    If Bill had found that report acceptable,

13   he would have accepted it.

14   BY MS. HASSELMAN:

15        Q    When you say that report, you mean the

16   report to be prepared by Columbia Financial?

17        A    Correct.

18        Q    By him finding it satisfactory, does that

19   mean being satisfied with the valuation conclusion in

20   that report?

21        A    Yes.

22        Q    Back in the third section there's a note at

23   the bottom that says, IRS, two valuations, usually you

24   lose to the IRS, Bill says we will fight them if that

25   happens, can you tell me what that note means?

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                           April 2, 2008

Page 187

1    than yourself?

2         A    I don't know that for a fact.  I presume

3    they did not.  I was to be the only liaison between

4    Columbia and our company and Peter Cazzolla.

5         Q    And following your provision of those

6    documents listed in the August 13th cover letter, did

7    Ms. Daly request any additional information from you?

8         A    No.

9         Q    Did Menke & Associates have any role in the

10   1999 valuation of KMH I stock?

11             MS. DILLER:    Object to the form.

12             MR. PALMER:    Object to the form.

13        A    No.

14   BY MS. HASSELMAN:

15        Q    Did anyone from the Menke Group have any

16   role in the 1999 valuation of KMH Series I stock?

17             MR. PALMER:    Object to the form.

18        A    No.

19   BY MS. HASSELMAN:

20        Q    Let's look at Exhibit 24.  Can you take a

21   quick look through this and tell me if you have seen it

22   before?  And if you have, I will ask you particular

23   questions and make sure you have enough time to look at

24   the specific areas I ask you about.

25        A    Yes, I have seen it.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                    April 2, 2008

Page 188

1      Q    When did you first see this document?

2      A    I don't recall when I first saw it.

3      Q    Did you see it before the ESOP transaction

4  on October 18th 1999?

5      A    I don't recall if I did or not.

6      Q    Do you know whether Columbia Financial sent

7  a draft valuation report to Mr. Moore?

8      A    No, I don't.

9      Q    Do you know whether Mr. Moore provided any

10  comments to Columbia Financial regarding the valuation

11  before production of the September 7th 1999, report?

12      A    No.

13      Q    Did you receive a draft valuation report

14  from Columbia Financial?

15      A    No.

16      Q    Do you know if anyone else at CIG received

17  a draft valuation report from Columbia Financial?

18      A    Not to my knowledge.

19      Q    Would you look at the last page of this

20  document.  It's a fax cover sheet.  We believe it was

21  originally the front cover for this document.  But based

22  on the Bate stamp numbering, it's been produced to us at

23  the back of the document.

24          Do you recognize the handwriting on this

25  fax cover sheet?

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363   Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                      April 2, 2008

Page 189

1          A    Yes, it's Mr. Moore's.

2          Q    Mr. Moore's.  And the fax cover sheet is

3    addressed to you; is that correct?

4          A    Yes.

5          Q    Does that refresh your recollection as to

6    whether you received a copy of this document?

7          A    It certainly does.

8          Q    And what is that recollection?

9          A    Recollection is that I received it.  I

10   don't -- I don't recall receiving it but I did.

11         Q    Do you know whether Mr. Cazzolla received

12   it?

13         A    I know he would have received it because I

14   would have given him a copy.

15         Q    Is it your understanding that Columbia

16   Financial provided the report directly to Mr. Moore?

17         A    Yes.

18         Q    Do you know who else received a copy of the

19   Columbia Financial report besides you and Mr. Moore and

20   Mr. Cazzolla?

21         A    No.

22         Q    Do you know whether Mr. Ferrari received

23   it?

24         A    No, I don't.

25         Q    Is it your belief that only Mr. Moore and

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                        April 2, 2008

1    engagement never asked for any further documentation of

2    this analysis.  She was firm about it.  She said it's

3    $55 million.  It was exactly what Duff & Phelps came up

4    with.  So he accepted Duff & Phelps'.

5         Q    Let's turn to page 5.

6              MR. LOVITT:    Still 24?

7    BY MS. HASSELMAN:

8         Q    Same exhibit, under summary and conclusion,

9    do you see that the conclusion states that the fair

10   market value range of 42 percent interest is

11   48.5 million to 55 million?

12        A    Yes, but Ms. Daly came without a subsequent

13   letter stating that she would present her proposal at

14   55 million.  No comment referred to the 48.5 at all.

15        Q    Would it have been better for the ESOP

16   participants if the purchase price had been 48.5 million

17   instead of 55 million?

18             MR. PALMER:    Object to the form.

19             MS. DILLER:    Object to the form.

20             MR. LOVITT:    Hypothetical.  Object to the

21   form.

22        A    Do I even have to answer that question

23   then?

24   BY MS. HASSELMAN:

25        Q    Yes, you do.

Edward Mines                                    April 2, 2008

Page 199

1        A     Of course, yes.

2        Q     Did you tell Duff & Phelps about the
3   expressions of interest in purchasing CIG?

4        A     No.

5        Q     Do you know which publicly traded companies
6   Columbia Financial used for its valuation?  Feel free to
7   look through the report and see if there's a list
8   provided.  I am not trying to trick you.

9        A     I was going to say without reviewing it, I
10  do not recall, no.

11       Q     I will represent to you that there is not a
12  list provided, and I am happy to let you look through
13  and verify that that representation is true.

14       A     No, I don't recall.

15       Q     Do you know whether Mr. Moore knew what
16  publicly traded companies Columbia Financial used for
17  the valuation?

18       A     No, I don't.

19       Q     Did you ask Ms. Daly what companies she
20  used for the valuation?

21       A     I don't recall.

22       Q     Did you ask any questions to Ms. Daly about
23  the September 7th valuation letter?

24       A     No.

25       Q     You said that Mr. Moore was unsatisfied

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363   Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                    April 2, 2008

Page 212

1    ESOP questions and answers, at the top of the page.

2    Have you seen this document before?

3         A    Yes.

4         Q    When have you seen it before?

5         A    I believe it would have been about the time

6    that we established the ESOP.

7         Q    Is it your understanding that that was in

8    1999?

9         A    Yes.

10        Q    Was this --

11        A    There's a date at the bottom of the second

12   page, yes.  It's October 12th '99.

13        Q    But that's before the date of the

14   transaction; is that correct?

15        A    Yes.

16        Q    Was this prepared as a handout for

17   employees?

18        A    I don't believe so.  I believe that this

19   resulted from my personal solicitation to all employees

20   of any questions they may have on the ESOP.  And then I

21   was using it to respond or to make a presentation at the

22   managers -- the annual managers meeting.

23        Q    So these questions and answers were

24   provided to the managers but not to the employees as a

25   whole; is that correct?

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                        April 2, 2008

Page 213

1    A    No, all employees were solicited to come up
2  with questions about the ESOP.
3    Q    But looking at Exhibit 109 can you tell me
4  whether the document in Exhibit 109 was distributed to
5  managers?
6    A    I don't recall whether it was or not.
7    Q    Do you know whether --
8    A    I know it was presented to managers.
9    Q    Do you know whether it was presented to any
10 employees other than managers?
11   A    I don't recall that.
12   Q    And looking at the Exhibit No. 108,
13 printout of the e-mail, is that your handwriting?
14   A    Yes.
15   Q    And does that mean received too late?
16   A    That means it was received too late to be
17 part of this summarization of questions.
18   Q    The date on the e-mail from Nancy Harty is
19 October 8th; is that correct?
20   A    Yes.
21   Q    And the date on the question and answers is
22 October 12th; right?
23   A    Yes.
24   Q    And the transaction took place on October
25 18th; is that correct?

Edward Mines                                    April 2, 2008

Page 217

1    included Kelly-Moore Paint?

2        A    Yes.

3        Q    And if they weren't to be part of the loan

4    transaction, then do you know why Kelly-Moore Paint

5    appeared in the draft loan document?

6        A    Well, sure.  Bank of America was going to

7    put everybody and their brother in there if they could.

8        Q    Any other reason other than that

9    Kelly-Moore was not part of the loan transaction that

10   Mr. Ferrari advocated excluding references to

11   Kelly-Moore Paint?

12            MS. DILLER:    Object to form.

13       A    No, I would have done the same thing if

14   California Insurance Group were part of their loan

15   agreement.

16   BY MS. HASSELMAN:

17       Q    Who made the ultimate decision on what

18   price the Moore Trust received for the KMH Series I

19   stock that it sold to the ESOP in 1999?

20       A    Who made the final determination?

21            MS. DILLER:    Object to form.

22   BY MS. HASSELMAN:

23       Q    That's correct.

24       A    Bill Moore.

25       Q    Did anyone else have any input other than

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines                                      April 2, 2008

Page 218

1    Mr. Moore?

2              MR. PALMER:    Object to the form.

3        A    No.

4    BY MS. HASSELMAN:

5        Q    Did you play any other role with respect to

6    the 1999 transaction in which the ESOP bought KMH

7    Series I stock from the Moore Trust that we haven't

8    already discussed?

9        A    No.

10       Q    Is there anything -- go ahead.

11       A    Excuse me.  We did discuss the fact that I

12   was the one who directly dealt with Bank of America and

13   other lenders in obtaining the financing.

14       Q    What was involved in obtaining the

15   financing for the ESOP transaction?

16       A    It was explaining the ESOP itself with the

17   exception of some of the lenders who had the expertise

18   in, such as Bank of America.  Wells Fargo and some of

19   the local ones that we entertained here didn't have a

20   good knowledge of the ESOP, so we had to explain that to

21   them.  And what it came down to is that there wasn't

22   much to consider at all.  B of A was far ahead of any

23   proposal the other banks had.  One of the banks couldn't

24   even entertain us.  It would have had to go to outside

25   sources to help fund it.

Esquire Deposition Services    505 Sansome Street, 5th Floor San Francisco, California 9411
Phone  (415)  288-4280  (800)  770-3363    Fax  (415)  288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

# EXHIBIT 71

Bill Moore     8/2/99

650-851-5090

ESOP Update —
CANCEL D&P - No FINAL REPORT

HULAHAN & LOKER — SENT 1998 & 1999 D&P

STEVE TO MONITOR IT

8/9/99
Per Bill- Have an Oregon Company preparing a report on a
preliminary basis. if Bill likes it we can have it
finalized. $15K to 20K fee

Steve
Ferrari
8/10/99
"Columbia" - recommended by Meenke & Jack Brooks
2nd tier - Large regional                    $75 to 100 K for
                                              Hulahan
                                              "LA office"
Book Value too low - Per Bill

IRS - 2 Valuations - Usually you lose
      to the IRS. Bill says we'll fight them
      if it happens —

**EXHIBIT**
**19**
Cazzolla    3-19-08

8/12   Called Bill after receiving FAX on engagement of
       Columbia, per his request. Said I should expect
       a call from Kathryn Daly.

       I called Steve — Informed him engagement letter was wrong
       No mention of K-M Ind. H.O. "I" Tracking Stock appraisal
                                    < Cont'd 7

CIG 015737

8/12  Cont'd.

Bill was in background saying he wanted a copy of everything being sent to CFAI.

Told Steve CFAI had to be informed of "I" Stock appraisal - Who will tell Bill Moor - Told him how adament Menke was on this issue.

Steve called John Menke who confirmed my statement. Steve told Bill & Bill agreed Steve should notify CFAI - Will copy us in writing.

CIG 015738

# EXHIBIT 72



## COLUMBIA FINANCIAL ADVISORS, INC.

720 SW WASHINGTON ST., SUITE 650
PORTLAND, OREGON 97205-3508
TELEPHONE (503) 222-0562

### Professional Services Agreement

Columbia Financial Advisors, Inc., hereafter called "CFAI", the Mr. William Moore as Trustee of the to be formed California Capital Insurance Company Employee Stock Ownership Plan (ESOP), hereafter called "Client," and California Capital Insurance Company, hereafter called "Company", agree as follows:

1. **Description of services.** CFAI agrees to perform certain professional services for Client, described as follows, with the understanding that any modification to the assignment will be by a letter agreement signed by both parties.

Determine the fair market value of California Capital Insurance Company as of August 31, 1999.

2. **Date(s) services due.** CFAI will begin performance upon receipt of all information requested of Company, and will complete assignment(s), unless delayed or prevented by matters beyond CFAI's control, according to the following schedule:

Oral report 30 days after receipt of requested information.

3. **Fees.** CFAI's fees for such professional services will be calculated on an hourly basis at our standard hourly billing rates, and are estimated to $15,000, plus reimbursement of out-of-pocket expenses such as travel, long distance telephone charges, purchases of data, copying and printing costs, etc.

4. **Retainer.** $10,000 is due upon execution of this Agreement. Retainer paid by Company will be applied to the **final** billings and any unused portion of the retainer will be refunded to the Company.

5. **Payment terms.** Company will receive regular monthly invoices, describing fees and expenses incurred. Payments will be due at CFAI's offices within 15 days of dates of invoices. Balances which remain unpaid 30 days from dates of invoices will be assessed a finance charge of 1.5% monthly (18% annual percentage rate).

ESO8.94

EXHIBIT
23
Cazzolla    3-19-08

CIG 008203

If CFAI is to provide expert witness testimony as part of its assignment, Company will pay CFAI all fees and expenses invoiced and/or incurred to date before CFAI provides expert witness testimony. If travel for testimony is necessary, Company will pay CFAI before travel is incurred.

Company agrees that the fees and expenses invoiced by CFAI must be paid in full before CFAI provides any report or analysis conclusions.

6. **Non-payment.** If this agreement, or any monies due under the terms hereof, is placed in the hands of an attorney for collection of the account, Company promises and agrees to pay CFAI's attorney fees and collection costs, plus interest at the then legal rate, whether or not any legal action is filed. If any suit or action is brought to enforce, interpret, or collect damages for the breach of this agreement, Company agrees to pay CFAI's reasonable attorney fees and costs of such suit or action, including any appeal as fixed by the applicable Court or Courts.

7. **No guarantee or contingency.** CFAI agrees to perform its services in a professional and objective manner. Client understands that CFAI does not guarantee the results of any analysis which it may undertake, but only agrees that any report or analysis shall represent CFAI's professional opinion based on the data given to or compiled by it. CFAI attempts to obtain and compile its information from reliable sources, but it cannot guarantee its accuracy or completeness. CFAI and Client agree that CFAI's fee is not based upon any opinions reached by CFAI.

8. **Information.** Company understands that CFAI will need prompt access to documents, materials, facilities, and/or Company personnel in order to perform its services in a timely and professional manner, and Company agrees to fulfill all such requests in a timely manner and to cooperate fully with CFAI. Client understands and agrees that delays in providing data or information may result in a delay of the completion date of the project.

9. **Warranty.** Company warrants that the information and data it supplies will be complete and accurate in every respect to the best of Company's knowledge; that any reports, analysis, or other documents prepared by CFAI will be used only in compliance with all applicable laws, regulations, and contingent and limiting conditions specified in the appraisal report, and attached to this agreement; and that Client and Company will hold CFAI harmless for any breach of this warranty.

ESC8.94

CIG 008204

10. **Confidentiality.** CFAI will not disclose factual data obtained from Client or Company, or the results of an assignment prepared for Client to anyone without the consent of the Client, other than: 1) to Client and persons specifically authorized by Client; and 2) such third parties as may be authorized by due process of law.

11. **Indemnification.** Company agrees to indemnify and hold CFAI harmless against any losses, claims, damages or liabilities, to which CFAI may become subject relating to services performed as part of this agreement. Company agrees to reimburse, as incurred, CFAI for any legal or other expenses incurred by CFAI in connection with defending or investigating any such action, proceeding, claim or investigation. However, Company shall not be obligated under this indemnification with respect to any loss, claim, damage or liability to the extent that a court having jurisdiction shall have determined in a final judgement that such loss, claim, damage, or liability resulted primarily from the gross negligence of CFAI. The indemnity and reimbursement obligations of the Company under this paragraph shall extend upon the same terms and conditions to the shareholders, directors, officers, and employees of CFAI; and shall be in addition to any liability the Company may otherwise have. These provisions survive termination of this agreement.

Dated this 11th day of August, 1999, at Portland, Oregon.

**Mr. William Moore, as Trustee of the
California Capital Insurance Company
Employee Stock Ownership Plan**

By: _William Moore_

Name: William Moore
Title: Trustee

**Columbia Financial Advisors, Inc.**

By: _[signature]_

Name: Kathryn Daly
Title: Principal

**California Capital Insurance Company**

By: _[signature]_

Name: Ed Mines
Title: Chief Financial Officer

PO Box 3110
2300 Garden Road
Monterey CA 93940
831.649.1155 office 831.647.8649 fax

ESO8.94

COLUMBIA FINANCIAL ADVISORS, INC.

## ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

1.  Information, estimates, and opinions contained in this report will be obtained from sources considered reliable; however, no liability for such sources is assumed by CFAI.

2.  Company by virtue of its agreement with Client, and its representatives warrant to CFAI that the information supplied to CFAI will be complete and accurate to the best of company's knowledge. Information supplied by management will be accepted without further verification as correctly reflecting the company's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted.

3.  This report shall be used for its intended purpose only, and only by the Client. Possession of this report does not include the right of publication.

4.  This report must be used in its entirety. Reliance on any portion of the report independent of others may lead the reader to erroneous conclusions regarding the opinion. No portion of the report stands alone without approval from CFAI.

5.  CFAI is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made.

6.  The various opinions presented in the report will apply to this engagement only and may not be used out of the context presented herein. The analysis and conclusions will be valid only for the date or dates specified in the report and only for the engagement purpose or purposes specified.

7.  Neither all, nor any part, of the contents of the report shall be conveyed to the public through advertising, public relations, news, sales, or other media without the written consent or approval of CFAI.

8.  CFAI and the individuals involved in the engagement, are not qualified to detect the presence of toxic or hazardous substances or materials, will not make an independent analysis of the subject company's present or potential environmental liabilities, and expressly disclaim any duty to note the presence of such materials. Any information regarding existing and/or potential liabilities will be accepted without further verification unless otherwise noted. The appraiser assumes no responsibility for determining if the subject company requires environmental approval by the governing agencies, nor if it is in violation thereof.

9.  Neither CFAI nor the individuals involved in this engagement, have any present or contemplated future interest in the subject property, or any other interest which might tend to prevent making a fair and unbiased analysis and opinion.

10. The liability of CFAI and employees is limited to the client only and only up to the amount of the fee actually received for the assignment. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the Client, the Client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions.

11. Neither this appraisal report nor any of its contents should be construed as investment advice or as a estimate or guarantee of a future economic value for the subject company.