# EXHIBIT 73

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO AND OAKLAND DIVISION

4

5    _____

6    THOMAS FERNANDEZ, et al.,                )
                                              )
7                 Plaintiffs,                 )
                                              ) Case No.
8           vs.                               )
                                              ) C-06-07339 CW
9    K-M INDUSTRIES HOLDING CO., INC., et al.,)
                                              )
10                Defendants.                 )
                                              )
11                                            )
                                              )
12

13   _____

14

15         VIDEOTAPED DEPOSITION OF KATHRYN DALY
                     April 30, 2008
16                 Oakland, California

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 80030
24

25

Page 32

1      Q     Did you present your findings to someone?

2      A     I do not recall if it was more than a

3  discussion of a range of value with Victor Alam and/or

4  Mr. Moore and/or Mr. Mines.  Those were my three primary

5  contacts.

6      Q     Okay.  And then would that have been in

7  person or by telephone?

8      A     Telephone.

9      Q     And then it says, within 60 days update

10  analysis and issue final valuation conclusion and

11  fairness letter as of transaction date.

12            Do you know if you actually took those

13  steps as part of this assignment?

14      A     Not all of those steps, no.

15      Q     Did you take some of those steps?

16      A     Yes.

17      Q     Which of those steps did you take?

18      A     I issued a draft fairness letter for

19  review.

20      Q     But not the other steps -- not the other

21  steps described in that paragraph that we are looking

22  at?

23      A     No, I was not asked to update my analysis

24  as of the transaction or issue a final valuation

25  conclusion.

1        Q     And, I take it, you did not provide a

2   summary letter as of the transaction with report to

3   follow within 30 days?

4        A     I did not.

5        Q     If you look lower down on this page and

6   under the estimated fee section, there's an estimate

7   that our fees for the initial valuation on a minority

8   basis to be $15,000.

9              Does that, do you know if you, in fact,

10  gave someone acting on behalf of -- did you give someone

11  an estimate for this assignment of $15,000?

12       A     Yes.

13       Q     And then later in that paragraph it says

14  that if a full -- this part is crossed out.  But if you

15  read the part that has been crossed out, if a full

16  written report is requested, we would estimate our fee

17  for production of that report to be $10,000.

18             Do you know why, do you have an

19  understanding as to why that sentence is crossed out?

20       A     No.

21       Q     Do you recall being asked not to prepare a

22  full written report?

23       A     I recall being fired before anybody asked

24  me whether I wanted to produce a full formal report.

25       Q     I would like you -- you can put that

1          A    Slightly tailored but, yes.

2          Q    So it's slightly tailored for this

3    assignment?

4          A    Yes.

5          Q    Does it include -- if you look under other

6    financial data, the last item is any appraisals of the

7    company stock performed over the past five years?

8          A    Yes.

9          MR. LOVITT:    Object to the form.

10   BY MR. FEINBERG:

11         Q    So would, in fact, the Duff & Phelps

12   6/30/98 appraisal be something that you had requested in

13   this instance?

14         MR. LOVITT:    Object to the form.

15         A    I did not know a Duff & Phelps report

16   existed.  But we request prior appraisal reports.

17   Sometimes they are performed for gift and estate tax

18   purposes, sometimes for option pricing, buy sell

19   agreements.  It's a standard request.

20   BY MR. FEINBERG:

21         Q    I see.  So if I want to make sure I

22   understand you correctly, you are saying that as part of

23   your standard request you included a request for all

24   prior company valuations for the past five years but at

25   that time -- at the time you made that request when you

Page 36

1    delivered this presentation, you didn't know that there

2    was a Duff & Phelps valuation?

3        A    Correct.

4        Q    But, obviously, you learned at some point

5    that there was a Duff & Phelps valuation or a Duff &

6    Phelps appraisal as of 6/30/98?

7        A    Well, I did not know what date it was, but

8    I did learn that subsequent to being fired that Duff &

9    Phelps had performed valuation work for CIG.  And I

10   believe my understanding was they were used as part of

11   the transaction.

12       Q    Yes.  Okay.  Let's take a look at what was

13   marked as Exhibit 14.  Do you have access to that in

14   that binder, I think?

15       A    I do.  There it is.

16       Q    Let me get my copy out so we are both on

17   the same page.  If you can take a minute to review that,

18   let me know if this is a document you have seen before.

19       A    No, I have not seen this document before.

20       Q    So although it's listed --

21       A    In item 107 in a cover letter for overnight

22   mail, I have not seen it.

23       Q    So you never read this Duff & Phelps

24   report?

25       A    No.

Page 37

1          Q     Did anybody else work with you on this

2     assignment at Columbia Financial?

3          A     I'm sure someone did, but I don't know who.

4          Q     I would like you to take a look at what has

5     been marked as Exhibit 18.

6          A     Another one.

7          Q     As you will note this one, it's dated

8     differently.  This is dated as June 30th 1999.

9          A     Yes, and for a different company.

10         Q     Correct.  It's a valuation for K-M

11    Industries Holding Company Inc., Class I stock as of

12    June 30, 1999.  Have you seen this valuation report

13    before?

14         A     No.

15         Q     So your testimony is that you learned about

16    the Duff & Phelps valuations after you were fired?

17         A     Yes.

18         Q     How did you learn about the Duff & Phelps

19    valuations?

20         A     I asked Victor Alam, and he told me that

21    the decision was to use Duff & Phelps as their financial

22    advisor for an ESOP transaction.

23         Q     And do you recall whether this conversation

24    took place in 1999 or at some later point?

25         A     I don't recall, but it would have been

Page 38

1    after whenever I was let go.

2        Q    Were you fired in 1999 or at some

3    different --

4        A    I believe in 1999.

5        Q    And so you found out from Victor Alam that

6    the client had decided to use Duff & Phelps instead for

7    the financial advisory services?

8        A    Yes.

9        Q    Were you told why the client had decided to

10   use Duff & Phelps rather than Columbia Financial?

11       A    I believe I was told that I made Mr. Moore

12   very angry by sending some information regarding 1042

13   rollover investments with a firm out of Atlanta.

14       Q    Why did you send Mr. Moore that 1042

15   rollover information?

16       A    He requested it.

17       Q    But then you were told it -- Mr. Alam told

18   you that made Mr. Moore very angry?

19       A    Well, Mr. Moore called me and was very

20   angry about it.

21       Q    Mr. Moore called you about it before you

22   were fired or after?

23       A    I believe it was the same time.

24       Q    And what did Mr. Moore tell you over the

25   telephone about this?

1        A     I remember the anger and, well, I guess I
2    could say fury and not so much the content.
3        Q     So you remember that Mr. Moore was furious
4    at you in this telephone conversation?
5            MR. LOVITT:    Object to the form.
6        A     He was angry.  And he said that I had no
7    business disrupting his team by sending that
8    information.  And I didn't understand, so I didn't
9    really engage in a conversation with him.
10   BY MR. FEINBERG:
11       Q     And the reason why you didn't understand
12   why he was angry was?
13       A     He had asked me to send him the
14   information.
15       Q     I see.  Do you recall any of the specific
16   words that Mr. Moore used in this conversation?
17       A     Yes.
18       Q     There is no children present in the room.
19   Do you feel comfortable sharing any of those words with
20   us?
21       A     He called me a God damn bitch.
22       Q     Were there any more words spoken by
23   Mr. Moore along those lines?
24       A     I don't remember any more.  I kind of went
25   blank at that point.  He was angry.

Page 40

1      Q    And how did that conversation end?

2      A    I don't recall.  I think he hung up.  I

3  hung up.  I don't think we ended friendly.

4      Q    Doesn't sound particularly amicable.

5      A    No, twitching with my cord now just

6  thinking about it.

7      Q    What did you do after that?

8      A    I called Victor Alam.

9      Q    You called Victor Alam after that phone

10  call.  And what did you tell Mr. Alam?

11     A    I believe I left a message.  I don't

12  believe I reached him immediately after.

13     Q    Did you later have a phone call with

14  Mr. Alam about this subject?

15     A    Yes.

16     Q    Was it the same day or soon thereafter?

17     A    It was soon thereafter.  I don't recall if

18  it was the same day or the next day or the following

19  day.

20     Q    Did you tell Mr. Alam more about your phone

21  call with Mr. Moore?

22     A    Yes.

23     Q    And what was Mr. Alam's response?

24     A    I believe there was a chuckle.  And there

25  may have been discussion about the 1042 rollovers, my

1    confusion as to what happened.  And I may have learned

2    at that point that Mr. Moore had decided to proceed with

3    Duff & Phelps as a financial advisor.

4         Q    Did Mr. Alam tell you anything else about

5    Mr. Moore in this conversation?

6         A    I think he may have tried to appease me

7    because I was still pretty upset at that point by

8    saying, well, the guy does get upset sometimes and I am

9    sorry this happened to you.  And there was some sort of

10   apology or recognition that it had happened.

11        Q    Do you recall anything else about your

12   conversation with Mr. Alam at that time?

13        A    No.

14        Q    In preparing your -- doing your preliminary

15   valuation analysis, did you talk with anyone at Duff &

16   Phelps about this assignment?

17        A    No.

18             MR. LOVITT:   Object to the form.

19   BY MR. FEINBERG:

20        Q    If you take a look at -- one second.

21   It's the --

22             MR. LOVITT:   Excuse me.  Dan, can we take

23   a short break?

24             MR. FEINBERG:   Not a problem.  Let's take

25   a seven minute break, which I think brings us up to

Page 52

1          Q    Did you -- were there any disclosures --

2    excuse me.  In the course of doing your valuation work,

3    did anyone talk to you about the subject of asbestos

4    litigation liability?

5          A    No.

6          Q    So you had no knowledge when you did your

7    valuation work of asbestos litigation liability that was

8    facing Kelly-Moore or its related companies?

9               MR. LOVITT:   Object to the form.

10         A    No.

11   BY MR. FEINBERG:

12         Q    Did anyone at -- did either Mr. Moore or

13   Mr. Mines or Mr. Alam say why you had been selected to

14   do this valuation work?

15         A    No.

16         Q    So there's no discussion about being

17   dissatisfied with a prior appraiser?

18              MR. LOVITT:   Object to the form.

19         A    No.

20   BY MR. FEINBERG:

21         Q    Are you familiar with an appraiser named --

22   were you familiar with an appraiser named B.J. Brooks

23   who is associated with the Menke Group?

24              MR. PALMER:   Object to form.

25         A    Jack Brooks?

1    in value in determining a concluded value for purposes

2    of the transaction.

3          Q     So this has a range of value but not a

4    concluded value?

5          A     Yes.

6          Q     Do you know -- well, first of all, did you

7    ever discuss this letter with Mr. Moore?  Did you ever

8    talk to Mr. Moore about this letter?

9          A     I think I have or I may have but I don't

10    recall specifically.

11          Q     So you may have had -- obviously, the phone

12    call would have been after September 7th or on or after

13    September 7th?

14          A     Uh-huh.

15          Q     So you may have discussed this draft

16    valuation letter with him but you are not certain?

17          A     I'm not certain.  My vague recollection --

18    I'm swearing to it, so I am going to call it a vague

19    recollection -- is that he did not understand why there

20    was a range of value.  And I explained to him that for

21    purposes of a transaction, the trustee would negotiate a

22    point along that range.

23          Q     And you are smiling here because there is a

24    certain issue with in this case the trustee and the

25    seller being the same individual?

Page 57

1          MR. LOVITT:   Object to the form.

2     A    Yeah, I don't know whether it's an issue in

3     the case.  But it was just a curious conversation to

4     have with him about a range of value and negotiating

5     within that range.

6     BY MR. FEINBERG:

7          Q    And it was a curious conversation because

8     he would have to be negotiating with himself if he was

9     the trustee?

10         MR. LOVITT:    Object to the form.

11    A    Yes.

12    BY MR. FEINBERG:

13         Q    Do you recall whether you discussed this

14    draft valuation letter with Mr. Mines?

15    A    No, I don't believe I did.

16         Q    Do you recall whether you discussed this

17    draft valuation letter with Mr. Alam?

18    A    Yes, I did.

19         Q    Do you recall when that conversation was?

20    A    No.

21         Q    Do you recall whether it was before or

22    after you were fired?

23    A    Oh, I would have discussed it before.

24         Q    And do you recall -- I take it that would

25    have been a telephone conversation?

1          Q    But you never did that additional work in

2    this instance?

3          A    No.

4               MR. FEINBERG:  Are we up to 246?  I am

5    going to mark as Exhibit 246 a two page document that's

6    Bate stamped CIG 008154 and 008160.

7                    (Exhibit No. 246 marked

8                    for identification.)

9

10   BY MR. FEINBERG:

11         Q    Have you seen this document before,

12   Ms. Daly?

13         A    This came out of our offices, yes.

14         Q    And the purpose of this was to have the new

15   professional services agreement in order to provide a

16   fairness opinion letter?

17         A    Yes.

18         Q    And I take it that the reason why there is

19   a new professional services agreement is the original

20   agreement that we looked at did not include providing a

21   fairness opinion as part of the deal?

22         A    Yes.  And it also has a change in here with

23   the percentage, and now it is the Class B-1 stock of K-M

24   Industries Holding Company, again identifying the

25   confusion with what the equity was that was being

1    valued.

2        Q    And, of course -- I believe actually it's

3    B-I rather than 1 but --

4        A    Oh, sorry.

5        Q    So having -- but, obviously, it's crucial

6    to know what equity you are valuing in preparing a

7    fairness opinion?

8        A    Yes.

9            MR. LOVITT:    Object to the form.

10   BY MR. FEINBERG:

11       Q    Do you know if this professional services

12   agreement was ever signed by anyone -- well, by

13   Mr. Moore?

14       A    I do not know.  But I note on the retainer

15   invoice big happy handwriting that says, do not execute

16   this agreement, this is not my handwriting, to answer

17   your question in advance.

18       Q    Yes, that was coming up.  So to your

19   knowledge -- well, you don't -- just to clarify, is it

20   your recollection that Mr. Moore never signed this

21   retainer or you just don't know for sure at this point?

22       A    I don't know.

23       Q    Do you know if Columbia was ever paid for

24   preparing a fairness opinion letter on this transaction?

25       A    I do not believe we were paid for a

Page 72

1    fairness opinion.  I do know we were paid for our

2    preliminary valuation work.

3         Q    Now, if you look at this letter -- well,

4    first of all, is it your recollection that you sent this

5    to Mr. Moore on or about September 16th 1999?

6         A    It's not my recollection but this letter

7    states that so I will agree with the print.

8         Q    And it also has a transaction price in here

9    at $55 million rather than a range.  Do you know how you

10   learned that the request was for a fairness opinion at

11   $55 million?

12        A    There was a discussion with Mr. Moore,

13   between Mr. Moore and myself about the range of value

14   and where in the range of value.  So if there is a range

15   in a value you can be at top range of the value, yes.  I

16   can also be at the low end of the value.  Again circling

17   back around to the difficulty of the concept of

18   negotiation between the seller and the buyer as the same

19   person.  I said it could be at either range.  And I

20   remember him saying, but you could be at the high range

21   of the range.  Yes, I could.  And this later -- this

22   letter I am guessing states the high end of the range.

23   I do not recall the range at this moment.

24        Q    We can help you on that.

25        A    Okay.

1              MR. PALMER:   Object to form.

2        A    I may have heard from Victor Alam when I

3   was -- my services were no longer needed about it, him

4   being unhappy.  I always thought it was about the Paine

5   Webber thing.  I may have heard a year or two later as

6   this went away but I still stayed kind of riled up about

7   it.  I may have asked Victor or talked to Victor about

8   what was the real problem here, what happened.  And I

9   may have heard that he thought I was too low.  I don't

10  know.

11  BY MR. FEINBERG:

12       Q    Did you at some point later learn that the

13  actual transaction had been completed, that there, in

14  fact, had been a transaction between the ESOP and

15  Mr. Moore?

16       A    Yes, I understood that Duff & Phelps issued

17  a fairness opinion for a transaction.  But I don't know

18  what the price were -- was or the terms.

19       Q    How did you learn that the transaction was

20  consummated?

21       A    At an ESOP conference.

22       Q    Who would have told you that?

23            MR. PALMER:   Object to the form.

24       A    I'm not sure.  I may have heard from

25  Victor.  I may have heard from somebody at Duff &

Page 99

1        Q    Has anyone from North Star Trust ever

2   contacted you about your valuation work on CIG?

3        A    No.

4        Q    Prior to lawyers involved in this

5   litigation contacting you about the CIG transaction, did

6   you have -- were you contacted by anyone else between

7   the date your services were terminated and between the

8   date lawyers involved in this litigation contacted you

9   about the CIG transaction, did anyone else contact you

10  about the CIG transaction?

11       A    Well, I don't know when this litigation

12  started.

13       Q    It would have been in 2006, late 2006 -- am

14  I right about that, late 2006?

15            MR. LOVITT:   You better believe it.

16  BY MR. FEINBERG:

17       Q    Yeah, 2006.

18       A    Wow, wow.  No, I don't believe so.

19       Q    Has someone other than a lawyer acting on

20  behalf of one of the parties here contacted you about

21  the litigation at any time since you were terminated?

22       A    No, I don't think so.

23       Q    Did you keep an appointment calendar in

24  1999?

25       A    I did.

# EXHIBIT 74

08/12/99  15:09  FAX 650 631 1971        KELLY-MOORE FIN.                    ☑02

*8-12-99*
*Pete*
*for your review*
*Ed*

*appraisal of CCIC*

*Not "I" tracking*
*stock*

# PRESENTATION TO

## CALIFORNIA CAPITAL INSURANCE COMPANY
## PROPOSED ESOP TRUST COMMITTEE

### FOR

### ESOP APPRAISAL and
### FINANCIAL ADVISORY SERVICES

**August 10, 1999**

**EXHIBIT**

*22*

*Cazzolla  3-19-08*

CIG 008161

PRESENTATION TO

CALIFORNIA CAPITAL INSURANCE COMPANY ESOP TRUST COMMITTEE

for

ESOP APPRAISAL and FINANCIAL ADVISORY SERVICES

Columbia Financial Advisors, Inc. (CFAI) is pleased to present this presentation about the appraisal and financial advisory services we would provide to the California Capital Insurance Company (CCIC) ESOP Trust Committee, for the purpose of a proposed transaction, whereby the ESOP would purchase an interest in the equity of CCIC.

The purpose of this presentation is to discuss our background and experience, outline the valuation process, and discuss the various approaches for the valuation of CCIC. We are very excited about this project, and we welcome the opportunity to provide appraisal services to your company.

**Presentation Format**

- Overview of Background and Experience
- Determination of Fair Market Value
- Factors Affecting Value
- Opinions To Be Rendered By CFAI In The Transaction
- The Appraisal and Advisory Process
- Appraisal Timing, Report, and Fees
- Attachments:
  Documents Information Checklist
  Valuation and Financial Advisory Services
  Statements of Qualifications

---

CIG 008165

## OVERVIEW OF BACKGROUND AND EXPERIENCE

**Qualifications**

CFAI has a professional appraisal staff of eight appraisers. Our five principals are either Chartered Financial Analysts (CFA) and/or members of the American Society of Appraisers (ASA). Combined, we have more than 60 years of experience in performing business appraisals. Three of our principals teach ASA business valuation courses and two of our principals are ASA course developers.

**Appraisal Services**

The majority of our appraisals are ESOP related (ESOP feasibility, annual ESOP appraisals, ESOP transactions), transaction related, and tax related (estate and gift tax, recapitalizations, charitable donations). We also perform appraisals for other purposes including buy/sell agreements, minority squeeze outs, and litigation support.

**ESOPs**

CFAI is a member of the National Center for Employee Ownership and The ESOP Association. One of our principals is a member of the Valuation Advisory Committee of the ESOP Association, and another is the course developer for the ASA's ESOP Valuation Course. We have over 70 clients for which we perform annual ESOP appraisals.

**Transactions**

Over the past decade CFAI principals have performed appraisals and financial advisory work in over 100 transactions totaling over $1 billion. These transactions have involved companies in many different industries located throughout the U.S. We have been involved in the following kinds of transactions.

Multi-investor ESOP transaction
ESOP buying (or selling) a minority or controlling interest
Corporate stock redemption or issuance
Buyout of existing shareholder(s)
Purchase (or sale) of entire company or minority interest to (or by) a third party
Sale or purchase of a division of a company

**Fairness Opinions**

CFAI has issued fairness opinions in a variety of transactions including leveraged ESOP transactions, ESOP multi-investor transactions, going private transactions, minority squeeze-outs, and purchase/sale of entire companies.

---

Columbia Financial Associates, Inc.                                      Page 2

CIG 008166

## Experience

We have provided appraisal and financial advisory services for many companies in the insurance business or related industries:

- W.M. Life Insurance Company of Seattle, WA. Appraise for buy/sell agreement purposes.

- Holmes Murphy Insurance Agency. Appraisal for management planning.

- Jewett, Barton, Leavy and Kirby Insurance Company of Portland, OR. Appraisal for annual ESOP purposes.

- Sammons Enterprises insurance division of Dallas, TX. Appraisal for annual ESOP purposes.

We are very experienced at familiarizing ourselves with the operating dynamics, issues, and critical factors of an industry. We do this in all our appraisals.

We have significant experience providing ESOP financial advisory services for large companies.

**Sammons Enterprises** (life insurance/distribution/resort operations), Bob Korba, President, 214-855-2800, ESOP client, Dallas, Texas.

**Freeman Companies** (convention services), Ellis Moseley, Vice President, 214-670-9004, ESOP client, Dallas, Texas.

**Lifetouch, Inc.** (photography services), Randy Pladson, CFO, 612-332-4212, ESOP client, Minneapolis, Minnesota.

**Opus Corporation** (real estate/construction), Luz Campa, Vice President - Taxes, 612-936-4508, tax related project, Minneapolis, Minnesota.

**J.C. Nichols Company** (real estate operating company), Price Sloan, Corp. Secretary, 816-561-3456, ESOP client, Kansas city, Missouri.

**Laidlaw Corporation** (manufacturer), Tim Allen, CFO, 602-951-0003, ESOP client, Phoenix, Arizona.

**Brown and Caldwell** (environmental engineering and consulting), Jim Meehan, CFO, 510-937-9026, ESOP client, Pleasant Hill, California.

CIG 008167

## DETERMINATION OF FAIR MARKET VALUE

Following is a discussion of the approaches to value that are most appropriate for the appraisal of the *fair market value* of the equity of CCIC to be purchased by the ESOP. Our appraisal methodology would follow the Department of Labor draft regulations on adequate consideration for ESOP appraisals, and the IRS valuation guidelines outlined in Revenue Ruling 59-60 for gift and estate tax appraisals.

## THE MARKET APPROACH

- In business valuation we use comparable sales analysis. We look at the prices at which other companies have sold and we look at the stock prices of publicly traded companies which are somewhat similar to CCIC.

- We will perform a search for companies in the insurance industry. Using on-line and CD Rom technology we will search SIC codes. While we may not find exact comparables, we will be able to find companies that operate in somewhat the same market as CCIC does.

- We calculate multiples for the comparable companies based on their stock (or acquisition) prices relative to earnings, cash flow, revenues, and book value. The most common of these is a price/earnings, or P/E ratio.

- We analyze CCIC performance compared to these companies. We make adjustments to reflect the differences between the comparable companies and CCIC. These differences include size; diversification of product lines; market strength; management depth; etc.

- Based on this analysis, we choose appropriate multiples for CCIC and apply the chosen multiples to CCIC earnings, cash flow, revenues, and book value to arrive at various indications of value from this approach.

## THE INCOME APPROACH

- The income approach, often referred to as discounted cash flow analysis, is used to determine the value of CCIC based on the present value of expected future levels of cash flow. In business valuation, we discount the forecasted cash flows of the business at a rate which appropriately reflects the risk of the company achieving these cash flows. Required rates of return for businesses are generally much higher than for real estate, because the risk of an investment in a business is generally much higher.

- In practice the application of this approach is difficult. The assumptions that lead to forecasting cash flow and selecting the appropriate discount rate involve a significant

---

CIG 008168

degree of subjectivity. However, we are experienced in dealing with the assumptions and complexities of the discounted cash flow approach.

- A variation of the discounted cash flow approach is a single period capitalization method. This method determines the earning capacity of CCIC and capitalizes this expected level of earnings, or cash flow, at a discount rate less growth. The use of a single period versus a multiple period version of the income approach for CCIC will depend on the availability of forecasted operating data.

## THE COST APPROACH

- The cost approach involves estimating the cost to replace an asset, less an allowance for the physical depreciation of the asset.

- In business appraisal, this approach is referred to as the adjusted net asset value approach. In this approach we estimate the market value of all of a company's assets (both tangible and intangible) and deduct the market value of its liabilities to arrive at the fair market value of its equity.

- This approach is not particularly relevant for operating companies, and companies with a significant amount of intangible value. Also, unless there is an intent to sell or liquidate assets, in our opinion, investors are more interested in the earnings assets generate, rather than the asset values themselves. In a going-concern business, income and market approaches are typically the primary valuation approaches used. In the case of CCIC, we may use an adjusted net asset value approach, but it will not be given primary consideration.

## INVESTED CAPITAL VERSUS EQUITY BASIS

In arriving at the value of a firm's equity, one can either value the invested capital of the firm (its equity and interest bearing debt) or one can directly value the equity. In theory, both methods should produce the same value of equity.

We will in all likelihood perform our appraisal on an invested capital basis because the company will be using leverage to finance the ESOP stock purchase.

## OTHER CONSIDERATIONS

The extent to which there are prior stock transactions, particularly if they are arm's length, could provide additional indications of value.

---

CIG 008169

08/12/99  15:09  FAX 650 631 1971          KELLY-MOORE FIN.                      ⊠08

## LEVERAGED ESOP VALUATION ISSUES

- Discount for lack of marketability

- Value absent transaction debt for initial transaction

- Post transaction equity value

    - Fall in equity value

    - Treatment of ESOP debt - debt of the Corporation

    - Shares outstanding

    - Treatment of contribution expense

    - Treatment of repurchase liability

CIG 008170

# FACTORS AFFECTING VALUE

## INTERNAL FACTORS

- Financial performance - all other things being equal, increases (decreases) in revenues and profits translate into increases (decreases) in value.

- Degree of financial risk (i.e. use of debt financing) - excessive use of debt financing can result in declines in value. This affects value for two reasons. First, it increases the cost of capital, and, second, it decreases earnings because of higher interest expense.

- CCIC actual financial results versus forecast results - all other things being equal, to the extent the company does not meet (exceeds) its forecasts, there would be a decline (increase) in value. This is because expected future results are incorporated into the current value. If these expectations are not met (exceeded), value generally tends to decline (increase).

- Expected growth - all other things being equal, companies with higher expected growth are worth more than ones with lower growth.

## EXTERNAL FACTORS

External factors affect value because an investor has a choice of where to make an investment. Therefore, the value of any investment is tied to the return that could be earned on alternative investments. In general, the greater the risk associated with an investment, the higher the rate of return an investor will require to make the investment. The return an investor in CCIC would require to make an investment in CCIC is dependent on the return on alternative investments of *comparable risk*.

- Interest rates - all other things being equal, increasing interest rates increase the cost of capital and therefore decrease value.

- The level of multiples (P/E ratios, etc.) in evidence for the similar publicly traded and/or acquired companies.

- Industry and economic factors such as expected growth, where we are in the national and regional economic cycle, competitive environment, etc.

---

Columbia Financial Associates, Inc.                                              Page 7

CIG 008171

## THE APPRAISAL AND ADVISORY PROCESS

- Documents/information request list

- Develop relevant economic data

- Develop relevant industry data

- Corporate due diligence

  - Analysis of subject company financial statements (historical and forecast)

    - Analyze internally over time
    - Make appropriate adjustments
    - Compare with specific guideline (or comparable) companies
    - Assumptions underlying forecasts

  - Field Trip

    - Facilities visit
    - Management Interviews
    - Meeting with ESOP Trustees

- Develop Data for Valuation Approaches

  - Market approach

    - Develop guideline company list
    - Obtain guideline company data
    - Analysis of guideline company data
      - Analysis of similarities and differences
      - Financial statement adjustments
        - Develop relevant market multiples
          - Price/earnings ratios
          - Price/cash flow ratios
          - Price/revenues ratios
          - Price/book value ratios

      - Choose appropriate multiples for CCIC

---

CIG 008172

- Income approach
- Analysis of management's forecast
- Calculate free cash flow based on management's forecasts
- Develop appropriate required rate of return for CCIC

- Cost approach

  - Adjust assets and liabilities to estimated market values
  - May require real estate or equipment appraisals

- Develop valuation

  - Analysis of quantitative and qualitative data

  - Incorporate analysis and develop conclusion

  - Peer review

- Verbal report to client

- Write report

  - Comprehensive -- reflect all above steps

  - Thoroughly document and support conclusions

  - Use conventional methodology, acceptable to IRS and DOL, and in conformance to ASA standards

  - Make it readable

- Determine Fairness of Transaction

---

Columbia Financial Associates, Inc.                                          Page 9

CIG 008173

### ANALYSIS NECESSARY TO DETERMINE FAIRNESS

I.  CFAI will render an opinion as to whether:

    A.   The purchase price to be paid by the ESOP for the equity of CCIC does not exceed the fair market value of such shares and does not exceed "adequate consideration" as defined under Section 3(18)(B) of ERISA.

    B.   The terms and conditions of the stock, including a possible conversion price, dividend coupon, and the time period in which lies the right to convert, as well as the ESOP's overall equity interest in the transaction, are fair and reasonable to the ESOP from a financial point of view.

    C.   The interest rate and terms of the ESOP loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's length negotiation between independent parties.

    D.   The overall transaction is fair to the ESOP from a financial point of view.

II.  In order to render such an opinion, CFAI will conduct the following analysis:

    A.   Determine the fair market value of CCIC as of the transaction date.

    B.   Allocate the fair market value among the various classes of debt and equity securities (if relevant).
        1.  Analyze relative internal rates of return of each class of debt and equity security.
        2.  Analysis of the terms and conditions of the super common stock based on comparable public market evidence of convertible preferred stock.
            a.  New issue convertible preferreds, ESOP convertible preferreds, and industry-specific convertible preferreds.
            b.  Relationship between dividend yield and conversion premium.
            c.  Reasonableness of dividend yield given CCIC financial condition and outlook.
            d.  Time to conversion.
        3.  Analysis of the terms and conditions of the debt securities based on capital market evidence and CCIC ability to service the debt.
        4.  Analysis of the equity allocation given the relative risk/return characteristics of each security.

CIG 008174

## APPRAISAL TIMING, REPORT, AND FEES

### TIMING

Perform initial valuation analysis within three weeks of receipt of requested information. Present findings to ESOP committee

Within 60 days, update analysis and issue final valuation conclusion and fairness letter as of transaction date. Provide summary letter as of transaction with report to follow within 30 days.

### REPORT

Our appraisal will be summarized in a written report which will cover all the factors listed in Revenue Ruling 59-60 and will use standard appraisal methodology acceptable to the Department of Labor and the Internal Revenue Service. The report will contain sections analyzing the U.S. economy, the manufacturing industry, CCIC financial statements and the company's historical operations. In addition, the valuation methodology, analysis and conclusions will be clearly presented with the tables and schedules necessary to support the appraisal.

### ESTIMATED FEES

Our fees are based on the amount of time we estimate a project to take at various billing rates associated with different parts of the project. Our billing rates range from $40 to $150 per hour with an average billing rate of approximately $110 per hour. Our estimated range for the appraisal is exclusive of out-of-pocket expenses which are billed separately. This fee covers all the due diligence and analysis necessary to reach a valuation conclusion and to issue a report.

We would estimate our fees for the initial valuation on a minority basis to be $15,000. We would estimate our fee for the update of our analysis and resulting fairness opinions issued at the closing of the transaction to be an additional $5,000. If a full, written report is required, we would estimate our fee for production of that report to be $10,000. The required annual ESOP updates would be approximately $15,000.

We appreciate your consideration and look forward to meeting with you. Thank you.

---

CIG 008175

**ATTACHMENTS**

CIG 008176

# DOCUMENTS AND INFORMATION CHECKLIST

**Financial Statements**
- Financial statements for the past five fiscal years
- Interim financial statements
- All budget forecasts and business plans developed by the company's management and/or outside consultants

**Other Financial Data**
- Aged accounts receivable summary
- Aged accounts payable summary
- Fixed asset summary
- Copies of any significant lease agreements
- Copies of any other important contracts (employment agreements, customer contracts, covenants not to compete, supplier and franchise agreements, labor contracts, and employee benefit plans), either currently in existence, or contemplated
- Compensation schedule for owners for the company, including all benefits and personal expenses for the past five years
- Schedule of insurance in force (key-man life, property and casualty, liability)
- Any real estate, building, machinery and equipment appraisals of the company performed over the past five years
- Any appraisal of the company's stock performed over the past five years

**Company Documents**
- Articles of incorporation, bylaws, and any amendments to either
- Any existing buy/sell agreements, options to purchase stock, or rights of first refusal
- A list of all shareholders as of the valuation date and the number of shares each owned
- Copy of ESOP Agreement and related transaction documents

**Other Information**
- *(If not readily available, this information will be gathered in management interviews).*
- Marketing literature (catalogs, brochures, advertisements, and so on)
- List of competitors, with location, relative size, any other relevant factors
- Resumes of, or list of, key personnel, with age, position, compensation, length of service, education, and prior experience
- Trade associations to which the company belongs or would be eligible for membership
- Relevant trade or government publications
- Any existing indications of asset values, including latest property tax assessments
- Any contingent or off-balance-sheet assets or liabilities (pending lawsuits, compliance requirements, warranty or other product liability, pension plan surpluses, etc.)
- A listing of all prior transactions in the company's stock, the price, terms, number of shares, and parties involved in each
- Number of employees, grouped by salaried, hourly, part time or otherwise

# VALUATION AND FINANCIAL ADVISORY SERVICES

## Employee Stock Ownership Plans

CFAI's services relating to ESOP appraisal and financial advisory services include:

- *ESOP Feasibility Analysis and Appraisal*
- *Equity Allocation and Securities Design*
- *Fairness Opinions*
- *Sub S Conversions*
- *Prohibited Transactions*

- *Annual Appraisals*
- *Acquisition IDesposition of Securities / Companies*
- *Appraisal of Various Classes of Securities Including Super Common and Convertible Preferred*

## Tax Related

Our Tax Related appraisal services include:

- *Estate & Gift Tax*
- *Recapitalization*
- *Family Limited Partnerships*

- *Sub S Conversions*
- *Ad Valorem*
- *Limited Liability Companies*

- *Estate Planning*
- *Charitable Donations*
- *SEC "Cheap Stock"*

## Discounts & Premia

CFAI provides empirical research and quantification of the following discounts and premia:

- *Lack of Marketability Discounts*
- *Control Premia*

- *Blockage Discounts*
- *Minority Interest Discounts*

- *Restricted Stock Discounts*
- *Non- Voting Discounts*

## Litigation Support

Members of our professional staff are qualified to give expert witness testimony in a number of situations, including:

- *Marital Dissolutions*
- *Dissenting Shareholder Actions*

- *Tax Related Matters*
- *Damages / Lost Profits*

- *Dept. of Labor Investigations*
- *Testimony Review IRebuttal*

## Other Appraisal Service

- *Appraisal ReviewlCritiqu*
- *BuylSell Agreement ICritique*
- *Ownership Transition*

- *Mergers and Acquisitions*
- *Initial Public Offerings*
- *Intangible Assets*

- *Statutory Mergers (fair value)*
- *Fairness Opinions*
- *Stock Options / Warrants*

## Investment Banking Services

- *Change of Control Asset or Stock Sales*
- *Fairness Opinions*
- *Strategic planning*

- *Acquisition Search Services*
- *Takeover Defense Advisory Services*
- *Divestitures of Divisions or Subsidiaries*

CIG 008178

# KATHRYN DALY, ASA
## STATEMENT OF QUALIFICATIONS

**Academic and Professional Credentials**

> Bachelor of Business Administration, Finance/Economics, George Washington University, Washington D. C., cum laude, 1988
>
> American Society of Appraisers, Accredited Senior Appraiser, Business Valuation

**Position and Experience**

> Principal, Columbia Financial Advisors, Inc., 1995 - present
>
> Senior Associate, Willamette Management Associates, Inc., 1988 - 1995
>
> Qualified as expert witness on business valuation issues

**Professional Affiliations**

> Officer of the Northwest Chapter of the ESOP Association
>
> The ESOP Association
>
> National Association of Business Economists
>
> American Society of Appraisers, Exam Grader for Business Valuation 202 Course

**Speeches and Presentations**

> National Center for Employee Ownership and the Northwest Chapter of the ESOP Association, **"ESOP Valuations - A Roundtable Discussion"**, Seattle, Washington, April 1999
>
> Northwest Chapter of The ESOP Association, **"The ESOP Valuation Process - What Effect Can I Have on Value?"** Seattle, Washington, March 1998
>
> National Center for Employee Ownership - Stock Option Workshop, **"Valuation and Accounting Issues for Stock Options"**, San Jose, California and Bellevue, Washington, November, 1997
>
> The Law Offices of Gunderson, Dettmer, et al, **"Issues during the IPO Process"** Menlo Park, California, July 1997
>
> The Securities and Exchange Commission, **"How Appraisers Appraise Closely-Held Businesses"**, Washington D.C., May 1997
>
> The Law Offices of Mitchell, Silberberg & Knupp **"Valuing an ESOP Company"**, Los Angeles, California, October 1995
>
> New Mexico Law School, **"What Attorneys Need to Know About Business Valuation"**, Albuquerque, New Mexico, April 1995
>
> Portland Community College, **"Analyzing Financial Statements"** Portland, Oregon Spring 1993

**Publications**

> **"Valuation Considerations for the Mature ESOP"**, Kathryn Daly, *Valuation Insights - ESOP issue*, Spring 1995, Willamette Management Associates, Inc.
>
> **"Chapter 22: Sample Case"** and **"Chapter 23: Solution to the Sample Case"**, *Valuing Small Businesses and Professional Practices*, 2nd Edition, by Shannon Pratt, Business One Irwin, 1993

CIG 008179

**KATHRYN F. ASCHWALD, CFA, ASA**
**STATEMENT OF QUALIFICATIONS**

**Academic and Professional Credentials**
> Bachelor of Science, Business Administration: Finance Law, with Honors, Portland State University, 1984
> Chartered Financial Analyst
> American Society of Appraisers, Accredited Senior Appraiser, Business Valuation

**Position and Experience**
> Principal, Columbia Financial Advisors, Inc., 1992 - present
> Principal, Willamette Management Associates, Inc., 1984–1992
> Financial Analyst Internship, First Interstate Bank of Oregon. Extensive economic and financial research for Oregon municipalities, Winter 1984
> Staff Accountant, A.G. Edwards & Sons (formerly Hammerbeck & Co.), 1982–1983

**Professional Affiliations**
> Association for Investment Management and Research
> Portland Society of Financial Analysts
> The ESOP Association
> Immediate Past Chair and Current Member, ESOP Association Valuation Advisory Committee
> Founders Group, Northwest ESOP Association Chapter
> Exam Grader, American Society of Appraisers' Business Valuation Courses 201-204
> Editorial Advisory Board, *The Journal of Employee Ownership Law and Finance*

**Speeches**
> Has presented speeches on ESOP valuation procedures, requirements, and special issues; valuation for different purposes; and invested capital valuation methods at seminars sponsored by numerous organizations including the American Society of Appraisers, The ESOP Association, The National Center for Employee Ownership, the Community Economic Stabilization Corporation of Oregon, the Association of Professional Design Firms, and KPMG Peat Marwick

**Publications**
> "Valuing S Corporation ESOP Companies" (co-author), *The Journal of Employee Ownership Law and Finance*, Summer 1999
> "The Market Comparable Approach-Using Public Market Data" (co-author), *The Valuation Handbook*, John Wiley & Sons, Inc., 1999
> "Employee Stock Ownership Plans" (co-author), *Valuing Small Businesses and Professional Practices*, 2nd Edition, by Shannon P. Pratt, Business One Irwin, 1993
> "Enterprise Valuations in ESOP's," *The ESOP Report*, December 1992.
> "ESOP Transaction Pricing in the Middle Market," (co-author), *Valuation Insights*, Autumn 1992
> "Determining the Value of A/E Firms" (co-author), *Ascent*, September/October 1991
> Contributing author, *Valuing a Business The Analysis and Appraisal of Closely Held Companies*, 2nd Edition, by Shannon P. Pratt, Business One Irwin, 1989

CIG 008180

08/12/99  15:09  FAX 650 631 1971          KELLY-MOORE FIN.                    ☒19

## MARY B. McCARTER, CFA, ASA
## STATEMENT OF QUALIFICATIONS

**Academic and Professional Credentials**
> Master of Business Administration, Finance, University of Portland, 1984
> Bachelor of Arts, Mathematics, Kenyon College, 1978
> Chartered Financial Analyst
> American Society of Appraisers, Accredited Senior Appraiser, Business Valuation

**Position and Experience**
> Principal, Columbia Financial Advisors, Inc., 1992 - present
> Director, Willamette Management Associates, Inc., 1981–1992
> Qualified as an expert witness on business valuation issues

**Professional Affiliations**
> The Appraisal Foundation, Trustee, Board of Trustees
> American Society of Appraisers
>> Co-Chair, International Education Committee
>> Member, Business Valuation Committee, 1991 - 1997
>> Chairman, Business Valuation Education Committee, 1995 - 1997
>> Course Developer -Valuation of Agricultural Related Businesses
>> Business Valuation 201 Course Developer, 1991 - 1997
> Association for Investment Management and Research

**Seminars, Speeches, and Instruction**
> "Valuation of Agricultural Related Businesses", two-day course offered jointly by the American Society of Farm Managers and Rural Appraisers and the American Society of Appraisers, 1996-1999
> "Introduction to Business Valuation," "Business Valuation Methodology," and "Business Valuation Case Study," four-day courses offered by the American Society of Appraisers, 1989-1998
> "NBV3: Data Research and the Market Approach to Valuation", California, Washington, and Illinois CPA Societies, 1995 - 1998
> "Estate Planning With Family Owned Entities and Valuation Discount Issues", Seattle Estate Planning Council, November, 1997
> "ESOP Valuation Issues," Employee ownership seminars sponsored by the Community Economic Stabilization Corporation (CESCO), 1989-1992

**Publications**
> "Employee Stock Ownership Plans" (co-author), *Valuing Small Businesses and Professional Practices*, 2nd Edition, by Shannon P. Pratt, Business One Irwin, 1993
> "The Market Comparable Approach-Using Public Market Data" (co-author), *The Valuation Handbook*, John Wiley & Sons, Inc., 1992
> Contributing author, *Valuing a Business The Analysis and Appraisal of Closely Held Companies*, 2nd Edition, by Shannon P. Pratt, Business One Irwin, 1989
> "Valuation of Forest Products Companies" *Journal of Business Valuation*, October 1990

# EXHIBIT 75

9/07/99   17:19   ☎503 222 1380   COLUMBIA FIN ADV   ☒012



650 Morgan Building
720 S.W. Washington St.
Portland, OR 97205-3508

(503) 222-0562
FAX (503) 222-1380

September 7, 1999

The Proposed ESOP Trust Committee
c/o Mr. William Moore
California Capital Insurance Corporation
303 Olive Hill Lane
Woodside, CA 94062

Dear Mr. Moore:

Columbia Financial Advisors, Inc. (CFAI) was retained by the Proposed
Employee Stock Ownership Plan (ESOP) Committee of California Capital
Insurance Corporation (CCIC) to determine the fair market value, as of the
current time, of a 42% interest in the Class I-A tracking stock of CCIC (or
Company), for ESOP transaction purposes. This letter conveys to you our
determination of fair market value.

### FACTORS CONSIDERED

In our analysis of CCIC's for purposes of determining a current fair market
value, we have taken into consideration the eight factors enumerated in
revenue ruling 59-60 including the nature and history of CCIC's operations,
the condition and outlook for the property and casualty insurance industry,
the condition and outlook for the national economy in which CCIC operates,
the financial condition and outlook for CCIC, CCIC's earning and dividend
paying capacity, whether or not CCIC has goodwill or intangible value,
previous sales of CCIC stock and the size of the block to be valued, and the
market prices of stocks of corporations engaged in the same or similar lines
of business as CCIC and whose stocks are actively traded in a free and open
market, either on an exchange or over the counter.

The purpose of this letter is to give you an understanding of the methodology
used in our approaches to value. Therefore, our research and analysis of the
industry, the national economic outlook in which CCIC operates, a written
analysis of the company and its financial condition and operations is not
presented in written form herein, but is maintained in our files.

*Offices in Portland, Oregon and Seattle, Washington  (206) 682-5677*

**EXHIBIT**

24

Cazzolla    3-19-08

CIG 008220

California Capital Insurance Corporation
ESOP Administrative Committee
Appraisal as of August 1999

The statements of appraiser's qualifications, appraiser's certification, and contingent and limiting conditions appearing at the end of this letter are an integral part of the analysis that follows and should be read in conjunction with this letter.

## CRITICAL ASSUMPTIONS
### Financial Statements

CCIC's interim 1999 financial statements relied upon in conducting our analysis are internally prepared and have not been audited. Any material changes in CCIC's financial position and/or operations that may be reflected in an audit may have a material impact on the value determined herein. However, we have no reason to believe any such changes would result from an audit.

## SOURCES OF INFORMATION

Various sources of information regarding CCIC's historical, current, and future operations and its financial condition and outlook were provided to us by company management. We have relied on this information supplied by management without further verification as correctly reflecting the company's past results and current condition. Kathryn Daly interviewed Company management regarding the financial performance, operations, and management's strategic direction for CCIC. Ms. Daly has visited the Company's offices in Monterey, California in conjunction with this appraisal.

Information regarding the economic and industry conditions and outlook were obtained from regularly published sources that CFAI believes, but does not guarantee, to be reliable. Financial information on the guideline companies was obtained from SEC filings, Compaq d\SEC (Disclosure on Disc), and CompuServe.

## VALUATION APPROACHES AND CONCLUSION

We have relied on the market approach for our determination of fair market value. Within the market approach, we have determined indications of value for CCIC based on both guideline publicly traded companies and on merged or acquired companies. In the recent year, CCIC has been approached by several insurance companies that have expressed an interest to purchase CCIC. We have relied on current, historical and forecasted financial results in our analysis of the market approach.

### The Market Approach

The market approach has been conducted on an equity basis. Indications of value were

Columbia Financial Advisors, Inc.                                    Page 2

COLUMBIA FINANCIAL ADVISORS, INC.

CIG 008230

California Capital Insurance Corporation
ESOP Administrative Committee
Appraisal as of August 1999

CONFIDENTIAL

REDACTED

CIG 008223

California Capital Insurance Corporation
ESOP Administrative Committee
Appraisal as of August 1999

CONFIDENTIAL

REDACTED

CIG 008224

Case 4:06-cv-07339-CW    Document 187    Filed 07/10/2008    Page 44 of 100

REDACTED

CONFIDENTIAL

CIG 008225

## ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

1.  Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, no liability for such sources is assumed by the appraiser.

2.  The company and its representatives warranted to appraiser that the information supplied to appraiser was complete and accurate to the best of the company's knowledge. Information supplied by management has been accepted without further verification as correctly reflecting the company's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted.

3.  This report shall be used for its intended purpose only, and only by the Client. Possession of this report does not include the right of publication.

4.  This report must be used in its entirety. Reliance on any portion of the report independent of others may lead the reader to erroneous conclusions regarding the value. No portion of the report stands alone without approval from the appraiser.

5.  Appraiser is not required to give testimony in court, or be in attendance during any hearings or depositions, with reference to the company being appraised, unless previous arrangements have been made.

6.  The various estimates of value presented in this report apply to this appraisal only and may not be used out of the context presented herein. This appraisal is valid only for the appraisal date or dates specified herein and only for the appraisal purpose or purposes specified herein.

7.  Neither all, nor any part, of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media without the written consent or approval of the appraiser(s).

8.  CFAI and the individuals involved in this appraisal, are not qualified to detect the presence of toxic or hazardous substances or materials, have not made an independent analysis of the subject company's present or potential environmental liabilities, and expressly disclaim any duty to note the presence of such materials. Any information regarding existing and/or potential liabilities has been accepted without further verification unless otherwise noted. The appraiser assumes no responsibility for determining if the subject company requires environmental approval by the governing agencies, nor if it is violation thereof.

9.  Neither CFAI nor the individuals involved in this appraisal, have any present or contemplated future interest in the subject property, or any other interest which might tend to prevent making a fair and unbiased appraisal.

10. The liability of CFAI and employees is limited to the client only and only up to the amount of the fee actually received for the assignment. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the Client, the Client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions.

CIG 008221

## QUALIFICATIONS OF APPRAISERS

This letter was prepared by Columbia Financial Advisors, Inc. (CFAI), a firm specializing in financial advisory services, especially the valuation of businesses and business interests. CFAI conducts valuation studies of both publicly traded and privately held business enterprises for a variety of purposes, including public stock offerings, tender offers, mergers and acquisitions, federal gift and estate taxes, employee stock ownership plans, buy/sell agreements, divorces, and other cases involving litigation.

Kathryn Daly, ASA, is a principal with CFAI. She holds a bachelor of business administration degree from The George Washington University, cum laude.

Dylan Normington is an associate with CFAI. He holds a bachelors of arts degree from Oregon State University.

NOTE PAGE 6 IS bLANK.
B

COLUMBIA FINANCIAL ADVISORS, INC.

CIG 008217

## APPRAISER'S CERTIFICATION

This letter has been prepared for the confidential use of the ESOP Committee. It was made using standard valuation techniques and practices. Our analysis, opinions, and conclusions were developed, and this letter has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, promulgated by The Appraisal Foundation and endorsed by the American Society of Appraisers. The American Society of Appraisers has a mandatory recertification program for all of its Accredited Senior Appraisers. All Accredited Senior Appraisers employed by Columbia Financial Advisors, Inc. (CFAI) are in compliance with the requirements of that program.

This letter was prepared under the direct supervision of, and managed by Kathryn Daly, with the assistance of Dylan Normington. Qualification statements for those individuals are attached as part of this letter. No individuals other than those identified provided significant professional assistance to the person(s) signing this letter.

To the best of our knowledge and belief, the statements of fact contained in this letter are true and correct. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are the unbiased professional analyses, opinions, and conclusions of CFAI and the individuals involved in this appraisal. CFAI's compensation is in no way contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this letter. Neither CFAI nor the individuals involved in this appraisal have any present or contemplated future interest in the subject property, or any other interest which might tend to prevent making a fair and unbiased appraisal.

Kathryn Daly, ASA
Principal

COLUMBIA FINANCIAL ADVISORS, INC.

CIG 008216

# DYLAN M. NORMINGTON
## STATEMENT OF QUALIFICATIONS

**Academic and Professional Credentials**

Bachelor of Arts cum laude, Political Science, minor Business Administration, Oregon State University, 1995

Currently enrolled in Level II of Chartered Financial Analyst Program

**Position and Experience**

Associate, Columbia Financial Advisors, Inc. 1998 - Present

Associate, Black & Company 1997 - 1998

**Experience Recap**

Mr. Normington is experienced in corporate financial analysis, investment research and analysis of both public and private companies. He has analyzed and researched a wide range of industries, companies and economies. Mr. Normington's educational background includes accounting, portfolio management, investment analysis, corporate finance and financial institution management.

COLUMBIA FINANCIAL ADVISORS, INC.

CIG 008219

KATHRYN DALY, ASA
STATEMENT OF QUALIFICATIONS

**Academic and Professional Credentials**
Bachelor of Business Administration, Finance/Economics, George Washington
University, Washington D. C., cum laude, 1988
American Society of Appraisers, Accredited Senior Appraiser, Business Valuation

**Position and Experience**
Principal, Columbia Financial Advisors, Inc., 1995 - present
Senior Associate, Willamette Management Associates, Inc., 1988 - 1995
Qualified as expert witness on business valuation issues

**Professional Affiliations**
Officer of the ESOP Association's Northwest Chapter
The ESOP Association
National Association of Business Economists
American Society of Appraisers, Exam Grader for Business Valuation 202 Course

**Speeches and Presentations**
Columbia Financial Advisors, Inc., Goldman Sachs & Co., McDermott, Will & Emery,
Phenneger & Morgan, Inc., U.S. Bank, "New Developments in Business
Succession Planning", Seattle, Washington, August 1999
National Center for Employee Ownership and the Northwest Chapter of the ESOP
Association, "ESOP Valuations - A Roundtable Discussion", Seattle,
Washington, April 1999
Northwest Chapter of The ESOP Association, "The ESOP Valuation Process - What
Effect Can I Have on Value?" Seattle, Washington, March 1998
National Center for Employee Ownership - Stock Option Workshop, "Valuation and
Accounting Issues for Stock Options", San Jose, California and Bellevue,
Washington, November, 1997
The Law Offices of Gunderson, Dettmer, et al. "Issues during the IPO Process" Menlo
Park, California, July 1997
The Securities and Exchange Commission, "How Appraisers Appraise Closely-Held
Businesses", Washington D.C., May 1997
The Law Offices of Mitchell, Silberberg & Knupp "Valuing an ESOP Company", Los
Angeles, California, October 1996
New Mexico Law School, "What Attorneys Need to Know About Business
Valuation", Albuquerque, New Mexico, April 1996
Portland Community College, "Analyzing Financial Statements" Portland, Oregon
Spring 1993

**Publications**
"Valuation Considerations for the Mature ESOP", Kathryn Daly, *Valuation
Insights - ESOP issue*, Spring 1995, Willamette Management Associates, Inc.
"Chapter 22: Sample Case" and "Chapter 23: Solution to the Sample Case",
*Valuing Small Businesses and Professional Practices*, 2nd Edition, by Shannon
Pratt, Business One Irwin, 1993

COLUMBIA FINANCIAL ADVISORS, INC.

CIG 008218

# FAX

**TO:**    Ed MINES - V.P.

CALIF. CAPITAL INS. CO.

MONTEREY, CA

**FAX NO.:**    1-831-649-1445

**FROM:**    William E. Moore
303 Olive Hill Lane
Woodside, California   94062

**TELEPHONE NO.:**    650-851-5090

**FAX NO.:**    650 851 0277

**NO. OF PAGES:**    11    (includes cover)

**DATE:**    Sept. 8, '99

**TIME:**    10:30

**REFERENCE:**    ESOP EVALUATION

**MESSAGE:**

PER OUR TELCON. THE ESOP EVALUATION by Kathryn DALY
of CFA is Enclosed. CALL ME AFTER RECEIPT.

Bill m.

If you do not receive all of the pages or have any questions, please call 650-851-5090 or 650-592-8337, Ext. 107.

CIG 008231

# EXHIBIT 76



**COLUMBIA FINANCIAL ADVISORS, INC.**

650 Morgan Building
720 S.W. Washington St.
Portland, OR 97205-3508

(503) 222-0562
FAX (503) 222-1380

September 16, 1999

Mr. William Moore
303 Olive Hill Lane
Woodside, CA 94062

Re: CCIC ESOP Transaction

Dear Mr. Moore:

I am enclosing a new Professional Services Agreement which instructs
Columbia Financial Advisors, Inc. to provide to you, in your capacity
as fiduciary for the purchase of 42% of the Class B-I stock of K-M
Industries Holding Co., Inc., with an opinion as to the $55.0 million
fair market value for transaction purposes. We are prepared to issue our
opinion as of the closing date of the transaction.

We look forward to working with you.

Sincerely yours,


Kathryn Daly, ASA
Principal
Columbia Financial Advisors, Inc.

EXHIBIT
246
Daly    4-30-08

*Offices in Portland, Oregon and Seattle, Washington (206) 682-5677*

CIG 008154





# COLUMBIA FINANCIAL ADVISORS, INC

### RETAINER INVOICE

September 16, 1999
California Capital Insurance Company
Invoice #131

Retainer for an Opinion as to the Fair Market Value of a 42% interest in the
Class B-I stock of K-M- Industries Holding Co., Inc as of the closing date of the
Transaction for ESOP purposes.

**10,000.00**

*Payment due upon receipt*
*Thank you*

CIG 008160

# EXHIBIT 77

• 2029 CENTURY PARK EAST, SUITE 820 • LOS ANGELES, CA 90067 • 310-284-8008 • FAX 310-284-8130

• KENNETH A. BODENSTEIN, CFA
*Managing Director*

## DUFF&PHELPS

October 18, 1999

Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
2300 Garden Road
Monterey, CA 93940

Dear Mr. Moore:

Duff & Phelps, LLC ("Duff & Phelps") has been retained as an independent financial advisor to the Trustee of the K-M Industries Holding Co. Inc. Employee Stock Ownership Plan (the "ESOP") to provide an opinion (the "Opinion") as to the fair market value, on a non-marketable minority interest basis, of a 42% interest in the Series "I" Tracking Stock ("Tracking Stock") of K-M Industries Holding Co. ("K-M Industries"). Generally, the Tracking Stock tracks the inherent economic value of the underlying common shares of California Capital Insurance Company ("California Capital" or the "Company"). The full terms of the Tracking Stock are contained in the Amended and Restated Articles of Incorporation of Kelly-Moore Paint Company, Inc., a California Corporation dated September 30, 1998. We understand that this Opinion will be used by the Trustee in connection with a proposed transaction to purchase a 42% interest in the Tracking Stock on October 18, 1999. Duff & Phelps has previously provided financial advisory services to California Capital.

The term "fair market value" is defined as the amount at which the Tracking Stock would change hands between a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under any compulsion to act, with equity to both.

California Capital, located in Monterey, California, and its wholly owned subsidiaries, Eagle West Insurance Company and Monterey Insurance Company, write property and casualty insurance policies in California and Nevada. Principal direct lines of business are commercial multiple peril, private passenger automobile, homeowners and farmowners coverage. The Company writes all lines of business through independent agents and brokers. As of the valuation date, 100 percent of the Company's common stock was owned by K-M Industries.

In the course of our assignment, we held discussions with Company management at their offices in Monterey and reviewed the Company's recent performance and future outlook. Our financial analysis was based on audited financial statements for the six fiscal years ended December 31, 1998 and unaudited, internally prepared interim financial statements for the eight month period ended August 31, 1999. We also reviewed the Company's

DEPOSITION
EXHIBIT
139
PENGAD 800-631-6989
4.11.8
MN

CIG 008319

Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
October 18, 1999
Page 2

REDACTED

**CONFIDENTIAL**

# EXHIBIT 78

4/30/02  Conversation w/Ed Mines, LA

CONFIDENTIAL

REDACTED

CIG 000136

# EXHIBIT 79

PROMISSORY NOTE                    CONFIDENTIAL

REDACTED

CIG 004561

Borrower failed to pay the installments required by this Note. The Company shall not have the right to accelerate the due date of any installment hereunder.

In the event of commencement of suit to enforce payment of this Note, the Borrower agrees to pay such attorneys' fees and costs of collection as the court may adjudge reasonable.

No delay or omission on the part of the holder hereof or of the Borrower in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

This Note is issued pursuant to the ESOP Loan Agreement, of even date herewith, between the Company and Borrower, to fund the purchase of Eight Million Four Hundred Thousand (8,400,000) shares of the Class I-B Stock of K-M Industries Holding Co., Inc., a California corporation (the "Parent") (the "Shares"), to which reference is made for a statement of the terms and conditions under which this Note is issued.

The execution by the Borrower of this Note is done in its own capacity and in Borrower's capacity as Sponsor of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust and under and pursuant to the instructions and authorizations provided for under the Trust Agreement.


K-M INDUSTRIES HOLDING CO., INC.


William E Moore
_____


— 2 —

CIG 004562

# EXHIBIT 80

Cristiano, Joseph P. (Vol. 01)
page 1

```
 1        SUPERIOR COURT OF CALIFORNIA
 2        COUNTY OF SAN FRANCISCO
 3
 4  KELLY-MOORE PAINT COMPANY,   )
 5  INC.,               )
 6                      )
 7        Plaintiff,    ) Case No.: 325147
 8                      )
 9  -vs-                )
10                      )
11  CONTINENTAL INSURANCE COMPANY,)
12  et al.,             )
13        Defendants.   )
14  _____)
15                      )
16  AND RELATED CROSS-ACTIONS.   )
17  _____)
18
19
20    **SPECIALLY CONFIDENTIAL PURSUANT TO
21
22      PROTECTIVE ORDER**
23
24
25      DEPOSITION of JOSEPH P. CRISTIANO,
26
27    taken on behalf of Defendants at
28
29    One Maritime Plaza, 2nd Floor, San
30
31    Francisco, California, on Tuesday,
32
33    December 18, 2007, commencing at
34
35    9:24 a.m., before LINDA
36
37    VACCAREZZA, CRP, RPR, CSR NO.
38
39      10201.
```

KMH_HE_ESI 167

1      A    Yes.
2      Q    Do you recall why the ESOP plan was
3   considered?
4      A    Yes.
5      Q    Why was that?
6      A    The Moore family wanted to have a
7   liquidity event, and Mr. Moore wanted to do
8   something for the employees.
9      Q    And by liquidity event, that would be --
10   Mr. Moore received approximately $230 million for
11   his share in the company; is that correct?
12      A    I'm not sure of the amount but that
13   sounds correct.  Yes.
14      Q    Do you recall who suggested the ESOP
15   program?
16      A    Mr. Moore.
17      Q    Are you aware of any attempts to sell
18   Kelly-Moore or merge it with another company
19   before 1998?
20      MR. ORLOFF:  Objection.  Assumes facts not in
21   evidence.
22      THE WITNESS:  Yes.
23   BY MR. GUITE:
24      Q    Did you ever come to have an
25   understanding that the asbestos liabilities

1 facing Kelly-Moore were a hindrance to the sale
2 of the company?
3    A   Yes.
4    Q   Did you discuss that with Mr. Moore at
5 any time?
6    A   Yes.
7    Q   Do you recall what your -- your
8 conversations with Mr. Moore on that topic?
9    A   Yes.  Mr. Moore told me that he was
10 discussing possible acquisition and that the
11 party that was thinking of acquiring the company
12 had said that with the asbestos problems facing
13 the company, they did not want to proceed.
14    Q   Do you have a general sense as to when
15 that took place?
16    A   The older you get, the tougher the dates
17 come.  I have to pick key points and then go
18 backwards and forward from that so just a minute.
19    Q   Certainly.
20    A   That probably occurred between '98 and
21 2000, I would guess.  '98 to 2000.
22    Q   Do you recall any other potential sales
23 or acquisitions of Kelly-Moore other than the one
24 that we just talked about?
25    A   Everybody was always coming, asking to

# EXHIBIT 81

# MILLS & LARSON
### ATTORNEYS AT LAW

REDACTED

PL 021726
Confidential

REDACTED

MILLS & LARSON
ATTORNEYS AT LAW

PL 021727
Confidential

# EXHIBIT 82

# MILLS & LARSON
### ATTORNEYS AT LAW

REDACTED

PL 010814
Confidential

REDACTED

MILLS & LARSON
ATTORNEYS AT LAW

PL 010815
Confidential

# EXHIBIT 83

EbK
3/01
1/13/01   A7

**KELLY·MOORE PAINT COMPANY, INC.**

"Quality is Economy"    987 Commercial Street • P.O. Box 3016 • San Carlos, California 94070 • (650) 592-8337

February 20, 2001

Ernst & Young LLP
1331 North California Blvd.
Suite 200
Walnut Creek, California  94596



REDACTED

CONFIDENTIAL

EY000147

REDACTED

CONFIDENTIAL

EY000148





CONFIDENTIAL

REDACTED

CONFIDENTIAL

EY000151

REDACTED

CONFIDENTIAL

EY000152

**Kelly-Moore Paint Company, Inc.**
**Summary of Unadjusted Audit Differences**
**Year Ended December 31, 2000**



# EXHIBIT 84

MILLS & LARSON
ATTORNEYS AT LAW

REDACTED

CONFIDENTIAL

EY000170

REDACTED

MILLS & LARSON
ATTORNEYS AT LAW

CONFIDENTIAL                                                      EY000171

# EXHIBIT 85



JOSEPH P. CRISTIANO
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

May 1, 1998

To All Eligible Employees:

It is with pleasure that we proudly announce the **Kelly-Moore Paint Company, Inc., Employee Stock Ownership Plan ("ESOP")** which is planned to be effective as of January 1, 1998. It is designed to make all eligible employees part owners of the Company without any deduction from your paychecks and at no other cost to you.

All employees are eligible to participate on the first day of the Plan Year (each January 1) in which you have completed 1,000 Hours of Service. However, employees whose terms of employment are subject to good faith collective bargaining are not eligible to participate in the Plan.

This announcement is merely a notice of the anticipated adoption of the **Employee Stock Ownership Plan** and does not include all of its provisions. A complete presentation of the details of the **Plan** will be made to you in the upcoming months, but because we think you will be excited about becoming an employee owner of Kelly-Moore Paint Company, Inc., we decided to make this preliminary ESOP announcement to you now.

With respect to the current 401(k) Plan at Kelly-Moore Paint Company, Inc., you will still be allowed to continue your discretionary salary deferrals. However, as Kelly-Moore Paint Company, Inc., intends to make significant cash contributions to the ESOP on your behalf (in order to allow the ESOP to acquire Kelly-Moore Paint Company, Inc. stock), effective May 1, 1998, we will no longer make any matching contributions to the 401(K) Plan.

Again, we will provide you with more details about the ESOP in upcoming months and we look forward to having you participate in the growth of Kelly-Moore Paint Company, Inc.

Sincerely,

Joseph P. Cristiano
President & CEO

JPC:jmb

P.O. BOX 3016    •    987 COMMERCIAL ST.    SAN CARLOS, CA 94070-4018    •    (415) 592-8337    •    FAX (415) 592-1022

EXHIBIT
116
Cristiano  4-08-08

KMH 000150

# EXHIBIT 86

*Menke & Associates, Inc.*
*Corporate Financial Consultants*

*144 Sansome, Suite 1000*
*San Francisco, California 94104-3821*
*(415) 362-5200*
*Fax (415) 362-3268*

*Mendham, New Jersey*
*Atlanta, Georgia*

RECEIVED
SEP 1 8 1998
V.P. / SEC'Y

September 14, 1998

PERSONAL AND CONFIDENTIAL

Mr. Steve Ferrari, CFO
Kelly-Moore Paint Co., Inc.
987 Commercial Street
San Carlos, CA  94070

Dear Steve:

This letter will confirm the scheduling for the initial ESOP briefings to be provided by me for your employees.  I will let you and John Givens work out the schedule for the other sites.  Sites, times and dates follow:

San Jose, 10:30 a.m., October 12
Stockton, 10:30 a.m., October 13
Sacramento, 3 p.m., October 13
San Carlos, 10:30 a.m., October 14
Tempe, 10 a.m., October 26
Denver, 10 a.m., October 27

The slide presentation to explain the ESOP transaction, purpose, features and potential takes about one and one-half hours on average, including Q&A session.

Please arrange for my use a Kodak Carousel slide projector with a remote control feature.

Please don't hesitate to invite your accountant, lawyer or other advisors to the briefing in order to further their knowledge regarding Employee Stock Ownership Plans.

I look forward to meeting you and your associates and helping you launch a successful ESOP.

Very truly yours,

MENKE & ASSOCIATES, INC.
The ESOP Leader

Sherman O. Coultas
Senior Vice President

SOC/js

cc: Kyle Coltman

EXHIBIT
56
_Menke_  _3-21-08_

OVER 1,200 ESOPs DESIGNED SINCE 1974

KMH 4951

# EXHIBIT 87



**VIDEO BULLETIN**

**Employee Stock Ownership Plan/
401k Plan Update**

TRT: 70 min. (Rev. 12/98)

**Kelly-Moore Paint Company**
987 Commercial Street, San Carlos, CA 94070
650/592-8337

Employee Stock
Ownership Plan/
401k Plan
Update



**VIDEO BULLETIN**

**Employee Stock
Ownership Plan/
401k Plan Update**

TRT: 70 min. (Rev. 12/98)

KMH 009089



Fernandez, et al. v. K-M Industries
Holding Co., Inc., et al.

Case No.: C 06-07339 MJJ

Lewis, Feinberg,
Lee, Renaker &
Jackson, P.C.

Rev. 12/98

70 min.

Exhibit 87

Video Bullentin: ESOP/401(k)
Plan Update

# EXHIBIT 88



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

Dear CIG Business Partner:

With the close of our first 100 years of successful performance, we must now face the challenges and opportunities of the new Millennium with renewed vigor and a strong desire to succeed. To motivate us in meeting these challenges, we now have an incentive that should encourage us individually and collectively to perform at our highest level: company ownership!

Congratulations on becoming an owner and business partner of the California Insurance Group. Through the implementation of our Employee Stock Ownership Plan (ESOP), we now have a significant financial interest, by means of stock ownership, in our company. The ESOP has purchased the Class I-B Common Shares of our Parent Company, K-M Industries Holding Co., Inc. (Sponsor Company) for $55,000,000.00. These Common Shares represent 42% ownership of the California Insurance Group. Mr. William E. Moore sold the shares to us to create a market for the stock he owns without a sale to outside interests and to recognize the loyalty, dedication, and hard work of CIG team members. The release of this stock for allocation to employee shareholder accounts is expected to be completed over the next nine years. Each year, stock will be distributed to eligible employees based on the financial performance of the company.

Now that we have an ownership interest in our company, we will share in its long-term value and growth. To realize this reward, we all must take absolute accountability for the way we individually perform and to involve ourselves, through active participation, in identifying and implementing the best business practices in running our company.

I am sure you are as proud as I to be a part of such an outstanding company and are grateful for this wonderful opportunity. I look forward to working with you in making CIG the best we can be, which will result in our mutual growth and prosperity.

Sincerely,

Peter M. Cazzolla

PMC/lld



# EXHIBIT 89

**Ed Mines**
**From:** Ken Myatt
**Sent:** Friday, October 08, 1999 4:32 PM
**To:** Nancy Harty
**Cc:** Edward T. Mines
**Subject:** RE: ESOP QUESTIONS

*Rec'd too late*

Thanks Nancy.

**From:** Nancy Harty
**Sent:** Friday, October 08, 1999 8:26 AM
**To:** Ken Myatt
**Subject:** ESOP QUESTIONS

HI KEN:  HERE ARE MY ESOP QUESTIONS

MATHEMATICALLY, THE WORTH OF A COMPANY IS EQUAL TO AN ESTIMATE OF THE PRESENT VALUE OF THE INCOME STREAM OF THE COMPANY

HOW WAS THE COMPANY STOCK VALUED?

IN A STOCK TRADED OPENLY ON A PUBLIC EXCHANGE, THE PUBLIC SETS THE VALUE OF THE STOCK. IF THEY THINK IT IS OVERPRICED, THEY WILL SELL; AND IF THEY THINK IT IS UNDERVALUED, THEY WILL BUY.

SINCE CIG STOCK IS NOT TRADED ON AN OPEN MARKET, WHAT ASSURANCE IS THERE THAT THE PURCHASE PRICE OF EMPLOYEE STOCK WAS SET FAIRLY?

WHAT WAS THE PURCHASE PRICE?

WHAT IS THE PRICE TO EARNINGS RATIO AND HOW DOES IT COMPARE WITH OTHER INSURANCE COMPANY E/P'S  WHO TRADE ON A PUBLIC EXCHANGE?

WHAT IS THE ANTICIPATED GROWTH RATE OF THE CIG STOCK?

HOW CAN I FIND OUT MORE ABOUT A PRIVATE COMPANY?

HOW CAN I TRACK HOW WELL MY INVESTMENT IS DOING?

A GOOD INVESTMENT, SHOULD BE LIQUID.

HOW LIQUID WILL CIG EMPLOYEE STOCK BE?

IF A CIG EMPLOYEE LEAVES THE COMPANY (RETIREMENT, DISABILITY, CAREER CHANGE), WHAT CONTROLS ARE IN EFFECT TO GUARANTEE THE EMPLOYEE WILL RECEIVE FAIR COMPENSATION WHEN THEY SELL THEIR STOCK BACK TO THE COMPANY.

THANKS !

**EXHIBIT**
*108*
Mines   4-02-08

CIG 012099

# EXHIBIT 90

## ESOP QUESTIONS AND ANSWERS

Q: How often will the stock be valued?
A: Annually

Q: Can I sell it if I want?
A: No

Q: Do I really have ownership of it?
A: Yes

Q: Can I buy someone else's shares?
A: No

Q: We are putting out publications that say we are "Employee Owned". Is that correct when we have only a limited percentage of the shares. Is there some kind of guidelines legally for using that phrase "Employee Owned"?
A: Yes, we can legally use the phrase "Employee Owned".

Q: Will the program require a mandatory retirement age? If so, what is that age.
A: No mandatory retirement age.

Q: Do we have a certain time period after retirement to collect the benefit?
A: One to five years as determined by the Plan Committee.

Q: Can we anticipate the employees or a committee of employees to be able to participate in decisions relative to ESOP?
A: The Board of Directors of K-M Industries Holding Co., Inc., makes decisions regarding amending or terminating the Plan. It also appoints the Trustee and selects Plan Committee members. The Plan Committee shall administer the terms and provisions of the Plan.

Q: Will the stock market issues or trends affect value?
A: Yes, the stock market plays a significant part in the annual appraisal of CIG.

Q: Can you get out of it and then back in depending on conditions in a given year?
A: No, you only "get out" by termination, death, disability or retirement.

EXHIBIT

_109_

Mines     4-02-08

CIG 012102

Q: What will be the situations with employees who have left the company before the program has been completely approved?

A: It will depend on their percentage of vesting at the time of termination. If they completed 1,000 hours in Plan year 1998, 1999 or both, there will be distributions to their plan accounts. Vesting is determined by their employment start date and completion of 1,000 hours for each year.

Q: Will the ESOP money in our accounts be invested? By whom? Into what? Do we have any input or control of that?

A: The intent and nature of the ESOP is not to have "Money" in your accounts, just shares of stock allocated from the ESOP. Should there be any other investment assets they will be administered by the Plan Committee.

Q: What will be the effect on Salaries, Profit Sharing, etc.?

A: Undetermined at this time.

Q: How will the ESOP affect the 401k program?

A: The ESOP doesn't affect the 401(k) other than as soon as it was put into a planning stage, the $1,000 Company Matching was discontinued. In reverse, the contributions to the 401(k) may have an affect on the amount of ESOP distributions.

Q: Until an employee is vested, should they put money in a 401(k), so they have some savings until becoming vested?

A: That is each individual's judgement call based on their particular financial situation, however, they should be aware that they may receive fewer shares of the ESOP due to 401(k) contributions. Advantages of the 401(k) may outweigh their value of ESOP shares, i.e., the non-taxable feature, the availability of an easily arranged personal loan, etc. Vesting should not have a bearing on investing in a 401(k). The primary question is whether they want to chance losing a portion of ESOP stock from the 25% payroll limitation.

Q: The numbers nationally seem to indicate that the number of companies in ESOPs is shrinking. Many have terminated their plans. Why this trend?

A: Each year 3% to 4% of all ESOPs are terminated, an unknown percentage frozen, usually to create a different kind of benefit plan, to recapture some ownership or (rarely) due to financial problems.

Q: Can Kelly Moore "Terminate" this plan?

A: K-M Industries Holding Co., Inc. can terminate or amend the Plan.

Q: How would that work and what would the effect be on the Employees-Owners?

A: If the Plan is terminated, participants would be 100% vested and distributions would be made within one year.

CIG 012103

Q:  How will the Trustees be chosen?
A:  Appointed by the Board of Directors.

Q:  Will the "Owners" elect them?
A:  No, however, the shareholders elect the Board of Directors.

Q:  What is the difference between ESOP and Stock options?
A:  An ESOP is a tax-qualified deferred compensation plan under section 401(a) of the Internal Revenue Code. Technically, an ESOP is a stock bonus plan qualified to borrow money. Unlike other stock bonus plans, it must invest primarily (around 50%?) in employer stock and is noncontributory for the employee. Unlike the ESOP, stock options give you the right to buy a company's stock at a specified price within a designated time period.

Q:  Is there federal or state legislation pending that would affect the ESOP, taxes, etc.?
A:  We are not aware of legislation with any critically potential impact.

Q:  As the law now stands, how and when are the ESOP funds taxed?
A:  This is covered in detail in the SPD, but, generally speaking, you will pay a 10% penalty plus ordinary income tax if distribution is made before age 59 ½ and not rolled over into an IRA or other qualified plan.

Q:  What are the estimated tax savings to K-M Industries Holding Co., Inc.?
A:  Under section 1042 of the Code, if the ESOP owns at least 30% of the shares, it qualifies the seller to reinvest the proceeds in securities of U. S. operating companies and defer tax on the gain until the investments are sold. In++++++ our case, the tax savings are for Mr. and Mrs. Moore, not the holding company.

Q:  What are the estimated tax savings to CIG?
A:  For every dollar spent to retire the ESOP debt, and pay interest expense or dividends, the Group receives a 35% Federal Income Tax benefit.

Q:  Will all employees, including the executives, hold shares based in the same formula?
A:  Yes, the formula being the appraised value as determined by an independent appraiser.

Q:  Any plan on having the ESOP administrators attend the meeting? That would be a great idea...well, maybe.
A:  No.

Q:  I want to save as much as I legally can in tax-deferred income each year. If my ESOP contribution is less than the legal amount of $10,000, can I contribute the balance in my 401(k) account to make sure I am maximizing my tax-deferred savings each year?

CIG 012104

A:  We have developed an extremely aggressive amortization schedule for allocation of the ESOP Stock. This is one which provides little or no room for contribution to a 401(k) without penalty in the ESOP distribution. Our plan is to maximize each year's permissible dividends and the 25% limitation of eligible compensation. A complicated allocation process is necessitated by this 25% maximum payroll limitation between the ESOP and 401(k). Therefore, employees must realize that contributions to their 401(k) may reduce ESOP allocations.

Q:  It would appear THE RIGHT THING TO DO would be to provide 100% vesting for the employees that have 10 years or more service. Won't this program benefit the younger employees more?

A:  We would all like to be fully vested, however, seasoned employees do have credit for two years of service prior to the ESOP and can be fully vested by mid-year 2002. That's only 2 years, 9 months away.

Q:  What happens when someone leaves the company? Can they keep the stock with the company or do they have to cash it out somehow and place it in some other type of retirement fund?

A:  Provided the shares are not publicly traded at the time of distribution, the Company will have "right of first refusal" to purchase the shares. Like a 401(k) plan, a terminated employee who receives a distribution from the Plan will be subject to income taxes unless there is a rollover/direct transfer to an IRA or other qualified plan.

Q:  As a manager, what do I tell a person who is wanting to contribute 15% to the 401(k) about the impact of this on their ESOP contribution?

A:  In view of the aggressive approach CIG is taking to retire the debt, indications are that contributions to the 401(k) may reduce ESOP distributions on a dollar-for-dollar basis. The effect cannot be determined at this time.

Q:  Why should investing their OWN money affect ESOP, which is money from the company?

A:  Each participant's total annual payments to all tax-qualified deferred compensation plans are limited to 25% of their W-2 Wages. Example: An employee contributes 15% to the 401(k) and CIG maximizes its ESOP distribution, that employee can receive only 10%.

Q:  Is there an ERISA regulation on this issue that employees can read, etc.?

A:  Probably, but I would suggest a thorough review of their SPD before tackling ERISA regulations.

Q:  When are we getting our statements? How soon?

A:  Within the week following DOI approval and completion of ESOP funding.

*CIG*                              *Page 4 of 4*                              *10/12/99*

# EXHIBIT 91



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

TO:    CIG Team Members and Shareholders

RE:    ESOP Statement – Plan Year 2000

Dear Team Member and Shareholder:

We are pleased to present you with your Employee Stock Ownership Plan statement for the plan year ending December 31, 2000. This statement includes stock from prior years and your allocation of stock for year 2000.

This program is a very special opportunity that provides us with ownership in our company with no monetary contribution on our part. The only contribution we need to make as owner/team members is to perform at our maximum capability, in keeping with our Company Values, to ensure our future success. With stock ownership, we will all benefit from our successful efforts through the resultant increased equity value of our company.

I encourage you to fully understand and embrace company ownership with pride, enthusiasm, and a high level of responsibility as we work together to satisfy our customers and make CIG the best that it can be.

For your better understanding, please refer to the enclosed ESOP Statement Glossary as you read through the entries on your statement. If you have not completed a Beneficiary Designation Form, please contact Pat Spencer in Human Resources. Feel free to direct any questions you may have regarding our ESOP to your manager or to Mike Ferguson or Ed Mines at extensions 291 and 222, respectively.

Thank you for your commitment to our mutual success.

Best personal regards,

Peter M. Cazzolla

PMC/dhh



EXHIBIT

Cora Smith 56
CT 4/16/08

HOME OFFICE
P.O. Box 3110  •  Monterey, California 93942-3110  •  (831) 649-1155  •  Fax # (831) 647-8649

P054