# EXHIBIT 92

 **KELLY·MOORE PAINT COMPANY, INC.**

"Quality is Economy"    987 Commercial Street • P.O. Box 3016 • San Carlos, California 94070 • (650) 592-8337

October 26, 1999

To the employees of the Hurst factory:

It has come to my attention that certain misleading statements have been made regarding our ESOP. I would like to clarify some of the issues put forth.

- *In 1998, Kelly-Moore's ESOP lost over $66,000,000.*

The ESOP took on a loan to purchase the stock. This is the only way such an ESOP can be set up. The decline in value is simply driven by the fact that there is debt now, compared to none before. Loans and declines in values such as these are typical in the initial year of an ESOP. Typically, as loans are repaid on schedule, the loan reduction is one factor that helps increase the value of the ESOP shares

- *Kelly-Moore's ESOP had expenses charged to the fund in excess of 3 Million Dollars in its first year of operation.*

Kelly-Moore pays all administrative fees of the ESOP. The expenses are only interest expense on the loan used to purchase the stock.

- *If you quit, get laid off or fired, Kelly-Moore's E.S.O.P will not make any payment to you for five (5) years and then, at the sole discretion of Management, can spread your payments over another five (5) year period.*
- *Kelly-Moore's E.S.O.P. CAN NOT be required to distribute any Employer Securities until the Securities Acquisition Loan has been repaid.*

The ESOP plan is a retirement plan. It is not designed to make immediate payments to persons who leave for other reasons; thus there are various restrictions such as these to prevent such payouts as required under federal law. If you read the plan document carefully, you can see that most of these restrictions are under the category "Other terminations" and not "Retirement". If an employee leaves after normal retirement age, he or she is paid out the following year. In fact we have made the first payments to retirees this year.

Sincerely,

*Steve Ferrari*
Steve Ferrari
Chief Financial Officer
Kelly-Moore Paint Company, Inc.

EXHIBIT
59
Menke   3-21-08

KMH 000154

# EXHIBIT 93



JOSEPH P. CRISTIANO
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

July 14, 1999

To: All Eligible Employees:

We are extremely pleased to be sending you your first Employee Stock Ownership Plan (ESOP) statement. This statement represents the first year's contribution into the Plan and covers the year 1998. Your next statement will be sent to you in 2000 after 1999 results are finalized and all of the data is completed for your account. We will be keeping you all informed during this time period by regular mailings of "Mind Our Own Business."

As you can see, you own shares in our Company. You have the ability to increase the value of these shares by how well you help to profitably operate the Company. I encourage you to make decisions on a daily basis based on how you can improve profits and deliver awesome service to our customers.

Once again, we are all grateful to Mr. and Mrs. Moore for allowing us to become employee-owners of their outstanding Company.

Sincerely,

Joseph P. Cristiano
President & CEO

JPC:jmb

987 COMMERCIAL ST. P.O. BOX 3016 SAN CARLOS, CA 94070 • (650) 592-8337 • FAX (650) 592-1022

EXHIBIT
118
Cristiano  4-08-08

KMH 000152

# EXHIBIT 94



EMPLOYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

**Volume II, Issue 4**                                    **December, 2000**

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## THE LITTLE THINGS ALSO AFFECT PROFITS

Providing high quality products, providing great service and working hard and smart are probably some of the main items that affect profit. But the little things are important also. Here is a list of items to keep in mind when doing our daily jobs:

- Work to eliminate waste whether it is mistinted paint or wasted paper.
- Continue to promote an injury free atmosphere, ensuring that safety has a high priority. Every injury not only hurts Employee Owners, but also our profits.
- Save on utility bills by turning off lights when not in use, turning down the heat or air conditioning when not needed and repairing leaking water valves.
- Make quality repairs to reduce the expense associated with repeat failures of store, factory and computer equipment.
- Watch cellular phone usage and stay under the maximum allowed time for a given cell phone package or consider a change in the cell phone package.
- Consider avoiding flying on expensive non-stop flights and instead take one-stop flights to significantly reduce travel expenses.
- Process invoices quickly so that discounts can be taken and late charges will not be incurred.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through November of 2000 including the Kelly-Moore Ponderosa acquisition are up approximately 6% over the same period in 1999. Sales excluding our Kelly-Moore Ponderosa acquisition are only up approximately 2% over the same period in 1999. Remember everything that <u>you</u> do including how you service your external or internal customers may help with one more sale. Increasing sales is one key way to increase profits.

## NEW STORES

Opened since the last report were **Edmond**, Oklahoma, **Longmont**, Colorado and **Lewisville**, Texas. With the purchase of assets of Kingsland Paint and Decorating on November 22, we now have a new store in **Kingsland**, Texas, east of Austin. This gives us 159 stores currently. Other locations where we have purchased property this year and will open stores in 2001 include **Napa, CA, Elk Grove, CA,** and **Sonora, CA.**

EXHIBIT

188

Thomas    4-18-08

KMH 000093

## SHARE VALUE

Kelly-Moore's stock price may go up and down based on many things. Among other things, the appraiser looks at current profits, potential profits, asset and debt levels, and market valuation of other paint companies and other items. Currently the stock price of our competitors has gone down significantly which may affect our stock price when the appraiser does the valuation. Included in the last issue of **Mind Our Own Business** was an installment adding to what has previously been discussed on how stocks are valued. You may want to peruse this article again as many of the items mentioned can affect Kelly-Moore stock value.

## 401K AND ESOP

We believe that dividends will be able to be used again in 2001, and that contributions this year to the 401k plan up to at least 10% is not expected to have an effect on your ESOP contribution. This may change in future years as contributions to the 401k plan may limit your ESOP contribution. Any changes during 2001 to your 401k plan contribution percentage should be sent in to Corporate Personnel.

## SUMMARY RECAP OF PLAN PROVISIONS

The primary purpose of the ESOP is to enable all non-bargaining unit employees to share in the growth and prosperity of Kelly-Moore and to provide Participants with an opportunity to accumulate capital for their retirement needs. The plan is designed to do this at no cost to the employee, whatsoever. Each year the Company may make contributions out of available profits to the plan. Your ESOP accounts will be increased by your share of the Company's contribution and your share of forfeitures from the accounts of Employees who leave before they are fully vested. The stock price will gain or lose value, as determined by an outside appraiser based on many items as discussed above.

Specific Provisions:

- Eligibility requirements: 1000 Hours of service during the Calendar Year.
- Requirement for Allocation of Employer Contribution: 1000 hours of Service during the Calendar Year.
- Year of Credited Service: All years of employment with Kelly-Moore in which the Employee completed 1000 or more Hours of Service after December 31, 1995.
- Vesting: Vesting refers to the percentage of your account that cannot be forfeited upon termination. Vesting schedule is as follows: Years of Credited Service – 1 year is 0% vested, 2 years is 0% vested, 3 years is 20% vested, 4 years is 40% vested, 5 years is 60% vested, 6 years is 80% vested, and 7 years is 100% vested.

Please refer to your Summary Plan Description for more definitive information.

KMH 000094

# EXHIBIT 95



_OYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

Volume III, Issue 1                                    May, 2001

Mind Our Own Business is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ENERGY ISSUES AFFECT YOU AND YOUR COMPANY

Energy costs are up significantly at Kelly-Moore. This cost category shows the second largest cost increase in 2001 behind employee wage expense. In addition, in California we expect to have severe power shortages that will probably require some conservation measures this summer. Many of you have been challenged to come up with creative ways to save energy. Some of those ways in California may even include, for example, turning off half the lights or severely reducing or turning off the Air Conditioning during peak periods. Attached is a list of additional items that can be considered if applicable, to save energy costs anywhere in the Company. Any dollar saved on an energy bill can increase profits and potentially have an effect on the stock price.

## STRIKE TEAMS VISIT KELLY-MOORE STORES

Kelly-Moore created Strike Teams where employees from various areas of the Company have gone to stores that were in a loss position in 2000 to help turn these losses to profits. Initial visits have occurred and reports and suggestions for profits have been submitted. Now it is time to make sure all of the worthwhile suggestions get appropriately implemented so that we see the losses turn into profits. You can assist by 1) helping out at your store while one of your store members is away on a future strike team visit, 2) Assisting a strike team if they come to your store to make their visit the most productive as possible and 3) Keeping an open mind and seriously implementing suggestions to make a store profitable. Profitability of all stores is important to all of us as ESOP shareholders.

## NEW STORES

Opened since the last report were **Napa, CA** in April 2001 and **San Francisco-Taraval** and **Sonora, CA** in May 2001. This gives us 161 stores currently. Sales appear to be brisk at these new locations. Increased sales will hopefully bring increased profits to these areas. Currently we are working to open a store in **Elk Grove, CA** late this summer.

EXHIBIT

137

Cristiano 4-08-08

KMH 000095

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through December of 2000 including the Kelly-Moore Ponderosa acquisition were up approximately 5% over the same period in 1999. Sales on the rest of the Company without counting our Kelly-Moore Ponderosa acquisition were only up approximately 1% over the same period in 1999. Operating Profit (profit before interest, taxes and ESOP contribution) in 2000 was down by about 17% from 1999. Reasons for the profit decline included: 1) Declining sales at the end of the year, 2) Kelly-Moore Ponderosa Division that didn't yet have margins and profits up to K-M Standards, 3) Pricing and Inventory issues at the Desert District and Guam and 4) Loss stores continued drag on profits. Remember that profits are one of the key items that affect your share price. Other items that may also affect your share price include valuations of other paint companies, our asset and debt levels and product liability issues such as asbestos litigation. Through March 2001, sales are up about 7% including Kelly-Moore Ponderosa. Sales on the remainder of Kelly-Moore without Kelly-Moore Ponderosa is up only about 1%. You can make a difference whether it is on energy usage, bringing in one more sale, or being on strike teams or supporting your team members that are on strike teams helping other stores.

## 2000 STATEMENTS

We continue to work on the many documents required to get the yearly ESOP statements out. We expect statements to be out summer, 2001. Remember that we expect to use dividends again in 2001, and that contributions in 2001 to the 401k Plan of up to 10% of your salary should not have a limiting effect on the ESOP contribution that you will get. This will change in future years, where contributions to the 401k Plan may limit your ESOP contribution.

## QUESTIONS AND ANSWERS

Question: What is the cost to the employee for the ESOP?

Answer: There is no cost to the employee. Nothing is deducted from your paycheck. The Company contribution is an amount over and above your earnings.

Question: How is my share of the ESOP contribution determined?

Answer: The contribution each year will be divided among the eligible participants in the proportion that each participant's compensation is to the total compensation of all participants.

Please send any questions that you may have to Personnel Department – ESOP at Corporate Office.

KMH 000096

# EXHIBIT 96



**EMPLOYEE STOCK OWNERSHIP PLAN**



# MIND OUR OWN BUSINESS

**Volume II, Issue 3**                                                                 **October, 2001**

Mind Our Own Business is the Newsletter for participants in the K-M Industries
Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ESOP DISTRIBUTIONS

On September 30, 2001, The ESOP is proud to have made its third year of distributions
for personnel leaving the Company in 2000. The plan allows distributions now only for
retirees over 65 years and for terminated personnel with vested balances less than
$3,500.00. The total of the distributions in 2001 was $354,459.47. We wish these
retirees well in enjoying their retirement benefits.

## ESOP COMMUNICATIONS

Unfortunately, there are still individuals that we have had difficulty sending ESOP
communications to due to changes of addresses, etc. If you know any individuals listed
on the attached sheets, please have them call Debbie Culmer in our Human Resources
Department at 650-592-8337 extension 187 so that they may receive information.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through September of 2001 including the Kelly-Moore Ponderosa acquisition are
up approximately 1% over the same period in 2000. Operating profit continues to be
down in 2001. Reasons for the profit decline include: 1) Declining sales for the whole
Company in five of the last seven months partially due to a tightening economy,
2) Margins and profits in certain outlying districts that are still not up to K-M standards
and 3) Loss stores continue to drag on profits.

One item you may have noticed in the news in September is the large asbestos judgement
against Kelly-Moore. Kelly-Moore is appealing the judgement, and it is believed that we
should prevail on appeal. Kelly-Moore does have insurance to cover normal damages in
this case. The Company works very hard to defend itself against asbestos litigation, but
such litigation continues to be a concern to the financial health and the stock price of the
Company. We hope that you will continue to work hard with us as we continue to fight
those legal firms that unfairly target our Company with such litigation.

## SUMMARY ANNUAL REPORT

Also attached is the Summary Annual Report as of December 31, 2000. Under the law,
the Plan is required to furnish a Summary Annual Report in the attached format as of the
end of the calendar year of the Plan.



EXHIBIT
83
Ferrari  3-26-08

KMH 000103

## NEW RULES IN 2002 BETWEEN ESOP's AND 401K's

In conjunction with the new tax laws passed by Congress effective January 1, 2002, there are fewer limitations between 401K plans and ESOP's. This means that it is unlikely that in 2002, even at the highest 15% deferral into the 401K, that there will be any limitation to your ESOP contribution. Please see the attached article for more detailed examples.

Recently, you may have noticed new posters on the 401K plan in stores and factories. Retirement assets should be allocated among many things based on risk. Remember that the ESOP is not a separate "fund" like the 401K plan funds. The ESOP represents company shares. Payouts are dependent on a high stock price, sufficient profits, and sufficient assets and cash to make payments out of company operating funds. With less restrictions now on the 401K, serious thought should be given to the many choices of funds in the 401K plan, so that retirement funds consider various instruments and risk levels. To start your 401K plan call Corporate personnel at 650-592-8337 extension 187. If you have any changes to your 401K contribution level, it should be in to Corporate Personnel by 11-30-01.

## QUESTIONS AND ANSWERS

Question: Remind us again, how does the ESOP work?

Answer: Our ESOP is a qualified retirement plan where if you are an eligible employee, you share in the Company's contribution if you complete 1000 hours of work in a calendar year with Kelly-Moore. The contribution is used to allocate shares through the ESOP to you, and lets you become an Employee Owner under the ESOP. The beauty is that you do not have to pay anything or have anything deducted from your paycheck to get your share. At the end of the year, there is an independent valuation done that is used to determine the value of the ESOP shares at that time. Payout usually occurs at retirement at age 65.

Question: I have worked for Kelly-Moore part time for more than a year since April of 2000, and I did not get a statement or any contribution. When will I get one?

Answer: You need to work more than 1000 hours in a calendar year. If you do that in 2001 and are eligible, you will receive a statement in 2002 showing your contribution.

Question: My statement shows vested % at 0% and vested interest value at $0.00. What does this mean?

Answer: If you didn't work 3 years (1000 hours in each of 3 years) through 2000, you have no vesting yet, meaning that if you leave you will forfeit your right to your shares. Vesting is 3 years 20%, 4 years 40%, 5 years 60%, 6 years 80% and 7 years 100%. Vesting is designed this way by the federal government to encourage an employee to stay with an employer, participate and contribute through a full year with the Company.

# EXHIBIT 97

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION


THOMAS FERNANDEZ, et al.,

        Plaintiffs,

        vs.                    No.  C 06-07339 CW

K-M INDUSTRIES HOLDING CO.,
INC., et al.,

        Defendants.

_____


VIDEOTAPED DEPOSITION OF LORA D. SMITH

San Francisco, California

Wednesday, April 16, 2008

VOLUME 1


Reported by:
TRACY L. PERRY
CSR No. 9577
CHRIS TE SELLE
CSR No. 10836

JOB No. 84325

25b71117-a0fb-4182-9f9a-6e3ec3d4cb86

LORA D. SMITH                                    04/16/08

Page 36

|  |  |  |
|--|--|--|
|  | 1 | bald spot instead of the witness. |
| 10:03:33 | 2 | Q   Let me ask it again.  Withdraw the last |
|  | 3 | question. |
| 10:03:36 | 4 | When was the first time that -- withdraw that. |
| 10:03:44 | 5 | Have you ever heard from any source words to the |
|  | 6 | effect that there were asbestos lawsuits against |
|  | 7 | Kelly-Moore Paint Company that could affect the value of |
|  | 8 | your shares in the ESOP? |
| 10:03:59 | 9 | A   Yes. |
| 10:04:02 | 10 | Q   When did you hear that? |
| 10:04:05 | 11 | MS. HASSELMAN:  I'll just caution the witness to |
|  | 12 | answer the question if you can without revealing |
|  | 13 | attorney-client communications, but stay away from any |
|  | 14 | attorney-client communications. |
| 10:04:15 | 15 | BY MR. LOVITT: |
| 10:04:15 | 16 | Q   Apart from that. |
| 10:04:16 | 17 | A   2007. |
| 10:04:20 | 18 | Q   What did you hear? |
| 10:04:23 | 19 | MS. HASSELMAN:  Same -- I'll caution the witness the |
|  | 20 | same -- the same thing.  If you can answer the question |
|  | 21 | without revealing communications from counsel, then you |
|  | 22 | can answer it. |
| 10:04:30 | 23 | THE WITNESS:  I can't answer that. |
| 10:04:34 | 24 | BY MR. LOVITT: |
| 10:04:34 | 25 | Q   So is it your testimony that apart from |

25b71117-a0fb-4182-9f9a-6e3ec3d4cb86

LORA D. SMITH                              04/16/08

Page 37

| | | |
|---|---|---|
| | 1 | communications with counsel, you have never heard |
| | 2 | anything about an asbestos issue connected to your ESOP |
| | 3 | shares? |
| 10:04:54 | 4 | A    Correct. |
| 10:05:27 | 5 | Q    Did anybody ever tell you how much the ESOP paid |
| | 6 | for the shares that it had in -- in the company? |
| 10:05:49 | 7 | MS. HASSELMAN:  Could you read the question back? |
| | 8 | I'm sorry. |
| 10:05:51 | 9 | (The record was read as follows: |
| 10:05:27 | 10 | "QUESTION:  Did anybody ever tell you how |
| | 11 | much the ESOP paid for the shares that it |
| | 12 | had in -- in the company?") |
| 10:06:05 | 13 | MS. HASSELMAN:  I'll give you the same caution as to |
| | 14 | the -- to the previous questions, to answer to the extent |
| | 15 | that you have the information from someone other than |
| | 16 | your counsel. |
| 10:06:15 | 17 | THE WITNESS:  Okay.  Yes. |
| 10:06:25 | 18 | BY MR. LOVITT: |
| 10:06:25 | 19 | Q    Who was that? |
| 10:06:25 | 20 | A    I can't recall. |
| 10:06:26 | 21 | Q    Was it in writing? |
| 10:06:27 | 22 | A    No. |
| 10:06:30 | 23 | Q    It was oral? |
| 10:06:31 | 24 | A    Correct. |
| 10:06:31 | 25 | Q    And was it a person connected with CIG? |

25b71117-a0fb-4182-9f9a-6e3ec3d4cb86

LORA  D.  SMITH                    04/16/08

Page 57

| | | |
|---|---|---|
| 10:20:13 | 1 | Q   The reporter will read it back and maybe -- |
| | 2 | maybe if that will help.  If not, I'll rephrase it. |
| 10:20:13 | 3 | THE WITNESS:  Okay. |
| 10:20:13 | 4 | (☐The record was read as follows: |
| 10:20:13 | 5 | "QUESTION:  So let me ask you this.  Did |
| | 6 | you -- have you ever learned up until this |
| | 7 | very minute that the shares of your ESOP |
| | 8 | were priced at more than fair market value |
| | 9 | at the time that they were bought by the |
| | 10 | ESOP?") |
| 10:20:13 | 11 | THE WITNESS:  Yes. |
| 10:20:13 | 12 | BY MR. LOVITT: |
| 10:20:13 | 13 | Q   When did you learn that? |
| 10:20:13 | 14 | A   2007. |
| 10:20:13 | 15 | Q   And who told you that? |
| 10:20:13 | 16 | MS. HASSELMAN:  Objection on the grounds of |
| | 17 | attorney-client privilege. |
| 10:20:13 | 18 | If you can answer the question without revealing |
| | 19 | communications from counsel you can answer, but if you |
| | 20 | have to reveal communications with counsel to answer the |
| | 21 | question, then you shouldn't answer. |
| 10:20:13 | 22 | THE WITNESS:  I can't answer that. |
| 10:20:13 | 23 | BY MR. LOVITT: |
| 10:20:13 | 24 | Q   Let me put it to you another way.  Did -- did |
| | 25 | you believe prior to talking to a lawyer that the ESOP |

25b71117-a0fb-4182-9f9a-6e3ec3d4cb86

LORA D. SMITH
04/16/08

Page 81

1        A.    I would say, fall.

2        Q.    Fall.  Fall of 2006.

3              And, is it fair to say that the reason you

4    sought counsel's advice was because of the

5    conversation with Mr. Lang?

6        A.    Yes.

7        Q.    And that was the only complaint you had

8    about your relationship with CIG, or the ESOP?

9        A.    Yes.

10       MR. LOVITT:  Let's move right along here.

11              We are going to ask the court reporter to

12    mark this as 149.

13                        (Exhibit Smith 149, letter re ESOP

14                        statement plan year 1999, Bates

15                        numbered P 055, marked for

16                        identification, as of this date.)

17       MS. HASSELMAN:  As a reminder, there are a

18    couple of times you nodded.  Make sure that if there

19    is a yes answer, say it out loud.

20       THE WITNESS:  Okay.

21    BY MR. LOVITT:

22       Q.    This is a letter that refers to the ESOP

23    statement plan year 1999, bears a Bates number of P

24    055.

25              Have you ever seen this document before?

LORA D. SMITH

04/16/08

Page 82

1          A.    Just a minute.

2                Yes.

3          Q.    Tell us how you came to see this document.

4          A.    I would assume, at work.

5          Q.    Uh-huh.

6                And the first paragraph, the first, it's

7    directed to, dear team member and shareholder.

8                Did you receive letters like this one,

9    along, throughout the years, that were having to do

10   with your ESOP, that were addressed, dear team

11   member and shareholder?

12          MS. HASSELMAN:   Objection.   Vague and

13   ambiguous.   Vague as to time.

14          THE WITNESS:   Yes.

15   BY MR. LOVITT:

16          Q.    I mean, you considered yourself, once the

17   ESOP got started, to be a shareholder; is that

18   correct?

19          A.    Yes.

20          Q.    And you considered yourself to be a team

21   member.

22          A.    Yes.

23          Q.    Okay.

24                Now, when the ESOP was announced to you,

25   what was your attitude toward it?

LORA D. SMITH                        04/16/08

Page 125

| | | |
|---|---|---|
| 14:42:25 | 1 | Q.  And a part owner in the company; is that |
| 14:42:26 | 2 | correct? |
| 14:42:27 | 3 | MS. HASSELMAN:  Objection.  Calls for legal |
| 14:42:28 | 4 | conclusion. |
| 14:42:29 | 5 | THE WITNESS:  That's the assumption I was |
| 14:42:31 | 6 | under. |
| 14:42:38 | 7 | MR. LOVITT:  Put this aside for a minute.  I |
| 14:42:43 | 8 | would like to ask the court reporter to please mark |
| 14:42:48 | 9 | this 162. |
| 14:42:58 | 10 | (Exhibit Smith 162, confidential |
| 14:43:01 | 11 | document on CIG letterhead, dated |
| 14:43:01 | 12 | May 31, 2002, addressed to dear CIG |
| 14:43:01 | 13 | owner and team member, signed by |
| 14:43:01 | 14 | Peter M. Cazzolla, Bates numbered |
| 14:43:01 | 15 | CIG 005569, marked for |
| 14:43:01 | 16 | identification, as of this date.) |
| 14:43:23 | 17 | BY MR. LOVITT: |
| 14:43:24 | 18 | Q.  Okay. |
| 14:43:25 | 19 | Exhibit 162 is a document on the CIG |
| 14:43:31 | 20 | letterhead, dated May 31, 2002, addressed to dear |
| 14:43:36 | 21 | CIG owner and team member, signed by Peter M. |
| 14:43:40 | 22 | Cazzolla, Bates number is CIG 005569, dated May 31, |
| 14:43:58 | 23 | 2002. |
| 14:43:59 | 24 | Have you ever seen this document before? |
| 14:44:02 | 25 | A.  No. |

25b71117-a0fb-4182-9f9a-6e3ec3d4cb86

# EXHIBIT 98



# CONFIDENTIAL



REDACTED

CIG 003587

# EXHIBIT 99

**CALIFORNIA INSURANCE GROUP**
**Inter-Office Memorandum**

CONFIDENTIAL

REDACTED

CIG 002447

# EXHIBIT 100

# TRUSTEE ENGAGEMENT AGREEMENT

REDACTED

MT 000543
Confidential

REDACTED

MT 000544
Confidential

REDACTED

MT 000545
Confidential

REDACTED

MT 000546
Confidential



MT 000547
Confidential



MT 000548
Confidential

REDACTED

MT 000549
Confidential



DALLAS3 858718v7 53313-00006

MT 000550
Confidential

**TRUSTEE FEE ADDENDUM**
**ANNUAL FEES**

REDACTED

DALLAS3 858718v7 53313-00006

MT 000551
Confidential

# EXHIBIT 101

## Report on Trustees

- I spoke with 4 potential Trustees

  Greatbanc Trust Company
  US Trust
  Northwest Fiduciary / Thomas Noult
  North Star Trust Company

- We went forward with all but
  Great banc, from my conversations, they
  were not interested in Companies with Litigation

  — U.S. Trust. They prepared a simple
  proposal, but upon investigation would
  go no further until we "chose" them.
  At that point, they would do more investigation
  to see if they wanted to be involved. Their
  lack of wanting to do any "due diligence" now
  seems to reduce their true interest, and might
  not be worthwhile following up, if for nothing

**EXHIBIT**

10

Stritmatter  3-12-08

KMH 003943

— I spoke on the phone and met with
Thomas Nault of Northwest Fiduciary
and his attorney Pat Parks on Friday 3-21-03
I had a good meeting with them
They are less tied in on working with
other attorneys. Thomas Nault did confide
that he had difficulties in working
with a Menke Plan before (This sent up
a red flag). Otherwise, They seemed
ok.


— I spoke on The phone and met with
John Honnell of North Star Trust Company on
Friday 3-27-03 I also met with his
attorneys John Kober and Erin Turley
from Jenkins & Gilchrist along with Vicki Alom.
   — They have good experience !
   — They have worked with Menke Plans
   — They would want to work together in
      a businesslike manner.
   — Litigation + Asbestos issues didn't scare
      them
   — They seemed Knowledgeable.


— I would recommend them to the board assuming
issues on their eng. letter are worked out to the satisfaction

KMH 003944

# EXHIBIT 102

Memo to file

On 3/27/03 I met with John Hommel of Northstar Trust. He was there with John Kober and Erin Turley of Jenkens & Gilchrist Victor Alam of Menke was in attendance.

- They provided an agreement based upon what is known now.

- They have extensive background in successfully acting as trustee for 100 ESOP's big & small. They are currently involved with 50 ESOP's. Approximately 20% are in Chicago area and the remainder are around the country.

- There would need to be a reallocation of duties and a new trust agreement drawn up by advisors & attorneys. Most significant responsibilities would be assigned to the trustee. Certain administrative duties would be assigned to the administrative committee relating to certain administrative responsibilities only. The administrative committee would still remain with a company person keeping the responsibility.

- John provided a Trustee agreement which would basically cover their services as trustee.

- They reminded me that if there were separate transactions, there would be separate fees.

- Issues relating to large transactions or asbestos litigation did not overly concern them. They knew there were issues that would be dealt with as they arise.

- They would hope to have open dialog, and attend 1 or 2 board meetings along with the shareholders meetings.

- They seemed to work well with Victor Alam of Menke and John Hommel seemed "down to earth" and "Businesslike". Since they had extensive knowledge of ESOP's, they wouldn't have to spend extra time learning.

- These individuals seemed most knowledgeable and willing to take on the task of any that I have met.



EXHIBIT
254
Hommel  5-08-08

KMH 003942

# EXHIBIT 103

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO AND OAKLAND DIVISION

4

5        _____

6     THOMAS FERNANDEZ, et al.,                    )
                                                   )
7                    Plaintiffs,                   )
                                                   ) Case No.
8              vs.                                 )
                                                   ) C-06-07339 CW
9     K-M INDUSTRIES HOLDING CO., INC., et al.,    )
                                                   )
10                   Defendants.                   )
                                                   )
11                                                 )
                                                   )
12

13       _____

14

15              VIDEOTAPED DEPOSITION OF JOHN HOMMEL, taken on

16     behalf of Plaintiffs, at One Market, Spear Street Tower, San

17     Francisco, California, beginning at 9:18 a.m. and ending at

18     6:12 p.m., on May 8, 2008, before me, EMI ALBRIGHT, RPR, CSR

19     No. 13042.

20

21

22

23

24

25

2

1    that the witness has indicated that he started less than

2    ten years ago.

3    BY MR. JACKSON:

4         Q    Let me --

5              MS. DILLER:    I am wrong.    Sorry about

6    that.    I withdraw my objection.

7    BY MR. JACKSON:

8         Q    I am going to strike the question anyway.

9              Over the last ten years how many times has

10   North Star served as an independent trustee representing

11   an ESOP in transactions?    And by transactions I mean

12   buying or selling stock.

13        A    I am going to approximate between 75 and

14   100.

15        Q    Does North Star have a practice of

16   documenting its communications regarding client matters,

17   that is, communications with clients about an ESOP for

18   which North Star serves as the independent trustee?

19        A    Could you rephrase that?

20        Q    Sure.    How does North Star document --

21   strike it.    What is North Star's practice for

22   documenting communications regarding a particular ESOP

23   where North Star serves as the independent trustee?

24             MS. DILLER:    Assumes facts not in

25   evidence.

45

1    A    Our practice would ordinarily be if we are

2    attending a meeting -- our practice would ordinarily

3    be -- I am sorry I have a deep voice -- that in

4    attending meetings that we would likely take minutes of

5    those meetings or notes.  If we had telephone

6    conversations, extensive telephone conversations, it's

7    possible that there would be some notes or minutes that

8    would be found either on a separate sheet of paper or as

9    you've seen, in a spiral binder in terms of just as a

10    single source.

11        I am sure there are a number of -- when we

12    have a committee meeting, that actually is not a

13    communication with the client but it certainly is all

14    about the client.  So we would make sure that we have

15    written materials prepared by our advisors to present to

16    the committee that would be the basis for the

17    conversation, the discussion of the committee.  And we

18    would if it's a formal committee meeting, we would have

19    minutes associated with that.

20    BY MR. JACKSON:

21        Q    Are there any other ways in which you

22    document any of the activities that take place around

23    your role as the independent trustee of an ESOP?

24        A    Other than as I stated we would typically

25    try and take notes when it was appropriate, when we felt

46

1   that there was conversation that needed to be reflected,

2   and we would have minutes when we had the appropriate

3   type of action.  We may have -- if we had e-mails, then

4   obviously the e-mails are there.  If we had written

5   correspondence communicated to the client, then that's

6   there.  But that would be -- that would be our practice.

7        Q    Those documentation practices apply both to

8   communications involving the client but also internal

9   communications regarding the account; correct?

10       A    They may not include written

11  communications -- excuse me -- written notes if I am

12  just having the conversation.  If, say, for example, a

13  question came up on account No. 1 and I just went around

14  the corner and asked Paul, for example, a question who

15  may be more immediately involved with that, then it is

16  not likely that I made a written documentation of that

17  discussion even though it dealt with a question

18  involving a client.

19       Q    But absent those sort of one off or short

20  communications, if it was a longer substantive

21  communication even internally, that would be noted in

22  notes; correct?

23       A    Typically but I would say not in all cases.

24       Q    If someone at North Star had a discussion,

25  for instance, with an attorney regarding issues raised

47

1    in North Star's capacity as an independent trustee,

2    those sort of discussions would typically be noted?

3        A    They would ordinarily be but not -- I

4    certainly can't vouch for the 100 percent consistency.

5        Q    It's the goal that they all be noted?

6        A    That's our target, where it's appropriate.

7    As I say there is going to be a lot of conversations

8    that are going to be the one offs, as it were, even with

9    our counsel because we will be in regular contact with

10   our counsel and our financial advisors in a lot of these

11   accounts, especially if there is some ongoing activity.

12   If we have a very -- not very but a much more static

13   account, then we are not likely to be talking with our

14   counsel on a regular basis.

15       Q    I see.  For something like a question

16   surrounding whether or not a stock sale is appropriate,

17   that's an issue that would go to the ESOP committee;

18   correct?

19       A    Correct; stock sale that we were the

20   trustee.  Right.

21       Q    What about an issue like suing a prior

22   fiduciary?  Would that be something that would go to the

23   ESOP committee?

24       A    If we -- I believe if we got to a point

25   where we were considering that, then we would seek a

48

1        A     We try to, yes, sir.

2        Q     Why do you try to follow that practice?

3        A     It's a better practice that we think allows

4   us to make a determination that can be well supported

5   and would stand scrutiny and makes it easier to recall a

6   situation after the fact.

7        Q     Any other reason you think it's a prudent

8   practice?

9             MS. DILLER:    Object to form.

10  Mischaracterizes testimony.

11       A     Yeah, again I am not saying it's prudent

12  practice.  It's we have looked -- it's not a practice in

13  the context of prudence.  But it's a practice that I

14  would say is advisable towards establish being the good,

15  strong paper trail and process that supports your

16  conclusion as to whether or not your decision is

17  prudent.

18  BY MR. JACKSON:

19       Q     When you say, I am not saying it's not a

20  practice in the context of prudence, by that you mean

21  you don't think it's per se imprudent to not document

22  but you think it's the better practice to document; is

23  that what you are saying?

24             MR. PALMER:    Object to form.

25             MS. DILLER:    Mischaracterizes testimony.

63

1    interest.   Do you know what your web site means by the

2    requisite -- first of all, did you actually write this

3    copy?

4         A    No, sir.

5         Q    Do you know who wrote it?

6         A    Not specifically.

7         Q    Did you review it before it was put up on

8    the site?

9         A    Yes, generally.

10        Q    So what is requisite impartiality?

11             MR. PALMER:   Object to form.   Lacks

12   foundation.

13   BY MR. JACKSON:

14        Q    You can answer.

15        A    In making its decision, as a trustee, the

16   trustee needs to be able to make a determination for the

17   benefit of the plan participants.   And in the context of

18   the rest of the statement, in terms of avoiding conflict

19   of interest, you got -- your goal should be -- not

20   should be -- has to be to be impartial with respect to

21   roles or situations that would be a conflict of interest

22   for you.   And requisite impartiality is not a legal

23   term.

24        Q    No, I just wondered what it meant.   And

25   then the potential conflicts of interest -- isn't the

109

1   had previously -- did you hire them any instances except

2   in instances where they had previously conducted

3   valuations for the ESOP that you were brought in as a

4   successor trustee on?

5           MR. PALMER:    Object to the form.

6       A    I don't specifically recall.

7   BY MR. JACKSON:

8       Q    Do you recall any instance where you

9   were -- for the first time you were hiring a valuator as

10  North Star and there had not been a prior valuator where

11  you hired them as the valuator in that instance, anyone

12  from Sansome?

13      A    I can't give the specific instance.   But my

14  general recollection is that I believe we did, we have.

15      Q    Where it says litigation and asbestos

16  issues didn't scare them, do you see that?

17      A    I see that sentence.   I guess that's what

18  the word at the end is.

19      Q    Do you recall in that first meeting with

20  Mr. Ferrari, Kober, Turley, and Alam discussing

21  litigation and asbestos issues?

22          MS. DILLER:    Object to the form.

23      A    I do have a -- I mean, we clearly talked

24  about the current status of the company.   And my

25  recollection is that there would have been discussion

1   about asbestos and litigation.  Don't recall saying I

2   wasn't scared, though.

3   BY MR. JACKSON:

4       Q   Do you recall saying something that to the

5   effect of we are not scared of asbestos litigation,

6   that's fine?

7       A   No, no, sir.

8       Q   Do you know if you said anything about

9   asbestos litigation or asbestos not being of concern to

10   you as a successor trustee for the ESOP?

11           MR. PALMER:  Object to the form.

12       A   I would not have said that.

13   BY MR. JACKSON:

14       Q   Why not?

15       A   Because in terms of the fact -- in terms of

16   the facts and circumstances we would have wanted to

17   understand all of the issues that might be associated

18   with either indeed any ESOP in terms of considering the

19   impact on the plan.

20       Q   I see.  So you would have wanted more

21   information before you decide if you were scared of it

22   or not; is that a fair way to put it?

23           MR. PALMER:  Object to form.

24       A   No.

25   BY MR. JACKSON:

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    Q    How would you put it?

2    A    We would have wanted more information in

3 terms of understanding the overall impact on the company

4 for current valuation purposes.

5    Q    I see.  Do you know a Thomas Nault of

6 Northwest Fiduciaries?

7    A    Not that I recall, no, sir.

8    Q    Have you ever had any interactions with

9 somebody named Thomas Nault?

10    A    Not that I recall, no, sir.

11    Q    What about Pat Parks, an attorney?

12    A    I believe I know the name and perhaps from

13 ESOP -- from the ESOP community.

14    Q    Did you have any discussions with

15 Mr. Ferrari, Kober, Turley or Alam regarding the fact

16 that some of the independent fiduciaries that KMH was

17 considering had had problems in the past with Menke

18 related plans?

19         MS. DILLER:    Object to the form.

20    A    Not sure what you mean by had had problems

21 with the --

22 BY MR. JACKSON:

23    Q    That they had concerns about Menke related

24 plans and were concerned about serving as a successor

25 trustee to a plan that had been implemented or in other

131

1        Q    Why was that?

2             MS. DILLER:    Object to the form.   Calls

3    for speculation.

4    BY MR. JACKSON:

5        Q    What did they tell you as to why that was?

6        A    They wanted to just move in that direction.

7        Q    Did they say why they wanted to move in

8    that direction?

9        A    Not that I recall, sir.

10        Q    You said you had a separate meeting with

11    Mr. Giffins on the same day that you met with

12    Mr. Ferrari, Mr. Kober, Ms. Turley and Mr. Alam.   Were

13    all the same people in that second meeting or was it

14    just you and Mr. Giffins?

15        A    It was all with the exception --

16    Mr. Ferrari did not attend.   But Victor Alam, myself,

17    John Kober, Erin Turley had lunch with Mr. Giffins.

18        Q    Do you remember what you discussed at that

19    lunch?

20        A    Basically a variety of issues, just

21    introducing North Star, who we were as an organization,

22    the role that we would play as trustee.

23        Q    Yes, sir.

24        A    And trying to learn more about the company

25    from him since he was the president of the company, and

135

1    about the company.  Again at that point we were trying

2    to -- we would be involved in terms of an interview to

3    be hired, and so we were trying to both present

4    ourselves as well as learn about the company.

5         Q    Did he tell you anything about asbestos

6    liability at that point?

7              MR. PALMER:    He being?

8    BY MR. JACKSON:

9         Q    Mr. Giffins?

10        A    He talked about asbestos litigation because

11   he listed that as one of his responsibilities.

12        Q    What did he say about asbestos litigation?

13        A    I don't recall specifically.  Generally

14   that at that point in time it was an item that was

15   consuming some of his time in terms of the operation of

16   the company -- excuse me -- consuming some of his time

17   in his management position and taking away from his time

18   operating the company.

19        Q    Did North Star approach KMH or vice versa

20   if you remember?

21             MR. PALMER:    Object to the form.

22        A    My recollection is that we were approached

23   probably by Victor Alam.

24   BY MR. JACKSON:

25        Q    Why do you say probably by Mr. Alam?

136

1    I still feel comfortable with the statement that when we

2    look at a transaction, we are not going to say, whoops,

3    anything that is larger than $10 million we don't want

4    to get involved with.

5    BY MR. JACKSON:

6        Q    Do you remember having a discussion in

7    March of '03, on the 27th of March in '03 with

8    Mr. Ferrari, Mr. Giffins, Mr. Kober, Ms. Turley, or

9    Mr. Alam, the fact that the Kelly-Moore Holding ESOP was

10   a large ESOP transaction?

11               MR. PALMER:   Object to form.

12       A    No, I don't recall that.

13   BY MR. JACKSON:

14       Q    Did you have any reservations about

15   accepting the engagement as trustee of the Kelly-Moore

16   Holding ESOP?

17               MR. PALMER:   Object to form.

18       A    Can you clarify that?

19   BY MR. JACKSON:

20       Q    Just did you have any concerns about

21   becoming the -- North Star becoming the trustee,

22   successor trustee for the Kelly-Moore Holding ESOP in

23   2003?

24               MR. PALMER:   Object to the form.

25       A    From what perspective?

151

BY MR. JACKSON:

     Q    From any perspective, any concerns?

       MR. PALMER:   Object to the form.

     A    We were certainly -- I was certainly aware that it was an ESOP that had some potential issues associated with it.

BY MR. JACKSON:

     Q    What did you understand those potential issues to be?

     A    Some outstanding litigation.

     Q    Other than -- by outstanding litigation you are referring to the asbestos litigation; correct?

     A    Primarily asbestos litigation, yes, sir.

     Q    And the coverage litigation as well?

     A    Actually, at that juncture it was more just asbestos litigation because that's what had been introduced to us.

     Q    Any other potential issues with the KMH ESOP that you were aware of before you became the trustee?

       MR. PALMER:   Object to the form.

     A    Just wanting to -- again not a concern but just part of our process, a goal to become more familiar with the ESOP, the company and the activity that had immediately preceded our participation.

152

1    Paint that we spoke with.

2         Q     What about CIG?

3         A     At CIG would have been Pete Cazzolla and

4    still is Pete Cazzolla is the president of the company.

5    Ed Mines was the initial CFO as I recall who was

6    involved in our first engagement activities with them.

7    Bob Erickson, who is the current CFO of the company.

8    Tom Scherff, I think, is his name, S-h-e-r-f -- he is --

9    I can't remember what the specific title is.  And I

10   think there is one other gentleman who is in their

11   regulatory area that we would talk with -- we do talk

12   with on an annual basis in terms of valuations.

13        Q     After becoming the independent trustee of

14   the ESOP, did North Star familiarize itself with

15   Kelly-Moore's asbestos liability?

16        A     We attempted to familiarize ourselves with

17   Kelly-Moore's asbestos liability together with other

18   issues associated with the company and its operation.

19        Q     Was that one of the very first steps you

20   took as the independent trustee of the ESOP?

21        A     That would have been, yes, a simultaneous

22   collective effort to process, however you would describe

23   it.

24        Q     Why was it that asbestos was one of the

25   first issues you looked at?

160

1      MS. DILLER:     Object to the form.

2  Mischaracterizes testimony.

3      A      We were looking -- as I said, we were

4  looking at a variety of issues, one of which was

5  asbestos, because as had been indicated in our meetings,

6  asbestos was an item that was confronting the company on

7  a larger basis than it had in the past.  So for

8  valuation purposes, as we are looking at the then

9  current valuation process, we wanted to understand,

10 first of all, the company's operation in terms of its

11 revenues and profits and things of that nature, and as

12 we would with any other valuation, try and understand

13 the other ancillary issues, which in this case would

14 have included the asbestos litigation, and trying to put

15 all those elements together in the context of the

16 valuation.

17 BY MR. JACKSON:

18     Q      Was it your understanding when you first

19 started looking at the company that bankruptcy as a

20 result of asbestos liability was a possibility?

21     A      No, sir.

22     Q      Did anybody tell you that the company had

23 considered bankruptcy as a response to asbestos

24 liability at that point?

25         MR. PALMER:     Object to the form.

161

BY MR. JACKSON:

Q    Up to that point?

A    Up to that point?  Not that I recall.

Q    Do you remember the month when North Star first took steps to evaluate Kelly-Moore's asbestos liabilities?

A    I'm guessing that it would be pretty much in April or May, shortly after we were engaged as a time at which we had the authority to actually look at something, yeah.

Q    So as soon as you had the authority?

A    Right, yeah.

Q    Once you had that authority to look at it, you looked at it immediately?

A    That's my recollection, I mean, all in the process.

Q    And when did North Star first evaluate Kelly-Moore's insurance coverage for asbestos litigation liability?

A    We looked to the issue of insurance coverage based on the information that we received from the company and the information that was contained in the audited financials at the time that we were engaged in 2003.

Q    What information did you receive from the

162

1      Q    When you say there may have been, would you

2  have kept those in your files?

3      A    They more likely would -- as we received

4  information, it would have been more in the form of a

5  verbal communication that we would have taken notes on.

6      Q    So were there any documents, I mean,

7  written documents --

8      A    Not that I specifically recall, sir.

9      Q    Were there any actuarial studies of

10  asbestos litigation liability that you received when you

11  started looking into asbestos liability in 2003?

12      A    Not from the company so --

13      Q    From anyone else?

14      A    We obtained information from one of the

15  valuation firms in terms of, you know, their familiarity

16  with asbestos issue, and they helped give us some

17  additional information in terms of what data was

18  generally available in the asbestos arena.

19      Q    Which valuation firm?

20      A    Would have been Duff & Phelps.

21      Q    What exactly did Duff & Phelps give you?

22      A    I am not sure if they gave it to us, but

23  they pointed us in the direction of the RAND report.

24      Q    The what report?

25      A    RAND, R-A-N-D.

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    later date?

2        A    At a later date, yes, they gave us -- we

3    had meetings with the company in terms of discussing the

4    then current status of the litigation, their assessment

5    of the type of claims that were pending and likely to be

6    forthcoming, the status of the insurance policies as

7    that process was being updated, status of the insurance

8    litigation as that process was being updated on an

9    outstanding ever more favorable perspective, status of

10   potential litigation involving Union Carbide.

11       Q    Did at a later date at any time the company

12   give you any documents related to asbestos liability as

13   it stood in 1997, 1998, or 1999?

14       A    Not that I specifically recall, no, sir.

15   We had information -- they gave us information on the

16   number of claims that had been filed and awards or

17   amounts that had been paid to that date.

18       Q    In what format did they give you

19   information on the number of claims that had been filed

20   to date as of 1998 or 1999?

21       A    I don't specifically recall if they gave it

22   to us in terms of a meeting at which we wrote it down or

23   if it was on a separate sheet of paper that they

24   provided us.

25       Q    Did they give you any documents from third

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    would have been prepared for the valuation.

2    BY MR. JACKSON:

3        Q    What do you mean by the type of report that

4    would have been prepared for the valuation?  You mean

5    the valuation report itself?

6        A    The valuation report.  Thank you.

7        Q    Okay.  Are you referring to any other

8    reports related to the valuation or just the valuation

9    report itself?

10        A    I am just trying to chronicle back in terms

11    of what we are doing.

12        Q    Right.  So you looked at financials, you

13    looked at the valuation report?

14        A    Yeah, we looked at financials, we looked at

15    valuation report.  We looked at --

16        Q    What else?

17        A    -- projections from the company in terms of

18    what their forward looking projections, and had

19    discussions with them with respect to asbestos as well

20    as other operational issues.  I believe shortly after

21    that as we became more familiar with some of the

22    specific data in the RAND report as a reference point,

23    had conversations with the valuation firm to, in effect,

24    see how they had come to their conclusions and what data

25    they might have to support their conclusions.

169

1    After that, going forward, there were --

2  the company was very proactive in the asbestos area, and

3  we had a number of conversations with both CIG when they

4  were involved in helping to monitor the litigation

5  process as well as the various law firms who were

6  involved in the asbestos processes for the company,

7  trying to monitor the trends that were taking place in

8  terms of the number of filings, the resolutions of the

9  filings, the locations of the filings, the dispositions

10  of the various claims, trying to basically track as much

11  we could in terms of the experience of the actual

12  litigation that the company -- for the company's

13  performance.

14    Q    When did you first find out that North Star

15  was considering filing bankruptcy because of its

16  asbestos?

17    A    That North Star or --

18    Q    Fair enough.

19    A    Please.

20    Q    I will strike and restate the question.   I

21  don't want to take out your employer with just one

22  question.

23    A    Not yet.  Not yet.

24    Q    When did North Star first learn that

25  Kelly-Moore was considering filing bankruptcy because of

170

1

2

3

4

14:51    5

6

7

8

9

14:51    10

11

12

13

14

14:51    15        REDACTED

16

17

18

19

14:52    20

21

22

23

24

14:52    25

ESQUIRE DEPOSITION SERVICES
800.770.3363

1
2
3
4
14:53    5
6
7
8
9
14:53    10
11
12
13
14
14:53    15        REDACTED
16
17
18
19
14:53    20
21
22
23
24
14:53    25

15:05

1
2
3
4
5
6
7
8
9

15:06   10
11
12
13
14

15:06   15
16
17
18
19

15:06   20
21
22
23
24

15:07   25

REDACTED

ESQUIRE DEPOSITION SERVICES
800.770.3363

1
2
3
4
15:07  5
6
7
8
9
15:07  10
11
12
13
14
15:07  15
16
17
18
19
15:07  20
21
22
23
24
15:08  25

REDACTED

192



ESQUIRE DEPOSITION SERVICES
800.770.3363

1

2

3

4

15:14    5

6

7

8

9

15:14    10

11

12

13

14

15:15    15                                        REDACTED

16

17

18

19

15:15    20

21

22

23

24

15:16    25

1

2

3

4

15:17    5

6

7

8

9

15:17    10

11

12

13

14

15:18    15

16    REDACTED

17

18

19

15:18    20

21

22

23

24

15:19    25

ESQUIRE DEPOSITION SERVICES
800.770.3363

1

2

3

4

15:19    5

6

7

8

9

15:19    10

11

12

13

14

15:19    15

16    REDACTED

17

18

19

15:20    20

21

22

23

24

15:20    25

199

1
2
3
4
15:20   5
6
7
8
9
15:20   10
11
12
13
14
15:21   15
16   *REDACTED*
17
18
19
15:21   20
21
22
23
24
15:21   25

200

15:21   1
        2
        3
        4
15:21   5
        6
        7
        8
        9
15:21   10
        11
        12
        13
        14
15:22   15                              REDACTED
        16
        17
        18
        19
15:22   20
        21
        22
        23
        24
15:22   25

201

1

2

3

4

15:27   5

6

7

8

9

15:27   10

11

12

13

14

15:27   15

16    REDACTED

17

18

19

15:28   20

21

22

23

24

15:28   25

204

1

2

3

4

17:40    5

6

7

8

9

17:40   10

11

12

13

14

17:40   15

16    REDACTED

17

18

19

17:41   20

21

22

23

24

17:41   25

266

1
2
3
4
17:41  5
6
7
8
9
17:42  10
11
12
13
14
17:42  15
16                          REDACTED
17
18
19
17:43  20
21
22
23
24
17:43  25

267

```
        1
        2
        3
        4
17:47   5
        6
        7
        8
        9
17:48  10
       11
       12
       13
       14
17:49  15          REDACTED
       16
       17
       18
       19
17:50  20
       21
       22
       23
       24
17:50  25
```

1
2
3
4
17:50    5
6
7
8
9
17:51   10
11
12
13
14
17:51   15

REDACTED

16
17
18
19
17:51   20
21
22
23
24
17:51   25

272

1

2

3

4

17:52    5

6

7

8

9

17:52    10

11

12

13

14

17:52    15

16                    REDACTED

17

18

19

17:52    20

21

22

23

24

17:53    25

273

1

2

3

4

17:53    5

6

7

8

9

17:53    10

11

12

13

14

17:53    15                              REDACTED

16

17

18

19

17:54    20

21

22

23

24

17:54    25

1

2

3

4

17:54    5

6

7

8

9

17:54    10

11

12

13

14

17:54    15    REDACTED

16

17

18

19

17:55    20

21

22

23

24

17:55    25

275

1

2

3

4

17:55    5

6

7

8

9

17:55    10

11

12

13

14

17:56    15                    REDACTED

16

17

18

19

17:56    20

21

22

23

24

17:56    25

276

1

2

3

4

17:56   5

6

7

8

9

17:56   10

11

12

13

14

17:57   15                    REDACTED

16

17

18

19

17:57   20

21

22

23

24

17:57   25

277

1
2
3
4
18:01    5
6
7
8
9
18:01    10
11
12
13
14
18:02    15            REDACTED
16
17
18
19
18:02    20
21
22
23
24
18:02    25

280

1

2

3

4

18:02     5

6

7

8

9

18:03     10

11

12

13

14

18:03     15                                    REDACTED

16

17

18

19

18:03     20

21

22

23

24

18:03     25

281

1

2

3

4

18:04    5

6

7

8

9

18:04    10

11

12

13

14

18:04    15    REDACTED

16

17

18

19

18:04    20

21

22

23

24

18:05    25

282

1

2

3

4

18:05    5

6

7

8

9

18:08    10

11

12

13

14

18:08    15

16    REDACTED

17

18

19

20

21

22

23

24

18:08    25

ESQUIRE DEPOSITION SERVICES
800.770.3363

1

2

3

4

18:09    5

6

7

8

9

18:09    10

11

12

13

14

18:09    15    REDACTED

16

17

18

19

18:10    20

21

22

23

24

18:10    25

284

1

2

3

4

18:10       5

6

7

8

9

18:10       10

11

12

13

14                              REDACTED

18:10       15

16

17

18

19

18:11       20

21

22

23

24

18:11       25

285

1

2

3

4

18:11     5

6

7

8

9

18:11    10

11

12

13

14

18:11    15                    REDACTED

16

17

18

19

18:12    20

21

22

23

24

25

286