# EXHIBIT 108

KMI Mtngs
EGSQinctN

5-14-03

53313-6
start 6:00 am

Kelly Moore Due Diligence
o/c w/ Steve Ferrari
John Hommel, Steve Ferrari, Schatebo

North Star will be fiduciary serp.
for accepting vestings fut Plan 2/
new & incoming Trustee

Ind. Auditors Report will be a
Going Concern Audit due to
Prudential Loan Issue
↳ Prudential has called KMI's note

w/ company name
in IT doc.

Land + Buildings/ KMI only sold
of retail store/      Liberty mutual
cash drop vs last year ?      NOL?
Income Tax Receivable - what is this?
What was 2001 note Payable

10,729   vs  #39,135
#12,006
#92,551

airelle & John Merino

2001 Liberty Mutual settlement added
20 million to cash in 2001

v/a Jucz
713.221.1109!

Prudential wants full collateral for
Note b/c of Asbestos litigation
& KMI was offered to pay down
to 1/2 of current balance
(company currently in heated negotiation
with Prudential

review Letter &
get back to Anne
& Mark !

June 26th > Thurs are
inc 27th >  Fri are

Subsequent Events 25 million has
come in from Ins. settlement/

Breach Covenants relate to debt
ratios and income levels/

EXHIBIT
263
Hommel 5-08-08

NS00020230

Retirement
↳ Company had calculated share
release under ESOP incorrectly 10
went back & fixed to 1998
   ↳ do we need to investigate
   how they corrected within the
   PM? Did they reallocate?
   what did they do for kind
   pt?

Store Placement
   ↳ how determined - traffic flow -
easy access to contractors/ - principal
focus - done at what level.
   Local mgnt would give suggestions/
   & then headquarters/ would sign
      off on the tactics
Environmental
Part of San Jose Super Fund Site
      Total Exposure = 500,000
Wanting to be on Non-Waste Product
Site - reuse all by products in
   end product
Raw Materials - separate containment
No substantial Environment Risk
Can't produce oil based paint
in California
Oil based paint produced in
Houst & Seattle &
   4 Primary Production OK/
Broken down
   2 Regional
   14 Districts

4:30 conf call w/
Candy Shaffer

Need to figure out if we can get
a litigation analysis so we can
get our hands around potential
liability

Profitability directly tied to market
share - key to financial success
Breed & Butter is in Northern
California

Gain Market Share
① Service
② Convenience
③ Quality

Interview w/ Herb Given/
- not familiar w/ Asbestos litigation
up to 3 years ago defense not very
organized - b/c that no real
illness now has become a big
illness - now last 5 major trial
this created or thought of litigation
2 big things/ - in drywall
① we select material
↳ only 6% - so approx very
small/
② they defense mentioned
Biggest factor is very few people can
prove they used KM product -
very small supplier
All suits are individual with
30,000 + - no class action suit

NS00020232

Case: when they do settle they settle
for for less than typical
company been settlement cost
L asbestos litigation excluded from
joint company?
Prudential has filed a lawsuit to collect
debt currently owed by company
Litigation relating? bed up to
date of there/ time and
up to 2006 at ITob; time

→ Initial SLP Purchase - we
need to figure out how to
treat the asbestos litigation ?
was when the initial purchase
took place - was it factored
into valuation? Did fee
look at it, take into consideration.

view & revise Matthews
Ahr; and G & A re: Holloman
VP for pm thru vote
1.1

revise & finalize TPC Holding
agreement Agmt, Trust
and then 2nd conf w/
bruce Jacz, John thru
& John Keiber
1.2

O/C w/ Victor Alan
re: valuation
Do we need to include litigation
exposure in valuation procedure
L look to other public companies
facing similar litigation
threats?

HLH 2 - Bob Ireland
L look into asbestos litigation in valuing
Kelly Moore Paint stock for KMI
Holdings
marketability discount
multiple discount
L do this should be impacted by litigation

NS00020233

But need to factor how litigation
being managed - paradigm that
has been set up
   HL172 & John Honnel will get
on the phone + talk w/ Phil/Pittsburg
re: the litigation
   Include legout in various report
management schematic over litigation
Add letter re: similar Public Companies
& non Public Companies facing similar
litigation list/

o/c w/ Ed M. nen; Tom Scheff & Pete Goth
Major challenges
      - regulatory compliance
pleased to have independent rev for ESOP
   "been trying to get one for a long time
John did quick overview of changes
to Plan & Trust & inspect they appointment
has on the Plan as a whole
who is Committee,
      - Herb a fire?
How does CIG want the Committee to look
ESOP very important to their employees
   Going forward how do we deal
w/ issues regarding reorganization
sale, etc.
Bank of America will be paid off
by next March
Company well capitalized
      set for growth & good resources
      an attractive buy for an Inv. Co.

CIG very concerned about Kelly
Moore, asbestos litigation
→ had corporate attorneys look at
the situations + came up with
a scenario that best deals
of these issues but insulate
the moore
DMIIIK D Reorg?

We need to have meeting w/
BOD of CIG & BOG of KM!
→ they have shared DMIIIK D
Reorg scenario w/ KM & d/o
KM cancel and they were
told not to pursue at this
time!
Also breached w/ Herb
↳

Two Recitals - re: DMIIIK D
Holding Company provides no
value to either company
not guaranteeing any financial
portion or anything.
No Merging of sites
But do file paper on a
candidate d berri.

Strategy for Prepotato
① Pete goes to Herb
② Herb gets w/ us
③ Steve & Herb & d/ get together
↳ see if we can regroup
June 3, 2003

NS00020235

what Risk! have CIG identified
2 certified re litigation
Der, Bill & Pete are board for CIG
CIG - really in the dark as to
Asbestos litigation
they have not been given
enough into a Duff & Phelps has
not dug deep enough
Information flow
what is CIG entitled?
Need copy of Duff & Phelps Engagement

Do we need to figure out if
Board make up of holding company
works?

Wde Presentation as beneficial to
Bill Moore b/c interests not
necessarily alligned w/ Kelly Moore
concerned that Bill Moore no
longer up to the task

Background
1985 mutual Inv. Co. up till then
Was the California Mutual
↳ Company needed capital & Bill
rest of the Board - Company went thru
private placement but Bill decided
to buy it - 1986 demutualized
& turn to stock company - Bill
paid 10 million then contributed
additional 22 million
Kelly Moore paint owned

NS00020236

Pete - w/ the company, 1) years
Ed      "        "     8  years
Tom     "        "     8  years
Bob     "        "    10  years

Most of business concentrated in CA.
Oregon & Nevada - growing markets

Want to change name to Capital Insurance
Group from California for greater
market here
Lwant/ to set up smaller regional
entities in each state
Deal w/ independent agents only -
about 320 agents
Slower Growth / Higher Profit focus

Internet Products / Access
    Ldoing own conversion & system
    creation- own in house system
Technology - only employ vendors temporarily
Saving of 40,000 per month once
temporary contract eliminated
    Linterestingly enough - results in
    very little staff increase
32 people run IT for the company
    IT expense 1.8% & currently planning
    goal to be down in 1.5%

2 million a year budgeted for IT

161 quarterly employee meetings
    Ldoes company have intention of
    moving to another state

Hq a headquarter site in Reno now
currently explored appx 20 seek
Upper Management & Underwriting
literally indiancur - chew/k
appx 20%

Ruff + Phelphy valuation does not
have Plan none correct

June 9 week is EICP week
Want Participant tolerant to be
the table - question is can
valuation be completed by then
Record keeper needs 2 weeks to get
statement due

→ Relationship w/ Independent Agent/
  - would this company be a good
    fit for the First (company) and
    model or the defined corp
    ride?

Recently changed Corporation Structure
for Independent Agents - went
over very well - has not
adversely impact policies being
written

Has Policy Cancellation had any impact
on business or relationship w/
Independent Agents
  - having impact on ability to
    grow.

NS00020238

Investment Portfolio Risk
   Casualty - but Property driven
   Toll ratio
Cash Flow
   Short term - Property
   Long term - Casualty

Pricing - Established by Committee
In almost all corporate decisions
involve Committee
   constantly marking to market
Monitor rate filings of all competitors
and also watch market share
2000 + 2001 due to non-experience
to price drops, lost 20 million in one
Jan - May best results ever in
history of Company
   (combined loss 94.4 v/ 115)
   last year (includes VCP load)
Net Earnings for 2003
   should be 12 million
         need to pin out
GMAC Title Reinsurer
Management (occasion A??

Weakness - "Key Man"
   hire a bit of a weakness yes but
only temporary
   could find someone either
internally or externally - history
of going outside Donnell
slightly greater weakness
here that @ Kelly McCabe

Build Five Year Models do
annual Budgeting
└ Financial Budgeting
   └ any repurchase liability
      analysis

CIG would like flexibility to pay
people at currently

¿¿ Coversion of Accounts at Term of Pl. ??

** **   Dept of Ins. auth come period
        trouble for CIG if arbitration, litigation
        heats up — DOI will start financial
        exam in less than a month
        will take approx a year
        └ so potential litigation is
           huge issue

Need to put b/f board
   ① Put Option
   ② Committee make up for O/CP
      Herb, Steve, Peter,

CIG will be paying dividend/
each year but Kelly Moore

# EXHIBIT 109





**SRR**
STOUT|RISIUS|ROSS

Effective As Of April 28, 2005

North Star Trust Company                    <u>**Confidential & Privileged**</u>
500 West Madison Street
Suite 3630
Chicago, Illinois 60661-2511
Attention: John G. Hommel, Senior Vice President

Re:    K-M Industries Holding Co., Inc.
       Employee   Stock Ownership Trust

Ladies and Gentlemen:

       This letter (the "<u>Agreement</u>") will confirm the terms and conditions of the agreement between North Star Trust Company, in its capacity as trustee ("<u>Trustee</u>") of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust, as amended from time to time (the "<u>Trust</u>" or "<u>ESOP Trust</u>") (which is a part of the K-M Industries Holding, Inc. Employee Stock Ownership Plan, as amended from time to time ("<u>ESOP Plan</u>", together with the Trust referred to as "<u>ESOP</u>")) and Stout Risius Ross, Inc. ("<u>Advisor</u>" or "<u>SRR</u>") regarding the retention of Advisor as the Trustee's financial advisor in connection with the valuation of the shares of capital stock held by the Trust ("<u>ESOP Stock</u>") and valuation services solely related to the ESOP Stock in the event of a possible restructuring of K-M Industries Holding Co., Inc. ("<u>KM Holding</u>") together with its direct and indirect subsidiaries including Kelly-Moore Paint Company, Inc. ("<u>KM</u>") California Capital Insurance Company, Eagle West Insurance Company, Monterey Insurance Company, and Nevada Capital Insurance Company (collectively,  "<u>CIG</u>"), (collectively referred to as the "<u>Company</u>").

       KM Holding and KM join in this Agreement with respect to the information provisions in Sections 2, 7, and 6.

       <u>Section 1.</u>  ·  <u>Services to be Rendered.</u>

       (a)    *Phase 1 – Valuation Services ("<u>Phase I Services</u>")*.  In connection with services provided to the Trustee in valuing the ESOP Stock as of December 31, 2003 ("<u>2003 ESOP Valuation</u>") and valuing the ESOP Stock as of December 31, 2004 ("<u>2004 ESOP Valuation</u>", together with the 2003 ESOP Valuation collectively referred to the "<u>ESOP Valuations</u>"), Advisor will perform such services relating to the ESOP Stock Valuations, including, but not limited to the following:

**EXHIBIT**

262

Hommel  5-08-08

One South Wacker Drive, Suite 1900
Chicago, IL 60606
| ph. 312 857-9000
| fax 312 857-9001
www.srr.com



North Star Trust Company
Dated As of April 28, 2005
Page 2

(i) conduct financial due diligence meetings at the locations of the Company (or such locations as reasonably requested by the Trustee) with the Trustee, its counsel and/or the Company;

(ii) perform financial analysis customary and normal in valuing capital stock of a privately held company held by an employee stock ownership plan and trust;

(iii) meet and present same valuation analysis to the Trustee (and to such other parties as reasonably requested by the Trustee);

(iv) deliver a valuation report to Trustee at such time as is reasonably requested by the Trustee, including the valuation analysis and conclusions of value;

(v) advise the Trustee, if the Trustee is required to testify in a hearing before the Bankruptcy Court, on matters relating to value of the ESOP Stock or value of the capital stock of the Company; and

(vi) as reasonably requested by the Trustee and subject to the Joint Defense Privilege--Common Interest Doctrine Agreement attached hereto as Exhibit A, meet with the Department of Labor and/or Internal Revenue Service relating to the valuation of the ESOP Stock and valuation process, provide preliminary materials with respect to such valuation and valuation process, and provide a report or valuation analysis to said governmental agencies, if and when requested by the Trustee.

(b) *Phase II – Testimony in Bankruptcy Court ("Phase II Services")*. In connection with any Bankruptcy Cases commenced by KM Holding and/or KM, Advisor will perform such services as the Trustee may request, including, but not limited to, the following:

(i) advise the Trustee, if the Trustee is required to testify in a hearing before the Bankruptcy Court, on matters relating to value of the ESOP Valuations;

(ii) provide relevant testimony in hearings before the Bankruptcy Court with respect to the matters relating to Phase I and issues arising in connection with the ESOP Valuations; and

(iii) provide, if requested by the Trustee or required by the Bankruptcy Court (as defined below) and subject to terms of the Joint Defense Privilege--Common Interest Doctrine Agreement attached hereto as Exhibit A and to the entry of appropriate orders pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9018 providing for filing of such materials under seal, a report suitable for filing

NS00018995



North Star Trust Company
Dated As of April 28, 2005
Page 3

with the Bankruptcy Court (as defined below) prepared in connection with Phase I, and address any similar valuation issues having an affect on the ESOP Trust arising in connection with any proposed Plan (as defined below). As used herein, the terms: (i) "Plan" shall mean, whether pursuant to an out of court restructuring and global settlement of Asbestos Claims (as defined below) or pursuant to a Chapter 11 plan of reorganization confirmed in connection with any case or cases commenced by or against the Company, any of its subsidiaries, any of its affiliates or any combination thereof, whether individually or on a consolidated basis (a "Bankruptcy Case"), under Title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code") or otherwise: any transaction (or series of transactions) that is (are) proposed for the purpose of affecting or implementing material settlements of, limitations on, treatment for, or satisfaction of a substantial portion of the Company's Asbestos Claims (as defined below); (ii) "Asbestos Claims" shall mean, any current or prospective creditors of or claimants against the Company and/or their respective representatives with respect to personal injury, wrongful death or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products or any similar claims; and (iii) "Bankruptcy Court" shall mean, court of law in which Bankruptcy Cases are commenced in the United States of America.

(c)     *Phase III – Subsequent ESOP Valuations and Other Services ("Phase III Services")*. To the extent the Trustee requests Advisor to perform additional services not contemplated by this Agreement such as but not limited to performing a valuation or valuations of the ESOP Stock on such other dates as requested by the Trustee ("Subsequent ESOP Stock Valuations"), and any other services, the Advisor and Trustee shall either amend this Agreement or agree in writing to the scope of such services.

Section 2.     Information and Electronic Transmission. The Trustee and the Company will cooperate with Advisor and furnish to Advisor any and all reasonable information as Advisor deems appropriate to enable Advisor to render services hereunder (all such information being the "Information"). The Trustee and the Company recognize and confirm that Advisor (a) will use and rely solely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently the same and (b) does not assume responsibility for the accuracy or completeness of the Information and such other information. Each of the Trustee and the Company will promptly notify Advisor if either, or each, learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to Advisor. The Trustee and the Company acknowledge that in the course of this engagement it may be necessary for Advisor and the Trustee to communicate electronically.



North Star Trust Company
Dated As of April 28, 2005
Page 4

The Trustee and the Company consent to and approve the Advisor using electronic transmission of information and acknowledge that Advisor will use commercially reasonable procedures to check for the most commonly known viruses, and that the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, the Trustee and the Company agree that Advisor shall have no liability to the Trust with respect to any error or omission arising from or in connection with: (x) the electronic communication of information to the ESOP Trust; or (y) the ESOP Trust's reliance on such information.

Section 3.    Duties of Advisor.   In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Advisor is not assuming any fiduciary responsibility for the Trustee's decision to follow the advice of Advisor. Although Advisor will provide the ESOP Valuations, Advisor will not act in the official capacity of an appraiser of specific assets of the Company or any other party.

Section 4.    Fees of Advisor.   As compensation for the services rendered hereunder, the Trustee, and its successors, if any, agree to pay Advisor (via wire transfer or other mutually acceptable means) the following fees in cash in addition to any expenses incurred by the Advisor a provided in Section 5:

(a)    *Retainer.*   Trustee shall pay a retainer (the "Retainer") of $100,000 to Advisor upon the execution of this Agreement. The Retainer shall be held by Advisor as a cash security deposit for application against the fees and expenses of Advisor due hereunder, in the event any such fees or expenses are (for any reason) not paid when due, whether before termination of this Agreement or upon or at any time following the termination of this Agreement. Portions of the Retainer shall be applied to Advisor's fees as and when set forth below. Any portion of the Retainer remaining upon termination of this Agreement which exceeds the aggregate amount of unpaid Phase I Fees, Phase II Fees, and Phase III Fees shall be promptly refunded to the Company.

(b)    *Phase I Fee.*   For all work performed by Advisor for any services described in Section 1(a) entitled "Phase I Services" (the "Phase I Fee"), a Phase I Fee of $175,000 shall accrue and be paid to Advisor in consideration for such services, as follows:

(i) $100,000 of the Phase I Fee shall accrue and become due and payable on the earlier of (a) May 31, 2005, or (b) the date the Advisor commences work on the ESOP Valuations; and



North Star Trust Company
Dated As of April 28, 2005
Page 5

   (ii) the remaining balance of $75,000 of the Phase I Fee shall accrue and become due and payable and shall be paid by Trustee on the earlier of: (a) the delivery of the valuation analysis relating to the 2003 ESOP Valuation and the 2004 ESOP Valuation; or (b) September 30, 2005.

   (c)   *Phase II Fee.*  For all work performed by Advisor for services described in Section 1(b) entitled "Phase II Services", Advisor shall accrue a monthly advisory fee, subject to the prior Company's consent (which will not be unreasonably withheld), based on either: (i) the time incurred by SRR professionals at hourly rates (which currently range from $200 per hour for senior associates to $425 per hour for principals (the "Hourly Monthly Fee"); or (ii) a fixed fee mutually agreed upon by the parties prior to the commencement of the Phase II Services (the "Fixed Monthly Fee", together with Hourly Monthly Fee collectively referred to as the "Monthly Fee"). In addition to the Monthly Fee, the Trust shall pay a retainer in an amount to be estimated by the parties (the "Monthly Retainer"). The Monthly Fee shall be payable by the Trust , or the parties agree the Monthly Retainer shall be used to offset such Monthly Fee and Trust shall pay the balance, on or before the tenth (10th) calendar day of the following month, provided that Advisor sends its invoice to the Trustee and the Chief Financial Advisor of KM. In any event, subject to Section 8 hereof, the Phase II Fee shall be paid upon the termination of this Agreement.

   (d)   *Phase III Fee.*  If the Trustee requests the Advisor perform any services described in Section 1(c) hereof (the "Phase III Fee"), the additional fees as shall be mutually agreed upon by Advisor and the Trustee, in writing, in advance, with the consent of the Company.

   The Trustee and Advisor acknowledge and agree that: (i) the hours worked; (ii) the results achieved; and (iii) the ultimate benefit to the ESOP Trust of the work performed, in each case, in connection with this engagement, may be variable, and that the Trustee and Advisor have taken such factors into account in setting the fees hereunder.

   (f)   *Limitation on Fees.*  Advisor and Trustee agree that upon a Bankruptcy Termination Event (as defined herein), Trustee shall pay, and Advisor shall limit its fees to, the sum of (a) that portion of the Phase I Fee actually accrued before the Bankruptcy Termination Event plus (b) that portion of the Phase II Monthly Fees actually accrued (as pro rated on a daily basis) before the Bankruptcy Termination Event. Any portion of the Retainer which exceeds the sum of (a) plus (b) calculated as of the Bankruptcy Termination Event shall be promptly refunded to the Company. A "Bankruptcy Termination Event" shall be deemed to occur if and when: (i) the Bankruptcy Court in a Bankruptcy Case in which KM Holding or KM is a debtor declines to authorize the employment and compensation of Advisor (after request is filed to so authorize) on the terms set forth in Sections 6 and 7; (ii) Advisor and Trustee are unable to agree on mutually satisfactory terms which are authorized by the Bankruptcy Court; and (iii) either Trustee notifies

NS00018998



North Star Trust Company
Dated As of April 28, 2005
Page 6

Advisor, or Advisor notifies Trustee, that Advisor's services shall not be provided during the Bankruptcy Case.

Section 5.    Expenses.    Without in any way reducing or affecting the provisions of Sections 4 and 6 hereto, the Trustee shall reimburse Advisor on a monthly basis, in arrears, for its reasonable expenses incurred in connection with the performance of its engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable expenses incurred in connection with coach class airfare, car rental, travel and lodging, data processing and communication charges, research and courier services, disbursements relating to the services provided under this Agreement and reasonable legal expenses incurred by Advisor (provided that the Trustee shall have approved of the retention of any such counsel in writing). In the event the Company becomes a debtor and/or a debtor-in-possession in a Bankruptcy Case, then the Trustee shall promptly reimburse Advisor for such expenses under this Section 5 upon presentation to the Trustee and the KM Chief Financial Officer of an invoice or other similar documentation with reasonable detail, which is consistent with and subject to any applicable order of the Bankruptcy Court, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Guidelines of the Northern District of California.

Section 6.    Indemnity.    Each of KM Holding and KM (each for purposes of this Section 6 referred to as an "Indemnifying Party", and collectively referred to as the "Indemnifying Parties") shall indemnify and hold harmless Advisor and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (Advisor and all of such other persons collectively referred to as the "Indemnified Parties"), from and against any losses, claims or proceedings, including without limitation stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, costs, fees and expenses (collectively, "Losses") directly or indirectly related to or arising out of: (i) oral or written information provided by the Company, the Company's employees or other Company agents, which either the Company or an Indemnified Party provides to any person or entity; or (ii) any other action or failure to act by the Company, the Company's employees or any Indemnifing Party at the Company's or Trustee's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to this Agreement, the retention of and services provided by Advisor under this Agreement;

( )    Provided, that the Indemnifying Parties shall not be required to indemnify any Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party; and



North Star Trust Company
Dated As of April 28, 2005
Page 7

( )    Provided, if multiple claims are brought against an Indemnified Party in any contested matter or adversary procceding under the Federal Rules of Bankruptcy Procedure or any litigation or lawsuit in any court ("Action"), with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Indemnifying Parties agree that any such Action shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judicial determination in such Action expressly states that the judgment or order or any portion thereof, is based on a claim as to which indemnification is not available.   This Section shall survive any termination, expiration or completion of this Agreement.

The Indemnifying Parties shall further reimburse any Indemnified Party promptly for any legal or other fees, disbursements or expenses as they are incurred for the following: (a) in investigating, preparing or pursuing any Action or threatened Action in which Indemnified Party is or may become a party; and (b) in connection with enforcing such Indemnified Party's rights under this Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party, such Indemnified Party will promptly remit to the Indemnifying Parties any amounts reimbursed under this Section.

Upon receipt by an Indemnified Party of notice of any Action or threatened Action in which Indemnified Party is or may become a party, such Indemnified Party shall notify the Indemnifying Parties in writing of such Action, but the failure to so notify shall not relieve the Indemnifying Parties from any liability hereunder: (a) if the Indemnifying Parties had actual notice of such Action; or (b) unless and only to the extent that such failure results in the forfeiture by the Indemnifying Parties of substantial rights and defenses.   The Indemnifying Parties shall, if requested by Advisor, assume the defense of any such Action or threatened Action in which Indemnified Party is or may become a party, including the employment of counsel reasonably satisfactory to Advisor and the Trustee, and will not, without the prior written consent of Advisor and Trustee, settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action in which Indemnified Party is or may become a party (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination: (a) contains an express, unconditional release of each Indemnified Party and the Trustee from all liability relating to such Action and the engagement of Advisor under this Agreement; and (b) does not include a statement as to, or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly to



North Star Trust Company
Dated As of April 28, 2005
Page 8

assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Agreement for the fees and expenses or more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Indemnifying Parties shall contribute to such Losses: (a) in such proportion as is appropriate to reflect the relative benefits received by the Trust and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions; and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Indemnifying Parties and such Indemnified Party.  Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other Company agents) on the one hand or by the relevant Indemnified Party, on the other hand.

Each Indemnifying Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or the Trustee for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses are finally judicially determined by a court of competent jurisdiction to have arisen primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise.  Except as otherwise expressly provided for in this Agreement, if any term, provisions, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated.  The reimbursement, indemnity and



North Star Trust Company
Dated As of April 28, 2005
Page 9

contribution obligations of the Indemnifying Parties set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

Section 7.   Fees Guaranty by the Company.   Subject to a KM Holding and/or KM Bankruptcy, each of KM Holding and KM (each for purposes of this Section 7, a "Guarantor", and collectively, the "Guarantors") hereby unconditionally guarantees, jointly and severally, to Advisor the prompt and full discharge by the Trustee of all the Trustee's and the Trust's payment obligations under this Agreement in accordance with terms hereof.   Each of the Guarantors, jointly and severally, hereby agrees that, if the Trustee fails to perform and discharge promptly all such obligations and liabilities in accordance with such terms provided that the Trust does not have sufficient and adequate cash or a court with proper jurisdiction prohibits Trustee from paying such obligations and liabilities, each Guarantor will forthwith, upon demand, perform and discharge the same.   The unconditional obligation of the Guarantors hereunder will not be affected, impaired or released by any termination or expiration hereof or by any extension, waiver, amendment or other circumstance whatsoever which could release a guarantor or in any way modify or impact a Guarantor's obligations (other than performance).

Section 8.   Term and Termination.   The term of Advisor's engagement shall extend until, and be deemed terminated upon, the completion of services contemplated by Phases I, II and III, unless terminated earlier as set forth herein.   This Agreement may be terminated by either the Trustee or Advisor after one hundred twenty (120) days from the date hereof by providing thirty (30) days advance notice in writing to the Trustee or Advisor (depending on who is terminating the Agreement).   If terminated by the Trustee for any reason or by Advisor with good reason therefor (such as, constructive termination, but excluding a Bankruptcy Termination Event), Advisor shall be entitled to payment of: (i) any accrued Phase I Fees; (ii) any accrued Monthly Fees for services commenced under Phases II (provided that the Company consented to the Monthly Fees before the Phase III services were commenced); (iii) if services have been commenced under Phase III, the Phase III Fees (provided that the Company consented to the Monthly Fees before the Phase III services were commenced); and (iv) reimbursement of Advisor's expenses pursuant to Section 5 hereof.   If Advisor terminates the Agreement without good reason therefor, Advisor shall be entitled to the payment of: (i) solely Phases I, II, and/or III Fees actually accrued based on an hourly basis; and (ii) reimbursement of Advisor's expenses pursuant to Section 5 hereof.   Any Retainer in excess of the amounts due to Advisor under this Section 8 shall be promptly returned to the Company.   Termination of Advisor's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify Advisor and certain related persons as provided in Section 6, if and to the extent Section 6 is authorized by the Bankruptcy Court in any Bankruptcy Case.



North Star Trust Company
Dated As of April 28, 2005
Page 10

### Section 9.    Miscellaneous.

(a)    *Survival, Successors & Assigns.*  Sections 3 through 9 hereof, inclusive, including the provisions set forth in Exhibit A hereto, shall survive the termination or expiration of this Agreement.  The benefits of this Agreement and the indemnification and other obligations of the Company to Advisor and certain related persons shall inure to the respective successors and assigns of the parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and in Exhibit A by the parties hereto and thereto shall be binding upon their respective successors and assigns.

(b)    *Benefit of Agreement; No Reliance by Third Parties.*  The advice (oral or written) rendered by Advisor pursuant to this Agreement is intended solely for the benefit and use of the Trustee and its professionals in considering the matters to which this Agreement relates, and the Trustee agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose without the prior written consent of Advisor, except the administrator of the ESOP may rely on such advice but solely to direct the Trustee in the performance of its duties.  Notwithstanding anything to the contrary in this paragraph, the Trustee shall be entitled to and able to use any report or testimony without further consent of or extra fee to Advisor provided that the Trustee had contracted and paid (or pays) the Advisor for a Phase II report or testimony.

(c)    *Nature of Relationship.*  The relationship of Advisor to the Trustee hereunder shall be that of an independent contractor and Advisor shall have no authority to bind, represent or otherwise act as a co-fiduciary or agent for the ESOP Trust, nor shall Advisor have the authority to manage any assets of the ESOP Trust.  The parties hereto acknowledge and agree that by providing the services contemplated hereunder, Advisor will not act, nor will it be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the ESOP Trust.

(d)    *Required Information.*  Since recently enacted Federal law requires Advisor to obtain, verify, and record information that identifies any entity not listed on the New York Stock Exchange, the American Stock Exchange or whose common stock or equity interests have not been designated as a National Market System security listed on the NASDAQ stock market that enters into a formal relationship with it, the Trustee agrees to provide Advisor with its tax or other similar identification number and/or other identifying documents, as Advisor may reasonably request, to enable it to comply with applicable law.  For your information, Advisor may also screen the Trustee against various databases to verify its identity.



North Star Trust Company
Dated As of April 28, 2005
Page 11

(e)    *CHOICE OF LAW; JURISDICTION.*  THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF CALIFORNIA.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY OF (A) ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA LOCATED IN SAN MATEO COUNTY OR SAN FRANCISCO COUNTY OR (B) TO THE EXTENT THAT JURISDICTION MAY BE HAD THEREIN AND IS EXERCISED THEREBY, THE BANKRUPTCY COURT.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH PARTY HERETO CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH CALIFORNIA LAW, AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE AND THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  THE TRUSTEE OF THE TRUST SHALL BE AUTHORIZED TO ACCEPT SERVICE ON ITS BEHALF.

(f)    *Waiver of Jury Trial*. To the extent permitted under applicable law, including under ERISA (as such term is defined in the ESOP Trust), each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement or any transaction. Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph. Nothing herein shall be deemed to waive, release, or prejudice, the right (if any) to a jury trial of any bankruptcy trustee appointed in any Chapter 7 Bankruptcy Case in which KM Holding or KM is a debtor.

(g)    *Authority*.  Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto



North Star Trust Company
Dated As of April 28, 2005
Page 12

and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. Advisor will assume that any instructions, notices or requests have been properly authorized by the Trustee if they are given or purported to be given by, or is reasonably believed by Advisor to be the Trustee or a director, officer, employee or authorized agent of the Trustee.

(h) *Entire Agreement.* This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of Advisor, Trustee, KM Holding and KM.

(i) *Counterparts.* This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart to this Agreement.

(j) *Confidentiality.* Advisor agrees to be bound by the Joint Defense Privilege-- Common Interest Doctrine Agreement Between KM Entities and ESOP Trustee, dated as of December 3, 2004, a copy of which is attached hereto as Exhibit a and incorporated herein. All non-public information and all Confidential Information (as defined therein) concerning the Company which is given to Advisor will be used solely in the course of the performance of our services hereunder and will be treated confidentially by Advisor for so long as it remains non-public.

[Remainder of page intentionally left blank]



Exhibit "A"

Joint Defense Privilege--Common Interest Doctrine Agreement
Between KM Entities and ESOP Trustee,
Dated as of December 3, 2004

(See Attached)



North Star Trust Company
Dated As of April 28, 2005
Page 13

        If the foregoing correctly sets forth the understanding and agreement between Advisor and the Trustee, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

Stout Risius Ross, Inc.

By: _Robert V Socol_

    Name: Robert S. Socol
    Title: Managing Director

*Accepted and Agreed to as of*
*the date first written above:*

North Star Trust Company, Not In
Its Corporate Capacity But Solely In Its
Capacity As The Trustee Of The K-M
Industries Holding Co., Inc. Employee
Stock Ownership Trust

By: _John G. Hommel_
Name: JOHN G. HOMMEL
Title: SR. VICE PRESIDENT

Kelly-Moore Paint Company, Inc., as
Guarantor and Indemnifying Party

By: _Herbert R. Giffins_
Name: HERBERT R. GIFFINS
Title: PRESIDENT

K-M Industries Holding Co., Inc., a
Guarantor and Indemnifying Party

By: _Herbert R. Giffins_
Name: HERBERT R. GIFFINS
Title: PRESIDENT

Each of Kelly-Moore Paint Company, Inc. and K-M Industries Holding Co., Inc., joins into this Agreement with respect to the information provisions of Section 2 hereof, the indemnification provisions set forth in Section 6 and Exhibit A hereto, and the guaranty provisions of Section 7 hereof.

# EXHIBIT 110



# ℕorth ℭtar

**LOGIN | REGISTER**

☑ **TRUSTS &**       ☑ **DEFERRED**       ☑ **ESOP &**       ☑ **SPECIALIZED**       ☑ **LAND**       ☑ **TITLE**
**INVESTMENTS**       **EXCHANGES**       **RETIREMENT**       **IRAs**       **TRUSTS**       **INSURANCE**

# ESOP & RETIREMENT SERVICES

## EMPLOYEE STOCK OWNERSHIP PLAN (ESOP)

*Establish part or full employee ownership of company. Realize tax deferral on transfer (IRS Section 1042)*

## FEATURES & BENEFITS

### Manage corporate transition

North Star's ESOP trustee services include professional management of plan termination and associated participant distributions due to company acquisition, sale, or merger.

### Succession planning

We help you map out an exit strategy for the current owner(s), creating the structure necessary to preserve cash flow and provide for an orderly transition to new management/ownership.

### Realize substantial tax savings

Take advantage of tax-deferred sale of stock (IRS Section 1042) to employee ESOP Trust, resulting in significant tax savings. The tax savings also have estate planning considerations with which we can also assist.

### Provide competitive & integrated benefits package

Attract quality employment candidates to your firm and increase long-term staff retention, integrating the ESOP with other elements of the company's employee benefit program.

### Increase employee productivity

With the incentive of providing employee ownership up to 100% of company, employees have a stake in the success and profitability of the company.

### Ensure regulatory compliance

North Star's experience as a professional fiduciary assures IRS and Department of Labor requirements continue to be satisfied. We also handle all tax information reporting to

---

**ESOP & RETIREMENT SERVICES HOME**

› **SERVICES**

- Trustee & Independent Fiduciary Services

- Investment Management

- 401(k) & Profit Sharing Plans

- Employer Securities in Qualified Plans

- Other Qualified & Non-Qualified Plans

- ESOP Rollover Services

› **Employee Stock Ownership Plan (ESOP)**

**RELATED ARTICLES AND LINKS**

**BIOGRAPHICAL INFO**

**REPRESENTATIVE TRANSACTIONS**

**CALL TOLL FREE**
**1.877.765.3782**

📄 **Note:** These documents are in PDF format. If you don't have PDF viewer, you can download Adobe Acrobat Reader for free here.

**Saving files**
To save pdf files to your computer, right click the link and select 'Save Target As...' from the menu.



EXHIBIT
253
Hommel 5-08-08

EXHIBIT 253-1

participants.

### Maintain trustee independence
In its capacity as trustee or independent fiduciary, North Star retains the requisite impartiality to avoid potential conflicts of interest.

### Economically manage pass-through voting
North Star's proprietary internet-based participant voting system allows your company to comply with pass-through voting requirements without the headaches.

## ADDITIONAL INFORMATION

Please call ESOP & Retirement Services at **1.312.559.9763** or request additional information.

North Star Trust Company and North Star Deferred Exchange offers products and services through various affiliates of Marshall & Ilsley Corporation, including Marshall & Ilsley Trust Company N.A., M&I Investment Management Corp., and M&I Financial Advisors, Inc. (member FINRA*/SIPC*, maintaining its principal offices at 111 E. Kilbourn Ave., Milwaukee, WI 53202). Insurance coverage is underwritten by a number of insurers. Insurance products are the obligation of the insurance company. ©2008 Marshall & Ilsley Corporation

| Investment products are: | Not FDIC Insured | No Bank Guarantee | May Lose Value |
|---|---|---|---|

*At certain places on this Web site, there are links to third-party sites unaffiliated with M&I. M&I does not warrant or guarantee the reliability of information on third-party sites.

View M&I's Privacy & Security Statement
View M&I's Advertising Disclosures & Disclaimers

EXHIBIT 253-2

# EXHIBIT 111

# CORPORATE GOVERNANCE

## IN AN

## ESOP COMPANY

## THE LEGAL ISSUES

John G. Hommel
*Senior Vice President*

The ESOP Association 20th Annual Conference
May 14-16, 1997
Washington, D.C.

I.    INTRODUCTION

*—Something Old, Something New*

A number of factors are now calling for ESOPs to be viewed with a new awareness

>    —Longevity of existing ESOPs

>    —Growth in size and proportionate ownership

>    —Identification of an ownership culture being instilled from
>         the ESOP's inception.

NORTH STAR TRUST



EXHIBIT
251
Hommel 5-08-08

EXHIBIT 251-1

Issues now being brought back into focus include

—Secondary transactions to accommodate
   additional purchases of existing stock, or
   issuance of new securities

—Restructuring benefit packages

—Repurchase liability

—Corporate governance

## II. WHAT IS CORPORATE GOVERNANCE?

### A. *In General*

Deals with the delineation of rights, authority and duties among
the various parties associated with a corporation.

The structure of the corporation illustrates authority·

The CORPORATION is the legal entity whose acts must
be executed by appropriately authorized individuals
recognized as acting on its behalf on a routine basis.
.....

The OFFICERS of the corporation are those individuals
who are specifically empowered to conduct day to day
business in the name of the corporation to further its
business enterprise.
.....

The BOARD OF DIRECTORS is that small group which
ultimately oversees the business enterprise of the
corporation and is responsible for supporting the
interests of the corporation's investors.
.....

The SHAREHOLDERS are the ultimate stakeholders in
the corporation who retain final global authority with
respect to the corporation's activities.

NORTH STAR TRUST

EXHIBIT 251-2

It should be noted that it is the ESOP, through the trustee, that is the legal shareholder of record.

"Employees" are not shareholders.

"Participants" are only Beneficial Shareholders.

"Participants" may be fiduciaries, if spelled out in the plan.

Trustee is the legal shareholder on behalf of the ESOP.

B.    *The ESOP's Expectations*

Like any shareholder, the ESOP, as a shareholder, has expectations regarding its investment in the corporation. As with other shareholders, these expectations are accumulated and exercised on behalf of the ESOP in the interests of the plan participants.

These expectations will include

1. Return on its investment in the form of

   —appreciation in asset value, and/or
   —dividends

2. Authority to control in the form of either

   —trustee voting on participants' behalf, or
   —pass through voting

3. Special Goals

   —what is acceptable?

PARTICIPANT VOTING

While the trustee is the primary entity authorized to vote shares held by the ESOP, that right is transferred to the participants in many cases by either operation of law of specific plan design.

*Note:* Even in cases of where the participant "votes," the process is one of participants directing the trustee on how to vote shares allocated to their accounts and of which they are the beneficial holder. This suggests that ultimately the trustee must be satisfied that carrying out the participants directions is appropriate.

NORTH STAR TRUST

EXHIBIT 251-3

THE VOTING PROCESS

In instances where the participants are entitled to direct the voting of their shares, they are to be treated in all respects as any other shareholder with respect to access to information and the opportunity to inquire of the company. In addition, the trustee is responsible for assuring that the process is one which protects the privacy of the participant. The standard for such voting processes is that it must be conducted

    —in a CONFIDENTIAL manner,
    —in a NON-COERCIVE environment,
    —allowing full ACCESS TO INFORMATION, and
    —allowing SUFFICIENT TIME for response.

MERE PARTICIPANT VS. DESIGNATED FIDUCIARY

Is there a difference and how is it distinguished?

C. *Specific Governance Issues*

1. VOTING AUTHORITY

Trustee voting

As the legal shareholder of record, the initial responsibility for voting shares of stock held by the ESOP resides with the trustee.

The trustee should fully exercise this authority on all matters ordinarily brought before the shareholders and certainly must look to issues involving the directors.

The trustee has a fiduciary responsibility under ERISA to the plan participants and their beneficiaries.

Because of the fiduciary role which the trustee assumes, it is essential to be aware of CONFLICTS OF INTEREST among the parties.

The best course of action in such cases is to hire an independent trustee whose actions are supported by the work of an independent financial advisor and legal counsel.

NORTH STAR TRUST

EXHIBIT 251-4

PROCEDURAL PRUDENCE is the watchword.

AN ADDITIONAL CAUTION:

While the shareholders are responsible for electing the board of directors and as such would ordinarily be the final authority, there is a wrinkle with an ESOP. In virtually all cases, the trustee is appointed by the board of directors and serves at its pleasure.

At a point of contention, there may be an issue of who can replace whom.

D.    *Shareholders' Expectations*

As the ultimate owners of the corporation, the shareholders of all companies, whether they are publicly traded or closely held, will have definite expectations in return for their participation in the corporation. They will include

1.    RETURN ON THEIR INVESTMENT in form of

    —appreciation in asset value, or
    —payment of dividends.

2.    AUTHORITY TO CONTROL in the form of

    —election of the board of directors, and
    —direct voting influence on special issues.

3.    SPECIAL CORPORATE GOALS which are usually less evident but may focus on such items as special policy or justice.

III.    GOVERNANCE IN AN ESOP COMPANY

A.    *In General*

Within the corporation, the structure and overall relationships are the same among:

        COMPANY      to
        OFFICERS      to
        BOARD OF DIRECTORS  to
        SHAREHOLDERS.

NORTH STAR TRUST

EXHIBIT 251-5

The DIFFERENCE is that the shareholder or one of the key shareholders is the ESOP through the trustee.

B.   *Establishing Authority*

The ESOP, through its trustee and other fiduciaries, must not only accept the minimal rights provided to them by local corporate law.

The issue of governance is rarely addressed at its most opportune time–the initial transaction.

Trustee has an obligation to negotiate the terms of a transaction which will be most favorable to the plan's participants. Terms to be negotiated are not limited to traditional economic items, but should consider all elements which enhance the value of the securities being acquired.

The specific role of the ESOP in matters of GOVERNANCE are key in any transaction. Economic reality of the situation may very well minimize the ability to layer ESOP rights above the statutory level.

While transaction must meet "primary benefit" rule, it must also be one with which all parties are willing to live.

NORTH STAR TRUST

EXHIBIT 251-6

# EXHIBIT 112

# K-M INDUSTRIES HOLDING CO., INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

Prepared: June 30, 1999
©1999, Menke & Associates, Inc.
All rights reserved.



EXHIBIT

64

Ferrari 3-26-08

# CONTENTS

Section                                                                          Page

1.    NATURE OF PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

2.    DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

3.    ELIGIBILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

4.    PARTICIPATION IN ALLOCATION OF BENEFITS. . . . . . . . . . . . . . . . . . . . . . . . . .  19
      (a)    Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      (b)    Leave of Absence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      (c)    Suspended Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      (d)    Inactive Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      (e)    Uniformed Services Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

5.    EMPLOYER CONTRIBUTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (a)    Amount of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (b)    Time for Making Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
      (c)    Form of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

6.    INVESTMENT OF TRUST ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (a)    Authorized Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (b)    Duties of Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (c)    Plan Loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
      (d)    Nonrecognition of Gain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

7.    ALLOCATIONS TO ACCOUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (a)    Individual Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (b)    Company Stock Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
      (c)    Other Investments Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

8.    EXPENSES OF THE PLAN AND TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

9.    VOTING COMPANY STOCK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

10.   DISCLOSURE TO PARTICIPANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (a)    Summary Plan Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (b)    Summary Annual Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (c)    Annual Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
      (d)    Notice of Rollover Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
      (e)    Additional Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

11.   ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES. . . . . . . . . . . .  32
      (a)    Allocation of Employer Contributions and Forfeitures. . . . . . . . . . . . . . . . .  32
      (b)    Allocation Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

i

12.  PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT. . . . . . . . . . . . . . . . . . . . 38
     (a)  Normal Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     (b)  Disability Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     (c)  Deferred Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

13.  OTHER TERMINATION OF SERVICE AND VESTING. . . . . . . . . . . . . . . . . . . . 39
     (a)  Vesting Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
     (b)  Vesting Upon Reemployment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
     (c)  Forfeitures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
     (d)  Cash-Out Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

14.  DISTRIBUTION OF PLAN BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
     (a)  Death, Disability or Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
     (b)  Other Termination of Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
     (c)  Death Prior to Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     (d)  Valuation Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     (e)  Consent and Notice Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     (f)  Required Commencement of Benefit Distribution. . . . . . . . . . . . . . . . . . 46
     (g)  Undistributed Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
     (h)  Optional Direct Transfer of Eligible Rollover Distributions. . . . . . . . . . 47
     (i)  Lien on Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15.  HOW PLAN BENEFIT WILL BE DISTRIBUTED. . . . . . . . . . . . . . . . . . . . . . . 48
     (a)  Form of Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
     (b)  Beneficiaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
     (c)  Location of Participant or Beneficiary Unknown . . . . . . . . . . . . . . . . . . 49

16.  RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK. . . . . . . . 51
     (a)  "Put" Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
     (b)  Right of First Refusal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
     (c)  Other Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

17.  SPECIAL PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
     (a)  Diversification of Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
     (b)  Cash Dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18.  ADMINISTRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
     (a)  Named Fiduciaries for Administration of Plan and for Investment and Control of
          Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
     (b)  Investment of Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
     (c)  Funding Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
     (d)  Claims Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
     (e)  Qualified Domestic Relations Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . 60
     (f)  General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
     (g)  Independent Fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

19.  AMENDMENT AND TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
     (a)  Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
     (b)  Changes in the Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
     (c)  Termination, Partial Termination or Complete Discontinuance of Contributions. . . . . 64

CIG 010956

(d)    Determination by Internal Revenue Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
(e)    Return of Employer's Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

20.    MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
(a)    Participation by Affiliated Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
(b)    Limitation of Rights; Employment Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
(c)    Merger; Transfer of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
(d)    Prohibition Against Assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
(e)    Applicable Law; Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

21.    TOP HEAVY PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
(a)    Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
(b)    Vesting Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
(c)    Minimum Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
(d)    Limitation on Annual Additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

22.    EXECUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

iii

CIG 010957

# K-M INDUSTRIES HOLDING CO., INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

**Section 1.    NATURE OF PLAN.**

(a)    The purpose of this Plan is to enable participating Employees of the Company and of any participating affiliates to share in the growth and prosperity of the Company and to provide Participants with an opportunity to accumulate capital for their future economic security. A primary purpose of the Plan is to enable Participants to acquire a proprietary interest in the Company. Consequently, Employer Contributions made to the Trust will be primarily invested in Employer Securities.

(b)    This Plan, originally effective as of January 1, 1998, is amended and herein restated effective as of July 16, 1999 (except that provisions which are required to be effective before this date in accordance with the Uruguay Round Agreements Act (GATT), the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), the Small Business Job Protection Act of 1996 (SBJPA), and the Taxpayer Relief Act of 1997 (TRA'97) (collectively "GUST") are hereby generally applicable to the Plan Years beginning after December 31, 1996, unless an earlier or later effective date is required pursuant to a statute or Treasury Regulation or as stated in the Plan document). The Plan is intended to qualify as an Employee Stock Ownership Plan, as defined in Section 4975(e)(7) of the Internal Revenue Code (hereinafter referred to as the "Code"), and as a stock bonus plan under Section 401(a) of the Code. This Plan is adopted as an amendment and restatement of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan, originally effective as of January 1, 1998. On July 16, 1999, the California Capital Insurance Company Employee Stock Ownership Plan was merged with and into the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan. Effective as of July 16, 1999, K-M Industries Holding Co., Inc. became the sponsor of the Kelly-Moore Paint Company, Inc Employee Stock Ownership Plan; that plan is now amended and restated to be the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan.

All Trust assets acquired under this Plan as a result of Employer Contributions, income and other additions to the Trust will be administered, distributed, forfeited and otherwise

1

CIG 010958

governed by the provisions of this Plan which is administered by the Committee for the exclusive benefit of Participants in the Plan and their Beneficiaries. It is intended that all benefits, rights and features of this Plan be uniformly available to all Participants.

CIG 010959

**Section 2.    DEFINITIONS.**

In this Plan, whenever the context so indicates, the singular or plural number shall each be deemed to include the other, and the capitalized words shall have the following meanings:

**ACCOUNT**

One of several Accounts maintained to record the interest of a Participant in the Plan.

**AFFILIATED COMPANY**

Any Company which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes the Employer, any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c) of the Code) with the Employer, any affiliated service group which includes the Employer (as defined in Section 414(m) of the Code), and any other entity required to be aggregated with the Employer under Section 414(o) of the Code. For purposes of Code Section 415 limits, the definition of Affiliated Company shall be expanded in accordance with Code Section 415(h).

**ALTERNATE PAYEE**

A spouse, former spouse, child or other dependent of a Participant who is recognized by a Domestic Relations Order as having a right to receive all or a portion of the benefits otherwise payable to a Participant.

**ANNIVERSARY DATE**

The 31st day of December of each year.

**ANNUAL ADDITIONS**

The aggregate of amounts credited to a Participant's Accounts each year from Employer Contributions, Forfeitures, and a Participant's voluntary contributions (if any) under all defined contribution plans of an Employer or Affiliated Company; provided, however, that Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall be excluded if no more than one-third (⅓) of the Employer Contribution deductible under Section 404(a)(9) of the Code for that year is allocated to the Accounts of Highly Compensated Employees. Amounts allocated after March 31, 1984 to an individual medical account (as defined in Section 415(l)(2) of the Code) which is part of a pension or annuity plan maintained by the Company shall be treated as

3

CIG 010960

an Annual Addition. Any amounts attributable to postretirement medical benefits allocated to the separate account of a Key Employee (as defined in Section 419A(d)(3) of the Code) under any Welfare Benefit Plan (as defined in Section 419(e) of the Code) after December 31, 1985 shall be treated as an Annual Addition. A restored Forfeiture, a transfer from another qualified pension plan and a rollover contribution (if any) shall not be counted as an Annual Addition. For purposes of Code Section 415 limits, the definition of Annual Additions shall be expanded in accordance with Code Section 415(h).

## BENEFICIARY

The person or persons entitled to receive any benefits under the Plan in the event of a Participant's death.

## BOARD OF DIRECTORS

The board of directors of the Company.

## BREAK IN SERVICE

A Plan Year during which a Participant has not completed more than 500 Hours of Service.

## CODE

The Internal Revenue Code of 1986, as amended from time to time.

## COMMITTEE

The Committee appointed by the Board of Directors to administer the Plan and to give instructions to the Trustee.

## COMPANY

K-M Industries Holding Co., Inc., a California corporation.

## COMPANY STOCK

Shares of any class of stock, preferred or common, voting or nonvoting, which are issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, including Employer Securities and Qualified Employer Securities.

4

CIG 010961

**COMPANY STOCK ACCOUNT**

The Account of a Participant which is credited with the shares of Company Stock purchased and paid for by the Trust or contributed to the Trust.

**CONTRIBUTIONS**

Employer contributions which are deductible by an Employer under Section 404(a) of the Code.

**COVERED COMPENSATION**

The Total Compensation paid to a Participant by the Employer for each Plan Year, including any salary deferrals under Sections 401(k) and 125 of the Code, but excluding reimbursement or other expense allowances, fringe benefits (cash and noncash), moving expenses, welfare benefits, and deferred compensation except deferrals under Sections 401(k) and 125 of the Code.  Notwithstanding the foregoing, Covered Compensation of any Participant taken into account in any Plan Year shall not exceed one hundred fifty thousand dollars ($150,000), as adjusted by the Commissioner for increases in cost of living in accordance with section 401(a)(17)(B) of the Code.

**DEFERRED RETIREMENT**

Termination of service subsequent to attainment of the Normal Retirement Date.

**DIRECT ROLLOVER**

A payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

**DISABILITY**

If a Participant terminated employment because of a total and permanent disability, the Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of the Participant's Accounts.  "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

**DISQUALIFIED PERSON**

The term "Disqualified Person" shall mean a person who is a fiduciary with respect to the Plan; a person providing services to the Plan; an Employer any of whose employees are covered by the Plan; an employee organization any of

CIG 010962

whose members are covered by the Plan; an owner, directly or indirectly, of fifty percent (50%) or more of (i) the total combined voting power of all classes of voting stock or of the total value of all classes of the stock of a corporation, (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an Employer or an employee organization any of whose employees or members are covered by the Plan; a member of the family of any Disqualified Person; a corporation, partnership, trust or estate of which (or in which) fifty percent (50%) or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate is owned, directly or indirectly, or held by Disqualified Persons; an employee, officer, director (or any individual having powers, similar powers and responsibilities), a ten percent (10%) or more shareholder, or a highly compensated employee (earning ten percent (10%) or more of the yearly wages of an employer) of a Disqualified Person; or a ten percent (10%) or more (in capital or profits) partner or joint venturer of a Disqualified Person.

**DISTRIBUTEE**

Any Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the Alternate Payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

**DOMESTIC RELATIONS ORDER**

Any judgment, decree, or order (including approval of a property settlement agreement) which is made pursuant to a State domestic relations law and which relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a Participant.

**EFFECTIVE DATE**

The Effective Date of this amended and restated Plan is July 16, 1999.

**ELIGIBILITY COMPUTATION PERIOD**

To determine Years of Service and Breaks in Service for purposes of eligibility, the initial 12-month period shall commence on the date the Employee first performs an Hour of Service for the Company. The second 12-month period shall be the Plan Year which commences prior to the end of the initial 12-month period, regardless of whether the Employee is entitled to be credited with 1,000 Hours of Service during the initial eligibility computation period. An Employee who is

6

CIG 010963

credited with 1,000 Hours of Service in both the initial eligibility computation period and the first Plan Year which commences prior to the first anniversary of the Employee's initial eligibility computation period will be credited with two Years of Service for purposes of eligibility to participate. All subsequent computation periods will continue to be determined on the Plan Year.

## ELIGIBLE RETIREMENT PLAN

An individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the Distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

## ELIGIBLE ROLLOVER DISTRIBUTION

Any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer Securities).

## EMPLOYEE

A person, employed by an Employer, any portion of whose income is subject to withholding of income tax and/or for whom Social Security contributions are made by an Employer, as well as any other person qualifying as a common law employee of an Employer. Employee shall include Leased Employees unless: (i) such Employee is covered by a money purchase pension plan providing: (1) a nonintegrated Employer contribution rate of at least ten percent (10%) of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Section 125, Section 402(e)(3), Section 402(h) or Section 403(b) of the Code; (2) immediate participation; and (3) full and immediate vesting; and (ii) Leased Employees do not constitute more than twenty percent (20%) of the Company's nonhighly compensated work force.

CIG 010964

## EMPLOYER

K-M Industries Holding Co., Inc. and any other affiliate of the Company, as defined in Section 407(d) of the ERISA, or any predecessor or successor corporation, which has been designated by the Company as an Employer participating in the Plan, and which has accepted such designation and has agreed to be bound by the terms of the Plan and Trust Agreement.

## EMPLOYER SECURITIES

Common stock issued by the Company or by any affiliate of the Company, as defined in Section 407(d) of ERISA, having a combination of voting power and dividend rights equal to (i) that class of common stock of the Company having the greatest voting power and (ii) that class of common stock of the Company having the greatest dividend rights. Noncallable preferred stock shall be treated as Employer Securities if such stock is convertible at any time into common stock which meets the above requirements, and if (as of the date of acquisition by the Plan) the conversion price is reasonable.

## EMPLOYMENT COMMENCEMENT DATE

The date on which the Employee shall first perform an Hour of Service for the Employer.

## ENTRY DATE

The first day of January of each year.

## ERISA

The Employee Retirement Income Security Act of 1974, as amended from time to time.

## FISCAL YEAR

The annual accounting period adopted by the Company for federal income tax purposes.

## FORFEITURES

The portion of a Participant's Accounts which does not become part of the Participant's Plan Benefit. See Section 13 of the Plan.

8

## HIGHLY COMPENSATED EMPLOYEE

The term "Highly Compensated Employee" shall mean:  (a) a Highly Compensated Former Employee of the Company as well as (b) a Highly Compensated Current Employee.  The term "Highly Compensated Current Employee" shall mean any Employee who:

    (A)    was a five percent (5%) owner at any time during the year or the preceding year, or

    (B)    for the preceding year, had compensation from the Company and/or from an Affiliated Company in excess of eighty thousand dollars ($80,000) (indexed at such time and in such manner as the Secretary of the Treasury may provide), and was in the top-paid group of Employees (i.e., was among the top twenty percent (20%) of Employees in compensation) for such preceding year.

The term "compensation" shall mean, for purposes of this provision, as defined in IRC Section 415(c)(3) but without regard to Sections 125, 402(e)(3), 402(h)(1)(B) or 403(b) of the Code.

For purposes of determining whether an employee is a Highly Compensated Employee for the Plan Year beginning in 1997, these changes are to be treated as having been in effect for the Plan Year beginning in 1996.

The determination of who is a Highly Compensated Employee, including the determination of the number and identity of Employees in the top-paid group, will be made in accordance with the provisions of Section 414(q) of the Code and the regulations thereunder.

A former employee shall be treated as a "Highly Compensated Former Employee" if such employee was a Highly Compensated Employee when he separated from service or was a Highly Compensated Employee at any time after attaining age fifty-five (55).

## HOUR OF SERVICE

    (a)    Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer or any Affiliated Company during the applicable computation period.

    (b)    Each hour for which an Employee is paid, or entitled to payment, by the Employer or any Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability),

CIG 010966

layoff, jury duty, military duty or leave of absence. Notwithstanding the preceding sentence, (1) no more than 501 Hours of Service will be credited under this paragraph (b) to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (2) an hour for which an Employee is directly or indirectly paid, or entitled to payment, during a period in which no duties are performed, will not be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workmen's compensation, unemployment compensation or disability insurance laws; and (3) Hours of Service will not be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee. For purposes of this paragraph (b), a payment shall be deemed to be made by or due from an Employer or an Affiliated Company regardless of whether such payment is made by or due from the Employer or an Affiliated Company directly or indirectly through, among others, a trust fund, or insurer, to which the Employer or an Affiliated Company contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

(c)    Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Company.

(d)    The determination of Hours of Service for reasons other than the performance of duties, and the crediting of Hours of Service to computation periods, shall be in accordance with U.S. Department of Labor Regulations Section 2530.200b-2 (b) and (c). There shall be no duplication of Hours of Service under any of the foregoing provisions.

(e)    In the case of a salaried Employee who is not paid on an hourly basis, Hours of Service shall be based on any available records which accurately reflect the actual number of hours worked by such Employee. If such records do not exist, such Employee shall be credited with Hours of Service on the basis of 45 hours for each week for which the Employee would be credited with at least one Hour of Service.

(f)    For purposes of determining whether a Participant has incurred a one-year Break in Service, a Participant will be credited with Hours of Service for certain periods of absence from work by reason of the Participant's pregnancy, the birth of a Participant's child, the adoption of a Participant's child, or caring for a Participant's child during the period immediately following the birth or adoption of such child. If the Participant's normal work hours are known, such Participant will be credited with the number of hours that normally would have been credited for such absence. If the Participant's normal work hours are not known, such Participant will be credited with eight Hours of Service for each normal workday

10

during such absence. Not more than 501 Hours of Service shall be credited for such purposes in the Plan Year in which such absence commences if the Participant would otherwise incur a Break in Service in such Plan Year; otherwise, such Hours of Service shall be credited in the following Plan Year if such absence continues in such Plan Year.

## INDEPENDENT APPRAISER

Any appraiser, appointed by the Trustee, who is independent of the Company and who meets requirements of the regulations prescribed under Section 170(a)(1) of the Code.

## INDEPENDENT FIDUCIARY

The term Independent Fiduciary shall refer to any entity or individual which is unrelated to any part of the Plan or Trust and which may be appointed from time to time by the Board of Directors, Trustee, or Committee to act on behalf of the Plan and/or Trust, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and/or Trust.

## LEASED EMPLOYEE

Any person (other than an Employee of the Company) who pursuant to an agreement between the Company and any other person ("leasing organization") has performed services for the Company (or for the Company and related persons determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis for a period of at least one (1) year, and such services are of a type historically performed by employees in the business field of the Company. Effective for all Plan Years beginning on or after January 1, 1997, the "historically performed" test is replaced with a new test under which an individual is not considered a leased employee unless the individual's services are performed under primary direction or control by the service recipient. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the Company shall be treated as provided by the Company.

## LIMITATION YEAR

For purposes of the limitations on Contributions and benefits imposed by Section 415 of the Code, the Limitation Year shall be the Plan Year.

11

CIG 010968

**NORMAL RETIREMENT**

Termination of service upon attainment of the Normal Retirement Date.

**NORMAL RETIREMENT DATE**

The date on which a Participant attains age sixty-five (65).

**OTHER INVESTMENTS ACCOUNT**

The Account of a Participant which is credited with a share of the net income (or loss) of the Trust and Employer Contributions and Forfeitures in other than Company Stock and which is debited with payments made to pay for Company Stock.

**PARTICIPANT**

Any Employee who is participating in this Plan as defined in Section 3 of the Plan or former Employee for whom an Account is maintained.  A Participant ceases to be a Participant when such Participant's Account is closed after all amounts have been distributed or Forfeited.

**PLAN**

The K-M Industries Holding Co., Inc. Employee Stock Ownership Plan, which includes the Plan and Trust Agreement.

**PLAN BENEFIT**

The vested amount, as defined in Sections 12 and 13 of the Plan, of a Participant's Accounts.

**PLAN YEAR**

The twelve (12) month period ending on each Anniversary Date.

**QUALIFIED ELECTION PERIOD**

The six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

12

CIG 010969

**QUALIFIED EMPLOYER SECURITIES**

Employer Securities which are issued by a domestic corporation that has no securities outstanding that are readily tradable on an established securities market, have been held for at least three (3) years by the seller and were not received by the seller in a distribution from a Plan qualified under Section 401(a) or in a transfer pursuant to an option or other right to acquire stock under Section 83, 422, 422A, 423 or 424 of the Code.

**QUALIFIED PARTICIPANT**

Any Participant who has attained age fifty-five (55) and has completed ten (10) years of participation under the Plan.

**QUALIFIED REPLACEMENT PROPERTY**

Any stock, bond, debenture, note, or other evidence of indebtedness issued by a domestic corporation (other than the Employer corporation or any corporation which is a member of a parent-subsidiary controlled group which includes the Employer corporation) which does not, for the taxable year preceding the taxable year in which such security is purchased, have passive investment income exceeding twenty-five percent (25%) of the gross receipts of such corporation for such year.

**RETIREMENT**

Termination of service due to Normal Retirement, Deferred Retirement, or Disability.

**SECURITIES ACQUISITION LOAN**

A loan which is used to purchase Employer Securities and which meets the requirements of paragraphs 1 and 2 of Section 6(c) of the Plan.

**SEGREGATED INVESTMENTS ACCOUNT**

The Account of a Participant which is credited with amounts which may not be used to purchase shares of Company Stock pursuant to the provisions of Rev. Proc. 87-22.

**STOCK BONUS PLAN**

The portion of the Plan which is designed to qualify as such and is subject to the rules pertaining to a stock bonus plan under Section 401(a) of the Code.

13

CIG 010970

## SUSPENSE ACCOUNT

The Suspense Account maintained by the Committee to which shall be credited all shares of Employer Securities purchased with the proceeds of a Securities Acquisition Loan.

## TOTAL COMPENSATION

For purposes of Section 415 of the Code and the Top Heavy provisions in Section 21 of this Plan,

(a)     The term "Total Compensation" includes:

(1)     The Employee's wages, salaries, fees for professional services, and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includible in gross income (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan (as described in Section 1.62-2(c) of the regulations under Section 62 of the Code).

Total Compensation also includes elective deferrals to Section 401(k) plans and similar arrangements (for example, Employer contributions under a salary reduction arrangement to purchase a Code Section 403(b) annuity); elective contributions to Code Section 457 nonqualified deferred compensation plans; and salary reductions made to a cafeteria plan.

(2)     In the case of an Employee who is an employee within the meaning of Section 401(c)(1) of the Code and the regulations thereunder, the Employee's earned income (as described in Section 401(c)(2) of the Code and the regulations thereunder).

(3)     Amounts described in Sections 104(a)(3), 105(a) and 105(h) of the Code, but only to the extent that these amounts are includable in the gross income of the Employee.

(4)     Amounts paid or reimbursed by the Employer for moving expenses incurred by an Employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are not deductible by the Employee under Section 217 of the Code.

14

CIG 010971

(5)   The value of a nonqualified stock option granted to an Employee by the Employer, but only to the extent that the value of the option is includable in the gross income of the Employee for the taxable year in which granted.

(6)   The amount includable in the gross income of an Employee upon making the election described in Section 83(b) of the Code.

(7)   For purposes of subdivisions (1) and (2) of this subparagraph, foreign earned income (as defined in Section 911(b) of the Code), whether or not excludable from gross income under Section 911 of the Code. Compensation described in subdivision (1) of this subparagraph is to be determined without regard to the exclusions from gross income in Sections 931 and 933 of the Code. Similar principles are to be applied with respect to income subject to Sections 931 and 933 of the Code in determining compensation described in subdivision (2) of this subparagraph.

(b)    The term "Total Compensation" does not include items such as:

(1)   Employer contributions made on behalf of an Employee to a simplified employee pension plan described in Code Section 408(k) are not considered as compensation for the taxable year in which contributed. Additionally, any distributions from a plan of deferred compensation are not considered as compensation for Section 415 purposes, regardless of whether such amounts are includable in the gross income of the Employee when distributed. However, any amounts received by an Employee pursuant to an unfunded nonqualified plan may be considered as compensation for Code Section 415 purposes in the year such amounts are includable in the gross income of the Employee.

(2)   Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture (under Section 83 of the Code).

(3)   Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option.

(4)   Other amounts which receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includable in the gross income of the Employee), or contributions made by an Employer (not under a salary deferral agreement) towards the purchase of an annuity contract described in Section 403(b) of the Code (only if the contributions are excludable from the gross income of the Employee).

CIG 010972

**TRUST**

The Trust created by the Trust Agreement entered into between the Company and the Trustee.

**TRUST AGREEMENT**

The Agreement between the Company and the Trustee or any successor Trustee establishing the Trust and specifying the duties of the Trustee.

**TRUSTEE**

The Trustee (or Trustees) designated by the Company's Board of Directors (and any successor Trustee). The Board of Directors may provide that any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan (including service as both Trustee and Committee member).

**VALUATION DATE**

The Anniversary Date coinciding with or immediately preceding the date of actual distribution of Plan Benefits. For purposes of the top heavy provisions of this Plan, the Valuation Date is the most recent Anniversary Date within a twelve (12)-month period ending on a Determination Date (as defined in Section 21).

**YEAR OF SERVICE**

For purposes of vesting under Section 13, all Plan Years beginning on or after the Effective Date during which an Employee has completed 1,000 or more Hours of Service, including any Plan Year during which such Participant has completed 1,000 or more Hours of Service but has not yet become eligible to participate in the Plan.

In addition, for purposes of vesting, Years of Service also include all years of employment with an Employer prior to the Effective Date of the Plan in which the Employee completed 1,000 or more Hours of Service within such Employer's fiscal year after December 31, 1995.

Years of Service also include, for purposes of vesting, all Years of Service prior to the Effective Date of this Plan recognized under the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and/or the California Capital Insurance Company Employee Stock Ownership Plan.

Notwithstanding the foregoing, effective as of December 12, 1994, service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.

16

CIG 010973

**Section 3.    ELIGIBILITY.**

Each Employee shall become eligible to participate in the Plan retroactively to the first day of the Plan Year in which the Employee first completes 1,000 Hours of Service, measured from the Employee's Employment Commencement Date.

All Employees who were eligible to participate in the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan or the California Capital Insurance Company Employee Stock Ownership Plan on the adoption date of this restated Plan are automatically eligible to participate in this Plan as of its Effective Date.

Upon the Employee so becoming eligible, participation shall be based on the total Covered Compensation paid to the Employee for the entire Plan Year during which the Employee becomes eligible to participate. If an Employee who has met the eligibility requirements leaves the service of the Employer and returns to service without incurring a one-year Break in Service, the Employee shall commence participation immediately upon returning to Service.

An Employee whose terms of employment with the Employer are covered by a collective bargaining agreement shall not be eligible to participate in the Plan unless the terms of such collective bargaining agreement specifically provide for participation in this Plan. Notwithstanding the foregoing, in the event any such Employees cease to be subject to the collective bargaining agreement, Years of Service for purposes of eligibility and vesting shall include years during which an Employee is covered by a collective bargaining agreement after the original Effective Date of the Plan.

An Employee who is a Leased Employee shall not be eligible to participate in this Plan. Notwithstanding the foregoing, in the event an Employee ceases to be a Leased Employee, Years of Service for purposes of eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

Nonresident aliens who do not receive any earned income (as defined in Code § 911(d)(2)) from the Employer which constitutes United States source income (as defined in Code § 861(a)(3)) are not eligible to participate in the Plan. Notwithstanding the foregoing, in the event an Employee ceases to be a nonresident alien, Years of Service for purposes of

17

CIG 010974

eligibility and vesting shall include all Years of Service with the Employer after the original Effective Date of the Plan.

18

CIG 010975

**Section 4.**    **PARTICIPATION IN ALLOCATION OF BENEFITS.**

(a)    Participation.

A Participant will share in the allocation of Employer Contributions and Forfeitures only if the Participant has accumulated 1,000 or more Hours of Service during the Plan Year. A Participant who accumulates less than 1,000 Hours of Service during a Plan Year will not share in the allocation of Employer Contributions and Forfeitures under Section 11 for such Plan Year, and shall become an inactive Participant for that Plan Year.

A Participant reemployed following a Break in Service shall again resume participation in the Plan as of the date of reemployment for purposes of vesting under Section 13 and for purposes of participating in Employer Contributions and Forfeitures under Section 11 (subject to the requirements of this Section 4 and Section 13 of the Plan). However, if the Participant is reemployed after a Break in Service and has no vested rights under the Plan and the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the number of aggregate years of prebreak service, whichever is greater, the Participant shall be treated as a new Employee for purposes of participation.

(b)    Leave of Absence.

A Participant's employment is not considered terminated for purposes of the Plan if the Participant has been on leave of absence with the consent of the Company, provided that the Participant returns to the employ of the Company within thirty (30) days after the leave (or within such longer period as may be prescribed by law). Leave of absence shall mean a leave granted by the Company, in accordance with rules uniformly applied to all Participants, for reasons of health or public service or for reasons determined by the Company to be in its best interests. Solely for purposes of preventing a Break in Service, a Participant on such leave of absence shall be credited with eight (8) Hours of Service for each business day of the leave. A Participant who does not return to the employ of the Company within the prescribed time following the end of the leave of absence shall be deemed to have terminated employment as of the date when the leave began, unless such failure to return was the result of death, Disability or Retirement.

19

CIG 010976

(c)    Suspended Participation.

A Participant who ceases to be an eligible Employee by becoming subject to a collective bargaining agreement shall become a suspended Participant. During the period of suspension, no amounts shall be credited to the Participant's Accounts which are based on the Participant's Covered Compensation from and after the date of suspension. However, amounts previously credited to a Participant's Accounts shall continue to vest and the Participant shall be entitled to benefits in accordance with the provisions of Section 14(g) of this Plan throughout the period during which the Participant is on suspended status.

(d)    Inactive Participation.

A Participant who has more than 500 Hours of Service but less than 1,000 Hours of Service in any Plan Year shall be an inactive Participant for that Plan Year. No amounts shall be credited to such Participant's Accounts which are based on the Participant's Covered Compensation for that Plan Year.

(e)    Uniformed Services Participants.

Notwithstanding the foregoing, effective as of December 12, 1994, participation in the allocation of Employer Contributions and Forfeitures with respect to a Participant's qualified military service will be provided in accordance with Section 414(u) of the Code.

CIG 010977

**Section 5.    EMPLOYER CONTRIBUTIONS.**

    (a)    <u>Amount of Contribution</u>.

    Employer Contributions shall be made to the Trust in such amounts as may be determined by the Company's Board of Directors, provided that such Contributions shall not exceed the maximum amounts deductible under Sections 404(a)(3) and 404(a)(9) of the Code. To the extent the Trust has not received cash in an amount sufficient to meet the Trust's current obligations under a Securities Acquisition Loan, Employer Contributions shall be made in sufficient amounts to cover principal and interest on a Securities Acquisition Loan. Notwithstanding the foregoing, Employer Contributions may not be made in amounts which would permit the limitation described in Section 11(b) to be exceeded.

    (b)    <u>Time for Making Contribution</u>.

    Employer Contributions for each year must be established by resolution of the Company's Board of Directors and paid to the Trust not later than the due date for filing the Company's federal income tax return for that year, including extensions of such date.

    (c)    <u>Form of Contribution</u>.

    Employer Contributions may be paid in cash, shares of Company Stock or other property as the Company's Board of Directors may from time to time determine. Shares of Company Stock and other property will be valued at their then fair market value.

CIG 010978

**Section 6.**      <u>INVESTMENT OF TRUST ASSETS.</u>

   (a)      <u>Authorized Investments.</u>

   Employer Contributions in cash received by the Trust will be applied to pay any outstanding obligations of the Trust incurred for the purchase of Employer Securities, or may be applied to purchase additional shares of Company Stock from current shareholders, treasury shares, or newly issued shares from the Company.  Pursuant to the terms of the Trust Agreement, the Committee may also direct the Trustee to invest funds under the Plan in savings accounts, certificates of deposit, securities, or other equity stocks or bonds or in any other kind of real or personal property, including interests in oil or other depletable natural resources, options, puts, calls, futures contracts and commodities; or such funds may be held in non-interest-bearing bank accounts as necessary on a temporary basis.

   (b)      <u>Duties of Committee.</u>

   Except as otherwise provided in Section 18(b), all investments will be made by the Trustee only upon the direction of the Committee.  Except in the case of a purchase from a Disqualified Person (as defined in Section 16(b) of the Plan), all purchases of Company Stock shall be made at no more than fair market value, as determined by an Independent Appraiser as of the most recent Anniversary Date.  In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of the Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

   (c)      <u>Plan Loans.</u>

   (1)      The Committee may direct the Trustee to incur Plan loans from time to time to carry out the purposes of the Trust, provided that if the loan is a Securities Acquisition Loan, the terms of the loan must comply with the following requirements: Any such loan shall be for a specified term, shall bear a reasonable rate of interest, and may only be secured by a collateral pledge of the Employer Securities so acquired.  Any such loan shall be primarily for the benefit of Plan Participants and their Beneficiaries.  No other Trust assets may be pledged as collateral by the Trustee, and no lender shall have recourse against Trust assets other than any shares of Employer Securities remaining subject to pledge.  Any pledge of Employer Securities must provide for the release of shares so pledged pursuant to either the "General Rule" or the "Special Rule" set forth in Section 7.  Shares of Employer Securities released from the Suspense

22

CIG 010979

Account shall be allocated to Participants' accounts in shares of stock or other nonmonetary units. Repayments of principal and interest on any Securities Acquisition Loan shall be made by the Trustee (as directed by the Committee) only from Employer Contributions in cash to the Trust, from any cash dividends received by the Trust on such Employer Securities or from any earnings attributable to the investment of Employer Contributions made to the Trust in cash to meet its obligations under the loan. Such Contributions, dividends and earnings shall be accounted for separately in the books of accounts of the Plan until the Securities Acquisition Loan is repaid. The proceeds of a Securities Acquisition Loan may be used only to acquire Employer Securities, to repay such loan or to repay a prior Securities Acquisition Loan. The Plan may not obligate itself to acquire securities from a particular security holder at an indefinite time determined upon the happening of an event such as the death of the holder. The protections and rights described in Section 16 are nonterminable. Should this Plan cease to be an Employee Stock Ownership Plan, or should the Securities Acquisition Loan be repaid, all Employer Securities will continue to be subject to the provisions of Section 16. If securities acquired with the proceeds of a Securities Acquisition Loan available for distribution consist of more than one class, a Distributee must receive substantially the same portion of each such class.

(2)     In the event of default upon a Securities Acquisition Loan, the value of Plan assets transferred in satisfaction of the loan must not exceed the amount of default. If the lender is a Disqualified Person, a loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the loan. For purposes of this paragraph, the making of a guarantee does not make a person a lender.

(d)     Nonrecognition of Gain.

(1)     There shall be no recognition of gain upon a sale of Employer Securities to the Plan if (i) the seller has held such Securities for at least three (3) years, (ii) after the purchase the Plan owns at least thirty percent (30%) of each class of outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), or thirty percent (30%) of the total value of all outstanding stock of the Company (other than preferred stock described in Section 1504(a)(4) of the Code), (iii) the seller purchases Qualified Replacement Property within three (3) months prior to the sale or within twelve (12) months after the sale, (iv) on or before the time (including extension) for filing an income tax return, the seller files with the IRS a written

23

CIG 010980

statement verified by the Company, regarding the terms of the sale, and (v) the Plan complies with the allocation requirements set forth in Section 11(b)(5).

(2)     If, during the three-year period after the Plan acquires Qualified Employer Securities in a transaction in which gain is not recognized, the Plan disposes of part or all of such Qualified Employer Securities, the Company shall be liable for a tax equal to ten percent (10%) of the amount realized upon the disposition, unless such disposition is necessary to meet the diversification requirements of Section 17(a) of the Plan, or unless such disposition is made to a Participant (or the Participant's Beneficiary) by reason of death, Disability, Retirement after age fifty-nine and one-half (59½), or a separation from service which results in a one-year Break in Service.

24

CIG 010981

**Section 7.**    <u>**ALLOCATIONS TO ACCOUNTS.**</u>

    (a)   <u>Individual Accounts</u>.

       The Committee shall establish and maintain individual Accounts for each Participant in the Plan. Individual Accounts shall also be maintained for all former Participants who still have an interest in the Plan. Except as provided in Section 17(a), such individual Accounts shall not require a segregation of the Trust assets and no Participant, former Participant or Beneficiary shall acquire any right to or interest in any specific asset of the Trust as a result of the allocation provided for in the Plan.

    (b)   <u>Company Stock Account</u>.

       (1)   The Company Stock Account of each Participant will be credited as of each Anniversary Date with the Participant's allocated share of Company Stock (including fractional shares) purchased and paid for by the Trust or contributed in kind by the Company, with Forfeitures of Company Stock and with stock dividends on Company Stock held in the Participant's Company Stock Account.

       Notwithstanding the provisions of this Subsection 7(b), the Plan is designed to allocate separate benefits, rights and features among the Plan's Participants, in accordance with IRS Regulation Section 1.401(a)(4)-4. The Participating Employers in this Plan are (1) Kelly-Moore Paint Company, Inc. (and its participating Affiliates) and California Capital Insurance Company (and its participating Affiliates). The Employer Securities acquired by this Plan shall consist of two classes of common stock of the Parent: Class P-B and Class I-B. Subject to receiving the IRS favorable determination regarding the allocation of separate benefits, the Company Stock Accounts of Participants employed by the Participating Employers Kelly-Moore Paint Company, Inc., K-M Universal Paint Company, Inc. and Preservative Paint Co. shall receive an allocation of <u>only</u> Class P-B common stock. The Company Stock Accounts of Participants employed by the Participating Employers California Capital Insurance Company, Monterey Insurance and Eagle West Insurance shall receive an allocation of <u>only</u> Class I-B common stock.

       Employer Securities acquired by the Trust with the proceeds of a Securities Acquisition Loan shall be credited to a Suspense Account. For each Plan Year during the duration of the loan, the number of shares of Employer Securities to be released from said

CIG 010982

Suspense Account and allocated to the Company Stock Accounts of Participants shall be determined pursuant to either the "General Rule" or the "Special Rule" described below as selected by the Committee for each Securities Acquisition Loan. Once the Committee has selected either the General Rule or the Special Rule, that Rule shall be used exclusively for the allocation of shares of Employer Securities purchased with the proceeds of a particular Securities Acquisition Loan.

(A)    General Rule: For each Plan Year during the duration of the loan, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(i)    The numerator of which is the amount of principal and interest paid for the Plan Year; and

(ii)    The denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years.

(B)    Special Rule:

(i)    For each Plan Year, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

(aa)    The numerator of which is the amount of principal paid for the Plan Year; and

(bb)    The denominator of which is the sum of the numerator plus the principal to be paid for all future Plan Years.

(ii)    The Committee may select the Special Rule only if:

(aa)    The Securities Acquisition Loan provides for annual payments of principal and interest at a cumulative rate which is not less rapid at any time than level annual payments of such amounts for ten (10) years;

(bb)    The interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and

26

(cc)    By reason of a renewal, extension or refinancing, the sum of the expired duration of the original loan, any renewal period, any extension period and the duration of any new loan does not exceed 10 years.

(C)    In determining the number of shares to be released for any Plan Year under either the General Rule or the Special Rule:

(i)    The number of future years under the Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods;

(ii)    If the Loan provides for a variable interest rate, the interest to be paid for all future Plan Years must be computed by using the interest rate applicable as of the end of the Plan Year for which the determination is being made; and

(iii)    If the Employer Securities allocated to the Suspense Account includes more than one class of shares, the number of shares of each class to be withdrawn for a Plan Year from the Suspense Account must be determined by applying the applicable fraction provided for above to each such class.

(2)    Allocations of Company Stock shall be reflected separately for each class of such stock, and the Committee shall maintain adequate records of the aggregate cost basis of Company Stock allocated to each Participant's Company Stock Account.

(c)    <u>Other Investments Account.</u>

The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the net income (or loss) of the Trust, with cash dividends on Company Stock not distributed to Participants or used to pay a Securities Acquisition Loan and with Employer Contributions and Forfeitures in other than Company Stock. The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the unrealized appreciation (or deprecia-tion) in the value of Trust assets other than Company Stock. It will be debited for any payments for purchases of Company Stock or for repayment of debt (including principal and interest) incurred for the purchase of Employer Securities.

27

CIG 010984

**Section 8.**    <u>**EXPENSES OF THE PLAN AND TRUST**</u>.

Normal brokerage charges which are included in the cost of securities purchased (or charged to proceeds in the case of sales) shall be paid by the Trust. The Company shall pay all expenses in connection with the design, establishment, or termination of the Plan. The Trust shall pay all costs of administering the Plan and Trust, unless such expenses are paid by the Company.

28

CIG 010985

**Section 9.** **VOTING COMPANY STOCK.**

All Company Stock held by the Trust shall be voted by the Trustee in accordance with instructions from the Committee. Notwithstanding the foregoing, Participants and/or Beneficiaries shall be entitled to direct the voting of any voting shares of Company Stock allocated to their Company Stock Accounts with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation. In accordance with instructions from the Committee, the Trustee shall vote any unallocated shares held by the Trust as well as any allocated shares for which a Participant has failed to give timely voting direction.

29

CIG 010986

**Section 10.    DISCLOSURE TO PARTICIPANTS.**

(a)    Summary Plan Description.

Within one hundred twenty (120) days after the receipt of an initial favorable determination letter from the Internal Revenue Service relating to the qualification of the Plan, and thereafter within ninety (90) days after a Participant commences participation (or after a Beneficiary first receives benefits under the Plan), the Committee shall furnish such Participant (or Beneficiary) with the summary plan description required by Sections 102(a)(1) and 104(b)(1) of ERISA. Such summary plan description shall be updated from time to time as required under ERISA and the Department of Labor regulations thereunder.

(b)    Summary Annual Report.

Within nine (9) months after each Anniversary Date, the Committee shall furnish each Participant (and each Beneficiary receiving benefits under the Plan) with the summary annual report of the Plan required by Section 104(b)(3) of ERISA, in the form required by regulations of the Department of Labor.

(c)    Annual Statement.

As soon as possible after each Anniversary Date, Participants will receive a written statement of their Accounts showing as of that Anniversary Date:

(1)    The balance in each of their Accounts as of the preceding Anniversary Date.

(2)    The amount of Employer Contributions and Forfeitures allocated to their Accounts for the year.

(3)    The adjustments to their Accounts to reflect their share of dividends and the income and expenses of the Trust for the year.

(4)    The new balances in each of their Accounts, including the number of shares of Company Stock.

(5)    The vested percentage of their Plan Benefit.

Upon the discovery of any error or miscalculation in an Account, the Committee shall correct the same insofar as, in the Committee's discretion, correction is feasible. Statements to Participants are for reporting purposes only, and no allocation, valuation or statement shall, by itself, vest any right or title in any part of the Trust fund.

CIG 010987

(d)     Notice of Rollover Treatment.

The Committee shall, when making any distribution which qualifies as a qualifying rollover distribution under Section 402(c) or Section 401(a)(31) of the Code, provide a written notice to the recipient which explains the provisions of Sections 402(c) and 401(a)(31) under which such distribution will not be subject to current tax if transferred to an Eligible Retirement Plan. In the case of a distribution under Section 402(c), such notice shall be given not less than thirty (30) days nor more than ninety (90) days before the distribution date. If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)11(c) of the Income Tax Regulations is given, provided that:

(1)     the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)     the Participant, after receiving the notice, affirmatively elects a distribution.

(e)     Additional Disclosure.

The Committee shall make available for examination by any Participant (or Beneficiary) copies of the summary plan description, the Plan, the Trust Agreement and the latest annual report of the Plan filed with the Department of Labor. Upon written request of any Participant (or Beneficiary), the Committee shall furnish copies of such documents and may make a reasonable charge to cover the cost of furnishing such copies, as provided in regulations of the Department of Labor.

31

CIG 010988

**Section 11.    ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES.**

(a)    Allocation of Employer Contributions and Forfeitures.

The allocation will be made as follows:

(1)    Employer Contributions.

Employer Contributions will be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.  Shares of Employer Securities released from the Suspense Account (as provided in Section 7(b)) by reason of the payment of interest and principal on a Securities Acquisition Loan shall be allocated pursuant to Subsection 7(b) as of each Anniversary Date among the Accounts of Participants in the Plan who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.

(2)    Forfeitures.

Forfeitures shall be allocated in the same manner as Employer Contributions are allocated.

(3)    Net Income (or Loss) of the Trust.

The net income (or loss) of the Trust will be determined annually as of each Anniversary Date.  Any stock dividends on shares of Company Stock held by the Trust shall be allocated to each Participant's Company Stock Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date.  Trust income attributable to any cash dividends paid on shares of Company Stock (whether or not allocated) and not used to make payments on a Securities Acquisition Loan shall be allocated to each Participant's Other Investments Account in the ratio in which the cumulative number of shares allocated to the Participant's Company Stock Account as of the preceding Anniversary Date bears to the total cumulative number of shares of Company Stock allocated to the Company Stock Accounts of all Participants as of that date.  Trust income attributable to any gain from the

32

CIG 010989

sale of unallocated shares of Employer Securities shall be allocated to each Participant's Other Investments Account in the proportion that each such Participant's Covered Compensation for the Plan Year bears to the total Covered Compensation of all such Participants for that Plan Year. All other net income (or loss) will be allocated to each Participant's Other Investments Account in the ratio in which the balance of the Participant's Other Investments Account on the preceding Anniversary Date bears to the sum of the balances of the Other Investments Accounts of all Participants on that date. For this purpose, Account balances shall be reduced by amounts distributed to Participants during the Plan Year.

The net income (or loss) includes the increases (or decreases) in the fair market value of assets of the Trust, interest, dividends, other income and expenses attributable to assets in the Other Investments Accounts since the preceding Anniversary Date. Net income (or loss) does not include the interest paid under any installment contract for the purchase of Company Stock by the Trust or on any loan obtained by the Trust to purchase Company Stock. Notwithstanding the foregoing, no income (or loss) shall be allocated to a terminated Participant's Account for the Plan Year in which the Participant receives final distribution of the Plan Benefit.

(b)    Allocation Limitations.

(1)    The total Annual Additions to a Participant's Accounts for any Limitation Year shall not exceed the lesser of (i) thirty thousand dollars ($30,000), or (ii) twenty-five percent (25%) of the Participant's Total Compensation for the Limitation Year.

The following is effective for plan years beginning after December 31, 1994 in order to bring the Plan's Code Section 415 provisions into compliance with the requirements of the General Agreement on Tariffs and Trade (GATT):

Effective for Plan Years beginning after December 31, 1994, notwithstanding any other provisions of the Plan, Contributions and other Annual Additions with respect to a Participant exceed the limitation of Code Section 415(c) if, when expressed as an Annual Addition (within the meaning of Code Section 415(c)(2)) to the Participant's Account, such Annual Addition is greater than the lesser of:

(A)    thirty thousand dollars ($30,000) or

33

CIG 010990

(B)    twenty-five percent of the Participant's compensation (as defined in Code Section 415(c)(3).

A Participant's allocable share of Employer Contributions applied to the payment of interest on a Securities Acquisition Loan and Forfeitures of Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall not be included as an Annual Addition, provided that no more than one-third (⅓) of the Employer Contribution for that year is allocated to the Accounts of Highly Compensated Employees.

The Annual Additions under Section 11(b) with respect to Employer Securities released from the Suspense Account (by reason of Employer Contributions used for payments on a Securities Acquisition Loan) and allocated to Participants' Company Stock Accounts shall be based upon the lesser of (A) the amount of such Employer Contributions, or (B) the fair market value of such Employer Securities (determined by an Independent Appraiser) as of the Allocation Date. Annual Additions shall not include any allocation attributable to proceeds from the sale of Employer Securities by the Trust or to appreciation (realized or unrealized) in the fair market value of Company Stock.

(2)    If an Employer is contributing to another defined contribution plan, as defined in Section 414(i) of the Code, for Employees of the Company or any Affiliated Company, some or all of whom may be Participants in this Plan, then any such Participant's Annual Additions in such other plan shall be aggregated with the Participant's Annual Additions derived from this Plan for purposes of the limitation in Paragraph (1) of this Subsection.

(3)    If a Participant in this Plan is also a Participant in a defined benefit plan to which Contributions are made by an Employer or Affiliated Company, then in addition to the limitation contained in Paragraph (1) of this Subsection, such Participant's allocations shall be limited, such that the sum of the defined benefit plan fraction and the defined contribution plan fraction for any Limitation Year shall not exceed 1.0. For purposes of this Paragraph (3), the defined benefit plan fraction is a fraction, the numerator of which is the projected annual benefit of the Participant under all such defined Plans determined as of the close of the Limitation Year, and the denominator of which is the lesser of (i) the product of 1.25 multiplied by the dollar limitation in effect for such Plan Year, or (ii) the product of 1.4 multiplied by one hundred percent (100%) of the Participant's average Total Compensation for the Participant's highest

34

CIG 010991

three Limitation Years. For purposes of this Paragraph (3), the defined contribution plan fraction for any Limitation Year is a fraction, the numerator of which is the sum of the Annual Additions to the Participant's Accounts as of the close of the Limitation Year, and the denominator of which is the sum of the lesser of the following amounts determined for such year and for each prior Year of Service with the Employer: (i) the product of 1.25 multiplied by the dollar limitation in effect for such Limitation Year or (ii) the product of 1.4 multiplied by twenty-five percent (25%) of the Participant's Total Compensation.

Effective for all Limitation Years beginning after December 31, 1999, the combined plan limit is repealed, and therefore, this Subsection 11(b)(3) is deleted from the Plan.

(4)    If Company Stock is purchased from a shareholder of the Company and if such shareholder is also a Participant in this Plan, then notwithstanding anything to the contrary contained in this Plan, the total Account balances of such Participant's Accounts other than the Participant's Segregated Investments Account, combined with the total Account balances of the Accounts of such Participant's spouse, parents, grandparents, children, and grandchildren under the Plan, shall not exceed twenty percent (20%) of the total of all Account balances under the Plan. However, if the total Account balances of such Participant's Accounts exceed twenty percent (20%) of the total of all Account balances, then the amounts in excess of said twenty percent (20%) shall be credited to that Participant's Segregated Investments Account and invested in investments other than Company Stock.

(5)    In the case of a sale in which a seller elects nonrecognition of gain under Section 1042 of the Code, no portion of such Qualified Employer Securities may be allocated to the Account of (i) the seller (or the seller's family) during the nonallocation period or (ii) any other person who owns (after application of the family attribution rules) more than twenty-five percent (25%) of any class of outstanding Company Stock, or more than twenty-five percent (25%) of the total value of any class of outstanding Company Stock, at any time during the one-year period preceding the purchase of such Qualified Employer Securities by the Plan, or on any subsequent date when such Qualified Employer Securities are allocated to Participants in the Plan. For purposes of this Paragraph, the seller's family shall include the seller's spouse, ancestors, lineal descendants, and brothers and sisters. Notwithstanding the foregoing, lineal descendants of a seller shall be permitted to share in the allocation of Qualified Employer

35

CIG 010992

Securities, provided that the aggregate amount of such stock allocated for the benefit of all such lineal descendants does not exceed more than five percent (5%) of such stock purchased from the seller. For purposes of this Paragraph (5), a person shall be considered to be a more than twenty-five percent (25%) shareholder if the amount of Company Stock which such person owns (whether outright or as a Plan Participant), together with the amount of Company Stock owned by such person's spouse, children, grandchildren and parents (whether outright or as Plan Participants), exceeds twenty-five percent (25%) of any class of outstanding Company Stock or twenty-five percent (25%) of the total value of any class of outstanding Company Stock. For purposes of this Paragraph (5), the "nonallocation period" means the period beginning on the date of the sale and ending on the later of (i) the date which is ten (10) years after the date of sale, or (ii) the date of the Plan allocation attributable to the final payment of the Securities Acquisition Loan.

(6)    If, due to forfeitures, reasonable error in estimating compensation, or other limited facts and circumstances as determined by the Commissioner, the Account balances or the Annual Additions to a Participant's Accounts would exceed the limitation described in Paragraphs (1), (2) or (3) of this Subsection, the aggregate of the Annual Additions to this Plan and the Annual Additions to any other plan described in Paragraphs (2) or (3) shall be reduced until the applicable limitation is satisfied.

(7)    The reduction shall be treated the same as Forfeitures and shall be allocated in accordance with Section 11(a)(2) of the Plan to the Accounts of Participants who are not affected by this limitation.

(8)    If any amount cannot be reallocated under the foregoing provision, such amount shall be deposited in a suspense account and allocated to the maximum extent possible under Section 11(a)(2) of the Plan in succeeding years, provided that (i) no Employer Contributions are made until Section 415 of the Code will permit their allocation, (ii) no investment gains or losses are allocated to such suspense account, and (iii) the amounts in such suspense account are allocated at the earliest possible date.

(9)    Notwithstanding the preceding provisions of this Section 11, if the allocation provided above for a Plan Year would result in an allocation to Highly Compensated Employees of more than one-third of the Employer contributions which are deductible under

36

Code Section 404(a)(9) for the Plan Year, the allocation of amounts to all Highly Compensated Employees shall be reduced in proportion to their respective Covered Compensation for the Plan Year, and the allocation to Participants other than Highly Compensated Employees shall be increased in proportion to their respective Covered Compensation for the Plan Year, by such amount that will result in the final allocation to the Highly Compensated Employees of Employer contributions which are deductible under Code Section 404(a)(9) being equal to one-third of the total allocation of such Employer contributions to all persons eligible to share in the allocations for said Plan Year.

CIG 010994

**Section 12.   PLAN BENEFIT AT DEATH, DISABILITY OR RETIREMENT.**

Participation in the allocation of Employer Contributions and Forfeitures terminates as of the end of the Plan Year coinciding with or following a Participant's death, Disability or Retirement, provided the Participant completes 1,000 or more Hours of Service during such Plan Year. A Participant's Plan Benefit upon death, Disability or Retirement will be the total of the Participant's Account balances as of the coinciding or following Anniversary Date, provided the Participant completes 1,000 or more Hours of Service during such Plan Year.

A Participant who, while employed with the Company, dies or attains any of the following Retirement dates will be one hundred percent (100%) vested.

(a)     Normal Retirement.

A Participant's Normal Retirement Date is the date the Participant attains age sixty-five (65).

(b)     Disability Retirement.

If a Participant terminated employment because of a total and permanent disability, such Participant will be given a Disability Retirement without regard to age or length of service, and the termination benefit shall be one hundred percent (100%) of the amounts in all of such Participant's Accounts. "Total and permanent disability" shall mean the Participant's entitlement to Social Security disability benefits.

(c)     Deferred Retirement.

If a Participant continues in the service of the Employer beyond the Normal Retirement Date, such Participant shall continue to participate in the Plan during any period of employment following the Normal Retirement Date.

Any amount credited to a Participant's Accounts with respect to the Employer's Contribution for the Plan Year in which such Participant dies, becomes Disabled or attains any of the above Retirement dates shall also be completely vested at the time of such contribution.

CIG 010995

**Section 13.**    **OTHER TERMINATION OF SERVICE AND VESTING.**

    (a)    Vesting Schedule.

       The vesting of a Participant's Plan Benefit will be based upon Years of Service, as defined in Section 2, in accordance with the following vesting schedule:

| Years of Service | Percentage of Accounts Vested |
|---|---|
| Less than Three Years | 0 |
| Three Years | 20 |
| Four Years | 40 |
| Five Years | 60 |
| Six Years | 80 |
| Seven or more Years | 100 |

       The computation of a Participant's nonforfeitable percentage of the Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. For this purpose, the Plan shall be treated as having been amended if the Plan provides for an automatic change in vesting due to a change in top heavy status. In the event that the Plan is amended to change or modify any vesting schedule, a Participant with at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's nonforfeitable percentage computed under the Plan without regard to such amendment. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

       (1)    the adoption date of the amendment,

       (2)    the effective date of the amendment, or

       (3)    the date the Participant receives written notice of the amendment from the Employer or Committee.

    (b)    Vesting Upon Reemployment.

       If a Participant is reemployed by the Company following a Break in Service, such Participant's Accounts shall be vested as follows:

       (1)    Vesting of Prior Account Balances.

         If a Participant has had five consecutive one-year Breaks in Service, Years of Service after such five-year period will not be taken into account for purposes of determining a Participant's vested interest in the Participant's prebreak Account balances and new Accounts

39

CIG 010996

will be established to record the Participant's interest in the Plan for service after such five-year period.

(2)    Vesting of Subsequent Account Balances.

(A)    In the case of a Participant who, at the time of a Break in Service, does not have any vested right under Paragraph (a) above, Years of Service before such Break in Service shall not be taken into account unless such Participant returns to work for the Employer and completes one (1) Year of Service.  Notwithstanding the foregoing, Years of Service before such Break in Service shall not be taken into account for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances if the number of consecutive one-year Breaks in Service equals or exceeds five (5) years or the aggregate number of years of prebreak service, whichever is greater.

(B)    If a Participant had any degree of vested interest at the time of the Participant's Break in Service, such Participant shall participate retroactively to the Participant's reemployment date for purposes of determining a Participant's vested interest in the Participant's postbreak Account balances.  Upon resuming participation, such Participant's Years of Service shall include all Years of Service prior to the Break in Service.

(c)    Forfeitures.

Forfeitures shall be first charged against a Participant's Other Investments Account, with any balance charged next against the Participant's Company Stock Account.  If a portion of a Participant's Account is to be forfeited and interests in more than one class of Employer Securities have been allocated to a Participant's Account, the Participant shall forfeit the same percentage of each such class.  The disposition of such Forfeitures shall be as follows:

(1)    If a Participant has incurred five consecutive one-year Breaks in Service and has not received a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as soon as possible after the close of the Plan Year in which the Participant incurs a five-year Break in Service.

(2)    If a Participant who is not one hundred percent (100%) vested receives a distribution of a Plan Benefit, which is not a "cash-out distribution" (as defined below), prior to the occurrence of a five-year Break in Service, and such Participant returns to work for the Employer, the portion of the Participant's Accounts which was not vested shall be maintained

40

CIG 010997

separately (from any additional contributions to this Plan) until such Participant becomes one hundred percent (100%) vested. Such Participant's vested and nonforfeitable percentage in such separate Accounts upon any subsequent termination of Service shall be equal to:

$$\frac{X - Y}{100\% - Y}$$

For purposes of applying this formula, X is the vested percentage at the time of the subsequent termination, and Y is the vested percentage at the time of the prior termination. Separate Accounts shall share in the allocation of Trust income or loss on every Anniversary Date prior to Forfeiture, but such accounts shall not share in allocation of Trust income or loss on the Anniversary Date on which they are forfeited.

(3)    If a Participant receives a "cash-out distribution" (as defined below), the nonvested balance of the Participant's Accounts shall be allocated as a Forfeiture as of the Anniversary Date coinciding with or following the date such Participant incurred a one-year Break in Service or received the cash-out distribution, whichever is later.

(d)    Cash-Out Distribution.

If a partially vested Participant receives a cash-out distribution, the cash-out distribution will result in a forfeiture of the nonvested portion of the Participant's Accounts. A "cash-out distribution" is a distribution of the entire vested portion of a Participant's Accounts that is made before the Participant incurs five (5) consecutive one-year Breaks in Service.

If any former Participant shall be reemployed by the Employer before five (5) consecutive one-year Breaks in Service, and such former Participant had received a cash-out distribution prior to reemployment, the forfeited portion of such Participant's Accounts shall be reinstated only if the Participant repays the full amount distributed to such Participant. Such repayment must be made by the former Participant before the Participant incurs five (5) consecutive one-year Breaks in Service following the date of distribution and before the five-year anniversary of his reemployment date. In the event the former Participant does repay the full amount distributed to such Participant, the undistributed portion of the Participant's Accounts must be restored in full, unadjusted by any gains or losses occurring subsequent to the Anniversary Date preceding the Participant's termination. Restoration of a Participant's

41

CIG 010998

Accounts shall include restoration of all Code Section 411(d)(6) protected benefits with respect to such restored amounts.

If the Participant repays the amount distributed to such Participant within the required time period, the Committee shall restore the forfeited portion of the Participant's Accounts as of the Anniversary Date coinciding with or following the repayment. Such amount shall be restored, to the extent necessary, in the following manner:

    (A)    first from current-year Forfeitures;

    (B)    second from current-year Trust earnings; and

    (C)    third from current-year Contributions.

To the extent the amounts described in clauses (A), (B) and (C) are insufficient to enable the Committee to make the required restoration, the Employer must contribute the additional amount necessary to enable the Committee to make the required restoration.

A terminated Participant who is zero percent (0%) vested shall be deemed to have received a cash-out distribution as of the day on which the Participant separates from service with the Employer. For purposes of applying the restoration provisions of this Paragraph, the Committee will treat a zero percent (0%) vested Participant as repaying the Participant's cash-out distribution on the first day of reemployment with the Employer.

42

CIG 010999

**Section 14.**   **DISTRIBUTION OF PLAN BENEFIT.**

    (a)   Death, Disability or Retirement.

In the event of death, Disability or Retirement, subject to Subsection 14(e), distribution of a Participant's Plan Benefit shall commence during the following Plan Year and shall be distributed in a lump sum, beginning not later than one (1) year after the close of the Plan Year in which such event occurs.

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

    (b)   Other Termination of Participation.

In the event a Participant terminates employment for reasons other than death, Disability or Retirement, subject to Subsection 14(e), the Participant's vested Plan Benefit will be distributed as follows:

    (1)   Company Stock Account and Other Investments Account (Exceeding $3,500).

If a Participant is not reemployed before the end of the fifth (5th) Plan Year following the Plan Year in which the Participant terminates employment, distribution of the Participant's Company Stock Account and Other Investments Account will be made in a lump sum as soon as administratively feasible during the sixth (6th) Plan Year following the Plan Year in which the Participant terminates employment.

CIG 011000

Notwithstanding the foregoing, pursuant to Treasury Regulation Section 1.411(d)-4, Q & A 2, (d)(1)(i), the Employer retains the discretion to eliminate the lump sum distribution form. The Committee may establish a uniform, nondiscriminatory distribution policy under which distributions may be made in substantially equal annual installments over a period of time not to exceed five (5) years; provided, however, that if the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed, the term of the distribution may be five (5) years, plus one (1) year (but not more than five (5) additional years) for each one hundred thousand dollars ($100,000) (or fraction thereof), as indexed, by which the Plan Benefit exceeds five hundred thousand dollars ($500,000), as indexed. In the event the Employer eliminates the lump sum distribution form, the amended distribution policy shall be consistent with the distribution rules of Section 409(o) of the Code and shall apply equally to all Participants. Furthermore, once the amended policy is established, the amended policy shall apply to all undistributed Plan Benefits.

Notwithstanding the foregoing provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities acquired with the proceeds of a Securities Acquisition Loan until the close of the Plan Year in which such Securities Acquisition Loan has been repaid in full.

Notwithstanding the other provisions of this Section 14(b), the Plan shall not be required to distribute any Employer Securities to the extent that the Participants or Beneficiaries have elected to have their Company Stock Account diversified under the provisions of Section 17(a) hereof.

Notwithstanding anything in this Section 14 to the contrary, in the event a Participant's employment is terminated for reasons other than death, Disability or Retirement, subject to Section 14(e), distribution of the Participant's Plan Benefit shall commence no later than one (1) year after the close of the Plan Year in which the earliest of the following events occurs:

    (A)    the Participant's Normal Retirement Date; or

    (B)    the Participant's death; or

    (C)    the Participant's Disability.

CIG 011001

(2)    Company Stock Account and Other Investments Account ($3,500 or Less).

Notwithstanding the foregoing, if the total vested value of a Participant's Company Stock Account and Other Investments Account Accounts is three thousand five hundred dollars ($3,500) or less, distribution shall be made in a lump sum as soon as possible after the close of the Plan Year in which the Participant terminates employment.

(c)    Death Prior to Distribution.

If a Participant dies before distribution of the Participant's Plan Benefit has commenced, such Participant's entire Plan Benefit shall be distributed in accordance with Subsection 15(b) within five (5) years of the date of the Participant's death.

If a Participant dies after the distribution of the Plan Benefit has commenced, the remaining portion of the Plan Benefit shall be distributed (in accordance with Subsection 15(b)) at least as rapidly as under the method being used at the date of the Participant's death.

(d)    Valuation Date.

All Accounts shall be valued as of the appropriate Valuation Date. The Company or the Committee may require other valuations from time to time as necessary. Any valuation of Company Stock contributed to or purchased by the Plan shall be determined by an Independent Appraiser.

(e)    Consent and Notice Requirements.

If a present value of a Participant's Plan Benefit (determined in accordance with Section 411(a)(11)(B) of the Code) has ever exceeded three thousand five hundred dollars ($3,500) (or five thousand dollars ($5,000) for Plan Years beginning on or after August 5, 1997), any distribution prior to the later of age sixty-two (62) or the Participant's Normal Retirement Date may be made only with the written consent of the Participant. The Committee shall provide the Participant with a written notice which explains the provision of Section 411(a)(11), not less than thirty (30) days nor more than ninety (90) days before the distribution date. If the distribution is one to which Sections 401(a)(11) and 417 of the Internal Revenue Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Section 1.411(a)-11(c) of the Income Tax Regulations is given, provided that:

45

   (1)  the Committee clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

   (2)  the Participant, after receiving the notice, affirmatively elects a distribution.

   Failure of a Participant to consent to an immediate distribution within the applicable time limit may be treated by the Employer as an election by the Participant to defer distribution of the benefits to the later of age sixty-two (62) or the Normal Retirement Date of the Participant.

   (f)  <u>Required Commencement of Benefit Distribution</u>.

   (1)  Distribution of a Participant's Plan Benefit shall commence not later than sixty (60) days after the Anniversary Date coinciding with or next following the latest of (1) the Participant's Retirement, (2) the tenth (10th) anniversary of the date the Participant became a Participant, or (3) the Participant's separation from service. If the amount of a Participant's Plan Benefit cannot be determined (by the Committee) by the date on which a distribution is to commence, or the Participant cannot be located, distribution of the Participant's Plan Benefit shall commence within sixty (60) days after the date on which the Participant's Plan Benefit can be determined or after the date on which the Committee locates the Participant.

   (2)  Pursuant to Section 401(a)(9) of the Code as amended by the Small Business Job Protection Act, distribution of a Participant's Plan Benefits is required to begin by April 1 of the Plan Year following the later of (1) the Plan Year in which the Participant attains age seventy and one-half (70½) or (2) the Plan Year in which the Participant separates from service with the Employer. However, in the case of a five-percent (5%) owner (as defined in Section 416(i)(1)(B)(i) of the Code), distributions are required to begin no later than April 1 of the next calendar year in which the Participant attains age seventy and one-half (70½).

   All distributions made under this Subsection 14(f)(2) shall be determined and made in accordance with the Proposed Regulations under Section 401(a)(9), including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the Proposed Regulations.

CIG 011003

(g)    Undistributed Accounts.

Any part of a Participant's Company Stock Account and Other Investments Account which is retained in the Trust after the Anniversary Date coinciding with or immediately following the date on which the Participant terminates employment will continue to be treated as a Company Stock Account or as an Other Investments Account, as the case may be. Thus, the Other Investments Account of a terminated Participant will be debited (and the Participant's Company Stock Account will be credited) with such Participant's share of any repurchases of Company Stock from other terminated Participants. However, except in the case of reemployment (as provided for in Section 4), none of the Participant's Accounts will be credited with any further Employer Contributions or Forfeitures.

(h)    Optional Direct Transfer of Eligible Rollover Distributions.

Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, for all distributions made on or after January 1, 1993, a Distributee may elect, at the time and in the manner prescribed by the Plan Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

(i)    Lien on Distribution.

Notwithstanding anything to the contrary herein, if, at the time of distribution, a Participant is indebted to the Trust, or has retained in his or her possession money or property which properly belongs to the Trust, the Trust shall have a lien on such distribution pending the resolution of such ownership rights. The Trustee may exercise such lien either by directing the Company secretary to withhold any stock transfer of title, or by withholding distribution of any stock or the value of any stock or other assets, pending resolution of such ownership rights. Notwithstanding the foregoing, Plan Benefits under this Plan may not be assigned or alienated except to the extent allowable under Code Sections 401(a)(13) and 414(p).

CIG 011004

**Section 15.   HOW PLAN BENEFIT WILL BE DISTRIBUTED.**

(a)     Form of Distribution.

Subject to a Participant's right to demand distribution of such Participant's Company Stock Account and Other Investments Account entirely in the form of Employer Securities, the Trustee may distribute such Participant's Plan Benefit entirely in cash or entirely in the form of Employer Securities. Distributions made in the form of Employer Securities shall be made in the form of whole shares of Employer Securities with the value of any fractional shares paid in cash.

However, if the Company's charter or bylaws restrict ownership of substantially all outstanding Employer Securities to Employees or to a trust under a qualified plan under Section 401(a) of the Code, or in the case of an Employer who elects to be treated as an S-corporation, as defined in Code Section 1361(a)(1), distribution of Plan Benefits may be made entirely in cash and Participants may not demand distribution of their Plan Benefit in the form of Employer Securities. Notwithstanding the foregoing, Employer Securities may be distributed by the Trustee subject to the requirement that such stock shall be immediately resold to the Employer (or the Trust).

Any shares purchased by the Employer (or the Trust) pursuant to this Subsection shall be purchased at their fair market value. For purposes of this Section, fair market value shall be based upon the appraised fair market value determined as of the Anniversary Date coinciding with or immediately preceding the date such shares are purchased. The appraised fair market value shall be determined by an Independent Appraiser and shall be based on all relevant factors for determining the fair market value of securities. In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction. Such shares shall be purchased by notifying the Participant (or Beneficiary) in writing.

The terms of payment for the purchase of such shares of stock shall be set forth in the written statement delivered to the Participant (or Beneficiary) and may be either in a single payment or in up to five (5) equal annual installments (with interest on the unpaid principal balance at a reasonable rate of interest), as determined by the Plan Committee. Payment for the

48

CIG 011005

purchase of such shares must commence within thirty (30) days after the Employer (or the Trust) notifies the Participant (or Beneficiary) of its intent to purchase the shares. If payment is made in installments, adequate security and a reasonable rate of interest must be provided.

The Trustee will make distributions from the Trust in accordance with instructions from the Committee.

(b) Beneficiaries.

(1) Designation.

Distribution will be made to the Participant if living, and if not, to the Participant's Beneficiary. A Participant may designate a Beneficiary upon becoming a Participant and may change such designation at any time by filing a written designation with the Committee. Notwithstanding anything in this Section 15 to the contrary, if a Participant is married, a Participant shall not designate anyone other than the Participant's spouse as primary Beneficiary of the Participant's Plan Benefit unless such spouse consents in writing to such designation, such spouse acknowledges the effect of such election, and such writing is witnessed by a Plan representative or notary public and filed with the Plan Committee.

(2) Absence of Valid Designation.

If, upon the death of a Participant, former Participant or Beneficiary, there is no valid designation of a Beneficiary on file with the Company or the benefit is not claimed by any Beneficiary within a reasonable period of time after the death of the Participant, the benefit shall be paid to the Participant's surviving spouse. If the Participant is not married or if the Participant's spouse does not survive the Participant, the benefit shall be paid to the Participant's estate.

(c) Location of Participant or Beneficiary Unknown.

If a Participant who is entitled to a distribution cannot be located and the Plan Committee has made reasonable efforts to locate the Participant, the Participant's interest shall be forfeited and treated as a Forfeiture in accordance with Section 13 at the time specified below. The Plan Committee will be deemed to have made reasonable efforts to locate the Participant if the Plan Committee is unable to locate the Participant (or, in the case of a deceased Participant, his or her Beneficiary) after having made two successive certified or similar mailings to the last address on file with the Plan Committee and after the Plan Committee has used the IRS Letter

49

CIG 011006

Forwarding Program.  The Participant's Account(s) shall be forfeited as of the last day of the Plan Year in which occurs the close of the 12 calendar month period following the later of the two successive mailings.  If the Participant or Beneficiary makes a written claim for the Account(s) subsequent to the forfeiture, the Employer shall cause the Account(s) to be reinstated, first from current year Forfeitures, if any, and then from an additional Employer Contribution.

CIG 011007

**Section 16.    RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK.**

    (a)    "Put" Option.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, then the "Qualified Holder" (as defined below) of such stock shall be granted, at the time that such shares are distributed to the Qualified Holder, an option to "put" the shares to the Company; provided, however, that all such shares are so put; and provided, further, that the Trust shall have the option to assume the rights and obligations of the Company at the time the "put" option is exercised. The term "Qualified Holder" shall mean the Participant or Beneficiary receiving the distribution of such shares, any other party to whom the shares are transferred by gift or by reason of death, and also any trustee of an individual retirement account (as defined under Code Section 408) to which all or any portion of the distributed shares is transferred pursuant to a tax-free rollover transaction satisfying the requirements of Sections 402 and 408 of the Code. A "put" option shall provide that, for a period of sixty (60) days after such shares are distributed to a Qualified Holder (as defined above) (and, if the "put" is not exercised within such sixty (60) day period, for an additional period of sixty (60) days in the following Plan Year), the Qualified Holder would have the right to have the Company purchase such shares at their fair market value, as defined hereinabove in subsection (a). Such "put" option shall be exercised by notifying the Company in writing.

In the case of a lump sum distribution of Company Stock, the terms of payment for the purchase of such shares of stock shall be as set forth in the "put" and may be paid either in a single payment or in up to five (5) equal annual installments with interest on the unpaid principal balance at a reasonable rate of interest. Payment for the purchase of such shares must commence within thirty (30) days after the "put" is exercised. The period during which the put option is exercisable does not include any time during which the distributee is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable federal or state law. If payment is made in installments, adequate security and a reasonable rate of interest must be provided. In the case of an installment distribution, payment must be made within thirty (30) days after the put option is exercised with respect to any installment distribution of Company Stock.

51

CIG 011008

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

The requirements of this Subsection 16(a) shall not apply to the distribution of any portion of a Participant's Plan Benefit which has been diversified, distributed or transferred to another plan pursuant to the provisions of Subsection 17(a) hereof.

(b)    Right of First Refusal.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, such shares of Company Stock distributed by the Trustee may, as determined by the Company or the Committee, be subject to a "right of first refusal," until such time as such shares are publicly traded. Such a "right" shall provide that prior to any subsequent transfer, the shares must first be offered by written offer, to the Trust, and then, if refused by the Trust, to the Company. In the event that the proposed transfer constitutes a gift or other such transfer at less than fair market value, the price per share shall be determined by an Independent Appraiser (appointed by the Board of Directors) as of the Anniversary Date coinciding with or immediately preceding the date of exercise, except in the case of a transfer to a Disqualified Person.

In the event of a proposed purchase by a prospective bona fide purchaser, the offer to the Trust and the Company shall be at the greater of fair market value, as determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of exercise (except in the case of a purchase by a Disqualified Person), or at the price offered by the prospective bona fide purchaser. In addition, such offer must equal or exceed the other terms of the offer made by the prospective bona fide purchaser. In the case of a purchase by or transfer to a Disqualified Person, fair market value shall be determined as of the actual date of the transaction. Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. The Trust may accept the offer at any time during a period not exceeding fourteen (14) days after receipt of such offer. In the event the Trust does not accept such offer, the Company may accept such offer at any time during said fourteen (14) day period.

52

CIG 011009

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

(c)     Other Options.

Except as otherwise provided in this Section 16, no security acquired with the proceeds of a Securities Acquisition Loan may be subject to a put, call, buy-sell or similar arrangement while held by or when distributed from the Plan.

CIG 011010

**Section 17.**   **SPECIAL PROVISIONS.**

    (a)    Diversification of Investments:

       Within ninety (90) days after the close of each Plan Year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than twenty-five percent (25%) of the value of the Participant's Company Stock Account to the extent such value exceeds the amount to which a prior election, if any, applies. In the case of the sixth (6th) year of the Qualified Election Period, the preceding sentence shall be applied by substituting "fifty percent (50%)" for "twenty-five percent (25%)." The Participant's direction shall be completed no later than ninety (90) days after the close of the ninety (90) day election period.

       The Plan Committee shall offer at least three investment options (not inconsistent with regulations prescribed by the Internal Revenue Service) to each Participant who makes an election under this Subsection.

       In lieu of offering such investment options, the Plan Committee may direct that all amounts subject to Participant elections under this Subsection be distributed to Qualified Participants. All such distributions shall be distributed within ninety (90) days after the close of the ninety (90) day election period and shall be made in cash.

       In lieu of receiving a distribution under this Subsection, a Qualified Participant may direct the Plan to transfer the distribution to another qualified plan of the Company which accepts such transfers, provided that such plan permits employee-directed investments and does not invest in Employer Securities to a substantial degree. Such transfer shall be made within ninety (90) days after the close of the ninety (90) day election period.

    (b)    Cash Dividends.

       Cash dividends, if any, on shares of Company Stock allocated to Participants' Accounts may be accumulated in the Trust or may be paid to Participants currently as determined in the sole discretion of the Committee, exercised in a uniform and nondiscriminatory manner. Provided that the Plan is primarily invested in Employer Securities, it is intended that the Company shall be allowed a deduction with respect to any dividends paid on allocated shares of Company Stock of any class held by the Plan on the record date to the extent such dividends are paid in cash directly to the Participants, or their Beneficiaries, or are paid to the Plan and are

54

CIG 011011

distributed from the Plan to the Participants or their Beneficiaries not later than ninety (90) days after the close of the Plan Year in which paid; provided, however, that the Company shall not be required to pay or distribute any dividends with respect to the nonvested portion of the Company Stock Account of a Participant who has terminated employment prior to the date such dividends are paid directly to Participants, or are distributed from the Plan to the Participants. Provided that the Plan is primarily invested in Employer Securities, it is also intended that the Company shall be allowed a deduction for any dividends used to make payments on a Securities Acquisition Loan the proceeds of which were used to acquire the Employer Securities (whether or not allocated) with respect to which the dividend is paid, provided that in the case of dividends paid on allocated shares, Employer Securities in an amount equal to such dividends are allocated to such Participants for the year in which such dividends would otherwise have been allocated to such Participants. The Company shall be allowed a deduction for dividends paid only in the taxable year of the Company in which the dividend is either paid to a Participant or Beneficiary or held to make payments on a Securities Acquisition Loan.

Shares of Employer Securities released from the suspense account (as provided in Section 7(b) of the Plan) by reason of the payment of principal and interest on a Securities Acquisition Loan with cash dividends paid to the Trust, shall be allocated as of each Anniversary Date among the Accounts of Participants who meet the requirements of Section 4 of the Plan, in the proportion that each such Participant's Covered Compensation bears to the total Covered Compensation of all such Participants for that year.

55

CIG 011012

**Section 18.    ADMINISTRATION.**

    (a)    Named Fiduciaries for Administration of Plan and for Investment and Control of Plan Assets.

        (1)    Board of Directors.

The Board of Directors shall have the following duties and responsibilities in connection with the administration of the Plan:

        (A)    Making decisions with respect to amending or terminating the Plan.

        (B)    Making decisions with respect to the selection, retention or removal of the Trustee.

        (C)    Making decisions with respect to the selection of the Plan Committee members.

        (D)    Periodically reviewing the performance of the Trustee, the members of the Committee, persons to whom duties have been allocated or delegated and any advisers appointed pursuant to paragraph (f)(1) below.

        (E)    Determining the form and amount of Employer Contributions.

The Board of Directors may by written resolution allocate its duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Board of Directors deems reasonable and prudent under the circumstances.

        (2)    Plan Committee.

        (A)    General.

The Company shall administer the Plan and is designated as the "Plan Administrator" within the meaning of Section 3(16) of ERISA and Section 414(g) of the Code. The Committee and the Company shall each be a "named fiduciary" within the meaning of Section 402 of ERISA, but each party's role as a named fiduciary shall be limited solely to the exercise of its own authority and discretion, as defined under this Plan, to control and manage the operation and administration of this Plan. A named fiduciary may designate other persons who are not named fiduciaries to carry out its fiduciary duties hereunder, and any such person shall become a fiduciary under the Plan with respect to such delegated responsibilities.   The members

56

CIG 011013

of the Committee shall be appointed by the Board of Directors and shall serve, without compensation, until such time as they resign, die or become incapable of exercising their duties. All members of the Committee are designated as agents of the Plan for purposes of service of legal process. The Company shall certify to the Trustee the names and specimen signatures of the members of the Committee. Any member may resign at any time by submitting an appropriate written instrument to the Company, and while any vacancy exists, the remaining members of the Committee may perform any act which the Committee is authorized to perform. Any vacancy on the Committee shall be filled by appointment by the Board of Directors. All decisions required to be made by the Committee involving the interpretation, application and administration of the Plan shall be resolved by action of the Committee either at a meeting or in writing without a meeting.

      (B)    <u>Duties and Responsibilities.</u>

The Committee shall have the following duties and responsibilities in connection with the administration of the Plan:

      (i)    Establishing and implementing a funding policy as described in Paragraph (c) below.

      (ii)    Determining the eligibility of Employees for participation in the Plan.

      (iii)    Determining the eligibility of Employees for benefits provided by the Plan including such duties and responsibilities as are necessary and appropriate under the Plan's claims procedures.

      (iv)    Making recommendations to the Board of Directors with respect to amendment or termination of the Plan, including recommendations with respect to contributions under the Plan.

      (v)    Assuring that bonding requirements imposed by ERISA are satisfied.

      (vi)    Authorizing, allocating and reviewing expenses incurred by the Plan.

      (vii)    Communicating with Participants and other persons.

57

CIG 011014

(viii)    Reviewing periodically any allocation or delegation of duties and responsibilities and any appointment of advisers.

(ix)    Investing and controlling the Plan assets.

(x)    Directing the Trustee with respect to voting shares of Company Stock, in accordance with the provisions of Section 9.

(xi)    Interpreting and construing the terms of the Plan and Trust Agreement.

The Committee may establish rules and regulations and may take any other necessary or proper action to carry out its duties and responsibilities. Notwithstanding the foregoing provisions, the Trustee shall have the primary responsibility for the withholding of income taxes from Plan distributions, for the payment of withheld income taxes on Plan distributions to the Internal Revenue Service, and for notification to Participants of their right to elect not to have income tax withheld from Plan distributions. Compliance with record keeping and reporting requirements of ERISA shall be the primary responsibility of the Company.

The Plan Committee shall have full discretion to construe and interpret the terms and provisions of this Plan, which interpretation or construction shall be final and binding on all parties including, but limited to, the Company and any Participant or Beneficiary, except as otherwise provided by law. The Plan Committee shall administer such terms and provisions in a uniform and nondiscriminatory manner and in full accordance with any and all laws applicable to the Plan. When making a determination or calculation, the Plan Committee shall be entitled to rely upon information furnished by the Employer or anyone acting on behalf of the Employer.

(C)    Allocation and Delegation of Responsibilities.

The Committee may, by written resolution, allocate its administrative duties and responsibilities to one or more of its members or it may delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

58

CIG 011015

(b)    Investment of Plan Assets.

The Plan assets shall be invested and controlled by the Committee; provided, however, that the actual management of Trust investments, other than Company Stock, may be delegated to the Trustee or may be delegated to one or more investment managers appointed by the Committee. Any investment manager appointed hereunder shall have the power to manage, acquire or dispose of assets of the Plan and shall be either an investment adviser registered under the Investment Advisers Act of 1940, or a bank, as defined in that Act, or an insurance company qualified to perform such services under the laws of one or more states. If an investment manager has been appointed, the Trustee shall neither be liable for acts or omissions of such investment manager nor be under any obligation to invest or otherwise manage any asset of the Trust fund, nor shall the Committee be liable for any act or omission of the investment manager in carrying out such responsibility. The custody of Plan assets shall at all times be retained by the Trustee, unless they consist of insurance contracts or policies issued and held by an insurance company authorized to conduct an insurance business in a state. In addition to appointment of investment managers, the Committee shall have the following duties and responsibilities:

(1)    Periodically reviewing the investment of Plan assets and the performance of the Trustee and any investment managers. With respect to the Trustee, the Committee shall advise the Board of Directors of any matters which might be relevant to the decision as to whether the services of the Trustee should be retained. Based on its review, the Committee shall determine the desirability of appointing or retaining investment managers.

(2)    Determining an investment policy to be followed with respect to the Plan assets and communicating this policy to the person or persons responsible for investing the Plan assets.

The Committee may by written resolution, allocate its investment duties and responsibilities to one or more of its members or delegate such duties and responsibilities to any other persons; provided, however, that any such allocation or delegation shall be terminable upon such notice as the Committee deems reasonable and prudent under the circumstances.

59

CIG 011016

(c)    <u>Funding Policy</u>.

The funding policy of the Plan is to invest trust assets primarily in Company Stock over the life of the Plan. The Committee shall, from time to time, establish such investment methods as may be necessary to accomplish this funding policy.

(d)    <u>Claims Procedures</u>.

Any person whose claim for benefits under the Plan has been denied in whole or in part shall receive a written notice from the Committee setting forth the specific reasons for such denial, specific references to the Plan provisions on which the denial was based and an explanation of the procedure for review of the denial. Such person, or a duly authorized representative, may appeal to the Committee for a review of the denial by sending to the Committee a written request for review within sixty (60) days after receiving notice of the denial. The request for review shall set forth all grounds on which it is based, together with supporting facts and evidence which the claimant deems pertinent, and the Committee shall give the claimant the opportunity to review pertinent documents in preparing the request. The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. Within sixty (60) days after the receipt of the request for review, the Committee shall communicate to the claimant in writing its decision, and if the Committee confirms the denial, in whole or in part, the communication shall set forth the reasons for the decision and specific references to the Plan provisions on which the decision is based. Such decisions of the Committee shall be final and conclusive upon all parties.

(e)    <u>Qualified Domestic Relations Orders</u>.

(1)    In the case of any Domestic Relations Order received by the Plan, the Committee shall promptly notify the Participant and any other Alternate Payee of the receipt of such order and of the Plan's procedures for determining the qualified status of Domestic Relations Orders. Any Alternate Payee shall be permitted to designate a representative for receipt of copies of notices that are sent to the Alternate Payee with respect to such order. The amount that would be payable to the Alternate Payee shall be segregated in a segregated account as of the first day of the Plan Year during which the Domestic Relations Order is received by the Committee. Such segregated account shall continue to be treated in the same manner as the affected Accounts of the Participant, but will not be credited with any further contributions or

60

forfeitures. Notwithstanding the foregoing, the Trustee may, in its sole discretion, exercised in a uniform and nondiscriminatory manner, choose to physically segregate the Account of the Alternate Payee and invest the assets of such Account, pursuant to Section 7 of the Plan, in assets other than Company Stock. If the order is determined to be a qualified order within the eighteen (18) month period described below, the segregated amount (including any interest or earnings thereon) shall continue to be treated as a segregated account in the name of the Alternate Payee. If the Committee determines that the order is not qualified, or if the Committee (or the appropriate court) is not able to resolve the issue within the eighteen (18) month period, the segregated amount (including any interest or earnings thereon) shall be restored to the Participant. For purposes of this Paragraph, the "eighteen (18) month period" shall mean the eighteen (18) month period beginning with the date on which the first payment would be required to be made under the Domestic Relations Order.

(2)     In determining whether a Domestic Relations Order is qualified, the Committee shall follow the procedures set forth in Section 18(d) with respect to claims for Plan Benefits.

(3)     A Domestic Relations Order will constitute a qualified Domestic Relations Order only if such order (i) does not require the Plan to provide any type or form of benefit (or any option) not otherwise provided under the Plan, (ii) does not require the Plan to provide increased benefits, and (iii) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another order previously determined to be a qualified order. In addition, a Domestic Relations Order will constitute a qualified order only if such order clearly specifies (i) the name and last known mailing address of the Participant and of each Alternate Payee covered by the order, (ii) the amount or the percentage of a Participant's Plan Benefit that is to be paid to each Alternate Payee, or the manner in which such amount or percentage is to be determined, (iii) the number of payments or the period to which such order applies, and (iv) each plan to which such order applies.

(4)     In the case of any payment to an Alternate Payee before a Participant has separated from service, the Plan shall not be required to make any payment to an Alternate Payee prior to the date the Participant attains (or would have attained) the Earliest Retirement Age. For purposes of this Paragraph, the term "Earliest Retirement Age" means the earliest of (i) the date

61

CIG 011018

on which the Participant is entitled to a distribution under the Plan, or (ii) the later of the date the Participant attains age fifty (50) or the earliest date on which the Participant could begin receiving benefit if the Participant separated from service.

(f)    General.

(1)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated, may employ other persons for advice in connection with their respective responsibilities, including actuaries, plan consultants, investment advisers, attorneys and accountants.

(2)    Any person may serve in more than one capacity with respect to the Plan.

(3)    The Board of Directors, the Committee or any person to whom duties and responsibilities have been allocated or delegated shall be indemnified and held harmless by the Company from any expense or liability hereunder unless due to or arising from fraud, dishonesty, gross negligence, or misconduct of the Board of Directors, the Committee, or such person, as the case may be.

(4)    The Board of Directors, the Plan Administrator and the Committee shall have complete control with respect to the duties and responsibilities allocated to them under the terms of the Plan, with all power and discretion necessary to carry out any of their duties described herein.

The decisions of the Board of Directors, the Plan Administrator and the Committee in matters within their jurisdiction shall be final, binding and conclusive upon each Employer, each Employee, beneficiary and every other interested or concerned person or party.

(g)    Independent Fiduciary.

An Independent Fiduciary may be appointed from time to time for such purposes as shall be determined by the Board of Directors, Trustee, or Committee. An Independent Fiduciary may be appointed to serve in such capacity as may be deemed appropriate to act on behalf of the Plan and Trust with respect to issues which involve a real or perceived conflict of interest among certain parties, or for such other purposes as the Board of Directors, Trustee, or Committee may determine to be in the best interest of the Plan and Trust. The Independent Fiduciary shall be granted such power, authority and discretion as may be necessary and appro-

62

CIG 011019

priate for it to carry out its duties and responsibilities, including, but not limited to, any and all powers and discretion granted the Committee and the Trustee under the Plan and Trust.

63

CIG 011020

**Section 19.   AMENDMENT AND TERMINATION.**

    (a)    Amendment.

       To provide for contingencies which may require or make advisable the clarification, modification or amendment of this Agreement, the Company reserves the right to amend the Plan at any time and from time to time, in whole or in part, including without limitation, retroactive amendments necessary or advisable to qualify the Plan and Trust under the provisions of Sections 401(a) and 4975(e)(7) of the Code or any successor or similar statute hereafter enacted. Any such amendment to the Plan or Trust must be adopted by resolution of the Company's Board of Directors. However, no such amendment shall (1) cause any part of the assets of the Plan and Trust to revert to or be recoverable by the Company or be used for or diverted to purposes other than the exclusive benefit of Participants, former Participants and Beneficiaries, (2) deprive any Participant, former Participant or Beneficiary of any benefit already vested, except to the extent that such amendment may be necessary to permit the Plan or the Trust to qualify or continue to qualify as tax-exempt, (3) terminate the protections and rights described in Section 16, (4) alter, change or modify the duties, powers or liabilities of the Trustee hereunder without its written consent, or (5) with respect to any benefit previously accrued, eliminate or reduce any early retirement benefit or retirement type subsidy, or eliminate any optional form of benefit, except to the extent permitted by Section 411(d)(6) of the Code.

    (b)    Changes in the Code.

       Any other provision of this Plan to the contrary notwithstanding, if any amendment to the Code requires that a conforming plan amendment must be adopted effective as of a stated effective date in order for this Plan to continue to be a qualified plan, this Plan shall be operated in accordance with the requirement of such amendment to that law until the date when a conforming plan amendment is adopted, or the date when a clear and unambiguous nonconforming plan amendment is adopted, whichever occurs first.

    (c)    Termination, Partial Termination or Complete Discontinuance of Contributions.

       Although the Company has established the Plan with the bona fide intention and expectation that it will be able to make contributions indefinitely, nevertheless, the Company shall not be under any obligation or liability to continue its contributions or to maintain the Plan for any given length of time. The Company may in its sole discretion discontinue such contribu-

CIG 011021

tions or terminate the Plan in whole or in part in accordance with its provisions at any time without any liability for such discontinuance or termination. In the event of a termination or complete discontinuance of contribution, if the Plan is not replaced by a comparable plan qualified under Section 401(a) of the Code, then the Accounts of all Participants affected by the termination or discontinuance of contributions will become nonforfeitable. In the event of a partial termination, the Accounts of all Participants affected by the partial termination will become nonforfeitable. After termination of the Plan, the Committee and the Trust will continue until the Plan Benefit of each Participant has been distributed. After termination of the Plan, the Trust will be maintained until the Plan Benefits of all Participants have been distributed. Plan Benefits may be distributed following termination of the Plan or distributions may be deferred and distributed as provided in Section 14, as the Company shall determine. If Plan Benefits will be distributed after the Plan is terminated, the distribution may be delayed until IRS approval is received. In the event that Company Stock is sold in connection with the termination of the Plan or the amendment of the Plan to become a qualified employee plan that is not a stock bonus plan, all Plan Benefits will be distributed in cash.

      (d)    <u>Determination by Internal Revenue Service</u>.

      Notwithstanding any other provision of the Plan, if the Internal Revenue Service shall fail or refuse to issue a favorable written determination or ruling with respect to the initial qualification of the Plan and exemption of the Trust from tax under Section 501(a) of the Code, all Employer Contributions under Section 401(a), together with any income received or accrued thereon less any benefits or expenses paid shall, upon the written direction of the Company, be returned to the Company notwithstanding the provisions of the Trust, and the Trust shall then terminate. Any such Contribution returned to the Employer must be returned within one (1) year after the date the initial qualification is denied, but only if the application for the qualification is made by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted.

      (e)    <u>Return of Employer's Contribution</u>.

      Notwithstanding any other provision of the Plan, if a Contribution is conditioned on its deductibility and the deduction is disallowed or if a Contribution is made due to a mistake of fact, such Employer Contribution may be returned to the Employer if such Contribution is

65

CIG 011022

returned within one (1) year thereafter and if the amount returned does not exceed the excess of the actual Contribution over the amount which would have been contributed had there been no error in determining the deduction or mistake of fact. Earnings of the Plan attributable to the excess Contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

66

CIG 011023

**Section 20.    <u>MISCELLANEOUS</u>.**

    (a)   <u>Participation by Affiliated Company</u>.

        (1)    Any Affiliated Company presently existing or hereafter acquired may, with the consent of the Company, adopt the Plan and Trust and thereby enable its employees to participate herein.

        (2)    In the event any Participant is transferred to an Affiliated Company which is a participating Employer, such Participant shall continue to participate hereunder in the allocation of Employer Contributions and the Participant's Accounts shall continue to vest in accordance with Section 13.  Any Participant who is transferred to an Affiliated Company which is not a participating Employer shall be treated as a suspended Participant in accordance with Section 4(c).

    (b)   <u>Limitation of Rights; Employment Relationship</u>.

       All Plan Benefits will be paid only from the Trust assets and neither the Company nor any Employer nor the Committee nor the Trustee shall have any duty or liability to furnish the Trust with any funds, securities or other assets except as expressly provided in the Plan.  Nothing herein shall be construed to obligate any Employer to continue to employ any Employee.

    (c)   <u>Merger; Transfer of Assets</u>.

       In no event shall this Plan be merged or consolidated with any other employee benefit plan, nor shall there be any transfer of assets or liabilities from this Plan to any other such plan, unless immediately after such merger, consolidation or transfer, each Participant's benefits, determined as if the plan had terminated, are at least equal to or greater than the benefits which the Participant would have been entitled to had this Plan been terminated immediately before such merger, consolidation or transfer.

    (d)   <u>Prohibition Against Assignment</u>.

       The benefits provided by this Plan may not be assigned or alienated; provided, however, that a qualified Domestic Relations Order shall not be construed as an assignment or alienation.  Except for indebtedness to the Trust and orders to make payments or assign benefits to a spouse, former spouse, child or other dependent under a qualified Domestic Relations Order, neither the Company nor the Trustee shall recognize any transfer, mortgage, pledge,

CIG 011024

hypothecation, order or assignment by any Participants or Beneficiaries of all or part of their interest hereunder, and such interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of creditors or other claimants from all orders, decrees, levies, garnishment and/or executions and other legal or equitable process or proceedings against such Participants or Beneficiaries to the fullest extent which may be permitted by law.  Notwithstanding anything in Subsection 20(d) to the contrary, Plan Benefits may be reduced to satisfy a Participant's liability to the Plan due to:  the Participant's conviction of a crime involving the Plan; a judgement, consent order, or decree in an action for violation of fiduciary standards; or a settlement involving the Department of Labor or the Pension Benefits Guarantee Corporation.

(e)    Applicable Law; Severability.

The Plan hereby created shall be construed, administered and governed in all respects in accordance with ERISA and to the extent not superseded by federal law, in accordance with the laws of the State of California; provided, however, that if any provision is susceptible of more than one interpretation, such interpretation shall be given thereto as is consistent with the Plan being a qualified Employee Stock Ownership Plan within the meaning of the Code.  If any provision of this instrument shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective.

68

CIG 011025

**Section 21.** <u>TOP HEAVY PROVISIONS</u>.

    (a)   <u>Definitions</u>.

    For purposes of this Section 21, the following capitalized words shall have the following meanings:

**AGGREGATION GROUP**

    (1)   **Required Aggregation Group**: In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

    In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

    (2)   **Permissive Aggregation Group**: The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

    In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

    (3)   Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

    (4)   An Aggregation Group shall include any terminated plan of the Employer if it was maintained within the last five (5) years ending on the Determination Date.

**DETERMINATION DATE**

    With respect to any Plan Year, the last day of the preceding Plan Year, or in the case of the first Plan Year of any Plan, the last day of such Plan Year.

69

CIG 011026

## KEY EMPLOYEE

Any Employee, or former Employee, or Beneficiary of an Employee or former Employee, who at any time during the Plan Year containing the Determination Date or during any of the four (4) preceding Plan Years is (or was) (i) an officer (and employee) having an annual compensation greater than fifty percent (50%) of the amount in effect under Section 415(b)(1)(A) of the Code for any such Plan Year, (ii) a shareholder (and employee) who owns (excluding any stock held under the Plan) both more than one half percent (.5%) ownership interest in value and one of the ten (10) largest interests in the Company (whether directly or through constructive ownership rules) and having annual compensation of more than the limitation in effect under Section 415 (c)(1)(A) of the Code, (iii) a more than five percent (5%) shareholder, or (iv) a more than one percent (1%) shareholder if such shareholder receives more than one hundred fifty thousand dollars ($150,000) of compensation from the Company during the Plan Year. For purposes of (iii) and (iv) above, the terms "five percent (5%) shareholder" and "one percent (1%) shareholder" mean any employee who owns (excluding any stock held under the Plan) more than five percent (5%) (or more than one percent (1%) of the outstanding stock of the corporation, or who owns stock possessing more than five percent (5%) (or one percent (1%) of the total combined voting power of all stock of the corporation (determined without regard to the aggregation rules under Section 414 of the Code). For purposes of (ii) above, if two or more Employees have the same interest in the Company, the Employee having the greater annual compensation from the Company shall be treated as having the larger interest. For purposes of (i) above, the term "officers" means persons whose regular duties include executive administrative duties; however, no more than three (3) Employees or ten percent (10%) of all Employees (up to a maximum of fifty (50) Employees), whichever is greater, may be counted as officers. If the number of officers of the Company exceeds these limitations, those officers with the highest compensation in the Plan Year containing the Determination Date or any of the four preceding Plan Years shall be treated as Key Employees.

## NON-KEY EMPLOYEE

Any Employee who is not a Key Employee.

## TOP HEAVY GROUP

Any Aggregation Group, if as of the Determination Date, the sum of (1) the present value of the accrued benefits for Key Employees under all defined benefit plans included in such group and (2) the aggregate Account balances of Key Employees under all defined contribution plans included in such group, exceeds sixty percent (60%) of a similar sum determined for all Employees.

CIG 011027

**TOP HEAVY PLAN**

With respect to any Plan Year, of the Company or of any Affiliated Company, any plan or Aggregation Group of plans of the Company or of any Affiliated Company if, as of the Determination Date, the aggregate Account balances of Key Employees under the plan or plans exceeds sixty percent (60%) of the aggregate Account balances of all Employees under such plan or plans. For purposes of this definition, the term, "Account balances" shall include Account balances of Participants attributable to Employer Contributions, the Account balances attributable to Employees' Nondeductible Contributions, and the amount of the aggregate distributions, if any, made with respect to any Participant during the five-year period ending on the Determination Date, including any distributions under a terminated plan which would have been required to be included in an aggregation group had such plan not been terminated. The Account balances of an individual shall not be taken into account if such individual has not performed any services for the Company at any time during the five-year period ending on the Determination Date. The Account balances of a non-key employee with respect to any Plan Year shall not be taken into account if such individual was formerly a Key Employee for any prior Plan Year. Any rollover contributions or transfers that are unrelated (i.e., both initiated by the Employee and made from a plan maintained by one Employer to a plan maintained by another Employer) shall not be taken into account for purposes of determining whether a plan is a Top Heavy Plan or whether any Aggregation Group is a Top Heavy Group.

(b)    Vesting Requirements.

With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the vesting of Plan Benefits for such Plan Year with respect to any Participant who completes one or more Hours of Service after the Plan becomes a Top Heavy Plan or part of a Top Heavy Group will be based upon Years of Service, as defined in Section 2 in accordance with the following vesting schedule, until such time as the Plan is no longer deemed to be top heavy:

| Years of Service | Percentage of Accounts Vested |
|---|---|
| Two Years | 20 |
| Three Years | 40 |
| Four Years | 60 |
| Five Years | 80 |
| Six Years or More | 100 |

With respect to any Plan Year, if as of the relevant Determination Date, this Plan ceases to be a Top Heavy Plan or part of a Top Heavy Group, the vested percentage of a Participant's Account that was nonforfeitable before the Plan ceased to be top heavy will remain

71

CIG 011028

nonforfeitable, and any Employee who was a Participant during the Top Heavy Plan Year and who had three or more Years of Service (including any Years of Service not yet taken into account under the Plan) will automatically remain under the top heavy vesting schedule.

      (c)   <u>Minimum Benefits</u>.

      With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, Employer Contributions and Forfeitures for such Plan Year for each Participant who is not a Key Employee shall be not less than three percent (3%) of each Participant's Total Compensation until such time as this Plan is no longer deemed to be top heavy. Notwithstanding the foregoing, such percentage for any such Plan Year shall not exceed the highest percentage at which Contributions and Forfeitures are made for such Plan Year for any Key Employee, as determined by dividing the Contribution for such Key Employee by so much of such Key Employee's Total Compensation (including any salary deferrals) for the Plan Year as does not exceed two hundred thousand dollars ($200,000) (or one hundred fifty thousand dollars ($150,000) for Plan Years beginning on or after January 1, 1994). Elective contributions on behalf of Key Employees are taken into account in determining the minimum required contribution under Section 416(c)(2). However, elective contributions on behalf of Employees other than Key Employees may not be treated as Employer contributions for purposes of the minimum contribution or benefit requirement of Section 416 of the Code.

      Amounts paid by the Company under the Federal Insurance Contributions Act or under the Social Security Act may not be taken into account for purposes of providing the required minimum benefits to Participants who are not Key Employees.

      For purposes of this Subsection (c), the term "Participant" shall refer to any Employee who has not separated from service at the end of the Plan Year, including Employees who have failed to complete 1,000 Hours of Service, and any Employees who have been excluded because their compensation is less than a stated amount but who must nevertheless be considered Participants in order to satisfy the coverage requirements of Section 410(b) of the Code.

      (d)   <u>Limitation on Annual Additions</u>.

      With respect to any Plan Year, if as of the relevant Determination Date, this Plan is deemed to be a Top Heavy Plan or part of a Top Heavy Group, the dollar limitation in the

CIG 011029

denominator of the defined contribution plan fraction and the defined benefit fraction shall be multiplied by 1.0 rather than by 1.25, for purposes of determining the aggregate limit on Contributions and Forfeitures for a Key Employee for such Plan Year, unless the sum of the Key Employees' benefits under all defined contribution plans does not exceed ninety percent (90%) of the total of all Participants' benefits for such Plan Year, and the Employer provides a minimum contribution of not less than four percent (4%) of each Participant's Total Compensation. The minimum benefit otherwise required under this paragraph shall be reduced to the extent a Participant who is not a Key Employee has received a benefit under any other plan maintained by the Employer and to the extent permitted by Section 416 of the Code and the regulations thereunder dealing with nonduplication of minimum benefits.

With respect to any Plan Year, if, as of the relevant Determination Date, any Employee is covered by both a top heavy defined contribution plan and a top heavy defined benefit plan, the minimum benefit provided for each such Participant who is not a Key Employee under the defined contribution plan shall be not less than five percent (5%) of the Participant's Total Compensation; provided, however, that if the Employer desires to use a factor of 1.25 in computing the denominators of the defined benefit fraction and in the denominator of defined contribution fraction, the defined contribution minimum benefit shall be seven and one half percent (7.5%) of compensation.

Solely for the purpose of determining if the Plan, or any other plan included in a required Aggregation Group of which this Plan is a part, is a Top Heavy Plan, the accrued benefit of an Employee (other than a Key Employee under a defined benefit plan or target benefit plan) shall be determined under (i) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Affiliated Employers, or (ii) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

73

CIG 011030

**Section 22.**    __EXECUTION__.

      To record the adoption of this Plan, the Company has caused its appropriate officers to affix its corporate name and seal hereto this _____*16*_____ day of _____*July*_____, 1999.

                K-M INDUSTRIES HOLDING CO., INC.

(SEAL)

                By _William Moore_____
                     William E. Moore, President

                By _Stephen Ferrari_____
                     Stephen A. Ferrari, Secretary

74

CIG 011031