# EXHIBIT 119

Checkpoint Contents
  Accounting, Audit & Corporate Finance Library
    Standards and Regulations
      FASB
        Original Pronouncements, as amended, including Implementation Guides and FASB Staff Positions
          FASB Interpretations (FIN)
            FIN 39: Offsetting of Amounts Related to Certain Contracts (as amended)

-----------------------------------------------------------------------------

Copyright © 2008 by Financial Accounting Standards Board, Norwalk, Connecticut

# Offsetting of Amounts Related to Certain Contracts (as amended)

**FIN 39 STATUS**

Issued: March 1992

Effective Date:

> For financial statements issued for periods beginning after December 15, 1993

Affects:

> Supersedes FTB 88-2

Affected by:

> Paragraph 7 amended by FAS 113, paragraph 32; FAS 135, paragraph 5(d); and FAS 144, paragraph C21

Other Interpretive Pronouncements:

> Other Interpretive Pronouncement: FIN 41

AICPA Accounting Standards Executive Committee (AcSEC)

Related Pronouncements:

> SOP 90-7
> SOP 96-1

Issues Discussed by FASB Emerging Issues Task Force (EITF)

Affects:

> Resolves EITF Issues No. 84-11 and Topic No. D-25
> Affects EITF Issue No. 86-25

Interpreted by:

> Paragraphs 6 and 48 interpreted by EITF Topic No. D-43

Interpreted by:

> Related Issues: EITF Issues No. 92-2, 97-14, and 03-8

## FIN 39 Summary

APB Opinion No. 10, *Omnibus Opinion—1966*, [Group 'apb10(am), par. 7']paragraph 7, states that "it is a general principle of accounting that the offsetting of assets and liabilities in the balance sheet is improper except where a right of setoff exists." This Interpretation defines *right of setoff* and specifies what conditions must be met to have that right. It also addresses the applicability of that general principle to forward, interest rate swap, currency swap, option, and other conditional or exchange contracts and clarifies the circumstances in which it is appropriate to offset amounts recognized for those contracts in the statement of financial position. In addition, it permits offsetting of fair value amounts recognized for multiple forward, swap, option, and other conditional or exchange contracts executed with the same counterparty under a master netting arrangement.

This Interpretation is effective for financial statements issued for periods beginning after December 15, 1993.

## INTRODUCTION

1. The FASB has been asked to clarify footnote i to the illustration in Appendix B of FASB Statement No. 105, *Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentrations of Credit Risk*. That footnote addresses the applicability of APB Opinion No. 10, *Omnibus Opinion—1966*, [Group 'apb10(am), par. 7']paragraph 7, and FASB Technical Bulletin No. 88-2, *Definition of a Right of Setoff*, to forward contracts, interest rate swaps, and currency swaps and discusses the circumstances in which amounts recognized for individual contracts may be offset against amounts recognized for other contracts and reported as a net amount in the statement of financial position. The fair value of those contracts or an accrued receivable or payable arising from those contracts, rather than the notional amounts or the amounts to be exchanged, is recognized in the statement of financial position. [1] Examples of other types of contracts for which the notional amounts or the amounts to be exchanged are not recognized in the statement of financial position include, but are not limited to, futures contracts and forward purchase-sale contracts.

2. Questions have also been raised about offsetting amounts recognized for contracts for which the fair value of those contracts, rather than the notional amounts or the items to be received or delivered in a conditional exchange, is recognized in the statement of financial position. Examples of those contracts include, but are not limited to, financial options, interest rate caps, collars and floors, and swaptions.

3. The contracts described in paragraphs 1 and 2 are often referred to as *conditional* and *exchange* contracts. *Conditional contracts* are those whose obligations or rights depend on the occurrence of some specified future event that is not certain to occur and that could change the timing of the amounts or of the instruments to be received, delivered, or exchanged. *Exchange contracts* are those that require a future exchange of assets or liabilities rather than a one-way transfer of assets.

4. This Interpretation supersedes Technical Bulletin 88-2 as of the effective date of this Interpretation or its earlier application. The guidance in that Technical Bulletin is incorporated substantially unchanged in paragraphs 5-7 of this Interpretation primarily as a matter of convenience.

## INTERPRETATION

### General Principle

5. Opinion 10, [Group 'apb10(am), par. 7']paragraph 7, states that "it is a general principle of accounting that the offsetting of assets and liabilities in the balance sheet is improper except where a

right of setoff exists." A *right of setoff* is a debtor's legal right, by contract or otherwise, to discharge all or a portion of the debt owed to another party by applying against the debt an amount that the other party owes to the debtor. [2] A right of setoff exists when all of the following conditions are met:

    a. Each of *two* parties owes the other determinable amounts.
    b. The reporting party has the right to set off the amount owed with the amount owed by the other party.
    c. The reporting party intends to set off.
    d. The right of setoff is enforceable at law.

A debtor having a valid right of setoff may offset the related asset and liability and report the net amount. [3]

6. Generally, debts may be set off if they exist between mutual debtors each acting in its capacity as both debtor and creditor. In particular cases, however, state laws about the right of setoff may provide results different from those normally provided by contract or as a matter of common law. Similarly, the U.S. Bankruptcy Code imposes restrictions on or prohibitions against the right of setoff in bankruptcy under certain circumstances. Legal constraints should be considered to determine whether the right of setoff is enforceable.

**Special Applications**

7. Various accounting pronouncements specify accounting treatments in circumstances that result in offsetting or in a presentation in a statement of financial position that is similar to the effect of offsetting. This Interpretation does not modify the accounting treatment in the particular circumstances prescribed by any of the following pronouncements:

FASB Statements and Interpretations

APB Opinions

Accounting Research Bulletins

FASB Technical Bulletins

AICPA Accounting Interpretations

AICPA Audit and Accounting Guides

AICPA Industry Audit Guides

AICPA Statements of Position

Examples of those pronouncements are:

FASB Statement No. 13, *Accounting for Leases* (leveraged leases, [Group 'fas13(am), par. 42'] [Group 'fas13(am), par. 43'][Group 'fas13(am), par. 44'][Group 'fas13(am), par. 45'][Group 'fas13(am), par. 46'] [Group 'fas13(am), par. 47']paragraphs 42-47)

FASB Statement No. 87, *Employers' Accounting for Pensions* (accounting for pension plan assets and liabilities)

FASB Statement No. 106, *Employers' Accounting for Postretirement Benefits Other Than Pensions* (accounting for plan assets and liabilities)

FASB Statement No. 109, *Accounting for Income Taxes* (net tax asset or liability amounts reported)

AICPA Audit and Accounting Guides, *Audits of Brokers and Dealers in Securities* (trade date accounting for trading portfolio positions), and *Construction Contractors* and *Audits of Federal Government Contractors* (advances received on construction contracts)

AICPA Audit and Accounting Guide, *Banks and Savings Institutions* (reciprocal balances with other banks)

## Applicability to Forward, Interest Rate Swap, Currency Swap, Option, and Other Conditional or Exchange Contracts

8. Unless the conditions in paragraph 5 are met, the fair value of contracts in a loss position should not be offset against the fair value of contracts in a gain position. Similarly, amounts recognized as accrued receivables should not be offset against amounts recognized as accrued payables unless a right of setoff exists.

9. When fair value or an amount receivable or payable related to conditional or exchange contracts of the reporting entity are recognized in the statement of financial position, the amount recognized represents an asset or a liability. The fair value of a contract in a gain position or an amount accrued as a receivable represents a probable future economic benefit controlled by the reporting entity under the contract. The fair value of a contract in a loss position or an amount accrued as a payable represents a probable future sacrifice of economic benefits arising from the reporting entity's present obligations to transfer assets under the contract.

10. Without regard to the condition in paragraph 5(c), *fair value amounts* [4] recognized for forward, interest rate swap, currency swap, option, and other conditional or exchange contracts executed with the same counterparty under a master netting arrangement may be offset. The reporting entity's choice to offset or not must be applied consistently. A master netting arrangement exists if the reporting entity has multiple contracts, whether for the same type of conditional or exchange contract or for different types of contracts, with a single counterparty that are subject to a contractual agreement that provides for the net settlement of all contracts through a single payment in a single currency in the event of default on or termination of any one contract. Offsetting the fair values recognized for forward, interest rate swap, currency swap, option, and other conditional or exchange contracts outstanding with a single counterparty results in the net fair value of the position between the two counterparties being reported as an asset or a liability in the statement of financial position.

## EFFECTIVE DATE AND TRANSITION

11. The provisions of this Interpretation are effective for financial statements issued for periods beginning after December 15, 1993. Earlier application is encouraged. Financial statements for fiscal years before the effective date may be restated to conform to the provisions of this Interpretation.

*This Interpretation was adopted by the affirmative votes of five members of the Financial Accounting Standards Board. Mr. Swieringa dissented. Mr. Northcutt did not vote.*

Mr. Swieringa disagrees with the exception in paragraph 10 that fair value amounts for certain contracts executed with the same counterparty under a master netting arrangement may be offset. The conditions in paragraph 5 specify that a right of setoff is necessary but not sufficient for offsetting assets and liabilities in a statement of financial position. To qualify for offsetting, that right must be unconditional and the reporting party must intend to set off.

Under a master netting arrangement, both the ability and intent to set off are conditional. That arrangement typically provides for the net settlement of cash flows that are payable at the same date and in the same currency, but it does not provide for the net settlement of cash flows that are payable

at different dates and in different currencies. Moreover, that arrangement provides for the net settlement of gains and losses only in the event of default. The Board previously concluded that offsetting assets and liabilities in the statement of financial position is not representationally faithful if a party does not intend to set off (paragraph 45) and is inappropriate if a party has the legal right to set off only in the event of default (paragraph 49). Mr. Swieringa agrees with those conclusions and would not permit the exception in paragraph 10.

Mr. Northcutt joined the Board just before this Interpretation was issued and did not vote on it.

*Members of the Financial Accounting Standards Board:*

Dennis R. Beresford, *Chairman*

Joseph V. Anania

Victor H. Brown

James J. Leisenring

Robert H. Northcutt, Jr.

A. Clarence Sampson

Robert J. Swieringa

### Appendix: BACKGROUND INFORMATION AND BASIS FOR CONCLUSIONS

### Introduction

12. This appendix summarizes considerations that Board members deemed significant in reaching the conclusions in this Interpretation. It includes reasons for accepting certain views and rejecting others. Individual Board members gave greater weight to some factors than to others.

### Background Information

13. Many financial instruments and other contracts have been developed to manage risks, and their use has increased dramatically in recent years. Those instruments and contracts, sometimes referred to as off-balance-sheet instruments or derivative instruments, include forward contracts, interest rate swap contracts, currency swap contracts, and option contracts, among others. In the absence of definitive accounting standards for reporting assets and liabilities arising from those instruments and contracts, various financial reporting practices have developed. Certain amounts arising from the potential benefits of the rights and the potential sacrifices from the obligations under those contracts are sometimes recognized.

14. For example, for an interest rate swap contract, the fair value of the contract, or the net amounts receivable or payable as a result of the contract, may be recognized as an asset or a liability. Similarly, the premium paid or received, or the fair value of an option contract, may be recognized as an asset or a liability. Also, the fair value of a forward contract to exchange one item for another may be recognized in the statement of financial position.

15. The general principle that the offsetting of assets and liabilities is improper except where a right of setoff exists is usually thought of in the context of unconditional receivables from and payables to another party. That general principle also applies to conditional amounts recognized for contracts under which the amounts to be received or paid or items to be exchanged in the future depend on future interest rates, future exchange rates, future commodity prices, or other factors.

16. Footnote i to the illustration in Appendix B of Statement 105 addresses forward contracts, interest rate swaps, and currency swaps and states, "Netting of receivable and payable amounts when right of setoff does not exist is in contravention of APB Opinion No. 10, *Omnibus Opinion—1966*, [Group 'apb10 (am), par. 7']paragraph 7, and FASB Technical Bulletin No. 88-2, *Definition of a Right of Setoff*." Dealers in these contracts commonly report their holdings in trading accounts measured at their fair values. Some dealers in those contracts have reported the fair value of contracts with different parties as a net increase in or reduction of a trading account or other assets, arguing that the recognized fair values are valuation accounts rather than separate assets and liabilities.

**Basis for Conclusions**

17. Amounts recognized for forward, interest rate swap, currency swap, option, and other conditional or exchange contracts are not valuation accounts. The fair values recognized in the financial statements are measurements of the rights and obligations associated with the contracts already executed and, therefore, are assets and liabilities in their own right. FASB Concepts Statement No. 6, *Elements of Financial Statements*, paragraphs 34 and 43, states the following about valuation accounts:

A separate item that reduces or increases the carrying amount of an asset is sometimes found in financial statements. For example, an estimate of uncollectible amounts reduces receivables to the amount expected to be collected, or a premium on a bond receivable increases the receivable to its cost or present value. Those "valuation accounts" are part of the related assets and are neither assets in their own right nor liabilities.

A separate item that reduces or increases the carrying amount of a liability is sometimes found in financial statements. For example, a bond premium or discount increases or decreases the face value of a bond payable to its proceeds or present value. Those "valuation accounts" are part of the related liability and are neither liabilities in their own right nor assets.

The fair values recognized for conditional or exchange contracts are not valuation accounts because valuation accounts exist only as part of a measurement of an asset or a liability, not as a complete measurement of an asset or a liability.

18. Paragraph 40 of FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments*, states:

Fair values of financial instruments depict the market's assessment of the present value of net future cash flows directly or indirectly embodied in them, discounted to reflect both current interest rates and the market's assessment of the risk that the cash flows will not occur. Investors and creditors are interested in predicting the amount, timing, and uncertainty of future net cash inflows to an entity, as those are the primary sources of future cash flows from the entity to them. Periodic information about the fair value of an entity's financial instruments under current conditions and expectations should help those users both in making their own predictions and in confirming or correcting their earlier expectations.

19. While the fair value amount is a representation of the current market assessment of future events that will have cash flow consequences, the conditional nature of the contracts discussed in paragraph 10 means that the eventual cash flow consequences are often not discernible from the amounts reported in the statement of financial position. Statement 105 requires that additional information about the financial instruments that result from those contracts, even if they are recognized at fair value, be disclosed in the financial statements because of the practical limits on the information that is conveyed by the amounts reported in the body of the financial statements.

20. FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises*, [Group 'con1(am), par. 37']paragraph 37, states that ". . . financial reporting should provide information to help investors, creditors, and others assess the amounts, timing, and uncertainty of prospective net cash inflows to the related enterprise" (footnote reference omitted). The amount of credit risk

exposure—the amount of accounting loss the entity would incur if the counterparties to forward, interest rate swap, currency swap, option, or other conditional or exchange contracts failed to perform in accordance with the terms of those contracts—is one indicator of the uncertainty of future cash flows from those instruments.

21. The Board decided to permit offsetting of the fair value recognized for forward, interest rate swap, currency swap, option, and other conditional or exchange contracts if they are executed with the same counterparty under a master netting arrangement. That arrangement effectively consolidates individual contracts into a single agreement between the parties. The failure to make one payment under the master netting arrangement would entitle the other party to terminate the entire arrangement and to demand the net settlement of all contracts. The Board believes that an exception to the requirement of paragraph 5(c) of this Interpretation, which states that "the reporting party intends to set off" is justified when a master netting arrangement exists because the net presentation discloses the amount of credit risk exposure under that arrangement. The Board decided that, given a master netting arrangement, presentation of the aggregate fair values of the individual contracts executed under that arrangement would not provide more information about the uncertainty of future cash flows from those contracts than net amounts would.

22. Paragraph 10 of this Interpretation applies only to *fair value amounts* recognized for conditional or exchange contracts executed with the same counterparty under a master netting arrangement. Paragraph 10 does not apply to other amounts recognized for other types of contracts executed under a master netting arrangement; however, those amounts could otherwise meet the conditions of paragraph 5 for a right of setoff. For example, unless the conditions in paragraph 5 are met, the amount recognized under a repurchase agreement may not be offset against the amount recognized under a reverse repurchase agreement solely because the agreements are executed with the same counterparty under a master netting arrangement, nor may an accrued receivable be offset against an accrued payable on interest rate swaps that are not recognized at fair value solely because the swaps are executed with the same counterparty under a master netting arrangement. The Board concluded that the gross unconditional receivables and payables recognized in the statement of financial position for these types of assets and liabilities provide useful information about the timing and amount of future cash flows that would be lost if those amounts were offset.

23. The Board recognizes that under the existing mixed attribute measurement system, some amounts recognized in the statement of financial position provide more information about the uncertainties of future cash flows than other amounts do. Where information about the uncertainties of future cash flows is readily discernible from an unconditional receivable or payable recognized in the statement of financial position, the Board believes that information is useful to financial statement users and should not be offset unless the conditions in paragraph 5 for the right of setoff are satisfied.

24. This Interpretation permits, but does not require, offsetting of fair value amounts recognized for conditional or exchange contracts executed with the same counterparty under a master netting arrangement. The Board recognizes that optional accounting treatment of similar contracts adversely affects the comparability of financial statements. However, the Board is concerned that requiring offsetting may be costly for entities that do not have systems that separately identify the contracts that have been executed under each arrangement.

25. The Board decided to use the term *fair value* rather than *market value* in the final Interpretation. The concept of fair value is the same as that of market value as it was used in the Exposure Draft of a proposed Interpretation. The change was made to be consistent with the terminology used in Statement 107.

## Comments on Exposure Draft

26. The Board issued a proposed Interpretation, *Offsetting of Amounts Related to Certain Contracts*, for comment on June 11, 1991 and received 59 letters of comment. Certain of the comments received and consideration of them are discussed in the following paragraphs.

27. Some respondents noted that the subject of offsetting is currently part of the Board's project on financial instruments and off-balance-sheet financing and should be addressed there rather than in this Interpretation. This Interpretation is intended to provide interim guidance on the application of the general principle of a right of setoff and does not anticipate the conclusions to be reached in the financial instruments and off-balance-sheet financing project.

28. Some respondents asserted that the fair value of forward, interest rate swap, currency swap, option, and other conditional or exchange contracts are valuation accounts, not assets and liabilities, because they do not satisfy the definitions in Concepts Statement 6. The Board's reasons for concluding that the fair values recognized are assets and liabilities are discussed in paragraph 17.

29. Some respondents asserted that [Group 'con6(am), par. 253']paragraph 253 of Concepts Statement 6, which addresses an estimated loss on a purchase commitment, seems to indicate that a valuation account may exist as a complete measurement of an asset or a liability. However, [Group 'con6(am), par. 251'][Group 'con6(am), par. 252'][Group 'con6(am), par. 253']paragraphs 251-253 of Concepts Statement 6 acknowledge that the current accounting for estimated losses on purchase commitments is an expedient with no conceptual support. In concept, a valuation account decreases or increases the value of an asset or liability and has no existence apart from that asset or liability. Paragraph 251 differentiates between concept and expedient: "It [the estimated loss on a purchase commitment] is at best part of a liability and is not *by itself* an obligation to pay cash or otherwise sacrifice assets in the future. There is no asset from which it may be a deduction in present practice. . . . That predicament results, however, because estimated loss on purchase commitments is the recorded part of a series of transactions and events that are mostly unrecorded."

30. Some respondents reported that there has been a significant effort recently to develop *cross-product* master netting arrangements. A cross-product master netting arrangement consolidates a variety of types of contracts with a single counterparty and, in the event of default, entitles the nondefaulting party to terminate the entire arrangement and to demand net settlement of all contracts. The Board intended for the provisions of paragraph 10 to apply to conditional or exchange contracts executed with the same counterparty under a cross-product master netting arrangement. Thus, the Board revised the definition of master netting arrangement to clarify that a master netting arrangement exists when the reporting entity has multiple contracts, *whether for the same type of conditional or exchange contract or for different types of contracts*, with a single counterparty that are subject to a contractual agreement that provides for the net settlement of all contracts through a single payment in a single currency in the event of default on or termination of any one contract.

31. Some respondents commented that the proposed Interpretation seemed inconsistent in the list of financial instruments to which it applies. In particular, respondents cited the difference in the list of instruments included in paragraphs 1 and 2 and paragraph 10. Although paragraphs 1 and 2 were intended to be a more detailed list of financial instruments that raise the question of how to apply the conditions for right of setoff, they were not intended to be exhaustive. The Board believes that specifying an exhaustive list of instruments that are addressed by the Interpretation is not desirable and therefore has included *other conditional or exchange contracts* in paragraph 10 in the list of items to which this Interpretation applies so that the Interpretation will address not only those financial instruments that exist today but instruments that will result from future innovation.

32. Some respondents indicated that the provisions of paragraph 10 also should apply to repurchase and reverse repurchase agreements executed with the same counterparty under a master netting arrangement and to all interest rate swaps executed with the same counterparty under a master netting arrangement. For the reasons discussed in paragraph 22, the Board concluded that offsetting of these assets and liabilities is inappropriate unless those contracts otherwise satisfy the conditions in paragraph 5 for right of setoff.

33. Some respondents asserted that comparability will be adversely affected unless offsetting of fair value amounts for contracts executed under a master netting arrangement is mandatory. The Board acknowledges that respondents have valid concerns about comparability. However, the Board believes that the cost-benefit considerations, discussed in paragraph 24, that led the Board to permit, but not

require, offsetting are valid.

34. Some respondents stated that an entity should be required to disclose whether it is offsetting fair value amounts so that financial statement users would be able to assess comparability between entities. This Interpretation does not affect the requirements of Statement 105 to disclose the extent, nature, and terms of financial instruments with off-balance-sheet risk and credit risk of financial instruments with off-balance-sheet credit risk. The Board believes that disclosure about whether an entity is offsetting fair value amounts under the provisions of paragraph 10 is not meaningful without also quantifying the effect of gross versus net presentation. Presumably an entity that reports gross amounts has determined that the cost-benefit of reporting net amounts is not justified; therefore, the Board concluded that the entity should not have to incur that same cost to make meaningful disclosures about the effect of choosing to report gross amounts.

35. Some respondents commented that having to apply the provisions of the proposed Interpretation would place U.S. financial institutions at a competitive disadvantage, thereby potentially reducing liquidity in the market. Other standard-setting organizations have issued guidance similar to the guidance in this Interpretation. For example, a joint Statement of Recommended Accounting Practice (SORP), *Off-Balance-Sheet Instruments and Other Commitments and Contingent Liabilities*, issued in November 1991 by the British Bankers' Association and the Irish Bankers' Federation, indicates that the value of interest rate, exchange rate, and market-price-related contracts should not be offset unless they are with the same counterparty and there is a legal right of setoff.

36. Some respondents indicated that paragraph 10 of this Interpretation seems inconsistent with the requirement in paragraph 5(c) that the reporting party intends to set off. Some respondents indicated that the requirement in paragraph 5(c) should be eliminated because intent is not relevant if the right and the ability to set off exist and because the requirement leads to noncomparability among financial statements. The Board concluded that a fundamental reconsideration of the requirements of paragraph 5 is beyond the scope of this Interpretation. The Board acknowledges the inconsistency between paragraph 10 and paragraph 5(c) and concluded, for the reasons stated in paragraph 21, that even if the reporting entity intends to set off only in the event of default or termination, it is appropriate to offset fair value amounts recognized for conditional or exchange contracts executed with the same counterparty under a master netting arrangement.

37. Some respondents commented that the effective date of this Interpretation should be delayed. In particular, banks requested a delay in the effective date to provide time to develop systems that can accumulate unrealized gains and losses on a counterparty basis and, thereby, permit offsetting of unrealized gains and losses for contracts executed under a master netting arrangement; to execute additional master netting arrangements; and to address capital adequacy concerns. Although the data required to implement the proposed Interpretation, gross unrealized gains and losses, are available and are currently disclosed under the requirements of Statement 105, the Board decided for practical reasons to delay the effective date of the Interpretation to provide adequate time for entities to resolve other implementation issues.

**Background Information Incorporated from Technical Bulletin 88-2**

38. This Interpretation supersedes FASB Technical Bulletin No. 88-2, *Definition of a Right of Setoff*, as of the effective date of this Interpretation or its earlier application. The guidance in that Technical Bulletin is incorporated substantially unchanged in paragraphs 5-7 of this Interpretation primarily as a matter of convenience. Some respondents to the proposed Interpretation suggested that the Background Information and Consideration of Comments Received on the Proposed Technical Bulletin section of Technical Bulletin 88-2 also be incorporated in this Interpretation. Respondents indicated that that information has been helpful in answering questions in practice and has provided preparers of financial statements with additional information to better understand the criteria needed for a right of setoff. Those sections of Technical Bulletin 88-2 have been reviewed and to the extent they are still relevant they have been incorporated as part of the basis for conclusions of this Interpretation in paragraphs 39-50. Those sections of this Interpretation have been brought forward from Technical Bulletin 88-2 essentially unchanged except for paragraph numbers; where applicable the word

*Interpretation* has been substituted for the words *Technical Bulletin* and references to specific paragraphs of this Interpretation have been added.

39. FASB Statements No. 76, Extinguishment of Debt, and No. 77, *Reporting by Transferors for Transfers of Receivables with Recourse*, and FASB Technical Bulletin No. 85-2, *Accounting for Collateralized Mortgage Obligations (CMOs)*, address extinguishment of recognized liabilities and derecognition of recognized assets. This Interpretation is based on the explanation in Statement 76 that offsetting is a display issue that does not presume the derecognition of recognized liabilities. Paragraph 40 of that Statement states:

Several respondents to the revised Exposure Draft commented about offsetting assets against liabilities, though it was apparent that some respondents had confused *offsetting* with *extinguishment*. In the Board's view, *offsetting* is a display issue—how recognized assets and recognized liabilities should be presented in a balance sheet (or how other recognized elements should be displayed in a basic financial statement). In contrast, *extinguishment* is a recognition issue—whether an asset or a liability exists and whether continued recognition is warranted in the basic financial statements. This Statement addresses when debt ceases to be a liability that warrants continued recognition in the balance sheet.

**Consideration of Comments Received Incorporated from Technical Bulletin 88-2**

40. Some respondents to the proposed Interpretation suggested that the Consideration of Comments Received on the Proposed Technical Bulletin section of Technical Bulletin 88-2 also be incorporated in this Interpretation. Relevant portions of that section are contained herein in paragraphs 41-50.

41. A proposed Technical Bulletin, *Definition of a Right of Setoff*, was released for comment on April 14, 1988. Sixty letters of comment were received on the proposed Technical Bulletin. Certain of the comments received and consideration of them are discussed in the following paragraphs.

42. Some respondents questioned whether the proposed Technical Bulletin was intended to prohibit offsetting in circumstances in which offsetting is prescribed or permitted by various existing accounting pronouncements. They noted that such an objective would exceed the guidelines for a Technical Bulletin established in FASB Technical Bulletin No. 79-1 (Revised), *Purpose and Scope of FASB Technical Bulletins and Procedures for Issuance*. Paragraph 7 of this Interpretation clarifies that such a change is not intended.

43. Paragraph 2(a) of the proposed Technical Bulletin stated that the right of setoff "exists when each of *two* parties owes the other determinable amounts." Some respondents indicated that the number of entities involved in the transaction is not relevant to the decision to offset. The general principle of a right of setoff involves only two parties, and exceptions to that general principle should be limited to practices specifically permitted by the pronouncements indicated in paragraph 7 of this Interpretation.

44. Some respondents requested clarification of the requirement that each party owes the other determinable amounts. They specifically questioned whether those amounts need to be in the same currency, have the same maturities, and, if applicable, bear the same interest rate. If the parties meet the other criteria specified in the definition, specifying currency or interest rate requirements is unnecessary. However, if maturities differ, only the party with the nearer maturity could offset because the party with the longer term maturity must settle in the manner that the other party selects at the earlier maturity date.

45. Some respondents disagreed with the requirement that each party intend to set off and proposed that ability to set off should be sufficient. Those respondents further stated that the decision for net or gross settlement often is a matter of convenience or is tax motivated, would not be made until shortly before settlement, and should not determine the presentation in a statement of financial position. Others indicated that intent is not a condition specified by Opinion 10 and that a new requirement should not be imposed. They also stated that intent is subjective, can exist in various degrees, and is

difficult to substantiate, and that such a requirement will be applied inconsistently in practice. If a party does not intend to set off even though the ability to set off exists, an offsetting presentation in the statement of financial position is not representationally faithful. Acknowledgment of the intent to set off by the reporting party and, if applicable, demonstration of the execution of the setoff in similar situations meet the criterion of intent.

46. Other respondents supported requiring an intent to set off if the condition is limited to the party intending to set off. They observed that a reliable assessment of the other party's intent is impractical and that the lack of that intent is irrelevant if a unilateral legal right of setoff exists for one party. This Interpretation requires that only the reporting entity need have the intent to set off.

47. As used in the proposed Technical Bulletin, *enforceable by law* meant enforceable in a court proceeding by reason of statute or otherwise and demonstrable through examination of a contract. However, some respondents interpreted the requirement to mean the existence of a statute, and they cited situations in which the right of setoff is not specifically included in contractual agreements but was enforceable because of regulatory procedures or as part of normal business practice. The wording of the requirement in paragraph 5(d) of this Interpretation was revised to state *enforceable at law* in order to include those situations.

48. Some respondents opposed the bankruptcy protection requirement in paragraph 2(d) of the proposed Technical Bulletin as inconsistent with the going-concern concept. Commentators indicated that, as a general rule, accounting should reflect what is expected to occur in the normal course of business and protection in bankruptcy is not pertinent when the probability of bankruptcy is remote. Some respondents were concerned also about the difficulty of determining protection in bankruptcy. They noted that the lack of a uniform bankruptcy law and the broad discretion provided to bankruptcy judges would make predicting the outcome of isolated transactions involved in a setoff situation extremely difficult. Those respondents also noted that legal opinions are costly, if obtainable at all, but would likely be required for management and auditors to determine if a right of setoff exists. Also, some banks pointed out that bankruptcy law generally is inapplicable to certain regulated industries due to regulatory intervention in insolvency. In light of these comments, the requirement of legal enforceability was deemed to be sufficient evidence of the right of setoff. This Interpretation does not include a separate requirement for protection in bankruptcy.

49. Some respondents questioned whether transactions involving a lender, a parent company, and its subsidiary could qualify under the proposed definition if all parties agree to the lender's unilateral right of setoff under a contractual arrangement. An example of that transaction is a loan by the foreign branch of a U.S. bank to a foreign subsidiary of a U.S. parent with the parent simultaneously depositing an amount equal to the loan in the U.S. bank for the same term. The deposit is collateral for the loan, and the bank has the legal right of setoff only in the event of default by the foreign subsidiary. Offsetting the collateral with the debt in that situation is inappropriate either in the bank's financial statements or in the consolidated financial statements of the parent and the foreign subsidiary.

50. Some respondents identified Statement 87 as an example in which plan assets are offset against the plan liabilities without meeting the criteria of the proposed Technical Bulletin. They indicated that other assets held in trust should be offset against the related liabilities in a manner similar to the reporting prescribed in Statement 87. Pension trusts are significantly different from most trusts and trusteed assets supporting other liabilities. The accounting and reporting for pensions was specifically considered by the Board in Statement 87. However, trusts established for other specified purposes, such as for decommissioning of a nuclear generating plant, would have to meet the conditions for setoff specified in paragraph 5.

---

  [Group 'fas133(am)', par. 525']FAS105, Appendix B, Footnote i—Netting of receivable and payable amounts when right of setoff does not exist is in contravention of APB Opinion No. 10, *Omnibus Opinion—1966*, [Group 'fas133(am)', par. 525']paragraph 7, and FASB Technical Bulletin No. 88-2, *Definition of a Right of Setoff*.

---

1

For example, a forward foreign exchange contract may call for a party to deliver one million U.S. dollars in exchange for two million German marks at a specified future date. Under current reporting practice, the party would not record a receivable for the German marks or a payable for the U.S. dollars. Rather, a net amount reflecting the fair value of the position may be reported in the statement of financial position.

2

For purposes of this Interpretation, cash on deposit at a financial institution is to be considered by the depositor as cash rather than as an amount owed to the depositor.

3

This Interpretation does not address derecognition or nonrecognition of assets and liabilities. Derecognition by sale of an asset or extinguishment of a liability results in removal of a recognized asset or liability and generally results in the recognition of gain or loss. Although conceptually different, offsetting that results in a net amount of zero and derecognition with no gain or loss are indistinguishable in their effects on the statement of financial position. Likewise, not recognizing assets and liabilities of the same amount in financial statements achieves similar reported results.

4

The fair value recognized for some contracts may include an accrual component for the periodic unconditional receivables and payables that result from the contract; the accrual component included therein may also be offset for contracts executed with the same counterparty under a master netting arrangement.

[Group 'fas133(am), par. 525']FAS105, Appendix B, Footnote i—Netting of receivable and payable amounts when right of setoff does not exist is in contravention of APB Opinion No. 10, *Omnibus Opinion—1966*, [Group 'fas133(am), par. 525']paragraph 7, and FASB Technical Bulletin No. 88-2, *Definition of a Right of Setoff.*

END OF DOCUMENT -
© 2008 Thomson/RIA. All rights reserved.

# EXHIBIT 120

1 of 2

DO NOT DESTROY

## THE WILLIAM E. and DESIREE MOORE

## 1990 REVOCABLE TRUST AGREEMENT

REDACTED

MT 002033
Confidential

REDACTED

MT 002042
Confidential

REDACTED

MT 002043
Confidential

REDACTED

MT 002044
Confidential

REDACTED

MT 002045
Confidential

REDACTED

MT 002046
Confidential

REDACTED

MT 002047
Confidential

REDACTED

MT 002048
Confidential

REDACTED

MT 002049
Confidential

# EXHIBIT 121

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,            )
                                     )
            Plaintiffs,              )
                                     )  Case No.
        vs.                          )
                                     )  C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                     )
            Defendants.              )
                                     )
                                     )
                                     )

VIDEOTAPED DEPOSITION OF THOMAS FERNANDEZ
                April 21, 2008
            San Francisco, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79887

e4d659ab-3a1d-40ea-870f-849f9b148d90

Page 32

1    Q    Do you have an understanding?

2    A    Yes, I do.

3    Q    Is it consistent with what I just said?

4         MS. HASSELMAN:    Objection.  Vague and also

5    prior objections I made.

6    A    Yes.

7  BY MR. LOVITT:

8    Q    So is it fair to say that if this case is

9  lost, you would personally be prepared to reimburse the

10 defendants for the costs that they have had in defending

11 this lawsuit?

12        MS. HASSELMAN:    Objection.  Misstates

13 prior testimony.

14   A    Yes, I would.

15 BY MR. LOVITT:

16   Q    Did you ever -- did it ever come to your

17 attention that the Paint Company was a defendant in a

18 large number of suits by individuals who claim that they

19 had been injured by asbestos contained in the product

20 that the Paint Company was selling?

21        MS. HASSELMAN:    Objection.  Vague and

22 ambiguous.

23   A    Yes.

24 BY MR. LOVITT:

25   Q    When did you first have that realization?

Page 33

1      A     I'm not sure of the exact date.

2      Q     Well, you left your employment at CIG in

3   October of '96 -- excuse me.  Excuse me.  Here we go

4   again.  October of 2005; is that correct?

5      A     That's correct.

6      Q     Now, in terms of that termination date,

7   October of '05, can you tell me approximately how soon

8   before that you learned of Kelly-Moore Paint Company's

9   asbestos problem?

10          MS. HASSELMAN:   Objection.  Vague and

11  ambiguous.

12      A     I don't remember the exact date.

13  BY MR. LOVITT:

14      Q     Can you tell me how you came to learn that

15  the Paint Company had a problem with asbestos

16  litigation?

17          MS. HASSELMAN:   Objection.  Vague.

18      A     It was through we were told at a meeting

19  personally by both Bob Winn and Pete Cazzolla of that.

20  BY MR. LOVITT:

21      Q     Where did that meeting take place?

22      A     At the Bay Area Branch.

23      Q     And why was Mr. Cazzolla at the Bay Area

24  Branch?  Was that his normal place of where he performed

25  his work?

ESQUIRE DEPOSITION SERVICES
800.770.3363

e4d659ab-3a1d-40ea-870f-849f9b148d90

Page 119

1    do.

2    BY MR. LOVITT:

3        Q    Okay.  What criticism do you have of the

4    purchase of the Paint Company ESOP shares?

5        MS. HASSELMAN:    Same objections.  Calls

6    for a legal conclusion and calls for expert testimony.

7        A    That regards a conversation I had with my

8    attorneys, so I don't think I'm required to state it, I

9    don't think.

10   BY MR. LOVITT:

11       Q    Well, prior to meeting with your attorneys,

12   did you have any knowledge at all as to the facts and

13   circumstances of the purchase of the Paint Company ESOP

14   stock?

15       A    No, I did not.

16       Q    And then down at the bottom of Exhibit 223

17   it says, in the discussion of how you determine the

18   value of the stock, it says, also the outcome of

19   Kelly-Moore Paint Company's asbestos liability will

20   affect the value of the K-M Industries Class I stock,

21   which we hold.

22       That was the stock that you held; that was

23   your ESOP stock, wasn't it, Class I stock?

24       MS. HASSELMAN:    Object to the form of the

25   question.  Vague and ambiguous.

e4d659ab-3a1d-40ea-870f-849f9b148d90

Page 183

1    that you left in October of '05.  How soon before you

2    left did you get that information?

3                MS. HASSELMAN:   Objection.  Asked and

4    answered.

5         A    I'm not sure of the exact time, but I think

6    it was around a year.

7    BY MR. LOVITT:

8         Q    And do you recall who provided that

9    information?

10        A    I believe it was in a company memo.

11        Q    Did Mr. Cazzolla provide that information?

12        A    Right off the bat I don't remember who

13   signed it.  I think it was a result of a quarterly

14   meeting.

15        Q    So it was this concern that your ESOP

16   interest would be reduced to zero that led to your

17   decision to leave CIG's employ; is that correct?

18        A    That was part of it, yes.

19        Q    And it was this same concern that led to

20   your decision to seek legal counsel and file a lawsuit;

21   is that correct?

22                MS. HASSELMAN:   Objection.  Asked and

23   answered.

24   BY MR. LOVITT:

25        Q    Is that correct, Mr. Fernandez?

e4d659ab-3a1d-40ea-870f-849f9b148d90

Page 184

1    A    That's correct.

2    Q    Now, that concern of yours has not come to

3    pass, has it, sir?

4         MS. HASSELMAN:    Objection.  Vague and

5    ambiguous.

6    BY MR. LOVITT:

7    Q    Your concern that your ESOP interest would

8    be wiped out by the asbestos litigation against the

9    Paint Company, that has not come about, has it, sir?

10    A    As of today it has not.

11    Q    Okay.  In fact, I think we saw a document,

12    Exhibit 179, which indicates that the current share

13    value of your ESOP shares is $10.55 per share.  I am

14    looking at Exhibit 179.

15         MS. HASSELMAN:    I am going to object

16    because the document that is marked Exhibit 179 hasn't

17    been authenticated.  That's the one he is talking about.

18    A    That's correct.

19    BY MR. LOVITT:

20    Q    So instead of your value of your ESOP

21    shares being reduced to zero, they have increased, in

22    fact, from $6.55 to $10.55; is that correct?

23         MS. HASSELMAN:    Objection.  Calls for a

24    legal conclusion.  Calls for expert testimony.

25    A    As of 5/17/2007 that would be correct.

# EXHIBIT 122

**?**

# QUARTERLY EMPLOYEE MEETING
### August 16, 2004

## QUESTIONS AND ANSWERS

1. **My questions pertain to ESOP as our Participant Statement for 2003 has not yet been received. (Anonymous)**

   - **If my employment ends today, what happens to my vested benefits? Will the vested amount/value I have in my account today be put aside so as not to gain or lose value until the time it is distributed to me?**

   *Response:*

   *You have a vested percentage at the end of each plan year, i.e., from 20% to 100%. When you terminate employment with CIG, that percentage remains the same from the last year you qualified to participate in the ESOP (worked 1,000 hours).*

   *No, your account will not be put aside to not change value until distributed to you.*

   *There may be small numbers of shares added to your account in following years from forfeitures and dividends, but the primary reason for increases/decreases in the value of your vested benefit will be from the change in share value. (Example — If the share value doubles, so will your account balance.)*

   - **Is there anything the Plan Administrator/Committee can do or have done to protect the benefits of the Plan participants in light of the asbestos/Mesothelioma lawsuits, which will be ongoing for many years to come?**

   *Response:*

   *The K-M Industries plan administrators and the plan trustee, North Star ESOP and Fiduciary Services, have been and are continuing to evaluate options to obtain the maximum benefit possible from our ESOP. The primary obstacle continues to be the extent of the liabilities created by asbestos claims and the estimated future value of these claims and their subsequent impact on the equity value of Kelly Moore. At this point, Kelly Moore Paint Company continues to take legal action to settle individual claims, with reasonable success, and to quickly move to trial their lawsuit against Union Carbide. Several trial dates were set this year with subsequent postponements. The trial date for August has been moved to September regarding this case, subject to further postponement due to challenges by Union Carbide. It is difficult to predict the outcome of a jury trial, so we will have to*

CIG_ESI 2713

Questions and Answers
August 16, 2004
Page 2

*wait for the jury's verdict. A verdict in favor of Kelly Moore should affect our ESOP value positively, but this cannot be guaranteed.*

*As presented to you and discussed with team members during previous Team Meetings, the worst case is if the asbestos liabilities cause Kelly Moore Paint to become insolvent, then the value of our ESOP shares could be zero up to some positive dollar value, depending on the ability of Kelly Moore Paint's assets and insurance to pay for the asbestos liabilities. Under this worst-case scenario, CIG may be faced with a need to seek new investors. Due to the excellent performance of CIG team members and our resultant strong financial performance, we should be in a position to put an equity structure in place that will allow the continuance of our company strategies.*

*Please be assured that all possible actions are being considered to minimize the impact Kelly Moore's asbestos liabilities will have on the K-M Industries "I" stock we own. The stock valuation is still in progress and will be finalized once the appraisers are relatively confident placing a value on Kelly Moore Paint Company.*

2.  With regards to the Personal Lines auto insurance policies, do you see us in a hard or a soft market? What is the difference between the two? In what timeframes do the two above occur: one to two years, two to three years? What type of business strategy will CIG use in the different markets? My questions come about because of all the TV ads that I have seen about discount auto insurance. One such ad shows CDI statistics with different company names and the rates that they charge. The companies sponsoring the ads that I've seen are Century 21, Progressive, and Mercury, along with Geico. (Gus Barkley, Junior Accountant—Home Office)

<u>Response:</u>

*A hard market is one where prices remain at a relatively higher level and underwriting terms and coverage are more restrictive. A soft market is one where prices are lower and underwriting terms and coverage more broad. The timing of these market conditions is driven by company loss experience and their strategies regarding growth and profit. Additionally, higher investment returns tend to encourage companies to lower rates to gain more premium dollars for investment returns that more than offset underwriting losses.*

*CIG will continue to market our personal lines products through independent agents. Other distribution models utilizing independent agents are being employed to better compete at point of sale with direct writers. Advertising may also be part of this strategy, however, not to the extent of the larger National Insurers. One-hundred-percent electronic interface with our agents and policyholders for new*

Questions and Answers
August 16, 2004
Page 3

---

*and renewal transactions, with Internet access, will give CIG a strong position in the markets we serve. This capability will improve our retention of existing clients and, through increased efficiency, allow our products to remain competitive. We have also embarked on a project to strengthen customer partnership and loyalty with CIG. The name of the project is CIGville, and you will be hearing more about our new program in the coming months. During our upcoming planning cycle, we will be developing strategies and actions to achieve our revised company five-year strategic goals, which are:*

- *Attain a before-tax average rate of return on surplus of 15% and revenue-growth rate of 10%.*

- *Develop strong agency relationships to achieve an average direct written premium of $1 million per agency.*

- *Provide superior customer service every transaction, every time, resulting in an average policyholder-retention ratio of 88% for all lines.*

- *Ensure team members, organization, and operating systems produce the flexibility needed to attain open communication, efficient operations, and proper controls, meeting or exceeding a total expense ratio, excluding commissions, of 15.5%.*

CIG_ESI 2713.003

# EXHIBIT 123

**Round Hill Securities, Inc.**
Broker/Dealer Member NASD/SIPC
Clearing Through BEAR, STEARNS SECURITIES CORP.

CLEARANCE AGENT:
BEAR, STEARNS SECURITIES CORP.
ONE METROTECH CENTER NORTH
BROOKLYN, NEW YORK 11201-3859
(212) 272-1000

REDACTED

REDACTED

MT 002260
Confidential

# EXHIBIT 124

# KELLY-MOORE MEMO

Doug Merrill    FROM Svend Stubb    DATE 3/31/82

SUBJECT    ASBESTOS USE IN PAINT PRODUCTS

We have reviewed the past use of asbestos in paint products at San Carlos and have found the following information.

Asbestos was used in product 225, from 1963 to 1968.  We do not have production figures for this entire period, however, during the six year period from 1972 to 1978, a total of 107,411 gallons of this product was manufactured.

Asbestos was used in product 235, from 1972 to 1978.  During that period a total of 17,274 gallons of this product was manufactured.

Asbestos was used in product 521 from 1974 to 1978.  During that period of time a total of 25,253 gallons of this product was manufactured.

The use of asbestos in paint manufacture was discontinued in 1978.

We have checked the old formulas and calculated the total amount of asbestos used in the San Carlos factory from 1972 through 1978.

Product 225 - 107,411 gals X .65 lbs = 69,817 lbs  (34.9 Tons)
Product 235 -  17,274 gals X 2.0 lbs = 34,548 lbs  (17.3 ,, )
Product 521 -  25,253 gals X .45 lbs = 11,364 lbs  (5.7 ,, )

Total Asbestos used -  115,729 lbs (57.9 Tons)

This information may be made available to our Attorneys and Insurance Companies.  However, the information should not be made available unless it is specifically requested.

SS:if

cc:  William E. Moore



EXHIBIT
WKKM 5016

KMX 00183

KMWK 000888

# EXHIBIT 125

# NORTH STAR
ESOP & FIDUCIARY SERVICES

500 West Madison Street
Suite 3630
Chicago IL 60661

312.559.9761
Fax 312.559.9762

www.northstartrust.com

July 5, 2005

Participant in the K-M Industries Holdings Co, Inc. Employee Stock Ownership Plan

Re:  Participant Statements for the 2003 and 2004 Plan Years
--- Kelly-Moore Paint Company, Inc.
-- California Capital Insurance Company, Inc.

Dear Participant:

This letter has been prepared to give all the participants in the K-M Industries Holding Co, Inc. Employee Stock Ownership Plan ("ESOP"), an update on the status of valuation of the stock held by the ESOP for the 2003 and 2004 plan years and the status of the participant statements for such plan years.  This includes those participants who are affiliated with Kelly-Moore Paint Company, Inc. ("Paint Company") and those participants who are affiliated with California Capital Insurance Company, Inc. ("Insurance Company").

As we advised you in February of this year, participant statements for the December 31, 2003 plan year reflecting your account balances in the ESOP were not distributed to you because the process of preparing a proper valuation of the K-M Industries Holdings Co., Inc. ("Company") stock held by the ESOP had not yet been completed for reasons that relate to the asbestos litigation.  As you know, the ESOP holds the following types of common stock; (i) a class of common stock of K-M Industries Holding Co, Inc. that tracks the performance of the Paint Company, and (ii) a class of common stock of K-M Industries Holding Co, Inc. that tracks the performance of the Insurance Company.  Both types of common stock held by the ESOP are affected by the impact of the asbestos litigation currently facing the Paint Company.

In our February letter, we had advised you that in our role as successor Trustee of the ESOP, North Star Trust Company ("Trustee"), had not yet engaged a qualified valuation firm.  We have now engaged the valuation firm of Stout Risius Ross, Inc. as the Trustee's independent financial advisor and we, together with Stout Risius Ross, Inc., are currently meeting with both the Paint Company and the Insurance Company to perform the necessary financial due diligence to perform a valuation of the K-M Industries Holding Co, Inc. stock held by the ESOP for the 2003 and 2004 plan years.  While the process is now focused on the valuation for 2003, we will move to the 2004 valuation when we have completed the work for 2003 and full information is available for 2004.

A division of
North Star
Trust Company

Once this process is complete and we, as Trustee, have received completed valuation reports for the appropriate plan years, participant statements for

1-DA/2017534.1

CIG 005150