

1 Ronald Lovitt, Bar No. 040921
  J. Thomas Hannan, Bar No. 039140
2 Henry I. Bornstein, Bar No. 75885
  Terence F. Young, Bar No. 069943
3 LOVITT & HANNAN, INC.
  900 Front Street, Suite 300
4 San Francisco, California 94111
  Telephone: (415) 362-8769
5 Facsimile: (415) 362-7528
  *rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com, tfylaw@earthlink.net*

6
  Attorneys for Defendants K-M Industries
7 Holding Co. Inc.; K-M Industries Holding Co.
  Inc. ESOP Plan Committee; and CIG ESOP
8 Plan Committee

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

## OAKLAND DIVISION

11

12 THOMAS FERNANDEZ, LORA SMITH
   and TOSHA THOMAS, individually and on
13 behalf of a class of all others similarly
   situated,

14            Plaintiffs,

15 v.

16 K-M INDUSTRIES HOLDING CO., INC.,
   *et al.,*

17            Defendants.

18

) Case No. C06-07339 CW
)
) **DECLARATION OF TERENCE F.**
) **YOUNG ESTABLISHING THAT**
) **INFORMATION DESIGNATED BY**
) **PLAINTIFFS IN SUPPORT OF THEIR**
) **OPPOSITION TO DEFENDANTS'**
) **MOTIONS FOR SUMMARY**
) **JUDGMENT IS SEALABLE**
)
) **CIVIL LOCAL RULE 79-5(d)**
)
)
)
)

19 I, Terence F. Young, declare:

20      1.      I am an attorney licensed to practice in the State of California and before this Court.

21 I am associated with Lovitt & Hannan, Inc., attorneys for Defendants K-M Industries Holding Co.

22 Inc., K-M Industries Holding Co. Inc. ESOP Plan Committee, and CIG ESOP Plan Committee (the

23 "KMH defendants") in this matter. I have custody of the relevant files of Lovitt & Hannan, Inc.

24 related to this action and am familiar with the contents thereof. I make this declaration pursuant to

25 L.R. 79-5(d) to establish that certain portions of plaintiffs' memorandum of points and authorities in

26

1    opposition to defendants' motions for summary judgment and certain documents designated by

2    plaintiffs to be confidential and submitted by plaintiffs in support of their opposition should be

3    sealed and not made part of the Court's public files.

4         2.     K-M Industries Holding Co. Inc. ("KMH") is a privately-held corporation comprising

5    two operating subsidiaries, Kelly-Moore Paint Company and Capital Insurance Group.  Prior to

6    1999, KMH was known as Kelly Moore Paint Co., Inc.  (Here, unless the distinction is significant, I

7    refer to all as "KMH.")  KMH maintains its financial and accounting records and other materials

8    related to its operation and operating results in strictest confidence and treats such matters as trade

9    secrets.  Such confidentiality applies as well to its communications with its auditors. KMH's shares

10   are not traded publicly and the estimated value of those shares is likewise a closely-guarded trade

11   secret of KMH.  Both of KMH's subsidiaries are engaged in highly-competitive industries.

12   Revealing KMH's confidential information in the public records of this Court potentially could

13   harm the privacy interests of KMH and put it and its subsidiaries at a competitive disadvantage.

14        3.     Plaintiffs' claims in the captioned lawsuit are premised on alleged violations of

15   Employee Retirement Income Security Act ("ERISA"). In the context of such litigation, the courts

16   have established that certain communications between ERISA Plan administrators, acting as

17   fiduciaries, and the attorneys retained by them, that normally would be protected from discovery by

18   the attorney-client privilege, are subject to a "fiduciary exception" to that privilege.  As a

19   consequence, the attorney-client privilege does not bar the discovery by Plan beneficiaries, such as

20   plaintiffs in this action, of otherwise privileged communications. *United States v. Mett*, 178 F.3d

21   1058, 1063 (9th Cir. 1999).  Communications subject to the fiduciary exception retain their

22   privileged status as to anyone other than the fiduciary and the beneficiaries.  Some documents and

23   declarations submitted by plaintiffs in support of their opposition to defendants' motions for

24   summary judgment were produced in discovery in this matter because they were subject to the

25   fiduciary exception.  Nevertheless, the KMH defendants continue to claim privilege as to such

26

1    documents and testimony and continue to assert a claim of privilege as to anyone other than

2    defendants and plaintiffs in this lawsuit.

3        4.        Among the issues raised by plaintiffs are claims primarily related to independent

4    appraisals of the value of KMH's shares performed at the time of the formation of the ESOPs that

5    are the subject of the lawsuit.  Said appraisals were performed to value shares that are not traded

6    publicly and were based on financial results that are not made publicly available by KMH.  KMH

7    continues to treat such appraisals and valuations as confidential.

8    **I.    Plaintiffs' Opposition To Defendants' Motions For Summary Judgment**

9        5.        Plaintiffs have redacted portions of their Opposition to Defendants' Motions for

10   Summary Judgment pursuant to L.R. 79-5(d) based on claims of confidentiality by the KMH

11   defendants.  Attached hereto as Exhibit A is a true and correct copy of a revised redacted version of

12   Plaintiffs' Opposition showing only those redactions requested by the KMH defendants.  There are

13   five categories of information as to which the KMH defendants assert claims of attorney-client

14   privilege and confidentiality:

15       a.        Information protected by the attorney-client privilege but produced in this

16   matter pursuant to the fiduciary exception.  KMH has maintained the strict confidentiality of such

17   information except where it is subject to discovery by plaintiffs based upon the fiduciary exception

18   doctrine.

19       b.        Information comprising communications between KMH and its auditors, all

20   of which is maintained as confidential by this privately-held company.  The release of such

21   information in the public records of this court would harm KMH's competitive advantage.

22       c.        Information comprising communications between KMH and appraisers and

23   valuators of its stock, done for the purpose of valuing the company's shares in connection with the

24   ESOP. KMH has maintained the confidentiality of such appraisals of its privately-held shares and of

25   the information on which such appraisals were based.

26   CASE C06-07339 CW                        -3-        DECLARATION OF TERENCE F. YOUNG IN
                                                         SUPPORT OF PLAINTIFFS' ADMIN. MOTION TO SEAL

1          d.      Information comprising communications between KMH and potential

2    purchasers of the company. All such communications have been maintained as confidential by the

3    company except as to such potential purchasers.

4          e.      Information comprising communications between KMH and its insurers on

5    the subject of coverage for asbestos related liabilities. All such communications have been

6    maintained as confidential by the company.

7      6.      Opposition, Page 3:15-17 - Defendants withdraw their confidentiality designation of

8    the information in this excerpt of Plaintiffs' brief.

9      7.      Opposition, Pages 3:20-4:7 – This portion of plaintiffs' brief comprises information

10   concerning the results of due diligence done by a proposed purchaser of KMH. The results of the

11   analysis by the proposed private purchaser are confidential and not publicly known.

12     8.      Opposition, Page 4:9-11 - Defendants withdraw their confidentiality designation of

13   the information in this excerpt of Plaintiffs' brief.

14     9.      Opposition, Page 4:17-22 - Defendants withdraw their confidentiality designation of

15   the information in this excerpt of Plaintiffs' brief.

16     10.     Opposition, Page 5:4-5 - Defendants withdraw their confidentiality designation of the

17   information in this excerpt of Plaintiffs' brief.

18     11.     Opposition, Page 5:9-11 – Defendants withdraw their confidentiality designation of

19   the information in this sentence of Plaintiffs' brief.

20     12.     Opposition, Page 5:11-13 - This sentence of plaintiffs' brief comprises the substance

21   of attorney-client communications produced in this matter pursuant to the fiduciary exception.

22     13.     Opposition, Page 5:19-25 – This paragraph comprises the substance of

23   communications between KMH and its insurers concerning the extent of insurance coverage for

24   asbestos-related claims. Such communications are maintained as confidential by KMH.

25     14.     Opposition, Pages 5:26-6:2 - This sentence of plaintiffs' brief comprises the

1  substance of attorney-client communications produced in this matter pursuant to the fiduciary

2  exception.

3      15.    Opposition, Page 6:8-10 - Defendants withdraw their confidentiality designation of

4  the information in this sentence of Plaintiffs' brief.

5      16.    Opposition, Page 8:15-20 – This portion of plaintiffs' brief comprises the substance

6  of communications between KMH and an independent appraiser of the value of the company and

7  the appraiser's analysis.

8      17.    Opposition, Page 9:17-22 - This sentence of plaintiffs' brief comprises the substance

9  of attorney-client communications produced in this matter pursuant to the fiduciary exception.

10      18.    Opposition, Page 9, footnote 11 - This footnote of plaintiffs' brief comprises

11  information about attorney-client communications produced in this matter pursuant to the fiduciary

12  exception.

13      19.    Opposition, Page 11, footnote 12 (partial) – Defendants withdraw their

14  confidentiality designation of the information in this sentence of Plaintiffs' brief.

15      20.    Opposition, Page 12:2-27 - This entire page of plaintiffs' brief comprises the

16  substance of attorney-client communications produced in this matter pursuant to the fiduciary

17  exception.  In addition, the page contains information concerning confidential communications of

18  such attorney-client communications between KMH and valuators of its stock.

19      21.    Opposition, Page 13:2-14:7 – This portion of plaintiffs' brief comprises the substance

20  of confidential communications between KMH and its accountants and auditors.  In addition, it

21  contains allusions to attorney-client communications which were produced in this matter pursuant to

22  the fiduciary exception.

23      22.    Opposition, Page 14:10-11 - This sentence comprises the substance of confidential

24  communications between KMH and its accountants and auditors.

25      23.    Opposition, Page 14, footnote 14 - These sentences comprise the substance of

26  CASE C06-07339 CW          -5-        DECLARATION OF TERENCE F. YOUNG IN
SUPPORT OF PLAINTIFFS' ADMIN. MOTION TO SEAL

confidential communications between KMH and its accountants and auditors and the contents of audited financial statements of KMH that are maintained as confidential.

24.    Opposition, Page 15:1-3 - Defendants withdraw their confidentiality designation of the information in this sentence of Plaintiffs' brief.

25.    Opposition, Page 15:17-18 - Defendants withdraw their confidentiality designation of the information in this sentence of Plaintiffs' brief.

26.    Opposition, Page 15:20-21 – Defendants withdraw their confidentiality designation of the information in this sentence of Plaintiffs' brief.

27.    Opposition, Page 17:2-5 - Defendants withdraw their confidentiality designation of the information in this sentence of Plaintiffs' brief.

28.    Opposition, Pages 17:11-18:1 - This portion of plaintiffs brief comprises confidential information concerning asbestos liabilities that was communicated by KMH's counsel to a prospective buyer of the company.

29.    Opposition, Page 18:2-8 - Defendants withdraw their confidentiality designation of the information in these seven lines of Plaintiffs' brief.

30.    Opposition, Page 18:8-11 – These lines of Plaintiff's brief comprise information concerning insurance coverage and KMH's communications with its insurers, which the company has maintained as confidential.

31.    Opposition, Page 18:12-19 – This paragraph of Plaintiffs' brief comprises the contents of communications between KMH and its auditors.

32.    Opposition, Page 18:20-23 – This portion of plaintiffs' brief relates to the subject of financial effects of litigation against KMH by plaintiffs claiming personal injuries from exposure to asbestos. Repeating the exact nature of those statements in this declaration would defeat the purpose of maintaining their confidentiality. Kelly Moore has carefully maintained the confidentiality of its internal discussions of the financial effects of such litigation and continues to believe that the public

1  revelation of such considerations would damage its public image and its business.

2      33.    Opposition, Page 18:23-26 - Defendants withdraw their confidentiality designation of

3  the information in these last two sentences of page 18 of Plaintiffs' brief.

4      34.    Opposition, Page 21, footnote 20 - Defendants withdraw their confidentiality

5  designation of the information in all but the last line of this footnote. The last line of the footnote

6  relates to the subject of financial effects of litigation against KMH by plaintiffs claiming personal

7  injuries from exposure to asbestos. Repeating the exact nature of those statements in this declaration

8  would defeat the purpose of maintaining their confidentiality. Kelly Moore has carefully maintained

9  the confidentiality of its internal discussions of the financial effects of such litigation and continues

10  to believe that the public revelation of such considerations would damage its public image and its

11  business.

12      35.    Opposition, Page 22:12-15 - Defendants withdraw their confidentiality designation of

13  the information in all but the last line of this sentence. The last line of the sentence relates to the

14  subject of financial effects of litigation against KMH by plaintiffs claiming personal injuries from

15  exposure to asbestos. Repeating the exact nature of those statements in this declaration would defeat

16  the purpose of maintaining their confidentiality. Kelly Moore has carefully maintained the

17  confidentiality of its internal discussions of the financial effects of such litigation and continues to

18  believe that the public revelation of such considerations would damage its public image and its

19  business.

20      36.    Opposition, Page 22:27-23:8 - Defendants withdraw their confidentiality designation

21  of the information in this portion of Plaintiffs' brief.

22      37.    Opposition, Page 23:9-15 - Defendants withdraw their confidentiality designation of

23  the information in this portion of Plaintiffs' brief.

24      38.    Opposition, Page 23, footnote 22 - Defendants withdraw their confidentiality

25  designation of the information in this footnote of Plaintiffs' brief.

26

39.     Opposition, Page 24:5-15 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

40.     Opposition, Page 25:7-10 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

41.     Opposition, Page 30:16-22 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

42.     Opposition, Page 32:1-2 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

43.     Opposition, Page 33:8-9 - This portion of plaintiffs' brief comprises the substance of attorney-client communications produced in this matter pursuant to the fiduciary exception.

44.     Opposition, Page 35:8-12 – This portion of plaintiffs' brief comprises the substance of confidential communications between KMH and its accountants and auditors.

45.     Opposition, Page 35:12-17 - This portion of plaintiffs' brief comprises the substance of attorney-client communications produced in this matter pursuant to the fiduciary exception.

46.     Opposition, Page 35:18-20 - This portion of plaintiffs' brief comprises the substance of confidential communications between KMH and its accountants and auditors.

47.     Opposition, Page 35:21-25 - This portion of plaintiffs' brief comprises the substance of attorney-client communications produced in this matter pursuant to the fiduciary exception.

48.     Opposition, Page 37:11-13 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

49.     Opposition, Pages 37:27-38:23 – This portion of plaintiffs' brief contains every type of confidential information: a) the contents of attorney-client communications, b) communications between KMH and its auditors, c) communications between KMH and potential buyers, and d) information concerning the financial effects of litigation against KMH by plaintiffs claiming personal injuries from exposure to asbestos.

50.     Opposition, Page 39:2-5 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

51.     Opposition, Page 39:9-16 - This portion of plaintiffs' brief contains almost every type of confidential information: a) the contents of attorney-client communications, b) communications between KMH and its auditors, c) and communications between KMH and potential buyers.

52.     Opposition, Page 40:16-19 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

53.     Opposition, Page 43:15-18 - Defendants withdraw their confidentiality designation of the information in this portion of Plaintiffs' brief.

54.     Opposition, Page 47:10-15 – This portion of plaintiffs' brief relates to the subject of financial effects of litigation against KMH by plaintiffs claiming personal injuries from exposure to asbestos. Repeating the exact nature of those statements in this declaration would defeat the purpose of maintaining their confidentiality.  Kelly Moore has carefully maintained the confidentiality of its internal discussions of the financial effects of such litigation and continues to believe that the public revelation of such considerations would damage its public image and its business.

**II.     Exhibits Designated as Confidential in Declaration of Nina Wasow in Support of Plaintiffs' Administrative Motion to File Documents Under Seal**

55.     Listed below are descriptions of the portions of the exhibits filed under seal by Plaintiffs in support of their opposition to defendants' motions for summary judgment and the basis for KMH's claim that portions of such exhibits either are confidential or protected by the attorney-client privilege.  As was the case with the information the KMH defendants sought to protect in plaintiffs' opposition brief, the information it seeks to protect in the Exhibits submitted by plaintiffs falls into the following categories:

a.     Information protected by the attorney-client privilege but produced in this matter pursuant to the fiduciary exception.  KMH has maintained the strict confidentiality of such

1 information except where it is subject to discovery by plaintiffs based upon the fiduciary exception

2 doctrine.

3          b.      Information comprising communications between KMH and its auditors, all

4 of which is maintained as confidential by this privately-held company. The release of such

5 information in the public records of this court would harm KMH's competitive advantage.

6          c.      Information comprising communications between KMH and appraisers and

7 valuators of its stock, done for the purpose of valuing the company's shares in connection with the

8 ESOP. KMH has maintained the confidentiality of such appraisals of its privately-held shares and of

9 the information on which such appraisals were based.

10          d.      Information comprising communications between KMH and potential

11 purchasers of the company. All such communications have been maintained as confidential by the

12 company except as to such potential purchasers.

13          e.      The minutes of meetings of the shareholders and boards of directors of this

14 privately-held company. Such minutes have been maintained as private and confidential by KMH.

15          f.      Information comprising communications between KMH and its insurers on

16 the subject of coverage for asbestos related liabilities. All such communications have been

17 maintained as confidential by the company.

18     56.    Exhibit 1, excerpts from the deposition of Joseph Cristiano taken April 8, 2008,

19 pages 250-252. Pages 250-252 comprise testimony related to financial effects of litigation against

20 KMH by plaintiffs claiming personal injuries from exposure to asbestos. Repeating the exact nature

21 of those statements in this declaration would defeat the purpose of maintaining their confidentiality.

22 Kelly Moore has carefully maintained the confidentiality of its internal discussions of the financial

23 effects of such litigation and continues to believe that the public revelation of such considerations

24 would damage its public image and its business.

25     57.    Exhibit 2, death certificate for William E. Moore, bates stamped KMH 1797.

26 CASE C06-07339 CW           -10-     DECLARATION OF TERENCE F. YOUNG IN
                              SUPPORT OF PLAINTIFFS' ADMIN. MOTION TO SEAL

1    Defendants withdraw their confidentiality designation of the information in this Exhibit.

2    58.    Exhibit 5, Minutes of the Annual Combined Meeting of the Board of Directors and

3    Shareholders of Kelly-Moore Paint Company, dated March 26, 1997, bates stamped KMH 11004-

4    11008.  These minutes of the combined board and shareholders meeting contain detailed financial

5    performance information related to both KMH subsidiaries, that comprises private and confidential

6    financial data.

7    59.    Exhibit 6, Minutes of a Joint Special Meeting of the Boards of Directors of K-M

8    Industries Holding Co., Inc. and Kelly-Moore Paint Company, dated March 9, 2006, bates stamped

9    KMH 555-557.  These minutes include information on financial results, asbestos litigation

10    management, and attorney-client privileged information produced in this matter pursuant to the

11    fiduciary exception.

12    60.    Exhibit 7, Unanimous Written Consent in Lieu of a Meeting of the Board of

13    Directors of Kelly-Moore Paint Company, Inc., dated March 14, 2003, page bates stamped KMH

14    6546.  This unanimous written consent in lieu of board meeting includes information of monetary

15    contributions to the ESOP and compensation of company officers, all of which is private and

16    confidential.

17    61.    Exhibit 8, minutes of a Joint Special Meeting of the Boards of Directors of KMH and

18    Kelly-Moore Paint, dated February 12, 2003, bates stamped KMH 505-508.  These minutes of a

19    joint board meeting include discussions of private financial obligations and attorney-client

20    communications produced in this matter pursuant to the fiduciary exception.

21    62.    Exhibit 9, ESOP Stock Purchase Agreement dated October 13, 1998, page bates

22    stamped MK 1590. Defendants withdraw their confidentiality designation of the information in

23    Exhibit 9.

24    63.    Exhibit 11, valuation of California Capital Insurance Company as of June 30, 1998,

25    by Duff & Phelps LLC, pages bates stamped CIG 1316-1318. This three page portion of Exhibit 11,

26    CASE C06-07339 CW                                -11-        DECLARATION OF TERENCE F. YOUNG IN
                                                                SUPPORT OF PLAINTIFFS' ADMIN. MOTION TO SEAL

1    a valuation by Duff & Phelps of the Class I tracking stock of KMH as of June 30, 1998, comprises

2    their opinion of the value of the stock and a general description of the business and operations

3    (including financial performance) of CCIC, the KMH insurance subsidiary. Such financial

4    information and operational data is maintained as strictly confidential by this privately-held

5    company and its release to the general public and competitors could negatively affect KMH's

6    competitive advantage.

7         64.     Exhibit 11, valuation of California Capital Insurance Company as of June 30, 1998,

8    by Duff & Phelps LLC, pages bates stamped CIG 1320-1326. This portion of Exhibit 11 comprises

9    a discussion of risks, weaknesses and threats inherent in the business operations of the KMH

10    insurance subsidiary and a financial overview of the subsidiary's operations, including consolidated

11    income statements, margin analyses and balance sheets for the period from 1993 through 1997. Such

12    financial information and analysis is maintained as strictly confidential by this privately-held

13    company and its release to the general public and competitors could negatively affect KMH's

14    competitive advantage.

15         65.     Exhibit 11, valuation of California Capital Insurance Company as of June 30, 1998,

16    by Duff & Phelps LLC, pages bates stamped CIG 1331-1338. This portion of Exhibit 11 comprises

17    a comparative analysis of the KMH insurance subsidiary's financial results with the results of

18    competitive publicly-held companies. Such competitive analyses are maintained as strictly

19    confidential by this privately-held company and its release to the general public and competitors

20    could negatively affect KMH's competitive advantage.

21         66.     Exhibit 11, valuation of California Capital Insurance Company as of June 30, 1998,

22    by Duff & Phelps LLC, pages bates stamped CIG 1341-1347. This portion of Exhibit 11 comprises

23    an analysis of the KMH insurance subsidiary's ranking vis-à-vis its competition and a financial

24    analysis of the same issues using the company's financial results. Such competitive analyses are

25    maintained as strictly confidential by this privately-held company and its release to the general

26

1   public and competitors could negatively affect KMH's competitive advantage.

2          67.    Exhibit 13, minutes of the Board of Directors meeting of California Capital Insurance

3   Company and Subsidiaries, dated October 27, 2006, bates stamped CIG 16128-16129.  These

4   minutes of a meeting of the board of CCIC are maintained as confidential by this privately-held

5   company and include information concerning the company's relationship with its auditors and

6   accountants.

7          68.    Exhibit 14, ESOP Stock Purchase Agreement dated October 18, 1999, page bates

8   stamped CIG 1871. Defendants withdraw their confidentiality designation of the information in

9   Exhibit 14.

10          69.    Exhibit 15, excerpt from a Presentation to North Star Trust Company as Trustee of

11   the K-M Industries Holding Company, Inc. Employee Stock Ownership Plan dated September 26,

12   2005, pages stamped KMH 5463-5465.  This three-page analysis of asbestos liability by Scott Risius

13   Ross is based on private and confidential information obtained from KMH in the course of the

14   valuation for the benefit of the ESOP and not publicly revealed by the company.

15          70.    Exhibit 18, Paco Textures Memo by Doug Merrill dated December 15, 1976, bates

16   stamped KMH-AR 5173. Defendants withdraw their confidentiality designation of the information

17   in Exhibit 18.

18          71.    Exhibit 20, letter from S.L. Highleyman to Harlan K. Veal, Esq., dated November 25,

19   1981, bates stamped KMH-AR 1941-1943. Defendants withdraw their confidentiality designation of

20   the information in Exhibit 20.

21          72.    Exhibit 21, Reed Decorative Products Asbestos Litigation Model display of expected

22   mortality by calendar year, bates stamped KMH-AR 1925.  Defendants withdraw their

23   confidentiality designation of the information in Exhibit 21.

24          73.    Exhibit 22, Reed Decorative Products Asbestos Litigation Model display of expected

25   loss costs by calendar year of manifestation, bates stamped KMH-AR 1933. Defendants withdraw

1   their confidentiality designation of the information in Exhibit 22.

2       74.    Exhibit 23, memo from Doug Merrill to William E. Moore entitled "Review of

3   'Analysis of Asbestos-Related Claim of Kelly-Moore Paint Company, Inc.,'" dated October 17,

4   1982, bates stamped KMH-AR 2017. Defendants withdraw their confidentiality designation of the

5   information in Exhibit 23.

6       75.    Exhibit 24, document entitled "Brief History of Kelly-Moore's Paco Dry Wall

7   Division's Production and Sales," stamped KMH-AR 2033-2035. Defendants withdraw their

8   confidentiality designation of the information in Exhibit 24.

9       76.    Exhibit 27, letter from CIGNA to Pat McDonald of Kelly-Moore Paint, dated

10  November 3, 1997, page bates stamped PL 10445.  This letter comprises communications with a

11  KMH insurer on the subject of coverage limits, a subject that KMH has treated as confidential.

12      77.    Exhibit 30, chart of asbestos claims pending against Kelly-Moore at year- end from

13  1997 to 2006, bates stamped CIG_ESI 593_CONF.  Exhibit 30 is a chart prepared by counsel for

14  KMH and is protected by the attorney-client privilege.  It was produced in this matter pursuant to the

15  fiduciary exception.

16      78.    Exhibit 31, excerpt of a presentation by Kirkland & Ellis to KMH on February 2,

17  2002, bates stamped KMH 10821-10832.  Exhibit 31 comprises communications between KMH and

18  its attorneys and is subject to the attorney-client privilege. It was produced in this matter pursuant to

19  the fiduciary exception.

20      79.    Exhibit 33, letter from Cheryl Mills to James Ferraro of CNA dated December 10,

21  1999, page bates stamped PL 9.  Exhibit 33 comprises communications between KMH's counsel

22  and its insurers on the subject of insurance coverage.

23      80.    Exhibit 34, letter from Zurich-American Insurance Group to Joseph Cristiano of

24  Kelly-Moore Paint dated July 7, 1998, bates stamped PL 10454-56. This letter comprises

25  communications with a KMH insurer on the subject of coverage limits, a subject that KMH has

26

1    treated as confidential.

2    81. Exhibit 35, document entitled "Clarification of Facts Concerning Coverage and

3    Coverage Disputes," bates stamped KMH_ESI 6484- KMH_ESI 6484.003. Exhibit 35 is a

4    memorandum directed to the Internal Revenue Service on the subject of treatment of asbestos

5    litigation and insurance coverage therefore. The letter comprises sensitive information related to the

6    federal tax treatment of KMH's asbestos coverage and litigation and should remain confidential.

7    82. Exhibit 36, document entitled "Kelly-Moore Paint Company, Inc. Coverage Chart,"

8    bates stamped KMH_ESI00006493_CONF. Exhibit 36 is a chart of insurance coverage available to

9    KMH and comprises sensitive proprietary information.

10    83. Exhibit 39, minutes of the Annual Combined Meeting of the Board of Directors and

11    Shareholders of Kelly-Moore Paint Company, dated April 21, 1998, bates stamped KMH 452-456.

12    These board and shareholder meeting minutes comprise confidential information belonging to this

13    privately-held company and should be maintained as confidential.

14    84. Exhibit 45, Evaluation of the Common Stock of Kelly-Moore Paint Company, Inc. as

15    of July 31, 1998, by B.J. Brooks, pages bates stamped KMH 1440-1444. This five-page portion of

16    Exhibit 45 comprises an appraisal report by B. J. Brooks dated August 5, 1998. It describes the

17    basis upon which the appraisers analysis was conducted and discusses financial and structural

18    aspects of the business of KMH. Such information is maintained as strictly confidential by this

19    privately-held company and its release to the general public and competitors could negatively affect

20    KMH's competitive advantage. (This document was submitted under seal by the Moore Trust

21    Defendants as Exhibit C.)

22    85. Exhibit 45, Evaluation of the Common Stock of Kelly-Moore Paint Company, Inc. as

23    of July 31, 1998, by B.J. Brooks, page bates stamped KMH 1446. This one-page portion of Exhibit

24    45 comprises a market analysis of the business of the retail paint company operations of KMH.

25    Such competitive analysis is maintained as strictly confidential by this privately-held company and

26

its release to the general public and competitors could negatively affect KMH's competitive

advantage. (This document was submitted under seal by the Moore Trust Defendants as Exhibit C.)

86.    Exhibit 45, Evaluation of the Common Stock of Kelly-Moore Paint Company, Inc. as

of July 31, 1998, by B.J. Brooks, pages bates stamped KMH 1448-1474. This portion of Exhibit 45

comprises a description of the appraiser's analysis of the book value and financial condition of

KMH, its earnings history and future earnings prospects, its dividend history, comparisons to

competing companies, a description of the appraiser's evaluation process as it applied to the

specifics of KMH's business, the appraiser's conclusions, balance sheets, income statements,

earnings statement, financial ratios, and comparisons to competing companies. Such financial

information and competitive analysis is maintained as strictly confidential by this privately-held

company and its release to the general public and competitors could negatively affect KMH's

competitive advantage. (This document was submitted under seal by the Moore Trust Defendants as

Exhibit C.)

87.    Exhibit 46, letter from B.J. Brooks to the Board of Directors of K-M Industries

Holding Co., Inc. dated October 12, 1998, pages bates stamped KMH 1367-1369.

88.    Exhibit 49, fax from Stephen Ferrari to B.J. Brooks dated June 18, 1998, page bates

stamped MK 3922. Exhibit 49 comprises a communication from KMH to stock appraiser B. J.

Brooks on the subject of miscellaneous income numbers for the period from 1993 through 1997.

This is private financial information that if confidential to the company.

89.    Exhibit 50, fax from Stephen Ferrari to B.J. Brooks dated July 25, 2008, pages bates

stamped MK 3589, 3591. Exhibit 50 comprises a communication from KMH to stock appraiser B.

J. Brooks on the subject of pro forma financial data and 5 year projections for the company for the

period from 1993 through 2002. This is private financial information that if confidential to the

company.

90.    Exhibit 51, fax from Stephen Ferrari to B.J. Brooks dated October 2, 1998, page

1  bates stamped MK 3813. Exhibit 51 comprises a pro-forma earnings report including the financial

2  performance of KMH, which information is maintained as confidential.

3      91.    Exhibit 52, handwritten notes by B.J. Brooks, pages bates stamped MK 3536, 3542,

4  3544-3549. The designated pages of Exhibit 52 are hand-written copies of KMH's financial results

5  for the period from 1992 through 1997 and information concerning KMH's price-setting policies, all

6  of which are maintained as strictly confidential.

7      92.    Exhibit 53, report by Robert Ireland entitled "Minority Interest Fair Market Valuation

8  of the Series P, Class B Shares of Common Stock of K-M Industries Holding Co., Inc. for Employee

9  Stock Ownership Plan Purposes as of December 31, 2000," dated March 27, 2001, pages bates

10  stamped KMH 1044, 1047-1049, 1053-1055, 1059, 1064-1071, 1073-1080, 1082-1101. (Exhibit 53

11  is the same document as North Star's Exhibit 75 that the Court has determined to be sealable.)

12  Exhibit 53 is a valuation report on KMH as of December 31, 2000, prepared by Ireland Associates

13  of Kentfield, California. Like the other valuation reports submitted as exhibits in this matter, the

14  Ireland report contains detailed financial and marketing information on KMH, including the results

15  of operations of both of its subsidiaries. Such financial and market information has been maintained

16  as strictly confidential by this privately-held company and its release to the general public and

17  competitors could negatively affect KMH's competitive advantage.

18      93.    Exhibit 54, handwritten "note to file" by Stephen Ferrari dated October 1, 1998, bates

19  stamped KMH 10997. (Exhibit 54 is the same document as Exhibit 3 to the Declaration of Steven

20  Ferrari in Support of the KMH defendants' motion for summary judgment that the court already has

21  determined to be sealable.) Exhibit 54 is a hand-written note reflecting the substance of a

22  communication between officers of Kelly-Moore Paint Company and its attorney, Cheryl Mills. On

23  December 3, 2007, Judge Bernard Zimmerman held, in response to plaintiffs' motion to compel and

24  after *in camera* review, that Exhibit 3 was subject to the fiduciary exception. The document is,

25  nevertheless, subject to the attorney-client privilege as to third parties and should not become part of

26

1    the pubic record.

2        94.    Exhibit 56, Minutes of a Special Meeting of the Board of Directors of KM Industries

3    Holding Co., Inc. dated October 13, 1998, bates stamped KMH 7557-7560. Defendants withdraw

4    their confidentiality designation of the information in Exhibit 56.

5        95.    Exhibit 57, document entitled "Overview of K-M Industries Holding Co., Inc. Legal

6    Structure and Ownership," bates stamped MT 292. Defendants withdraw their confidentiality

7    designation of the information in Exhibit 57.

8        96.    Exhibit 58, letter from Cheryl Mills to Joseph Cristiano dated December 11, 1998,

9    bates stamped KMH_ESI00006668-6668.006. (Exhibit 58 is the same document as Exhibit 2 to the

10   Declaration of Joseph Cristiano in Support of the KMH defendants' motion for summary judgment

11   that the court already has determined to be sealable.) Exhibit 58 is a letter from Kelly-Moore Paint

12   Company's attorney, Cheryl Mills, to its President on the subject of available insurance coverage for

13   asbestos claims against the company.  It was produced in this matter as subject to the fiduciary

14   exception to the attorney-client privilege. Nevertheless, it is subject to the attorney-client privilege

15   as to third parties and should not become part of the pubic record.

16       97.    Exhibit 60, letter from Cheryl Mills to Ernst & Young dated February 13, 1997, bates

17   stamped EY000042. Exhibit 60 comprises correspondence between KMH's attorneys and its

18   auditors on the subject of pending litigation.  Such communications are maintained as confidential

19   by the company.

20       98.    Exhibit 62, letter from Kelly-Moore Paint Company, Inc. to Ernst & Young dated

21   April 4, 1997, bates stamped EY000044-49. Exhibit 62 comprises correspondence between KMH

22   and its auditors on the subject of its consolidated financial statements for 1995 and 1996.  Such

23   communications are maintained as confidential by the company.

24       99.    Exhibit 63, letter from Kelly-Moore Paint Company, Inc. to Ernst & Young dated

25   March 27, 1998, bates stamped KMH 11009-11014. Exhibit 63 comprises correspondence between

1 | KMH and its auditors on the subject of its consolidated financial statements for 1996 and 1997.

2 | Such communications are maintained as confidential by the company.

3 |      100.    Exhibit 64, letter from Kelly-Moore Paint Company, Inc. to Ernst & Young dated

4 | February 12, 1999, bates stamped KMH 11022-11028. Exhibit 64 comprises correspondence

5 | between KMH and its auditors on the subject of its consolidated financial statements for 1997 and

6 | 1998. Such communications are maintained as confidential by the company.

7 |      101.    Exhibit 65, letter from Kelly-Moore Paint Company, Inc. to Ernst & Young dated

8 | February 11, 2000, bates stamped EY000070-77. Exhibit 62 comprises correspondence between

9 | KMH and its auditors on the subject of its consolidated financial statements for 1998 and 1999.

10 | Such communications are maintained as confidential by the company.

11 |      102.    Exhibit 66, Consolidated Financial Statements of Kelly-Moore Paint Company, Inc.

12 | for the years ended December 31, 2000 and 1999 with Report of Independent Auditors, bates

13 | stamped KMH 432-451. Exhibit 66 comprises a copy of the consolidated financial statements for

14 | KMH for the years 1999 and 2000. Such materials are maintained as confidential by the company.

15 |      103.    Exhibit 67, chart entitled "K-M Industries Current Corporate Structure," bates

16 | stamped CIG 4588. This chart of corporate structure includes information of financial relationships

17 | among KMH and its subsidiaries which is private and confidential information.

18 |      104.    Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June

19 | 30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5819-5821. (Exhibit 69 is the same

20 | document as Exhibit 2 to the North Star motion for summary judgment that the court already has

21 | determined to be sealable.) This three page portion of Exhibit 69, an valuation by Duff & Phelps of

22 | the Class I tracking stock of KMH, comprises the conclusions of the appraisers of such value as of

23 | June 30, 1999, a general description of the business and operations (including financial

24 | performance) of CCIC, the KMH insurance subsidiary. Such financial information and operational

25 | data is maintained as strictly confidential by this privately-held company and its release to the

general public and competitors could negatively affect KMH's competitive advantage.

105.   Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June 30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5823-5824. (Exhibit 69 is the same document as Exhibit 2 to the North Star motion for summary judgment that the court already has determined to be sealable.) This two-page portion of Exhibit 69 comprises a discussion of risks, weaknesses and threats inherent in the business operations of the KMH insurance subsidiary. Such competitive analysis is maintained as strictly confidential by this privately-held company and its release to the general public and competitors could negatively affect KMH's competitive advantage.

106.   Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June 30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5828-5834. (Exhibit 69 is the same document as Exhibit 2 to the North Star motion for summary judgment that the court already has determined to be sealable.) These seven page portion of Exhibit 69 comprises a financial overview of KMH operations, and includes a consolidated income statement for 1998 and 1999, and consolidated income statements, margin analyses and balance sheets for the period from 1993 through 1998. Such financial information and analysis is maintained as strictly confidential by this privately-held company and its release to the general public and competitors could negatively affect KMH's competitive advantage.

107.   Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June 30, 1999, by Duff & Phelps LLC, page bates stamped KMH 5838. (Exhibit 69 is the same document as Exhibit 2 to the North Star motion for summary judgment that the court already has determined to be sealable.) This page from Exhibit 69 comprises a comparative analysis of KMH's financial results with the results of competitive publicly-held companies. Such competitive analyses are maintained as strictly confidential by this privately-held company and its release to the general public and competitors could negatively affect KMH's competitive advantage.

108.   Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June

1  30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5841-5842. (Exhibit 69 is the same

2  document as Exhibit 2 to the North Star motion for summary judgment that the court already has

3  determined to be sealable.) This two page portion of Exhibit 69 comprises a financial analysis of

4  KMH's insurance subsidiary in comparison with competitors. Such competitive analyses are

5  maintained as strictly confidential by this privately-held company and its release to the general

6  public and competitors could negatively affect KMH's competitive advantage.

7      109.    Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June

8  30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5849-5855. (Exhibit 69 is the same

9  document as Exhibit 2 to the North Star motion for summary judgment that the court already has

10  determined to be sealable.) This seven page portion of Exhibit 69 comprises an analysis of the KMH

11  insurance subsidiary's ranking vis-à-vis its competition and a financial analysis of the same issues

12  using the company's financial results. Such competitive analyses are maintained as strictly

13  confidential by this privately-held company and its release to the general public and competitors

14  could negatively affect KMH's competitive advantage.

15      110.    Exhibit 69, valuation of K-M Industries Holding Co., Inc. Class I Stock as of June

16  30, 1999, by Duff & Phelps LLC, pages bates stamped KMH 5870. (Exhibit 69 is the same

17  document as Exhibit 2 to the North Star motion for summary judgment that the court already has

18  determined to be sealable.). This one page portion of Exhibit 69 comprises the appraiser's value

19  conclusion concerning KMH's insurance subsidiary. Such financial information and estimates of the

20  value of the shares of KMH are maintained as strictly confidential by this privately-held company

21  and its release to the general public and competitors could negatively affect KMH's competitive

22  advantage.

23      111.    Exhibit 75, letter from Columbia Financial Advisors, Inc. to William Moore dated

24  September 7, 1999, pages bates stamped CIG 8223-8225. This portion of Exhibit 75 includes

25  detailed financial information concerning a KMH subsidiary which is maintained as confidential by

26

1    the company.

2        112.    Exhibit 77, letter from Duff & Phelps, LLC to William Moore dated October 18,

3    1999, page bates stamped CIG 8320. (Exhibit 77 is the same document as Exhibit G to the Moore

4    Trust defendants' motion for summary judgment that the court already has determined to be

5    sealable.) This page of Exhibit 77 comprises the conclusion of Duff & Phelps' appraisal of the fair

6    market value of the shares of KMH's insurance subsidiary's stock. Such estimates of the value of

7    the shares of KMH are maintained as strictly confidential by this privately-held company and its

8    release to the general public and competitors could negatively affect KMH's competitive advantage.

9        113.    Exhibit 78, handwritten notes by Kenneth Bodenstein dated April 30, 2002, bates

10   stamped CIG 136. Exhibit 78 comprises notes of a communication between officers of the KMH

11   insurance subsidiary and Mr. Bodenstein, an employee of Duff & Phelps, appraisers of KMH shares.

12   Communications with the appraisers have been maintained as confidential by KMH.

13       114.    Exhibit 79, Promissory Note dated October 18, 1999, page bates stamped CIG 4561.

14   Exhibit 79 comprises a note between KMH and one of its subsidiaries. Such financial information is

15   maintained as confidential by KMH.

16       115.    Exhibit 81, letter from Cheryl Mills to Joseph Cristiano dated July 25, 2000, bates

17   stamped PL 21726-21727. Exhibit 81 is correspondence between counsel for KMH and its officers

18   on the subject of KMH's asbestos liability exposure, the substance of which was intended to be

19   conveyed to a prospective purchaser of the company. Such information has been maintained as

20   confidential by KMH.

21       116.    Exhibit 82, letter from Mills & Larson to Ernst & Young dated February 11, 2000,

22   bates stamped PL 10814-10815. Exhibit 82 comprises correspondence between KMH's attorneys

23   and its auditors on the subject of pending litigation. Such communications are maintained as

24   confidential by the company.

25       117.    Exhibit 83, letter from Kelly-Moore Paint Company, Inc. to Ernst & Young dated

26

1  February 20, 2001, bates stamped EY000147-153. Exhibit 83 comprises correspondence between

2  KMH and its auditors on the subject of its consolidated financial statements for 1999 and 2000.

3  Such communications are maintained as confidential by the company.

4      118.    Exhibit 84, letter from Cheryl Mills to Ernst & Young dated February 26, 2001, bates

5  stamped EY000170-171. Exhibit 84 comprises correspondence between KMH's attorneys and its

6  auditors on the subject of pending litigation.  Such communications are maintained as confidential

7  by the company.

8      119.    Exhibit 98, memo dated May 23, 2002, from Peter Cazzolla to CIG Owners and

9  Team Members, bates stamped CIG 3587. Defendants withdraw their confidentiality designation of

10 the information in Exhibit 98.

11     120.    Exhibit 99 is a true and correct copy of a memo dated January 21, 2003, from Peter

12 Cazzolla to all CIG Team Members, bates stamped CIG 2447. Defendants withdraw their

13 confidentiality designation of the information in Exhibit 99.

14     121.    Exhibit 100, Trustee Engagement Agreement dated April 22, 2003, bates stamped

15 MT000543-551. Defendants withdraw their confidentiality designation of the information in Exhibit

16 100.

17     122.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

18 183-184. Defendants withdraw their confidentiality designation of the information in this portion of

19 Exhibit 103.

20     123.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

21 191-193. Defendants withdraw their confidentiality designation of the information in this portion of

22 Exhibit 103.

23     124.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

24 197-201. This portion of Exhibit 103 comprises testimony related to financial effects of litigation

25 against KMH by plaintiffs claiming personal injuries from exposure to asbestos. Repeating the exact

26

1    nature of those statements in this declaration would defeat the purpose of maintaining their

2    confidentiality.  Kelly Moore has carefully maintained the confidentiality of its internal discussions

3    of the financial effects of such litigation and continues to believe that the public revelation of such

4    considerations would damage its public image and its business.

5         125.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

6    204. Defendants withdraw their confidentiality designation of the information in this portion of

7    Exhibit 103.

8         126.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, page

9    266-267. Defendants withdraw their confidentiality designation of the information in this portion of

10   Exhibit 103.

11        127.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

12   271-277. Defendants withdraw their confidentiality designation of the information in this portion of

13   Exhibit 103.

14        128.    Exhibit 103, excerpts from the deposition of John Hommel taken May 8, 2008, pages

15   280-286. Defendants withdraw their confidentiality designation of the information in this portion of

16   Exhibit 103.

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25

26

129.    Exhibit 107, handwritten notes by John Hommel, bates stamped NS 31489-31560. Intertwined into these hand-written notes on the primary person responsible for trustee duties at North Star are his factual findings related to KMH's financial information, asbestos litigation, and competitive structure.  Such information is confidential.  It's release would be detrimental to KMH's competitive status.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: July 17, 2008

_____/s/_____

Terence F. Young

# Exhibit A

1  Daniel Feinberg – CA State Bar No. 135983
   Todd F. Jackson – CA State Bar No. 202598
2  Margaret E. Hasselman – CA State Bar No. 228529
   Nina R. Wasow – CA State Bar No. 242047
3  Kirsten G. Scott – CA State Bar No. 253464
   LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
4  1330 Broadway, Suite 1800
   Oakland, CA  94612
5  Telephone: (510) 839-6824
   Facsimile: (510) 839-7839
6  Email: dfeinberg@lewisfeinberg.com
   Email: tjackson@lewisfeinberg.com
7  Email: mhasselman@lewisfeinberg.com
   Email: nwasow@lewisfeinberg.com
8  Email: kscott@lewisfeinberg.com

9  *Attorneys for Plaintiffs and the Class*
   (Additional counsel listed within)

10

11                 IN THE UNITED STATES DISTRICT COURT
12            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO AND OAKLAND DIVISION
13

| | |
|---|---|
| 14  THOMAS FERNANDEZ, LORA SMITH, and TOSHA THOMAS, individually and on behalf 15  of a class of all other persons similarly situated, | Case No. C-06-07339 CW |
| 16                    Plaintiffs, | **REDACTED** |
| 17            vs. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| 18  K-M INDUSTRIES HOLDING CO., INC.; K-M INDUSTRIES HOLDING CO., INC. 19  ESOP PLAN COMMITTEE; WILLIAM E. AND DESIREE B. MOORE REVOCABLE 20  TRUST; TRUSTEES OF THE WILLIAM E. AND DESIREE B. MOORE REVOCABLE 21  TRUST; CIG ESOP PLAN COMMITTEE; NORTH STAR TRUST COMPANY; 22  DESIREE B. MOORE REVOCABLE TRUST; WILLIAM E. MOORE MARITAL TRUST; 23  WILLIAM E. MOORE GENERATION-SKIPPING TRUST; and DESIREE MOORE, 24  BOTH IN HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE WILLIAM E. 25  AND DESIREE B. MOORE REVOCABLE TRUST'S SUCCESSOR TRUSTS NAMED 26  ABOVE, | Date:        July 31, 2008 Time:        2:30 p.m. Courtroom:  2, 4th Floor Judge:       Hon. Claudia Wilken |
| 27                    Defendants. | |

28

PLAINTIFFS' OPP. TO DEFS' MOTIONS FOR SUM. JUDG. [CASE NO. C-06-07339 CW]

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   The Moore Family Owned and Controlled Kelly Moore Paint and CIG.. . . . . . . 2

      B.   Asbestos Litigation Against Kelly-Moore Paint Began Long Before the 1998
           ESOP Transaction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.   Insurance Coverage for Kelly-Moore's Asbestos Liability Was Uncertain
           in 1998.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.   Mr. Moore Decided to Form an ESOP In Order to Plan for His Estate While
           Maintaining Control of The Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      E.   K-M Concealed Material Information Regarding Asbestos Liability From the
           Valuator for the 1998 Transaction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      F.   Kelly-Moore Hired Attorney Cheryl Mills To Coordinate Asbestos Litigation in
           1997, Prior to the ESOP Transactions, But Did Not Provide Her Findings to
           Valuators, Auditors or ESOP Participants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      G.   In the 1998 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M
           and Moore Trust Defendants Withheld Asbestos Information From Auditors,
           Valuators, and Participants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           1.   The K-M and Moore Trust Defendants Withheld a December 1998 Letter
                From Cheryl Mills From Valuators and Participants. . . . . . . . . . . . . . . . . 12

           2.   The K-M Defendants Concealed Information About Kelly-Moore's
                Asbestos Liability From Auditors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      H.   In the 1999 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M
           and Moore Trust Defendants Withheld Vital Information From Auditors,
           Valuators, and Participants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      I.   The K-M and Moore Trust Defendants Hid Information About Asbestos
           Liabilities After the ESOP Transactions That Concealed their Fiduciary
           Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      J.   Kelly-Moore and CIG's Communications With Participants Concealed That the
           1998 and 1999 Transactions Were For More Than Fair Market Value. . . . . . . . 19

      K.   North Star, the Successor Trustee, Failed to Investigate the 1998 and
           1999 Transactions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  LEGAL STANDARD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.   ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.   ERISA's Statute of Limitations for Fiduciary Violations.. . . . . . . . . . . . . . . . 26

B.   Plaintiffs' Claims Against The K-M Defendants and the Moore Trust Defendants Are Timely...............................................27

   1.   The K-M and Moore Trust Defendants' Violations of ERISA First Occurred in 1998 and 1999 When the ESOP Purchased Stock from the Moore Trust..............................................27

   2.   Because the K-M and Moore Trust Defendants Withheld Vital Information From the Participants, Valuators, and Auditors, Plaintiffs' Claims Against Them are Timely Under the Fraud or Concealment Exception..............................................28

      i.   The K-M Defendants Engaged in Acts of Fraud or Concealment..............................................29

         a.   Concealment of Asbestos Litigation Against Kelly-Moore From Participants..............................................30

         b.   Concealment of the Asbestos Litigation Against Kelly-Moore From Valuators..............................................33

         c.   Concealment of Asbestos Litigation Against Kelly-Moore From Auditors..............................................35

         d.   Concealment of the Columbia Financial Advisors, Inc. Report from Participants and Valuators..............................................37

         e.   The K-M Defendants Concealed Asbestos Information After The ESOP Transactions..............................................37

      ii.   Acts of Concealment by the Moore Trust Defendants..............................................38

   4.   The Court Should Not Countenance the K-M and Moore Trust Defendants' Arguments Based on Rule 9(b)..............................................41

   5.   If the Fraud or Concealment Exception Applies, Plaintiffs Filed Suit Within the Statute of Limitations..............................................42

C.   Plaintiffs Filed Suit Against North Star Within the Applicable Statute of Limitations Period..............................................45

   1.   Plaintiffs Allege That North Star Breached Its Fiduciary Duty By Failing to Take Proper Steps to Remedy the Fiduciary Violations Committed By Mr. Moore and His Co-Fiduciaries in the 1998 and 1999 Transactions..............................................45

   2.   North Star Could Have Pursued Claims for Fiduciary Violations Against the Prior Trustee and Co-Fiduciaries After North Star Became Successor Trustee..............................................48

   3.   Plaintiffs Filed Their Breach of Fiduciary Duty Claim Against North Star Within the Statute of Limitations..............................................49

III.   CONCLUSION..............................................49

# TABLE OF AUTHORITIES

Page No.

**FEDERAL CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Barker v. Am. Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 28

Bolt v. Merrimack Pharmaceuticals, Inc., 503 F.3d 913  (9th Cir. 2007). . . . . . . . . . . . . . . . 36

Canale v. Yegen, 782 F. Supp. 963 (D.N.J. 1992) and 789 F. Supp. 147 (D.N.J. 1992). . . . . . 40

Celotex Corp. v. Catrett, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559  (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Community Bancshares, Inc. v. Patterson, 547 F. Supp. 2d 1230 (N.D. Ala. 2008). . . . . . . . . . 40

Conley v. Gibson, 355 U.S. 41 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992). . . . . . . . . . . . . . 26

Evanson v. Price, 2006 WL 2829789 (E.D. Cal. Sept. 29, 2006). . . . . . . . . . . . . . . . . . . . 31, 37

Fink v. Nat'l Sav. and Trust Co., 772 F.2d 951, 957 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . 49

Foman v. Davis, 371 U.S. 178 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Han v. Mobil Oil Corp., 73 F.3d 872 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Harris v. Itzhaki, 183 F.3d 1043 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Heim v. Weeres Industries, Inc., 1990 WL 25102 (Minn. App. 1990). . . . . . . . . . . . . . . . . . . 6

Hemphill v. Pers. Representative of the Estate of James J. Ryskamp, Jr., 2006 WL 1837917 (E.D. Cal. July 5, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Horn v. McQueen, 215 F. Supp. 2d 867 (W.D. Ky. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 27

In re AST Research Securities Litig., 887 F. Supp. 231 (C.D. Cal. 1995). . . . . . . . . . . . . . . . 42

In re Crown Vantage, Inc., 2004 WL 1635543 (N.D. Cal. July 12, 2004). . . . . . . . . . . . . . . . 29

In re Enron Securities, Derivative & ERISA Litigation, 284 F.Supp.2d 511 (S.D. Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

J. Geils Band Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245 (1st Cir. 1996). . . . . 45

Landwehr v. DuPree, 72 F.3d 726 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Lundy v. Union Carbide Corp., 695 F.2d 394 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . 26

Martin v. Consultants & Adm'rs, 966 F.2d 1078 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 45

Meagher v. International Association of Machinists and Aerospace Workers Pension Plan,
856 F.2d 1418 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 45

Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999). . . . . . . . . . . . 26

Peralta v. Hispanic Business, Inc., 419 F.3d 1064 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . 32

Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380 (1993). . . . . 36

Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1220 (7th Cir. 1990). . . . . . . . 28

S.E.C. v. Sands, 902 F. Supp. 1149 (C.D. Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Shaver v. Operating Engineers Local 428 Pension Trust Fund, 332 F.3d 1198
(9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98 (2d Cir. 1998). . . . . . . . . . . . . . . . 46, 47

Snow v. Harnischfeger Corp., 12 F. 3d 1154 (1st Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . 41

Stanford University Hosp. v. Federal Ins. Co., 174 F.3d 1077 (9th Cir. 1999). . . . . . . . . . . . . 29

Tatum v. R.J. Reynolds Tobacco Co., 2007 WL 1612580 (M.D.N.C. May 31, 2007). . . . . . . . 29

Volk v. D.A. Davidson & Co., 816 F.2d 1406 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . passim

W.R. Grace & Co. v. Western U.S. Industries, 608 F.2d 1214 (9th Cir. 1979). . . . . . . . . . . . . 29

Waller v. Blue Cross of Cal., 32 F.3d 1337 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 49

**STATE CASES**

In re Rehabilitation of Centaur Ins. Co., 158 Ill.2d 166 (1994). . . . . . . . . . . . . . . . . . . . . . . 6

Middlesex Ins. Co. v. Mann, 177 Cal. Rptr. 495 (Cal. Ct. App. 1981). . . . . . . . . . . . . . . . . . 40

Paramount Communications, Inc. v. Gibraltar Cas. Co., 90 N.Y.2d 507 (1997). . . . . . . . . . . . 6

Pillsbury v. Karmgard, 22 Cal. App. 4th 743  (Cal. Ct. App. 1994). . . . . . . . . . . . . . . . . . . . 38

Quackenbush v. Mission Ins. Co., 46 Cal. App.4th 458  (1996). . . . . . . . . . . . . . . . . . . . . . . 6

**FEDERAL STATUTES**

29 U.S.C. § 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1102(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 U.S.C. § 1104(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

29 U.S.C. § 1105(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

29 U.S.C. § 1106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 U.S.C. § 1108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 U.S.C. § 1109. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

29 U.S.C. § 1113.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 43

**OTHER AUTHORITIES**

RESTATEMENT (2ND) OF TRUSTS § 169. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 46

Schwarzer, Tashima & Wallace, FEDERAL CIVIL PROCEDURE BEFORE TRIAL (2008). . . . . . . . 26

## I.    INTRODUCTION.

In moving for summary judgment on all of Plaintiffs' claims based on ERISA's[1] statute of limitations, Defendants omit or gloss over the key facts.  In 1998 and 1999, William Moore acted as both buyer and seller of company stock when he sold his family trust's shares to the ESOP while serving as the sole ESOP trustee.  In connection with these transactions, the K-M and Moore Trust Defendants[2] withheld crucial information about Kelly-Moore Paint Company's asbestos liabilities from ESOP participants, the valuators who appraised Kelly-Moore Paint and Capital Insurance Group ("CIG") for the transactions, and the Company's auditors.  If a prudent, independent fiduciary had been informed of these asbestos liabilities, the fiduciary would have either demanded a substantially lower price for the stock or walked away from the deal altogether.  By hiding Kelly-Moore's asbestos liabilities both before and after the ESOP stock transactions, the K-M and Moore Trust Defendants concealed their ERISA violations from participants.  The K-M and Moore Trust Defendants' actions of withholding information bring this case within the "fraud or concealment" provision of ERISA's statute of limitations, rendering Plaintiffs' claims timely.

North Star's summary judgment motion sets up a claim that Plaintiffs have not asserted against North Star and ignores the gravamen of Plaintiffs' actual claim against North Star.  Plaintiffs have not asserted that North Star's breaches took place in 1998 and 1999.  Instead, Plaintiffs allege that North Star breached its fiduciary duties after it was appointed as successor trustee in 2003.  Plaintiffs allege that beginning in 2003, North Star failed to take appropriate

---

[1] The Employee Retirement and Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq.

[2] The "K-M Defendants" include K-M Industries Holding Co., Inc. ("KMH"), the KMH ESOP Plan Committee, and the CIG ESOP Plan Committee.  The "Moore Trust Defendants" consists of the Moore Trust and Trustees of the Moore Trust; successor trusts which include the Desiree B. Moore Revocable Trust, the William E. Moore Marital Trust, and the William E. Moore Generation-Skipping Trust; and Desiree Moore, both in her individual capacity and as trustee of the Moore Trust's successor trusts.  "North Star" is Defendant North Star Trust Company.

1   steps to investigate and remedy breaches of duty by Mr. Moore and his co-fiduciaries.  That

2   alleged breach of North Star's duties as a successor trustee falls within the ERISA statute of

3   limitations, because it occurred less than six years before Plaintiffs filed suit and Plaintiffs did

4   not have actual knowledge of the breach until after 2005.

5   **II.    FACTS.**

6       **A.    The Moore Family Owned and Controlled Kelly Moore Paint and CIG.**

7         William E. Moore founded Kelly-Moore Paint in 1946 and served a leading role in the

8   company until his death in 2004.  Declaration of Dan Stritmatter in Support of K-M Defendants'

9   Motion for Summary Judgment ("Stritmatter Dec.") at ¶ 3.  He was the President of the

10   Company until 1984, when Joseph Cristiano was hired as President and CEO.  Declaration of

11   Nina Wasow in Support of Plaintiffs' Opposition to Defendants' Motions for Summary

12   Judgment ("Wasow Dec."), Exh. 1 (Cristiano Dep. 23:1-23:11).[3]  However, Mr. Moore

13   continued in his role as Chairman of the Board of Directors until his death on November 21,

14   2004, and "was very active in running the company," including coming in to the office every day,

15   until approximately 2002. Exh. 2; Exh. 1 (Cristiano Dep. at 23:13-24:7).  *See also* Exh. 3

16   (Stritmatter Dep. 86:8-87:13) (noting that Mr. Moore took a "hands on" approach); Exh. 4

17   (Cazzolla Dep. 125:4-22) (explaining that Mr. Moore "was a person that ran [the company] on

18   his own.  He wanted to be in charge and in control of the operation").  Mr. Moore's wife,

19   Defendant Desiree Moore, also served (and continues to serve) on the Kelly-Moore Paint Board

20   of Directors. *See, e.g.*, Exhs. 5, 6; Wasow Dec. ¶ 8. Until the 1998 ESOP transaction, the

21   Moores's family trust, the William E. and Desiree B. Moore Revocable Trust ("Moore Trust"),

22   was the sole owner of Kelly-Moore Paint. Exh. 9. Mr. and Mrs. Moore served as trustees of the

23   Moore Trust until Mr. Moore's death, at which point Mrs. Moore became the sole trustee of the

24   successor trusts. Exh. 9; Exh. 10 at MT 2134-36.

25   _____

26   [3]  Unless otherwise noted, all Exhibits cited herein are attached to the Wasow Declaration, and
27   will be cited by Exhibit number only.  Cites to deposition transcripts will be cited by Exhibit
    number and "[Deponent's surname] Dep."

28   PLAINTIFFS' OPP. TO DEFS' MOTIONS FOR SUM. JUDG. [CASE NO. C-06-07339 CW]        Page 2

1

In 1985, Kelly-Moore Paint acquired California Capital Insurance Company, which later

2

changed its name to CIG.  Exh. 11 at CIG 1317; Declaration of Peter Cazzolla in Support of K-M

3

Defendants' Motion for Summary Judgment ("Cazzolla Dec.") at ¶¶ 1, 3.  Mr. Moore was on the

4

Board of Directors of CIG until his death, and Mrs. Moore also served and continues to serve on

5

the CIG Board of Directors.  *See* Exhs. 12, 13.  CIG was wholly owned by the Moore Trust until

6

the ESOP purchased 42% of Mr. Moore's shares in 1999.  Exh. 14.

7

### B.    Asbestos Litigation Against Kelly-Moore Paint Began Long Before the 1998 ESOP Transaction.

8

Kelly-Moore Paint Company has a long history of asbestos litigation liability, of which

9

Mr. Moore and other company officers were well aware.  A former subsidiary of Kelly-Moore

10

Paint, Paco Textures Corporation,[4] sold asbestos-containing products, including patching

11

compounds and seam sealers for drywall, from 1968 until approximately 1981.  Exh. 16 (Giffins

12

Dep. 47:13-48:13).  In 1971, William Moore, apparently anticipating litigation, established an

13

"asbestos repository" at Kelly-Moore's headquarters in San Carlos, where company documents

14

relating to asbestos were collected.  *Id.* (Giffins Dep. 43:22-44:24).[5]  In 1976, Doug Merrill (a

15

longtime employee of Kelly-Moore and now the Vice President for Manufacturing, *see* Exh. 17)

16

wrote in a memo that "we could be judged liable in a suit where a person exposed

17

to our asbestos containing product that [sic] developed cancer related injury or death."  Exh. 18.

18

William Moore was copied on the memo.  *Id.*  Kelly-Moore Paint was first sued for asbestos-

19

related bodily injuries in 1977.  Exh. 19 at p. 40.

20

21

22

**REDACTED**

23

24

25

26

[4]  Kelly-Moore purchased Paco in the 1960s, and held it as a wholly-owned subsidiary until its dissolution in 1982.  Exh. 15 at KMH 5463.

27

28

[5]  Mr. Cristiano testified that he learned about the asbestos repository a couple of years after he came to work for Kelly-Moore (in 1984), "when asbestos became an issue."  Exh. 1 (Cristiano Dep. 108:11-16).

**REDACTED**

The next decade saw the bankruptcies of the major suppliers of the asbestos fibers used in Kelly-Moore's products. Approximately 20% of Kelly-Moore's asbestos fibers were supplied by Johns-Manville, approximately 72% were supplied by Carey Canadian, and approximately 8% were supplied by Union Carbide. Exh. 24 at KMH-AR 2034. Johns-Manville went bankrupt due to asbestos liability in 1982. The actuarial consultant retained by Reed International in 1981 to analyze Kelly-Moore's asbestos liabilities sent the Company a series of newspaper articles about the then-pending Johns-Manville bankruptcy, which also discussed the rising tide of asbestos cases and ongoing coverage disputes with insurance companies. Exh. 25.[6] Carey Canadian went bankrupt in 1990. Exh 26 at NS 823.

Kelly-Moore's asbestos problems escalated in the wake of these bankruptcies. Minutes of a meeting of the Board of Directors on March 26, 1997, noted that "[t]he Company continues to have concerns over asbestos related lawsuits particularly in Texas. The Company will work aggressively with our attorneys to insure that all sources of excess insurance policies are made available to cover any potential future claims." Exh. 5 at KMH 11006. That meeting was attended by Mr. and Mrs. Moore, their daughter Christine McCall, Mr. Cristiano, and the CFO Stephen Ferrari. *Id.* Also in 1997, the settlement of *Patricio Sanchez*, an asbestos bodily injury case in El Paso, Texas, exhausted the first of Kelly-Moore's primary insurance policies covering asbestos bodily injury cases. Exh. 27. After the *Sanchez* case, asbestos was "on the radar" at Kelly-Moore, according to Cheryl Mills, an attorney whom the company hired in 1997 to oversee

---

[6] These articles were retained in Kelly-Moore's asbestos repository, as shown by the KMH-AR prefix.

1    the asbestos litigation and report to the company and its auditors about asbestos litigation and

2    insurance coverage. Exh. 28 (Mills Dep. 53:1-53:14, 63:21-63:22). In fact, in 1997, there were

3    4,364 new asbestos bodily injury claims filed against Kelly Moore (compared to 2,144 new

4    claims filed in 1996). Exh. 29 at p. 5. There were nearly 10,000 asbestos claims pending against

5    Kelly-Moore at year-end 1997. Exh. 30.

6        The situation worsened in 1998 and 1999. In 1998, 7,049 new asbestos claims were filed

7    against Kelly-Moore, bringing the total number of claims filed since 1993 to 16,917. Exh. 29 at

8    p. 5. 9,707 new claims were filed in 1999, bringing the total number of claims filed since 1993

9    to 26,624. *Id.* While some of those claims were resolved, approximately 18,000 asbestos claims

10   were pending as of year-end 1998, and approximately 25,000 claims were pending as of year-end

11   1999. Exh. 30.

12                                  **REDACTED**

13                        Kelly-Moore's top management was aware of this wave

14   of asbestos claims, but, as discussed below, they concealed asbestos litigation from ESOP

15   participants, auditors, and valuators, and the liability was not accounted for in the valuations for

16   the ESOP transactions.

17   **C.    Insurance Coverage for Kelly-Moore's Asbestos Liability Was Uncertain in
            1998.**

18       Kelly-Moore was advised to put all of its insurers on notice of asbestos claims in 1981.

19   Exh. 32.

20

21

22

23

24

25                                  **REDACTED**

26

27

28

**REDACTED**

In addition, several of Kelly-Moore's reinsurers were insolvent by 1998.[7] Thus, by 1998, the extent of available insurance coverage was already in doubt. *See also id.* (noting that "Kelly-Moore faced significant numbers of asbestos suits long before 2000").[8]

### D.    Mr. Moore Decided to Form an ESOP In Order to Plan for His Estate While Maintaining Control of The Company.

In the Spring of 1998, Mr. Moore began seriously considering implementation of an ESOP. *See* Exh. 38 (Ferrari Dep. 67:5-67:25). At a Board of Directors Meeting on April 21, 1998, he stated that "[a]n ESOP may be the best vehicle to make funds available to the owners to pay for estate taxes." Exh. 39 at KMH 456. In other words, one of his reasons for establishing the ESOP was to extract some capital from the company and reduce his tax liability. Exh. 40 (Menke Dep. 104:21-104:25). Mr. Moore also wanted to diversify his personal assets. Exh. 1 (Cristiano Dep. 78:6-78:11). However, he also "wanted to absolutely maintain control" of the company. Exh. 40 (Menke Dep. 112:25-113:12, 114:15-18). *See also* Exh. 4 (Cazzolla Dep. 125:4-22) ("He wanted to be in charge and in control of the operation").

To achieve his goals, Mr. Moore began discussions with Menke & Associates, which is a one-stop shop for ESOP services. Exh. 40 (Menke Dep. 44:20-50:11). Shortly after the first meeting with Mr. Moore, Menke & Associates sent him a letter explaining some of the advantages of an ESOP, including that the selling shareholder (Mr. Moore) would be able to realize some or all of his investment in the company tax-free, while maintaining control: "[y]ou

---

[7] *See* Exh. 36 (chart of Kelly-Moore's insurers); *Quackenbush v. Mission Ins. Co.*, 46 Cal. App. 4th 458, 464 (Cal. Ct. App. 1996) (Mission Insurance Company placed in liquidation in 1987); *Heim v. Weeres Industries, Inc.*, 1990 WL 25102, *1 (Minn. Ct. App. 1990) (Pine Top Insurance Company placed in liquidation in 1987); *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E. 2d 1015, 1016 (Ill. 1994) (Centaur Insurance Company placed in rehabilitation in 1987); *Paramount Communications, Inc. v. Gibraltar Cas. Co.*, 90 N.Y.2d 507, 511 (N.Y. 1997) (Integrity Insurance Company declared insolvent in 1987).

[8] By 2001, the dispute over the excess insurers' duty to defend or indemnify escalated to litigation, with Kelly-Moore filing a lawsuit in San Francisco Superior Court against multiple insurers for breach of contract and bad faith. Exh. 37.

may elect yourself to be a one-person ESOP Committee, thereby voting all the stock in the ESOP for as long as you wish." Exh. 41 at MT 108. *See also* Exh. 40 (Menke Dep. at 114:25-115:14) (explaining that Mr. Moore could keep absolute control by acting as the sole member of the ESOP Committee and the Trustee). Menke & Associates also advised that Mr. Moore could provide very limited information to participants: under the heading "Confidentiality Preserved Each Year," the letter states that "the employees simply receive their individual account values. The employees do not have to see the balance sheet or profit/loss statements or even the appraisal." (emphasis in original). Exh. 41 at MT 108.

Mr. Moore engaged Menke & Associates on May 11, 1998. Exh. 42. Menke & Associates provided plan design and installation services to Kelly-Moore and CIG; it did not provide services to the ESOP. Exh. 40 (Menke Dep. at 129:23-130:24).

As discussed below, in October 1998, Mr. Moore sold 42% of the Moore Trust's interest in Kelly-Moore Paint to the ESOP for $232 million, and also served as the sole trustee for the ESOP. He sold 42% of the Moore Trust's interest in CIG to the ESOP in October 1999 for $55 million. As the trustee of the ESOP, Mr. Moore conducted no negotiations for the ESOP, hired no independent advisors for the ESOP, retained absolute voting control of the ESOP shares, and chose to keep the participants in the dark.

### E.    K-M Concealed Material Information Regarding Asbestos Liability From the Valuator for the 1998 Transaction.

To assist in setting a price for the ESOP shares, Mr. Moore (as both buyer and seller of the shares) hired a valuator who worked for a subsidiary of the Menke Group, the same company that helped install the ESOP. Mr. Moore, as the fiduciary of the to-be-formed Kelly-Moore Paint ESOP, entered into an agreement with Sansome Street Appraisers on May 26, 1998, for valuation services; B.J. Brooks was given the assignment.[9] Exh. 43; Exh. 44; Exh. 40 (Menke Dep. 67:3-68:4). Mr. Brooks, who worked for a company which had a financial stake in the establishment

---

[9] Sansome Street Appraisers, Inc. is a wholly-owned subsidiary of the Menke Group, and John Menke is its president. Exh. 40 (Menke Dep. 66:3-67:2). Clients pay Sansome Street Appraisers (or Menke directly) for valuation services, and the appraiser is paid a percentage of that fee (50% for initial valuations and 60% for annual updates). Exh. 47 (Ireland Dep. 23:5-23:20, 24:11-24:19).

and administration of the ESOP, was not a fully independent valuator.

Mr. Brooks performed a valuation of Kelly-Moore Paint as of July 31, 1998, which concluded that the Company was worth $580 million. Exh. 45 at KMH 1440. He provided an updated valuation as of the transaction date, October 13, 1998, concluding that the Company was worth $550 million. Exh. 46.

Although Mr. Brooks reviewed the Company and its assets and liabilities, nothing in his valuation report suggests that he was provided with any information about asbestos litigation against the Company. Mr. Brooks died shortly after the October 1998 transaction. Exh. 47 (Ireland Dep. 29:3-12). Mr. Ferrari claims that he discussed asbestos litigation against Kelly-Moore with Mr. Brooks, but his statement is unsupported by any documents or corroborating evidence. Exh. 38 (Ferrari Dep. 216:16-19). *See also* Declaration of Stephen Ferrari in Support of K-M Defendants' Motion for Summary Judgment ("Ferrari Dec.") ¶ 10. Mr. Ferrari could not recall the specifics of the alleged communications, including whether he told Mr. Brooks the number of claims pending, or whether he gave Mr. Brooks any documents about asbestos litigation. Exh. 38 (Ferrari Dep. at 245:10-246:11).


**REDACTED**


Exh. 40 (Menke Dep. 230:17-232:2). Finally, Mr. Brooks' valuation report dated August 5, 1998 does not mention asbestos, nor does his updated valuation letter as of October 12, 1998. Exhs. 45, 46.

Moreover, John Menke, who was intimately involved in setting up the ESOP, and who owned Sansome Street Appraisers, testified that no one from Kelly-Moore alerted him to any asbestos litigation against the Company until 2001 or 2002. *See* Exh. 40 (Menke Dep. 66:3-66:5, 190:11-192:25). Indeed, Mr. Menke noted that had anyone mentioned asbestos liability to him at the time of the transactions, he likely would have included that information in letters he sent to

banks in an attempt to secure financing for the ESOP transaction.  Exh. 40 (Menke Dep. 194:25-196:16).

Robert Ireland, the valuator who took over after Mr. Brooks passed away, testified that he could not recall receiving any information about Kelly-Moore's involvement in asbestos litigation until sometime after 2000.  Exh. 47 (Ireland Dep. 75:16-76:19, 77:11-78:12).[10]  The first valuation report to mention asbestos litigation was Mr. Ireland's report as of year-end 2000, which was completed in March 2001.  Exh. 53, Exh. 47 (Ireland Dep. 132:21-24).  Thus, nothing in the record supports Mr. Ferrari's self-serving testimony that he provided information about asbestos liability to the now-deceased Mr. Brooks, and it should therefore be disregarded.

F.    **Kelly-Moore Hired Attorney Cheryl Mills To Coordinate Asbestos Litigation in 1997, Prior to the ESOP Transactions, But Did Not Provide Her Findings to Valuators, Auditors or ESOP Participants.**

As noted above, attorney Cheryl Mills was retained in 1997 to coordinate the Company's response to asbestos litigation, including tracking the number of lawsuits filed and the remaining insurance coverage.  Exh. 1 (Cristiano Dep. 26:21-27:2, 29:1-15)[11]; Exh. 28 (Mills Dep. 53:1-19).

Mr. Ferrari testified that just prior to the first ESOP transaction, on October 1, 1998, Mssrs. Ferrari and Cristiano had a telephone conversation with Ms. Mills

**REDACTED**

---

[10]  Mr. Ferrari contradicts this testimony, stating that he discussed Kelly-Moore's asbestos litigation and insurance coverage with Mr. Ireland in early 1999.  Ferrari Dec. ¶ 12.

[11]

**REDACTED**

In his deposition, Mr. Ferrari asserted that Mr. Cristiano was the main person dealing with Ms. Mills.  Exh. 38 (Ferrari Dep. 170:8-9).  Mr. Cristiano, however, testified that Mr. Ferrari was her primary point of contact.  Exh. 1 (Cristiano Dep. 45:13-24).

The latter statement refers to the fact that one of Ms. Mills' responsibilities was reporting on asbestos litigation to Ernst & Young, the auditor for Kelly-Moore Paint. Exh. 28 (Mills Dep. 65:6-17). In February 1998, Ms. Mills' letter to Ernst & Young about pending litigation against Kelly-Moore failed to mention any asbestos cases. Exh. 55. Instead, the letter affirmatively stated that no matters other than those listed (an EPA superfund site and a personal injury matter) would affect the company's consolidated financial statement by more than $200,000 in the aggregate. *Id.* In order for that statement to be true, each of the over 10,000 asbestos claims pending against KM at year-end 1997 would have to be worth $20 or less.

Mr. Ferrari testified that the conversation with Ms. Mills memorialized in the note to file was part of the company's "due diligence" process in setting up the ESOP, but he does not recall any details of the conversation. Exh. 38 (Ferrari Dep. 175:2-14). However, Ms. Mills testified in a deposition in 2003 that she was not involved in setting up the ESOP, and that she did not provide any information to people involved in setting up the ESOP. Exh. 28 (Mills Dep. 62:20-63:14). Ms. Mills did not analyze information such as the size of the population that might have been exposed to asbestos sold by Kelly-Moore, the period of exposure, or the age of those exposed in order to assess the present value of future asbestos claims when the ESOP was set up. *Id.* at 64:17-66:21, 68:23-69:16.

Mr. Ferrari never shared Ms. Mills' statements with the ESOP participants. Exh. 38 (Ferrari Dep. 175:18-22). Neither did Mr. Cristiano nor anyone else at Kelly-Moore (including Mr. Moore). Exh. 1 (Cristiano Dep. 56:21-57:3). Finally, as discussed below, Ms. Mills' opinion was not provided to the valuator by the Company or by Mr. Moore.

> **G.    In the 1998 Transaction, Mr. Moore Was the Buyer and the Seller, and the K-M and Moore Trust Defendants Withheld Asbestos Information From Auditors, Valuators, and Participants.**

The first ESOP transaction closed on October 13, 1998. Exh. 9 at MK001589. The Moore Trust sold 33,745,455 shares of stock[12] to the ESOP for $6.875 per share, or

---

[12] As part of the 1998 transaction, the company was re-structured. Declaration of Caroline Walters in Support of Motion for Summary Judgment by the Moore Trust Parties ("Walters Dec."), Exh. A (KMH 3119-3120). A holding company, K-M Industries Holding Co., Inc. ("KMH"), was formed, which held Kelly-Moore Paint Co. and CIG as wholly-owned

$232,000,000 total. *Id.*

Mr. Moore as the trustee of the ESOP was the buyer, and as trustee of the Moore Trust (which held the Moore family's shares in the company) was also the seller. *Id.* at MK 1597. At least two company executives expressed reservations to Mr. Moore about his decision to serve as the sole trustee of the ESOP – Mr. Cristiano testified that he felt that "an independent outside administrator would probably have the interest of the employees uppermost, No. 1," Exh. 1 (Cristiano Dep. 155:10-12) – but Mr. Moore was "adamant" that he would be the sole trustee. *Id.* at 153:4-154:7. Mr. Cazzolla testified that he told Mr. Moore that "it would be prudent to have a third party because it's very difficult to be independent and making decisions as an accumulative owner," but Mr. Moore was unconcerned because "that's the way he functions and that's the way he ran our companies." Exh. 4 (Cazzolla Dep. 21:25-22:24).[13] This was consistent with Mr. Moore's overall approach: he was "very hands on" and "made all the decisions for the company," Exh. 3 (Stritmatter Dep. 86:8-87:13), and once he made a decision, "that was it." Exh. 1 (Cristiano Dep. 156:6-13). *See also id.* at 157:8-14 (stating that he "only recommended things to [Mr. Moore] once").

The ESOP participants were not independently represented in the transaction. Exh. 40 (Menke Dep. 130:3-6). As trustee of the ESOP and seller of the stock, Mr. Moore was the ultimate decision-maker as to the price paid in the 1998 transaction. Exh. 1 (Cristiano Dep. 186:5-9); Exh. 38 (Ferrari Dep. 267:25-268:4). There were no negotiations over the price. *See* Exh. 38 (Ferrari Dep. 269:21-271:14).

---

subsidiaries. *Id.* Mr. and Mrs. Moore, along with Mr. Ferrari, comprised the Board of Directors of KMH at that time. Exh. 56. The Moore Trust owned 100% of the shares of KMH until the ESOP transactions, after which time the Moore Trust owned 58% of KMH. Exh. 57.

The shares of KMH were organized into two groups of "tracking stock," each intended to track the performance of their underlying subsidiary. The "Series P" stock tracks Kelly-Moore Paint, and the "Series I" stock tracks CIG. Stritmatter Decl. Exh. 3.

[13] *See also id.* at 125:4-22 (explaining that Mr. Moore "was a person that ran [the company] on his own. He wanted to be in charge and in control of the operation. And he felt confident and we did too, quite honestly, even though we told him there could be a technical conflict, that he was confident that that would not be an issue for him.").

1

**1.    The K-M and Moore Trust Defendants Withheld a December 1998
Letter From Cheryl Mills From Valuators and Participants.**

REDACTED

1

2. **The K-M Defendants Concealed Information About Kelly-Moore's Asbestos Liability From Auditors.**

**REDACTED**

1

2

3

**REDACTED**

4

5

6

7

8  However, Mr. Ferrari received copies of Ms. Mills' letters to auditors wherein information about

9  asbestos liability was withheld. *See* Exh. 61; Exh. 38 (Ferrari Dep. 202:24-203:6).

10

11  **REDACTED**                                                                    Mr.

12  Cristiano again testified that Ms. Mills was reporting to the auditor about asbestos litigation and

13  that they had sufficient insurance, Exh. 1 (Cristiano Dep. 233:5-24), but this was not true as

14  described above.

15  The Company's withholding of information about asbestos litigation from Ernst & Young

16  (through its executives and its attorney) is significant because, among other reasons, the valuator

17  for Kelly-Moore Paint relied on the audited financials and notes thereto for information about the

18  company's liabilities. *See* Exh. 47 (Ireland Dep. 136:13-137:2). *See also* Exh. 59 (Bodenstein

19  Dep. 57:8-12, 58:14-59:5) (the valuator for CIG also relied on Kelly-Moore's audited financials

20  for information about asbestos litigation).  Thus, hiding crucial information from Ernst & Young

21  amounted to concealment from the valuators as well.[14]

22  **H.    In the 1999 Transaction, Mr. Moore Was the Buyer and the Seller, and the**
**K-M and Moore Trust Defendants Withheld Vital Information From**
23  **Auditors, Valuators, and Participants.**

24  Mr. Moore, both as Trustee of the ESOP and Chairman of the Board of CIG, engaged

25  _____

26  14

27

28  **REDACTED**

Duff & Phelps to provide a valuation of the Series I stock as of June 30, 1999.[15]  Exh. 68.  Duff & Phelps concluded that the value of 42% of the Series I stock was $55 million.  Exh. 69 at KMH 005819.  However, Mr. Moore was unhappy with Duff & Phelps' valuation, believing their value conclusion to be too low.  Exh. 4 (Cazzolla Dep. 114:6-115:7); Exh. 70 (Mines Dep. 155:6-156:16).  He had a telephone conversation with Kenneth Bodenstein of Duff & Phelps, who was primarily responsible for their valuation report, in which he asked why the valuation conclusion was not higher.  Exh. 59 (Bodenstein Dep. 124:9-125:19); Exh. 4 (Cazzolla Dep. 115:8-22).  Mr. Bodenstein explained Duff & Phelps' analysis to Mr. Moore, and declined to increase the price per share.  Exh. 59 (Bodenstein Dep. 128:11-23); Exh. 4 (Cazzolla Dep. 115:16-22).

Accordingly, Mr. Moore decided to cancel the Duff & Phelps report, and engaged Columbia Financial Advisors, Inc., to perform another valuation of CIG.  Exh. 70 (Mines Dep. 156:17-157:4); Exh. 71; Exh. 72.  Kathryn Daly, the valuator at Columbia Financial in charge of the CIG assignment, was not told that there had already been two valuations performed by Duff & Phelps.  Exh. 73 (Daly Dep. 35:15-36:11).  She was not given Duff & Phelps' June 1999 valuation, even though she requested copies of all valuations of CIG performed in the prior five years.  Id. (Daly Dep. 35:21-37:14); Exh. 74 at CIG 008177.  Ms. Daly provided Mr. Moore with a preliminary draft valuation on September 7, 1999.  Exh. 75.  Ed Mines, the CFO of CIG, and Peter Cazzolla, the CEO of CIG, also received copies of Columbia Financial's draft valuation.  Exh. 70 (Mines Dep. 187:20-189:17); Exh. 4 (Cazzolla Dep. 141:15-17).  Ms. Daly's conclusion was a range of value from $48.5 to $55 million.  Exh. 75 at CIG 008225.  Mr. Moore was dissatisfied with Ms. Daly's valuation, because the estimated range of value was not higher than Duff & Phelps' value conclusion.  Exh. 73 (Daly Dep. 96:2-10) (statement by Ms. Daly that she

---

[15] CIG first engaged Duff & Phelps to provide a valuation report in June 1998.  At that time, KMH contemplated that there would be separate ESOPs for Kelly-Moore Paint and CIG, and that both transactions would happen in 1998.  Exh. 4 (Cazzolla Dep. 43:25-44:17).  However, the IRS would not approve that arrangement, and the two ESOPs were merged in July 1999.  Id.; Exh. 67 at CIG 004588.  Accordingly, the ESOP's purchase of Series I tracking stock, which was intended to track the performance of CIG, was delayed until October 1999.  Exh. 4 (Cazzolla Dep. 43:25-44:17).

vaguely recalls that Mr. Moore thought her valuation was too low). Ms. Daly vaguely recalled a conversation with Mr. Moore in which he questioned why her draft report had a range of values, and she explained that "for purposes of a transaction, the trustee would negotiate a point along the range." *Id.* at 56:17-22. It was a "curious conversation," according to Ms. Daly, because Mr. Moore as trustee would have had to negotiate with himself. *Id.* at 57:2-11. Mr. Moore asked Ms. Daly whether he could use the high end of her range of value, and requested that Ms. Daly prepare a fairness opinion letter for a price of $55 million. *Id.* at 70:14-72:22; Exh. 76 at CIG 008154. Ms. Daly prepared a draft fairness opinion, but never finalized it because she was fired soon after. Exh. 73 (Daly Dep. 32:18-33:24).[16]

Duff & Phelps' original value conclusion of $55 million was ultimately used in the transaction, and they provided an updated valuation letter as of the date of the transaction. Exh. 77. However, Duff & Phelps was never told that there had been a valuation of CIG by another appraiser which had concluded a range of fair market value starting at $48.5 million. Exh. 59 (Bodenstein Dep. 130:8-24). Although Mr. Mines admitted that a purchase price of $48.5 million would have been better for the ESOP participants, Exh. 70 (Mines Dep. 198:15-199:1), the participants also were never told that there was another valuation of CIG which concluded that the ESOP could negotiate a lower fair market value than the price actually paid.

Neither Duff & Phelps nor Columbia Financial were informed that Kelly-Moore Paint had thousands of asbestos lawsuits pending against it in 1999. Exh. 59 (Bodenstein Dep. 53:5-54:1); Exh. 73 (Daly Dep. 52:1-10). Duff & Phelps was first told by Mssrs. Mines and Cazzolla in 2002 that there was asbestos litigation against the Paint company. Exh. 59 (Bodenstein Dep. 53:24-54:1); *see also* Exh. 78 (notes of conversation between Mr. Bodenstein and Mr. Mines dated April 30, 2002, in which Mr. Mines notified Mr. Bodenstein of asbestos litigation against

---

[16] Ms. Daly sent Mr. Moore some information (pursuant to his request) about how he could invest his personal ESOP proceeds, after which Mr. Moore called her, infuriated, and stated that she "had no business disrupting his team by sending that information" and called her a "god damn bitch." Exh. 73 (Daly Dep. 38:9-39:21). She was informed soon thereafter by Victor Alam, an attorney for Menke & Associates, that CIG would be using Duff & Phelps going forward. *Id.* at 40:23-41:3.

1  Kelly-Moore).

2      The second ESOP transaction closed on October 18, 1999. Exh. 14. The ESOP

3  purchased 8,400,000 shares of Series I tracking stock for $55 million, or $6.55 per share: D&P's

4  concluded value and the highest of Ms. Daly's range of values. *Id.* The transaction was

5  financed, in part, with a $20 million loan from CIG to KMH. Exh. 79. Again, Mr. Moore acted

6  as both the buyer and the seller in the transaction, and there was no negotiation over the price

7  paid by the ESOP or independent representation of the ESOP participants. Exh. 14; Exh. 4

8  (Cazzolla Dep. 154:25-155:24); Exh. 70 (Mines Dep. 217:17-218:3).

9  I.    **The K-M and Moore Trust Defendants Hid Information About Asbestos
        Liabilities After the ESOP Transactions That Concealed their Fiduciary
10      Violations.**

11

12

13

14

15

16

17

18

19                              **REDACTED**

20

21

22

23

24

25

26

27

28

**REDACTED**

Indeed, asbestos claims against Kelly-Moore continued to increase after the ESOP transactions, as predicted by the 1981 actuarial study received by Mr. Moore. In 2000, 9,898 new claims were filed, Exh. 29 at p. 3-5, and there were approximately 27,000 claims pending at the end of that year. Exh. 30. In 2001, there were 13,736 new claims filed. Exh. 29 at p. 5. During 2001, a $55 million verdict was entered against Kelly-Moore in the *Hernandez* asbestos personal injury lawsuit in Texas. Stritmatter Dec. Exh. 10. The case was ultimately settled for $15 million. Stritmatter Dec. Exh. 11.

**REDACTED**

There were 19,113 new asbestos claims filed against the company that year, and approximately 39,000 claims pending at year-end. Exhs. 29, 30. In both 2003 and 2004, the numbers of claims pending exceeded 50,000. Exh. 30.

---

[17] The Kirkland & Ellis presentation raised the concern that asbestos creditors would attack the 1998 ESOP transaction as a fraudulent conveyance.

**J.    Kelly-Moore and CIG's Communications With Participants Concealed That the 1998 and 1999 Transactions Were For More Than Fair Market Value.**

Kelly-Moore Paint and CIG officers, as well as Mr. Moore, provided minimal information to participants in the ESOP from its inception. On May 1, 1998, Mr. Cristiano sent an announcement of the ESOP to employees of Kelly-Moore Paint. Exh. 85. The letter did not say that Mr. Moore was both the buyer and the seller of the shares, nor did it mention asbestos litigation against the company, nor did it state how the company would be valued or who would value it. *Id.* Menke & Associates also conducted briefings for Kelly-Moore employees at various sites around the inception of the ESOP. Exh. 86. These briefings likewise did not mention asbestos litigation or valuation of the company. *See* Exh. 87 (DVD of "Employee Stock Ownership Plan/401k Plan Update").

CIG announced the ESOP to employees through a memo from its CEO, Peter Cazzolla. Exh. 88. The memo informed employees that the ESOP had purchased 42% of the Series I stock of K-M Industries Holding Co., Inc. for $55 million, and that "Mr. William E. Moore sold the shares to us to create a market for the stock he owns without a sale to outside interests." *Id.* The memo did not inform participants about the valuation by Columbia Financial, which had found that $48.5 million would be a fair price for the Series I stock, nor did it inform participants about the existence of thousands of asbestos bodily injury cases pending against Kelly-Moore Paint nor that Mr. Moore acted as both buyer and seller in the transaction. *Id.* Mr. Mines also solicited questions about the ESOP from CIG employees around the 1999 transaction. Exh. 70 (Mines Dep. 212:16-22). One participant, Ken Myatt, emailed Ed Mines a series of questions including: "how was the company stock valued?" and "since CIG stock is not traded on an open market, what assurance is there that the purchase price of employee stock was set fairly?" Exh. 89. However, these difficult questions were not addressed in the "ESOP Questions and Answers" document that was used in Mr. Mines' presentation to managers. Exh. 90; Exh. 70 (Mines Dep. 212:5-213:8). *See also* Declaration of Peter Cazzolla in Support of K-M Defendants' Motion for Summary Judgment ("Cazzolla Dec."), Exh. 5 (memorandum dated November 9, 1999,

answering questions about the ESOP).[18]

In October 1999, Steve Ferrari sent a memo to employees of Kelly-Moore's Hurst factory to "clarify" "certain misleading statements . . . regarding our ESOP." Exh. 92. In it, he stated that the ESOP's decline in value of over $66 million in 1998 was due to the fact that the ESOP took on a loan to purchase stock. *Id.* He made no mention of the thousands of asbestos cases pending against Kelly-Moore at that time. *Id.*

After the ESOP was implemented, Kelly-Moore Paint communicated with employees about the ESOP through cover letters for annual plan statements, *see, e.g.*, Exh. 93, and through a quarterly newsletter called "Mind Our Own Business." *See, e.g.*, Exh. 94. The earliest communication from Kelly-Moore Paint to participants making any mention of asbestos is an issue of Mind Our Own Business from May 2001. Exh. 95. The newsletter states, "Remember that profits are one of the key items that affect your share price. Other items that may also affect your share price include valuations of other paint companies, our asset and debt levels and product liability issues such as asbestos litigation." *Id.* It contains no information about the number of asbestos cases then pending against Kelly-Moore or the amount of insurance available to cover such cases. More importantly, it does not mention that there were over 15,000 claims pending against Kelly-Moore at the time of the 1998 and 1999 stock purchases, or the fact that asbestos liability was not taken into account in determining the price paid in those transactions. *Id.*

The next mention of asbestos litigation came in another issue of Mind Our Own Business, dated October 2001, in which the company announced a large asbestos judgment against it (presumably the *Hernandez* verdict). Exh. 96. The newsletter went on to say that "[t]he Company works very hard to defend itself against asbestos litigation, but such litigation continues to be a concern to the financial health and the stock price of the Company." *Id.* Again, the October 2001 Mind Our Own Business withheld the fact that massive asbestos litigation was already pending against the company in 1998 and 1999, and that such litigation was not taken

---

[18] CIG also sent cover letters along with annual plan statements, *see, e.g.*, Exh. 91, but they likewise contained no information about Kelly-Moore's asbestos liabilities.

1    into consideration in setting the stock price. *Id.*

2        The first mention of asbestos litigation to CIG employees (Mind Our Own Business was

3    not sent to them) came in May 2002, in a memo from Peter Cazzolla to CIG team members.[19]

4    Exh. 98.[20] Mr. Cazzolla sent another memo to CIG employees in January 2003, further

5    discussing the asbestos litigation. Exh. 99.[21] These memos explain the nature of the relationship

6    between Kelly-Moore and CIG – namely, that one holding company owned Kelly-Moore and

7    CIG, and that as a result the asbestos litigation could harm the value of both types of tracking

8    stock held by the ESOP. Exhs. 98, 99. They are striking in that they are very explicit about the

9    scope and possible effect of the asbestos litigation in the future, but make absolutely no mention

10   of the asbestos liability that existed at the time of the 1998 and 1999 transactions.

11   **K.    North Star, the Successor Trustee, Failed to Investigate the 1998 and 1999
        Transactions.**

12       By Spring 2003, Mr. Moore's health had deteriorated to the point where the KMH Board

13

---

15   [19] This memo, and other memos labeled as interoffice memoranda, do not appear to have been
16   sent to former employees of CIG. Exh. 4 (Cazzolla Dep. 175:21-176:4). *See also* Exh. 97
     (Smith Dep. 125:19-25) (testifying that she did not receive Mr. Cazzolla's May 2002 memo).

17   [20] The memo states, in relevant part, that: "One other factor has been brought to our attention. . .
18   . As a result of our joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation
     may depress the value of our CIG stock, which would affect the value of your ESOP account."
19   Exh. 98.
         Interestingly, Mr. Cazzolla testified in this case that he first became aware of asbestos
20   litigation against Kelly-Moore Paint in 1997 or 1998. Exh. 4 (Cazzolla Dep. 32:7-33:4). In his
21   declaration in support of the K-M Defendants' Motion for Summary Judgment, Mr. Cazzolla
     revises this somewhat, stating that he became aware in 2002 that asbestos litigation against
22   **REDACTED**                                    Cazzolla Dec. at
23   ¶ 6.

24   [21] The memo states: "Currently there are over 30,000 claims pending against Kelly-Moore. . . .
     Although the pending claims have been asserted against Kelly-Moore rather than CIG, which are
25   both owned by K-M Holdings, you should be aware that there are some circumstances under
26   which the asbestos litigation might adversely affect the value of the shares held by your ESOP.
     These shares – like those held by the Kelly-Moore ESOP – are actually "tracking" shares issued
27   by K-M Holdings, itself. . . . Both sets of tracking shares, however, are subject to whatever debts
     K-M Holdings, itself, might have to third parties. Therefore, to the extent that any claim – even
28   one arising out of Kelly-Moore's operations – is ultimately satisfied by K-M Holdings rather than
     one of its subsidiaries, the value of the shares held by your ESOP may be affected adversely."

of Directors decided that he should resign as trustee of the ESOP. Exh. 16 (Giffins Dep. 106:24-108:2). North Star was appointed as the successor trustee of the ESOP on April 22, 2003. Exh. 100 at MT000543. North Star and Kelly Moore's representatives discussed Kelly Moore's asbestos litigation at their first meeting in March 2003. Exhs. 101, 102; Exh. 103 (Hommel Dep. 129:19-131:4, 135:10-136:18). According to North Star's designated 30(b)(6) witness, John Hommel, North Star immediately "attempted to familiarize itself with Kelly Moore's asbestos liability." Exh. 103 (Hommel Dep. 160:13-161:7, 162:4-16, 151:14-152:13). North Star also evaluated Kelly Moore's insurance coverage for asbestos litigation as soon as it became successor trustee. Exh. 103 (Hommel Dep. 162:17-24).

North Star devoted substantial time and resources to evaluating Kelly Moore's "forward looking projections" of asbestos litigation liability. Exh. 103 (Hommel Dep. 169:14-170:13). From 2003 to 2005, North Star participated in numerous meetings and phone calls with Kelly Moore's management and professional advisors regarding Kelly Moore's future asbestos litigation liability, insurance coverage for this liability, **REDACTED** *See* Exhs. 104, 105, 106, 107, 108.

In contrast, North Star did not investigate whether (1) Kelly Moore's asbestos litigation liability was accounted for in the 1998 and 1999 transactions between the ESOP and the Moore Trust; and (2) the ESOP paid more than fair market value for the stock purchased from the Moore Trust. As discussed below, North Star gave these issues scant consideration, even though substantial concerns were brought to North Star's attention.

North Star's notes from meetings with Kelly-Moore and CIG representatives show that North Star had warning signs about the initial ESOP transactions. North Star's notes from the May 14, 2003 "Kelly Moore Due Diligence Meeting" attended by John Hommel, a senior vice president at North Star (and an attorney), and Mr. Ferrari, Kelly Moore's CFO, state "Initial ESOP Purchase – we need to figure out how far along the asbestos litigation was when the initial purchase took place – was it factored into the valuation? Did Tee [Trustee] look at; take into consideration?" Exh. 108 at NS00020233. Mr. Hommel's notes from the May 15, 2003 due diligence meeting with CIG attended by CIG's top management state "really concerned about the asbestos issue – CIG has had their own counsel look at the issue. Don't want to do anything that

negatively affects the Moores." Exh. 103 (Hommel Dep. 191:22-193:24); Exh. 104 at NS00031774.[22]

North Star interviewed representatives of Stout Risius Ross, Inc. ("SRR"), on December 30, 2004, as part of North Star's search for a new valuation expert for the ESOP.[23] Exh. 107 at NS00031513. North Star eventually hired SRR as the ESOP's new valuation advisor effective April 25, 2005. Exh. 109. At North Star's initial interview with SRR, an attorney for North Star, John Kober, mentioned a "possible lawsuit against original transaction." Exh. 107 at NS00031513.

In June 2005, North Star was informed that Kelly Moore's asbestos creditors were threatening to attack the 1998 and 1999 ESOP transactions in the event that Kelly Moore filed for bankruptcy. Kelly Moore's lawyers told North Star that the potential bankruptcy "Plaintiffs (ACC) [Asbestos Creditors' Committee] asked about how much money left the company that should have been retained – looking at potential cause of action against Moores when ESOP was formed. Question did ESOP pay more than adequate consideration?" Exh. 106 at NS00020062; Exh. 104 at NS00031792; Exh. 103 (Hommel Dep. 197:16-198:20).

In addition, North Star knew that Mr. Moore had a glaring conflict of interest because he was both the buyer and the seller in the 1998 and 1999 ESOP transactions, and no independent fiduciary or advisor represented the interests of the ESOP participants. North Star's marketing materials stress the importance of having an independent fiduciary represent the interests of the ESOP participants – "In its capacity as trustee or independent fiduciary, North Star retains the requisite impartiality to avoid potential conflicts of interest." Exh. 110, Exh. 103 (Hommel Dep. 109:10-23). Likewise, despite the fact that Mr. Hommel has emphasized the importance of "hir[ing] an independent trustee whose actions are supported by the work of an independent

---

[22] At his deposition, Mr. Hommel claimed that he could not read his own handwriting and therefore could not read the word "negatively" between "that" and "affects." Exh. 103 (Hommel Dep. 193:16-18).

[23] Mr. Hommel's notes from this meeting are captioned "Thursday Dec. 30." Exh. 107 at NS00031513. December 30 fell on a Thursday in 2004. *See* http://www.timeanddate.com/calendar/index.html?year=2004&country=1.

financial advisor and legal counsel" in an ESOP conference presentation, North Star did not

investigate whether the lack of an independent fiduciary infected the original transactions. Exh.

111 at p. 4.

Despite the red flags discussed above, North Star did not take steps to investigate or

remedy the fiduciary violations committed by the prior ESOP fiduciaries. Mr. Hommel claimed

that North Star determined that there was no basis for challenging the 1998 transaction, but

admitted there is no written record to corroborate this assertion. Exh. 103 (Hommel Dep.

266:25-267:3).[24] North Star did not have an attorney prepare a report or memorandum analyzing

whether or not Mr. Moore and his co-fiduciaries breached their fiduciary duties in the 1998 or

1999 transactions. Wasow Dec. ¶ 128; Exh. 103 (Hommel Dep. 271:15-277:19). Likewise,

North Star did not commission a written report as to Kelly Moore's asbestos litigation liability at

the time of the original ESOP transactions. Exh. 103 (Hommel Dep. 183:17-184:5). Finally,

North Star did not have an attorney or valuation expert determine whether or not the ESOP paid

more than fair market value for the stock purchased from the Moore Trust in the 1998 and 1999

transactions. Wasow Dec. ¶ 129; Exh. 103 (Hommel Dep. 280:18-286:2).

Nor did North Star investigate the valuations used for the 1998 and 1999 transactions.

Robert Ireland, who prepared the valuations for Paint tracking stock from December 1998 until

December 2002, testified that North Star did not ask him any questions about his December 1998

valuation when North Star became successor trustee. Exh. 47 (Ireland Dep. 202:10-13). Nor did

North Star ask Mr. Ireland any questions about the valuation for the October 1998 transaction

prepared by the late B. J. Brooks. *Id.* at 202:14-17. In fact, Mr. Ireland doesn't recall North Star

asking him any questions about when he first learned of Kelly Moore's asbestos litigation

liability. *Id.* at 202:18-23.[25] North Star never contacted Kathryn Daly, who performed the

second valuation of CIG. Exh. 73 (Daly Dep. 99:1-3). Mr. Cazzolla, the 30(b)(6) witness for

---

[24] Mr. Hommel also admitted that North Star strives to document in writing substantive
communications and communications with counsel in its role as independent trustee. Exh. 103
(Hommel Dep. 45:20-48:6).

[25] Mr. Hommel claimed that North Star did, in fact, ask Mr. Ireland about the 1998 transaction,
Exh. 103 (Hommel Dep. 274:10-275:3).

CIG, could not recall whether North Star ever investigated the potential liability of prior fiduciaries of the ESOP, nor could he recall any conversations with anyone from North Star about the terms of the 1998 and 1999 transactions. Exh. 4 (Cazzolla Dep. 184:18-185:25).

North Star did not obtain any actuarial studies of asbestos litigation liability from Kelly-Moore. Exh. 103 (Hommel Dep. 165:9-12). North Star did not get any documents from Kelly Moore relating to asbestos liability as of the time of the initial ESOP transactions. *Id.* (Hommel Dep. 167:11-14). North Star never reviewed any documents in the Kelly Moore asbestos repository, even though North Star knew that it existed. *Id.* (Hommel Dep. 199:16-201:16). Likewise, North Star never contacted Cheryl Mills, the attorney who advised Kelly Moore about asbestos liability insurance coverage issues beginning in 1997. *Id.* (Hommel Dep. 204:8-25).

In short, the evidence shows that starting in 2003 North Star either had or should have had concerns about the fairness of the 1998 and 1999 transactions, but failed to take adequate steps to remedy the fiduciary violations by Mr. Moore and his co-fiduciaries. North Star thoroughly investigated the impact of Kelly Moore's asbestos litigation liability on the proper valuation of the ESOP's tracking stock as of 2003 and in subsequent years, but did not investigate the original transaction. North Star also obtained advice from attorneys, valuation experts, and other professional advisors as part of its review of the impact of Kelly Moore's asbestos litigation liability on the then-current and future valuations. North Star, however, failed to take similar steps to investigate whether Mr. Moore and his co-fiduciaries violated their fiduciary obligations in the 1998 and 1999 transactions.

## III.    LEGAL STANDARD.

Summary judgment is proper only if there are no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment always bears the initial responsibility of identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor. *Id.* at 255. *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Issues of credibility and intent should not be resolved on summary judgment. *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

Whether a statute of limitations bars an action is typically viewed as a mixed question of law and fact: "whether the statute of limitations (rule of law) bars the action may depend on certain historical facts" such as whether Defendants took affirmative steps to conceal their fiduciary violations. Schwarzer, Tashima & Wallace, FEDERAL CIVIL PROCEDURE BEFORE TRIAL (2008), § 14:220. Summary judgment is not proper where there are factual disputes as to when a plaintiff was on notice of his claim. *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 397 (9th Cir. 1982). *See also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (holding that "the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the [fact-finder]").

## IV.    ARGUMENT.

The K-M and Moore Trust Defendants engaged in fraud or concealment of facts that prevented participants from discovering those Defendants' violations of ERISA. Defendants spend most of their briefs on arguments related to whether six years have elapsed since the alleged violations of ERISA. This is beside the point for the K-M and Moore Trust Defendants, because those Defendants' actions in concealing the fact and scope of Kelly-Moore's asbestos liability from participants, valuators, and auditors, both at the time of the two ESOP transactions and after, prevented Plaintiffs from discovering that the Plan paid too much for its stock until many years later. Accordingly, the "fraud or concealment" exception to the ERISA statute of limitations applies to the K-M and Moore Trust Defendants.

As discussed in Section C below, Plaintiffs' claim against Defendant North Star falls within the statute of limitations because North Star's failure to take appropriate steps to investigate and remedy the prior fiduciaries' violations occurred after North Star became successor trustee in 2003, and Plaintiffs filed suit in 2006.

### A.    ERISA's Statute of Limitations for Fiduciary Violations.

All of Plaintiffs' claims are governed by the ERISA statute of limitations for fiduciary violations, which provides that no breach of fiduciary duty action may be commenced after the

earlier of:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
> *except that in the case of fraud or concealment*, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (emphasis added).[26]

**B.    Plaintiffs' Claims Against The K-M Defendants and the Moore Trust Defendants Are Timely.**

    **1.    The K-M and Moore Trust Defendants' Violations of ERISA First Occurred in 1998 and 1999 When the ESOP Purchased Stock from the Moore Trust.**

The starting point for the Court's statute of limitations analysis is identifying Defendants' alleged fiduciary violations. *Meagher v. Int'l Assn. of Machinists and Aerospace Workers Pension Plan*, 856 F.2d 1418, 1422 (9th Cir. 1988) ("To apply the limitations period, we must first isolate and define the underlying violation upon which [plaintiff's] claim is founded.").

Plaintiffs make two claims against the K-M and Moore Trust Defendants. First, Plaintiffs allege that the ESOP's purchases of stock for more than fair market value violated the prohibited transactions rules codified at ERISA § 406, 29 U.S.C. § 1106. Second Amended Complaint ("SAC") ¶¶ 74, 75. All sales of stock between an ESOP and a party in interest such as Mr. Moore are per se violations of the prohibited transaction rules under ERISA § 406, regardless of good intention or procedural prudence, unless the K-M and Moore Trust Defendants meet their burden of proving that the ESOP paid fair market value for the company shares it purchased. *Horn v. McQueen*, 215 F. Supp. 2d 867, 876 (W.D. Ky. 2002); ERISA §§ 406, 408, 29 U.S.C. §§ 1106, 1108. Thus, the prohibited transaction claims accrued on October 13, 1998 and October

---

[26] The K-M and Moore Trust Defendants' argument that the ERISA statute of limitations is a "statute of repose," *see* Memorandum of Points and Authorities in Support of K-M Defendants' Motion for Summary Judgment ("K-M Brief") at 6-7; Memorandum of Points and Authorities in Support of Moore Trust Defendants' Motion for Summary Judgment ("Moore Trust Brief") at 6-7, is misplaced and irrelevant. The statute contains an express provision for extending the limitations period in the case of fraud or concealment, and thus Defendants' repose can be disturbed.

18, 1999, respectively.

Second, Plaintiffs allege that the K-M Defendants and Defendant Desiree Moore breached their fiduciary duties under ERISA §§ 404(a)(1) and 409, 29 U.S.C. §§ 1104(a)(1) and 1109, by causing the ESOP to pay more than fair market value for KMH stock in 1998 and 1999. SAC ¶¶ 67, 16.  In addition to the overpayments, Plaintiffs further allege that the K-M Defendants and Desiree Moore breached their fiduciary duties to the ESOP by failing to hire an independent valuator or provide full information to the valuator, and by failing to sufficiently review the valuation and ask questions before relying upon it.  SAC ¶ 67.  These breaches each took place prior to or on the October 13, 1998 and October 18, 1999 transaction dates.

> **2.      Because the K-M and Moore Trust Defendants Withheld Vital Information From the Participants, Valuators, and Auditors, Plaintiffs' Claims Against Them are Timely Under the Fraud or Concealment Exception.**

The fraud or concealment exception applies here due to the information withheld by the K-M and Moore Trust Defendants.  As a result, the statute of limitations runs six years from the Plaintiffs' discovery of Defendants' fiduciary violations.  29 U.S.C. § 1113.  Thus, Defendants' arguments about the applicability of the "continuing violation" theory and the characterization of the breaches as omissions rather than acts are irrelevant.  *See* K-M Brief at 9-12; Moore Trust Brief at 9-13.

The fraud or concealment exception applies when "an ERISA fiduciary either 'misrepresent[s] the significance of facts the beneficiary is aware of (fraud) or . . . hid[es] facts so that the beneficiary never becomes aware of them (concealment).'" *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1401 (9th Cir. 1995) (quoting *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990)).  Defendants must have hidden or misrepresented facts which had the effect of concealing any of their fiduciary violations. *See, e.g., Hemphill v. Pers. Representative of the Estate of James J. Ryskamp, Jr.*, 2006 WL 1837917, at *17 (E.D. Cal. July 5, 2006) (holding that the defendant's withholding of information from the plaintiff rendered it impossible for her to discover all breaches of fiduciary duty, and thus tolling was appropriate).  Thus, if Plaintiffs can show facts upon which a reasonable fact-finder could determine that the K-M and Moore Trust Defendants engaged in acts constituting fraud or concealment, then the

statute of limitations for *all* of Plaintiffs' claims against them is extended to six years after Plaintiffs' discovery of the fiduciary violations.

### i. The K-M Defendants Engaged in Acts of Fraud or Concealment.

The K-M Defendants concealed and misrepresented facts about asbestos litigation against Kelly-Moore from participants. In addition, they concealed and misrepresented facts about asbestos litigation from valuators and auditors, which also had the effect of preventing participants from discovering the K-M Defendants' breaches of fiduciary duty.

As an initial matter, acts by Kelly-Moore or CIG senior management, or by William Moore as chairman of the board, are imputed to KMH. *See Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1086 (9th Cir. 1999). Their knowledge is also imputed to the corporation. *See W.R. Grace & Co. v. Western U.S. Industries, Inc.*, 608 F.2d 1214, 1219 (9th Cir. 1979) ("It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself.") (citations omitted). *See also In re Crown Vantage, Inc.*, 2004 WL 1635543, at *5 (N.D. Cal. July 12, 2004) (holding that knowledge of a corporation's sole shareholder is legally imputed to the corporation). By the same token, any acts by William Moore were acts of the ESOP Plan Committees, because he was the sole member from the inception of the ESOP until 2003.[27] *See* Exh. 115 at NS00001648; Exh. 3 (Stritmatter Dep.

---

[27] Contrary to the K-M Defendants' argument, *see* K-M Brief at 4 n.4, the KMH ESOP Plan Committee and the CIG ESOP Plan Committee are proper defendants. Pursuant to ERISA § 402(a)(1), each plan must provide for "one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. 1102(a)(1). The KMH Plan in effect at the time of the 1999 transaction listed its "Plan Committee" as a named fiduciary. Exh. 112 (KMH Plan 6/30/99 at 56, CIG 011013). The CCIC Employee Stock Ownership Plan in effect as of June 22, 1998 listed its "Plan Committee" as a named fiduciary. Exh. 113 (CCIC Plan 6/22/98 at 52, CIG 008479). And the "Plan Committee" was also a named fiduciary of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan effective January 1, 1998. Exh. 114 (Paint Plan 6/11/98 at 51, MK001541). Thus, each Plan Committee was a fiduciary with authority to administer the plan.

The unpublished case relied on by Defendants, *Tatum v. R.J. Reynolds Tobacco Co.*, 2007 WL 1612580 (M.D.N.C. May 31, 2007), confuses the *plan itself*, which cannot be sued for breach of fiduciary duty, and the Plan Committee, which is responsible for administering the plan in accordance with its fiduciary duties. *See Tatum*, 2007 WL 1612580 at *8 (citing cases holding

73:14-74:4).

Bearing this in mind, there were multiple affirmative acts by representatives of Kelly-Moore Paint, CIG, and KMH that had the effect of concealing the breaches from participants.

**a.      Concealment of Asbestos Litigation Against Kelly-Moore From Participants.**

The K-M Defendants hid the fact that Kelly-Moore had significant asbestos liabilities from participants at the time of the transactions in 1998 and 1999.  Mr. Cristiano's announcement of the ESOP said nothing about asbestos litigation, Exh. 85, nor did briefings by the Menke organization (done at the behest of and on behalf of the Company).  Likewise, Mr. Cazzolla said nothing about asbestos litigation against Kelly-Moore in his announcement of the ESOP to CIG employees.  Exh. 88.  It is undisputed that the company said nothing to ESOP participants about Kelly-Moore's asbestos litigation until 2001, and statements in 2001 and after addressed pending and future, not past, asbestos litigation.  Until discovery in this lawsuit, the K-M Defendants have *never* given participants information about the number, value, or type of asbestos claims pending against the company in 1998 and 1999.  Ferrari Dec. ¶¶ 15-24.  *See supra* Section II.J.

That the K-M Defendants and Mr. Moore had knowledge of the Company's asbestos liability at the time of the ESOP transactions is hard to dispute:  they started to collect documents related to asbestos in the 1970's, received an actuarial study of future asbestos liability from Reed International in 1981, announced their concern about the growing asbestos litigation problem at a Board Meeting in 1997, received notices of exhaustion of primary insurance policies in 1998, and communicated regularly with their attorney about the scope of the asbestos problem.  *See supra* Section II.B.  Moreover, it strains credulity that Mr. Moore and his senior executives

that the *plan* is not a proper defendant).  Courts that have correctly differentiated between the plan itself and its fiduciaries in analyzing whether a Plan Committee may be sued have determined that it may.  *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 616-17 (S.D. Tex. 2003) (calling Committee defendants' challenge "frivolous" and noting that "ERISA, which provides the substantive law here, expressly contemplates that when an administrative committee acts in the denial of plan benefits or as a fiduciary in breach of its fiduciary duties, it may be sued.").

would be unaware of the existence of over 15,000 thousand asbestos claims asserted by 1998.

The K-M Defendants make a halfhearted attempt to assert that they did not conceal the existence and magnitude of asbestos litigation against Kelly-Moore in 1998 and 1999 via unsupported, incredible statements by Mr. Ferrari that this was "common knowledge" among Kelly-Moore employees. Ferrari Dec. ¶ 15; Exh. 38 (Ferrari Dep. 291:12-15). The only basis for Mr. Ferrari's statement was his belief that some employees worked for Kelly-Moore back when asbestos-containing products were being manufactured (i.e. in the 1970s); he could not recall ever directly discussing asbestos litigation with employees. Exh. 38 (Ferrari Dep. 292:3-293:4). There is no other evidence that asbestos litigation against Kelly-Moore was common knowledge among employees. In fact, Plaintiff Tosha Thomas (a former Kelly-Moore employee) testified that she became aware of asbestos litigation against the company in 2002. Exh. 116 (Thomas Dep. 110:16-111:2). The K-M Defendants have not proferred testimony from any employees (other than top executives) that they knew about asbestos litigation in 1998 and 1999, or that asbestos litigation was common knowledge. Furthermore, even assuming that some employees knew there was some asbestos litigation, the evidence shows that the KM and Trust Defendants still concealed information regarding the scope and severity of that litigation that would have led a prudent fiduciary to demand more information and negotiate a better deal for the participants. At most, Mr. Ferrari's statement only serves to create a genuine issue of material fact as to the participants' knowledge about asbestos litigation in 1998 and 1999, which should preclude summary judgment.

The K-M Defendants' actions constitute concealment within the meaning of the statute of limitations: Mssrs. Ferrari, Cristiano, and Moore had knowledge that the company faced thousands of asbestos lawsuits at the time of the ESOP transactions and decided not to reveal that knowledge to the participants. In *Evanson v. Price*, 2006 WL 2829789, at *2, 5 (E.D. Cal. Sept. 29, 2006), the court found concealment because defendants placed certain letters in a file that was inaccessible to others and kept secret the contents of those letters. This case is similar to *Evanson* because Mr. Moore certainly had knowledge about the extent and severity of the asbestos litigation: he received an actuarial analysis of Kelly-Moore's likely future asbestos

liabilities in 1981. Exhs. 20, 21, 22, 23. He presided over the Board of Directors meeting in 1997 in which the company's concerns about asbestos litigation were discussed, Exh. 5; and he communicated directly and indirectly with Cheryl Mills. Exh. 1 (Cristiano Dep. 38:19-39:16). He also kept copies of newspaper articles about other companies forced into bankruptcy by asbestos litigation. Exh. 25. Mssrs. Ferrari and Cristiano had, *inter alia*, (1) communications with Cheryl Mills about the scope of asbestos litigation, Exh. 54, Section II.F at p. 9-10, and (2) their own knowledge as Kelly-Moore executives that the company was a defendant in a large number of asbestos lawsuits. *See* Ferrari Dec. ¶ 5, Cristiano Dec. ¶¶ 3-4. Further, the Company received letters from insurers declaring exhaustion of policies due to asbestos litigation. *See, e.g.*, Exh. 34. All of this information was, literally and figuratively, placed in files to which participants, valuators, and auditors did not have access and kept secret. These actions are not "mere silence," *see* K-M Brief at 14, they are concealment.

Further, the K-M Defendants' argument that they believed disclosure to participants of the existence of asbestos litigation was unnecessary because such litigation was purportedly covered by insurance, *see* K-M Brief at 16-17 n.6, is simply an argument that there was no fiduciary violation.[28] It amounts to an argument that they concealed information about asbestos, but such concealment caused no harm. That argument actually supports Plaintiffs' position in the current motion: the fact that Defendants chose to conceal information about asbestos litigation is sufficient under the fraud or concealment exception. Concealing that there were thousands of asbestos cases in 1998 and 1999 had the effect of preventing participants from questioning the purchase price – in other words, it had the effect of concealing the alleged violations of ERISA. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (noting that the statute of

---

[28] Defendants contend, in essence, that information about Kelly-Moore's asbestos liabilities to participants was immaterial. Although the Court should not reach this issue because it goes to the merits of Plaintiffs' claims, it is worth noting that the Ninth Circuit has held that, consistent with ERISA's purpose to safeguard the well-being of employees, plan fiduciaries have a duty to disclose information (beyond the express disclosure obligations in the statute) that will allow plan participants to "know where they stand with respect to the plan," make informed decisions about whether to seek alternative employment, or "bargain further." *Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1072-73 (9th Cir. 2005).

limitations should be tolled if the plaintiff "establishes affirmative conduct on the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief") (internal citation omitted).

Further, in asserting that asbestos litigation did not have to be disclosed because it was supposedly covered by insurance, Defendants misrepresent the record. Cheryl Mills, the attorney to whom Mssrs. Cristiano and Ferrari delegated responsibility to keep track of asbestos litigation, told them in writing in December 1998 that "a few large hits" could throw projections about

**REDACTED**

Thus, coverage for asbestos cases was in doubt even in 1998, and Kelly-Moore executives knew it. *See supra* Section II.C. In addition, there are credibility issues as to whether Kelly-Moore executives actually believed that asbestos litigation did not need to be disclosed because it was covered by insurance: Mr. Ferrari states (incredibly, as discussed below) that he informed the valuator for the Paint company in 1998 about the litigation and insurance coverage therefor. Ferrari Dec. ¶ 10. If the valuator had to be informed of the litigation – presumably so that he could make a judgment as to whether it affected the company's value – then the participants had to be informed for the same reason.

Construing the facts in the light most favorable to Plaintiffs, the K-M Defendants concealed their knowledge of asbestos litigation from participants. At a minimum, there are disputed issues of fact which preclude summary judgment.

> **b.    Concealment of the Asbestos Litigation Against Kelly-Moore From Valuators.**

In addition to concealing facts about asbestos litigation (and insurance coverage) from participants, the K-M Defendants concealed such facts from the persons hired to appraise Kelly-Moore Paint in 1998 and CIG in 1999, which likewise had the effect of preventing participants from discovering the breach.

The K-M Defendants concealed the existence and magnitude of Kelly-Moore's asbestos litigation from the valuator for the 1998 transaction, B.J. Brooks. *See supra* Section II.I. Mr. Ferrari stated, in his deposition and his declaration, that he told Mr. Brooks about the existence

of asbestos litigation against Kelly-Moore, including the "large number of asbestos claims and the insurance coverage for those claims." Ferrari Dec. ¶ 10. Substantial evidence casts doubt upon Mr. Ferrari's assertions: first, Mr. Brooks' notes from conversations with Mr. Ferrari do not mention asbestos. Second, letters and faxes from Mr. Ferrari to Mr. Brooks enclosing information pertinent to the valuation do not identify any asbestos-related documents. Third, Mr. Brooks' valuation report dated August 5, 1998, and his update letter dated October 12, 1998, make no mention of any asbestos claims against the company. Fourth, the valuator who took over the Kelly-Moore assignment from Mr. Brooks, Robert Ireland, testified that he did not receive any information about asbestos litigation from Mr. Ferrari until sometime after 2000. Exh. 47 (Ireland Dep. 75:16-76:19, 77:11-78:12). Fifth, Mr. Menke, who was involved in multiple aspects of the ESOP, was not told about asbestos litigation by Mr. Cristiano, Mr. Moore, or anyone else, until 2001 or 2002. *See* Exh. 40 (Menke Dep. 66:3-5, 190:11-192:25). Viewing the facts in the light most favorable to Plaintiffs, Mr. Ferrari did not inform Mr. Brooks about any asbestos litigation against Kelly-Moore. Mr. Cristiano testified that he was not aware of whether any information about asbestos litigation was provided to Mr. Brooks. Exh. 1 (Cristiano Dep. 183:16-184:1, 184:24-185:3). The only reasonable inference from these facts is that the K-M Defendants and Mr. Moore concealed the existence and magnitude of asbestos litigation from Mr. Brooks.

Further, the K-M Defendants and Mr. Moore concealed the existence and scope of asbestos litigation against Kelly-Moore from Duff & Phelps, the principal valuator for CIG, as well as from Columbia Financial Advisors, Inc., the second-opinion valuator that Mr. Moore hired in an attempt to obtain a higher price for the Series I stock. Exh. 59 (Bodenstein Dep. 53:5-54:1); Exh. 73 (Daly Dep. 52:1-10).

Concealment of asbestos litigation from the valuators by Mssrs. Ferrari, Cristiano and Mines constitutes concealment within the meaning of the fraud or concealment exception to the statute of limitations. The valuators could not take asbestos litigation liabilities into account in their appraisals without information on its scope. This also had the effect of concealing the fiduciary violations from Plaintiffs because they could not learn of the proper fair market values

for the 1998 and 1999 valuations from their account statements or annual updates from the plan fiduciaries.[29] The K-M Defendants' fraud or concealment prevented Plaintiffs from learning that the ESOP paid far too much for the stock Mr. Moore purchased from the Moore Trust on their behalf in 1998 and 1999.

### c. Concealment of Asbestos Litigation Against Kelly-Moore From Auditors.

Annual letters to Ernst & Young from Mssrs. Cristiano and Ferrari in 1998, 1999, and 2000 contained affirmative misrepresentations about the nature of asbestos litigation against

**REDACTED**

---

[29] By way of contrast, when Paint stock's value fell in 1999, Mr. Ferrari was quick to explain the purported cause to ESOP participants, stating that the share price fell due to the new ESOP debt. Exh. 92.

1   that Kelly-Moore had any asbestos liability. Exhs. 55, 61, 60. She acted as an agent of the

2   Company in reporting to the auditor, *see Pioneer Inv. Services Co. v. Brunswick Associates Ltd.*

3   *Partnership,* 507 U.S. 380, 396 (1993) ("clients must be held accountable for the acts and

4   omissions of their attorneys"). Thus, her letters also constitute acts of concealment by Kelly-

5   Moore which had the effect of concealing the fiduciary violations.

6        Defendants may assert that Kelly Moore did not have to disclose its asbestos litigation to

7   auditors, valuators, or ESOP participants in 1998 and 1999, because Kelly Moore believed that

8   its liabilities would be covered by insurance. Aside from misrepresenting the facts, this

9   argument has no merit. Basic principles of business and accounting require separate disclosure

10   of liabilities (such as asbestos litigation) and assets (such as expected insurance recoveries).

11   Both third parties that considered buying Kelly Moore Paint – Reed International and Benjamin

12   Moore – insisted upon a careful analysis of Kelly Moore's asbestos liabilities as part of their due

13   diligence. *See supra* Sections II.B, II.I. In addition, the Financial Accounting Standards Board

14   (FASB) holds that "[i]t is a general principle of accounting that the offsetting of assets and

15   liabilities in the balance sheet is improper except where a right of setoff exists." FASB

16   Accounting Principles Board (APB) No. 10. Exh. 117 at paragraph 7.[30] Similarly, American

17   Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 96-1,

18   *Environmental Remediation Liabilities*, Paragraph 140, states that "The amount of an

19   environmental remediation liability should be determined independently from any potential claim

20   for recovery, and an asset relating to the recovery should be recognized only when realization of

21   the claim for recovery is deemed probable."[31] Exh. 118.

22        Concealment of Kelly-Moore's asbestos liabilities from Ernst & Young also had the

---

[30] *See also* FASB Interpretation (FIN) No. 39, *Offsetting of Amounts Related to Certain Contracts.* Exh. 119 at p. 2.

[31] Although SOP 96-1 focuses on environmental remediation, the SOP provides guidance on a broad spectrum of environmental liabilities except as specifically excluded in Paragraphs 100-01. The Ninth Circuit has recognized that FIN and APB opinions are among "the highest level" of "[o]fficially established accounting principles" in the Generally Accepted Accounting Principles (GAAP) hierarchy. *Bolt v. Merrimack Pharmaceuticals, Inc.*, 503 F.3d 913, 918 n. 6 (9th Cir. 2007). SOP opinions are in the next highest level of accounting authority. *Id.*

1    effect of preventing Plaintiffs from discovering the K-M and Moore Trust Defendants' fiduciary

2    violations. *See Volk*, 816 F.2d at 1415. The valuators relied on audited financials for

3    information about Kelly-Moore's asbestos liabilities, *see supra* Section II..G, and thus

4    concealment from auditors prevented participants from discovering the proper fair market value

5    for the KMH shares purchased by the ESOP in 1998 and 1999.

> **d.    Concealment of the Columbia Financial Advisors, Inc. Report from Participants and Valuators.**

6    The K-M Defendants prevented ESOP participants from discovering that they could have

7    paid a lower price for the Series I stock purchased in 1999, by concealing the fact that there was

8    another valuation performed which concluded that the fair market value of 42% of Series I stock

9    could be $48.5 million, or $6.5 million less than they actually paid.

10    Messrs. Moore, Mines, and Cazzolla all received copies of Kathryn Daly's September 7,

11    1999 report. Exh. 75; Exh. 70 (Mines Dep. 187:20-189:17); Exh. 4 (Cazzolla Dep. 141:15-17).

12    However, participants in the ESOP were never informed of its existence or range of values.

13    Further, Duff & Phelps, the valuator whose price was ultimately used in the transaction, was

14    never told that there was a second valuation of CIG. Exh. 59 (Bodenstein Dep. 130:8-24).

15    Again, similar to the letters in *Evanson v. Price*, Ms. Daly's valuation was put away and

16    kept secret. 2006 WL 2829789 at *4-5. Had participants known that there was a valuation

17    opining that the fair market value of 42% of the Series I stock was less than the price paid by the

18    ESOP, they would have been put on notice that the price actually paid for the stock was too high;

19    instead, they were prevented from discovering the breach by Defendants' concealment.

20    Accordingly, the Court should find that the K-M Defendants engaged in fraud or concealment

21    sufficient to toll the statute of limitations.

> **e.    The K-M Defendants Concealed Asbestos Information After The ESOP Transactions.**

22    As discussed in the fact section, the K-M Defendants continued to conceal important

23    information regarding asbestos liability from the participants, valuators, and auditors after the

24    1998 and 1999 transactions, thereby preventing discovery of their ERISA violations.

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**REDACTED**

24      ii.      **Acts of Concealment by the Moore Trust Defendants**.

25      William Moore and Desiree Moore were the trustees of the Moore Trust at the time of the

26  transactions.  *See* Exhs. 9, 14.  A trust must, of course, act through its trustee(s).  *See*

27  RESTATEMENT (2ND) OF TRUSTS § 169 ("Upon acceptance of the trust by the trustee, he is under

28  a duty to the beneficiary to administer the trust.").  *See also Pillsbury v. Karmgard*, 22 Cal. App.

4th 743, 753 (Cal. Ct. App. 1994) (holding that a trust "is not an entity separate from its trustees" and thus the trustee is the real party in interest in litigation involving trust property). *See also* Exh. 120 at MT 2033, 2047 (Moore Trust instrument) (designating Mr. and Mrs. Moore as trustees and granting various powers to them, including investment of trust funds and "execut[ion] of any and all documents on behalf of the Trust"). Thus, Mr. Moore's concealment of the existence and magnitude of asbestos liability against Kelly-Moore Paint is attributable to the Moore Trust.[32]

William Moore, as discussed above, ran KMH and its subsidiaries, and he had direct knowledge about the asbestos litigation facing Kelly-Moore.

**REDACTED**

Mr. Moore was "very much involved in the . . . asbestos issue," Exh. 1 (Cristiano Dep. 38:19-39:16), just as he was actively involved in all other aspects of Kelly-Moore and CIG. However, he concealed the information he had about asbestos litigation from employees, valuators, and auditors.

Mr. Moore also concealed Kathryn Daly's report, and the fact that the fair market value of CIG could have been more than $6 million less than the price paid by the ESOP, from participants. Mr. Moore certainly received a copy of her report, as discussed above, and was personally responsible for firing her. *See supra* Section II.H. Disclosure of her report would have caused participants to question the fairness of the price paid for the Series I tracking stock in 1999, but Mr. Moore kept it secret.

---

[32] The Moore Trust's argument that Plaintiffs cannot make out the elements for co-fiduciary liability against Desiree Moore are misplaced in this motion for summary judgment on the statue of limitations. Moore Trust Brief p. 15-16. Whether Mrs. Moore is liable for breach of fiduciary duty will be addressed in a subsequent motion for summary judgment on the merits, or at trial.

1    The fact that Mr. Moore wore many hats – trustee of the ESOP, sole member of the ESOP

2    committee, majority owner of KMH and its subsidiaries, and Chairman of their Boards of

3    Directors – does not excuse his concealment of Kelly-Moore's asbestos liability.  Courts have

4    held that knowledge gained by an ERISA fiduciary while acting in a corporate capacity does not

5    disappear when he acts as in his fiduciary capacity: "[e]ven if [defendant] was wearing a

6    different corporate hat at the time he committed the fraud, when he donned the Plan

7    Administrator hat in 1998 and made decisions about the ESOP, he did so with full knowledge of

8    his own fraudulent misconduct that would negatively affect the Plan.  He may have figuratively

9    'taken off' the other hat, but . . . that knowledge remained in his head even if he kept it 'under his

10   hat,' his new one, that is." *Community Bancshares, Inc. v. Patterson*, 547 F. Supp. 2d 1230,

11   1245 (N.D. Ala. 2008) (citing *Canale v. Yegen*, 782 F. Supp. 963 (D.N.J. 1992) and 789 F. Supp.

12   147 (D.N.J. 1992)).

13       Desiree Moore, as co-trustee of the Moore Trust, is legally chargeable with Mr. Moore's

14   acts of concealment, because she did nothing to stop them.  *See Middlesex Ins. Co. v. Mann*, 177

15   Cal. Rptr. 495, 504 (Cal. Ct. App. 1981) (holding that a trustee is responsible for the wrongful

16   acts of a co-trustee "which, by his negligence, he enabled the co-trustee to commit").  Further,

17   Mrs. Moore was a member of the Board of Directors of Kelly-Moore Paint and CIG (and KMH),

18   and was present at the 1997 meeting in which concerns about Kelly-Moore's asbestos liability

19   were discussed.  Exh. 5.  She has been a member of the Board of Directors of Kelly-Moore Paint

20   and KMH at all times since 1997, and has been the Chairperson of the Board since Mr. Moore's

21   death.  Thus, she also had direct knowledge about Kelly-Moore's asbestos liability which she

22   concealed from participants.

23       Because the trustees of the Moore Trust concealed information about asbestos litigation

24   and Kathryn Daly's valuation report, the statute of limitations for Plaintiffs' claims against the

25   Moore Trust Defendants can not run until six years after Plaintiffs' discovery of their fiduciary

26   violations.

27

28

1

2

### 4.    The Court Should Not Countenance the K-M and Moore Trust Defendants' Arguments Based on Rule 9(b).

The K-M Defendants (and, to some extent, the Moore Trust Defendants) assert that Plaintiffs fall short of the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). K-M Brief at 12-13, Moore Trust Brief at 15. As the Court well knows, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, the Court should, at this stage in the case, consider all of the evidence proffered by Plaintiffs and Defendants in determining whether the fraud or concealment exception applies, and should not limit its review to the allegations in the pleadings. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56, Notes to 1963 Amendment. *See also Snow v. Harnischfeger Corp.*, 12 F. 3d 1154, 1157 (1st Cir. 1993) (same).

Defendants could have – but did not – move to dismiss based on their statute of limitations defense. Such a motion would have been the proper time to attack Plaintiffs' pleadings. *See S.E.C. v. Sands*, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995) (on motions and cross-motions for summary judgment, holding that "the assertion that the complaint fails to plead scienter and fraud with particularity is an attack on the pleading. It normally provides the grounds for a motion to dismiss. The allegation that the complaint does not state fraud with particularity is not an affirmative defense on which the Defendants will produce evidence at trial"). The Court should not countenance Defendants' gamesmanship in waiting until completion of over a year of discovery to raise this issue.

Further, Defendants have been on notice that Plaintiffs intended to invoke the fraud or concealment exception since the inception of the case,[33] and all of the discovery sought by

---

[33] The parties' Joint Case Management Statement identifies as one of the key issues in the case "[w]hether the defendants intentionally concealed facts relevant to plaintiffs' claims from the plaintiffs." Docket No. 26 at 4-5. *See also, e.g.*, SAC ¶¶ 43, 51, 52 (alleging that KMH management and other fiduciaries intentionally withheld information about Kelly-Moore's

1  Plaintiffs made clear that Plaintiffs would attempt to show that their claims were timely due to

2  Defendants' concealment of asbestos litigation liabilities. Plaintiffs' responses to Defendants'

3  contention interrogatories served as additional notice that Plaintiffs intended to show at summary

4  judgment that Defendants engaged in concealment. Walter Decl. Exhs. J, K. Thus, Defendants

5  cannot show prejudice from any deficiency in Plaintiffs' pleadings on the fraud or concealment

6  issue. *See Han. v. Mobil Oil Corp.*, 73 F.3d 872, 877-78 (9th Cir. 1995) (holding that an

7  affirmative defense based on lapse of a limitations period may be raised for the first time on a

8  motion for summary judgment where no prejudice is caused to the non-moving party).

9         However, if the Court is concerned about ensuring that the Complaint complies with Rule

10  9(b), it should allow amendment to conform with proof. *See* Fed. R. Civ. P. 15(b)(2) ("A party

11  may move – at any time, even after judgment – to amend the pleadings to conform them to the

12  evidence and to raise an unpleaded issue."). "The Federal Rules reject the approach that pleading

13  is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the

14  principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v.*

15  *Gibson*, 355 U.S. 41, 48 (1957). Rule 15(a) provides that leave to amend shall be freely given

16  when justice so requires; "this mandate is to be heeded. If the underlying facts or circumstances

17  relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity

18  to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Defendants would

19  not be prejudiced by amendment, for the reasons noted above. Thus, amendment to conform

20  with evidence should be allowed. *See In re AST Research Securities Litig.*, 887 F. Supp. 231,

21  236 (C.D. Cal. 1995) (permitting amendment to conform to proof because the alleged

22  impropriety added to the complaint "has been a recurring issue in this action" and the amended

23  complaint "merely places the proverbial 'meat on the bone'").

        **5.**      **If the Fraud or Concealment Exception Applies, Plaintiffs Filed Suit Within the Statute of Limitations.**

24

25         If the Court finds that the fraud or concealment exception applies, the next question is

26  whether Plaintiffs brought this action within six years of their discovery of the fiduciary

27

28  ────────────

    asbestos liabilities from valuators and participants).

1  violations. ERISA § 413, 29 U.S.C. § 1113 ("except that in the case of fraud or concealment,

2  such action may be commenced not later than six years after the date discovery of such breach or

3  violation.")  Plaintiffs filed suit on November 29, 2006.  Thus, Plaintiffs must have discovered

4  the breaches sometime after November 29, 2000.  As discussed below, the evidence shows that

5  Plaintiffs had no actual or constructive notice of the fiduciary violations arising from the initial

6  ESOP transactions until well after that date.[34]

7          There is no evidence that the Company ever told ESOP participants about the massive

8  asbestos liability facing Kelly Moore Paint at the time of the 1998 and 1999 ESOP transactions.

9  *See supra* Section II.J.  Plaintiffs did not learn of the asbestos liability facing the Company in

10  1998 and 1999 until very recently.  *See* Declaration of Tosha Thomas in Support of Plaintiffs'

11  Opposition to Defendants' Motions for Summary Judgment ("Thomas Dec.") ¶ 2; Declaration of

12  Thomas Fernandez in Support of Plaintiffs' Opposition to Defendants' Motions for Summary

13  Judgment ("Fernandez Dec.") ¶ 2.  Further, there were no communications at all about asbestos

14  liabilities with ESOP participants until 2001, and those communications only addressed the

15  impact of asbestos claims in 2001 and in the future.  *See supra* Section II..J.  Likewise, all of the

16  Company's subsequent communications with ESOP participants about asbestos litigation

17  informed participants about the then-current status of the litigation and possible ramifications for

18  the ESOP going forward.  *See, e.g.*, Exhs. 95, 96, 98, 99.  These communications withheld vital

19  information, e.g., that asbestos litigation against Kelly-Moore had been ongoing since before

20  1998, information about the thousands of asbestos cases pending against Kelly-Moore in 1998

21  were withheld from auditors and valuators, asbestos liabilities were not considered in the 1998

22  and 1999 transactions, and a second-opinion valuator reported a fair market value range

23  supporting a lower price for the 1999 transaction.  Thus, the Company did not inform ESOP

24  participants of the key facts relating to the breaches alleged by Plaintiffs.

25

26  [34]  ERISA § 413 provides for a six-year statute from the date of plaintiff's discovery of the breach
27  where there is fraud or concealment, which is more generous than the three-year statute from the
    date of plaintiff's actual knowledge of the breach where there is no fraud or concealment. This
28  longer statute apparently reflects a policy decision intended to deter acts of fraud or concealment
    by fiduciaries since such actions are clearly inconsistent with ERISA's fiduciary duties.

Given that the K-M and Moore Trust Defendants concealed so much information from participants, none of the Plaintiffs was aware that there was significant asbestos litigation against Kelly-Moore in 1998 and 1999 until shortly before the commencement of this litigation. Neither Lora Smith nor Thomas Fernandez (who worked for CIG) was informed at any time by CIG (or KMH) that there had been a large number of asbestos cases against Kelly-Moore Paint in 1998 and 1999. *See* Fernandez Dec. ¶ 2. Likewise, Tosha Thomas was not informed at any time by Kelly-Moore (or KMH) that there had been a large number of asbestos cases against the Company in 1998 and 1999. Thomas Dec. ¶ 2. Mr. Fernandez testified that he could not recall when he first became aware that there was asbestos litigation against Kelly-Moore, but that he remembered being told in 2004 that asbestos liability could affect the value of his ESOP shares in the future. Exh. 121 (Fernandez Dep. 32:16-33:12; 119:3-8). Tosha Thomas testified that she first became aware of asbestos litigation against Kelly-Moore in 2002 or 2003. Exh. 116 (Thomas Dep. 110:16-111:2, 199:23-200:9). Lora Smith (who worked for CIG) testified that she first became aware of asbestos litigation in 2007 through communications with counsel. Exh. 97 (Smith Dep. 36:5-37:4).[35]

Further, none of the Plaintiffs discovered that the Plan may have overpaid for the stock purchased in 1998 and 1999 until long after November 2000. Mr. Fernandez testified that he first questioned whether the Plan may have overpaid, and thus sought legal counsel, when he received notification from the company that the value of the ESOP could fall to zero due to asbestos litigation, which occurred in 2004. Exh. 122; Exh.121 (Fernandez Dep. 183:15-184:1). Both Ms. Thomas and Ms. Smith testified that they first came to believe that the ESOP overpaid for shares 1998 when they met with counsel for Plaintiffs in this matter in 2007. Exh. 116 (Thomas Dep. 149:22-150:19); Exh. 97 (Smith Dep. 57:4-22). Accordingly, none of the

---

[35] North Star's discussion of when Plaintiffs learned of asbestos litigation against Kelly-Moore is misleading and, at times, inaccurate. *See* North Star Brief at 10-12. For example, North Star asserts that Lora Smith admitted contemporaneously receiving Mr. Cazzolla's May 2002 memo about asbestos litigation against Kelly-Moore. The deposition testimony that North Star cites is actually about Ms. Smith's receipt of a cover letter for her 1999 Plan statement, which doesn't mention asbestos. Exh. 97 (Smith Dep. 81:13-82:14).

1 Plaintiffs even arguably discovered K-M and Moore Trust Defendants' fiduciary violations until

2 years after November 2000, rendering this case timely under the applicable statute of limitations.

3          Defendants may argue that actual discovery is not required under the fraud or

4 concealment exception, and Plaintiffs must sue when they have "constructive" discovery of the

5 breach. The Ninth Circuit has not addressed whether constructive discovery is sufficient to start

6 the running of the statute of limitations for the fraud or concealment exception to ERISA. The

7 First and Seventh Circuits have held that under the fraud or concealment exception, both actual

8 and constructive discovery of the breach will trigger the running of the statute of limitations. *See*

9 *J. Geils Band Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1254-55 (1st Cir.

10 1996); *Martin v. Consultants & Adm'rs*, 966 F.2d 1078, 1096 (7th Cir. 1992). The First Circuit

11 stated that plaintiffs have "constructive" discovery if they receive documents with "sufficient

12 storm warnings" to alert them to the possibility of fraud had they acted with reasonable diligence.

13 *J. Geils Band*, 76 F.3d at 1252.

14          Even, assuming arguendo, that the 2001 communications to participants about Kelly-

15 Moore's asbestos problems were "sufficient storm warnings" to start the 6-year statute under the

16 fraud or concealment exception, Plaintiffs' lawsuit filed in 2006 is timely. Therefore, the Court

17 should deny the K-M and Moore Trust Defendants' motions for summary judgment, because

18 Plaintiffs have shown that there is a genuine issue as to whether (1) these Defendants hid or

19 misrepresented facts which had the effect of concealing their fiduciary violations, and (2)

20 Plaintiffs filed suit within six years of their discovery of Defendants' fiduciary violations.

21     **C.     Plaintiffs Filed Suit Against North Star Within the Applicable Statute of
               Limitations Period.**

22
23     **1.     Plaintiffs Allege That North Star Breached Its Fiduciary Duty By
               Failing to Take Proper Steps to Remedy the Fiduciary Violations
               Committed By Mr. Moore and His Co-Fiduciaries in the 1998 and
24             1999 Transactions.**

25          As stated above, "to apply the limitations period, [the Court] must first isolate and define

26 the underlying violation upon which . . . plaintiff's claim is founded." *Meagher*, 856 F.2d at

27 1422. North Star's motion for summary judgment misstates the underlying violation for

28

Plaintiffs' claim against North Star.[36]

Plaintiffs do not allege that North Star played any role in the 1998 and 1999 ESOP transactions. Rather, after North Star became the successor trustee of the ESOP in 2003, North Star learned that the original trustee and sole member of the Plan Committee, Mr. Moore, and his co-fiduciaries had breached their fiduciary duties in the 1998 and 1999 ESOP transactions, but failed to take proper steps to remedy these fiduciary violations.

Plaintiffs allege that North Star violated ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), which states that a fiduciary "shall be liable for a breach of fiduciary responsibility by such other fiduciary . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." SAC ¶ 68.  In *Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998), the Second Circuit held that "[t]his principle is consistent with the common law of trusts, which imposes a duty on a successor trustee to remedy the breach of a prior trustee, and imposes liability for breach of this duty 'to the extent to which a loss results from [the successor trustee's] failure to take such [remedial] steps.' *See* RESTATEMENT (SECOND) OF TRUSTS § 223(2) and cmts. c. and d. (1959)."  Comment c states that "[s]ince a trustee is under a duty to the beneficiary to take reasonable steps to realize on claims which are part of the trust property, a successor trustee is liable for breach of trust if he neglects to take proper steps to compel his predecessor to redress a breach of trust committed by the predecessor." RESTATEMENT (SECOND) OF TRUSTS § 223(2) cmt.d.[37]

In *Silverman*, the prior trustees had embezzled funds from the pension plan.  138 F.3d at

---

[36] North Star's incorrect statement of Plaintiffs' claim is puzzling because Plaintiffs answered North Star's contention interrogatories and Plaintiffs' counsel had a detailed telephone discussion of Plaintiffs' theory of liability and position with regard to the applicable statute of limitations with North Star's counsel.  Declaration of Daniel Feinberg in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ¶ 2 and Exh. 1.

[37] The courts frequently turn to the Restatement of Trusts in limning ERISA's fiduciary duties because ERISA draws much of its content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment.  *See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985) ("[R]ather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility)."

101.  The Second Circuit found that the plaintiff adduced sufficient evidence that the successor

trustee had knowledge of the prior trustees' fiduciary breach and failed to take sufficient steps to

recover the missing funds. *Id.* at 104-05.  The Court nonetheless affirmed summary judgment in

favor of the successor trustee because the prior trustees were insolvent and therefore the plaintiff

failed to show that the plan suffered any loss from the successor trustee's inaction. *Id.* at 105.  In

the present case, it is undisputed that the Moore Trust and its successors still have the funds

received from the 1998 and 1999 stock sale to the ESOP. *See* Exh. 123.

As shown *supra* in Section II.K, North Star's primary focus upon becoming successor

trustee in April 2003 was to understand the scope of Kelly-Moore's future asbestos liability and

its impact on the then-current value of the ESOP's tracking stocks.

**REDACTED**

As successor trustee, North Star had to exercise its independent judgment to decide

whether Kelly-Moore faced significant asbestos liability at the time of the 1998 and 1999

transactions.  As shown *supra* in Section II.B, Kelly-Moore's asbestos litigation liability was not

a problem that suddenly burst forth in 2001.  Rather, the Company had known about the

predicament for years, and the rising tide of asbestos claims made it clear by 1998 that Kelly-

Moore faced serious consequences from selling products containing over 50 tons of asbestos over

the course of 15 years.  Exh. 124.  Faced with Kelly-Moore's dire situation in 2003, North Star

should have investigated whether (1) asbestos litigation liability should have been taken into

account in the 1998 and 1999 transactions in which Mr. Moore, acting on behalf of the ESOP,

purchased stock from Mr. Moore, acting on behalf of the Moore Trust; and (2) whether the ESOP

paid more than fair market value.  The evidence shows that North Star either did not investigate

these issues or gave them only passing consideration.

North Star may argue that it investigated the 1998 and 1999 ESOP transactions, but

1    decided that there was no basis for pursuing claims against Mr. Moore or his co-fiduciaries. That

2    argument is irrelevant to the statute of limitations. Further, there is no record of this purported

3    investigation or North Star's decision-making process.[38]

4              **2.    North Star Could Have Pursued Claims for Fiduciary Violations**
                       **Against the Prior Trustee and Co-Fiduciaries After North Star**
5                      **Became Successor Trustee.**

6              North Star cannot argue that the statute of limitations for North Star's potential ERISA

7    fiduciary violation claims against Mr. Moore had already expired when it became successor

8    trustee in 2003. In *Landwehr v. DuPree*, 72 F.3d 726, 732 (9th Cir. 1995), the Ninth Circuit held

9    "that the limitations period in an ERISA action begins to run on the date that the person bringing

10   suit learns of the breach or violation." The plaintiff in an action under ERISA for fiduciary

11   violations is the "fiduciary, beneficiary, or participant bringing suit." *Id.* That other fiduciaries

12   knew of the violations does not set the limitations period running. North Star's actual knowledge

13   initiated the limitations period "regardless of whether any Plan fiduciary or service provider

14   knew of the violation before that date." *Id.*

15             Thus, under the "actual knowledge" prong of ERISA § 413, North Star had until at least

16   April 2006 to file suit against Mr. Moore or his family trusts. Likewise, under the "last action"

17   prong of ERISA § 413, North Star had until at least six years after the 1998 and 1999 ESOP

18   transactions, i.e., until at least October 2004 and October 2005, respectively, to file suit against

19   Mr. Moore or his Estate. If North Star believed that it needed more time to investigate Mr.

20   Moore's potential fiduciary violations, then North Star could have demanded a tolling agreement

21

22   ───────────────

23   [38] Both ERISA and the common law of trusts impose on trustees a fiduciary duty to keep
     adequate records of their actions. *Shaver v. Operating Engineers Local 428 Pension Trust Fund*,
24   332 F.3d 1198, 1202 (9th Cir. 2003). *See also* Gertner, M., *Employee Benefits Journal*, p. 5
     (December 1988) ("Upon receiving the advice and opinion of the expert, the trustees must
25   carefully review and consider it and challenge it, not blindly accept and rubber-stamp it. Next,
     the trustees must add to the expert's advice and opinion their own input based on their
26   knowledge and experience. *Finally, the trustees must document this prudent methodological
     procedure they have employed.*") (Emphasis added.). Similarly, Mr. Hommel testified that a
27   trustee should document the steps taken in exercising fiduciary duties as "a practice that I would
     say is advisable towards [establishing] the good, strong paper trail and process that supports your
28   conclusion as to whether or not your decision is prudent." Exh. 103 (Hommel Dep. 63:13-17).

– a step that North Star never considered. Wasow Dec. ¶ 130.[39]

        **3.**    **Plaintiffs Filed Their Breach of Fiduciary Duty Claim Against North Star Within the Statute of Limitations.**

Likewise, Plaintiffs filed their claim against North Star within the statute of limitations period under ERISA § 413. The applicable statute of limitations period is six years from the date of North Star's breach or omission. Since, as discussed above, the statute of limitations for North Star's claim against Mr. Moore or his Estate expired at the earliest in October 2004, Plaintiffs had until at least October 2010 to file suit against North Star.

Nor can North Star invoke the "actual knowledge" prong of ERISA § 413. Prior to filing this action, the Plaintiffs did not know what steps defendant North Star had (or had not) taken to remedy Mr. Moore's fiduciary violations. Thomas Dec. ¶ 3; Fernandez Dec. ¶ 3. Moreover, the documents produced in discovery by Defendants indicate that North Star's first communication with ESOP participants was in 2005, *see* Exh. 125 (July 5, 2005 letter), so Plaintiffs had no way to know that North Star was the ESOP's new trustee prior to that date. Even if the ESOP had informed Plaintiffs in 2003 that North Star had been named the successor trustee, this would not have been enough to start running the statute of limitations. Unless a transaction is "inherently a statutory breach of fiduciary duty," disclosure of that transaction alone, "cannot communicate the existence of an underlying breach." *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1341 (9th Cir. 1994) (citing *Fink v. Nat'l Sav. and Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985)). Defendant North Star has not submitted any evidence that Plaintiffs had actual knowledge of the underlying facts of its failure to remedy Mr. Moore's fiduciary violations.

In sum, since the statute of limitations for Plaintiffs' claim against Defendant North Star will not run until October 2010, at the earliest, and Plaintiffs filed suit in 2006, the Court should deny North Star's motion for summary judgment.

## III.   CONCLUSION.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

---

[39] Plaintiffs believe that ERISA § 413's "fraud or concealment" provision may have extended the statute of limitations for North Star's potential fiduciary claims against Mr. Moore, but the Court need not decide this issue for purposes of the present motion.

1    Motions for Summary Judgment.

2

3    Dated:  July 10, 2008                          Respectfully submitted,

4                                                   LEWIS, FEINBERG, LEE,
                                                    RENAKER & JACKSON, P.C.
5
                                       By:          /s/
6                                                   Todd Jackson
                                                    LEWIS, FEINBERG, LEE,
7                                                   RENAKER & JACKSON, P.C.
                                                    1330 Broadway, Suite 1800
8                                                   Oakland, CA  94612
                                                    Telephone: (510) 839-6824
9                                                   Facsimile: (510) 839-7839

10                                                  Peter Rukin – CA State Bar No. 178336
                                                    RUKIN HYLAND DORIA
11                                                  & TINDALL LLP
                                                    100 Pine Street, Suite 725
12                                                  San Francisco, CA
                                                    Telephone: (415) 421-1800
13                                                  Facsimile: (415) 421-1700
                                                    Email: peterrukin@rhddlaw.com
14
                                                    *Attorneys for Plaintiffs*
15                                                  *and the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28



1   Ronald Lovitt, Bar No. 040921
    J. Thomas Hannan, Bar No. 039140
2   Henry I. Bornstein, Bar No. 75885
    Terence F. Young, Bar No. 069943
3   LOVITT & HANNAN, INC.
    900 Front Street, Suite 300
4   San Francisco, California 94111
    Telephone: (415) 362-8769
5   Facsimile: (415) 362-7528
    *rl@lh-sf.com, jth@lh-sf.com, hib@lh-sf.com, tfylaw@earthlink.net*
6
7   Attorneys for Defendants K-M Industries
    Holding Co. Inc.; K-M Industries Holding Co.
    Inc. ESOP Plan Committee; and CIG ESOP
8   Plan Committee

## UNITED STATES DISTRICT COURT

9
## NORTHERN DISTRICT OF CALIFORNIA

10
## OAKLAND DIVISION

11

12  THOMAS FERNANDEZ, LORA SMITH          )   Case No. C06-07339 CW
    and TOSHA THOMAS, individually and on )
13  behalf of a class of all others similarly )  **[PROPOSED]**
    situated,                              )   **ORDER GRANTING IN PART**
                                           )   **PLAINTIFFS' ADMINISTRATIVE**
14                Plaintiffs,              )   **MOTION TO FILE DOCUMENTS**
                                           )   **UNDER SEAL (Docket No. 172)**
15  v.                                     )
                                           )
16  K-M INDUSTRIES HOLDING CO., INC.,      )
    *et al.,*                              )
                                           )
17                Defendants.              )
                                           )
18                                         )

19          Plaintiffs move for leave to file under seal portions of their brief in support of their

20  opposition to defendants' motions for summary judgment, as well as Exhibits 2, 5, 6, 8, 13, 18, 20,

21  21, 22, 23, 24, 30, 31, 34, 35, 36, 39, 54, 56, 57, 58, 60, 62, 63, 64, 65, 66, 67, 78, 81, 82, 83, 84, 98,

22  99, 100, and 107 and portions of Exhibits 1, 7, 9, 11 , 14, 15, 27, 33, 45, 46, 49, 50, 51, 52, 53, 69,

23  75, 77, 79, and 103 to the Declaration of Nina Wasow in Support of Plaintiffs' Opposition to

24  Defendants' Motions for Summary Judgment. These documents contain information that was

25  designated as confidential by Defendant K-M Industries Holding Co., Inc. (KMH).

1    Plaintiffs' requests are made in connection with a dispositive motion. Accordingly, the

2   documents may not be filed under seal unless there is a "compelling interest" in doing so. <u>Pintos v.</u>

3   <u>Pac. Creditors Ass'n</u>, 504 F.3d 792, 801-03 (9th Cir. 2007). This is because the public interest

4   favors filing all court documents in the public record. A compelling interest cannot be established

5   simply by showing that the document is subject to a protective order or is considered confidential by

6   a party, but rather must be supported by a sworn declaration demonstrating with particularity the

    need to file each document or portion thereof under seal. <u>See</u> <u>id</u>.; Local Rule 79-5(a). If a document

7   has been designated as confidential by another party, that party must file a declaration establishing

8   good cause to file the document under seal. Local Rule 79-5(d).

9    KMH has filed a declaration in support of North Star's motions. In the declaration, KMH

10  withdraws its designation of confidentiality as to the information plaintiffs previously submitted

11  under seal, except with respect to the following documents or portions thereof:

12  • Exhibit 1;

13  • Exhibit 5;

14  • Exhibit 6;

    • Exhibit 7;

15  • Exhibit 8;

16  • Exhibit 11;

17  • Exhibit 13;

18  • Exhibit 15;

19  • Exhibit 27;

20  • Exhibit 30;

21  • Exhibit 31;

22  • Exhibit 33;

23  • Exhibit 34;

    • Exhibit 35;

24  • Exhibit 36;

25

26

1   • Exhibit 39;

2   • Exhibit 45;

3   • Exhibit 46;

4   • Exhibit 49;

5   • Exhibit 50;

6   • Exhibit 51;

7   • Exhibit 52;

8   • Exhibit 53;

9   • Exhibit 54;

10  • Exhibit 58;

11  • Exhibit 60;

12  • Exhibit 62;

13  • Exhibit 63;

14  • Exhibit 64;

15  • Exhibit 65;

16  • Exhibit 66;

17  • Exhibit 67;

18  • Exhibit 69;

19  • Exhibit 75;

20  • Exhibit 77;

21  • Exhibit 78;

22  • Exhibit 79;

23  • Exhibit 81;

24  • Exhibit 82;

25  • Exhibit 83;

26  • Exhibit 84;

    • Exhibit 103, pages 197-201;

1    • Exhibit 107; and

2  the following portions of plaintiffs' Opposition to Defendants' Motions for Summary Judgment:

3    • Pages 3:20-4:7;

4    • Page 5:11-13;

5    • Page 5:19-6:2;

6    • Page 8:15-20;

7    • Page 9:17-22;

8    • Page 9, footnote 11;

9    • Page 12:2-27;

10   • Page 13:2-14:7;

11   • Page 14:10-11;

12   • Page 14, footnote 14;

13   • Pages 17:11-18:1;

14   • Page 18:8-23;

15   • Page 21, footnote 20, last line;

16   • Page 22:15;

17   • Page 33:8-9;

18   • Page 35:8-25;

19   • Pages 37:27-38:23;

20   • Page 39:9-16; and

21   • Page 47:10-15.

KMH has established that these documents or portions thereof contain sensitive financial

information or attorney-client communications for which a compelling interest exists to file under

seal.

         Accordingly, plaintiffs' motion for leave to file under seal is GRANTED IN PART. The

clerk shall file under seal plaintiffs' opposition to defendants' motions for summary judgment and

Exhibits 1, 5, 6, 7, 8, 11, 13, 15, 27, 30, 31, 33, 34, 35, 36, 39, 45, 46, 49, 50, 51, 52, 53, 54, 58, 60,

1   62, 63, 64, 65, 66, 67, 69, 75, 77, 78, 79, 81, 82, 83, 84, 103, pages 197-201, and 107 to the Wasow

2   declaration. Plaintiffs must re-submit these documents to the clerk in a form suitable for filing, in

3   compliance with Local Rule 79-5.1

4       Plaintiffs shall file in the public record via ECF a version of its opposition to defendants'

5   motions for summary judgment redacting only those portions, identified above, as to which KMH

6   has not withdrawn its designation of confidentiality. Plaintiffs shall also re-file in the public record

7   via ECF the Wasow declaration and all exhibits thereto, omitting or redacting only those documents

    or portions thereof identified as sealable in this order.

8       IT IS SO ORDERED.

9

10  Dated: _____        _____

11                                         Hon. Claudia Wilken
                                           United States District Judge
12                                         Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25