MORGAN, LEWIS & BOCKIUS LLP
Nicole A. Diller (State Bar No. 154842)
Donald P. Sullivan (State Bar No. 191080)
Andrew C. Sullivan (State Bar. No. 226902)
One Market, Spear Street Tower
San Francisco, California 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

Attorneys for North Star Trust Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FERNANDEZ, LORA SMITH, and TOSHA THOMAS,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>K-M INDUSTRIES HOLDING CO., INC.; K-M INDUSTRIES HOLDING CO., INC. ESOP PLAN COMMITTEE; WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; TRUSTEES OF THE WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; ADMINISTRATOR OF THE ESTATE OF WILLIAM E. MOORE, DECEASED; CIG ESOP PLAN COMMITTEE; and NORTH STAR TRUST COMPANY,<br><br>                    Defendants. | Case No. C06-07339 CW<br><br>**NORTH STAR TRUST COMPANY'S NOTICE OF MOTION, MOTION AND SUPPORTING MEMORANDUM FOR SUMMARY JUDGMENT RE STATUTE OF LIMITATIONS**<br><br>Date:     July 31, 2008<br>Time:     2:00 p.m.<br>Dept.:    Courtroom 2, 4th Floor<br>Judge:    Hon. Claudia Wilken |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 2

II.  FACTUAL BACKGROUND ............................................................................... 3

    A.   Establishment of the Kelly-Moore ESOP and Disclosure of the Transaction ........ 4

    B.   Establishment and Disclosure of the CIG ESOP ..................................... 6

    C.   Herbert R. Giffins Succeeds Bill Moore as Trustee in 2002................................... 8

    D.   Kelly-Moore Becomes Targeted by Asbestos Litigants ......................................... 9

        1.   History of Kelly-Moore Asbestos Litigation ............................................. 9

        2.   Disclosure of the Asbestos Threat........................................................ 9

        3.   Resolution of the Asbestos Litigation .................................................. 12

    E.   North Star's Conduct as the ESOP's Discretionary Trustee................................. 12

III. PLAINTIFFS' CLAIMS AGAINST NORTH STAR ARISING OUT OF THE
     1998 AND 1999 TRANSACTIONS ARE TIME-BARRED ........................................... 14

    A.   Standard of Review Governing Motion ............................................... 14

    B.   ERISA Section 413 Applies to Both Claims for Relief ....................................... 15

    C.   Plaintiffs Had Actual Knowledge of the Alleged 1998 and 1999
         Transactions More Than Three Years Before They Filed This Action ................ 16

    D.   Plaintiffs' Claims Relating to the 1998 and 1999 Transactions Are Time-
         Barred by the Six-Year Repose Period .............................................. 18

    E.   The Limitations Period Cannot Be Tolled as to North Star on the Grounds
         of Fraud or Concealment.......................................................... 19

IV.  CONCLUSION ................................................................................................ 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

i

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1996) ................................................................................................ 15

5

*Barker v. American Mobil Power Corp.,*
    64 F.3d 1397 (9th Cir. 1995) .................................................................... 15, 19, 20

6

7

*Blanton v. Anzalone,*
    760 F.2d 989 (9th Cir. 1985) .................................................................... 15, 16, 17, 18

8

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................................ 14

9

10

*Cervantes v. City of San Diego,*
    5 F.3d 1273 (9th Cir. 1993) .................................................................................... 15

11

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) .................................................................................... 6

12

13

*Landwehr v. DuPree,*
    72 F.3d 726 (9th Cir. 1995) .................................................................................... 15

14

*Larson v. Northrop Corp.,*
    21 F.3d 1164 (D.C. Cir. 1994) ................................................................................ 19

15

16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ......................................................................................... 14, 15

17

*Phillips v. Alaska Hotel and Restaurant Employees Pension Fund,*
    944 F.2d 509 (9th Cir. 1991) .................................................................................. 18

18

19

*Radford v. General Dynamics Corp.,*
    151 F.3d 396 (5th Cir. 1998) .................................................................................. 15

20

*Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.,*
    919 F.2d 1216 (7th Cir. 1990) ................................................................................ 19

21

22

*Schaefer v. Arkansas Medical Soc.,*
    853 F.2d 1487 (8th Cir. 1988) ................................................................................ 19

23

*Unisys Corp. Retiree Medical Benefit ERISA Litigation,*
    242 F.3d 497 (3d Cir. 2001) ................................................................................... 16

24

25

*Ziegler v. Connecticut Gen. Life Ins. Co.,*
    916 F.2d 548 (9th Cir. 1990) ............................................................................ 16, 17

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Statutes**

29 U.S.C. § 1113 ................................................................................................................. 15

29 U.S.C. § 1113(1) ........................................................................................................... 18

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

TO PLAINTIFFS THOMAS FERNANDEZ, LORA SMITH, TOSHA THOMAS,
AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 31, 2008 at 2:00 p.m. or as soon after that time as counsel may be heard, in Courtroom 2 of the above-entitled Court, located at 1301 Clay Street, Oakland, California, Defendant North Star Trust Company will, and hereby does, move this Court, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and this Court's March 5, 2008 Order regarding motions relating to the statute of limitations (Docket No. 95), for summary judgment on all claims based on the applicable statute of limitation, ERISA Section 413, 29 U.S.C. § 1113, and related governing case law.

This motion is based upon this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the Declaration of Nicole A. Diller and its attachments, all records on file with the Court relating to this matter, and any and all argument provided by counsel at the hearing.

Dated:  June 26, 2008                    Respectfully submitted,

                                         MORGAN, LEWIS & BOCKIUS LLP

                                          /s/ Nicole A. Diller
                                         Nicole A. Diller
                                         Donald P. Sullivan
                                         Andrew C. Sullivan

                                         Attorneys for Defendant North Star Trust
                                         Company

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    Defendant North Star Trust Company ("North Star") submits the following memorandum

2    of points and authorities in support of its Motion for Summary Judgment re Statute of

3    Limitations.

4    **I.    INTRODUCTION**

5    Plaintiffs commenced this litigation on November 29, 2006 to address alleged

6    overpayments made by their employee stock ownership plan ("ESOP") in two separate

7    transactions.  The first transaction occurred in 1998, when the ESOP purchased an interest in

8    Kelly-Moore Paint Company ("Kelly-Moore"), and the second occurred in 1999 in connection

9    with the purchase of an interest in Kelly-Moore's sister corporation, California Insurance Group

10   ("CIG").  The complaint asserts that both transactions involved breaches of fiduciary duty and

11   prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended

12   ("ERISA"), 29 U.S.C. §§1001, *et seq*.

13   ERISA contains limitations provisions that bar both claims.  The relevant provision,

14   ERISA Section 413, precludes actions brought after the earlier of three years from the date on

15   which the plaintiff obtained actual knowledge of the conduct allegedly constituting the breach, or

16   six years after the breach occurred.  The statute tolls these time periods for claims against a

17   fiduciary who fraudulently conceals his or her wrongdoing.

18   On its face, because more than six years elapsed between both transactions and the filing

19   of the complaint, the repose period bars Plaintiffs' claims absent proof of fraud or concealment.

20   In an attempt to address this issue, the complaint attempts to allege fraud and concealment by

21   asserting that the former owner of the stock knew that Kelly-Moore faced serious asbestos

22   liability, but hid that information from the company's participants, auditors, and valuators.

23   Without knowledge of the lurking liability, the Complaint alleges, the worth of both companies

24   was overestimated at the time of the purchase transactions.

25   These allegations are not enough to toll the statute under the law of this Circuit or Section

26   413 of ERISA.  Moreover, the undisputed facts refute Plaintiffs' allegations of concealment.  The

27   evidence demonstrates  that Kelly-Moore and CIG disclosed the asbestos litigation to Plaintiffs,

28   the companies' auditors, and the valuation experts retained to assess the companies' worth for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    purposes of the initial transactions.  In addition, the companies disclosed the facts constituting the

2    alleged breaches and prohibited transactions—the sale of the ownership interests in the

3    companies to the ESOP and the price paid in exchange for those holdings—to Plaintiffs

4    contemporaneously with the transactions, giving Plaintiffs actual knowledge of the conduct

5    sufficient to trigger the three-year prong of ERISA's limitations provision.  Finally, when the

6    asbestos liability appeared to threaten the financial viability of the Kelly-Moore, and potentially

7    impact the value of CIG through the companies' holding company, K-M Industries Holding Co.,

8    Inc. ("KMH" or the "Company"), both Kelly-Moore and CIG disclosed the situation to their

9    employee-owners.

10    Even in the absence of all these facts establishing that no fraud or concealment ever tolled

11    the limitations period, Plaintiffs have not alleged, and cannot show, any fraud or concealment on

12    the part of North Star, the Plan's successor trustee.  The lack of any such possible conduct by

13    North Star means that any claims Plaintiffs may believe they have against North Star relating to

14    the 1998 and 1999 transactions expired, at the latest, in 2005.  The complaint's assertions that

15    Defendants failed to remedy the ostensible overpayments cannot extend the limitations period, as

16    the Ninth Circuit has rejected that end-run around the limitations period.  The Court should

17    therefore dismiss Plaintiffs' claims against North Star with prejudice.

18    **II.    FACTUAL BACKGROUND**

19    Kelly-Moore is a Bay Area-based company that specializes in providing paint products to

20    homeowners and paint professionals.  Declaration of Nicole A. Diller in Support of Defendant

21    North Star Trust Company's Motion for Summary Judgment re Statute of Limitations, Exh. 1.[1]

22    CIG provides insurance products to businesses and families throughout California and Nevada.

23    Exh. 2.  The two unrelated subsidiary companies are solely owned by KMH, which, in turn, is

24    owned by the employees of Kelly-Moore and CIG and a trust established by the companies'

25    founder, William E. Moore (the "Moore Trust").  *See* Exh. 3 at SRR 10782.

26    Prior to 1998, the Moore Trust owned all of KMH, and Mr. Moore served as the person in

27    _____

28    [1] All subsequent references to exhibits refer to the exhibits attached to the Diller Declaration.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    charge of the Company's strategy and development.  Exh. 4.  In May 1998, Kelly-Moore and CIG

2    both established ESOPs, effective January 1, 1998.  Exhs. 5, 6.  The ESOPs were merged into a

3    single plan the following year.[2]

4        **A.    Establishment of the Kelly-Moore ESOP and Disclosure of the Transaction**

5            Prior to selecting an independent valuation firm to appraise the fair market value of Kelly-

6    Moore, the Company reviewed the qualifications of several appraisers.  Exh. 9 at 225:7-226:19.

7    The Company explored each candidate's education, experience, and understanding of the

8    challenges and opportunities facing Kelly-Moore.  Exh. 9 at 225:7-226:19, 231:20-232:16.  After

9    interviewing numerous candidates, Kelly-Moore selected B.J. Brooks of Sansome Street

10   Appraisers to prepare a valuation for ESOP purposes.  Exhs. 1, 9 at 225:24-226:9.  Mr. Brooks

11   received his B.S. in Economics from Yale University and his M.B.A., with distinction, from

12   Harvard University.  Exh. 10 at KMH1313.  He had over twenty years of experience valuing

13   privately-held companies, including past work appraising paint companies.  Exh. 9 at 232:2-16;

14   *see also* Exh. 1.

15           In connection with his appraisal of Kelly-Moore, Mr. Brooks conducted extensive due

16   diligence.  He reviewed several years of audited financial statements, the prior 10 years of

17   historical operations, the Company's history, market trends and forecasts, and relevant statistical

18   data.  Exh. 9A.  Mr. Brooks interviewed Kelly-Moore's officers and directors, who, among other

19   things, disclosed the Company's pending asbestos litigation and insurance coverages.  Exh. 9 at

20   242:14-24.  In sum, the record establishes that Mr. Brooks' engaged in the following due

21   diligence:

22         Brooks researched the history of the Company, the condition and outlook of the
           industry, the book value and overall financial condition of the Company, the

23         earnings and dividends history and prospects of the Company, and pertinent IRS
           regulations.

24

---

25   [2] The Company initially created two separate ESOPs, one for Kelly-Moore and one for CIG.
     Exh. 7.  Considerations relating to the Internal Revenue Code ultimately required the

26   establishment of a single plan.  Exh. 7.  Thus, on July 16, 1999, KMH merged the Kelly-Moore
     ESOP and the CIG ESOP.  Exh. 8 at NS00019508-09.  The resulting plan and trust were renamed

27   as the K-M Industries Holding Co., Inc. ESOP and Trust, respectively.  *Id.*  For ease of reference,
     this memorandum references both ESOP components as a single plan regardless of the time

28   period except as otherwise noted.

> Brooks reviewed more than six years of audited financial statements for Kelly-Moore, recent internal financial statements, documentation related to Kelly-Moore's history and operations, and press related to the industry.
>
> Brooks interviewed Kelly-Moore management to review the aforementioned information and to discuss the Company's history, status, and future outlook with the management team.

Exh. 1.

Mr. Brooks concluded that the fair market value of Kelly-Moore as of October 12, 1998 was $550 million. Exh. 9 at 236:5-237:13. Prior to accepting the valuation, Kelly-Moore management and the ESOP's trustee reviewed the report to ensure its accuracy and completeness. Exh. 9 at 243:1-15. Using Mr. Brook's determination to set the price, on October 13, 1998, the Moore Trust sold the ESOP 33,745,455 shares of KMH Class P-B common stock to the ESOP for $232 million ($6.875 per share), which represented a 42 percent interest in Kelly-Moore.[3] Exhs. 4, 5, 14.

Kelly-Moore disclosed the details of the transaction to its now employee-owners through briefings at all major worksites, at which the ESOP's third party administrator explained the terms and structure of the ESOP transaction and responded to inquiries in an open Q&A session. Exhs. 15, 16 at 269:17-270:3.

Following the valuation process for the first plan year, Kelly-Moore sent each participant a statement showing the results for 1998. Exh. 17. On July 31, 1999, correspondence recapped the transaction details for the participants and explicitly alerted them to an approximate 28 percent decline in the value of the ESOP's holdings between the purchase date of October 13, 1998 and the end of the first plan year. Exh. 18. The following year, in October 2000, Kelly-Moore informed Plan participants of a further decrease of $2,040,101 in the value of the shares held in the Plan when it provided participants copies of the Plan's Summary Annual Report for

---

[3] To finance the transaction, the ESOP Trustee received a $232 million loan from Kelly-Moore, Exh. 4 , which Kelly-Moore financed through $96 million of its own funds and $136 million of external financing. Exh. 11. In exchange, the ESOP granted Kelly-Moore a security interest in the ESOP's unallocated stock through a Pledge Agreement. Exh. 4. The ESOP Trustee allocates the Kelly-Moore stock to the accounts of the Plan's participants as Kelly-Moore makes annual contributions to the ESOP, which pay down the debt. Exh. 12 at P069-P070, P072-P073, P089. The employees do not contribute any money to the ESOP. Exh. 13.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    the 1999 Plan year.  Exh. 19.

2        ESOP statements were mailed to Kelly-Moore participants following each annual

3    valuation, and thus were received as early as 1999.  *See, e.g.,* Exhs. 20-23.  The annual ESOP

4    Plan statements disclosed the participant's prior year balance and the current investment in the

5    ESOP by showing the total shares allocated to the participant's account and their current per share

6    price.  *Id.*  The statements also explained the adjustment of the shares to the most recent appraised

7    value of Kelly-Moore.  *Id.*  To help participants read the Plan statements, participants received a

8    glossary explaining each of the terms used on the statement and describing what each term

9    represented.  *See*, *e.g.*, Exhs. 24-28.  These statements put each participant on notice of the facts

10   underlying the complaint's claims.   Thus, within the first two years of the Plan's history—all

11   before the year 2001—participants were informed verbally and in writing about the purchase

12   transaction, consideration paid by the Plan to the Moore Trust, and the declines in the stock about

13   which Plaintiffs protest in the complaint filed eight years after the transaction.  While Plaintiff

14   Tosha Thompson – the only class representative who ever worked at Kelly-Moore – did not start

15   working at Kelly-Moore until 2001, the undisputed facts show that the ESOP's participants

16   received the above-described multiple notices of the terms of the transaction that underlie

17   Plaintiffs' claims.[4]

18       **B.      Establishment and Disclosure of the CIG ESOP**

19       CIG established its ESOP through a similar process.  Members of CIG management met

20   with representatives of various valuation firms and compared the firms' capabilities and

21   experience.  Exh. 29 at 46:24-47:14.  The ESOP trustee retained Duff & Phelps, which was a

22   nationally-recognized valuation firm used for ESOP transaction purposes and had prior

23   experience in the valuation of insurance companies.  See Exh. 30 at 101:9-16, 102:1-20; Exh. 31.

24

25   [4] Ms. Thomas' lack of employment during this critical period provides yet another grounds for
     the Court to find her an unsuitable class representative, as it makes her uniquely situated as to
26   Defendants' statute of limitations defense.  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th
     Cir. 1992).  However, as discussed in Section II.D.2.b, *infra*, Ms. Thomas admits that she had
27   actual knowledge of the events constituting the alleged breach more than three years before the
     filing of the complaint.  As a result, Ms. Thomas' belated start with Kelly-Moore does not serve
28   to avoid the statute's application to this case.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    In order to determine the fair market value of CIG, Duff & Phelps reviewed CIG's audited

2 financial statements, operations, historical performance, and projected growth.   Exh. 29 at 196:7-

3 197:5; Exh. 2.  It researched relevant economic and industry information, analyzed comparable

4 companies' performance, and interviewed CIG's senior management.  Exh. 29 at 196:7-197:5;

5 Exh. 2.  CIG's management team, like the Kelly-Moore managers, disclosed Kelly-Moore's

6 asbestos litigation during this due diligence phase.  Exh. 29 at 35:2-18, 39:1-6; Exh. 2.

7    Duff & Phelps concluded that, as of June 30, 1999, the fair market value of a 42% interest

8 in CIG was $55 million.  Exh. 2.  CIG management reviewed the Duff & Phelps report to confirm

9 it included all material information, including appropriate comparable companies, and the ESOP

10 trustee spoke with Duff & Phelps about the report's assumptions and methodology.  Exh. 29 at

11 109:1-10, 63:6-16.

12    Prior to accepting the Duff & Phelps valuation, the ESOP's trustee sought a second

13 opinion from another top valuation firm, Columbia Financial Advisors, Inc. ("Columbia").  Exh.

14 32. Columbia, without the benefit of Duff & Phelps' opinion, independently concluded that a

15 42% interest in CIG was worth $55 million.  Exh. 33.

16    Having received two appraisals of CIG that independently reached the same valuation

17 conclusion, the ESOP trustee determined that the valuation was fair and reasonable.  Exh. 34 at

18 D&P 000790.  However, because the transaction did not take place immediately following the

19 issuance of Duff & Phelps' report, the ESOP trustee asked for an updated valuation opinion.  Exh.

20 35.  Duff & Phelps reviewed interim financial statements, considered further industry and CIG

21 developments and determined that, as of October 18, 1999, the fair market value of a 42% interest

22 in CIG's remained at $55 million.  Exhs. 2, 35.  The ESOP trustee relied upon the updated

23 valuation to set the purchase price, and on October 18, 1999, the ESOP purchased 8.4 million

24 shares of KMH Series I stock from the Moore Trust for $55 million ($6.55 per share).[5]  Exh. 36;

25 Exh. 29 at 196:7-197:5.

26

27 [5] The Trustee financed the ESOP's purchase through loans from KMH amounting to
$54,096,230.  Exh. 34 at D&P 000790, D&P 000793.  As collateral for the loan, the KMH ESOP

28 Trustee pledged the unallocated shares.  Exh. 34 at D&P 000797.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    As with the Kelly-Moore ESOP, CIG informed its new employee-owners of the essential

2  terms of the transaction.  CIG sent participants a letter explaining that the purchase price,

3  percentage interest in CIG and other details of the ESOP transaction.  Exh. 37 at 103:7-19; Exh.

4  38.  Plaintiffs Fernandez and Smith admit they received this information.  *See, e.g.,* Exhs. 38;

5  Exh. 37 at 71:19-72:10.  CIG reiterated this information at its next quarterly employee meeting on

6  November 9, 1999, with an open Q&A session regarding the ESOP taking place at the end of the

7  meeting.  Exh. 39.  In the following years, participants, including Plaintiffs Fernandez and Smith,

8  received regular statements pertaining to the value of their ESOP interests.  *See* Exhs. 40-54, 55,

9  61.  As with the Kelly-Moore participants, the ESOP statements disclosed the per share value as

10  well as the change in the appraised value of each participant's shares. Exhs. 41-42, 44, 46, 52, 55,

11  57-61.  In addition, the glossary compared each year's per share valuation with the original

12  transaction.  *See*, *e.g.*, Exhs. 62, 63.

13    **C.    Herbert R. Giffins Succeeds Bill Moore as Trustee in 2002**

14    On February 28, 2003, at a special joint meeting of the Boards of KMH and Kelly-Moore,

15  Mr. Moore resigned as trustee of the ESOP.  Exh. 64.  At the same meeting, the Board approved

16  the appointment of Herbert R. Giffins, President and Chief Executive Office of Kelly-Moore, to

17  succeed Mr. Moore.  Exh. 64; Exh. 65 at 21:16-19.  The Board selected Mr. Giffins based on the

18  Board's close observations of Mr. Giffins' abilities to understand, manage, and function with the

19  skill required of a trustee.  Exh. 64; *see also* Exh. 65 at 109:22-110:06.

20    At the February 2003 meeting, the Board also directed the commencement of a search for

21  an institutional trustee to serve as a permanent successor trustee.  Exh. 65 at 129:23 - 130:6; 131:

22  14-22; Exh. 66 at 123:15 – 124:10.  The Company reviewed the qualifications of several

23  candidates prior to selecting the successor, including conducting in-person interviews of qualified

24  candidates and calling each service provider's professional references.  Exh. 65 at 129:23 - 130:6;

25  131:17-22, 133: 18-23; Exh. 67, 68.  Management presented the alternatives to the Board at a

26  special meeting held on April 8, 2003, at which the strengths and weaknesses of each candidate

27  were discussed.  *Id.*  The Board considered North Star's high level of knowledge regarding

28  ESOPs and fiduciary duties, and noted its good working relationship with the ESOP's third party

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1  administrator.  Exh. 7 at KMH003942; Exh. 69.  The Board concluded that North Star was the

2  most capable candidate and that it demonstrated an ability to act in the best interests of the ESOP

3  and its participants and, on that basis, appointed North Star as the ESOP's trustee effective April

4  22, 2003.  Exh. 70 at KMH003144-003146; Exh. 65 at 129:23–130:6, 131:17-22, 133:18-23.

5  **D.     Kelly-Moore Becomes Targeted by Asbestos Litigants**

6  **1.     History of Kelly-Moore Asbestos Litigation**

7  In 1967, Kelly-Moore acquired Paco Corporation, a company that manufactured and sold

8  joint and texture products, some of which contained asbestos.  Exh. 3 at SRR 10807.  Paco

9  dissolved in January 1982.  *Id*.  As a result of its former ownership of Paco, the occasional suit

10  named Kelly-Moore as a defendant in the 1980s and 1990s.  The average cost of these suits was

11  roughly $2,700, all of which was paid by Kelly-Moore's insurers.  Exh. 71.  Given the minimal

12  exposure posed by the cases and the Company's ample insurance reserves, asbestos litigation did

13  not pose a significant concern to Kelly-Moore or its auditors and advisors until 2001.  Exh. 72 at

14  54:9-24; Exhs. 71, 73.  On August 28, 2001, however, a jury rendered a verdict against Kelly-

15  Moore for $ 55.5 million in a case captioned *Hernandez v. Kelly-Moore*.  Exh. 72 at 109:12 -

16  110:8.  Described as a "watershed" case, the outcome of *Hernandez* signaled for the first time the

17  financial toll asbestos litigation could potentially take upon Kelly-Moore's business. Exh. 9 at

18  171:20 – 172:4.

19  **2.     Disclosure of the Asbestos Threat**

20  **a.     Disclosure of Asbestos Litigation to Valuators and Auditors**

21  Since the inception of the ESOP, management kept the companies' auditors and the

22  ESOP's valuators informed of the asbestos litigation.  Exh. 9 at 242:14-24, 246:3-8.  Kelly-

23  Moore's Chief Executive Office and Chief Financial Officer both took steps to ensure its counsel

24  had provided complete and accurate information to the company's auditors, Ernst & Young, in

25  connection with the release of the audited financial report to Mr. Brooks.  Exh. 73 (management's

26  documentation of communication with legal counsel confirming that attorneys relayed views to

27  auditors).  Following the *Hernandez* verdict, management believed the asbestos litigation posed a

28  serious enough threat to the Company that it requested its auditors disclose the litigation in Kelly-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    Moore's 2001 audited financial statement.  Exh. 74.

2          The valuation of Kelly-Moore for ESOP purposes relied on the audited financial reports,

3    which, as discussed above, incorporated the auditors' views as to the materiality of the asbestos

4    litigation.  Exh. 75.  In addition, as early as 2000, Ireland & Associates independently assessed

5    the number of asbestos cases pending against the Company, settlement projections, and available

6    insurance.  Exh. 75 at KMH 001098; Exh. 76 at 75:16 - 76:9, 76:20-24, 79:13-19, 80:14 – 81:2,

7    123:22 – 124:18.

8          Similarly, in valuing CIG for ESOP purposes, Duff & Phelps not only reviewed the

9    audited financial reports, but also conferred with CIG's management regarding, among other

10   things, the possible impact of the asbestos litigation on CIG.  Exh. 29 at 37:6-38; Exh. 30 at

11   57:22-58:11.  These discussions occurred with the initial valuation of CIG for the 1999

12   transaction and continued year-to-year thereafter.  Exh. 29 at 37:6-38:4; Exh. 30 at 54:10-55:9;

13   57:22-58:11.

14                          b.      Disclosure of the Potential Impact of
                                    the Litigation to ESOP Participants
15

16         As soon as management became concerned about the asbestos litigation, Kelly-Moore and

17   CIG informed their employees of the situation.  Kelly-Moore distributed quarterly newsletters

18   discussing the status of the litigation and potential impact on the value of the participants' ESOP

19   accounts, which Plaintiff Thomas admits she received.  Exhs. 77 at Interrog. Response 1; Exh. 88

20   at 93:15-24.[6]  The October 2001 newsletter explained to Thomas and the other Kelly-Moore

21   employees the asbestos suits facing Kelly-Moore and management's concerns about the impact

22   on the value of the Class P-B shares.  Exh. 89 ("[t]he Company works very hard to defend itself

23   against asbestos litigation, but such litigation continues to be a concern to the financial health and

---

[6] *See also,* Exh. 19 at KMH 000087-92 (October 2000); Exh. 78 at KMH 000093-94 (December 2000); Exh. 79 at KMH 000095-98 (May 2001); Exh. 24 at KMH 010680-83 (June 2001); Exh. 80 at KMH 010684-89 (October 2001); 81 at KMH 010690 (December 2001); Exh. 82 at KMH 010691 (February 2002); Exh. 25 at KMH 010693-96 (June 2002); Exh. 83 at KMH 010697-702 (October 2002); Exh. 84 at KMH 010703 (December 2002); Exh. 26 at KMH 000127-30 (July 2003); Exh. 85 at KMH 010708-09 (September 2003); Exh. 27 at P1126-29 (October 2005); Exh. 28 at P1121-24 (November 2005); Exh. 86 at KMH 010714-17 (July 2006); Exh. 87 at P1113-16 (July 2007).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1   the stock price of the Company"). Ms. Thomas acknowledges that, by April 2002, she knew

2   asbestos was challenging the company based on the publications distributed by Kelly-Moore,

3   including a 2002 newsletter reporting on the asbestos litigation and its potential impact on the

4   ESOP's value. Exh. 88 at 110:24-111:7. As she admits, Kelly-Moore Management specifically

5   apprised Ms. Thomas that asbestos litigation could negatively impact the value of her ESOP

6   account in early 2003. Exh. 88 at 87:12-88:14. Ms. Thomas' admissions refute the allegations in

7   the complaint that she did not have actual knowledge of the relevant events until 2005. *Id.*; *see*

8   *also* Exh. 88 at 76:23-77:18, 95:3-16, 99:3-17.

9       CIG made similar disclosures, which Plaintiffs Fernandez and Smith admit they received.

10  On May 23, 2002, CIG informed Plaintiffs and the other ESOP participants of the potential

11  impact that the asbestos litigation could have on the value of CIG:

12      One other factor has been brought to our attention that may have an effect on the
        future value of our CIG stock. K-M Industries Holding Co., Inc., our holding
13      company, also owns Kelly-Moore Paint Company. Significant asbestos claims
        have been filed against Kelly-Moore. To date, the costs of these claims have been
14      covered by insurance polices. Kelly-Moore is vigorously proceeding against its
        various insurance carries to assured coverage of these asbestos-related claims. As
15      the asbestos litigation continues against Kelly-Moore, Kelly-Moore's current
        believe is that the litigation is likely to depress its stock value. As a result of our
16      joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation may
        depress the value of our CIG stock, which would affect the value of your ESOP
17      account.

18  Exh. 90; Exh. 77 (Interrog. Response 1, 2); *see also* Exh. 37 at 81:13-82:14. At the start of the

19  following year, on January 21, 2003, CIG followed up on this advisement with more facts about

20  the asbestos litigation and reiteration of the potential impact on the participants' ESOP accounts.

21  That communication stated:

22      [O]ur sister company, Kelly-Moore, continues to be a defendant in asbestos
        litigation. Currently there are over 30,000 claims pending against Kelly-Moore.
23      These claims arise from a product manufactured decades go by a prior subsidiary
        called Paco Textures Corporation....

24      Although the pending claims have been asserted against Kelly-Moore rather than
        CIG, which are both owned by K-M Holdings, you should be aware that there are
25      some circumstances under which the asbestos litigation might adversely affect the
        value of the shares held by your ESOP. These shares—like those held by the
26      Kelly-Moore ESOP—are actually 'tracking' shares issued by K-M Holdings,
        itself.... Both sets of tracking shares … are subject to whatever debts K-M
27      Holdings, itself, might have to third parties. Therefore, to the extent that any
        claim—even one arising out of Kelly-Moore's operations—is ultimately satisfied
28      by K-M Holdings rather than one of its subsidiaries, the value of the shares held by

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

your ESOP may be affected adversely.

Exh. 91.  Again, Plaintiffs Fernandez and Smith admit that they contemporaneously received this communication.  Exh. 91; Exh. 77 at Interrog. Responses 1 and 2; *see also* Exh. 37 at 81:13-82:14.  In addition, each year CIG provided all participants, including Plaintiffs Fernandez and Smith, with an annual ESOP statement, which showed the annual valuation reports' conclusions and applied those results to the participant's own interest in the Plan.  *See, e.g.,* Exh. 92, 93, 42, 44, 46, 57.

The undisputed facts therefore belie the Complaint's allegation that "until the Fall of 2004, Defendant Fiduciaries intentionally withheld information about the extent of KMH's potential asbestos liability from participants who were active employees."  *See* Complaint ¶ 52. In fact, contrary to the allegations of the complaint, each Plaintiff admits that they know of no facts to support the proposition that any defendants withheld information concerning Kelly-Moore's asbestos liability.  Exhs. 37 at 195:2-13; Exh. 94 at 179:2-6; Exh. 88 at 208:1-12.

### 3.    Resolution of the Asbestos Litigation

While the complaint criticizes the alleged failure of Defendants to have Kelly-Moore's asbestos litigation taken into consideration in the valuation of KMH's subsidiaries for purposes of the initial ESOP transactions, the asbestos issues never resulted in KMH's downfall. ███████ ████████████████████████████████████████████ the Company's auditors and the ESOP's valuators believe the damage has been contained.  Exh. 95 at 254:18 – 257:3; *see also* Exh. 3 at SRR10811.  In other words, while at one time management was concerned enough about the asbestos litigation to discuss it with all shareholders (including Plaintiffs and the putative class), subsequent events have led the Company to the determination ███████████████████████ ██████, a conclusion with which Kelly-Moore's and CIG's auditors and the ESOP's valuators agree.  *See, e.g.,* Exh. 3 at SRR10811; Exh. 95 at 256:17 – 257:3.

### E.    North Star's Conduct as the ESOP's Discretionary Trustee

North Star took an active role as trustee following its appointment in April 2003.  It met with members of management and attended board and shareholder meetings to discuss the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1   financial position and outlook of both CIG and Kelly-Moore.  Exh. 96 at NS00006504.  In light

2   of management's increased concerns regarding asbestos litigation at the time of North Star's

3   retention, North Star decided to restructure the valuation process to value the tracking stocks at

4   the holding company level instead of the company level, thereby ensuring that the valuations

5   reflected the accretive or dilutive value of the holding company on the values of the Class P-B

6   and Class I-B stocks.  Exh. 66 at 243:6-23.

7          To implement this initiative, North Star reviewed a number of possible valuation firms

8   that would have the capacity to value both a paint company and an insurance company.  Exh. 66

9   at 257:17 – 258:21.  North Star seriously considered engaging Houlihan, Lokey Howard & Zukin

10  Financial Advisors, Inc., as well as Rothschild Inc., but was unable to arrive at acceptable terms

11  for the engagement of either of those firms.  Exh. 66 at 257:25-258:25.  In the end, North Star

12  selected Stout, Risius & Ross ("SRR"), a firm with experience in valuing companies, including

13  companies with ESOPs, with asbestos litigation and other industrial claim exposure, as well as

14  the background requisite to capably appraise both Kelly-Moore and CIG.  Exh. 66 at 253:21 –

15  254:25, 259:18 – 260:9.

16         Following its appointment to serve as trustee, North Star assessed whether the ESOP paid

17  more than adequate consideration for either the Class P-B or Class I-B stock in the 1998 and 1999

18  initial purchase transactions.  Exh. 66 at 272:19-273:17, 275:40-24.  Although Mr. Brooks had

19  passed away and Mr. Moore's health did not permit a constructive interview, North Star spoke

20  with *every* other person involved in the purchase transactions.  *See* Exh. 66 at 157:15-158:4,

21  160:13-18, 162:17-164:13, 169:12-170:13, 182:23-183:4, 201:25-202:5, 223:12-225:13, 271:15-

22  275:14, 283:11-17.  North Star reviewed the key documents underlying the valuations, including

23  Ernst and Young's audited financials, and spoke with the auditors responsible for preparing the

24  reports.  Exh. 66 at 168:13-169:25; 262:11-18.  North Star familiarized itself with Kelly-Moore's

25  asbestos liability, the insurance reserves covering that liability and the related processes for

26  collecting the insurance proceeds, and the day-to-day issues associated with KMH and the

27  operations of its subsidiaries.  Exh. 66 at 160:13-18; 161:3-16, 2123:16-22.  North Star

28  interviewed Duff & Phelps' asbestos liability expert, studied outside materials on the issues, and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

interviewed Kelly-Moore's asbestos and insurance recovery attorneys regarding the past, current and prospective implications of the asbestos litigation to the Company and its subsidiaries. Exh. 66 at 165:14-25, 166:8-16. North Star's independent legal counsel reviewed the documentation relating to the initial transactions and reported that the transaction documents were appropriate and safeguarded the ESOP's interests. Exh. 66 at 272:21-273:17. North Star determined that the available information, including the audited financial statements, supported Kelly-Moore's position at the time of the initial transactions that it had adequate insurance coverage for then-contemplated asbestos claims. Exh. 66 at 163:15-164:13, 213:5-22; *see also* Exhs. 2, 75.

Based upon its due diligence and analysis, North Star concluded following its retention in 2003 that no evidence supported the theory that the ESOP paid more than adequate consideration for either the Class P-B or Class I-B stock. Exh. 66 at 275:16-24. In addition, when North Star retained SRR in 2005, it requested SRR review the valuations underlying both initial transactions. Exh. 66 at 283:11-17. SRR agreed with the ultimate conclusion reached in each of the valuations, confirming North Star's earlier determination that the initial valuations did not involve payment in excess of adequate consideration. Exh. 66 at 265:25-266:8; 275:16-24; 277:9-17, 284:17–285:1.

## III.    PLAINTIFFS' CLAIMS AGAINST NORTH STAR ARISING OUT OF THE 1998 AND 1999 TRANSACTIONS ARE TIME-BARRED

### A.    Standard of Review Governing Motion

The Supreme Court has instructed that courts should regard summary judgment "as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment will be granted when there is "'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *California Architectural Bldg Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1988) (quoting Fed.R.Civ.P. 56(c)). There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    moving party demonstrates the absence of genuine issues of material fact, the burden then shifts

2    to the non-moving party to "come forward with 'specific facts showing that there is a genuine

3    issue for trial.'" *Id.* (quoting Fed.R.Civ.P. 56(e)).  If the opposing party's evidence "is merely

4    colorable or is not significantly probative, summary judgment may be granted."  *Anderson v.*

5    *Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1996).

6         **B.     ERISA Section 413 Applies to Both Claims for Relief**

7         Plaintiffs' Second Amended Complaint presents two claims for relief.  The first asserts a

8    claim for breach of fiduciary duty under ERISA Sections 502(a)(2) and (a)(3), 29 U.S.C.

9    §§ 1132(a)(2) and (a)(3).  The second asserts a violation of the prohibited transaction rules found

10   in ERISA Sections 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b).  ERISA Section 413 provides the

11   limitations period applicable to both claims.  29 U.S.C. § 1113; *see also*, *Barker v. American*

12   *Mobil Power Corp.*, 64 F.3d 1397, 1400-01 (9th Cir. 1995) (Section 413 governs claims for

13   breach of fiduciary duty brought under ERISA Sections 502(a)(2) and (a)(3));  *Blanton v.*

14   *Anzalone*, 760 F.2d 989, 991 (9th Cir. 1985) (Section 413 governs the limitations period for

15   prohibited transaction claims).

16        ERISA Section 413 states that:

17        No action may be commenced under this subchapter with respect to a fiduciary's
          breach of any responsibility, duty, or obligation under this part, or with respect to a
18        violation of this part, after the ***earlier*** of –

19        (1) six years after (A) the date of the last action which constituted a part of the
          breach or violation, or (B) in the case of an omission the latest date on which the
20        fiduciary could have cured the breach or violation, or

21        (2) three years after the ***earliest*** date on which the plaintiff had actual knowledge
          of the breach or violation;
22

23        except that in the case of fraud or concealment, such action may be commenced
          not later than six years after the date of discovery of such breach or violation.

24   29 U.S.C. § 1113 (emphasis added).  Section 413 functions as an absolute bar to untimely claims,

25   and entry of judgment in defendants' favor on a time-barred claim is proper when plaintiffs

26   cannot prove that the limitations period has been tolled.  *Landwehr v. DuPree*, 72 F.3d 726, 733

27   (9th Cir. 1995); *Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993); *see also*

28   *Radford v. General Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    The Plan's alleged payment of excess consideration in both the 1998 and 1999 transaction

2    forms the crux of both of Plaintiffs' claims that Defendants caused the Plan to pay more than fair

3    market value for KMH stock.  SAC, ¶¶ 67, 74-75; *see also* Plaintiffs' Reply Brief in Support of

4    Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (Docket No. 127) at

5    5 ("Plaintiffs . . . all understand the basic allegation in this case:  that the ESOP paid too much for

6    the stock at the time of the initial transactions") and 4 n. 2 (Plaintiffs "all understand that the

7    gravamen of the claims is that the ESOP overpaid for stock").  Allegations that Defendants

8    purportedly failed to conduct a thorough and independent review of the 1998 and 1999

9    transactions, or prudently investigate the qualifications of the persons valuing the stock, also

10   relate to conduct that occurred in 1998 and 1999.  SAC, ¶¶ 27-44, 67, 74-75.  Plaintiffs assert no

11   deficiency with respect to the annual valuations of either Class I-B or Class P-B stock subsequent

12   to the initial valuations.[7]  *See generally* SAC.

### C.    Plaintiffs Had Actual Knowledge of the Alleged 1998 and 1999 Transactions More Than Three Years Before They Filed This Action

15   ERISA Section 413's three-year limitations period is triggered by Plaintiffs' *knowledge of*

16   *the event* that constitutes the alleged breach, whether or not Plaintiffs then understood that the

17   event amounted to a breach of fiduciary duty.  *Blanton*, 760 F.2d at 992 ("[t]he statute of

18   limitations is triggered by the defendants' knowledge of the transaction that constituted the

19   alleged violation, not by their knowledge of the law").  In other words, Plaintiffs' lack of

20   knowledge of the applicable law will not stop the limitations period from beginning to run.  *Id.*

21   Harm to plaintiffs is also not required to start the statute running.  *In re Unisys Corp. Retiree*

22   *Medical Benefit ERISA Litigation*, 242 F.3d 497, 505-6 (3d Cir. 2001); *Ziegler v. Connecticut*

23   *Gen. Life Ins. Co.*, 916 F.2d 548, 551 (9th Cir. 1990) ("Indeed, the key to the ERISA statute of

24   limitations when applied to these types of violations [*i.e.*, prohibited transactions] is not 'actual

25   harm,' but rather 'actual knowledge' of the ERISA breach or violations").

26   Courts engage in a two-step analysis to determine whether a claim is time-barred by

---

[7] Indeed, Plaintiffs did not even bother to depose SRR, the valuator retained by North Star, which has prepared the annual valuations for the Plan years 2003 through 2007.  Diller Decl., ¶ 3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1  ERISA Section 413's three-year limitations period. *Ziegler*, 916 F.2d at 550. First, the Court

2  must determine when the alleged breach occurred. *Id.* Second, it must determine when the

3  plaintiff learned of actions constituting the breach. *Id.* Analysis of both factors shows that

4  Plaintiffs had actual knowledge within the meaning of ERISA Section 413 of the facts relating to

5  the 1998 and 1999 transactions more than three years before they filed this case in November

6  2006.

7      As discussed in Section II, *supra,* the ESOP purchased interests in Kelly-Moore and CIG

8  in 1998 and 1999. Exhs. 4, 5, 14, 97. All three Plaintiffs admit to having knowledge of the

9  ESOP transactions prior to November 2003. *See* Exhs.15, 17, 18, 38; *see also* Exh. 16 at 269:17-

10  270:3. Further, each Plaintiff understood before November 2003 that asbestos liability could

11  impact the value of his or her ESOP shares. *See* Exh. 88 at 87:12-88-10, 110:24-111:7; Exhs. 90,

12  91; Exh. 77 at Interrog. Responses 1 and 2; Exh. 37 at 81:13-82:14; Exh. 94 at 95:9-16.

13      As Plaintiffs acknowledge, management of both companies circulated frequent updates to

14  the ESOP participants, apprising them of Kelly-Moore and CIG's corporate developments,

15  including negative developments associated with the asbestos litigation. In October 2001, Kelly-

16  Moore disclosed that asbestos litigation was a concern to the financial health and the stock price

17  of the Company, Exh. 89, and Ms. Thomas admits that Kelly-Moore management directly

18  informed with her in early 2003 - more than three years before the filing of the complaint in

19  November 2006 - that asbestos litigation could negatively impact the value of her ESOP shares.

20  Exh. 88 at 87:12-88:10. Despite allegations in her complaint to the contrary, Ms. Thomas admits

21  she had actual knowledge of the transactions and the potential impact of the asbestos litigation on

22  the value of her share price well before November 2003. Exh. 88 at 76:23-77:18, 87:12-88:10,

23  93:15-24, 95:3-16, 99:3-17, 110:24-111:7. Therefore, her actual knowledge bars this lawsuit with

24  respect to Class P-B shares. *Blanton, 760 F.2d at 922.*

25      Similarly, both Ms. Smith and Mr. Fernandez testified that CIG kept them informed of

26  developments at Kelly-Moore and how its asbestos liability could negatively impact their ESOP

27  shares. Exh. 90, 91; Exh. 77 at Interrog. Responses 1 and 2; Exh. 37 at 81:13-82:14; Exh. 94 at

28  95:9-16. Each admits that they received newsletters detailing the nature of the asbestos concerns

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1    at Kelly-Moore as early as 2002.  Exh. 90.  On-going communications continued to inform Class

2    I-B shareholders of recent developments with respect to the asbestos in early 2003.  *See, e.g.,*

3    Exh. 91.  Thus, as with Ms. Thomas, CIG's disclosures provided Ms. Smith and Mr. Fernandez

4    with actual knowledge of the facts underlying their current claims as to the Class I-B shares.

5    Because this knowledge was acquired before November 2003, both claims are barred by the

6    three-year statute of limitations.  *Blanton, 760 F.2d at 922*

7      **D.**  **Plaintiffs' Claims Relating to the 1998 and 1999 Transactions Are Time-
     Barred by the Six-Year Repose Period**

8

9       In the event that the Court for some reason concludes that a material factual dispute

10   precludes finding that Plaintiffs had actual knowledge of the facts on which they base their claims

11   more than three years before filing this case, ERISA Section 413(1) nevertheless bars the claims

12   because the transactions occurred more than six years before they filed this action.  *See* Docket

13   No. 1 (Complaint's filing on November 29, 2006).  ERISA Section 413(1) functions as a statute

14   of repose, barring an action for breach of fiduciary duty or prohibited transaction if the participant

15   does not file it within six years of the date of the alleged violation, regardless of whether the

16   participant ever learns of the breach.  29 U.S.C. § 1113(1).  Because the 1998 and 1999

17   transactions occurred more than six years before Plaintiffs' filed the initial complaint in

18   November 2006, their claims based on the 1998 and 1999 transactions are time barred.  *Id.*

19      Plaintiffs' allegations that Defendants committed "additional" breaches of fiduciary duty

20   by failing to cure the alleged wrongdoing cannot, as a matter of law, extend the six-year period

21   for challenging the 1998 and 1999 transactions.  In *Phillips v. Alaska Hotel and Restaurant*

22   *Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991), the Ninth Circuit considered and

23   rejected the application of the "continuing violation" theory to claims subject to the limitations

24   period contained in ERISA Section 413.  The plaintiffs in *Philips* argued, and the district court

25   ruled, that the period in which plaintiffs had to bring a claim for breach of fiduciary duty ran

26   anew each time the defendants committed a discrete but related breach of fiduciary duty.

27   Reversing the district court, the Ninth Circuit held that the application of a continuing violation

28   theory to an ERISA breach of fiduciary duty claimed contradicted on the plain language of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

ERISA Section 413.  *Phillips*, 944 F.2d at 520 (stating "[t]he earliest date on which a plaintiff became aware of any breach would thus start the limitation period of § 1113(a)(2) running.  The district court's application of the continuing violation theory essentially reads the 'actual knowledge' standard out of the statute").  Accordingly, Plaintiffs' allegations that Defendants breached their fiduciary duties after 1999 cannot extend the six-year period in which they had to bring their claims relating to the 1998 and 1999 transactions.

**E.     The Limitations Period Cannot Be Tolled as to North Star on the Grounds of Fraud or Concealment**

While fraud or concealment tolls Section 413's six-year repose period until the date of discovery of the alleged fiduciary breach, no evidence even remotely suggests any such conduct in this case.  Under the governing Ninth Circuit standard, ERISA Section 413 tolls running of the repose period only in cases against the fiduciary who took the affirmative steps to hide his or her breach of fiduciary duty.  *Barker*, 64 F.3d at 1402 (under the doctrine of fraudulent concealment, "a statute of limitations may be tolled only if the plaintiff 'establishes affirmative conduct upon the part of the *defendant* which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief'") (emphasis in original) (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) and *Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986)); *see also Larson v. Northrop Corp.*, 21 F.3d 1164, 1172-73 (D.C. Cir. 1994); *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990); *Schaefer v. Arkansas Medical Soc.*, 853 F.2d 1487, 1491 (8th Cir. 1988).

The fraudulent concealment doctrine does not serve to toll the statute against a party who did not act to conceal the alleged fiduciary breach.  *Barker*, 64 F.3d at 1402 ("[t]he doctrine of fraudulent concealment tolls the statute of limitations only as to those defendants who committed the concealment," and "Plaintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants") (quoting *Greenwald v. Manko*, 840 F. Supp. 198, 203 (E.D.N.Y. 1993) and *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 n. 20 (S.D.N.Y. 1990), *aff'd,* 744 F. Supp. 1237 (2d Cir. 1993).

Plaintiffs have not alleged—have no evidence to support—that North Star took any steps

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1   to conceal the facts on which Plaintiffs base their claims. *See* Exhs. 37 at 195:2-13; Exh. 94 at

2   179:2-6; Exh. 88 at 206:23-207:9, 208:1-12. As discussed above, the crux of Plaintiffs'

3   allegations is that the Plan paid too much for the Class P-B stock in 1998 and for the Class I-B

4   stock in 1999. *See SAC,* ¶ 51. North Star did not become a trustee of the Plan until 2003. Exh.

5   66 at 60:19-23. Because no evidence indicates that North Star attempted to fraudulently conceal

6   any facts regarding the 1998 or 1999 transactions, and because Plaintiffs filed this action more

7   than six years after the latest of the two transactions, their breach of fiduciary duty and prohibited

8   transaction claims are time-barred. *Barker*, 64 F.3d at 1402.

9   **IV.    CONCLUSION**

10        For the reasons discussed above, North Star Trust Company respectfully requests the

11   Court dismiss the Complaint as to North Star with prejudice.

12   Dated: June 26, 2008                         MORGAN, LEWIS & BOCKIUS LLP

13

14                                               By: /S/ Nicole A. Diller

15                                                  Nicole A. Diller
                                                    Donald P. Sullivan
16                                                  Andrew C. Sullivan

17                                               Attorneys for North Star Trust Company

18   DB2/20744984.11

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

NORTH STAR TRUST CO.'S MOTION FOR
SUMMARY JUDGMENT RE LIMITATIONS
CASE NO. C06-07339 CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS & BOCKIUS LLP
Nicole A. Diller (State Bar No. 154842)
Donald P. Sullivan (State Bar No. 191080)
Andrew C. Sullivan (State Bar. No. 226902)
One Market, Spear Street Tower
San Francisco, California  94105
Telephone:  (415) 442-1000
Facsimile:  (415) 442-1001

Attorneys for North Star Trust Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FERNANDEZ, LORA SMITH, and TOSHA THOMAS<br><br>Plaintiffs,<br><br>vs.<br><br>K-M INDUSTRIES HOLDING CO., INC.; K-M INDUSTRIES HOLDING CO., INC. ESOP PLAN COMMITTEE; WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; TRUSTEES OF THE WILLIAM E. AND DESIREE B. MOORE REVOCABLE TRUST; ADMINISTRATOR OF THE ESTATE OF WILLIAM E. MOORE, DECEASED; CIG ESOP PLAN COMMITTEE; and NORTH STAR TRUST COMPANY,<br><br>Defendants. | Case No. C06-07339 CW<br><br>**DECLARATION OF NICOLE A. DILLER IN SUPPORT OF NORTH STAR TRUST COMPANY'S NOTICE OF MOTION, MOTION AND SUPPORTING MEMORANDUM FOR SUMMARY JUDGMENT RE STATUTE OF LIMITATIONS**<br><br>Date:      July 31, 2008<br>Time:      2:00 p.m.<br>Dept.:     Courtroom 2, 4th Floor<br>Judge:     Hon. Claudia Wilken |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1

Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

I, Nicole A. Diller, declare and state as follows:

1.    I am a partner with the law firm of Morgan, Lewis & Bockius LLP ("Morgan Lewis"), attorneys of record for Defendant North Star Trust Company ("North Star").  I am licensed to practice law in the State of California and have been admitted to practice in the Northern District of California.  Except as otherwise indicated, I have direct and personal knowledge of the facts set forth in this Declaration and, if called and sworn as a witness, I would competently testify to these facts.

2.    As the partner with primary responsibility for the management of this litigation. on behalf of North Star, I had personal involvement in the discovery undertaken in this action, including the parties' production of documents, the taking of depositions and receipt of deposition transcripts, and the parties' exchanges of initial disclosures.  The management and storage of discovery has been undertaken by Morgan Lewis personnel or its agents under my supervision and guidance.

3.    Accompanying this Declaration are copies of the exhibits as described below.

4.    Exhibit 1, Deposition Exhibit #9, B.J. Brooks Evaluation of the Common Stock of Kelly-Moore Paint Company, Inc. as of July 31, 1998, as received by Morgan Lewis in the course of this litigation.

5.    Exhibit 2, a true and correct copy of Deposition Exhibit #18, KMH, Inc. Class I Stock Valuation as of 06/30/99 by Duff & Phelps, as received by Morgan Lewis in the course of this litigation.

6.    Exhibit 3, a true and correct copy of SRR May 17, 2007 Presentation to North Star Trust Company, as received by Morgan Lewis in the course of this litigation.

7.    Exhibit 4, a true and correct copy of Deposition Exhibit #5, October 13, 1998 Kelly-Moore Paint ESOP Loan Agreement, as received by Morgan Lewis in the course of this

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                                    1              Declaration ISO North Star's MSJ re Statute of
                                                                Limitations
                                                                CASE NO. C06-07339 CW

litigation.

8.      Exhibit 5, a true and correct copy of Deposition Exhibit #4, October 13, 1998 Kelly-Moore Paint ESOP Plan Committee Resolutions to Authorize Borrowing and Purchase of Employer Securities, as received by Morgan Lewis in the course of this litigation.

9.      Exhibit 6, a true and correct copy of Deposition Exhibit #101, December 8, 1998 CCIC Resolution Authorizing Execution and Implementation of ESOP, as received by Morgan Lewis in the course of this litigation.

10.     Exhibit 7, a true and correct copy of Deposition Exhibit #104, correspondence dated June 11, 1999 from V. Alam to E. Mines and S. Ferrari, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

11.     Exhibit 8, a true and correct copy of July 16, 1999 Minutes of Special Meeting of the Board of Directors of Kelly-Moore Paint Co., Inc., NS00019508-19511, as received by Morgan Lewis in the course of this litigation.

12.     Exhibit 9, a true and correct copy of excerpts from the transcript of the deposition of Stephen Ferrari taken March 26, 2008, as received by Morgan Lewis in the course of this litigation.

13.     Exhibit 9A, a true and correct copy of Deposition Exhibit #78, May 27, 2998 correspondence from S. Ferrari to B.J. Brooks enclosing documents for appraisal of K-M Paint, as received by Morgan Lewis in the course of this litigation.

14.     Exhibit 10, a true and correct copy of Deposition Exhibit #30, Sansome St. Appraisers Business Valuation Appraisals brochure, as received by Morgan Lewis in the course of this litigation.

15.     Exhibit 11, a true and correct copy of Deposition Exhibit #44, October 13, 1998 correspondence from J. Menke to Prudential Ins. Co. of America re: KM Paint ESOP and Trust,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                                   2                Declaration ISO North Star's MSJ re Statute of
                                                                 Limitations
                                                                 CASE NO. C06-07339 CW

as received by Morgan Lewis in the course of this litigation.

16.     Exhibit 12, a true and correct copy of Deposition Exhibit #151, Summary Annual Report for CCIC ESOP for the Period January 1, 1998 – December 31, 1998, as received by Morgan Lewis in the course of this litigation.

17.     Exhibit 13, a true and correct copy of Deposition Exhibit #161, February 28, 2002 correspondence from E. Mines to Dear Team Member re: enclosing copy of the Summary Plan Description, as received by Morgan Lewis in the course of this litigation.

18.     Exhibit 14, a true and correct copy of Deposition Exhibit #3, October 13, 1998 ESOP Stock Purchase Agreement for Kelly-Moore Paint, as received by Morgan Lewis in the course of this litigation.

19.     Exhibit 15, a true and correct copy of Deposition Exhibit #56, September 14, 1998 correspondence from S. Coultas of Menke to S. Ferrari re: confirmation of ESOP briefings to be provided to K-M Paint employees, as received by Morgan Lewis in the course of this litigation.

20.     Exhibit 16, a true and correct copy of excerpts from the transcript of the deposition of John Menke taken March 21, 2008, as received by Morgan Lewis in the course of this litigation.

21.     Exhibit 17, a true and correct copy of Deposition Exhibit #118, July 14, 1999 correspondence to all eligible employees re: first ESOP statement, as received by Morgan Lewis in the course of this litigation.

22.     Exhibit 18, a true and correct copy of Deposition Exhibit #60, July 31, 1999 Explanation of Summary Annual Report of Employee Stock Ownership Plan ("ESOP") of K-M Paint Co., as received by Morgan Lewis in the course of this litigation.

23.     Exhibit 19, a true and correct copy of Deposition Exhibit #187, Mind Our Own Business newsletter, Vol. II, Issue 3 dated for October, 2000, as received by Morgan Lewis in the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                3              Declaration ISO North Star's MSJ re Statute of
                                            Limitations
                                            CASE NO. C06-07339 CW

1   course of this litigation.

2         24.    Exhibit 20, a true and correct copy of Deposition Exhibit #208, "KMH Employee

3   Stock Ownership Plan December 31, 2003" for Tosha Thomas, as received by Morgan Lewis in

4   the course of this litigation (document submitted under seal).

5         25.    Exhibit 21, a true and correct copy of Deposition Exhibit #209, KMH Employee

6   Stock Ownership Plan December 31, 2004" for Tosha Thomas, as received by Morgan Lewis in

7   the course of this litigation (this document was submitted under seal)

8

9         26.    Exhibit 22, a true and correct copy of Deposition Exhibit #210, "KMH Employee

10   Stock Ownership Plan December 31, 2005" for Tosha Thomas as received by Morgan Lewis in

11   the course of this litigation (this document was submitted under seal)

12

13         27.    Exhibit 23, a true and correct copy of Deposition Exhibit #211, "KMH Employee

14   Stock Ownership Plan December 31, 2006" for Tosha Thomas, as received by Morgan Lewis in

15   the course of this litigation (document submitted under seal).

16         28.    Exhibit 24, a true and correct copy of Deposition Exhibit #190, Mind Our Own

17   Business newsletter, Vol. III, Issue 2 for June, 2001, as received by Morgan Lewis in the course

18   of this litigation.

19         29.    Exhibit 25, a true and correct copy of Deposition Exhibit #194, Mind Our Own

20   Business newsletter, Vol. IV, Issue 2 for June, 2002, as received by Morgan Lewis in the course

21   of this litigation.

22

23         30.    Exhibit 26, a true and correct copy of Deposition Exhibit #197, Mind Our Own

24   Business newsletter, Vol. V, Issue 1 for July, 2003, as received by Morgan Lewis in the course of

25   this litigation.

26         31.    Exhibit 27, a true and correct copy of Deposition Exhibit #200, Mind Our Own

27   Business newsletter, for October, 2005, as received by Morgan Lewis in the course of this

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1            4        Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

1    litigation.

2        32.    Exhibit 28, a true and correct copy of Deposition Exhibit #201, as received by

3    Morgan Lewis in the course of this litigation.

4        33.    Exhibit 29, a true and correct copy of the transcript of the deposition of Peter

5    Cazzolla taken March 19, 2008, as received by Morgan Lewis in the course of this litigation.

6

7        34.    Exhibit 30, a true and correct copy of excerpts from the transcript of the deposition

8    of Edward Mines taken April 2, 2008, as received by Morgan Lewis in the course of this

9    litigation.

10       35.    Exhibit 31, a true and correct copy of Deposition Exhibit #16, June 22, 1999

11   correspondence from K. Bodenstein of Duff & Phelps to W. Moore re: proposal for engagement

12
     of Duff & Phelps, as received by Morgan Lewis in the course of this litigation.
13

14       36.    Exhibit 32, a true and correct copy of Deposition Exhibit #246, Correspondence

15   dated September 16, 1999 from K. Daly to W. Moore enclosing CFAI Professional Services

16   Agreement, as received by Morgan Lewis in the course of this litigation.

17       37.    Exhibit 33, a true and correct copy of Deposition Exhibit #24, September 7, 1999

18   correspondence from K. Daly of CFAI to Proposed ESOP Trust Committee re: fair market value

19
     of 42% interest in Class I-A tracking stock of CCIC, as received by Morgan Lewis in the course
20
     of this litigation.
21

22       38.    Exhibit 34, a true and correct copy of documents Bates labeled D&P 000773 – 861

23   comprising CIG ESOP Loan Documents including ESOP Plan and Loan Agreement, as received

24   by Morgan Lewis in the course of this litigation.

25       39.    Exhibit 35, a true and correct copy of Deposition Exhibit #139, October 18, 1999

26   correspondence from Duff & Phelps to W. Moore re: valuation of non-marketable minority

27   interest basis of 42%   interest of Series I Tracking Stock of K-M Industries, as received by

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                                  5         Declaration ISO North Star's MSJ re Statute of
                                                                               Limitations
                                                                         CASE NO. C06-07339 CW

Morgan Lewis in the course of this litigation.

40.    Exhibit 36, a true and correct copy of Deposition Exhibit #25, ESOP Stock Purchase Agreement dated October 18, 1999 between W. Moore as trustee of KM Paint Co. ESOP, Wm. and Desiree Moore 1990 Revocable Trust, Wm. and Desiree Moore as Trustees, and KMH, Inc., as received by Morgan Lewis in the course of this litigation.

41.    Exhibit 37, a true and correct copy of excerpts from the deposition transcript of Lora Smith taken on April 16, 2008, as received by Morgan Lewis in the course of this litigation.

42.    Exhibit 38, a true and correct copy of Deposition Exhibit #148, undated correspondence from P. Cazzolla to Dear CIG Business Partner regarding creation of CIG ESOP, as received by Morgan Lewis in the course of this litigation.

43.    Exhibit 39, a true and correct copy of Deposition Exhibit #153, November 9, 1999 Quarterly Employee Meeting Questions and Answers document, as received by Morgan Lewis in the course of this litigation.

44.    Exhibit 40, a true and correct copy of Deposition Exhibit #149, undated correspondence from P. Cazzolla to CIG Team Members and Shareholders re: ESOP Statement – Plan Year 1999, as received by Morgan Lewis in the course of this litigation.

45.    Exhibit 41, a true and correct copy of Deposition Exhibit #150, Spreadsheet entitled, "CCIC Employee Stock Ownership Plan December 31, 1998" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

46.    Exhibit 42, a true and correct copy of Deposition Exhibit #154, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 1999" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

47.    Exhibit 43, a true and correct copy of Deposition Exhibit #156, undated correspondence from P. Cazzolla to CIG Team Members and Shareholders re: ESOP Statement –

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                     6          Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

Plan Year 2000, as received by Morgan Lewis in the course of this litigation.

48.      Exhibit 44, a true and correct copy of Deposition Exhibit #157, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 2000" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

49.      Exhibit 45, a true and correct copy of Deposition Exhibit #158, undated correspondence from P. Cazzolla to CIG Team Members and Shareholders re: ESOP Statement – Plan Year 2001, as received by Morgan Lewis in the course of this litigation.

50.      Exhibit 46, a true and correct copy of Deposition Exhibit #159, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 2001" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

51.      Exhibit 47, a true and correct copy of Deposition Exhibit #162, May 31, 2002 correspondence from P. Cazzolla to Dear CIG Owner and Team Member re: value of company is $4.18/share, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

52.      Exhibit 48, a true and correct copy of Deposition Exhibit #163, June 10, 2002 CIG Inter-Office Memorandum from H.R. Department to Past CIG Employees re: Information Regarding the ESOP, as received by Morgan Lewis in the course of this litigation

53.      Exhibit 49, a true and correct copy of Deposition Exhibit #164, undated correspondence from P. Cazzolla to CIG Team Members and Shareholders re: ESOP Statement – Plan Year 2002, as received by Morgan Lewis in the course of this litigation.

54.      Exhibit 50, a true and correct copy of Deposition Exhibit #168, June 10, 2003 CIG Inter-Office Memorandum from H.R. Dept. to Former CIG Employees Information Regarding the Employee Stock Ownership Plan, as received by Morgan Lewis in the course of this litigation.

55.      Exhibit 51, a true and correct copy of Deposition Exhibit #171, November 15,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                7                Declaration ISO North Star's MSJ re Statute of
                                              Limitations
                                              CASE NO. C06-07339 CW

2005 correspondence from P. Cazzolla to Dear CIG Team Member and Employee/Owner re: 2003 ESOP Statement, as received by Morgan Lewis in the course of this litigation.

56.     Exhibit 52, a true and correct copy of Deposition Exhibit #172, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 2003" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

57.     Exhibit 53, a true and correct copy of Deposition Exhibit #175, December 1, 2005 correspondence from P. Cazzolla to Dear CIG Team Member and Employee/Owner enclosing 2004 ESOP Statement, as received by Morgan Lewis in the course of this litigation.

58.     Exhibit 54, a true and correct copy of Deposition Exhibit #176, July 3, 2006 correspondence from P. Cazzolla to Dear Fellow Team Member and Shareholder re: price per share of I tracking stock, as received by Morgan Lewis in the course of this litigation.

59.     Exhibit 55, a true and correct copy of Deposition Exhibit #220, "KMH Employee Stock Ownership Plan December 31, 2002" for Thomas Fernandez, as received by Morgan Lewis in the course of this litigation (document submitted under seal)..

60.     Exhibit 56, a true and correct copy of Deposition Exhibit #224, October 16, 2005 email from islandgirl to beavis666 forwarding March 8, 2004 email from G. Cushing to Bay Area Staff, as received by Morgan Lewis in the course of this litigation.

61.     Exhibit 57, a true and correct copy of Deposition Exhibit #166, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 2002" for Lora Smith, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

62.     Exhibit 58, a true and correct copy of Deposition Exhibit #167, ESOP Participant Statement Glossary for Plan Year Ending December 31, 2002, as received by Morgan Lewis in the course of this litigation.

63.     Exhibit 59, a true and correct copy of Deposition Exhibit #174, Spreadsheet

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1     8     Declaration ISO North Star's MSJ re Statute of Limitations
CASE NO. C06-07339 CW

entitled, "KMH Employee Stock Ownership Plan December 31, 2004" for Lora Smith as received by Morgan Lewis in the course of this litigation.

64.    Exhibit 60, a true and correct copy of Deposition Exhibit #177, Spreadsheet entitled, "KMH Employee Stock Ownership Plan December 31, 2005" for Lora Smith, as received by Morgan Lewis in the course of this litigation.

65.    Exhibit 61, a true and correct copy of Deposition Exhibit #234, "KMH Employee Stock Ownership Plan December 31, 2005" for Thomas Fernandez, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

66.    Exhibit 62, a true and correct copy of Deposition Exhibit #160, ESOP Participant Statement Glossary for Plan Year Ending 12/31/01, as received by Morgan Lewis in the course of this litigation.

67.    Exhibit 63, a true and correct copy of Deposition Exhibit #167, ESOP Participant Statement Glossary for Plan Year Ending 12/31/02, as received by Morgan Lewis in the course of this litigation.

68.    Exhibit 64, a true and correct copy of Deposition Exhibit #84, February 28, 2003 Minutes of a Joint Special Meeting of the Board of Directors of KMH, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

69.    Exhibit 65, a true and correct copy of excerpts from the transcript of the deposition of Herbert R. Giffins taken March 28, 2008, as received by Morgan Lewis in the course of this litigation.

70.    Exhibit 66, a true and correct copy of excerpts from the transcript of the deposition of John Hommel taken May 8, 2008, as received by Morgan Lewis in the course of this litigation.

71.    Exhibit 67, a true and correct copy of the March 18, 2003 Minutes of a Joint Special Meeting of the Board of Directors of K-M Industries Holding Co., Inc. and K-M Paint

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                    9          Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

Co., Inc, Bates # KM006543-6545, as received by Morgan Lewis in the course of this litigation.

72.     Exhibit 68, a true and correct copy of correspondence dated March 25, 2003 from T. Nault to S. Ferrari, Bates #KMH 003643, as received by Morgan Lewis in the course of this litigation.

73.     Exhibit 69, a true and correct copy of Deposition Exhibit #254, memo to file re: March 27, 2003 meeting with J. Hommel, J. Kober, E. Turley, and V. Alam, as received by Morgan Lewis in the course of this litigation.

74.     Exhibit 70, a true and correct copy of April 16, 2003 Written Consent of the Directors of K-M Industries Holding Co., Inc., Bates #'s KMH 003144 – 3157, as received by Morgan Lewis in the course of this litigation.

75.     Exhibit 71, a true and correct copy of Deposition Exhibit #75, December 11, 1998 Facsimile Transmission from C. Mills of Pillsbury, Levinson to J. Cristiano of K-M Paint re: Preliminary Overview: Insurance Coverage in the Asbestos Litigation, as received by Morgan Lewis in the course of this litigation (document submitted under seal).

76.     Exhibit 72, a true and correct copy of excerpts from the transcript of Joseph Cristiano taken April 8, 2008, as received by Morgan Lewis in the course of this litigation.

77.     Exhibit 73, a true and correct copy of Deposition Exhibit #69, Single page of handwritten notes dated October 1, 1998 and entitled "Note to file," as received by Morgan Lewis in the course of this litigation (document submitted under seal).

78.     Exhibit 74, a true and correct copy of Deposition Exhibit #111, single page of handwritten notes dated April 30, 2002 entitled "Conversation w/Ed Mines, CA," as received by Morgan Lewis in the course of this litigation.

79.     Exhibit 75, a true and correct copy of Deposition Exhibit #122, March 27, 2001 Ireland valuation of KM Holding Co., Inc. Series P stock as of December 31, 2000, as received

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1

10

Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

by Morgan Lewis in the course of this litigation.

80.     Exhibit 76, a true and correct copy of excerpts from the transcript of the deposition of Robert M. Ireland taken April 23, 2008, as received by Morgan Lewis in the course of this litigation.

81.     Exhibit 77, a true and correct copy of Plaintiffs' Second Supplemental Responses to Defendant K-M Industries Holding Co. Inc. ESOP Plan Committee's First Set of Interrogatories to Plaintiffs, as received by Morgan Lewis in the course of this litigation.

82.     Exhibit 78, a true and correct copy of Deposition Exhibit #188, Mind Our Own Business newsletter, Vol. II, Issue 4 for December, 2000, as received by Morgan Lewis in the course of this litigation.

83.     Exhibit 79, a true and correct copy of Deposition Exhibit #189, Mind Our Own Business newsletter, Vol. III, Issue 1 for May, 2001, as received by Morgan Lewis in the course of this litigation.

84.     Exhibit 80, a true and correct copy of Deposition Exhibit #191, Mind Our Own Business newsletter, Vol. II, Issue 3 for October, 2001, as received by Morgan Lewis in the course of this litigation.

85.     Exhibit 81, a true and correct copy of Deposition Exhibit #192, Mind Our Own Business newsletter, Vol. III, Issue 4 for December, 2001, as received by Morgan Lewis in the course of this litigation.

86.     Exhibit 82, a true and correct copy of Deposition Exhibit #193, Mind Our Own Business newsletter, Vol. IV, Issue 1 for February, 2002, as received by Morgan Lewis in the course of this litigation.

87.     Exhibit 83, a true and correct copy of Deposition Exhibit #195, Mind Our Own Business newsletter, Vol. IV, Issue 3 for October, 2002, as received by Morgan Lewis in the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1          11          Declaration ISO North Star's MSJ re Statute of
Limitations
CASE NO. C06-07339 CW

course of this litigation.

88.     Exhibit 84, a true and correct copy of Deposition Exhibit #196, Mind Our Own Business newsletter, Vol. IV, Issue 4 for December, 2002, as received by Morgan Lewis in the course of this litigation.

89.     Exhibit 85, a true and correct copy of Deposition Exhibit #198, Mind Our Own Business newsletter, Vol. V, Issue 2 for September, 2003, as received by Morgan Lewis in the course of this litigation.

90.     Exhibit 86, a true and correct copy of Deposition Exhibit #205, Mind Our Own Business newsletter, for July, 2006, as received by Morgan Lewis in the course of this litigation.

91.     Exhibit 87, a true and correct copy of Deposition Exhibit #206, Mind Our Own Business newsletter, for July, 2007, as received by Morgan Lewis in the course of this litigation.

92.     Exhibit 88, a true and correct copy of excerpts from the deposition transcript of Tosha Thomas taken April 18, 2008, as received by Morgan Lewis in the course of this litigation.

93.     Exhibit 89, a true and correct copy of Deposition Exhibit #83, Mind Our Own Business newsletter for October, 2001, as received by Morgan Lewis in the course of this litigation.

94.     Exhibit 90, at true and correct copy of Deposition Exhibit #27, May 23, 2002 correspondence from P. Cazzolla to CIG Owners and Team Members re: status of ESOP and potential negative effect of asbestos claims, as received by Morgan Lewis in the course of this litigation.

95.     Exhibit 91, a true and correct copy of Deposition Exhibit #28, January 21, 2003 CIG Interoffice Memorandum from P. Cazzolla to All CIG Team Members re: Kelly-Moore Asbestos Litigation, as received by Morgan Lewis in the course of this litigation.

96.     Exhibit 92, a true and correct copy of Deposition Exhibit #95, June 30, 2003

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                                    12          Declaration ISO North Star's MSJ re Statute of
                                                                                    Limitations
                                                                            CASE NO. C06-07339 CW

1  correspondence from H. Giffins to All Eligible Employees enclosing ESOP statement, as received

2  by Morgan Lewis in the course of this litigation.

3      97.    Exhibit 93, a true and correct copy of Deposition Exhibit #96, October 31, 2005

4  correspondence from H. Giffins to All Eligible Employees enclosing 2003 ESOP statement, as

5  received by Morgan Lewis in the course of this litigation.

6

7      98.    Exhibit 94, a true and correct copy of excerpts from the transcript of the deposition

8  of Thomas Fernandez taken April 21, 2008, as received by Morgan Lewis in the course of this

9  litigation.

10     99.    Exhibit 95, a true and correct copy of excerpts from the transcript of the deposition

11 of Dan Stritmatter taken March 12, 2008, as received by Morgan Lewis in the course of this

12

13 litigation (document submitted under seal).

14     100.   Exhibit 96, a true and correct copy of an August 15, 2005 email from Erin Turley

15 to Margaret Sheneman and others re: KM Holdings Board meetings, Bates #'s NS00006504-

16 6507, as received by Morgan Lewis in the course of this litigation.

17     101.   Exhibit 97, a true and correct copy of Deposition Exhibit #225, October 16, 2005

18 email from islandgirl3 to beavis666 transmitting April 4, 2008 email from G. Cushing to Bay

19 Area Staff, as received by Morgan Lewis in the course of this litigation.

20

21     I declare under penalty of perjury under the laws of the United States of America that the

22 foregoing is true and accurate.

23

24 Dated:  June 26, 2008                      Respectfully submitted,

25

26                                            /S/ Nicole A. Diller

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7720340.1                    13        Declaration ISO North Star's MSJ re Statute of
                                            Limitations
                                            CASE NO. C06-07339 CW

# EXHIBIT 1
# TO DILLER DECLARATION

B. J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

Evaluation
of the
Common Stock
of

KELLY-MOORE PAINT COMPANY, INC.

as of
July 31, 1998

Prepared by:
B. J. BROOKS, ASA
August 1998

EXHIBIT

9

Stritmatter     3-12 08

Corporate Valuations

Financial Consulting

KMH 001439

B. J. BROOKS
114 Sansome Street, Suite 808
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

August 5, 1998

**CONFIDENTIAL**

Corporate Valuations

Financial Consulting

KMH 001440

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

Kelly Moore Paint Company, Inc.
August 5, 1998
Page two

**CONFIDENTIAL**

KMH 001441

**DOCUMENT SUBMITTED UNDER SEAL**

B.J. BROOKS

**CONFIDENTIAL**

KMH 001442

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. Brooks                    CONFIDENTIAL

DOCUMENT SUBMITTED UNDER SEAL

B J. BROOKS

CONFIDENTIAL

KMH 001444

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

## DESCRIPTION AND HISTORY OF THE COMPANY

### Summary

Kelly-Moore Paint Company, Inc., of San Carlos, California, designs and manufactures a complete line of architectural paints. The paints and purchased paint-related products are marketed through Company stores, primarily to professional painting contractors. The Company also currently owns two insurance companies: California Insurance Group (CIG) and K-M Insurance Company; and also owns Montana Operations, a cattle ranch in Montana. The proposed recapitalization anticipates that CIG and the Montana operations will be spun out of the Company. Consequently, the following paragraphs concern only the paint operations, referred to as Kelly-Moore Paints (KMP), and K-M Insurance Company (KMI), a captive insurer providing automobile, general liability and workers' compensation coverage for KMP.

The Company was founded as a partnership in 1946 by Mr. William Moore and Mr. William Kelly and incorporated in 1952. The Company has grown and prospered over the years. At the present time, the Company owns and operates four manufacturing plants and markets through approximately 145 company stores (some owned, some leased) throughout the Southwest and West Coast states. Total revenues during 1997 were almost $270 million. KMP is the largest privately held paint company in the United States.

The Company has operated profitably and has financed its growth with retained earnings. The Company has no funded debt. KMP is privately held by one shareholder.

### Products and Services

KMP manufactures and markets water-based and oil based exterior and interior paints; available in gloss, semi-gloss and flat finishes. The Company also manufactures and markets a limited range of stain and varnish products. The Company purchases and markets a wide variety of paint related products, such as Rustoleum, solvents, varnishes, spray equipment, masking tape, ladders, brushes, rollers, buckets, gloves, drop cloths, wallpaper and others. An estimated 80% of the total sales volume derives from paint products manufactured in-house.

The Company considers its products to be of the highest quality, and is continually alert to the need to maintain and improve quality and service. An important competitive advantage is the ability and willingness to match colors provided by customers — and the ability to guarantee that any batch of a given color will match previous batches. The corporate ability to manufacture and deliver specified colors rapidly is an important service provided to customers.

The Company does not manufacture private label products for mass marketers or others. All paint products are sold under the Company names.

KMH 001445

B. J. BROOKS                    **CONFIDENTIAL**

KMH 001446

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

## Operations

The Company operates from four plants, as shown below:

| Location | Size | Comment |
|---|---|---|
| San Carlos, CA | 350M sq.ft. | Full line |
| Hurst, TX | 340M sq.ft. | Full line |
| Tempe, AZ | 44M sq.ft. | Full line |
| Seattle, WA | 47M sq.ft. | Limited line |

San Carlos was the original location of the Company. The Company began manufacturing paint in Texas in 1962, and the present Texas plant was finished in 1971. Hurst is between Dallas and Fort Worth and the plant serves the Southwest and Colorado. The Preservative Paint Co. in Seattle was purchased in 1994 and the Universal Paint Corporation in Tempe, Arizona was purchased in 1995. Both acquisitions were acquired as a way to acquire market presence in these two markets.

The Company has the ability to increase production, as may be required. Consequently, production capacity is not considered to be a constraint on the Company's growth.

Operations consist of standard paint-making processes: receiving and storing raw materials, mixing the raw materials into a wide variety of colors and types of paint, using additives when appropriate, testing for trueness and consistency of color and other variables, packaging, labeling, warehousing and shipping. The principal raw material is titanium dioxide, available from a number of suppliers. Other raw materials include a wide variety of extenders, pigments and other items. The Company has no "single vendor" problems due to the wide availability of standard raw materials.

The Company's stores typically vary in size from 5,000 to 8,000 square feet, and are generally larger than those of competitors. The extra space allows the stores to carry more inventory and is considered to provide a definite competitive advantage. Annual sales value per store varies from approximately $1 million to $3 million. $1 million is considered the threshold sales volume for profitable ongoing operations.

## Other

The Company's corporate headquarters are in San Carlos, California, approximately 25 miles south of San Francisco.

The Company considers itself to be people-oriented and is continually conscious of the contribution of its employees to its continued success and prosperity. The individual store managers, for instance, are given considerable authority, and responsibility, for the operation of each location. There are approximately 2,200 employees, including 300 who are union members.

KMP has kept its manufacturing facilities up-to-date, and believes it is not unduly exposed to any EPA or similar contingencies.

-6-

KMH 001447

B. J. Brooks                    **CONFIDENTIAL**

KMH 001448

**DOCUMENT SUBMITTED UNDER SEAL**

B.J. BROOKS

**CONFIDENTIAL**

KMH 001449

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. Brooks

CONFIDENTIAL

KMH 001450

DOCUMENT SUBMITTED UNDER SEAL

B. J. BROOKS

**CONFIDENTIAL**

KMH 001451

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

CONFIDENTIAL

KMH 001452

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

**CONFIDENTIAL**

KMH 001453

**DOCUMENT SUBMITTED UNDER SEAL**

B. J. BROOKS

CONFIDENTIAL

KMH 001454

DOCUMENT SUBMITTED UNDER SEAL

B. J. Brooks

**CONFIDENTIAL**

KMH 001455

**DOCUMENT SUBMITTED UNDER SEAL**

B.J. BROOKS                    CONFIDENTIAL

KMH 001456

**DOCUMENT SUBMITTED UNDER SEAL**

B.J. BROOKS

CONFIDENTIAL

KMH 001457

DOCUMENT SUBMITTED UNDER SEAL

B. J. Brooks

CONFIDENTIAL

KMH 001458

DOCUMENT SUBMITTED UNDER SEAL

B. J. BROOKS

CONFIDENTIAL

KMH 001459

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001460

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

KMH 001461

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

KMH 001462

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001463

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

KMH 001464

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001465

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001466

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001467

DOCUMENT SUBMITTED UNDER SEAL

**CONFIDENTIAL**

KMH 001468

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001469

DOCUMENT SUBMITTED UNDER SEAL

**CONFIDENTIAL**

KMH 001470

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001471

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

KMH 001472

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

DOCUMENT SUBMITTED UNDER SEAL

KMH 001473

**CONFIDENTIAL**

KMH 001474

**DOCUMENT SUBMITTED UNDER SEAL**

B.J. BROOKS
114 Sansome Street, Suite 806
San Francisco, California 94104
(415) 362-9900
Fax: (415) 362-6492

<u>EXPERIENCE</u>

1975 to
Present

<u>Independent Financial Consultant</u> - San Francisco

Primary emphasis of consulting practice has been on the evaluation of the common stock and other securities of private companies for Employee Stock Ownership Trusts and Stock Bonus Plans, gift taxes, death taxes, mergers and acquisitions, issuance of stock options and restricted stock, litigation, marriage dissolution, partnership dissolution and other purposes. More than 900 written reports have been prepared for more than 250 individual clients.

Assignments have involved expert witness testimony at depositions and trial, as well as representation of clients before taxing authorities.

1972 to 1974

BAY EQUITIES, INC. - San Francisco
<u>President</u>

Managed Bay Equities, Inc., a private venture capital corporation owned by 16 pension fund clients of the Trust Department of the First National Bank of Chicago. BEI was founded to purchase BCIC's assets. At the end of 1974, BEI's $4 million portfolio consisted of investments in 12 technology-oriented companies.

Investigated, negotiated and completed new investments. Monitored and counseled individual investees, with particular emphasis on financial problems. Director of six investee companies.

1968 to 1972

BOOTHE COMPUTER INVESTMENT CORPORATION - San Francisco
<u>President</u>

Established and managed BCIC, a wholly-owned venture capital subsidiary of Boothe Computer Corp. Established policies and operating procedures; identified and analyzed appropriate investment opportunities; presented detailed recommendations; negotiated and completed investment transactions; monitored investee operations; terminated investment participations and administered all aspects of BCIC's operations. BCIC invested over $4-1/2 million in 14 companies during four years. Identified, evaluated and negotiated with prospective purchasers of BCIC resulting in the sale of BCIC's total portfolio to Bay Equities in 1972.

1961 to 1968

CONTINENTAL CAPITAL CORPORATION - San Francisco
<u>Vice President, Treasurer, Secretary</u>

Participated in all aspects of the management of Continental, a publicly-held Small Business Investment Company, as Continental's portfolio grew from less than $1 million to more than $10 million.

Corporate Valuations                                                                                   Financial Consulting

KMH 001475

B. J. BROOKS

Resume - pg. 2

| | | |
|---|---|---|
| 1957 to 1961 | **FIBREBOARD CORPORATION** - San Francisco<br>Manager, Market Planning | |

Coordinated information, ideas and interests of the various operating departments - marketing research, sales, production and finance - to develop significant and practical long-range facilities plans.

| 1955 to 1957 | **UNION CHEMICAL & MATERIAL CORPORATION** - Chicago<br>Financial Analyst |
|---|---|

Analyzed merger possibilities and performed other staff financial work.

| 1950 to 1953 | **UNION CARBIDE CORPORATION** - New York<br>Copywriter |
|---|---|

Wrote advertising copy for the Linde Air Products Division of Union Carbide.

EDUCATION

| 1953 to 1955 | Harvard University - M.B.A. in Business Administration,<br>Degree with Distinction |
|---|---|
| 1946 to 1950 | Yale University - B.S. in Economics,<br>Phi Beta Kappa |

DIRECTORSHIPS AND PROFESSIONAL ACTIVITIES

| Present | Senior Member: | American Society of Appraisers |
|---|---|---|
| | Director: | McGrath RentCorp<br>Fair, Isaac and Company, Incorporated<br>Lifetouch Inc. |
| Past | Trustee: | Continental Capital Liquidation Trust |
| | Instructor: | Golden Gate University<br>- Graduate level finance course |
| | Director: | California Tennis Club<br>ICOT Corporation<br>Information Magnetics Corporation<br>Metric Resources Corporation<br>Vector General, Inc. and other small companies |
| | President: | Western Association of SBICs (1964-65) |

MILITARY EXPERIENCE

| 1945 to 1946 | U.S. Navy |
|---|---|

KMH 001476

# EXHIBIT 2
# TO DILLER DECLARATION

# DUFF&PHELPS, LLC

2029 CENTURY PARK EAST, SUITE 820  ·  LOS ANGELES, CA 90067
210/284-8008 · FAX 310/284-8130

## K-M INDUSTRIES HOLDING CO., INC.
## CLASS I STOCK

### VALUATION AS OF

### JUNE 30, 1999

*The information contained herein is of a confidential nature and is intended for the exclusive use of the persons or firm to whom it is furnished by us. Reproduction, publication, or dissemination of portions hereof may not be made without prior approval of Duff & Phelps, LLC.*

**EXHIBIT**
_18_
Cazzolla   3-19-08

KMH 005817

# K-M INDUSTRIES HOLDING CO., INC.
## TABLE OF CONTENTS

I.      ENGAGEMENT OVERVIEW

II.     BUSINESS OVERVIEW AND RISK ANALYSIS

III.    ECONOMIC OVERVIEW

IV.     FINANCIAL OVERVIEW

V.      CCIC VALUATION
        COMPARABLE COMPANY ANALYSIS

VI.     KMI'S CLASSES P AND I TRACKING STOCK

VII.    DISCOUNT FOR LACK OF MARKETABILITY

VIII.   OVERVIEW ON TRACKING STOCK

IX.     VALUE CONCLUSION

KMH 005818

CONFIDENTIAL

DUFF & PHELPS, LLC

KMH 005819

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

- 2 -

DUFF & PHELPS, LLC

KMH 005820

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 005821

**DOCUMENT SUBMITTED UNDER SEAL**

## K-M INDUSTRIES HOLDING CO., INC.
### BUSINESS OVERVIEW & RISK ANALYSIS

| | |
|---|---|
| Employees | The Company has approximately 274 employees. Approximately 170 of these employees are located at the Company's headquarters in Monterey. |
| Claims | Whenever possible, the Company utilizes internal staff in claims operations. Each branch is staffed with a claims manager and at least one adjuster. To meet unusual demand requirements, however, independent adjusters are often utilized. The Company has also outsourced all legal counsel since in-house counsel was eliminated in July 1997. |
| Management | The Company and its subsidiaries are all under the same general management. There have been no recent changes in the Company's directors or senior management. Key managers and directors are listed below. |

| Manager | Title |
|---|---|
| William E. Moore | Chairman of the Board |
| Peter M. Cazzolla | President and CEO |
| Thomas H. Scherff | VP, Claims |
| Robert D. Winn | VP, Underwriting/Field Operations |
| Edward T. Mines | VP, Chief Financial Officer |

Directors

William E. Moore
Peter M. Cazzolla
Desiree B. Moore

| | |
|---|---|
| Property | As of the valuation date, the Company owned no real estate. CCIC's headquarter facility, located in Monterey California, is leased from the Kelly-Moore Paint Company. |

- 4 -

DUFF & PHELPS, LLC

KMH 005822

KMH 005823

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 005824

DOCUMENT SUBMITTED UNDER SEAL

## K-M INDUSTRIES HOLDING CO., INC.
### BUSINESS OVERVIEW & RISK ANALYSIS

*Industry consolidation*

The insurance industry is undergoing a period of rapid consolidation. Competitors are attempting to maintain or grow market share, and as a consequence, price competition has been particularly severe.

- 7 -

DUFF & PHELPS, LLC

KMH 005825

**DOCUMENT SUBMITTED UNDER SEAL**



# K-M INDUSTRIES HOLDING CO., INC.
## ECONOMIC OVERVIEW

*The purpose of this economic overview is to provide a review of the current condition of the national economy and the outlook for the year to come. The overview reflects the consensus forecast of the Blue Chip Economic Indicators panel (the "Consensus") and our examination of other pertinent economic analyses. As these sources are generally published midmonth, this overview reflects the economic outlook as of that time.*

### Overall Economic Growth

Numbers for the first quarter of 1999 surpassed analysts' expectations. Inflation-adjusted (real) GDP rose at an annual rate of 4.5%, more than a percentage point faster than Consensus forecasts. Surging domestic demand offset the drag from trade, wherein a sharp widening of the net export deficit subtracted 2.5 percentage points from overall growth. Personal consumption expenditures (PCE) expanded at a 6.7% real annual rate, faster than any quarter in 1998. While durable goods continued to do well, it was primarily home furniture, appliances and household equipment that provided the boost. As a percentage of total GDP, household expenditures rose to a near-record level of 73.2% in the first quarter of 1999. Retail sales grew at an impressive annual rate of nearly 15%.

Additionally, home buying produced a 15.6% annualized increase in residential investment, spending on information technology rose at a 21% annual rate, residential construction did well, rising at a 16% annual rate, and total gross private domestic investment rose at a 10% rate, its best quarterly gain since the first quarter of last year.

The Consensus forecast of 1999 real GDP growth rose 0.3 of a percentage point from last month to 3.8%, while that of nominal GDP growth rose an identical 0.3 of a point to 5.1%, which would exceed 1998's growth rate of 4.9%. Real GDP is now expected to grow at an annual rate of 3.0% in the second quarter of 1999, 2.8% in the third quarter and 3.0% in the fourth, all higher than last month's estimates. This would produce a fourth-quarter-over-fourth-quarter gain in real GDP of 3.3% in 1999 compared with 4.3% in 1998.

Consensus forecasts of economic activity in 2000 also registered increases this month. Analysts now estimate real GDP will grow 2.5% next year and nominal GDP will rise by 4.2%, increases of 0.2 of a percentage point and 0.1 of a point, respectively. The GDP price index is expected to increase 1.7% next year, 0.1 of a point less than a month ago.

The Consensus forecast of the real next export deficit rose sharply to $312.2 billion; it is expected to reach $-323.5 billion in 2000. As Asia and Latin America rebound, U.S. exports will grow and the trade gap will shrink.

DUFF & PHELPS, LLC

KMH 005826

## K-M Industries Holding Co., Inc.
### Economic Overview

*Consumption and Investment*

In addition to May's upward revisions in Consensus estimates of 1999 GDP growth, forecasts of growth this year also rose in real disposable personal income (from 3.3% to 3.6%), PCE (from 3.9% to 4.4%) and corporate profits (from 1.8% to 3.1%). The estimate of 1999 growth in nonresidential investment remained at 7.6%. The Consensus now puts total 1999 housing starts at 1.65 million, compared to 1.62 million last month. PCE and disposable personal income (DPI) are expected to grow 2.8% and 2.7%, respectively; both estimates are up 0.2 of a point from last month. The 1999 forecast of the Consumer Price Index (CPI) remained at 1.9%, but sharply rising gasoline prices threaten an upward revision of that estimate next month.

The Consensus currently believes tight labor markets, solid wage and salary growth, high levels of confidence and the wealth effects of the sharp rebound in stock prices since last fall likely preclude a sharp, sustained cutback in spending. The CPI estimate for 2000 remained at 2.3% for a fourth consecutive month.

*Inflation and Unemployment*

The unemployment rate is expected to average 4.3% in 1999, unchanged from last month's estimate, and 4.5% in 2000.

*Interest Rates*

The Fed made no change in interest rates or monetary policy at the May 18 meeting, after which the Fed funds rate was 4.75%, T-bills were trading at 4.50%, 10-year T-notes at 5.60%, and 30-year Treasury bonds at 5.85%. Analysts expect rates to remain close to current levels going forward, with the long bond in a range of 5.40% to 6.00%, the 10-year between 5.00% and 5.80%, and Fed funds at 4.75%. In the foreign exchange markets, the euro has slightly recovered from the weakness seen at the start of NATO's Yugoslavian campaign. A rate of $1.05 to $1.08 against the euro is expected through the end of the summer. The Japanese yen, recently near 120, could weaken to about 125 by late summer.

Sources:   *Blue Chip Economic Indicators*, April 10, 1999
          *Standard & Poor's Trends & Projections*, April 15, 1999

- 9 -

Duff & Phelps, llc

KMH 005827

KMH 005828

DOCUMENT SUBMITTED UNDER SEAL

KMH 005829

DOCUMENT SUBMITTED UNDER SEAL

KMH 005830

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 00!

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 005832

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 005833

KMH 005834

DOCUMENT SUBMITTED UNDER SEAL

## K-M INDUSTRIES HOLDING CO., INC.
### KMI'S CLASSES P AND I STOCK

The Articles of Incorporation of the Kelly-Moore Paint Company, Inc., a California Corporation, were amended and restated in September of 1998 to cause the following changes to the Articles of Incorporation:

- The Kelly-Moore Paint Company, Inc. was renamed K-M Industries Holding Co., Inc. ("KMI"). The paint operations of the Kelly-Moore Paint Company and CCIC became wholly-owned subsidiaries of KMI.

- The Company is authorized to issue 100 million shares of common stock, 80 million to be designated as "Class P Stock" and 20 million to be designated as "Class I Stock".

- Both Class P Stock and Class I Stock will be treated as Tracking Stock, where each class is intended to reflect operations of different subsidiaries of the parent company. The Class P Stock will track the performance of KMI's paint subsidiary (the Kelly-Moore Paint Company) and the Class I Stock will track the performance of KMI's insurance subsidiary (CCIC).

- Each class of stock is entitled to one vote per share in all matters to be voted upon by shareholders of KMI. Class I Stock and Class P Stock will vote together as one class in such matters.

- Restrictions on the sale or other transfer of 10% or greater of either company's stock require a 70% passing vote of Class P shareholders if the transfer or sale relates to the Paint subsidiary and a 70% passing vote by the Class I shareholders if such transfer or sale relates to KMI's insurance subsidiary.

- Each class of stock is to be further divided into two series of stock: a Series A stock and a Series B stock. Both series shall vote together as one class and are entitled to receive dividends as a whole.

- Dividends to shareholders of Class P Stock will be limited to the sum of: (1) all dividends received by KMI from KMI's paint subsidiary; (2) the proceeds received by KMI from the sale of any capital of the paint subsidiary; and (3) a pro rata amount (taking into account all classes of common stock in KMI and Class P Stock as a portion of that amount) x KMI's retained earnings and surplus available for distribution from sources other than (1) or (2).

- Dividends to shareholders of Class I Stock will be limited to the sum of (1) all dividends received by KMI from KMI's insurance subsidiary; (2) the proceeds received by KMI from the sale of any capital of the insurance subsidiary; and (3) a pro rata amount (taking into account all classes of common stock in KMI and Class I

DUFF & PHELPS, LLC

KMH 005835



K-M INDUSTRIES HOLDING CO., INC.
KMI'S CLASSES P AND I STOCK

Stock as a portion of that amount) x KMI's retained earnings and surplus available for distribution from sources other than (1) or (2).

- Shareholders of Class P-A Stock or Class I-A Stock have the option to convert, at any time, each share of Class P-A Stock or Class I-A Stock into one share of Class P-B Stock or Class I-B Stock, respectively. Each share of Class P-B Stock and Class I-B Stock will be automatically converted into one fully paid and nonassessable share of Class P-A Stock and Class I-A Stock, respectively, upon the effectiveness of a registration statement covering the first underwritten offer and sale of KMI's Common Stock.

- In the event of a liquidation, dissolution or winding up of KMI, whether involuntary or voluntary, Class P shareholders are entitled to the common stock of the paint subsidiary and Class I shareholders are entitled to the common stock of the insurance subsidiary. Each class of stock is also entitled to cash or other property equal to the amount of any accrued dividends, provided there is sufficient cash or other property to also repay all Class P Stock and Class I Stock accrued dividends.

  In the case where there are insufficient assets to repay all Class P Stock and Class I Stock accrued dividends, each class shall receive in lieu thereof the pro rata portion (based on the proportion which each class' accrued dividends bears to the total accrued dividends of both classes) of KMI's net assets.

  In the case where there are remaining net assets of KMI after payment of all accrued dividends, the remaining assets shall be distributed ratably to the holders of Class P Stock and Class I Stock on a share-for-share basis without distinction as to class shares.

In summary, KMI's Class P Stock and Class I Stock were developed to "track" solely the operations of KMI's paint subsidiary and KMI's insurance subsidiary, respectively. This capital structure is intended to provide holders with securities that would represent the value of either KMI's paint subsidiary or its insurance subsidiary, independent of one another.

DUFF & PHELPS, LLC

KMH 005836

## K-M INDUSTRIES HOLDING CO., INC.
### COMPARABLE PUBLIC COMPANY ANALYSIS

#### Overview of Methodology

Determine representative levels of revenue, earnings, etc.

- Representative of company's revenues or earnings generating capability going forward.

- Adjusted for unusual and nonrecurring items, if necessary.

- Completed on a minority interest basis.

Select market multiples to apply to representative levels

- Comparable public companies were used as a guide.

- Investment attributes of subject company were contrasted to the comparable companies.

Multiples of:

- Total revenue

- Net premiums earned

- Pretax income

- Earnings or net income

- Book value

- 19 -

DUFF & PHELPS, LLC

KMH 005837

KMH 005838

DOCUMENT SUBMITTED UNDER SEAL

## K-M INDUSTRIES HOLDING CO., INC.
## COMPARABLE PUBLIC COMPANY ANALYSIS

### Comparative Analysis

**Size**

With premiums earned of $121 million for the twelve months ended May 31, 1999 and total assets of $254 million at May 31, 1999, CCIC is smaller than most of the comparable companies (when taken as a single group) but is similar to the Tier 1 subset of companies. The Tier 1 companies have annual premiums earned ranging from $88 to $189 million and total assets ranging from $222 to $409 million.

**Growth**

Since 1998, CCIC has exhibited negative growth rates (in terms of premiums earned). Additionally, CCIC has lower growth rates than those exhibited by the comparable companies. While many of the comparable companies have grown through acquisitions, CCIC's growth has been entirely internally driven.

**Profitability**

CCIC's profitability has declined since 1997, due primarily to a highly competitive pricing environment. In comparison to the comparable companies, CCIC has recently been at the middle to higher end in terms of profitability margins exhibited.

**Returns**

CCIC's return on average assets has been at the higher end of the range of comparable companies. CCIC's return on invested capital, however, has been near the middle and lower end of the range of comparable companies.

**Leverage**

The Company exhibits generally similar levels of financial leverage relative to the comparable companies. With regards to operating leverage (in terms of net premiums earned to equity) the Company is at the lower end of the range.

**Risk**

CCIC is relatively small when compared to the comparable companies. Because of this, the Company is relatively more vulnerable to certain risks including: (i) the loss of a key manager, (ii) adverse regional political or economic developments, (iii) adverse regional weather events, and (iv) downward pricing pressure from larger competitors. While these risks are present at many companies, any one of the listed events has the potential to cause CCIC significant hardship. It is our opinion that the added risk

DUFF & PHELPS, LLC

KMH 005839



## K-M INDUSTRIES HOLDING CO., INC.
### COMPARABLE PUBLIC COMPANY ANALYSIS

involved with an investment in CCIC would warrant lower capitalization multiples for the Company.

**Future Growth**

Net premiums earned can be expected to grow at low single digit rates in the future. Profitability, however, is not expected to grow at the same pace as increasing pricing pressure from stiff competition in California can be expected to keep CCIC's margins relatively narrow. Although none are currently planned, an acquisition made by CCIC could result in more rapid growth in premiums and potentially improved profitability (through cost savings from the elimination of duplicative overhead) over what may be generated internally.

**Conclusion**

Based on the Company's historical growth and profitability, in light of its current risk profile and prospects for future growth, we believe that an investment in the Company offers slightly lower growth prospects and slightly higher risk than the comparable public companies.

- 22 -

DUFF & PHELPS, LLC

KMH 005840

KMH 005841

DOCUMENT SUBMITTED UNDER SEAL

KMH 005842

DOCUMENT SUBMITTED UNDER SEAL

## CALIFORNIA CAPITAL INSURANCE COMPANY
## ANALYSIS OF PUBLICLY TRADED COMPARABLE COMPANIES
## VALUATION MULTIPLES
### June 30, 1999

| | Prices as Multiple of Earnings Per Share(1) | | | | Capitalized Value as a Multiple of Pretax Income(1) | | | | Price as a Multiple of Book Value |
|---|---|---|---|---|---|---|---|---|---|
| | LTM | Projected Fiscal Year | 3-Year Average | LTM Relative to S&P 500 (%) | LTM | 3-Year Average | LTM Premium Earned | LTM Total Revenues | Book Value |
| **Tier 1** | | | | | | | | | |
| Donegal Group | 12.0x | 9.5x | 9.6x | 33.8 | 11.1x | 8.8x | 0.87x | 0.78x | 0.9x |
| Farm Family Holdings | 11.6 | 10.7 | 12.2 | 32.8 | 8.2 | 8.9 | 0.96 | 0.86 | 1.2 |
| Gainsco | DEF | 12.8 | 22.1 | NM | DEF | 23.5 | 1.5 | 1.34 | 1.2 |
| Meadows Group | 10.4 | 10.9 | 21.7 | 20.3 | 6.2 | 15.2 | 0.58 | 0.50 | 0.7 |
| Merklan Insurance Group | 11.7 | 16.8 | 14.9 | 33.0 | 9.1 | 13.2 | 0.70 | 0.61 | 2.0 |
| Penn-America Group | 11.8 | 12.4 | 14.0 | 33.3 | 7.8 | 8.4 | 1.05 | 0.94 | 1.0 |
| | | | | | | | | | |
| Range - High | 12.0 | 16.0 | 22.1 | 33.8 | 11.1 | 23.5 | 1.5 | 1.34 | 1.2 |
| Low | 10.4 | 9.5 | 9.6 | 20.3 | 6.2 | 8.4 | 0.58 | 0.50 | 0.7 |
| | | | | | | | | | |
| Mean | 11.5 | 12.2 | 15.1 | 32.4 | 8.5 | 13.3 | 0.95 | 0.84 | 1.0 |
| Median | 11.7 | 11.6 | 13.5 | 33.0 | 8.2 | 11.6 | 0.91 | 0.82 | 0.9 |
| | | | | | | | | | |
| **Tier 2** | | | | | | | | | |
| Commerce Group | 10.2x | 11.9x | 9.9x | 28.8 | 7.8x | 7.4x | 1.12x | 0.99x | 1.3x |
| Harleysville Group | 9.1 | 10.5 | 12.1 | 25.8 | 8.6 | 11.5 | 1.04 | 0.88 | 1.1 |
| Mercury General Corp. | 11.4 | 11.1 | 12.9 | 32.2 | 9.0 | 10.0 | 1.70 | 1.57 | 2.0 |
| Ohio Casualty Corp | 20.3 | 22.2 | 12.2 | 57.3 | 20.3 | 10.8 | 1.02 | 0.91 | 0.9 |
| Progressive Corp. | 24.7 | 23.6 | 27.9 | 69.7 | 18.3 | 20.7 | 2.27 | 2.14 | 3.9 |
| State Auto Financial Corp. | 15.7 | 12.6 | 6.8 | 44.4 | 11.2 | 13.4 | 1.55 | 1.55 | 1.6 |
| 20th Century Industries | 14.7 | 13.4 | 15.6 | 41.6 | 10.5 | 11.8 | 2.23 | 1.97 | 2.1 |
| | | | | | | | | | |
| Range - High | 24.7 | 23.6 | 27.9 | 69.7 | 20.3 | 20.7 | 2.27 | 2.14 | 3.9 |
| Low | 9.1 | 10.5 | 9.9 | 25.8 | 7.8 | 7.4 | 1.07 | 0.88 | (0.9) |
| | | | | | | | | | |
| Mean | 15.2 | 15.0 | 15.3 | 42.8 | 12.2 | 12.2 | 1.56 | 1.40 | 1.8 |
| Median | 14.7 | 12.6 | 12.9 | 41.6 | 10.5 | 11.5 | 1.55 | 1.37 | 1.6 |

S&P 500: 35.4
Dow Jones Industrial Avg: 26.7

(1) Special items have been excluded from all calculations.

Sources: Standard & Poor's Compustat Services, Inc., Bloomberg Financial and First Call Corporation.

- 25 -

DUFF & PHELPS, LLC

KMH 005843



CALIFORNIA INSURANCE GROUP
Comparable Public Companies - Tier 2
5-year Stock Price Performance

June 1994 = 100

- 29 -

DUFF & PHELPS, LLC

KMH 005847

CALIFORNIA INSURANCE GROUP
Comparable Public Companies vs. S&P 500
5-Year Stock Price Performance

- 30 -

DUFF & PHELPS, LLC

KMH 005848

KMH 005849

KMH 005850

DOCUMENT SUBMITTED UNDER SEAL

KMH 005851

DOCUMENT SUBMITTED UNDER SEAL

KMH 005852

DOCUMENT SUBMITTED UNDER SEAL

KMH 005853

DOCUMENT SUBMITTED UNDER SEAL

KMH 005854

DOCUMENT SUBMITTED UNDER SEAL

KMH 005855

DOCUMENT SUBMITTED UNDER SEAL

# CALIFORNIA CAPITAL INSURANCE COMPANY

## Analysis of Comparable Companies

### TIER I Group of Comparable Companies

| | Baldwin Group | Farm Family Holdings | Gainsco, Inc. | Meridian Insurance Group, Inc. | Merchants Group, Inc. | Penn-America Group |
|---|---|---|---|---|---|---|
| Ticker | BWINC | FFH | GNA | MIGI | AMGP | PNG |
| LTM Net Premiums Earned ($MM) | $373.0 | $183.0 | $79.0 | $99.0 | $53.0 | $79.0 |
| | $2.8 | $21.8 | ($1.2) | $14.2 | $4.7 | $4.7 |
| LTM Equity Value [q] ($MM) | $50.0 | $180.0 | $123.0 | $122.0 | $55.0 | $25.0 |
| Capitalized Value ($Mkt) | $100.0 | $190.0 | $113.0 | $113.0 | $55.0 | $35.0 |
| Type of Company | Property & casualty insurance provider | Farm casualty and life insurance provider | Underwriter of property and casualty insurance | Underwriter of property and casualty insurance | Insurance holding company offering property and casualty insurance | Underwriter of commercial property, general liability and non-standard automobile insurance |
| Services and Products | | | | | | |
| Target Market | | | | | | |
| **Capitalized Value as a multiple of:** | | | | | | |
| Net Premiums Earned | 0.5x | 1.0x | 1.5x | 1.7x | 0.6x | 1.4x |
| Total Revenues | 0.8x | 0.9x | 1.3x | 4.6x | 0.5x | 0.9x |
| Pre-Tax Income | 11.1x | 8.2x | def | 9.1x | 6.2x | 7.8x |
| **Price as a multiple of:** | | | | | | |
| Earnings | 13.1x | 11.0x | ncl | 11.7x | 10.9x | 11.8x |
| Projected Earnings | 9.5x | 10.7x | 17.0x | 14.6x | 10.7x | 12.4x |
| Book Value | 8.2x | 1.2x | 1.2x | 0.9x | 0.7x | 1.0x |

DUFF & PHELPS, LLC

KMH 005856

CALIFORNIA CAPITAL INSURANCE COMPANY

**Analysis of Comparable Companies**

**TIER 2 Group of Comparable Companies**

| | The Commerce Group, Inc. | Harleysville Group, Inc. | Mercury General Corporation | Ohio Casualty Corporation |
|---|---|---|---|---|
| Ticker | CGI | HGIC | MCY | OCAS |
| LTM Net Premiums Earned ($MM) | $762.0 | $672.0 | $1,139.0 | $1,731.0 |
| LTM Pre-Tax Income ($MM) | $109.1 | $81.4 | $215.1 | $0.1 |
| 6/03 Equity Mkt Cap ($MM) | $850.0 | $660.0 | $1,859.0 | $1,111.0 |
| Capitalized Value ($MM) | $953.0 | $593.0 | $1,721.0 | $1,200.0 |
| Type of Company | Parent of two property and casualty insurance subsidiaries. | Regional holding company for property and casualty insurance companies. | Insurance holding company whose subsidiaries operate primarily in California. | Property and casualty insurer, underwrites personal and commercial insurance and engages in insurance premium financing. |
| Services and Products | The company writes property and casualty insurance, including commercial automobile, homeowners, inland marine, fire, general liability and commercial umbrella insurance. | Personal auto insurance is the company's single biggest segment although total commercial business dominates personal lines. The company's commercial lines include automobile, workers' compensation and small business, commercial and casualty. The company also writes personal auto and homeowners insurance. | The company's subsidiaries write a full line of automobile coverage for all classifications of risk. The company also writes a small number of homeowners, insurance, mechanical breakdown insurance, commercial and dwelling fire insurance and commercial property insurance. Non-automobile lines of insurance accounted for 12% of premiums written in 1997. | The company underwrites most lines of property-casualty insurance including main segments (personal and commercial), homeowners, commercial multi-peril, workers' compensation, general liability, fidelity and surety insurance. |
| Target Market | The company is the leading provider of personal automobile insurance in Massachusetts. This company also writes insured automobile insurance in California and operates as a fronting company with Massachusetts and Connecticut. Though a new subsidiary the company also writes automobile and homeowners insurance in 20 states through 23 AAA automobile club offices. | The company's subsidiaries marketing territories are in the eastern and midwestern U.S. The company's product are marketed primarily in 31 states in the eastern and midwestern U.S. through approx. 3,000 independent insurance agencies. The company has regional offices in the areas of CA, IL, IN, MI, MA, MN, MN, NC, NY, OH, TN and VA. | The company's subsidiaries operate primarily in California, with a smaller amount of auto insurance written in the states of FL, IL, TX, GA, OK, KS and FL. The company sells its policies through more than 1,300 independent agents, with about 80% in California, and 650 in Oklahoma, Kansas and Texas. | The company is represented by more than 4,000 independent agents in 39 states. In 1997 the company's four largest markets were New Jersey, Ohio, Kentucky and Pennsylvania. |
| **Capitalized Value to a multiple of:** | | | | |
| Net Premiums Earned | 1.1x | 1.0x | 1.2x | 1.9x |
| Total Revenue | 1.0x | 0.9x | 1.5x | 1.5x |
| Pre-Tax Income | 9.6x | 8.6x | 9.4x | 20.3x |
| **Price to a multiple of:** | | | | |
| Earnings | 10.1x | 9.1x | 11.1x | 29.1x |
| Projected Earnings | 11.9x | 10.5x | 11.1x | 22.2x |
| Book Value | 1.3x | 1.1x | 2.0x | 0.9x |

Capitalized Value = Equity value plus debt, preferred stock, and minority interest, less cash and equivalents.

DUFF & PHELPS, LLC

KMH 005857

CALIFORNIA CAPITAL INSURANCE COMPANY
Analysis of Comparable Companies

| TIER 2 Group of Comparable Companies, Continued | | | |
|---|---|---|---|
| | The Progressive Corporation | State Auto Financial | 20th Century Industries |
| Ticker | PGR | STFC | TW |
| LTM Net Premiums Earned ($MM) | $5,129.0 | $510.0 | $1730.0 |
| LTM Pre-Tax Income ($MM) | $451.7 | $50.8 | $162.3 |
| GPM Equity Mkt Cap ($MM) | $10,156.0 | $530.0 | $1,631.0 |
| Capitalized Value ($MM) | $11,434.2 | $554.0 | $1,721.9 |
| Type of Company | Leading underwriter of nonstandard auto and other specialty personal lines coverages | Writer of property and casualty business in 26 states. | Insurance holding company with subsidiaries that market auto insurance. |
| Services and Products | The company's core business consists of nonstandard private passenger auto, recreational vehicle and small commercial vehicle insurance, primarily sold through independent agencies. The company also provides motorcycle and boat insurance, as well as credit related insurance to lending institutions. | The company offers personal and commercial property/casualty insurance, nonstandard auto/personal, commercial multi-peril, workers' compensation and fire insurance. | The company's subsidiary markets full-coverage private passenger auto insurance directly to consumers. Subsidiary also markets out-of-state personal and commercial liability insurance. |
| Target Markets | The company operates in 42 states, with Florida, Texas, New York and Ohio accounting for over 41% of the company's written premiums. | The company targets 26 states, primarily in the Midwest and eastern U.S., excluding New York, New Jersey and the New England states. | The company's market targets the California market and has expanded into Nevada, Oregon, Washington and Arizona in the past two years. |
| Capitalized Value as a multiple of: | | | |
| Net Premiums Earned | 2.2x | 1.6x | 2.2x |
| Total Revenue | 2.1x | 1.4x | 2.0x |
| Pre-Tax Income | 18.3x | 11.1x | 10.2x |
| Earnings | 24.7x | 11.2x | 14.2x |
| Projected Earnings | 23.9x | 13.5x | 13.4x |
| Book Value | 3.9x | 1.6x | 3.1x |

Capitalized Value = Equity market price plus debt, preferred stock, and minority interest, less cash and equivalents.

- 40 -

DUFF & PHELPS, LLC

KMH 005858



K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

The methods we have used to value the Company's common stock results in values representative of the price at which the stock would trade if there were an active, seasoned public market for the stock (the marketable minority interest value).  The comparative company method is based on the prices at which minority interest blocks of common stocks trade in the public equity markets.  The stocks we examined in applying this method have had public markets for considerable periods, are traded daily in significant volumes, and are seasoned by past trading and the fact that the operations, finances and conditions surrounding the companies which issued the stocks are regularly followed by a community of securities analysts and investors.

The Company's common stock has never traded in any public market nor is there any reasonable prospect of the stock being registered in the foreseeable future for trading in a public market.  Absent a price set in a public market; extensive, widely circulated information about a company; a following of security analysts and investors;  or the prospect of a sale of a company or an initial public offering of its stock in the near term, it is difficult to find parties interested and willing to buy a minority holding of stock in a closely-held company.  It would be extremely difficult under these circumstances to find a buyer willing to pay a price based on what the stock's value would be if it had an active, seasoned public market.  In recognition of the difficulties of selling a minority holding of stock in a closely-held company where all these circumstances prevail, a discount for lack of marketability is often applied in valuing such a stock interest.

There is no definitive body of generally available information on the prices at which trades of minority holdings of stocks in closely-held companies have occurred.  Even if such information were available, it would not provide a basis for calculating discounts for lack of marketability since there would be no public market prices to refer to on the closely-held stocks.  In the absence of actual data on discounts for lack of marketability for closely-held stock, valuation analysts have devised several models for estimating appropriate levels of such discounts.  These models fall into two general categories:  (1) stock sales prior to an initial public offering ("IPO"); and (2) the restricted stock model.  These models are presented in further detail on the following pages.

DUFF & PHELPS, LLC

KMH 005859



## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

#### Stock Sales Prior to an IPO

Analyzing stock sales prior to an IPO is method to estimate discounts for lack of marketability. This is done by examining the relationship between prices paid in private transactions for stocks in companies prior to initial public offerings with the prices at which the stocks were offered to the public. The following table summarizes the results of two of these studies.

| Study | Years Covered | Marketability Discounts | | |
|---|---|---|---|---|
| | | Range | Mean | Median |
| Emory (Baird Company) | 1980 - 1995 | (6%) to 94% | 44% | 43% |
| Willamette Mgmt. Assoc. | 1975 - 1993 | NA | 41% | 52% |

#### Emory Studies

John Emory of Robert W. Baird & Company has conducted a series of pre-IPO studies covering 206 IPOs from 1985 to 1995. The mean and median discounts for all transactions were 44% and 43%, respectively. The mean and median discounts were also fairly consistent across all periods studied.

Source:    Emory, John D., "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock," *Business Valuation News*, September 1985, pp. 21-4; Business Valuation Review, December 1992, Pp. 208-212; March 1994, pp. 3-7; and December 1995, pp. 155-60.

#### Willamette Study

Willamette Management Associates, Inc. has performed a series of pre-IPO studies covering 827 transactions, involving 432 companies, occurring between 1975 and 1993. The mean and median discounts found in this study were 41% and 52%, respectively.

Source:    Willamette Management Associates, Pre-IPO Studies, in Christopher Z. Mercer, *Quantifying Marketability Discounts*. Memphis, TN: Peabody Publishing, LP, 1997. PP 82-85.

- 42 -

DUFF & PHELPS, LLC

KMH 005860

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

Restricted Stock Model

The restricted stock model is based on the differences observed between the prices paid for restricted stock in private placements and the prices at which the unrestricted stock of the same companies were trading in public markets. The restricted stock involved in the private placements generally were unregistered "letter" stock which were not marketable except as provided under the Securities and Exchange Commission's Rule 144. Under this rule, the stocks were restricted from transfer to other owners (except in a subsequent private placement) for a period of at least two years. The restricted stock were identical in every way except marketability, to common stock traded on recognized public exchanges or in the over-the-counter market.

The differences in prices on the same dates observed between restricted and unrestricted common stock of the same companies can be attributed to the restricted stock's lack of immediate marketability, analogous in certain respects to the lack of marketability of stock of closely-held companies. The discounts observed in the prices of restricted stock reflect the fact that a holder of such securities may sustain losses or forgo profits because of the inability to sell them at a time of his own choosing. He is forced to hold the stock while the prices of the unrestricted stock fluctuate as a result of changes in the issuing companies' businesses or operations, in their financial conditions as the use of debt financing goes up or down, in the demand for the individual companies' stock or in general stock market conditions.

Numerous studies of the discounts attached to restricted stocks have been published and we have periodically conducted our own studies of such discounts. It should be noted that in most of the transactions analyzed in these studies, the buyer generally expected to be able to resell the stock in the public market in the foreseeable future. The following table summarizes the results of some of these studies.

| Study | Years Covered | Marketability Discounts | | |
| --- | --- | --- | --- | --- |
| | | Range | Mean | Median |
| SEC Institutional Investor | 1966 - 1969 | (15%) to 80% | 26% | 24% |
| Gelman | 1968 - 1970 | <15% to >40% | 33% | 33% |
| Moroney | 1968 - 1972 | (30%)to 90% | 36% | 33% |
| Maher | 1969 - 1973 | 3% to 76% | 35% | 33% |
| Trout | 1968 - 1972 | NA | 34% | NA |
| Standard Research Consultants | 1978 - 1982 | 7% to 91% | NA | 45% |
| Willamette Mgmt. Assoc. | 1981 - 1984 | NA | NA | 31% |
| Silber | 1981 - 1988 | (13%) to 84% | 34% | 35% |
| Management Planning | 1980 - 1995 | 0% to 58% | 28% | 29% |
| Duff & Phelps | 1992 - 1997 | (13%) to 90% | 24% | 18% |

DUFF & PHELPS, LLC

KMH 005861



## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

---

#### Securities and Exchange Commission Study

In 1971, the Securities and Exchange Commission published the Institutional Investor Study Report ("SEC Study") to serve as a basis for the Internal Revenue Service Revenue Ruling 77-287. Revenue Ruling 77-287 sets forth valuation guidelines to determine discounts for lack of marketability for securities restricted under Rule 144. The SEC Study empirically examined discounts in transactions involving securities that are restricted under Rule 144. Based on more than 300 transactions, the SEC Study found the following relationships:

| By Sales (in millions): | Average Discount Range |
|---|---|
| $ 100 ÷ | 10.1 - 20% |
| $ 20 - 100 | 10.1 - 20% |
| $ 5 - 20 | 30.1 - 40% |
| $ 1 - 5 | 30.1 - 40% |
| $ 0 - 1 | 40.1 - 50% |

| By Earnings (in millions): | |
|---|---|
| $ 10 ÷ | 10.1 - 20% |
| $ 1 - 10 | 10.1 - 20% |
| $ 0 - 1 | 20.1 - 30% |

| By Exchange: | |
|---|---|
| NYSE | 10.1 - 20% |
| ASE | 20.1 - 30% |
| OTC Reporting | 20.1 - 30% |
| OTC Non reporting | 30.1 - 40% |

Source:    "Discounts Involved in Purchases of Common Stock," in *Institutional Investor Study Report of the Securities and Exchange Commission*. Washington, D.C.: U.S. Government Printing Office, March 10, 1971. Vol. 5:2444-2456, Document No. 92-64, Part 5.

DUFF & PHELPS, LLC

KMH 005862

### Management Planning Study

Management Planning, Inc. ("Management Planning") has conducted an ongoing restricted stock study over a period of years that updates the SEC study. Management Planning analyzed all private placements which were reported from 1980 through 1995 which met the following criteria:

- The company selling stock in a private placement must have common stock, which is equal in all other respects except marketability to the registered stock that is publicly held and actively traded.

- Sufficient data on the private transaction must be readily available to enable analysis.

- Sufficient data on the private transaction must be readily available.

- The publicly-traded common stock counterpart must be selling at a price of at least $2.00 per share.

- The company must be a domestic corporation.

- The company must not have been characterized in public disclosure documents as being in a "developmental" stage.

Based on this criteria, 200 private transactions were identified and analyzed. Subsequent elimination of start-up companies with revenues less than $3 million, companies which had suffered a deficit in the fiscal year preceding the transaction and transactions that were known to have registration rights resulted in 49 transactions meeting the final criteria.

The average and median discounts for the group of issues analyzed were 28% and 29%, respectively, with a range of 0% to 58%.

Source:    Management Planning, Inc., "The Management Planning Study," in Christopher Z. Mercer, *Quantifying Marketability Discounts.* Memphis, TN: Peabody Publishing, LP, 1997. PP 345-70.

DUFF & PHELPS, LLC

KMH 005863

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

---

### Duff & Phelps Study

On June 30, 1997, Duff & Phelps completed a study involving private placements of Rule 144 stock by public companies which had essentially the same common stock publicly trading on an exchange or over the counter. The purpose of the study was to examine discounts associated with Rule 144 stock relative to the price of freely traded equivalent common stock.

Safe harbor provisions under Rule 144 allow for the resale of restricted securities and control securities without registration, subject to certain resale limitations. Restricted securities are securities acquired from the issuer or an affiliate of the issuer (controlling shareholders, certain directors, and officers) in a private transaction. Control securities are securities owned by affiliates of the issuer, whether acquired in the open market or in private transactions.

For affiliates of the issuer, the safe harbor provisions of Rule 144 restrict the sale of unregistered stock after a one year holding period as follows. The amount of stock sold in any three month period, together with any stock sold by such person within the preceding three months, cannot exceed the greater of: 1) one percent of the outstanding shares of the issuer; or 2) the average weekly trading volume for the four week period immediately preceding the proposed sale. The sale must be conducted in a brokerage transaction or through a market maker, and a notice on Form 144 must be filed with the SEC concurrently with the sale.

r non-affiliates of the issuer, the safe harbor provisions of Rule 144(k) allow the sale of unregistered stock after a two-year holding period without being subject to any of the other Rule 144 requirements.

Duff & Phelps used the Securities Data Corporation database to identify private placement issues of Rule 144 stock by public companies which have identical freely traded securities. The study analyzed 62 private placements between January 1992 to June 1997.

The average and median discounts for the group of issues analyzed were 24% and 18%, respectively, with a range of -13% (a premium) to 90%.

- 46 -          DUFF & PHELPS, LLC

KMH 005864

K-M Industries Holding Co., Inc.
DISCOUNT FOR LACK OF MARKETABILITY

Other Studies

Gelman Study

Gelman analyzed the prices paid for restricted securities by four closed-end investment companies founded in 1968 and specializing in restricted securities. In total, Gelman used public disclosure documents of the issuing companies to analyze 39 transactions which occurred between 1968 and 1970. Gelman found that the average discount was 33% and that nearly 60% of the transactions reflected discounts of 30% or more.

Source:    Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company." *Journal of Taxation*, June 1972, pp. 353-4.

Moroney Study

Moroney analyzed 146 purchases of restricted equity securities (common stocks, convertible preferred stocks, convertible debt securities, warrants) by ten registered investment companies. Moroney found mean and median discounts of 36% and 33%, respectively. Additionally, in 55% of the transactions, the discounts were 30% or greater.

In comparing these discounts to those of a minority interest in a closely held corporation, Moroney offers the following reasons for even higher discounts in the later:

> "...in the late 1960 and early 1970s, many buyers of restricted securities felt confident they would be able to market them to the public in two or three years either by registration and public sale as a block, or by feeding them slowly into the market without registration. By contrast, most hypothetical buyers of most minority interests in closely held companies involved in tax cases haven't the foggiest idea as to when or how they will be able to sell... Literally, in many instances the buyer must prepare himself to hold the stock for an indeterminable period of time, maybe for as long as a generation."

> "Before a registered investment company buys restricted securities, the investment company's staff and investment committee have rated the investment a good risk and promising... On the other hand, a considerable number of companies whose stocks must be valued for tax purposes are palpably without promise."

Source:    Moroney, Robert E., "Most Courts Overvalue Closely Held Stocks." *Taxes*, March 1973, pp. 144-55.

- 47 -

DUFF & PHELPS, LLC

KMH 005865

K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

### Maher Study

Maher analyzed 34 purchases of restricted common stock by four mutual funds between 1969 and 1973. Maher found that the mean discount for lack of marketability was 35%. After eliminating the top 10% and bottom 10% of purchases in an effort to remove especially high and low risk situations, the mean discount was unchanged at 35%. Maher further noted that the discount for lack of marketability even exceeded the cost of making the stock marketable via a public offering. This was potentially due to several factors: "...by committing funds to restricted common stock, the willing buyer (a) would be denied the opportunity to take advantage of other investments, and (b) would continue to have his investment at the risk of the business until the shares could be offered to the public or another buyer is found."

Source:    Maher, J. Michael, "Discounts for Lack of Marketability for Closely-Held Business Interests." *Taxes*, September 1976, pp. 562-71.

### Trout Study

Trout analyzed the prices paid for restricted securities by six investment companies between 1968 and 1972. Utilizing data from 60 transactions with an average discount of 33%, Trout constructed economic models to estimate the discount that should be accorded a transfer of restricted securities. The variables and assumptions included in the models are described below.

- Exchange listing* - major exchange listing was associated with lower discounts
- Number of shares outstanding - a large number of shares outstanding was associated with lower discounts
- Shares purchased as % of share outstanding - control effects were associated with lower discounts while blockage effects were associated with higher discounts
- Purchases of less than 1%* - small purchases were associated with lower discounts
- Value of purchase - larger purchases were associated with higher discounts

  * Indicator variable

While the models accounted for approximately 24% of the variation in discounts observed in the subject transactions, much of the variation remained unexplained due to the nature of the purchase agreements, differences in relative bargaining power and the lack of an auction market for restricted securities. Thus, other relevant information, if any, should be used to adjust the results derived from applying these models.

Source:    Trout, Robert R., "Estimation of the Discount Associated with the Transfer of Restricted Securities." *Taxes*, June 1977, pp. 381-5.

DUFF & PHELPS, LLC

KMH 005866

## K-M INDUSTRIES HOLDING CO., INC.
### DISCOUNT FOR LACK OF MARKETABILITY

### Standard Research Consultants Study

In an update to the SEC Study, Standard Research Consultants analyzed 28 private placements of restricted common stock from October 1978 through June 1982. The discounts ranged from 7% to 91% with median discount of 45%. This study found support for higher discounts for smaller companies as well as for inconsistently profitable companies.

Source:   Pittock, William F. and Stryker, Charles H., "Revenue Ruling 77-287 Revisited." *SRC Quarterly Reports*, Spring 1983, pp. 1-3.

### Willamette Study

Willamette Management Associates, Inc. performed an analysis of 33 restricted stock transactions occurring between January 1981 and May 1984. The median discount found in this study was 31%.

Source:   Willamette Management Associates, Private Placements of Restricted Stocks, January 1981 through May 1984, in Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Third Edition, Chicago, IL: Irwin Professional Publishing, 1996.

### Silber Study

Silber reviewed 310 private placements of common stock of publicly traded companies between 1981 and 1988. After eliminating issues that had warrants or other special provisions, 69 private placements were analyzed. The average discount for the 69 transactions was 33.75% and the range was a premium of 12.7% to a discount of 84%. Dividing the sample at the median discount of 35%, Silber found that firms with lower revenues, earnings and market capitalizations were associated with higher discounts. The results of the study are presented below:

| Discount Number of companies | >35% 34 | <35% 35 | All 69 |
|---|---|---|---|
| Percentage discount | 53.9% | 14.1% | 33.75% |
| Revenues | $13.9 | $65.4 | $40.0 |
| Earnings | ($1.4) | $3.2 | $0.9 |
| Market Capitalization | $33.8 | $74.6 | $53.0 |
| Dollar size of issue | $2.7 | $5.8 | $4.3 |
| Restricted share / total shares | 16.3% | 10.9% | 13.6% |

Source:   Silber, William L. "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices." *Financial Analysts Journal*, July-August 1991, pp. 60-4.

DUFF & PHELPS, LLC

KMH 005867

K-M INDUSTRIES HOLDING CO., INC.
DISCOUNT FOR LACK OF MARKETABILITY

Summary of Factors Affecting the Discount for Lack of Marketability

| Factor | Effect on Discount for Lack of Marketability | |
|---|---|---|
| | Higher | Lower |
| Public markets | No foreseeable public offering | Imminent public offering |
| Other markets | No other markets | Limited market (e.g. ESOP) |
| Sale of the company | No foreseeable sale of company | Imminent sale of company |
| Dividend Policy | No foreseeable dividends | Imminent large dividends |
| Transfer restrictions | Significant transfer restrictions | No transfer restrictions |
| Pricing information | No trading activity | Recent trading activity |
| Options | Not applicable | Put option |
| Financial status | Small, weak and volatile | Large, strong and stable |
| Industry status | Unattractive for investment purposes | Attractive for investment purposes |
| Management | Weak management | Strong management |
| Other | Size of block (depends on size and circumstances) Buy-sell agreement (depends on provisions) | |

DUFF & PHELPS, LLC

KMH 005868

## K-M INDUSTRIES HOLDING CO., INC.
### OVERVIEW ON TRACKING STOCK

Tracking stocks are being developed with greater frequency as companies seek a method of allowing investors to focus on the performance of a subsidiary or division that operates in a specific industry. Typically, a company will issue a tracking stock out of concern that the investment markets will undervalue an entire company because the markets do not understand how to allocate value to one or more of a company's major businesses.

Many believe that tracking stocks "unlock the value" of a company's divisions without the need for a spin-off or Initial Public Offering ("IPO") of that division. There are, however, several factors which must be considered in the valuation of tracking stock. These include, but are not limited to, the following:

1) The ownership interest represented by the tracking stock issue, relative to the Company's non-tracking common stock;

2) Who the shareholders of the tracking stock will be, and their relative interest in the class of tracking stock;

3) The industry in which the company being "tracked" by the stock operates in;

4) The relative voting rights of the classes of tracking stock; and

5) Tracking stocks are more likely to trade at a discount to their comparable, peer, non-tracking stock issues due to:

   - Lack of specific voting rights related to the targeted group or operation
   - Difficulty in achieving acquisition premiums in valuation
   - Potential double taxation on the sale of a targeted group
   - Ability of parent to unwind the tracking stock at predetermined formula which may not fully reflect current value
   - Market focus on product instead of underlying investment themes
   - Notwithstanding the allocation of assets and liabilities and shareholders' equity among targeted groups, holders of one group's tracking stock will be subject to all of the risks associated with the others
   - Potential divergence of interests between targeted groups and the issues that could arise in resolving such conflicts

DUFF & PHELPS, LLC

KMH 005869

KMH 005870

DOCUMENT SUBMITTED UNDER SEAL

# EXHIBIT 3
# TO DILLER DECLARATION

Presentation to North Star Trust Company
As Trustee of the
K-M Industries Holding Company, Inc.
Employee Stock Ownership Plan
As of December 31, 2006

Report Date:
May 17, 2007



SRR
STOUT|RISIUS|ROSS

SRR10770

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10771

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10772

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10773

DOCUMENT SUBMITTED UNDER SEAL

SRR10774

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10775

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10776

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10777

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10778

DOCUMENT SUBMITTED UNDER SEAL

SRR10779

DOCUMENT SUBMITTED UNDER SEAL

SRR10780

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10781

DOCUMENT SUBMITTED UNDER SEAL

SRR10782

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10783

DOCUMENT SUBMITTED UNDER SEAL

SRR10784

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10785

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10786

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10787

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10788

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10789

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10790

DOCUMENT SUBMITTED UNDER SEAL

SRR10791

DOCUMENT SUBMITTED UNDER SEAL

SRR10792

DOCUMENT SUBMITTED UNDER SEAL

SRR10793

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10794

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10796

DOCUMENT SUBMITTED UNDER SEAL

SRR10797

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10799

**Document Submitted Under Seal**

SRR10800

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10801

DOCUMENT SUBMITTED UNDER SEAL

SRR10802

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10803

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10894

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10805

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10806

DOCUMENT SUBMITTED UNDER SEAL

SRR10807

**DOCUMENT SUBMITTED UNDER SEAL**

DOCUMENT SUBMITTED UNDER SEAL

SRR10809

DOCUMENT SUBMITTED UNDER SEAL

SRR10810

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10812

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10813

DOCUMENT SUBMITTED UNDER SEAL

SRR10814

DOCUMENT SUBMITTED UNDER SEAL

SRR10815

DOCUMENT SUBMITTED UNDER SEAL

SRR10816

DOCUMENT SUBMITTED UNDER SEAL

SRR10817

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

DOCUMENT SUBMITTED UNDER SEAL

SRR10820

DOCUMENT SUBMITTED UNDER SEAL

SRR10821

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10822

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10823

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10824

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10825

DOCUMENT SUBMITTED UNDER SEAL

SRR10826

DOCUMENT SUBMITTED UNDER SEAL

SRR10827

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10828

DOCUMENT SUBMITTED UNDER SEAL

SRR10829

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10830

DOCUMENT SUBMITTED UNDER SEAL

SRR10831

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10833

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10834

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10835

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10836

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10837

DOCUMENT SUBMITTED UNDER SEAL

SRR10838

DOCUMENT SUBMITTED UNDER SEAL

SRR10839

DOCUMENT SUBMITTED UNDER SEAL

SRR10840

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10841

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10842

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10843

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10844

DOCUMENT SUBMITTED UNDER SEAL

SRR10845

DOCUMENT SUBMITTED UNDER SEAL

SRR10846

DOCUMENT SUBMITTED UNDER SEAL

SRR10847

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10848

DOCUMENT SUBMITTED UNDER SEAL

SRR10849

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10850

DOCUMENT SUBMITTED UNDER SEAL

SRR10851

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10853

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10854

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10855

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10858

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10859

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10862

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10863

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10864

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10865

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10866

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10867

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10868

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10870

DOCUMENT SUBMITTED UNDER SEAL

SRR10871

DOCUMENT SUBMITTED UNDER SEAL

SRR10872

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10873

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10374

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10875

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10876

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10877

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10878

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10879

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10880

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10881

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10882

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10883

DOCUMENT SUBMITTED UNDER SEAL

SRR10884

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10885

DOCUMENT SUBMITTED UNDER SEAL

SRR10886

DOCUMENT SUBMITTED UNDER SEAL

SRR10887

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10889

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10890

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10892

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10693

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10894

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10896

SRR10897

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10898

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10899

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10900

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10901

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10902

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10904

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10905

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10906

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10907

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10908

DOCUMENT SUBMITTED UNDER SEAL

SRR10909

DOCUMENT SUBMITTED UNDER SEAL

SRR10910

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

DOCUMENT SUBMITTED UNDER SEAL

SRR10913

DOCUMENT SUBMITTED UNDER SEAL

SRR10914

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10915

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10916

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10918

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10920

**DOCUMENT SUBMITTED UNDER SEAL**

SER10921

DOCUMENT SUBMITTED UNDER SEAL

SRR10922

**DOCUMENT SUBMITTED UNDER SEAL**

SPR10923

DOCUMENT SUBMITTED UNDER SEAL

SRR10924

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10925

DOCUMENT SUBMITTED UNDER SEAL

SRR10926

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10927

DOCUMENT SUBMITTED UNDER SEAL

SRR10928

DOCUMENT SUBMITTED UNDER SEAL

SRR10929

DOCUMENT SUBMITTED UNDER SEAL

SRR10930

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10932

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10934

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10935

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10936

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10228

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10939

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10940

DOCUMENT SUBMITTED UNDER SEAL

SRR10941

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10942

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SER10945

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10946

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10948

DOCUMENT SUBMITTED UNDER SEAL

SRR10949

SPR10950

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10951

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10952

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10954

**DOCUMENT SUBMITTED UNDER SEAL**

SFR10955

DOCUMENT SUBMITTED UNDER SEAL

DOCUMENT SUBMITTED UNDER SEAL

SRR10957

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10958

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10959

DOCUMENT SUBMITTED UNDER SEAL

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10961

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10962

**DOCUMENT SUBMITTED UNDER SEAL**

SRR1?? 63

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10964

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10965

**DOCUMENT SUBMITTED UNDER SEAL**

SRR10966

# Robert S. Socol

Robert S. Socol is a Managing Director in the *Valuation & Litigation Advisory Services Group* at *Stout Risius Ross, Inc.* His concentration is in ESOP and ERISA Advisory Services. Mr. Socol has worked on over 250 ESOP transactions of all sizes, from small private companies to major public corporations. He has performed engagements for the valuation of ESOP securities, the valuation of business entities and the valuation of business and security interests. Additionally, Mr. Socol has performed analyses in a broad range of industries for numerous purposes, including transaction opinions, mergers and acquisitions, financing leveraged buyouts, corporate planning, business valuations litigation support and financial restructuring. He also has extensive experience in equity allocation issues, complex deal structuring, deal negotiation and design of innovative securities.

Mr. Socol is a nationally recognized expert in the arena of ESOPs and has extensive experience in multi-investor employee stock ownership plan leveraged buyouts. He has been involved in many of the earliest and most complex ESOP transactions completed or attempted, including Aramark Corporation, Appleton, Dan River, Dentsply International Inc., Ferrell Companies, Inc., HT Research Institute, The Parsons Corporation, Raymond International Inc., STV Group, Inc., United States Sugar Corporation and US Investigations Services, Inc.

Prior to joining *Stout Risius Ross, Inc.*, Mr. Socol was a principal and director of Employee Benefits with a national valuation firm specializing in the valuation of closely held companies. Prior to that, he was a Managing Director with Houlihan, Lokey, Howard & Zukin, Inc., where he provided valuation and financial advisory services for a variety of purposes including ESOPs, corporate planning, mergers and acquisitions, recapitalizations and leveraged buyouts.

Mr. Socol earned an MBA in Finance and Accounting from the University of Chicago and a BA in Finance from the University of Illinois. Additionally, he is the chairman of the Valuation Advisory Committee of The ESOP Association and is on the advisory board of the Employee-Owned S Corporations of America.

SRR10967

# Andrew S. Ward

Andrew S. Ward is a Director in the *Valuation & Litigation Advisory Services Group* at *Stout Risius Ross, Inc.* His concentration is in ESOP and ERISA Advisory Services. Mr. Ward has over ten years of experience in performing valuations and financial advisory services for a variety of purposes, including ESOP transactions and annual ESOP updates, fairness opinions, solvency opinions, merger and acquisitions, gift and estate taxation, post-acquisition purchase price allocation, dissenting shareholder disputes, marital dissolutions, corporate dissolutions litigation support, and appraisal review.

Mr. Ward has significant experience in performing analyses for a broad array of industries, including, but not limited to, advertising, manufacturing, agriculture, aircraft conversion, apparel, bakery, banking, biomedical engineering, bookbinding, chemical manufacturing, coal mining, commodities, communications, computers consulting, consumer goods, engineering, food and beverage distribution, forest products, freight forwarding, government contracting, healthcare services, information system services, insurance, investigative services, investment companies and partnerships, investment holding companies, plastics, printing and publishing, and professional sports.

Prior to joining *Stout Risius Ross, Inc.*, Mr. Ward was a senior associate with a national valuation firm and a consultant in the specialty consulting division of a Big 4 international accounting and consulting firm. In these roles, Mr. Ward performed, supervised, and executed numerous valuation, financial advisory, and litigation consulting engagements.

Mr. Ward earned a BA with a concentration in Economics and Management from DePauw University and was a Management Fellow in the McDermond Center for Management and Entrepreneurship. Mr. Ward is a candidate of the American Society of Appraisers (ASA) in business valuation. Mr. Ward is also a member of the ESOP Association and its Valuation Advisory Committee, the National Center for Employee Ownership, and the Business Valuation Association of Chicago. Mr. Ward frequently speaks at professional conferences and seminars and authors articles on valuation and ESOP related topics.

# Scott D. Levine, CPA / ABV, CFA, ASA

Scott D. Levine is a Managing Director in the Valuation & Litigation Advisory Services Group at *Stout Risius Ross, Inc.* His concentration is in ESOP and ERISA Advisory Services. Over the last ten years, he has had extensive experience in the valuation of business interests in both private and public corporations. Mr. Levine has performed valuation analyses in a broad range of industries and for numerous purposes including fairness and solvency opinions, estate and gift taxation, shareholder disputes, purchase price allocation, mergers and acquisitions, marital dissolutions and liability and damages analysis. He has a particular expertise in the valuation of business ownership interests in employee stock ownership plan (ESOP) related analyses, including ESOP security formation, transaction analysis, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. Levine has served are biotechnology, computer services, construction, engineering, entertainment, financial services, government contracting, health care, manufacturing, medical practices, telecommunications and wholesale distribution.

Mr. Levine has presented on many different topics in the field of business valuation to the following organizations: the American Society of Appraisers; the National Center for Employee Ownership; the ESOP Association; and the Association for Corporate Growth. He has also authored many articles related to the valuation of closely held companies. In addition, Mr. Levine has testified as an expert witness in state courts, arbitration and deposition.

Prior to joining *Stout Risius Ross, Inc.*, Mr. Levine was a principal with a national valuation firm specializing in the valuation of closely held companies. During his tenure, he was responsible for business development and management of business valuation assignments as well as hiring and supervising staff. Prior to that, Mr. Levine was a CPA with Price Waterhouse in their audit group and was responsible for conducting audits for both privately held and publicly traded companies.

Mr. Levine earned an MBA with a concentration in Finance from George Washington University. He also graduated cum laude from Boston University's School of Management with a concentration in Accounting. Mr. Levine is a certified public accountant licensed in the state of Maryland, and a member of the American Institute of Certified Public Accountants holding the ABV designation (accredited in business valuation). He has also earned the right to use the Chartered Financial Analyst designation. Mr. Levine is an Accredited Senior Appraiser of the American Society of Appraisers, certified in business valuation. Mr. Levine is a member of the CFA Institute, the American Institute of Certified Public Accountants and the ESOP Association. He is also a member of the Finance Committee of the ESOP Association.

**EXHIBITS 4-13
TO DILLER DECLARATION**

# EXHIBIT 4
# TO DILLER DECLARATION



## KELLY-MOORE PAINT COMPANY, INC.

### ESOP LOAN AGREEMENT

THIS AGREEMENT (hereinafter referred to as the "Loan Agreement" or "Agreement"), entered into on this thirteenth day of October, 1998, by and between Kelly-Moore Paint Company, Inc., a California corporation (hereinafter referred to as the "Company") and William E. Moore, as trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as "Trustee" or "Borrower"),

### WITNESSETH:

WHEREAS, the William E. a_d Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder") owns all of the issued and outstanding shares of K-M Industries Holding Co., Inc., a California corporation (the "Parent"); and

WHEREAS, the Selling Shareholder desires to sell Thirty-three Million Seven Hundred Forty-five Four Hundred Fifty-five (33,745,455) shares of the Parent's Class P-B Stock (hereinafter referred to as the "Shares") to the Trustee; and

WHEREAS, Trustee desires to purchase the Shares from the Seller pursuant to that certain Stock Purchase Agreement between the Seller and the Trustee for the benefit of the participants in the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan (hereinafter referred to as the "ESOP"); and

WHEREAS, the Company is willing to make a loan to the Trustee to enable the Trustee to purchase the Shares for cash;

NOW THEREFORE, in consideration of the mutual covenants, representations, warranties and recitations contained herein, the parties hereto agree as follows:

1.    The Loan. The Company shall loan to the Trustee and the Trustee shall borrow from the Company the sum of Two Hundred Thirty-two Million and 00/100 Dollars

1

EXHIBIT

5

Stritmatter    3-12-08

KMH 006992

($232,000,000.00) to fund the purchase of a portion of the Shares from the Seller for the benefit of the participants in the ESOP.

2.    Promissory Note.  The indebtedness of the Trustee to the Company shall be evidenced by a promissory note dated of even date herewith, attached hereto and incorporated herein by reference (hereinafter "Promissory Note" or "Note"), the terms of which shall provide for repayment as described therein.

3.    Pledge Agreement.  To secure payment of the Note, Trustee shall grant to the Company a security interest in and agrees to pledge the Shares pursuant to the terms of a Pledge Agreement of even date herewith, attached hereto and incorporated herein by reference (hereinafter the "Pledge Agreement").

4.    Interest.  Interest on the unpaid principal balance of the loan shall accrue at a rate in accordance with the terms of the Note.

5.    Principal Payments.  All payments of principal shall be made in accordance with the terms of the Note.

6.    Representation and Warranties by Trustee.  In order to induce the Company to make the loan herein provided for, Trustee hereby represents and warrants as follows:

(a)    The Plan is an employee retirement trust duly organized and validly existing under the laws of the State of California and is an employee stock ownership plan which meets the requirements of Section 4975(e)(7) of the Internal Revenue Code and Section 54.4975-11 of the Income Tax Regulations.

(b)    The Trustee (i) has the power, authority and legal right to enter into and perform this Agreement and has taken all necessary action to authorize the borrowings on the terms and conditions specified herein and to authorize the execution, delivery and performance of this Agreement and the Note, (ii) is the duly appointed trustee of the Plan and is authorized, on behalf of the Plan, to execute, deliver and perform this Agreement and the Note, and (iii) has the power, authority and legal right to administer the Plan for the benefit of its participants.

(c)    The execution, delivery and performance of this Loan Agreement and the Note does not and will not conflict with any law, regulation, rule, order of any court or governmental agency or the documents pursuant to which the Plan was established, by which it is governed or to which it is subject.  This Loan Agreement and the Note constitute or will constitute legal, valid and binding obligations of the Plan enforceable against the Plan in accordance with their respective terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws affecting the enforcement of creditors rights generally.

2

KMH 006993

(d)    The loan contemplated hereunder will qualify for the prohibited transaction exemption under Section 4975(d)(3) of the Internal Revenue Code and as an "exempt loan" as defined in Section 54.4975-7(b) of the Income Tax Regulations. The purchase price to be paid by Trustee for the Shares will not be in excess of "adequate consideration" as defined in Section 3(18) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Said loan, the purchase of the Shares and the entire transaction contemplated hereby will not constitute a prohibited transaction as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA.

(e)    All of the proceeds of the loan will be used by Trustee to purchase shares of "employer securities" as defined in Section 409(l) of the Internal Revenue Code.

7.    General Provisions.

(a)    This Loan Agreement contemplates the entire agreement between the parties pertaining to the subject matter herein and supersedes all prior agreements, representations and understandings of the parties, either oral or written. No supplement, modification or amending of this Loan Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Loan Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding, unless executed in writing by the party making the waiver.

(b)    This Loan Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument. .

(c)    This Loan Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, successors and assigns.

(d)    If any action or proceeding is commenced to enforce any of the provisions or rights under this Loan Agreement, the prevailing party shall be entitled to recover all of its costs, expenses and reasonable attorneys' fees incurred therein, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.

(e)    All notices, offers, acceptances, waivers and other acts under this Loan Agreement shall be in writing and shall be sufficiently given if either delivered in person or mailed by certified or registered mail, postage prepaid, to the parties at such addresses as each of them, by notice to the other, may designate from time to time. Any written document will be deemed delivered either on the day of delivery in person or two (2) days after the mailing of such document.

3

KMH 006994

(f)    The laws of the State of California shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

IN WITNESS WHEREOF, the parties have executed this Loan Agreement effective as of the date first above written.

KELLY-MOORE PAINT COMPANY, INC.

By: _____
Joseph P. Cristiano, President

By: _____
Stephen A. Ferrari, Secretary

KELLY-MOORE PAINT COMPANY, INC.
EMPLOYEE STOCK OWNERSHIP TRUST

_____
William E. Moore, Trustee

4

KMH 006995



(f)   The laws of the State of California shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

IN WITNESS WHEREOF, the parties have executed this Loan Agreement effective as of the date first above written.

KELLY-MOORE PAINT COMPANY, INC.

By: _____
    Joseph P. Cristiano, President


By: _____
    Stephen A. Ferrati, Secretary


KELLY-MOORE PAINT COMPANY, INC.
EMPLOYEE STOCK OWNERSHIP TRUST


_____
William E. Moore, Trustee

4

KMH 006996

ESOP PROMISSORY NOTE

**CONFIDENTIAL**

$232,000,000

October 13, 1998

FOR VALUE RECEIVED, the undersigned (the "Borrower") promises to pay to the order of Kelly-Moore Paint Company, Inc. (the "Company") or order, the principal sum of Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00) together with interest on the unpaid principal balance at a rate equal to six and one-half percent (6½%) per annum. Interest shall be computed at the above rate on the basis of the actual number of days during which the principal hereunder is outstanding, divided by Three Hundred Sixty-Five (365), which shall, for the purposes of this Note, be one (1) year.

This loan shall be repaid in fifty-seven (57) quarterly payments which include principal and interest. The first payment shall be in the amount of Twenty-three Million Two Hundred Thirty-six Thousand Six Hundred Forty-eight and 46/100 Dollars ($23,236,648.46) and shall be due on December 31, 1998. The remaining balance shall be payable in equal quarterly installments of principal and interest in the amount of Five Million Eight Hundred Nine Thousand One Hundred Sixty-two and 11/100 Dollars ($5,809,162.11) per quarter, each installment due on the last day of the quarter, beginning December 31, 1998, and continuing thereafter until December 31, 2012 at which point all remaining principal and accrued but unpaid interest shall be due and payable.

Borrower may prepay any part or all of any of the installments payable hereunder without premium or penalty. In the event of prepayment, the prepayment shall be applied on the principal payments of latest maturity.

In the event of default in the payment of one or more of the installments provided for under the terms of this Note, the value of the Borrower's assets to which the Company may have recourse shall be limited to the amount then in default as determined by the amount by which

1

KMH 006997



Borrower failed to pay the installments required by this Note. The Company shall not have the right to accelerate the due date of any installment hereunder.

In the event of commencement of suit to enforce payment of this Note, the Borrower agrees to pay such attorneys' fees and costs of collection as the court may adjudge reasonable.

No delay or omission on the part of the holder hereof or of the Borrower in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

This Note is issued pursuant to the ESOP Loan Agreement, of even date herewith, between the Company and Borrower, to fund the purchase of Thirty-three Million Seven Hundred Forty-five Four Hundred Fifty-five (33,745,455) shares of the Class P-B Stock of K-M Industries Holding Co., Inc., a California corporation (the "Parent") (the "Shares"), to which reference is made for a statement of the terms and conditions under which this Note is issued. This Note is secured by a security interest in, and pledge of the Shares pursuant to a Pledge Agreement, of even date herewith, between the Company and the Borrower.

The execution by the Borrower of this Note is done in Borrower's capacity as Trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and Trust and under and pursuant to the instructions and authorizations provided for under the Trust Agreement. This loan is without recourse against the Trust. The only assets of the Trust that may be given as collateral on this loan are qualifying employer securities of two classes: those acquired with the proceeds of this loan and those that were used as collateral on a prior exempt loan repaid with the proceeds of this loan. No person entitled to payment under this loan shall have any right to assets of the Trust other than:

    (i)     Collateral given for the loan,

2

KMH 006998



(ii)    Contributions (other than contributions of employer securities) that are made to the Trust to its obligations under this loan, and

(iii)   Earnings attributable to such collateral and the investment of such contributions and the obligations and liabilities of the Trustees in connection therewith are limited to the assets of said Trust.

KELLY-MOORE PAINT COMPANY, INC.
EMPLOYEE STOCK OWNERSHIP TRUST


William E. Moore, Trustee

3

KMH 006999

**EXHIBIT 5
TO DILLER DECLARATION**




### KELLY-MOORE PAINT COMPANY, INC.
### EMPLOYEE STOCK OWNERSHIP PLAN

#### Plan Committee Resolutions to Authorize Borrowing and
#### Purchase of Employer Securities

WHEREAS, the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan (the "Plan"), effective as of January 1, 1998, provides that the Plan Committee may direct the trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (the "Trust") to borrow funds from any lender for the purpose of purchasing employer securities of K-M Industries Holding Co., Inc., a California corporation (the "Parent"); and

WHEREAS, the Plan provides that cash contributed to the Trust or obtained by the Trust as the result of any loans thereto may be used to purchase employer securities of the Parent, provided that Trust does not pay more than the fair market value of the shares; and

WHEREAS, the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (collectively the "Seller" or "Selling Shareholder") owns all of the Parent's issued and outstanding stock and offered to sell to the Trust Thirty-three Million Seven Hundred Forty-five Thousand Four Hundred Fifty-five (33,745,455) shares of the Parent's Class P-B Stock (the "Shares") at Six and Eight Hundred Seventy-five Thousandths Dollars ($6.875) per share; and

WHEREAS, the Plan Committee has received an independent appraisal opinion to the effect that the fair market value of the Parent's Class P-B Stock, as of the date hereof, is at least Six and Eight Hundred Seventy-five Thousandths Dollars ($6.875) per share; and

WHEREAS, the Plan Committee has made its own prudent investigation of value and has determined that the underlying assumptions on which the independent appraisal was made are fair and reasonable and will not change as of the time the Trust purchases the shares; and

WHEREAS, a loan in the sum of Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00) is being offered to the Trust by the Company in order to enable the Trustee to purchase the Shares;

NOW, THEREFORE, BE IT RESOLVED, that William E. Moore, as trustee of the Trust (the "Trustee"), be, and he hereby is, authorized and directed as follows, to:

EXHIBIT
4

Stritmatter    3-12-08



1. Execute and deliver the ESOP Loan Agreement for the Loan to the Trust in the aggregate principal sum of Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00) in substantially the form delivered to the Trustee herewith.

2. Execute and deliver the ESOP Promissory Note in the aggregate principal sum of Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00) in favor of the Company, in substantially the form delivered to said Trustee herewith.

3. Execute and deliver the ESOP Pledge Agreement in substantially the form delivered to the Trustee herewith, and in accordance with the ESOP Pledge Agreement, release the Shares based on the "General Rule" as such term is defined in the Plan.

4. Execute and deliver the Stock Purchase Agreement between the Selling Share-holder and the Trust, and purchase the Shares for Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00) in cash.

5. Disburse such funds from the Trust as necessary to effectuate the purchase of the Shares in accordance with the Stock Purchase Agreement.

6. Execute and deliver such other documents, instruments and certificates and take such further action as may be necessary and appropriate to carry out the intent and purpose of the foregoing resolutions.

RESOLVED, FURTHER, that, in reliance on the appraisal opinion prepared by the ESOP's independent appraiser, it is hereby determined that the fair market value, as of the date hereof, of the Shares to be purchased by the Trust is Six and Eight Hundred Seventy-five thousandths Dollars ($6.875) per share.

Dated: October 13, 1998

COMMITTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP PLAN

By: _____

William E. Moore
Plan Committee Member

2

NS00001648

**EXHIBIT 6
TO DILLER DECLARATION**

# CALIFORNIA CAPITAL INSURANCE COMPANY

## RESOLUTIONS AUTHORIZING EXECUTION

## AND IMPLEMENTATION OF

## EMPLOYEE STOCK OWNERSHIP PLAN

---

The Chairman reported that an Employee Stock Ownership Plan had been developed to qualify as an Employee Stock Ownership Plan under Section 401(a) as defined by Section 4975(e)(7) of the Internal Revenue Code. The Chairman distributed to each member of the Board copies of the Plan and Trust Agreement and recommended that they be adopted by the Company, effective as of January 1, 1998. After discussion and upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Employee Stock Ownership Plan and the Trust Agreement, in substantially the forms submitted to this meeting, be, and they hereby are, adopted effective as of January 1, 1998; and it was further

RESOLVED, that the appropriate officers of the Company be, and they hereby are, authorized and directed to submit to the Internal Revenue Service the Employee Stock Ownership Plan, Trust Agreement and other documents relating to the adoption of the Plan with their request that the Internal Revenue Service issue a Determination Letter that the said Plan is a qualified plan under Section 401(a) of the Internal Revenue Code; and it was further

RESOLVED, that the following be, and he hereby is, designated as Trustee of the Employee Stock Ownership Plan:

William E. Moore

and it was further

RESOLVED, that the President or a Vice President and the Secretary or an Assistant Secretary of the Company be, and they hereby are, authorized and directed to execute the Employee Stock Ownership Plan and the Trust Agreement on behalf of the Company and to obtain an execution of the Trust Agreement by the Trustee; and it was further

1

EXHIBIT
101

Mines   4-03-08



RESOLVED, that the following is hereby designated as a member of the Committee to administer the Employee Stock Ownership Plan:

William E. Moore

and it was further

RESOLVED, that the following individuals will serve as a nonvoting nonfiduciary members of the Employee Stock Ownership Plan Advisory Committee:

Peter M. Cazzolla
Edward T. Mines

and it was further

RESOLVED, that a copy of the Employee Stock Ownership Plan and the Trust Agreement be attached to and made a part of the Minutes of this meeting; and it was further

RESOLVED, that the appropriate officers of the Company be, and they hereby are, authorized and directed to do any and all things necessary to implement the establishment of the Plan and to carry out the intent of the foregoing resolutions.

2

CIG 008058

# CERTIFICATE

I, Edward T. Mines, hereby certify that I am the duly appointed and acting Secretary of California Capital Insurance Company and that the above resolutions are a true and correct copy of resolutions duly adopted at a meeting of the Board of Directors held on the _4th_ day of _DECEMBER_, 1998, at which meeting a quorum was at all times present and acting, and that said resolutions are still in full force and effect.

Date _12-8-98_

By _Edward T. Mines_

Edward T. Mines, Secretary
California Capital Insurance Company

CIG 008059

# EXHIBIT 7
# TO DILLER DECLARATION



San Francisco, California
Mendham, New Jersey
Atlanta, Georgia

# MENKE & ASSOCIATES, INC.
### ESOP ADVISORS AND BANKERS

June 11, 1999

PERSONAL AND CONFIDENTIAL

Mr. Edward T. Mines
Chief Financial Officer
California Capital Insurance Company
2300 Garden Road
Monterey, California 93940

**CONFIDENTIAL**

Mr. Stephen A. Ferrari
Vice President–Finance
Kelly-Moore Paint Company, Inc.
987 Commercial Street
P.O. Box 3016
San Carlos, California 94070

Dear Ed and Steve:

Pursuant to our recent conversation, it appears that the determination has been made that the spinoff of California Capital Insurance Company ("CCIC") from K-M Industries Holding Co., Inc. (the "Parent") followed by the immediate sale by Mr. Moore to the CCIC ESOP cannot be accomplished. Therefore, the decision has been made by the Boards of CCIC and Kelly-Moore Paint Company, Inc. ("KMPC") to proceed with the merger of the CCIC ESOP into the KMPC ESOP. Thereafter, under the structure of one ESOP, Mr. Moore will sell approximately $60,000,000 of the Class I stock of the Parent to the ESOP.

Based on this understanding, let me outline the steps which need to be taken in order to conclude Mr. Moore's second sale of the stock to the ESOP.

> **EXHIBIT**
> **104**
> _Mines_    4-02-08

114 Sansome, 10th Floor, San Francisco, California 94104-3821, Telephone: (415) 362-5200, Facsimile: (415) 362-3268

OVER 1,500 ESOPs ESTABLISHED SINCE 1974

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

CIG 008053



MENKE & ASSOCIATES, INC.
ESOP ADVISORS AND BANKERS

Mr. Edward T. Mines
Mr. Stephen A. Ferrari
June 11, 1999
Page 2

## Plan Merger Procedures and Documentation

1.  I have already sent to Ed Mines for his review and execution, the IRS Form 5310-A, which is used to notify the IRS that the CCIC ESOP will be merged into the KMPC ESOP. Early on, I had inadvertently concluded that KMPC would also need to file the Notice. This conclusion was in error. The effective date of the merger of the plans is July 16, 1999 (a date that will be <u>at least 30 days post the filing of the Notice</u>). Upon receiving the signed Notice back from Ed Mines, our office will submit the Notice to the IRS by no later than June 16, 1999.

2.  Menke & Associates, Inc. will prepare and shortly deliver to each of you, Resolutions for your respective Boards to approve the merger of the plans as of July 16, 1999.

3.  Menke & Associates, Inc. will draft a restatement of the KMPC ESOP effective as of July 16, 1999. The purposes of the restatement are as follows: i) indicate the merger of the CCIC ESOP into the KMPC ESOP as of July 16, 1999; ii) design the new allocation rules to specifically state that the participating companies will share in the allocation of plan benefits separately, i.e., the contributions and dividends by KMPC will allocate Class P stock to the KMPC participating employees, and the similar result will occur as the CCIC participating employees; iii) rename the surviving plan and trust from KMPC to K-M Industries Holding, Co., Inc. Employee Stock Ownership Plan and Trust; iv) rename the surviving sponsor from KMPC to K-M Industries Holding Co., Inc.; v) update the plan for the remaining technical provisions of the 1996 and 1997 tax legislation.

4.  As a result of the restatement of the plan, a new restated Summary Plan Description will be needed to distribute to each participant in the place of the SPDs which were issued earlier.

5.  Subsequent to the ESOP's purchase of the Class I stock, Menke & Associates, Inc. will proceed to file the restated plan with the IRS in order to secure the IRS favorable determination letter. We have conducted our preliminary analysis and have determined that the IRS will approve the restated plan's separate benefit allocation provisions.

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

CIG 008054

## MENKE & ASSOCIATES, INC.
### ESOP ADVISORS AND BANKERS

Mr. Edward T. Mines
Mr. Stephen A. Ferrari
June 11, 1999
Page 3

**CONFIDENTIAL**

### Financing and Funding Structure of the ESOP's Purchase of $60,000,000 of Class I Stock

1.  Ed Mines has notified Duff & Phelps that their valuation's update, dated as of the day of the closing (estimated to be July 28, 1998) will be needed.

2.  Once the valuation is concluded, Ed will need to determine the exact number of the Class I-B shares of the Parent that Mr. Moore will sell to the ESOP. Once the price per share and the number of shares has been determined, Menke & Associates, Inc. will prepare the stock purchase agreement between the Moore's trust and the ESOP.

3.  Bank of America has committed to make a loan to the Parent in the principal amount of $38.5 million. CCIC will provide the additional $20 million of financing necessary. Based on the applicable provisions of Section 404(k) of the Internal Revenue Code (relating to deductible dividends), the ESOP must receive the entire financing from the Parent, as opposed to two separate loans. It is my understanding that your tax, banking, and legal advisers have informed you that for purposes of certain regulatory provisions applicable to California insurance companies, CCIC will be required to make a loan to the Parent company, as opposed to the payment of a $20 million dividend to the Parent. The Parent will then loan $58.5 million to the ESOP (the inside or internal loan). The promissory note on the internal loan should provide for a 15-year principal amortization and an annual interest rate in the amount of 7½ or 8 percent. Menke & Associates, Inc. will prepare the necessary ESOP loan agreement, promissory note, pledge agreement and resolutions of the Plan Committee authorizing the Trustee to enter into the transaction. If Bank of America requests an opinion of ESOP counsel, the Law Offices of John D. Menke will prepare the opinion.

### Fees

As represented to Steve Ferrari in my memorandum dated December 1, 1998, our fee to prepare and file the IRS Form 5310-A is $500. Our fee to prepare the stock purchase agreement and the ESOP loan documents will be $1,500. If an opinion letter is requested from the bank relating to the ESOP's transaction, our fee to prepare the opinion letter will be $5,000. Our fee to prepare the resolutions relating to the merger, the restated K-M Industries Holding Co., Inc. Employee Stock Ownership Plan, and the restated Summary Plan Description will be $5,000.

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

## MENKE & ASSOCIATES, INC.
### ESOP ADVISORS AND BANKERS

Mr. Edward T. Mines
Mr. Stephen A. Ferrari
June 11, 1999
Page 4

Please instruct me as to which company will be responsible for the payment of these fees.

### Conclusion

By no means is this letter intended to be a conclusive road map of all the steps to be taken to complete the transaction with the ESOP. Therefore, I would suggest sharing this letter with all of the involved parties, including Duff & Phelps, Bank of America, and the appropriate attorneys involved in the transaction. If additional questions arise, please contact me.

Sincerely,

MENKE & ASSOCIATES, INC.

Victor N. Alam
Corporate Counsel

VNA:lb:1272esop.ltr

cc:    John D. Menke, Menke & Associates, Inc.
       Kyle Coltman, Menke & Associates, Inc.
       Richard M. Acheson, Esq., BSI

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

CIG 008056

# EXHIBIT 8
# TO DILLER DECLARATION

## MINUTES OF SPECIAL MEETING
## OF THE BOARD OF DIRECTORS OF
## K-M INDUSTRIES HOLDING CO., INC.
### HELD JULY *16*, 1999

The undersigned, being all of the Directors of K-M Industries Holding Co., Inc., a California corporation (the "Parent"), do hereby waive notice and consent to the holding of a special meeting of the Board of Directors of the Parent at _____*10*_____ o'clock at 987 Commercial Street, San Carlos, California.

This waiver of notice and consent to said meeting is made in compliance with the applicable terms of state law, and the undersigned hereby consent that the same may be made a part of the records of said meeting, and that any business transacted at said meeting shall be as valid as if held at a meeting regularly called or noticed.

The Chairman of the Board, William E. Moore, called the meeting to order and noted that a quorum of Directors was present.

The Chairman stated that the purpose of the meeting was to review current matters related to the Employee Stock Ownership Plan (the "ESOP") sponsored by Kelly-Moore Paint Company, Inc. ("KMPC"), a member of the controlled group of corporations with the Parent and California Capital Insurance Company ("CCIC"). The Chairman reported that the members of the controlled group of corporations had determined that it is in the best interests of the corporations, their shareholders, and the participants and beneficiaries of the retirement plans of the controlled entities, to merge the ESOP sponsored by CCIC with and into the KMPC ESOP. Following the merger, CCIC and the participating employers in the CCIC ESOP will become participating employers in the KMPC ESOP. The effective date of the merger is July 16, 1999.

The Chairman next reported that the KMPC ESOP will be amended and restated to change the sponsor of the ESOP from KMPC to the Parent, and to rename the plan and trust to be the "K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust." The Chairman also indicated that the amended and restated ESOP would include provisions which will permit the allocation of separate benefits among the participating employers. The Class P-B shares of the Parent acquired by the ESOP will <u>only</u> be allocated to the participating employer KMPC, and its participating affiliates, K-M Universal Paint Company, Inc., Preservative Paint Co., and Premier Dry Wall Tool Company. The Parent's Class I-B shares acquired by the ESOP will <u>only</u> be allocated to the participating employer CCIC and its participating affiliates, Monterey Insurance and Eagle West Insurance.

After discussion and upon a motion duly made, seconded and unanimously carried, the following resolutions were adopted:

- 1 -

**WHEREAS**, it is in the best interests of the Parent, KMPC, CCIC, and their participating affiliates to amend and restate. effective as of July 16, 1999, the KMPC ESOP and Trust to be the "K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust" (the "Plan and Trust") sponsored by the Parent;

**NOW THEREFORE BE IT**

**RESOLVED**, that effective as of July 16, 1999, the KMPC ESOP and Trust is amended and restated to be the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust; and it was further

**RESOLVED**, that effective as of July 16, 1999, the plan sponsor of the amended and restated Plan and Trust shall be the Parent; and it was further

**RESOLVED**, that William E. Moore shall continue to service as the Trustee and member of the Plan Committee for the amended and restated Plan and Trust.

There being no further business to come before this meeting, it was thereupon adjourned.

_____
William E. Moore, Director

_____
Desiree B. Moore, Director

_____
Stephen A. Ferrari, Director

- 2 -

NS00019509

MINUTES OF SPECIAL MEETING
OF THE BOARD OF DIRECTORS OF
KELLY-MOORE PAINT COMPANY, INC.
HELD JULY _16_, 1999

The undersigned, being all of the Directors of Kelly-Moore Paint Company, Inc., a California corporation ("KMPC"), do hereby waive notice and consent to the holding of a special meeting of the Board of Directors of KMPC at _____11_____ o'clock at 987 Commercial Street, San Carlos, California.

This waiver of notice and consent to said meeting is made in compliance with the applicable terms of state law, and the undersigned hereby consent that the same may be made a part of the records of said meeting, and that any business transacted at said meeting shall be as valid as if held at a meeting regularly called or noticed.

The Chairman of the Board, William E. Moore, called the meeting to order and noted that a quorum of Directors was present.

The Chairman stated that the purpose of the meeting was to review current matters related to the KMPC Employee Stock Ownership Plan (the "ESOP"). The Chairman reported that the members of the controlled group of corporations with KMPC had determined that it is in the best interests of the corporations, their shareholders, and the participants and beneficiaries of the retirement plans of the controlled entities, to merge the ESOP sponsored by California Capital Insurance Company ("CCIC") with and into the KMPC ESOP. Following the merger, CCIC and the participating employers in the CCIC ESOP will become participating employers in the KMPC ESOP.

The Chairman next reported that the KMPC ESOP will be amended and restated to change the sponsor of the ESOP from KMPC to K-M Industries Holding Co., Inc. (the "Parent Corporation"), and to rename the plan and trust to be the "K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust." The Chairman also indicated that the amended and restated ESOP would include provisions which will permit the allocation of separate benefits among the participating employers. The Class P-B shares of the Parent Corporation acquired by the ESOP will only be allocated to the participating employer KMPC, and its participating affiliates, K-M Universal Paint Company, Inc., Preservative Paint Co., and Premier Dry Wall Tool Company. The Parent Corporation's Class I-B shares acquired by the ESOP will only be allocated to the participating employer California Capital Insurance Company and its participating affiliates, Monterey Insurance and Eagle West Insurance.

After discussion and upon a motion duly made, seconded and unanimously carried, the following resolutions were adopted:

- 1 -

NS00019510

**WHEREAS,** it is in the best interests of KMPC and the related corporations of the controlled group to merge the CCIC ESOP with and into the KMPC ESOP effective as of July 16, 1999; and

**WHEREAS,** the appropriate notification of the plan merger has been submitted to the Internal Revenue Service, and such notification occurred at least thirty (30) days prior to the effective date of the merger; and

**WHEREAS,** it is in the best interests of KMPC, CCIC, and their participating affiliates to amend and restate, effective as of July 16, 1999, the KMPC ESOP and Trust to be the "K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust" (the "Plan and Trust") sponsored by the Parent Corporation, subject to appropriate action by the Board of Directors of the Parent to accept designation as the sponsor of the restated Plan and Trust;

**NOW THEREFORE BE IT**

**RESOLVED,** that effective as of July 16, 1999, the CCIC ESOP and Trust shall be merged with and into the KMPC ESOP and Trust; and it was further

**RESOLVED,** that effective as of July 16, 1999, the KMPC ESOP and Trust is amended and restated to be the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust; and it was further

**RESOLVED,** that subject to appropriate action by the Board of Directors of the Parent Corporation, the plan sponsor of the amended and restated Plan and Trust shall be the Parent Corporation.

There being no further business to come before this meeting, it was thereupon adjourned.

_____
William E. Moore, Director

_____
Desiree B. Moore, Director

_____
Stephen A. Ferrari, Director

_____
Joseph P. Cristiano, Director

_____
Christine M. McCall, Director

- 2 -

NS00019511

**EXHIBIT 9
TO DILLER DECLARATION**



STEPHEN FERRARI

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,                    )
                                             )
              Plaintiffs,                    )
                                             )
       vs.                                   ) Case No.
                                             )
K-M INDUSTRIES HOLDING CO., INC., et al.,    ) C-06-07339 CW
                                             )
              Defendants.                    )
                                             )
                                             )
                                             )

VIDEOTAPED DEPOSITION OF STEPHEN FERRARI
March 26, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79126

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 94111
Fax (415) 288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN FERRARI

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47

DOCUMENT SUBMITTED UNDER SEAL

STEPHEN FERRARI

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 94111
Fax (415) 288-4286

c89c09a3-f54c-4ea8-ad2d-7fc0f7eeb47

**DOCUMENT SUBMITTED UNDER SEAL**

1    Q    And what is this document?

2    A    This appears to be -- it appears to be an

3    engagement letter with Sansome Street Appraisers.

4    Q    And it's signed for Sansome Street by Kyle

16:00   5    Coltman; is that correct?

6    A    It appears to be signed by Kyle Coltman.

7    Q    Do you recall if Kyle Coltman recommended

8    to you that the company use Sansome Street Appraisers

9    for the purpose of valuing the company for the Paint

16:00  10    ESOP transaction?

11    A    I seem to recall that there was various

12    appraisers that we became aware of.  Kyle Coltman may

13    have recommended some appraisers through Sansome Street

14    Appraisers.  I recall that there was due diligence that

16:01  15    was done on various appraisers.

16    Q    And the question was do you recall if Kyle

17    Coltman recommended that Kelly-Mc    retain Sansome

18    Street Appraisers to do the appraisal for Kelly-Moore

19    ESOP?

16:01  20    MR. PALMER:    Objection.  Asked and

21    answered.

22    A    I don't recall if Kyle Coltman simply gave

23    us Sansome Street Appraisers or if he made a

24    recommendation.  I don't recall that right now.  I know

16:01  25    that we did do due diligence on several appraisers that

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
1(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47

1 he didn't recommend that were outside of Sansome Street

2 Appraisers, and then also Jack Brooks.  And based upon

3 our due diligence and review of the extensive history of

4 appraisals that Jack Brooks had done and also that he

16:02 5 had experience in appraising paint companies, that

6 extensive and varied experience along with the

7 experience that he had appraised paint companies led to

8 the conclusion of choosing Sansome -- of choosing Jack

9 Brooks basically to do the appraisal.

16:02 10 BY MR. JACKSON:

11   Q When you say we did due diligence, who did

12 it?

13   A I believe most of the due diligence was

14 done by myself.

16:03 15   Q What did you do?

16   A I believe I called others who had used some

17 of the people that we had appraisal recommendations from

18 and looked at the qualifications, potential

19 qualifications of the appraisers, things like that.

16:03 20   Q Do you remember who you called?

21   A No, I don't.

22   Q You said he appraised another paint

23 company.  Do you know what paint company it was?

24   A I don't recall that right now.

16:04 25    MS. DILLER:   I would like to object to the

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

1    again Jack Brooks had very good experience, a wide

2    variety of experience relating to ESOPs and also paint

3    company experience.  And I think that weighed heavily in

4    the decision to choose the appraisal, the independent

16:11  5    appraisal that was needed for the ESOP transaction.

6        Q    And did you do any due diligence on

7    Willamette's qualifications to the appraisal?

8        A    I believe I did due diligence on

9    Willamette.  I can't recall right now.

16:12 10        Q    Did you make calls?

11        A    I don't recall the details of the due

12    diligence right at the moment.

13        Q    Do you know if the Willamette appraisers

14    had done anything for Paint companies?

16:12 15        A    Not that I was aware of at the time.

16        Q    And what way would you understand a paint

17    company to be different from other companies in terms of

18    valuation?

19        MS. DILLER:    Object to the form.

16:12 20        A    A paint company is its own industry with

21    its own competitive issues and problems.  And we felt at

22    the time that someone who understood paint companies

23    could best understand the issues, challenges, and

24    opportunities to give the most appropriate and fairest

16:13 25    evaluation.

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47?

STEPHEN FERRARI

BY MR. JACKSON:

    Q    Any other reason you think a paint company is different from any other company for the purpose of valuation?

    MS. DILLER:   Object to the form.  Calls for expert testimony.

    A    I don't recall right now.  We just felt that paint companies were their own unique industry. And when we had the opportunity to really find someone who had great experience, very good qualifications from very prestigious schools that Jack Brooks did -- I think he had degrees from Harvard and Yale, and he had hundred if not hundreds of valuations that he had done, plus a number of them from -- number of them for paint companies, it seemed like a very easy decision at the time.

BY MR. JACKSON:

    Q    Did you ask if he had published any articles regarding how to properly value companies for ESOP purposes?

    A    I don't recall.

    Q    Did you have any discussions with anyone at Willamette about what were the proper methodologies that should be used in valuing a paint company?

    A    I am not a valuation expert.  I don't

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

c89c09a3-f54c-4ea8-ad2d-7fc0f7eeb477

STEPHEN FERRARI

1      A     I don't recall right now.

2      Q     Do you recall if you did raise any concerns

3  about the valuation?

4      A     I don't recall.

16:20 5      Q     I am going to ask you to look at 55 now.

6            MR. LOVITT:    55?

7      A     Yes, I see Exhibit No. 55.

8  BY MR. JACKSON:

9      Q     Have you seen that document before?

16:20 10      A     Yes, I have seen that document before.

11      Q     What do you understand that document to be?

12      A     I understand this to be an updated

13  valuation that was done by Mr. Brooks.  The day of this

14  letter is October 12th 1998.

16:21 15            It was my understanding that there is a

16  certain time frame as to when an independent valuation

17  is required for an ESOP transaction.  And the other

18  valuation as of July 31st was too old, so had to get an

19  updated valuation for the ESOP transaction.  And I

16:21 20  believe that's what this document attempted to take care

21  of.

22      Q     Do you know if this document was the

23  document used to set the price for the ESOP transaction

24  on October -- in October of 1998?

16:21 25      A     I believe it was.

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47

Q    And did you ask any questions about
Exhibit 55?

A    Well --

MR. PALMER:    Object to form.

A    -- I believe -- I don't recall the detail
of all the questions I may have asked.  But I do recall
that I asked Mr. Brooks as to the change in the
valuation where one as of July 31st was 580 million and
then this one was 550 million.  And I seem to recall
that some of the reason had to do with comparative
prices of other paint companies had gone down in price.
That was one of the reasons.  I don't recall what other
reasons were right now.

BY MR. JACKSON:

Q    Were there any other reasons you discussed
with him that you recall?

A    I don't recall right now.

Q    And do you know if Mr. Moore asked about
the decrease in price?

A    I believe Mr. Moore did talk to me about
the price and inquired about it.  And I believe I talked
with Mr. Brooks and told Mr. Moore the answer.

Q    I see.  So Mr. -- did Mr. Moore request
that you ask Mr. Brooks why the price had gone down?

A    I don't know if he asked me to ask

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb477

STEPHEN FERRARI

Page 242
March 26, 2008

1   voiced to you about Exhibit 55 or Exhibit 9 --

2           MR. PALMER:   Object to form.

3   BY MR. JACKSON:

4       Q    -- anyone at Kelly-Moore about Exhibit 9 or

16:27 5   55?

6           MR. PALMER:   Object to the form.

7           MR. LOVITT:   Object to the form.  Take

8   them one at a time and I will remove my objection.

9   BY MR. JACKSON:

16:28 10      Q    Fair enough.  Do you remember any concerns

11  that anyone at Kelly-Moore had about Exhibit 55?

12          MR. PALMER:   Object to form.

13          MS. DILLER:   Calls for speculation.

14      A    I don't recall any concerns that people had

16:28 15  with the valuations that Mr. Brooks did.  We attempted

16  to give Mr. Brooks all the information that he wanted.

17  We told him about the asbestos litigation.  We told him

18  about the insurance coverage.  We offered to give him

19  anything that he wanted and answer all of his questions

16:28 20  and do whatever he wanted.  I don't recall specific

21  questions right now that I had, but I remember ongoing

22  dialog with Mr. Brooks.  Mr. Brooks asked a lot of

23  questions and we attempted to give him all the answers

24  that he asked.

16:29 25  BY MR. JACKSON:

```
 1        Q     Did you think the Exhibit 9 report was well

 2   done?

 3               MR. PALMER:   Object to the form.

 4        A     I'm not an expert who does valuations.  All

 5   I can do is do my due diligence that we did in selecting

 6   Mr. Brooks.  I can read the valuation and see if there

 7   is anything that I see that is unreasonable.  But I have

 8   to leave it to the independent appraisal experts to give

 9   the valuation.  That's what we tried to do here.

10   BY MR. JACKSON:

11        Q     Did you see anything in the Exhibit 9 that

12   was unreasonable?

13        A     I don't recall seeing anything in the

14   valuation provided by Mr. Brooks that I didn't think was

15   reasonable at the time.

16        Q     Were you concerned that it didn't mention

17   asbestos liability?

18        A     I was not concerned that it didn't mention

19   asbestos liabilities.  I'm not one who tells a person

20   who is doing a valuation what he is supposed to include

21   in his report or not.  He has his own standards that

22   he's required to come under.  I give the people all the

23   information that they need to know and then it's them --

24   up to them to take all the information that they have

25   got, use their appropriate standards, and come up with
```

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47

STEPHEN FERRARI

Q    Asking if you know?

A    I don't know.

Q    Did you tell him that there were over 10,000 claims at the time that the valuation was done?

16:32 A    I don't recall if I told him an exact number.  But I do recall that I told him that there was many claims so that he knew that there was a large magnitude of asbestos litigation.

Q    Did you give him any document which laid 16:33 out the magnitude of the asbestos litigation?

A    I don't recall.

Q    Do you know if he took notes when you told him this?

A    I don't specifically recall.

16:33 Q    Do you generally recall whether or not he was taking notes when you met with him about the company?

A    I don't recall.

Q    I am going to ask you to take a look at 16:33 what has been previously marked as Exhibit 52. Actually, let's start with Exhibit 53.  You already have 53?

A    I have 53 here.

Q    I will ask you to look at the second page 16:34 there.  Do you have that document in front of you?

c89c09a3-154c-4ea8-ad2d-7fc0f7eeb47

STATE OF CALIFORNIA )

: ss              )

County of Alameda    )


     I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:  That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

     I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

     IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____

_____

EMI ALBRIGHT, CSR No. 13042

# EXHIBIT 9a
# TO DILLER DECLARATION

# KELLY-MOORE PAINT COMPANY, INC.

"Quality is Economy"    957 Commercial Street • P.O. Box 3016 • San Carlos, California 94070 • (415) 592-8337

$110

May 27, 1998

Mr. B. J. Brooks
114 Sansome Street, Suite 808
San Francisco, CA 94104

Dear Jack,

Enclosed are documents that you requested so that you can begin working on the appraisal of The Company:

1.)    Audited financial statements for 5 years. (Please note that Kelly-Moore Paint Company, Inc. and K-M Insurance Company is the portion being valued (Pages 22, 23 and 26 of audited statements). California Insurance Group and Montana operations (Ranch) will be spun off in a tax free reorganization. The Investment in Subsidiaries will be basically gone).

2.)    10 year Summary
(Please note that the Investment in Subsidiary asset is included. The Montana Operations are not included in the lower calculations).

3.)    Our Company Brochure

4.)    A memo discussing history and operations.

5.)    Various statistical information.

I look forward to working with you.

Sincerely,

Steve Ferrari
Vice President-Finance

cc:    Joseph P. Cristiano
    William E. Moore

EXHIBIT
78
Ferrari  3-26-08

MK003568

**EXHIBIT 10
TO DILLER DECLARATION**



# SANSOME STREET APPRAISERS, INC.

## Business Valuation Appraisals

114 Sansome Street, Suite 808
San Francisco, California 94104-3818
(415) 362-3900
FAX (415) 362-6492

5 Cold Hill Road South, Suite 23
P.O. Box 312
Mendham, New Jersey 07945-0352
(201) 543-5650
FAX (201) 543-5756

Called Jack
5-22-98
Left Msg. We will
be in process

**EXHIBIT**

30

Menke   3-21-08

KMH 001312

## Services Provided by Sansome Street Appraisers, Inc.

Sansome Street Appraisers, Inc. is an appraisal register which contracts with independent appraisal firms to provide business valuation appraisals of private companies.

Most of the firms employed by Sansome Street Appraisers, Inc. have provided business valuation appraisal services since 1974. Collectively, the firms engaged by Sansome Street Appraisers, Inc. provide business valuation appraisals for over 600 companies per year.

Business valuation appraisals are primarily prepared for purposes of establishing the value of stock to be acquired by Employee Stock Ownership Plans. However, the firms engaged by Sansome Street Appraisers, Inc. also appraise the value of private companies for purposes of sale or merger, for estate and gift tax purposes, for purposes of divorce, and for purposes of valuing stock options and other employee stock purchase plans.

The names and backgrounds of the independent appraisal firms which are engaged by Sansome Street Appraisers, Inc. to provide business valuation appraisals are as follows:



### B. J. Brooks, ASA

Bryan J. Brooks has an extensive background in corporate finance, venture capital, investment banking and mergers and acquisitions. Mr. Brooks was President of Bay Equities, a venture capital firm, from 1974 to 1979. From 1968 to 1973, Mr. Brooks was President of Bionics Computer Investment Corporation, also a venture capital firm. Prior to that, Mr. Brooks was Vice President and Treasurer of Continental Capital Corporation, a publicly-held Small Business Investment Company.

Mr. Brooks is a senior member of the American Society of Appraisers.

Mr. Brooks was graduated Phi Beta Kappa from Yale University in 1950, receiving a B.S. degree in Economics. He received an M.B.A. with Distinction, from Harvard University in 1955.



### J. R. Leyon Associates, Inc.

Prior to becoming a valuation analyst, John R. Leyon was manager of financial planning and analysis for AT&T Communications.

Mr. Leyon received a B.S. in Industrial Engineering from Lehigh University and his M.B.A. from the Harvard Graduate School of Business Administration. Mr. Leyon has also been a guest lecturer at the Boston College Graduate School of Business.

KMH 001313

## Everett A. Mathews, Inc.

Everett A. Mathews graduated from the University of California, Berkeley, with a B.S. degree in Finance. Prior to 1971 he was employed as a commercial loan officer by Security Pacific National Bank in their San Francisco Main Office with responsibility for lending to businesses. Since 1971 he has specialized in financial analysis and the valuation of closely held businesses.

## Enterprise Services, Inc.

Scott D. Miller has an extensive background in financial management and analysis that includes his experience with Arthur Andersen & Company and as a principal and officer in several closely held companies. As the Vice President of Finance in a large, closely held ESOP company he gained in-depth knowledge on all aspects of ESOTs. He founded the Wisconsin Chapter of the ESOP Association. Mr. Miller has completed valuation studies for a broad range of organizations including mergers and acquisitions, gift taxes, estate taxes, and ESOTs.

Mr. Miller received his M.B.A. degree in Finance from Cornell University, his B.A. degree from Kenyon College, and is a Certified Public Accountant (CPA) in Wisconsin. His professional affiliations include membership in the American Institute of Certified Accountants (AICPA), the Wisconsin Institute of Certified Public Accountants (WICPA) and the National Association of Certified Valuation Analysts (NACVA).



## Ireland Associates

Robert M. Ireland was previously a Vice President and General Partner of Kelso & Company, Inc.

Prior to his association with Kelso & Company, Mr. Ireland was a consultant to Transamerica Corporation and Memorex Corporation. From 1970 to 1974, Mr. Ireland was a Security Analyst at BA Investment Management Corporation, a subsidiary of Bank of America NT&SA.

Mr. Ireland graduated from Stanford University with an A.B. in Economics in 1965. He received his M.B.A. in Finance from the University of California at Los Angeles in 1967.

Mr. Ireland is a senior member of the American Society of Appraisers.

## Pilot Financial Services, Inc.

Donald J. Tubb has varied and extensive experience in general and financial management as well as in corporate finance and business valuation. Mr. Tubb is a retired Air Force officer with 22 years service as a pilot and operations/logistics manager. He was a Vice President in the Wells Fargo Bank Corporate Finance Department from 1977 through 1981 where he performed stock valuations and assisted in corporate planning, mergers/acquisitions and private placements for bank customers. He has also served as CFO of a manufacturing company. Mr. Tubb is a senior member of the American Society of Appraisers.

Mr. Tubb received an M.B.A. degree in Finance in 1973 from the University of California at Berkeley and a B.A. in 1955 from Oklahoma State University.





KMH 001314



## Services Provided by Sansome Street Appraisers, Inc.

Sansome Street Appraisers, Inc. is an appraisal register which contracts with independent appraisal firms to provide business valuation appraisals of private companies.

Most of the firms employed by Sansome Street Appraisers, Inc. have provided business valuation appraisal services since 1974. Collectively, the firms engaged by Sansome Street Appraisers, Inc. provide business valuation appraisals for over 600 companies per year.

Business valuation appraisals are primarily prepared for purposes of establishing the value of stock to be acquired by Employee Stock Ownership Plans. However, the firms engaged by Sansome Street Appraisers, Inc. also appraise the value of private companies for purposes of sale or merger, for estate and gift tax purposes, for purposes of divorce, and for purposes of valuing stock options and other employee stock purchase plans.

The names and backgrounds of the independent appraisal firms which are engaged by Sansome Street Appraisers, Inc. to provide business valuation appraisals are as follows:



**B. J. Brooks, ASA**

Bryon J. Brooks has an extensive background in corporate finance, venture capital, investment banking and mergers and acquisitions. Mr. Brooks was President of Bay Equities, a venture capital firm, from 1972 to 1974. From 1968 to 1972, Mr. Brooks was President of Boolite Computer Investment Corporation, also a venture capital firm. Prior to that, Mr. Brooks was Vice President and Treasurer of Continental Capital Corporation, a publicly-held Small Business Investment Company.

Mr. Brooks is a senior member of the American Society of Appraisers.

Mr. Brooks was graduated Phi Beta Kappa from Yale University in 1950, receiving a B.S. degree in Economics. He received an M.B.A., with Distinction, from Harvard University in 1955.



**J. R. Leyon Associates, Inc.**

Prior to becoming a valuation analyst, John R. Leyon was manager of financial planning and analysis for AT&T Communications.

Mr. Leyon received a B.S. in Industrial Engineering from Lehigh University and his M.B.A. from the Harvard Graduate School of Business Administration. Mr. Leyon has also been a guest lecturer at the Boston College Graduate School of Business.

KMH 001315

# EXHIBIT 11
# TO DILLER DECLARATION

LAW OFFICES OF
# JOHN D. MENKE AND ASSOCIATES

114 Sansome Street
Suite 1008
San Francisco, California 94104
(415) 362-5200
Fax (415) 362-3268

John D. Menke
Victor N. Alam
Charles W. Bachman

October 13, 1998

EXHIBIT
44
Menke    3-21-08

MK001665

DOCUMENT SUBMITTED UNDER SEAL



LAW OFFICES OF
JOHN D. MENKE AND ASSOCIATES

The Prudential Insurance Company of America
Pruco Life Insurance Company
October 13, 1998
Page 2

MK001666

DOCUMENT SUBMITTED UNDER SEAL

LAW OFFICES OF
### JOHN D. MENKE AND ASSOCIATES

The Prudential Insurance Company of America
Pruco Life Insurance Company
October 13, 1998
Page 3

MK001667

**DOCUMENT SUBMITTED UNDER SEAL**



LAW OFFICES OF
## JOHN D. MENKE AND ASSOCIATES

The Prudential Insurance Company of America
Pruco Life Insurance Company
October 13, 1998
Page 4

MK001668

DOCUMENT SUBMITTED UNDER SEAL

# EXHIBIT 12
# TO DILLER DECLARATION



**SUMMARY ANNUAL REPORT**
**FOR CALIFORNIA CAPITAL INSURANCE COMPANY**
**EMPLOYEE STOCK OWNERSHIP PLAN**
**FOR THE PERIOD JANUARY 1, 1998 THROUGH DECEMBER 31, 1998**

This is a summary of the annual report for the California Capital Insurance Company Employee Stock Ownership Plan, EIN 77-6166830, Plan No. 002, for the period January 1, 1998 through December 31, 1998. The annual report has been filed with the Internal Revenue Service, as required under the Employee Retirement Income Security Act of 1974 (ERISA).

**Basic Financial Statement**

Benefits under the plan are provided through a trust fund. Plan expenses were $0. A total of 256 persons were participants in or beneficiaries of the plan at the end of the plan year, although not all of these persons had yet earned the right to receive benefits.

The value of plan assets, after subtracting liabilities of the plan, was $903,770 as of December 31, 1998, compared to $0 as of January 1, 1998. During the plan year the plan experienced an increase in its net assets of $903,770. The plan had total income of $903,770 including employer contributions of $903,770.

**Your Rights To Additional Information**

You have the right to receive a copy of the full annual report, or any part thereof, on request. The items listed below are included in that report:

1. an accountant's report.

To obtain a copy of the full annual report, or any part thereof, write or call the office of Edward T. Mines who is Vice President-CFO, California Capital Insurance Company, 2300 Garden Road, Monterey, CA 93940, (831) 649-1155.

You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, or a statement of income and expenses of the plan and accompanying notes, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes will be included as part of that report. The charge to cover copying costs given above does not include a charge for the copying of these portions of the report because these portions are furnished without charge.

You also have the legally protected right to examine the annual report at the main office of the plan (California Capital Insurance Company, 2300 Garden Road, Monterey, CA 93940) and at the U.S. Department of Labor in Washington, D.C., or to obtain a copy from the U.S. Department of Labor upon payment of copying costs. Requests to the Department should be addressed to: Public Disclosure Room, N-5638, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.





P057

**EXHIBIT 13
TO DILLER DECLARATION**

**CIG**
SINCE 1898

*California Capital Insurance Company*
*Nevada Capital Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

February 28, 2002

Dear Team Member:

It is with great pleasure that we address you as a Participant in the Company's Employee Stock Ownership Plan (ESOP). Enclosed you will find a copy of the *Summary Plan Description.*

There is no enrollment application to complete. To remain eligible each plan year, you must work 1000 hours per year. After three years of continuous service with CIG, you will vest at 20 percent. You will receive 20 percent vesting each year thereafter with 100 percent vesting after seven years.

This program provides us with ownership in our Company with no monetary contribution on our part. The only contribution we need to make as owners/team members is to perform at our maximum capability, keeping with our Company Values, to ensure our future success. With stock ownership, we will benefit from our successful efforts through the resultant increased equity value of our Company.

Your participation in ESOP will give you capital ownership in the Company and should produce for you during your years of participation a growing portfolio of Company stock paid for entirely by Company contributions. You are encouraged to fully understand and embrace Company ownership with pride, enthusiasm, and a high level of responsibility as we work together to satisfy our customers and make CIG the best that it can be.

It is very important that you complete the enclosed *Designation of Beneficiary* form with care and keep it up to date, filing a new form promptly as circumstances change. Please return your Designation of Beneficiary form to the Human Resources Department.

We look forward to a long and mutually rewarding association.

Sincerely,

Edward T. Mines
Chief Financial Officer

/nadg

Enclosures:  Employee Stock Ownership Plan Summary Plan Description
                   Designation of Beneficiary Form



EXHIBIT
Lora Smith 161
CT 4/16/08

CIG_ESI00001618

Addressee
Date
Page 2

CIG_ESI00001618.002

Addressee
Date
Page 3

CIG_ESI00001618.003

Addressee
Date
Page 4

CIG_ESI00001618.004

**EXHIBITS 14-26
TO DILLER DECLARATION**

# EXHIBIT 14
# TO DILLER DECLARATION

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this thirteenth day of October, 1998, by and among William E. Moore as trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and Kelly-Moore Paint Company, Inc., a California corporation (hereinafter referred to as the "Company"),

### WITNESSETH:

WHEREAS, Trustee is the trustee of the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") established by the Company to be effective as of January 1, 1998, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding shares of K-M Industries Holding Co., Inc., a California corporation (the "Parent"); and

WHEREAS, Selling Shareholder desires to sell Thirty-three Million Seven Hundred Forty-five Four Hundred Fifty-five (33,745,455) shares of the Parent's Class P-B Stock (the "Shares") to the Trustee; and

1

EXHIBIT
3

Strittmatter 3-12-08

MK001589



WHEREAS, Trustee wishes to purchase from Selling Shareholder, and Selling Shareholder wishes to sell to Trustee the Shares for the benefit of the employees of the Company who are participants in the Plan; and

WHEREAS, the parties desire to design said purchase and sale so that the Selling Shareholder will be entitled to the benefits of Section 1042 of the Internal Revenue Code; and

WHEREAS, the Company desires to provide a means for its employees to acquire a proprietary interest in it as an incentive for them to advance the business and affairs of the Company;

NOW, THEREFORE, in consideration of the promises and the respective agreements hereinafter set forth, Selling Shareholder and Trustee hereby agree as follows:

1.    <u>Sale of Stock</u>.  As of this date and subject to the terms and conditions of this Agreement, Selling Shareholder does hereby sell and deliver to Trustee, and Trustee does hereby purchase from the Selling Shareholder, the Shares.

2.    <u>Purchase Price</u>.7

(a)    In consideration for the transfer of the Shares as provided in Section 1, Trustee shall pay to Selling Shareholder an amount equal to Six and Eight Hundred Seventy-Five Thousandths Dollars ($6.875) per share, or a total of Two Hundred Thirty-two Million and 00/100 Dollars ($232,000,000.00).  The Purchase Price shall be paid to Selling Shareholder in cash at the closing.

(b)    The purchase price in Section 2(a) hereof is not more than the fair market valuation established as of the date of this Agreement.  In the event that there is a final determination by the Internal Revenue Service, a court of competent jurisdiction or otherwise that the

2



MK001590

fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee, then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee shares of the Parent's Class P-B Stock, or any combination thereof, equal in value to the difference between the Purchase Price and said fair market value for all such Shares. In the event that cash and/or shares of the Parent's Class P-B Stock are paid and/or transferred to the Trustee under this provision, such shares shall be valued at their fair market value as of the date hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid by Selling Shareholder on the amount of cash paid.

3. <u>Representations and Warranties of Selling Shareholder</u>. The Selling Shareholder, to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties.

(a) On the date hereof, the Shares being sold hereunder will be validly issued and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever upon or against such shares; and there will be in existence no limitations or restrictions of any kind (other than restrictions under a buy/sell agreement among Company shareholders) on the right of Selling Shareholder to sell such Shares in accordance with the terms hereof. No options, warrants, agreements, or similar rights created by the Company for the issue or sale of any stock or securities of any kind or for the purchase thereof by any person other than pursuant to or as disclosed by this Agreement will then be in existence.

(b) Selling Shareholder is the owner, free and clear of any encumbrances, of the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

MK001591

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)      Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)      Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby. Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year. Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.     <u>Representations and Warranties of Trustee</u>. Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)      Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

MK001592

(b)     Trustee has ful' power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)     Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.     <u>Representations and Warranties of Company</u>.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)     The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)     Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Parent.

(c)     None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

MK001593

outstanding "employer securities" of the Parent. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)    Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.    <u>Obligations of Trustee</u>.  Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.    <u>Indemnification</u>.  Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

MK001594



8.    <u>Survival of Representations, Warranties and Agreements</u>. All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement. All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto. Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    <u>Notices, etc</u>. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

> 303 Olive Hill Lane
> Woodside, CA 94062
> Attn: William E. Moore

If to Trustee, at:

> Kelly-Moore Paint Company, Inc. Employee Stock Ownership
> Plan and Trust
> Attn.: Trustee
> 987 Commercial Street
> San Carlos, CA 94070

If to the Company, at:

> Kelly-Moore Paint Company, Inc.
> Attn.: President
> 987 Commercial Street
> San Carlos, CA 94070

7

MK001595

10.    <u>Amendments and Entire Agreement</u>.  This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    <u>Parties in Interest</u>.  This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    <u>Law to Govern</u>.  This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    <u>Section and Other Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

MK001596

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WILLIAM E. AND DESIREE B. MOORE 1990 REVOCABLE TRUST, AS AMENDED:**

_____
William E. Moore, Trustee

_____
Desiree B. Moore, Trustee

**TRUSTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP TRUST:**

_____
William E. Moore, Trustee

**KELLY-MOORE PAINT COMPANY, INC.**

_____
Joseph P. Cristiano, President

_____
Stephen A. Ferrari, Secretary

9

MK001597

10/08/98  14:36 FAX 415 382 3268    Menke & Associates, Inc.    ☑002/004

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WILLIAM E. AND DESIREE B. MOORE 1990 REVOCABLE TRUST, AS AMENDED:**

_____

William E. Moore, Trustee

_____

Desiree B. Moore, Trustee

**TRUSTEE OF THE KELLY-MOORE PAINT COMPANY, INC. EMPLOYEE STOCK OWNERSHIP TRUST:**

_____

William E. Moore, Trustee

**KELLY-MOORE PAINT COMPANY, INC.**

_____

Joseph P. Cristiano, President

_____

Stephen A. Ferrari, Secretary

9

MK001598

# EXHIBIT 15
# TO DILLER DECLARATION

*Menke & Associates, Inc.*
*Corporate Financial Consultants*

*114 Sansome, Suite 1000*
*San Francisco, California 94104-3821*
*(415) 362-5200*
*Fax (415) 362-3263*

*Mendham, New Jersey*
*Atlanta, Georgia*

RECEIVED AND FILED

SEP 1 8 1998

V.P. / SEC'Y

September 14, 1998

PERSONAL AND CONFIDENTIAL

Mr. Steve Ferrari, CFO
Kelly-Moore Paint Co., Inc.
987 Commercial Street
San Carlos, CA  94070

Dear Steve:

This letter will confirm the scheduling for the initial ESOP briefings to be provided by me for your employees.  I will let you and John Givens work out the schedule for the other sites.  Sites, times and dates follow:

    San Jose, 10:30 a.m., October 12
    Stockton, 10:30 a.m., October 13
    Sacramento, 3 p.m., October 13
    San Carlos, 10:30 a.m., October 14
    Tempe, 10 a.m., October 26
    Denver, 10 a.m., October 27

The slide presentation to explain the ESOP transaction, purpose, features and potential takes about one and one-half hours on average, including Q&A session.

Please arrange for my use a Kodak Carousel slide projector with a remote control feature.

Please don't hesitate to invite your accountant, lawyer or other advisors to the briefing in order to further their knowledge regarding Employee Stock Ownership Plans.

I look forward to meeting you and your associates and helping you launch a successful ESOP.

                    Very truly yours,

                    MENKE & ASSOCIATES, INC.
                    The ESOP Leader

                    Sherman O. Coultas
                    Senior Vice President

SOC/js

cc: Kyle Coltman

> **EXHIBIT**
> _56_
> _Menke   3-21-08_

OVER 1,200 ESOPs DESIGNED SINCE 1974

KMH 004051

# EXHIBIT 16
# TO DILLER DECLARATION



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,          )
                                   )
              Plaintiffs,          )
                                   ) Case No.
        vs.                        )
                                   ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                   )
              Defendants.          )
                                   )
                                   )
                                   )

VIDEOTAPED DEPOSITION OF JOHN MENKE
March 21, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79125

CERTIFIED
COPY

23769c21-4489-4d16-8bde-00ca310129e5



John Menke                        Confidential                        Page 269
                                                                  March 21, 2008

1          Q      Do you know if Mr. Alam recommended

2     Mr. Hommel?

3               MS. DILLER:    Asked and answered.

4          A      Yeah, I don't know if he specifically

5     recommended John Hommel.  He has recommended him in

6     other cases.

7     BY MR. JACKSON:

8          Q      What other cases?

9          A      I couldn't tell you specifically.

10         Q      All right.  I'm going to -- can you

11    describe to me the communications with participants

12    performed by Menke & Associates regarding the

13    Kelly-Moore ESOPs?

14               MR. PALMER:    Object to form.

15         A      Say again.

16    BY MR. JACKSON:

17         Q      Yeah, can you describe to me the

18    communications with participants performed by Menke &

19    Associates surrounding the Kelly-Moore ESOPs?

20               MR. PALMER:    Object to the form.

21         A      Well, someone from our group did the

22    initial employee communications briefing or meeting.  I

23    don't recall specifically who that was.  The only other

24    issue with communications I remember is that I remember

25    the company or Steve Ferrari asked me to prepare a

Esquire Deposition Services            505 Sansome Street, 5th Floor        San Francisco, California 9411
Phone (415) 288-4280                    (800) 770-3363                    Fax (415) 288-4286

                                                                  23769c21-4489-4d16-8bde-00ca310129e5



1    projection, a little notice that would be handed out to

2    participants which would give them a projection about

3    their potential benefits.

4    BY MR. JACKSON:

5         Q    Do you know if such a notice was handed

6    out?

7         A    I don't know specifically if it was handed

8    out or not.

9         Q    Did you prepare such a document?

10        A    Yes.

11        Q    Was that document edited?

12        A    I don't know.

13        Q    And do you know if that document was

14    ultimately sent out?

15        A    I don't know.

16        MS. DILLER:    Asked and answered.

17   BY MR. JACKSON:

18        Q    I am going to hand you a document Bates

19   4951 which we will mark as 56.

20             (Exhibit No. 56 marked

21             for identification.)

22

23        A    Okay.

24        Q    First question is have you seen this

25   document before?

23769c21-4489-4d16-8bde-00ca310129e

STATE OF CALIFORNIA )

: SS                )

County of Alameda   )

     I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify: That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

     I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

     IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____

_____

JAN ALBRIGHT, CSR No. 3042

# EXHIBIT 17
# TO DILLER DECLARATION



**JOSEPH P. CRISTIANO**
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

July 14, 1999

To:  All Eligible Employees:

We are extremely pleased to be sending you your first Employee Stock Ownership Plan (ESOP) statement. This statement represents the first year's contribution into the Plan and covers the year 1998.  Your next statement will be sent to you in 2000 after 1999 results are finalized and all of the data is completed for your account.  We will be keeping you all informed during this time period by regular mailings of "Mind Our Own Business."

As you can see, you own shares in our Company.  You have the ability to increase the value of these shares by how well you help to profitably operate the Company.  I encourage you to make decisions on a daily basis based on how you can improve profits and deliver awesome service to our customers.

Once again, we are all grateful to Mr. and Mrs. Moore for allowing us to become employee-owners of their outstanding Company.

Sincerely,

Joseph P. Cristiano
President & CEO

JPC:jmb

987 COMMERCIAL ST. P.O. BOX 3016 SAN CARLOS, CA 94070  •  (650) 592-8337  •  FAX (650) 592-1022

**EXHIBIT**
*118*
Cristiano  4-08-08

KMH 000152

**EXHIBIT 18
TO DILLER DECLARATION**



07-30-99  11:00 FAX 415 362 3268       MENKE & ASSOCIATES, INC.                    ☐002

# CONFIDENTIAL

### KELLY-MOORE PAINT COMPANY, INC.

<u>Explanation of Summary Annual Report of Employee Stock Ownership Plan ("ESOP")</u>

July 31, 1999

To All Eligibles Employees:

Enclosed for your information is the Summary Annual Report of the Kelly-Moore Paint Company Inc. ESOP as of December 31, 1998. Under the law, the Plan is required to furnish a Summary Annual Report to each eligible Participant as of the end of each calendar year of the Plan.

As previously announced, the ESOP borrowed a total of $232,000,000 on October 13, 1998 and purchased $232,000,000 worth of the Series "P" stock of K-M Industries Holding Co. Inc. This stock will be allocated to accounts of the Participants over a period of 15 years as contributions are made to the Plan and as these contributions are used to pay down the loan.

As of the end of the first plan year, December 31, 1998, the value of the stock held by the Plan decreased in the amount of $66,647,271. This decrease in the value of the stock was due entirely to the fact that the Company borrowed $136,000,000 from an outside lender in order to finance the transaction.

This decrease in the value of Plan assets was partially offset by the fact that the Company made a contribution to the Plan in the amount of $9,738,456. Of this amount, $3,222,575 was used to pay interest on the ESOP loan. The balance of the contribution was used to pay principal on the ESOP loan. Thus, the net reduction in the value of the Plan assets was $60,131,380.

Please note that this one-time reduction in the net value of the Plan assets is entirely due to the fact that the transaction was financed by borrowing $136,000,000 from an outside lender. In future years, we anticipate that the net value of the Plan assets will show substantial increases each year. These increases will come from two sources. First, we anticipate that the sales and profits of the Company will continue to increase steadily just as they have in the past. Second, the value of the Company will increase each year as the Company makes loan payments to pay down the loan from the outside lender. The combination of these two factors should result in substantial increases in the net value of the Plan assets over the next 15 years.

It should also be noted that the ESOP is a long-term program. The current value of the Plan assets represents only a starting benchmark. What matters most is the value of the stock five years from now, ten years from now, or 15 years from now, when you wish to retire and cash in your shares.

EXHIBIT

60

Menke    3-21-08

KMH 000153

.

# EXHIBIT 19
# TO DILLER DECLARATION



EMPLOYEE STOCK OWNERSHIP PLAN



AN EMPLOYEE OWNED COMPANY

# MIND OUR OWN BUSINESS

Volume II, Issue 3                                                    October, 2000

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ESOP DISTRIBUTIONS

On September 30, 2000, The ESOP is proud to have made its second year of distributions for personnel leaving the Company in 1999. The plan allows distributions now only for retirees over 65 years and for terminated personnel with vested balances less than $3,500.00. The total of the distributions in 2000 was $269,922.27. We wish these retirees and others well in being among the first to enjoy ESOP benefits.

## ESOP COMMUNICATIONS

Unfortunately there are still some individuals that we have had difficulty sending ESOP communications due to changes of addresses, etc. If you know any individuals listed on the attached sheet, please have them call Debbie Culmer in our Human Resources Department at 650-592-8337 extension 187 so that they may receive information.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through September of 2000 including the Kelly-Moore Ponderosa acquisition are up approximately 7% over the same period in 1999. Sales excluding our Kelly-Moore Ponderosa acquisition are only up approximately 4% over the same period in 1999. Remember everything that _you_ do may make one more sale or can increase profits, which hopefully will affect share value.

## SHARE VALUE

Included in this issue of **Mind Our Own Business** is another installment adding to what has previously been discussed on how stocks are valued. Remember the stock price may go up or down based on many factors. Among other things, the appraiser looks at current profits, potential profits, asset and debt levels, and market valuation of other paint companies and other items. Please make sure to peruse this attached article as many of the items mentioned can affect Kelly-Moore stock value.

## SUMMARY ANNUAL REPORT AND SUMMARY PLAN DESCRIPTION (SPD)

Also attached is the Summary Annual Report as of December 31, 1999. Under the law, the Plan is required to furnish a Summary Annual Report in the attached format as of the end of the calendar year of the Plan. In addition, due to changes in Federal regulations, we were required to make legal changes to the Summary Plan Document (SPD). Please file the attached Modification to your SPD.

> **EXHIBIT**
> _187_
> _Thomas_    _4-18-08_

KMH 000087

 

Please call 650-592-8337 x 187 to
Have information sent.

| | | |
|---|---|---|
| Anselmo, Gerald J. | Jackson, Jed R. | Tillman, Lee M. |
| Apodaca, Frank J. | Jenkins, Randall S. | Trujillo, Adrian M. |
| Arias, Rudolph | Johnson, David A | Underwood, Luther S. |
| Armstrong, Charles | Johnston, Glenn E. | Wheeler, Mindy K. |
| Awuku, Kwame O. | Jones, Ali O. | Winston, Mary D. |
| Barry, Sean P. | Kaczmarek, Rodd L. | |
| Bennett, Steve J. | Kelly, Jeffrey V. | |
| Brewer, Christoper J. | Knutson, Sandra J. | |
| Briscoe, Tryone | Kytola, Stephen D. | |
| Brock, Jerry F. | Lacour, Benjamin D. | |
| Brown, Denise H. | Lemay, Joseph J. | |
| Bryan, Christopher L. | Lewis, Shawn D. | |
| Carter, Chris J. | Liu, Janice H. | |
| Case, Karsen L. | Lobue, Steven D. | |
| Cashion, Michael S. | Lopez-Hernandez | |
| Chavarria, Alfonso Jr. | Lowther, William | |
| Cisneros, Stephen A. | Luong, Karen K. | |
| Cole, Austra K. | Martinez, Jesus S. | |
| Corley, Freddie L. | Martinez, Mark V. | |
| Crews, Kenneth J. | Mc Kinney, Kamarlo | |
| Crum, William J. | Mc Clanahan, Roland W. | |
| Dahlen, Travis S. | Miller, Brian L. | |
| Docherty, Hal | Miller, Micheal A. | |
| Drummond, Wilson | Mose, Donna A. | |
| Duggins, Damon T. | Noecker, Stephen R. | |
| Earley, Christoper L. | Odom, Benjamin | |
| Ellison, Brandon | Patrick, Gordan | |
| Faeo, Anthony M. | Pearson, Kareem | |
| Garcia, Agustin G. | Perez, David | |
| George, Stuart B. | Pheng, Sokchea | |
| Gest, Scott A. | Phillips, Dave D. | |
| Godines, Robert L. | Pittman, Brenda | |
| Gomez, Ernest | Puhlovski, Berislav B. | |
| Gonzales, Francisco J. | Richter, Martin | |
| Goodman, Robert A. | Rivera, Richard L. | |
| Gracey, Margaret | Robinson, Lisa Ann | |
| Gray, Daniel L. | Sanchez, Joseph M. | |
| Griffin, Issac K. | Sandoval, Paul A. | |
| Guzy, Jason E. | Santa, Jason | |
| Han, John C. | Santos, Fernando D. | |
| Harrington, Scott D. | Schulz, Tonya A. | |
| Hayes, Helen M. | Semere, Zeraservai G. | |
| Heilman, Jerry | Shackleford, Jason L. | |
| Heinrich, Susan K. | Smith, Kevin A | |
| Henderson, Ethan R. | Taff, Benjamin F. | |

KMH 000088

THE EMPLOYEE OWNERS' PAGE

# How Stocks Are Valued

The value of a share of stock seems especially mystical these days, whether it is set by the stock market (as it is for companies on stock exchanges) or by an appraisal (as is true for private ESOP companies, for instance). Shares in "dot-com" companies soar even though they have little revenue and huge losses. Meanwhile, other companies report profits for the quarter but, because they are not as good as experts expected, the company shares plummet. And all the shares on the market may take a hit, or rise sharply, because Alan Greenspan, chair of the Federal Reserve Board, seems in a good mood or bad mood that day. What's going on?

## In the Long Run, It's All About Profits

Over the long run, most of the change in stock prices is explained by the company's profitability. If you buy a company, you get the right to decide what to do with its profits. After you have paid out all your costs, what you have left over can be used to pay yourself a dividend, reinvest in the company to build the potential for more profits, or buy another company, for instance. So the more money a company appears capable of making in the future, the more you will pay. In fact, you will pay some multiple of what the company's annual profits are expected to be. Imagine you buy a company that you expect will make a $500,000 profit every year. If you buy it for $2 million, you will make a 25% return every year on your investment, because 25% of 2 million is $500,000.

## Risk Gets Rewarded

But just how much of a multiple should you pay? To figure that out, you have to consider how much money you could make investing in something else, as well as how risky that investment is.

As an investor, you could make 3% or 4% per year just putting your money in the bank. You could make more by buying a CD, a Treasury bill (a bond you can buy from the government that pays an interest rate), or a corporate bond (an interest paying investment issued by a company). Each of these investments is fairly safe: you get a higher return if you are willing to take the risk of tying up your money for a longer period of time, having to put in a minimum amount, or betting on a company's chances instead of a bank or the government. The more risk, the bigger the interest rate.

Similarly, if you invested in the stock market, you would be taking an even bigger risk, but the average return on stocks is significantly higher than the return on bonds and savings accounts. If you put all your money in just one company, especially a newer or smaller company, your risk would be even higher, and you would expect a higher rate of return. It's just like betting on a long shot; you expect to be paid more if it wins. When deciding what multiple of a company's earnings to pay for its shares, therefore, a rational investor will ask how much risk is involved, and what level of return should be paid for it.

## Assets Count Too

A company's assets count as well, such as buildings, machinery, patents, etc., all of which could help someone who bought them make money. In the technology business world, the principal asset is knowledge. People value Amazon.com so highly because they believe it is accumulating enormous knowledge about how to market on the Internet. That knowledge can either be used to make money some day or can be sold to other companies to use to make money. As the world moves more and

Shares in "dot-com" companies soar even though they have little revenue and huge losses. Meanwhile, other companies report profits for the quarter but, because they are not as good as experts expected, the company shares plummet...What's going on?

more to a knowledge-based economy, this "intellectual capital," as opposed to hard assets or financial capital, accounts for more and more of the value of all companies.

## No Company Is an Island

Finally, no matter how clever a company may be in generating profits or assets, general conditions in the industry or the economy will play a part in its stock price. For instance, if interest rates go up, investors may decide to move their money out of stocks into bonds. If interest rates are high, the relative risk of investing in stocks is greater. So investors will pay less for a dollar of a company's earnings, as explained above. Similarly, if investors believe the whole economy is turning down, they will pay less for stocks in the U.S. Beyond all these rational explanations, there is also a lot of irrational herd behavior on stock markets, although this tends to wash out in the long term.

All the things get put in the blender, and a price emerges. It may all seem crazy, but for most companies, share prices do make sense over the long term. NCEO

Employee Ownership Report

KMH 000089

SUMMARY ANNUAL REPORT
FOR K-M INDUSTRIES HOLDING CO., INC. ESOP
FOR THE PERIOD JANUARY 1, 1999 THROUGH DECEMBER 31, 1999

This is a summary of the annual report for the K-M Industries Holding Co., Inc. ESOP, EIN 94-1230192, Plan No. 002, for the period January 1, 1999 through December 31, 1999. The annual report has been filed with the Internal Revenue Service, as required under the Employee Retirement Income Security Act of 1974 (ERISA).

### Basic Financial Statement

Benefits under the plan are provided through a trust fund. Plan expenses were $14,546,611. These expenses included $45,937 in benefits paid to participants and beneficiaries and $14,500,674 in other expenses. A total of 1,886 persons were participants in or beneficiaries of the plan at the end of the plan year, although not all of these persons had yet earned the right to receive benefits.

The value of plan assets, after subtracting liabilities of the plan, was $(62,171,571) as of December 31, 1999, compared to $(60,131,380) as of January 1, 1999. During the plan year the plan experienced a decrease in its net assets of $2,040,191. This decrease includes unrealized depreciation in the value of plan assets; that is, the difference between the value of the plan's assets at the end of the year and the value of the assets at the beginning of the year or the cost of assets acquired during the year. The plan had total income of $11,602,650 including employer contributions of $21,364,104, earnings from investments of $(17,928,727) and other income of $8,167,273. Transfer of assets from another plan was $903,770.

### Your Rights To Additional Information

You have the right to receive a copy of the full annual report, or any part thereof, on request. The items listed below are included in that report:

1. an accountant's report; and
2. assets held for investment.

To obtain a copy of the full annual report, or any part thereof, write or call the office of William E. Moore who is Trustee, K-M Industries Holding Co., Inc., 987 Commercial Street, San Carlos, CA 94070, (650) 592-8337. The charge to cover copying costs will be $3.50 for the full annual report, or 25 cents per page for any part thereof.

You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, or a statement of income and expenses of the plan and accompanying notes, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes will be included as part of that report. The charge to cover copying costs given above does not include a charge for the copying of these portions of the report because these portions are furnished without charge.

You also have the legally protected right to examine the annual report at the main office of the plan (987 Commercial Street, San Carlos, CA 94070) and at the U.S. Department of Labor in Washington, D.C., or to obtain a copy from the U.S. Department of Labor upon payment of copying costs. Requests to the Department should be addressed to: Public Disclosure Room, Room N-5638, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

KMH 000090

SUMMARY MODIFICATION MEMORANDUM
TO
K-M INDUSTRIES HOLDING CO., INC.
EMPLOYEE STOCK OWNERSHIP PLAN
SUMMARY PLAN DESCRIPTION


Except as specified, effective as of January 1, 1998 the following changes are made to your Summary Plan Description ("SPD"). In some cases the modifications represent new provisions being added to your SPD. Other modifications represent changes to an existing provision of your SPD. When an existing provision of your SPD is amended, you may wish to cross out the old question and answer so that you do not confuse the old information with the new information.


The following new answer is added to the question, "Must I Consent Before Distribution of My Plan Benefit Begins?":

"Effective for all Plan Years after August 5, 1997, if the present value of your Plan Benefit has ever exceeded five thousand dollars ($5,000) (or for distributions made on or after October 17, 2000, if the value of your Plan Benefit exceeds five thousand dollars ($5,000) at the time of your distribution), any distribution prior to the later of age sixty-two (62) or your Normal Retirement Date may be made only with your written consent. The Committee shall provide you with a written notice which explains this requirement, not less than thirty (30) days nor more than ninety (90) days before the distribution date. Such distribution may commence less than thirty (30) days after such notice is given, provided that:

"1.    the Committee clearly informs you that you have a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

"2.    after receiving the notice, you affirmatively elect a distribution.

"If you fail to consent to an immediate distribution within the applicable time limit, the Employer may treat that as an election by you to defer distribution of the benefits to the later of age sixty-two (62) or your attainment of the Normal Retirement Date."


The following new answer is added to the question "When Are Benefits Required to Be Distributed?"

"(a)    Distribution of your Plan Benefit is required to commence not later than sixty (60) days after the Anniversary Date coinciding with or next following the latest of (1) your

1

KMH 000091



Retirement, (2) the tenth (10th) anniversary of the date you became a Participant, or (3) your separation from service. If the amount of your Plan Benefit cannot be determined (by the Committee) by the date on which a distribution is to commence, or you cannot be located, distribution of your Plan Benefit shall commence within sixty (60) days after the date on which your Plan Benefit can be determined or after the date on which you are located by the Committee.

"(b)    Pursuant to Section 401(a)(9) of the Code as amended by the Small Business Job Protection Act, distribution of your Plan Benefits is required to begin by April 1 of the calendar year following the later of (1) the calendar year in which you attain age seventy and one-half (70½) or (2) the calendar year in which you separate from service with the Employer. However, in the case of a five-percent (5%) owner (as defined in Section 416(i)(1)(B)(i) of the Code), distributions are required to begin no later than April 1 following the calendar year in which you attain age seventy and one-half (70½).

"All distributions made under this paragraph (b) shall be determined and made in accordance with the Proposed Regulations under Section 401(a)(9), including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the Proposed Regulations."

2

KMH 000092

# EXHIBIT 20
# TO DILLER DECLARATION

**KELLY-MOORE** PAINT CO.

AN EMPLOYEE OWNED COMPANY

# K - M  I N D U S T R I E S  H O L D I N G  C O . ,  I N C .

## E M P L O Y E E  S T O C K  O W N E R S H I P  P L A N

### D E C E M B E R  3 1 ,  2 0 0 3

PARTICIPANT NAME: TOSHA M. THOMAS

| | SHARES | VALUE OF SHARES |
|---|---|---|
| BALANCES AT 01/01/2003 | 1,847.32613 | $4,779.96 |
| CONTRIBUTIONS | | |
| INVESTMENTS | 1,004.93685 | 1,787.30 |
| FORFEITURES | 134.56404 | 302.45 |
| DISTRIBUTIONS | | |
| INCOME | | |
| EXPENSES | | |
| BALANCES AT 12/31/2003 | 2,986.82902 | $6,869.71 |

VESTED PERCENTAGE                    20.0000%

VESTED INTEREST VALUE                $1,373.54

PER SHARE VALUE AT 12/31/2003        $2.3000

---

TOSHA M. THOMAS

PARTICIPANT STATUS:

BIRTHDATE:              07/08/19
AGE AS OF 12/31/2003:
EMPLOYMENT DATE: 07/24/20
ENTRY DATE:      01/01/20
PLAN VESTING
DATE:            12/31/20
PLAN YEARS OF SERVICE: 2.0
VESTING HOURS:
PLAN RETIREMENT
DATE:            07/08/20

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
PERSONNEL DEPARTMENT.

TOSHA M. THOMAS
19 Lewis Ave #5
So. San Francisco, CA 94080

REPORT AS OF 12/31/2003

**CONFIDENTIAL**

EXHIBIT
208
Thomas    4-18-08

**EXHIBIT 21
TO DILLER DECLARATION**

**KELLY-MOORE PAINT CO.®**
AN EMPLOYEE OWNED COMPANY

# K-M INDUSTRIES HOLDING CO., INC.
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 2004

PARTICIPANT NAME: TOSHA M. THOMAS

| | SHARES | VALUE OF SHARES | OTHER INVESTMENTS | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2004 | 2,986.82902 | $6,869.71 | $0.00 | $6,869.71 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS | 212.04408 | 1,767.96 | 0.43 | 1,768.39 |
| FORFEITURES | 122.72842 | 330.60 | | 330.60 |
| DISTRIBUTIONS | | | | |
| INCOME | | | 0.14 | 0.14 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2004 | 3,321.58152 | $8,968.27 | $0.57 | $8,968.84 |

| | |
|---|---|
| VESTED PERCENTAGE | 40.0000% |
| VESTED INTEREST VALUE | $3,587.54 |
| PER SHARE VALUE AT 12/31/2004 | $2.7000 |

TOSHA M. THOMAS

PARTICIPANT STATUS:

BIRTHDATE: 07/08/20
AGE AS OF 12/31 2004:
EMPLOYMENT DATE 12/04 2.
ENTRY DATE: 07/08/2
PLAN VESTING
DATE 12/31/2
PLAN YEARS OF SERVICE 1.
VESTING HOURS 1.

PLAN RETIREMENT DATE:
NORMAL 07/08/20

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
PERSONNEL DEPARTMENT.

TOSHA M. THOMAS
19 LEWIS AVE #5
SO. SAN FRANCISCO, CA 94080

REPORT AS OF 12/31/2004

**CONFIDENTIAL**

EXHIBIT
209
Thomas  4-18-08

P1131

# EXHIBIT 22
# TO DILLER DECLARATION

TOSHA M. THOMAS

PARTICIPANT STATUS

BIRTHDATE:                    07/08/1?
AGE AS OF 12/31/2005:        3?
EMPLOYMENT DATE: 22/04/?2
ENTRY DATE                   01/01/?2
PLAN VESTING
DATE          12/31/?2
PLAN YEARS OF SERVICE:       2.
VESTING HOURS:               2.

PLAN RETIREMENT DATE:
NORMAL        07/06/2?

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
PERSONNEL DEPARTMENT.

TOSHA M. THOMAS
19 LEWIS AVE #5
SO. SAN FRANCISCO, CA 940?

REPORT AS OF 12/31/2005

---

**KELLY-MOORE PAINT CO.**
AN EMPLOYEE OWNED COMPANY

K-M INDUSTRIES HOLDING CO., INC.

EMPLOYEE STOCK OWNERSHIP PLAN

DECEMBER 31, 2005

PARTICIPANT NAME: TOSHA M. THOMAS

| | SHARES | VALUE OF SHARES | OTHER INVESTMENTS | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2005 | 3,321.58152 | $8,968.27 | $0.57 | $8,968.84 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS | 1,113.52577 | 3,893.54 | 206.24 | 4,099.78 |
| FORFEITURES | 187.54466 | 543.88 | | 543.88 |
| DISTRIBUTIONS | | | | |
| INCOME | | | 0.06 | 0.06 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2005 | 4,622.65195 | $13,405.69 | $206.87 | $13,612.56 |

VESTED PERCENTAGE                  60.0000%

VESTED INTEREST VALUE              $8,167.54

PER SHARE VALUE AT 12/31/2005     $2.90000

**CONFIDENTIAL**

EXHIBIT
210
Thomas  4-18-08

P1132

# EXHIBIT 23
# TO DILLER DECLARATION



KELLY-MOORE PAINT CO.®
AN EMPLOYEE OWNED COMPANY

K - M  I N D U S T R I E S  H O L D I N G  C O . ,  I N C .
E M P L O Y E E  S T O C K  O W N E R S H I P  P L A N
D E C E M B E R  3 1 ,  2 0 0 6

PARTICIPANT NAME: TOSHA M. THOMAS

| | SHARES | VALUE OF SHARES | OTHER INVESTMENTS | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2006 | 4,622.55155 | $13,455.69 | $206.87 | $13,612.56 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS | 1,209.33180 | 3,507.06 | -103.42 | 3,403.64 |
| FORFEITURES | 163.58434 | 474.39 | 1.91 | 476.30 |
| DISTRIBUTIONS | | | | |
| INCOME | | | 11.88 | 11.88 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2006 | 5,995.56809 | $17,387.15 | $117.24 | $17,504.39 |

VESTED PERCENTAGE          80.0000%
VESTED INTEREST VALUE      $14,003.51
PER SHARE VALUE AT 12/31/2006   $2.90000

TOSHA M. THOMAS

PARTICIPANT STATUS:

BIRTHDATE:          07/08/23

AGE AS OF 12/31/2006:
EMPLOYMENT DATE: 11/04/23

ENTRY DATE:         01/01/25
PLAN VESTING
DATE:               12/31/23
PLAN YEARS OF SERVICE:
VESTING HOURS:      2.0

PLAN RETIREMENT DATE:
NORMAL:             07/08/23

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
PERSONNEL DEPARTMENT.

TOSHA M. THOMAS
19 LEWIS AVE #5
SO. SAN FRANCISCO, CA 94080

REPORT AS OF 12/31/2006

CONFIDENTIAL

EXHIBIT
211

Thomas    4-18-08

P1133

**EXHIBIT 24**
**TO DILLER DECLARATION**



**ESOP**
LOYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

Volume III, Issue 2

June, 2001

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2000 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1000 hours for Kelly-Moore in 2000 received a contribution for 2000.

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of **$23,506,570.71** has been put into our ESOP for 2000. This includes a contribution out of Kelly-Moore profits of $18,040,091.33, a tax-deductible dividend out of profits of $5,196,557.11 and a contribution of $269,922.27 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. Excluding the amounts paid to retirees and terminated employees, a full $23,236,648.44 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. Remember that this was the loan that was used to buy the original stock. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $23,236,648.44 divided by the total of principal and interest of all the loan payments (which go on from 1998 to 2012 or 15 years) of $347,460,310.84. This result is then multiplied by the 33,745,455 shares in the ESOP. This allows for a release of approximately **2,256,750.63** shares to employee shareholder accounts for 2000.

## SHARE VALUE

Those of you with your 1998 or 1999 statements can refer back and see that our stock was valued at $4.50 per share at December 31, 1998 and $4.6875 at December 31, 1999. At December 31, 2000, the valuation from the independent appraiser decreased by 16.8% to **$3.90** per share. This is the value that is used to value both old and new shares on the 2000 statements. Remember the stock price may go up or down based on many factors. Among other things, the appraiser looks at current profits, potential profits, asset and debt levels, and market valuation of other paint companies and other items.

**EXHIBIT**

*190*

*Thomas* 4·18·08

KMH 010680



## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year is on a multi-step process based on your 2000 total earnings. Much of this complicated allocation process is due to the fact that there is a 25% maximum of payroll limitation between the ESOP and 401K on only one part of the allocation, the contribution used for loan principal repayment. There is not a limitation on the interest portion or the dividend portion. The allocation was a multi-step process for many people. There were allocation calculations for stock purchased back from terminated and retired participants, contribution principal, contribution interest, and 2 calculations for dividends. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-00. The main reason why the increase is less than last year is that while the contribution brought most account values up, the decline in stock value brought them down.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount at this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. A total of **398,937.61** forfeited shares at $3.90 per share totaling **$1,555,856.67** were reallocated to participants eligible for contributions. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## FUTURE CONTRIBUTIONS

Kelly-Moore hopes to have profits to make contributions that will allow the ESOP to make the same loan payment of $23,236,648.44 which will allow for a release of approximately 2,256,750.63 shares to be allocated for 2001 also. This should happen as long as significant profitability continues as it has in 2000. We believe that dividends will be able to be used again in 2001, and that contributions this year to the 401k plan up to at least 10% should not have an effect on your ESOP contribution. This may change in future years as contributions to the 401k plan may limit your ESOP contribution. Any changes to your 401k plan contribution for the final quarter of 2001 should be in to Corporate Personnel by 8-31-2001.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through May of 2001 are up approximately 4% over the same period in 2000 including Kelly-Moore Ponderosa sales.




**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. **SHARES** – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by Mr. & Mrs. Moore. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. They have additional dividend rights, which makes it easier to make ESOP contributions.

2. **VALUE OF SHARES** – The fair market value of the shares at the statement date.

3. **CONTRIBUTIONS/INVESTMENTS** – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. **FORFEITURES** – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see your summary plan document for more details.

5. **DISTRIBUTIONS** - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. **VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. **VESTED INTEREST VALUE** – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. **PER SHARE VALUE AS OF 12/31/00** – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser valued this stock.

9. **PARTICIPANT STATUS** – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

KMH 010682



10. <u>ENTRY DATE</u> – Entry Date is the effective beginning of the plan year that you - become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. <u>PLAN VESTING DATE</u> – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of four dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998 or 1999, the plan vesting date will show 12/31/98 or 12/31/99. Finally, if the first year that you worked 1000 hours was 2000, the plan vesting date will show 12/31/00.

12. <u>PLAN YEARS OF SERVICE</u> – The total number of Years of Service you have with Kelly-Moore as of 12/31/00 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. <u>VESTING HOURS</u> – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. <u>PLAN RETIREMENT DATE</u> – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

<u>Note:</u> This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

KMH 010683

**EXHIBIT 25
TO DILLER DECLARATION**





°LOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

**Volume IV, Issue 2**                                                    **June, 2002**

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2001 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1000 hours for Kelly-Moore in 2001 received a contribution for 2001.

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of $23,591,107.91 has been put into our ESOP for 2001. This includes a contribution out of Kelly-Moore profits of $17,687,666.99, a tax-deductible dividend out of profits of $5,548,981.45 and a contribution of $354,459.47 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. Excluding the amounts paid to retirees and terminated employees, a full $23,236,648.44 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. Remember that this was the loan that was used to buy the original stock. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $23,236,648.44 divided by the total of principal and interest of all the loan payments (which go on from 1998 to 2012 or 15 years) of $347,460,310.84. This result is then multiplied by the 33,745,455 shares in the ESOP. This allows for a release of approximately 2,256,750.63 shares to employee shareholder accounts for 2001.

## SHARE VALUE

At December 31, 2001, the valuation from the independent appraiser decreased by 11.5% to $3.45 per share. This is the value that is used to value both old and new shares on the 2001 statements. Remember the stock price may go up or down based on many factors. Among other things, the appraiser looks at current profits, potential profits, asbestos and other litigation, asset levels, debt levels, market valuations of other paint companies and other items.

**EXHIBIT**

_194_

_Thomas    4-18-08_

KMH 010693



## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year is on a multi-step process based on your 2001 total earnings. It is included on the investment line on your statement. There were allocation calculations for stock purchased back from terminated and retired participants, contribution principal, contribution interest, and 2 calculations for dividends. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-01. The main reason why the increase is less than prior years is that while the contribution brought most account values up, the decline in stock value brought them down.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. A total of 384,443.38 forfeited shares at $3.45 per share totaling $1,326,329.67 were reallocated to participants eligible for contributions. Remember that unless YOU stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## RISK RELATING TO ESOP INVESTMENTS

The Kelly-Moore portion of the ESOP's assets by design were and are invested only in Kelly-Moore shares. There continues to be risk in the ultimate value of the Kelly-Moore shares due to substantial ongoing asbestos litigation. Depending on the results of this litigation, there could be a severe effect to the value of the shares. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans, IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through May of 2002 are down by approximately 0.5% over the same period in 2001. Consider what you can do to have your customer bring in one more additional sale or what you can do to bring one more dollar to the bottom line.

KMH 010694



**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. <u>SHARES</u> – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by Mr. & Mrs. Moore. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. They have additional dividend rights, which makes it easier to make ESOP contributions.

2. <u>VALUE OF SHARES</u> – The fair market value of the shares at the statement date.

3. <u>CONTRIBUTIONS/INVESTMENTS</u> – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. <u>FORFEITURES</u> – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. <u>DISTRIBUTIONS</u> - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. <u>VESTED PERCENTAGE</u> – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. <u>VESTED INTEREST VALUE</u> – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. <u>PER SHARE VALUE AS OF 12/31/01</u> – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. <u>PARTICIPANT STATUS</u> – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

KMH 010695



10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of four dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998, 1999 or 2000, the plan vesting date will show 12/31/9, 12/31/99 or 12/31/00. Finally, if the first year that you worked 1000 hours was 2001, the plan vesting date will show 12/31/01.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/01 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

KMH 010696

**EXHIBIT 26
TO DILLER DECLARATION**

 



EMPLOYEE STOCK OWNERSHIP PLAN



## MIND OUR OWN BUSINESS

Volume V, Issue 1                                                      July, 2003

_Mind Our Own Business_ is the Newsletter for participants in the K-M Industries
Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint
Company, Inc.

### ESOP STATEMENTS

The December 31, 2002 ESOP statements are now being distributed. Those persons with
activity in their accounts received statements. Only eligible employees that worked over
1000 hours for Kelly-Moore in 2002 received a contribution for 2002.

### KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of $23,571,787.85 has been put into our ESOP for 2002. This includes a
contribution out of Kelly-Moore profits of $20,250,139.07, a tax-deductible dividend out
of profits of $2,986,509.37 and a contribution of $335,139.41 to pay retirees over 65
years old and to pay terminated employees' vested balances that were less than
$3,500.00. Excluding the amounts paid to retirees and terminated employees, a full
$23,236,648.44 was used to pay down the principal and interest on the ESOP loan from
Kelly-Moore. Remember that this was the loan that was used to buy the original stock.
As the ESOP loan is paid down each year, a portion of the shares is released to be
allocated to employee shareholder accounts. The release is calculated by taking the
current principal and interest on the loan payment of $23,236,648.44 divided by the total
of principal and interest of all the loan payments (which go on from 1998 to 2012 or 15
years) of $347,460,310.84. This result is then multiplied by the 33,745,455 shares in the
ESOP. This allows for a release of approximately 2,256,750.63 shares to employee
shareholder accounts for 2002.

### SHARE VALUE

At December 31, 2002, the independent appraiser found the per share valuation decreased
from $3.45 in 2001 to $2.5875. This is the value that is used to value both old and new
shares on the 2002 statements. Remember the stock price may go up or down based on
many factors. Among other things, the independent appraiser looks at current profits,
potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset
levels, debt levels, market valuations of other paint companies and other items. Kelly-
Moore had lower operating income from Paint Operations and had significantly higher
costs relating to asbestos litigation in 2002 compared to 2001.

**EXHIBIT**

_197_

_Thomas_          _4-18-08_

KMH 000127

## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year is on a multi-step process based on your 2002 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-02. The main reason why final balances may be less than prior years is that while the contribution may have brought account values up, the decline in stock value brought them down.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. Remember that unless YOU stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares. There continues to be risk in the ultimate value of the Kelly-Moore shares due to substantial ongoing asbestos litigation. Depending on the results of this litigation, there could be further severe effect to the value of the shares. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans (which now has a Company match), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through May of 2003 are down by approximately 2% over the same period in 2002. Sales for 2002 were about even with 2001 which indicates that the stores have not grown over the past 18 months. However the stores operating expenses are up 3.4% through the end of May. Continue to work together to increase sales and control expenses.

## NEW TRUSTEE

A new independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required independent of Kelly-Moore and the appraiser.

KMH 000128




K-M Industries Holding Co., Inc.
Employee Stock Ownership Plan
Participant Statement Glossary

1. SHARES – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by Mr. & Mrs. Moore. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. They have additional dividend rights, which makes it easier to make ESOP contributions.

2. VALUE OF SHARES – The fair market value of the shares at the statement date.

3. CONTRIBUTIONS/INVESTMENTS – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. FORFEITURES – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. DISTRIBUTIONS - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. VESTED PERCENTAGE – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. VESTED INTEREST VALUE – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. PER SHARE VALUE AS OF 12/31/02 – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. PARTICIPANT STATUS – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

KMH 000129



10. ENTRY DATE – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. PLAN VESTING DATE – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998, 1999, 2000 or 2001, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00 or 12/31/01. Finally, if the first year that you worked 1000 hours was 2002, the plan vesting date will show 12/31/02.

12. PLAN YEARS OF SERVICE – The total number of Years of Service you have with Kelly-Moore as of 12/31/02 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. VESTING HOURS – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. PLAN RETIREMENT DATE – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

Note: This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

KMH 000130

**EXHIBITS 27-33
TO DILLER DECLARATION**

# EXHIBIT 27
# TO DILLER DECLARATION





**EMPLOYEE STOCK OWNERSHIP PLAN**

# MIND OUR OWN BUSINESS

**October, 2005**

<u>**Mind Our Own Business**</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2003 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1000 hours for Kelly-Moore in 2003 received a contribution for 2003. **A value has also been determined for 2004 and statements for 2004 will be distributed in the next couple of months.**

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of **$23,803,431.23** has been put into our ESOP for 2003. This includes a contribution out of Kelly-Moore profits of $23,236,648.44 and a contribution of $566,782.79 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. A full $23,236,648.44 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. Remember that this was the loan that was used to buy the original stock. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $23,236,648.44 divided by the total of principal and interest of all the loan payments (which go on from 1998 to 2012 or 15 years) of $347,460,310.84. Note: This loan was restated in 2005 to extend the term to 2014 due to asbestos issues in 2004. This result is then multiplied by the 33,745,455 shares in the ESOP. This allows for a release of approximately **2,256,750.63** shares to employee shareholder accounts for 2003.

## SHARE VALUE

At December 31, 2003, the independent appraiser found the per share valuation decreased from $2.5875 in 2002 to **$2.30**. This is the value that is used to value both old and new shares on the 2003 statements. Remember the stock price may go up or down based on many factors. Among other things, the independent appraiser looks at current profits, potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset levels, debt levels, market valuations of other paint companies and other items.

<div style="border:1px solid black">

**EXHIBIT**

*200*

Thomas    4-18-08

</div>

P1126

## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year is on a multi-step process based on your 2003 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-03  The main reason why final balances may be less than prior years is that while the contribution may have brought account values up, the decline in stock value brought them down.

## FORFEITURES

Again this year, you may see activity on the forfeiture line.  Forfeitures arise from participants who terminate before they are fully vested.  If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested.  Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate.  These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares.  There continues to be risk in the ultimate value of the Kelly-Moore shares due to substantial ongoing asbestos litigation.   Depending on the results of this litigation, there could be further severe effect to the value of the shares.  Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans (which now has a Company match), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through September of 2005 are virtually the same as through September 2004. This sales figure is good for the company, considering fifteen stores were sold in the Houston, San Antonio and Arizona markets in September 2004.  Margins continue to increase for the company and operating expenses are down for 2005.  Profits for the company have increased in 2005 over 2004.

**TRUSTEE**

An independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required independent of Kelly-Moore and the appraiser.

<div align="center">

**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

</div>

1. **SHARES** – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by the Moore trusts. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. The Series P-B shares have additional dividend rights, making it easier to make ESOP contributions.

2. **VALUE OF SHARES** – The fair market value of the shares at the statement date.

3. **CONTRIBUTIONS/INVESTMENTS** – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. **FORFEITURES** – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. **DISTRIBUTIONS** - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. **VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. **VESTED INTEREST VALUE** – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. **PER SHARE VALUE AS OF 12/31/03** – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.



9. **PARTICIPANT STATUS** – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998, 1999, 2000 or 2001, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00, 12/31/01 or 12/31/02. Finally, if the first year that you worked 1000 hours was 2003, the plan vesting date will show 12/31/03.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/03 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

# EXHIBIT 28
# TO DILLER DECLARATION



EMPLOYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

**November, 2005**

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2004 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1000 hours for Kelly-Moore in 2004 received a contribution for 2004.

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of $6,268,713.42 has been put into our ESOP for 2004. This includes a contribution out of Kelly-Moore profits of $5,809,162.11 and a contribution of $459,551.31 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. The amount of $5,809,162.11 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. This represents the first quarter loan payment in 2004. Due to the continuing asbestos liability, no payments were made for the other three quarterly payments. The note has been restructured with approval from the Board of Directors and the ESOP Trustee to make yearly payments on the note, with the note now scheduled to be fully paid in 2014. Remember that this was the loan that was used to buy the original stock. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $5,809,162.11 divided by the total of principal and interest of all the loan payments (which go on from 1998 to 2014 or 17 years) of $347,460,310.84. This result is then multiplied by the 33,745,455 shares in the ESOP. This allows for a release of approximately 564,187.66 shares to employee shareholder accounts for 2004.

EXHIBIT

201

Thomas    4-18-08

P1121

## SHARE VALUE

At December 31, 2004, the independent appraiser found the per share valuation increased from $2.30 in 2003 to **$2.70** in 2004. This is the value that is used to value both old and new shares on the 2004 statements. Remember the stock price may go up or down based on many factors. Among other things, the independent appraiser looks at current profits, potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset levels, debt levels, market valuations of other paint companies and other items.

## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year are on a multi-step process based on your 2004 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-04. The main reason why final balances may be higher than prior years is that the stock value is higher and the contribution also increases the number of shares.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants forfeited shares that have been reallocated to you. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares. There continues to be risk in the ultimate value of the Kelly-Moore shares due to substantial ongoing asbestos litigation. Depending on the results of this litigation, there could be further severe effect to the value of the shares. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans (which now has a Company match), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through October 2005 are up 1% over October 2004. This sales figure is good for the company, considering fifteen stores were sold in the Houston, San Antonio and Arizona markets in September 2004. Margins continue to increase for the company and operating expenses are down for 2005. Profits for the company have increased in 2005 over 2004.

PI 122

## TRUSTEE

An independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required independent of Kelly-Moore and the appraiser.

**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. **SHARES** – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by the Moore trusts. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. The Series P-B shares have additional dividend rights, making it easier to make ESOP contributions.

2. **VALUE OF SHARES** – The fair market value of the shares at the statement date.

3. **CONTRIBUTIONS/INVESTMENTS** – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. **FORFEITURES** – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. **DISTRIBUTIONS** - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3500.00., etc.

6. **VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. **VESTED INTEREST VALUE** – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

P1123



8. **PER SHARE VALUE AS OF 12/31/04** – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. **PARTICIPANT STATUS** – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you - become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1000 hours was 1998, 1999, 2000 or 2001, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00, 12/31/01, 12/31/02, or 12/31/03. Finally, if the first year that you worked 1000 hours was 2004, the plan vesting date will show 12/31/04.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/04 starting from 12/31/96. A year of Service is a Plan Year in which you have 1000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

# EXHIBIT 29
# TO DILLER DECLARATION

Page 1
March 19, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,           )
                                    )
                Plaintiffs,         )
                                    )
        vs.                         ) Case No.
                                    )
                                    ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                    )
                Defendants.         )
                                    )
                                    )
                                    )

VIDEOTAPED DEPOSITION OF PETER CAZZOLLA
March 19, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79124

a62d2e0c-e9a0-488c-a369-a2841daa5031



1          A      That could be it.

2          Q      When did you discuss asbestos liabilities

3    with the Duff & Phelps team?

4                MS. SMITH:   Objection.   I would like to

09:52 5    have a continuing objection to the use of the phrase,

6    asbestos liabilities.   Vague and ambiguous.

7    BY MR. FEINBERG:

8          Q      You can answer.

9          A      When we were going through the valuation

09:52 10    process, we had part of that process was the part of the

11    due diligence was the audited statements of the Holding

12    Company as well as CIG, and that at some point we

13    discussed that as part of the process.   I can't be

14    definitive where along the line that occurred.   But my

09:53 15    recollection is we at least mentioned it.

16          Q      So when you say we at least mentioned it,

17    who is the "we" in that statement?

18          A      Me.

19          Q      I sometimes use the royal pronoun too but

09:53 20    my kids don't respect that.

21                But, anyway, when you say we or you at

22    least mentioned it, was it only verbal or was it

23    somewhere in writing?

24          A      It was just verbal other than the audit

09:53 25    report.

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

382d2e0c-e9a0-488c-a369-a2841daa5631



1          A     I don't -- I can't tell you the report

2     exactly what it says.

3     BY MR. FEINBERG:

4          Q     You can't recall?

09:54 5          A     I can't recall, yeah.

6          Q     But you recall saying something

7     specifically about asbestos?

8          A     I do recall discussing that, yes.

9          Q     And do you recall what your discussion with

09:54 10    the Duff & Phelps team was on this subject?

11         A     My recollection again was that it was a

12    basic, you know, we have this potential or they have

13    that liability and basically to make sure we disclosed

14    what was going on.

09:55 15         Q     Was there a reason why you disclosed

16    asbestos liability in particular to the Duff & Phelps

17    team?

18              MS. SMITH:    Objection to form.

19         A     Just to make sure that they knew that what

09:55 20    all the contingencies were.  It was part of the process,

21    part of the valuation process.

22    BY MR. FEINBERG:

23         Q     Do you recall which year you -- well, is

24    your recollection that you made this disclosure to the

09:55 25    Duff & Phelps team prior to the 1999 ESOP transaction?

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 94111
Fax (415) 288-4286

c82d2e0c-e9a0-488c-a369-a2841daa5031



PETER CAZZOLLA

1       A       During that process, yes.

2       Q       So it was during the 1999 valuation

3   process?

4       A       Yes.

09:55 5      Q       Do you recall disclosing any other

6   particular liabilities to the Duff & Phelps team as part

7   of that process?

8               MS. SMITH:   Objection to the form.

9       A       Well, other than your typical potential

09:56 10  legal liabilities, being an insurance company, we had

11  those types of contingencies but basically nothing other

12  than that.

13  BY MR. FEINBERG:

14      Q       Did you disclose the asbestos liability to

09:56 15  the Duff & Phelps team because you thought it was a

16  material liability?

17              MS. SMITH:   Objection to form.

18              MS. DILLER:   Calls for legal conclusion.

19      A       No.

09:56 20  BY MR. FEINBERG:

21      Q       What is your understanding of the term,

22  material liability?

23      A       Well, it would have a significant impact on

24  the financial condition of the company, could

09:56 25  potentially have that.  That was not the case.

Esquire Deposition Services
Phone (415) 288-4280                     505 Sansome Street, 5th Floor              San Francisco, California 94111
                                         (800) 770-3363                            Fax (415) 288-4286

a82d2e0c-e9a0-488c-a369-a2841daa5031

```
    1         Q    Do you recall anything that the Duff &

    2   Phelps team said about your disclosure of asbestos

    3   liability?

    4              MS. SMITH:   Objection.  Form.

09:56 5         A    Other than they would take it into their

    6   valuation process.  I don't again specifically recall.

    7   BY MR. FEINBERG:

    8         Q    Now, let's see.  I am going to cross a

    9   couple things off here, which is always a good sign for

09:57 10   you.

   11              How did the idea of setting up the ESOP

   12   come about?

   13              MS. SMITH:   Objection.  Calls for

   14   speculation.

09:57 15         A    That I can't answer how the idea was

   16   germinated.  But what I can tell you is that Bill one

   17   day came in at one of our manager meetings and announced

   18   that he is considering an ESOP and that he will let us

   19   know if, in fact, it comes to fruition and when it comes

09:58 20   to fruition.

   21   BY MR. FEINBERG:

   22         Q    Do you recall what year this was in?

   23         A    Well, I believe it was in the 1997, '98

   24   time frame.

09:58 25         Q    Did Mr. Moore say anything about why he
```

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 94111
Fax (415) 288-4286

a82d2e0c-e9a0-488c-a369-a2841daa5031

 1    Duff & Phelps.  Is it your understanding that Duff &

 2    Phelps was hired to do a valuation of CIG for the

 3    potential ESOP transaction?

 4         A    That's correct.

10:05 5        Q    Who made the decision to hire Duff &

 6    Phelps?

 7         MS. SMITH:   Objection to form.

 8         A    Okay.  Initially, we -- Ed Mines, who was

 9    the CFO at the time, was doing some research on

10:06 10   valuation firms.  And once he came up with the valuation

11    firms, then he and I together decided who would have

12    been the best for that function.

13    BY MR. FEINBERG:

14         Q    When you say Mr. Mines was doing some

10:06 15   research and on valuation firms, do you know what kind

16    of research he was doing?

17         A    Just calling and asking people.  You know,

18    he would probably be better -- in a better position to

19    give you a little more specifics there possibly.  But

10:06 20   just checking what's available out there, getting some

21    references I would imagine from people in identifying

22    what firms would be appropriate for evaluating an

23    insurance company ESOP.

24         Q    So once Mr. Mines identified which

10:06 25   valuation firms would be appropriate for evaluating an

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
1(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286



PETER CAZZOLLA

1  insurance company, what happened next to make the

2  selection, in the selection process?

3           MS. SMITH:   Objection to the form.

4      A   We would determine all of the pros and cons

10:07 5  presented to us in terms of costs of valuation, in terms

6  of capability and experience in insurance company

7  valuations, and that's what we basically looked at.

8  BY MR. FEINBERG:

9      Q   How did you get that information?  How did

10:07 10  you --

11     A   By speaking with the firms.

12     Q   Did you have meetings with their

13  representatives?

14     A   Yes.

10:07 15     Q   And you attended those meetings?

16     A   I attended -- the one meeting I did attend

17  was with Duff & Phelps.  And I can't say I attended

18  another one.  If we did, I don't remember.

19     Q   Do you recall which valuation firms were

10:07 20  being considered?

21     A   You know, right now I can't remember.  All

22  I remember is Duff & Phelps.  I honestly can't remember

23  that other one.

24     Q   Now, was anyone else involved in this

10:08 25  selection process besides you and Mr. Mines?

Esquire Deposition Services          505 Sansome Street, 5th Floor          San Francisco, California 94111
Phone (415) 288-4280                      (800) 770-3363                          Fax (415) 288-4286

982d2e0c-e9a0-488c-a369-a2841daa5031



1          A    As stated, yes.

2          Q    Now, as I said I am only going to ask you

3    about a few sections of this.  Could you take a look at

4    page 16, please?  You will see that this includes a list

10:51 5    of comparable companies for purposes of valuing CIG.

6               Do you know how Duffs & Phelps -- did Duffs

7    & Phelps tell you how they selected the comparable

8    companies?

9          A    They actually worked with us on that.

10:51 10   First they came up with them on their own.  And then we

11   reviewed them with them to make sure that we had

12   companies that best matched CIG in terms of our book of

13   business, how we do business.  And came down to the fact

14   that these were the ones that most appropriately

10:52 15   benchmarked us against in terms of coming up with a fair

16   valuation basically.

17         Q    And when you say we, once again who are you

18   referring to?

19         A    Well, myself and Ed.

10:52 20        Q    You and Ed?

21         A    Yeah.

22         Q    These discussions with Duffs & Phelps took

23   place by phone prior to this July 15th meeting?

24         A    I'm sure there were some telephonic

10:52 25   conversations.  I can't really recall exactly how it all

a82d2e0c-e9a0-488c-a369-a2841daa5031

1          Q      Now, when Duff & Phelps did their valuation

2     in 1998, there was as we saw there was a preliminary

3     report and a meeting.  Was there a preliminary report

4     for 1999 or did you just get this document?

13:20 5          A      The typical process was to prepare a

6     preliminary just to make sure that Duff & Phelps did not

7     miss anything in terms of operational strategies,

8     results and various other things.  So before they

9     finalize it, we get that opportunity to review it, make

13:20 10    sure we didn't miss anything.

11          Q      Do you recall getting a preliminary report

12    for this 1999 valuation?

13          A      I would only have to conject that we did,

14    given the process.

13:20 15         Q      Do you recall having a meeting with Duff &

16    Phelps to discuss the preliminary report?

17          A      That I don't recall specifically.  But we

18    again had communications with them during the process,

19    whether it's in person, telephone, whatever the case may

13:21 20    be.

21          Q      Sure.  Have you look at page 1 of the

22    report.  It states that there was interviews done with

23    you and Mr. Mines --

24          A      Okay.

13:21 25         Q      -- I guess as part of their due diligence.

a82d2e0c-e9a0-488c-a369-a2841daa503

1          A     Yes.

2               MR. FEINBERG:    Objection as to the leading

3     questions.   I don't really think that this is an adverse

4     witness, so I would prefer that you don't lead the

16:11 5     witness.

6     BY MS. DILLER:

7          Q     Why don't you tell us what other factors

8     than the comparability analysis that Duff & Phelps

9     provided led you to believe that you could rely on their

16:11 10     advice with respect to use of the June 1999 valuation

11     for the October 1999 transaction?

12          A     Well, they were very thorough.   They did a

13     very intense due diligence on the company, the

14     operations, our financial projections.   They met with

16:12 15     and spoke to the management team, understanding the

16     quality and credentials and criteria of the team.   They

17     looked at the historical performance of the company and

18     what it was up to that point in time and the growth and

19     progress we made.

16:12 20               And basically their comment to us too was

21     that we were not an average company.   We were an

22     exceptional company in terms of the valuation.   And

23     that's all I could recollect at this point in terms of

24     factors.

16:12 25               They did the comparisons by the various

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 94111
Fax (415) 288-4286

a62d2e0c-e9a0-488c-a369-a2841daa503?

1  different measurements, not only the price of the stocks

2  but they looked at that one chart we looked at where

3  they showed the different valuation methods by multiples

4  and various factors.  So it was a combination of things

16:13 5  with the comparative companies just being part of that.

6      Q    And what are your opinions with respect to

7  the expertise of the individuals at Duff & Phelps with

8  whom you associated?

9      A    I had a very high opinion, very

16:13 10  professional, came highly recommended when we did our

11  references.  And then as we actually worked with them,

12  we were very impressed with them.

13          MS. DILLER:   I have no further questions.

14  Thank you.

16:13 15          THE WITNESS:   You are welcome.

16          MR. FEINBERG:   I have one further

17  question.  I guess we have to do our --

18          MS. DILLER:  We have to switch around?

19          THE VIDEOGRAPHER:  He will be okay.

20

21

22          FURTHER EXAMINATION

23  BY MR. FEINBERG:

24      Q    We can look at this again, if you like,

16:13 25  Mr. Cazzolla.  But is it your understanding for the

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

982d2e0c-e9a0-488c-a369-a2841daa5031

STATE OF CALIFORNIA )

       : ss            )

County of Alameda    )

           I, the undersigned, a Certified Shorthand Reporter
of the State of California, do hereby certify: That the
foregoing proceedings were taken before me at the time and
place herein set forth; that any witnesses in the foregoing
proceedings, prior to testifying, were placed under oath;
that a verbatim record of the proceedings was made by me
using machine shorthand which was thereafter transcribed
under my direction; further, that the foregoing is an
accurate transcription thereof.

           I further certify that I am not a relative,
employee, attorney or counsel of any party to this action or
relative or employee of any such attorney or counsel and that
I am not financially interested in the said action or the
outcome thereof;

           IN WITNESS WHEREOF, I have this date subscribed my
name.

Dated: _April 2, 2008_

_Emi Albright_

EMI ALBRIGHT, CSR No. 13042

# EXHIBIT 30
# TO DILLER DECLARATION

Edward Mines

Page 1
April 2, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO AND OAKLAND DIVISION

---

THOMAS FERNANDEZ, et al.,

        Plaintiffs,

vs.

K-M INDUSTRIES HOLDING CO., INC., et al.,

        Defendants.

)
)
)
)
) Case No.
)
) C-06-07339 CW
)
)
)
)

---

VIDEOTAPED DEPOSITION OF EDWARD MINES
April 2, 2008
Monterey, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79128

CERTIFIED
COPY

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871

1            MS. DILLER:   Object to the form.

2        A    Yes, during our normal meetings, officer

3    meetings we would have discussed that.  That would have

4    been Bob Winn, Tom Scherff.

5    BY MS. HASSELMAN:

6        Q    Do you recall how often you discussed it?

7            MR. PALMER:   Object to the form.

8        A    No.

9    BY MS. HASSELMAN:

10       Q    Did you ever discuss the potential impact

11   on the ESOP of Kelly-Moore's asbestos litigation with

12   Mr. Ferrari?

13       A    Yes.

14       Q    Do you recall when that was?

15       A    No.

16       Q    Was it around the same time that the

17   discussions that we've just talked about took place?

18           MR. PALMER:   Object to the form.

19       A    Yes.

20   BY MS. HASSELMAN:

21       Q    And that was around 2002?

22       A    Yes.

23       Q    Did those discussions with Mr. Ferrari

24   include any discussion of insurance coverage for

25   asbestos litigation?

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

Edward Mines

 1          A      No.

 2          Q      Did you ever discuss asbestos litigation or

asbestos liability with Ernst & Young?

 4                 MR. PALMER:    Object to the form.

 5          A      Yes.

 6   BY MS. HASSELMAN:

 7          Q      And when was that?

 8                 MR. PALMER:    Object to the form.

 9          A      Approximately the same time.

10   BY MS. HASSELMAN:

11          Q      What was the content of your discussions in

12   the officers meetings regarding the potential impact on

13   the ESOP of asbestos litigation?

14          A      We discussed the possible impact on the

15   value of the ESOP.

16          Q      And can you describe that more for me?

17                 MR. PALMER:    Object to the form.

18          A      Well, we just discussed what was the

19   possible impact on the value of the ESOP based on the

20   outcome of the asbestos litigation.  We wanted to be

21   certain that we kept the participants informed of any

22   action that was taken that could impair the value of the

23   stock.  And we wanted to be certain that we did it in a

24   timely manner.

25   BY MS. HASSELMAN:

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871c

Edward Mines

```
 1              MR. PALMER:   Object to the form.

 2        A    I asked Ernst & Young -- advised Ernst &

 3   Young of the existence of this possibility of impairment

 4   and asked them if there was any footnote disclosure

 5   required.  And their response was no.

 6   BY MS. HASSELMAN:

 7        Q    When you say footnote disclosure, are you

 8   referring to footnote to CIG's financial statements?

 9        A    CIG's audited financial statements.

10        Q    What was Ernst & Young's response to that

11   question?

12              MS. DILLER:   Asked and answered.

13              MR. BORNSTEIN:   Asked and answered.

14              MR. PALMER:   Asked and answered.

15   BY MS. HASSELMAN:

16        Q    You can answer.

17        A    They felt there was no need for footnote

18   disclosure.

19        Q    Did you ever discuss Kelly-Moore's asbestos

20   litigation with anybody from the Menke Group?

21        A    No.

22        Q    Did you ever discuss Kelly-Moore's asbestos

23   litigation with anybody from Duff & Phelps?

24        A    Yes.

25        Q    Do you recall when that discussion took
```

Page 58
April 2, 2008

Edward Mines

```
 1    place?

 2              MR. PALMER:   Object to the form.

 3         A    Once again it's approximately the same

 4    time.  I believe that I discussed it with Duff & Phelps

 5    at the same time I discussed it with Ernst & Young.

 6    BY MS. HASSELMAN:

 7         Q    Do you recall who you spoke with at Duff &

 8    Phelps?

 9         A    Yes.

10         Q    Who was that?

11         A    Ken Bodenstein.

12         Q    Was that a telephone call?

13              MR. PALMER:   Object to form.

14         A    Yes.

15    BY MS. HASSELMAN:

16         Q    Is there anyone else at Duff & Phelps that

17    you discussed asbestos liability with?

18         A    No.

19         Q    Do you recall the content of your

20    discussions with Mr. Ferrari about Kelly-Moore's

21    asbestos litigation?

22         A    How do I qualify this?  When you say the

23    content of the discussion, I recall that we talked about

24    the fact that the number of claims had increased

25    substantially.  And there was a possibility that the
```

tc77991c-1c96-44dc-b902-74dd74a787

Edward Mines

1        A    I believe it was Bill Moore.

2        Q    Were you involved in selecting Duff &

3   Phelps to perform a valuation of KMH Series I tracking

4   stock in 1998?

5        A    Yes.

6        Q    Did you investigate Duff & Phelps's

7   qualifications?

8        A    Yes.

9        Q    Can you describe how you investigated those

10  qualifications?

11       A    Well, partially based on references.  As

12  you can see their proposal here was based on a lot of

13  their experience in the insurance industry.  A lot of

14  emphasis was placed on the fact that they had such

15  knowledge of the insurance industry as opposed to other

16  type of industries.

17       Q    Did you do anything else to investigate

18  Duff & Phelps' qualifications?

19            MS. DILLER:   Object to the form.

20       A    Discussions with other companies such as

21  Menke.  Menke strongly recommended them.

22  BY MS. HASSELMAN:

23       Q    Did you consider any other valuation firms

24  besides Duff & Phelps?

25       A    Yes.

Esquire Deposition Services
Phone (415) 288-4280          505 Sansome Street, 5th Floor          San Francisco, California 94111
                              (800) 770-3363                         Fax (415) 288-4286

1c77991c-1c96-44dc-b902-74dd74a7871f

Edward Mines

1    Q    And what other firms did you consider?

2    A    One of them was I believe Houlihan and

3  Lonkey (phonetic) or something similar to that.

4    Q    Houlihan & Lokey?

5    A    That's it.

6    Q    Anyone else?

7    A    I believe we took into consideration Brooks

8  also but abandoned that idea because he had no

9  experience in insurance valuation -- insurance company

10  valuations.  And because of the fact that the statutory

11  and GAAP accounting is such a complex issue, we wanted

12  to be certain that we found a very, very well qualified

13  and experienced appraiser.  And that's why we decided on

14  Duff & Phelps.

15    Q    Did you obtain written proposals from

16  Houlihan Lokey on Mr. Brooks?

17    A    Yes.  Excuse me.  Not from Mr. Brooks, no.

18  He was discounted earlier in the due diligence portion

19  because he lacked the experience in the insurance

20  industry.

21    Q    Other than Houlihan Lokey and Mr. Brooks

22  and Duff & Phelps, did you consider any other valuation

23  firms in 1998?

24    A    Not that I recall.

25    Q    Did anyone other than you investigate Duff

1c77991c-1c36-44dc-b902-74dd74a7871c

STATE OF CALIFORNIA )

: ss )

County of Alameda )

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify: That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____

_____

CSR NO.

# EXHIBIT 31
# TO DILLER DECLARATION

• 2025 CENTURY PARK EAST, SUITE 620  •  LOS ANGELES, CA 90067  •  310-264-8006  •  FAX 310-264-8130

JUN 2 3 1999

# DUFF&PHELPS, LLC

June 22, 1999

Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
2300 Garden Road
Monterey, CA  93940

Dear Mr. Moore:

We are pleased to submit this proposal as the basis of an agreement (the "Agreement") among yourself, the trustee (the "Trustee") of the K-M Industries Holding Co. Inc. Employee Stock Ownership Plan (the "ESOP"), K-M Industries Holding Co. Inc. ("K-M Industries"), California Capital Insurance Company ("California Capital" or the "Company") and Duff & Phelps, LLC ("Duff & Phelps"), whereby Duff & Phelps would serve as independent financial advisor to the Trustee, to provide an opinion as to the fair market value of a 42% interest in the Series "I" Tracking Stock of K-M Industries Holding Co. It is our understanding that this valuation will be used by the Trustee in connection with potential ESOP transactions.   Duff & Phelps has previously provided financial advisory services to the Company.

## Nature and Scope of Engagement

As background for our analysis, we will meet with key members of Company management to discuss in detail the history, current operations, and future outlook of California Capital and K-M Industries. Our financial analysis will be based on available historical financial statements and operating data provided by management.  We will also review industry and comparable public company financial data obtained from published or other available sources.  The Company warrants and represents that all information provided or otherwise made available to Duff & Phelps by or on behalf of the Company will be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they are made.  The Company further warrants and represents that any projections provided by them to Duff & Phelps will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable.  The Company acknowledges and agrees that in rendering its services hereunder Duff & Phelps will be using and relying on the information provided by and on behalf of the Company without independent verification thereof by Duff & Phelps.  Duff

Corporate Advisors Since 1932

EXHIBIT

16

Cazzoila    3-19-08

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 2

& Phelps assumes no responsibility for the accuracy or completeness of any information provided by or on behalf of the Company or any other information regarding the Company provided or otherwise made available to Duff & Phelps.

We will use generally accepted valuation and analytical techniques as the basis for our Opinion. Duff & Phelps agrees to maintain the confidentiality of all information provided to it by the Company. The Company agrees that it will not permit any summary of or excerpt from the Opinion or any written materials prepared by Duff & Phelps and provided to the Company in support of the Opinion to be given to anyone who is not a party to this Agreement. Such Opinion and written materials shall be used only for the purposes described in the Agreement. No public reference to the Opinion or this Agreement may be made, without the express written consent of Duff & Phelps, which shall not be unreasonably withheld.

## Work Product

At the conclusion of our engagement (the "Engagement"), we will provide you with a written report which will set forth the scope of our assignment, the principal materials reviewed, the assumptions and qualifications upon which we have relied and our final Opinion as of the valuation date.

## Fees

Our fees for this Engagement, as outlined above, will be $40,000. Duff & Phelps requests a $20,000 retainer to be paid upon execution of this Agreement, to be credited against the fees described above. The remainder of the fees will be due upon completion of the Engagement, where completion is defined as delivery of the final Opinion unless this Engagement is terminated by you prior to such delivery. Any party hereto may terminate this Agreement at any time upon written notice, without liability or continuing obligation, except as set forth in the remainder of this paragraph. Neither the termination nor completion of this Engagement shall effect: (i) any compensation earned by Duff & Phelps up to the date of termination or completion; (ii) the reimbursement of expenses incurred by Duff & Phelps up to the date of termination or completion; (iii) the indemnification provisions; and (iv) the provisions relating to successors and assigns in the following paragraph. If this Engagement is terminated prior to completion, Duff & Phelps would bill you for its professional time spent to date on the Engagement plus out-of-pocket expenses, less the retainer.

CIG 008251

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 3


In addition to the fees described above, the Company agrees to promptly reimburse Duff & Phelps, from time to time upon request, for its reasonable out-of-pocket and incidental expenses, as documented, for travel, meals, lodging, telephone, document reproduction, telecopying, and computer charges and database access fees, and for reasonable fees and expenses of counsel, consultants and advisors retained by Duff & Phelps, incurred during the term, and in furtherance, of its Engagement hereunder. Fees for legal counsel, consultant and advisors will not be paid by the company without prior written approval for such services. No portion of these fees is contingent upon the consummation of a transaction or the conclusion reached in the Opinion. In the event that the terms of the Engagement as outlined herein are modified after substantial completion of the analysis by Duff & Phelps in preparation of its Opinion and such modifications require substantial additional analysis or other services by Duff & Phelps, the Company agrees to negotiate in good faith the terms of additional compensation to Duff & Phelps.

<u>Indemnification</u>

To the fullest extent lawful, the Company will promptly, upon demand, indemnify and hold harmless Duff & Phelps, LLC and its affiliates (collectively, "D&P"), and each director, officer, employee, agent, member and controlling person of D&P (any or all of the foregoing hereinafter referred to as an "Indemnified Person"), from and against all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel and accountants), costs and liabilities (joint or several), (collectively, "Losses"), resulting directly or indirectly from any threatened or pending investigation, action, claim, proceeding or dispute, including securityholder actions (collectively, a "Claim"), which are related to or arise out of D&P's Engagement, role, activities or the performance or non-performance of professional services on the Company's behalf. The Company will not be responsible, however, for any Losses which are judicially determined to have resulted primarily and directly from the willful misconduct or gross negligence of the party seeking indemnification hereunder; but pending any such judicial determination, the indemnification and reimbursement obligations of the Company hereunder shall continue to apply. The Company also agrees that neither D&P nor any Indemnified Person shall have any liability to the Company, its owners, parents, creditors or securityholders for or in connection with its Engagement, except for Losses incurred by the Company which are judicially determined to have resulted primarily and directly from D&P's willful misconduct or gross negligence. For purposes of the foregoing, "judicially determined" shall mean determined by a court of competent jurisdiction in a final non-appealable judgment on the merits.

CIG 008252

Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 4

The Company will not, without the prior written consent of D&P, settle or compromise or consent to the entry of any judgment in any pending or threatened Claim or Proceeding in respect of which indemnification may be sought hereunder unless such settlement, compromise or consent includes provisions holding harmless and unconditionally releasing D&P and each other Indemnified Person hereunder from all liability related to or arising out of such Claim or Proceeding, including claims for contribution. The Company shall not be liable for any settlement of any Claim effected by D&P without its written consent (which consent shall not be unreasonably withheld). The Company's indemnity, reimbursement and contribution obligations provided for herein shall: (1) be in addition to any liability that the Company otherwise may have to D&P and any rights that D&P or any Indemnified Person may have at common law or otherwise; (2) survive the completion or termination of professional services rendered by D&P under the Agreement; (3) apply to any activities prior to this date and any amendment, modifications or future addition to D&P's Engagement; and (4) inure to the benefit of the heirs, personal representatives, successors, and assigns of D&P and each other Indemnified Person. The Company hereby consents to personal jurisdiction and service and venue in any court in which any Claim or Proceeding which is subject to the terms provided for herein is brought against D&P or any other Indemnified Person. The parties waive any right to trial by jury with respect to any claim or proceeding related to or arising out of D&P's Engagement, any transaction or conduct in connection therewith or this Agreement.

The Agreement shall inure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto. Each such counterpart shall be, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same Agreement. This Agreement may not be modified or amended except in writing signed by the parties hereto.

Corporate Obligation

The obligations of D&P are solely corporate obligations. No director, officer, employee, agent, shareholder or controlling person of D&P shall be subjected to any liability to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement.

CIG 008253



Mr. William E. Moore
California Capital Insurance Company
June 22, 1999
Page 5


In conclusion, we look forward to working with you on this Engagement.   If the foregoing terms are acceptable to you, we request that you arrange to have the Agreement fully executed and returned to us, along with the retainer fee in the amount of $20,000.

Sincerely,

DUFF & PHELPS, LLC


By: _____
Kenneth Bodenstein
Managing Director


AGREED TO AND ACCEPTED BY:

K-M INDUSTRIES HOLDING CO. INC. EMPLOYEE STOCK OWNERSHIP PLAN

By: _____

Title: _____ Trustee _____          Date: JUNE 25, 1999


K-M INDUSTRIES HOLDING CO. INC.

By: _____

Title: _____ Chairman _____          Date: JUNE 25, 1999


CALIFORNIA CAPITAL INSURANCE COMPANY

By: _____

Title: _____ Chairman _____          Date: JUNE 25, 1999


CIG 008254

**EXHIBIT 32**
**TO DILLER DECLARATION**





**COLUMBIA FINANCIAL ADVISORS, INC.**

650 Morgan Building
720 S.W. Washington St.
Portland, OR 97205-3508

(503) 222-0562
FAX (503) 222-1380

September 16, 1999

Mr. William Moore
303 Olive Hill Lane
Woodside, CA 94062

Re: CCIC ESOP Transaction

Dear Mr. Moore:

I am enclosing a new Professional Services Agreement which instructs Columbia Financial Advisors, Inc. to provide to you, in your capacity as fiduciary for the purchase of 42% of the Class B-I stock of K-M Industries Holding Co., Inc., with an opinion as to the $55.0 million fair market value for transaction purposes. We are prepared to issue our opinion as of the closing date of the transaction.

We look forward to working with you.

Sincerely yours,

Kathryn Daly, ASA
Principal
Columbia Financial Advisors, Inc.

EXHIBIT
246
Daly    4-30-08

CIG 008154



# COLUMBIA FINANCIAL ADVISORS, INC

## RETAINER INVOICE

September 16, 1999
California Capital Insurance Company
Invoice #131

---

Retainer for an Opinion as to the Fair Market Value of a 42% interest in the Class B-I stock of K-M- Industries Holding Co., Inc as of the closing date of the Transaction for ESOP purposes.

**10,000.00**

---

*Payment due upon receipt*
*Thank you*

CIG 008160

# EXHIBIT 33
# TO DILLER DECLARATION

9/07/99   17:19   ☎505 222 1580        COLUMBIA FIN ADV                    ☒012



650 Morgan Building
720 S.W Washington St.
Portland. OR 97205-3508

(503) 222-0562
FAX (503)222-1580

September 7, 1999

The Proposed ESOP Trust Committee
c/o Mr. William Moore
California Capital Insurance Corporation
303 Olive Hill Lane

DOCUMENT SUBMITTED UNDER SEAL

CIG 008220

California Capital Insurance Corporation

**DOCUMENT SUBMITTED UNDER SEAL**

CIG 008230

DOCUMENT SUBMITTED UNDER SEAL

CIG 008223

DOCUMENT SUBMITTED UNDER SEAL

CIG 008224

09/07/99   17:17        222 1380        COLUMBIA FIN AD

**DOCUMENT SUBMITTED UNDER SEAL**

CIG 008225

CIG 008221

**DOCUMENT SUBMITTED UNDER SEAL**

DOCUMENT SUBMITTED UNDER SEAL

CIG 008217

COLUMBIA FINANCIAL ADVISORS, INC.

**DOCUMENT SUBMITTED UNDER SEAL**

CIG 008216

COLUMBIA FINANCIAL ADVISORS, INC.

**DOCUMENT SUBMITTED UNDER SEAL**

CIG 008219

COLUMBIA FINANCIAL ADVISORS, INC.

**DOCUMENT SUBMITTED UNDER SEAL**

CIG 008218

FAX

DOCUMENT SUBMITTED UNDER SEAL

CIG 008231

**EXHIBIT 34
TO DILLER DECLARATION**

C16  12/99
ESOP Loan Documents

D&P 000773

IMPORTANT - SAVE !

ENDORSED - FILED
in the office of the Secretary of State
of the State of California

SEP 3 0 1998

BILL JONES, Secretary of State

## AMENDED AND RESTATED ARTICLES OF INCORPORATION OF KELLY-MOORE PAINT COMPANY, INC., A CALIFORNIA CORPORATION

Joseph P. Cristiano and Stephen A. Ferrari certify that:

1.    They are the President and Secretary, respectively, of Kelly-Moore Paint Company, Inc., a California corporation (the "Corporation").

2.    The Articles of Incorporation of this Corporation are amended and restated to read in full as follows:

### "ARTICLES OF INCORPORATION

#### OF

#### K-M INDUSTRIES HOLDING CO., INC.

#### I.

The name of this Corporation is K-M Industries Holding Co., Inc.

*TO Change*
*11 600.000 — T-A*
*000 — T-B*
*60000 U*

#### II.

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business, or the practice of a profession permitted to be incorporated by the California Corporations Code.

#### III.

A.    Authorized Shares.  This Corporation is authorized to issue 100,000,000 shares of Common Stock, of which 80,000,000 shares shall be designated as Class P Stock and 20,000,000 shares shall be designated as Class I Stock. Each class of Common Stock shall be further divided into two series. Class P Stock shall consist of 46,254,545 shares designated as Class P-A Stock and 33,745,455 shares designated as Class P-B Stock. Class I Stock shall consist of 12,000,000 designated as Class I-A Stock and 8,000,000 shares designated as Class I-B Stock.

B.    Recapitalization.  Upon the filing of these amended and restated Articles of Incorporation, each issued and outstanding share of Common Stock is hereby converted into 6,193.5250 shares of Class P-A Stock, 4,518.5466 shares of Class P-B Stock and 1,606.8107

D&P 000774

Confidential

NOV 17 '98   22:27PM KELLY MOORE CORP OFF                                    P.3

shares of Class I-A Stock. At the subsequent time that a stock purchase agreement is executed between the holder of Class I-A Stock and a Trust established in accordance with an Employee Stock Ownership Plan ("ESOP"), the authorized 8,000,000 shares of Class I-B Stock shall be issued to the holder of the Class I-A Stock and the fair market value and basis of the Class I-A Stock will be reallocated equally among all the outstanding shares of both Class I-A Stock and Class I-B Stock.

     C.    <u>Existing First Tier Subsidiaries</u>. As of the filing of these amended and restated Articles of Incorporation, this Corporation will hold the outstanding shares of two wholly-owned subsidiaries, Kelly-Moore Paint Company, Inc. ("Paint Sub") and California Capital Insurance Company ("Insurance Sub").

<div align="center">IV.</div>

     The rights, preferences, privileges and restrictions granted to, or imposed upon, the Class P-A Stock and Class P-B Stock (collectively referred to as "Class P Stock") and Class I-A Stock and Class I-B Stock (collectively referred to as "Class I Stock") are as follows:

     A.    <u>Voting</u>. Except as otherwise provided by law and the Articles of Incorporation of this Corporation, each share of Class P Stock and Class I Stock shall be entitled to one vote per share in all matters voted upon by the shareholders of this Corporation and Class P Stock and Class I Stock shall vote together as one class on such matters. Any Organic Change (as hereafter defined) in the Paint Sub or the Insurance Sub shall be approved by the affirmative vote of the holders of at least seventy percent (70%) of the outstanding shares of:

          1. Class P Stock (voting as a class) if such Organic Change is of, or relates to, the Paint Sub; and

          2. Class I Stock (voting as a class) if such Organic Change is of, or relates to, the Insurance Sub.

     As used herein an "Organic Change" of or relating to a corporation shall mean any sale or other transfer of any capital stock of such corporation that constitutes the transfer of more than 10% of such stock within the 12-month period prior to such sale or other transfer, any merger or consolidation of such corporation with any other corporation, any recapitalization or reclassification of the capital stock of such corporation, any sale or other transfer of all or substantial part of the assets of such corporation and any partial or complete liquidation of such corporation. Nothing in this Section A shall act to limit the obligations of a related ESOP to transfer any of its Shares owned by the ESOP in accordance with §14 of the ESOP. Moreover, nothing in this Section A shall act to limit those certain "Put Options" rights described in §16 of the ESOP.

C:\Documents\Kelly-Moore\Amended Articles-Final.doc

D&P 000775

NOV 17 '98  02:27PM KELLY MOORE CORP OFF                                      P.4

### B. Dividends.

1. Class P Stock. The holders of the outstanding shares of Class P Stock shall be entitled to receive dividends thereon when, as and if declared by the Board of Directors of this Corporation; provided, however, that no dividends may be paid on the Class P-A Stock unless the holders of Class P-B Stock are paid at the same time an equivalent amount for each share of Class P-B Stock held by such holders; and provided further that dividends which may be paid in the aggregate with respect to such class or series at any time, or from time to time, shall be limited to the sum of:

    a. all dividends paid to this Corporation by the Paint Sub;

    b. the proceeds received by this Corporation from the sale of any capital stock of Paint Sub; and

    c. the pro rata portion (based on the number of outstanding shares of Class P Stock relative to the total number of outstanding shares of all classes of common stock of this Corporation) of this Corporation's retained earnings and surplus legally available for distribution and which arise from sources other than (x) dividends paid by any of the subsidiaries of this Corporation or (y) the sale of any capital stock of any of the subsidiaries of this Corporation.

2. Class I Stock. The holders of the outstanding shares of Class I Stock shall be entitled to receive dividends thereon when, as and if declared by the Board of Directors of this Corporation; provided, however, that no dividends may be paid on the Class I-A Stock unless the holders of Class I-B Stock are paid at the same time an equivalent amount for each share of Class I-B Stock held by such holders; and provided further that dividends which may be paid in the aggregate with respect to such class or series at any time, or from time to time, shall be limited to the sum of:

    a. all dividends paid to this Corporation by the Insurance Sub;

    b. the proceeds received by this Corporation from the sale of any capital stock of Insurance Sub; and

    c. the pro rata portion (based on the number of outstanding shares of Class I Stock relative to the total number of outstanding shares of all classes of common stock of this Corporation) of this Corporation's retained earnings and surplus legally available for distribution and which arise from sources other than (x) dividends paid by any of the subsidiaries of this Corporation or (y) the sale of any capital stock of any of the of the subsidiaries of this Corporation.

    C.   Conversion. The following shall apply while any shares of Class P Stock or Class I Stock remains outstanding:

    1. Option to Convert. Except on or after the event of automatic conversion set

C:\Documents\Kelly-Moore\Amended Articles-Final.doc

D&P 000776

forth in Section C.2 (below), each share of Class P-A Stock and Class I-A Stock shall be convertible, at the option of the holder thereof, at any time at the office of this Corporation or any transfer agent for the Stock, into one fully paid and nonassessable share of Class P-B Stock and Class I-B Stock, respectively.

2. Automatic Conversion. Each share of Class P-B Stock and Class I-B Stock shall be automatically converted at this Corporation's office or at its transfer agent's office into one fully paid and nonassessable share of Class P-A Stock and Class I-A Stock, respectively, upon the effectiveness of a registration statement under the Securities Act of 1933, as amended, covering the first underwritten offer and sale of this Corporation's Common Stock.

D. Liquidation.

1. Definitions. As used herein:

a. the amount of all dividends paid to this Corporation by Paint Sub plus the proceeds received from the sale of any capital stock of the Paint Sub but which dividends and proceeds have not been distributed by this Corporation as a dividend to the holders of Class P Stock as provided in Section B.1 above shall be referred to as "Class P Accrued Dividends;"

b. the amount of all dividends paid to this Corporation by the Insurance Sub plus the proceeds received from the sale of any capital stock of any of the Insurance Sub or its subsidiaries but which dividends and proceeds have not been distributed by this Corporation as a dividend to the holders of Class I Stock as provided in Section B.2 above shall be referred to as "Class I Accrued Dividends;" and

c. the sum of Class P Accrued Dividends and the Class I Accrued Dividends shall be referred to as "Total Accrued Dividends."

2. Preferences of Class P Stock. In the event of any liquidation, dissolution or winding up of this Corporation, whether voluntary or involuntary, the holders of the outstanding shares of Class P Stock shall be entitled to receive out of the net assets of this Corporation legally available for distribution to shareholders the following:

a. the shares of stock of the Paint Sub then owned by this Corporation; and

b. cash and other property equal in amount and value to the amount of the Class P Accrued Dividends; provided, however, that if the assets legally available for distribution to shareholders of this Corporation are insufficient to distribute the Total Accrued Dividends, then the holders of the outstanding shares of Class P Stock shall be entitled to receive in lieu thereof the pro rata portion (based on the proportion which the Class P Accrued Dividends bears to the Total Accrued Dividends) of the assets of this Corporation which are legally available for distribution;

- 4 -

D&P 000772

3. <u>Preferences of Class I Stock</u>.  In the event of any liquidation, dissolution or winding up of this Corporation, whether voluntary or involuntary, the holders of the outstanding shares of Class I Stock shall be entitled to receive out of the net assets of this Corporation legally available for distribution to shareholders the following:

a. the shares of stock of the Insurance Sub then owned by this Corporation; and

b. cash and other property equal in amount and value to the amount of the Class I Accrued Dividends; provided, however, that if the assets legally available for distribution to shareholders of this Corporation are insufficient to distribute the Total Accrued Dividends, then the holders of the outstanding shares of Class I Stock shall be entitled to receive in lieu thereof the pro rata portion (based on the proportion which the Class I Accrued Dividends bears to the Total Accrued Dividends) of the assets of this Corporation which are legally available for distribution;

4. <u>Distribution of Remaining Assets</u>.  The remainder of any net assets of this Corporation after payment of the amounts under Sections D.2 and 3 above shall be distributed ratably to the holders of the Class P Stock and the Class I Stock on a share-for-share basis without distinction as to class shares.

<p style="text-align:center">V.</p>

A.    <u>Limitation of Directors' Liability</u>.    The liability of the directors of this Corporation for monetary damages shall be eliminated to the fullest extent not prohibited under California law.

B.    <u>Indemnification of Corporate Agents</u>.  This Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through Bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code with respect to actions for breach of duty to this Corporation and its shareholders.

C.    <u>Repeal or Modification</u>.  Any repeal or modification of the foregoing provisions of this Article V by the shareholders of this Corporation shall not adversely affect any right or protection of a director of this Corporation existing at the time of such repeal or modification."

3.    The foregoing amendment and restatement of the Articles of Incorporation has been duly approved by the Board of Directors.

4.    The foregoing amendment and restatement of the Articles of Incorporation has been duly approved by the required vote of the shareholders in accordance with Section 902 of the California Corporations Code.  The total number of outstanding shares of this Corporation

D&P 000778

is 7,468.21.  The number of shares voting in favor of the amendment equaled or exceeded the vote required.  The percentage vote required was more than 50 percent.

We further declare, under penalty of perjury under the laws of the State of California, that the matters set forth in the foregoing Certificate are true and correct of our own knowledge.

Executed as of September _30_, 1998, at San Carlos, California.

_____
Joseph P. Cristiano, President

_____
Stephen A. Ferrari, Secretary



C:\Documents\Kelly-Moore\Amended Articles-Final.doc

D&P 000779

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this __18__ day of October, 1999, by and among William E. Moore as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust, formerly known as the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder"), and K-M Industries Holding Co., Inc., a California corporation (hereinafter referred to as the "Company"),

## WITNESSETH:

WHEREAS, Trustee is the trustee of the amended and restated K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan") originally effective as of January 1, 1998, and amended and restated effective as of July 16, 1999, and intended to be qualified as an employee stock ownership plan as defined in Section 4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code; and

WHEREAS, Selling Shareholder owns all of the issued and outstanding Class 1-B shares of the Company; and

1

D&P 000780



WHEREAS, Selling Shareholder desires to sell eight million four hundred thousand (8,400,000) shares of the Company's Class I-B Stock (the "Shares") to the Trustee; and

WHEREAS, Trustee wishes to purchase from Selling Shareholder, and Selling Shareholder wishes to sell to Trustee the Shares for the benefit of the employees of the Company who are participants in the Plan; and

WHEREAS, the parties desire to design said purchase and sale so that the Selling Shareholder will be entitled to the benefits of Section 1042 of the Internal Revenue Code; and

WHEREAS, the Company desires to provide a means for its employees to acquire a proprietary interest in it as an incentive for them to advance the business and affairs of the Company;

NOW, THEREFORE, in consideration of the promises and the respective agreements hereinafter set forth, Selling Shareholder and Trustee hereby agree as follows:

1.    Sale of Stock.  As of this date and subject to the terms and conditions of this Agreement, Selling Shareholder does hereby sell and deliver to Trustee, and Trustee does hereby purchase from the Selling Shareholder, the Shares.

2.    Purchase Price.7

(a)    In consideration for the transfer of the Shares as provided in Section 1, Trustee shall pay to Selling Shareholder an amount equal to Six and 55/100 Dollars ($6.55) per share rounded, or a total of Fifty-five Million and 00/100 Dollars ($55,000,000.00).  Purchase Price shall be paid to Selling Shareholder in cash at the closing.

(b)    The purchase price in Section 2(a) hereof is not more than the fair market valuation established as of the date of this Agreement.  In the event that there is a final determi-

2

D&P 000781

nation by the Internal Revenue Service, a court of competent jurisdiction or otherwise that the fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee, then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee shares of the Company's Class P-B Stock, or any combination thereof, equal in value to the difference between the Purchase Price and said fair market value for all such Shares. In the event that cash and/or shares of the Company's Class P-B Stock are paid and/or transferred to the Trustee under this provision, such shares shall be valued at their fair market value as of the date hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid by Selling Shareholder on the amount of cash paid.

3.    Representations and Warranties of Selling Shareholder. The Selling Shareholder, to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties.

(a)    On the date hereof, the Shares being sold hereunder will be validly issued and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever upon or against such shares; and there will be in existence no limitations or restrictions of any kind (other than restrictions under a buy/sell agreement among Company shareholders) on the right of Selling Shareholder to sell such Shares in accordance with the terms hereof. No options, warrants, agreements, or similar rights created by the Company for the issue or sale of any stock or securities of any kind or for the purchase thereof by any person other than pursuant to or as disclosed by this Agreement will then be in existence.

(b)    Selling Shareholder is the owner, free and clear of any encumbrances, of the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

D&P 000782



to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)    Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)    Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby.  Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year.  Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.    Representations and Warranties of Trustee.  Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

D&P 000783

(b)     Trustee has full power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)     Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.     Representations and Warranties of Company. Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)     The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)     Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Company.

(c)     None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

D&P 000784



outstanding "employer securities" of the Company.  In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)    Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.    Obligations of Trustee.  Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.    Indemnification.  Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

D&P 000785



8.    <u>Survival of Representations, Warranties and Agreements</u>.  All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement.  All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    <u>Notices, etc</u>.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

303 Olive Hill Lane
Woodside, CA  94062
Attn:  William E. Moore

If to Trustee, at:

K-M Industries Holding Co., Inc. Employee Stock Ownership Plan
and Trust
Attn.: Trustee
987 Commercial Street
San Carlos, CA  94070

If to the Company, at:

K-M Industries Holding Co., Inc.
Attn.: President
987 Commercial Street
San Carlos, CA  94070

7

D&P 000786

10.    Amendments and Entire Agreement. This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.    Parties in Interest. This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.    Law to Govern. This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.    Section and Other Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

D&P 000787

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WILLIAM E. AND DESIREE B. MOORE 1990
REVOCABLE TRUST, AS AMENDED:


_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee



TRUSTEE OF THE K-M INDUSTRIES
HOLDING CO., INC. EMPLOYEE STOCK
OWNERSHIP TRUST:


_____
William E. Moore, Trustee



K-M INDUSTRIES HOLDING CO., INC.


_____
William E. Moore, President

9

D&P 000788



K-M INDUSTRIES HOLDING CO., INC.

EMPLOYEE STOCK OWNERSHIP PLAN

Plan Committee Resolutions to Authorize Borrowing and

Purchase of Employer Securities

WHEREAS, the amended and restated K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (the "Plan"), originally effective as of January 1, 1998 (formerly known as the Kelly-Moore Paint Company, Inc. Employee Stock Ownership Plan), provides that the Plan Committee may direct the trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust (the "Trust") to borrow funds from any lender for the purpose of purchasing employer securities of K-M Industries Holding Co., Inc., a California corporation (the "Company"); and

WHEREAS, the Plan provides that cash contributed to the Trust or obtained by the Trust as the result of any loans thereto may be used to purchase employer securities of the Company, provided that Trust does not pay more than the fair market value of the shares; and

WHEREAS, the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (collectively the "Seller" or "Selling Share-holder") owns all of the Company's issued and outstanding Class I-B stock of the Company and has offered to sell to the Trust eight million four hundred thousand (8,400,000) shares of the Company's Class I-B Stock (the "Shares") at Six and 55/100 Dollars ($6.55) per share (rounded); and

1

D&P 000789

WHEREAS, the Plan Committee has received an independent appraisal opinion to the effect that the fair market value of the Company's Class I-B Stock, as of the date hereof, is at least Six and 55/100 Dollars ($6.55) per share (rounded); and

WHEREAS, the Plan Committee has made its own prudent investigation of value and has determined that the underlying assumptions on which the independent appraisal was made are fair and reasonable and will not change as of the time the Trust purchases the shares; and

WHEREAS, the Trust has received an Employer contribution in the amount of Nine Hundred Three Thousand Seven Hundred Seventy and 00/100 Dollars ($903,770.00) which will enable the Trustee to purchase one hundred thirty-eight thousand thirty (138,030) of the Shares; and

WHEREAS, a loan in the principal sum of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) is being offered to the Trust by the Company in order to enable the Trustee to purchase eight million two hundred sixty-one thousand nine hundred seventy (8,261,970) of the Shares;

NOW, THEREFORE, BE IT RESOLVED, that William E. Moore, as trustee of the Trust (the "Trustee"), be, and he hereby is, authorized and directed as follows, to:

1.      Execute and deliver the ESOP Loan Agreement for the Loan to the Trust in the aggregate principal sum of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) in substantially the form delivered to the Trustee herewith.

2.      Execute and deliver the ESOP Promissory Note in the aggregate principal sum of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) in favor of the Company, in substantially the form delivered to said Trustee herewith.

D&P 000790

 

3.    Execute and deliver the ESOP Pledge Agreement in substantially the form delivered to the Trustee herewith, and in accordance with the ESOP Pledge Agreement, release the Shares based on the "General Rule" as such term is defined in the Plan.

4.    Execute and deliver the Stock Purchase Agreement between the Selling Share-holder and the Trust, and purchase the Shares for Fifty-five Million and 00/100 Dollars ($55,000,000.00) in cash.

5.    Disburse such funds from the Trust as necessary to effectuate the purchase of the Shares in accordance with the Stock Purchase Agreement.

6.    Execute and deliver such other documents, instruments and certificates and take such further action as may be necessary and appropriate to carry out the intent and purpose of the foregoing resolutions.

Dated: October 18, 1999

COMMITTEE OF THE K-M INDUSTRIES
HOLDING CO., INC. EMPLOYEE
STOCK OWNERSHIP PLAN


By:    _William E. Moore_____
William E. Moore
Plan Committee Member

3

D&P 000791

## K-M INDUSTRIES HOLDING CO., INC.

### ESOP LOAN AGREEMENT

THIS AGREEMENT (hereinafter referred to as the "Loan Agreement" or "Agreement"), entered into on this __19__ day of October, 1999, by and between K-M Industries Holding Co., Inc., a California corporation (hereinafter referred to as the "Company") and William E. Moore, as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust (hereinafter referred to as "Trustee" or "Borrower"),

### W I T N E S S E T H:

WHEREAS, the William E. and Desiree B. Moore 1990 Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter referred to as the "Seller" or "Selling Shareholder") owns all of the issued and outstanding Class I-B shares of the Company; and

WHEREAS, the Selling Shareholder desires to sell eight million four hundred thousand (8,400,000) shares of the Company's Class I-B Stock (hereinafter referred to as the "Shares") to the Trustee; and

WHEREAS, Trustee desires to purchase the Shares from the Seller pursuant to that certain Stock Purchase Agreement between the Seller and the Trustee for the benefit of the participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (hereinafter referred to as the "ESOP"); and

WHEREAS, the Company is willing to make a loan to the Trustee to enable the Trustee to purchase the Shares for cash;

1

D&P 000792



NOW THEREFORE, in consideration of the mutual covenants, representations, warranties and recitations contained herein, the parties hereto agree as follows:

1.    The Loan. The Company shall loan to the Trustee and the Trustee shall borrow from the Company the sum of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) to fund the purchase of eight million two hundred sixty-one thousand nine hundred seventy (8,261,970) of the Shares from the Seller for the benefit of the participants in the ESOP.

2.    Promissory Note. The indebtedness of the Trustee to the Company shall be evidenced by a promissory note dated of even date herewith, attached hereto and incorporated herein by reference (hereinafter "Promissory Note" or "Note"), the terms of which shall provide for repayment as described therein.

3.    Pledge Agreement. To secure payment of the Note, Trustee shall grant to the Company a security interest in and agrees to pledge the Shares pursuant to the terms of a Pledge Agreement of even date herewith, attached hereto and incorporated herein by reference (hereinafter the "Pledge Agreement").

4.    Interest. Interest on the unpaid principal balance of the loan shall accrue at a rate in accordance with the terms of the Note.

5.    Principal Payments. All payments of principal shall be made in accordance with the terms of the Note.

6.    Representation and Warranties by Trustee. In order to induce the Company to make the loan herein provided for, Trustee hereby represents and warrants as follows:

(a)    The Plan is an employee retirement trust duly organized and validly existing under the laws of the State of California and is an employee stock ownership plan which

2

D&P 000793

meets the requirements of Section 4975(e)(7) of the Internal Revenue Code and Section 54.4975-11 of the Income Tax Regulations.

(b)    The Trustee (i) has the power, authority and legal right to enter into and perform this Agreement and has taken all necessary action to authorize the borrowings on the terms and conditions specified herein and to authorize the execution, delivery and performance of this Agreement and the Note, (ii) is the duly appointed trustee of the Plan and is authorized, on behalf of the Plan, to execute, deliver and perform this Agreement and the Note, and (iii) has the power, authority and legal right to administer the Plan for the benefit of its participants.

(c)    The execution, delivery and performance of this Loan Agreement and the Note does not and will not conflict with any law, regulation, rule, order of any court or governmental agency or the documents pursuant to which the Plan was established, by which it is governed or to which it is subject. This Loan Agreement and the Note constitute or will constitute legal, valid and binding obligations of the Plan enforceable against the Plan in accordance with their respective terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws affecting the enforcement of creditors rights generally.

(d)    The loan contemplated hereunder will qualify for the prohibited transaction exemption under Section 4975(d)(3) of the Internal Revenue Code and as an "exempt loan" as defined in Section 54.4975-7(b) of the Income Tax Regulations. The purchase price to be paid by Trustee for the Shares will not be in excess of "adequate consideration" as defined in Section 3(18) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Said loan, the purchase of the Shares and the entire transaction contemplated hereby will not constitute a prohibited transaction as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA.

(e)    All of the proceeds of the loan will be used by Trustee to purchase shares of "employer securities" as defined in Section 409(l) of the Internal Revenue Code.

3

D&P 000794

7.     General Provisions.

(a)     This Loan Agreement contemplates the entire agreement between the parties pertaining to the subject matter herein and supersedes all prior agreements, representations and understandings of the parties, either oral or written. No supplement, modification or amending of this Loan Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Loan Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding, unless executed in writing by the party making the waiver.

(b)     This Loan Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

(c)     This Loan Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, successors and assigns.

(d)     If any action or proceeding is commenced to enforce any of the provisions or rights under this Loan Agreement, the prevailing party shall be entitled to recover all of its costs, expenses and reasonable attorneys' fees incurred therein, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.

(e)     All notices, offers, acceptances, waivers and other acts under this Loan Agreement shall be in writing and shall be sufficiently given if either delivered in person or mailed by certified or registered mail, postage prepaid, to the parties at such addresses as each of them, by notice to the other, may designate from time to time. Any written document will be deemed delivered either on the day of delivery in person or two (2) days after the mailing of such document.

4

D&P 000795

(f)     The laws of the State of California shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

IN WITNESS WHEREOF, the parties have executed this Loan Agreement effective as of the date first above written.

K-M INDUSTRIES HOLDING CO., INC.


By: _William E. Moore_____
       William E. Moore, President

K-M INDUSTRIES HOLDING CO., INC.
EMPLOYEE STOCK OWNERSHIP TRUST


_William E. Moore_____
William E. Moore, Trustee

5

D&P 000796

## ESOP PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT is made this ___18___ day of October, 1999, between William E. Moore, as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust (hereinafter referred to as the "Pledgor"), and K-M Industries Holding Co., Inc. (hereinafter referred to as the "Pledgee" or the "Company").

WHEREAS, Pledgee has loaned funds to Pledgor in order to enable Pledgor to purchase eight million two hundred sixty-one thousand nine hundred seventy (8,261,970) shares of the Company's Class I-B Stock (hereinafter called the "Shares") pursuant to the terms of the ESOP Loan Agreement and ESOP Promissory Note of even date herewith, copies of which are attached hereto and made a part hereof; and

WHEREAS, Pledgor in order to secure said note payments to the Pledgee on the dates and in the amounts specified therein, has agreed to pledge to Pledgee the Shares purchased by the Pledgor;

NOW, THEREFORE, the Pledgor agrees as follows:

I.    PLEDGE.  The Pledgor hereby pledges to the Pledgee the Shares as collateral security for the payment of the ESOP Promissory Note dated of even date herewith in the principal amount of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) (hereinafter referred to as the "Note").

II.    STOCK ASSIGNMENT OR STOCK POWER.  Simultaneously with the execution and delivery of this Pledge Agreement and the Shares, the Pledgor has delivered to the Pledgee a stock assignment or stock power duly endorsed in blank and the Pledgee hereby acknowledges such delivery and receipt thereof.

1

D&P 000797

III.    ADDITIONAL SHARES.  If any additional shares of stock of the Parent's Class P-B Stock (hereinafter referred to as the "Additional Shares") shall be issued by reason of stock dividends, stock splits, recapitalization, or reorganization, all of the Additional Shares issued to the holder of the Shares of the Company then pledged hereunder, shall also be deposited hereunder as additional collateral.

IV.    VOTING RIGHTS.  Unless and until there is a default in the payment of any amounts due Pledgee under the Note, or if the Pledgee waives such default, all shares of stock pledged hereunder shall be voted by Pledgor.  In the event of nonpayment by the Pledgor to Pledgee of any payment due to Pledgee under the Note, and such nonpayment continuing for ten (10) days after notice of default is delivered to Pledgor, the Pledgee shall have full right, power and authority to exercise all voting rights with respect to the shares of stock pledged hereunder which have not been released from the pledge in accordance with Paragraph V of this Agreement.

V.    RELEASE FROM PLEDGE.  For each Plan Year during the duration of the term loan reflected by the Note, a number of Shares shall be released from this Pledge Agreement as of each December 31, which number of Shares for each fiscal year shall equal the product of (A) times (B) where:

    (A)    equals the number of Shares subject to this Pledge Agreement immediately prior to the release of Shares required hereby; and

    (B)    equals a fraction, the numerator of which is the total principal and interest paid under the Note for that fiscal year and the denominator of which is the sum of (i) the numerator plus (ii) the principal and interest to be paid for all future Plan Years.

2

D&P 000798

VI.    SALE OF STOCK UPON DEFAULT. If the Pledgor shall default in the payment of the Note, the Pledgee shall have the right to sell the collateral or any part thereof upon ten (10) days written notice to the Pledgor served by certified mail, return receipt requested, but without further advertisement and the Pledgee may thereupon collect, receive, appropriate, and realize upon the collateral, or any part thereof, or may sell, assign and deliver the collateral of any part thereof, at public or private sale in California or elsewhere, at such price as the Pledgee may deem best for cash or on credit or for future delivery or the Pledgee may purchase the whole or any part of the collateral; provided, however, that this Article VI shall be subject to the restrictions and limitations of Article XVI.

VII.    ADJOURNMENT OF SALE. The Pledgee may without further notice or publication, adjourn any public or private sale or cause it to be adjourned from time to time by announcement at the time and place fixed for the sale and each said sale may be made at any time or place to which the same may be so adjourned.

VIII.    APPLICATION OF PROCEEDS. The Pledgee shall apply the net proceeds of any such collection, realization, or sale, after deducting all costs and expenses of every kind incurred therein or incidental to the care, safe keeping, or otherwise of the collateral, or in any way relating to the rights of the Pledgee hereunder, including reasonable counsel fees, to the payment in whole or in part of the Note, accounting for any surplus to the Pledgor.

IX.    SALE ON JUDGMENT. In lieu of exercising the power of sale herein conferred upon the Pledgee, such Pledgee may proceed by a suit or suits in law or in equity to foreclose this Pledge Agreement and to sell the collateral or any portion thereof (subject, however, to the limitations and restrictions set forth in Article XVI) under a judgment or decree of a court of competent jurisdiction.

D&P 000799



X.    WAIVER OF RIGHTS.  No failure or delay on the part of the Pledgee to exercise any right, power, or remedy hereunder shall operate as a waiver thereof.  The remedies provided herein are cumulative and not exclusive and in addition to the remedies specifically provided for herein, the Pledgee shall be entitled to all of the remedies under the Uniform Commercial Code as adopted in the State of California.

XI.    CONTROLLING LAW.  This Agreement shall be construed in accordance with the laws of the State of California and the parties shall be entitled to such rights and duties as are imposed by the Uniform Commercial Code of said State.

XII.    OTHER DOCUMENTS.  All of the terms, provisions, covenants, and conditions set forth in the Note and any agreements, instruments and documents required to be executed and delivered by Pledgor to Pledgee, are hereby incorporated by reference into this Agreement.  All events of default therein shall apply as events of default hereunder.

XIII.    NOTICES.  All notices desired or required to be given hereunder shall be deemed to have been given when mailed by United States Certified Mail, Return Receipt Requested, addressed to the other party or parties hereunder at its respective address, as follows:

> PLEDGOR:   K-M Industries Holding Co., Inc. Employee Stock
> Ownership Plan and Trust
> 987 Commercial Street
> San Carlos, CA  94070
> Attn: Trustee

> PLEDGEE:   K-M Industries Holding Co., Inc.
> 987 Commercial Street
> San Carlos, CA  94070
> Attn: President

XIV.    INDEMNIFICATION.  The Pledgor agrees to indemnify the Pledgee and to hold the Pledgee free and harmless against payment of documentary stamps, assessments and charges made by any governmental authority by reason of the execution and delivery of this Agreement or by reason of the transfer of any of said shares.

4

D&P 000800

XV.   BINDING EFFECT.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns.

XVI.   FORECLOSURE RESTRICTIONS.  Notwithstanding anything contained herein or in the Note to the contrary, upon default by the Pledgor such that the Pledgee shall have foreclosure rights against the Shares, either arising under this Pledge Agreement, the Note, or applicable laws, such foreclosure rights shall be limited and restricted so that a transfer of Shares from Pledgor to Pledgee pursuant to the exercise by Pledgee of such foreclosure rights shall occur only upon and to the extent of the failure by the Pledgor to meet the payment schedule of the Note.  This Article XVI shall be construed and interpreted so that this Pledge Agreement, and all rights and duties thereunder, comply with the requirements of Treasury Regulation 54.4975-7(b)(6).

IN WITNESS WHEREOF, this Agreement has been executed by the Parties and delivered by the Pledgor on the day and year first above written.

PLEDGOR:   K-M INDUSTRIES HOLDING CO., INC. EMPLOYEE STOCK OWNER-SHIP TRUST

By _William E Moore_____
    William E. Moore, Trustee

PLEDGEE:   K-M INDUSTRIES HOLDING CO., INC.

By _William Emory_____
    William E. Moore, President

5

D&P 000801

## ESOP PROMISSORY NOTE

$54,096,230.00

San Carlos, California
October 18, 1999

FOR VALUE RECEIVED, the undersigned (the "Borrower") promises to pay to the order of K-M Industries Holding Co., Inc. (the "Company") or order, the principal sum of Fifty-four Million Ninety-six Thousand Two Hundred Thirty and 00/100 Dollars ($54,096,230.00) together with interest on the unpaid principal balance at a rate equal to six and one-half percent (6½%) per annum. Interest shall be computed at the above rate on the basis of the actual number of days during which the principal hereunder is outstanding, divided by Three Hundred Sixty-Five (365), which shall, for the purposes of this Note, be one (1) year.

This loan shall be repaid in fifty-three (53) quarterly payments which include principal and interest. The first payment shall be in the amount of Five Million Nine Hundred Seven Thousand Three Hundred Eighty-two and 00/100 Dollars ($5,907,382.00) and shall be due on December 31, 1999. The remaining balance shall be payable in fifty-two (52) quarterly installments pursuant to the amortization schedule attached hereto. Each subsequent installment shall be due on the last day of the quarter, and continuing thereafter until December 31, 2012, at which point all remaining principal and accrued but unpaid interest shall be due and payable. *12 years? This was changed to eight.*

Borrower may prepay any part or all of any of the installments payable hereunder without premium or penalty. In the event of prepayment, the prepayment shall be applied on the principal payments of latest maturity.

In the event of default in the payment of one or more of the installments provided for under the terms of this Note, the value of the Borrower's assets to which the Company may have recourse shall be limited to the amount then in default as determined by the amount by which Borrower failed to pay the installments required by this Note. The Company shall not have the right to accelerate the due date of any installment hereunder.

1

D&P 0008D2

In the event of commencement of suit to enforce payment of this Note, the Borrower agrees to pay such attorneys' fees and costs of collection as the court may adjudge reasonable.

No delay or omission on the part of the holder hereof or of the Borrower in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

This Note is issued pursuant to the ESOP Loan Agreement, of even date herewith, between the Company and Borrower, to fund the purchase of eight million two hundred sixty-one thousand nine hundred seventy (8,261,970) shares of the Company's Class I-B Stock (the "Shares"), to which reference is made for a statement of the terms and conditions under which this Note is issued. This Note is secured by a security interest in, and pledge of the Shares pursuant to a Pledge Agreement, of even date herewith, between the Company and the Borrower.

The execution by the Borrower of this Note is done in Borrower's capacity as Trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust and under and pursuant to the instructions and authorizations provided for under the Trust Agreement. This loan is without recourse against the Trust. The only assets of the Trust that may be given as collateral on this loan are qualifying employer securities of two classes: those acquired with the proceeds of this loan and those that were used as collateral on a prior exempt loan repaid with the proceeds of this loan. No person entitled to payment under this loan shall have any right to assets of the Trust other than:

(i)  Collateral given for the loan,

(ii)  Contributions (other than contributions of employer securities) that are made to the Trust to its obligations under this loan, and

2

D&P 000803

(iii)    Earnings attributable to such collateral and the investment of such contributions and the obligations and liabilities of the Trustees in connection therewith are limited to the assets of said Trust.

K-M HOLDING CO., INC. EMPLOYEE
STOCK OWNERSHIP TRUST


William E. Moore, Trustee

3

D&P 000804



## STOCK POWER

KNOW ALL MEN BY THESE PRESENTS:

THAT, FOR VALUE RECEIVED, K-M Industries Holding Co., Inc. Employee Stock Ownership Trust has bargained, sold, assigned and transferred and by these presents does bargain, sell, assign and transfer, unto K-M Industries Holding Co., Inc. (the "Company"), _____ (_____) shares of the Company's Class I-B Stock represented by Certificate No. _____ herewith, and does hereby irrevocably constitute and appoint _____ as its true and lawful attorney-in-fact, for and in its name, place and stead, to sell, assign and transfer all or any part of said stock for that purpose, to make and execute all necessary acts of assignment and transfer thereof, and to substitute one or more persons with like full power, it being understood that it hereby ratifies and confirms all that said substitute or substitutes shall lawfully do by virtue hereof.

IN WITNESS WHEREOF, the undersigned has executed this Stock Power this _____ day of October, 1999.

K-M Industries Holding Co., Inc.
Employee Stock Ownership Trust


_____
William E. Moore, Trustee

D&P 000805



OCT 1 8 1999

 KELLY·MOORE PAINT COMPANY, INC.

'Quality is Economy'  •  987 Commercial Street • P.O. Box 3016 • San Carlos, California 94070 • (650) 592-8337

October 15, 1999

Mr. Ed Mines
Vice President
California Insurance Group
2300 Garden Road
Monterey, CA 93942-3110

Dear Ed,

Enclosed are signed copies of the ESOP documents prepared by Menke & Associates for your files.

Sincerely,

*Steve Ferrari*
Steve Ferrari
Vice President & CFO

SAF:ajl

Enclosures:

D&P 000806

# PROMISSORY NOTE

California
October 18, 1999

FOR VALUE RECEIVED, the undersigned, K-M Industries Holding Co., Inc. (the "Borrower"), promises to pay to the order of California Capital Insurance Company (the "Company"), or order, the principal sum of Twenty Million and 00/100 Dollars ($20,000,000.00) together with interest on the unpaid principal balance at a rate equal to one-month LIBOR plus 1.70% per annum through March 18, 2001 and one-month LIBOR plus 1.65% per annum thereafter. Interest shall be computed on the basis of the actual number of days during which the principal hereunder is outstanding, divided by Three Hundred Sixty-Five (365), which shall, for the purposes of this Note, be one (1) year. Interest shall be payable monthly in arrears.

This loan shall be repaid in three (3) annual principal payments of Five Million Six Hundred Thousand and 00/100 Dollars ($5,600,000.00) on each March 18, beginning on March 18, 2005, and a balloon payment of $3,200,000.00 on March 18, 2008.

Borrower may prepay any part or all of any of the installments payable hereunder without premium or penalty. In the event of prepayment, the prepayment shall be applied on the principal payments of latest maturity.

This Note is secured with a first-priority interest in 18% of the shares of California Capital Insurance Company held by the Borrower. The value of the shares will be assessed annually by an independent third party acceptable to the Company.

In the event of default in the payment of one or more of the installments provided for under the terms of this Note, the value of the Borrower's assets to which the Company may have recourse shall be limited to the amount then in default as determined by the amount by which

D&P 000807

Borrower failed to pay the installments required by this Note. The Company shall not have the right to accelerate the due date of any installment hereunder.

In the event of commencement of suit to enforce payment of this Note, the Borrower agrees to pay such attorneys' fees and costs of collection as the court may adjudge reasonable.

No delay or omission on the part of the holder hereof or of the Borrower in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

This Note is issued pursuant to the ESOP Loan Agreement, of even date herewith, between the Company and Borrower, to fund the purchase of Eight Million Four Hundred Thousand (8,400,000) shares of the Class I-B Stock of K-M Industries Holding Co., Inc., a California corporation (the "Parent") (the "Shares"), to which reference is made for a statement of the terms and conditions under which this Note is issued.

The execution by the Borrower of this Note is done in its own capacity and in Borrower's capacity as Sponsor of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan and Trust and under and pursuant to the instructions and authorizations provided for under the Trust Agreement.

K-M INDUSTRIES HOLDING CO., INC.

William E Moore

— 2 —

D&P 000808

NOV. 29. 1999  12:06PM     BANK OF AMERICA IL                    NO. 3604   P. 1

231 South LaSalle Street
Chicago, Illinois 60697
(312) 828-3737



# Fax

| | | | |
|---|---|---|---|
| **To:** | Michael Feather | **From:** | Valeriana R. Watson |
| **Company:** | | **Fax:** | 831-647-8649 |
| **Fax:** | (312) 974-9524 | **Pages:** | 53 |
| **Phone:** | (312) 828-3737 | **Date:** | 11/29 |
| **Re:** | | | |

**Comments:**

TERM LOAN AGREEMENT

dated as of October 18, 1999

between

K-M INDUSTRIES HOLDING CO., INC.,

and

BANK OF AMERICA, NATIONAL ASSOCIATION

795431            98508127

D&P 000810

## TABLE OF CONTENTS

Page

SECTION 1.  CERTAIN DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1     General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2     Other Interpretive Provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    1.3     Accounting Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SECTION 2.  AGREEMENT TO MAKE LOANS; TYPES OF ADVANCES;
            BORROWING AND CONVERSION PROCEDURES. . . . . . . . . . . . 11
    2.1     Agreement to Make Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2.2     Various Types of Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2.3     Borrowing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2.4     Conversion/Continuation Procedures. . . . . . . . . . . . . . . . . . . . . . 12
    2.5     Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SECTION 3.  NOTE EVIDENCING LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SECTION 4.  INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.1     Interest Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.2     Interest Payment Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.3     Interest Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.4     Setting and Notice of LIBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.5     Computation of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SECTION 5.  FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SECTION 6.  PREPAYMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    6.1     Voluntary Prepayments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    6.2     Application of Prepayments, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SECTION 7.  MAKING AND PRORATION OF PAYMENTS; SETOFF. . . . . . . . 15
    7.1     Making of Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    7.2     Application of Certain Payments . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    7.3     Due Date Extension. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    7.4     Setoff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    7.5     Payments Net of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SECTION 8.  INCREASED COSTS; SPECIAL PROVISIONS FOR
            OFFSHORE RATE ADVANCES. . . . . . . . . . . . . . . . . . . . . . . . . 16
    8.1     Increased Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    8.2     Basis for Determining Interest Rate Inadequate or Unfair . . . . . . . . 18
    8.3     Changes in Law Rendering Offshore Dollar Lending Unlawful. . . . . . 18

325131        98508197                        -i-

D&P 000811

| | 8.4 | Funding Losses. | 18 |
|---|---|---|---|
| | 8.5 | Right of Bank to Fund through Other Offices | 19 |
| | 8.6 | Discretion of Bank as to Manner of Funding. | 19 |
| | 8.7 | Conclusiveness of Statements; Survival of Provisions | 19 |
| SECTION 9. | | REPRESENTATIONS AND WARRANTIES. | 19 |
| | 9.1 | Corporate Existence and Power | 19 |
| | 9.2 | Corporate Authorization; No Contravention | 20 |
| | 9.3 | Governmental Authorization | 20 |
| | 9.4 | Binding Effect | 20 |
| | 9.5 | Litigation | 20 |
| | 9.6 | No Default | 21 |
| | 9.7 | ERISA Compliance | 21 |
| | 9.8 | Use of Proceeds; Margin Regulations | 22 |
| | 9.9 | Title to Properties | 22 |
| | 9.10 | Taxes | 22 |
| | 9.11 | Financial Condition | 22 |
| | | 9.11.1    The Company. | 22 |
| | | 9.11.2    The Restricted Subsidiaries | 23 |
| | 9.12 | Environmental Matters | 23 |
| | 9.13 | Collateral Documents | 24 |
| | 9.14 | Regulated Entities | 24 |
| | 9.15 | No Burdensome Restrictions | 24 |
| | 9.16 | Subsidiaries | 24 |
| | 9.17 | Insurance. | 24 |
| | 9.18 | Solvency | 24 |
| | 9.19 | Full Disclosure. | 25 |
| | 9.20 | Year 2000 Problem. | 25 |
| COVENANTS | | | 25 |
| | 10.1 | Reports, Certificates, Other Information | 25 |
| | | 10.1.1    Financial Reports | 25 |
| | | 10.1.2    Interim Reports | 26 |
| | | 10.1.3    Certificates | 27 |
| | | 10.1.4    Notice of Default, Litigation and ERISA Matters | 27 |
| | | 10.1.5    Subsidiaries | 28 |
| | | 10.1.6    Insurance Reports | 28 |
| | | 10.1.7    Annual Appraisal | 29 |
| | | 10.1.8    Other Information | 29 |
| | 10.2 | Taxes and Liabilities | 29 |
| | 10.3 | Preservation of Corporate Existence, etc. | 29 |
| | 10.4 | Compliance with Applicable Laws | 29 |
| | 10.5 | Notices | 30 |
| | 10.6 | Maintenance of Property | 31 |

895431        98308187        -ii-

D&P 000812

10.7    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
10.8    Payment of Obligations . . . . . . . . . . . . . . . . . . . . . . . . 31
10.9    Compliance with ERISA . . . . . . . . . . . . . . . . . . . . . . . 32
10.10   Inspection of Property and Books and Records . . . . . . . . . . . . 32
10.11   Environmental Laws . . . . . . . . . . . . . . . . . . . . . . . . . . 32
10.12   Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
10.13   Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SECTION 11. NEGATIVE COVENANTS . . . . . . . . . . . . . . . . . . . . 33
11.1    Limitation on Liens . . . . . . . . . . . . . . . . . . . . . . . . . . 33
11.2    Disposition of Assets . . . . . . . . . . . . . . . . . . . . . . . . . 34
11.3    Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
11.4    Consolidations and Mergers . . . . . . . . . . . . . . . . . . . . . 35
11.5    Limitation on Indebtedness . . . . . . . . . . . . . . . . . . . . . . 35
11.6    Transactions with Affiliates . . . . . . . . . . . . . . . . . . . . . . 35
11.7    Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
11.8    Lease Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
11.9    Restricted Payments . . . . . . . . . . . . . . . . . . . . . . . . . . 36
11.10   ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
11.11   Change in Business . . . . . . . . . . . . . . . . . . . . . . . . . . 37
11.12   Accounting Changes . . . . . . . . . . . . . . . . . . . . . . . . . . 37
11.13   ESOP Dividends and Payments . . . . . . . . . . . . . . . . . . . . 37
11.14   Financial Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . 37

SECTION 12. CONDITIONS OF LENDING . . . . . . . . . . . . . . . . . . . 38
12.1    Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        12.1.1   Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        12.1.2   Organization Documents . . . . . . . . . . . . . . . . . . . 38
        12.1.3   Consents, etc . . . . . . . . . . . . . . . . . . . . . . . . . 38
        12.1.4   Incumbency and Signatures . . . . . . . . . . . . . . . . . 38
        12.1.5   Opinion of Counsel for the Company . . . . . . . . . . . . 38
        12.1.6   Interest Rate Cap Agreement . . . . . . . . . . . . . . . . 38
        12.1.7   Pledge Agreement . . . . . . . . . . . . . . . . . . . . . . 38
        12.1.8   Security Agreement . . . . . . . . . . . . . . . . . . . . . 38
        12.1.9   Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        12.1.10  Sources and Uses Letter . . . . . . . . . . . . . . . . . . . 39
        12.1.11  Cal Capital Loan Agreement . . . . . . . . . . . . . . . . 39
        12.1.12  Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
12.2    No Default, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 13. EVENTS OF DEFAULT AND THEIR EFFECT . . . . . . . . . 39
13.1    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        13.1.1   Non-Payment of the Note, etc. . . . . . . . . . . . . . . . 39
        13.1.2   Non-Payment of Other Indebtedness . . . . . . . . . . . . 39

195491        98506117                    -iii-

D&P 000813

|  | 13.1.3 | Other Material Obligations | 39 |
|  | 13.1.4 | Bankruptcy, Insolvency, etc. | 39 |
|  | 13.1.5 | Certain Covenant Defaults | 40 |
|  | 13.1.6 | Non-Compliance with Provisions of this Agreement | 40 |
|  | 13.1.7 | Warranties | 40 |
|  | 13.1.8 | Pension Plans | 40 |
|  | 13.1.9 | Judgments | 40 |
|  | 13.1.10 | Change in Control | 40 |
|  | 13.1.11 | Collateral | 40 |
|  | 13.1.12 | Unauthorized Issuance of Stock | 41 |
|  | 13.1.13 | Default under Cal Capital Loan Agreement | 41 |
| 13.2 | | Effect of Event of Default | 41 |

| SECTION 14. | GENERAL | 41 |
|---|---|---|
| 14.1 | Waiver; Amendments | 41 |
| 14.2 | Notices | 41 |
| 14.3 | Computations | 42 |
| 14.4 | Costs, Expenses and Taxes | 42 |
| 14.5 | Subsidiary References | 42 |
| 14.6 | Captions | 42 |
| 14.7 | Governing Law | 42 |
| 14.8 | Counterparts | 43 |
| 14.9 | Successors and Assigns | 43 |
| 14.10 | Indemnification by the Company | 43 |
| 14.11 | Waiver of Jury Trial | 43 |
| 14.12 | Confidentiality | 44 |

935431          98308107

D&P 000814



NOV. 29. 1999 12:08PM     BANK OF AMERICA IL                          NO. 3604    P. 7

EXHIBIT A     Form of Note
EXHIBIT B     Form of Opinion of Counsel for the Company
EXHIBIT C     Form of Pledge Agreement
EXHIBIT D     Form of Security Agreement
EXHIBIT E     Form of Compliance Certificate

SCHEDULE 9.5      Litigation
SCHEDULE 9.7      ERISA Compliance
SCHEDULE 9.11     Financial Condition
SCHEDULE 9.12     Environmental Matters
SCHEDULE 9.16     Subsidiaries
SCHEDULE 9.17     Insurance
SCHEDULE 11.1     Liens
SCHEDULE 11.4     Indebtedness

895431          913503357                    -v-

D&P 000815



## TERM LOAN AGREEMENT

### Dated as of October 18, 1999

This TERM LOAN AGREEMENT, dated as of October 18, 1999, is entered into between K-M INDUSTRIES HOLDING CO., INC., a California corporation (the "Company"; it being understood that any references herein to "the Company" shall not be deemed to refer to Kelly Moore Paint Company or any subsidiary of Kelly Moore Paint Company or to California Capital Insurance Company, Inc. or any subsidiary of California Capital Insurance Company, Inc.) and BANK OF AMERICA, NATIONAL ASSOCIATION (the "Bank").

WHEREAS, the Company has requested that the Bank make a term loan available to it, and the Bank is willing to make such term loan available on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

SECTION 1.   CERTAIN DEFINITIONS.

1.1     When used herein the following terms shall have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

Advance means an Offshore Rate Advance or a Floating Rate Advance.

Affiliate means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, membership interests, by contract, or otherwise.

Agreement – see the Preamble.

Annual Statement means the annual financial statement of any insurance company as required to be filed with the Department, together with all exhibits or schedules filed therewith, prepared in conformity with SAP. References to amounts on particular exhibits, schedules, lines, pages and columns of such Annual Statements are based on the formats promulgated by the NAIC for 1998 Annual Statements for the applicable type of insurance company. If such format is changed in future years so that different information is contained in such items or they no longer exist, it is understood that the reference is to information consistent with that recorded in the referenced item in the 1998 Annual Statement of the insurance company.

D&P 000816

Available Cash at any time means the sum of the maximum allowable dividends (as determined by the relevant California statutory provisions) from Cal Capital and employee expense contributions under the ESOP from Cal Capital, but excluding cash and cash equivalents of KMPC.

Bank - see Preamble.

Base Rate means, for any day, the higher of: (a) 0.50% per annum above the latest Federal Funds Rate; and (b) the rate of interest in effect for such day as publicly announced from time to time by the Bank in Charlotte, North Carolina as its "reference rate." (The "reference rate" is a rate set by the Bank based upon various factors including the Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.) Any change in the reference rate announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

Board of Directors means the board of directors of the Company or any committee thereof which, in the instance, has the lawful power to exercise the power and authority of such board of directors.

Business Day means any day other than a Saturday, Sunday or other day on which commercial banks in San Francisco are authorized or required by law to close, and if the applicable Business Day relates to any Offshore Rate Advance, means such a day on which dealings are carried on in the applicable interbank offshore dollar market.

Cal Capital means California Capital Insurance Company, a 100%-owned subsidiary of the Company.

Cal Capital Loan Agreement means the loan agreement of even date herewith pursuant to which Cal Capital will make a $20,000,000 loan to the Company.

Change in Control means (i) the William Moore Trust fails to own a majority of the shares of the Company or (ii) the Company fails to own 100% of the outstanding shares of Cal Capital.

Code means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

Collateral means all property and interests in property and proceeds thereof now owned or hereafter acquired by the Company and its Restricted Subsidiaries in or upon which a Lien now or hereafter exists in favor of the Bank, whether under this Agreement or under any other Collateral Documents.

Collateral Documents means, collectively, (i) the Security Agreement and the Pledge Agreement and all other similar agreements between the Company and the Bank now or hereafter delivered to the Bank pursuant to or in connection with the transactions contemplated hereby, and

195431          985081.27                       -2-



all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against the Company as debtor in favor of the Bank as secured party, and (ii) any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the foregoing.

Company - see the Preamble.

Conversion/Continuation Date means any date on which, under Section 2.4, the Company (a) converts Advances of one type to another type, or (b) continues as Offshore Rate Advances, but with a new Interest Period, Offshore Rate Advances having Interest Periods expiring on such date.

Contractual Obligation means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its property is bound.

Debt Service Coverage Ratio means, at any time, the quotient of (i) Available Cash of the Company divided by (ii) the sum of pro forma scheduled payments of principal and interest (calculated for the first fiscal quarter following the Effective Date using LIBOR in effect on the Effective Date, and for each subsequent fiscal quarter using LIBOR in effect at the end of the previous fiscal quarter) on the Loans for the four fiscal quarters following the computation date, measured on a rolling four-quarter basis.

Department means the applicable Governmental Authority of the state of domicile of an insurance company responsible for the regulation of said insurance company.

Dollars and "$" each mean lawful money of the United States of America.

Effective Date means the date of the making of the Loans hereunder.

Environmental Claims means all claims, however asserted, by any Governmental Authority or other Person alleging potential liability or responsibility for violation of any Environmental Law, or for release or injury to the environment or threat to public health, personal injury (including sickness, disease or death), property damage, natural resources damage, or otherwise alleging liability or responsibility for damages (punitive or otherwise), cleanup, removal, remedial or response costs, restitution, civil or criminal penalties, injunctive relief, or other type of relief, resulting from or based upon the presence, placement, discharge, emission or release (including intentional and unintentional, negligent and non-negligent, sudden or non-sudden, accidental or non-accidental, placement, spills, leaks, discharges, emissions or releases) of any Hazardous Material at, in, or from property, whether or not owned by the Company or any Restricted Subsidiary.

Environmental Laws means all federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental

195311            91368187                    -3-

D&P 000818

Authorities, in each case relating to environmental, health, safety and land use matters; including the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Solid Waste Disposal Act, the Federal Resource Conservation and Recovery Act, the Toxic Substances Control Act and the Emergency Planning and Community Right-to-Know Act.

ERISA means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

ERISA Affiliate means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

ERISA Event means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate.

ESOP means the employee stock ownership plan of the Company.

ESOT means the employee stock ownership trust maintained in connection with the ESOP.

Event of Default means any of the events described in Section 13.1.

Federal Funds Rate means, for any day, the rate set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Bank of New York (including any such successor, "H.15(519)") on the preceding Business Day opposite the caption "Federal Funds (Effective)"; or, if for any relevant day such rate is not so published on any such preceding Business Day, the rate for such day will be the arithmetic mean as determined by the Bank of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of three leading brokers of Federal funds transactions in New York City selected by the Bank.

Floating Rate Advance means any portion of a Loan which bears interest at or by reference to the Base Rate.

835431        91501187                            -4-

D&P 000819

**FRB** means the Board of Governors of the Federal Reserve System, and any governmental authority by succeeding to any of its principal functions.

**GAAP** means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the Effective Date.

**Hazardous Materials** means all those substances that are regulated by, or which may form the basis of liability under, any Environmental Law, including any substance identified under any Environmental Law as a pollutant, contaminant, hazardous waste, hazardous constituent, special waste, hazardous substance, hazardous material, or toxic substance, or petroleum or petroleum derived substance or waste.

**Insurance Code** means, with respect to any insurance company, the insurance code of its state of domicile and any successor statute of similar import, together with the regulations thereunder, as amended or otherwise modified and in effect from time to time. References to sections of the Insurance Code shall be construed to also refer to successor sections.

**Interest Period** - see Section 4.3.

**Interest Rate Cap Agreement** means the ISDA Master Agreement dated as of October 18, 1999 between the Company and the Bank.

**KMPC** means Kelly Moore Paint Company, a California corporation.

**Lien** means any security interest, mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or other) or preferential arrangement of any kind or nature whatsoever in respect of any property (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law), but not including the interest of a lessor under an operating lease.

**Loan** means the Tranche A Loan or the Tranche B Loan.

**Loan Documents** means this Agreement, the Note and the Collateral Documents.

**Margin Stock** means any "margin stock" as defined in Regulation U of the FRB.

D&P 000820

Material Adverse Effect means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) or prospects of the Company, Cal Capital or the Company and its Restricted Subsidiaries taken as a whole; (b) a material impairment of the ability of the Company or any Restricted Subsidiary to perform under any Loan Document and to avoid any Event of Default; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against the Company or any Restricted Subsidiary of any Loan Document, or (ii) the perfection or priority of any Lien granted under the Collateral Documents.

Maturity Date means the earlier to occur of (i) March 18, 2004 and (ii) such earlier date as the Loans become due and payable pursuant to Section 13.

Multiemployer Plan means a "multiemployer plan", within the meaning of Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes, is making, or is obligated to make contributions or, during the preceding three calendar years, has made, or been obligated to make, contributions.

NAIC means the National Association of Insurance Commissioners.

Note means the single promissory note executed by the Company in favor of the Bank pursuant to Section 3, in substantially the form of Exhibit A.

Offshore Rate Advance means any portion of a Tranche B Loan which bears interest at a rate determined by reference to the Offshore Rate (Reserve Adjusted).

Offshore Office means with respect to the Bank the office or offices of the Bank which shall be making or maintaining the Offshore Rate Advances of the Bank hereunder or such other office or offices through which the Bank determines LIBOR. An Offshore Office of the Bank may be, at the option of the Bank, either a domestic or foreign office.

Offshore Rate (Reserve Adjusted) means, for any Interest Period, with respect to an Offshore Rate Advance the rate of interest per annum (rounded upward to the next 1/16th of 1%) determined by the Agent as follows:

$$\text{Offshore Rate (Reserve Adjusted)} = \frac{\text{LIBOR}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

Where,

"Eurodollar Reserve Percentage" means for any day for any Interest Period the maximum reserve percentage (expressed as a decimal, rounded upward to the next 1/100th of 1%) in effect on such day (whether or not applicable to the Agent)

295.131          91501137

D&P 000821

under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities"); and

"LIBOR" means, with respect to any Offshore Rate Advance for any Interest Period, the rate per annum equal to the rate at which Dollar deposits in immediately available funds are offered to the Offshore Office of the Bank two Business Days prior to the beginning of such Interest Period by major banks in the interbank offshore dollar market as at or about the relevant local time of such Offshore Office, for delivery on the first day of such Interest Period, for the number of days comprised therein and in an amount equal or comparable to the amount of the Offshore Rate Advance of the Bank for such Interest Period.  As used herein, "relevant local time" as to any Offshore Office shall mean 11:00 A.M., London time, when such Offshore Office is located in Europe or the Middle East, or 10:00 A.M., Chicago time, when such Offshore Office is located in North America or the Caribbean.

LIBOR shall be adjusted automatically as to all Offshore Rate Advances then outstanding as of the effective date of any change in the Eurodollar Reserve Percentage.

Organization Documents means, for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, any shareholder rights agreement, and all applicable resolutions of the board of directors (or any committee thereof) of such corporation.

Participant - see Section 14.9.2.

PBGC means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

Pension Plan means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which the Company sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a multiple employer plan (as described in Section 4064(a) of ERISA) has made contributions at any time during the immediately preceding five (5) plan years.

Permitted Liens - see Section 11.1.

Person means any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

593431        93508187                        -7-

D&P 000823

Plan means an employee benefit plan (as defined in Section 3(3) of ERISA) which the Company sponsors or maintains or to which the Company makes, is making, or is obligated to make contributions and includes any Pension Plan.

Pledge Agreement means the Pledge Agreement to be executed and delivered by the Company pursuant to Section 12.1.7, substantially in the form of Exhibit C hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

Reportable Event means, any of the events set forth in Section 4043(b) of ERISA or the regulations thereunder, other than any such event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

Requirement of Law means, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

Responsible Officer means the chief executive officer or the president of the Company, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants, the chief financial officer or the treasurer of the Company, or any other officer having substantially the same authority and responsibility.

Restricted Subsidiaries means Cal Capital and its Subsidiaries. KMPC and its Subsidiaries shall not be deemed "Restricted Subsidiaries."

Risk Based Capital Ratio means, at any time, the consolidated risk based capital ratio, determined in accordance with the risk based capital guidelines of the NAIC, and shall be expressed as a percentage of the "Company Action Level" as defined therein, provided that the ratio which is defined to be the "Company Action Level" shall, for purposes of this definition, be 100%.

SAP means, as to any insurance company, the statutory accounting practices prescribed or permitted by the Department, or in the event that the Department fails to prescribe or address such practices, the NAIC guidelines.

SEC means the Securities and Exchange Commission.

Security Agreement means the Security Agreement to be executed and delivered by the Company pursuant to Section 12.1.8, substantially in the form of Exhibit D hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

Solvent means, as to any Person at any time, that (a) the fair value of the property of such Person is greater than the amount of such Person's liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated for purposes of Section 101(31) of the Bankruptcy Code and, in the alternative, for purposes of the Illinois Uniform

-8-

D&P 000823



Fraudulent Transfer Act; (b) the present fair saleable value of the property of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (c) such Person is able to realize upon its property and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business; (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital.

Subsidiary of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than 50% of the voting stock, membership interests or other equity interests (in the case of Persons other than corporations), is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Company.

Taxes means any and all present or future taxes, levies, assessments, imposts, duties, deductions, fees, withholdings or similar charges, and all liabilities with respect thereto, excluding, in the case of the Bank, taxes imposed on or measured by its net income by the jurisdiction (or any political subdivision thereof) under the laws of which the Bank is organized or maintains a lending office.

type means, with respect to any Advance, either a Floating Rate Advance or an Offshore Rate Advance.

Tranche A Loan means the $6,096,230 bridge term loan maturing three months from the Effective Date.

Tranche B Loan means the $28,000,000 term loan maturing five years from the Effective Date.

UCC means the Uniform Commercial Code as in effect in the State of Illinois.

Unfunded Pension Liability means the excess of a Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

Unmatured Event of Default means any event which if it continues uncured will, with lapse of time or notice or lapse of time and notice, constitute an Event of Default.

Welfare Plan means a "welfare plan," as such term is defined in section 3(1) of ERISA.

D&P 0008 4



**Wholly-Owned Restricted Subsidiary** means any Subsidiary 100% of all of the equity securities (except directors' qualifying shares) and voting securities of which are owned by any one or more of Cal Capital and the other 100%-owned Subsidiaries of Cal Capital.

1.2    Other Interpretive Provisions.    (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and subsection, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)(i)    The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(ii)    The term "including" is not limiting and means "including without limitation."

(iii)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

(iv) The term "property" includes any kind of property or asset, real, personal or mixed, tangible or intangible.

(d) Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(e) The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(f) This Agreement and other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.    All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms. Unless otherwise expressly provided, any reference to any action of the Bank by way of consent, approval or waiver shall be deemed modified by the phrase "in its/their sole discretion."

(g) This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to the Bank, the Company and the other parties, and are the products of all parties.    Accordingly, they shall not be construed against the Bank merely because of the Bank's involvement in their preparation.

895431            98508167                        -10-

D&P 000825

1.3    Accounting Principles.   (a)   Unless the context otherwise clearly requires, all accounting terms not expressly defined herein shall be construed, and all financial computations required under this Agreement shall be made, in accordance with GAAP, consistently applied.

(b)   References herein to "fiscal year" and "fiscal quarter" refer to such fiscal periods of the Company.

## SECTION 2.    AGREEMENT TO MAKE LOANS; TYPES OF ADVANCES; BORROWING AND CONVERSION PROCEDURES.

2.1    Agreement to Make Loans.   On and subject to the terms and conditions of this Agreement, the Bank agrees to make the Tranche A Loan and the Tranche B Loan to the Company on or before October 18, 1999 in the aggregate principal amount of $34,096,230.

2.2    Various Types of Advances.   The Tranche A Loan shall be maintained as a Floating Rate Advance, and the Tranche B Loan shall be maintained as a Floating Rate Advance or an Offshore Rate Advance or a combination of the foregoing, as the Company shall specify from time to time; provided that the aggregate principal amount of any Offshore Rate Advance shall be at least $5,000,000 and an integral multiple of $100,000.

2.3    Borrowing Procedures.   The Company shall give notice to the Bank of the proposed borrowing by 10:00 A.M., Chicago time, on the proposed borrowing date if the Loans are initially to be maintained entirely as Floating Rate Advances, and on a Business Day at least three Business Days prior to the proposed borrowing date if any portion of the Tranche B Loan is initially to be maintained as an Offshore Rate Advance.  Such notice shall be effective upon receipt by the Bank, shall be in writing (or by telephone to be promptly confirmed in writing by the Company), and shall specify the date, amount and type of borrowing and, if applicable, the initial Interest Period for any Offshore Rate Advances.  Not later than noon, Chicago time, on the proposed borrowing date, the Bank shall pay over the requested amount to the Company on the requested borrowing date.  The borrowing shall be on a Business Day.

2.4    Conversion/Continuation Procedures.

(a)   Subject to the provisions of Section 2.2, the Company may, upon irrevocable written notice to the Bank in accordance with subsection 2.4(b):

(i) elect, as of any Business Day, in the case of Floating Rate Loans, or as of the last day of the applicable Interest Period, in the case of any other type of Advances, to convert any such Advances (or any part thereof in an amount not less than $5,000,000, or that is in an integral multiple of $100,000 in excess thereof) into Offshore Rate Advances; or

895433         04569387                -11-

D&P D00826



(ii) elect, as of the last day of the applicable Interest Period, to continue any Advances having Interest Periods expiring on such day (or any part thereof in an amount not less than $5,000,000, or that is in an integral multiple of $100,000 in excess thereof).

(b) The Company shall deliver a Notice of Conversion/ Continuation to be received by the Bank not later than [9:00 a.m.] (Chicago time) at least (i) [three] Business Days in advance of the Conversion/Continuation Date, if the Loans are to be converted into or continued as Offshore Rate Advances and (ii) [one] Business Day in advance of the Conversion/Continuation Date, if the Advances are to be converted into Floating Rate Advances, specifying:

(A) the proposed Conversion/Continuation Date;

(B) the aggregate amount of Advances to be converted or continued; and

(C) the type of Advances resulting from the proposed conversion or continuation.

(c) If upon the expiration of any Interest Period applicable to Offshore Rate Advances, the Company has failed to select timely a new Interest Period to be applicable to such Offshore Rate Advances, or if any Default or Event of Default then exists, the Company shall be deemed to have elected to convert such Offshore Rate Advances into Floating Rate Advances effective as of the expiration date of such Interest Period.

(d) During the existence of a Default or Event of Default, the Company may not elect to have an Advance converted into or continued as an Offshore Rate Advance.

2.5    Conditions. Notwithstanding any other provision of this Agreement, the Bank shall not be obligated to make any Loan, or to convert into or permit the continuation at the end of the applicable Interest Period of any Offshore Rate Advance, if an Event of Default or Unmatured Event of Default exists or would result therefrom.

SECTION 3.    NOTE EVIDENCING LOANS. The Loans of the Bank shall be evidenced by a single promissory note (the "Note") substantially in the form set forth in Exhibit A, with appropriate insertions, dated the date of the making of the Loans (or such earlier date as shall be satisfactory to the Bank), payable to the order of the Bank in the principal amount of the Loans of the Bank in installments, as follows:

(a) With respect to the Tranche A Loan, $2,032,076, $2,032,076, $2,032,077 on the 29th day of each of October, November and December of 1999, respectively; and

(b) With respect to the Tranche B Loan, $5,600,000 on each March 18th, commencing on March 18, 2000, with a final payment of $5,600,000 on the Maturity Date.

195231        983061127                    -12-

D&P 000827

## SECTION 4.  INTEREST.

4.1    Interest Rates.  The Company hereby promises to pay interest on the unpaid principal amount of each Loan for the period commencing on the date of such Loan until such Loan is paid in full, as follows:

(a)  With respect to the Tranche A Loan, at a rate per annum equal to the Base Rate from time to time in effect minus 0.50%.

(b)  With respect to any portion of the Tranche B Loan that is maintained as (i) a Floating Rate Advance, at a rate per annum equal to the Base Rate from time to time in effect minus 0.50%; and (ii) an Offshore Rate Advance, at a rate per annum equal to the Offshore Rate (Reserve Adjusted) applicable to each Interest Period for such Offshore Rate Advance plus (A) 1.70% per annum from the Effective Date to and including March 18, 2001 and (B) 1.65% thereafter.

(c)  Notwithstanding the provisions of the preceding clauses (a) and (b), in the event that any principal of any Loan is not paid when due (whether by acceleration or otherwise), after the due date of such principal until such principal is paid, at a rate per annum equal to the Base Rate from time to time in effect (but not, for any Advance constituting a portion of such Loan, less than the applicable interest rate in effect for such Advance as at such due date), plus 2% per annum.

4.2    Interest Payment Dates.  Accrued interest on each Floating Rate Advance shall be payable in arrears on the last day of each calendar month and at maturity, commencing with the first of such dates to occur after the date hereof.  Accrued interest on each Offshore Rate Advance shall be payable in arrears on the last day of each Interest Period relating to such Advance and at maturity.  After maturity, accrued interest on all Advances shall be payable on demand.

4.3    Interest Periods.  Each Interest Period for an Offshore Rate Advance shall commence on the date such Offshore Rate Advance is made or converted from a Floating Rate Advance, or on the expiration of the immediately preceding Interest Period for such Offshore Rate Advance, and shall end on the date which is one month thereafter.

Each Interest Period for an Offshore Rate Advance which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day (unless such next succeeding Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the next preceding Business Day).

Each Interest Period for a Floating Rate Advance shall be one day.

Notwithstanding any other provision of this Agreement, the Company may not specify an Interest Period for any Offshore Rate Advance that would (i) end after March 18, 2004 or (ii) result in the aggregate amount of all Offshore Rate Advances having an Interest Period ending after a date on which an installment of principal of the Note is to be paid pursuant to Section 3 being in excess

895432        915021127

-13-

D&P 000828



of the aggregate amount of all Loans scheduled to be outstanding after giving effect to payment of such installment.

    4.4    Setting and Notice of LIBOR.  Applicable LIBOR for each Interest Period shall be determined by the Bank, and notice thereof shall be given by the Bank promptly to the Company. Each determination of applicable LIBOR by the Bank shall be conclusive and binding upon the parties hereto, in the absence of demonstrable error. The Bank shall, upon written request of the Company, deliver to the Company a statement showing the computations used by the Bank in determining applicable LIBOR hereunder.

    4.5    Computation of Interest.  Interest shall be computed for the actual number of days elapsed on the basis of a year of 360 days; provided that at any time that interest on Floating Rate Advances is determined based upon the Bank's reference rate (rather than the Federal Funds Rate), interest on Floating Rate Advances shall be computed for the actual number of days elapsed on the basis of a year of 365 or, if applicable, 366 days.  The applicable interest rate under clauses (a) and (c) of Section 4.1 shall (to the extent applicable in the case of clause (c)) change simultaneously with each change in the Base Rate.

    SECTION 5.   FEES. The Company agrees that on the Effective Date it will pay to the Bank a closing fee in an amount equal to $120,000, less any portion of such amount previously paid to the Bank.

    SECTION 6.  PREPAYMENTS.

    6.1    Voluntary Prepayments.  The Company may from time to time prepay the Loans in whole or in part, provided that (a) the Company shall give the Bank not less than one Business Day's prior notice thereof, specifying the Advances to be prepaid and the date and amount of prepayment, and (b) each such partial prepayment shall be in a principal amount of at least $100,000 and an integral multiple of $100,000.

    6.2    Application of Prepayments, etc.  All partial prepayments shall be applied to the unpaid installments of the Loans in the inverse order of the maturity of such installments.  Any prepayment shall include accrued interest to the date of prepayment on the amount being prepaid, and any prepayment of an Offshore Rate Advance prior to the end of the Interest Period relating thereto shall be subject to Section 8.4.

    SECTION 7.  MAKING AND PRORATION OF PAYMENTS; SETOFF.

    7.1    Making of Payments.  All payments of principal of, or interest on, the Note shall be made by the Company to the Bank in immediately available funds. All such payments shall be made to the Bank at its office in Chicago not later than noon, Chicago time, on the date due; and funds received after that hour shall be deemed to have been received by the Bank on the next following Business Day. The Company hereby authorizes the Bank to charge the Company's demand deposit account maintained with the Bank for the amount of any such payment on the due date therefor, but

995431                98508187

D&P 000829

the Bank's failure to so charge such account shall in no way affect the obligation of the Company to make any such payment.

All payments under Section 8.1 and 8.4 shall be made by the Company directly to the Bank.

7.2    Application of Certain Payments. Each payment of principal shall be applied to such Advances as the Company shall direct by notice to be received by the Bank on or before the date of such payment, or in the absence of such notice, as the Bank shall determine in its discretion.

7.3    Due Date Extension. If any payment of principal or interest with respect to any of the Loans or the Note falls due on a Saturday, Sunday or other day which is not a Business Day, then such due date shall be extended to the next following Business Day (unless, in the case of a payment with respect to an Offshore Rate Advance, such next following Business Day is the first day of a calendar month, in which case such due date shall be the next preceding Business Day), and additional interest shall accrue and be payable for the period of such extension.

7.4    Setoff. The Company agrees that the Bank shall have all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, the Company agrees that at any time (i) any payment or other amount owing by the Company under this Agreement is then due to the Bank or (ii) any Event of Default or event which might mature into an Event of Default described in Section 12.1.4 exists, the Bank may apply to the payment of such payment or other amount any and all balances, credits, deposits, accounts or moneys of the Company then or thereafter with the Bank.

7.5    Payments Net of Taxes. All payments made by the Company to the Bank under this Agreement and the Note shall be made without any setoff or counterclaim, and free and clear of and without deduction for or on account of any Taxes (except to the extent that such withholding or deduction is compelled by law or results from the breach, by the recipient of a payment, of its agreement contained in clause (b) below or would not be required if the representation and warranty contained in clause (b) below were true), excluding any Taxes assessed on or measured by the net income of the Bank by the government or other authority of the country in which the Bank is incorporated or in which its Offshore Office or the office through which it is acting hereunder is located (any such excluded Taxes being herein called "Excluded Taxes"). If the Company is compelled by law to make any such deduction or withholding, it will:

(i)    pay to the relevant authorities the full amount required to be so withheld or deducted,

(ii)    except to the extent that such withholding or deduction results from the breach, by the recipient of a payment, of its agreement contained in clause (b) below or would not be required if the representation and warranty contained in clause (b) below were true, pay such additional amounts as may be necessary in order that the net amount received by the Bank and each Participant after such deduction or withholding (including any required deduction or withholding on such additional amounts) shall equal the amount such payee would have received had no such deduction or withholding been made, and

835431        90508187

-15-

D&P 000830

(iii)    promptly forward to the Bank an official receipt or other documentation satisfactory to the Bank evidencing such payment to such authorities.

Moreover, if any Taxes (other than Excluded Taxes) are directly asserted against the Bank, the Bank shall promptly notify the Company and, unless the Company promptly provides satisfactory evidence that such Taxes have been paid or properly withheld by the Company, the Bank may pay such Taxes and the Company shall promptly pay such additional amount (including, without limitation, any penalties, interest or expenses, excluding any such items resulting from (A) the failure of the Bank to promptly notify the Company of the assertion of such Taxes against the Bank or (B) the gross negligence or willful misconduct of the Bank) as may be necessary in order that the net amount received by such payee after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such payee would have received had no such Taxes been asserted. For purposes of this Section 7.6, a distribution hereunder by the Bank shall be deemed to be a payment by the Company. The Company's agreement under this clause (a) shall survive repayment of the Loans, cancellation of the Note and any termination of this Agreement.

SECTION 8.    INCREASED COSTS; SPECIAL PROVISIONS FOR
                    OFFSHORE RATE ADVANCES.

8.1    Increased Costs. (a) If after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any Offshore Office of the Bank) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency

(i)    shall subject the Bank (or any Offshore Office of the Bank) to any tax, duty or other charge with respect to its Offshore Rate Advances, its Note or its obligation to make Offshore Rate Advances, or shall change the basis of taxation of payments to the Bank of the principal of or interest on its Offshore Rate Advances or any other amounts due under this Agreement in respect of its Offshore Rate Advances or its obligation to make Offshore Rate Advances (except for changes in the rate of tax on the overall net income of the Bank or its Offshore Office imposed by the jurisdiction in which the Bank's principal executive office or Offshore Office is located);

(ii)    shall impose, modify or deem applicable any reserve (including, without limitation, any reserve imposed by the Board of Governors of the Federal Reserve System, but excluding any reserve included in the determination of interest rates pursuant to Section 4), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Bank (or any Offshore Office of the Bank); or

(iii)    shall impose on the Bank (or its Offshore Office) any other condition affecting its Offshore Rate Advances, its Note or its obligation to make Offshore Rate Advances;

895431        98508117                          -16-

D&P 000831

and the result of any of the foregoing is to increase the cost to (or in the case of Regulation D of the FRB, to impose a cost on) the Bank (or any Offshore Office of the Bank) of making or maintaining any Offshore Rate Advance, or to reduce the amount of any sum received or receivable by the Bank (or its Offshore Office) under this Agreement or under its Note with respect thereto, then within 10 days after demand by the Bank (which demand shall be accompanied by a statement setting forth the basis of such demand), the Company shall pay directly to the Bank such additional amount or amounts as will compensate the Bank for such increased cost or such reduction.

(b)  If the Bank shall reasonably determine that the adoption or phase-in of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or its Offshore Office) or any Person controlling the Bank with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's or such controlling Person's capital as a consequence of the Bank's obligations hereunder to a level below that which the Bank or such controlling Person could have achieved but for such adoption, change or compliance (taking into consideration the Bank's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by the Bank or such controlling Person to be material, then from time to time, within 10 days after demand by the Bank (which demand shall be accompanied by a statement setting forth the basis of such demand), the Company shall pay to the Bank such additional amount or amounts as will compensate the Bank or such controlling Person for such reduction.

8.2    Basis for Determining Interest Rate Inadequate or Unfair.  If with respect to any Interest Period:

(a)  deposits in Dollars (in the applicable amounts) are not being offered to the Bank in the interbank offshore dollar market for such Interest Period, or the Bank otherwise reasonably determines (which determination shall be binding and conclusive on the Company) that by reason of circumstances affecting the interbank offshore dollar market adequate and reasonable means do not exist for ascertaining LIBOR; or

(b)  the Bank determines that LIBOR as determined by the Bank will not adequately and fairly reflect the cost to the Bank of maintaining or funding Offshore Rate Advances for such Interest Period (taking into account any amount to which the Bank may be entitled under Section 8.1), or that the maintaining or funding of Offshore Rate Advances has become impracticable as a result of an event occurring after the date of this Agreement which in the opinion of the Bank materially affects such Advances;

then the Bank shall not be under any obligation to convert into Offshore Rate Advances and (ii) on the last day of the current Interest Period for each Offshore Rate Advance, such Advance shall, unless then repaid in full, automatically convert to a Floating Rate Advance.

192131          98503187                              -17-

D&P 000832



**8.3** <u>Changes in Law Rendering Offshore Dollar Lending Unlawful.</u>  If any change in (including the adoption of any new) applicable laws or regulations, or any change in the interpretation of applicable laws or regulations by any governmental or other regulatory body charged with the administration thereof, should make it (or in the good faith judgment of the Bank cause a substantial question as to whether it is) unlawful for the Bank to make, maintain or fund Offshore Rate Advances, then the Bank shall promptly notify the Company and, so long as such circumstances shall continue, (a) the Bank shall have no obligation to convert into Offshore Rate Advances (but shall maintain its Tranche B Loan entirely as a Floating Rate Advance) and (b) on the last day of the current Interest Period for each Offshore Rate Advance (or, in any event, on such earlier date as may be required by the relevant law, regulation or interpretation), such Offshore Rate Advance shall, unless then repaid in full, automatically convert to a Floating Rate Advance.

**8.4** <u>Funding Losses.</u>  The Company hereby agrees that upon demand by the Bank (which demand shall be accompanied by a statement setting forth the basis for the calculations of the amount being claimed) the Company will indemnify the Bank against any net loss or expense which the Bank may sustain or incur (including, without limitation, any net loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Bank to fund or maintain Offshore Rate Advances), as reasonably determined by the Bank, as a result of (a) any payment or prepayment or conversion of any Offshore Rate Advance of the Bank on a date other than the last day of an Interest Period for such Advance (including, without limitation, any conversion pursuant to <u>Section 8.3</u>) or (b) any failure of the Company to borrow, convert into, continue or prepay any Offshore Rate Advance on a date specified therefor in a notice of borrowing, conversion, continuation or prepayment pursuant to this Agreement. For this purpose, all notices to the Bank pursuant to this Agreement shall be deemed to be irrevocable.

**8.5** <u>Right of Bank to Fund through Other Offices.</u>  The Bank may, if it so elects, fulfill its commitment as to any Offshore Rate Advance by causing a foreign branch or affiliate of the Bank to maintain such Advance, <u>provided</u> that in such event for the purposes of this Agreement such Advance shall be deemed to have been maintained by the Bank and the obligation of the Company to repay such Advance shall nevertheless be to the Bank and shall be deemed held by it, to the extent of such Advance, for the account of such branch or affiliate.

**8.6** <u>Discretion of Bank as to Manner of Funding.</u>  Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Loans in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if the Bank had actually funded and maintained each Offshore Rate Advance during each Interest Period for such Advance through the purchase of deposits having a maturity corresponding to such Interest Period and bearing an interest rate equal to the Offshore Rate (Reserve Adjusted) for such Interest Period.

**8.7** <u>Conclusiveness of Statements; Survival of Provisions.</u>  Determinations and statements of the Bank pursuant to <u>Section 8.1</u>, <u>8.2</u>, <u>8.3</u> or <u>8.4</u> shall be conclusive absent demonstrable error. The Bank may use reasonable averaging and attribution methods in determining

393433          94344187                        -18-

D&P 000833

compensation under Sections 8.1 and 8.4, and the provisions of such Sections shall survive repayment of the Loans, cancellation of the Note and any termination of this Agreement.

SECTION 9.   REPRESENTATIONS AND WARRANTIES.

To induce the Bank to enter into this Agreement and to make Loans hereunder, the Company represents and warrants to the Bank that:

9.1    Corporate Existence and Power.  The Company and each Restricted Subsidiary:

(a)  is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation;

(b)  has the power and authority and all governmental licenses, authorizations, consents and approvals to own its assets, carry on its business and to execute, deliver, and perform its obligations under the Loan Documents;

(c)  is duly qualified as a foreign corporation and is licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification or license; and

(d)  is in compliance with all Requirements of Law; except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

9.2    Corporate Authorization; No Contravention.    The execution, delivery and performance by the Company and its Subsidiaries of this Agreement and each other Loan Document to which such Person is party, have been duly authorized by all necessary corporate action, and do not and will not:

(a)  contravene the terms of any of that Person's Organization Documents;

(b)  conflict with or result in any breach or contravention of, or the creation of any Lien under, any document evidencing any Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject; or

(c)  violate any Requirement of Law.

9.3    Governmental Authorization.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority (except for recordings or filings in connection with the Liens granted to the Bank under the Collateral Documents) is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Company or any of its Subsidiaries of the Agreement or any other Loan Document.

895431        94508117

-19-

D&P 000834

**9.4    Binding Effect.** This Agreement and each other Loan Document to which the Company or any of its Subsidiaries is a party constitute the legal, valid and binding obligations of the Company and any of its Subsidiaries to the extent it is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

**9.5    Litigation.** Except as specifically disclosed in Schedule 9.5, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of the Company, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against the Company or its Restricted Subsidiaries or any of their respective properties which:

(a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby; or

(b) if determined adversely to the Company or its Restricted Subsidiaries, would reasonably be expected to have a Material Adverse Effect. No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.

**9.6    No Default.** No Default or Event of Default exists or would result from the incurring of any Obligations by the Company or from the grant or perfection of the Liens of the Bank on the Collateral. As of the Effective Date, neither the Company nor any Subsidiary is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, could reasonably be expected to have a Material Adverse Effect, or that would, if such default had occurred after the Effective Date, create an Event of Default under Section 13.

**9.7    ERISA Compliance.** Except as specifically disclosed in Schedule 9.7:

(a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state law. Each Plan which is intended to qualify under Section 401(a) of the Code has received, or has applied for and expects to receive, a favorable determination letter from the IRS and to the best knowledge of the Company, nothing has occurred which would cause the loss of such qualification. The Company and each ERISA Affiliate has made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b) There are no pending or, to the best knowledge of the Company, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect. There has been no

895431        91501177                        -20-

D&P 000835



prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Company nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Company nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Company nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

9.8    Use of Proceeds; Margin Regulations.  The proceeds of the Loans are to be used solely for the purposes set forth in and permitted by this Agreement. Neither the Company nor any Subsidiary is generally engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

9.9    Title to Properties.  The Company and each Restricted Subsidiary have good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of their respective businesses, except for such defects in title as could not, individually or in the aggregate, have a Material Adverse Effect. As of the Effective Date, the property of the Company and its Restricted Subsidiaries is subject to no Liens, other than Permitted Liens.

9.10    Taxes.  The Company and its Restricted Subsidiaries have filed all Federal and other material tax returns and reports required to be filed, and have paid all Federal and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against the Company or any Restricted Subsidiary that would, if made, have a Material Adverse Effect.

9.11    Financial Condition.

9.11.1    The Company.  (a)  The unaudited unconsolidated financial statements of the Company dated December 31, 1998, the unaudited unconsolidated financial statements of the Company dated June 30, 1999, the Federal tax returns of the Company for the fiscal year ended December 31, 1997, the audited financial statements of KMPC dated as of December 31, 1998 and the unaudited financial statements of KMPC dated as of June 30, 1999, and the related statements of income or operations, shareholders' equity and cash flows for the fiscal year and the fiscal quarter, respectively, ended on such dates for the Company and KMPC:

895431        895081117                        -21-

D&P 000836

(i)      with respect to the financial statements of KMPC, were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein;

(ii)     fairly present the financial condition of the Company and KMPC as of the date thereof and results of operations for the period covered thereby; and

(iii)    except as specifically disclosed in Schedule 9.11, show all material indebtedness and other liabilities, direct or contingent, of the Company and KMPC as of the date thereof, including liabilities for taxes, material commitments and contingent obligations.

(b) Since December 31, 1998, there has been no Material Adverse Effect.

9.11.2  The Restricted Subsidiaries.  (a) The audited consolidated financial statements of the Restricted Subsidiaries dated December 31, 1998 and the unaudited consolidated financial statements of the Restricted Subsidiaries dated June 30, 1999, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal year ended on such dates:

(i)      were prepared in accordance with SAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein;

(ii)     present in accordance with SAP the financial condition of the Restricted Subsidiaries as of the date thereof and results of operations for the period covered thereby; and

(iii)    except as specifically disclosed in Schedule 9.11, show all material indebtedness and other liabilities, direct or contingent of the Restricted Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and contingent obligations.

(b)     Since December 31, 1998, there has been no Material Adverse Effect.

9.12    Environmental Matters.  (a) Except as specifically disclosed in Schedule 9.12, the on-going operations of the Company and each of its Restricted Subsidiaries comply in all respects with all Environmental Laws, except such non-compliance which would not (if enforced in accordance with applicable law) result in liability in excess of $100,000 in the aggregate.

(b)     Except as specifically disclosed in Schedule 9.12, the Company and each of its Restricted Subsidiaries have obtained all licenses, permits, authorizations and registrations required under any Environmental Law ("Environmental Permits") and necessary for their respective ordinary course operations, all such Environmental Permits are in good standing, and the Company and each of its Restricted Subsidiaries are in compliance with all material terms and conditions of such Environmental Permits.

895103          91509137

-22-

D&P 000837



(c)  Except as specifically disclosed in Schedule 9.12, none of the Company, any of its Restricted Subsidiaries or any of their respective present property or operations, is subject to any outstanding written order from or agreement with any Governmental Authority, nor subject to any judicial or docketed administrative proceeding, respecting any Environmental Law, Environmental Claim or Hazardous Material.

(d)  Except as specifically disclosed in Schedule 9.12, there are no Hazardous Materials or other conditions or circumstances existing with respect to any property of the Company or any Restricted Subsidiary, or arising from operations prior to the Effective Date, of the Company or any Restricted Subsidiary that would reasonably be expected to give rise to Environmental Claims with a potential liability of the Company and its Restricted Subsidiaries in excess of $100,000 in the aggregate for any such condition, circumstance or property.  In addition, (i) neither the Company nor any Restricted Subsidiary has any underground storage tanks (x) that are not properly registered or permitted under applicable Environmental Laws, or (y) that are leaking or disposing of Hazardous Materials off-site, and (ii) the Company and its Restricted Subsidiaries have notified all of their employees of the existence, if any, of any health hazard arising from the conditions of their employment and have met all notification requirements under Title III of CERCLA and all other Environmental Laws.

9.13   Collateral Documents.  (a)  The provisions of each of the Collateral Documents are effective to create in favor of the Bank a legal, valid and enforceable first priority security interest in all right, title and interest of the Company and its Restricted Subsidiaries in the collateral described therein; and financing statements have been filed in the offices in all of the jurisdictions listed in the schedule to the Security Agreement.

(b)  All representations and warranties of the Company and any of its Restricted Subsidiaries party thereto contained in the Collateral Documents are true and correct.

9.14   Regulated Entities.  None of the Company, any Person controlling the Company, or any Subsidiary, is an "Investment Company" within the meaning of the Investment Company Act of 1940.  The Company is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute or regulation limiting its ability to incur Indebtedness.

9.15   No Burdensome Restrictions.  Neither the Company nor any Restricted Subsidiary is a party to or bound by any Contractual Obligation, or subject to any restriction in any Organization Document, or any Requirement of Law, which could reasonably be expected to have a Material Adverse Effect.

9.16   Subsidiaries.  As of the Effective Date, the Company has no Subsidiaries other than those specifically disclosed in Schedule 9.16 hereto.

995431          91508187

-23-

D&P 000838

9.17    Insurance. Except as specifically disclosed in Schedule 9.17, the properties of the Company and its Restricted Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Company, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Company or such Restricted Subsidiary operates.

9.18    Solvency. The Company and each of its Restricted Subsidiaries is Solvent.

9.19    Full Disclosure. None of the representations or warranties made by the Company or any Subsidiary in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in any exhibit, report, statement or certificate furnished by or on behalf of the Company or any Subsidiary in connection with the Loan Documents (including the offering and disclosure materials delivered by or on behalf of the Company to the Bank prior to the Effective Date), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

9.20    Year 2000 Problem. The Company, and the Restricted Subsidiaries are taking all necessary and appropriate steps to ascertain the extent of, and to quantify and successfully address, business and financial risks facing the Company and the Restricted Subsidiaries as a result of what is commonly referred to as the "Year 2000 problem" (i.e., the inability of certain computer applications to recognize correctly and perform date-sensitive functions involving certain dates prior to and after December 31, 1999) including risks resulting from the failure of key vendors and customers of the Company and the Restricted Subsidiaries to successfully address the Year 2000 problem, and (b) the Company's and the Restricted Subsidiaries' material computer applications and those of its key vendors and customers will, on a timely basis, adequately address the Year 2000 problem in all material respects.

SECTION 10. COVENANTS. Until all obligations of the Company hereunder and under the Note are paid in full, the Company agrees that, unless at any time the Bank shall otherwise expressly consent in writing, it will:

10.1    Reports, Certificates, Other Information. Deliver to the Bank:

10.1.1  Financial Reports.

(a) as soon as available, and in any event

(i)     within 150 days after each fiscal year of the Company, a copy of an annual audit report of Cal Capital, consisting of a consolidated balance sheet of Cal Capital and its Subsidiaries as at the end of such fiscal year and the related statements of income, shareholder's equity, and cash flows of Cal Capital and its Subsidiaries for such fiscal year, setting forth in comparative form the corresponding figures for the preceding fiscal year,

695(3)        94308187

-24-

D&P 000839



prepared in conformity with SAP consistently applied (except for changes disclosed in such financial statements and concurred in by the independent auditors referred to herein);

(ii)    within 120 days after each fiscal year of the Company, a copy of the unaudited, unconsolidated financial statements of the Company, consisting of an unconsolidated balance sheet of the Company as at the end of such fiscal year and the related statements of income, shareholder's equity, and cash flows of the Company for such fiscal year, setting forth in comparative form the corresponding figures for the preceding fiscal year;

(iii)   within 120 days after each fiscal year of the Company, a copy of the audited, consolidated financial statements of KMPC and its Subsidiaries for such fiscal year, setting forth in comparative form the corresponding figures for the preceding fiscal year, prepared in conformity with GAAP consistently applied (except for changes disclosed in such financial statements and concurred in by the independent auditors referred to herein); and

(iv)    within 30 days after filing thereof with the Internal Revenue Service, the Federal tax returns of the Company for the previous fiscal year,

each of the foregoing reports in clauses (i) and (iii) duly certified by, and containing an opinion of Ernst & Young, LLP or other independent auditors of recognized national standing selected by the Company and reasonably acceptable to the Bank, which opinion if not unqualified and without exception shall be in scope and substance satisfactory in the good faith judgment of the Bank, together with a certificate from such accountants of Cal Capital (A) containing a computation of, and showing compliance with, each of the financial ratios and restrictions contained in Section 11.14 and (B) to the effect that, in making the audit necessary for the signing of such annual audit report by such accountants of Cal Capital, they have not become aware of any Event of Default or Unmatured Event of Default under any of the terms or provisions of this Agreement insofar as any such terms or provisions pertain to or involve accounting matters or determinations, and if any such event or condition exists, specifying the nature and period of existence thereof.

(b)    as soon as available, but not later than 75 days after the end of each fiscal year, a copy of the Annual Statement of each Restricted Subsidiary for such fiscal year prepared in accordance with SAP and accompanied by the certification of the chief executive officer or the chief financial officer of such Restricted Subsidiary that such Annual Statement is complete and correct and presents fairly in accordance with SAP the financial position of such Restricted Subsidiary for the period then ended;

(c)    within 75 days after the close of each fiscal year, a copy of each Restricted Subsidiary's "Statement of Actuarial Opinion" which is provided to the Department (or equivalent information should the Department no longer require such a statement) as to the adequacy of loss reserves of such Restricted Subsidiary, which opinion shall be in the format prescribed by the Insurance Code; and

183453        98508107                    -25-

D&P 0008

 
(d) as soon as available, a copy of the Management Discussion and Analysis filed with the Department with respect to any of the foregoing financial statements of the Restricted Subsidiaries and such other information.

10.1.2 <u>Interim Reports</u>.

(a) as soon as available, and in any event within 45 days after each quarter (except the last quarter) of each fiscal year of the Company, a copy of the unaudited unconsolidated financial statements of the Company and the unaudited financial statements of KMPC prepared in a manner consistent with the audited financial statements referred to in <u>Section 10.1.1</u>, signed by the Chief Financial Officer of the Company and KMPC and consisting of at least balance sheets as at the close of such quarter, statements of earnings of the Company and KMPC for such quarter, and statements of earnings and cash flows of the Company and KMPC for the period from the beginning of such fiscal year to the close of such quarter, all of which financial statements may be subject to customary year-end audit adjustments;

(b) as soon as possible, but no later than 60 days after the end of each of the first three fiscal quarters of each fiscal year, a copy of the quarterly statement of each Restricted Subsidiary for each such fiscal quarter, all prepared in accordance with SAP and accompanied by the certification of the chief executive officer or the chief financial officer of such Restricted Subsidiary that all such quarterly statements are complete and correct and present fairly in accordance with SAP the financial position of such Restricted Subsidiary for the period then ended; and

(c) as soon as available, a copy of the Management Discussion and Analysis filed with the Department with respect to any of the foregoing financial statements of the Restricted Subsidiaries and such other information.

10.1.3 <u>Certificates</u>. Contemporaneously with the furnishing of a copy of each annual audit report and of each set of quarterly statements provided for in this <u>Section 10.1</u>, a certificate, substantially in the form of <u>Exhibit E</u>, dated the date of such annual report or such quarterly statements and signed by the Chief Financial Officer, Treasurer and the Secretary or an Assistant Secretary of the Company to the effect that (i) no Event of Default or Unmatured Event of Default has occurred and is continuing, or, if there is any such event, describing it and the steps, if any, being taken to cure it, (ii) that no Change in Control has occurred or, to the knowledge of such officers, has been proposed and (iii) containing, in the case of each certificate other than the certificate dated the date of such annual report, a computation of, and showing of compliance with, each of the financial ratios and restrictions contained in <u>Section 11.14</u>.

10.1.4 <u>Notice of Default, Litigation and ERISA Matters</u>. Immediately upon becoming aware of any of the following, written notice describing the same and the steps being taken by the Company or any Restricted Subsidiary affected thereby with respect thereto:

(a) the occurrence of an Event of Default or an Unmatured Event of Default;

895401          98508127                    -26-

D&P 000841

(b) any litigation, arbitration or governmental investigation or proceeding not previously disclosed by the Company to the Bank which has been instituted or, to the knowledge of the Company, is threatened against the Company or any Restricted Subsidiary or to which any of the properties of any thereof is subject which, if adversely determined, might reasonably be expected to have a Material Adverse Effect;

(c) the institution of any steps by any ERISA Affiliate or any other Person to terminate any Pension Plan, or the failure of any ERISA Affiliate to make a required contribution to any Pension Plan (if such failure is sufficient to give rise to a lien under Section 302(f) of ERISA) or to any Multiemployer Pension Plan, or the taking of any action with respect to a Pension Plan which could result in the requirement that the Company furnish a bond or other security to the PBGC or such Pension Plan, or the occurrence of any event with respect to any Pension Plan or Multiemployer Pension Plan which could result in the incurrence by any ERISA Affiliate of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Pension Plan), or any material increase in the contingent liability of Parent with respect to any post-retirement Welfare Plan benefit, or any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent;

(d) any cancellation (without replacement) or material change in any insurance maintained by the Company or any Restricted Subsidiary;

(e) any event (including any violation of any Environmental Law or the assertion of any Environmental Claim) which might reasonably be expected to have a Material Adverse Effect; or

(f) any setoff, claims (including, with respect to the environmental claims) withholdings or other defenses to which any of the collateral granted under any Collateral Document, or the Bank's rights with respect to any such collateral, are subject.

10.1.5 Subsidiaries. Promptly upon any change in the list of its Subsidiaries, a written report of such change.

10.1.6 Insurance Reports.

(a) not later than 30 days after the end of each fiscal year, a copy of the Restricted Subsidiaries' projections for the period through the Maturity Date, prepared in accordance with SAP;

(b) not later than 60 days after received, a copy of any financial examination reports or market conduct examination reports by a Governmental Authority with respect to any Restricted Subsidiary, relating to the insurance business of such Restricted Subsidiary; provided, that such

-27-

D&P 000842

Restricted Subsidiary shall not have to deliver any interim report hereunder so long as a final report is issued and delivered to the Bank within 90 days of such interim report;

(c) within two Business Days of the receipt of such notice, notice of the actual suspension, termination or revocation of any material license of the Company or any Restricted Subsidiary by any Governmental Authority or notice from any Governmental Authority notifying the Company or any Restricted Subsidiary of a hearing relating to such a suspension, termination or revocation, including any request by a Governmental Authority which commits the Company or any Restricted Subsidiary to take, or refrain from taking, any action or which otherwise materially and adversely affects the authority of the Company or any Restricted Subsidiary to conduct its business;

(d) within two Business Days of the receipt of such notice, notice of any material pending or threatened investigation or regulatory proceeding (other than routine periodic investigations or reviews) by any Governmental Authority concerning the business, practices or operations of the Company or any Restricted Subsidiary, including any agent or managing general agent thereof; and

(e) promptly upon the receipt of such notice, notice of any actual material changes in the Insurance Code governing the investment or dividend practices of insurance companies domiciled in any of the states in which any Restricted Subsidiary is domiciled.

10.1.7  Annual Appraisal.  A copy of a written opinion from an independent appraiser, addressed to the Bank and dated as of a recent date, stating the fair market value of the issued and outstanding shares of Cal Capital.

10.1.8  Other Information.  From time to time such other information concerning either the Company or any of its Subsidiaries as the Bank may reasonably request.

10.2  Taxes and Liabilities.  File, and cause each Restricted Subsidiary to file, all tax returns when due, and pay or discharge, and cause each Restricted Subsidiary to pay or discharge, when due, all taxes reflected on such returns; and pay, and cause each Restricted Subsidiary to pay, when due, all assessments and other liabilities (including, without limitation, liabilities which could result in imposition of any Lien), except where contested in good faith and by appropriate proceedings and for which reserves are being maintained to the extent required in accordance with generally accepted accounting principles except where the failure to file such tax returns or pay or discharge such taxes would not have a Material Adverse Effect.

10.3  Preservation of Corporate Existence, etc.  Preserve and maintain, and cause each Subsidiary to preserve and maintain, its existence and good standing, in the jurisdiction of its incorporation and (b) its qualification and good standing as a foreign corporation in each other jurisdiction in which such qualification is necessary in view of its business or operations and where the failure to so qualify would have a Material Adverse Effect.

10.4  Compliance with Applicable Laws.  Comply, and cause its Subsidiaries to comply, with the requirements of all applicable laws, rules, regulations, decrees, judgments and orders of any

195-91    98308187

-28-

D&P 000843

governmental authority (Federal, state, local or foreign, and including, without limitation, all Environmental Laws) a breach of which could have a Material Adverse Effect, except where contested in good faith and by proper proceedings and for which adequate reserves are being maintained.

10.5   Notices.  The Company shall promptly notify the Bank:

(a)  of the occurrence of any Default or Event of Default, and of the occurrence or existence of any event or circumstance that foreseeably will become a Default or Event of Default;

(b)  of (i) any breach or non-performance of, or any default under, any Contractual Obligation of the Company or any of its Restricted Subsidiaries which could result in a Material Adverse Effect; and (ii) any dispute, litigation, investigation, proceeding or suspension which may exist at any time between the Company or any of its Restricted Subsidiaries and any Governmental Authority;

(c)  of the commencement of, or any material development in, any litigation or proceeding affecting the Company or any Restricted Subsidiary (i) in which the amount of damages claimed is $1,000,000 (or its equivalent in another currency or currencies) or more, (ii) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement or any Loan Document;

(d)  upon, but in no event later than 10 days after, becoming aware of (i) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened against the Company or any Restricted Subsidiary or any of their respective properties pursuant to any applicable Environmental Laws, (ii) all other Environmental Claims, and (iii) any environmental or similar condition on any real property adjoining or in the vicinity of the property of the Company or any Restricted Subsidiary that could reasonably be anticipated to cause such property or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of such property under any Environmental Laws;

(e)  of any other litigation or proceeding affecting the Company or any of its Restricted Subsidiaries which the Company would be required to report to the SEC pursuant to the Exchange Act, within four days after reporting the same to the SEC;

(f)  of the occurrence of any of the following events affecting the Company or any ERISA Affiliate (but in no event more than 10 days after such event), and deliver to the Agent and each Bank a copy of any notice with respect to such event that is filed with a Governmental Authority and any notice delivered by a Governmental Authority to the Company or any ERISA Affiliate with respect to such event:

(i)  an ERISA Event;

395433          98308187

-29-

D&P 000844



(ii)    a material increase in the Unfunded Pension Liability of any Pension Plan;

(iii)    the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by the Company or any ERISA Affiliate; or

(iv)    the adoption of any amendment to a Plan subject to Section 412 of the Code, if such amendment results in a material increase in contributions or Unfunded Pension Liability; and

(g)    of any material change in accounting policies or financial reporting practices by the Company or any of its consolidated Subsidiaries.

Each notice under this Section 10.5 shall be accompanied by a written statement by a Responsible Officer setting forth details of the occurrence referred to therein, and stating what action the Company or any affected Subsidiary proposes to take with respect thereto and at what time. Each notice under this Section 10.5 shall describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been (or foreseeably will be) breached or violated.

10.6    Maintenance of Property.    The Company shall maintain, and shall cause each Restricted Subsidiary to maintain, and preserve all its property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.    The Company and each Restricted Subsidiary shall use the standard of care typical in the industry in the operation and maintenance of its facilities.

10.7    Insurance.    The Company shall maintain, and shall cause each of its Restricted Subsidiaries to maintain, with financially sound and reputable independent insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons; including workers' compensation insurance, public liability and property and casualty insurance.    Upon request of the Bank, the Company shall furnish the Bank, at reasonable intervals (but not more than once per calendar year) a certificate of a Responsible Officer of the Company (and, if requested by the Agent, any insurance broker of the Company) setting forth the nature and extent of all insurance maintained by the Company and its Restricted Subsidiaries in accordance with this Section (and which, in the case of a certificate of a broker, were placed through such broker).

10.8    Payment of Obligations.    The Company shall, and shall cause each Restricted Subsidiary to, pay and discharge as the same shall become due and payable, all their respective obligations and liabilities, including:

(a)    all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings and adequate

D&P 000845

 

reserves in accordance with GAAP or SAP are being maintained by the Company or such Restricted Subsidiary;

    (b)  all lawful claims which, if unpaid, would by law become a Lien upon its property; and

    (c)  all indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

    10.9    Compliance with ERISA.  The Company shall, and shall cause each of its ERISA Affiliates to:  (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; and (c) make all required contributions to any Plan subject to Section 412 of the Code.

    10.10    Inspection of Property and Books and Records.  The Company shall maintain and shall cause each Restricted Subsidiary to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP or SAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Company and such Restricted Subsidiary.  The Company shall permit, and shall cause each Restricted Subsidiary to permit, representatives and independent contractors of the Bank to visit and inspect any of their respective properties, to examine their respective corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, all at the expense of the Company and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided, however, when an Event of Default exists the Bank may do any of the foregoing at the expense of the Company at any time during normal business hours and without advance notice.

    10.11    Environmental Laws.  (a)  The Company shall, and shall cause each Restricted Subsidiary to, conduct its operations and keep and maintain its property in compliance with all Environmental Laws.

    (b)  Upon the written request of the Bank, the Company shall submit and cause each of its Restricted Subsidiaries to submit to the Bank, at the Company's sole cost and expense, at reasonable intervals, a report providing an update of the status of any environmental, health or safety compliance, hazard or liability issue identified in any notice or report required pursuant to Section 10.5, that could, individually or in the aggregate, result in liability in excess of $100,000.

    10.12    Use of Proceeds.  The Company shall use the proceeds of the Loans to finance the establishment of the ESOP.

    10.13    Further Assurances.  (a)  The Company shall ensure that all written information, exhibits and reports furnished to the Bank do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make

895331        985081 87                              -31-

D&P 000846



the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to the Bank and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgment or recordation thereof.

(b)  Promptly upon request by the Bank, the Company shall (and shall cause any of its Restricted Subsidiaries to) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register, any and all such further acts, deeds, conveyances, security agreements, mortgages, assignments, estoppel certificates, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments the Bank may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the properties, rights or interests covered by any of the Collateral Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Bank the rights granted or now or hereafter intended to be granted to the Bank under any Loan Document or under any other document executed in connection therewith.

SECTION 11. NEGATIVE COVENANTS

So long as any Loan or other Obligation shall remain unpaid or unsatisfied:

11.1    Limitation on Liens.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its property, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)  any Lien (other than a Lien on the Collateral) existing on property of the Company or any Restricted Subsidiary on the Effective Date and set forth in Schedule 11.1 securing Indebtedness outstanding on such date;

(b)  any Lien created under any Loan Document;

(c)  Liens for taxes, fees, assessments or other governmental charges which are not delinquent or remain payable without penalty, or to the extent that non-payment thereof is permitted by Section 9.10, provided that no notice of lien has been filed or recorded under the Code;

(d)  carriers,' warehousemen's, mechanics,' landlords,' materialmen's, repairmen's or other similar Liens arising in the ordinary course of business which are not delinquent or remain payable without penalty;

(e)  Liens (other than any Lien imposed by ERISA and other than on the Collateral) consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation; easements,

395431         91501187
-32-

D&P 000847

rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the businesses of the Company and its Restricted Subsidiaries;

(f)  Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; provided that (i) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Company in excess of those set forth by regulations promulgated by the FRB, and (ii) such deposit account is not intended by the Company or any Restricted Subsidiary to provide collateral to the depository institution; and

(g)  any Lien created pursuant to the Cal Capital Loan Agreement. .

11.2    Disposition of Assets.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any property (including accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

(a)  dispositions of inventory, or used, worn-out or surplus equipment, all in the ordinary course of business,

(b)  the sale of equipment to the extent that such equipment is exchanged for credit against the purchase price of similar replacement equipment, or the proceeds of such sale are reasonably promptly applied to the purchase price of such replacement equipment; and

(c)  dispositions not otherwise permitted hereunder which are made for fair market value; provided, that (i) at the time of any disposition, no Event of Default shall exist or shall result from such disposition, (ii) the aggregate sales price from such disposition shall be paid in cash, and (iii) the aggregate value of all assets so sold by the Company and its Restricted Subsidiaries, together, shall not exceed in any fiscal year $1,000,000.

11.3    Investments.  The Company shall not purchase or acquire, or make any commitment therefor, any capital stock, equity interest, or any obligations or other securities of, or any interest in, any Person, or make or commit to make any advance, loan, extension of credit or capital contribution to or any other investment in, any Person, including any Affiliate of the Company.

11.4    Consolidations and Mergers.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except:

895431          P8508127

-33-

D&P 000848



(a) any Restricted Subsidiary may merge with the Company, provided that the Company shall be the continuing or surviving corporation, or with any one or more Restricted Subsidiaries, provided that if any transaction shall be between a Restricted Subsidiary and a Wholly-Owned Restricted Subsidiary, the Wholly-Owned Restricted Subsidiary shall be the continuing or surviving corporation; and

(b) any Restricted Subsidiary may sell all or substantially all of its assets (upon voluntary liquidation or otherwise), to the Company or another Wholly-Owned Restricted Subsidiary.

11.5    Limitation on Indebtedness.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, create, incur, assume, suffer to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a) Indebtedness incurred pursuant to this Agreement;

(b) Indebtedness existing on the Effective Date and set forth in Schedule 11.4;

(c) Indebtedness secured by Liens permitted by Section 11.1 in an aggregate amount outstanding not to exceed $1,000,000;

(d) Indebtedness incurred in connection with leases permitted pursuant to Section 11.8;

(e) Indebtedness incurred pursuant to the Cal Capital Loan Agreement; and

(f) Indebtedness incurred with regard to insurance claims arising in the ordinary course of business.

11.6    Transactions with Affiliates.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, enter into any transaction with any Affiliate of the Company, except upon fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than would obtain in a comparable arm's-length transaction with a Person not an Affiliate of the Company or such Restricted Subsidiary.

11.7    Use of Proceeds.  (a) The Company shall not, and shall not suffer or permit any Subsidiary to, use any portion of the Loan proceeds, directly or indirectly, (i) to purchase or carry Margin Stock, (ii) to repay or otherwise refinance indebtedness of the Company or others incurred to purchase or carry Margin Stock, (iii) to extend credit for the purpose of purchasing or carrying any Margin Stock, or (iv) to acquire any security in any transaction that is subject to Section 13 or 14 of the Exchange Act.

11.8    Lease Obligations.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, create or suffer to exist any obligations for the payment of rent for any property under lease or agreement to lease, except for:

D&P 000849

(a) leases of the Company and of Restricted Subsidiaries in existence on the Effective Date and any renewal, extension or refinancing thereof;

(b) operating leases entered into by the Company or any Restricted Subsidiary after the Effective Date in the ordinary course of business not to exceed in any fiscal year $1,000,000;

(c) capital leases other than those permitted under clauses (a) and (c) of this Section, entered into by the Company or any Restricted Subsidiary after the Effective Date to finance the acquisition of equipment; provided that the aggregate annual rental payments for all such capital leases shall not exceed in any fiscal year $500,000.

11.9 <u>Restricted Payments</u>. The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any class of its capital stock, or purchase, redeem or otherwise acquire for value any shares of its capital stock or any warrants, rights or options to acquire such shares, now or hereafter outstanding; except that:

(a) the Company may declare and make dividend payments or other distributions payable solely in its common stock; and

(b) the Company may purchase, redeem or otherwise acquire shares of its common stock or warrants or options to acquire any such shares with the proceeds received from the substantially concurrent issue of new shares of its common stock;

(c) any Restricted Subsidiary may declare and make dividend payments to the Company, <u>provided</u> that dividends paid by Cal Capital shall not exceed principal and interest payments hereunder and interest payments on the note issued pursuant to the Cal Capital Loan Agreement less other cash available to the Company to pay principal and interest hereunder; and

(d) Cal Capital may declare and make dividend payments or other distributions payable solely in its common stock.

11.10 <u>ERISA</u>. The Company shall not, and shall not suffer or permit any of its ERISA Affiliates to: (a) engage in a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan which has resulted or could reasonably be expected to result in liability of the Company in an aggregate amount in excess of $50,000; or (b) engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

11.11 <u>Change in Business</u>. The Company shall not, and shall not suffer or permit any Subsidiary to, engage in any material line of business substantially different from those lines of business carried on by the Company and its Subsidiaries on the date hereof.

895131        93509187
-35-



11.12  Accounting Changes.  The Company shall not, and shall not suffer or permit any Subsidiary to, make any significant change in accounting treatment or reporting practices, except as required by GAAP or SAP, or change the fiscal year of the Company or of any Subsidiary.

11.13  ESOP Dividends and Payments.  The Company shall not, and shall not suffer or permit any Restricted Subsidiary to, declare and pay dividends to the ESOT in an amount greater than that needed to make payments of principal and interest on the Loans and employee expense contributions related to the ESOP.

11.14  Financial Covenants.  The Company will not at any time permit:

(a)  the Debt Service Coverage Ratio at any time to be less than 1.25 to 1.00;

(b)  the Risk Based Capital Ratio of Cal Capital to be less than 300%;

(c)  the Minimum Capital and Surplus of Cal Capital to be less than $90,000,000 from and including the Effective Date to and including March 31, 2000, increasing every March 31 thereafter until the Maturity Date by the greater of (i) zero or (ii) 25% of the remainder of (x) net income of Cal Capital less (y) any dividends from Cal Capital for the immediately preceding fiscal year of the Company ending December 31; and

(d)  the A.M. Best Rating of Cal Capital to be less than A- at any time.

SECTION 12.  CONDITIONS OF LENDING.

The obligation of the Bank to make the Loans is subject to the conditions precedent that:

12.1  Documents.  The Bank shall have received all of the following, each duly executed and dated the date of the Loans (or such earlier date as shall be satisfactory to the Bank), in form and substance satisfactory to the Bank:

12.1.1  Note.  The Note of the Company payable to the order of the Bank.

12.1.2  Organization Documents.  Certified copies of the Articles of Incorporation and By Laws of the Company, along with a Certificate of Good Standing dated as of a recent date from the Secretary of State of the State of California and resolutions of the Board of Directors authorizing or ratifying the execution, delivery and performance of this Agreement, the Note and the other Loan Documents.

12.1.3  Consents, etc.  Certified copies of all documents evidencing any necessary corporate action, consents and governmental approvals (if any) with respect to this Agreement, the Note and the other Loan Documents.

855631        985011B7                -36-

D&P 000851



12.1.4  Incumbency and Signatures.  A certificate of the Secretary or an Assistant Secretary of the Company certifying the names of the officer or officers of the Company authorized to sign this Agreement, the Note and the other Loan Documents, together with a sample of the true signature of each such officer (it being understood that the Bank may conclusively rely on such certificate until advised in writing by the Company of any changes therein).

12.1.5  Opinion of Counsel for the Company.  The opinion of LeBoeuf, Lamb, Greene & MacRae L.L.P., Counsel of the Company, substantially in the form of Exhibit B.

12.1.6  Interest Rate Cap Agreement.  The Interest Rate Cap Agreement, duly executed by the Company and the Bank.

12.1.7  Pledge Agreement.  The Pledge Agreement, duly executed by the Company and the Bank, wherein the Company will pledge 82% of the shares of Cal Capital owned by it to secure the Obligations hereunder.

12.1.8  Security Agreement.  The Security Agreement, duly executed by the Company and the Bank, wherein the Company will grant a first-priority security interest in certain of the Company's bank accounts.

12.1.9  Appraisal.  A copy of a written opinion from an independent appraiser, addressed to the trustee of the ESOP and dated as of a recent date, confirming that the fair market value of the issued and outstanding shares of Cal Capital is at least equal to $130,000,000.

12.1.10  Sources and Uses Letter.  A copy of a disbursement letter setting forth in reasonable detail the use of the proceeds of the Loans.

12.1.11  Cal Capital Loan Agreement.  A copy of the executed Cal Capital Loan Agreement

12.1.12  Other.  Such other documents as the Bank may reasonably request.

12.2   No Default, etc.  (a) No Event of Default or Unmatured Event of Default has occurred and is continuing or will result from the making of the Loans and (b) the warranties of the Company contained in Section 9 are true and correct as of the date of the Loans, with the same effect as though made on such date.

SECTION 13. EVENTS OF DEFAULT AND THEIR EFFECT.

13.1   Events of Default.  Each of the following shall constitute an Event of Default under this Agreement:

13.1.1  Non-Payment of the Note, etc.  Default in the payment when due of any principal of any Loan; or default, and continuance thereof for five days, in the payment when due of any interest on any Loan or any fees or other amounts payable by the Company hereunder.

675451        91501187

-37-

D&P 000852

**13.1.2  Non-Payment of Other Indebtedness.**  Any default shall occur under the terms applicable to any indebtedness of the Company or any Restricted Subsidiary in an aggregate amount exceeding $50,000 and such default shall (a) consist of the failure to pay such indebtedness when due (subject to any applicable grace period), whether by acceleration or otherwise, or (b) accelerate the maturity of such Indebtedness or permit the holder or holders thereof, or any trustee or agent for such holders, to cause such indebtedness to become due and payable prior to its expressed maturity.

**13.1.3  Other Material Obligations.**  Default in the payment when due, or in the performance or observance of, any material obligation of, or condition agreed to by, the Company or any Restricted Subsidiary with respect to any material purchase or lease of goods or services (except only to the extent that the existence of any such default is being actively contested by the Company or such Restricted Subsidiary in good faith and by appropriate proceedings and appropriate reserves have been made in respect of such default).

**13.1.4  Bankruptcy, Insolvency, etc.**  The Company or any Restricted Subsidiary becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or the Company or any Restricted Subsidiary applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for the Company or such Restricted Subsidiary or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for the Company or any Restricted Subsidiary or for a substantial part of the property of any thereof and is not discharged within 30 days; or the bankruptcy, reorganization, debt arrangement, or other case or proceeding under the bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of the Company or any Restricted Subsidiary, and if such case or proceeding is not commenced by the Company or such Restricted Subsidiary, it is consented to or acquiesced in by the Company or such Restricted Subsidiary, or remains for 30 days undismissed; or the Company or any Restricted Subsidiary takes any corporate action to authorize, or in furtherance of, any of the foregoing.

**13.1.5  Certain Covenant Defaults.**  Failure by the Company to comply with or to perform any covenant set forth in Sections 11 or Section 10.1.

**13.1.6  Non-Compliance with Provisions of this Agreement.**  Failure by the Company to comply with or to perform any provision of this Agreement or any other Loan Document (and not constituting an Event of Default under any of the other provisions of this Section 13) and continuance of such failure for 30 days after notice thereof to the Company from the Bank.

**13.1.7  Warranties.**  Any warranty made by the Company herein is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice, or other writing furnished by the Company to the Bank is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified.

195431        38501187

-38-

D&P 000853

13.1.8  Pension Plans.  (i) Institution of any steps by the Company or any other Person to terminate a Pension Plan if as a result of such termination the Company could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $100,000, or (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a lien under section 302(f) of ERISA.

13.1.9  Judgments.  Final judgments which exceed an aggregate of $1,000,000 shall be rendered against one or more of the Company and any Restricted Subsidiary and shall not have been discharged or vacated or had execution thereof stayed pending appeal within 30 days after entry or filing of such judgments.

13.1.10  Change in Control.  A change in control shall occur not consented to in writing by the Bank, which consent will not be unreasonably withheld.

13.1.11  Collateral.

(a)  any provision of any Collateral Document shall for any reason cease to be valid and binding on or enforceable against the Company or any Restricted Subsidiary party thereto or the Company or any Restricted Subsidiary shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or

(b)  any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected and first priority security interest subject only to Permitted Liens.

13.1.12  Unauthorized Issuance of Stock.  The Company authorizes and issues any shares of common stock or preferred stock (other than the shares issued to the ESOT) in addition to the shares issued and outstanding as of the date hereof without the Bank's written consent, which consent will not be unreasonably withheld.

13.1.13  Default under Cal Capital Loan Agreement.  A default in the payment of any amounts due and payable under the Cal Capital Loan Agreement shall occur.

13.2  Effect of Event of Default.  If any Event of Default described in this Section 13 shall occur, the Bank may (and upon written request of the Bank shall) declare the Note and all other obligations hereunder to be due and payable, whereupon the Note and all other obligations hereunder shall become immediately due and payable, all without presentment, demand, protest or notice of any kind.  The Bank shall promptly advise the Company of any such declaration, but failure to do so shall not impair the effect of such declaration.  Notwithstanding the foregoing, the Bank shall have no recourse to the Company in excess of the Collateral, and the effect as an Event of Default of any event described in this Section 13 may be waived by the written concurrence of the Bank.

295131        983501187

-39-

D&P 000854

## SECTION 14.    GENERAL.

14.1    Waiver; Amendments. No delay on the part of the Bank in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or any Loan Document shall in any event be effective unless the same shall be in writing and signed and delivered by the Bank, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

14.2    Notices. Except as otherwise provided in Sections 2.3, 2.4 and 4.3, all notices hereunder shall be in writing (including, without limitation, telex or facsimile transmission) and shall be sent to the applicable party at its address shown below its signature hereto or at such other address as such party may, by written notice received by the other party, have designated as its address for such purpose. Notices sent by telegram, telex or facsimile transmission shall be deemed to have been given when sent; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery shall be deemed to have been given when received.

14.3    Computations. Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement, such determination or calculation shall, to the extent applicable and except as otherwise specified in this Agreement, be made in accordance with generally accepted accounting principles as in effect from time to time. If there should be any material change in generally accepted accounting principles after the date hereof which materially affects the financial covenants in this Agreement, the parties hereto agree to negotiate in good faith appropriate revisions of such covenants to maintain the intended restrictiveness thereof.

14.4    Costs, Expenses and Taxes. The Company agrees to pay on demand all reasonable out-of-pocket costs and expenses of the Bank (including the fees and out-of-pocket expenses of counsel for the Bank, in connection with the preparation, execution, delivery and administration of this Agreement, the Note and all other Loan Documents, and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and legal expenses and allocated costs of staff counsel) incurred by the Bank in connection with the enforcement of this Agreement, the Note or any other Loan Document. In addition, the Company agrees to pay, and to save the Bank harmless from all liability for, any stamp or other taxes which may be payable in connection with the execution and delivery of this Agreement, the borrowings hereunder, the issuance of the Note or the execution and delivery of any other documents provided for herein or delivered or to be delivered hereunder or in connection herewith. All obligations provided for in this Section 14.6 shall survive repayment of the Loans, cancellation of the Note and any termination of this Agreement.

191131        91101187                          -40-

D&P 000835


14.5   Subsidiary References.  The provisions of this Agreement relating to Subsidiaries shall apply only during such times as the Company has one or more Subsidiaries.

14.6   Captions.  Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

14.7   Governing Law.  This Agreement and the Note shall be a contract made under and governed by the internal laws of the State of Illinois.  Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  All obligations of the Company and rights of the Bank expressed herein or in the Note shall be in addition to and not in limitation of those provided by applicable law.

14.8   Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.

14.9   Successors and Assigns.  This Agreement shall be binding upon the Company and the Bank and their respective successors and assigns, and shall inure to the benefit of the Company and the Bank and the successors and assigns of the Bank.  The Company may not assign any of its rights or obligations hereunder.

14.10   Indemnification by the Company.

(a)  In consideration of the execution and delivery of this Agreement by the Bank and the agreement to make the Loans hereunder, the Company hereby agrees to indemnify, exonerate and hold the Bank and each of the officers, directors, employees and agents (collectively herein called the "Indemnified Parties" and individually each called an "Indemnified Party") free and harmless from and against any and all actions, causes of action, suits, losses, liabilities, damages and expenses, including, without limitation, reasonable attorneys' fees and disbursements and allocated costs of staff counsel (collectively herein called the "Indemnified Liabilities"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to (i) the direct or indirect use of the proceeds of any of the Loans or (ii) the execution, delivery, performance, enforcement or administration of this Agreement by any of the Indemnified Parties, except for any such Indemnified Liabilities arising on account of any such Indemnified Party's gross negligence or willful misconduct.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Company hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

(b)  The Company agrees to reimburse each Indemnified Party against any and all losses, claims, damages, penalties, judgments, liabilities and expenses (including all reasonable attorneys'

891491        98508187                    -41-

D&P 000856



NOV. 29. 1999 12:24PM    BANK OF AMERICA IL

NO. 3604    P. 49

and consultant's fees and allocated costs of staff counsel) which any Indemnified Party may pay, incur or become subject to arising out of or relating to any Environmental Law, except to the extent caused by the acts or omissions of any Indemnified Party.

(c) All obligations provided for in this Section 14.12 shall survive repayment of the Loans, cancellation of the Note and any termination of this Agreement.

14.11   Waiver of Jury Trial. EACH OF THE COMPANY AND THE BANK HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, THE NOTE, ANY LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

14.12   Confidentiality. All information provided to the Bank pursuant to this Agreement, unless such information is publicly available or obtainable at any time from a source other than the Company or the accounting firms providing information pursuant to this Agreement, shall not be made available by the Bank to anyone, except (i) the Bank's counsel or independent auditors in connection with the transactions contemplated by this Agreement or enforcement of any obligation under or in connection with this Agreement, the Note or any other Loan Document; (ii) any insurance broker, expert or company retained by the Bank in connection with the transactions contemplated by this Agreement or enforcement of any obligation under or in connection with this Agreement, the Note or any other Loan Document; (iii) any other independent expert retained by the Bank in connection with the transactions contemplated by this Agreement or enforcement of any obligation under or in connection with this Agreement, the Note or any other Loan Document; (iv) any other Person in connection with enforcement of any obligation under or in connection with this Agreement, the Note or any other Loan Document; or (v) as may be requested or required by any governmental, judicial or regulatory authority. The Company agrees that if an Event of Default shall have occurred, the Company shall not make any claim for, and hereby waives any claim or right which it may have arising out of, any breach or purported breach of this Section 14.12 regardless of when such breach or purported breach occurred.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-42-

D&P 000857

Delivered at Chicago, Illinois, as of the day and year first above written.

K-M INDUSTRIES HOLDING CO., INC.

By: _____
Name: Stephen Ferrari
Its: Chief Financial Officer


By: _____
Name: William E. Moore
Its: Chairman of the Board

P.O. Box 3016
987 Commercial Street
San Carlos, California 94070
Attention: Stephen Ferrari, Chief Financial Officer
Tel: (650) 592-8337
Fax:(650) 631-1971


BANK OF AMERICA, NATIONAL
ASSOCIATION


By: _____
Name: _____
Its: _____

231 South LaSalle Street
Chicago, Illinois 60697
Attention: Mehul D. Mehta, Vice President
Tel: (312) 828-2147
Fax: (312) 987-0889

893431     98308187

D&P 000858

Delivered at Chicago, Illinois, as of the day and year first above written.

K-M INDUSTRIES HOLDING CO., INC.

By: _____
Name: Stephen Ferrari
Its: Chief Financial Officer


By: _____
Name: William E. Moore
Its: Chairman of the Board

P.O. Box 3016
987 Commercial Street
San Carlos, California 94070
Attention: Stephen Ferrari, Chief Financial Officer
Tel: (650) 592-8337
Fax:(650) 631-1971


BANK OF AMERICA, NATIONAL
ASSOCIATION


By: _____
Name: _____
Its: _____

231 South LaSalle Street
Chicago, Illinois 60697
Attention: Mehul D. Mehta, Vice President
Tel: (312) 828-2147
Fax: (312) 987-0889

835431    98508387

D&P 000859

NOTE                                          COPY

$34,096,230                                          October 18, 1999

    FOR VALUE RECEIVED, the undersigned, K-M INDUSTRIES HOLDING CO., INC., a California corporation (the "Company"), unconditionally promises to pay to the order of BANK OF AMERICA, NATIONAL ASSOCIATION (the "Lender"), the principal sum of THIRTY FOUR MILLION NINETY SIX THOUSAND TWO HUNDRED THIRTY DOLLARS ($34,096,230). This Note evidences one or more Loans made by the Lender to the Company pursuant to that certain Term Loan Agreement dated as of October 18, 1999 between the Company and the Lender (together with all amendments and other modifications, if any, from time to time thereafter made thereto, the "Loan Agreement"; capitalized terms used in this Note, unless otherwise defined, having the meanings provided in the Loan Agreement). The indebtedness evidenced by this Note is payable in the amounts and on the dates specified in the Loan Agreement.

    The Company also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from and including the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid (as well as before judgment), at the rates per annum and on the dates specified in the Loan Agreement.

    Payments of both principal and interest are to be made at the applicable lending office of the Lender in lawful money of the United States of America in same day or immediately available funds to the account designated by the Lender pursuant to the Loan Agreement.

    This Note is the Note referred to in, and evidences indebtedness incurred under, the Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Company is permitted and required to make prepayments and repayments of principal of the indebtedness evidenced by this Note and on which such indebtedness may be declared to be or shall become immediately due and payable.

    All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

960325      98508187

D&P 000860

THIS NOTE HAS BEEN DELIVERED IN CHICAGO, ILLINOIS AND
SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED
BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS.

K-M INDUSTRIES HOLDING CO., INC.

By: _William C. Moore_____

Title: _Chairman_____

960325   98508187

**EXHIBITS 35-50
TO DILLER DECLARATION**

# EXHIBIT 35
# TO DILLER DECLARATION

• 2029 CENTURY PARK EAST, SUITE 820 • LOS ANGELES, CA 90067 • 310-284-8008 • FAX 310-284-8130

• KENNETH A. BODENSTEIN, CFA
Managing Director

# DUFF&PHELPS

October 18, 1999

Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
2300 Garden Road
Monterey, CA 93940

Dear Mr. Moore:

Duff & Phelps, LLC ("Duff & Phelps") has been retained as an independent financial advisor to the Trustee of the K-M Industries Holding Co. Inc. Employee Stock Ownership Plan (the "ESOP") to provide an opinion (the "Opinion") as to the fair market value, on a non-marketable minority interest basis, of a 42% interest in the Series "I" Tracking Stock ("Tracking Stock") of K-M Industries Holding Co. ("K-M Industries"). Generally, the Tracking Stock tracks the inherent economic value of the underlying common shares of California Capital Insurance Company ("California Capital" or the "Company"). The full terms of the Tracking Stock are contained in the Amended and Restated Articles of Incorporation of Kelly-Moore Paint Company, Inc., a California Corporation dated September 30, 1998. We understand that this Opinion will be used by the Trustee in connection with a proposed transaction to purchase a 42% interest in the Tracking Stock on October 18, 1999. Duff & Phelps has previously provided financial advisory services to California Capital.

The term "fair market value" is defined as the amount at which the Tracking Stock would change hands between a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under any compulsion to act, with equity to both.

California Capital, located in Monterey, California, and its wholly owned subsidiaries, Eagle West Insurance Company and Monterey Insurance Company, write property and casualty insurance policies in California and Nevada. Principal direct lines of business are commercial multiple peril, private passenger automobile, homeowners and farmowners coverage. The Company writes all lines of business through independent agents and brokers. As of the valuation date, 100 percent of the Company's common stock was owned by K-M Industries.

In the course of our assignment, we held discussions with Company management at their offices in Monterey and reviewed the Company's recent performance and future outlook. Our financial analysis was based on audited financial statements for the six fiscal years ended December 31, 1998 and unaudited, internally prepared interim financial statements for the eight month period ended August 31, 1999. We also reviewed the Company's

Corporate Advisors Since 1932

DEPOSITION
EXHIBIT
139
PENGAD 800-631-6989
4.11.8        MN



Mr. William E. Moore
Trustee
K-M Industries Holding Co. Inc. Employee Stock Ownership Plan
October 18, 1999
Page 2

1999 budget plan. Industry information and data on comparable public companies used as background for our analysis and valuation were obtained from regularly published industry and investment sources.

Determination of the fair market value of the common stock of California Capital and the Tracking Stock was based on the generally accepted valuation methodologies utilizing comparable publicly traded companies. We focused on the Company's historical performance and on those factors that will likely impact the future profitability and cash-generating capability of the Company and, in reaching our conclusions, we considered the Company's recent operating and financial performance as well as future potential.

Based on all of the foregoing and assuming the accuracy and completeness of all information provided to us, it is our opinion that, as of October 18, 1999, the fair market value, on a non-marketable minority basis, of a 42% interest in the Series "I" Tracking Stock of K-M Industries Holding Co. is reasonably stated in the aggregate amount of $55,000,000.

Respectfully submitted,

*Duff & Phelps, LLC*

Duff & Phelps, LLC

**CONFIDENTIAL**

CIG 00832

# EXHIBIT 36
# TO DILLER DECLARATION

## ESOP STOCK PURCHASE AGREEMENT

THIS AGREEMENT, entered into this __18__ day of October, 1999, by and among

William E. Moore as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership

Trust, formerly known as the Kelly-Moore Paint Company, Inc. Employee Stock Ownership

Trust (hereinafter referred to as the "Trustee"), the William E. and Desiree B. Moore 1990

Revocable Trust, as Amended, William E. Moore and Desiree B. Moore, Trustees (hereinafter

referred to as the "Seller" or "Selling Shareholder"), and K-M Industries Holding Co., Inc., a

California corporation (hereinafter referred to as the "Company"),

## WITNESSETH:

WHEREAS, Trustee is the trustee of the amended and restated K-M Industries Holding

Co., Inc. Employee Stock Ownership Plan and related Trust (hereinafter referred to as "Plan")

originally effective as of January 1, 1998, and amended and restated effective as of July 16,

1999, and intended to be qualified as an employee stock ownership plan as defined in Section

4975(e)(7) of the Internal Revenue Code, a stock bonus plan under Section 401(a) of the Internal

Revenue Code, and exempt from income tax under Section 501(a) of the Internal Revenue Code;

and

WHEREAS, Selling Shareholder owns all of the issued and outstanding Class I-B shares

of the Company; and

1

EXHIBIT
25
Cazzolla  3-19-08

CIG 001870



WHEREAS, Selling Shareholder desires to sell eight million four hundred thousand

(8,400,000) shares of the Company's Class I-B Stock (the "Shares") to the Trustee; and

WHEREAS, Trustee wishes to purchase from Selling Shareholder, and Selling

Shareholder wishes to sell to Trustee the Shares for the benefit of the employees of the Company

who are participants in the Plan; and

WHEREAS, the parties desire to design said purchase and sale so that the Selling

Shareholder will be entitled to the benefits of Section 1042 of the Internal Revenue Code; and

WHEREAS, the Company desires to provide a means for its employees to acquire a

proprietary interest in it as an incentive for them to advance the business and affairs of the

Company;

NOW, THEREFORE, in consideration of the promises and the respective agreements

hereinafter set forth, Selling Shareholder and Trustee hereby agree as follows:

1.    Sale of Stock.  As of this date and subject to the terms and conditions of this

Agreement, Selling Shareholder does hereby sell and deliver to Trustee, and Trustee does hereby

purchase from the Selling Shareholder, the Shares.

2.    Purchase Price.7

(a)    In consideration for the transfer of the Shares as provided in Section 1,

Trustee shall pay to Selling Shareholder an amount equal to Six and 55/100 Dollars ($6.55) per

share rounded, or a total of Fifty-five Million and 00/100 Dollars ($55,000,000.00).  Purchase

Price shall be paid to Selling Shareholder in cash at the closing.

(b)    The purchase price in Section 2(a) hereof is not more than the fair market

valuation established as of the date of this Agreement.  In the event that there is a final determi-

2

CIG 001871

nation by the Internal Revenue Service, a court of competent jurisdiction or otherwise that the fair market value of the Shares as of this date is less than the Purchase Price paid by the Trustee, then Selling Shareholder shall transfer to the Trustee an amount of cash, or transfer to the Trustee shares of the Company's Class P-B Stock, or any combination thereof, equal in value to the difference between the Purchase Price and said fair market value for all such Shares.  In the event that cash and/or shares of the Company's Class P-B Stock are paid and/or transferred to the Trustee under this provision, such shares shall be valued at their fair market value as of the date hereof and interest at a reasonable rate from the date hereof to the date of payment shall be paid by Selling Shareholder on the amount of cash paid.

3.    <u>Representations and Warranties of Selling Shareholder</u>.  The Selling Shareholder, to induce the Trustee to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties.

(a)    On the date hereof, the Shares being sold hereunder will be validly issued and outstanding, fully paid and nonassessable without any liens or encumbrances whatsoever upon or against such shares; and there will be in existence no limitations or restrictions of any kind (other than restrictions under a buy/sell agreement among Company shareholders) on the right of Selling Shareholder to sell such Shares in accordance with the terms hereof.  No options, warrants, agreements, or similar rights created by the Company for the issue or sale of any stock or securities of any kind or for the purchase thereof by any person other than pursuant to or as disclosed by this Agreement will then be in existence.

(b)    Selling Shareholder is the owner, free and clear of any encumbrances, of the Shares being sold hereunder and has the power and authority to enter into this Agreement and

3

CIG 001872

to perform the same, and is not a party to or obligated under or restricted by any contract or other provision which might be violated by making and performing this Agreement.

(c)    Selling Shareholder has been the owner of the Shares for more than three (3) years from the date hereof (including any tacking period under Section 1041 of the Internal Revenue Code) and did not receive the Shares as a distribution from a plan qualified under Section 401(a) of the Internal Revenue Code or pursuant to an option or other right to acquire stock to which Sections 83, 422, 422A, 423 or 424 of the Internal Revenue Code applies.

(d)    Selling Shareholder will file with the Internal Revenue Service the appropriate elections to have Section 1042 of the Internal Revenue Code apply to all or a portion of the sale of Shares contemplated hereby. Said elections shall be filed not later than the last day prescribed by law (including extensions thereof) for filing Selling Shareholder's federal income tax return for the taxable year in which the sale occurs and Selling Shareholder shall deliver to the Company a copy of such elections not later than the date on which the Selling Shareholder files its federal income tax return for such taxable year. Selling Shareholder shall advise Trustee in writing as to the number of Shares with respect to which it then intends to elect the provisions of said Section 1042.

4.    <u>Representations and Warranties of Trustee</u>. Trustee, to induce Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    Trustee is trustee of the Plan pursuant to an Agreement validly created and existing under the laws of the State of California.

4

CIG 001873

(b)    Trustee has full power and is duly authorized by law and the Trust Agreement to obligate itself to pay moneys for lawful trust purposes, including specifically but not in limitation thereof, for the purpose of acquiring shares of the Parent.

(c)    Proper action has been taken by Trustee to authorize the execution of this Agreement and of any and all agreements or instruments necessary to effectuate the transactions contemplated hereby.

5.    Representations and Warranties of Company.  Company, to induce the Selling Shareholder to conclude the transaction contemplated hereunder, hereby makes the following representations and warranties:

(a)    The Company is a corporation duly organized and existing and in good standing under the laws of the State of California having the corporate power to carry on its business as it is now being conducted and is duly qualified to do business and is in good standing in all other states where it is doing business.

(b)    Immediately after the purchase of the Shares by Trustee as contemplated hereby, Trustee will own at least thirty percent (30%) of the total value of the then outstanding stock of the Company.

(c)    None of the Shares to be purchased by Trustee hereunder will be allocated under the Plan to the accounts of or for the benefit of the Selling Shareholder, any person who is a member of the family of the Selling Shareholder (within the meaning of Section 267(c)(4) of the Internal Revenue Code), or any other person who owns (after application of Section 318(a) of the Internal Revenue Code) more than twenty-five percent (25%) in value of any class of

5

CIG 001874

outstanding "employer securities" of the Company. In the administration of the Plan, the Company will comply with the requirements of Section 409(n) of the Internal Revenue Code.

(d)    Upon execution of this Agreement or as soon thereafter as is reasonably practical, the Company shall execute and deliver to the Selling Shareholder the verified written statements required by Section 1042(b)(3) of the Internal Revenue Code pursuant to which the Company consents to the application of Section 4978(a) and 4979A of the Internal Revenue Code in the event that either (i) the Trustee disposes of any of the Shares during the three (3) year period from the date of purchase, other than as a distribution to Participants or otherwise as described in said Section 4978(a) or (ii) there is a prohibited allocation, as defined in Section 4979A of the Internal Revenue Code.

6.    Obligations of Trustee. Selling Shareholder understands and agrees that the execution by the Trustee of this Agreement and of any other instrument or agreement in connection herewith is done in Trustee's capacity as Trustee of the Plan and under and pursuant to the instructions and authorization provided for under the Trust Agreement pursuant to which the Trust was created and that the obligations and liabilities of Trustee in connection therewith are limited to the assets of the Trust.

7.    Indemnification. Selling Shareholder agrees to indemnify and hold harmless Trustee, and Trustee agrees to hold Selling Shareholder harmless, from any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character resulting or arising therefrom or resulting from or arising out of the breach of any representation, agreement or warranty made under or pursuant to this Agreement.

6

CIG 001875

8.    Survival of Representations. Warranties and Agreements.  All statements contained in any certificate, opinion or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions and warranties by said party herein shall survive the execution of this Agreement.  All representations and warranties shall survive the execution of this Agreement and any investigation at any time made by or on behalf of any party hereto.  Any party against whom a claim shall arise after the execution hereof shall be notified promptly in writing of any such claim.

9.    Notices. etc.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses herein designated or at such other address as may be designated in writing by notice given by registered or certified mail to the other parties:

If to Selling Shareholder, at:

> 303 Olive Hill Lane
> Woodside, CA  94062
> Attn:  William E. Moore

If to Trustee, at:

> K-M Industries Holding Co., Inc. Employee Stock Ownership Plan
> and Trust
> Attn.: Trustee
> 987 Commercial Street
> San Carlos, CA  94070

If to the Company, at:

> K-M Industries Holding Co., Inc.
> Attn.: President
> 987 Commercial Street
> San Carlos, CA  94070

7

CIG 001876

10.  Amendments and Entire Agreement.  This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and may be changed or modified only by an instrument duly executed by the parties hereto.

11.  Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedy under or by reason of this Agreement.

12.  Law to Govern.  This Agreement shall be construed and governed in accordance with the laws of the State of California.

13.  Section and Other Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

14.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

CIG 001877

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly

executed as of the day and year first above written.

WILLIAM E. AND DESIREE B. MOORE 1990
REVOCABLE TRUST, AS AMENDED:


_____
William E. Moore, Trustee


_____
Desiree B. Moore, Trustee


TRUSTEE OF THE K-M INDUSTRIES
HOLDING CO., INC. EMPLOYEE STOCK
OWNERSHIP TRUST:


_____
William E. Moore, Trustee


K-M INDUSTRIES HOLDING CO., INC.


_____
William E. Moore, President


9

CIG 001878

# EXHIBIT 37
# TO DILLER DECLARATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,

        Plaintiffs,

        vs.          No.  C 06-07339 CW

K-M INDUSTRIES HOLDING CO.,
INC., et al.,

        Defendants.

# CERTIFIED
# COPY

---

VIDEOTAPED DEPOSITION OF LORA D. SMITH

San Francisco, California

Wednesday, April 16, 2008

VOLUME 1

Reported by:
TRACY L. PERRY
CSR No. 9577
CHRIS TE SELLE
CSR No. 10836

JOB No. 84325

LORA D. SMITH                                                04/16/08

1    Q.    So you don't have any hard feelings about

2  that?

3    A.    No.

4    Q.    Your attitude toward CIG, are you angry at

5  CIG for anything?

6    MS. HASSELMAN:  Objection.  Vague.

7    THE WITNESS:  No.  I enjoyed working for the

8  company.  I enjoyed the people I work with.  I

9  really kind of in a way regret giving up my job.

10  But, I mean, I made the best decision I could at the

11  time for my son.  Hindsight is 20/20.

12  BY MR. LOVITT:

13    Q.    Okay.

14    But you don't feel like you have been

15  mistreated in any way by CIG.

16    A.    Oh, no.

17    MS. HASSELMAN:  Asked and answered.

18  BY MR. LOVITT:

19    Q.    Okay.  Take a look at Exhibit 148, please,

20  and review it briefly to yourself and tell me when

21  you will be prepared to respond to a few questions I

22  have about the document.

23    A.    Okay.  Okay.

24    Q.    Have you ever seen this document before?

25    A.    Yes.

71

1    Q.    You notice down in the lower right-hand

2    corner there is a number called P 056?

3    A.    Yes.

4    Q.    We call that a Bates number, and that

5    apparently is a number that was put on the document

6    by your counsel and produced to us from your

7    records.

8         Is that, is this a document you turned

9    over to your lawyer --

10   A.    Yes.

11   Q.    -- in connection with this lawsuit?

12   A.    Yes.

13   Q.    Okay.

14        Now, did you have some procedure that you

15   used for filing documents that related to the ESOP

16   at your home, once you left the employment of the

17   company?

18   A.    Yes.

19   Q.    And was that, was that more or less the

20   same system that you had when you were employed by

21   the company?

22   MS. HASSELMAN:  Objection.  Vague and

23   ambiguous.

24        THE WITNESS:  Yes.

25   BY MR. LOVITT:

72

1      A.    I would say, fall.

2      Q.    Fall.    Fall of 2006.

3            And, is it fair to say that the reason you

4   sought counsel's advice was because of the

5   conversation with Mr. Lang?

6      A.    Yes.

7      Q.    And that was the only complaint you had

8   about your relationship with CIG, or the ESOP?

9      A.    Yes.

10     MR. LOVITT:  Let's move right along here.

11           We are going to ask the court reporter to

12  mark this as 149.

13                      (Exhibit Smith 149, letter re ESOP

14                      statement plan year 1999, Bates

15                      numbered P 055, marked for

16                      identification, as of this date.)

17     MS. HASSELMAN:  As a reminder, there are a

18  couple of times you nodded.  Make sure that if there

19  is a yes answer, say it out loud.

20     THE WITNESS:  Okay.

21  BY MR. LOVITT:

22     Q.    This is a letter that refers to the ESOP

23  statement plan year 1999, bears a Bates number of P

24  055.

25           Have you ever seen this document before?

LORA D. SMITH                                      04/16/08

1    A.    Just a minute.

2          Yes.

3    Q.    Tell us how you came to see this document.

4    A.    I would assume, at work.

5    Q.    Uh-huh.

6          And the first paragraph, the first, it's

7    directed to, dear team member and shareholder.

8          Did you receive letters like this one,

9    along, throughout the years, that were having to do

10   with your ESOP, that were addressed, dear team

11   member and shareholder?

12         MS. HASSELMAN:  Objection.  Vague and

13   ambiguous.  Vague as to time.

14         THE WITNESS:  Yes.

15   BY MR. LOVITT:

16   Q.    I mean, you considered yourself, once the

17   ESOP got started, to be a shareholder; is that

18   correct?

19   A.    Yes.

20   Q.    And you considered yourself to be a team

21   member.

22   A.    Yes.

23   Q.    Okay.

24         Now, when the ESOP was announced to you,

25   what was your attitude toward it?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    Q.    Uh-huh.

2          Did you ever try to make a calculation as

3    to what the per share price was that the ESOP paid

4    for that 42 percent?

5    A.    No.  I was pretty busy at work.

6    Q.    Uh-huh.

7          Anybody ever tell you or you ever see

8    anything in writing that said the ESOP paid $6.55

9    per share?

10   A.    Yes.

11   Q.    Who told you?  How did you find that out?

12   A.    A memo I received, letter.

13   Q.    Uh-huh.

14         During what time period?

15   A.    I'm not sure.  The very, maybe -- I don't

16   know.

17   Q.    It would have been right around the early

18   days of the ESOP?

19   A.    Yeah, I would say that, yes.

20   Q.    Okay.

21         So at some point fairly early in the

22   game -- I don't mean it's a game -- early in your

23   involvement with the ESOP, you had an understanding

24   that the ESOP had paid approximately $6.55 per

25   share?

103

LORA D. SMITH                                    04/16/08

```
09:40  1    go to page 13, it's paragraph 52.
09:55  2         Do you have any personal knowledge of
09:58  3    facts that support the statement that defendant
10:00  4    fiduciaries and KMH management intentionally
10:03  5    withheld information about the extent of KMH's
10:08  6    potential asbestos liability from participants who
10:10  7    were active employees, including plaintiffs
10:14  8    Fernandez and Thomas, that would have shown them and
10:16  9    other participants that the plan overpaid for KMH
10:22  10   stock?
10:22  11        MS. HASSELMAN:  Objection.  Calls for a legal
10:24  12   conclusion.
10:25  13        THE WITNESS:  No.
01:10  14   BY MR. SULLIVAN:
01:11  15        Q.   We talked earlier about the North Star
01:12  16   Trust Company, and it was a little unclear to me.
01:17  17        Do you know who North Star Trust Company
01:18  18   is?
01:19  19        MS. HASSELMAN:  Objection.  Asked and answered.
01:21  20        THE WITNESS:  No.
01:30  21   BY MR. SULLIVAN:
01:30  22        Q.   In terms of your complaint, is there
01:33  23   anything specific that you think that North Star
01:34  24   Trust Company did to not permit you to receive your
01:40  25   shares under the ESOP?
```

195

1           I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11          Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: _____MAY 1 2008_____

22

23                                 _____

24                             CHRIS TE SELLE
                               CSR No. 10836

25

# EXHIBIT 38
# TO DILLER DECLARATION



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

Dear CIG Business Partner:

With the close of our first 100 years of successful performance, we must now face the challenges and opportunities of the new Millennium with renewed vigor and a strong desire to succeed. To motivate us in meeting these challenges, we now have an incentive that should encourage us individually and collectively to perform at our highest level: company ownership!

Congratulations on becoming an owner and business partner of the California Insurance Group. Through the implementation of our Employee Stock Ownership Plan (ESOP), we now have a significant financial interest, by means of stock ownership, in our company. The ESOP has purchased the Class I-B Common Shares of our Parent Company, K-M Industries Holding Co., Inc. (Sponsor Company) for $55,000,000.00. These Common Shares represent 42% ownership of the California Insurance Group. Mr. William E. Moore sold the shares to us to create a market for the stock he owns without a sale to outside interests and to recognize the loyalty, dedication, and hard work of CIG team members. The release of this stock for allocation to employee shareholder accounts is expected to be completed over the next nine years. Each year, stock will be distributed to eligible employees based on the financial performance of the company.

Now that we have an ownership interest in our company, we will share in its long-term value and growth. To realize this reward, we all must take absolute accountability for the way we individually perform and to involve ourselves, through active participation, in identifying and implementing the best business practices in running our company.

I am sure you are as proud as I to be a part of such an outstanding company and are grateful for this wonderful opportunity. I look forward to working with you in making CIG the best we can be, which will result in our mutual growth and prosperity.

Sincerely,

Peter M. Cazzolla

PMC/lld



# EXHIBIT 39
# TO DILLER DECLARATION



| QUARTERLY EMPLOYEE MEETING |
| November 9, 1999 |

**QUESTIONS AND ANSWERS**

1. What is the status of the ESOP and what is the timeline for preparing statements of employee "ESOP account status" for all participants. Please review how it works...explain the "pre-tax" savings implications of participation on the 401(k) versus the ESOP. (Carolyn Schwarz, Home Office, Project Leader—ITS)

*Response:*

*As previously announced, the ESOP has been closed and 8,400,000 shares (42%) of CIG have been bought from K-M Industries Holding Co., Inc. for $55,000,000. We expect to provide each member of the ESOP with statements of individual accounts within the first 60 days of each new calendar year, beginning in the year 2000.*

*Our 401(k) rules do not allow employees to contribute after-tax dollars to their account. Therefore, if employees elect to contribute to the 401(k) Plan, they will deposit before-tax dollars to their account. The ERISA limits the amount of before-tax dollars that can be deposited in a qualified retirement plan(s), which in our case includes the 401(k) and the ESOP. If employees choose to contribute to the 401(k), then the amount they deposit in the 401(k) will be deducted from their maximum permissible 25% payroll limitation on contributions to qualified tax deferral plans to comply with the ERISA limitations on before-tax deposits in qualified retirement plans.*

2. Why doesn't our company allow business casual dress? I work underneath computers, underneath desks, I carry computers...I don't like to have to wear a tie and wear nice shoes. Nice shoes are expensive and easily damaged. Business casual does not mean that people dress like slobs or wear ugly clothing. Thanks. (Stephen O'Neill-Yoder, Home Office, Technical Support Assistant—ITS)

*Response:*

*When team members are performing tasks that do not require dressier clothing, it is acceptable to wear appropriate casual clothing that suits the task, e.g., jobs requiring moving, cleaning, or storing.*



EXHIBIT

Lora Smith 153
CT 4/16/08

CIG_ESI00001542

3. Now that I am a stockholder and partial owner of this company, I would like to ask you to reconsider the dress code here at CIG. I would like to see it relaxed to business casual dress everyday. I believe the gentlemen in this company would be happier if they didn't have to wear neckties and dress shoes everyday. I also believe the women would be happier if they didn't have to wear dress shoes and hose. Our dress code is not dictated for reasons of safety and most of us have direct contact with the public only over the phone. I think allowing people to dress more comfortably would allow people to focus more on delivering better customer service, rather than on worrying about what someone else is wearing. Will you please reconsider your previous decision on the dress code? (Beverly Smith, Home Office, Project Leader—ITS)

*Response:*

*We have made several adjustments over the years to provide more opportunity for casual clothing to be worn during business hours. Our dress policy is one that sets a professional standard for our company four days out of each workweek. We feel that this is a fair compromise at this time, and we will continue to be receptive to a dress code modification that does not detract from the professional image of our company.*

4. I also think that you could expand your core business hours from 8-5 to 8-6 easily by allowing some flextime. If you have half of your staff work from 8-5 and the other half work from 9-6, your business still appears to be open from 8-6 without increasing the number of hours worked by employees. You would also gain phone coverage in more departments by having the 8-5 group keep the 12-1 lunch period while the 9-6 group can take the 1-2 lunch slot. Your computer operations currently cover these extended hours already, so your systems are already available to you. I'm probably over simplifying this issue, but I thought I'd mention it anyway. (Beverly Smith, Home Office, Project Leader—ITS)

*Response:*

*We have been evaluating flexible business hours and have not found one that can be applied equitably throughout the company for all employees, and one that will not cause deterioration in our customer service. We also will be faced with a new Wages and Hours law that creates additional complications to the implementation of flexible hours, which needs to be considered as part of any plan we adopt. Your suggestion will be considered as we evaluate the flextime concept.*

CIG_ESI00001542.002

Questions and Answers
November 9, 1999
Page 3

5.  I am _thankful_ to work for a company that keeps pace with other companies
    in compensating employees (salaries, medical, dental, and vision plans,
    ESOP, sick leave, paid vacation days). Now that CIG is more removed
    from the Kelly-Moore Paint Company, is there a possibility that the
    vacation schedule could be reevaluated? I am asking because by the time I
    have earned more than 10 days of vacation, my younger children will be
    past the stage of childhood diseases, field trips, awards ceremonies, and
    other special things that take place in their young lives. Is it possible to
    take time off without pay in certain circumstances, say if a child is sick?
    Any other times that it would be okay to do so? Thank you for your
    response. (Anonymous)

    _Response:_

    _We continue to review our benefit program every year with a goal of providing the
    best possible benefits our company can afford, from both a cost and productivity
    standpoint. We are in the process of conducting this review for the year 2000 and
    will include your concerns in our review process._

CIG_ESI00001542.003

# EXHIBIT 40
# TO DILLER DECLARATION



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

TO:    CIG Team Members and Shareholders

RE:    ESOP Statement — Plan Year 1999

Dear Team Member and Shareholder:

We are pleased to present you with your Employee Stock Ownership Plan statement for the plan year ending December 31, 1999. This statement includes your allocation of stock for both 1998 and 1999.

This program is a very special opportunity that provides us with ownership in our company with no monetary contribution on our part. The only contribution we need to make as owner/team members is to perform at our maximum capability, in keeping with our Company Values, to ensure our future success. With stock ownership, we will all benefit from our successful efforts through the resultant increased equity value of our company.

I encourage you to fully understand and embrace company ownership with pride, enthusiasm, and a high level of responsibility as we work together to satisfy our customers and make CIG the best that it can be.

For your better understanding, please refer to the enclosed ESOP Statement Glossary as you read through the entries on your statement. If you have not completed a Beneficiary Designation Form, please contact Pat Spencer in Human Resources. Feel free to direct any questions you may have regarding our ESOP to your manager or to Mike Ferguson or Ed Mines at extensions 291 and 222, respectively.

Thank you for your commitment to our mutual success.

Best personal regards,

Peter M. Cazzolla

PMC/lld

EXHIBIT
Lora Smith 149
CT 4/16/08

# EXHIBIT 41
# TO DILLER DECLARATION

# CALIFORNIA CAPITAL INSURANCE COMPANY
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 1998

PARTICIPANT NAME: LORA D. SMITH

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/1998 | 0.00000 | $0.00 | $0.00 | $0.00 |
| CONTRIBUTIONS | | | 1,985.22 | 1,985.22 |
| INVESTMENTS | | | | |
| UNREALIZED GAIN/LOSS | | | | |
| FORFEITURES | | | | |
| DISTRIBUTIONS | | | | |
| INCOME | | | | |
| EXPENSES | | | | |
| BALANCES AT 12/31/1998 | 0.00000 | $0.00 | $1,985.22 | $1,985.22 |

| | | |
|---|---|---|
| VESTED PERCENTAGE | | 0.0000% |
| VESTED INTEREST VALUE | | $0.00 |
| PER SHARE VALUE AT 12/31/1998 | | $0.00 |

LORA D. SMITH
SOCIAL SECURITY NO: 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/00
PARTICIPANT STATUS:    N?

BIRTHDATE: 02/09/1971
AGE AS OF 12/31/1998: 27

EMPLOYMENT DATE: 09/19/1996
ENTRY DATE: 01/01/1998
VESTING DATE: 12/31/1997

PLAN YEARS OF SERVICE: 2
VESTING HOURS: 2,096
RETIREMENT DATE: 02/09/2036

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY CHANGES TO YOUR
SUPERVISOR.

REPORT AS OF 12/31/98

**CONFIDENTIAL**


EXHIBIT
Lora Smith SD
CT 4/16/08

# EXHIBIT 42
# TO DILLER DECLARATION

K - M   I N D U S T R I E S   H O L D I N G   C O . ,   I N C .
E M P L O Y E E   S T O C K   O W N E R S H I P   P L A N
D E C E M B E R   3 1 ,   1 9 9 9

PARTICIPANT NAME: LORA D. SMITH

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/1999 | 0.00000 | $0.00 | $1,965.22 | $1,965.22 |
| CONTRIBUTIONS | | | 6,901.12 | 6,901.12 |
| INVESTMENTS | 1,995.17973 | 13,056.16 | -13,056.16 | |
| UNREALIZED GAIN/LOSS | | -5,753.80 | | -5,753.80 |
| FORFEITURES | 22.21740 | 81.32 | 8.71 | 90.03 |
| DISTRIBUTIONS | | | | |
| INCOME | | | 7,528.38 | 7,528.38 |
| EXPENSES | | | -3,238.37 | -3,238.37 |
| BALANCES AT 12/31/1999 | 2,017.39713 | $7,383.67 | $128.90 | $7,512.57 |

VESTED PERCENTAGE                 20.0000%

VESTED INTEREST VALUE             $1,502.51

PER SHARE VALUE AT 12/31/1999     $3.66

LORA D. SMITH

SOCIAL SECURITY NO.
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/00

PARTICIPANT STATUS:    C:

BIRTHDATE:       02/03/1971

AGE AS OF 12/31/1999:    28

EMPLOYMENT DATE: 03/19/1996
ENTRY DATE:      01/01/1996
VESTING DATE:    12/31/1997

PLAN YEARS OF SERVICE:   3
VESTING HOURS:
RETIREMENT DATE:02/03/2036    2,060

P041

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY CHANGES TO YOUR
SUPERVISOR.

REPORT AS OF 12/31/1999

EXHIBIT
Lora Smith 154
CT 4/16/03

CONFIDENTIAL

# EXHIBIT 43
# TO DILLER DECLARATION



California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

TO:    CIG Team Members and Shareholders

RE:    ESOP Statement - Plan Year 2000

Dear Team Member and Shareholder:

We are pleased to present you with your Employee Stock Ownership Plan statement for the plan year ending December 31, 2000.  This statement includes stock from prior years and your allocation of stock for year 2000.

This program is a very special opportunity that provides us with ownership in our company with no monetary contribution on our part.  The only contribution we need to make as owner/team members is to perform at our maximum capability, in keeping with our Company Values, to ensure our future success.  With stock ownership, we will all benefit from our successful efforts through the resultant increased equity value of our company.

I encourage you to fully understand and embrace company ownership with pride, enthusiasm, and a high level of responsibility as we work together to satisfy our customers and make CIG the best that it can be.

For your better understanding, please refer to the enclosed ESOP Statement Glossary as you read through the entries on your statement.  If you have not completed a Beneficiary Designation Form, please contact Pat Spencer in Human Resources.  Feel free to direct any questions you may have regarding our ESOP to your manager or to Mike Ferguson or Ed Mines at extensions 291 and 222, respectively.

Thank you for your commitment to our mutual success.

Best personal regards,

Peter M. Cazzolla

PMC/dhh

EXHIBIT
Lora Smith 56
CT 4/16/08

# EXHIBIT 44
# TO DILLER DECLARATION

K - M   I N D U S T R I E S   H O L D I N G   C O . ,   I N C .

E M P L O Y E E   S T O C K   O W N E R S H I P   P L A N

D E C E M B E R   3 1 ,   2 0 0 0

LORA D. SMITH

SOCIAL SECURITY NO:
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/00

PARTICIPANT STATUS:        CP

BIRTHDATE:            02/09/1971

AGE AS OF 12/31/2000:    29

EMPLOYMENT DATE:09/19/1996
ENTRY DATE:          01/01/1998
VESTING DATE:        12/31/1997

PLAN YEARS OF SERVICE:    2.049
VESTING HOURS:
RETIREMENT DATE:02/09/2036

P040

PARTICIPANT NAME: LORA D. SMITH
COMPANY : CALIFORNIA INSURANCE GROUP

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2000 | 2,017.39713 | $7,383.67 | $128.90 | $7,512.57 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 2,013.35060 | 13,140.80 | | 13,140.80 |
| ADJUSTMENT TO APPRAISED VALUE | -5,892.86 | -5,892.86 | | -5,892.86 |
| FORFEITURES | 165.26821 | $99.92 | | |
| DISTRIBUTIONS | | | 22.16 | 622.08 |
| INCOME | | | 88.30 | 88.30 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2000 | 4,196.01594 | $15,231.54 | $239.36 | $15,470.90 |

VESTED PERCENTAGE             40.0000%

VESTED INTEREST VALUE       $6,188.36

PER SHARE VALUE AT 12/31/2000    $3.63



EXHIBIT
Lora Smith 157
CT 4/16/08

CONFIDENTIAL

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2000

# EXHIBIT 45
# TO DILLER DECLARATION



**CIG**
SINCE 1878

*California Capital Insurance Company*
*Nevada Capitol Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

PETER CAZZOLLA
President-C.E.O.

TO:    CIG Team Members and Shareholders

RE:    ESOP Statement — Plan Year 2001

---

Dear Team Member and Shareholder:

We are pleased to present you with your Employee Stock Ownership Plan statement for the plan year ending December 31, 2001. This statement includes stock from prior years and your allocation of stock for year 2001.

This program is a very special opportunity that provides us with ownership in our company with no monetary contribution on our part. The only contribution we need to make as owner/team members is to perform at our maximum capability, in keeping with our Company Values, to ensure our future success. With stock ownership, we will all benefit from our successful efforts through the resultant increased equity value of our company.

I encourage you to fully understand and embrace company ownership with pride, enthusiasm, and a high level of responsibility as we work together to satisfy our customers and make CIG the best that it can be.

For your better understanding, please refer to the enclosed ESOP Statement Glossary as you read through the entries on your statement. Please complete the enclosed Beneficiary Designation Form if you have not done so already or if you need to make Beneficiary changes. Feel free to direct any questions you may have regarding our ESOP to your manager or to Mike Ferguson or Ed Mines at extensions 291 and 222, respectively.

Thank you for your commitment to our mutual success.

Best personal regards,

Peter M. Cazzolla

pmc/lld

EXHIBIT
Lora Smith 158
CT 4/16/08

P051

# EXHIBIT 46
# TO DILLER DECLARATION

EXHIBIT
Lora Smith 178
CT 4/6/13

**CONFIDENTIAL**

LORA D. SMITH

SOCIAL SECURITY NO: 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/00

PARTICIPANT STATUS:        B1

BIRTHDATE:        02/09/1971
TERMINATION:      10/26/2001
AGE AS OF 12/31/2001:  30

EMPLOYMENT DATE: 09/19/1996
ENTRY DATE:      01/01/1998
VESTING DATE:    12/31/1997

PLAN YEARS OF SERVICE:   4
VESTING HOURS:         443
RETIREMENT DATE: 02/09/2036

P039

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2001

K - M  I N D U S T R I E S  H O L D I N G  C O . ,  I N C .
E M P L O Y E E  S T O C K  O W N E R S H I P  P L A N
D E C E M B E R  3 1 ,  2 0 0 1

PARTICIPANT NAME: LORA D. SMITH
COMPANY: CALIFORNIA INSURANCE GROUP

|  | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2001 | 4,196.01594 | $15,231.54 | $239.36 | $15,470.90 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 277.64964 | 1,817.94 | | 1,817.94 |
| ADJUSTMENT TO APPRAISED VALUE | | 1,650.44 | | 1,650.44 |
| FORFEITURES | | | | |
| DISTRIBUTIONS | | | | |
| INCOME | | | 48.97 | 48.97 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2001 | 4,473.66558 | $18,699.92 | $288.33 | $18,988.25 |

VESTED PERCENTAGE            40.0000%
VESTED INTEREST VALUE        $7,595.30
PER SHARE VALUE AT 12/31/2001   $4.18

# EXHIBIT 47
# TO DILLER DECLARATION





California Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

**CONFIDENTIAL**

PETER M. CAZZOLLA
President-C.E.O.

May 31, 2002

Dear CIG Owner and Team Member:

We have completed the fourth year of our Employee Stock Ownership Program, and I am pleased to announce that the value of our company and personal ownership continues to grow. Upon completion of their annual appraisal of CIG, Duff and Phelps has set the value of our company at $4.18 a share. This current fair market value is 15% higher than last year's value of $3.63. Additionally, as each year passes, the vested portion of our stock balance increases as long as we continue to be active and qualified members of the CIG team.

I again want to remind you that there are many factors that can positively or negatively affect the value of our CIG stock. Several of the key factors include company growth and profit performance, the stock performance of publicly traded insurance companies similar to CIG, and the reduction of our ESOP loan principal. One other factor has been brought to our attention that may have an effect on the future value of our CIG stock. K-M Industries Holding Co., Inc., our holding company, also owns Kelly-Moore Paint Company. Significant asbestos claims have been filed against Kelly-Moore. To date, the costs of these claims have been covered by insurance policies. Kelly-Moore is vigorously proceeding against its various insurance carriers to assure coverage for these asbestos-related claims. As the asbestos litigation continues against Kelly-Moore, Kelly-Moore's current belief is that the litigation is likely to depress its stock value. As a result of our joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation may depress the value of our CIG stock, which would affect the value of your ESOP account.

As we have communicated to you at our Quarterly Owner/Employee Meetings, we have many challenges facing us, and we are meeting these challenges with timely and decisive actions that will keep our company on a course of long-term profit and growth. I assure you that, to the best of our ability, your management team is highly focused and dedicated to do all we can to ensure that the operating and financial position of CIG will not be compromised over the long term by market conditions or emerging liabilities.

Sincerely,

Peter M. Cazzolla
President and Chief Executive Officer

pmc/lld

**EXHIBIT**

Lura Smith 162
CT 4/16/08

CIG 005569

# EXHIBIT 48
# TO DILLER DECLARATION

**CALIFORNIA INSURANCE GROUP**
**Inter-Office Memorandum**

To:      Past CIG Employees

From:    Human Resources Department

Subject: Information Regarding The Employee Stock Ownership Plan

Date:    June 10, 2002

---

We are pleased to provide you with information regarding your K-M Industries Holding Co., Inc., Employee Stock Ownership Plan (ESOP). Your statement for the Plan Year ended December 31, 2001, is enclosed.

Employees showing a vested amount of more than $3500 as *Vested Interest Value* on your statement, payout will be made in accordance with the terms of the ESOP. (Please refer to your Employee Stock Ownership Plan Summary Plan Description, Page 14, Sections A and B.)

**Employees Terminated in 2002**

The following information is also included in this package:

       Beneficiary Designation Form (please complete and return).

No payouts will be made until after the end of *Plan Year 2002.*

If you have any questions, please feel free to contact the Human Resources Department.

/enclosures

EXHIBIT

LoraSmith 163
CT 4/16/08

# EXHIBIT 49
# TO DILLER DECLARATION





California Capital Insurance Company
Nevada Capital Insurance Company
Eagle West Insurance Company
Monterey Insurance Company

PETER M. CAZZOLLA
President-C.E.O.

TO:    CIG Team Members and Shareholders

RE:    ESOP Statement — Plan Year 2002

Dear Fellow Team Member and Shareholder:

Another year has passed, and we can all be proud of the progress we continue to make on improving the market position and value of our company. Your enclosed ESOP Participant Statement reflects the additional shares allocated to you as of December 31, 2002 and the value of your account based on our current price of $4.20 per share.

The share price is a slight increase over our previous appraisal and shows that CIG remains a good value even during a period of time where we were faced with significant economic, competitive, and regulatory challenges. Our progress and value are the culmination of the hard work and dedication of you and all employee/owners, and we should thank each other for this commitment to a high level of performance. Please accept the enclosed gasoline card as additional appreciation of your efforts.

As we execute our strategic plan, we are now actively writing business in three states: California, Nevada, and Oregon. Consistent with our state expansion, we have concluded that a change in our group name would more accurately identify our group of companies and better serve our strategic marketing direction. Effective immediately, our group name will be Capital Insurance Group. We will still be representing our company as CIG and are in the process of finalizing the registration of this service mark. Please refer to our company as Capital Insurance Group or CIG in all future communications with customers, business partners, and the general public.

Thank you for your contribution to our results. We encourage all team members to continue to lead CIG in a focused, outstanding way as we deliver our products and services to our customers. In this way, we will positively influence our company's growth and profit as well as the future value of our ownership in CIG.

Best personal regards,

Peter M. Cazzolla

pmc/lld
Enclosures

EXHIBIT
Lora Smith / 64
CT 4/16/08

P004

HOME OFFICE
P.O. Box 3110 • Monterey, California 93942-3110 • (831) 649-1155 • Fax (831) 647-8549 • www.ciginsurance.com

# EXHIBIT 50
# TO DILLER DECLARATION



**CALIFORNIA INSURANCE GROUP.**
**Inter-Office Memorandum**

To:          Former CIG Employees

From:      Human Resources Department

Subject:  Information Regarding The Employee Stock Ownership Plan

Date:      June 10, 2003

---

We are pleased to provide you with information regarding your K-M Industries Holding Co., Inc., Employee Stock Ownership Plan (ESOP). Your statement for the Plan Year ended December 31, 2002, is enclosed.

Employees showing a vested amount of more than $3500 as *Vested Interest Value* on your statement, payout will be made in accordance with the terms of the ESOP. (Please refer to your Employee Stock Ownership Plan Summary Plan Description, Page 14, Sections A and B.)

**Employees Terminated in 2003**

The following information is also included in this package:

Beneficiary Designation Form (please complete and return).

No payouts will be made until after the end of *Plan Year 2003*.

If you have any questions, please feel free to contact the Human Resources Department.

/enclosures



P049

**EXHIBITS 51-65
TO DILLER DECLARATION**

# EXHIBIT 51
# TO DILLER DECLARATION





**CIG**
SINCE 1898

*California Capital Insurance Company*
*Nevada Capital Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

PETER M. CAZZOLLA
*President-C.E.O.*

November 14, 2005

Dear CIG Team Member and Employee/Owner:

We are pleased to provide you with your ESOP Statement for 2003. As we have communicated to you over the last several years, the reason we have experienced a delay in completing our stock valuation was the asbestos-liability exposure incurred by our sister company, Kelly Moore Paint Company. Even though this asbestos liability remains with Kelly Moore Paint, our independent stock appraiser feels that the liability has been fairly stated and that the Paint Company has relative value on a going-concern basis. Progress is being made in the management and control of Kelly Moore Paint's asbestos liability; however, its future development could have an impact on CIG's future stock value.

You will be encouraged to see that the per-share price of CIG's stock for 2003 was $6.35, an increase of 51% over 2002's price of $4.20. Our increase in value is attributed to the continued hard work and commitment to a high level of performance by all CIG team members. I encourage you to thank all team members and business partners for their contribution to the increase in the value of our company.

As we go forward, it is our goal to complete timely ESOP stock valuations and to deliver them to all ESOP participants by June of each year. Along these lines, we have completed the stock valuation for 2004, and you can expect to receive your ESOP Statement with 2004 account values before the end of 2005. I am pleased to announce that our CIG stock value for 2004 is $7.80, a 22% increase over our prior valuation and 19% higher than our initial contribution price of $6.55.

I am proud of being a CIG team member and greatly appreciate our team's high performance level and pride as well. It is an exceptional opportunity for us, as owners, to share in the financial success of our efforts.

Best personal regards,

Peter M. Cazzolla

2004 — $37,000

$15,000

pmc/lld

# EXHIBIT 52
# TO DILLER DECLARATION

CONFIDENTIAL

# K-M INDUSTRIES HOLDING CO., INC.
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 2003

PARTICIPANT NAME: LORA D. SMITH
COMPANY: CALIFORNIA INSURANCE GROUP

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2003 | 4,795.00896 | $20,139.04 | $255.08 | $20,394.12 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 36.38251 | 238.22 | | 238.22 |
| ADJUSTMENT TO APPRAISED VALUE | | 10,302.06 | | 10,302.08 |
| FORFEITURES | | | | |
| DISTRIBUTIONS | | | | |
| INCOME | | | -152.20 | -152.20 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2003 | 4,831.39147 | $30,679.34 | $102.88 | $30,782.22 |

VESTED PERCENTAGE 40.0000%

VESTED INTEREST VALUE $12,312.89

PER SHARE VALUE AT 12/31/2003 $6.35

LORA D. SMITH

PARTICIPANT STATUS: B3

BIRTHDATE: 02/09/1971
TERMINATION: 10/26/2001
AGE AS OF 12/31/2003: 32

EMPLOYMENT DATE: 05/13/1996
ENTRY DATE: 01/01/1998
VESTING DATE: 12/31/1997

PLAN YEARS OF SERVICE: 5
VESTING HOURS: 0
RETIREMENT DATE: 02/09/2036

P037

PLEASE REVIEW THIS STATEMENT AND REPORT ANY QUESTIONS TO THE HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2003



EXHIBIT 72

# EXHIBIT 53
# TO DILLER DECLARATION



**CIG**
SINCE 1898

*California Capital Insurance Company*
*Nevada Capital Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

PETER M. CAZZOLLA
President-C.E.O.

December 1, 2005

Dear CIG Team Member and Employee/Owner:

Enclosed you will find your ESOP Statement for 2004. As I communicated to you in my cover letter included with your 2003 ESOP Statement, even though Kelly-Moore Paint Company continues with a liability exposure to asbestos, our independent stock appraiser asserts, as of the 2004 valuation, that their liability has been fairly stated and that the Paint Company has relative value on a going-concern basis. Significant resources continue to be applied to managing and controlling Kelly-Moore Paint's asbestos liability; however, the future development of these claims could have an impact on CIG's future stock value.

Our price per share for 2004 is $7.80, a 22% increase over our 2003 per-share price of $6.35. You should also note that our 2004 per-share value exceeds the ESOP per-share cost price of $6.55 by 19%. This is the first time our price per share has exceeded cost.

You will also notice that your 2004 ESOP Statement includes a small amount in the Investment line that represents stock allocation for our ESOP loan interest expense only. We did not allocate stock in 2004 due to the uncertainty of Kelly-Moore Paint's asbestos liability and subsequent delay in valuations. To fairly deal with the ESOP uncertainty in 2004, CIG's Board of Directors established our 401(k) Profit Sharing Plan and contributed approximately 25% of each team member's annual salary into his or her personal 401(k) account. Future remaining ESOP participant investments, the shares we receive each year, will be extended over an additional five years with the final share allocations to be made in 2014. This extension of our ESOP provides added incentive for team members to stay with CIG, helps us attract new employees, and enhances our annual financial performance by reducing the expenditures related to our ESOP.

We are pleased that we are back on track to complete our ESOP valuations in a timely way, and our goal continues to be to deliver statements to all participants by June of each year. Thank you again for your part in making CIG a company of choice by our customers, which leads to the enhanced financial value of our company for all CIG employees and shareholders.

Best personal regards,

Peter M. Cazzolla

pmc/lld
Enclosure

EXHIBIT
Lura Smith | 75
CT 4/16/08

P044

HOME OFFICE

# EXHIBIT 54
# TO DILLER DECLARATION



**CIG**
SINCE 1898

*California Capital Insurance Company*
*Nevada Capital Insurance Company*
*Eagle West Insurance Company*
*Monterey Insurance Company*

PETER M. CAZZOLLA
President-C.E.O.

July 3, 2006

Dear Fellow Team Member and Shareholder:

Our company valuation for 2005 is complete, and we are proud to enthusiastically report that the price per share for K-M Industries "I" tracking stock, which represents Capital Insurance Group's value, is $9.05. This is a 16% increase over our 2004 per-share price of $7.80. CIG team members should, again, all pay tribute to each other for sustaining our excellent performance, which has added growth, profit, and increased value to our franchise.

Your personalized statement is attached that shows how your equity in CIG continues to grow, both from the number of shares owned and the adjusted total value of your shares at the end of 2005. Since the inception of our Employee Stock Ownership Plan, the value per share of CIG stock has grown 38%, and the total stock value we have received represents 30% or more of our total ESOP-eligible salaries.

Our sister company, Kelly-Moore Paint, continues to grow profitably and shows progress in controlling its asbestos liabilities. However, our future CIG stock value could be affected if this trend should reverse and there is a significant deterioration in Kelly-Moore Paint's financial performance.

We will be celebrating our valued ownership benefit in CIG the week of July 3, 2006, which has been officially designated as "CIG ESOP Week." Please join in the celebrations, and let us recognize each other for the contributions we made to our company's success in 2005 and the value we have as CIG employee/owners.

Best personal regards,

*Peter Cazzolla*

pmc/lld
Attachment

EXHIBIT
LoneSmith 176
CT 4/16/08

P043

# EXHIBIT 55
# TO DILLER DECLARATION

# K - M INDUSTRIES HOLDING CO., INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

### DECEMBER 31, 2002

**CONFIDENTIAL**

PARTICIPANT NAME: THOMAS FERNANDEZ JR
COMPANY : CALIFORNIA INSURANCE GROUP

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2002 | 9,226.58002 | $38,567.10 | $503.50 | $39,070.60 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 2,972.06290 | 19,459.93 | | 19,459.93 |
| ADJUSTMENT TO APPRAISED VALUE | | -6,792.74 | | -6,792.74 |
| FORFEITURES | 139.90195 | 587.59 | 7.11 | 594.70 |
| DISTRIBUTIONS | | | | |
| INCOME | | | 134.94 | 134.94 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2002 | 12,338.54487 | $51,821.89 | $645.55 | $52,467.44 |

| | | |
|---|---|---|
| VESTED PERCENTAGE | 100.0000% | |
| VESTED INTEREST VALUE | $52,467.44 | |
| PER SHARE VALUE AT 12/31/2002 | $4.20 | |



EXHIBIT
220
Fernandez 4-21-08

P005

THOMAS FERNANDEZ JR

PARTICIPANT STATUS:          CP

BIRTHDATE:        03/20/1963

AGE AS OF 12/31/2002:      39

EMPLOYMENT DATE:07/08/1996
ENTRY DATE:      01/01/1998
VESTING DATE:    12/31/1996

PLAN YEARS OF SERVICE:    7
VESTING HOURS:      2,080
RETIREMENT DATE:03/20/2028

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2002

# EXHIBIT 56
# TO DILLER DECLARATION

**Thomas Fernandez Jr.**

From:       "islandgirl 3oahu" <islandgirl3oahu@yahoo.com>
To:         <beavis666@prodigy.net>
Sent:       Sunday, October 16, 2005 6:10 AM
Subject:    Fwd: Quarterly Employee Meeting on financials - ESOP

> Date: Mon, 08 Mar 2004 14:18:53 -0800
> From: "George Cushing"
> CC: "Amy Roth" ,
> "Bella Penrose" ,
> "Cheryl Bruns" ,
> "Cecilia Ray" ,
> "Dan Adams" ,
> "Dallas Harrison" ,
> "Deborah Nishiki" ,
> "Edward Donati" ,
> "Erlinda Thompson" ,
> "Genavieve Capone" ,
> "George Cushing" ,
> "Jon McGuire" ,
> "Jim Robinson" ,
> "Kindi Trueheart" ,
> "MailRoom" ,
> "Matilde Magbitang" ,
> "Paul Baker" ,
> "Rosa Delmar"
> Subject: Quarterly Employee Meeting on financials -
> ESOP
>
> Bay Area Staff......FYI
>
> Last Wednesday I forwarded the Quarterly Employee
> Meeting material to you and in it is a comparison,
> contained in the financials, on the contributions to
> ESOP for the last two years. Upon review you can
> see the contribution for 2002 is noted as 5.6
> million and the contribution for 2003 is 3.1
> million. The makeup of the contributions is the
> total of 1)25% of salaries and 2)declared dividends.
> The reason for the decrease in the contribution for
> 2003 is that in 2003 Kelly Moore did not declare any
> dividends due to the asbestos case, we have known
> about, coming to trial soon. The trial, I'm told,
> begins 3-29-04 and is expected to last 4 to 6 weeks.
> To declare dividends, with this case resolution
> closely pending, could be viewed negatively in the
> event of an unfavorable outcome. Let me know if you

EXHIBIT

224

Fernandez 4-21-08

P013

10/18/2005

> have questions.
>
> George
>
>

Yahoo! Music Unlimited
Access over 1 million songs. Try it free.
http://music.yahoo.com/unlimited/

Yahoo! Music Unlimited - Access over 1 million songs. Try it free.

# EXHIBIT 57
# TO DILLER DECLARATION

K - M  I N D U S T R I E S  H O L D I N G  C O . ,  I N C .

E M P L O Y E E  S T O C K  O W N E R S H I P  P L A N

D E C E M B E R  3 1 ,  2 0 0 2

PARTICIPANT NAME: LORA D. SMITH
COMPANY : CALIFORNIA INSURANCE GROUP

LORA D. SMITH

PARTICIPANT STATUS:                                    B2

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2002 | 4,473.66558 | $18,699.92 | $288.33 | $18,988.25 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 321.34138 | 2,104.03 | | 2,104.03 |
| ADJUSTMENT TO APPRAISED VALUE | | -664.92 | | -664.92 |
| FORFEITURES | | | | |
| DISTRIBUTIONS | | | | |
| INCOME | | | -33.25 | -33.25 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2002 | 4,795.00896 | $20,139.04 | $255.08 | $20,394.12 |

VESTED PERCENTAGE                    40.0000%

VESTED INTEREST VALUE            $8,157.65

PER SHARE VALUE AT 12/31/2002      $4.20

BIRTHDATE:         02/09/1971
TERMINATION:       10/26/2001
AGE AS OF 12/31/2002:    31

EMPLOYMENT DATE: 09/19/1996
ENTRY DATE:      01/01/1998
VESTING DATE:    12/31/1997

PLAN YEARS OF SERVICE:    4
VESTING HOURS:            0
RETIREMENT DATE: 02/09/2036

P038

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2002

CONFIDENTIAL

EXHIBIT
Lora Smith 146
CT 4/16/08

# EXHIBIT 58
# TO DILLER DECLARATION

# EMPLOYEE STOCK OWNERSHIP PLAN
## PARTICIPANT STATEMENT GLOSSARY
### PLAN YEAR ENDING 12/31/2002

## TOP ROW

**SHARES** – The number of shares of ESOP stock allocated to your account.

**VALUE OF SHARES** – The value of the shares as of a particular transaction or point in time.

**CASH** – Cash allocated to your account.

**TOTAL** – The combined value of ESOP stock and cash.

## LEFT-HAND COLUMN

**BALANCES AT 01/01/2002** – The balance carried forward from last year's Participant Statement.

**INVESTMENTS (AT COST)** – The total shares allocated to your account during the current year times the original purchase price of $6.55 per share.

**ADJUSTMENT TO APPRAISED VALUE** – The sum of two components:

- Shares as of 01/01/02 - The number of shares multiplied by the change each year between the ending and beginning values ($4.20 - $4.18 = $.02)

- Shares allocated to your account during calendar year 2002 [(Investments (At Cost)] These current calendar year allocated shares multiplied by the difference between the appraised value at the end of the year and the original purchase price. ($4.20 – $6.55 = $2.35). Most of this difference is due to the debt remaining from the purchase of the stock and stock market conditions at the time of the appraisal.

**FORFEITURES** – The non-vested account balances of terminated participants, which have been credited to your account.

**DISTRIBUTIONS** – The amount of distributions you have received during the plan year.

**INCOME** – Cash dividends allocated to your account.

## BOTTOM SECTION

**VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the Company. This percentage relates directly to your Years of Service.

You become 20% vested in the third calendar year in which you work at least 1000 hours. Your vesting then increases another 20% in each subsequent year until you are fully vested by the seventh year that you work at least 1000 hours. Full-time employees who were hired prior to 7/1/96 are 100% vested as of 12/31/2002, providing they worked at least 1000 hours in each of the years, 1996 through 2002.

EXHIBIT

Lera Smith 167

CT 4/16/08

Page 1 of 2

VESTED INTEREST VALUE – The value of your vested (earned) balance of the account.

PER-SHARE VALUE AT 12/31/2002 – This is the appraised value per share of ESOP stock in your account. It has been determined independently by Duff and Phelps, a highly accredited appraisal firm and confirmed by our Trustee, North Star ESOP & Fiduciary Services.

Three major factors were used to establish the appraised value:

- Company performance.
- Remaining debt for ESOP stock.
- Comparable property and casualty insurance company stock prices.

# INFORMATION ON CERTIFICATE STUB

PARTICIPANT STATUS

| | |
|---|---|
| NP | new participant |
| CP | continuing participant |
| DD | deceased |
| DS | total and permanent disability |
| RN | retired at Normal Retirement Age |
| LA | leave of absence |
| ML | maternity leave |
| RH | rehired |
| TI | terminated in the current year without a Break-in-Service (Plan Year with less than 501 Hours of Service and not employed on Plan Year End) |
| TA | terminated, receives allocation |
| TB | terminated with a Break-in-Service and not vested |
| TE | terminated after plan entry |
| XX | terminated with Break-in-Service, has vested interest, forfeiture occurs |
| XI | "XX" from previous year, unpaid in current year |
| B1 | terminated with Breaks-in-Service equal to the number of years indicated in the code |
| B2-B5 | see above |
| P1 | terminated with Breaks-in-Service equal to the number of years indicated in the code AND paid the vested amount of the account. The vested percentage will show as 0%. |
| P2-P5 | see above |
| PD | Participant paid in full |
| PX | Paid vested account, forfeits balance. |

PLAN YEARS OF SERVICE – The total number of Years of Service you have as of the current Plan Year End starting from January 1, 1996. A Year of Service is a Plan Year in which you had at least 1000 Hours of Service.

VESTING HOURS – The number of Hours of Service that you worked during the current plan year.

P059

# EXHIBIT 59
# TO DILLER DECLARATION

# K - M INDUSTRIES HOLDING CO., INC.
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 2004

PARTICIPANT NAME: LORA D. SMITH
COMPANY: CALIFORNIA INSURANCE GROUP

PARTICIPANT STATUS: B4

LORA D. SMITH

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2004 | 4,831.39147 | $30,679.34 | $102.88 | $30,782.22 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | | | | |
| ADJUSTMENT TO APPRAISED VALUE | | | | |
| FORFEITURES | | | | |
| DISTRIBUTIONS | | 7,005.52 | | 7,005.52 |
| INCOME | | | 0.97 | 0.97 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2004 | 4,831.39147 | $37,684.85 | $103.84 | $37,788.69 |

VESTED PERCENTAGE               40.0000%
VESTED INTEREST VALUE           $15,115.48
PER SHARE VALUE AT 12/31/2004   $7.80

BIRTHDATE:       02/09/1971
TERMINATION:     10/26/2001
AGE AS OF 12/31/2004: 33
EMPLOYMENT DATE:09/19/1995
ENTRY DATE:      01/01/1998
VESTING DATE:    12/31/1997

PLAN YEARS OF SERVICE:  4
VESTING HOURS:
RETIREMENT DATE:02/09/2036

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2004

P036

**CONFIDENTIAL**



EXHIBIT
Lora Smith 174
CT 4/6/06

# EXHIBIT 60
# TO DILLER DECLARATION

# K-M INDUSTRIES HOLDING CO., INC.
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 2005

PARTICIPANT NAME: LORA D. SMITH
COMPANY: CALIFORNIA INSURANCE GROUP

PARTICIPANT STATUS: 85

LORA D. SMITH

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2005 | 4,831.39147 | $37,684.85 | $103.84 | $37,788.69 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 112.85913 | 738.96 | | 738.96 |
| ADJUSTMENT TO APPRAISED VALUE | | 6,321.66 | | 6,321.66 |
| *DISTRIBUTIONS* | -2,961.17048 | -26,798.59 | -121.72 | -26,920.31 |
| INCOME | | | 17.87 | 17.87 |
| EXPENSES | | | | |
| BALANCES AT 12/31/2005 | 1,983.08012 | $17,946.88 | $0.00 | $17,946.88 |

| | | |
|---|---|---|
| VESTED PERCENTAGE | | 100.0000% |
| VESTED INTEREST VALUE | | $17,945.88 |
| PER SHARE VALUE AT 12/31/2005 | | $9.05 |

BIRTHDATE: 02/05/1971
TERMINATION: 10/26/2001
AGE AS OF 12/31/2005: 34

EMPLOYMENT DATE: 09/19/1996
ENTRY DATE: 01/01/1998
VESTING DATE: 12/31/1997

PLAN YEARS OF SERVICE: 4
VESTING HOURS:
RETIREMENT DATE: 02/09/2036

PLEASE REVIEW THIS
STATEMENT AND REPORT
ANY QUESTIONS TO THE
HUMAN RESOURCES DEPT.

REPORT AS OF 12/31/2005

CONFIDENTIAL

EXHIBIT 17

P035

# EXHIBIT 61
# TO DILLER DECLARATION

**CONFIDENTIAL**

# K - M INDUSTRIES HOLDING CO., INC.
## EMPLOYEE STOCK OWNERSHIP PLAN
### DECEMBER 31, 2005

PARTICIPANT NAME: THOMAS FERNANDEZ JR
COMPANY: CALIFORNIA INSURANCE GROUP

| | SHARES | VALUE OF SHARES | CASH | TOTAL |
|---|---|---|---|---|
| BALANCES AT 01/01/2005 | 14,577.95752 | $113,708.07 | $605.56 | $114,313.63 |
| CONTRIBUTIONS | | | | |
| INVESTMENTS (AT COST) | 1,831.31441 | 11,990.74 | | 11,990.74 |
| ADJUSTMENT TO APPRAISED VALUE | | | | |
| FORFEITURES | | 22,805.10 | | 22,805.10 |
| DISTRIBUTIONS | 254.11443 | 2,299.74 | 17.92 | 2,317.66 |
| INCOME | | | | |
| EXPENSES | | | 27.58 | 27.58 |
| BALANCES AT 12/31/2005 | 16,663.38636 | $150,803.65 | $651.06 | $151,454.71 |

VESTED PERCENTAGE                100.0000%
VESTED INTEREST VALUE            $151,454.71
PER SHARE VALUE AT 12/31/2005    $9.05

EXHIBIT
234
Fernandez 4-21-08

P033

# EXHIBIT 62
# TO DILLER DECLARATION

# EMPLOYEE STOCK OWNERSHIP PLAN
## PARTICIPANT STATEMENT GLOSSARY
### PLAN YEAR ENDING 12/31/2001

## TOP ROW

SHARES – The number of shares of ESOP stock allocated to your account.

VALUE OF SHARES – The value of the shares as of a particular transaction or point in time.

CASH – Cash allocated to your account.

TOTAL -- The combined value of ESOP stock and cash.

## LEFT-HAND COLUMN

BALANCES AT 01/01/2001 – The balance carried forward from last year's Participant Statement.

INVESTMENTS (AT COST) – The total shares allocated to your account during the current year times the original purchase price of $6.55 per share.

ADJUSTMENT TO APPRAISED VALUE – The sum of two components:

- Shares as of 01/01/01 - The number of shares multiplied by the difference between the beginning and ending values ($3.63 - $4.18 = $.55)

- Shares allocated to your account during calendar year 2001 [(Investments (At Cost)] These current calendar year allocated shares multiplied by the difference between the original purchase price and the appraised value at the end of the year ($6.55 - $4.18 = $2.37). Most of this difference is due to the debt remaining from the purchase of the stock and stock market conditions at the time of the appraisal.

FORFEITURES -- The non-vested account balances of terminated participants, which have been credited to your account.

DISTRIBUTIONS -- The amount of distributions you have received during the plan year.

INCOME -- Cash dividends allocated to your account.

## BOTTOM SECTION

VESTED PERCENTAGE – The percentage of the account that you have earned by virtue of your length of service to the Company. This percentage relates directly to your Years of Service.

You become 20% vested in the third calendar year in which you work at least 1000 hours. Your vesting then increases another 20% in each subsequent year until you are fully vested by the seventh year that you work at least 1000 hours. Full-time employees who were hired prior to 7/1/96 are 80% vested as of 12/31/2001, providing they worked at least 1000 hours in each of the years, 1996 through 2001.



EXHIBIT

Lora Smith/60
CT 4/16/08

P060

LA=    leave of absence
ML=    maternity leave
RH=    rehired
TI=    terminated in the current year without a Break-in-Service (Plan Year with less than
       501 Hours of Service and not employed on Plan Year End)
TA=    terminated, receives allocation
TB=    terminated with a Break-in-Service and not vested
TE=    terminated after plan entry
XX=    terminated with Break-in-Service, has vested interest, forfeiture occurs
XI=    "XX" from previous year, unpaid in current year
B1=    terminated with Breaks-in-service equal to the number of years indicated in the code
B2-B5  see above
P1=    terminated with Breaks-in-Service equal to the number of years indicated in the code
       AND paid the vested amount of the account. The vested percentage will show as 0%.
P2-P5  see above
PD=    Participant paid in full
PX=    Paid vested account, forfeits balance

**PLAN YEARS OF SERVICE** – The total number of Years of Service you have as of the current Plan Year End starting from January 1, 1996. A Year of Service is a Plan Year in which you have 1000 Hours of Service.

**VESTING HOURS** – The number of Hours of Service that you worked during the plan year.

# EXHIBIT 63
# TO DILLER DECLARATION

# EMPLOYEE STOCK OWNERSHIP PLAN
## PARTICIPANT STATEMENT GLOSSARY
### PLAN YEAR ENDING 12/31/2002

## TOP ROW

**SHARES** – The number of shares of ESOP stock allocated to your account.

**VALUE OF SHARES** – The value of the shares as of a particular transaction or point in time.

**CASH** – Cash allocated to your account.

**TOTAL** – The combined value of ESOP stock and cash.

## LEFT-HAND COLUMN

**BALANCES AT 01/01/2002** – The balance carried forward from last year's Participant Statement.

**INVESTMENTS (AT COST)** – The total shares allocated to your account during the current year times the original purchase price of $6.55 per share.

**ADJUSTMENT TO APPRAISED VALUE** – The sum of two components:

- **Shares as of 01/01/02** – The number of shares multiplied by the change each year between the ending and beginning values ($4.20 – $4.18 = $.02)

- **Shares allocated to your account during calendar year 2002 [(Investments (At Cost)]** These current calendar year allocated shares multiplied by the difference between the appraised value at the end of the year and the original purchase price. ($4.20 – $6.55 = $2.35). Most of this difference is due to the debt remaining from the purchase of the stock and stock market conditions at the time of the appraisal.

**FORFEITURES** – The non-vested account balances of terminated participants, which have been credited to your account.

**DISTRIBUTIONS** – The amount of distributions you have received during the plan year.

**INCOME** – Cash dividends allocated to your account.

## BOTTOM SECTION

**VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the Company. This percentage relates directly to your Years of Service.

You become 20% vested in the third calendar year in which you work at least 1000 hours. Your vesting then increases another 20% in each subsequent year until you are fully vested by the seventh year that you work at least 1000 hours. Full-time employees who were hired prior to 7/1/96 are 100% vested as of 12/31/2002, providing they worked at least 1000 hours in each of the years, 1996 through 2002.

EXHIBIT

LisaSmith 167
CT 4/16/08

Page 1 of 2

**VESTED INTEREST VALUE** – The value of your vested (earned) balance of the account.

**PER-SHARE VALUE AT 12/31/2002** – This is the appraised value per share of ESOP stock in your account. It has been determined independently by Duff and Phelps, a highly accredited appraisal firm and confirmed by our Trustee, North Star ESOP & Fiduciary Services.

Three major factors were used to establish the appraised value:

- Company performance.
- Remaining debt for ESOP stock.
- Comparable property and casualty insurance company stock prices.

## INFORMATION ON CERTIFICATE STUB

**PARTICIPANT STATUS**

| | |
|---|---|
| NP | new participant |
| CP | continuing participant |
| DD | deceased |
| DS | total and permanent disability |
| RN | retired at Normal Retirement Age |
| LA | leave of absence |
| ML | maternity leave |
| RH | rehired |
| TI | terminated in the current year without a Break-in-Service (Plan Year with less than 501 Hours of Service and not employed on Plan Year End) |
| TA | terminated, receives allocation |
| TB | terminated with a Break-in-Service and not vested |
| TE | terminated after plan entry |
| XX | terminated with Break-in-Service, has vested interest, forfeiture occurs |
| XI | "XX" from previous year, unpaid in current year |
| BI | terminated with Breaks-in-Service equal to the number of years indicated in the code |
| B2-B5 | see above |
| P1 | terminated with Breaks-in-Service equal to the number of years indicated in the code AND paid the vested amount of the account. The vested percentage will show as 0%. |
| P2-P5 | see above |
| PD | Participant paid in full |
| PX | Paid vested account, forfeits balance. |

**PLAN YEARS OF SERVICE** – The total number of Years of Service you have as of the current Plan Year End starting from January 1, 1996. A Year of Service is a Plan Year in which you had at least 1000 Hours of Service.

**VESTING HOURS** – The number of Hours of Service that you worked during the current plan year.

Page 2 of 2

# EXHIBIT 64
# TO DILLER DECLARATION

## MINUTES OF A JOINT SPECIAL MEETING
## OF THE BOARDS OF DIRECTORS OF
## K-M INDUSTRIES HOLDING CO., INC. ("HOLDINGS")
### AND
## KELLY MOORE PAINT COMPANY, INC. (THE "COMPANY")

| | |
|---|---|
| DATE: | February 28, 2003 |
| TIME: | 10:00 a.m. |
| PLACE: | Residence of Mr. and Mrs. William E. Moore<br>303 Olive Hill Lane<br>Woodside, California 94062 |
| DIRECTORS PRESENT: | Mr. William E. Moore, Chairman*<br>Mrs. Desiree B. Moore*<br>Mr. Herbert R. Giffins*<br>Mr. William E. Moore II*<br>Ms. Christine M. McCall* |
| DIRECTORS ABSENT: | None |
| OTHERS PRESENT: | Mr. Stephen A. Ferrari<br>*(Chief Financial Officer of the Company)*<br><br>Philip L. Pillsbury, Jr., Esq.<br>*(of Pillsbury & Levinson, LLP)*<br><br>Andrea A. Wirum, Esq.<br>Nathaniel M. Cartmell III, Esq.<br>Cindy V. Schlaefer, Esq.<br>Philip J. Tendler, Esq.<br>*(of Pillsbury Winthrop LLP)* |

### 1.    Call to Order.

Mr. Moore called the meeting to order. All directors of each company waived notice of the meeting and consented to the holding of the meeting at this time and place. Upon motion duly made and seconded, Mrs. Moore was appointed Chair of the joint meeting, and she thereafter presided. Mrs. Moore then announced that a quorum of directors for each company was present and that the joint meeting was ready to proceed with its business. Upon motion duly made and seconded, Mr. Ferrari acted as Secretary to the joint meeting. Mr. Pillsbury then reviewed the agenda with the respective Boards of Directors.

---

* On behalf of Holdings and the Company.

10695952v4

1

EXHIBIT
84
Giffins  3-28-08

KMH 007372
Confidential

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception



2.    K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (the "ESOP).

Ms. Schlaefer discussed with the Board of Holdings its fiduciary duties and responsibilities in connection with the selection, monitoring, retention and removal of the committee that administers the ESOP (the "Plan Committee") and the ESOP trustee, which positions have been held solely by Mr. Moore, and the fiduciary duties and responsibilities of the Plan Committee and trustee with respect to the investment of ESOP assets. Questions were asked and discussion ensued. Upon motion duly made and seconded, all members of the Board of Directors of Holdings other than Mr. Moore (who abstained) unanimously adopted the resolution under I.A below, all members of the Board of Directors Holdings other than Mr. Giffins (who abstained) unanimously adopted the resolution under I.B below and Mr. Giffins accepted his appointment as sole member of the Plan Committee and trustee of the ESOP.

I.    ACCEPTANCE OF RESIGNATION OF MR. MOORE AS ESOP TRUSTEE AND FROM THE PLAN
      COMMITTEE; APPOINTMENT OF MR. GIFFINS

WHEREAS, Paragraph N(1) of that certain Employee Stock Ownership Trust Agreement effective as of July 1, 1999 between Holdings and William E. Moore, as Trustee (the "Trust Agreement"), provides that any Trustee may resign at any time upon thirty (30) days prior written notice to Holdings, and that Holdings (through its Board pursuant to Section 18(a) of the ESOP) shall appoint a successor trustee;

WHEREAS, Section 18(a)(2)(a) of the ESOP provides that any member of the administrative committee may resign at any time by submitting an appropriate written instrument to Holdings, and that the Board of Directors of Holdings shall fill any vacancy on the committee;

WHEREAS, Mr. Moore, in his capacity as Trustee, and sole Plan Committee member has expressed his desire and willingness to resign as Trustee and from his membership on the Plan Committee; and

WHEREAS, the Board of Directors of Holdings believes it to be in the best interest of Holdings to accept said resignation of Mr. Moore and pursuant to and in accordance with the ESOP and the Trust Agreement, to appoint Mr. Giffins as sole member of the Plan Committee and Trustee to serve in such positions with the advice of such independent counsel or other advisors as he shall determine to be necessary or advisable;

NOW, THEREFORE, BE IT RESOLVED, that:

A.    the requirement that the requirement that Mr. Moore provide thirty (30) days prior written notice of his resignation as Trustee and written notice of his resignation as a member of the Plan Committee is hereby waived and that the resignation of Mr. Moore as Trustee and member of the Plan Committee be, and hereby is, accepted as of the date hereof, and Mr. Moore is directed to assign, transfer and pay over to Mr. Giffins as successor Trustee all the money, securities and other property constituting the assets of the ESOP trust, together with such records or copies thereof as may be necessary to the successor Trustee;

B.    Mr. Herbert Giffins is hereby appointed as successor Trustee under the Trust Agreement and sole member of the Plan Committee, such appointments to be effective as

10693952v4

2

KMH 007373
Confidential

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception



of the date hereof, to serve as Trustee and Plan Committee member until his successor has been appointed, or until his earlier resignation or removal; and his acceptance of each such appointment is hereby accepted, effective as of the date hereof; and Mr. Giffins is hereby directed to obtain the advice of such independent counsel and advisors as he deems necessary or appropriate to assist him in fulfilling his responsibilities in such positions.

3.    **Review of the Company's Senior Promissory Notes Held by The Prudential Insurance Company.**

Ms. Wirum reviewed the status of ongoing discussions with The Prudential Insurance Company ("Prudential") regarding the proposed amendment and restatement of the Company's senior promissory notes (the "Notes") that are held by Prudential (the "Prudential Transaction"). Members of the Boards questioned Ms. Wirum and Messrs. Ferrari and Pillsbury about the interrelated legal, financial and operating risks that could materially impact the Company's financial condition and how the respective Boards' assessment thereof could affect its decision of whether or not to grant Prudential a security interest in certain collateral of the Company pursuant to the proposed terms of the Prudential Transaction. Questions were asked and extensive discussion ensued with respect to the assumptions underlying the analyses of Ms. Wirum and Messrs. Ferrari and Pillsbury. The Boards then questioned all of those present regarding alternatives to the Prudential Transaction. Further discussion then ensued with respect to ability of the Company to repay the Notes from different sources of cash flow that might be able to be obtained as well as the risks to Holdings and the Company if the Prudential Transaction was not consummated.

Mr. Cartmell then presented to and discussed with each Board its fiduciary duties in connection the foregoing process. Questions were asked of and answered by Mr. Cartmell with respect to the nature of the Boards' fiduciary obligations and the related implications thereof. Discussion subsequently ensued.

4.    **Adjournment.**

Upon motion duly made and seconded, it was unanimously decided by each of the Boards that their respective meetings would be adjourned until March 2, 2003 at 9:00 a.m.

_____
Secretary of the Meeting

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

KMH 007374
Confidential

## ACCEPTANCE OF APPOINTMENT AS TRUSTEE

I, Herbert Giffins, hereby confirm my acceptance of my appointment by the Board of Directors of K-M Industries Holding Co., Inc., as trustee of the trust established under the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (the "Plan") pursuant to the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust Agreement dated July 1, 1999 (the "Trust Agreement"), effective February 28, 2003, and agree to be subject to and bound by the provisions thereof as successor trustee effective as of such date. I understand that, upon the effective date of this appointment, I am vested with all the powers and duties of a successor trustee as set forth in the Plan and Trust Agreement.

_____

Herbert Giffins

Date: ___2/28/03___

60306066v1

KMH 007375
Confidential

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

## ACCEPTANCE OF APPOINTMENT AS COMMITTEE MEMBER

I, Herbert Giffins, hereby confirm my acceptance on February 28, 2003, of my appointment by the Board of Directors of K-M Industries Holding Co., Inc., as a member of the committee responsible for the administration of the K-M Industry Holding Co., Inc. Employee Stock Ownership Plan (the "Plan") pursuant to Section 18 of the Plan, effective February 28, 2003. I understand that, upon the effective date of this appointment, I became vested with all the powers and duties of a member of the committee as set forth in the Plan.

_____
Herbert Giffins

Date: ___2/28/03_____

60306067v1

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

KMH 007376
Confidential

## RESIGNATION AS TRUSTEE

By my signature below, I hereby confirm my resignation on February 28, 2003, as trustee of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (the "Plan") trust established pursuant to the K-M Industries Holding Co., Inc. Employee Stock Ownership Trust Agreement dated July 1, 1999, effective February 28, 2003, and the assignment and transfer to Mr. Herbert Giffins, as successor trustee, of all money, securities and other property constituting the trust assets.

_William E. Moore_ (signature)

William E. Moore

Date: _2/28/03_

Accepted by:

K-M Industries Holding Co., Inc.

By: _Herbert L. Giffins_ (signature)
    _Director_

Title: _President_

Date: _2/28/0.3_

60506068v1

KMH 007377
Confidential

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception.

## RESIGNATION AS COMMITTEE MEMBER

By my signature below, I hereby confirm my resignation on February 28, 2003, as a member of the committee responsible for the administration of the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan in accordance with Section 18 thereof, effective February 28, 2003.

_____
William E. Moore

Date: _____2/28/03_____

Accepted by:

K-M Industries Holding Co., Inc.

By: _____

Title: _____

Date: ___2/28/03___

60506069v1

Attorney-Client Privileged - Produced Pursuant to Fiduciary Exception

# EXHIBIT 65
# TO DILLER DECLARATION

HERBERT R. GIFFINS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO AND OAKLAND DIVISION

THOMAS FERNANDEZ, et al.,          )
                                   )
           Plaintiffs,             )
                                   ) Case No.
       vs.                         )
                                   ) C-06-07339 CW
K-M INDUSTRIES HOLDING CO., INC., et al.,  )
                                   )
           Defendants.             )
                                   )
                                   )
                                   )

VIDEOTAPED DEPOSITION OF HERBERT R. GIFFINS
March 28, 2008
Oakland, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 79127

HERBERT R. GIFFINS

```
 1            Q     Or any other job?

 2            A     Yeah, I am completely free.  Bored.  You

 3   got something you want me to do?

 4            Q     Let me think about that.  When did you

09:28 5   leave Kelly-Moore?

 6            A     '06, June of '06.

 7            Q     Did you have any other employment after

 8   that?

 9            A     I did two consulting jobs for a consulting

09:28 10  firm on the East Coast unrelated to Kelly-Moore.  But it

11   was within the coatings industry, and that was right

12   after I left.  So I have not really been involved in any

13   business aspects for about a year and a half now.

14            Q     When did you begin working at Kelly-Moore?

09:28 15          A     1985.

16            Q     Now, what was your job title when you left

17   Kelly-Moore?

18            A     President and CEO.  When I retired, it was

19   president and CEO.

09:29 20          Q     And when did you first begin with that

21   position as president and CEO?

22            A     It would have been in the year 2002, April

23   maybe, May.  It may have been later than that.

24            Q     Was there any transition period where there

09:29 25  were -- let me rephrase that.
```

HERBERT R. GIFFINS

1    with Mr. Moore serving as the trustee, if you know?

2              MS. SMITH:   Object to form.

3         A    Your question is was there anyone at

4    Kelly-Moore who questioned his ability to serve as

13:10  5    trustee?

6    BY MS. SCOTT:

7         Q    Yes?

8         A    Not that I'm aware of.

9         Q    Were you concerned with Mr. Moore serving

13:10 10    as trustee of the ESOP?

11              MS. SMITH:   Object to the form.

12         A    I waited.

13              I understood very little about what was

14    involved with the trustee issue.  So it would be hard

13:10 15    for me to say that I was concerned about his ability to

16    serve as trustee when I was there prior to my being

17    assigned.  But because of his failing health, it was

18    basically felt that it was time for him to step out and

19    let someone else come on in.  And so that was how that

13:11 20    process took place.

21    BY MS. SCOTT:

22         Q    How were you selected to become the ESOP

23    trustee?

24              MS. SMITH:   Object to form.

13:11 25              MR. SULLIVAN:   Object to form.

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R. GIFFINS

1       A     It's a good question.  It was determined at

2   the time that we needed to find someone to basically be

3   the trustee, an independent.  And it was felt that in

4   the interim I could serve -- the board felt I could

13:12  5   serve in that position.  And I accepted the

6   recommendation.

7   BY MS. SCOTT:

8       Q     I believe you said that it was felt that in

9   the -- it was felt that we needed to find someone to

13:12 10   basically be the trustee, an independent.  What do you

11   mean by it was felt or who felt that?

12       A     It was discussed by the board about the

13   need that probably would better to have an independent

14   trustee as compared to continue to handle that position

13:12 15   in-house.

16       Q     And you said that the board discussed that.

17   Why did the board believe that it would be better to

18   have an independent trustee?

19       MS. SMITH:    Object to form.

13:13 20       A     Trying to remember the conversations.  But

21   I think it was both the fact that I knew nothing about

22   ESOPs per se.  No one else did.  Mr. Moore was resigning

23   from that position.  And we had to have somebody that

24   really knew how to basically manage and function as a

13:13 25   trustee for that type of function.  So --

Esquire Deposition Services
Phone (415) 288-4280                  505 Sansome Street, 5th Floor              San Francisco, California 9411
                                              (800) 770-3363                              Fax (415) 288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R. GIFFINS

1    be other input from other people.  Is that what you

2    asked me?

3              Can I take a break?  I am getting all

4    frustrated.

5              MR. HANNAN:    Yes, of course.

6    BY MS. SCOTT:

7         Q    And what was that input from other people?

8              MR. HANNAN:  Excuse me.  The witness has

9    asked for a break, and as you said, he may have one at

13:42 10    any time he likes.

11              MS. SCOTT:  Okay.

12              THE VIDEOGRAPHER:   Off the record at 1:42.

13                   (Recess 1:42 p.m.-1:51 p.m.)

14              THE VIDEOGRAPHER:    We are back on the

13:51 15    record at 1:51 p.m.

16

17

18              EXAMINATION (Continuing)

19    BY MS. SCOTT:

13:51 20         Q    I am going to ask you some questions about

21    North Star when North Star took over as the trustee.

22         A    Okay.

23         Q    And I would like to know if were you

24    involved at all in that decision with North Star taking

13:51 25    over as independent trustee?

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R. GIFFINS

```
 1              MS. SMITH:    Object to form.

 2         A     There was three or four people involved or

 3    considered.  And I read, I guess, the profiles on all.

 4    And it was basically felt in conjunction with some

 5    others in the company that North Star would be the best

 6    one.

 7    BY MS. SCOTT:

 8         Q     And you say -- I think you said three or

 9    four were involved or considered.  Were there three or

10    four trustees considered?

11         A     No, no, no, never companies as trustee.

12    And there was, you know, because we were doing a search.

13         Q     Okay.  And who was involved with doing that

14    search?  Was it just you?

15         A     No, no, no, because it was mainly handled

16    by the financial officer was doing the primary search to

17    begin with.

18         Q     Was that Steve Ferrari?

19         A     It would have been in part, Steve, yes.

20         Q     With others as well?

21         A     Yes.

22         Q     And who else was involved?

23         A     I wasn't personally involved.  He was

24    primarily the gentleman who was ramrodding the whole

25    thing and doing all the analysis and then coming with a
```

fe82e26e-5d39-40b9-88f6-6995befa669

HERBERT R. GIFFINS

1 recommendation as well as the profile on each of them.

2 Who else he used, I don't know internally.

3        Q    Do you recall the other companies that were

4 considered as potential trustees?

13:53 5        A    I sure don't.

6        Q    And let's see.  So was it -- let me see if

7 I understood this correctly.  Was it Mr. Ferrari who was

8 collecting information about the three or four potential

9 companies?

13:54 10        A    Yes, ma'am.

11            MS. SMITH:    Object to form.  Asked and

12 answered.

13 BY MS. SCOTT:

14        Q    What involvement did you have?  You

13:54 15 reviewed some of that information; is that right?

16            MS. SMITH:    Object to form.

17        A    Well, what I think I said was Steve did all

18 the leg work to get the profiles on these companies and

19 then put it all in an abbreviated outline.  I looked at

13:54 20 the outline.  I was part of, not just me but the board

21 as well, we went over the various things about the

22 companies, and then North Star was selected.

23 BY MS. SCOTT:

24        Q    Do you know who made the final decision in

13:54 25 terms of selecting North Star?

Esquire Deposition Services
Phone (415) 288-4280

505 Sansome Street, 5th Floor
(800) 770-3363

San Francisco, California 9411
Fax (415) 288-4286

fe82e26e-5d39-40b9-88f6-6995befa6691

HERBERT R. GIFFINS

1          Q    Go ahead.

2          A    He would have been part of the

3     recommendation process.

4          Q    And it was so he was involved with the

13:55 5     recommendation process and then the board was the entity

6     to make the decision?

7               MR. BORNSTEIN:    Object.  Asked and

8     answered.

9     BY MS. SCOTT:

13:55 10         Q    Is that a correct characterization?

11         A    Yes, ma'am.

12         Q    How was it decided that North Star would be

13     good as -- would serve as a good trustee for the ESOP?

14              MR. SULLIVAN:    Object to form.

13:56 15              MR. BORNSTEIN:    Object to form.

16     BY MS. SCOTT:

17         Q    If you know?

18         A    Based on my recall, and there was quite a

19     few factors that go into it.  First of all, the

13:56 20     company's expertise, references from other companies

21     that they've been involved with, the fees, the services

22     they offer, all those issues became part of the decision

23     making process.

24         Q    And did you ever participate in any sit

13:56 25     down meetings with individuals from North Star during

HERBERT R. GIFFINS

```
 1    STATE OF CALIFORNIA )

 2    : SS            )

 3    County of Alameda    )

 4

 5         I, the undersigned, a Certified Shorthand Reporter

 6    of the State of California, do hereby certify:  That the

 7    foregoing proceedings were taken before me at the time and

 8    place herein set forth; that any witnesses in the foregoing

 9    proceedings, prior to testifying, were placed under oath;

10    that a verbatim record of the proceedings was made by me

11    using machine shorthand which was thereafter transcribed

12    under my direction; further, that the foregoing is an

13    accurate transcription thereof.

14         I further certify that I am not a relative,

15    employee, attorney or counsel of any party to this action or

16    relative or employee of any such attorney or counsel and that

17    I am not financially interested in the said action or the

18    outcome thereof;

19         IN WITNESS WHEREOF, I have this date subscribed my

20    name.

21              Dated: _____

22

23

24              EMI ALBRIGHT, CSR No. 13042

25
```

fe82e26e-5d39-40b9-88f6-6995befa66

# EXHIBIT 66
# TO DILLER DECLARATION

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO AND OAKLAND DIVISION

4

5    _____

6    THOMAS FERNANDEZ, et al.,              )
                                            )
7              Plaintiffs,                  )
                                            )
8          vs.                              ) Case No.
                                            )
9    K-M INDUSTRIES HOLDING CO., INC., et al., ) C-06-07339 CW
                                            )
10             Defendants.                  )
                                            )
11                                          )
                                            )
12                                          )

13   _____

14

15        VIDEOTAPED DEPOSITION OF JOHN HOMMEL
                   May 8, 2008
16            San Francisco, California

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 79903
24

25

1    though we would have direction from a co-fiduciary to

2    take a particular step, we would likely not be able to

3    execute those instructions because to execute those

4    instructions would place us in violation of ERISA, in

10:37    5    violation of the statutes.

6    BY MR. JACKSON:

7        Q    I see.  And would you hire an expert to

8    help you with those instances, legal expert to tell you

9    whether or not an action would place you in violation of

10:37    10    ERISA?

11        A    Most often, yes.

12        Q    So unless there was an obvious case, you

13    would go ahead and hire the expert?

14        A    Yes, yeah.  I would say we would hire an

10:38    15    advisor who presumably is expert in that area.

16        Q    Would you hope to hire an advisor who had

17    more expertise in the area than you, no?

18        A    Exactly.

19        Q    Fair enough.  And when was North Star

10:38    20    appointed the independent trustee of the Kelly-Moore

21    Holding ESOP?

22        A    I believe in April of 2003, March or April

23    of 2003.

24        Q    Other than the duties of loyalty and

10:38    25    prudence that you've described, is there any other

1          EXAMINATION (Continuing)

2    BY MR. JACKSON:

3          Q    We are back after lunch.  Did you have a

4    good lunch, sir?

13:14    5          A    I did indeed.  Thank you, sir.

6          Q    So North Star was retained as the

7    trustee -- successor trustee for the KMH ESOP; correct?

8          A    Yes, sir.

9          Q    And I would like you to look at what was

13:14   10    previously marked as Exhibit 10, particularly at the

11    second page of that.  For starters, independent of that

12    document who did you talk to at -- initially talk to at

13    KMH about serving as the successor trustee for the ESOP?

14          A    I spoke with KMH?

13:15   15          Q    Yeah, who at KMH did you initially speak

16    with about North Star being a potential successor

17    trustee on the KMH ESOP?

18          A    My recollection in the first meeting that

19    we had with them it was with Steve Ferrari and then

13:15   20    separately in the same day with Herb Giffins.

21          Q    And where did that first meeting take

22    place?

23          A    In their suburban San Francisco office, San

24    Rafael, I think.

13:15   25          Q    And so you flew out from Chicago to meet

1    with them; is that correct?

2        A    Yes, sir, it's my recollection.

3        Q    Did you speak with them on the phone prior

4    to that time?

13:16    5        A    I may have had just a general introductory

6    conversation with them or short conversation but not an

7    extended interview with them that I recall.

8        Q    Was -- and do you remember when the first

9    meeting was?  Was that in March of '03?

13:16    10        A    That's my recollection generally.

11        Q    Taking a look back at this document which

12    has previously been marked as Exhibit 10, do you

13    recognize the handwriting by any chance?

14        A    Excuse me.  No, sir.

13:16    15        Q    Okay.  Looking at the I spoke on the phone

16    and met with John Hommel of North Star paragraph, do you

17    see that?

18        A    Yes, sir.

19        Q    And were John Kober and Erin Turley with

13:16    20    you in that initial meeting?

21        A    Yes, sir, they were.

22        Q    And was Victor Alam of Menke & Associates

23    there as well?

24        A    That's my -- I believe he was, yes, sir.

13:16    25        Q    Do you recall in your first meeting with

124

1          A    No.

2          Q    All right.  In terms -- were there any

3    discussions regarding, on page 4, paragraph 14,

4    indemnification?

14:02   5          A    There may have been discussions, but we are

6    often asked to modify our language.  But this is our

7    standard language, so we did not modify it.

8          Q    Did North Star ever ask Mr. Moore any

9    questions about the 1998 or 1999 transactions between

14:03   10   the ESOP and the Moore Trust?

11         A    Not Mr. Moore directly, no, sir.

12         Q    Did North Star ever ask Mr. Moore any

13   questions about Kelly-Moore's asbestos liability?

14         A    No, sir.

14:03   15         Q    Did North Star meet with any other members

16   of the Moore family?

17         A    We attended the board meetings, and the

18   other members of the board -- the Moore family were

19   there in their capacity as officers of the company as

14:03   20   members of the board and shareholders of the company.

21   And, no.

22         Q    So other than those board meetings were

23   there any other meetings with other members of the Moore

24   family?

14:04   25         A    I believe we may have had a meeting with

1    Mrs. Moore, who was also an officer of the company,

2    talking -- that would have been after our engagement,

3    perhaps before the first board meeting, talking about

4    the company's operation and the company's performance.

14:04    5        Q    When did that meeting take place?

6        A    My recollection is that would have been

7    like in August.  I think that's when board meetings

8    typically were.

9        Q    In August of 2003 initially?

14:04    10        A    That may have been.  I don't recall.

11        Q    Did you have more than one meeting with

12    Miss Moore or just one?

13        A    Apart from board meetings just one that I

14    can recall.  As I say, other than social meetings -- I

14:04    15    mean, when Mr. Moore passed away, we went to his

16    memorial services and I, obviously, spoke with her there

17    and things of that nature.  But --

18        Q    But in terms of substantive meetings there

19    was one?

14:05    20        A    That I recall, yes, sir.

21        Q    And how long was that?

22        A    Probably about 10 minutes, 15 minutes.

23        Q    Where was it?

24        A    Either at the company or it may have been

14:05    25    at their house.

1    Paint that we spoke with.

2         Q    What about CIG?

3         A    At CIG would have been Pete Cazzolla and

4    still is Pete Cazzolla is the president of the company.

14:06  5    Ed Mines was the initial CFO as I recall who was

6    involved in our first engagement activities with them.

7    Bob Erickson, who is the current CFO of the company.

8    Tom Scherff, I think, is his name, S-h-e-r-f -- he is --

9    I can't remember what the specific title is.  And I

14:07  10   think there is one other gentleman who is in their

11   regulatory area that we would talk with -- we do talk

12   with on an annual basis in terms of valuations.

13        Q    After becoming the independent trustee of

14   the ESOP, did North Star familiarize itself with

14:07  15   Kelly-Moore's asbestos liability?

16        A    We attempted to familiarize ourselves with

17   Kelly-Moore's asbestos liability together with other

18   issues associated with the company and its operation.

19        Q    Was that one of the very first steps you

14:07  20   took as the independent trustee of the ESOP?

21        A    That would have been, yes, a simultaneous

22   collective effort to process, however you would describe

23   it.

24        Q    Why was it that asbestos was one of the

14:08  25   first issues you looked at?

160

1              MS. DILLER:    Object to the form.

2    Mischaracterizes testimony.

3         A   We were looking -- as I said, we were

4    looking at a variety of issues, one of which was

14:08  5    asbestos, because as had been indicated in our meetings,

6    asbestos was an item that was confronting the company on

7    a larger basis than it had in the past.  So for

8    valuation purposes, as we are looking at the then

9    current valuation process, we wanted to understand,

14:08  10   first of all, the company's operation in terms of its

11   revenues and profits and things of that nature, and as

12   we would with any other valuation, try and understand

13   the other ancillary issues, which in this case would

14   have included the asbestos litigation, and trying to put

14:08  15   all those elements together in the context of the

16   valuation.

17   BY MR. JACKSON:

18      Q   Was it your understanding when you first

19   started looking at the company that bankruptcy as a

14:09  20   result of asbestos liability was a possibility?

21      A   No, sir.

22      Q   Did anybody tell you that the company had

23   considered bankruptcy as a response to asbestos

24   liability at that point?

14:09  25        MR. PALMER:    Object to the form.

BY MR. JACKSON:

Q    Up to that point?

A    Up to that point?  Not that I recall.

Q    Do you remember the month when North Star
first took steps to evaluate Kelly-Moore's asbestos
liabilities?

A    I'm guessing that it would be pretty much
in April or May, shortly after we were engaged as a time
at which we had the authority to actually look at
something, yeah.

Q    So as soon as you had the authority?

A    Right, yeah.

Q    Once you had that authority to look at it,
you looked at it immediately?

A    That's my recollection, I mean, all in the
process.

Q    And when did North Star first evaluate
Kelly-Moore's insurance coverage for asbestos litigation
liability?

A    We looked to the issue of insurance
coverage based on the information that we received from
the company and the information that was contained in
the audited financials at the time that we were engaged
in 2003.

Q    What information did you receive from the

1    company?

2        A    My recollection is that we received

3    information in terms of the types of insurance policies

4    that they had.

14:10    5        Q    Did you receive any analyses of whether or

6    not those types of insurance policies, any analysis by

7    anyone as to whether or not the types of insurance

8    policies were sufficient to cover the asbestos

9    liability?

14:10    10            MS. DILLER:    Vague as to time.

11    BY MR. JACKSON:

12        Q    You can answer.

13        A    For which time?

14        Q    For any time period?

14:10    15        A    At the time that we were first looking into

16    it, we had representations that were made to us, and by

17    the accountants, that the insurance proceeds were

18    sufficient to cover the estimated liability.

19        Q    Were those written?

14:11    20        A    The auditor's statements, I believe, were.

21        Q    Other than the auditor's statements

22    anyplace else that you believe representations by the

23    accountants were made?

24        A    That's where we would have looked, in the

14:11    25    audited statements in the financial -- the footnotes --

163

1    excuse me -- to the audited statements.

2         Q    Other than the footnotes to the audited

3    statements was there anyplace else -- anything else that

4    the company gave you regarding asbestos liability for

14:11    5    any time period?

6         A    My recollection is that we had discussions

7    with them in terms of the amount of claims that were

8    pending, the type of settlements that had taken place,

9    the insurance proceeds that they had available to them,

14:12    10    and the auditor's -- the statements that those policies,

11    the proceeds associated with those policies were

12    sufficient to provide coverage for the likely asbestos

13    claims.

14         Q    Other than what you just mentioned, were

14:12    15    there any other documents that the company gave you

16    regarding the sufficiency of insurance to cover asbestos

17    liability?

18             MS. DILLER:    Object to the form of that

19    question.  He just enumerated a litany of

14:12    20    communications.  I don't understand what you are -- you

21    are asking him for --

22    BY MR. JACKSON:

23         Q    Documents?

24         A    I don't recall specifically.  There may

14:12    25    have been but I don't recall.

1          Q      When you say there may have been, would you

2     have kept those in your files?

3          A      They more likely would -- as we received

4     information, it would have been more in the form of a

14:13    5     verbal communication that we would have taken notes on.

6          Q      So were there any documents, I mean,

7     written documents --

8          A      Not that I specifically recall, sir.

9          Q      Were there any actuarial studies of

14:13   10    asbestos litigation liability that you received when you

11    started looking into asbestos liability in 2003?

12         A      Not from the company so --

13         Q      From anyone else?

14         A      We obtained information from one of the

14:13   15    valuation firms in terms of, you know, their familiarity

16    with asbestos issue, and they helped give us some

17    additional information in terms of what data was

18    generally available in the asbestos arena.

19         Q      Which valuation firm?

14:13   20    A      Would have been Duff & Phelps.

21         Q      What exactly did Duff & Phelps give you?

22         A      I am not sure if they gave it to us, but

23    they pointed us in the direction of the RAND report.

24         Q      The what report?

14:14   25    A      RAND, R-A-N-D.

165

1      Q      By that you mean -- how exactly would you

2   describe RAND?  I love asking this question.  Everybody

3   gives me a slightly different answer.  What is the RAND?

4             MR. PALMER:   Object to the form of the

14:14   5   question.

6   BY MR. JACKSON:

7      Q      Fair enough.  I will strike the question.

8   How would you describe RAND?

9      A      RAND is a private entity that engages in

14:14  10   particular analysis for policy purposes.

11      Q      Other than the RAND report regarding

12   asbestos were there any other documents that Duff &

13   Phelps gave you or described to you?

14      A      Additional articles from magazines,

14:14  15   references to the Wall Street Journal, things of

16   commercial application, of that nature.

17      Q      Anything else?

18      A      Not that I recall, sir.

19      Q      Anything that they mentioned to you that

14:15  20   came from company?

21      A      At that time not that I recall, no, sir.

22      Q      At a later time did they give you further

23   information?

24      A      Duff & Phelps did not, no, sir.

14:15  25      Q      Did the company give you anything at a

```
 1   parties, not the company, regarding the number of claims

 2   or the amounts that had been paid?

 3              MR. PALMER:   Object to the form.

 4        A    No, there was material that they had

 5   gathered through their counsel.

 6   BY MR. JACKSON:

 7        Q    When you say gathered through their

 8   counsel, what do you mean?

 9        A    In terms of number of claims and the

10   combination of settlements, payments.

11        Q    Who did you understand their counsel to be?

12        A    I don't recall.

13        Q    What steps exactly did North Star take to

14   understand Kelly-Moore's asbestos liabilities after it

15   became the independent trustee of the ESOP?

16              MR. PALMER:   Object to the form.

17        A    At what time if I may ask?

18   BY MR. JACKSON:

19        Q    When you were first hired as independent

20   trustee?

21              MR. PALMER:   Same objection.

22        A    As I indicated, we started by looking into

23   the audited financials, the company's general financials

24   and projections, the type of work papers that would have

25   been -- not work papers but the type of report that
```

14:17  5
14:17  10
14:17  15
14:18  20
14:18  25

1  would have been prepared for the valuation.

2  BY MR. JACKSON:

3       Q    What do you mean by the type of report that

4  would have been prepared for the valuation?  You mean

14:18  5  the valuation report itself?

6       A    The valuation report.  Thank you.

7       Q    Okay.  Are you referring to any other

8  reports related to the valuation or just the valuation

9  report itself?

14:18  10      A    I am just trying to chronicle back in terms

11  of what we are doing.

12      Q    Right.  So you looked at financials, you

13  looked at the valuation report?

14      A    Yeah, we looked at financials, we looked at

14:18  15  valuation report.  We looked at --

16      Q    What else?

17      A    -- projections from the company in terms of

18  what their forward looking projections, and had

19  discussions with them with respect to asbestos as well

14:19  20  as other operational issues.  I believe shortly after

21  that as we became more familiar with some of the

22  specific data in the RAND report as a reference point,

23  had conversations with the valuation firm to, in effect,

24  see how they had come to their conclusions and what data

14:19  25  they might have to support their conclusions.

169

```
 1              After that, going forward, there were --
 2   the company was very proactive in the asbestos area, and
 3   we had a number of conversations with both CIG when they
 4   were involved in helping to monitor the litigation
 5   process as well as the various law firms who were
 6   involved in the asbestos processes for the company,
 7   trying to monitor the trends that were taking place in
 8   terms of the number of filings, the resolutions of the
 9   filings, the locations of the filings, the dispositions
10   of the various claims, trying to basically track as much
11   we could in terms of the experience of the actual
12   litigation that the company -- for the company's
13   performance.
14        Q    When did you first find out that North Star
15   was considering filing bankruptcy because of its
16   asbestos?
17        A    That North Star or --
18        Q    Fair enough.
19        A    Please.
20        Q    I will strike and restate the question.  I
21   don't want to take out your employer with just one
22   question.
23        A    Not yet.  Not yet.
24        Q    When did North Star first learn that
25   Kelly-Moore was considering filing bankruptcy because of
```

14:20  (line 5)
14:20  (line 10)
14:21  (line 15)
14:21  (line 20)
14:21  (line 25)

```
 1    regard to asbestos liability?
 2              MR. PALMER:   Object to form.
 3    BY MR. JACKSON:
 4         Q    I will restate.  Did North Star agree with
 5    the opinion that there was no real problem prior to 2000
 6    with regard to asbestos liability for Kelly-Moore?
 7              MR. PALMER:   Object to the form.
 8    BY MR. JACKSON:
 9         Q    You can answer that one.
10         A    I wouldn't characterize that we felt there
11    was no problem with respect to asbestos litigation.
12    There was clearly the asbestos litigation represented a
13    drain on everyone's time and to some extent some assets
14    as well.  So from that standpoint we were aware of it in
15    that that was certainly one of the ways that we were
16    focusing on it, if that's your question.
17         Q    Did North Star do any investigation of
18    Kelly-Moore's history of asbestos litigation?
19              MR. PALMER:   Object to form.
20              MS. DILLER:   Object to form.
21    BY MR. JACKSON:
22         Q    You can answer.
23         A    We had many conversations with the company
24    over the years talking in which they were explaining to
25    us the level of activity in terms of claims or filings
```

14:49    5
14:49    10
14:50    15
14:50    20
14:50    25

182

```
 1    or settlements.  So, I mean, that is my answer.  That's
 2    what we did.
 3         Q     Other than the conversations with the
 4    company, did North Star do any investigation or analysis
 5    of its own regarding the history of Kelly-Moore's
 6    asbestos litigation liability?
 7              MR. PALMER:   Object to the form.
 8         A     We worked and relied on the information
 9    that the company was providing through its professional
10    advisors in terms of the status of litigation, the
11    status of possible claims, and indeed to the point that
12    when they transferred it over to CIG, to be involved in
13    overseeing the process as well.  So I think from that
14    standpoint we were involved in getting additional
15    information.
16    BY MR. JACKSON:
17         Q     Did North Star have any written report of
18    its own regarding Kelly-Moore's history of asbestos
19    litigation liability?
20              MR. PALMER:   Object to the form.
21         A     We had materials that were prepared for our
22    benefit by counsel in terms of looking at the asbestos
23    process, some calculations, you know, relying back --
24    not relying but looking to the RAND process to do some
25    types of general extrapolations.
```

14:51  5
14:51  10
14:51  15
14:52  20
14:52  25

183

1  asbestos sales stored onsite at San Carlos in a

2  particular room?.

3        A    Not that I specifically recall.  It may

4  have come up but --

15:21  5        Q    Do you recall anybody saying you should go

6  in there and take a look at all those documents from the

7  company?

8        A    Not that I recall, no, sir.

9        Q    Had the company said you should go take a

15:21  10  look at all those documents, would you have done so?

11            MS. DILLER:   Calls for speculation.

12        A    We certainly would have taken a look to see

13  what they were to try and get a sense as to whether or

14  not it was appropriate for us to do anything and whether

15:22  15  or not to rely on our experts -- or advisors.  Strike

16  that.  Excuse me.

17  BY MR. JACKSON:

18        Q    Did you discuss directly KMH's asbestos

19  litigation issues or insurance coverage issues with any

15:22  20  attorneys for the company?

21            MS. DILLER:   Which company?

22  BY MR. JACKSON:

23        Q    KMH, Kelly-Moore Paint, or CIG?  Let's call

24  it the companies.

15:22  25        A    We had a number of conversations over the

1   years with the company and their various advisors

2   regarding the asbestos issues -- asbestos litigation,

3   .

4   meetings and discussions with various counsel as well as

15:23   5   company representatives.

6        Q    Okay.  Did you ever have meetings with an

7   attorney named Cheryl Mills?

8        A    I don't recall specifically.  I believe

9   it's a name that was earlier on.

15:23   10        Q    When you say you believe that is a name

11   that is earlier on, what do you mean by that?

12        A    I don't recall specifically meeting --

13   having met with her.  But I think that's a name I may

14   have seen in some of the earlier documents.

15:23   15        Q    Okay.  Let me go ahead and show you a

16   couple of different documents.  First can you take a

17   look at something that has been previously been marked

18   as Exhibit 75?  Go ahead and take the time to page

19   through that document.

15:25   20             First question is have you seen that

21   document before?

22        A    No, sir, not that I recall.

23        Q    When you took over as successor trustee in

24   2003, did anyone from the company tell you that Cheryl

15:25   25   Mills had stated that a few big hits could throw any

202

DOCUMENT SUBMITTED UNDER SEAL

1    Q    Were you given any documentation regarding

2    the reservation of rights, companies proceeding under

3    reservation of rights?

4    A    Not that I recall, no, sir.

15:58  5    Q    Do you recall when North Star first learned

6    that Kelly-Moore had exhausted all of its primary

7    insurance coverage?

8    A    No, sir, we didn't necessarily -- we did

9    not distinguish between primary insurance and insurance

15:59  10   that was available for the claims.  We saw no reason to

11   distinguish between.

12   Q    Why not?

13   A    Because all the policies as we understood

14   them provided the benefits that we were told were

15:59  15   appropriate for the litigation.

16   Q    Who told you they were appropriate for the

17   litigation?

18   A    The various counsel that we were involved

19   with as well as looking at the audited financials that

15:59  20   we were -- they made the representation that there was

21   sufficient insurance proceeds to cover the potential

22   claims.

23   Q    Other than the audited financials was there

24   any other document that you relied upon to reach the

15:59  25   understanding that there was sufficient insurance

1    between the ESOP and the Moore Trust was determined?

2        A    It was our understanding, it was set by the

3    input of a valuation firm working with the trustee,

4    Mr. Moore, in terms of doing an independent analysis and

16:15   5    making the determination as to what the value of the

6    stock of the company would have been.  And that was the

7    primary basis for the structure.

8        Q    Okay.  So the B.J. Brooks report -- is that

9    right -- was used to set the price in your

16:15   10    understanding?

11        A    Generally.

12        Q    Did you review the B.J. Brooks report?

13        A    We did.

14        Q    And did you have any questions about the

16:16   15    B.J. Brooks report?

16            MR. PALMER:   Object to form.

17            MS. DILLER:    Object as to the form.

18    BY MR. JACKSON:

19        Q    Did you communicate any questions about the

16:16   20    B.J. Brooks report to anyone?

21        A    We had -- Mr. Brooks had since had passed

22    away, so he wasn't involved in the prior valuations

23    immediately when we took over.  When we reviewed the

24    valuations, we talked about it with Bob Ireland in terms

16:16   25    of his familiarity with it and the process that was

223

1    behind it, as he was the then current valuation firm for

2    the ESOP.

3         Q    And did you ask Mr. Ireland any questions

4    about the B.J. Brooks report that you can recall?

16:17  5         A    We asked questions in terms of the process

6    that he would have followed, how he went about getting

7    the information, to the extent that he knew, his

8    analysis, if he had had any contact with Mr. Brooks

9    during that process.  And he said he had not.

16:17  10        Q    So he just couldn't tell you much about how

11   the process happened?

12              MS. DILLER:   Mischaracterizes testimony.

13   BY MR. JACKSON:

16:17  14        Q    I am asking.

16:17  15        A    Basically he explained to us that the

16   process from a valuation side, which is what we were

17   focusing on.

18        Q    What did he explain?

19        A    That he explained how the valuation

16:18  20   methodologies were used in the report and that he was

21   comfortable with the data that had been the basis for

22   the information for concluding the value.

23        Q    And does North Star know how the

24   transaction price for the 1999 transaction between the

16:18  25   ESOP and the Moore Trust was determined?

224

```
 1          A     I'm sorry.  Could you repeat that?
 2          Q     Sure.  Does North Star know how the
 3    transaction price for the 1999 transaction between the
 4    ESOP and the Moore Trust was determined?
 5          A     With respect to CIG?
 6          Q     Yes.
 7          A     That the firm of Duff & Phelps was engaged
 8    to act as the independent valuation firm, that they
 9    reported to the trustee, Mr. Moore.  They conducted
10    their due diligence and followed their regular
11    procedures.  And the report was the basis for the
12    valuation -- excuse me -- it was the basis for the
13    purchase agreement.
14          Q     Has North Star ever used B.J. Brooks as an
15    ESOP valuation expert or did North Star ever use B.J.
16    Brooks as a valuation expert?
17          A     No, we had not.
18          Q     Had North Star ever heard of Mr. Brooks
19    before becoming the independent trustee for the
20    Kelly-Moore ESOP?
21          MR. PALMER:  Objection to form.  Lacks
22    foundation.
23    BY MR. JACKSON:
24          Q     If you know?
25          A     Actually we had.
```

1    letter?

2         A    I believe that we would have to both --

3    well -- yes.

4         Q    To both --

16:55    5         A    To both Duff & Phelps and Bob Ireland.

6         Q    Okay.  Why did you quit using Duff &

7    Phelps?

8         A    As the letter indicates, one of the -- when

9    we assumed the role as trustee, we felt that it was

16:55    10    appropriate and advantageous for there to be a single

11    valuation of the Holding Company and then basically a

12    separation into its two component parts because -- and

13    from the standpoint of consistency and standpoint of

14    operations, we wanted to make sure that we had a single

16:55    15    report ideally by a single firm addressing the value of

16    the firm as a whole and then fairly differentiating it

17    between the values of the P stock and the I stock.

18         Q    I see.

19         A    And that in addition whether or not there

16:56    20    were any value associated with the Holding Company,

21    whether that value determination would be accretive or

22    dilutive to the respective positions of the individual

23    stocks.

24         Q    Why didn't you hire Duff & Phelps to do

16:56    25    both?

243

```
  1  address other issues.  And just looking at the -- not

  2  the standard -- that the industry that we had -- I'm

  3  sorry -- not industry -- looking at the firms that we

  4  had available to us, that we looked at those who had

17:11  5  substantial resources as well as more specific

  6  experience in both the insurance industry as well as the

  7  manufacturing industry.  So they would be able

  8  to effectively address both issues.

  9        Q    And you did not think Ireland had the

17:12 10  resources or the insurance specific knowledge in order

 11  to do a valuation; is that a fair statement?

 12             MR. PALMER:    Object to form.

 13        A    Was our understanding that Bob Ireland was

 14  basically a more limited shop with one person or two

17:12 15  people possibly to help him.  And the company had made

 16  it clear, as all companies appropriately do, that they

 17  wanted to have full resources available to handle the

 18  valuation on sufficient timeline to allow them to

 19  communicate with their participants as appropriate.

17:12 20  BY MR. JACKSON:

 21        Q    Did you understand that Stout Risius had

 22  expertise in paint companies particularly?

 23        A    They had experience with manufacturing and

 24  production companies of this nature -- not of that

17:12 25  nature.  They had experience with manufacturing and
```

1    production companies which we thought was germane to the

2    task that we would ask them to do.

3         Q    Is there any difference in manufacturing

4    and general and paint that you think is relevant to an

17:13   5    ESOP valuation?

6              MS. DILLER:    Object as to form.

7    BY MR. JACKSON:

8         Q    You can answer.

9         A    Not -- no, sir, not to the point of

17:13   10   exclusion.

11        Q    What do you mean, not to the point of

12   exclusion?

13        A    We wouldn't -- wouldn't have excluded

14   someone from like SRR from doing the valuation just

17:13   15   because they may not have had any experience directly

16   with a paint company.  But if they did have sufficient

17   experience with companies that were basically a

18   combination of manufacturing, commercial and

19   distribution, which is exactly what Kelly-Moore was, and

17:13   20   Stout Risius & Ross did have that experience.  I mean,

21   Kelly-Moore is about distributing, manufacturing the

22   paint, distributing the paint, dealing with retailers,

23   dealing with consumers.  And so we thought that was a

24   broad enough experience to tie into the nature and the

17:14   25   essence of what Kelly-Moore was about.

254

1

2                    EXAMINATION (Continuing)

3    BY MR. JACKSON:

4         Q    Mr. Hommel, you have Exhibit 262 in front

17:28  5    of you.

6         A    Yes.

7         Q    And does that refresh your recollection

8    that Stout Risius came on as of April 28th 2005, to

9    serve as the valuation firm for the KMH ESOP?

17:28  10        A    Thank you, yes.

11        Q    And why did it take so long to hire a

12   valuation firm?

13             MS. DILLER:    Object to form.

14   BY MR. JACKSON:

17:28  15        Q    You can answer.

16        A    We were involved with a number of

17   conversations with the company and just in terms of the

18   status at the company, its operations, possible

19   directions for the company.  And in terms of our

17:29  20   offering -- not offering -- in terms of our engaging the

21   financial advisor, we had recommended some other names

22   in the process to the company.  And in conversations

23   with the company, we came to the conclusion to hire

24   Stout Risius & Ross.

17:29  25        Q    I see.  What other companies did you look

257

```
 1   at?

 2        A    Houlihan, Lokey, Howard, and Zukin, which

 3   is another firm that is again another national firm that

 4   has substantial experience.

 5        Q    Why didn't you use Houlihan Lokey?

 6        A    In conversations with the company, we

 7   determined that there was a potential conflict in that

 8   they may have been involved in possibly doing some work

 9   for one of the parties before.  So we wanted to

10   maintain some -- not some -- independence.

11        Q    Which one of the parties had they been

12   involved in?

13        A    I don't recall.  I don't recall.

14        Q    And do you recall if there were any other

15   firms that you looked at?

16        A    I believe we also considered the firm of

17   Rothchilds Group, the firm, Rothchilds Group.  They were

18   introduced to us, and then they are also a national firm

19   that has significant experience in valuation and

20   financial issues for ESOPs and companies and things of

21   that nature.

22        Q    Why didn't you use them?

23        A    Ultimately they -- the terms of their

24   engagement agreement were unacceptable to the company,

25   and the company is responsible for paying the fees.
```

17:29 — line 5
17:30 — line 10
17:30 — line 15
17:30 — line 20
17:31 — line 25

258

1          Q      Were they unacceptable because the fees

2      were too high?

3          A      They were unacceptable -- unacceptable may

4      be too strong a word.  They weren't deemed appropriate

17:31  5      from the company's perspective because they sought full

6      and unequivocal indemnification for every event that

7      might in any manner, way, shape, or form -- that for any

8      event that may be in any way associated with their

9      engagement.

17:31  10          Q      So the indemnification clause was too broad

11      for the company's taste?

12          A      Simply stated.

13          Q      And when you were looking at Stout Risius,

14      did you look into whether or not Stout has a background

17:31  15      in valuing contingent liability?

16                MS. DILLER:   Object to the form.

17      BY MR. JACKSON:

18          Q      Let me restate it.  When looking into Stout

19      Risius's qualifications to serve as the valuator for the

17:32  20      ESOP, did you look into whether or not Stout Risius had

21      previously valued contingent liability as part of an

22      ESOP valuation?

23                MS. DILLER:   Object to the form.

24          A      In our conversations with Stout Risius &

17:32  25      Ross, we did make inquiries as to whether that they had

1    been involved in similar issues in terms of dealing with

2

3

4    industrial context.  And they satisfied us based on

17:32    5    their answers that they did, in fact, have such

6    experience, both with some of the individuals with whom

7    we would be immediately dealing, and if need be that

8    they had additional resources within their broader team

9    that had some specific knowledge in these areas.

17:33    10    BY MR. JACKSON:

11        Q    Specific knowledge as to asbestos

12    liability?

13        A    In terms of contingent liabilities for

14    industrial types of claims and pending litigation --

17:33    15        Q    I see.

16        A    -- in general.

17        Q    And did they tell you what they thought in

18    those due diligence meetings as to whether or not to

19    hire them, did anyone at Stout Risius tell you what they

17:33    20    thought as a general rule was the proper way to value

21    contingent liability -- contingent litigation liability?

22            MS. DILLER:  Object to the form.

23            MR. PALMER:   Object to the form.

24        A    They reviewed with us their process in

17:33    25    terms of valuing and again looking to the facts and

260

DOCUMENT SUBMITTED UNDER SEAL

1    CIG?

2         A    Not specifically.

3         Q    Did you receive copies from the company of

4    draft valuations from Kathryn Daly regarding the value

17:35    5    of CIG?

6         A    Not that -- no, not that I recall.

7         Q    Did anybody at the company tell you that

8    Kathryn Daly had conducted a valuation at the direction

9    of Mr. Moore as to CIG's value?

17:35    10         A    No, they did not that I can recall.

11         Q    Has North Star had any discussions with

12    Kelly-Moore's auditors about Kelly-Moore's audited

13    financial statements?

14              MR. PALMER:    Object to the form.

17:36    15         A    Yes, we did have conversations with the

16    auditors as part of our due diligence for the annual

17    update.  So if not in every year, certainly in part of

18    our analysis.

19    BY MR. JACKSON:

17:36    20         Q    When you say as part of the annual updates,

21    are you talking about the audited financials for the

22    year of the update; is that correct?

23         A    That would be correct.

24         Q    So you had discussions with them about the

17:36    25    2002 audited financials?

262

```
1          Q     The question was for the 2003 audited

2    financial reports did North Star have any discussions

3    with Kelly-Moore's auditors regarding Kelly-Moore's

4    disclosures that were used and created the audited

5    financials?

6                MS. DILLER:   Object to the form.

7          A     Disclosures of what to whom?

8    BY MR. JACKSON:

9          Q     Just the disclosures from the company to

10   the auditors regarding information needed for the

11   audited financial statements?

12               MR. PALMER:   Object to the form.

13         A     I don't recall specifically but I suspect

14   we did.

15   BY MR. JACKSON:

16         Q     Do you remember that you did or not?

17         A     That would have been the logical reason --

18   one of the logical reasons for having those

19   conversations, but I don't recall the specific

20   conversation or with whom I spoke.

21         Q     Okay.  What about 2004?  Same answer?

22         A     Yes, sir, I believe so.

23         Q     2005, same answer?

24         A     I don't recall.

25         Q     Did North Star ever investigate whether the
```

17:38  5
17:38  10
17:39  15
17:39  20
17:39  25

265

```
 1    ESOP paid more than adequate consideration for the

 2    Series P stock in 1998?

 3         A    As part of our role in assuming the

 4    trusteeship, we looked at the materials that we received

17:40  5    with respect to the transaction, considered the

 6    appraisal report, and determined at that point that

 7    there was nothing that warranted going back and

 8    challenging the 1998 transaction.

 9         Q    Did you write down that process in that

17:40 10    conclusion anywhere?

11         A    It was an ongoing process in terms of

12    learning about the company, learning about the

13    progression of the company, and also having the chance

14    to review the analysis, the valuations.

17:40 15         Q    And the question is narrower.  It's did you

16    write down that process?

17         A    No, sir, we did not as a specific process.

18         Q    Did you write down the conclusion anywhere

19    that it wasn't necessary to go back to the 1998

17:41 20    transaction and try to unwind it?

21              MS. DILLER:   Object to the form.

22    Mischaracterizes testimony.

23              MR. PALMER:   Yes, it is.

24    BY MR. JACKSON:

17:41 25         Q    Did you write down anywhere the conclusion
```

ESQUIRE DEPOSITION SERVICES
800.770.3363

1

2          Q     First of all, is that your handwriting?

3          A     Yes, sir.

4          Q     And is this some sort of form that is used

17:47  5   at North Star?

6          A     It is a form that I use irregularly.  It's

7   an effort to be more organized than simply notebooks.

8          Q     I see.  And looking three pages into that

9   document at North Star 19277, the 3/24/03 --

17:48  10         A     Yes, sir.

11         Q     -- what does it say at the bottom?

12         A     I apologize.  I can't make out my own

13  writing and I don't recall.  Let's see if I can put it

14  in context.  As to -- I apologize, I can't read it.

17:49  15         Q     Okay.  With regard to the investigation of

16  the 1998 -- well, with regard to looking at the 1998

17  valuation, did North Star seek any expert advice on the

18  asbestos litigation issue regarding asbestos litigation

19  as it affected the 1998 transaction?

17:50  20                MR. PALMER:   Object to the form.  You mean

21  beyond what he has already testified to or --

22  BY MR. JACKSON:

23         Q     You can answer.

24         A     Other than working with our financial

17:50  25  advisor, Bob Ireland, at the time and our legal counsel

1    in terms of understanding the history of the transaction

2    and the company and the current status of the issue, no,

3    we did not hire yet a different -- yet a different

4    expert.

17:50    5         Q    Who is your legal counsel that you are

6    referring to in that answer?

7         A    Would have been Morgan Lewis.  At the time

8    they were different firm.

9         Q    And with Morgan Lewis being your legal

17:51   10    counsel, did someone from Morgan Lewis review the 1998

11    transaction as part of your looking into the 1998

12    transaction?

13              MS. DILLER:    Object to the form.  He

14    stated it was actually a different law firm at that

17:51   15    time, so --

16    BY MR. JACKSON:

17         Q    I'm sorry.  Which law firm was it in 1998?

18         A    I believe it was Jenkins and Gilchrist.

19         Q    That's Erin Turley and --

17:51   20         A    John Kober.

21         Q    Did Ms. Turley and Mr. Kober look into the

22    1998 valuation and discuss that with you?

23         A    They looked into documentation and the

24    structure of the transaction from a legal standpoint.

17:51   25         Q    But aside from the legal standpoint -- this

272

is a more narrow question -- for the 1998 transaction

did your legal counsel look at the issues of whether or

not adequate consideration had been paid or more than

adequate consideration had been paid in 1998?

        MS. DILLER:    I will object to the form on

that.

BY MR. JACKSON:

    Q    You can answer.

    A    They looked into the structure of the

transaction, the valuation report as it was prepared in

its totality in terms of giving us guidance as to the

going forward with the ESOP and -- going forward with

the ESOP.

    Q    Why don't you explain to me what you mean

by they looked into the structure of the transaction?

    A    The documents, the plan, the trust, stock

purchase agreement, loans -- loan documents.

    Q    And did they look at the valuation?

    A    I don't recall specifically.

    Q    Do you recall if they at any point gave you

an opinion as to whether or not the ESOP had paid more

than adequate consideration for the stock that the ESOP

purchased from the Moore Trust in 1998?

        MS. DILLER:    Object to the form.

    A    I don't recall that they made a

1          Q     When you said the then current appraiser,

2    you are referring to Mr. Ireland?

3          A     Yes, sir.  Apologize.

4          Q     Did North Star ever investigate whether the

17:54   5    ESOP paid more than adequate consideration for the

6    Series I stock in 1999?

7                MR. PALMER:   Object to the form.  Asked

8    and answered.

9          A     We had conversations with the appraiser,

17:54  10    Duff & Phelps, who was involved in the original

11    transaction in 1999, questions with respect to the

12    structure and their process, their consideration and

13    their development of the value of the stock, the value

14    of the company at that time.

17:54  15    BY MR. JACKSON:

16          Q     What was North Star's conclusion as to

17    whether or not the company paid more than fair market

18    value in 1999 for the shares that the ESOP purchased

19    from the Moore family trust?

17:55  20          A     We saw nothing to demonstrate that the

21    conclusion, in the process leading to the conclusion as

22    to the value paid for the stock was anything other than

23    fair market value and certainly not in excess of

24    adequate consideration.

17:55  25          Q     Did you document that conclusion anywhere?

                                                              275

```
 1          Q    Did North Star form an opinion as to

 2     whether or not Mr. Moore negotiated the transaction

 3     terms that would be most favorable to the ESOP's

 4     participants as part of the 1998 transaction between the

 5     ESOP and the Moore family trust?

 6               MS. DILLER:   I'm sorry.  Could you repeat

 7     that please?

 8     BY MR. JACKSON:

 9          Q    Sure.  Did North Star form an opinion as to

10     whether or not Mr. Moore negotiated the transaction

11     terms that would be most favorable to the ESOP's

12     participants as part of the 1998 transaction between the

13     ESOP and the Moore family trust?

14          A    In reviewing the transaction, in reviewing

15     the value conclusion, we determined that the value at

16     which the stock was sold was a fair and adequate price

17     and in the best interests of the plan participants.

18          Q    Did you write that down anywhere?

19          A    Not that I can specifically recall.

20          Q    Did you investigate whether or not

21     Mr. Moore negotiated at all?

22          A    We tried to investigate the -- we

23     investigated the process as to how the price was arrived

24     at.

25          Q    And the question is narrower.  Did you look
```

17:56    5
17:56   10
17:57   15
17:57   20
17:57   25

1    It would have been a possible conversation just in terms

2    of rounding out --

3        Q    Do you have that written down anywhere?

4        A    No, sir.  Apologize.

18:05    5        MR. JACKSON:    Let's go off the record for

6    a short bit.

7        THE VIDEOGRAPHER:    Off the record at 6:05.

8        (Recess 6:05 p.m.-6:08 p.m.)

9        THE VIDEOGRAPHER:    Back on the record at

18:08   10    6:08.

11        THE WITNESS:    Actually, if I may, just in

12    terms of your earlier question in terms of all what did

13    we do in terms of assessing the '98, '99 valuations, as

14    we engaged SRR, we had -- they looked at it as well.  So

18:08   15    we not only had the then current valuation firms when we

16    were first engaged but as we moved from each of those

17    respective firms to SRR, we had SRR look at it as well.

18

19

20        EXAMINATION (Continuing)

21    BY MR. JACKSON:

22        Q    Where, if anywhere, are the SRR conclusions

23    documented?

24        A    I don't think they were in writing.  It was

18:08   25    based on conversations and their work.

283

1          Q     And when you say their work, you mean their

2     valuation reports?

3          A     Yes, sir, and reviews.

4          Q     Anyplace else that your discussions with

18:09  5     SRR are documented?

6          A     Not that I can specifically recall.

7          Q     Did SRR conduct a valuation -- you okay?

8          A     Yeah, I am just trying -- no, thank you.

9          Q     Did SRR create a valuation of the value of

18:09  10    the company, a re-creation valuation of the company

11    in -- let's try again.

12               When my own associate cracks up at the

13    question, I should probably reform it.

14         A     No respect.

18:09  15         Q     Did Stout Risius -- oh, it's just a joking

16    form of respect.

17               Did Stout Risius create a valuation for the

18    value of the company in 1998, the Paint Company in 1998?

19         A     No, sir, not specifically.

18:10  20         Q     And did they generally do a valuation?

21         A     They generally, my recollection is that

22    they generally reviewed the report that had been

23    prepared by Mr. Brooks and the data that was available

24    and came to a conclusion that the valuation report and

18:10  25    summary -- excuse me -- the valuation report and

```
 1   conclusion itself was not unreasonable.

 2        Q    And that was in their report itself; is

 3   that your understanding?

 4        A    That was not in a written report; that was

 5   in conversations with us.

 6        Q    When were those conversations?

 7        A    Subsequent to their engagement in 2005.

 8        Q    Who did it?  Who did that valuation?

 9        A    It wasn't --

10             MS. DILLER:   Mischaracterizes testimony.

11   BY MR. JACKSON:

12        Q    Who was it who talked to you about that

13   process?

14        A    The work was done by Bob Socol, Andy Ward,

15   Scott Levine, and two or three other individuals who

16   were at SRR who were all involved in the process of

17   valuing the respective companies for ESOP purposes.

18        Q    Did they write down their conclusion

19   anywhere?

20             MS. DILLER:   Calls for speculation.

21   BY MR. JACKSON:

22        Q    If you know?

23        A    Not that I am aware of.

24        Q    Did Stout Risius Ross create a valuation

25   for the value of CIG as of 1999?
```

18:10  5
18:10  10
18:10  15
18:11  20
18:11  25

285

STATE OF CALIFORNIA )

: SS                 )

County of Alameda    )

      I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:  That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

      I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

      IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____ MAY 1 6 2008 _____

*Emi Albright*

EMI ALBRIGHT, CSR No. 13042

**EXHIBITS 67-74
TO DILLER DECLARATION**

# EXHIBIT 67
# TO DILLER DECLARATION

### Minutes of a Joint Special Meeting
### of the Boards of Directors of
### K-M Industries Holding Co., Inc. ("Holdings")
### and
### Kelly Moore Paint Company, Inc. (the "Company")

DATE:               March 18, 2003

TIME:               9:00 a.m.

PLACE:              Residence of Mr. and Mrs. William E. Moore
                    303 Olive Hill Lane
                    Woodside, California 94062

DIRECTORS PRESENT:  Mr. William E. Moore, Chairman[*]
                    Mrs. Desiree B. Moore[*]
                    Mr. Herbert R. Giffins[*]
                    Mr. William E. Moore II[*†]
                    Ms. Christine M. McCall[*†]

DIRECTORS ABSENT:   None

OTHERS PRESENT:     Mr. Stephen A. Ferrari
                    (*Chief Financial Officer of the Company*)

                    Philip L. Pillsbury, Jr., Esq.
                    (*of Pillsbury & Levinson, LLP*)

                    Andrea A. Wirum, Esq.
                    Nathaniel M. Cartmell III, Esq.
                    Cindy V. Schlaefer, Esq.[†]
                    Philip J. Tendler, Esq.
                    (*of Pillsbury Winthrop LLP*)

1.    Call to Order.

        Mr. Moore called the meeting to order. All directors of each company waived notice of the meeting and consented to the holding of the meeting at this time and place. Upon motion duly made and seconded, Mrs. Moore was appointed Chair of the joint meeting, and she thereafter presided. Mrs. Moore then announced that a quorum of directors for each company was present and that the joint meeting was ready to proceed with its business. Upon motion duly made and seconded, Mr. Ferrari acted as Secretary to the joint meeting. Mr. Pillsbury then reviewed the agenda with the respective Boards of Directors.

---

[*] On behalf of Holdings and the Company.

[†] Ms. McCall, Mr. Moore, II, and Ms. Schlaefer participated by telephone, by means of which all participants could hear each other.

KMH 006543

4.    Update on ESOP Trustee

Next, Mr. Ferrari provided an update on Holdings search for a ESOP trustee to replace Mr. Giffins. Mr. Ferrari reported on discussions with two companies that provide corporate trust services and noted that a meeting was scheduled with a third corporate trust service company for later that day.

5.    Meeting Dates.

The Boards then discussed the schedule for subsequent meetings of the Boards to consider matters relating to Prudential and the asbestos litigation. After discussion and upon motion duly made and seconded, each Board unanimously approved a resolution to hold its next special meeting on April 8, 2003 at 9:00 a.m.

6.    General Authority Conferred On Officers to Effectuate Resolutions.

Upon motion duly made and seconded, the Board of Directors of Holdings unanimously approved the resolution under I below, and the Board of Directors of the Company unanimously approved the resolution under II below.

I.    RESOLVED, that the proper officers of Holdings, each with full power to act alone, be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of Holdings, to carry out and fully perform the terms and provisions of each document delivered pursuant to the foregoing resolutions, and to execute, deliver and, where called for by the particular document, affix the seal of Holdings to all such consents, agreements, certificates, instruments and other documents, to make all such payments, and to do and perform all such other acts and things as such officer may deem necessary,

10712443v2

2

KMH 006544

**DOCUMENT SUBMITTED UNDER SEAL**

appropriate or convenient, as conclusively evidenced by such action by such officer in order to carry into effect the foregoing resolutions and each document as delivered pursuant thereto, all such action heretofore taken being hereby ratified, confirmed and approved.

     **II.**     **RESOLVED**, that the proper officers of the Company, each with full power to act alone, be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to carry out and fully perform the terms and provisions of each document delivered pursuant to the foregoing resolutions, and to execute, deliver and, where called for by the particular document, affix the seal of the Company to all such consents, agreements, certificates, instruments and other documents, to make all such payments, and to do and perform all such other acts and things as such officer may deem necessary, appropriate or convenient, as conclusively evidenced by such action by such officer in order to carry into effect the foregoing resolutions and each document as delivered pursuant thereto, all such action heretofore taken being hereby ratified, confirmed and approved.

7.     <u>Adjournment</u>.

     There being no further business to come before the meetings, each of the same was, on motion duly made, seconded, and carried, adjourned.

_____
Secretary of the Meeting

KMH 006545

# EXHIBIT 68
# TO DILLER DECLARATION



**THOMAS NAULT**

RECEIVED

MAR 3 1 2003

V.P./SEC'Y

March 25, 2003

14150 Northeast 20th Street, No. 317
Bellevue, Washington 98007
*tel:* 425/881-6393   *fax:* 425/882-0528

Mr. Steve Ferrari
Vice President and CFO
Kelly-Moore Paint Company, Inc.
987 Commercial Street
San Carlos, California 94070

**Sent via fax, and regular mail, one page (650) 631-1971**

Dear Steve;

Thank you for taking the time to meet with Pat and me on Friday. I really enjoyed meeting you, and I am very interested in acting as the Plan's ESOP Trustee.

One thing that sets me apart from many of the other Trustee doing this type of work is that I've been appointed by the Federal Courts on three separate occasions. On matter was almost identical to what you are considering. Under my court appointment, I was responsible for the valuation and sale of a large block of company stock. In that capacity I've also had to resolve matters of disputed valuations from prior years. I've also been recommended by the DOL on two recent case matters.

We talked a bit about your expectation regarding interfacing with the Trustee because in my experience, every company has different expectations about how the Trustee will work on Plan matters. As a matter of personal style, I get things done in a quiet and effective way where the relevant parties are well informed of any action I may be taking as Trustee. This goes a long way in helping the mission go very smoothly with no surprises.

I look forward to answering any other questions you may have regarding my experience and if there is anything I can do to assist you in the process, please let me know. Once again, thank you for considering me for this role.

Sincerely,

Thomas J. Nault

KMH 003643

**EXHIBIT 69
TO DILLER DECLARATION**

Memo to file

On 3/27/03 I met with John Hommel of Northstar Trust. He was there with John Kober and Erin Turley of Jenkens & Gilchrist Victor Alam of Menke was in attendance.

- They provided an agreement based upon what is known now.

- They have extensive background in successfully acting as trustee for 100 ESOP's big & small. They are currently involved with 50 ESOP's. Approximately 20% are in Chicago area and the remainder are around the country.

- There would need to be a reallocation of duties and a new trust agreement drawn up by advisors & attorneys. Most significant responsibilities would be assigned to the trustee. Certain administrative duties would be assigned to the administrative committee relating to certain administrative responsibilities only. The administrative committee would still remain with a company person keeping the responsibility.

- John provided a Trustee agreement which would basically cover their services as trustee.

- They reminded me that if there were separate transactions, there would be separate fees.

- Issues relating to large transactions or asbestos litigation did not overly concern them. They knew there were issues that would be dealt with as they arise.

- They would hope to have open dialog, and attend 1 or 2 board meetings along with the shareholders meetings.

- They seemed to work well with Victor Alam of Menke and John Hommel seemed "down to earth" and "Businesslike". Since they had extensive knowledge of ESOP's, they wouldn't have to spend extra time learning.

- These individuals seemed most knowledgeable and willing to take on the task of any that I have met.

EXHIBIT

254

Hommel  5-08-08

# EXHIBIT 70
# TO DILLER DECLARATION

# WRITTEN CONSENT

## OF

## THE DIRECTORS OF

## K-M INDUSTRIES HOLDING CO., INC.

The undersigned, being all the directors (the "Board") of K-M Industries Holding Co. Inc., a California corporation (the "Corporation"), do hereby consent, pursuant to section 307 (b) of the California Corporations Code, to the adoption of the following resolutions:

### Retention of Discretionary ESOP Trustee

WHEREAS, this Corporation sponsors an employee stock ownership plan known as the K-M Industries Holdings Co., Inc. Employee Stock Ownership Plan (the "Plan"; capitalized terms used herein but not otherwise defined herein shall have the respective meanings assigned such terms in the Plan); and

WHEREAS, contributions by this Corporation to the Plan are held by the K-M Industries Holdings Co., Inc. Employee Stock Ownership Trust (the "Trust") for the benefit of the Participants of the Plan and their Beneficiaries, pursuant to a separate trust agreement, with individual trustees serving as trustees of the Trust; and

WHEREAS, this Board has the authority to select, retain or remove the Trustee pursuant to Section 18 of the Plan; and

WHEREAS, this Board believes the best interests of this Corporation and the Participants of the Plan and their Beneficiaries would be served by the retention of North Star Trust Company ("North Star") as successor Trustee of the Trust, and North Star is willing to serve as the successor Trustee of the Trust, on the terms and subject to the conditions set forth in the Trustee Engagement Agreement attached hereto as Exhibit "A" (the "Trustee Engagement Agreement");

NOW, THEREFORE, BE IT RESOLVED, that the Trustee Engagement Agreement by and among North Star and this Corporation and, solely for purposes of Sections 5, 12 and 14 thereof, its subsidiaries listed on the signature page thereto, be and it hereby is accepted, and that William E. Moore, Chairman of the Board, be and he is hereby is authorized to execute, in the name and in behalf of this Corporation, the Trustee Engagement Agreement in substantially the form attached hereto as Exhibit "A"; and

RESOLVED FURTHER THAT, effective concurrently upon the acceptance by North Star of the position of discretionary Trustee, Mr. Herbert R. Giffens shall be removed from the position of Trustee; and

10717441v2

RESOLVED FURTHER THAT, following the acceptance by North Star of the position of discretionary Trustee, pursuant to, and in accordance with, the Trustee Engagement Agreement, the officers of the Corporation be, and each of them hereby is, authorized to amend the Plan and the Trust Agreement in order to reallocate fiduciary responsibilities from the Committee to the successor, discretionary Trustee.

## Omnibus

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized to do and perform (or caused to be done and performed), in the name and on behalf of the Corporation or otherwise, all acts and things and to execute, file and deliver (or caused to be executed, filed and delivered) all such agreements, documents, and instruments as any of them shall deem necessary or advisable to effectuate the intent and purposes of the foregoing resolutions, such determination to be conclusively evidenced by the performance of such acts and things and the execution, filing and delivery of such agreements, documents and instruments; and that each and every action and thing previously taken and performed by any officer of the Corporation in connection with the actions contemplated by the foregoing resolutions be, and each and every such action hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Corporation.

10717441v2

KMH 003145

IN WITNESS WHEREOF, the undersigned directors of the Corporation have executed this unanimous written consent as of the _16_ day of April, 2003.


_____
Mr. William E. Moore
Director


_____
Mrs. Desiree B. Moore
Director


_____
Mr. Herbert Giffins
Director


_____
Mr. William E. Moore, Jr.
Director


_____
Ms. Christine M. McCall
Director


10717441v2

KMH 003146

IN WITNESS WHEREOF, the undersigned directors of the Corporation have executed this unanimous written consent as of the _16_ day of April, 2003.


_____
Mr. William E. Moore
Director


_____
Mrs. Desiree B. Moore
Director


_____
Mr. Herbert Giffins
Director


_____
Mr. William E. Moore, II
Director


_____
Ms. Christine M. McCall
Director

1071744lv2

KMH 003147

**EXHIBIT A**
**TRUSTEE ENGAGEMENT AGREEMENT**

10717441v2

KMH 003148

## TRUSTEE ENGAGEMENT AGREEMENT

This Trustee Engagement Agreement is made and entered into this 22 day of April, 2003 by and between North Star Trust Company ("North Star"), and K-M Industries Holdings Co., Inc. a California corporation (the "Company") and, solely for purposes of Sections 5, 12, and 14, its subsidiaries.

## RECITALS

The Company has established the K-M Industries Holdings Co., Inc. Employee Stock Ownership Plan, (the "Plan") (which is a part of the K-M Industries Holdings Co., Inc. Employee Stock Ownership Trust (the "Trust", together with the Plan referred to as the "ESOP")) for the benefit of its employees. All contributions made by the Company to the Plan are held in the Trust that was created by the Company under a separate trust agreement, with individual trustees serving as trustees of the Trust.

The Company desires to retain North Star as successor trustee of the Trust, and North Star is willing to serve as the successor trustee of the Trust, on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

In consideration of the mutual covenants and agreements set forth in this Agreement, the parties agree to amend and restate the Trust Agreement to reflect the following:

## APPOINTMENT AND DUTIES

1.    <u>Appointment of Trustee</u>. The Company hereby appoints North Star to serve as the successor trustee of the Trust, and North Star hereby accepts this appointment. The Company acknowledges that North Star is a successor trustee of the Trust and is not liable for any actions of the prior trustee or trustees. Concurrent with the appointment of North Star as trustee of the Trust, the Company has accepted the resignation of the prior trustees.

2.    <u>Continuing Service</u>. North Star will continue to serve as the trustee of the Trust until it resigns or is removed by the Company. North Star may resign at any time by providing 30 days' advance written notice to the Company. The Company may remove North Star by providing North Star with 30 days' advance written notice, subject to providing North Star with satisfactory written evidence of the appointment of a successor trustee and of the acceptance by the successor trustee.

3.    <u>Duties of Trustee</u>. (a) North Star shall hold and manage all contributions made by the Company to the Plan in accordance with the terms of the Plan and of the Trust Agreement, to the extent that they are consistent with the provisions of the Employee Retirement Income

-1-

KMH 003149

Security Act of 1974 ("ERISA"). North Star will exercise its independent discretionary judgment in connection with the acquisition, custody and disposal of Trust assets in accordance with the requirements of part 4 of Title I of ERISA and the Plan. The parties agree to amend in restated form the Trust Agreement to provide North Star with such independent discretionary authority.

(b)     North Star will maintain accurate records regarding the acquisition and holding of Company stock and of any other Trust investments and regarding distributions to Plan participants. North Star will provide quarterly reports of such activities. North Star will not provide participant recordkeeping, accounting, or tax or other reporting services for the Plan. These services will be provided by the Plan Administrator or its agent; and the Company or the Plan Administrator will provide periodic reports to North Star demonstrating that these services are being provided by the Plan Administrator or its agent. If requested by the Company, North Star will prepare IRS Forms 1099 for delivery to participants in the Plan when their benefits are distributed.

4.     Valuation Preparation. To the extent necessary for completing the annual valuation of the common stock for administrative purposes and as otherwise agreed to among the parties, the Company: (i) shall reasonably cooperate with North Star and its advisors to provide information reasonably requested by North Star and its advisors relevant to such valuation; and (ii) shall reasonably grant to North Star and its advisors reasonable access to the officers and directors of the Company with respect to such valuation.

5.     Retention of Financial Advisor. North Star will engage the services of a qualified independent financial advisor, who will report directly to North Star and not to the Company. North Star or the financial advisor will be entitled to timely periodic payment by the Company of all reasonable fees and expenses of the financial advisor. The Company and its subsidiaries shall pay all reasonable fees and expenses of the financial advisor that are incurred by North Star. If North Star pays such fees and expenses of its financial advisor, the Company shall immediately reimburse North Star for such expenses.

6.     Retention of Legal Counsel. North Star will engage its own independent legal counsel. North Star or its legal counsel shall be entitled to timely payments on a monthly basis by the Company for all reasonable fees and expenses of North Star's legal counsel. The Company shall pay all reasonable legal fees and expenses that are incurred by North Star. If North Star pays such fees and expenses of its financial advisor, the Company shall immediately reimburse North Star for such expenses.

7.     Confidentiality. North Star shall use the information disclosed to it by the Company only for the purpose of performing services as trustee. North Star shall restrict disclosure of the information that it obtains from the Company to those persons who require knowledge of information in order to help North Star perform its services as trustee (including, but not limited to, officers, directors, employees, and professional advisors of North Star).

KMH 003150

## COMPENSATION

8.    Acceptance Fee.  The Company shall pay to North Star the sum of $15,000 as compensation for accepting the fiduciary responsibility in connection with the Trust.  Such fees shall compensate North Star for its time and expense to review the existing documentation and setup of accounts for the Plan.

9.    Annual Fees.  In consideration for North Star's ongoing service as trustee of the Trust and as custodian of the assets of the Trust, the Company shall pay to North Star an annual fee as set forth in the  Trustee Fee Addendum (which is incorporated by reference) payable as follows:  (i) semi-annually during the first year of the engagement with the first payment due on the date hereof and the next payment due on the first day of the sixth month thereafter; and (ii) quarterly thereafter, which shall be subject to change on January 1, 2005 and from time to time thereafter, and any reasonable expenses incurred on behalf of  (such as, but not limited to, expenses relating to its financial advisor and legal counsel) or by North Star (such as, but not limited to, travel, postage, long distance telephone, and copying charges).

10.    Fees for Transactions and Extraordinary Services.  In addition to the fees due and payable to North Star under Sections 8 and 9, the Company agrees to pay additional fees to North Star for any services performed by North Star in addition to those provided for in this Agreement. Examples of additional services that may be provided by North Star from time to time include: (1) Involvement in a transaction involving the Company and/or the ESOP; (2) Involvement in providing counsel or testimony in connection with, or other involvement in, litigation relating to the ESOP; (3) Involvement in responding to hostile, contested, or unsolicited tender offers for shares of the Company's stock held by the ESOP and/or assets of the Company; and (4) Involvement in exercising fiduciary responsibilities in connection with proposed mergers, acquisitions, divestitures, public offerings, reorganizations, or similar transactions involving the Company.  The scope of such services shall be agreed upon with the Company prior to providing such services; provided that North Star is not required to take immediate action.   Unless otherwise agreed, North Star will charge for such  services based size and complexity of a transaction or based on the time spent on a particular matter by officers or employees of North Star, charged at their normal hourly rates then in effect (currently $350.00 per hour).

11.    Reimbursement of Expenses.  The Company shall immediately reimburse North Star for all reasonable expenses incurred by North Star in connection with the performance of its services pursuant to this Agreement.  Expenses for which North Star shall be entitled to reimbursement shall include reasonable charges for fees and expenses of North Star's financial advisors and legal counsel and reasonable out-of-pocket expenses incurred by officers or employees of North Star, such as charges for travel, lodging, and private express mail deliveries.

12.    Reimbursement from the Trust.  Notwithstanding any provision herein for the payment of costs and expenses by the Company or its subsidiaries, the parties acknowledge that the Trust is and shall continue to be liable for the payment of all costs and expenses of administering the Plan, unless such costs and expenses are paid by the Company or its

KMH 003151


subsidiaries. To the extent that the Company shall fail to pay the fees due to North Star or to reimburse North Star for its expenses on a timely basis, the Company agrees that North Star shall be paid the amounts due to it from the Trust. If there is not sufficient cash in the Trust to pay the amounts due to North Star, then North Star shall have the right to offset the amounts due to it against the assets of the Trust, and North Star shall be authorized to either sell assets of the Trust, or put such shares to the Company (and the Company agrees to immediately purchase such shares for fair market value as of the date of the transaction) to the extent necessary to obtain sufficient cash to pay the amounts due to North Star.

## TAX QUALIFICATION PLAN

13.    *Representations and Warranties of the Company*. The Company hereby represents and warrants to North Star as follows:

(a)    The Plan is qualified under Section 401(a) of the Internal Revenue Code of 1986 (the "Code") and is qualified as an "employee stock ownership plan" within the meaning of Section 4975 (e)(7) of the Code and Section 407(d)(6) of ERISA;

(b)    The Trust is exempt from taxation under Section 501(a) of the Code; and

(c)    The Company has received from the Internal Revenue Service a letter of determination that:  (a) the Plan constitutes an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code; (b) the Plan is qualified under Section 401(a) of the Code; and (c) the Trust is exempt from taxation under Section 501(a) of the Code.

## INDEMNIFICATION

14.    *Indemnification*.  For purposes of this Section 14, the term "Indemnitees" shall mean North Star and its officers, directors, employees, and agents.  Subject to the applicable provisions of ERISA, the Company shall indemnify the Indemnitees for any loss, cost, expense, or other damage, including reasonable attorney's fees, suffered by any of the Indemnitees resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by any one or more of the Indemnitees pursuant to this Agreement.  The indemnification provided for in this Section 14 shall extend to:  (a) any action taken or not taken by any of the Indemnitees at the direction or request of the Plan Administrator or of any agent of the Plan Administrator; (b) any action taken or not taken by the prior trustee or trustees, and (c) all reasonable costs and expenses incurred by the Indemnitees in enforcing the indemnification provisions of this Section 14, including reasonable attorney's fees and court costs.  However, these indemnification provisions shall not apply to the extent that any loss, cost, expense, or damage with respect to which any of the Indemnitees shall seek indemnification is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have resulted either from the gross negligence of one or more of the Indemnitees or from the willful misconduct of one or more of the Indemnitees.

KMH 003152

15.   Defense of Actions. (a) Notice and Assumption of Defense. If one or more of the Indemnitees receives notice of any legal proceeding with respect to which indemnification may be sought against the Company pursuant to Section 14 (a "Proceeding"), the Indemnitees shall notify the Company of the Proceeding in writing within 10 days of the commencement of the Proceeding. However, failure by the Indemnitees to so notify the Company shall not relieve the Company from any liability, except to the extent that the failure to notify the Company shall actually have prejudiced the defense of any Proceeding. The Company will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to the Indemnitees or to otherwise participate in the Proceeding. If the Company elects to assume the defense of the Proceeding, it then shall pay all reasonable costs of defense.

(b)   Reimbursement of Expenses. The Company shall reimburse the Indemnitees for all reasonable costs of investigation, of testifying at any hearing, of responding to discovery proceedings, and of consulting with the Company or the attorneys for the Company. The Indemnitees shall have the right to employ their own counsel in any Proceeding, and the reasonable fees and expenses of the Indemnitees' counsel shall be paid by the Company as they are incurred, if any one or more of the following conditions are satisfied:

(i)   the employment by the Indemnitees of their own counsel shall be authorized by the Company;

(ii)   the Indemnitees are advised by their counsel that there may   be one or more legal defenses available to them which are different from or additional to defenses available to the Company (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of the Indemnitees);

(iii)   the Company fails to assume the defense of the Proceeding and to employ counsel satisfactory to the Indemnitees within 14 days after being notified of the commencement of the Proceeding; or

(iv)   the Indemnitees shall be informed by their counsel that a conflict exists with the counsel selected by the Company.

16.   Governmental Investigations. The provisions of this Section 16 shall apply if any governmental or private commission or regulatory authority shall investigate any of the Indemnitees, or shall require any of the Indemnitees to testify at any hearing or in connection with any investigation, regarding the performance of services by the Indemnitees pursuant to this Agreement. Investigations covered by this Section 16 shall include, but shall not be limited to, investigations conducted by any agency of the United States or of the legislature of any state, or by a stock exchange or other entity having authority to investigate or regulate similar to that of a stock exchange. In the case of any investigation, the Indemnitees shall have the right to employ separate counsel to represent them, and the Company shall pay the reasonable fees and expenses of the Indemnitees' counsel as they are incurred.   North Star agrees that it shall reasonably cooperate with the Company in connection with any investigation.

KMH 003153



17. <u>Limitation</u>. If a court of competent jurisdiction shall hold that any payment or award of indemnification pursuant to the terms of this Agreement shall be unavailable to any one or more of the Indemnitees from the Company for any reason other than their gross negligence or willful misconduct, the Company then shall reimburse the affected Indemnitees, as required by Section 14, but taking into account the basis for the denial of full indemnification by the court.

## MISCELLANEOUS

18. <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the successors, assigns, and legal representatives of the Company and of North Star. Neither termination nor completion of the engagement of North Star or of any of the Indemnitees shall affect the indemnification provisions of this Agreement, which shall remain operative and in full force and effect after the termination or completion of the engagement. The Company shall not merge or consolidate with any other corporation or entity in a transaction after which the Company is not the surviving entity, and the Company shall not sell all or substantially all of its assets to any other person, corporation, or entity, unless the other person, corporation, or entity expressly assumes the duties and obligations of the Company as set forth in this Agreement.

19. <u>Notice</u>. Any notice required or permitted to be given under this Agreement shall be in writing and shall be delivered in person or sent by certified or by private express mail, postage prepaid, and properly addressed as follows:

To the Company:   K-M Industries Holdings Co., Inc.
                  987 Commercial Street
                  San Carlos, California 94070
                  Attention: Steve Ferrari

Copies to:        Pillsbury Winthrop, LLP
                  50 Fremont Street
                  San Francisco, California 94105
                  Attention: Cindy Schlaefer

To North Star:    North Star Trust Company
                  500 West Madison Street, Suite 3800
                  Chicago, IL 60661
                  Attention: John G. Hommel, Senior Vice President
                             Trust Officer

Copies to:        Jenkens & Gilchrist, P.C.
                  1445 Ross Avenue, Suite 3200
                  Dallas, Texas 75202
                  Attention: John A. Kober

21. <u>Partial Invalidity</u>. If any portion of this Agreement shall be determined to be unenforceable, the remaining provisions shall remain in full force and effect.

KMH 003154

21.    Partial Invalidity.  If any portion of this Agreement shall be determined to be unenforceable, the remaining provisions shall remain in full force and effect.

22.    Waivers.  Either the Company or North Star may, by written notice to the other party:  (a) extend the time for the performance of any of the obligations or other actions of the other party under this Agreement; or (b) waive or modify performance of any of the obligations of the other party under this Agreement.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement shall be deemed to constitute a waiver by that party of compliance with any of the obligations contained in this Agreement.  The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

23.    Governing Law.  This Agreement shall be interpreted and enforced in accordance with, and governed by, the laws of the State of Illinois.

24.    Entire Agreement.  This Agreement supersedes all prior agreements (including the existing Trust Agreement, but not the Trust Agreement adopted after this engagement with respect to the duties of the Trustee unless otherwise incorporated by reference) and understandings between the parties and may not be changed or terminated orally.  No attempted change, termination, or waiver of any of the provisions of this Agreement shall be binding, unless in writing and signed by the party against whom the change, termination, or waiver is sought to be enforced.

IN WITNESS WHEREOF, the Company and North Star have caused this Agreement to be signed as of the day and year first written above.

*North Star Trust Company*

By: _____
John G. Hommel, Senior Vice President
and Trust Officer

*K-M Industries Holdings Co., Inc.*

By: _____
Print Name:  William E. Moore
Its:    Chairman of the Board

KMH 003155

*Subsidiaries (Solely for Purposes of Sections 5, 12, and 14):*

*Kelly-Moore Paint Company, Inc.*

By: _William Emory_
Print Name:  William E. Moore
Its:  Chairman of the Board

*California Capital Insurance Company*

By: _William Emory_
Print Name:  William E. Moore
Its:  Chairman of the Board

DALLAS3 858718v7 53313-00006                    -8-

KMH 003156



## TRUSTEE FEE ADDENDUM
### ANNUAL FEES

| Annual Fee | Asset Range | Basis Points | Annual Fee |
|---|---|---|---|
| | | | $75,000 |
| Pass Through Voting | Each Participant and Beneficiary | $3.00 plus out-of-pocket expenses | |
| Stock Distributions (Incl. 1099) | Each Participant and Beneficiary | $50.00 | |

KMH 003157

# EXHIBIT 71
# TO DILLER DECLARATION



NAL MESSAGE

**EXHIBIT**

75

Ferrari  3·26·08

11

KMH_ESI00006668
Confidential

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

KMH_ESI00006668.002
Confidential

**DOCUMENT SUBMITTED UNDER SEAL**

KMH_ESI00006668.003
Confidential

DOCUMENT SUBMITTED UNDER SEAL

KMH_ESI00006668.004
Confidential

KMH_ESI00006668.005
Confidential

**DOCUMENT SUBMITTED UNDER SEAL**

DOCUMENT SUBMITTED UNDER SEAL

KMH_ESI00006668.006
Confidential

# EXHIBIT 72
# TO DILLER DECLARATION

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO AND OAKLAND DIVISION

4

5    _____

6    THOMAS FERNANDEZ, et al.,                    )
                                                  )
7                   Plaintiffs,                   )
                                                  )
8             vs.                                 ) Case No.
                                                  )
9    K-M INDUSTRIES HOLDING CO., INC., et al.,    ) C-06-07339 CW
                                                  )
10                  Defendants.                   )
                                                  )
11                                                )
                                                  )
12                                                )

13   _____

14

              VIDEOTAPED DEPOSITION OF JOSEPH CRISTIANO
15                        April 8, 2008
                        Oakland, California
16

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 79129
24

25

                                                              1

ESQUIRE DEPOSITION SERVICES
800.770.3363

**DOCUMENT SUBMITTED UNDER SEAL**

BY MS. HASSELMAN:

    Q   Do you know whether it contains any information regarding insurance coverage for Kelly-Moore asbestos litigation?

        MR. SULLIVAN:  Object to the form.

    A   If it had anything to do with asbestos, it would have been in those files.

BY MS. HASSELMAN:

    Q   Did you ever put documents into the asbestos repository?

    A   No.

    Q   When did asbestos litigation start to be a problem for Kelly-Moore?

        MR. LOVITT:  Object to the form.

        MS. SMITH:  Object to the form.

    A   It was a minor irritation during the '80s. It was one of those things that when I joined the company, there was no -- there was not even any mention in '84 of any asbestos problem.  Later on it, as I already mentioned, it was a nuisance type of thing, $500 claims, $250 claims.  It was, you know, inconsequential. Insurance companies were handling it.

        And then at some point the insurance companies stopped giving us information.  And I already told you about that, and the need to get Cheryl

1   involved.  But it ratcheted up when the Texas cases,

2   when the litigation in Texas started increasing, the

3   number of cases starting going up dramatically.  And I'd

4   say that was the beginning of it.  The real to me,

5   anyway, the real crucial point where we all became very,

6   very concerned was the Hernandez.  That's why I remember

7   that so well.  And I think that was 2000, 2001,

8   something like that.

9   BY MS. HASSELMAN:

10      Q    But as of 1997 the number of lawsuits that

11   were filed in Texas had increased sharply and there was

12   discussion at the board of directors meeting about the

13   increasing concern over those lawsuits; is that correct?

14        MS. SMITH:  Object to form.

15      A    Right; they were still small.  The

16   settlements were still small.  I don't remember what the

17   dollar amount of the settlements was.  But what I

18   remember was there were a lot more lawsuits but there

19   were still not the big Hernandez type lawsuit.

20   BY MS. HASSELMAN:

21      Q    In 1997 did you have an understanding of

22   what that sharp increase in lawsuits looked like, what

23   the numbers were?

24        MS. SMITH:   Object to form.

25      A    Other than Cheryl's reports, you know

```
1         A    I don't know.
2         Q    Do you recall that Sansome Street
3    Appraisers was engaged to perform a valuation of
4    Kelly-Moore Paint Company in 1998?
5              MS. SMITH:   Object to form.
6         A    Is that Brooks or Ireland?   Sansome Street?
7    BY MS. HASSELMAN:
8         Q    Do you recall that somebody was engaged to
9    perform a valuation of Kelly-Moore Paint Company in
10   1998?
11        A    Yes.
12        Q    Who do you recall was engaged to do that
13   valuation?
14        A    Mr. Brooks or Mr. Ireland.
15        Q    But you are not sure which?
16        A    I think that Mr. Brooks was first and then
17   Mr. Ireland after him.
18        Q    Do you know how Mr. Brooks was chosen to
19   perform a valuation of Kelly-Moore Paint in 1998?
20             MS. SMITH:   Object to form.
21        A    The thing that I recall was that Mr. Moore
22   checked out his qualifications, was very impressed with
23   his background.  Somehow in the back of my mind I got
24   that he went to Yale or somewhere, Princeton or Yale or
25   something like that.  And he also had done paint
```

1  companies. And nobody else had done paint companies

2  that Mr. Moore looked at, and Mr. Moore's concept was I

3  don't have to train him about what a paint company is.

4  And so I know -- those are the comments that I remember

5  from Mr. Moore.

6  BY MS. HASSELMAN:

7      Q    So you discussed -- you discussed with

8  Mr. Moore who would perform the Paint Company valuation

9  in 1998, I take it?

10     A    I didn't do much of the discussion; I did

11  the listening.

12     Q    For lack of a better word, that

13  conversation, when did that conversation take place?

14     A    1998.

15     Q    Sometime before the ESOP transaction?

16     A    Sometime before the ESOP transaction, yes.

17     Q    Other than that he went to Yale and had

18  valued paint companies in the past, do you recall

19  anything else that Mr. Moore said about why Mr. Brooks

20  was being chosen to perform the valuation?

21     A    No, I don't.

22     Q    Did you ever discuss Mr. Brooks' engagement

23  to do the valuation with Mr. Ferrari?

24     A    No.

25     Q    Do you know when Mr. Brooks was chosen to

GEORGE F. VAN HARE, M.D.                                    September 25, 2007

1    STATE OF CALIFORNIA )

2    : ss                )

3    County of Alameda    )

4

5        I, the undersigned, a Certified Shorthand Reporter

6    of the State of California, do hereby certify:  That the

7    foregoing proceedings were taken before me at the time and

8    place herein set forth; that any witnesses in the foregoing

9    proceedings, prior to testifying, were placed under oath;

10   that a verbatim record of the proceedings was made by me

11   using machine shorthand which was thereafter transcribed

12   under my direction; further, that the foregoing is an

13   accurate transcription thereof.

14       I further certify that I am not a relative,

15   employee, attorney or counsel of any party to this action or

16   relative or employee of any such attorney or counsel and that

17   I am not financially interested in the said action or the

18   outcome thereof;

19       IN WITNESS WHEREOF, I have this date subscribed my

20   name.

21              Dated: _____ APR 1 ⊙ 2008 _____

22

23

24       EMI ALBRIGHT, CSR No. 13042

25

Phone (415) 288-4280              Esquire Deposition Services              Fax (415) 288-4266
505 Sansome Street, Suite 502     San Francisco, California 94111              (800) 770-3362

# EXHIBIT 73
# TO DILLER DECLARATION

Highly Confidential
Attorney-Client Privileged

EXHIBIT

6 9

Ferrari  3-26-08

KMH 010997

**DOCUMENT SUBMITTED UNDER SEAL**

# EXHIBIT 74
# TO DILLER DECLARATION

4/30/02 Conversation w/ Ed Mines, CA                    CONFIDENTIAL

... Ed wanted us to know that the Kelley-Moore Paint Co. has had
... a number of asbestos lawsuits for the past few years and now
... the activity w/ these lawsuits is fairly high. The paint Co. believes
... it is adequately insured for the current level of lawsuits but they
... don't know how long they'll continue seeing such lawsuits.

... Ed wanted to know if there's any remote reason this should be
... disclosed by DiP in the appraisal report.

... K-M gave the lawsuit info to the Paint Co's appraisal firm
... and suggested they (Ed) give it bus.

... EY doesn't think they need to disclose this info. in CIGS
... audited financials as info deals solely w/ the paint Co.'s operations.

... K-M wanted the paint Co's auditors to mention it in the paint
... Co's audited financials so the auditors wrote a P about it.
... Ed will fax us a copy of that P. The Paint Co's appraisers
... did not mention/disclose this info in their valuation reports
... as they did not feel it was necessary.

EXHIBIT

_111_

Mines    4-02-08

CIG 000136

**EXHIBIT 75
TO DILLER DECLARATION**



IRELAND ASSOCIATES
P.O. BOX 487
KENTFIELD, CALIFORNIA 94914
(415) 464-0424

KMH 001041

DOCUMENT SUBMITTED UNDER SEAL

IRELAND ASSOCIATES
P.O. Box 487
KENTFIELD, CALIFORNIA 94914
(415) 464-0424

March 27, 2001

KMH 001042

DOCUMENT SUBMITTED UNDER SEAL



Kelly-Moore Paint Company, Inc.
March 27, 2001
Page 2

KMH 001043

DOCUMENT SUBMITTED UNDER SEAL



# CONFIDENTIAL

Kelly-Moore Paint Company, Inc.
March 27, 2001
Page 3

KMH 001044

DOCUMENT SUBMITTED UNDER SEAL



Kelly-Moore Paint Company, Inc.
March 27, 2001
Page 4

KMH 001045

DOCUMENT SUBMITTED UNDER SEAL

KMH 001046

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001047

**CONFIDENTIAL**

KMH 001048

DOCUMENT SUBMITTED UNDER SEAL

**CONFIDENTIAL**

KMH 001049

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001050

**DOCUMENT SUBMITTED UNDER SEAL**

-2-

KMH 001051

DOCUMENT SUBMITTED UNDER SEAL

-6-

KMH 001052

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001053

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001054

DOCUMENT SUBMITTED UNDER SEAL

KMH 001055

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001056

DOCUMENT SUBMITTED UNDER SEAL

KMH 001057

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001058

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001059

DOCUMENT SUBMITTED UNDER SEAL

KMH 001060

**DOCUMENT SUBMITTED UNDER SEAL**

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001061

DOCUMENT SUBMITTED UNDER SEAL

KMH 001062

-17-

KMH 001063

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001064

CONFIDENTIAL

KMH 001065

**DOCUMENT SUBMITTED UNDER SEAL**

# CONFIDENTIAL

-20-

KMH 001066

DOCUMENT SUBMITTED UNDER SEAL

KMH 001067

DOCUMENT SUBMITTED UNDER SEAL

KMH 001068

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001069

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

-21-

KMH 001070

DOCUMENT SUBMITTED UNDER SEAL

**CONFIDENTIAL**

-22-

KMH 001071

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001072

**DOCUMENT SUBMITTED UNDER SEAL**

**CONFIDENTIAL**

-24-

KMH 001073

**DOCUMENT SUBMITTED UNDER SEAL**

**CONFIDENTIAL**

-25-

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001074

# CONFIDENTIAL

**DOCUMENT SUBMITTED UNDER SEAL**

KMH 001075

**CONFIDENTIAL**

KMH 001076

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

-26-

KMH 001077

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001078

**DOCUMENT SUBMITTED UNDER SEAL**

# CONFIDENTIAL

KMH 001079

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

-31-

DOCUMENT SUBMITTED UNDER SEAL

KMH 001080

KMH 001081

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001082

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001083

DOCUMENT SUBMITTED UNDER SEAL

**ΞIJ ERNST & YOUNG LLP**

- 1331 North California Blvd.
  Suite 200
  Walnut Creek, California 94596

- Phone: 925 977 2900
  Fax:   925 977 2994

DOCUMENT SUBMITTED UNDER SEAL

KMH 001084

CONFIDENTIAL

DOCUMENT SUBMITTED UNDER SEAL

KMH 001085

CONFIDENTIAL

KMH 001086

DOCUMENT SUBMITTED UNDER SEAL

KMH 001087

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001088

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001089

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001090

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001091

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001092

DOCUMENT SUBMITTED UNDER SEAL

# CONFIDENTIAL

KMH 001093

**DOCUMENT SUBMITTED UNDER SEAL**

# CONFIDENTIAL

DOCUMENT SUBMITTED UNDER SEAL

KMH 001094

# CONFIDENTIAL

KMH 001095

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001096

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001097

DOCUMENT SUBMITTED UNDER SEAL

**CONFIDENTIAL**

KMH 001098

**DOCUMENT SUBMITTED UNDER SEAL**

CONFIDENTIAL

KMH 001099

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001100

DOCUMENT SUBMITTED UNDER SEAL

CONFIDENTIAL

KMH 001101

DOCUMENT SUBMITTED UNDER SEAL

KMH 001102

DOCUMENT SUBMITTED UNDER SEAL

IRELAND ASSOCIATES
P.O. Box 487
KENTFIELD, CALIFORNIA 94914
(415) 464-0424

KMH 001103

DOCUMENT SUBMITTED UNDER SEAL

KMH 001104

**DOCUMENT SUBMITTED UNDER SEAL**

**EXHIBITS 76-78
TO DILLER DECLARATION**

# EXHIBIT 76
# TO DILLER DECLARATION

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO AND OAKLAND DIVISION

4

5   _____

6   THOMAS FERNANDEZ, et al.,          )
                                       )
7             Plaintiffs,              )
                                       ) Case No.
8        vs.                           )
                                       ) C-06-07339 CW
9   K-M INDUSTRIES HOLDING CO., INC., et al., )
                                       )
10            Defendants.              )
                                       )
11                                     )
                                       )
12                                     )

13  _____

14

15       VIDEOTAPED DEPOSITION OF ROBERT M. IRELAND
                  April 23, 2008
16               Oakland, California

17

18

19

20

21

22  Reported by:
    EMI ALBRIGHT
23  RPR, CSR No. 13042
    Job No. 79905
24

25

A    I relied upon the opinions that were set forth in the audit report.  Whether I discussed them in significant detail with Mr. Ferrari, now I don't recall. I know at some point in time we did, but I don't exactly know when.

BY MS. WASOW:

Q    With regard to the paragraph that I just read on KMH 912, did Mr. Ferrari ask you any questions about that paragraph?

A    Not that I recall.

Q    Did Mr. Moore ask you any questions about that paragraph?

A    Never spoke with Mr. Moore.

Q    You never spoke with Mr. Moore at all?

A    Never spoke with Mr. Moore at all.

Q    Did Mr. Ferrari tell you that Kelly-Moore Paint was a defendant in some asbestos bodily injury suits in 1998?

A    I don't have any recollection of that.  He did tell me at some point in time, but I don't recall when.

Q    When he told you that, do you remember whether he told you how many cases were pending against Kelly-Moore Paint?

A    At some point in time he did quantify the

1    number of cases.

2         Q    Was that after your initial conversation

3    about Kelly-Moore's asbestos litigation?

4         A    I can't be sure when he quantified the

5    number of cases or the magnitude of the cases, if it was

6    at the same time or not.  As time progressed, more and

7    more information about the asbestos litigation was

8    provided to me.  And I asked for some of that

9    information.

10         Q    Do you recall whether your first

11    conversation with Mr. Ferrari was after 2000?

12         A    Could have been.

13         Q    But you are not sure?

14         A    You are saying concerning asbestos

15    litigation?

16         Q    That's correct.

17         A    It could have been.

18         Q    But you are not sure if it was?

19         A    I'm not sure.  Most likely that it was.

20    But I think if you review the audited financial

21    statements and the comments made by the company's

22    auditors, their statements relative to litigation

23    matters and environmental matters gradually changed over

24    time and became more specific and more descriptive.

25         Q    And is it fair to say that as those reports

1   counsel.

2   BY MS. WASOW:

3        Q    Do you recall whether Mr. Ferrari made that

4   statement for your valuation as of year end 1998?

11:35   5        A    I said I didn't recall.  I said he may have

6   but I don't recall.  I can't say he did or he didn't.

7        Q    So what's the basis of your opinion that he

8   may have said that?

9        A    Because at some point in time we discussed

11:35   10   litigation matters.

11        Q    And when you discussed litigation matters,

12   that's what he said?

13        A    We discussed litigation matters, we

14   discussed the number of cases, the size of the claims,

11:36   15   typical settlements, how they were addressing

16   litigation, how much insurance coverage they had, things

17   like that.  Maybe not all at the same time, but those

18   type of items were discussed over the course of my

19   involvement with Kelly-Moore.

11:36   20        Q    All right.  So the statement that you

21   believe Mr. Ferrari may have made that there were

22   product liability claims but there was sufficient

23   insurance, do you recall whether he made that statement

24   before he told you about the size of claims, type of

11:36   25   claims, location of claims --

79

1      A    He may have.

2      Q    -- et cetera?

3      A    I don't recall.

4      Q    Okay.  Is there a method that you know of

11:37    5  for valuing contingent liabilities?

6           MR. PALMER:    Object to the form.

7           MS. DILLER:    Object to the form.

8      A    Is there a specific method?  I don't know

9  that there's a specific method for evaluating contingent

11:37   10  liabilities.  It perhaps depends on the liability and

11  what you know, again, the facts and circumstances

12  surrounding that liability.

13  BY MS. WASOW:

14     Q    Okay.  Well, let me ask a more precise

11:37   15  question.  Is there a method that you know of for

16  valuing contingent litigation liabilities?

17          MR. PALMER:    Object to the form.

18     A    There may be within the legal industry a

19  method for doing that.  I know that at some point in

11:38   20  time in the Kelly-Moore involvement I did somewhat of a

21  back of the envelope analysis of their number of claims

22  that they had in existence, a number of claims that were

23  being started each year, and what type of settlements

24  they were reaching on average and, you know, trying to

11:38   25  figure out what their exposure might be over some period

1    of time.  And whether that's the proper way to do it or

2    not, that's the way I looked at it.

3    BY MS. WASOW:

4        Q    And do you recall what year you did that

11:38  5    analysis?

6        A    It was probably -- could have been 2002,

7    maybe 2003.  It was a time when I was -- they started to

8    provide me more information relative to the asbestos

9    situation.

11:39  10        Q    Is it fair to say you don't consider

11    yourself an expert on valuation of contingent

12    liabilities?

13            MR. PALMER:  Object to the form.

14        A    I don't hold myself out to be an expert of

11:39  15    contingent liabilities.  Can I do it?  I probably could,

16    but --

17    BY MS. WASOW:

18        Q    Have you done it for other valuations other

19    than the valuations you performed of Kelly-Moore Paint?

11:39  20            MS. DILLER:  Object to the form.

21        A    Not that I specifically recall.  To be

22    clear, though, from time to time I do valuations of

23    companies that do have environmental remediation

24    problems, and they often receive estimates of the cost

11:40  25    of remediation or settlement of environmental matters

1    documentation. I think it was under the guise of

2    attorney client privilege and all that.

3        Q    Did Mr. Ferrari say that he couldn't give

4    you any documents from Kelly-Moore's attorneys because

13:42    5    of attorney client privilege?

6        A    I know he told me there were some documents

7    he could not give to me. Exactly when he said that, I

8    don't recall. But there were -- there was some type of

9    reports they had or, you know, opinions that he said he

13:43    10   was unable to provide to me based on -- and I am making

11   the assumption that advised not to by their corporate

12   counsel or something like that.

13       Q    So did Mr. Ferrari tell you that he

14   couldn't provide them because of attorney client

13:43    15   privilege?

16       A    That's my recollection, but I don't have a

17   specific remembrance of the wording that he used.

18       Q    And this conversation with Mr. Ferrari

19   about the company's legal advice, did that take place

13:43    20   after you prepared your valuation as of year end 1999?

21       A    That's my -- that's my recollection.

22       Q    Did Mr. Ferrari describe the contents of

23   those documents to you?

24       A    What time frame are we talking about?

13:44    25       Q    Well, I believe you've said you can't

1   recall when this conversation occurred in which you

2   talked about Kelly-Moore's advice from counsel about

3   asbestos litigation.  But when Mr. Ferrari did tell you

4   about it and said, I can't give you the documents

13:44  5   because they are privileged or -- strike that -- said he

6   couldn't give you the documents, did he describe the

7   contents of the documents?

8          MR. PALMER:   Object to form.

9     A    Maybe in a general sense to say there

13:44  10  were -- he had reports or studies or, you know, opinions

11  from experts, whether they be legal or nonlegal experts

12  related to the asbestos litigation.

13        The only thing he gave me which is in my

14  files were some printouts that talked about I think the

13:45  15  number of cases filed and settlements and how much

16  insurance I think that they had, something like that.

17  But I think that was, you know, circa early as 2001,

18  maybe even 2002.

19        Then after a while he said he couldn't even

13:45  20  give me those anymore, so -- so I relied upon what was

21  set forth in the audited statement and had comfort that

22  the auditors were satisfied with the opinions they

23  received from legal counsel and that the company was

24  in -- was well within, I guess, insurance coverage for

13:46  25  the claims pending at that time.

1  STATE OF CALIFORNIA )

2  : ss                )

3  County of Alameda    )

4

5          I, the undersigned, a Certified Shorthand Reporter

6  of the State of California, do hereby certify:  That the

7  foregoing proceedings were taken before me at the time and

8  place herein set forth; that any witnesses in the foregoing

9  proceedings, prior to testifying, were placed under oath;

10  that a verbatim record of the proceedings was made by me

11  using machine shorthand which was thereafter transcribed

12  under my direction; further, that the foregoing is an

13  accurate transcription thereof.

14          I further certify that I am not a relative,

15  employee, attorney or counsel of any party to this action or

16  relative or employee of any such attorney or counsel and that

17  I am not financially interested in the said action or the

18  outcome thereof;

19          IN WITNESS WHEREOF, I have this date subscribed my

20  name.

21  Dated: _____ MAY 0 1 2008 _____

22

23  _Emi Albright_____

24  EMI ALBRIGHT, CSR No. 13042

25

# EXHIBIT 77
# TO DILLER DECLARATION

1   Daniel Feinberg – CA State Bar No. 135983
    Todd F. Jackson – CA State Bar No. 202598
2   Margaret E. Hasselman – CA State Bar No. 228529
    Nina R. Wasow – CA State Bar No. 242047
3   Kirsten G. Scott – CA State Bar No.253464
    LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
4   1330 Broadway, Suite 1800
    Oakland, CA  94612
5   Telephone: (510) 839-6824
    Facsimile: (510) 839-7839
6   Email: dfeinberg@lewisfeinberg.com
    Email: tjackson@lewisfeinberg.com
7   Email: mhasselman@lewisfeinberg.com
    Email: nwasow@lewisfeinberg.com
8   Email: kscott@lewisfeinberg.com

9   *Attorneys for Plaintiffs and the Proposed Class*
    (Additional counsel listed within)
10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13             SAN FRANCISCO AND OAKLAND DIVISION

14
    THOMAS FERNANDEZ et al.,              )   Case No. C-06-07339 CW
15                                        )
                  Plaintiffs,             )   **PLAINTIFFS' SECOND**
16                                        )   **SUPPLEMENTAL RESPONSES TO**
                                          )   **DEFENDANT K-M INDUSTRIES**
17      vs.                               )   **HOLDING CO., INC. ESOP PLAN**
                                          )   **COMMITTEE'S FIRST SET OF**
18   K-M INDUSTRIES HOLDING CO., INC.;    )   **INTERROGATORIES TO PLAINTIFFS**
     et al.,                              )
19                                        )
                  Defendants.             )
20   ─────────────────────────────────── )

21
    PROPOUNDING PARTY:   Defendant K-M INDUSTRIES HOLDING CO., INC. ESOP
22                       PLAN COMMITTEE

23   RESPONDING PARTY:   Plaintiffs THOMAS FERNANDEZ, LORA SMITH, AND
                         TOSHA THOMAS
24

25   SET NUMBER:         ONE

26              PRELIMINARY STATEMENT

27      All of these responses are based only upon the information that is presently available to

28   and specifically known by Plaintiffs, except as to those matters stated on their information and

1  belief, and as to those matters they believe them to be true. Independent investigation, legal

2  research, and analysis may supply additional facts and add meaning to the known facts, as well as

3  establish entirely new factual conclusions and legal contentions, all of which may lead to the

4  discovery of additional information, thereby resulting in additions to, changes in, and variations

5  from, these responses.

6  These responses are given without prejudice to Plaintiffs' right to produce evidence of

7  any subsequently discovered documents or compiled facts or determinations thereof that

8  Plaintiffs may later locate or discover. Accordingly, Plaintiffs reserve the right to change any and

9  all of these responses as additional facts are ascertained, analyses are made, legal research is

10  completed, contentions are made, and documents are located. Moreover, all information is being

11  produced only for the purpose of this litigation.

12  With regard to each interrogatory, Plaintiffs reserve the right, notwithstanding these

13  responses, to employ at trial or in any pre-trial proceeding, information subsequently obtained or

14  discovered, information the materiality of which is not presently ascertained, or information

15  Plaintiffs do not regard as coming within the scope of these interrogatories as Plaintiffs

16  understand them.

17  Any information within the scope of the attorney-client privilege, the attorney work

18  product doctrine, or any other privilege or protection that is inadvertently disclosed herein is not

19  intended to be and should not be construed to be a waiver of any applicable privilege or

20  immunity from disclosure, except where such privilege is expressly waived by Plaintiffs in

21  writing. Plaintiffs reserve the right to assert these privileges at any time in these proceedings and

22  further reserves the right to request the return of all privileged information, including copies of

23  the responses themselves. In addition, all evidentiary objections are reserved and no waiver of

24  any objection is to be implied from any response. To the extent that a response might arguably

25  waive an otherwise assertable objection or claim of privilege, such waiver shall be limited to the

26  specific response only and shall not extend to any other discovery.

27  Plaintiffs make no incidental or implied admissions with regard to the contents of these

28  responses. The fact that Plaintiffs have responded or objected to any interrogatory or any part

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                                    Page 2

1  thereof should not be taken as an admission that Plaintiffs accept or admit the existence of any

2  facts set forth or assumed by Propounding Party's interrogatory, or that such response or

3  objection constitutes admissible evidence. The fact that Plaintiffs have answered part or all of

4  any interrogatory is not intended and shall not be construed to be a waiver by Plaintiffs of any

5  objections to any interrogatory or to further inquiry into the subject matter of any interrogatory.

6  These responses are made solely for the purpose of this action. Each response is subject to all

7  objections as to competence, relevance, materiality, propriety, admissibility, privacy, privilege,

8  and any and all other objections that would require exclusion of any statement contained here if

9  any such requests were asked of, or any statement contained here were made by, a witness

10  present and testifying in court, all of which objections and grounds are reserved and may be

11  interposed at the time of trial.

12      This preliminary statement is incorporated into each response by this reference.

13                              **GENERAL OBJECTIONS**

14      The following objections apply to the entire set of responses and are incorporated by

15  reference as though fully set forth in each response to each individual interrogatory listed below:

16      1.      Plaintiffs object to each interrogatory to the extent it calls for disclosure of

17  communications, information, or documents that are protected by the attorney-client privilege,

18  the attorney work product doctrine, Federal Rule of Civil Procedure 26(b)(4)(B), Plaintiffs'

19  privacy rights, the privacy rights of others, or any other constitutional, statutory or common law

20  privilege or protection.

21      2.      Plaintiffs object to each interrogatory to the extent it calls for premature disclosure

22  of expert testimony.

23      3.      Plaintiffs object to each interrogatory to the extent it calls for the disclosure of

24  privileged communication with consulting experts.

25      4.      Plaintiffs object to each interrogatory as unduly burdensome, oppressive,

26  harassing, and abusive of the discovery process to the extent that they, individually or

27  cumulatively, purport to seek to impose obligations upon Plaintiffs beyond those authorized by

28  the Federal Rules of Civil Procedure, the Local Rules of the Court, and/or the Court's orders in

1    this action.

2        5.    Plaintiffs object to the entire set of interrogatories, and to each interrogatory

3    individually, to the extent it is overly broad, vague, ambiguous, unduly burdensome, harassing,

4    oppressive, abusive of the discovery process, or generally non-specific as to indicate what a full

5    and complete response would be. Such vagueness appears frequently in undefined terms and

6    phrases. Where possible, however, Plaintiffs will make reasonable assumptions as to

7    Defendant's intended meaning and will respond accordingly, while preserving their objections as

8    to vagueness, ambiguity, and uncertainty.

9        6.    Plaintiffs object to each interrogatory as unduly burdensome, oppressive,

10    harassing, and abusive of the discovery process to the extent it requires the production of

11    information and/or documents already produced to Defendant or by Defendant in this action, or

12    within the possession, custody or control of third parties or public records, and therefore equally

13    available to Defendant.

14        7.    Plaintiffs object to each interrogatory as unduly burdensome, oppressive,

15    harassing, and abusive of the discovery process to the extent it requires the production of

16    information and/or documents within the possession, custody or control of the Defendant.

17        8.    Plaintiffs object to each interrogatory as unduly burdensome, oppressive,

18    harassing, and abusive of the discovery process to the extent it seeks information and/or the

19    production of documents and/or things which are not in Plaintiffs' possession, control, or

20    custody.

21        9.    Plaintiffs object to Defendant's definition of the word "CONCERNING" as

22    overbroad and unduly burdensome because the definition "related in any way to the matter in

23    question" and the additional defining terms, including "reflecting, referring to, referencing,

24    identifying, explaining, summarizing, documenting, recording, constituting, discussing,

25    quantifying, and describing" potentially encompasses information far beyond that relevant to the

26    claims at issue in this action. In the context of the Interrogatories, which relate to certain

27    allegations set forth in the Second Amended Complaint, such a definition is unreasonably

28    overbroad and unduly burdensome. Therefore Plaintiffs interpret each use of the word

1  CONCERNING in the Interrogatories as though it were the word SUPPORTING.

2      10.   Plaintiffs object to the definition "STATE ALL FACTS" as overbroad and unduly

3  burdensome because the definition because it requests a "full and complete statement of all facts

4  and application of facts to law relating to the subject matter of the interrogatory including the

5  IDENTITY of any PERSON having knowledge of any such fact and the IDENTITY of any

6  DOCUMENT which concerns, refers, relates, or evidences such facts." Such a definition

7  potentially encompasses information far beyond that relevant to the claims at issue in this action

8  because "related to" is vague and potentially limitless. Plaintiffs further object to this definition

9  as compound by virtue of requiring three separate responses to each interrogatory. Plaintiffs

10  further object to this definition as calling for production of protected attorney work product

11  because it requests "application of facts to law," which requires the revelation of attorneys'

12  opinions and mental impressions relating to the claims in the case. Plaintiffs will respond to each

13  interrogatory to the extent possible without revealing protected attorney work product.

14      11.   Plaintiffs object to each interrogatory as unduly burdensome, oppressive,

15  harassing, and abusive of the discovery process because they impose a high burden on Plaintiffs

16  to respond, but the benefit to Defendants of receiving answers from Plaintiffs is minimal,

17  because the interrogatories request facts to which Defendants already have access because they

18  within the knowledge of Defendants or within the documents produced by Defendants. Thus, the

19  burden on Plaintiffs vastly outweighs any possible benefit to Defendants, rendering the

20  interrogatories inappropriate.

21      12.   Plaintiffs assert these objections without waiving or intending to waive any

22  objections as to competency, relevancy, materiality, or privilege.

23      13.   Without waiving any of the foregoing General Objections, each of which is hereby

24  expressly incorporated into each individual response as if fully restated therein, Plaintiff

25  responds, as set forth below, subject to the following additional reservations:

26          a.   The right to object on any permissible ground whatsoever, including, but

27  not limited to, competency, vagueness, relevance, and materiality, to the admission into evidence

28  or any other use of any of these responses at the trial of this action or at any other proceeding in

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                    Page 5

1    this action or by any other action;

2            b.      The right to object on any permissible ground whatsoever to any demand

3    for further responses to the interrogatories or any other discovery procedures involving or

4    relating to the subject matter of the responses; and

5            c.      The right at any time to revise, correct, add to, or clarify any of the

6    responses set forth herein.

7    14.      These General Objections and Limitations apply to each interrogatory as though

8    restated in full therein.  The failure to mention any of the foregoing General Objections and

9    Limitations in the specific responses set forth below shall not be deemed a waiver of such

10    objection or limitation.

11            Subject to and without waiving the foregoing objections, and incorporating them by

12    reference into each of the responses provided below, Plaintiffs respond to Defendant K-M

13    Industries Holding Co. Inc.'s First Set of Interrogatories to Plaintiffs as follows:

14                                    **INTERROGATORIES**

15    **INTERROGATORY NO. 1:**

16            STATE ALL FACTS CONCERNING YOUR contention in paragraph 52 of the

17    COMPLAINT that "Defendant Fiduciaries have intentionally withheld information about the

18    extent of KMH's potential asbestos liabilities from participants who are terminated employees,

19    including Plaintiff Smith."

20    **RESPONSE TO INTERROGATORY NO. 1:**

21            Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

22    this interrogatory on the ground that it is vague, ambiguous, unduly burdensome, and overbroad

23    by virtue of forcing Plaintiffs to speculate as to the meaning of the undefined term "intentionally"

24    and show facts demonstrating Defendants' own state of mind, which is within the knowledge of

25    Defendants, not Plaintiffs.  Plaintiffs further object to this interrogatory as compound, overbroad

26    and unduly burdensome by virtue of its inclusion of the terms "STATE ALL FACTS" and

27    "CONCERNING," to which Plaintiffs object as compound, overbroad and unduly burdensome,

28    as described in the General Objections above.  Plaintiffs further object to this Interrogatory as

premature, unduly burdensome, harassing, oppressive, and abusive of the discovery process on the grounds that it constitutes an improper contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs further object to this Interrogatory on the ground that it seeks communications, information, or documents that are protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs further object to this Interrogatory as duplicative of Interrogatory No. 25 served by KMH and therefore particularly burdensome, harassing, oppressive, and abusive of the discovery process. Plaintiffs further object to this Interrogatory on the grounds that it is unduly burdensome, harassing, oppressive, and abusive of the discovery process because it requests production of information and documents equally available to Defendant because Defendant has equal access to all documents produced by all parties to this action and by third parties, and has equal access to all transcripts of depositions taken by any party in this action. Any further description of the documents and information responsive to this Interrogatory would require revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney work product doctrine. Plaintiffs do not waive any other objection that may apply.

Subject to and without waiving the foregoing objections and their right to supplement any answers as further facts are discovered or to rely upon facts not described in this response, Plaintiffs provide the following response: Plaintiffs Smith, Thomas, and Fernandez all testified in their depositions regarding the information they received from their former employers regarding Kelly-Moore Paint Co.'s and KMH's potential asbestos liabilities. Smith Dep. 35:3-37:4, 38:19-40:24, 53:19-56:2, 81:10-82:22, 84:12-87:21, 109:23-117:20, 125:18-130:19, 133:8-135:9, 142:15-146:17, 150:5-157:7, 160:13-172:4, 173:24-174:16, 175:1-176:3. Thomas Dep. 12:22-13:16, 75:23-76:18, 81:3-89:9, 91:19-96:7, 97:5-101:15, 104:15-117:10, 119:12-126:3, 132:3-134:6, 135:7-150:12, 156:22-168:3, 172:1-173:8, 177:13-187:14, 199:2-9, 209:14-210:14. Fernandez Dep. 31:16-36:18, 40:6-12, 85:18-89:12, 93:3-94:16, 95:25-99:24, 102:7-14, 118:16-119:8, 121:14-123:10, 130:12-132:20, 134:14-146:10, 154:1-156:7, 157:19-163:10, 181:4-182:18, 187:1-188:18. Plaintiffs further identify Deposition Exhs 9, 27, 28, 55, 59, 60, 83, 95-

1   97, 116-120, 137, 147-150, 153-166, 168-179, 183, 187-211, 217, 219-221, 223, 228-235.

2   Plaintiffs further identify all documents showing asbestos sales or liability of Kelly Moore Paint

3   Co. or KMH in the period before October 13, 1998. Further, Messrs. Stritmatter, Ferrari,

4   Cristiano, Giffins, and Ireland testified regarding the knowledge possessed by Mr. Moore and

5   other executives of Kelly-Moore Paint Co. regarding the extent of the company's potential

6   asbestos liabilities in 1998 and 1999. Stritmatter Dep. 34:3-35:17, 125:4-130:18, 143:13-23,

7   211:8-217:18, 249:19-251:4, 253:14-254:1. Ferrari Dep. 156:24-173:6, 173:11-187:25, 193:12-

8   215:19. Crisitano Dep. 26:8-40:3, 46:14-48:13, 53:9-64:20, 107:11-111:7, 113:8-20, 114:12-

9   115:19, 116:9-15, 119:12-120:24, 149:22-151:4. Giffins Dep. 41:23-42:22, 79:21-80:19. Ireland

10  Dep. 73:23-79:19. In addition, Mr. Cazzolla testified about the knowledge possessed by Mr.

11  Moore and other executives of CIG regarding the extent of Kelly-Moore Paint Co.'s potential

12  asbestos liabilities in 1998 and 1999. Cazzolla Dep. 31:7-32:19, 53:2-54:2, 93:3-17, 100:12-

13  101:16. Mr. Hommel testified about the information that North Star received regarding the

14  extent of the company's asbestos liabilities in 1998 and 1999 and about whether these liabilities

15  were taken into account in valuation reports. Hommel Dep. 167:11-168:10, 179:3-185:7,

16  199:16-209:25, 238:1-241:4. Plaintiffs further incorporate by reference their responses to

17  Interrogatories Nos. 6, 13, and 15. Further, Messrs. Giffins, Cristiano, Ferrari, Stritmatter, and

18  Cazzolla testified about communications with participants, including communications (or lack

19  thereof) about asbestos liabilities. Giffins Dep. 165:12-181:21. Cristiano Dep. 165:15-173:1,

20  205:20-212:7. Ferrari Dep. 174:18-175:3, 211:25-212:19, 222:10-20. Stritmatter Dep. 103:17-

21  104:8, 177:16-178:18, 198:1-15, 237:7-241:13. Cazzolla Dep. 24:24-25:1, 93:21-97:25, 169:24-

22  175:4. Plaintiffs further incorporate by reference their response to Interrogatories No. 6, 13, 15,

23  and 25 served by KMH. Plaintiffs are unable to state further facts and identify further documents

24  without revealing information protected by the attorney work-product doctrine, and on that basis

25  will not further respond.

26  **INTERROGATORY NO. 2:**

27      STATE ALL FACTS CONCERNING how YOU gained actual knowledge that the Plans'

28  purchases of KMH stock may have been for more than fair market value, as alleged in the

1    COMPLAINT.

2    **RESPONSE TO INTERROGATORY NO. 2:**

3         Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

4    this interrogatory on the ground that it is vague and ambiguous by virtue of its inclusion of the

5    undefined terms "actual knowledge" and "fair market value," which are legal terms of art but for

6    which Defendants have not provided a definition for purposes of these responses. Plaintiffs

7    further object to this interrogatory on the ground that it is unintelligible because it requests

8    information regarding actual knowledge of a mere possibility. Plaintiffs further object to this

9    interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of the

10   terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound,

11   overbroad and unduly burdensome, as described in the General Objections above. Plaintiffs

12   further object to this Interrogatory as premature, unduly burdensome, harassing, oppressive, and

13   abusive of the discovery process on the grounds that it constitutes an improper contention

14   interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs further

15   object to this Interrogatory on the ground that it seeks communications, information, or

16   documents that are protected by the attorney-client privilege and/or the attorney work product

17   doctrine. Plaintiffs further object to this Interrogatory on the ground that it seeks the identity of,

18   facts known by, and opinions held by Plaintiffs' consulting, non-testifying experts. Such

19   information is shielded from disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work

20   product privilege. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

21   burdensome, harassing, oppressive, and abusive of the discovery process because it requests

22   production of information and documents equally available to Defendant because Defendant has

23   equal access to all documents produced by all parties to this action and by third parties, and has

24   equal access to all transcripts of depositions taken by any party in this action. Any further

25   description of the documents and information responsive to this Interrogatory would require

26   revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

27   opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

28   attorney work product doctrine. Plaintiffs further object to this interrogatory on the ground that it

1  calls for the production of communications between Plaintiffs and their counsel.  Plaintiffs do not

2  waive any other objection that may apply.

3       Subject to and without waiving the foregoing objections and their right to supplement any

4  answers as further facts are discovered or to rely upon facts not described in this response,

5  Plaintiffs provide the following response:  Plaintiffs Smith, Thomas, and Fernandez all testified

6  in their depositions regarding the information they received from their former employers

7  regarding Kelly-Moore Paint Co.'s and KMH's potential asbestos liabilities.  Smith Dep. 35:3-

8  37:4, 38:19-40:24, 53:19-56:2, 81:10-82:22, 84:12-87:21, 109:23-117:20, 125:18-130:19, 133:8-

9  135:9, 142:15-146:17, 150:5-157:7, 160:13-172:4, 173:24-174:16, 175:1-176:3.  Thomas Dep.

10  12:22-13:16, 75:23-76:18, 81:3-89:9, 91:19-96:7, 97:5-101:15, 104:15-117:10, 119:12-126:3,

11  132:3-134:6, 135:7-150:12, 156:22-168:3, 172:1-173:8, 177:13-187:14, 199:2-9, 209:14-210:14.

12  Fernandez Dep. 31:16-36:18, 40:6-12, 85:18-89:12, 93:3-94:16, 95:25-99:24, 102:7-14, 118:16-

13  119:8, 121:14-123:10, 130:12-132:20, 134:14-146:10, 154:1-156:7, 157:19-163:10, 181:4-

14  182:18, 187:1-188:18.  Plaintiffs further identify Deposition Exhs 9, 27, 28, 55, 59, 60, 83, 95-

15  97, 116-120, 137, 147-150, 153-166, 168-179, 183, 187-211, 217, 219-221, 223, and 228-235.

16  Plaintiffs are unable to state further facts and identify further documents without revealing

17  information protected by the attorney-client privilege and attorney work-product doctrine, and on

18  that basis will not further respond.

19  **INTERROGATORY NO. 3:**

20       STATE ALL FACTS CONCERNING YOUR contention in paragraph 57 of the

21  COMPLAINT that "PLAINTIFFS, like other Plan participants in the Plaintiff Class, suffered a

22  diminution in the values of their KMH and predecessor plan accounts when the Plans purchased

23  KMH stock owned by Defendant Moore Trust for more than fair market value, and continue to

24  suffer such losses in the present because Defendant Fiduciaries have failed to correct the

25  overpayment by the KMH Plan and its predecessor plans."

26  **RESPONSE TO INTERROGATORY NO. 3:**

27       Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

28  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

1  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

2  compound, overbroad and unduly burdensome, as described in the General Objections above.

3  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

4  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

5  contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

6  further object to this Interrogatory on the ground that it seeks communications, information, or

7  documents that are protected by the attorney-client privilege and/or the attorney work product

8  doctrine. Plaintiffs further object to this Interrogatory on the ground that it seeks the identity of,

9  facts known by, and opinions held by Plaintiffs' consulting, non-testifying experts. Such

10  information is shielded from disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work

11  product privilege. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

12  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

13  production of information and documents equally available to Defendant because Defendant has

14  equal access to all documents produced by all parties to this action and by third parties, and has

15  equal access to all transcripts of depositions taken by any party in this action. Any further

16  description of the documents and information responsive to this Interrogatory would require

17  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

18  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

19  attorney work product doctrine. Plaintiffs do not waive any other objection that may apply.

20    Subject to and without waiving the foregoing objections and their right to supplement any

21  answers as further facts are discovered or to rely upon facts not described in this response,

22  Plaintiffs provide the following response: Plaintiffs are unable to respond to this interrogatory

23  without revealing attorney work product or prematurely disclosing expert testimony, and on that

24  ground will not respond further. Plaintiffs will disclose expert reports in accordance with the

25  Court's pre-trial scheduling order.

26  **INTERROGATORY NO. 4:**

27    If YOU contend that the value of YOUR KMH and predecessor plan accounts was greater

28  prior to the Plans purchasing KMH stock owned by the Defendant Moore Trust, STATE ALL

1  FACTS CONCERNING YOUR contention.

2  **RESPONSE TO INTERROGATORY NO. 4:**

3       Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

4  this interrogatory on the ground that it is unintelligible. Plaintiffs further object to this

5  interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of the

6  terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound,

7  overbroad and unduly burdensome, as described in the General Objections above. Plaintiffs

8  further object to this Interrogatory as premature, unduly burdensome, harassing, oppressive, and

9  abusive of the discovery process on the grounds that it constitutes an improper contention

10  interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs further

11  object to this Interrogatory on the ground that it seeks communications, information, or

12  documents that are protected by the attorney-client privilege and/or the attorney work product

13  doctrine. Plaintiffs further object to this Interrogatory on the ground that it seeks the identity of,

14  facts known by, and opinions held by Plaintiffs' consulting, non-testifying experts. Such

15  information is shielded from disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work

16  product privilege. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

17  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

18  production of information and documents equally available to Defendant because Defendant has

19  equal access to all documents produced by all parties to this action and by third parties, and has

20  equal access to all transcripts of depositions taken by any party in this action. Any further

21  description of the documents and information responsive to this Interrogatory would require

22  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

23  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

24  attorney work product doctrine. Plaintiffs further object to this interrogatory as vague as to the

25  time frame referenced. Plaintiffs do not waive any other objection that may apply.

26       Subject to and without waiving the foregoing objections and their right to supplement any

27  answers as further facts are discovered or to rely upon facts not described in this response,

28  Plaintiffs provide the following response: Plaintiffs find this interrogatory so unintelligible and

1   confusing as to render it nearly impossible to provide an answer. If Defendants mean, by this

2   interrogatory, to ask if Plaintiffs contend that the value of their ESOP plan accounts was greater

3   before the plans received (from loans) the cash that was used to purchase KMH tracking stock,

4   Plaintiffs do not so contend. However, Plaintiffs do contend that the value of the cash received

5   from loans to the ESOP was greater than the value of the KMH tracking stock for which that

6   cash was exchanged. Plaintiffs are unable to state further facts and identify further documents

7   without revealing information protected by the attorney-client privilege and attorney work-

8   product doctrine, or prematurely disclosing expert testimony, and on that basis will not further

9   respond.

10  **INTERROGATORY NO. 5:**

11  STATE ALL FACTS CONCERNING YOUR contention in paragraph 58 of the

12  COMPLAINT that "PLAINTIFFS will fairly and adequately represent and protect the interests of

13  the Plaintiff Class."

14  **RESPONSE TO INTERROGATORY NO. 5:**

15  Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

16  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

17  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

18  compound, overbroad and unduly burdensome, as described in the General Objections above.

19  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

20  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

21  contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

22  further object to this interrogatory on the ground that it calls for the production of

23  communications between Plaintiffs and their counsel. Plaintiffs further object to this

24  Interrogatory on the ground that it seeks communications, information, or documents that are

25  protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs

26  further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,

27  oppressive, and abusive of the discovery process because it requests production of information

28  and documents equally available to Defendant because Defendant has equal access to all

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                    Page 13

1  documents produced by all parties to this action and by third parties, and has equal access to all

2  transcripts of depositions taken by any party in this action. Any further description of the

3  documents and information responsive to this Interrogatory would require revelation of

4  attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions

5  regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney

6  work product doctrine. Plaintiffs do not waive any other objection that may apply.

7      Subject to and without waiving the foregoing objections and their right to supplement any

8  answers as further facts are discovered or to rely upon facts not described in this response,

9  Plaintiffs provide the following response: Plaintiffs are participants in the KMH Plan. The relief

10  sought primarily consists of declaratory and injunctive relief and restoration of losses to the

11  plans, so participant status is all that is necessary. Defendants have acted or refused to act on

12  grounds generally applicable to the Class, making appropriate declaratory and injunctive relief

13  with respect to Plaintiffs and the Class as a whole. The prosecution of separate actions by

14  individual Class members would create a risk of inconsistent or varying adjudications which

15  would establish incompatible standards of conduct for Defendants, or adjudications with respect

16  to individual Class members would as a practical matter be dispositive of the interests of non-

17  party Class members. Plaintiffs have also retained counsel experienced in litigating complex

18  ERISA fiduciary matters and class actions. Plaintiffs are unable to state further facts and identify

19  further documents without revealing information protected by the attorney-client privilege and

20  attorney work-product doctrine, and on that basis will not further respond.

21  **INTERROGATORY NO. 6:**

22      STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

23  COMPLAINT that "Defendant Fiduciaries have breached their duties of loyalty and prudence

24  under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)."

25  **RESPONSE TO INTERROGATORY NO. 6:**

26      Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

27  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

28  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

1  compound, overbroad and unduly burdensome, as described in the General Objections above.

2  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

3  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

4  contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

5  further object to this Interrogatory on the ground that it seeks the identity of, facts known by, and

6  opinions held by Plaintiffs' consulting, non-testifying experts. Such information is shielded from

7  disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work product privilege. Plaintiffs

8  further object to this Interrogatory on the ground that it seeks communications, information, or

9  documents that are protected by the attorney-client privilege and/or the attorney work product

10  doctrine. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

11  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

12  production of information and documents equally available to Defendant because Defendant has

13  equal access to all documents produced by all parties to this action and by third parties, and has

14  equal access to all transcripts of depositions taken by any party in this action. Any further

15  description of the documents and information responsive to this Interrogatory would require

16  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

17  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

18  attorney work product doctrine. Plaintiffs further object to this interrogatory on the ground that it

19  is overbroad, unduly burdensome, harassing, and abusive of the discovery process because it

20  requests that Plaintiffs state every fact concerning their entire First Claim for Relief. As such, it

21  is also objectionable as unduly burdensome, harassing, and abusive of the discovery process

22  because it is duplicative of Interrogatories Nos. 1-25 served by Defendant K-M Industries

23  Holding Co., Inc., of Interrogatories Nos. 1-5 and 7-22 of the instant set of Interrogatories, and of

24  Interrogatory No. 24 served by Defendant North Star Trust Co., which the parties have agreed

25  Plaintiffs will answer at a later date. Plaintiffs do not waive any other objection that may apply.

26      Subject to and without waiving the foregoing objections and their right to supplement any

27  answers as further facts are discovered or to rely upon facts not described in this response,

28  Plaintiffs provide the following response: Plaintiffs contend that Defendants breached their

1    duties of loyalty and prudence by causing the Plans to pay more than fair market value for KMH

2    stock; failing to conduct a thorough and independent review and adequately consider whether the

3    October 1998 purchase of KMH Series P stock, and the October 1999 purchase of KMH Series 1

4    stock from Defendant Moore Trust were in the best interests of the Plan participants; failing to

5    undertake an adequate and independent valuation of the KMH stock prior to those transactions;

6    failing to ensure that they secured an independent expert assessment of the fair market value of

7    KMH stock prior to those transactions; failing to investigate adequately the qualifications of any

8    and all valuation experts retained to prepare the valuations of KMH stock in connection with the

9    transactions; failing to provide complete and accurate information regarding KMH to such

10   valuation experts for use in the valuations prepared in connection with the transactions; failing to

11   make certain that reliance on any and all valuation experts' advice was reasonably justified under

12   the circumstances of the transactions; failing adequately to consider how KMH's potential

13   asbestos liabilities affected the value of KMH Series 1 and Series P stock; failing adequately to

14   consider that the status of KMH Series 1 and Series P stock as "tracking stock" affected its

15   value; failing to make an honest, objective effort to read the valuation reports, understand them,

16   and question the methods and assumptions that did not make sense; failing to seek a refund of

17   the KMH Plan's overpayment for KMH stock at any time between 1998 and the present;

18   overvaluing the KMH stock purchased from Defendant Moore Trust by the KMH Plan in

19   October 1998 and October 1999; withholding information about KMH's potential asbestos

20   liabilities from valuators; and violating the terms of the plan document of the KMH Plan by

21   refusing to redeem Plaintiff Smith's put option on the schedule established by the KMH Plan.

22   Plaintiffs further incorporate by reference their responses to Interrogatory No. 7. Plaintiffs are

23   unable to state further facts and identify further documents without revealing information

24   protected by the attorney work-product doctrine, and on that basis will not further respond.

25   **INTERROGATORY NO. 7:**

26        STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

27   COMPLAINT that the Fiduciary DEFENDANTS failed "to conduct a thorough and independent

28   review and adequately consider whether the October 13, 1998 purchase of KMH Series P stock,

1  and the October 13, 1999 purchase of KMH Series 1 stock from Defendant Moore Trust was in

2  the best interests of the Plan participants."

3  **RESPONSE TO INTERROGATORY NO. 7:**

4      Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

5  this interrogatory on the ground that it is compound.  Plaintiffs further object to this interrogatory

6  as compound, overbroad and unduly burdensome by virtue of its inclusion of the terms "STATE

7  ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound, overbroad and

8  unduly burdensome, as described in the General Objections above.  Plaintiffs further object to

9  this Interrogatory as premature, unduly burdensome, harassing, oppressive, and abusive of the

10  discovery process on the grounds that it constitutes an improper contention interrogatory and that

11  investigation and discovery in this case are ongoing.  Plaintiffs further object to this Interrogatory

12  on the ground that it seeks the identity of, facts known by, and opinions held by Plaintiffs'

13  consulting, non-testifying experts.  Such information is shielded from disclosure by Fed. R. Civ.

14  P.26(b)(4)(B) and the attorney work product privilege.  Plaintiffs further object to this

15  Interrogatory on the ground that it seeks communications, information, or documents that are

16  protected by the attorney-client privilege and/or the attorney work product doctrine.  Plaintiffs

17  further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,

18  oppressive, and abusive of the discovery process because it requests production of information

19  and documents equally available to Defendant because Defendant has equal access to all

20  documents produced by all parties to this action and by third parties, and has equal access to all

21  transcripts of depositions taken by any party in this action.  Any further description of the

22  documents and information responsive to this Interrogatory would require revelation of

23  attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions

24  regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney

25  work product doctrine.  Plaintiffs further object to this Interrogatory as duplicative of

26  Interrogatory No. 6 and of Interrogatories Nos. 2-5 and 9-12 served by the KMH ESOP

27  Committee and therefore particularly burdensome, harassing, oppressive, and abusive of the

28  discovery process.  Plaintiffs do not waive any other objection that may apply.

1    Subject to and without waiving the foregoing objections and their right to supplement any

2  answers as further facts are discovered or to rely upon facts not described in this response,

3  Plaintiffs provide the following response: As to the October 1998 transaction, Messrs.

4  Stritmatter, Cristiano, Ireland, Ferrari, and Menke all testified with regard to the qualifications of

5  and process used to hire Mr. B.J. Brooks to perform a valuation of the KMH Series P stock

6  purchased by the Paint Plan on October 13, 1998; regarding the provision of information to Mr.

7  Brooks for preparation of the valuation report prepared in connection with the purchase of KMH

8  Series P stock by the Paint Plan; and regarding the analysis, or lack thereof, made by the Plan's

9  fiduciaries of the Mr. Brooks's valuation report prepared in connection with the purchase of

10  KMH Series P stock by the Paint Plan. Stritmatter Dep. 201:3-202:13, 203:14-206:18, 208:14-

11  217:18, 216:9-217:3. Cristiano Dep. 70:8-20, 151:6-14, 162:14-15, 173:2-177:4, 178:4-180:12,

12  180:18-181:18, 184:5-186:4, 191:10-195:20. Ireland Dep. 23:1-28:25, 46:23-55:22, 62:18-

13  62:22. Menke Dep. 230:17-232:4, 232:5-239:14, 251:13-251:24. Ferrari Dep. 224:9-234:6,

14  242:10-242:24, 243:11-263:13, 235:5-244:11. Plaintiffs further identify Deposition Exhibits 9,

15  55, 74, and 75. As to the October 1999 transaction, Plaintiffs identify Deposition Exhs. 18, 24,

16  and 139. Further, Messrs. Mines, Cazzolla, and Bodenstein and Ms. Daly testified regarding the

17  manner of choosing Duff & Phelps to perform a valuation for purposes of the Plan's purchase of

18  KMH Series I stock on October 18, 1999; regarding the information provided to Duff & Phelps

19  for use in its preparation of its valuation report dated 6/30/99 (Deposition Exh. 18); and

20  regarding the analysis, or lack thereof, made by the Plan's fiduciaries of Deposition Exhibit 18;

21  the analysis, or lack thereof, made by the Plan's fiduciaries of Deposition Exhibit 139; and the

22  analysis, or lack thereof, of Deposition Exhibit 24. Mines Dep.100:15-105:11, 117:25-121:8,

23  130:1-137:8, 150:1-150:20, 143:6-149:21, 154:1-158:24. Cazzolla Dep. 33:8-38:6, 45:5-47:22,

24  54:6-55:24, 80:7-81:2, 85:23-87:12, 88:23-89:16, 90:22-91:5, 103:16-104:16, 106:19-121:10,

25  147:6-149:11, 159:4-166:21, 202:7-203:15. Bodenstein Dep. 39:20-48:1, 48:22-53:3, 68:8-78:7,

26  108:25-109:24, 123:7-128:10, 142:11-142:18. Daly Dep. 65:20-66:6, 69:14-69:25. Plaintiffs

27  further incorporate by reference their responses to Interrogatory No. 6 and to Interrogatories Nos.

28  2-5 and 9-12 served by KMH. Plaintiffs are unable to state further facts and identify further

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                    Page 18

1  documents without revealing information protected by the attorney work-product doctrine, and

2  on that basis will not further respond.

3  **INTERROGATORY NO. 8:**

4      STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

5  COMPLAINT that the Fiduciary DEFENDANTS failed "to undertake an adequate and

6  independent valuation of the KMH stock prior to" the October 13, 1998 purchase of KMH Series

7  P stock, and the October 13, 1999 purchase of KMH Series 1 stock from Defendant Moore

8  Trust."

9  **RESPONSE TO INTERROGATORY NO. 8:**

10      This interrogatory was withdrawn on May 5, 2008, pursuant to agreement of the parties.

11  On that basis, Plaintiffs will not respond to this interrogatory.

12  **INTERROGATORY NO. 9:**

13      STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

14  COMPLAINT that the Fiduciary DEFENDANTS failed "adequately to consider how KMH's

15  potential asbestos liabilities affected the value of KMH Series I and Series P stock."

16  **RESPONSE TO INTERROGATORY NO. 9:**

17      Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

18  this interrogatory on the ground that it is compound.  Plaintiffs further object to this interrogatory

19  as compound, overbroad and unduly burdensome by virtue of its inclusion of the terms "STATE

20  ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound, overbroad and

21  unduly burdensome, as described in the General Objections above.  Plaintiffs further object to

22  this Interrogatory as premature, unduly burdensome, harassing, oppressive, and abusive of the

23  discovery process on the grounds that it constitutes an improper contention interrogatory and that

24  investigation and discovery in this case are ongoing.  Plaintiffs further object to this Interrogatory

25  on the ground that it seeks the identity of, facts known by, and opinions held by Plaintiffs'

26  consulting, non-testifying experts.  Such information is shielded from disclosure by Fed. R. Civ.

27  P. 26(b)(4)(B) and the attorney work product privilege.  Plaintiffs further object to this

28  Interrogatory on the ground that it seeks communications, information, or documents that are

1   protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs
2   further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,
3   oppressive, and abusive of the discovery process because it requests production of information
4   and documents equally available to Defendant because Defendant has equal access to all
5   documents produced by all parties to this action and by third parties, and has equal access to all
6   transcripts of depositions taken by any party in this action. Any further description of the
7   documents and information responsive to this Interrogatory would require revelation of
8   attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions
9   regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney
10  work product doctrine. Plaintiffs further object to this Interrogatory as duplicative of
11  Interrogatories Nos. 4-6 and 11-13 served by the KMH ESOP Committee and therefore
12  particularly burdensome, harassing, oppressive, and abusive of the discovery process. Plaintiffs
13  do not waive any other objection that may apply.

14         Subject to and without waiving the foregoing objections and their right to supplement any
15  answers as further facts are discovered or to rely upon facts not described in this response,
16  Plaintiffs provide the following response: As to the Series P stock purchased by the Plan,
17  Messrs. Stritmatter, Ferrari, Menke, and Cristiano testified regarding the provision of
18  information to Mr. Brooks for preparation of the valuation report prepared in connection with the
19  purchase of KMH Series P stock by the Paint Plan; and regarding the analysis, or lack thereof,
20  made by the Plan's fiduciaries of the Mr. Brooks's valuation report prepared in connection with
21  the purchase of KMH Series P stock by the Paint Plan. Stritmatter Dep. 203:14-205:12, 210:14-
22  217:18. Ferrari Dep. 242:10-242:24, 243:11-263:13, 235:5-244:11. Menke Dep. 230:17-232:4,
23  232:5-239:14, 251:13-251:24. Cristiano Dep. 70:8-20, 151:6-14, 162:14-15, 178:4-180:12,
24  180:18-181:18, 184:5-186:4, 191:10-195:20. Plaintiffs further identify Deposition Exh. 9, 55,
25  74, and 75. As to the Series I stock purchased by the Plans, Plaintiffs identify Deposition Exhs.
26  18, 24, and 139. Further, Messrs. Mines, Cazzolla, and Bodenstein, and Ms. Daly testified
27  regarding the information provided to Duff & Phelps for use in its preparation of its valuation
28  report dated 6/30/99 (Deposition Exh. 18); and regarding the analysis, or lack thereof, made by

1   the Plan's fiduciaries of Deposition Exhibit 18; the analysis, or lack thereof, made by the Plan's

2   fiduciaries of Deposition Exhibit 139; and the analysis, or lack thereof, of Deposition Exhibit 24.

3   Mines Dep. 130:1-137:8, 150:1-150:20, 143:6-149:21, 154:1-158:24.  Cazzolla Dep. 33:8-38:6,

4   54:6-55:24, 85:23-87:12, 103:16-104:16, 106:19-121:10, 147:6-149:11, 159:4-166:21, 202:7-

5   203:15.  Bodenstein Dep. 48:22-53:3, 68:8-78:7, 108:25-109:24, 123:7-128:10, 142:11-142:18.

6   Daly Dep. 65:20-66:6, 69:14-69:25.  Mr. Hommel testified about the information that North Star

7   received regarding the extent of the company's asbestos liabilities in 1998 and 1999, and about

8   whether these liabilities were taken into account in valuation reports.  Hommel Dep. 167:11-

9   168:10, 179:3-185:7, 199:16-209:25, 238:1-241:4.  Plaintiffs further incorporate by reference

10  their responses to Interrogatories Nos. 4-6 and 11-13 served by KMH.  Plaintiffs are unable to

11  state further facts and identify further documents without revealing information protected by the

12  attorney work-product doctrine, and on that basis will not further respond.

13  **INTERROGATORY NO. 10:**

14          STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

15  COMPLAINT that the Fiduciary DEFENDANTS failed "adequately to consider that the status of

16  KMH Series 1 and Series P stock as "tracking stock" affected its value."

17  **RESPONSE TO INTERROGATORY NO. 10:**

18          Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

19  this interrogatory on the ground that it is compound.  Plaintiffs further object to this interrogatory

20  as compound, overbroad and unduly burdensome by virtue of its inclusion of the terms "STATE

21  ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound, overbroad and

22  unduly burdensome, as described in the General Objections above.  Plaintiffs further object to

23  this Interrogatory as premature, unduly burdensome, harassing, oppressive, and abusive of the

24  discovery process on the grounds that it constitutes an improper contention interrogatory and that

25  investigation and discovery in this case are ongoing.  Plaintiffs further object to this Interrogatory

26  on the ground that it seeks the identity of, facts known by, and opinions held by Plaintiffs'

27  consulting, non-testifying experts.  Such information is shielded from disclosure by Fed. R. Civ.

28  P.26(b)(4)(B) and the attorney work product privilege.  Plaintiffs further object to this

1  Interrogatory on the ground that it seeks communications, information, or documents that are
2  protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs
3  further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,
4  oppressive, and abusive of the discovery process because it requests production of information
5  and documents equally available to Defendant because Defendant has equal access to all
6  documents produced by all parties to this action and by third parties, and has equal access to all
7  transcripts of depositions taken by any party in this action. Any further description of the
8  documents and information responsive to this Interrogatory would require revelation of
9  attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions
10 regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney
11 work product doctrine. Plaintiffs further object to this Interrogatory as duplicative of
12 Interrogatories Nos. 5, 7, 12, and 14 served by the KMH ESOP Committee and therefore
13 particularly burdensome, harassing, oppressive, and abusive of the discovery process. Plaintiffs
14 do not waive any other objection that may apply.

15      Subject to and without waiving the foregoing objections and their right to supplement any
16 answers as further facts are discovered or to rely upon facts not described in this response,
17 Plaintiffs provide the following response: As to the Series P stock, Plaintiffs identify Deposition
18 Exhs. 9 and 55. Further, Messrs. Stritmatter, Ferrari, and Cristiano all testified regarding the
19 analysis, or lack thereof, made by the Plan's fiduciaries of the Mr. Brooks's valuation report
20 prepared in connection with the purchase of KMH Series P stock by the Paint Plan. Stritmatter
21 Dep. 216:9-217:3. Ferrari Dep. 235:5-244:11. Cristiano Dep. 162:14-15, 178:4-180:12, 184:5-
22 186:4, 191:10-195:20. As to the Series I stock, Plaintiffs identify Deposition Exh. 18 and
23 testimony regarding Exh. 18 by Mr. Bodenstein. Bodenstein Dep. 111:3-123:6. Further, Messrs.
24 Mines, Cazzolla, and Bodenstein, and Ms. Daly all testified regarding the analysis, or lack
25 thereof, made by the Plan's fiduciaries of Deposition Exhibit 18; the analysis, or lack thereof,
26 made by the Plan's fiduciaries of Deposition Exhibit 139; and the analysis, or lack thereof, of
27 Deposition Exhibit 24. Mines Dep. 143:6-149:21, 154:1-158:24. Cazzolla Dep. 106:19-121:10,
28 147:6-149:11, 159:4-166:21, 202:7-203:15. Bodenstein Dep. 123:7-128:10, 142:11-142:18.

1    Daly Dep. 65:20-66:6, 69:14-69:25. Plaintiffs further incorporate by reference their responses to

2    Interrogatories Nos. 5, 7, 12, and 14 served by KMH. Plaintiffs are unable to state further facts

3    and identify further documents without revealing information protected by the attorney work-

4    product doctrine, and on that basis will not further respond.

5    **INTERROGATORY NO. 11:**

6          STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

7    COMPLAINT that the Fiduciary DEFENDANTS overvalued "the KMH stock purchased from

8    Defendant Moore Trust by the KMH Plan in October 1998 and October 1999."

9    **RESPONSE TO INTERROGATORY NO. 11:**

10         Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

11   this interrogatory on the ground that it is compound. Plaintiffs further object to this interrogatory

12   as compound, overbroad and unduly burdensome by virtue of its inclusion of the terms "STATE

13   ALL FACTS" and "CONCERNING," to which Plaintiffs object as compound, overbroad and

14   unduly burdensome, as described in the General Objections above. Plaintiffs further object to

15   this Interrogatory as premature, unduly burdensome, harassing, oppressive, and abusive of the

16   discovery process on the grounds that it constitutes an improper contention interrogatory and that

17   investigation and discovery in this case are ongoing. Plaintiffs further object to this Interrogatory

18   on the ground that it seeks the identity of, facts known by, and opinions held by Plaintiffs'

19   consulting, non-testifying experts. Such information is shielded from disclosure by Fed. R. Civ.

20   P.26(b)(4)(B) and the attorney work product privilege. Plaintiffs further object to this

21   Interrogatory on the ground that it seeks communications, information, or documents that are

22   protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs

23   further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,

24   oppressive, and abusive of the discovery process because it requests production of information

25   and documents equally available to Defendant because Defendant has equal access to all

26   documents produced by all parties to this action and by third parties, and has equal access to all

27   transcripts of depositions taken by any party in this action. Any further description of the

28   documents and information responsive to this Interrogatory would require revelation of

1  attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions

2  regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney

3  work product doctrine. Plaintiffs further object to this Interrogatory as duplicative of

4  Interrogatory No. 21 served by the KMH ESOP Committee and therefore particularly

5  burdensome, harassing, oppressive, and abusive of the discovery process. Plaintiffs do not waive

6  any other objection that may apply.

7        Subject to and without waiving the foregoing objections and their right to supplement any

8  answers as further facts are discovered or to rely upon facts not described in this response,

9  Plaintiffs provide the following response:  Plaintiffs incorporate by reference their response to

10  Interrogatory No. 21 served by KMH.  Plaintiffs are unable to respond to this interrogatory

11  without revealing attorney work product or prematurely disclosing expert testimony, and on that

12  ground will not respond further.  Plaintiffs will disclose expert reports in accordance with the

13  Court's pre-trial scheduling order.  After meeting and conferring on this issue, the parties agree

14  that Plaintiffs need not supplement their response to this Interrogatory because it would involve

15  premature disclosure of expert testimony.

16  **INTERROGATORY NO. 12:**

17        STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

18  COMPLAINT that the Fiduciary DEFENDANTS violated "the terms of the plan DOCUMENT

19  of the KMH Plan by refusing to redeem Plaintiff Smith's put option on the schedule established

20  by the Plan."

21  **RESPONSE TO INTERROGATORY NO. 12:**

22        Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

23  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

24  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

25  compound, overbroad and unduly burdensome, as described in the General Objections above.

26  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

27  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

28  contention interrogatory and that investigation and discovery in this case are ongoing.  Plaintiffs

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                          Page 24

1  further object to this Interrogatory on the ground that it seeks communications, information, or

2  documents that are protected by the attorney-client privilege and/or the attorney work product

3  doctrine. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

4  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

5  production of information and documents equally available to Defendant because Defendant has

6  equal access to all documents produced by all parties to this action and by third parties, and has

7  equal access to all transcripts of depositions taken by any party in this action. Any further

8  description of the documents and information responsive to this Interrogatory would require

9  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

10  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

11  attorney work product doctrine. Plaintiffs do not waive any other objection that may apply.

12       Subject to and without waiving the foregoing objections and their right to supplement any

13  answers as further facts are discovered or to rely upon facts not described in this response,

14  Plaintiffs provide the following response: Plaintiffs identify Deposition Exhs. 65, 66, 67, and

15  152, various versions of the KMH Plan document and Summary Plan Description, which speak

16  for themselves. Plaintiff Smith testified at her deposition to the facts surrounding her attempt to

17  exercise her put option and the company's refusal to do so. Smith Dep. 22:13-29:15, 51:11-

18  52:20, 69:7-23, 79:6-15, 150:5-151:3. Plaintiffs further identify Deposition Exh. 169. Plaintiffs

19  are unable to state further facts and identify further documents without revealing information

20  protected by the attorney work-product doctrine, and on that basis will not further respond.

21  **INTERROGATORY NO. 13:**

22       STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

23  COMPLAINT that the "DEFENDANTS' repeated failures to seek a refund of the Paint Plan's

24  overpayment for KMH Series P stock at any time between 1998 and the present constitute part of

25  the 1998 prohibited transaction."

26  **RESPONSE TO INTERROGATORY NO. 13:**

27       Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

28  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

1  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

2  compound, overbroad and unduly burdensome, as described in the General Objections above.

3  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

4  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

5  contention interrogatory and that investigation and discovery in this case are ongoing.  Plaintiffs

6  further object to this Interrogatory on the ground that it seeks communications, information, or

7  documents that are protected by the attorney-client privilege and/or the attorney work product

8  doctrine.  Plaintiffs further object to this Interrogatory on the grounds that it is unduly

9  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

10  production of information and documents equally available to Defendant because Defendant has

11  equal access to all documents produced by all parties to this action and by third parties, and has

12  equal access to all transcripts of depositions taken by any party in this action.  Any further

13  description of the documents and information responsive to this Interrogatory would require

14  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

15  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

16  attorney work product doctrine.  Plaintiffs do not waive any other objection that may apply.

17          Subject to and without waiving the foregoing objections and their right to supplement any

18  answers as further facts are discovered or to rely upon facts not described in this response,

19  Plaintiffs provide the following response:  Plaintiffs incorporate by reference their response to

20  Interrogatory No. 23 served by KMH. Mr. Hommel, Mr. Stritmatter and Mr. Cazzolla testified

21  regarding the actions, or lack thereof, taken by North Star Trust to investigate and cure the

22  breaches of fiduciary duty and prohibited transactions.  Hommel Dep. 261:24-286:2.  Stritmatter

23  Dep. 146:22-147:10.  Cazzolla Dep. 184:1-25.

24  **INTERROGATORY NO. 14:**

25          STATE ALL FACTS CONCERNING YOUR contention in paragraph 67 of the

26  COMPLAINT that the "DEFENDANTS' repeated failures to seek a refund of the KMH Plan's

27  overpayment for KMH Series I stock at any time between 1999 and the present constitute part of

28  the 1999 prohibited transaction."

1  **RESPONSE TO INTERROGATORY NO. 14:**

2       Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

3  this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

4  the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

5  compound, overbroad and unduly burdensome, as described in the General Objections above.

6  Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

7  oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

8  contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

9  further object to this Interrogatory on the ground that it seeks communications, information, or

10  documents that are protected by the attorney-client privilege and/or the attorney work product

11  doctrine. Plaintiffs further object to this Interrogatory on the grounds that it is unduly

12  burdensome, harassing, oppressive, and abusive of the discovery process because it requests

13  production of information and documents equally available to Defendant because Defendant has

14  equal access to all documents produced by all parties to this action and by third parties, and has

15  equal access to all transcripts of depositions taken by any party in this action. Any further

16  description of the documents and information responsive to this Interrogatory would require

17  revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and

18  opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the

19  attorney work product doctrine. Plaintiffs do not waive any other objection that may apply.

20       Subject to and without waiving the foregoing objections and their right to supplement any

21  answers as further facts are discovered or to rely upon facts not described in this response,

22  Plaintiffs provide the following response: Plaintiffs incorporate by reference their response to

23  Interrogatory No. 23 served by KMH. Messrs. Hommel, Stritmatter, and Cazzolla testified

24  regarding the actions, or lack thereof, taken by North Star Trust to investigate and cure the

25  breaches of fiduciary duty and prohibited transactions. Hommel Dep. 261:24-286:2. Stritmatter

26  Dep. 146:22-147:10. Cazzolla Dep. 184:1-25.

27  **INTERROGATORY NO. 15:**

28       If YOU contend that any Defendant Fiduciary is "liable as a co-fiduciary" under any of

1    the circumstances provided for in paragraphs 68 and 82 of the COMPLAINT, STATE ALL

2    FACTS CONCERNING YOUR contention.

3    **RESPONSE TO INTERROGATORY NO. 15:**

4         Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

5    this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

6    the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

7    compound, overbroad and unduly burdensome, as described in the General Objections above.

8    Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

9    oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

10   contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

11   further object to this Interrogatory on the ground that it seeks communications, information, or

12   documents that are protected by the attorney-client privilege and/or the attorney work product

13   doctrine. Plaintiffs further object to this interrogatory on the ground that it is unintelligible

14   because it asks for Plaintiffs' contentions regarding an excerpt of the COMPLAINT that contains

15   a pure quote of ERISA. Plaintiffs further object to this interrogatory on the ground that it is

16   compound. Plaintiffs further object to this interrogatory on the ground that it is compound

17   because it asks Plaintiffs to identify contentions and every single fact concerning any such

18   contentions with respect to several different subsections of the statute quoted in the referenced

19   paragraphs. Plaintiffs further object to this interrogatory on the ground that it improperly calls

20   for a statement of pure law.

21        Subject to and without waiving the foregoing objections and their right to supplement any

22   answers as further facts are discovered or to rely upon facts not described in this response,

23   Plaintiffs provide the following response: KMH's breaches of fiduciary duty and prohibited

24   transactions are set forth in Interrogatory No. 6, and in Interrogatory No. 24 served by North Star,

25   and KMH is a co-fiduciary because the company was knowledgeable through its officers about

26   the acts or failure to act stated therein. The company participated knowingly in the breaches and

27   prohibited transactions; the company enabled its officers to commit a breach; and the company

28   did not prevent or make reasonable efforts to remedy the breach.

1    North Star is liable as a successor fiduciary, as expressed in Interrogatory No. 24 served

2    by North Star. KMH is also liable as a co-fiduciary for North Star's breaches of fiduciary duty

3    because the company knowingly participated in the breaches, and did not prevent or make

4    reasonable efforts to remedy the breach. Desiree Moore is also liable as a co-fiduciary for the

5    breaches of fiduciary duty committed by Mr. Moore and the other fiduciaries of the ESOP as

6    described in response to Interrogatory No. 6 above, because she knowingly participated in the

7    breaches, enabled the other fiduciaries to commit the breaches, and did not prevent or make

8    reasonable efforts to remedy the breaches.

9    **INTERROGATORY NO. 16:**

10    STATE ALL FACTS CONCERNING YOUR contention in paragraph 74 of the

11    COMPLAINT that "DEFENDANTS engaged in a prohibited transaction in violation of ERISA

12    §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b) by failing to ensure that the Paint Plan paid fair market

13    value for the Series P stock of KMH held by the Moore Trust on October 13, 1998."

14    **RESPONSE TO INTERROGATORY NO. 16:**

15    This interrogatory was withdrawn on May 5, 2008, pursuant to agreement of the parties.

16    On that basis, Plaintiffs will not respond to this interrogatory.

17    **INTERROGATORY NO. 17:**

18    STATE ALL FACTS CONCERNING YOUR contention in paragraph 74 of the

19    COMPLAINT that "DEFENDANTS failed to conduct an independent and prudent investigation

20    into the fair market price before entering into the stock purchase agreement with Defendant

21    Moore Trust" in regard to the October 13, 1998 transaction."

22    **RESPONSE TO INTERROGATORY NO. 17:**

23    This interrogatory was withdrawn on May 5, 2008, pursuant to agreement of the parties.

24    On that basis, Plaintiffs will not respond to this interrogatory.

25    **INTERROGATORY NO. 18:**

26    STATE ALL FACTS CONCERNING YOUR contention in paragraph 74 of the

27    COMPLAINT that "DEFENDANTS could have cured the prohibited transaction at any time

28    since October 13, 1998, by securing an independent valuation of KMH Series P stock as of

1   October 13, 1998, and seeking a refund from the Moore Trust and the Successor Trusts of any

2   amount by which such valuation determined the Paint Plan overpaid the Moore Trust."

3   **RESPONSE TO INTERROGATORY NO. 18:**

4     Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

5   this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

6   the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

7   compound, overbroad and unduly burdensome, as described in the General Objections above.

8   Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

9   oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

10  contention interrogatory and that investigation and discovery in this case are ongoing.  Plaintiffs

11  further object to this Interrogatory on the ground that it seeks communications, information, or

12  documents that are protected by the attorney-client privilege and/or the attorney work product

13  doctrine.  Plaintiffs further object to this Interrogatory on the ground that it seeks the identity of,

14  facts known by, and opinions held by Plaintiffs' consulting, non-testifying experts.  Such

15  information is shielded from disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work

16  product privilege.  Plaintiffs further object to this Interrogatory as duplicative of Interrogatory

17  No. 23 served by the KMH ESOP Committee and therefore particularly burdensome, harassing,

18  oppressive, and abusive of the discovery process.  Plaintiffs further object to this Interrogatory on

19  the grounds that it is unduly burdensome, harassing, oppressive, and abusive of the discovery

20  process because it requests production of information and documents equally available to

21  Defendant because Defendant has equal access to all documents produced by all parties to this

22  action and by third parties, and has equal access to all transcripts of depositions taken by any

23  party in this action.  Any further description of the documents and information responsive to this

24  Interrogatory would require revelation of attorneys' mental impressions, strategies, analysis of

25  documents and testimony, and opinions regarding those materials' role in the proof of Plaintiffs'

26  case, which is protected by the attorney work product doctrine.  Plaintiffs further object to this

27  interrogatory as vague and ambiguous, overbroad, and unduly burdensome because it purports to

28  require Plaintiffs to provide each and every fact concerning a hypothetical ability of Defendants.

1    Such a complete statement is impossible and would encompass information far beyond that

2    relevant to any claim or defense in this action.  Plaintiffs do not waive any other objection that

3    may apply.

4         Subject to and without waiving the foregoing objections and their right to supplement any

5    answers as further facts are discovered or to rely upon facts not described in this response,

6    Plaintiffs provide the following response:  Messrs. Stritmatter, Cazzolla, Mines and Hommel

7    testified regarding the actions, or lack thereof, taken by the Plan's fiduciaries to cure the breaches

8    of fiduciary duty and prohibited transactions by seeking a refund of amounts overpaid by the

9    Plan.  Stritmatter Dep. 216:9-217:3.  Cazzolla Dep. 184:1-25.  Mines Dep. 236:1-236:4.

10   Hommel Dep. 261:24-286:2.  Plaintiffs further incorporate by reference their response to

11   Interrogatory No. 23 served by KMH.  Plaintiffs are unable to state further facts and identify

12   further documents without revealing information protected by the attorney work-product

13   doctrine, and on that basis will not further respond.

14   **INTERROGATORY NO. 19:**

15        STATE ALL FACTS CONCERNING YOUR contention in paragraph 75 of the

16   COMPLAINT that "DEFENDANTS engaged in a prohibited transaction in violation of ERISA

17   §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b) by failing to ensure that the KMH Plan paid fair market

18   value for the Series I stock of KMH held by the Moore Trust on October 13, 1999."

19   **RESPONSE TO INTERROGATORY NO. 19:**

20        This interrogatory was withdrawn on May 5, 2008, pursuant to agreement of the parties.

21   On that basis, Plaintiffs will not respond to this interrogatory.

22   **INTERROGATORY NO. 20:**

23        STATE ALL FACTS CONCERNING YOUR contention in paragraph 75 of the

24   COMPLAINT that "DEFENDANTS could have cured the prohibited transaction at any time

25   since October 13, 1999, by securing an independent valuation of KMH Series I stock as of

26   October 13, 1999, and seeking a refund from the Moore Trust and the Successor Trusts of any

27   amount by which such valuation determined the KMH Plan overpaid the Moore Trust."

28   **RESPONSE TO INTERROGATORY NO. 20:**

1    Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to
2    this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of
3    the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as
4    compound, overbroad and unduly burdensome, as described in the General Objections above.
5    Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,
6    oppressive, and abusive of the discovery process on the grounds that it constitutes an improper
7    contention interrogatory and that investigation and discovery in this case are ongoing.  Plaintiffs
8    further object to this Interrogatory on the ground that it seeks communications, information, or
9    documents that are protected by the attorney-client privilege and/or the attorney work product
10   doctrine.  Plaintiffs further object to this Interrogatory on the ground that it seeks the identity of,
11   facts known by, and opinions held by Plaintiffs' consulting, non-testifying experts.  Such
12   information is shielded from disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work
13   product privilege.  Plaintiffs further object to this Interrogatory on the grounds that it is unduly
14   burdensome, harassing, oppressive, and abusive of the discovery process because it requests
15   production of information and documents equally available to Defendant because Defendant has
16   equal access to all documents produced by all parties to this action and by third parties, and has
17   equal access to all transcripts of depositions taken by any party in this action.  Any further
18   description of the documents and information responsive to this Interrogatory would require
19   revelation of attorneys' mental impressions, strategies, analysis of documents and testimony, and
20   opinions regarding those materials' role in the proof of Plaintiffs' case, which is protected by the
21   attorney work product doctrine.  Plaintiffs further object to this Interrogatory as duplicative of
22   Interrogatory No. 23 served by the KMH ESOP Committee and therefore particularly
23   burdensome, harassing, oppressive, and abusive of the discovery process.  Plaintiffs further
24   object to this interrogatory as vague and ambiguous, overbroad, and unduly burdensome because
25   it purports to require Plaintiffs to provide each and every fact concerning a hypothetical ability of
26   Defendants.  Such a complete statement is impossible and would encompass information far
27   beyond that relevant to any claim or defense in this action.  Plaintiffs do not waive any other
28   objection that may apply.

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]                                    Page 32

1    Subject to and without waiving the foregoing objections and their right to supplement any

2    answers as further facts are discovered or to rely upon facts not described in this response,

3    Plaintiffs provide the following response:  Plaintiffs believe the transaction referenced in the

4    interrogatory was completed on October 18, 1999.  Messrs. Stritmatter,, Cazzolla, Mines and

5    Hommel testified regarding the actions, or lack thereof, taken by the Plan's fiduciaries to cure the

6    breaches of fiduciary duty and prohibited transactions by seeking a refund of amounts overpaid

7    by the Plan.  Stritmatter Dep. 146:22-147:10.  Cazzolla Dep. 184:1-25.  Mines Dep. 236:1-236:4.

8    Hommel Dep. 261:24-286:2.  Plaintiffs further incorporate by reference their response to

9    Interrogatory No. 23 served by KMH.  Plaintiffs are unable to state further facts and identify

10   further documents without revealing information protected by the attorney work-product

11   doctrine, and on that basis will not further respond.

12   **INTERROGATORY NO. 21:**

13       STATE ALL FACTS CONCERNING YOUR contention in paragraphs 69 and 81 of the

14   COMPLAINT that "Defendant Fiduciaries' actions caused millions of dollars of losses to the

15   Plan...."

16   **RESPONSE TO INTERROGATORY NO. 21:**

17       Plaintiffs incorporate their general objections by reference.  Plaintiffs further object to

18   this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

19   the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

20   compound, overbroad and unduly burdensome, as described in the General Objections above.

21   Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

22   oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

23   contention interrogatory and that investigation and discovery in this case are ongoing.    Plaintiffs

24   further object to this interrogatory on the ground that it is vague and ambiguous and incomplete

25   in itself by virtue of its incomplete quote of the sentences it references from the COMPLAINT,

26   which state that the amount will be proven more specifically at trial.  Plaintiffs further object to

27   this Interrogatory on the ground that it seeks communications, information, or documents that are

28   protected by the attorney-client privilege and/or the attorney work product doctrine.  Plaintiffs

1    further object to this Interrogatory on the ground that it seeks the identity of, facts known by, and

2    opinions held by Plaintiffs' consulting, non-testifying experts. Such information is shielded from

3    disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work product privilege. Plaintiffs

4    further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,

5    oppressive, and abusive of the discovery process because it requests production of information

6    and documents equally available to Defendant because Defendant has equal access to all

7    documents produced by all parties to this action and by third parties, and has equal access to all

8    transcripts of depositions taken by any party in this action. Any further description of the

9    documents and information responsive to this Interrogatory would require revelation of

10   attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions

11   regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney

12   work product doctrine. Plaintiffs do not waive any other objection that may apply.

13          Subject to and without waiving the foregoing objections and their right to supplement any

14   answers as further facts are discovered or to rely upon facts not described in this response,

15   Plaintiffs provide the following response: Plaintiffs are unable to respond to this interrogatory

16   without revealing attorney work product or prematurely disclosing expert testimony, and on that

17   ground will not respond further. Plaintiffs will disclose expert reports in accordance with the

18   Court's pre-trial scheduling order.

19   **INTERROGATORY NO. 22:**

20          STATE ALL FACTS CONCERNING YOUR contention in paragraphs 69 and 81 of the

21   COMPLAINT that "Defendant Moore Trust and DEFENDANTS Successor Trusts have profited

22   . . . from the prohibited transactions by receiving more than fair market value for the KMH stock.

23   . . ."

24   **RESPONSE TO INTERROGATORY NO. 22:**

25          Plaintiffs incorporate their general objections by reference. Plaintiffs further object to

26   this interrogatory as compound, overbroad and unduly burdensome by virtue of its inclusion of

27   the terms "STATE ALL FACTS" and "CONCERNING," to which Plaintiffs object as

28   compound, overbroad and unduly burdensome, as described in the General Objections above.

1   Plaintiffs further object to this Interrogatory as premature, unduly burdensome, harassing,

2   oppressive, and abusive of the discovery process on the grounds that it constitutes an improper

3   contention interrogatory and that investigation and discovery in this case are ongoing. Plaintiffs

4   further object to this interrogatory on the ground that it is vague and ambiguous and incomplete

5   in itself by virtue of its incomplete quote of the sentence it references from the COMPLAINT,

6   which states that the amount will be proven more specifically at trial. Plaintiffs further object to

7   this Interrogatory on the ground that it seeks communications, information, or documents that are

8   protected by the attorney-client privilege and/or the attorney work product doctrine. Plaintiffs

9   further object to this Interrogatory on the ground that it seeks the identity of, facts known by, and

10  opinions held by Plaintiffs' consulting, non-testifying experts. Such information is shielded from

11  disclosure by Fed. R. Civ. P.26(b)(4)(B) and the attorney work product privilege. Plaintiffs

12  further object to this Interrogatory on the grounds that it is unduly burdensome, harassing,

13  oppressive, and abusive of the discovery process because it requests production of information

14  and documents equally available to Defendant because Defendant has equal access to all

15  documents produced by all parties to this action and by third parties, and has equal access to all

16  transcripts of depositions taken by any party in this action. Any further description of the

17  documents and information responsive to this Interrogatory would require revelation of

18  attorneys' mental impressions, strategies, analysis of documents and testimony, and opinions

19  regarding those materials' role in the proof of Plaintiffs' case, which is protected by the attorney

20  work product doctrine. Plaintiffs do not waive any other objection that may apply.

21        Subject to and without waiving the foregoing objections and their right to supplement any

22  answers as further facts are discovered or to rely upon facts not described in this response,

23  Plaintiffs provide the following response: When Defendant Moore Trust received more than fair

24  market value for KMH stock, it profited at the expense of the Plan, because it unfairly received

25  more value in the transaction than the Plan did. The Moore Trust profited further by investing

26  the extra money received in corporate bonds, which have increased in value. Upon Mr. Moore's

27  death, the Moore Trust's assets received from the Plan transaction were transferred to the

28  Successor Trusts, thereby transferring the profit as well. On information and belief, the

1   Successor Trusts have continued to earn further profits on the investment in corporate bonds of

2   the additional amounts over fair market value that the Plans paid. Plaintiffs are unable to

3   respond further to this interrogatory without revealing attorney work product or prematurely

4   disclosing expert testimony, and on that ground will not respond further. Plaintiffs will disclose

5   expert reports in accordance with the Court's pre-trial scheduling order.

6

7

8   Dated:    June 12, 2008          LEWIS, FEINBERG, LEE,
                                      RENAKER & JACKSON, P.C.
9
                                      By:    _Margo Hasselman_
10                                           Margo Hasselman

11                                    Daniel Feinberg
                                      Todd F. Jackson
12                                    Margaret E. Hasselman
                                      Nina R. Wasow
13                                    Kirsten G. Scott
                                      LEWIS, FEINBERG, LEE,
14                                    RENAKER & JACKSON, P.C.
                                      1330 Broadway, Suite 1800
15                                    Oakland, CA 94612
                                      Telephone: (510) 839-6824
16                                    Facsimile: (510) 839-7839

17                                    Peter Rukin – CA State Bar No. 178336
                                      RUKIN HYLAND DORIA
18                                    & TINDALL LLP
                                      100 Pine Street, Suite 725
19                                    San Francisco, CA
                                      Telephone: (415) 421-1800
20                                    Facsimile: (415) 421-1700
                                      Email: peterrukin@rhddlaw.com
21
                                      *Attorneys for Plaintiffs*
22                                    *and the Proposed Class*

23

24

25

26

27

28

1

# PROOF OF SERVICE

2      I, Vickie Martin, declare:

3      My business address is 1330 Broadway, Suite 1800, Oakland, California 94612. I am

4 over the age of 18 years and not a party to the above-entitled action.

5      On June 12, 2008, I served:

6      **PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES TO DEFENDANT K-M**
**INDUSTRIES HOLDING CO., INC. ESOP PLAN COMMITTEE'S FIRST SET**
7      **OF INTERROGATORIES TO PLAINTIFFS**

8 on the persons listed below by electronic mail and by placing a true and correct copy thereof in a

9 United States Postal Service Mail Box, with First Class with postage prepaid, addressed as

10 follows:

11  Ronald Lovitt
    J. Thomas Hannan                          Nicole A. Diller
12  Henry I. Bornstein                         Don Sullivan
    LOVITT & HANNAN, INC.                      Andrew C. Sullivan
13  900 Front Street, Suite 300                MORGAN, LEWIS & BOCKIUS LLP
    San Francisco, CA 94111                    One Market, Spear Street Tower
14  Telephone: 415-362-8769                    San Francisco, CA 94105
    Facsimile: 415-362-7528                    Telephone: 415-442-1000
15  E-mail:rl@lh-sf.com, jth@lh-sf.com, hib@lh-   Facsimile: 415-442-1001
    sf.com                                     E-mail:ndiller@morganlewis.com,
16                                             dpsullivan@morganlewis.com,
                                               asullivan@morganlewis.com
    Robert L. Palmer
17  Lauren A. Smith
    Caroline Walters
18  Paul B. Derby
    Allison K. Chock
19  HENNIGAN, BENNETT & DORMAN LLP
    865 South Figueroa Street, Suite 2900
20  Los Angeles, CA 90017
    Telephone: 213-694-1200
21  Facsimile: 213-694-1234
    E-mail: Palmer@hbdlawyers.com,
22  SmithL@hbdlawyers.com,
    WaltersC@hbdlawyers.com,
23  DerbyP@hbdlawyers.com,
    ChockA@hbdlawyers.com
24
    **Attorneys for Defendants**
25
       I declare under penalty of perjury that the foregoing is true and correct. Executed on June
26
    12, 2008, at Oakland, California.
27
28
                                               Vickie Martin

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO K-M INDUSTRIES ESOP PLAN COMMITTEE'S FIRST
INTERROGATORIES [CASE NO. C-06-07339 CW]

# EXHIBIT 78
# TO DILLER DECLARATION




ESOP

EMPLOYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

Volume II, Issue 4                                    December, 2000

Mind Our Own Business is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## THE LITTLE THINGS ALSO AFFECT PROFITS

Providing high quality products, providing great service and working hard and smart are probably some of the main items that affect profit. But the little things are important also. Here is a list of items to keep in mind when doing our daily jobs:

- Work to eliminate waste whether it is mistinted paint or wasted paper.
- Continue to promote an injury free atmosphere, ensuring that safety has a high priority. Every injury not only hurts Employee Owners, but also our profits.
- Save on utility bills by turning off lights when not in use, turning down the heat or air conditioning when not needed and repairing leaking water valves.
- Make quality repairs to reduce the expense associated with repeat failures of store, factory and computer equipment.
- Watch cellular phone usage and stay under the maximum allowed time for a given cell phone package or consider a change in the cell phone package.
- Consider avoiding flying on expensive non-stop flights and instead take one-stop flights to significantly reduce travel expenses.
- Process invoices quickly so that discounts can be taken and late charges will not be incurred.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through November of 2000 including the Kelly-Moore Ponderosa acquisition are up approximately 6% over the same period in 1999. Sales excluding our Kelly-Moore Ponderosa acquisition are only up approximately 2% over the same period in 1999. Remember everything that you do including how you service your external or internal customers may help with one more sale. Increasing sales is one key way to increase profits.

## NEW STORES

Opened since the last report were Edmond, Oklahoma, Longmont, Colorado and Lewisville, Texas. With the purchase of assets of Kingsland Paint and Decorating on November 22, we now have a new store in Kingsland, Texas, east of Austin. This gives us 159 stores currently. Other locations where we have purchased property this year and will open stores in 2001 include Napa, CA, Elk Grove, CA, and Sonora, CA.

EXHIBIT

_188_

Thomas    4-18-08

KMH 000093



## SHARE VALUE

Kelly-Moore's stock price may go up and down based on many things. Among other things, the appraiser looks at current profits, potential profits, asset and debt levels, and market valuation of other paint companies and other items. Currently the stock price of our competitors has gone down significantly which may affect our stock price when the appraiser does the valuation. Included in the last issue of **Mind Our Own Business** was an installment adding to what has previously been discussed on how stocks are valued. You may want to peruse this article again as many of the items mentioned can affect Kelly-Moore stock value.

## 401K AND ESOP

We believe that dividends will be able to be used again in 2001, and that contributions this year to the 401k plan up to at least 10% is not expected to have an effect on your ESOP contribution. This may change in future years as contributions to the 401k plan may limit your ESOP contribution. Any changes during 2001 to your 401k plan contribution percentage should be sent in to Corporate Personnel.

## SUMMARY RECAP OF PLAN PROVISIONS

The primary purpose of the ESOP is to enable all non-bargaining unit employees to share in the growth and prosperity of Kelly-Moore and to provide Participants with an opportunity to accumulate capital for their retirement needs. The plan is designed to do this at no cost to the employee, whatsoever. Each year the Company may make contributions out of available profits to the plan. Your ESOP accounts will be increased by your share of the Company's contribution and your share of forfeitures from the accounts of Employees who leave before they are fully vested. The stock price will gain or lose value, as determined by an outside appraiser based on many items as discussed above.

Specific Provisions:

- Eligibility requirements: 1000 Hours of service during the Calendar Year.
- Requirement for Allocation of Employer Contribution: 1000 hours of Service during the Calendar Year.
- Year of Credited Service: All years of employment with Kelly-Moore in which the Employee completed 1000 or more Hours of Service after December 31, 1995.
- Vesting: Vesting refers to the percentage of your account that cannot be forfeited upon termination. Vesting schedule is as follows: Years of Credited Service – 1 year is 0% vested, 2 years is 0% vested, 3 years is 20% vested, 4 years is 40% vested, 5 years is 60% vested, 6 years is 80% vested, and 7 years is 100% vested.

Please refer to your Summary Plan Description for more definitive information.

**EXHIBITS 79-88**
**TO DILLER DECLARATION**

# EXHIBIT 79
# TO DILLER DECLARATION



**ESOP**

\_OYEE STOCK OWNERSHIP PLAN



**KELLY-MOORE PAINTS™**

# MIND OUR OWN BUSINESS

Volume III, Issue 1                                          May, 2001

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ENERGY ISSUES AFFECT YOU AND YOUR COMPANY

Energy costs are up significantly at Kelly-Moore. This cost category shows the second largest cost increase in 2001 behind employee wage expense. In addition, in California we expect to have severe power shortages that will probably require some conservation measures this summer. Many of you have been challenged to come up with creative ways to save energy. Some of those ways in California may even include, for example, turning off half the lights or severely reducing or turning off the Air Conditioning during peak periods. Attached is a list of additional items that can be considered if applicable, to save energy costs anywhere in the Company. Any dollar saved on an energy bill can increase profits and potentially have an effect on the stock price.

## STRIKE TEAMS VISIT KELLY-MOORE STORES

Kelly-Moore created Strike Teams where employees from various areas of the Company have gone to stores that were in a loss position in 2000 to help turn these losses to profits. Initial visits have occurred and reports and suggestions for profits have been submitted. Now it is time to make sure all of the worthwhile suggestions get appropriately implemented so that we see the losses turn into profits. You can assist by 1) helping out at your store while one of your store members is away on a future strike team visit, 2) Assisting a strike team if they come to your store to make their visit the most productive as possible and 3) Keeping an open mind and seriously implementing suggestions to make a store profitable. Profitability of all stores is important to all of us as ESOP shareholders.

## NEW STORES

Opened since the last report were Napa, CA in April 2001 and San Francisco-Taraval and Sonora, CA in May 2001. This gives us 161 stores currently. Sales appear to be brisk at these new locations. Increased sales will hopefully bring increased profits to these areas. Currently we are working to open a store in Elk Grove, CA late this summer.

**EXHIBIT**
*189*
Thomas    4-18-08

KMH 000095

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through December of 2000 including the Kelly-Moore Ponderosa acquisition were up approximately 5% over the same period in 1999. Sales on the rest of the Company without counting our Kelly-Moore Ponderosa acquisition were only up approximately 1% over the same period in 1999. Operating Profit (profit before interest, taxes and ESOP contribution) in 2000 was down by about 17% from 1999. Reasons for the profit decline included: 1) Declining sales at the end of the year, 2) Kelly-Moore Ponderosa Division that didn't yet have margins and profits up to K-M Standards, 3) Pricing and Inventory issues at the Desert District and Guam and 4) Loss stores continued drag on profits. Remember that profits are one of the key items that affect your share price. Other items that may also affect your share price include valuations of other paint companies, our asset and debt levels and product liability issues such as asbestos litigation. Through March 2001, sales are up about 7% including Kelly-Moore Ponderosa. Sales on the remainder of Kelly-Moore without Kelly-Moore Ponderosa is up only about 1%. You can make a difference whether it is on energy usage, bringing in one more sale, or being on strike teams or supporting your team members that are on strike teams helping other stores.

## 2000 STATEMENTS

We continue to work on the many documents required to get the yearly ESOP statements out. We expect statements to be out summer, 2001. Remember that we expect to use dividends again in 2001, and that contributions in 2001 to the 401k Plan of up to 10% of your salary should not have a limiting effect on the ESOP contribution that you will get. This will change in future years, where contributions to the 401k Plan may limit your ESOP contribution.

## QUESTIONS AND ANSWERS

Question: What is the cost to the employee for the ESOP?

Answer: There is no cost to the employee. Nothing is deducted from your paycheck. The Company contribution is an amount over and above your earnings.

Question: How is my share of the ESOP contribution determined?

Answer: The contribution each year will be divided among the eligible participants in the proportion that each participant's compensation is to the total compensation of all participants.

Please send any questions that you may have to Personnel Department – ESOP at Corporate Office.

KMH 000096

THE EMPLOYEE OWNERS' PAGE

# The Long–Term It's Not What It Used to Be

The English economist John Maynard Keynes gained considerable influence by urging governments to spend more money to help ease the problems of recessions and depressions. Derided by critics who said he was elevating short-run concerns over long-term structural issues, Keynes famously retorted that "in the long run, we are all dead."

Even Keynes, however, would no doubt be shocked at how so many institutions in our economy have become focused on the extremely short-term. At the extreme are day traders, busily buying and selling stocks on the Internet looking for momentary movements to pounce on. A step above are the MSNBC types, opining endlessly (and often incorrectly) about what will happen to the stock market tomorrow, a horizon of concern that can only matter to a relative handful of investors. Then there are all the economic pundits proclaiming that the stock market is down (or up) and that we are in for a prolonged period of whichever direction that is. By prolonged, they mean the next quarter or, for the far-sighted, perhaps the next year.

It isn't just stock market types whose time perspectives have changed, though. Internet companies are born, get financed, go public, and are sold, merged, or disappear all within a few years. Employees often think that a few or several years with a company is a long tenure, although most spend much longer with their employer than they ever thought they would. Our personal lives are compressed as well. Waiting a few seconds for our computer to respond seems like an eternity. Faxes, cell phones, Federal Express, emails, and other communications tools make anything other than almost instant access seem like slow torture.

This compression of the long term raises important issues for employee ownership and employee ownership companies. Consider, for example, employees with stock options. To be sure, a small minority of the millions of employees with options work for the volatile start-up technology companies where a few years really is forever. But the large majority of option holders work for stable, mature companies.

> *ESOP participants and most option holders in most companies would be better off simply to filter out what is happening to the stock market on a day-to-day basis.*

Their options have 10-year lives, and they are likely to get more options in the future. So even if their companies' share prices drop dramatically, there is a very good chance that eventually many of their options will have some value, and/or that they will get new options at the lower price that eventually will be worth a great deal. But meanwhile, it is hard to filter out all the noise saying that options aren't worth much anymore because the market is down. In fact, only those options that are about to expire, or are priced at a multiple of the current stock price, are likely to be worthless.

For employees in ESOPs, focusing on short-term changes in stock prices, or even year-to-year fluctuations, is even more misleading. ESOP participants typically get new shares contributed every year and will not get a payout until they leave the company or can diversify part of their account balance at age 55. For them, the truly long-term is the only thing that matters unless they are near a point when they are going to be paid out. Both these ESOP participants and most option holders in most companies would be better off

simply to filter out what is happening to the stock market on a day-to-day, week-to-week, or month-to-month basis and focus instead on what is going to happen over the next year or the next several years.

This is especially true when you consider what causes a company's stock price, and the market in general, to move over the short term (days, weeks, and months) and the long term (years). Day-to-day, the market can fluctuate madly based on what Alan Greenspan had for lunch. Whole sectors on the market can go up or down because one major company reports earnings a bit above or below what people who advise investors had told them to expect. Over weeks or months, perceptions about the general direction of the economy come into play, driving most stocks up or down despite any individual company's performance. Over a matter of years, however, most of how any individual company's stock performs is a function of how much money it makes. This is true for large public companies and even more true for private companies whose stock prices are set primarily by assessments of expected future earnings.

As an employee with a long-term interest in your employer, then, unless you plan to cash out soon your focus should be on the company's performance, not the performance of the market. Most employee ownership companies (but not all, of course) are solid performers with good long-term prospects. Outside of some start-up companies, companies with less certain futures generally are poor candidates to set up employee ownership plans in the first place. So follow the market if you are curious, but follow the company if you want to really know how you'll do as an owner. NCEO

KMH 000097

# Ways to Cut Energy Use in Your Business

The energy challenge facing businesses in California affects us all. The following ways to save electricity (and therefore see savings on your energy bill) are taken from the PG&E website www.pge.com and other sources.

## Office Equipment

- Turn off PCs, monitors, printers, copiers, and lights every night and every weekend. If you can't turn off the whole computer, turn off the monitor and the printer.
- Use inkjet printers rather than laser printers to save up to 90 percent on printer energy costs.
- When purchasing PCs, monitors, printers, fax machines and copiers, consider Energy Star models that "power down" after a user-specified period of inactivity.
- If appropriate, use laptop computers -- they consume 90% less energy than standard desktop computers.
- If appropriate, use ink-jet printers -- they consume 90% less energy than laser printers.
- Implement paper reducing strategies such as double-sided printing and reusing paper.
- Use e-mail instead of sending memos and faxing documents.
- Purchase appropriately sized copiers for your company's needs.

## Lighting

- Turn out lights in empty rooms. Turn down other lighting when possible.
- Retrofit T12 lights with magnetic ballasts to T8 lights with electronic ballasts.
- Retrofit incandescent light bulbs with compact fluorescent lights.
- Consider removing excess fluorescent lights and installing reflectors.
- Install motion detectors to control lighting in frequently unoccupied areas, such as restrooms & copy rooms.
- Retrofit incandescent or fluorescent exit signs with long-lasting, low-energy LED exit signs.
- Clean dusty diffusers and lamps every 6-12 months for improved lumen output.
- Rewire restroom fans to operate with the lights.

Remember that dark walls require more power to produce the same amount of light.

## HVAC

- Consider replacing old HVAC systems with new energy-efficient systems.
- Install time clocks or setback-programmable thermostats to maximize efficiency.
- Install locking covers on your thermostats to prevent employee tampering with temperature settings.
- Clean condenser coils and replace filters regularly.
- Install blinds or solar screen shades to cool the office.
- Install reflective window film or awnings on all south-facing windows.
- Close shades or blinds during early morning and late evening to reduce solar insulation heat gain.
- For optimal energy savings, set thermostats at 78 degrees F for cooling in the summer and 68 degrees F for heating in the winter.
- Install ceiling and wall insulation.
- Insulate water heaters and supply pipes.

KMH 000098

# EXHIBIT 80
# TO DILLER DECLARATION

 

EMPLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

Volume II, Issue 3                                    October, 2001

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ESOP DISTRIBUTIONS

On September 30, 2001, The ESOP is proud to have made its third year of distributions for personnel leaving the Company in 2000. The plan allows distributions now only for retirees over 65 years and for terminated personnel with vested balances less than $3,500.00. The total of the distributions in 2001 was $354,459.47. We wish these retirees well in enjoying their retirement benefits.

## ESOP COMMUNICATIONS

Unfortunately, there are still individuals that we have had difficulty sending ESOP communications to due to changes of addresses, etc. If you know any individuals listed on the attached sheets, please have them call Debbie Culmer in our Human Resources Department at 650-592-8337 extension 187 so that they may receive information.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through September of 2001 including the Kelly-Moore Ponderosa acquisition are up approximately 1% over the same period in 2000. Operating profit continues to be down in 2001. Reasons for the profit decline include: 1) Declining sales for the whole Company in five of the last seven months partially due to a tightening economy, 2) Margins and profits in certain outlying districts that are still not up to K-M standards and 3) Loss stores continue to drag on profits.

One item you may have noticed in the news in September is the large asbestos judgement against Kelly-Moore. Kelly-Moore is appealing the judgement, and it is believed that we should prevail on appeal. Kelly-Moore does have insurance to cover normal damages in this case. The Company works very hard to defend itself against asbestos litigation, but such litigation continues to be a concern to the financial health and the stock price of the Company. We hope that you will continue to work hard with us as we continue to fight those legal firms that unfairly target our Company with such litigation.

## SUMMARY ANNUAL REPORT

Also attached is the Summary Annual Report as of December 31, 2000. Under the law, the Plan is required to furnish a Summary Annual Report in the attached format as of the end of the calendar year of the Plan.

**EXHIBIT**

*191*

Thomas    4-18-08

KMH 010684

## NEW RULES IN 2002 BETWEEN ESOP's AND 401K's

In conjunction with the new tax laws passed by Congress effective January 1, 2002, there are fewer limitations between 401K plans and ESOP's. This means that it is unlikely that in 2002, even at the highest 15% deferral into the 401K, that there will be any limitation to your ESOP contribution. Please see the attached article for more detailed examples.

Recently, you may have noticed new posters on the 401K plan in stores and factories. Retirement assets should be allocated among many things based on risk. Remember that the ESOP is not a separate "fund" like the 401K plan funds. The ESOP represents company shares. Payouts are dependent on a high stock price, sufficient profits, and sufficient assets and cash to make payments out of company operating funds. With less restrictions now on the 401K, serious thought should be given to the many choices of funds in the 401K plan, so that retirement funds consider various instruments and risk levels. To start your 401K plan call Corporate personnel at 650-592-8337 extension 187. If you have any changes to your 401K contribution level, it should be in to Corporate Personnel by 11-30-01.

## QUESTIONS AND ANSWERS

Question: Remind us again, how does the ESOP work?

Answer: Our ESOP is a qualified retirement plan where if you are an eligible employee, you share in the Company's contribution if you complete 1000 hours of work in a calendar year with Kelly-Moore. The contribution is used to allocate shares through the ESOP to you, and lets you become an Employee Owner under the ESOP. The beauty is that you do not have to pay anything or have anything deducted from your paycheck to get your share. At the end of the year, there is an independent valuation done that is used to determine the value of the ESOP shares at that time. Payout usually occurs at retirement at age 65.

Question: I have worked for Kelly-Moore part time for more than a year since April of 2000, and I did not get a statement or any contribution. When will I get one?

Answer: You need to work more than 1000 hours in a calendar year. If you do that in 2001 and are eligible, you will receive a statement in 2002 showing your contribution.

Question: My statement shows vested % at 0% and vested interest value at $0.00. What does this mean?

Answer: If you didn't work 3 years (1000 hours in each of 3 years) through 2000, you have no vesting yet, meaning that if you leave you will forfeit your right to your shares. Vesting is 3 years 20%, 4 years 40%, 5 years 60%, 6 years 80% and 7 years 100%. Vesting is designed this way by the federal government to encourage an employee to stay with an employer, participate and contribute through a full year with the Company.

KMH 010685



# Returned ESOP Mail List
## Please call Debbie Culmer at 650-592-8337 x 187 if you can help get information to these people.

| Name | Last Work Location |
|------|--------------------|
| Adams, Shannon | Bremerton |
| Almonte, Edwin | Killeen |
| Anselmo, Gerald J. | Oakland Telegraph |
| Apodaca, Frank | Santa Rosa 4th St. |
| Arias, Rudolph | Alum Rock |
| Armstrong, Charl | Phoenix |
| Arends, Kenneth | Santa Rosa Roberts |
| Awuku, Kwame | Concord |
| Baldemor, Jose N. | Guam |
| Barry, Sean P. | Vallejo |
| Benneth, Steve | Beaverton |
| Bibbs, Charles | Hayward |
| Bintz, Steven | Flagstaff |
| Blanco, Guillermo A. | Seattle Airport |
| Bossarte, Robert Y. | Tempe |
| Brewer, Christopher | Abilene |
| Brewer, W.C. Jr. | Antioch |
| Briscoe, Tyrone | Walnut Creek |
| Brock, Jerry F. | Amarillo |
| Brown, Denise H. | Kent |
| Bryan, Christopher | Vallejo |
| Butler, Christopher | Amarillo |
| Campbell, David C. | Ft. Worth Alta Mere |
| Canfield, Verna M. | Livermore |
| Carter, Chris J. | Bremerton |
| Cashion, Michael | Austin Burnet |
| Casias, Roy A. Jr. | Tempe |
| Charlebois, Audie J. | Chandler |
| Chavarria, Alfonso | San Jose Auzerais |
| Cisneros, Stephen | Odessa |
| Clarke, Norman F. | Camp Wisdom |
| Clemons, Mark | Seaside |
| Cole, Austra K. | Lawton |
| Coody, Ben M. | Mt. View Fairchild |
| Corley, Freddie | Seattle Airport |
| Cravanas, John J. | Hayward |
| Crews, Kenneth J. | Aurora |
| Crum, William J. | Kent |
| Cuse, Karsen L. | Reno |
| Dahlen, Travis S. | San Jose Blossom Hill |
| De Anda, Yvonne | Tempe |
| Decelles, Christie M. | Everett |

| Name | Last Work Location |
|------|--------------------|
| Docherty, Hal | Anchorage |
| Drummond, Wilson | Austin Victory |
| Duggings, Damon | Olympia |
| Earley, Christopher | Santa Cruz |
| Ellison, Brandon | Austin Victory |
| Faeo, Anthony | Anchorage |
| Flores, Carlos | Vallejo |
| Flores, Richard | Mt. View El. Camino |
| Forth, Carmen | Tempe |
| Garcia, Gus | Hurst |
| Garcia, Ernest | South San Francisco |
| George, Stewart B. | Austin Burnet |
| Gest, Scott A. | Kirkland |
| Godines, Robert L. | San Angelo |
| Gomez, Ernesto | Bellaire |
| Gonzales, Francis | Garland Rd. |
| Goodman, Robert | San Jose Bascom |
| Gracey, Margaret A. | Hurst |
| Gray, Daniel L. | Oaklahoma City |
| Greenblatt, Zack A. | Seattle Aurora |
| Greenwood, Donald | Carmichael |
| Griffin, Issac K. | San Jose Alum Rock |
| Guzy, Jason E. | San Jose Bascom |
| Ham, John C. | Walnut Creek |
| Harrington, Scott D. | Sacramento 65th St. |
| Hart, David | Mesa |
| Hayes, Helen | Mt. Vernon |
| Heilman, Jerry | Seattle Airport |
| Heinrich, Susan | Tracy |
| Henderson, Ethan | Anchorage |
| Hill, Darryl | San Jose Blossom Hill |
| Hull, Taylor | Seattle Airport |
| Jackson, Jed | Flagstaff |
| Jenkins, Randall S. | Rancho Cordova |
| Johnson, David A. | San Mateo |
| Johnson, Kevin | Modesto |
| Johnston, Glenn E. | San Francisco 4th St. |
| Jones, Ali O. | San Lorenzo |
| Jones, Freddy E. | Tempe |
| Jordan, Steven | Ft. Worth Seminary |
| Kaczmarch, Rodd | Hurst |
| Kellum, Joseph | Plano |
| Kelly, Jeffrey V. | Fort Collins |

KMH 010686

| Name | Last Work Location |
|------|-------------------|
| Khachi, Jeff J. | San Jose Blossom Hill |
| Kievit, Timothy J. | Webster |
| KinCanon, Angelique | Sacramento Florin |
| Kytola, Stephen D. | Puyallup |
| Lacour, Benjamin D. | Keller |
| Lane, Larry | Northwest |
| Lawther, William | San Francisco Divisadero |
| Lemay, Joseph J. | Santa Rosa 4th St. |
| Levin, Craig J. | Boulder |
| Lewis, Shawn D. | Denison |
| Liu, Janice | San Carlos |
| Lobue, Steven D. | Ukiah |
| Lopez, Cinda | San Carlos |
| Lowther, William | South San Francisco |
| Luong, Karen K. | San Francisco Divisadero |
| Lyons, Maurice | Oakland International |
| Mahaffey, Brain | San Carlos |
| Mannering, Matthew | Dublin |
| Martinez, Jesus S. | Lubbock |
| Martinez, Mark V. | San Angelo |
| Massaker, Brian L | Tulsa |
| McClahan, Roland | Bellaire |
| McKinney, Kamarlo | Oakland Telegraph |
| McLaughlin, Joseph | San Carlos |
| Meyer, Carlos R. | San Rafael |
| Miller, Brian | San Francisco 4th St. |
| Miller, Michael A. | Farmers Branch |
| Noecker, Stephen | Tempe |
| O'Neal, Scott | Walnut Creek |
| Olive, Stan E. | Tempe |
| Owen, Timothy A. | Phoenix |
| Palacios, Dorothy C. | Austin Victory |
| Parker, Nathan | Flagstaff |
| Patrick, Gordon | Arlington |
| Pearson, Karen | Sacramento 65th St. |
| Pendergraph, Devon | Hurst |
| Perez, David | Ft. Worth Alta Mere |
| Pheng, Sokchea | San Lorenzo |
| Phillips, Dave D. | Bremerton |

| Name | Last Work Location |
|------|-------------------|
| Pittman, Brenda | Tyler |
| Plank, Adam | Santa Rosa 4th St. |
| Puhlovski, Berisl | San Francisco Cesar Chavez |
| Ramos, Abel Mr. | Austin Burnet |
| Rentschler, Eliza K. | San Carlos |
| Richards, Royce A. | Tempe |
| Rivera, Richard | San Jose Auzerais |
| Roberts, Danny F. | So. San Francisco |
| Sanchez, Joseph M. | Midland |
| Sandoval, Paul A. | Tempe |
| Santos, Fernandez | Austin Victory |
| Sapien, Jose Tommy | Tempe |
| Schiska, Michael L. | Hurst |
| Schulz, Tonya A. | Carmichael |
| Semere, Zeraserva | Seattle Airport |
| Sluackleford, Jason | Tempe |
| Shepherd, Alan | Seminary |
| Shepard, Nick | Mt. View Fairchild |
| Silva, Christian | Santa Clara |
| Smith, Kevin A. | Sparks |
| Soto, Ray | San Carlos |
| Steppy, Richard W. | Hurst |
| Storkel, Erle W. | Fairbanks |
| Sullivan, Cecilia R. | Bremerton |
| Taff, Benjamin F. | Bremerton |
| Talkington, Christian | Tulsa |
| Taylor, Bruce | Taylor |
| Teasley, Alonzo | San Pablo |
| Tillman, Lee M | Seattle Airport |
| Trujillo, Adrian | Ft. Collins |
| Tucker, Brad C. | Arlington |
| Underwood, Luther | Odessa |
| Wade, Everett | Hayward |
| Wheeler, Mindy k. | Richmond |
| Whiteside, Dwayne | Fairfield |
| Willis, Richard Mr | Antioch |
| Winston, Mary D. | San Lorenzo |
| Wolfe, Ronnie | Millbrae |

2

KMH 010687



THE EMPLOYEE OWNERS' PAGE

# What Happened to My 401(k) – and Why It Might Be Back

I've got great news!," your manager says. "You're going to have an employee stock ownership plan (ESOP). You don't pay anything into it; the company funds it entirely." Sounds good so far. "But there's some bad news too. We won't be able to let you put anything into the 401(k) plan for a while, and our match will have to be suspended too."

What's going on here? And why might this all change with the new tax law?

## Those Pesky Rules

Most of the time, the suspension of a 401(k) plan is not because your company wants to do away with the plan. In fact, ESOP companies are *more* likely to have 401(k) plans than non-ESOP companies. But in some ESOPs, it's just not possible.

Current (2001) law requires that no one employee can get more than 25% per year in "annual additions" to their employee retirement accounts. That means that all the company contributions to an ESOP, a 401(k) plan, a retirement-oriented profit sharing plan, and similar plans have to be added together *along with what you defer to the 401(k).* So if the company puts 20% into an ESOP, you could still put 5% into a 401(k). But if the company is "maxing out" at 25% of pay to the ESOP, there's no room left for you to defer salary into the 401(k). Moreover, the company can only deduct a maximum of 25% of pay into the ESOP and 401(k) combined, *and this counts what you personally defer.*

In many ESOPs, it is necessary for the company to make the full 25% of pay contribution because it is using the ESOP to buy out an owner. That's because there is often a lot of stock to acquire relative to the payroll of employees in the ESOP, and every allowable dollar has to be used to make the transaction possible. The result is that the company can't legally allow

you to contribute to the 401(k). As explained later, the new law will change all this.

## I Can, But the Company Can't

In other cases, the 401(k) plan is kept, but the company no longer makes a cash match to it. It may match in the form of an allocation from the ESOP, or just drop the match altogether. Here the legal prohibition may not be the issue. The company has "room" to make matches outside the ESOP, it just doesn't have the money. In order to fund the ESOP, something may have to give, and the most likely candidate is the company match because the employees now are getting an ESOP contribution instead. But employees can still defer their pay into the 401(k) plan, although there may be a limit on how much they can put in.

> Most of the time, the suspension of a 401(k) plan is not because your company wants to do away with the plan. In fact, ESOP companies are more likely to have 401(k) plans than non-ESOP companies. But in some ESOPs, it's just not possible.

## It's Not Such Bad News

The good news is when the 401(k) is suspended, it is usually only a temporary situation. True, in the meanwhile you have lost the opportunity to have put away some of your own money before tax in diversified investments, but you are getting a much larger contribution of the company's money into your ESOP account. So you can afford to save some of your own money outside the ESOP. A Roth IRA is a very good choice. You

don't get a tax deduction for what you put in, but the money you make in the plan builds up tax free and, better yet, you take it out tax free.

If the company ends the match, the news is more mixed — you are giving something up for the ESOP. But in almost all cases, the ESOP contribution is greater than what the old match was. Moreover, the ESOP may prevent your company from being sold to someone else.

In either case, you need to recognize that even though you are probably getting a significant increase in the company's contribution to your retirement plans, an ESOP is not diversified. You need to make sure you have enough other money put away so that if the ESOP does not do as well as expected, you won't end up in financial difficulty.

## The New Tax Law

The new tax law will change these issues dramatically, starting next year. Basically, the company will now be able to deduct up to 25% of pay for contributions to the ESOP, but will not have to count your deferrals into the 401(k) plan against this amount, as it now does. Moreover, the limit on annual additions to an employee accounts will go up from 25% of pay to 100% of pay. What this means is that companies legally can put in the maximum 25% of pay into your ESOP, and, in all but a few cases, you can defer any percentage of your pay you like up to the new maximum dollar limits, which will gradually rise from $11,000 next year to $15,000 in 2006. Of course, what a company and what you put into the plan are also a function of what you both can afford, but at least the rules now make life a lot easier.    NCEO

KMH 010688

### SUMMARY ANNUAL REPORT
### FOR K-M INDUSTRIES HOLDING CO., INC. ESOP
### FOR THE PERIOD JANUARY 1, 2000 THRU DECEMBER 31, 2000

This is a summary of the annual report for the K-M Industries Holding Co., Inc. ESOP, EIN 94-1230192, Plan No. 002, for the period January 1, 2000 through December 31, 2000. The annual report has been filed with the Pension and Welfare Benefits Administration, U.S. Department of Labor, as required under the Employee Retirement Income Security Act of 1974 (ERISA).

#### Basic Financial Statement

Benefits under the plan are provided through a trust fund. Plan expenses were $16,241,566. These expenses included $289,908 in benefits paid to participants and beneficiaries and $15,951,658 in other expenses. A total of 2,024 persons were participants in or beneficiaries of the plan at the end of the plan year, although not all of these persons had yet earned the right to receive benefits.

The value of plan assets, after subtracting liabilities of the plan, was $(74,380,627) as of December 31, 2000, compared to $(62,171,571) as of January 1, 2000. During the plan year the plan experienced a decrease in its net assets of $12,209,056. This decrease includes unrealized depreciation in the value of plan assets; that is, the difference between the value of the plan's assets at the end of the year and the value of the assets at the beginning of the year or the cost of assets acquired during the year. The plan had total income of $4,032,510 including employer contributions of $23,353,990 and earnings from investments of $(19,321,480).

#### Your Rights To Additional Information

You have the right to receive a copy of the full annual report. To obtain a copy of the full annual report, or any part thereof, write or call the office of William E. Moore who is Trustee, K-M Industries Holding Co., Inc., 987 Commercial Street, San Carlos, CA 94070, (650) 592-8337. The charge to cover copying costs will be $3.50 for the full annual report, or 25 cents per page for any part thereof.

You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, or a statement of income and expenses of the plan and accompanying notes, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes will be included as part of that report. The charge to cover copying costs given above does not include a charge for the copying of these portions of the report because these portions are furnished without charge.

You also have the legally protected right to examine the annual report at the main office of the plan (987 Commercial Street, San Carlos, CA 94070) and at the U.S. Department of Labor in Washington, D.C., or to obtain a copy from the U.S. Department of Labor upon payment of copying costs. Requests to the Department should be addressed to: Public Disclosure Room, Room N5638, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

KMH 010689

# EXHIBIT 81
# TO DILLER DECLARATION





EMPLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

Volume III, Issue 4                                             December, 2001

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## PROFITABILITY AFFECTS YOU AND YOUR ESOP

With the slow economy, it is even more important to get that extra sale and to make sure that it is the most profitable sale ever. Continue to try and avoid waste whether it is mixing and tinting paint or using supplies efficiently. Profitability is one of the main items that affects the ESOP share price. If profitability is down, it may correspond that the ESOP share price goes down. Remember that the appraiser looks at current profits, potential profits, asset and debt levels, and market valuation of other paint companies and other items in determining the share price of your ESOP.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through November of 2001 are up approximately 1.5% over the same period in 2000. Operating profits continue to be down in 2001. Remember everything that <u>you</u> do including how you service your external or internal customers may help with one more sale. Increasing sales is one key way to increase profits. Reasons for the profit decline include: 1) Slow sales at less than 2% increase for the year while costs have risen at a much higher rate, 2) Margins and profits in certain outlying districts that are still not up to K-M standards, 3) Loss stores continue to drag on profits and 4) Costs associated with asbestos and related litigation continue to mount.

One item we mentioned in the last newsletter was the large asbestos judgement against Kelly-Moore. We believe we had done nothing wrong in this case, but decided that fighting the case would rack up significant attorney fees very quickly. Even though we believe we could have won on appeal of the case, Kelly-Moore fully settled this case out of court to avoid a costly and protracted legal battle. Kelly-Moore has insurance to fully cover the settlement cost. The Company continues to work very hard to defend itself against asbestos litigation, but such litigation continues to be a concern to the financial health and the stock price of the Company. Please continue to assist us as we fight those legal firms that unfairly target our Company with such litigation.

## NEW STORES

Opened since the last report was a store in **Colorado Springs**. It is the **Colorado Springs – Northpark** store. It was opened on December 19, 2001. Opening new stores that provided highly profitable sales was one very positive aspect for Kelly-Moore in 2001 when facing a very tough economy.

EXHIBIT

192

Thomas    4-18-08

KMH 010690

# EXHIBIT 82
# TO DILLER DECLARATION





EMPLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

**Volume IV, Issue 1**                    **February, 2002**

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## STORE CHANGES

The Company has made certain adjustments in store levels by closing stores that were now in a poor location, had limited chance for future financial success, or were close to a nearby location that could better handle our customers needs. The stores closed were Tomball, Texas, Phoenix-North 19th Ave. and the Boise- Aeronca store. In each of these 3 cases, the business was transferred to other stores only a few miles away where it could be handled more profitably. Unfortunately, consolidations are sometimes painful because they affect our Kelly-Moore employees. Adjustments need to be made though when there is limited opportunity for long-term future success and profitable operations.

Another change made after looking at our long-term strategy was to sell our Guam store. Although we made more profit than not over the 6 years that we were there, these profits were becoming more elusive. In the long run it did not make sense to commit assets and management attention away from our core important markets where we excel. These key markets are the Western and Southwestern United States. The store was sold to Frank Guererro, the store manager of many years. It will remain a dealer of Kelly-Moore products. So, in a sense we gain the best of the situation – we don't have to put our assets or management time and attention in a far away place and we can continue to sell Kelly-Moore Paint as a dealer with less management involvement.

Kelly-Moore continues to look for opportunities that will provide new <u>profitable</u> growth. We have been very successful with some of our new stores that have provided great profit in the first year of business. These stores include the San Francisco-Taraval store, the Santa Clara store and our Sonora, California store. In all cases we tapped both under served markets and markets where we were already delivering to customers. We are very proud of the success that our Kelly-Moore people have brought to these stores by their hard work.

EXHIBIT

193

Thomas    4-18-08

KMH 010691

In looking for new store opportunities, we have considered taking over competitors' locations to enlarge our market presence if it made sense financially. Normally opportunities like these occur only after lengthy negotiations. Because of 2 of these opportunities, we now have 2 new stores. One is in growing North Colorado Springs, Colorado where we took over a location from Dunn-Edwards/Wellborn. The store opened December 19, 2001. The second opportunity is a location that we took over from Deen Pierce Paint. It is located in Pleasant Hill, California, not far from our long time Walnut Creek, CA location. This store has a planned opening date of March 1, 2002.

We still have other stores planned for opening. We own the property in Elk Grove, CA near Sacramento. Governmental complications outside of the Company control and extremely wet weather conditions continue to prevent timely construction. We still hope to have a store here soon. We also have a letter of intent to open up a store in Vacaville, CA near Fairfield on the I-80 corridor. We hope to have this store open by May 1, 2002. The Company is also currently evaluating other location opportunities where we hope to find quality profitable growth in under served markets.

## ASBESTOS LITIGATION

Asbestos litigation continues to challenge the Company. The Company continues to fight or settle the lawsuits where appropriate. In the final quarter of 2001, over $10 million was paid out with respect to asbestos claims. These costs have been covered by the company's insurance policies. The Company is vigorously proceeding against its various insurance carriers to assure coverage for these asbestos related claims. As the asbestos litigation continues against the Company, our current belief is that the litigation is likely to depress the stock price of the Company, which would affect the value of your ESOP account.

## KELLY-MOORE PAINT COMPANY PRELIMINARY FINANCIAL RESULTS

Sales through December of 2001 were up approximately 0.8% over the same period in 2000. Operating profits (those profits from operating the stores and factories, exclusive of asbestos, ESOP contributions, interest taxes and gains on asset sales) were down by about 12%. The economy, loss stores and certain under performing markets had the biggest effect on these results. In January 2002, sales were down by about 2.1%.

## NEW RULES IN 2002 BETWEEN ESOP's AND 401K's

In conjunction with the new tax laws passed by Congress effective January 1, 2002, there are fewer limitations between 401K plans and ESOP's. This means that it is unlikely that in 2002, even at 15% or higher deferral into the 401K, that there will be any limitation to your ESOP contribution.

A friendly reminder is that your 401k allows you to diversify your assets beyond what you have in your ESOP. This year tax laws have increased the limits on 401k accounts from $10,500.00 to $11,000.00. In addition for those over 50 years old, an additional $1,000.00 can be deferred. Specific details on the additional deferral are still to come.

KMH 010692

# EXHIBIT 83
# TO DILLER DECLARATION





ᵗᴾLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

**Volume IV, Issue 3**                                             **October, 2002**

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## GETTING DOWN TO THE BASICS

Making the highest quality paint and providing awesome customer service are the main ingredients to making Kelly-Moore successful. Remember these basic items and keep in mind that the customer comes first in doing your daily job.

## ESOP DISTRIBUTIONS

On September 30, 2002, The ESOP is proud to have made its fourth year of distributions for personnel leaving the Company in 2001. The plan allows distributions now only for retirees over 65 years and for terminated personnel with vested balances less than $3,500.00. The total of the distributions so far in 2002 was $302,600.91. We wish these retirees well in enjoying their retirement benefits.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through September of 2002 are down approximately 0.3% over the same period in 2001. Operating profit continues to be down in 2002. Reasons for the profit decline include: 1) Sales for some areas of the Company have not yet picked up due to strong competition and a tight economy 2) Margins and profits in certain outlying districts continue to be below K-M standards and 3) Certain stores with extreme losses continue to drag on profits. Overall profit is down in part, but primarily due to settlements and defense costs relating to asbestos litigation as discussed on the back of this page.

## SUMMARY ANNUAL REPORT

The Summary Annual Report as of December 31, 2001 is attached.

## STORE CHANGES

Kelly-Moore has continued to make adjustments to store levels as dictated by markets. Kelly-Moore closed or sold a few stores that were struggling and gave no indication of being successful in the foreseeable future. Kelly-Moore has charged ahead with other opportunities at the same time that appeared to have great profit potential. In March, the Pleasant Hill Store in California was opened after obtaining the location from a competitor. The Vacaville, California location was opened in June. Then in August, a store was opened in New Braunfels, Texas. These three stores have shown immediate successes. Also planned are stores in Elk Grove, Brentwood, Turlock and Palo Alto California.

```
EXHIBIT
  195
Thomas    4-18-08
```

KMH 010697

## ASBESTOS LITIGATION

Kelly-Moore continues to be a defendant in asbestos litigation. Currently there are over 30,000 claims against the Company. The allegations arise from a product manufactured decades ago by a prior subsidiary called Paco Textures Corporation. The manufactured product was joint compound that contained asbestos.

Kelly-Moore has insurance policies that to date have provided coverage for asbestos litigation. However, Kelly-Moore has been consuming applicable coverage amounts from these policies at a rapid rate. In addition, due to the uncertain timing of payments from policies for claims, Kelly-Moore itself has significant settlement costs as well as monthly litigation costs affecting income this year.

Kelly-Moore continues to settle cases where it makes sense and vigorously contests or fights other cases in court where appropriate. However, these challenges are taking a large toll on cash and profits and are likely to have a major effect on the value of the shares held by the ESOP.

Kelly-Moore currently has a large lawsuit seeking damages against a previous vendor who supplied the asbestos used to make joint compound. The lawsuit is in its very early stages of preparation.

## QUESTIONS AND ANSWERS

Question: Remind us again, how does the ESOP work?

Answer: Our ESOP is a qualified retirement plan, where if you are an eligible employee, you share in the Company's contribution if you complete 1000 hours of work in a calendar year with Kelly-Moore. The contribution is used to allocate shares through the ESOP to you, and lets you become an Employee Owner under the ESOP. You do not have to pay anything or have anything deducted from your paycheck. At the end of the year, there is an independent valuation done that is used to determine the value of the ESOP shares at that time. Payout usually occurs at retirement at age 65.

There is the potential that share values could go up or down. The ongoing asbestos litigation mentioned above provides significantly more risk to adversely affect the ESOP value. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans, IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## SUMMARY PLAN DESCRIPTION ADDENDUM

Due to changes in Federal regulations, we were required to make legal changes to the Summary Plan Description (SPD). Please file the attached modification to your SPD.

KMH 010698

| | | | | |
|---|---|---|---|---|
| Arends, Kenneth W. | SR. Roberts | | Mullen, Frances A. | Ft. Worth Alta-Mere |
| Barker, Erin M. | N.B.D.O. | | O'Neal Scott | Walnut Creek |
| Bintz, Steve | Flagstaff | | Panyasawat, Bobby | Ft. Worth Alta-Mere |
| Brownley, Sherri Lyn | Antioch | | Patrick, Bonnie | Carmichael |
| Brundle, Carla | Carson City | | Patterson, Tampatha | San Lorenzo |
| Burge, Gary | San Fran ( Divis ) | | Pendergraph, Devon | Hurst |
| Bush, ALeisha | Rohnert Park | | Perez, Jesse D. | Lodi |
| Castillo, Ray A. | Plano | | Phillip, Dave D. | Bremerton |
| Charlebois, Audie | Chandler | | Rose, Shril | Antioch |
| Clarke, Norman | Camp Wisdom | | Ross, Leo Jr. | Houston- Bellaire |
| Coffman, Aaron D. | Abilene | | Santana, Vanessa V. | Corporate/Accounting |
| Cooper, Gary E. | Highland Ranch | | Scott, Clifton D. | Dallas Garland |
| Davis, Jerome Q. | Hayward | | Smith, Kevin A. | Sparks |
| Demo, Jean C. | Highland Ranch | | Taylor, Bruce | Universal |
| Eaton, David | Tempe | | Tedder, Carlton | Kirkland |
| Egbert, Curt E. | Universal | | Triplett, Donald R. | Irving |
| Ellis, Christopher | Roseville | | Turner, Daryl R. | So. San Francisco |
| Fanely, Richard | Austin- Burnet | | Velo, Steven | S.J. Bascom |
| Flores, Richard | MV EL Camino | | Wallway, John | Olympia |
| Franklin, Nehemiah | Bascom | | Ward, Jeffrey A. | Seattle Airport |
| Fuqua, Mike | Bascom | | Wolfe, Ronnie | Millbrae |
| Gault, Branden J. | Phoenix | | | |
| Hammer, Stephen C. | Garland Rd. | | | |
| Henson, Jaqueline | Austin-Burnet | | | |
| Honable, Angelo C. | San Rafael | | | |
| Horner, James C. | Tucson | | | |
| Jager, Melody | Boulder | | | |
| Jefferson, Kelvin B. | Fremont | | | |
| Jordan, Steve | Ft. Worth Seminary | | | |
| Keller, Michael D. | Premier Drywall | | | |
| Kievit, Timothy | Cedar Park | | | |
| Klein, Scott | San Rafael | | | |
| Lagrutta,, Bradley | Antioch | | | |
| Lawrence, Timothy | Anchorage | | | |
| Linear, Mario M. | Bascom | | | |
| Luna, Jorge L. | Seaside | | | |
| Mahaffey, Brian W. | San Carlos | | | |
| Martinez, Hestroverto N. | San Angelo | | | |
| Mata, Eddie | Bascom | | | |
| Mc Call, Shane | Olympia | | | |
| Meyer, Carlos | San Rafael | | | |
| Morales, Jose | Houston-Airline | | | |

## ESOP COMMUNICATIONS

Unfortunately, there are still individuals that we have had difficulty sending ESOP communications to due to changes of addresses, etc. If you know any individuals listed on the attached sheet, please have them call Debbie Culmer in our Human Resources Department at 650-592-8337 extension 187 so that they may receive information.

KMH 010699

**SUMMARY ANNUAL REPORT**
**FOR K-M INDUSTRIES HOLDING CO., INC. ESOP**
**FOR THE PERIOD JANUARY 1, 2001 THROUGH DECEMBER 31, 2001**

This is a summary of the annual report for the K-M Industries Holding Co., Inc. ESOP, EIN 94-1230192, Plan No. 002, for the period January 1, 2001 through December 31, 2001. The annual report has been filed with the Pension and Welfare Benefits Administration, U.S. Department of Labor, as required under the Employee Retirement Income Security Act of 1974 (ERISA).

**Basic Financial Statement**

Benefits under the plan are provided through a trust fund. Plan expenses were $15,345,115. These expenses included $697 in administrative expenses, $381,588 in benefits paid to participants and beneficiaries, and $14,962,830 in other expenses. A total of 2,212 persons were participants in or beneficiaries of the plan at the end of the plan year, although not all of these persons had yet earned the right to receive benefits.

The value of plan assets, after subtracting liabilities of the plan, was $(69,213,976) as of December 31, 2001, compared to $(74,380,627) as of January 1, 2001. During the plan year the plan experienced an increase in its net assets of $5,166,649. This increase includes unrealized depreciation in the value of plan assets; that is, the difference between the value of the plan's assets at the end of the year and the value of the assets at the beginning of the year or the cost of assets acquired during the year. The plan had total income of $20,511,764 including employer contributions of $23,128,221 and earnings from investments of $(2,616,457).

**Your Rights To Additional Information**

You have the right to receive a copy of the full annual report, or any part thereof, on request. The items listed below are included in that report:

1. an accountant's report;
2. financial information; and
3. assets held for investment.

To obtain a copy of the full annual report, or any part thereof, write or call the office of William E. Moore who is Trustee, K-M Industries Holding Co., Inc., 987 Commercial Street, San Carlos, CA 94070, (650) 592-8337. The charge to cover copying costs will be $3.50 for the full annual report, or 25 cents per page for any part thereof.

You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, or a statement of income and expenses of the plan and accompanying notes, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes will be included as part of that report. The charge to cover copying costs given above does not include a charge for the copying of these portions of the report because these portions are furnished without charge.

You also have the legally protected right to examine the annual report at the main office of the plan (987 Commercial Street, San Carlos, CA 94070) and at the U.S. Department of Labor in Washington, D.C., or to obtain a copy from the U.S. Department of Labor upon payment of copying costs. Requests to the Department should be addressed to: Public Disclosure Room, Room N1513, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

KMH 010700

SUMMARY MODIFICATION MEMORANDUM
TO
K-M INDUSTRIES HOLDING CO., INC.
EMPLOYEE STOCK OWNERSHIP PLAN
SUMMARY PLAN DESCRIPTION

Except as specified, effective for all Plan Years beginning after January 1, 2002 the following changes are made to your Summary Plan Description ("SPD"). In some cases the modifications represent new provisions being added to your SPD. Other modifications represent changes to an existing provision of your SPD. When an existing provision of your SPD is amended, you may wish to cross out the old question and answer so that you do not confuse the old information with the new information.

The discussion under the heading "**TREATMENT OF DISTRIBUTIONS FROM YOUR PLAN,**" has been revised as follows:

"Whenever you receive a distribution from your Plan, it will normally be subject to income taxes. You may, however, reduce, or defer entirely, the tax due on your distribution through use of one of the following methods:

"1.    The rollover of all or a portion of the distribution to an Individual Retirement Account (IRA) or another qualified employer plan. This will result in no tax being due until you begin withdrawing funds from the IRA or other qualified employer plan. The rollover of the distribution, however, MUST be made within strict time frames (normally, within sixty (60) days after you receive your distribution). Under certain circumstances all or a portion of a distribution may not qualify for this rollover treatment. In addition, most distributions made after December 31, 1992 will be subject to mandatory federal income tax withholding at a rate of twenty percent (20%). This will reduce the amount you actually receive. For this reason, if you wish to roll over all or a portion of your distribution amount, the direct rollover described in paragraph 2 below would be the better choice.

"2.    You may request for most distributions that a direct transfer of all or a portion of your distribution amount be made to either an Individual Retirement Account (IRA) or another qualified employer plan willing to accept the transfer. A direct transfer will result in no tax being due until you withdraw funds from the IRA or other qualified employer plan. Like the rollover, under certain circumstances all or a portion of the amount to be distributed may not qualify for this direct transfer. If you elect to actually receive the distribution rather than request a direct rollover, then in most cases (other than a distribution in the form of employer securities) twenty percent (20%) of the distribution amount will be withheld for federal income tax purposes.

"3.    The election of favorable income tax treatment under 'capital gains' method of taxation, if you qualify.

1

KMH 010701

"4.     Any distribution in excess of $1,000 may be made by transferring the amount to be distributed to an individual retirement plan designated by the Plan Committee, unless the Participant or Beneficiary entitled to receive the distribution elects (1) to receive the distribution directly, or (2) to have the distribution paid directly to another Eligible Retirement Plan as described in Section 10 of the Plan.  The requirement of this paragraph shall not be effective until the effective date of regulations issued by the Department of Labor with respect to the requirements of the Plan Committee's selection of individual retirement plans."

The following revised information is added to your Summary Plan Description:

## "WHEN IS THE PLAN REQUIRED TO BEGIN DISTRIBUTING YOUR PLAN BENEFITS?

Pursuant to Section 401(a)(9) of the Code as amended by the Small Business Job Protection Act, distribution of your Plan Benefits is required to begin by April 1 of the calendar year following the later of (1) the calendar year in which you attain age seventy and one-half (70½) or (2) the calendar year in which you separate from service with the Employer.  However, in the case of a five-percent (5%) owner (as defined in Section 416(i)(1)(B)(i) of the Code), distributions are required to begin no later than April 1 following the calendar year in which you attain age seventy and one-half (70½).  All distributions made under this paragraph shall be determined and made in accordance with the treasury regulations under Section 401(a)(9) of the Internal Revenue Code.

2

KMH 010702

# EXHIBIT 84
# TO DILLER DECLARATION



EMPLOYEE STOCK OWNERSHIP PLAN



# MIND OUR OWN BUSINESS

**Volume IV, Issue 4**                                    **December, 2002**

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## FOCUS ON THE CUSTOMER

Kelly-Moore has recently made various changes in its organization structure to allow us to be more focused on the customer. Listening to what the customer needs and in turn providing awesome customer service will keep the customers with us and away from the competition. Ask yourself if you really went out of your way today to provide the best service to all _your_ customers whether that customer is an internal, potential or an existing customer. Your actions or lack of effort make the difference in the customer's mind as to whether he or she will be back and provide us with sales in the future. Great customer service helps get profitable sales, which also can help our ESOP. Keep in mind that the customer comes first in doing your daily job.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through November of 2002 are down approximately 0.2% over the same period in 2001. Operating profit continues to be down in 2002. Overall profit is down in part, but primarily due to settlements and defense costs relating to asbestos litigation.

## ASBESTOS LITIGATION

Challenges from asbestos litigation continue to take a large toll on cash and profits and are likely to have a major effect on the value of the shares held by the ESOP. The ongoing asbestos litigation represents significant risk that could adversely affect the ESOP value. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans, IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets. Easing of tax laws in 2003 can provide additional opportunities in these areas.

## NEW STORES

Kelly-Moore expects to open a store in Brentwood, California in late January or early February 2003. A store in Elk Grove, California is expected to be opened by March or April 2003. A store in Turlock, California is planned for this summer. Also planned is a store in Palo Alto California.

**EXHIBIT**

_196_

_Thomas_    _4-18-08_

KMH 010703

# EXHIBIT 85
# TO DILLER DECLARATION





'PLOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

Volume V, Issue 2                                        September 2003

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## STAY WITH THE BASICS

Making the highest quality paint and providing responsive customer service are the main ingredients to making Kelly-Moore successful. These are the main ingredients in bringing along more sales.   Remember these basic items and keep in mind that the customer comes first in doing your daily job.

## ESOP DISTRIBUTIONS

On September 29, 2003, The ESOP will make its fifth year of distributions for personnel leaving the Company in 2002.  The plan allows distributions now for retirees over 65 years and for terminated personnel with vested balances less than $3,500.00.  The total of the distributions expected in 2003 is $403,163.66.   We wish these retirees well in enjoying their retirement benefits.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through August of 2003 are down approximately 0.5% over the same period in 2002.  This year's operating profit continues to be below 2002.  Reasons for the profit decline include: 1) Sales for some areas of the Company have not yet picked up due to strong competition and a continuing sluggish economy, 2) Margins and profits in most districts continue to be below goal and below last year, 3) Expenses in certain districts continue to increase without any corresponding sales increases and 4) Certain stores with extreme losses continue to drag on profits.  The viability of some of these locations is under continued review.  Overall profit is still being weighed down by settlements and defense costs and other legal costs relating to asbestos litigation as discussed on the back of this page.

## STORE CHANGES

Kelly-Moore continues to open stores in new markets where the stores are projected to realize an acceptable profit within a reasonable time frame.  In February, the Elk Grove Store in California was opened.  The Brentwood, California and Mesa, Arizona - Baseline stores were opened in March.  Then in May, a store was opened in Turlock, California.  Also planned to open in a couple of months are stores in Pleasanton and Palo Alto, California.

EXHIBIT

198

Thomas   4-18-08

KMH 010708

## ASBESTOS LITIGATION

Kelly-Moore continues to be a defendant in asbestos litigation. Currently there are about 45,000 claims against the Company. The allegations arise from a product manufactured decades ago by a prior subsidiary called Paco Textures Corporation. The manufactured products were joint compounds that contained asbestos fibre.

Kelly-Moore has insurance policies that to date have provided some coverage for asbestos litigation. However, Kelly-Moore continues to consume applicable coverage amounts from these policies at a rapid rate. In addition, due to the uncertain timing of payments from policies for claims, Kelly-Moore itself has significant settlement costs as well as monthly litigation costs affecting income this year.

Kelly-Moore continues to settle cases where it makes sense and vigorously contests or fights other cases in court where appropriate. However, these challenges continue to take a large toll on cash and profits and are likely to have a major effect on the value of the shares held by the ESOP.

Kelly-Moore currently has a large lawsuit seeking damages against a supplier of asbestos fibre used to make joint compounds. The lawsuit is set for trial in October 2003.

## QUESTIONS AND ANSWERS

Question: Remind us again, how does the ESOP work?

Answer: Our ESOP is a qualified retirement plan, where if you are an eligible employee, you share in the Company's contribution if you complete 1000 hours of work in a calendar year with Kelly-Moore. The contribution is used to allocate shares through the ESOP to you, and lets you become an Employee Owner under the ESOP. You do not have to pay anything or have anything deducted from your paycheck. At the end of the year, there is an independent valuation done that is used to determine the value of the ESOP shares at that time. Payout usually occurs at retirement at age 65.

There is the potential that share values could go down. The ongoing asbestos litigation mentioned above provides significantly more risk to adversely affect the ESOP value. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401(K) plans, IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

KMH 010709

# EXHIBIT 86
# TO DILLER DECLARATION



**EMPLOYEE STOCK OWNERSHIP PLAN**



# MIND OUR OWN BUSINESS

**July, 2006**

<u>Mind Our Own Business</u> is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2005 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1,000 hours for Kelly-Moore in 2005 have received a contribution for 2005.

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of $23,759,668.09 has been put into our ESOP for 2005. This includes a contribution out of Kelly-Moore profits of $22,590,921.64 and a contribution of $1,168,746.45 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. The amount of $22,590,921.64 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. This represents the loan payment made in December 2005. The note has been restructured with approval from the Board of Directors and the ESOP Trustee to make yearly payments on the note, with the note now scheduled to be fully paid in 2014. Remember that this was the loan that was used to buy the original stock in 1998. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $22,590,921.64 divided by the total of principal and interest of all remaining loan payments of $193,718,592.87. This result is then multiplied by the 19,640,764 remaining unallocated shares in the ESOP. This allows for a release of approximately 2,290,451.03 shares to employee shareholder accounts for 2005.

## SHARE VALUE

At December 31, 2005, the independent appraiser found the per share valuation increased from $2.70 in 2004 to $2.90 in 2005. This is the value that is used to value both old and new shares on the 2005 statements. Remember the stock price may go up or down based on many factors. Among other things, the independent appraiser looks at current profits, potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset levels, debt levels, market valuations of other paint companies and other items.

**EXHIBIT**

_205_

Thomas    4-18-08

KMH 010714

## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year are on a multi-step process based on your 2005 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12-31-05. The main reason why final balances may be higher than prior years is that the stock value is higher and the contribution also increases the number of shares.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants' forfeited shares that have been reallocated to you. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares. There continues to be risk in the ultimate value of the Kelly-Moore shares due to the ongoing asbestos litigation. Depending on the results of this litigation, there could be further severe effect to the value of the shares. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans (which now has a Company match of $1,000), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through May 2006 are up 1% over May 2005. Margins are down for 2006 and operating expenses are up for 2006. Profits for the company have decreased in 2006 compared to 2005. We hope to have a better 2nd half of the year to attempt to recoup some of the losses incurred earlier this year.

## TRUSTEE

An independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required independent of Kelly-Moore and the appraiser.

KMH 010715

**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. <u>SHARES</u> – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by the Moore trusts. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. The Series P-B shares have additional dividend rights, making it easier to make ESOP contributions.

2. <u>VALUE OF SHARES</u> – The fair market value of the shares at the statement date.

3. <u>CONTRIBUTIONS/INVESTMENTS</u> – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. <u>FORFEITURES</u> – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. <u>DISTRIBUTIONS</u> - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3,500.00, etc.

6. <u>VESTED PERCENTAGE</u> – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. <u>VESTED INTEREST VALUE</u> – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. <u>PER SHARE VALUE AS OF 12/31/05</u> – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. <u>PARTICIPANT STATUS</u> – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.

KMH 010716



10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1,000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1,000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1,000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1,000 hours was 1998, 1999, 2000, 2001, 2002, 2003, or 2004, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00, 12/31/01, 12/31/02, 12/31/03, or 12/31/04. Finally, if the first year that you worked 1,000 hours was 2005, the plan vesting date will show 12/31/05.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/05 starting from 12/31/96. A year of Service is a Plan Year in which you have 1,000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1,000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least by age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Corporate Personnel.

KMH 010717

# EXHIBIT 87
# TO DILLER DECLARATION





F LOYEE STOCK OWNERSHIP PLAN

# MIND OUR OWN BUSINESS

**July, 2007**

**Mind Our Own Business** is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan (ESOP) for Kelly-Moore Paint Company, Inc.

## ESOP STATEMENTS

The December 31, 2006 ESOP statements are now being distributed. Those persons with activity in their accounts received statements. Only eligible employees that worked over 1,000 hours for Kelly-Moore in 2006 have received a contribution for 2006.

## KELLY-MOORE CONTRIBUTION TO THE ESOP

A total of $23,570,807.77 has been put into our ESOP for 2006. This includes a contribution out of Kelly-Moore profits of $21,864,171.64 and a contribution of $1,706,636.13 to pay retirees over 65 years old and to pay terminated employees' vested balances that were less than $3,500.00. The amount of $21,864,171.64 was used to pay down the principal and interest on the ESOP loan from Kelly-Moore. This represents the loan payment made in December 2006. The note was restructured in 2005 with approval from the Board of Directors and the ESOP Trustee to make yearly payments on the note, with the note now scheduled to be fully paid in 2014. Remember that this was the loan that was used to buy the original stock in 1998. As the ESOP loan is paid down each year, a portion of the shares is released to be allocated to employee shareholder accounts. The release is calculated by taking the current principal and interest on the loan payment of $21,864,171.64 divided by the total of all remaining loan payments of $171,127,671.23. This result is then multiplied by the 17,350,313 remaining unallocated shares in the ESOP. This allows for a release of approximately 2,216,767.22 shares to employee shareholder accounts for 2006.

## SHARE VALUE

At December 31, 2006, the independent appraiser found the per share valuation remained the same as the 2005 valuation at $2.90 per share in 2006. This is the value that is used to value both old and new shares on the 2006 statements. Remember the stock price may go up or down based on many factors. Among other things, the independent appraiser looks at current profits, potential profits, asbestos and other litigation costs, future asbestos litigation risk, asset levels, debt levels, market valuations of other paint companies and other items.

EXHIBIT
_206_
Thomas   4-18-08

P1113

**K-M Industries Holding Co., Inc.**
**Employee Stock Ownership Plan**
**Participant Statement Glossary**

1. **SHARES** – The number of shares of K-M Industries Holding Co., Inc. Series P-B allocated to your account. The Series P-A and P-B shares represent all of the interest in Kelly-Moore Paint Company. The Series P-A represents the 58% of Kelly-Moore owned by the Moore trusts. They are basically the same as P-B except that they have less dividend rights than Series P-B. The ESOP has the Series P-B shares representing 42% of Kelly-Moore Paint Company. The Series P-B shares have additional dividend rights, making it easier to make ESOP contributions.

2. **VALUE OF SHARES** – The fair market value of the shares at the statement date.

3. **CONTRIBUTIONS/INVESTMENTS** – Your portion of the shares released made possible by the contribution by Kelly-Moore Paint Company, Inc. It also includes any unrealized gain or loss from the change in stock value.

4. **FORFEITURES** – The non-vested account balances from terminated employees, which are reallocated to other participants. In certain instances, upon reemployment, forfeited portions of accounts may be restored. Please see summary plan document.

5. **DISTRIBUTIONS** - The amount of any distributions you have received during the plan year, due to retirement or termination with an account balance less than $3,500.00, etc.

6. **VESTED PERCENTAGE** – The percentage of the account that you have earned by virtue of your length of service to the company. This percentage relates directly to your Plan Years of Service shown at the right of the document.

7. **VESTED INTEREST VALUE** – The value of your vested (earned) balance of your account. The vested portion of your account is yours and cannot be lost through forfeiture, but may increase or decrease based on stock price change.

8. **PER SHARE VALUE AS OF 12/31/06** – The fair market value of one share of K-M Industries Holding Co., Inc. Series P-B. An independent appraiser values this stock on an annual basis.

9. **PARTICIPANT STATUS** – NP is a new participant.
   B1, B2, DD, TA, TE, TI are participants who have terminated.
   CP and PA are continuing participants.
   PD is a participant paid in full due to being fully vested at retirement.
   PX is a participant who has forfeited balances due to lack of vesting.
   RH is a participant who has both quit and then rehired since the start of the plan.
   RN is a participant who has retired after 65 years of age.


## YOUR PORTION OF THE SHARE ALLOCATION

The shares allocated to you this year are on a multi-step process based on your 2006 total earnings. It is included on the investment line on your statement. In addition, the investment line includes the unrealized gain or loss this year on the change in stock value at 12/31/06. The main reason why final balances may be higher than prior years is that the contribution increases the number of shares held in your account.

## FORFEITURES

Again this year, you may see activity on the forfeiture line. Forfeitures arise from participants who terminate before they are fully vested. If you see a negative amount on this line, it represents the amount you lost from terminating your employment before your shares were fully earned and vested. Alternately, if you see a positive amount on this line, this is the portion of terminated participants' forfeited shares that have been reallocated to you. Remember that unless **YOU** stay at Kelly-Moore and become 100% fully vested, you lose your nonvested shares when you terminate. These shares are then split up and reallocated to other participants.

## RISK RELATING TO YOUR ESOP ACCOUNT INVESTMENTS

The Kelly-Moore portions of the ESOP's assets by design were and are invested only in Kelly-Moore shares. There continues to be risk in the ultimate value of the Kelly-Moore shares due to the ongoing asbestos litigation. Depending on the results of this litigation, there could be further severe effect to the value of the shares. Because of this risk, individuals should consider diversification of their retirement assets by not having all retirement assets in one plan with concentrated risk. This can be done by participating in other retirement vehicles such as 401K plans (which has a Company match of $1,000), IRA's, Roth IRA's and other plans that provide additional diversification of total retirement assets.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Store sales through June 2007 are down 6.4% versus June 2006. Margins are up for 2007 and operating expenses are up as well. Profits for the company have decreased in 2007 compared to 2006. We hope to have a better 2nd half of the year to attempt to recoup some of the losses incurred earlier this year.

## TRUSTEE

An independent Trustee, North Star Trust has been appointed as a Trustee for the ESOP. North Star will handle all fiduciary responsibilities. They will also handle all distributions as required, independent of Kelly-Moore and the appraiser of the stock.




10. **ENTRY DATE** – Entry Date is the effective beginning of the plan year that you become eligible to participate in the ESOP. There are no entry dates before the plan started effective 1/1/98. An employee's entry date is the beginning of the year in which he or she has 1,000 hours worked in a calendar year at Kelly-Moore after 1/1/98.

11. **PLAN VESTING DATE** – Although the plan began in 1998, the plan allows you to accrue up to two prior years of service if you worked 1000 hours in 1996 or 1997 for Kelly-Moore. The plan vesting date will be one of several dates. If you worked 1,000 hours in 1996, the plan vesting date will show 12/31/96. If the first year that you worked 1,000 hours was in 1997, the plan vesting date will show 12/31/97. If the first year that you worked 1,000 hours was 1998, 1999, 2000, 2001, 2002, 2003, 2004 or 2005, the plan vesting date will show 12/31/98, 12/31/99, 12/31/00, 12/31/01, 12/31/02, 12/31/03, 12/31/04, or 12/31/05. Finally, if the first year that you worked 1,000 hours was 2006, the plan vesting date will show 12/31/06.

12. **PLAN YEARS OF SERVICE** – The total number of Years of Service you have with Kelly-Moore as of 12/31/06 starting from 12/31/96. A year of Service is a Plan Year in which you have 1,000 Hours of Service.

13. **VESTING HOURS** – The number of Hours of Service that you worked during the plan year. This number is only used to determine whether the minimum 1,000 hours of service was reached for eligibility and vesting.

14. **PLAN RETIREMENT DATE** – This is the date of retirement at age sixty-five (65). Although you are not required to retire at 65 under the plan, you are eligible to receive a distribution not later than one year after the plan year-end when you retire at least by age 65.

**Note:** This is only a brief explanation of major terms used here. If any more detailed information is needed, please refer to your Summary Plan Description. The actual Plan and Trust Documents govern at all times. If you need a copy of the Summary Plan Description, please request a copy from Dan Stritmatter at (650) 610-4115.

# EXHIBIT 88
# TO DILLER DECLARATION

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3            SAN FRANCISCO AND OAKLAND DIVISION

 4

 5    _____

 6    THOMAS FERNANDEZ, et al.,            )
                                           )
 7                 Plaintiffs,             )
                                           )
 8          vs.                            ) Case No.
                                           )
 9    K-M INDUSTRIES HOLDING CO., INC., et al.,  ) C-06-07339 CW
                                           )
10                 Defendants.             )
                                           )
11                                         )
                                           )
12                                         )
13    _____

14

15         VIDEOTAPED DEPOSITION OF TOSHA THOMAS
                     April 18, 2008
16               San Francisco, California

17

18

19

20

21

22    Reported by:
      EMI ALBRIGHT
23    RPR, CSR No. 13042
      Job No. 79885
24

25
```

1      A    Just basically remailing it to that

2  whatever the participant was at the time or is.

3  BY MR. HANNAN:

4      Q    Now, going back to the complaint that you

5  have in front of you, which is Exhibit 147, would you

6  look at paragraph 7?  And after you've had a chance to

7  read it, I will ask you whether the facts set forth in

8  paragraph 7 are true.

9      A    There is one something -- well, there's one

10 thing on here that is incorrect.

11     Q    What is that?

12     A    My address on here is incorrect.

13     Q    All right.  Anything else?

14     A    No.

15     Q    And what correction should you make to your

16 address?

17     A    That I moved to a different city.

18     Q    And what city is that?

19     A    Palo Alto, California.

20     Q    So it is correct that since 2001 you were a

21 participant in the Kelly-Moore ESOP; true?

22     A    Yes.

23     Q    Ms. Thomas, is it true that in 2005 you

24 learned for the first time that Kelly-Moore was liabl-

25 to numerous plaintiffs for asbestos?

1    A    I believe it to be earlier than that.

2    Q    Well, let's look at paragraph 53.  And if

3  you go down to line 17 and the first part of line 18, do

4  you see that it states there, plaintiff Thomas, meaning

5  you, was unaware that Kelly-Moore was liable to numerous

6  plaintiffs for asbestos litigation until in or about

7  2005.

8         Is that --

9    A    I would say it was a little bit before

10  that.

11   Q    All right.  And when was it?

12   A    Beginning of 2003, I believe.

13   Q    2003.  So this, to be accurate, this

14  complaint should read, plaintiff Thomas was unaware that

15  Kelly-Moore was liable to numerous plaintiffs for

16  asbestos litigation until in or about early 2003;

17  correct?

18   A    Yes.

19   Q    All right.  Ms. Thomas, is it true that KMH

20  or any K-M entity intentionally withheld info about

21  Kelly-Moore's potential asbestos liabilities until the

22  fall of '04?

23        MS. HASSELMAN:   Objection.  Calls for a

24  legal conclusion.  Calls for speculation.

25   A    I don't know.

77

```
1    debt levels might affect the share price valuation?
2              MS. HASSELMAN:   Objection.  Vague and
3    ambiguous.
4         A    No.
5    BY MR. HANNAN:
6         Q    Do you know what assets and debts are?
7         A    When you incur debts from maybe you've
8    purchased more than you can pretty much afford.
9         Q    Okay.  And what are assets?
10        A    I believe it to be your property that you
11   have.
12        Q    All right.  And when did you first
13   understand that the asset and debt levels at Kelly-Moore
14   might affect your valuation of your ESOP shares?
15             MS. HASSELMAN:   Objection.  No foundation.
16        A    To my knowledge 2003.
17   BY MR. HANNAN:
18        Q    I see.  And how is it you recall that in
19   2003?
20             MS. HASSELMAN:   Objection.  Vague.
21        A    Just from brief discussions.
22   BY MR. HANNAN:
23        Q    And with whom did you have that discussion?
24        A    I, myself, didn't have it.  It was just
25   brought to our attention from an upper management.
```

1    Q    Who was it in upper management that brought

2  it to your attention?

3    A    Pat McDonald.

4    Q    What was Mr. McDonald's job title?

12:01   5    A    He was the VP of loss prevention.

6    Q    All right.  And what is it that

7  Mr. McDonald said that caused you to become aware of the

8  effect of asset and debt levels on the valuation of ESOP

9  shares?

12:01  10    A    He just basically mentioned that there was

11  a lot of asbestos litigation and that can cause damage

12  or harm to the ESOP plan.

13    Q    I see.  Anything else?

14    A    No.

12:01  15    Q    All right.  Now, you see the reference

16  here, do you not, to asbestos litigation in this same

17  paragraph?

18    A    Yes.

19    Q    And you agree with me that if this was

12:01  20  distributed in the ordinary course of business, you

21  would have seen that in or about May of 2001; true?

22        MS. HASSELMAN:   Objection.  Misstates

23  prior testimony.  Calls for speculation.  No foundation.

24  Assumes facts not in evidence.

12:02  25    A    I'm sorry.  Please repeat the question,

1   been attached, particular because the last page is the

2   summary annual report.

3        The date is October 2001.  Production Nos. KMH

4   010684 through 89.

5             MS. HASSELMAN:   I will object.  We don't

6   necessarily agree with the characterization of the

7   document.  We don't have evidence about what was or

8   wasn't attached, which pages were attached together in

9   the originals.

10             MR. HANNAN:   This is Exhibit 191.

11             (Exhibit No. 191 marked

12                  for identification.)

13

14   BY MR. HANNAN:

15        Q   Ms. Thomas, did you receive Exhibit 191 on

16   or shortly after the date it bears, October 2001?

17        A   I would say after.

18        Q   Okay.  How much after?

19             MS. HASSELMAN:   Objection.  Vague.

20        A   Maybe a month or so.

21   BY MR. HANNAN:

22        Q   So you might have received it in November

23   '01?

24        A   Yes.

25        Q   All right.

ESQUIRE DEPOSITION SERVICES
800.770.3363

1    see that?

2         A    Okay.  Sorry.

3         Q    You were aware of that fact, weren't you,

4    that the large asbestos judgment against Kelly-Moore

5    existed at least as of November of '01?

6              MS. HASSELMAN:  Objection.  Vague and

7    ambiguous.  Asked and answered.  Assumes facts not in

8    evidence.  No foundation.

9         A    No, not that I recall, no.

10   BY MR. HANNAN:

11        Q    When did you first learn about this large

12   asbestos judgment?

13             MS. HASSELMAN:  Same -- well, objection.

14   Assumes facts not in evidence.

15        A    Just from what was brought to our attention

16   in beginning of '03.

17   BY MR. HANNAN:

18        Q    I see.  And it was your habit, however, to

19   read these Mind Our Own Business when you first received

20   them; true?

21             MS. HASSELMAN:  Objection.  Argumentative.

22        A    When I did receive them, yes, I would scan

23   through them.

24   BY MR. HANNAN:

25        Q    And this particular one on the third page

1    whether in or about the same time frame, that is, let's

2    say October to the end of 19 -- excuse me.  Strike that.

3         The time frame October of '01 to the end of

4    December of '01, did you hear just in discussion around

5    the company in sum and substance that there was concern

6    about the asbestos litigation being of concern to the

7    financial health and stock price of the company?

8         MS. HASSELMAN:  Objection.  Asked and

9    answered.

10        A    No.

11   BY MR. HANNAN:

12        Q    You never heard that until sometime in '03?

13        A    Yes.

14        Q    Was that in January of '03?

15        A    Probably I would say maybe March of '03.

16        Q    March of '03?

17        A    Yes.

18        Q    Okay.  Now, do you know where these Mind

19   Our Own Business newsletters were filed?

20        MS. HASSELMAN:  Objection.  Vague and

21   ambiguous.  Assume facts not in evidence.

22        A    No, I don't know.

23   BY MR. HANNAN:

24        Q    Were they filed anywhere in the HR

25   department?

99

1
2     BY MR. HANNAN:
3         Q    And what is your recollection about these
4     some that you might have had on file as additional
5     documents?
6             MS. HASSELMAN:    Objection.  Vague and
7     ambiguous.
8         A    Basically I just remember it just being
9     extra copies of this particular document.
10    BY MR. HANNAN:
11        Q    And but you do recall seeing this document
12    before?
13        A    Yes.
14        Q    All right.  And what is your best
15    recollection as to when you first saw it?
16        A    I would say later in '02 after February.
17        Q    After February?
18        A    Yes.
19        Q    In March?
20        A    I don't remember exact dates.
21        Q    Can you tell us whether it was between the
22    1st of March and the 1st of June?
23        A    Possibly, maybe around April possibly.
24        Q    All right.  And among the things stated in
25    Exhibit 193 under the heading, asbestos litigation, is

1    the following:  Asbestos litigation continues to

2    challenge the company.

3             You were aware of that not later than April

4    of '02?

5             MS. HASSELMAN:  Objection.  Asked and

6    answered.  Misstates prior testimony.

7        A    Yes.

8    BY MR. HANNAN:

9        Q    And were you also aware that in the final

10   quarter of '01 over 10,000,000 was paid out with regard

11   to asbestos claims?

12            MS. HASSELMAN:   Same objection.

13       A    I don't know.

14            MS. HASSELMAN:   Actually, I'm sorry.  I

15   need to add an objection of vague and ambiguous to the

16   question, you were aware of that not later than April of

17   '02.

18   BY MR. HANNAN:

19       Q    And you were aware, were you not, not later

20   than April of '02 of the company's current belief that

21   the asbestos litigation is likely to depress the stock

22   price of the company?

23            MS. HASSELMAN:   Objection.  Asked and

24   answered.

25       A    Please repeat it, please.

1          A        The summary annual report as of

2    December 31 -- December 31st 2001, is attached.

3          Q    Does that refresh your memory that, in

4    fact, the summary annual report was attached to this

5    Exhibit 195 at the time you saw it?

6               MS. HASSELMAN:   Objection.  Lacks

7    foundation.  You haven't established when she saw it.

8          A    No, not that I remember, no.

9    BY MR. HANNAN:

10         Q    Now, on the second -- you did see this

11   document, did you not, as you say, except for the pages

12   that are called the summary annual report?

13         A    Yes.

14         Q    All right.  And you saw it in or sometime

15   shortly after October of 2002?

16              MS. HASSELMAN:   Objection.  Misstates

17   prior testimony.

18         A    After 2002 -- sorry.  After October 2002.

19   BY MR. HANNAN:

20         Q    After October.  And when, when do you

21   recall it was in 2002?

22              MS. HASSELMAN:   Objection.  Misleading.

23   Assumes facts not in evidence.  Mischaracterizes prior

24   testimony.

25         A    Possibly beginning of '03.

123

1    BY MR. HANNAN:

2         Q    January of '03?

3         A    I'm not exact on the date but between

4    January and February.

5         Q    Okay.  When you saw it, you read it?

6         A    Yes.

7         Q    And on the second page do you see the

8    section entitled, asbestos litigation?

9         A    Yes.

10        Q    You read that when you first saw

11   Exhibit 195; true?

12             MS. HASSELMAN:  Objection.  Vague and

13   ambiguous.  I will object to the form of the question.

14        A    Yes, I scanned over it briefly, yes.

15   BY MR. HANNAN:

16        Q    And you became aware that there were over

17   30,000 claims against the company?

18             MS. HASSELMAN:  Objection.  Vague and

19   ambiguous.  Assumes facts not in evidence.

20        A    That I can remember, yes.

21   BY MR. HANNAN:

22        Q    And you were aware that the asbestos issues

23   arose from a product managed -- excuse me --

24   manufactured by a prior subsidiary called PACO; true?

25             MS. HASSELMAN:  Object to the form of the

1    ambiguous.  Misstates prior testimony.  Misleading.
2    Lacks foundation.
3        A    Yes.
4    BY MR. HANNAN:
5        Q    And did you discuss the subject matter of
6    that lawsuit with anyone?
7        A    No.
8        Q    Did you make any attempt to learn anything
9    more about it?
10        A    No.
11        Q    And have you heard of something called the
12    Union Carbide litigation?
13        A    No.
14        Q    Now, there's a series of names that are on
15    the third page here.  Were you involved at this time in
16    trying to locate or assist with locating any of the
17    people listed on the third page of Exhibit 195?
18        A    Yes, I have.
19        Q    What was your role?
20        A    Read any documents or any certificates that
21    we mailed out, once if they were returned to us, with an
22    address, we would reforward it to that person who it
23    belongs to.
24        Q    And that could have included some of the
25    folks listed on this page?

127

1          MS. HASSELMAN:    Objection.  Calls for

2    speculation.

3          A    Yes.

4    BY MR. HANNAN:

5          Q    All right.  And you had been involved in

6    that process the entire time you had been with the HR

7    department; true?

8          MS. HASSELMAN:    Objection.  Asked and

9    answered.

10          A    The entire time, no.

11    BY MR. HANNAN:

12          Q    When did you first become involved with it?

13    This is now sometime in '02 or early '03.

14          MS. HASSELMAN:    Objection.

15    BY MR. HANNAN:

16          Q    Were you --

17          MS. HASSELMAN:    I don't think you have

18    established the time frame.

19          A    Well, I don't remember exact but they

20    weren't doing this the whole time when they were mailing

21    out the statements.

22    BY MR. HANNAN:

23          Q    Well, would you look at Exhibit 191 and see

24    if you can tell me whether you were involved in that

25    process at or about the date of Exhibit 191.  And if you

```
 1   want to look at the list of names, it would be on the
 2   third page.
 3               MS. HASSELMAN:   Objection.  Vague and
 4   ambiguous.
 5        A    I was involved in some of the mail outs but
 6   I can't recall this particular one here.
 7   BY MR. HANNAN:
 8        Q    This Debbie Culmer that is referred to on
 9   that page, that was your supervisor?
10        A    Yes.
11        Q    And you were at extension 161?
12        A    Yes.
13        Q    And she was at 187?
14        A    Yes.
15        Q    All right.  Now, there's a second page,
16   page 4 with some more names.  Are any of those names
17   that refresh your memory?
18               MS. HASSELMAN:   Which exhibit are we on
19   now?
20               MR. HANNAN:   191.
21               MS. HASSELMAN:   Objection.  Vague and
22   ambiguous.  Refresh her memory as to what?
23        A    Some of the names, yes.
24   BY MR. HANNAN:
25        Q    You recognize some of those names?
```

```
 1        A    Yes.
 2        Q    And were you involved in the process of
 3   trying to locate some of those people?
 4        A    Yes.
 5        Q    Now, can you tell us which names you
 6   recognize?
 7        A    Christopher Butler.
 8        Q    Anyone else?
 9        A    Verna Canfield.
10        Q    Anyone else?
11        A    Kenneth Crews.
12        Q    Any others?
13        A    Wilson Drummond.
14        Q    I'm sorry.  Didn't hear what you said.
15        A    Wilson Drummond.
16        Q    Drummond?  All right.
17        A    Yes.
18        Q    Any others?
19        A    Kamarlo McKinney.
20        Q    Any others?
21        A    Royce Richards.
22        Q    Any others?
23        A    Ronnie Wolfe.
24        Q    All right.  I take it that's the last one
25   since that's the last name?
```

ESQUIRE DEPOSITION SERVICES
800.770.3363

```
 1        A    Yes.

 2        Q    Did you succeed in locating any of these

 3   folks?

 4        A    Not that I remember, no.

 5        Q    Do you know whether or not they were

 6   located?

 7             MS. HASSELMAN:    Objection.  Calls for

 8   speculation.

 9        A    No.

10   BY MR. HANNAN:

11        Q    If we compare Exhibit 191 and Exhibit 195,

12   would you agree that Mr. Butler was no longer on the

13   list as of the date of Exhibit 195?

14             MS. HASSELMAN:    Objection.  Vague and

15   ambiguous.

16        A    Yes.

17   BY MR. HANNAN:

18        Q    And do you know why that is?

19        A    Could have been that he was located.

20        Q    All right.  And the same is true of Verna

21   Canfield; true?

22             MS. HASSELMAN:    Objection.  Vague and

23   ambiguous.  Calls for speculation.

24        A    Yes, it could have been, yes.

25   BY MR. HANNAN:
```

131

```
 1        Q    Same thing is :: .. of Kenneth Crews?

 2             MS. HASSELMAN:    Objection.  Vague and

 3   ambiguous.  Unintelligible.  It's not clear what you are

 4   asking her is true of Kenneth Crews.

 5        A    Yes.

 6   BY MR. HANNAN:

 7        Q    And the same thing is true of Wilson

 8   Drummond?

 9             MS. HASSELMAN:    Same objections.

10        A    Yes.

11   BY MR. HANNAN:

12        Q    Same thing is true of Kamarlo McKinney?

13             MS. HASSELMAN:    Same objections.

14        A    Yes.

15   BY MR. HANNAN:

16        Q    And the same thing is true of Royce

17   Richards?

18             MS. HASSELMAN:    Same objections.

19        A    Yes.

20   BY MR. HANNAN:

21        Q    And as to Mr. Wolfe, Mr. Wolfe is the only

22   one of those you mentioned who still remain missing as

23   of the date of Exhibit 195; true?

24             MS. HASSELMAN:    Objection.  Assumes facts

25   not in evidence.  Mischaracterizes prior testimony.
```

1    Calls for speculation.

2         A    Yes.

3         MR. HANNAN:    Mark as next in order

4    Exhibit 196 a company Mind Our Own Business newsletter

5    dated December 2002, production No. KMH 010703.

6         MS. HASSELMAN:    I will object that we

7    don't necessarily agree to the characterization.    The

8    document speaks for itself.

9              (Exhibit No. 196 marked

10                  for identification.)

11

12   BY MR. HANNAN:

13        Q    Can you identify Exhibit 196 for us,

14   please?

15        MS. HASSELMAN:    Objection.    Calls for

16   speculation.    No foundation.

17        A    It's a Mind Our Own Business document.

18   BY MR. HANNAN:

19        Q    Do you have any reason to believe that you

20   did not receive this on or shortly after the date it

21   bears, December 2002?

22        MS. HASSELMAN:    Objection.    Calls for

23   speculation.    Assumes facts not in evidence.    No

24   foundation.

25        A    I would say after December of 2002.

```
 1   record.   The time is 4:47 p.m.
 2
 3
 4                    EXAMINATION
 5   BY MR. SULLIVAN:
 6        Q     Ms. Thomas, my name is Andrew Sullivan.  I
 7   am an attorney for North Start Trust Company.  I only
 8   have a few questions for you.  I know it's been a long
 9   day.
10             Do you know who North Start Trust Company
11   is?
12        A     I am somewhat familiar with it, yes.
13        Q     And can you describe your understanding of
14   who they are?
15        A     That North Star basically stepped in as a
16   temporary like sort of a trustee for the ESOP plan.
17        Q     And do you know when they stepped in as a
18   trustee for the ESOP plan?
19        A     No, I don't remember.
20        Q     Did you know at one time and you just don't
21   remember today or you weren't sure when they stepped in?
22        A     I don't remember the exact date today.
23        Q     Okay.  What claims do you believe that you
24   are asserting against North Star in the second amended
25   complaint?
```

16:47  5
16:47  10
16:47  15
16:47  20
16:48  25

206

1          MS. HASSELMAN:   Objection.  Calls for a

2  legal conclusion.

3          A    Like I had stated earlier, that the plan

4  paid too much.

16:48  5  BY MR. SULLIVAN:

6          Q    And do you believe you have any other

7  claims against North Star, whether they have been

8  asserted or not?

9          A    No.

16:48  10         MS. HASSELMAN:   Objection.  Vague and

11  ambiguous and calls for a legal conclusion.

12  BY MR. SULLIVAN:

13         Q    And do you think that you personally have

14  sustained any losses because you weren't a participant

16:48  15  back in 1998?

16         MS. HASSELMAN:   Objection.  Calls for a

17  legal conclusion and vague and ambiguous.

18         A    I don't know.

19  BY MR. SULLIVAN:

16:48  20         Q    Do you think the subsequent valuations

21  after the initial transaction were appropriate?

22         MS. HASSELMAN:   Objection.  Calls for a

23  legal conclusion.

24         A    I don't know.

16:49  25  BY MR. SULLIVAN:

207

```
 1          Q    With respect to Exhibit 147 there is a
 2    question withdrawn, but I think I would like to ask the
 3    follow up, which is could you state each and every fact
 4    that defendant fiduciaries have intentionally withheld
```
16:49 `5    information about the extent of KMH's potential asbestos`
```
 6    liability from participants who are terminated
 7    employees?  Do you have any facts to support that
 8    statement?
 9               MS. HASSELMAN:   Objection.  Calls for a
```
16:49 `10   legal conclusion.  Compound.  Vague and ambiguous.`
```
11    Misleading.
12          A    No.
13               MR. SULLIVAN:   I don't think I have any
14    other questions.
```
16:50 `15               MS. HASSELMAN:   We have just a couple`
```
16    short things.  I don't think we need another break.
17    Give me just a minute.
18
19
20                         EXAMINATION
21    BY MS. HASSELMAN:
22          Q    I know this is a little awkward because I
23    am sitting next to you and the camera angle is a little
24    odd, but I'm just going to ask you a couple quick
```
16:50 `25    clarifying questions.`

STATE OF CALIFORNIA )

  : ss          )

County of Alameda   )

        I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:  That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

        I further certify that I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

        IN WITNESS WHEREOF, I have this date subscribed my name.

APR 2 8 2008

Dated:_____

_Emi Albright_____

EMI ALBRIGHT, CSR No. 13042

**EXHIBITS 89-97**
**TO DILLER DECLARATION**

# EXHIBIT 89
# TO DILLER DECLARATION



**EMPLOYEE STOCK OWNERSHIP PLAN**



# MIND OUR OWN BUSINESS

**Volume II, Issue 3**                                              October, 2001

Mind Our Own Business is the Newsletter for participants in the K-M Industries Holding Co., Inc. Employee Stock Ownership Plan for Kelly-Moore Paint Company, Inc.

## ESOP DISTRIBUTIONS

On September 30, 2001, The ESOP is proud to have made its third year of distributions for personnel leaving the Company in 2000. The plan allows distributions now only for retirees over 65 years and for terminated personnel with vested balances less than $3,500.00. The total of the distributions in 2001 was $354,459.47. We wish these retirees well in enjoying their retirement benefits.

## ESOP COMMUNICATIONS

Unfortunately, there are still individuals that we have had difficulty sending ESOP communications to due to changes of addresses, etc. If you know any individuals listed on the attached sheets, please have them call Debbie Culmer in our Human Resources Department at 650-592-8337 extension 187 so that they may receive information.

## KELLY-MOORE PAINT COMPANY FINANCIAL NEWS

Sales through September of 2001 including the Kelly-Moore Ponderosa acquisition are up approximately 1% over the same period in 2000. Operating profit continues to be down in 2001. Reasons for the profit decline include: 1) Declining sales for the whole Company in five of the last seven months partially due to a tightening economy, 2) Margins and profits in certain outlying districts that are still not up to K-M standards and 3) Loss stores continue to drag on profits.

One item you may have noticed in the news in September is the large asbestos judgement against Kelly-Moore. Kelly-Moore is appealing the judgement, and it is believed that we should prevail on appeal. Kelly-Moore does have insurance to cover normal damages in this case. The Company works very hard to defend itself against asbestos litigation, but such litigation continues to be a concern to the financial health and the stock price of the Company. We hope that you will continue to work hard with us as we continue to fight those legal firms that unfairly target our Company with such litigation.

## SUMMARY ANNUAL REPORT

Also attached is the Summary Annual Report as of December 31, 2000. Under the law, the Plan is required to furnish a Summary Annual Report in the attached format as of the end of the calendar year of the Plan.



**EXHIBIT**

*83*

*Ferrari   3-26-08*

KMH 000103

## NEW RULES IN 2002 BETWEEN ESOP's AND 401K's

In conjunction with the new tax laws passed by Congress effective January 1, 2002, there are fewer limitations between 401K plans and ESOP's. This means that it is unlikely that in 2002, even at the highest 15% deferral into the 401K, that there will be any limitation to your ESOP contribution. Please see the attached article for more detailed examples.

Recently, you may have noticed new posters on the 401K plan in stores and factories. Retirement assets should be allocated among many things based on risk. Remember that the ESOP is not a separate "fund" like the 401K plan funds. The ESOP represents company shares. Payouts are dependent on a high stock price, sufficient profits, and sufficient assets and cash to make payments out of company operating funds. With less restrictions now on the 401K, serious thought should be given to the many choices of funds in the 401K plan, so that retirement funds consider various instruments and risk levels. To start your 401K plan call Corporate personnel at 650-592-8337 extension 187. If you have any changes to your 401K contribution level, it should be in to Corporate Personnel by 11-30-01.

## QUESTIONS AND ANSWERS

Question: Remind us again, how does the ESOP work?

Answer: Our ESOP is a qualified retirement plan where if you are an eligible employee, you share in the Company's contribution if you complete 1000 hours of work in a calendar year with Kelly-Moore. The contribution is used to allocate shares through the ESOP to you, and lets you become an Employee Owner under the ESOP. The beauty is that you do not have to pay anything or have anything deducted from your paycheck to get your share. At the end of the year, there is an independent valuation done that is used to determine the value of the ESOP shares at that time. Payout usually occurs at retirement at age 65.

Question: I have worked for Kelly-Moore part time for more than a year since April of 2000, and I did not get a statement or any contribution. When will I get one?

Answer: You need to work more than 1000 hours in a calendar year. If you do that in 2001 and are eligible, you will receive a statement in 2002 showing your contribution.

Question: My statement shows vested % at 0% and vested interest value at $0.00. What does this mean?

Answer: If you didn't work 3 years (1000 hours in each of 3 years) through 2000, you have no vesting yet, meaning that if you leave you will forfeit your right to your shares. Vesting is 3 years 20%, 4 years 40%, 5 years 60%, 6 years 80% and 7 years 100%. Vesting is designed this way by the federal government to encourage an employee to stay with an employer, participate and contribute through a full year with the Company.

KMH 000104

# EXHIBIT 90
# TO DILLER DECLARATION



**CONFIDENTIAL**



May 23, 2002

Dear CIG Owner and Team Member:

We have completed the fourth year of our Employee Stock Ownership Program, and I am pleased to announce that the value of our company and personal ownership continues to grow. Upon completion of their annual appraisal of CIG, Duff and Phelps has set the value of our company at $4.18 a share. This current fair market value is 15% higher than last year's value of $3.63. Additionally, as each year passes, the vested portion of our stock balance increases as long as we continue to be active and qualified members of the CIG team.

I again want to remind you that there are many factors that can positively or negatively affect the value of our CIG stock. Several of the key factors include company growth and profit performance, the stock performance of publicly traded insurance companies similar to CIG, and the reduction of our ESOP loan principal. One other factor has been brought to our attention that may have an effect on the future value of our CIG stock. K-M Industries Holding Co., Inc., our holding company, also owns Kelly-Moore Paint Company. Significant asbestos claims have been filed against Kelly-Moore. To date, the costs of these claims have been covered by insurance policies. Kelly-Moore is vigorously proceeding against its various insurance carriers to assure coverage for these asbestos-related claims. As the asbestos litigation continues against Kelly-Moore, Kelly-Moore's current belief is that the litigation is likely to depress its stock value. As a result of our joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation may depress the value of our CIG stock, which would affect the value of your ESOP account.

As we have communicated to you at our Quarterly Owner/Employee Meetings, we have many challenges facing us, and we are meeting these challenges with timely and decisive actions that will keep our company on a course of long-term profit and growth. I assure you that, to the best of our ability, your management team is highly focused and dedicated to do all we can to ensure that the operating and financial position of CIG will not be compromised over the long term by market conditions or emerging liabilities.

Sincerely,

Peter M. Cazzolla
President and Chief Executive Officer

pmc/lld

**EXHIBIT**

27

Cazzolla    3-19-08

HOME OFFICE
P.O. Box 3110, Monterey, California 93942-3110
(800) 682-9255 ● (831) 649-1155 ● FAX # (831) 847-8649 ● www.ciginsurance.com
California Capital Insurance Company ● Eagle West Insurance Company ● Monterey Insurance Company ● Nevada Capital Insurance Company

CIG 003587

# EXHIBIT 91
# TO DILLER DECLARATION



**CALIFORNIA INSURANCE GROUP**
Inter-Office Memorandum

Date:     January 21, 2003

To:       All CIG Team Members

From:     Peter Cazzolla

Subject:  Kelly-Moore Asbestos Litigation

**CONFIDENTIAL**

As we have done in the past four years of our ESOP, we will again contract with Duff & Phelps to appraise the value of our CIG "tracking" stock to determine the value of our ESOP accounts.

When we distributed your ESOP statement to you in June 2002, included with your statement was a note from me summarizing the company's stock-appraisal results and a statement advising you about Kelly-Moore's asbestos litigation. As a follow-up to this advisement, our sister company, Kelly-Moore, continues to be a defendant in asbestos litigation. Currently there are over 30,000 claims pending against Kelly-Moore. These claims arise from a product manufactured decades ago by a prior subsidiary called Paco Textures Corporation. The manufactured product was a joint compound that contained asbestos.

Although the pending claims have been asserted against Kelly-Moore rather then CIG, which are both owned by K-M Holdings, you should be aware that there are some circumstances under which the asbestos litigation might adversely affect the value of the shares held by your ESOP. These shares— like those held by the Kelly-Moore ESOP—are actually "tracking" shares issued by K-M Holdings, itself. The shares held by your ESOP will track the performance of CIG and the shares held by the Kelly-Moore ESOP will track the performance of Kelly-Moore. Both sets of tracking shares, however, are subject to whatever debts K-M Holdings, itself, might have to third parties. Therefore, to the extent that any claim—even one arising out of Kelly-Moore's operations—is ultimately satisfied by K-M Holdings rather than one of its subsidiaries, the value of the shares held by your ESOP may be affected adversely.

pmc/lld

EXHIBIT
_28_
Cazzolla   3-19-08

CIG 002447

# EXHIBIT 92
# TO DILLER DECLARATION





HERBERT R. GIFFINS
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

June 30, 2003

To All Eligible Employees:

Enclosed is your Employee Stock Ownership Plan (ESOP) statement. This statement represents contributions offset by changes in valuation to the plan for the year 2002. Your next statement will be sent to you in 2004 after 2003 results are finalized and your account data is completed. We will continue to keep you informed by periodic mailings of "Mind Your Own Business."

Profitability of our Company remains one of the key factors in valuing your shares. We all need to make every effort to grow sales and improve our profitability. You can help us achieve that objective by working as a team at all levels of the company to provide responsive customer service, while managing our day to day expenses.

Thank you for your contributions this past year and continue to push paint. Paint is who we are...the more we sell, the better for all of us.

Sincerely,

Herbert R. Giffins
President and CEO

HRG:jmb

EXHIBIT
95

Giffins 3-28-08

987 COMMERCIAL ST. SAN CARLOS, CA 94070-1516 • (650) 592-8337 X113 • FAX: (650) 592-1022 • HGIFFINS@KELLYMOORE.COM

KMH 004884

# EXHIBIT 93
# TO DILLER DECLARATION





**CONFIDENTIAL**

October 31, 2005

To All Eligible Employees

Enclosed is your 2003 Employee Stock Ownership Plan (ESOP) statement. As you know, this statement as well as the 2004 statement has been delayed because of the Trustees' inability to secure an independent evaluation due to the Company's potential asbestos liability. While asbestos litigation continues to be a negative influence on the Company, the Company's recent improvement in sales and expense control is having a positive effect on the per share value.

I am pleased to announce that the 2003 per share value is $2.3000. $2.3000 only represents an (11%) decline ($.2875 cents) from the 2002 price of $2.5875. However, it is important to note that 2002's price of $2.5875 was a ($.8625 decline (25%) from the 2001 price. Your successful implementation of the Company's objectives over the last few years has helped maintain a reasonable share value, even with our continuing asbestos liability. Because of your efforts, I can also tell you that 2004 per share value (soon to be announced) <u>WILL EXCEED</u> the 2003 per share price.

I want to personally thank you for your contributions to our Company and remind you how much I appreciate your continued commitment to our goals and objectives.

We still have a few hills to climb, but I am confident that, with your continued support, we will continue to improve our profitability and grow our paint sales.

Best Regards,

Herb Giffins
President and CEO

HG:jmb

**EXHIBIT**
96
Giffins  3-28-08

CIG 004966

**EXHIBIT 94
TO DILLER DECLARATION**

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3       SAN FRANCISCO AND OAKLAND DIVISION

4

5    ————————————————————————————————

6   THOMAS FERNANDEZ, et al.,       )

7          Plaintiffs,      )

8       vs.             ) Case No.

9   K-M INDUSTRIES HOLDING CO., INC., et al.,   ) C-06-07339 CW

10        Defendants.     )

11                     )

12                     )

13    ————————————————————————————————

14

15     VIDEOTAPED DEPOSITION OF THOMAS FERNANDEZ
             April 21, 2008
16         San Francisco, California

17

18

19

20

21

22  Reported by:
    EMI ALBRIGHT
23  RPR, CSR No. 13042
    Job No. 79887
24

25

BY MR. LOVITT:

    Q    Do you recall being distributed with a document that informed you of the information contained on Exhibit 217?

12:04        MS. HASSELMAN:    Objection. Vague and ambiguous.

    A    Yes.

BY MR. LOVITT:

    Q    Now, at the time that you got that information, you were aware that the asbestos litigation against the Paint Company and against the Holding Company might reduce the value of your CIG stock; is that correct?

        MS. HASSELMAN:    Objection. Vague and ambiguous. Vague as to time.

    A    Yes, that's correct.

BY MR. LOVITT:

    Q    Did you take any action as a result of that understanding?

12:05        MS. HASSELMAN:    Objection. Vague and ambiguous.

    A    During which time period?

BY MR. LOVITT:

    Q    During the time period around the time of January 2003?

95

BY MR. SULLIVAN:

Q    But sitting here today there is nothing that you can recall specifically that you think CIG should have told you that they didn't?

MS. HASSELMAN:    Same objections.

A    Not that I can think of.

BY MR. SULLIVAN:

Q    Do you know when North Star began serving as the trustee for the ESOP?

A    I don't remember.

Q    A couple of the exhibits that were introduced today talked about employees submitting questions in to either CIG or the Kelly-Moore Paint Company.  Did you ever submit any questions to the company?

MS. HASSELMAN:    I will object to the characterization of the document because we have not seen that material --

THE WITNESS:    Which document are you referring to?

MS. HASSELMAN:    -- but the separate question -- the separate question can stand.  Make sure I get my objections in.  I realize I am pausing sometimes.

THE WITNESS:    I'm sorry.

STATE OF CALIFORNIA )

    : ss                )

County of Alameda    )


     I, the undersigned, a Certified Shorthand Reporter
of the State of California, do hereby certify:  That the
foregoing proceedings were taken before me at the time and
place herein set forth; that any witnesses in the foregoing
proceedings, prior to testifying, were placed under oath;
that a verbatim record of the proceedings was made by me
using machine shorthand which was thereafter transcribed
under my direction; further, that the foregoing is an
accurate transcription thereof.

     I further certify that I am not a relative,
employee, attorney or counsel of any party to this action or
relative or employee of any such attorney or counsel and that
I am not financially interested in the said action or the
outcome thereof;

     IN WITNESS WHEREOF, I have this date subscribed my
name.

Dated: _____ APR 2 9 2008 _____


_Emi Albright_
_____
EMI ALBRIGHT, CSR No. 13042

# EXHIBIT 95
# TO DILLER DECLARATION

Dan Stritmatter                        CONFIDENTIAL
                                                                    March 12, 2008

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO AND OAKLAND DIVISION

4

5        ─────────────────────────────────────────

6    THOMAS FERNANDEZ, et al.,                    )
                                                  )
7              Plaintiffs,                        )
                                                  )
8         vs.                                     ) Case No.
                                                  )
9    K-M INDUSTRIES HOLDING CO., INC., et al.,    ) C-06-07339 CW
                                                  )
10             Defendants.                        )
                                                  )
11                                                )
                                                  )
12                                                )

13       ─────────────────────────────────────────

14

                 VIDEOTAPED DEPOSITION OF DAN STRITMATTER
15                         March 12, 2008
                         Oakland, California
16

17

18

19

20

21

22   Reported by:
     EMI ALBRIGHT
23   RPR, CSR No. 13042
     Job No. 79122
24

25

Dan Stritmatter    CONFIDENTIAL    March 12, 2008

Page 254

1

2

3

4

5

6

7

8

9

10

11

12

13

14     **Filed Under Seal**

15

16

17

18

19

20

21

22

23

24

25

Dan Stritmatter                              CONFIDENTIAL                        March 12, 2008

Page 255

1

2

3

4

5

6

7

8

9

10

11

12                              **Filed Under Seal**

13

14

15

16

17

18

19

20

21

22

23

24

25

Dan Stritmatter                      CONFIDENTIAL                      March 12, 2008

Page 256

1

2

3

4

5

6

7

8

9

10

11

12                    **Filed Under Seal**

13

14

15

16

17

18

19

20

21

22

23

24

25

Dan Stritmatter                    CONFIDENTIAL                    March 12, 2008

Page 257

1

2

3

4

5

6

7

8

9

10

11

12

13                         **Filed Under Seal**

14

15

16

17

18

19

20

21

22

23

24

25

Page 2?,3

```
 1    STATE OF CALIFORNIA )

 2    : ss                 )

 3    County of Alameda    )

 4

 5         I, the undersigned, a Certified Shorthand Reporter

 6    of the State of California, do hereby certify:  That the

 7    foregoing proceedings were taken before me at the time and

 8    place herein set forth; that any witnesses in the foregoing

 9    proceedings, prior to testifying, were placed under oath;

10    that a verbatim record of the proceedings was made by me

11    using machine shorthand which was thereafter transcribed

12    under my direction; further, that the foregoing is an

13    accurate transcription thereof.

14         I further certify that I am not a relative,

15    employee, attorney or counsel of any party to this action or

16    relative or employee of any such attorney or counsel and that

17    I am not financially interested in the said action or the

18    outcome thereof;

19         IN WITNESS WHEREOF, I have this date subscribed my

20    name.

21              Dated:_____

22

23

24              EMI ALBRIGHT, CSR No. 13042

25
```

505 Sansome Street Ste. 502          Esquire Deposition Services          San Francisco, C.A. 94111
Phone (415) 399-4280                   1-800-770-3363                     Fax (415) 288-4286

                                                                    **Page Filed Under Seal**

**EXHIBIT 96
TO DILLER DECLARATION**


| From: | Erin Turley |
|---|---|
| Sent: | Monday, August 15, 2005 11:23 AM |
| To: | Sheneman, Margaret <MSheneman@winston.com> |
| Cc: | berickson@ciginsurance.com; dstritmatter@kellymoore.com; jkober@morganlewis.com; Falk, Michael - MFalk@winston.com> |
| Subject: | RE: KM Holdings Board meetings |

Peggy, we are happy to attend and would welcome the opportunity to be fully briefed as to the financials of both subsidiaries. I was simply pointing out the meeting to which our comments related and from where they arose.

Erin Turley
Morgan, Lewis & Bockius, LLP
1717 Main Street, Suite 3400
Dallas, Texas 75201-7395
214.438.1558 (d)
214.438.1551 (f)
877.432.9652 (e-fax)
214.766.1313 (c)

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. For information about why we are required to include this legend in emails, please see http://www.morganlewis.com/circular230.

"Sheneman, Margaret" <MSheneman@winston.com>
08/15/2005 01:19 PM

To
eturley@morganlewis.com
cc
berickson@ciginsurance.com, dstritmatter@kellymoore.com,
jkober@morganlewis.com, "Falk, Michael" <MFalk@winston.com>
Subject
RE: KM Holdings Board meetings

Well, if you want to wait until next year, that is up to you. Otherwise, it is not unheard of for a major shareholder to attend a portion of a Board of Directors' meeting for a financial presentation.

NS00006504


-----Original Message-----
From: eturley@morganlewis.com [mailto:eturley@morganlewis.com]
Sent: Monday, August 15, 2005 11:09 AM
To: Sheneman, Margaret
Cc: berickson@ciginsurance.com; dstritmatter@kellymoore.com;
jkober@morganlewis.com; Falk, Michael
Subject: Re: KM Holdings Board meetings

Peggy, just to be clear - we (Trustee and Trustee Counsel) were referring
to the shareholder meeting since this is the only meeting we attend and the
only meeting upon which we would/could have comment.

Erin Turley
Morgan, Lewis & Bockius, LLP
1717 Main Street, Suite 3400
Dallas, Texas 75201-7395
214.438.1558 (d)
214.438.1551 (f)
877.432.9652 (e-fax)
214.766.1313 (c)

To ensure compliance with requirements imposed by the IRS, we inform you
that any U.S. federal tax advice contained in this communication (including
any attachments) is not intended or written to be used, and cannot be used,
for the purpose of (i) avoiding penalties under the Internal Revenue Code
or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.  For information about why we are
required to include this legend in emails, please see
http://www.morganlewis.com/circular230.

"Sheneman,

Margaret"

<MSheneman@winsto                        To
n.com>            eturley@morganlewis.com,

                  jkober@morganlewis.com,

08/15/2005 01:07    berickson@ciginsurance.com,

PM                dstritmatter@kellymoore.com

NS00006505

cc

"Falk, Michael" <MFalk@winston.com>

Subject

KM Holdings Board meetings

Counsel for the ESOP Trustee has asked that a KM Board meeting include on the agenda a discussion of the financials of the CIG Insurance group.

The next KM Holding Board meeting is scheduled for Sept 23, 2005. The next quarterly CCIC Board meeting is October 21, 2005. Although the ESOP Trustee does not usually attend Board meetings, a financial presentation could be arranged on either date, if it works for you.

I am informed that cousel for the ESOP Trustee has received the 2004 consolidated financial statements for KM Holdings.

---

Margaret Sheneman        msheneman@winston.com
Winston & Strawn LLP
101 California Street, Suite 3900
San Francisco, CA 94111
Telephone (415) 591-1000    Facsimile (415) 591-1400

---

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
*****************************************************************

NS00006506

Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.


DISCLAIMER
This e-mail message is intended only for the personal

use of the recipient(s) named above. This message may

be an attorney-client communication and as such privileged
and confidential.  If you are not an intended recipient,
you may not review, copy or distribute this message. If
you have received this communication in error, please
notify us immediately by e-mail and delete the original
message.


The contents of this message may be privileged and confidential. Therefore, if
this message has been received in error, please delete it without reading it.
Your receipt of this message is not intended to waive any applicable privilege.
Please do not disseminate this message without the permission of the author.
**************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot
be used, by you (or any other taxpayer) to avoid penalties under the Internal
Revenue Code of 1986, as amended.

NS00006507

# EXHIBIT 97
# TO DILLER DECLARATION

## Thomas Fernandez Jr.

**From:** "islandgirl 3oahu" <islandgirl3oahu@yahoo.com>
**To:** <beavis666@prodigy.net>
**Sent:** Sunday, October 16, 2005 8:10 AM
**Subject:** Fwd: Today 4-8-04

> Date: Thu, 08 Apr 2004 10:15:07 -0700
> From: "George Cushing"
> To: "Bari Thoe" ,
> "Eric Harada" ,
> "Elizabeth Norton" ,
> "John Reynoso" ,
> "Jacqueline Souza" ,
> "Linda Reuter" ,
> "Michael Johnson" ,
> "Martina Kocianova" ,
> "Nancy Harty" ,
> "Nancy Langella" ,
> "Ria Alfaro" ,
> "Steve Lehrke" ,
> "Sofia Rosana" ,
> "Teresa Borchard" ,
> "Venessa McConneaughey"
>
> CC: "Amy Roth" ,
> "Bella Penrose" ,
> "Cheryl Bruns" ,
> "Cecilia Ray" ,
> "Dan Adams" ,
> "Dallas Harrison" ,
> "Deborah Nishiki" ,
> "Edward Donati" ,
> "Erlinda Thompson" ,
> "Genavieve Capone" ,
> "George Cushing" ,
> "Jon McGuire" ,
> "Jim Robinson" ,
> "Kindi Trueheart" ,
> "MailRoom" ,
> "Matilde Magbitang" ,
> "Paul Baker" ,
> "Rosa Delmar"
> Subject: Today 4-8-04
>
> Bay Area Staff.....
>
> Tomorrow we will be missing a few due to vacation,



EXHIBIT

225

Fernandez 4-21-08

P025

10/18/2005

> floating holiday. Those will be Matilde, Nancy &
> Debbie. On Monday Nancy and Amy will also be out.
>
> I have a few answers to questions brought up
> yesterday in our team meeting.
>
> 1. Where do we get medical forms?
>
> Answer: Human Resources in HO has the CSBA forms.
> Contact Nancy Gilbert or Amy Huse. I tried to see
> if you could get them from the CSBA website but
> found it somewhat difficult to navigate and wasn't
> able to procure.
>
> 2. Will any dispersion of vested monies from ESOP
> be or now frozen as a result of the impending KM
> trial.
>
> Answer: (Per email from Ed Mines, and quote " based
> on best known information at this time") "Until we
> are told differently by the ESOP Trustee,
> distributions for reasons of retirement, death and
> disability will continue at this time. We have not
> received word to discontinue distributions".
>
> 3. Is the amount paid out the value at the date of
> dispersion? In other words, if someone leaves the
> company and has an ESOP vested amount coming and the
> payout is not until 5 years, is the amount to be
> paid that which would be the value at the end of 5
> years? I presume or understand this to be true. If
> the claim against KM turns the values negatively, or
> to worst case ), then those values would apply to
> the payout. Correct?
>
> Answer: (Again per Ed's email response) "The
> amounts paid out are based on the appraised value as
> of the end of the previous plan year end. i.e.,
> those to be paid out this year will be based on the
> value of the shares as of 12/31/03. If there is a
> subsequent event between that date and the time of
> distribution which has a material affect on the
> value of the shares, it may, in turn, affect the
> amounts paid out.
>
> Second part of this question - Keep in mind,
> distributions are not made 5 years after
> termination, they are only made in cases of death,
> disability or retirement (reaching 65). And, as
> stated above, at the time of payment, value is as of
> 12/31 of the previous plan year end. You are

P026

10/18/2005

> correct on the effect an adverse judgment would have
> on the value, it would apply to the payout.
>
> Hopefully, another pretty day. Have a nice one!
>
> George
>
>

Yahoo! Mail - PC Magazine Editors' Choice 2005
http://mail.yahoo.com

Yahoo! Music Unlimited - Access over 1 million songs. Try it free.