IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FERNANDEZ, LORA SMITH, and TOSHA THOMAS, individually and on behalf of a class of all other persons similarly situated,<br><br>Plaintiffs,<br><br>   v.<br><br>K-M INDUSTRIES HOLDING CO., INC., et al.,<br><br>Defendants. | No. C 06-7339 CW<br><br>ORDER DENYING NORTH STAR'S MOTION FOR SUMMARY JUDGMENT |

Defendant North Star Trust Company moves for summary judgment on the basis that Plaintiffs' claim against it under the Employee Retirement Income Security Act (ERISA) for breach of fiduciary duty is invalid and is barred by the applicable statute of limitations. Plaintiffs oppose North Star's motion. The matter was heard on October 30, 2008. Having considered oral argument and all of the papers submitted by the parties, the Court denies North Star's motion.

BACKGROUND

Plaintiffs are former employees of either Kelly-Moore Paint Company or Capital Insurance Group (CIG). Kelly-Moore was founded in 1946 by William Moore, who served as the company's president until 1984 and effectively exercised control over the company until shortly before his death in 2004. Kelly-Moore acquired CIG in 1985. Kelly-Moore and CIG continued to be wholly owned by Mr. Moore and his family through a trust (the Moore Trust), the successor trusts of which are Defendants in this lawsuit, until 1998. As discussed below, in 1998, Kelly-Moore and CIG became wholly owned subsidiaries of Defendant K-M Industries Holding Co., Inc. (KMH).

This lawsuit arises from Mr. Moore's establishment of an employee stock ownership plan (ESOP) for Kelly-Moore and CIG employees in 1998. The gist of the complaint is that the ESOP purchased KMH shares for more than they were worth because plan fiduciaries failed to provide valuation experts with complete and accurate information about Kelly-Moore's exposure to liability from asbestos litigation.

I.  Kelly-Moore's Asbestos Liability

Kelly-Moore's asbestos problems stem from its 1967 acquisition of Paco Textures Corporation, a company that manufactured joint compound and wall and ceiling texture products, some of which contained asbestos. Kelly-Moore anticipated potential liability arising from Paco's asbestos-containing products as early as 1971, when it created a central repository for asbestos-related documents. Wasow Dec. Ex. 16 at 43-44. In 1976, an internal memo discussed regulations relating to asbestos and advised that the

2

company "could be judged liable in a suit where a person exposed to our asbestos containing product that [sic] developed cancer related injury or death." Id. Ex. 18. Kelly-Moore was first sued for asbestos-related liability in 1977. Id. Ex. 19 at 40.

In 1981, Reed International, a British company, considered purchasing Kelly-Moore. As part of its due diligence, Reed sought detailed information concerning the company's involvement with products containing asbestos, and engaged actuaries to determine the company's likely exposure to liability from future asbestos lawsuits. The actuarial report predicted losses that would increase steadily until a peak in 2007. Id. Exs. 22, 23. In a memo addressed to Mr. Moore, Doug Merrill, who is now a Kelly-Moore executive, analyzed the report, disputing some of its assumptions. Id. Ex. 24. Ultimately, Reed did not purchase Kelly-Moore, but it is not clear that the breakdown of the deal was related to the latter's exposure to asbestos liability.

Kelly-Moore continued to be concerned about potential losses from asbestos litigation during the following decades, and asbestos litigation against it increased significantly during the 1990s. In 1997, Kelly-Moore hired an attorney, Cheryl Mills, to monitor the litigation and determine the extent of Kelly-Moore's insurance coverage. Ms. Mills reported periodically to the company and its auditors.

In December, 1998, Ms. Mills advised Kelly-Moore that, in her opinion and based on a rough estimate, the company had sufficient primary and excess insurance to cover its asbestos liability. She cautioned, however, that "a few large hits in a venue such as El Paso, Texas will throw all of the projections out the window." Id.

3

Ex. 58. By the end of 1999, Kelly-Moore had exhausted its primary insurance coverage. At that time, one of its excess insurers, Liberty Mutual, "began to supervise the defense of the asbestos claims, with assistance from other excess carriers, though they did so under a 'reservation of rights,' contesting whether they had any duty to defend or to indemnify Kelly-Moore for the asbestos liabilities." Id. Ex. 35.

II. Establishment of the ESOP

In 1998, Mr. Moore hired the firm of Menke & Associates to establish an employee stock ownership plan (ESOP). To determine the value of the stock that would be sold to the ESOP, Mr. Moore first sought an appraisal of Kelly-Moore from Sansome Street Appraisers, a subsidiary of the Menke group. The appraiser, B.J. Brooks, concluded that, as of October 12, 1998, one day before the first ESOP transaction closed, Kelly-Moore was worth $550 million.

The parties dispute whether Kelly-Moore's 1998 appraisal took asbestos liability into account. By the end of 1998, there were almost 10,000 asbestos claims pending against Kelly-Moore. Stephen Ferrari, a Kelly-Moore executive at the time of the stock valuation, stated at his deposition and in a declaration that he discussed the asbestos litigation with Mr. Brooks and assured him that the company had adequate insurance to cover its potential liability. However, at his deposition, Mr. Ferrari could not remember the specific information he provided and did not recall whether he had provided Mr. Brooks with documents concerning the asbestos litigation. Id. Ex. 38 at 245-46.

Mr. Brooks died shortly after completing the report, and thus was not available to testify about the information he was provided.

4

However, the valuation report does not mention asbestos litigation, and Defendants have not pointed to any notes or other documents from the valuation that refer to the litigation. Mr. Brooks' handwritten notes contain no mention of asbestos under a section entitled, "What are areas of exposure?" Id. Ex. 53 at 3543. Nor does it appear that Ms. Mills provided any information about the asbestos litigation and insurance coverage directly to Mr. Brooks or to Ernst & Young, the company that audited the financial reports upon which Mr. Brooks relied in conducting his appraisal.

In addition, John Menke, the principal of the firm that set up the ESOP, testified that no one from Kelly-Moore alerted him to asbestos litigation until 2001 or 2002. Id. Ex. 40 at 190-92. Robert Ireland, the appraiser who took over after Mr. Brooks' death, testified that he could not recall hearing about the asbestos litigation against Kelly-Moore until 2000. See id. Ex. 47 at 75-78.

In connection with the establishment of the ESOP, Kelly-Moore was restructured. KMH was created as a holding company, all of whose shares were owned by the Moore Trust. Kelly-Moore and CIG became wholly-owned subsidiaries of KMH. KMH's shares were organized into two groups of "tracking stock," each intended to track the performance of its associated subsidiary: the "series P" stock tracked Kelly-Moore and the "series I" stock tracked CIG.

Based on the appraisal report, in October, 1998, Mr. Moore sold forty-two percent of the Moore Trust's interest in KMH's series P stock to the ESOP for $232 million. Mr. Moore was the sole trustee for the ESOP, and thus was both the buyer and the seller in the transaction.

5

1    Mr. Moore hired the firm of Duff & Phelps to provide a
2 valuation of KMH's series I stock.  Based on this valuation, in
3 October, 1999, Mr. Moore sold forty-two percent of the Moore
4 Trust's interest in KMH's series I stock to the ESOP for $55
5 million.  As with the sale of series P stock, Mr. Moore was both
6 the buyer and the seller in the transaction.  Duff & Phelps did not
7 know of the asbestos litigation against Kelly-Moore until 2002.
8 Id. Ex. 59 at 53-54; Ex. 73 at 52.

III. Events Subsequent to Establishment of the ESOP

   In 2000, another paint company, Benjamin Moore, considered purchasing Kelly-Moore.  In connection with the negotiations, in July, 2000, Ms. Mills sent a Kelly-Moore executive an update on the status of asbestos litigation against the company.  She prefaced her letter with a heading stating, "Use of this document is limited to the extent necessary to apprise Benjamin Moore of the status of the Paco asbestos litigation.  This information cannot be used for any other purpose.  Release of this information by Benjamin Moore will cause irreparable damage to Kelly-Moore Paint Company, Inc."  Id. Ex. 81 (capitalization and punctuation altered).  She stated that there were 22,000 active claims in Texas and that it would take approximately three years to resolve them.  She added:

> Kelly-Moore has exhausted its primary level of insurance for personal injury claims.  It is now into the first level of its excess coverage. . . . There is a third level of umbrella/excess coverage that has not been involved.  Currently, approximately 10% of the claims are dismissed with no payment from the carriers.  The remaining claims settle for an average of $5,000 per claim.
>
> Kelly-Moore has sufficient coverage to settle all of the pending claims and those claims made well into the future.  It is unknown how many claims will ultimately be made against Kelly-Moore, therefore, it is impossible to

6

>    say whether there is enough insurance indemnity dollars
>    to cover all claims that may be brought in the years to
>    come.  In 2000, the number of new claims has varied.  The
>    last figure was six hundred and eighty new claims in
>    April 2000.  It is unknown if that number will increase
>    or decrease over the next year.

Id. at 2.  Because of concerns over Kelly-Moore's asbestos liability, Benjamin Moore decided not to purchase the company.  Id. Ex. 80 at 54.

The number of asbestos claims against Kelly-Moore increased further.  On August 28, 2001, a jury in the case of Hernandez v. Kelly-Moore returned a verdict against Kelly-Moore in the amount of $55.5 million.  Although the company later settled the case for $15 million, Kelly-Moore executives regarded Hernandez as a watershed that put into question the company's ability to withstand the tide of asbestos cases against it.  In the wake of the settlement, certain of Kelly-Moore's excess insurance carriers declared their policies exhausted.  In October, 2001, Kelly-Moore sued these companies in state court for breach of contract.

Following Hernandez, Kelly-Moore began to disclose asbestos litigation to Ernst & Young in connection with its audits.  Kelly-Moore apparently had previously taken the position that it was not required to report the asbestos litigation because it believed that any liability would be covered by its insurance.  See, e.g., id. Exs. 61 & 62.

Official communications between KMH and ESOP participants did not mention asbestos litigation until May, 2001, when an issue of the ESOP newsletter for Kelly-Moore employees stated that items which might affect the price of shares "include valuations of other paint companies, our asset and debt levels and product liability

7

1  issues such as asbestos litigation." Ex. 95.  In October of that

2  year, another issue of the newsletter discussed the <u>Hernandez</u>

3  litigation:

> One item you may have noticed in the news in September is the large asbestos judgment against Kelly-Moore. Kelly-Moore is appealing the judgment, and it is believed that we should prevail on appeal. Kelly-Moore does have insurance to cover normal damages in this case. The Company works very hard to defend itself against asbestos litigation, but such litigation continues to be a concern to the financial health and the stock price of the Company. We hope that you will continue to work hard with us as we continue to fight those legal firms that unfairly target our Company with such litigation.

<u>Id.</u> Ex. 83.

Asbestos litigation was first mentioned to CIG employees in an internal memorandum in May, 2002. It stated:

> [A] factor has been brought to our attention that may have an effect on the future value of our CIG stock. K-M Industries Holding Co., Inc., our holding company, also owns Kelly-Moore Paint Company. Significant asbestos claims have been filed against Kelly-Moore. To date, the costs of these claims have been covered by insurance policies. Kelly-Moore is vigorously proceeding against its various insurance carriers to assure coverage for these asbestos-related claims. As the asbestos litigation continues against Kelly-Moore, Kelly-Moore's current belief is that the litigation is likely to depress its stock value. As a result of our joint ownership by K-M Industries Holding Co., Inc., the asbestos litigation may depress the value of our CIG stock, which would affect the value of your ESOP account.

<u>Id.</u> Ex. 98.

In 2002, KMH began to consider bankruptcy due to its exposure to asbestos liability. It consulted with attorneys, who identified the possibility that the company's creditors would attack the ESOP transaction as a fraudulent transfer. Ultimately, KMH did not file for bankruptcy.

IV.  North Star's Involvement as the ESOP Trustee

In 2003, Mr. Moore's deteriorating health necessitated his

8

resignation as the ESOP trustee. North Star was appointed to replace him in April of that year. As North Star began familiarizing itself with KMH's potential asbestos liability, it realized that the initial stock valuation raised some concerns. In notes from a May 14, 2003 due diligence meeting with Kelly-Moore representatives, North Star wrote, "Initial ESOP Purchase -- we need to figure out how far along the asbestos litigation was when the initial purchase took place -- was it factored into valuation? Did Tee [(Trustee)] look at; take into consideration?" Id. Ex. 108 at NS20233.

Questions about the propriety of the original transaction persisted, and North Star eventually became aware that Kelly-Moore's creditors might attack the transaction in the event that the company filed for bankruptcy. North Star's notes from a June 2, 2005 meeting state, "Plaintiffs (ACC) [Asbestos Creditors' Committee] asked about how much money left the company that should have been retained -- looking at potential cause of action against Moores when ESOP was formed[.] [Q]uestion did ESOP pay more than adequate consideration?" Id. Ex. 106 at NS20062.

North Star took no action to challenge the price for which the ESOP purchased the KMH shares. In a deposition, a North Star representative stated that this is because the company determined that there was no legal basis for challenging the ESOP transaction. Whether North Star was justified in coming to this conclusion is a question that goes to the merits of Plaintiffs' claim, and is not presently before the Court.

9

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

DISCUSSION

Plaintiffs assert a claim against North Star for breach of fiduciary duty in violation of ERISA.[1]  See 29 U.S.C.

---

[1]The second amended complaint asserts a second claim against all Defendants, including North Star, for engaging in a "prohibited transaction" in violation of ERISA. Under the relevant ERISA provisions, sales by a plan to a "party in interest" are not

10

§§ 1104(a)(1), 1109, 1132(a)(2), 1132(a)(3).  Specifically, Plaintiffs charge North Star with liability under 29 U.S.C. § 1105(a)(3), which provides that a fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."[2]  Plaintiffs claim that, despite clear warning signs, North Star did not take adequate steps to investigate whether the ESOP paid more than fair market value for the KMH shares it purchased from the Moore Trust and to remedy the overpayment.  Although listed as a single claim, Plaintiffs actually assert two distinct breach claims: the first for North Star's failure to remedy the other Defendants' breaches made in connection with the Kelly-Moore ESOP transaction; and the second for North Star's failure to remedy the other Defendants' breaches made in connection with the CIG ESOP transaction.

North Star argues that it cannot be held liable under 29 U.S.C. § 1105 because that statute applies only to co-fiduciaries, not to successor fiduciaries.  North Star asserts that liability for successor fiduciaries is governed instead by 29 U.S.C. § 1109,

---

permitted unless they reflect the fair market value of the asset. See 29 U.S.C. §§ 1106(a), 1106(b), 1108(e).  At oral argument, Plaintiffs clarified that they do not intend to pursue this claim against North Star, which was not involved in either ESOP transaction.

[2]North Star asserts that the complaint did not put it on notice of the nature of this claim.  However, the complaint alleges that each Defendant who was a plan fiduciary, including North Star, is liable for violating 29 U.S.C. § 1105 "if he, she, or it has had knowledge of a breach by any other fiduciary, unless he, she, or it has made reasonable efforts under the circumstances to remedy the breach."  Compl. ¶ 68.  This is sufficient to place North Star on notice of the claim against it.

which provides, "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b).

Plaintiffs respond that § 1109 merely provides that a successor fiduciary may not be held vicariously liable for a breach committed by its predecessor. Plaintiffs, however, do not seek to hold North Star vicariously liable for the acts of the other Defendants, but rather charge North Star itself with committing an independent breach of fiduciary duty by failing to remedy the earlier breaches, even though it knew of those breaches. Accordingly, Plaintiffs argue, North Star can be held liable under § 1105.

The Ninth Circuit has not addressed the issue of a successor fiduciary's liability under § 1105, and thus there is no binding precedent on point. Plaintiffs' position, however, finds support in an opinion of the Department of Labor:

> Section 409(b) [29 U.S.C. § 1109(b)] provides that no fiduciary shall be liable with respect to a breach of fiduciary duty under Title I of the Act, if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary. Section 409(b) does not, however, exempt a fiduciary from carrying out his responsibilities to a plan imposed by various provisions of Part 4 of Title I of the Act. For example, although a fiduciary may not be liable under section 409 of the Act for the acts of predecessor fiduciaries, if he knows of a breach of fiduciary responsibility committed by a predecessor fiduciary, he would be obligated to take whatever action is reasonable and appropriate under the circumstances to remedy such breach. Failure to take such action would constitute a separate breach of fiduciary responsibility by the successor fiduciary.

DOL Opinion No. 76-95 (Sept. 30, 1976). This view, coming from the agency charged with enforcing ERISA, is "entitled to respect." See

12

1  Christensen v. Harris County, 529 U.S. 576, 120 (2000); Villegas v.
2  The Pep Boys Manny Moe & Jack, 551 F. Supp. 2d 982, 990 (C.D. Cal.
3  2008).  Other courts have also adopted the statutory interpretation
4  urged by Plaintiffs.  See, e.g., Silverman v. Mutual Ben. Life Ins.
5  Co., 138 F.3d 98, 104 (2d Cir. 1998); Conner v. Mid S. Ins. Agency,
6  943 F. Supp. 647, 661 (W.D. La. 1995); McDougall v. Donovan, 552 F.
7  Supp. 1206, 1210 (D. Ill. 1982).  In addition, this interpretation
8  is consistent with the common law of trusts, "which imposes a duty
9  on a successor trustee to remedy the breach of a prior trustee, and
10 imposes liability for breach of this duty to the extent to which a
11 loss results from the successor trustee's failure to take such
12 remedial steps."  Silverman, 138 F.3d at 104.
13     Of the cases cited by North Star, Stephens v. US Airways
14 Group, 555 F. Supp. 2d 112 (D.D.C. 2008), provides the most support
15 for its position.  In that case, the court approved of the view
16 that § 1105 governs liability where a plan has multiple fiduciaries
17 at one time.  Nonetheless, the court stated that, although it would
18 be contrary to § 1109 to conclude that "a successor trustee is
19 always liable for a breach by its predecessor . . ., [o]n the other
20 hand, a predecessor's breach that continues to have effect on
21 beneficiaries during the term of a successor trustee must be
22 remedied to the extent practicable under § 1105(a)(3)."  Id. at
23 119.  As this makes clear, the court adopted Plaintiffs' approach,
24 notwithstanding its suggestion that § 1105 applies to
25 contemporaneous co-fiduciaries only.  Ultimately, the court
26 concluded that the plaintiffs could not pursue their claim because
27 the alleged breach was "a single event as to each Plaintiff with no
28 continuing effect to the present."  Id.  Here, in contrast, the

**United States District Court**
For the Northern District of California

13

alleged breach committed by North Star's predecessors has a continuing effect: Plaintiffs allege that the ESOP paid more than fair market value for the KMH shares, and has yet to be compensated.

The Court concludes that North Star may potentially be liable under § 1105 for its failure to remedy the alleged breaches of fiduciary duty that took place before it was appointed the ESOP trustee, because its failure to act despite allegedly knowing of those breaches could constitute an independent breach of fiduciary duty.

North Star also argues that Plaintiffs' claims are barred by the statute of limitations. The parties agree that the time for bringing Plaintiffs' claims is governed by 29 U.S.C. § 1113, which provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

As noted above, Plaintiffs charge North Star with failing to make a reasonable effort to remedy the breaches of fiduciary duty committed by the other Defendants, despite knowing of facts

14

sufficient to inform it of those breaches. Because Plaintiffs seek to impose liability on North Star for its omissions, each of North Star's actionable alleged breaches of fiduciary duty occurred on the latest date on which North Star could have cured the relevant breaches by the other Defendants.[3]  Assuming that the other Defendants did not engage in "fraud or concealment," North Star could have brought a lawsuit against them for breaches made in connection with the Kelly-Moore ESOP transaction until October, 2004 -- six years after the October, 1998 transaction.[4]  Similarly, North Star could have brought a lawsuit against the other Defendants for breaches in connection with the CIG ESOP transaction until October, 2005 -- six years after the October, 1999 ESOP transaction. North Star's alleged breaches thus occurred in October, 2004 and October, 2005, when it let its right to sue the other Defendants expire.[5]  Even assuming that Plaintiffs learned of

---

[3] Alternatively, if North Star made a final decision, on a specifically identifiable date, not to pursue action against the previous fiduciaries, its alleged breach may be considered to have occurred on that date. There is no evidence in the record, however, of any such decision. In the absence of such evidence, on this motion the Court must assume, in Plaintiffs' favor, that North Star's breach did not occur until the last date on which North Star could have cured the earlier breaches.

[4] The statute of limitations provides that a claim must be filed by the <u>earlier</u> of either three years after the date on which the plaintiff had actual knowledge of the breach or six years after the date of the breach. Because North Star could not have had actual knowledge of the other Defendants' breaches until it was appointed the ESOP trustee in April, 2003, the end of the six-year period occurred before the end of the three-year period.

[5] If the previous fiduciaries engaged in fraud or concealment, North Star could have brought a lawsuit against them within six years from the date of its discovery of the breaches, an event which did not take place until, at the earliest, it was appointed ESOP trustee April, 2003. For the sake of argument, the Court will assume that no fraud or concealment was committed by the other

15

1 North Star's breaches immediately, they had three years -- until
2 October, 2007 and October, 2008, respectively -- to file their
3 claims for those breaches.  Because the complaint was filed in
4 November, 2006, North Star is not entitled to summary judgment that
5 Plaintiffs' claims are untimely.
6     North Star argues for a different analysis of the statute of
7 limitations issue.  It asserts that the three year period of 29
8 U.S.C. § 1113 applies, and that the period began running for each
9 claim on the date Plaintiffs found out that the ESOP transactions
10 had taken place -- presumably, at the time of the transactions or
11 shortly thereafter.  But the plain language of § 1113 states that
12 the three-year period begins to run when the plaintiff learns of
13 the <u>breach</u>, not merely of the transaction in connection with which
14 the breach was committed.  In support of its counter-textual
15 interpretation of § 1113, North Star cites only one Ninth Circuit
16 case, <u>Blanton v. Anzalone</u>, 760 F.2d 989 (9th Cir. 1985).  In
17 <u>Blanton</u>, the court stated, "The statute of limitations is triggered
18 by the defendants' knowledge of the transaction that constituted
19 the alleged violation, not by their knowledge of the law."  <u>Id.</u> at
20 992.  This simply means that the limitations period under § 1113
21 begins to run when the plaintiff has knowledge of the unlawful act,
22 rather than of the fact that the act was unlawful.  In <u>Blanton</u>,
23 which involved a prohibited transaction claim, not a breach of
24 fiduciary duty claim, the plaintiffs were parties to the
25 transaction and knew at the time of the transaction all of the
26 facts which would have enabled them to conclude, had they known the

---

28 Defendants -- an assumption that is favorable to North Star, but under which its argument fails nonetheless.

16

law, that the transaction was prohibited. As the court held, their ignorance of the law did not delay the running of the three-year period. Here, Plaintiffs' knowledge of the law is not at issue. Unlike the plaintiffs in Blanton, they did not know of the unlawful act -- Defendants' failure to take into account Kelly-Moore's asbestos liability when valuing the ESOP shares -- at the time of the ESOP transactions. Plaintiffs could not be expected to have filed an ERISA claim for breach of fiduciary duty armed only with their knowledge that the ESOP transactions had taken place, without knowing the facts that constituted the breach. Nothing in the governing law suggests otherwise.

Moreover, it is not necessary to determine exactly when Plaintiffs possessed sufficient information to realize that the other Defendants caused the ESOP to pay more than fair market value for the KMH shares. With respect to their breach claims against North Star, the question is not when Plaintiffs learned of the other Defendants' breaches, but rather when they learned of North Star's breaches. By North Star's reasoning, Plaintiffs' claims against it would have been time-barred even before it took over as the ESOP fiduciary. And, contrary to North Star's assertion, the Court is not "extending the six-year period for challenging the 1998 and 1999 transactions," Def.'s Mot. at 18, on a "continuing violation" theory, which has been rejected by the Ninth Circuit, see Phillips v. Alaska Hotel and Restaurant Employees Pension Fund, 944 F.2d 509, 520 (9th Cir. 1991). Plaintiffs are not directly challenging the 1998 and 1999 transactions through their claims against North Star; they are challenging North Star's failure to remedy breaches made by other fiduciaries in connection with the

17

1998 and 1999 transactions. This failure, which is independently actionable under 29 U.S.C. § 1105(a)(3), took place long after the dates of the transactions themselves.

The Court concludes that, on the present record, Plaintiffs' claims against North Star for breach of fiduciary duty are not time-barred as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court DENIES North Star's motion for summary judgment (Docket No. 210). Because Plaintiffs have reached a negotiated settlement of their claims against the remaining Defendants, those Defendants' motions for summary judgment (Docket Nos. 130 and 140) are DENIED as moot.

IT IS SO ORDERED.

Dated: 11/14/08

CLAUDIA WILKEN
United States District Judge